# MIKE CARUSO
## CLERK OF THE CIRCUIT COURT & COMPTROLLER
### PALM BEACH COUNTY

**CASE NUMBER: 50-2025-CA-008971-XXXA-MB**
**CASE STYLE: BLATT, ELI V GOLDNER, MARC J**
ACCESS LEVEL: D

| Search Criteria | Search Results | Case Info | Party Names | **Dockets & Documents** | Case Fees | Court Events |
|---|---|---|---|---|---|---|

View documents and order certified copies*. See our eCaseView FAQ for step-by-step guidance and information about what documents are available online.

**Document Icons**

 Document available. Click icon to view.

Add a certified copy of the document to your shopping cart.

Document is Viewable on Request (VOR). Click to request.

VOR document is being reviewed. Click to be notified when available.

**0**

Public =    VOR =    In Process =    Page Size: 25 ▼

| | | **DIN** | **Effective Date** | **Description** | **Notes** |
|---|---|---|---|---|---|
| | | 2 | 09/03/2025 | CIVIL COVER SHEET | |
| | | 3 | 09/03/2025 | COMPLAINT | VERIFIED F/B PLT |
| | | 1 | 09/04/2025 | DIVISION ASSIGNMENT | AK: Circuit Civil Central - AK (Civil) |
| | | 4 | 09/04/2025 | PAID $406.00 ON RECEIPT 5938051 | $406.00 5938051 Fully Paid |
| | | 5 | 09/05/2025 | DCM DESIGNATION TO THE STREAMLINE TRACK WITH NON-JURY TRIAL ORDER | JAMES SHERMAN 09/05/2025 |
| | | 6 | 12/04/2025 | ORDER DIRECTING SERVICE | ORDER DIRECTING PLAINTIFF TO EFFECT SERVICE UPON DEFENDANT G. JOSEPH CURLEY, JR. CIRCUIT 12/04/2025 |
| | | 7 | 12/19/2025 | COMPLAINT | FIRST AMENDED VERIFIED F/B PLT |
| | | 8 | 12/21/2025 | MOTION FOR EXTENSION OF TIME | MOTION FOR ENLARGEMENT OF TIME TO ACHIEVE SERVICE |
| | | 11 | 12/23/2025 | SUMMONS ISSUED | bradkelsky@kelskylaw.com;barbarallinas@kelskylaw.com;benkelsky@kelskylaw.com AS TO MEGA CAPITAL LLC |

| | | 12 | 12/23/2025 | SUMMONS ISSUED | bradkelsky@kelskylaw.com;barbarallinas@kelskylaw.com;benkelsky@kelskylaw.com AS TO GOLDNER BLATT INVESTMENTS LLC |
| | | 13 | 12/23/2025 | SUMMONS ISSUED | bradkelsky@kelskylaw.com;barbarallinas@kelskylaw.com;benkelsky@kelskylaw.com AS TO DHARMA INITIATIVE LLC |
| | | 9 | 12/24/2025 | NOTICE OF HEARING | NOTICE OF HEARING MOTION CALENDAR 01/06/2026 08:30:00 AM |
| | | 15 | 12/24/2025 | SUMMONS ISSUED | bradkelsky@kelskylaw.com;barbarallinas@kelskylaw.com;benkelsky@kelskylaw.com AS TO RODERYCK REITER |
| | | 16 | 12/24/2025 | SUMMONS ISSUED | bradkelsky@kelskylaw.com;barbarallinas@kelskylaw.com;benkelsky@kelskylaw.com AS TO RACHEL KORSEN |
| | | 17 | 12/24/2025 | SUMMONS ISSUED | bradkelsky@kelskylaw.com;barbarallinas@kelskylaw.com;benkelsky@kelskylaw.com AS TO MARC J GOLDNER |
| | | 18 | 12/24/2025 | SUMMONS ISSUED | bradkelsky@kelskylaw.com;barbarallinas@kelskylaw.com;benkelsky@kelskylaw.com AS TO SIMON DIVILOV |
| | | 10 | 12/31/2025 | NOTICE OF CANCELLATION | NOTICE OF CANCELLATION OF HEARING 01/06/2026 |
| | | 14 | 01/02/2026 | PAID $30.00 ON RECEIPT 6091363 | $30.00 6091363 Fully Paid |
| | | 19 | 01/02/2026 | PAID $40.00 ON RECEIPT 6091398 | $40.00 6091398 Fully Paid |

517-60f47ff1-f417-4364-b270-efdd0ed72e4c

Case 9:26-cv-80004-AMC   Document 1-1   Entered on FLSD Docket 01/05/2026   Page 3 of 1222

# FORM 1.997.   CIVIL COVER SHEET

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

## I.   CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>FIFTEENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>PALM BEACH</u>   COUNTY, FLORIDA

<u>Eli Blatt</u>
Plaintiff

Case # _____
Judge _____

vs.

<u>Marc Goldner, Simon Divilov, Roderyck Reiter</u>
Defendant

## II.   AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

## III.   TYPE OF CASE   (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☒ Negligence—other
　　　☐ Business governance
　　　☒ Business torts
　　　☐ Environmental/Toxic tort
　　　☐ Third party indemnification
　　　☐ Construction defect
　　　☐ Mass tort
　　　☐ Negligent security
　　　☐ Nursing home negligence
　　　☐ Premises liability—commercial
　　　☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
　　　☐ Commercial foreclosure
　　　☐ Homestead residential foreclosure
　　　☐ Non-homestead residential foreclosure
　　　☐ Other real property actions

☐ Professional malpractice
　　　☐ Malpractice—business
　　　☐ Malpractice—medical
　　　☐ Malpractice—other professional
☐ Other
　　　☐ Antitrust/Trade regulation
　　　☐ Business transactions
　　　☐ Constitutional challenge—statute or ordinance
　　　☐ Constitutional challenge—proposed amendment
　　　☐ Corporate trusts
　　　☐ Discrimination—employment or other
　　　☐ Insurance claims
　　　☐ Intellectual property
　　　☐ Libel/Slander
　　　☐ Shareholder derivative action
　　　☐ Securities litigation
　　　☐ Trade secrets
　　　☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
   ☐ Residential Evictions
   ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

**IV.     REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.      NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

   <u>17</u>

**VI.     IS THIS CASE A CLASS ACTION LAWSUIT?**
   ☐ yes
   ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
   ☒ no
   ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.   IS JURY TRIAL DEMANDED IN COMPLAINT?**
   ☐ yes
   ☒ no

**IX.     DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
   ☐ yes
   ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Brad E Kelsky</u>                 Fla. Bar # <u>59307</u>
                Attorney or party                              (Bar # if attorney)

<u>Brad E Kelsky</u>                          <u>09/03/2025</u>
 (type or print name)                         Date

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, individually and
derivatively on behalf of GOLDNER
BLATT INVESTMENTS, LLC and
MEGACAP CAPITAL, LLC, and in his
representative capacity as Managing
Member of MEGACAP CAPITAL, LLC,
General Partner of MEGACAP FUNDS, LP
– TECH I and MEGACAP FUNDS, LP –
SPACEX I,

      Plaintiff,

v.                            Case No.: _____

MARC J. GOLDNER, RACHEL KORSEN,
SIMON DIVILOV, THE DHARMA
INITIATIVE, LLC, RODERYCK REITER,
GOLDNER BLATT INVESTMENTS, LLC
(Direct and Nominal Defendant), and
MEGACAP CAPITAL, LLC (Nominal
Defendant),

      Defendants.

_____/

## VERIFIED COMPLAINT

Plaintiff, ELI M. BLATT ("Blatt" or "Plaintiff"), brings this action (i) individually

against Defendants MARC J. GOLDNER ("Goldner"), RACHEL KORSEN ("Korsen"), SIMON

DIVILOV ("Divilov"), THE DHARMA INITIATIVE, LLC ("Dharma"), and RODERYCK

REITER ("Reiter"); (ii) derivatively on behalf of GOLDNER BLATT INVESTMENTS, LLC

("GBI"); (iii) derivatively on behalf of MEGACAP CAPITAL, LLC ("Megacap"); and (iv) in his

representative capacity as Managing Member of Megacap, the General Partner of MEGACAP

NOT A CERTIFIED COPY

FUNDS, LP – TECH I ("Tech I") and MEGACAP FUNDS, LP – SPACEX I ("SpaceX"), and states as follows:

<h3 align="center">INTRODUCTORY STATEMENT</h3>

1.      This action arises from two related but distinct disputes: (i) claims concerning Plaintiff and GBI; and (ii) claims concerning Megacap and its affiliated limited partnerships, Tech I and SpaceX. Both sets of claims involve overlapping parties and entities, with Defendant Goldner central to each.

2.      Plaintiff, Eli M. Blatt, asserts claims (i) in his individual capacity for harms personally suffered; (ii) derivatively on behalf of GBI (in the alternative) and Megacap to protect those companies' interests, as applicable; and (iii) in his representative capacity as Managing Member of Megacap, the General Partner of Tech I and SpaceX, to protect the rights and assets of those partnerships.

3.      For the sake of clarity and judicial efficiency, this Complaint is organized into two major parts to ensure that each group of claims is read together with its supporting factual allegations, improving readability and clarity while avoiding duplication of facts across counts. Each part contains a set of factual allegations followed by the corresponding counts:

   a. **Part I – The GBI Claims:** this section sets forth factual allegations concerning GBI, followed immediately by the counts arising from those allegations.
   b. **Part II – The Megacap Claims:** this section sets forth factual allegations concerning Megacap and its role as General Partner of Tech I and SpaceX, followed immediately by the counts arising from those allegations.

<h3 align="center">PARTIES, JURISDICTION, AND VENUE</h3>

4.      **Plaintiff.** Plaintiff Blatt is a natural person over the age of eighteen who resided in Miami-Dade County, Florida at the time of the events alleged herein and currently resides in Broward County, Florida. Plaintiff Blatt is a member of GBI along with Defendant Goldner and

shares Florida citizenship with Defendant Reiter. Likewise, Megacap, on whose behalf Plaintiff brings derivative claims, is the General Partner of Tech I and SpaceX; those partnerships share citizenship with their limited partners, Defendants Reiter and Divilov. Accordingly, because Plaintiff, GBI, Megacap, Tech I, SpaceX, and multiple Defendants share overlapping citizenship, complete diversity is lacking under 28 U.S.C. § 1332.

5.    **GBI and Megacap (Derivative and Nominal)**. GBI and Megacap ("the Companies") are Delaware limited liability companies. Plaintiff brings certain claims derivatively on behalf of Megacap in the best interest of Megacap, and derivatively on behalf of GBI in the alternative to the extent the Court determines any claims belong to GBI. In addition, the Companies are joined as a nominal in the derivative counts to ensure complete relief and to bind the entity as to governance or property rights affected by the adjudication, consistent with Fla. R. Civ. P. 1.210(a) and Del. Ch. Ct. R. 17(a) (real party in interest). Note GBI is also a direct defendant for Counts I and II. Counts I and II notwithstanding, no wrongdoing is alleged against GBI or Megacap in the derivative counts, and no affirmative relief is sought from either. The Companies' inclusion is procedural, non-adverse and for the sake of completeness.

6.    **Tech I and SpaceX (Representative Capacity).** Tech I and SpaceX ("The Partnerships") are limited partnerships organized under Delaware law for which Megacap is the General Partner. Plaintiff Blatt appears in his representative capacity as Managing Member of Megacap (the GP) and asserts claims on The Partnerships' behalf through that representative capacity. The Partnerships are not named as separate party plaintiffs or defendants; their inclusion is procedural, non-adverse, and for the sake of being complete, consistent with Fla. R. Civ. P. 1.210(a) and Del. Ch. Ct. R. 17(a) (real party in interest).

7.  **Defendants.** Defendants Goldner, GBI, Korsen, Divilov, Dharma, and Reiter are persons and entities whose acts and omissions give rise to Plaintiff's claims under Florida and Delaware law.

8.  **Jurisdiction.** This Court has subject matter jurisdiction because the claims asserted arise under the common law and statutory law of Florida and under Delaware law pursuant to the governing agreements of the entities at issue. Personal jurisdiction exists over Defendants because Defendant Reiter resides in Florida and because Defendants conducted substantial wrongful acts in Florida directed at Plaintiff, a Florida resident at all relevant times. The amount in controversy exceeds the minimum jurisdictional amount of Fifty Thousand ($50,000) exclusive of costs and prejudgment interest. For avoidance of doubt, complete diversity does not exist in either Part I or Part II of this action. Plaintiff Blatt is a resident and citizen of Florida. Defendant Reiter is likewise a citizen of Florida. In addition, both GBI and Megacap are Delaware limited liability companies whose members include Plaintiff Blatt, thereby imputing his Florida citizenship to those entities. Further, Megacap serves as General Partner of Tech I and SpaceX, and Defendants Reiter and Divilov are limited partners in those partnerships, thereby creating common citizenship among the parties. Because Plaintiff, the Partnerships, and multiple defendants and entity-defendants share citizenship, and because GBI and Megacap are named as real and adverse parties in several counts, complete diversity is destroyed. This action is therefore not removable under 28 U.S.C. § 1332.

9.  **Venue.** Venue is proper in Palm Beach County pursuant to Fla. Stat. § 47.011 because Reiter resides in Palm Beach County.

10.  **Choice of Law.** Contract-based and fiduciary duty counts are pleaded under Delaware law pursuant to the governing agreements of GBI and the Megacap entities, while tort

and statutory counts are pled under Florida law to reflect the wrongful acts directed at Plaintiff in

Florida, with each Count clearly indicating choice of law.

## PART I:  THE GBI CLAIMS

## THE GBI FACTUAL ALLEGATIONS

### Summary of the GBI Case

11.     On December 7, 2021, after numerous representations by Goldner to Blatt (the "GBI Members"), as detailed below, the GBI Members executed the GBI operating agreement (the "GBI Agreement"), pursuant to which they were to be equal members and managers. A true and correct copy of the GBI Agreement is attached hereto as **Exhibit "A."**

12.     As further detailed below, immediately after execution of the GBI Agreement, Goldner made a series of misrepresentations, omissions, and concealments to induce Blatt to wire him and Compass Mining, LLC ("Compass") a total of Four Hundred Twenty-Two Thousand, One Hundred Forty-Eight Dollars and Fifty-Five Cents ($422,148.55) (the "Funds"), all of which were wired and received from Florida.

13.     Goldner represented that the Funds would be used by Goldner for the purchase of bitcoin miners (the "Miners") and non-fungible tokens (the "NFTs"), which Goldner would title to GBI on Blatt's behalf as in-kind capital contributions by Blatt to GBI (collectively, the "Assets"), as recorded on a GBI Spreadsheet of intended GBI contributions.

14.     Goldner's representations, which Blatt relied upon, were false, however; as detailed below, Goldner never intended to, nor did he, use the Funds to complete Blatt's intended in-kind capital contributions to GBI by purchasing the Assets for GBI's benefit and formally titling or assigning them to GBI as required by the GBI Agreement, as evidenced by his actions and inactions.

15.     Instead, Goldner misappropriated Blatt's Funds to purchase the NFTs and Miners for his and Dharma's benefit, respectively, leaving Blatt with no benefit of his Funds or consideration for the GBI Agreement.

16.     As a result, Blatt's capital contributions to GBI were never completed and the GBI Agreement is void for lack of consideration.

**Background and the Companies**

17.     Blatt and Goldner met virtually in late 2020 through their TRIUM Executive MBA program ("TRIUM").

18.     After having extensive in-person meetings in Dubai in November, 2021, Blatt and Golder discussed the proposed formation of GBI, during which Goldner made numerous representations to Blatt, as detailed below, where Goldner proposed that they start GBI to invest and engage in related commercial activities "in the cryptocurrency world."

19.     Prior to that, Goldner, Korsen, and Divilov (collectively, the "Dharma Members") had allegedly independently organized Dharma to service miners for others for a fee.

20.     As Dharma's managing member and in his individual capacity, Goldner represented that Blatt would receive membership interests in Dharma in exchange for Blatt entering into the GBI Agreement.

21.     However, Goldner never provided Blatt with a Dharma operating agreement or with any other governing documents prior to Blatt wiring the Funds, and Blatt never executed Dharma's operating agreement and never became a Dharma Member.

**The GBI Representations**

22.     In early December 2021, Goldner sent Blatt a proposed operating agreement for GBI that he initially drafted.

23.     In it, Goldner memorialized prior representations to Blatt material for Blatt to subsequently execute the GBI Agreement, including but not limited to, that:

    a.  Goldner was a "freelance spy" for unnamed agencies working on bringing down the hacktivist collective Anonymous, and that he conducted "business-like activities for the sake of national security, by any direct government orders and/or mandates, or for any missions by any given contractor or intelligence agency" (*See* GBI Agreement at § 53(f)), giving him unique connections that would lead to various safe and legal opportunities for GBI;

    b.  Goldner would give GBI a percentage of the revenue generated from his "Mutual Contacts", including those from his spy activities;

    c.  "[t]itle to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member." *See* id § 74;

    d.  all GBI funds were to be held in accounts unanimously voted on by GBI Members, and the GBI Members were prohibited from commingling GBI's funds and assets with any other persons or entities' assets, accounts, or liabilities. *See* at §§ 58, 74;

    e.  "Any investments that the Managing Members make are a 1:1 cash value based on current market prices at the time of assignment and will be certified and memorialized in an email and on WhatsApp to avoid confusion or dispute of that assets value with a screenshot being taken at the time of assignment and attached. All such assignments must be signed over in writing to GBI and approved by both Managing Members unanimously." *See* id at § 3(e); and

    f.  "When deciding to purchase an… there will be an agreement VIA email in writing in relation to the time horizon to hold the Investment and the Exit Parameters of such an investment… and then once the asset, property, and/or investment hits either of those marks then [e]ither partner may force a sale." *See* id at § 3(i).

(Collectively, the "GBI Representations").

24.     Relying upon the GBI Representations ultimately codified in the GBI Agreement, Blatt executed an updated version of the draft operating agreement on December 7, 2021 (*See* GBI Agreement Exhibit A) and created a spreadsheet to track the assets that he and Goldner *planned* to title to GBI to maintain equal contributions (the "GBI Spreadsheet," attached hereto as **Exhibit "B"**).

**The NFT Funds**

25.     After Blatt executed the GBI Agreement, on or around December 19, 2021, Goldner proposed that GBI purchase NFTs to then sell to a planned GBI NFT Fund.

26.     No email ever stated or otherwise discussed a time horizon to hold the NFTs or exit parameters limiting the GBI Members' ability to force a sale as per GBI Agreement § 3(i).

27.     Instead, as detailed in a February 6, 2022 WhatsApp exchange, Goldner and Blatt agreed that GBI would own the NFTs only until the contemplated but never launched GBI NFT Fund had raised enough capital to purchase them from GBI.

28.     As recorded on the GBI Spreadsheet[1], Goldner ultimately agreed to contribute Four Hundred Thousand Dollars ($400,000.00) worth of NFTs to GBI as in-kind capital contributions, given that Goldner had already purchased NFTs he wished to contribute, with their differing NFT contributions to be offset by Blatt's Miner contributions, as detailed below.

29.     Prior to Blatt wiring Goldner the first tranche of the funds for the NFTs, on February 4, 2022, Blatt emailed Goldner memorializing a telephonic conference he had with Goldner immediately prior regarding the NFTs (the "NFT Assignment Email"). A true and correct copy of the NFT Assignment Email is attached hereto as Exhibit **"C."**

30.     In the NFT Assignment Email, Blatt memorialized Goldner's representations and affirmations on their preceding call with an enumerated list of steps they had agreed Goldner would follow to purchase NFTs for GBI, including, critically, that Goldner would "assign" all the subject NFTs to GBI, as per the GBI Representations relating to GBI property, thereby completing the GBI Members' capital contributions.

---

[1] The GBI Members used the GBI Spreadsheet to track their *promised* contributions to GBI to ensure that the GBI Members would be making equal in-kind contributions to GBI, however, as a factual matter, none of the assets listed on the spreadsheet were ever titled to GBI as required by the terms of the GBI Agreement governing GBI property as detailed in the GBI Representations.

31.     Goldner never revised, objected to, or corrected Blatt's email or established any parameters for the NFTs that would limit the GBI Members' ability to force a sale pursuant to GBI Agreement § 3(i).

32.     Based on representations that Goldner would ultimately contribute Four Hundred Thousand Dollars ($400,000.00) worth of NFTs to GBI, that GBI would sell the NFTs to the NFT Fund in approximately six (6) months, the NFT Assignment Email, and the GBI Representations (collectively, the "NFT Representations"), on February 4, 2022, and February 7, 2022, Blatt sent two One Hundred Thousand Dollar ($100,000.00) wires, totaling Two Hundred Thousand Dollars ($200,000.00) (the "NFT Funds") directly to Goldner to purchase NFTs to be contributed by Goldner to GBI on Blatt's behalf as in-kind capital contributions by Blatt to GBI.

33.     Blatt's NFT Funds were wired directly to Goldner at his instruction; never cleared any account owned by GBI or voted on by the Members as being a GBI account; and were used to purchase NFTs into Goldner's own personal wallets commingled with other NFTs over which GBI had no ostensible ownership, care, or control—the same wallets Goldner had been using to purchase NFTs for himself prior to the NFT Assignment Email.

34.     Despite Goldner's telephonic representation that Blatt memorialized in the NFT Assignment Email, however, Goldner never formally assigned the NFTs to GBI in writing or otherwise took any steps to title them to GBI by storing them in cryptocurrency wallets[2] belonging to and accessible by Blatt as a GBI Managing Member.

---

[2] NFTs are stored in "hot" virtual "wallets" as well as in "cold" hardware wallets that are tried to a physical wallet device; both types of wallets are identified by a unique address on a blockchain, with the latter requiring access to the physical wallet device. Unique wallet addresses can be generated via either soft wallet providers or using a hot wallet, which can host numerous wallet addresses.

35.     In fact, Goldner never even created a wallet to store the NFTs for GBI's exclusive use and benefit, despite having allegedly purchased NFTs for GBI prior to Blatt wiring the NFT Funds.

36.     Instead, Goldner, at all times, stored the NFTs in wallets belonging to and exclusively accessible by him, commingling them with NFTs he claimed belonged to the Dharma Members.

37.     In short, Goldner simply took Blatt's NFT Funds and bought NFTs for himself.

38.     The NFTs were thus never GBI property, and, as a result, Goldner never completed Blatt's intended capital contribution to GBI as he represented he would.

**The Miner Funds and Miners**

39.     Beginning in late December 2021, Goldner approached Blatt about purchasing miners for GBI to be leased out to investors for profit—which he claimed would require unspecified servicing activities that Dharma could perform for GBI for a fee.

40.     Korsen and Divilov participated in this plan because they both actively engaged in a WhatsApp group chat with Goldner and Blatt (the "Miner Chat"), as they wanted to purchase miners for their benefit.

41.     On February 28, 2022, Goldner affirmed to Blatt, Divilov, and Korsen in the Miner Chat that "Eli and I [are] doing 3 [B]undles" (referring to the GBI Members).

42.     To further induce Blatt to wire funds for the Miners, on March 1, 2022, Goldner posted screenshots of Compass' invoices for the Miners (collectively, the "Invoices") in the Miner Chat and claimed he had secured a "heavy discount" (collectively with the February 28 Message, the "First Miner Chat Messages"); however, these screenshots omitted the name of the invoicee, and Goldner failed to specify what, exactly, the discount was.

43.     At the time Goldner shared the Invoices, the word "Dharma" never appeared in the Miner Chat.

44.     Blatt thus had no possible reason to think that Goldner would use Blatt's Miner Funds to purchase Miners for Dharma, a company for which Blatt had never even seen an operating agreement and in which he had no formal interest.

45.     Based on the Invoices, the GBI Spreadsheet, the First Miner Chat Messages, and the GBI Representations, (collectively, the "Initial Miner Representations"), on March 2, 2022, at Goldner's instruction, Blatt sent Compass two (2) wires totaling One Hundred Thirty-One Thousand, Nine Hundred Fifty One Dollars ($131,951).

46.     The wire was to be used by Goldner to purchase a Bundle of Miners (the "First Bundle Purchase") Goldner had agreed to title to GBI as in-kind capital contributions to GBI by Blatt, offsetting his promised $400,000 worth of NFT contributions.

47.     The next day, in a series of WhatsApp messages on the Miner Chat, Goldner claimed that he "pushed hard" and got Compass to sell him one more Bundle (the "Second Miner Chat Messages").

48.     In the Second Miner Chat Messages, Goldner also reaffirmed explicitly to Blatt with Korsen and Divilov copied that GBI would own its own Bundles, stating, "$29,318 for GBI to own one more bundle… Dharma has 3 bundles. GBI will have 3 bundles… Rachel [Korsen] and Simon [Divilov] don't get economics on GBI bundles. You [Blatt] and I split 50/50 on all GBI miners." *See* id.

49.     None of the Dharma Members disputed, retracted, clarified, or restated the Second Miner Chat Messages, even though, as detailed further below, Korsen would later admit

in the "Korsen Correspondence" email to Blatt that the Dharma Members "all knew" from the outset that Dharma, and not GBI, would own all the Miners.

50.     That same day, upon realizing that, despite Goldner's prior representations, in fact no "servicing" was required with Compass miners and that no servicing agreement between GBI and Dharma was needed, which Blatt had drafted at Goldner's behest, Blatt directly told Goldner via WhatsApp that "GBI owns the miners and the contracts [with lessees], we can just sell our own miners (or some of them) and own the carry. For this Compass deal we don't need Dharma [to service]... Everyone can own their own machines and if they want they can sell / lease them."

51.     Goldner responded immediately to this "Dharma Message" but never refuted, objected to, or disputed the contents of the message.

52.     To the contrary, Goldner instructed Blatt to draft a "GBI Miner Lease Agreement," which Blatt did, listing GBI as the lessor and owner of the Miners. Goldner reviewed drafts on two occasions without ever asserting that GBI would not be the owner of the Miners. To the contrary, he instructed Blatt to send an agreement to a prospective GBI investor.

53.     Based upon the Dharma Message, GBI Lease Agreement drafts to which Goldner did not object, the Initial Miner Representations, and the Second Miner Chat Messages (collectively, the "Miner Representations"), on March 4, 2022, Blatt wired Twenty Thousand Dollars ($20,000.00) directly to Goldner at his instruction to purchase the additional Bundle for GBI from Compass (the "Second Bundle Purchase").

54.     Subsequently, predicated upon the Miner Representations and at Goldner's instructions, on March 21, 2022, Blatt wired Compass Seventy Thousand Two Hundred Seventeen Dollars and Fifty-Five Cents ($70,217.55) to be used to purchase additional Miners to be contributed by Goldner to GBI in kind as a capital contribution on behalf of Blatt.

55.     In total, Blatt wired Two Hundred Twenty-Two Thousand, One Hundred Forty-Eight Dollars and Fifty-Five Cents ($222,148.55) of his funds (the "Miner Funds") to be used by the recipients at Goldner's instructions to purchase Miners to be titled by Goldner to GBI as in-kind contributions by Blatt.

56.     As with the NFT Funds, the GBI Members recorded the Miner Funds on the GBI Spreadsheet as intended but never titled in-kind capital contributions to GBI in the form of the Miners. *See* Exhibit B.

57.     Goldner reviewed the GBI Spreadsheet on April 24, 2022 and never represented that the GBI Members had incorrectly recorded Blatt's Funds as being intended to be used by Goldner to purchase the Assets for GBI's use and benefit.

58.     Meanwhile, unbeknownst to Blatt, Goldner used Blatt's Miner Funds to purchase Miners from Compass for his and Dharma's own benefit and use, rather than completing Blatt's intended in-kind contribution to GBI.

59.     Instead, Goldner, acting as both GBI's and Dharma's manager, purchased the Miners into an account owned by and exclusively accessible to and managed by Goldner and Dharma which were commingled with other miners that had no connection to GBI or the Miner Funds whatsoever.

60.     Goldner never granted Blatt as GBI's Managing Member access to the account storing the Miners or transferred title of any of the Miners therein to GBI, nor did GBI ever receive depreciation statements from Compass, which Compass stated to Blatt it provides to the owners of their miners for tax purposes.

61.     Accordingly, neither Blatt's Miner Funds, wired directly to Goldner and Compass by Blatt, nor the Miners purchased therewith, ever became GBI property pursuant to the GBI

Agreement terms governing GBI asset ownership or Compass' records, nor does GBI have any claim to ownership over either given that the Miner Funds were Blatt's.

62.     As a result, no capital contributions to GBI were ever completed by Blatt or on his behalf.

**The Falsities and Concealments**

63.     In May 2022, given a  downturn in the cryptocurrency market that the GBI Members agreed would worsen, as well as a lack of any investor interest in the contemplated GBI NFT Fund, Blatt called for GBI to sell the NFTs, as was his right pursuant to the GBI Representations and corresponding GBI Agreement terms governing the purchase and sale of investment assets (GBI Agreement §3(e)).

64.     Goldner refused, saying in a May 6, 2022 WhatsApp message: "sue me, Eli, **I'm not selling**" (emphasis added), indicating that *he* was not selling, not that GBI would not sell.

65.     Adding insult to injury, Goldner went on to admit in that same thread that he had valued the Ethereum coins he had previously used to allegedly purchase the NFTs at their basis price when recording NFTs on the GBI Spreadsheet, approximately double their value at the time he purchased the NFTs, despite the clear requirement in GBI Agreement § 3(e) to value in-kind contributions at their current fair market value.

66.     This is when Blatt first realized that Goldner had misled him about his use of the NFT Funds and how Goldner would title and manage the NFTs and GBI in general, leading him to conclude that GBI in fact did not own the NFTs, as Goldner never titled, assigned, or stored the NFTs in GBI's name in wallets owned by GBI and accessible only by the GBI Members, nor was he managing the NFTs for GBI as required by the GBI Agreement.

67.    Regarding the Miners, it likewise became clear to Blatt that, as with the NFTs, GBI did not own any Miners in the manner required by the GBI Agreement to be deemed GBI property.

68.    In fact, no non-fungible asset of any kind was ever properly titled to GBI, and as a result, Blatt's and Goldner's tax basis in GBI is $0, as is GBI's net asset value, as evidenced by the fact that, on information and belief, Goldner never filed any tax returns for GBI.

69.    Meanwhile, Goldner personally received the NFT Funds and some of the Miner Funds to Blatt's exclusion.

70.    Dharma also benefited from Blatt's Miner Funds to Blatt's detriment, with the GBI Members benefiting derivatively.

71.    Blatt, on the other hand, received no consideration of any kind for the GBI Agreement, as all of his Funds were misappropriated for the benefit of Dharma and the Dharma Members to his exclusion.

72.    Adding to this injustice, the GBI Representations, NFT Representations, and Miner Representations (collectively, the "Representations"), upon which Blatt had relied when sending the Funds, were false.

73.    The GBI Representations were false because, among other things, Goldner:

    a.    was not a spy with access to government contracts and relationships that would provide GBI financial benefit;

    b.    never made any efforts to, nor did he ever, title any property (including the Assets) in GBI's name or contribute assets of any kind to GBI, either on his own behalf or Blatt's; and

    c.    never made any efforts to, nor did he ever grant Blatt equal management rights over or access to GBI's alleged assets, even though doing so would have been trivial.

74.     The NFT Representations were likewise false, as evidenced by, among other things: (i) Goldner never assigning or otherwise titling the NFTs to GBI, with Goldner making no efforts of any kind to do so; (ii) Golnder instead using Blatt's NFT Funds to purchase NFTs into his own wallets; (iii) Goldner never creating a cryptocurrency wallet for GBI; and (iv) Goldner never refuting the NFT Assignment Email.

75.     The Miner Representations were also false, as evidenced by, among other things: (i) Goldner never making a Compass account for GBI and (ii) Korsen's later admission that the Dharma Members "all knew" from the start that the Miners would be owned by Dharma, as detailed below. Collectively with the preceding two paragraphs, the "Falsities."

76.     Goldner made the Representations and Falsities knowing they were false, or else made them with reckless indifference to the truth at the time they were made, and used the GBI Agreement and GBI Spreadsheet to induce Blatt to wire the Funds to him and Compass for his and Dharma's benefit.

77.     The Dharma Members also concealed material facts and made omissions and material misrepresentations with the intent of inducing Plaintiff to rely upon the misrepresentations and omissions and thereby defraud and deceive Plaintiff.

78.     Specifically, the Dharma Members deliberately concealed material facts relating to the GBI Agreement, Assets, and Funds, *inter alia*, including, among other things, that:

   a.  Goldner never intended to title any of the Assets in GBI's name, as evidenced by Goldner making no effort to secure a cryptocurrency wallet to store NFTs for GBI, instead purchasing NFTs into his own wallets commingled with the Dharma Members NFTs;
   b.  Goldner never intended to complete any capital contributions to GBI, nor did he;
   c.  the "heavy discount" Goldner had allegedly secured for the Miners was, in fact, Compass' standard Bundle pricing available to any person purchasing a Bundle (WhatsApp, January 12, 2023) but which Korsen and Divilov could not afford on their own;
   d.  GBI was not the invoicee on the Compass mining invoices sent to Blatt;

e.   as Korsen would later admit, the Dharma Members "all knew" from the start that Dharma, and not GBI, would in fact own and have access to the Miners prior to Blatt wiring the Miner Funds; and

f.   that the Representations were false.

(Collectively, the "Concealments").

## Demands, Extortion, and Rescission

79.     Dharma and the Dharma Members exercised their ownership and control of the Miners by demanding, without any prior basis, that Blatt alone among the Parties prepay Dharma five (5) years of Compass' monthly hosting fees, which, if he did not, would entitle it to seize the Miners for which Blatt's Miner Funds had paid the deposits.

80.     In response, Blatt tried to gain access to, control, and use the Assets by sending Goldner, both individually and as Dharma's manager, a demand letter (the "Demand Letter") demanding that Goldner transfer him the number of Miners that Blatt's Miner Funds had been used to pay deposits on and that Goldner place the NFTs in a shared wallet. A true and correct copy of the Demand Letter is attached hereto as **Exhibit "D."**

81.     Goldner and Dharma refused to comply with the Demand Letter.

82.     Instead, Goldner and Dharma demanded that Blatt (i) personally and alone among the parties (i) prepay Dharma monies for balances Dharma *may* owe on the Miners in the future; (ii) agree to hold the NFTs in a Special Purpose Vehicle that would pay fees to another of Korsen and Goldner's companies; and (iii) agree to reimburse Goldner $30,000 (thirty thousand dollars) for non-preapproved, unitemized travel expenses for Megacap in order for Blatt to gain any benefit from his Funds.

83.     Then, on December 31, 2022, Divilov, as one of Dharma's members, sent Blatt a Notice of Default (the "Notice of Default"), copying the Dharma Members. A true and correct copy of the Notice of Default and the accompanying email messages, including the Korsen

Correspondence, is attached hereto as **Compound Exhibit "E."** To the extent required by law, delivery of a derivative claim notice would be futile as the only members for GBI were (or could be) Blatt and Goldner and, under the circumstances, there is nothing that could be resolved between them as they maintain diametrically opposed positions to one another.

84.     The Notice of Default (i) falsely asserted without evidence that Blatt was one of Dharma's members; (ii) claimed Blatt was in "material breach" of an agreement, without specifying what agreement he was supposedly bound to; (iii) asserted ownership on behalf of Dharma of the Miners; and (iv) demanded that Blatt pay Dharma One Hundred Forty Thousand Five Hundred Twelve Dollars and Fifty Cents ($140,512.50) by January 30, 3023, for Dharma's outstanding balance due from Compass, as well as for future service fees without including any accounting or documentation detailing those charges; (v) threatening Dharma would pursue legal action against Blatt if he did not comply; and (vi) admitting that no Miners had yet been delivered, without providing any evidence the Miners had in fact even been purchased.

85.     At the end of the Notice of Default, Divilov wrote, "[n]ote, [a]s an alternative, Marc [Goldner] has agreed to continue to have good faith discussions with you to determine the final language for a settlement agreement that will allow all parties to be made whole."

86.     With that statement, Divilov made it clear that Goldner orchestrated these baseless demands against Blatt to try, with Korsen and Divilov's assistance, to extort Blatt into an unfavorable settlement involving not only the Miners but also the NFTs and travel expense reimbursement that Goldner was demanding.

87.     Before the Notice of Default's deadline expired, on January 29, 2023, Korsen wrote Blatt with the Dharma Members copied:

    a.  offering to "veto" Blatt's default if Blatt agreed to concessions to Goldner;

b.  admitting the Dharma Members "all knew our money was being sent to Dharma;" and

c.  tacitly admitting that Blatt was, in fact, not a Member of Dharma, by stating that the Defendants were willing to backdate an agreement that would allow Blatt to "share the capital losses and make the effective date of the Agreement between you and Marc to be 2022." (*See* Exhibit E).

88.     Having come to the inescapable conclusion that he had been misled by Goldner as to the use of his Funds, and that the GBI Agreement was void of consideration, Blatt served a rescission notice upon Goldner on April 30, 2023 (the "Rescission Notice"). A true and correct copy of the Rescission Notice and the associated email thread is attached hereto as **Exhibit "F."**

89.     In the Rescission Notice, Blatt rescinded the GBI Agreement because of (i) Goldner's Representations being false and misleading; (ii) Blatt's lack of consideration of any kind for entering into the GBI Agreement; (iii) the GBI Members' lack of completed contributions to GBI; and (iv) Goldner's repeated and habitual breaches of the GBI Agreement.

90.     Blatt further stated in the Rescission Notice that *if* a court were ultimately to deny the rescission, *without waiving his rights to any of the consideration granted to him by the GBI Agreement*, and *on the stated assumption that the net asset value was $0*, that he was to be considered retroactively withdrawn from GBI as of December 31, 2022, and that if that retroactive withdrawal were ever to be ruled invalid, that he was withdrawing as of the date of the Rescission Notice.

91.     That same day, as a final attempt to get Goldner to return Blatt's Funds, Blatt sent Goldner individually and as Dharma's Manager a Civil Theft Notice demanding the return of the Funds and Assets (the "Civil Theft Notice"). A true and correct copy of the Civil Theft Notice is attached hereto as **Exhibit "G."**

92.     Goldner responded to the Civil Theft Notice with a campaign of felonious written threats and extortion against Blatt and his fiancé, as further detailed below in Part II, never complying with the demands therein.

93.     Goldner also directly responded to the Rescission Notice, writing in a June 29, 2023 letter to Blatt "your attempted withdrawal as of April 30th, 2023 is hereby accepted as of June 29, 2023, and the entire equity, interest, and all assignments are being purchased for $0," without providing any accounting or any consideration for the unilaterally asserted purchase.

94.     In doing so, Goldner was simply trying in yet another way to usurp from Blatt the value of his Funds and Assets, this time by pure fiat.

95.     In fact, "withdrawal" in the GBI Agreement, whether voluntary or involuntary, simply initiates a process permitting the other Members to purchase the withdrawing Member's interests at a valuation determined by mutual agreement or a formal independent GAAP accounting (*See* GBI Agreement §§ 38, 40, and 46-48).

96.     Membership per se, however, is determined by ownership of Membership Units.

97.     In the absence of a "withdrawn" Member's Membership Units being formally purchased at an agreed valuation or one determined by a formal GAAP valuation conducted by an independent accounting firm, the "withdrawn" Member in fact, even if it be semantically confusing, retains their Membership Units, and, with them, their Membership in the Company[3].

---

[3] The present situation is, admittedly, confusing by virtue of Goldner's persistent pattern of refusing to understand and adhere to any formal corporate protocols, as well as his abject refusal to provide Blatt any benefit of his Funds. The assumption in the GBI Agreement surrounding Member withdrawal is that the Member subsequent to their "withdrawal" is no longer bound to the GBI Agreement, but also that the remaining Members will purchase their Membership Units thus rendering them no longer a Member. In the present case, Goldner refused to hire an independent auditor to perform a GAAP analysis and sought to simply usurp Blatt's Membership Units for free while simultaneously maintaining that the claims in question belong to GBI. The net result is, definitively, that Blatt retains his Membership Units and with it his Membership status in GBI and associated rights under Delaware law.

98.     Accordingly, despite Goldner's letter seeking to usurp Blatt's shares for $0 by fiat without any accounting, (i) Blatt's withdrawal was in fact contingent on GBI's rescission being formally ruled invalid and on GBI's value being $0; (ii) no price was ever agreed upon or GAAP valuation ever conducted; (iii) Blatt never accepted Goldner's offer; (iv) no formal purchase instrument for Blatt's Membership Units was ever executed by anyone nor any consideration afforded to Blatt; (v) no Delaware corporate records were ever updated; and (vi), on top of it, §38(a) of the GBI Agreement actually prohibited Members' withdrawal prior to 3 years from the execution of the GBI Agreement.

99.     For all these reasons, given that the stipulated 60-day window to purchase a withdrawn Member's shares has passed (*See* GBI Agreement §40), and with it Goldner's right to purchase Blatt's shares, Blatt's assertion of GBI's rescission stands, his Membership Units remain his, and with them his Membership in GBI intact and his rights thereunder under Delaware law, to the extent this honorable Court should rule it is not subject to rescission.

100.    Ironically, the only thing that Goldner's letter accomplished is effectively conceding that he did not complete any capital contributions to GBI on Blatt's behalf as per the Representations Falsities, since that is only way Blatt's Membership Units could be worth $0 per §§ 16-19 and 46-48 of the GBI Agreement—i.e. if no capital contributions were ever completed by or on behalf of Blatt.

101.    As this dispute has now been ongoing for several years, the 3-year prohibition on termination of the GBI Agreement upon which Goldner had insisted has passed; since Goldner has contested the rescission, on August 6, 2025, pursuant to his rights under GBI Agreement §§ 4, 30, 50, and 53, Blatt served notice upon Goldner that he was terminating the GBI Agreement, demanding an accounting of GBI's assets for the purposes of a formal GAAP valuation, and

immediate liquidation of all its assets, as it was only under the GBI Agreement's Purpose §3 that it had the authority to own any investment assets for the benefit of its Members.

102.   Goldner refused to comply with the demand for accounting and liquidation of GBI's Assets.

103.   Defendants' actions have left Blatt with no choice but to bring this action.

**An Asset Shell Game**

104.   This case has been complicated and frustrated for years now by virtue of Goldner playing a shell game as to who he asserts owns the Assets, what GBI's value is, and who—Blatt or GBI—own the claims at issue.

105.   The GBI Representations were codified in the GBI Agreement so that there can be no doubt whether GBI owns an asset, as ownership requires title in GBI's name; GBI funds, in turn, must be in an account unanimously voted on by the GBI Members—precisely to prevent such a shell game (e.g. "well, it's in my account but it belongs to GB").

106.   It would thus be inequitable and frustrate the intent of the GBI Agreement to determine that GBI owns or otherwise has claims to any funds or assets that were not at one point legally titled to GBI in the manner the GBI Agreement requires for all GBI property prior to its rescission and/or termination.

107.   Plaintiff has unwaveringly and explicitly maintained the position, consistently articulated in the factual allegations herein, that the claims in question are direct, as the GBI Agreement is clear that neither the Funds nor the Assets could possibly have belonged to GBI given the plain language of the GBI Agreement governing GBI funds and property.

108.   However, Goldner has simultaneously asserted that the claims belong to GBI but also purported to purchase Blatt's interests in GBI for $0, creating a moving target.

109. There is thus a genuine dispute as to whom the claims belong to, with Plaintiff consistently maintaining they are direct given the unequivocal language of the GBI Agreement. Therefore, Plaintiff is in doubt as to his rights under the GBI Agreement.

110. In the event the Court determines that, despite the GBI Representations, the Assets, the bitcoin mined by the Miners (the "Mined Bitcoin"), and any proceeds thereof (the "Disputed Assets") nonetheless belong to GBI and thus the claims belong to GBI as well, Plaintiff is herein bringing derivative *claims* in the alternative without Plaintiff in any way asserting alternative *factual allegations*.

111. In the interest of absolute clarity on this matter, (i) Plaintiff maintains that the claims are direct and all factual allegations asserted here are consistent with that position; (ii) GBI is named derivatively in the alternative in the event that the claims are deemed by the Court to belong to it despite Plaintiff's consistent allegations to the contrary, and to ensure that justice will be served regardless of who the Court deems owns the claims.

112. All conditions precedent to the filing of this action have occurred, have been performed, or have otherwise been fulfilled; or their performance has been excused or waived.

113. Plaintiff has retained the services of undersigned counsel for the purpose of bringing and maintaining this action and has obligated himself to pay a reasonable fee for the costs and legal services associated with the same.

## THE GBI COUNTS

### COUNT I - DECLARATORY JUDGMENT (DE)
(Blatt v. GBI, Goldner, and Dharma)

114. Plaintiff repeats and re-alleges the allegations in paragraphs 11-16 and 22-111 as if fully set forth herein.

115. There is a substantial and continuing controversy between Blatt and Goldner regarding GBI's status under Delaware Law and the Disputed Assets, namely whether GBI was rescinded or has since been terminated, and what, if any, assets it rightfully owns.

116. Plaintiff has consistently maintained that the damages suffered were direct because the Funds were wired directly by Blatt to Goldner, and neither the Funds nor the Assets could ever have become GBI property given the GBI Agreement's language governing GBI property (*See* GBI Agreement §§ 58 and 74). Likewise, it is also unclear to Plaintiff whether GBI ever came into existence for a failure of consideration or because of the Representations, Falsities and Concealments.

117. Goldner has sought to obscure the existence of GBI by his own misdeeds, misrepresentations and stated contradictory positions.

118. A declaration is thus both necessary and appropriate to establish;

a. whether:
   i. the GBI Agreement is void *ab initio* (i) due to having been arranged by Goldner, *ultra vires*, in breach of his fiduciary duties, fraudulently, by way of the Representations and Concealments with knowledge of the Falsities; (ii) in furtherance of a fraudulent scheme; (iii) because neither of the GBI Members completed any contributions; and/or (iv) because neither Blatt nor GBI received consideration related thereto; or
   ii. whether it is instead terminated as of August 6, 2025 per Blatt's written notice, pursuant to his right as GBI Member to do so and now pending liquidation under the terms of GBI Agreement §§ 4, 30, 50, and 53; or
   iii. whether, if it is neither rescinded nor terminated:
      1. GBI §38 precluded Blatt's attempted premature withdrawal; and/or
      2. that Goldner's attempted purchase of Blatt's Membership Units for $0 was not valid, and that he thus retains his Membership Units in GBI and, by extension, his Membership in GBI;

b. whether, if the GBI Agreement is not subject to rescission, Goldner and/or Dharma are liable to GBI or Blatt for the Funds and Assets, in order to clarify who holds the causes of action in the subsequent counts; and

c. whether, if the agreement is deemed to have been terminated, to declare which, if any, Assets belong to GBI such that GAAP accounting and liquidation can be effectuated.

WHEREFORE, Plaintiff, ELI M. BLATT, respectfully requests that this Court grant judgment in his favor and against MARC J. GOLDNER by (i) declaring that the GBI Agreement is void ab initio and subject to rescission; or, in the event the Court finds the Agreement not subject to rescission, declaring that Blatt retained his Membership Units in GBI and that, pursuant to his written termination notice of August 6, 2025 under GBI Agreement §§ 4, 30, 38, 50, and 53, the Agreement has been terminated and GBI is subject to liquidation; (ii) declaring the rightful ownership of the Disputed Assets, including whether related claims belong to GBI or to Plaintiff individually; (iii) declaring that the Assets are subject to a constructive trust in favor of either Blatt or GBI as a function of which the court deems to have the claims; (iv) awarding supplemental relief to Blatt under 10 Del. C. § 6508; (v) awarding Blatt his costs; and (vi) granting such other and further relief as this Court deems just and equitable.

**COUNT II – JUDICIAL DISSOLUTION AND LIQUIDATION - in the alternative (DE)**
(Blatt v. GBI and Goldner, Pursuant to 6 Del. C. § 18-802)

119.    Plaintiff Blatt repeats and re-alleges the allegations in paragraphs 11-16, 22-24, 37-38, 58-62, 66-68, 71-78, 88-89, and 101-102 as if fully set forth herein.

120.    GBI is a Delaware limited liability company governed by the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq.

121.    To the extent the Court declines to declare the GBI Agreement void and subject to rescission, Plaintiff Blatt alleges in the alternative that because he terminated the GBI Agreement pursuant to GBI Agreement §§ 4, 30, 38, 50, and 53, GBI is subject to immediate liquidation, no longer having the requisite contractual mandate to own or manage investment assets.

122.    As a result of that termination, and in light of the complete breakdown of trust and functionality among the GBI Members, it is no longer reasonably practicable for GBI to carry on its business in conformity with its limited liability company agreement.

123.    Accordingly, under 6 Del. C. § 18-802, this Court should decree that GBI be judicially dissolved.

124.    Besides being explicitly contemplated by the GBI Agreement as able to be effectuated by written notice of any Member after the 3-year anniversary of the GBI Agreement, judicial dissolution is further warranted because (i) the parties have irreconcilable disagreements concerning the control and operation of GBI; (ii) Goldner has engaged in conduct that frustrates the entity's purpose; (iii) Goldner retains sole control over the Disputed Assets necessary to effectuate Plaintiff's rights; and (iv) no practical means exists to carry on the business other than through court-supervised winding up

125.    Plaintiff further understands that, despite his allegations to the contrary, the Disputed Assets may be determined by the Court to be property of GBI despite the GBI Agreement terms governing same. In that event, and to the extent either Plaintiff's withdrawal or termination is to be deemed effective and GBI retains the Assets, GBI is obligated to pay Plaintiff the present fair value of his interest, based on an independent GAAP valuation.

126.    Goldner, who, on information and belief, retains sole dominion over the Disputed Assets has refused to pay or arrange for the payment of such value, and continues to assert unauthorized control over the Assets in derogation of Plaintiff's rights.

WHEREFORE, Plaintiff ELI M BLATT respectfully requests that the Court: (i) order that GOLDNER BLATT INVESTMENTS, LLC be judicially dissolved pursuant to 6 Del. C. § 18-802 and/or Blatt's notice of termination; (ii) appoint a liquidating trustee or accountant to

wind up GBI's affairs at Goldner's expense; (iii) direct that any liquidation be based on a GAAP valuation of GBI's present assets and liabilities to be performed by a court-appointed accounting firm at Goldner's expense; (iv) declare that Plaintiff is entitled to receive the fair value of his interest in GBI, including in any Disputed Assets determined to belong to GBI, based on such GAAP valuation; (v) compel Defendants or GBI to make prompt payment of such amount to Plaintiff; (vi) award Plaintiff his attorneys' fees and costs incurred in enforcing his rights; and (vii) grant such other and further relief as the Court deems just and equitable.

## COUNT III - CIVIL THEFT (FL)
### (Blatt v. Goldner and Dharma)

127.    Plaintiff realleges and incorporates by reference paragraphs 11-16, 32-38, 45-46, 53-62, and 66-78 as if fully set forth herein.

128.    At Goldner's instruction, Plaintiff wired $220,000 directly to Goldner and $202,148.55 to Compass to be credited to Goldner's account, for the benefit of Goldner and Dharma, respectively.

129.    Goldner, acting individually and on behalf of Dharma, obtained or used these Funds with felonious intent to either temporarily or permanently deprive Plaintiff of his right to the Funds or a benefit therefrom.

130.    Goldner knowingly obtained and/or used Plaintiff's funds through fraud, willful misrepresentation of a future act, or false promise by way of the Representations, which he knew to be false at the time he made them, and Concealments.

131.    Goldner used the Funds Plaintiff wired directly to him for his own personal benefit and/or for the benefit of Dharma, rather than for the benefit of GBI as he had represented to Plaintiff.

132.    Goldner's actions constitute theft under Fla. Stat. § 812.014, and Plaintiff is entitled to treble damages and attorneys' fees under Fla. Stat. § 772.11.

133.    As a direct and proximate result of Goldner's theft, Plaintiff has suffered damages in the amount of $422,148.55, which is subject to trebling under applicable civil theft statutes, together with additional damages as allowed by law.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court grant judgment in his favor and against MARC J. GOLDNER and THE DHARMA INITIATIVE, LLC by (i) awarding Blatt treble damages, including but not limited to $1,266,445.65, treble the amount wrongfully obtained by Defendants; (ii) awarding Blatt costs, prejudgment interest, and post-judgment interest; (iii) awarding Blatt reasonable attorneys' fees; and (iv) granting such other and further relief as this Court deems just and equitable.

## COUNT IV - CIVIL THEFT (FL) - in the alternative
(Blatt, derivatively on behalf of GBI v. Goldner and Dharma; GBI named as Nominal Defendant)

134.    Plaintiff realleges and incorporates by reference paragraphs 11-16, 32-38, 45-46, 53-62, and 66-78 as if fully set forth herein.

135.    At Goldner's instruction, Plaintiff wired $220,000 directly to Goldner and $202,148.55 to Compass to be credited to Goldner's account, for the benefit of Goldner and Dharma, respectively.

136.    Goldner, acting individually and on behalf of Dharma, obtained or used these Funds with felonious intent to either temporarily or permanently deprive GBI of its right to the Funds or a benefit therefrom.

137.    Goldner knowingly obtained and/or used Plaintiff's funds through fraud, willful misrepresentation of a future act, or false promise by way of the Representations, which he knew to be false at the time he made them, and Concealments.

138.   Goldner used the Funds Plaintiff wired directly to him for his own personal benefit and/or for the benefit of Dharma, rather than for the benefit of GBI as he had represented to Plaintiff.

139.   Goldner's actions on behalf of himself and as Manager of Dharma constitute theft under Fla. Stat. § 812.014, and Plaintiff is entitled to treble damages and attorneys' fees under Fla. Stat. § 772.11.

140.   As a direct and proximate result of Goldner's theft, Plaintiff has suffered damages in the amount of $422,148.55, which is subject to trebling under applicable civil theft statutes, together with additional damages as allowed by law.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of GBI, respectfully requests that this Court grant judgment in its favor and against MARC J. GOLDNER and THE DHARMA INITIATIVE, LLC by (i) awarding GBI treble damages in an amount to be determined at trial, including but not limited to $1,266,445.65, treble the amount wrongfully obtained by Defendants; (ii) awarding GBI costs, prejudgment interest, and post-judgment interest; (iii) awarding GBI reasonable attorneys' fees; and (iv) granting such other and further relief as this Court deems just and equitable.

## COUNT V - COMMON LAW FRAUD (FL)
(Blatt v. Goldner, Divilov, Korsen, and Dharma)

141.   Plaintiff re-alleges and reincorporates paragraphs 11-108 as if fully set forth herein.

142.   Defendants, individually and acting in concert, knowingly made the false Representations of material fact to Plaintiff, including but not limited to:

    a.   that Plaintiff's capital contributions and funds provided pursuant to the GBI Agreement would be used to acquire and hold assets (including NFTs and

Miners) for the benefit of Plaintiff and GBI as in-kind capital contributions to GBI by Blatt (Goldner);

b.  that Plaintiff would be recognized and treated as a member/owner in GBI and entitled to the rights, profits, and assets associated therewith (Goldner);

c.  that Defendants would not divert or misappropriate Plaintiff's funds or assets acquired with those funds for their own benefit or for the benefit of entities other than GBI (The Dharma Members); and

d.  the Falsities (Goldner), Concealments (Dharma Members), Miner Representations (Dharma Members), and NFT Representations (Goldner).

143.   As Korsen would later admit, at the time the Miner Representations were made, Defendants "all knew" they were false, or made them recklessly without regard for their truth, intending that Plaintiff rely upon them.

144.   Plaintiff, in justifiable reliance on Defendants' misrepresentations, wired the Funds with the specific intent and expectation that they would be used for the purchase of NFTs and Miners for GBI's benefit as in-kind capital contributions to GBI to be completed by Goldner on behalf of Blatt.

145.   Instead, Defendants misappropriated Plaintiff's funds and caused the NFTs, Miners, and related assets to be purchased and held in the name of Defendants or their controlled entities, excluding Plaintiff and GBI from ownership and benefit.

146.   As a direct and proximate cause of Plaintiff's justifiable reliance upon these knowingly false Representations, Plaintiff suffered damages that are severable from any harm to GBI or its other member, Goldner, who solely benefitted at Plaintiff's expense, including but not limited to (i) the value of the Funds wrongfully diverted; and (ii) the loss of ownership and profits from the Disputed Assets.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court grant judgment in his favor and against by (i) granting Plaintiff compensatory, consequential, and special damages jointly and severally; (ii) ordering disgorgement of all Disputed Assets to be

returned to Plaintiff; (iii) granting Plaintiff costs, prejudgment interest, and post-judgment interest; and (iv) granting Plaintiff such other and further relief that this Court deems just and equitable.

<div align="center">

**COUNT VI - COMMON LAW FRAUD (FL) – in the alternative**
(Blatt derivatively on behalf of GBI v. Goldner, Divilov, Korsen, and Dharma; GBI named as Nominal Defendant)

</div>

147.    Plaintiff re-alleges and reincorporates paragraphs 11-16 and 22-108 as if fully set forth herein.

148.    Defendants, individually and acting in concert, knowingly made the false Representations of material fact to Plaintiff, including but not limited to:

    a.  that Plaintiff's capital contributions and funds provided pursuant to the GBI Agreement would be used to acquire and hold assets (including NFTs and Miners) for the benefit of Plaintiff and GBI as in-kind capital contributions to GBI by Blatt (Goldner);

    b.  that Plaintiff would be recognized and treated as a member/owner in GBI and entitled to the rights, profits, and assets associated therewith (Goldner);

    c.  that Defendants would not divert or misappropriate Plaintiff's funds or assets acquired with those funds for their own benefit or for the benefit of entities other than GBI (The Dharma Members); and

    d.  the Falsities (Goldner), Concealments (Dharma Members), Miner Representations (Dharma Members), and NFT Representations (Goldner).

149.    As Korsen would later admit, at the time the Miner Representations were made, Defendants "all knew" they were false, or made them recklessly without regard for their truth, intending that Plaintiff rely upon them.

150.    Plaintiff, in justifiable reliance on Defendants' misrepresentations, wired the Funds with the specific intent and expectation that they would be used for the purchase of NFTs and Miners for GBI's benefit as in-kind capital contributions to GBI to be completed by Goldner on behalf of Blatt.

151.    Instead, Defendants misappropriated Plaintiff's funds and caused the NFTs, Miners, and related assets to be purchased and held in the name of Defendants or their controlled entities to the exclusion of Plaintiff's benefit.

152.    As a direct and proximate cause of Plaintiff's justifiable reliance upon these knowingly false Representations, Plaintiff suffered damages including the difference in the value paid versus the value received and/or the appreciation of value of the Assets over time.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of GBI, respectfully (i) enter judgment for Plaintiff for damages, jointly and severally (ii) ordering disgorgement of all Disputed Assets to be returned to Plaintiff; (iii) granting Plaintiff costs, prejudgment interest, and post-judgment interest; and (iv) granting Plaintiff such other and further relief that this Court deems just and equitable.

## COUNT VII - NEGLIGENT MISREPRESENTATION (FL)
### (Blatt v. Goldner, Divilov, Korsen, and Dharma)

153.    Plaintiff re-alleges and reincorporates paragraphs 11-16 and 22-108 as if fully set forth herein.

154.    Defendants, individually and acting in concert, made representations of material fact to Plaintiff, including but not limited to:

a.  that Plaintiff's funds would be used to acquire assets (including NFTs and Miners) to be contributed to GBI as in-kind capital contributions for the benefit of Plaintiff and GBI (Goldner);

b.  that Plaintiff would be recognized and treated as a member/owner in GBI and entitled to the rights, profits, and assets associated therewith (Goldner);

c.  that Plaintiff and GBI would be treated equally to the other individuals on whose behalf Goldner was purchasing Miners (Dharma Members);

d.  that GBI would ultimately own the Miners purchased with Plaintiff's Miner Funds (Dharma Members); and

e.  the Miner Representations (Dharma Members).

155.    Divilov and Korsen, as members of Dharma, joined in and ratified these misrepresentations and concealments, knowingly benefitting from the diversion of Plaintiff's funds, later using Dharma's ownership of the Miners to attempt to aid Goldner in securing concessions from Blatt regarding the NFTs and travel expenses.

156.    Defendants made these representations without exercising reasonable care to ensure their truth or accuracy.

157.    Defendants should have known, and a reasonable person in their position would have known, that the representations were false or misleading, with Korsen explicitly admitting Defendants "all knew" from the start that no Miners were being purchased for GBI. Plaintiff had no reason to know the representations were false or that they could reasonably be discovered to be false.

158.    Plaintiff, in justifiable reliance on Defendants' misrepresentations, wired the Funds, specifically $220,000 to Goldner and $202,148.55 to Compass at Goldner's direction, with the intent and expectation that they would be used for the purchase of NFTs and Miners for GBI's benefit as in-kind capital contributions to GBI to be completed by Goldner on behalf of Blatt.

159.    As a direct and proximate cause of Plaintiff's justifiable reliance upon these false misrepresentations, Plaintiff suffered damages that are severable from any harm to GBI or its other member, Goldner, who solely benefitted at Plaintiff's expense, including but not limited to:

    a.  the value of the Funds wrongfully diverted;
    b.  the loss of ownership and profits from the Disputed Assets; and
    c.  the gains, profits, and appreciation derived by Defendants from their wrongful use of Plaintiff's contributions.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court grant judgment in his favor and against MARC J. GOLDNER, SIMON DIVILOV, RACHEL

KORSEN, and THE DHARMA INITIATIVE, LLC by (i) granting Plaintiff compensatory, consequential, and special damages jointly and severally; (ii) ordering disgorgement of all Disputed Assets to be returned to Plaintiff; (iii) granting Plaintiff costs, prejudgment interest, and post-judgment interest; (iv) imposing a constructive trust for Plaintiff's benefit over all the Disputed Assets; and (v) granting Plaintiff such other and further relief that this Court deems just and equitable.

### COUNT VIII - NEGLIGENT MISREPRESENTATION (FL) - in the alternative
(Blatt, derivatively on behalf of GBI v. Goldner, Divilov, Korsen, and Dharma; GBI named as Nominal Defendant)

160.    Plaintiff re-alleges and reincorporates paragraphs 11-16 and 22-108 as if fully set forth herein.

161.    Defendants, individually and acting in concert, made representations of material fact to Plaintiff, including but not limited to:

     a.  that Plaintiff's funds would be used to acquire assets (including NFTs and Miners) to be contributed to GBI as in-kind capital contributions for the benefit of Plaintiff and GBI (Goldner);

     b.  that Plaintiff would be recognized and treated as a member/owner in GBI and entitled to the rights, profits, and assets associated therewith (Goldner);

     c.  that Plaintiff and GBI would be treated equally to the other individuals on whose behalf Goldner was purchasing Miners (Dharma Members);

     d.  that GBI would ultimately own the Miners purchased with Plaintiff's Miner Funds (Dharma Members); and

     e.  the Miner Representations (Dharma Members).

162.    Divilov and Korsen, as members of Dharma, joined in and ratified these misrepresentations and concealments, knowingly benefitting from the diversion of Plaintiff's funds, later using Dharma's ownership of the Miners to attempt to aid Goldner in securing concessions from Blatt regarding the NFTs and travel expenses.

163.    Defendants made these representations without exercising reasonable care to ensure their truth or accuracy.

164.    Defendants should have known, and a reasonable person in their position would have known, that the representations were false or misleading, with Korsen explicitly admitting Defendants "all knew" from the start that no Miners were being purchased for GBI. Plaintiff had no reason to know the representations were false or that they could reasonably be discovered to be false.

165.    Plaintiff, in justifiable reliance on Defendants' misrepresentations, wired the Funds, specifically $220,000 to Goldner and $202,148.55 to Compass at Goldner's direction, with the intent and expectation that they would be used for the purchase of NFTs and Miners for GBI's benefit as in-kind capital contributions to GBI to be completed by Goldner on behalf of Blatt.

166.    As a direct and proximate cause of Plaintiff's justifiable reliance upon these false misrepresentations, Plaintiff suffered damages that are severable from any harm to GBI or its other member, Goldner, who solely benefitted at Plaintiff's expense, including but not limited to:

     a.  the value of the Funds wrongfully diverted;
     b.  the loss of ownership and profits from the Disputed Assets; and
     c.  the gains, profits, and appreciation derived by Defendants from their wrongful use of Plaintiff's contributions.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of GBI, respectfully requests that this Court grant judgment in his favor and against MARC J. GOLDNER, SIMON DIVILOV, RACHEL KORSEN, and THE DHARMA INITIATIVE, LLC by (i) granting Plaintiff compensatory, consequential, and special damages jointly and severally; (ii) ordering disgorgement of all Disputed Assets to be returned to Plaintiff; (iii) granting Plaintiff costs, prejudgment interest, and post-judgment interest; and (iv) granting Plaintiff such other and further relief that this Court deems just and equitable.

## COUNT IX - UNJUST ENRICHMENT FOR THE NFT FUNDS AND NFTs (FL)

(Blatt v. Goldner)

167.     Plaintiff repeats and re-alleges paragraphs 11-16, 22-38, 63-66, 69, and 80-81 as if fully set forth herein.

168.     Goldner was unjustly enriched by Plaintiff by knowingly accepting and retaining the benefit of the NFT Funds conferred by Plaintiff and, in turn, purchasing the NFTs for Goldner's own benefit, without providing Blatt or GBI fair value for them by assigning them formally to GBI as per the NFT Representations and managing them in accordance with the GBI Representations.

169.     There is a relationship between the unjust enrichment of Goldner and Blatt's efforts individually and as Managing Member of GBI.

170.     It would be inequitable for Goldner to retain the benefits conferred upon him by Plaintiff without compensating Plaintiff for the value of the benefit conferred.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court (i) grant judgment for damages in his favor and against MARC J. GOLDNER in an amount to be proven at trial, but in no event less than the greater of the NFT Funds or the current value of the NFT, together with costs and prejudgment interest; and (ii) grant such other and further relief as the Court deems just, equitable, and proper.

## COUNT X - UNJUST ENRICHMENT FOR THE NFT FUNDS AND NFTs (FL) - in the alternative
(Blatt, derivatively on behalf of GBI v. Goldner; GBI named as Nominal Defendant)

171.     Plaintiff repeats and re-alleges paragraphs 11-16, 22-38, 63-66, 69, and 80-81 as if fully set forth herein.

172.     Goldner was unjustly enriched by Plaintiff by knowingly accepting and retaining the benefit of the NFT Funds conferred by Plaintiff and, in turn, purchasing the NFTs for

Goldner's own benefit, without providing Blatt or GBI fair value for them by assigning them formally to GBI as per the NFT Representations and managing them in accordance with the GBI Representations.

173.    There is a relationship between the unjust enrichment of Goldner and Blatt's efforts as Managing Member of GBI.

174.    It would be inequitable for Goldner to retain the benefits conferred upon him by Plaintiff without compensating Plaintiff for the value of the benefit conferred.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of GBI, respectfully requests that this Court (i) grant judgment for damages in his favor and against MARC J. GOLDNER in an amount to be proven at trial, but in no event less than the greater of the NFT Funds or the current value of the NFT, together with costs and prejudgment interest; (ii) impose a constructive trust for Plaintiff's benefit over all NFTs ever commingled in wallets with the NFTs purchased in part or in whole with Plaintiff's NFT Funds, including any proceeds from their sale; and (iii) grant such other and further relief as the Court deems just, equitable, and proper.

## COUNT XI - CONVERSION OF THE NFT FUNDS AND NFTs (FL)
### (Blatt v. Goldner)

175.    Plaintiff repeats and re-alleges his allegations in paragraphs 11-16, 22-38, 63-66, 69, and 80-81 as if fully set forth herein.

176.    Under Florida law, Goldner's conduct, as shown above, constitutes conversion of the NFT and NFT Funds for Goldner's benefit and to the detriment of Plaintiff.

177.    Goldner's use, possession, and control of the NFT Funds and the NFTs purchased therewith were taken without justification and to injure Plaintiff, and are inconsistent with

Plaintiff's ownership interest in same and was otherwise intended to deprive Plaintiff of his ownership interest in the NFTs.

178.    Goldner performed the improper and unlawful actions solely for his own benefit and not on behalf of Plaintiff or any other persons or entities.

179.    As a direct and proximate cause of Goldner's conversion of the NFT Funds and NFTs, Plaintiff has suffered damages.

\WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court (i) grant judgment in his favor and against MARC J. GOLDNER, for damages in an amount to be proven at trial, but in no event less than the greater of the NFT Funds or the current value of the NFTs, together with costs and prejudgment interest; and (ii )grant such other and further relief as the Court deems just, equitable, and proper.

## COUNT XII - CONVERSION OF THE NFT FUNDS AND NFTs (FL) - in the alternative
(Blatt derivatively on behalf of GBI v. Goldner; GBI named as Nominal Defendant)

180.    Plaintiff repeats and re-alleges his allegations in paragraphs 11-16, 22-38, 63-66, 69, and 80-81 as if fully set forth herein.

181.    Under Florida law, Goldner's conduct, as shown above, constitutes conversion of the NFT and NFT Funds for Goldner's benefit and to the detriment of Plaintiff.

182.    Goldner's use, possession, and control of the NFT Funds and the NFTs purchased therewith were taken without justification and to injure Plaintiff, and are inconsistent with Plaintiff's ownership interest in same and was otherwise intended to deprive Plaintiff of his ownership interest in the NFTs.

183.    Goldner performed the improper and unlawful actions solely for his own benefit and not on behalf of Plaintiff or any other persons or entities.

184.    As a direct and proximate cause of Goldner's conversion of the NFT Funds and NFTs, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of GBI, respectfully requests that this Court (i) grant judgment in his favor and against MARC J. GOLDNER, for damages in an amount to be proven at trial, but in no event less than the greater of the NFT Funds or the current value of the NFTs, together with costs and prejudgment interest; and (ii) grant such other and further relief as the Court deems just, equitable, and proper.

## COUNT XIII - UNJUST ENRICHMENT FOR THE MINER FUNDS, MINERS, AND MINED BITCOIN (FL)
### (Blatt v. Goldner and Dharma)

185.    Plaintiff repeats and re-alleges paragraphs 11-16, 22-24, 39-62, 67, 70-71, and 80-87 as if fully set forth herein.

186.    Goldner was unjustly enriched by Plaintiff when Goldner by accepted and retained $20,000 of the Miner Funds conferred upon him by Plaintiff, without providing Plaintiff fair value therefore.

187.    Dharma was unjustly enriched by Plaintiff's Miner Funds by titling ownership of the Miners purchased therewith to itself and using them to mine bitcoin without providing Plaintiff with any consideration.

188.    Goldner and Dharma knowingly and willfully accepted the benefit conferred upon them by Blatt.

189.    Neither Goldner nor Dharma has any justification for retaining the Miner Funds, the Miners purchased therewith, or the Mined Bitcoin without providing Plaintiff adequate compensation.

190.   It would be inequitable for Goldner and Dharma to retain this knowingly conferred benefit without compensating Plaintiff.

191.   As a direct and proximate cause of Dharma and Goldner's unjust enrichment, Plaintiff has suffered in an amount to be determined at trial, for which he lacks an adequate remedy at law given the unique and appreciating nature of the Miners and Mined Bitcoin.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court enter judgment in his favor and against MARC J. GOLDNER and THE DHARMA INITIATIVE, LLC by ordering (i) the disgorgement of all Miners purchased in part or in whole with the Miner Funds as well as the Mined Bitcoin; (ii) awarding costs and prejudgment interest; and (iii) granting such other and further relief as the Court deems just, equitable, and proper.

### COUNT XIV - UNJUST ENRICHMENT FOR THE MINER FUNDS, MINERS, AND MINED BITCOIN (FL) – in the alternative
(Blatt, derivatively on behalf of GBI v. Goldner and Dharma; GBI named as Nominal Defendant)

192.   Plaintiff repeats and re-alleges paragraphs 11-16, 22-24, 39-62, 67, 70-71, and 80-87 as if fully set forth herein.

193.   Goldner was unjustly enriched by Plaintiff when Goldner voluntarily accepted and retained $20,000 of the Miner Funds conferred upon him by Plaintiff, without providing Plaintiff fair value therefore.

194.   Dharma was unjustly enriched by Plaintiff's Miner Funds by titling ownership of the Miners purchased therewith to itself and using them to mine bitcoin without providing Plaintiff with any consideration.

195.   Goldner and Dharma knowingly and willfully accepted the benefit conferred upon them by GBI.

196.    Neither Goldner nor Dharma has any justification for retaining the Miner Funds, the Miners purchased therewith, or the Mined Bitcoin without providing Plaintiff adequate compensation.

197.    It would be inequitable for Goldner and Dharma to retain this knowingly conferred benefit without compensating Plaintiff.

198.    As a direct and proximate cause of Dharma and Goldner's unjust enrichment, Plaintiff has suffered in an amount to be determined at trial, for which he lacks an adequate remedy at law given the unique and appreciating nature of the Miners and Mined Bitcoin.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of GBI, respectfully requests that this Court enter judgment in his favor and against MARC J. GOLDNER and THE DHARMA INITIATIVE, LLC by ordering (i) the disgorgement of all Miners purchased in part or in whole with the Miner Funds as well as the Mined Bitcoin; (ii) awarding costs and prejudgment interest; and (iii) granting such other and further relief as the Court deems just, equitable, and proper.

## COUNT XV - CONVERSION OF THE MINER FUNDS, MINERS, AND MINED BITCOIN (FL)
### (Blatt v. Goldner and Dharma)

199.    Plaintiff repeats and re-alleges his allegations in paragraphs 11-16, 22-24, 39-62, 67, 70-71, and 80-87 as if fully set forth herein.

200.    As shown above, Goldner and Dharma's conduct constitutes conversion under Florida common law of the Miner Funds, Miners, and Mined Bitcoin for the benefit of Goldner and Dharma and to the detriment of Plaintiff in a manner inconsistent with Plaintiff's ownership interest in same and for the purpose of depriving Plaintiff of his ownership interest in the Miner Funds, the Miners, and the Mined Bitcoin.

201.   Dharma and Goldner's use, possession, control, and application of the Miner Funds, the Miners purchased therewith, as well as the Mined Bitcoin, were taken without justification and to injure Plaintiff.

202.   Goldner and Dharma performed the improper and unlawful actions, including demanding that Blatt prepay Dharma to receive any benefit from the Miners, solely for their own benefit and not on behalf of Blatt or any other persons or entities.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court enter judgment in his favor and against MARC J. GOLDNER and THE DHARMA INITIATIVE, LLC by (i) ordering the disgorgement of all Miners purchased in part or in whole with the Miner Funds and the bitcoin mined therewith or, alternatively, the Miner Funds; (ii) awarding costs and prejudgment interest; and (iii) granting such other and further relief as the Court deems just, equitable, and proper.

## COUNT XVI - CONVERSION OF THE MINER FUNDS, MINERS, AND MINED BITCOIN (FL) - in the alternative

(Blatt, derivatively on behalf of GBI v. Goldner and Dharma; GBI named as Nominal Defendant)

203.   Plaintiff repeats and re-alleges his allegations in paragraphs 11-16, 22-24, 39-62, 67, 70-71, and 80-87 as if fully set forth herein.

204.   As shown above, Goldner and Dharma's conduct constitutes conversion under Florida common law of the Miner Funds, Miners, and Mined Bitcoin for the benefit of Goldner and Dharma and to the detriment of Plaintiff in a manner inconsistent with Blatt's ownership interest in same and for the purpose of depriving Plaintiff of his ownership interest in the Miner Funds, the Miners, and the Mined Bitcoin.

205.    Dharma and Goldner's use, possession, control, and application of the Miner Funds, the Miners purchased therewith, as well as the Mined Bitcoin, were taken without justification and to injure Plaintiff.

206.    Goldner and Dharma performed the improper and unlawful actions, including demanding that Blatt prepay Dharma to receive any benefit from the Miners, solely for their own benefit and not on behalf of Blatt or any other persons or entities.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of GBI, respectfully requests that this Court enter judgment in his favor and against MARC J. GOLDNER and THE DHARMA INITIATIVE, LLC by (i) ordering the disgorgement of all Miners purchased in part or in whole with the Miner Funds and the bitcoin mined therewith or, alternatively, the Miner Funds; (ii) awarding costs and prejudgment interest; and (iii) granting such other and further relief as the Court deems just, equitable, and proper.

### COUNT XVII - BREACH OF FIDUCIARY DUTIES (DE)
(Blatt v. Goldner; GBI and Dharma named as Nominal Defendants)

207.    Plaintiff re-alleges and reincorporates by reference paragraphs 11-108 as if fully set forth herein.

208.    At all times relevant, Blatt and Goldner have been parties to the GBI Agreement.

209.    Delaware law imposes fiduciary obligations, including a duty of care and loyalty, upon members of a Delaware limited liability company and to a company itself (*See* 6 Del. C. § 18-1101(c)).

210.    The GBI Members never executed any agreements that extinguished their duties of loyalty and care owed to each other and to GBI pursuant to Delaware law; to the contrary, GBI §30(a) expressly imposes a duty of care upon its Members.

211.    As such, Goldner owed Blatt the fiduciary duties of good faith, loyalty, and care.

212.   Fiduciary principles demanded that Goldner refrain from making the Representations and Concealments to Blatt as a Member of GBI with knowledge of the Falsities.

213.   Goldner breached his fiduciary duties to GBI and Blatt by engaging in egregious misconduct that resulted in Goldner's personal enrichment to Blatt's detriment, including by, among other things:

    a.  making the Representations with actual knowledge of the Falsities and Concealments;

    b.  inducing Plaintiff to execute the GBI Agreement and wire the Funds under false pretenses;

    c.  making no efforts to honor the Representations thereafter or provide Blatt the benefit of his Funds;

    d.  failing to assign the NFTs to GBI as per the NFT Assignment Email to which he did not object;

    e.  titling the Assets in his own and Dharma's name;

    f.  seeking to needlessly have GBI pay Dharma servicing fees;

    g.  demanding that Plaintiffs pay Dharma and Goldner for Miners purchased using Plaintiffs's Miner Funds that Goldner represented would belong to GBI;

    h.  intentionally overvaluing the ethereum he allegedly used to purchase the NFTs recorded on the GBI Spreadsheet in spite of the GBI Representations;

    i.  abjectly refusing Blatt's legitimate call to force a sale of the NFTs or otherwise have access or manage the Assets; and

    j.  using threats, intimidation, and extortion in his efforts to coerce Blatt into dropping his claims on the Assets.

214.   Goldner had superior knowledge of and access to material information regarding the Miners, as he was the only one communicating with Compass about the Miners and the only one with access to the account storing the Miners under his own personal email address, ostensibly acting in his capacity as Dharma's Manager.

215.   Goldner also had superior knowledge of and access to material information regarding the NFTs because he was the only one with access to the cryptocurrency wallets where he was storing the NFTs, none of which were associated with a GBI email address or otherwise accessible by both of the GBI Members.

216.   Goldner improperly used his superior knowledge and position of trust and confidence to further his own personal benefit.

217.   Goldner thereby breached the special trust and confidence placed in him by Blatt and GBI not to use the GBI Agreement, the Assets, or the Funds to Blatt's detriment.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court grant judgment in his favor and against MARC J. GOLDNER by (i) awarding damages in an amount to be proven at trial, but in no event less than the present value of the Disputed Assets; (ii) ordering the disgorgement of the Disputed Assets to restore Plaintiff and/or GBI to their rightful position; (iii) declaring that Plaintiff has authority to effectuate the sale and/or liquidation of any of the Disputed Assets properly belonging to Plaintiff or GBI pursuant to its termination, or alternatively appointing a JAMS Neutral at Goldner's expense to do so; and (iv) granting such other and further relief as this Court deems just and equitable.

## COUNT XVIII - BREACH OF FIDUCIARY DUTIES (DE) - in the alternative
(Blatt, derivatively on behalf of GBI v. Goldner; GBI and Dharma named as Nominal Defendants)

218.   Plaintiff re-alleges and reincorporates by reference paragraphs 11-108 as if fully set forth herein.

219.   At all times relevant times up to and including the present, Blatt, Goldner, and GBI have been parties to the GBI Agreement and Members of GBI.

220.   Delaware law imposes fiduciary obligations, including a duty of care and loyalty, upon members of a Delaware limited liability company and to a company itself (*See* 6 Del. C. § 18-1101(c)).

221.    The GBI Members never executed any agreements that extinguished their duties of loyalty and care owed to each other and to GBI pursuant to Delaware law; to the contrary, GBI §30(a) expressly imposes a duty of care upon its Members.

222.    As such, Goldner owed GBI the fiduciary duties of good faith, loyalty, and care.

223.    Fiduciary principles demanded that Goldner refrain from making the Representations and Concealments to Blatt as a Member of GBI with knowledge of the Falsities.

224.    Goldner breached his fiduciary duties to GBI by engaging in egregious misconduct that resulted in Goldner's personal enrichment to GBI's detriment, including by, among other things:

    a.  making the Representations with actual knowledge of the Falsities and Concealments;

    b.  inducing Plaintiff to execute the GBI Agreement and wire the Funds under false pretenses;

    c.  making no efforts to honor the Representations thereafter or provide GBI the benefit of Blatt's Funds by completing the promised capital contributions;

    d.  failing to assign the NFTs to GBI as per the NFT Assignment Email, to which he did not object;

    e.  titling the Assets in his own and Dharma's name;

    f.  seeking to needlessly have GBI pay Dharma servicing fees;

    g.  demanding that Blatt as a GBI Member pay Dharma and Goldner for Miners purchased using Blatt's Miner Funds that Goldner represented would belong to GBI;

    h.  intentionally overvaluing the ethereum he allegedly used to purchase the NFTs recorded on the GBI Spreadsheet in spite of the GBI Representations;

    i.  abjectly refusing Blatt's—and by extension GBI's—legitimate call to force a sale of the NFTs or otherwise have access or manage the Assets; and

    j.  using threats, intimidation, and extortion in his efforts to coerce Blatt as a GBI Member into dropping his claims on the Assets.

225.    Goldner had superior knowledge of and access to material information regarding the Miners, as he was the only one communicating with Compass about the Miners and the only one with access to the account storing the Miners under his own personal email address, ostensibly acting in his capacity as Dharma's Manager.

226.   Goldner also had superior knowledge of and access to material information regarding the NFTs because he was the only one with access to the cryptocurrency wallets where he was storing the NFTs, none of which were associated with a GBI email address or otherwise accessible by both of the GBI Members.

227.   Goldner improperly used his superior knowledge and position of trust and confidence to further his own personal benefit.

228.   Goldner thereby breached the special trust and confidence placed in him by GBI not to use the GBI Agreement, the Assets, or the Funds to GBI's detriment.

229.   Blatt as GBI's Member made demands upon Goldner to remedy his offenses, which were refused.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of GBI, respectfully requests that this Court grant judgment in their favor and against MARC J. GOLDNER by (i) awarding damages in an amount to be proven at trial, but in no event less than the present value of the Disputed Assets; (ii) ordering the disgorgement of the Disputed Assets to restore Plaintiff and/or GBI to their rightful position; (iii) declaring that Plaintiff has authority to effectuate the sale and/or liquidation of any of the Disputed Assets properly belonging to Plaintiff or GBI pursuant to its termination, or alternatively appointing a JAMS Neutral at Goldner's expense to do so; and (iv) granting such other and further relief as this Court deems just and equitable.

## PART II: THE MEGACAP CLAIMS

## THE MEGACAP FACTUAL ALLEGATIONS

**The Megacap Parties**

230.    Megacap serves as the General Partner of multiple Special Purpose Vehicles ("SPVs"), managing more than $4 million in late-stage startup equity exposure for over 50 Limited Partners ("LPs"). A true and correct copy of the founding operating agreement ("Megacap Agreement") governing Megacap at all relevant times is attached as **Exhibit "H."**

231.    Tech I and SpaceX are two SPVs that Megacap manages as General Partner.

232.    Defendant Goldner is a former member of Megacap. As further detailed below:

    a.  he was involuntarily withdrawn as a Class A Member and Manager on January 16, 2023, by Megacap pursuant to the terms of the Megacap Agreement governing member withdrawal;
    b.  he subsequently had his unvested Membership Units redeemed on May 22, 2023 pursuant to the terms of Megacap Agreement and the Redemption Agreement template attached thereto governing same; and
    c.  he was thereafter involuntarily withdrawn from Megacap, and his remaining Class B Membership Units purchased by the remaining Members, on September 2, 2025, pursuant to the terms of the Megacap Agreement.

233.    True and correct copies of Goldner's initial and amended Class A withdrawal, redemption, and final Class B withdrawal and Membership Unit Purchase are attached hereto as **Compound Exhibit "I."**

234.    Defendant Reiter was a Class A Member of Megacap whose Membership Units were voluntarily redeemed by Megacap in exchange for being granted LP interests in Tech I as consideration on March 24, 2022. A true and correct copy of Reiter's executed "Redemption Agreement" is attached as **Exhibit "J."** Reiter remains bound by the Governing Documents of Tech I and SpaceX as a Limited Partner, despite no longer being a Member of Megacap.

235.    Defendant, Divilov, is Goldner's "long-time business partner, colleague, friend, and investor," as well as an LP in Tech I and SpaceX, bound by their Governing Documents.

**Summary of the Megacap Claims**

236.    While the dispute detailed in the GBI Claims was unfolding, Goldner initiated a

calculated campaign of threats, harassment, and intimidation against Blatt with regard to issues relating to Megacap.

237.    As part of Goldner's unrelenting campaign of terror, he transmitted threats against Blatt and his family's lives and physical safety, threatened to disclose compromising photos of Blatt, and repeatedly and flagrantly breached his fiduciary duties and duty of care to Megacap and Blatt, as detailed below.

238.    Goldner's actions left Megacap no choice but to initially involuntarily withdraw him as a Class A Member without redeeming his unvested Membership Units in the hope this would prevent him from seeking to harm Megacap and Blatt.

239.    When that turned out not to be the case, Megacap subsequently redeemed his unvested Membership Units four months later for continued and escalating offenses.

240.    Subsequent to his redemption, Goldner recruited Divilov and Reiter to form an association-in-fact in order to threaten not only Blatt but also Megacap and its vendors, contractors, associates, and limited partners, causing the company irreparable harm.

241.    This ultimately led to Megacap involuntarily withdrawing Goldner for these new breaches of fiduciary duty and new forbidden acts, with the remaining Members purchasing his remaining Membership Units pursuant to the terms of the Megacap Agreement governing same, rendering Goldner no longer a member but still having substantial debts to Megacap.

**Initial Threats and Harassment**

242.    As Blatt sought to gain the benefit of his Funds in the GBI dispute, Goldner repeatedly pressured Blatt as part of that settlement to agree on behalf of Megacap to grant Goldner exclusively among Megacap's Managers reimbursement for Thirty Thousand Dollars ($30,000.00) of non-pre-approved, non-itemized travel expenses.

243.   When Blatt refused to acquiesce to Goldner's pressure to have Megacap grant him concessions as part of resolving their GBI dispute, Goldner, having already defrauded Blatt of his Funds, wrote him an email on June 19, 2022, stating, "I'll make this business the most difficult it can be. You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me."

244.   As detailed in **Exhibit "K,"** Blatt's Declaration, Goldner's threat here was not an idle one, as he thereafter embarked on a campaign of terror against Blatt including extortion, sextortion, harassment, and the transmission of death threats.

245.   On January 12, 2023, in an effort to protect himself from Goldner's escalating harassment, as detailed further below, Blatt, who had by then blocked Goldner personally on messaging channels, instructed Goldner to "please email me with any [Megacap] or other business" instead of writing messages in Megacap's official WhatsApp group.

246.   Goldner rejected Blatt's appeal, continuing to write Blatt threatening and harassing messages regarding non-Megacap matters on Megacap's official WhatsApp Channel, as detailed in Blatt's Declaration (collectively, Goldner's "Harassment").

**Tax Breaches and Self-Dealing**

247.   In a December 9, 2022 WhatsApp message on Megacap's official internal company "WhatsApp Channel," Goldner explicitly tied his willingness to manage critical Megacap business to Blatt making concessions in their GBI dispute, stating that the two issues were "intertwined" for him.

248.   Goldner reaffirmed in the WhatsApp Channel on December 16, 2022 that his willingness to cooperate on critical Megacap business was tied to Blatt personally paying him at least One Hundred Thousand Dollars ($100,000.00), stating, "I cannot commit to a new

[Megacap] fund admin when you owe me over $100k" (collectively with the June 19 Email and December 9, 2022 message contents, the "Self-Dealing Statements").

249.    In doing so, Goldner conditioned honoring his fiduciary duties to Megacap on Blatt agreeing to a personal settlement with him unrelated to Megacap; in doing so, he breached those same fiduciary duties.

250.    Beginning early December 2022, Blatt and Goldner, as Managers of Megacap, disagreed on several matters critical to Megacap's timely filing of tax returns.

251.    The disagreement centered around the tax reporting of Tech I management fees.

252.    Blatt had consulted with Megacap's fund administrator ("Flow"), legal counsel, and accountant, all of whom had confirmed that the Tech I Governing Documents had the General Partner earning its Management Fees upon each LP's closing.

253.    As a practical matter, the Management Fees had also been sent from the SPV in question to Megacap's operating accounts.

254.    Goldner, however, insisted that he would not allow taxes to be filed that showed Megacap had earned the Management Fees, as he wanted to reduce his own pass-through tax liability.

255.    To rationalize his position, he wrote: "The management fee shouldn't be 5% up front, the 5% is held in trust" on December 12, 2022 in the WhatsApp Channel.

256.    Blatt, in numerous WhatsApp messages from December, 2023 to January 2024, tried to impress upon Goldner the reality of the situation and that he was not willing to commit tax fraud by filing returns showing no management fees as having been earned.

257.    Nonetheless, seeking to decrease his own personal tax burden, Goldner continued to pressure Blatt to have Megacap file inaccurate and possibly fraudulent tax returns for Megacap not showing the Management Fees as having been earned (the "Tax Breaches").

258.    Shortly thereafter, during the banking crisis of 2023, Megacap agreed that Goldner and Blatt would each hold half of Megacap's funds in trust on a temporary basis until they could be redeposited into a new Megacap account.

259.    Goldner and Blatt each received Eighteen Thousand One Hundred and Forty-Six Dollars and Seventy Cents ($18,146.70) of Megacap funds (the "Megacap Funds") to hold in trust and use for needed Megacap expenses until such time as Megacap had a new bank account into which the Megacap Funds could be deposited.

260.    Upon Megacap establishing a new bank account in its name at Bank of America, Blatt asked Goldner to return the Megacap Funds.

261.    Goldner refused, stating that he would use the Megacap Funds to perfect a judgment against a Limited Partner who had defaulted on a One Million Two Hundred Thousand Dollars ($1,200,000.00) subscription to Tech I.

262.    But Goldner never returned the Megacap Funds to Megacap's account, nor did he take any action to perfect the judgment against the defaulted Limited Partner (collectively, the "Banking Breaches"), to the detriment of Megacap, which stood to earn sixty thousand dollars ($60,000) in upfront fees from that subscription.

**Extortion and Withdrawal**

263.    Beginning around December 2022, Goldner began pressuring Blatt to execute an interest waiver agreement (the "Interest Agreement") with a "Creditor" of Megacap that he believed would derivatively benefit him financially by freezing the accrual of interest on a

Megacap loan—at the cost of Megacap taking on substantial additional liability capable of bankrupting it.

264.    Goldner would ultimately resort to repeatedly transmitting extortive death threats against Blatt and his family if Blatt did not sign the Interest Agreement, initially telling Blatt on a December 8, 2022 Zoom Meeting that people would "show up at [his] door and break [his] knees" if he didn't sign the Interest Agreement.

265.    Goldner also threatened in writing on numerous occasions to unilaterally withdraw Blatt from Megacap if Blatt did not acquiesce to his threats relating to the Interest Agreement.

266.    The Megacap Agreement provides for involuntary withdrawal and redemption of interests at the sole discretion of the voting Members by way of a unanimous vote of the Class A Members, not including the Member whose withdrawal is being voted on.

267.    Goldner's threat to withdraw Blatt was thus not an idle one; even if for invalid reasons, Goldner could unilaterally withdraw Blatt from Megacap, thus forcing Blatt to take expensive legal action to overturn his withdrawal, in the meantime leaving Megacap and its LPs at the mercy of an increasingly erratic and tyrannical Goldner.

268.    Goldner's (i) persistent patterns of placing his own interests above those of Megacap in breach of his fiduciary duty; (ii) breaches prevailing law—a "forbidden act" triggering involuntary withdrawal per the Megacap Agreement; and (iii) breaches of duty of care to Blatt by way of his threats and harassment, including repeated threats to unilaterally withdraw Blatt from Megacap without good cause; left Megacap no choice but to involuntarily withdraw Goldner as a Class A Member of Megacap on January 16, 2023.

269.    In an effort to avoid extra-legal retribution from Goldner at a critical time for Megacap, and because Goldner's withdrawal was not financially motivated, at the time of his withdrawal from Megacap as a Manager and Class A Member in January 2023, Megacap did *not redeem* his *unvested* Membership Units–it only converted his Membership Units to Class B.

270.    According to the Megacap Agreement, notice to a Member is only required if the remaining Members wish to *purchase* a withdrawn Member's *vested* Membership Units, which Megacap initially did not elect to do—again to protect itself from retribution[4].

271.    Goldner's threats towards Blatt continued to escalate thereafter, with Goldner graduating to transmitting written death threats against not only Blatt but also his family as part of his unsuccessful attempts to secure personal benefits from Megacap at its expense.

272.    On January 27, 2023 in group text messages to Blatt and Blatt's mother, Goldner sought to ascertain Blatt's physical location and said that Blatt was putting his "family's lives at risk" by not acquiescing to Goldner's pressure regarding the Interest Agreement.

273.    Goldner would repeat these threats several times via WhatsApp and email, writing on March 18, 2023 "what do you think they're going to do to us if we repay in shares," (collectively with the December 8, 2022 and January 27, 2023 threats, Goldner's "Personal Threats").

274.    Goldner's increasing hostility and threats led Blatt on March 19, 2023 to write to Goldner that, with regard to his efforts for Megacap, he "cannot and will not continue working

---

[4] Note that the GBI and Megacap Agreements are built on the same template. Goldner's withdrawal here shows that, even though he was withdrawn and his *unvested* Membership Units redeemed, because his *vested* Membership Units were not at this time purchased by the remaining Members, he remained at that time a Class B Member of the Company in spite of his withdrawal. The same dynamic applies to Blatt's Withdrawal from GBI: his Membership units were not purchased in accordance with the terms laid out in the GBI Agreement, and thus he retains his Membership Units and with it his status as a GBI Member under Delaware law.

under the current environment of constant, near-daily threats against me, nor am I under any obligation to do so.  Despite what you seem to think, you do not have the right to verbally abuse me—or anyone for that matter."

275.    Rather than respect Blatt's request, Goldner escalated his campaign of harassment and extortion further by writing inappropriate messages in an official Megacap WhatsApp channel with several LPs and the Creditor:

 a.    threatening to withdraw Blatt from Megacap for refusing to sign the Interest Agreement and not acquiescing to the Tax Breaches;

 b.    admittedly and wilfully deceiving the Creditor by knowingly and demonstrably lying to them about Blatt refusing to approve a cap table transaction;

 c.    falsely claiming Blatt had made unauthorized distributions;

 d.    again attacking Blatt's fiancé and baselessly claiming Megacap could sue her for tortiously interfering with Megacap affairs simply because she (understandably) did not like Goldner;

 e.    expressing a desire to avoid personal taxable income by having Megacap breach Tech I's governing documents; and

 f.    detailing private internal Megacap business to Megacap Creditors and LPs in an effort to improve his own personal standing with them, to the detriment of Megacap.

(Collectively, the "Creditor Breaches.")

276.    Shortly thereafter, upon being served notice by Blatt of his intent to sue over the GBI Claims, Goldner threatened to take actions that would "destroy" Megacap and the Tech I SPV if Blatt did not acquiesce to his various demands, including dropping his GBI claims against Goldner, a gross breach of his fiduciary duty to Megacap.

277.    This led to Goldner's prior withdrawal being amended and Goldner being notified of his withdrawal, which had been effective since January 16, 2023, subsequent to which he was only a Class B Member. (*See* Exhibit I).

278.     At that time, despite all his malfeasance, Megacap *still* did not redeem Goldner's unvested Membership Units, hoping that this would prevent him from seeking to harm the company by virtue of fully aligning his financial interests with that of Megacap.

**Redemption and Retribution**

279.     Despite Blatt and Megacap's hope that not redeeming Goldner would keep him from seeking to harm Megacap, subsequent to being noticed of his withdrawal, Goldner escalated his campaign of threats against Blatt, Megacap, and the interests of its LPs, ultimately leading to his unvested equity being redeemed via the May 22, 2023 Redemption Notice served upon Goldner over four months after his initial withdrawal. (*See* Exhibit I).

280.     Goldner responded by doubling down on his threats of a "scorched-earth" campaign against Megacap and its affiliates, including, among other things, by writing letters to:

   a.  Blatt as manager of Megacap, threatening (i) to destroy Megacap and Tech I SPV, (ii) to share indecent photos of Blatt publicly, (iii) to disclose highly sensitive, confidential legal information to opposing parties in ongoing litigation in which Blatt represented the plaintiff, and (iv) to accuse Blatt of crimes under threat of imprisonment if Blatt did not acquiesce to his demands relating to Megacap;

   b.  LPs of Megacap (i) soliciting funds from them personally for his own benefit to aid in bringing litigation against Blatt, (ii) defaming and disparaging Blatt as Manager of Megacap, and thus by extension Megacap itself, by accusing him without any factual basis of stealing Tech I equity, and (iii) instilling fear about the safety of their investments;

   c.  prospective LPs instructing them not to invest with Megacap;

   d.  numerous vendors and partners of Megacap with baseless threats of litigation, some of whom subsequently refused to provide services to Megacap out of fear of Goldner; and

   e.  suppliers of equity to the SPVs it manages, pressuring them not to make contractually mandated distributions thereto.

(Collectively, the "Partner Threats")

281.     To aid him in his efforts to use threats, coercion, and intimidation of Megacap's LPs to try and secure their assistance in pressuring Megacap to reinstate him, in flagrant breach

of Megacap's Dispute Resolution terms, Goldner recruited former Megacap Member Reiter with the promise of reinstating him if he could help Goldner force his way back into Megacap via extra-legal means.

282.   Upon being recruited by Goldner, on July 12, 2023, Blatt's mother texted him saying "I got a call from Roderyck - threatening" to put [Blatt] "in jail" if Blatt didn't acquiesce to Goldner's demands—the second time Defendants harassed Blatt's mother (also the representative of a Megacap Limited Partner) with threats relating to Megacap.

283.   Divilov subsequently joined Goldner and Reiter's association-in-fact to collectively confuse and intimidate Megacap's partners, with the three of them declaring in a "November 2023 Letter" (attached hereto as **Exhibit "L"**) to Megacap's LPs: "Marc Goldner and Roderyck Reiter Reunite to Unify MegaCap Capital & MegaCap Funds."

284.   The November 2023 Letter was written by Goldner in collaboration with Divilov and Reiter (collectively the "Conspirators"), who each included their own letter.

285.   In it, Goldner states that his allegations were confirmed by "Simon Divilov, an LP of MegaCap, a close friend, and my longtime business partner, as well as confirmed by Roderyck Reiter, the other rightful Managing Partner of MegaCap. Simon & Rod granted me permission to disclose this information to you."

286.   In writing the November 2023 Letter and positioning Reiter as a "rightful Managing Partner of MegaCap" despite Reiter no longer being a Megacap Member, Goldner expressly committed the forbidden act detailed in § 68 of the Megacap Agreement: "No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company."

287.    Among the Conspirators' numerous communications to Megacap's partners in that letter, described by one partner as "alarming," the Conspirators:

      a.  breached the Operating Agreement's dispute resolution terms by seeking to resolve his dispute with Megacap by way of direct appeal to Megacap's LPs, writing, "I am requesting that there is a mass request from each and every LP to tell Eli to comply with his duties;"

      b.  threatened to needlessly make public highly sensitive, confidential information about Megacap's suppliers, which they warned could wipe out all the LPs investments as well as destroy Megacap;

      c.  claimed that a critical Megacap supplier would withhold Megacap's investors' equity at Goldner's instruction, writing, "MegaCap and Eli will not be distributed anything from the Sellers in which we acquired [redacted] and [redacted] without either my consent, authorization, and approval or without proper adjudication;"

      d.  falsely claimed to represent the company, sharing a new fraudulent company email addresses to contact Goldner and Reiter as Megacap Managers;

      e.  defamed and disparaged Blatt as Megacap's Manager and, by extension, Megacap, by, among other things, baselessly accusing Blatt of crimes, including double-selling Tech I inventory, thereby defrauding Megacap LPs;

      f.  disclosed detailed confidential Megacap information, including disclosing Megacap had a One Million Dollar ($1,000,000.00) debt obligation;

      g.  falsely claimed that mismanagement by Megacap could "result in the destruction of LP equity;" and

      h.  attached letters written by Divilov as well as Goldner and Divilov's personal lawyer defaming Megacap by, among other things, falsely and baselessly claiming to Tech I LPs that their K1s were incorrect and fraudulent.

(Collectively, the "Partner Breaches")

288.    The Partner Breaches were made by the Conspirators with willful and flagrant disregard for their confidentiality, dispute resolution, and non-interference obligations under the Megacap Agreement and SPV governing documents, causing some Tech I LPs to fear for the safety of their investments.

289.    Despite the Conspirators' best efforts, however, while several LPs did contact the company expressing concern and confusion over the communications, not a single Limited Partner expressed any support for the Conspirators.

290.    Nonetheless, Goldner's actions leading up to the November 2023 letter led Blatt to seek an injunction on behalf of Megacap in his litigation against Goldner, which was subsequently removed to Federal Court before being closed, leading to the filing of the instant case. A true and correct copy of the filed injunction is attached as **Exhibit "M."**

291.    Thereafter, as a result of Goldner's November 2023 Letter, the Partner Breaches, and Goldner's ongoing efforts to harm Megacap, on September 2, 2025, Megacap involuntarily withdrew Goldner as a Class B Member for breaches of fiduciary duty and committing forbidden acts.

292.    At that time, the remaining Members elected to purchase Goldner's Class B Membership Units at a price determined by an independent third-party GAAP valuation, pursuant to §§ 44, 46, and 51-53 of the Megacap Agreement (*See* Exhibit H), thereby fully expelling him as a Member of Megacap, leaving him with a substantial negative capital account balance with Megacap that it is now unable to offset against future distributions.

293.    Nonetheless, as a direct and proximate result of Defendants' actions, Megacap has suffered significant damages that are impossible to calculate, including but not limited to:

      a.  loss of referrals from current LPs;
      b.  loss of investment from prospective LPs;
      c.  disruption of services from vendors and partners;
      d.  increased costs associated with finding new service providers;
      e.  loss of future business opportunities and revenue;
      f.  costs associated with mitigating the effects of Goldner's breaches, including legal fees and vendor switching costs;
      g.  a negative capital account balance with Megacap that can no longer be offset by future distributions; and
      h.  reputational damage.

294.    Blatt is now forced to bring this action on behalf of himself and derivatively on behalf of Megacap and as the representative of Tech I and SpaceX to protect himself, Megacap, and its LPs from further harm.

## THE MEGACAP COUNTS

### COUNT XIX: VIOLATION OF THE FLORIDA RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO) – FLA. STAT. § 772.103(3)

(Blatt, derivatively on behalf of Megacap and as representative of Tech I v. Goldner, Divilov, and Reiter; Megacap named as Nominal Defendant)

295.     Plaintiff realleges and incorporates by reference paragraphs 230–246 and 263–294 of the Factual Allegations as if fully set forth herein.

296.     **Enterprise:** Defendants Goldner, Divilov, and Reiter formed an association-in-fact enterprise with the common purpose of undermining Plaintiff's managerial control of Megacap and appropriating its brand, reputation, and business operations for their own benefit.

297.     This is evidenced by their coordinated public representation of themselves as a unified management team of Megacap, including the November 2023 letter to limited partners (LPs) falsely asserting that "Marc Goldner and Roderyck Reiter Reunite to Unify MegaCap Capital & MegaCap Funds" with a supporting letter from Divilov.

298.     **Pattern of Racketeering Activity:** Defendants engaged in a pattern of racketeering activity as defined under Fla. Stat. § 895.02(8), by committing at least two predicate acts within a 5-year period that are chargeable under Florida law and related to each other and the enterprise:

    a.  **Extortion (Fla. Stat. § 836.05):** Defendants Goldner and Reiter used threats of serious bodily harm, reputational damage, and criminal accusations to coerce Plaintiff into executing Megacap agreements and relinquishing rights and control over Megacap. These threats were issued with the intent to extract concessions and gain property from both Blatt and Megacap.

    b.  **Written Threats to Kill or Injure (Fla. Stat. § 836.10):** Goldner transmitted written and/or electronic threats relaying that Megacap creditors would kill or seriously harm Plaintiff Blatt and his family if he did not comply with Goldner's demands—including signing documents related to Megacap. These threats were intended to induce fear and extract compliance through intimidation.

    c. **Scheme to Defraud (Fla. Stat. § 817.034):** Defendants sent communications to Megacap LPs and vendors containing knowingly false representations about (i) the identity of Megacap's leadership; (ii) the legitimacy of a new web domain and contact emails; and (iii) the operational status of the firm. These misrepresentations were intended to divert business and relationships away from Megacap, and to mislead investors and vendors into dealing with Defendants personally.

    d. **Criminal Use of Personal Identification Information (Fla. Stat. § 817.568):** Defendants used the Megacap name, trademarks, and domain registration information without authorization to impersonate the entity and its management, causing confusion to Megacap LPs and injury to Megacap.

    e. **Unauthorized use of false web domains and contact channels (Fla. Stat. § 815.06):** Defendants engaged in computer-related fraud by impersonating Megacap using fraudulent Megacap email addresses to mislead LPs and vendors; and

    f. **Stalking and Harassment under Fla. Stat. § 784.048:** As part of their ongoing campaign to extort, intimidate, and unlawfully pressure Blatt into surrendering his interests and legal rights, Defendants engaged in a pattern of stalking and harassment, including but not limited to threats of physical harm, reputational destruction, and exposure of personal matters, communicated repeatedly over electronic channels such as WhatsApp, email, and text.

299.    **Operation and Management of Enterprise:** Defendants participated in the operation or management of the enterprise by:

    a. Coordinating threats and coercive communications in a course of conduct;

    b. Disseminating false information to LPs and vendors under false pretenses,

    c. Creating or controlling fraudulent websites and contact channels,

    d. Attempting to oust Blatt and extract value from Megacap without legal authority.

300.    **Damages to Megacap:** As a direct and proximate result of Defendants' RICO violations, Plaintiff has suffered (i) loss of business relationships with LPs and vendors; (ii) reputational damage within the investment community; (iii) disruption of legitimate business operations; (iv) lost subscription opportunities for remaining Tech I inventory; and (v) legal and investigatory costs incurred as a result of the racketeering scheme.

**WHEREFORE**, Plaintiff, ELI M. BLATT, derivatively on behalf of MEGACAP CAPITAL, LLC and as representative of TECH I, respectfully requests that this Court enter

judgment in favor of MEGACAP CAPITAL, LLC and against Defendants MARC J. GOLDNER, RODERYCK REITER, and SIMON DIVILOV, and award the following relief: (i) threefold the actual damages sustained, including but not limited to the value of unsold Tech I shares that Megacap was unable to place as a result of Defendants' racketeering conduct, in an amount to be determined at trial, pursuant to Fla. Stat. § 772.104(1); (ii) reasonable attorney's fees and court costs as provided under Fla. Stat. § 772.104(1); (iii) injunctive and equitable relief enjoining Defendants from further impersonation, interference, or unlawful use of Megacap's name, brand, or business relationships; and (iv) such other and further relief as the Court deems just and proper.

## COUNT XII – TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS (FL)

(Blatt, derivatively on behalf of Megacap, v. Goldner, Divilov, and Reiter; Megacap named as Nominal Defendant)

301.     Plaintiff realleges and incorporates by reference paragraphs 230-235, 240, and 281-294 of the Factual Allegations as if fully set forth herein.

302.     At all times relevant, Plaintiff Blatt was the Managing Member of Megacap Capital, LLC and the General Partner of Megacap Funds, LP, and was responsible for managing Megacap's relationships with its limited partners (LPs), vendors, and prospective investors.

303.     Blatt on behalf of Megacap maintained advantageous business relationships with numerous third parties, including but not limited to:

    a. Existing limited partners who had entrusted funds under management;
    b. Prospective limited partners who had engaged in diligence or were referred by existing LPs;
    c. Vendors and service providers who supported Megacap's infrastructure and operations.

304.   Defendants Goldner, Divilov, and Reiter had actual knowledge of these business relationships by virtue of their past affiliations with Megacap and their receipt of confidential internal information concerning LPs and vendors.

305.   Beginning in 2023, Defendants intentionally and unjustifiably interfered with Megacap's business relationships by, among other things, sending the November 2023 Letter and committing the Partner Breaches.

306.   Defendants also intentionally and maliciously interfered with Blatt's relationship as Megacap's Manager with investors, partners, and vendors, and business relationships held by Megacap in trust by Plaintiff in his fiduciary capacity by, among other things:

    a.   disseminating communications attacking Blatt personally, making false and disparaging statements about his professional character and conduct;
    b.   claiming he engaged in misconduct that would subject him to regulatory or criminal penalties;
    c.   alleging he had "double-sold" LPs' interests in Tech I;
    d.   attempting to replace or discredit him as the point of contact for Megacap LPs and vendors; and
    e.   using threats, false pretenses, and impersonation tactics to induce others to terminate or avoid dealings with Blatt.

307.   These actions were designed to, and did, harm Blatt's personal standing as Megacap's Manager, credibility, and prospects, as well Megacap's operational relationships.

308.   Defendants' actions were intentional, malicious, and without legal justification or privilege. Their sole objective was to disrupt Blatt's control of Megacap and divert relationships and business opportunities for their own gain.

309.   As a direct and proximate result of Defendants' interference, Megacap has suffered (i) damage to its reputation and credibility with LPs and third parties; (ii) loss of existing and prospective investment commitments; (iii) termination or suspension of vendor relationships; and (iv) increased legal, administrative, and reputational costs.

WHEREFORE, Plaintiff ELI M. BLATT, derivatively on behalf of MEGACP CAPITAL, LLC, respectfully request that the Court enter judgment in its favor and against Defendants MARC J. GOLDNER, SIMON DIVILOV, and RODERYCK REITER and award the following relief: (i) damages against Goldner in an amount to be determined at trial but no less than the value of his negative capital account value with Megacap; (ii) damages against Divilov and Reiter in an amount to be determined at trial but no less than the value of their capital account balances in Megacap SPVs; (iii) an order that the value of their interests be deducted from the award and applied towards redemption of their LP units by Megacap, with said units deemed redeemed by Megacap upon entry of judgment, without further action required by Divilov or Reiter, as contemplated by the Governing Documents; (iv) pre- and post-judgment interest as allowed by law; (v) costs and expenses incurred in bringing this action, including reasonable attorney's fees if provided for by contract or statute; and (vi) such other and further relief as the Court deems just and proper.

## COUNT XII: BREACH OF FIDUCIARY DUTY (DE)
(Blatt, derivatively on behalf of Megacap v. Goldner; Megacap named as Nominal Defendant)

310. Plaintiff realleges and incorporates by reference paragraphs 230-233 and 236-294 of the Factual Allegations as if fully set forth herein.

311. Goldner is and was at all relevant times a Member of Megacap.

312. As such, under Delaware law, Goldner owed Megacap a fiduciary duty, including the duties of loyalty, care, and good faith.

313. Goldner breached his fiduciary duties to Megacap in numerous ways, including but not limited to, by:

    a. making the Self-Dealing Statements and Partner Threats, and engaging in the Tax Breaches, Self Dealing, Creditor Breaches, Partner Breaches, and

Banking Breaches, thus placing his own interests above Megacap's while causing direct harm to Megacap; and

   b.  engaging in the Harassment and making the repeated Personal Threats against Blatt and his family's lives on the official Megacap WhatsApp Channel, as a result of which Goldner breached his duties of care and good faith to Blatt as Manager of Megacap and thus, by extension, Megacap.

314.  Goldner's actions were willful, wanton, and in conscious disregard of their fiduciary obligations to Megacap.

315.  As a direct and proximate result of Goldner's breaches of fiduciary duty, Megacap has suffered damages including but not limited to (i) the value of unsold Tech I inventory that could not be placed with investors; (ii) Goldner's outstanding debt to Megacap represented by his negative capital account balance following his withdrawal and purchase of his units; and (iii) the amounts paid to Goldner by Megacap during his tenure that should be disgorged as a result of his breaches. The precise amount of such damages will be determined at trial.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of MEGACAP CAPITAL, LLC, respectfully requests that this Court enter judgment in its favor against Defendant MARC J. GOLDNER, and award the following relief: (i) damages in an amount to be determined at trial, including but not limited to the value of unsold Tech I inventory that Megacap was unable to place with investors; (ii) an order requiring Goldner to pay his outstanding debt to Megacap, including the negative balance of his capital account; (iii) disgorgement of all payments, compensation, and distributions received by Goldner from Megacap during his tenure; (iv) injunctive relief enjoining Goldner from further interference with Megacap's business relationships, use of its name, or solicitation of its investors; and (v) such other and further relief as the Court deems just and proper.

## COUNT XIII: BREACH OF CONTRACT (DE)
(Blatt, derivatively on behalf of Megacap v. Goldner; Megacap named as Nominal Defendant)

316.    Plaintiff realleges and incorporates by reference paragraphs 230-233 and 236-294 of the Factual Allegations as if fully set forth herein.

317.    The Megacap Agreement, to which Goldner is bound, contains express terms governing forbidden acts, confidentiality, dispute resolution, and commingling of personal and Megacap assets, which were material to the contract and intended to protect Megacap's interests and those of its members and LPs (see Exhibit H the Megacap Agreement § 10, 58, 74, 80 and Exhibit B thereto the Confidentiality Agreement).

318.    Goldner intentionally breached these provisions in bad faith in numerous ways, including but not limited to, by:

      a.   committing the Forbidden Acts detailed in Exhibits I, K, and M;

      b.   willfully and flagrantly disregarding Megacap's dispute resolution terms detailed in Megacap Agreement §80 by seeking to resolve his dispute with Megacap via direct appeal to its LPs instead of through arbitration or injunctive relief;

      c.   publicly disclosing to Megacap LPs confidential information about Megacap's internal business matters, including but not limited to internal tax matters, member disputes, and the amount of Megacap's debt, in breach of the Confidentiality Agreement attached to the Megacap Agreement;

      d.   making the Self-Dealing Statements;

      e.   engaging in the Harassment of Blatt, Tax Breaches, and Self Dealing acts; and

      f.   Committing Banking Breaches, Creditor Breaches, Affiliate Threats, and Partner Breaches.

319.    Goldner's willful breaches of the Megacap Agreement and Redemption Agreement were material and intentionally made to defeat the object of these clauses for his own personal gain, to the detriment of Megacap.

320.    As a direct and proximate result of Goldner's contract breaches, Megacap has suffered damages including but not limited to (i) the value of unsold Tech I inventory that could not be placed with investors; (ii) Goldner's outstanding debt to Megacap represented by his negative capital account balance following his withdrawal and purchase of his units; and (iii) the

amounts paid to Goldner by Megacap during his tenure that should be disgorged as a result of his breaches. The precise amount of such damages will be determined at trial.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of MEGACAP CAPITAL, LLC, respectfully requests that this Court enter judgment in favor of MEGACAP CAPITAL, LLC and against Defendant MARC J. GOLDNER, and award the following relief: (i) damages in an amount to be determined at trial, including but not limited to the value of unsold Tech I inventory that Megacap was unable to place with investors; (ii) an order requiring Goldner to pay his outstanding debt to Megacap, including the negative balance of his capital account; (iii) disgorgement of all payments, compensation, and distributions received by Goldner from Megacap during his tenure; (iv) injunctive relief enjoining Goldner from further interference with Megacap's business relationships, use of its name, or solicitation of its investors; and (v) such other and further relief as the Court deems just and proper.

## COUNT XIV: BREACH OF CONTRACT (DE)
(Blatt, derivatively on behalf of Megacap and as representative of Tech I and SpaceX v. Divilov and Reiter; Megacap named as Nominal Defendant)

321.    Plaintiff realleges and incorporates by reference paragraphs 230-231, 234-235, and 281-294 of the Factual Allegations as if fully set forth herein.

322.    Divilov and Reiter are bound to the Governing Documents for two Megacap SPVs, which include provisions relating to confidentiality (Series Agreement, Section 5.9) and tortious interference (Series Agreement, Section 6.2).

323.    Divilov and Reiter's participation in authoring and sending the November 2023 letter, as well as Reiter contacting a Megacap Limited Partner by phone conveying a threat to Blatt, were in material breach of these provisions.

324.     Divlov and Reiter's actions were in bad faith and were undertaken with the improper motive of intentionally violating the express purpose of the above provisions in order to advance their own interests at the expense of Megacap.

325.     Section 5.2 of the Series Agreements to which Divilov and Retier are bound allows for the removal of a Limited Partner for cause through redemption of their interest for the value of their capital account.

326.     As a direct and proximate result of Defendants' contractual breaches, Megacap and its SPVs have suffered damages including but not limited to (i) the value of unsold Tech I inventory that could not be placed with investors due to Defendants' misconduct; and (ii) the value of their respective capital account balances in Tech I and SpaceX, which should be forfeited and applied toward redemption of their LP units pursuant to Section 5.2 of the Series Agreements. The full measure of damages will be determined at trial.

**WHEREFORE**, Plaintiff, ELI M. BLATT, derivatively on behalf of MEGACAP CAPITAL, LLC and as representative of TECH I and SPACEX, respectfully requests that this Court enter judgment in favor of MEGACAP CAPITAL, LLC and against Defendants SIMON DIVILOV and RODERYCK REITER, and award the following relief: (i) damages in an amount to be determined at trial, including but not limited to the value of unsold Tech I inventory that Megacap was unable to place with investors and the value of Defendants' capital account balances in Tech I and SpaceX; (ii) an order that the value of Defendants' capital accounts be applied toward redemption of their LP units by Megacap, with said units deemed redeemed upon entry of judgment, without further action required by Divilov or Reiter, as contemplated by the Governing Documents; (iii) pre- and post-judgment interest as allowed by law; (iv) costs and

expenses incurred in bringing this action, including reasonable attorney's fees if provided for by contract or statute; and (v) such other and further relief as the Court deems just and proper.

**COUNT XV: CONVERSION (FL)**

(Blatt, derivatively on behalf of Megacap v. Goldner; Megacap named as Nominal Defendant)

327.    Plaintiff realleges and incorporates by reference paragraphs 230 and 258-262 of the Factual Allegations as if fully set forth herein.

328.    Megacap entrusted Goldner on a temporary basis to steward the Megacap Funds.

329.    Despite Megacap's demands, Defendant Goldner has failed and refused, and continues to fail and refuse, to return the Megacap Funds to Megacap.

330.    Goldner has exerted dominion and control over Megacap's funds in a manner inconsistent with Megacap's ownership thereof.

331.    As a direct and proximate result of Goldner's wrongful conversion of the Megacap Funds, Megacap has been damaged, including but not limited to:

    a.   loss of the Eighteen Thousand One Hundred and Forty-Five Dollars ($18,145.00) entrusted to Defendant, being the value of the Megacap Funds minus $1.70 for Goldner's redemption that was deducted therefrom as payment of his unvested Membership Units; and

    b.   loss of Sixty Thousand Dollars ($60,000.00) in Management Fees, future lost carried interest, and other damages relating to Megacap failing to perfect the judgment against the defaulted Limited Partner due to the Banking Breaches;

WHEREFORE, Plaintiff ELI M BLATT, derivatively on behalf of MEGACAP CAPITAL, LLC, respectfully requests that the Court enter judgment in its favor and against Defendant MARC J. GOLDNER and award the following relief: (i) compensatory damages; (ii) disgorgement of any profits or benefits Defendant obtained through his improper retention of the Megacap Funds; (iii) imposition of a constructive trust over any property or funds in Defendant's possession that rightfully belong to Megacap; (iv) pre-judgment interest on the converted funds

from the date of conversion; (v) post-judgment interest as allowed by law; (vi) costs and expenses incurred in bringing this action; and (vii) such other and further relief as the Court deems just and proper.

## COUNT XVI: UNJUST ENRICHMENT (FL)

(Blatt, derivatively on behalf of Megacap v. Goldner; Megacap named as Nominal Defendant)

332.    Plaintiff realleges and incorporates by reference paragraphs  230 and 258-262 of the Factual Allegations as if fully set forth herein.

333.    Megacap knowingly conferred benefits upon Defendant Goldner in several ways, including but not limited to:

    a. entrusting Goldner with the Megacap Funds during the 2023 banking crisis, to be held in trust until they could be re-deposited into a new Company account;
    b. providing Goldner with access to confidential Company information, including financial data, investor information, and business strategies; and
    c. affording Goldner the opportunity to participate in Megacap's business operations and decision-making processes as a Class B Member.

334.    Goldner had knowledge of these benefits and voluntarily accepted and retained them.

335.    Goldner has been unjustly enriched by retaining these benefits without providing compensation or consideration to Megacap, including but not limited to:

    a. refusing to return the amount of the Debt owed to Megacap, despite Megacap's demands; and
    b. utilizing confidential Megacap information for his personal gain and to the detriment of Megacap, including soliciting funds from LPs for his own benefit and interfering with Megacap's business relationships.

336.    The circumstances are such that it would be unjust and inequitable for Goldner to retain these benefits without compensating Megacap.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of MEGACAP CAPITAL, LLC, respectfully requests that the Court enter judgment in its favor and against Defendant MARC J. GOLDNER, and award the following relief: (i) compensatory damages in an amount to be determined at trial, including but not limited to the $18,145 in Company funds entrusted to Defendant and the value of lost management fees, carried interest, and other profits Megacap was unable to realize; (ii) disgorgement of any profits or benefits Defendant obtained through his improper retention or use of Megacap's funds and resources; (iii) imposition of a constructive trust over any property or funds in Defendant's possession that rightfully belong to Megacap; (iv) pre-judgment interest on the converted funds from the date of conversion; (v) post-judgment interest as allowed by law; (vi) costs and expenses incurred in bringing this action; and (vii) such other and further relief as the Court deems just and proper.

## COUNT XVII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (FL)
### (Blatt v. Goldner)

337.   Plaintiff ELI M. BLATT realleges and incorporates by reference paragraphs 236-237, 242-246, 263-265, 264-267, 271-276, 280, 287, and 290 of the Factual Allegations as if fully set forth herein.

338.   As detailed in Blatt's Declaration and the Personal Threats, Defendant MARC GOLDNER engaged in a prolonged and malicious pattern of harassment, threats, and psychological abuse directed at Blatt, including but not limited to:

    a.  transmitting threats to Blatt's physical safety via a Zoom call, including statements that someone would "show up at Blatt's door and break his knees" if he refused to sign the Interest Agreement;

    b.  transmitting written threats to the lives of Blatt and his family, including against and directly to his mother, by stating that Blatt was putting his "family's lives at risk" and "what do you think they're going to do to us if we repay in shares;"

    c.  a sextortion attempt via a WhatsApp message to Blatt's former fiancée, threatening to release compromising images of Blatt unless he withdrew his legitimate legal claims relating to GBI;

    d.  dispossessing Blatt of the Funds and Disputed Assets;

    e.  repeated abusive communications on official Megacap channels, including defamatory attacks on Blatt's fiancée and false accusations of criminal conduct; and

    f.  repeated personal attacks against Blatt including allegations of criminal misconduct on the TRIUM alumni WhatsApp group.

339.    Goldner engaged in this conduct intentionally and with knowledge that it would inflict severe emotional distress upon Blatt. These acts were designed to coerce Blatt into surrendering legal rights and executing documents under duress, including but not limited to the Interest Agreement and, unsuccessfully, Megacap Resolutions executed in or around February 2023, as detailed in Blatt's Declaration.

340.    Goldner's conduct includes:

    a.  repeated, escalating threats over a period of more than 12 months, despite Blatt's repeated demands for cessation;

    b.  use of telecommunications across state lines to carry out the threats and harassment;

    c.  statements and admissions that his threats were intended to force Blatt into compliance;

    d.  exploitation of personal and professional channels to amplify distress and reputational harm.

341.    As a direct and proximate result of Goldner's conduct, Blatt has suffered severe emotional distress, including:

    a.  clinically significant anxiety, panic attacks, and sleep disturbances;

    b.  entry into therapy and medical treatment for stress-induced conditions;

    c.  ongoing financial and emotional strain;

    d.  a reported nervous breakdown and serious disruption of his personal and professional life, including his relationship with his fiancée.

342.    Goldner's harassment of Blatt was so severe and unrelenting that it caused Blatt to seek a restraining order against Goldner, which the Florida Sheriff was unable to serve upon him despite repeated attempts.

343.    Florida law recognizes a claim for intentional infliction of emotional distress where a defendant's conduct is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community. *See Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592 (Fla. 2d DCA 2007); *Williams v. Worldwide Flight Servs., Inc.*, 877 So. 2d 869 (Fla. 3d DCA 2004).

344.    Goldner's actions clearly meet this standard. His conduct was intentional, extreme, and outrageous and caused Blatt emotional distress so severe that no reasonable person should be expected to endure it.

**WHEREFORE**, Plaintiff, ELI M. BLATT, respectfully requests that this Court enter judgment in his favor and against Defendant MARC J. GOLDNER, and award (i) compensatory damages for emotional distress, reputational harm, and related losses; (ii) punitive damages for Goldner's malicious, wanton, and outrageous conduct; (iii) injunctive relief barring Goldner from any further direct or indirect contact with Blatt or his family; and (iv) costs of this action, together with attorneys' fees if and as permitted by law.

Dated this 2nd day of September, 2025.

/s Brad E. Kelsky
Counsel for Plaintiff
Kelsky Law, P.A.
150 S. Pine Island Rd
Suite 300
Plantation, FL 33324
954.449.1400
Fax:  954.449.8986
Primary:  bradkelsky@kelskylaw.com
Secondary:  barbarallinas@kelskylaw.com
FBN:  0059307

## VERIFICATION

I, Eli M. Blatt, hereby certify that I am the Plaintiff in the foregoing action. I have read the foregoing Complaint and know the contents thereof. The factual allegations contained in the Complaint are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct.

Executed on this 2nd day of September, 2025.

_Eli M. Blatt_

Eli M. Blatt, Plaintiff

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served upon all counsel of record through CM/ECF this 2nd day of September, 2025 as follows:

Stanley Quinn Casey, Esq.
501 NE 31st Street
# 1704
Miami, FL 33137

/s Brad E. Kelsky
BRAD E. KELSKY
FBN: 0059307



## OPERATING AGREEMENT OF GOLDNER BLATT INVESTMENTS, LLC

**This OPERATING AGREEMENT** (the "**Agreement**") made and entered into this 7 day of December 2021 (the "**Effective Date**") by and among **GOLDNER BLATT INVESTMENTS LLC**, a Delaware Series Limited Liability Company (the "**Company**" or "GBI" used interchangeably) and the following persons (each, a "**Member**," and, collectively the "**Members**"):

ELI M BLATT

MARC GOLDNER

### BACKGROUND:

A. The Members wish to associate themselves as members of a limited liability company.

B. The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

### Formation

1) By this Agreement, the Members form a Series Limited Liability Company (the "**Company**") in accordance with the laws of the State of Delaware. The rights and obligations of the Members will be as stated in the Delaware Limited Liability Company Act (the "**Act**") except as otherwise provided in this Agreement.

### Name

2) The name of the Company will be **GOLDNER BLATT INVESTMENTS, LLC**.

### Purpose

3) Investing, Operations, Speculation, Analysis, Consulting, and Finance relating to any asset class (i.e. tokens, currencies, collectibles, neural interfaces, tokenization, real estate, diamonds, fund management, fund operations, funds, and anything else that is part of the Company decks in the below Exhibits, etc.) in the cryptocurrency world (including but not limited to Cryptocurrencies, Metaverse, and NFTs except for the exclusion listed below relating to Marc's independent NFT-related ventures and businesses. Further, it is acknowledged that Marc has several collectibles which are part of his personal collection and not part of the Company unless Marc agrees to assign some of those assets. Marc's collectibles include but are not limited to video games sometimes pre-dating SNES

area, Pokemon Cards, Yu-Gi-Oh cards, Comic Books, Figurines, Sports Memorabilia, and other collectibles. If Marc sells any of his Collectibles, that money is not due to the Company.), Pre-IPO FinTech sourcing platform such as building with Kumar an early employee stock option Pre-IPO platform (also, however, the Parties agree that BitSource DBA The Crypto Bank and any former BitFinance assets such as the tokenomics and/or platform are part of BitSource and are governed under that operating agreement and that cap table where Marc and Eli are currently at 45% each and Courtney Spaeth is at 10%), and brokering or otherwise intermediating non MegaCap Securities as defined herein ("the Purpose"). However, it is noted that the Crypto Bank South Africa is held 75% by The Crypto Bank main series in America while 25% is held by Quentin Van Der Heever and his team.

a) If any investment and/or opportunity and/or deal is in the cryptocurrency world or is considered to be a non-MegaCap Securities brokering and/or intermediating deals (i.e. less than $250,000,000 valued companies), real estate (by tokenization or otherwise), or any other general deals whether institutional, retail, or otherwise, then this shall be structured as 100% of the proceeds, earnings, and/or revenue goes 100% directly to the Company's House pool which shall be split evenly between the Class A Members pro-rata based on each Class A Member's share of equity ownership as defined herein.

   i) For The Dharma Initiative LLC (which is a separate Series LLC whose purpose is to mine cryptocurrencies) the splits proposed shall be 24.4% will go to Marc Goldner, 24.4% will go to Eli Blatt, 24.4% will go to Simon Divilov, 24.4% will go to Rachel Korsen, 2% shall go to Jasmine Garcia, .1% shall go to Eric Goldner, .1% shall go to Robert Gross, .1% shall go to Josh Korsen, and .1% shall go to Abigail Shewalter.

b) Any equity or cash earned as part of compensation for employment or other services such as but not limited to consulting services is subject to this Agreement, which applies to joint investment and fees from individual deals.
   i) Any consulting that either Eli or Marc do will be split 50/50. In the event that any consulting services exceeds $10,000 then there will be a new series created on a 50/50 basis for our Consulting business. This business will earn cash fees and equity. Any advisory equity and/or board fees will be split on a 50/50 basis split between the Class A members.
   ii) The only exclusion that applies here is that Simon Divilov, Rachel Korsen, and Marc Goldner have had a consulting business called Columbus Computer Consulting since 2013 and has had a focus on investment club, and technology related consulting. That entity Columbus Computer Consulting will remain entirely under the ownership of Marc Goldner, Simon Divilov, and Rachel Korsen. In full disclosure, that entity may hold Bitcoin and other crypto assets that could have been stolen during the Mt Gox hack so any crypto assets received or earned from that entity that is not new business but potentially a legal recovery or finding any crypto assets will remain entirely the ownership of Marc Goldner, Rachel Korsen, and Simon Divilov. Thus, any Technology related consulting service or business will be split 25% between each of the Founding Members with Eli being the newest member of a new entity that they form called The Crypto Consultants Group with Eli also receiving 25% equity in that business.

c) Goldner Blatt Divilov will be the first Series created at the Company and the splits shall be 33.3% each to Marc Goldner, Eli Blatt, and Simon Divilov, with .1% being held for an advisor. This series shall be for passive investments only for Marc, Eli, and Simon to make together (i.e. If there is a limited investments such as $50,000 being made available of any particular investment and Marc

Doc ID: 88a0ad065a55a3c832141744af1fb05755e013db

& Eli want to put in the full $50,000 then they may put that in themselves through Goldner Blatt Investments without any obligation to offering Simon an opportunity to invest in that asset, however, if there is an extra allocation or an availability for something we want to minimize risk then Simon will have the option to invest and be involved in that asset purchase and/or investment). This will also be the equity split for a potential new venture with a trading algorithm programmed by Simon (whether for publicly traded stock markets and/or Crypto). For avoidance of doubt, the equity split on the trading algorithm program and software business for that trading algorithm will be 33.3% each to Marc, Eli, and Simon, with .1% being held for an advisor. However, if any token (crypto or otherwise) is created by Eli, Marc, and Simon, then Marc and Eli shall each be fully vested with 45% equity and Simon shall earn 10% equity where Simon's first 5% is fully dilutable to outside investors prior to Marc and Eli diluting.

d) If any deals conducted are not part of the Purpose, then the splits will be the deal lead takes 60% and there is a two-sided origination that is 40%. For example, if both sides of the origination (buy and sell side) have a shared contact then both sides of the origination would go to GBI, however, if one side is a shared contact then only that side would go to GBI and the other side would go to whoever is responsible for that contact. Therefore, if it's one sided then the Members split the 20% (one sided origination) that goes to the house where each Managing Member gets half of the 20% and therefore each Managing member gets 10%, whereas also if there is a two-sided origination then the full 40% (two sided origination) goes to the house and each Managing Member splits the 40% and therefore gets 20% to each Managing Member. It is noted that two-sided is defined as a buyer and a seller. For illustrative purposes only, if the supplier comes to Eli through his neighbor and then Eli goes to David Ruttenberg (who is a shared contact between the Members) then 20% would go to GBI and Marc and Eli would get 10% each on that deal. All such deals would be assigned to GBI so if Eli were to get 90% on a Real Estate deal then Eli's entity Anthropos would invoice GBI and be paid and then the 10% would be paid directly to Marc (either personally or through an entity of his choosing) for that deal.

e) Any investments that the Managing Members make are a 1:1 cash value based on current market prices at the time of assignment and will be certified and memorialized in an email and on WhatsApp to avoid confusion or dispute of that assets value with a screenshot being taken at the time of assignment and attached. All such assignments must be signed over in writing to GBI and approved by both Managing Members unanimously.

i) In the event that one of the Managing Members wants to sell a GBI asset for any reason and there is a potential buyer, then the other Managing Member has the right of first refusal and can buy out the Managing Member who wants to sell. For illustrative purposes only, if a Collectible is worth $50,000, then the partner that wants to sell can sell his portion to GBI through an assignment and then GBI can pay out $25,000 out of net pocket expenses to the Member who wants to sell.

(1) When deciding to purchase an asset (i.e. a Collectible, a Cryptocurrency, a piece of Artwork, Shares in a company, or otherwise), there will be an agreement VIA email in writing in relation to the time horizon to hold the Investment and the Exit Parameters of such an investment (i.e. if the Investment doubles, or if the Members agree to hold it for 5 years, or if an investment like a Painting on MasterWorks has a 10 year old period estimate), and then once the asset, property, and/or investment hits either of those marks

NOT A CERTIFIED COPY

then ither partner may force a sale but the right of first refusal as stated above will apply. In the event one of the Managing Members opts out of an investment, then a tacit waiver is given for that managing member to go invest in that asset, property, investment, or otherwise on their own, however, the Managing Member who declines to invest in that asset, property, investment, or otherwise will not circumvent the other Managing Member and invest in that on their own. For avoidance of doubt, the email setting the terms, time horizon, and overall agreement of the purchase of that specific asset will say something to the effect of this email constitutes the final agreement for this asset purchase that explicitly confirms the asset purchase and if it is approved with a confirmation email than that asset purchase contract will be bound by this Operating Agreement. No forced sale may happen until after the agreed amount of time has passed as defined in the time horizon of the agreed upon time window to hold the Investment unless mutually agreed unanimously by the Class A Members.

ii) Potential investments include but are not limited to TV and Game Studios (including but not limited to Virtual Reality and Video Game studios), Masterworks, Vinovest, Rally, Collectibles (i.e. Video Games, Pokemon Cards, Art, Cars, etc.), NFTs, Mining Assets (that may not be part of The Dharma Initiative), and Real Estate. However, it is noted that Marc Goldner's personal collection of collectibles ranging from Pokemon Cards, Video Games, Comic Books, and other collectible items are not part of GBI unless they are explicitly transferred to GBI and Marc & Eli can agree on the valuation of those collectibles so that Eli can match Marc's collectible contribution with another asset of equal value.

(1) Any investment either Member makes, where possible, should be offered to the other partner to be made though GBI. This includes but is not limited to cryptocurrencies, NFTs, and private investments.

iii) NFTs will be considered on a case-by-case basis because Marc Goldner's company that is unrelated to Eli Blatt is currently pursuing NFTs. Thus, Marc and Golden Bell have an exclusion to pursue NFTs without Eli's permission. However, if Eli and Golden Bell agree that Eli will lead an NFT project, then Eli and Golden Bell will discuss a consulting fee agreement or a percentage split on that NFT if Eli is able to help bring that NFT to market and runs that specific NFT project. Eli would have the right of first refusal to be the newest member of any NFT projects (that exclude simply listing an NFT for a Golden Bell property on a place like OpenSea) that are run, concepted, created, or planned for Golden Bell. In the event that Eli chooses to be a part of Golden Bell's NFT project, then Golden Bell will set up a new Series LLC that Eli Blatt would be on the cap table for. In no event would Eli ever receive more than 50% of Marc's total equity in that LLC for Golden Bell NFTs. Golden Bell would be the Managing Member of this project and would be responsible as the solo Manager of that LLC with sole decision making authority.

f) For any new entities that are created by either Marc Goldner or Eli Blatt (excluding Entertainment related businesses, leveraging any existing Golden Bell relationships to create new entitles in the Trans and Multi Media Space including but not limited to toys, games, comics, and/or animation, as well as the Adult and/or Entertainment Businesses, and MegaCap/BitSource/Golden Bell/Dharma related companies which are already defined. This exclusion includes any companies that are created either as part of a Series or as a separate entity under Golden Bell such as a

Golden Bell off-shoot spin off company like Strangelight Games after they acquire it and it becomes a separate entity) then those entities will be split between Marc and Eli on a 50%/50% basis. For example, if one of the Managing Members created a discretionary fund (i.e. GBI Real Estate) then that will be split between the Class A Members of GBI. If Marc and Eli both decide to start a new venture unrelated to any of the aforementioned ventures, then they agree that GBI shall hold their equity in that new business since that new venture will be taking time away from their current obligations, and the Class A Members will split the equity that is held in that new business 50/50. Additionally, if Marc decides to work with any third parties on a Sex Robot business, then Marc's equity will be held in GBI.

i)   Marc Goldner hereby assigns all his equity from Suitor Tutor, LLC. to GBI. In the event that it is not permitted, half of any distributions, half of any sales, half of any equity, or otherwise shall be given directly to Eli Blatt within 90 days of distribution and/or sale.

ii)  Eli Blatt hereby assigns all his equity from Catalyst, LLC. to GBI. In the event that it is not permitted, half of any distributions, half of any sales, half of any equity, or otherwise shall be given directly to Marc Goldner within 90 days of distribution and/or sale.

iii) Any entity (i.e. a new digital start-up, crypto start-up, virtual space startup, etc.) that GBI creates that utilizes Golden Bell relationships then Golden Bell will receive 50% and GBI will receive 50% equity, ownership, and share in profits of that specific start-up entity and/or deal.

g)  The Neuralverse Fund that is an investment fund (essentially a hybrid PE/VC/Hedge Fund Model) will have an equity cap table of 23.75% to each of the founding 4 members will be Managing Members, they are Marc Goldner, Rachel Korsen, Simon Divilov, and Eli Blatt. There will be 5% allocated to the advisor pool, In terms of being the 'director of the vision of the fund', that role would be held by Marc Goldner where Marc will steer the strategic investments and vision of the fund that then the investment committee and Managing Partners will vote to invest in. Managing Partners may recommend investments and there will be some investment committee that will be agreed upon by the partners in the Operating Agreement to vote on submissions by partners. Each of the partners will be allowed to invest in at least 2.5% of the Fund's allocated budget without any votes from any managing members of the Neuralverse fund.

h)  A separate series will be created for each Neural Interface Device intellectual property that is created, 50% of that new entity will be owned by The Neuralverse Fund and 50% will be given to Golden Bell and/or it's Founders and/or Equity Holding Partners. For example, for a theoretical neural interface device camera that has been conceptualized for years that IP's ownership would be 50% split between the founding members of The NeuralVerse Fund (Marc Goldner, Eli Batt, Rachel Korsen, and Simon Divilov) while the other 50% would be given to the leads and intellectual property creators on that project whereas 10% would be owned by Robert Gross, 5% by Golden Bell, 10% would be owned by Marc Goldner, 10% would be owned by Rachel Korsen, 10% would be owned by Simon Divilov, 2% would be owned by Jasmine Garcia, 1.5% would be owned by Jon Meller, and 1.5% would be owned by Ezelle Van Der Heever. The deal lead on a specific project, in this case Robert Gross, would have the 'vision' control that sets the stage for how the technology should be commercialized, implemented, used, and so forth.

i)   For any Neural Interface Device content that is created, 51% would be owned by Golden Bell and Golden Bell has final authority on direction of all content that is created, 5% would be allocated to Advisors, while 44% is given to The Neuralverse Fund for the content being created such as an immersive underwater experience that is more a 'lived' entertainment adventure akin to a simulated adventure in a virtual space. The Neural Verse Fund would be granted the equity in any Neural Interface Device Content if and only if the Neuralverse Fund is the primary investor at an acceptable valuation to the managing members that own the intellectual property that is potentially being licensed and in question and/or development.

j)   Any data business that either Marc or Eli start will be split 50/50. However, Marc has complete decision making authority on the data if used for any intelligence, espionage, or legal purposes. All other data deals being brokered such as consumer data would be agreed to and split on a 50/50 basis. The data business will be structured that Andrew has 50% and GBI has 50% which is split 25% each for Marc and Eli.

k)   The Pre-IPO secondaries platform being built with Kumar to source employee forward contracts, grants, and options will be split on a 50/50 basis between Eli and Marc.

l)   The new series that is created for any new entity such as GBI Properties and GBI Securities as defined in the GBI Deck will also be split 50/50 between Marc and Eli. For avoidance of doubt, any new entity that is not defined herein to be a different percentage equity structure (cap table) will be 50% for Marc Goldner and 50% for Eli Blatt.

## Term

4)   The Company will continue until terminated as provided in this Agreement or in the Act.

## Place of Business

5)   The Company's principal place of business will be located at: A Registered Agent, Inc.

      ATTN: GOLDNER BLATT INVESTMENTS, LLC.
      8 The Green Street
      Suite A
      Dover, Delaware 19901

## Units and Capital Contributions

6)   The Company shall be authorized to issue one million (**1,000,000**) units of membership interest in the Company (each, a "**Unit,**" collectively, "**Units**"), of which 1,000,000 units are hereby issued ("**Issued Units**") as per Section 8. These units constitute units of the "Master Series". The Company may authorize the issuance of additional Units with the prior written consent of all of the Class A Voting Members. As per Section 14, additional Series may be authorized each with its own Membership Units. The remainder of this agreement concerns the Master Series of the Company, however all provisions shall apply to any additional Series authorized unless otherwise approved by a unanimous

Doc ID: 88a0ad065a55a3c832141744af1fb05755e013db

vote of the Class A Members of the Master Series. For clarity, both Members (Marc Goldner and Eli Blatt) are fully vested with no redemption agreement in relation to GBI.

7) Units shall be divided into two classes: (a) "**Class A Voting Members**," and (b) "**Class B Non-Voting Members**." Each class will have distinct rights and obligations as follows:

| Member Class | Rights and Obligations |
|---|---|
| Class A | Class A Voting Members have full voting rights. |

8) The following is a list of the initial Members (the "**Initial Members**") of the Company and Units of membership interest of the Company:

| Member | Class and Units Issued |
|---|---|
| Eli M Blatt | 500,000 Class A Units (50% of all Issued Units) |
| Marc Goldner | 500,000 Class A Units (50% of all Issued Units) |

9) The following is a list Initial Members of the Company and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution | Value |
|---|---|---|
| Eli M Blatt | Cash | $1,000.00 |
| Marc Goldner | Cash | $1,000.00 |

## Confidentiality Contractor Agreement

10) All Members shall be required to execute that certain **Confidentiality Agreement**, a copy of which is attached hereto as Exhibit A. In addition to the foregoing, any and all owners, principals, officers, directors, managers, members, or affiliates of each Member (each, along with the Members, a "Member Affiliate") shall also execute the Confidentiality Agreement.

## Allocation and Distribution of Profits/Losses

11) Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will be allocated between all Class A Members in accordance with their percentage interest in the Company or individual Series as determined by their respective percentage of Issued Units therein. For the Initial Members in the Master Series, Net Profits and Losses shall be allocated in the following manner:

| Member | Profit and Loss Percentage |
|---|---|
| Eli M Blatt | 50% |

NOT A CERTIFIED COPY

| Marc Goldner | 50% |
|---|---|

12) Cash Distributions to Class A Members will be made in the same fixed proportions as the allocation of Net Profits or Losses described above. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

13) The Company shall make distributions of profit monthly, retaining an operating account reserve as agreed by a unanimous vote of Class A Members, however in no case shall this reserve be lower than $1,000. If a unanimous vote can't be reached on the operating account's cash reserves, then the entire cash reserves shall be evenly distributed between the Class A Members, leaving no less than $1,000 in reserve.

14) Series Interests and Series.

a) The Members shall cause the Company to issue Interests in one or more separate and distinct series (each, a "Series"), with each such Series including but not limited to establishing such Series to make separate Investments, portfolio of Investments, business ventures, or other types of business deals such as brokering, being an intermediary, or anything else relating to the Company Purpose. The Members may establish a Series for the purpose of (1) making Investments in specific and distinct companies identified by the Members, (2) making Investments in specific and distinct assets identified by the Members (such as Collectibles, Real Estate, Cryptocurrencies, Crytpoassets, NFTs, Pre-IPO Shares, or otherwise) (3) to purchase securities in such companies from secondary sources, or (4) to invest in interests of investment funds, special purpose vehicles or other Entities consistent with the Company's investment focus, which such Series will be segregated from each other which shall exclude MegaCap's securities (for clarity, the Company will invest in all early stage companies together that are under $250,000,000 as to not compete with MegaCap, as well as all types of securities under or over $250,000,000 that aren't defined by MegaCap's scope such as raising debt for publicly traded companies).any purpose on which the Members agree. The Members may use its commercially reasonable efforts to have assets and/or securities purchased by a particular Series be issued for the benefit of such particular Series to which they are allocated. For illustrative purposes only, if Masterworks doesn't allow Marc to transfer his ownership of a fractional piece of a painting, he has partially purchased to the GBI entity then Eli would have a choice to either allow Marc to keep it in his name and then pay out once it is liquidated or Marc may just choose another asset at his decision. Otherwise, a side letter can be issued by the owner of the asset and that side letter becomes an asset of the Company. Members of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to share in the profits, losses, allocations or distributions of any other Series of which they are not a Member. A creation of such Series must be unanimously agreed upon by all Class A Members.

b) Each Series so established shall be set forth on Schedule A (which is an external spread sheet that will be created upon signing of this Agreement) to this Agreement, and Schedule A will be updated by the Managers from time to time in connection with the establishment of one or more additional Series. Subject to such limitations as may be set forth in this Agreement, the Members

shall establish and may modify the investment objective and policies of each Series and all other rights and features thereof.

i)   Interests of each Series shall have the following relative rights and preferences:

   (1) Assets Held with Respect to a Particular Series. All Capital Contributions made to the Company with respect to a particular Series, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Series for all purposes, subject only to the rights of creditors of such Series, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Series, are herein referred to as "assets held with respect to" that Series. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Series (collectively "General Assets"), the Members shall allocate such General Assets to, between or among any one or more of the Series' in such manner and on such basis as the Members, in its sole discretion, deems fair and equitable, and any General Assets so allocated to a particular Series shall be assets held with respect to that Series. Each such allocation by the Members shall be conclusive and binding upon Members of all Series for all purposes.

   (2) Liabilities Attributable to a Particular Series. The assets of the Company held with respect to each particular Series shall be charged with all liabilities, expenses, costs, charges and reserves attributable to that Series. All such liabilities, expenses, costs, charges, and reserves so charged to a Series are herein referred to as "liabilities attributable to" that Series. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Series ("General Liabilities") shall be allocated and charged by a unanimous vote by the Class A Members to, between or among any one or more of the Series in such manner and on such basis as the Members, in their sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Series shall be liabilities attributable to that Series. Each such allocation of liabilities, expenses, costs, charges and reserves by the Members shall be conclusive and binding upon Members of all Series for all purposes. The liabilities attributable to any Series shall be enforceable against the assets of such Series only, and not against the General Assets, or the assets of any other Series. All Persons, including any Affiliates of the Members, who have extended credit that has been allocated to a particular Series, or who have a claim or contract that has been allocated to any particular Series, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Series for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship

ii)   In the event any Series files for Bankruptcy, it shall in no way impact the assets and/or obligations of any of the other Series including but not limited to the Master Series.

## Withdrawal of Contribution

15) No Member will withdraw any portion of their Capital Contribution or any assets, property, and/or investments without the unanimous consent of the Class A Voting Members.

## Additional Contributions

16) Capital Contributions may be amended from time to time, according to the business needs of the Company by a unanimous vote of the Class A Voting Members.

17) Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by the Class A Voting Members, voting unanimously. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

## Capital Accounts

18) An individual capital account (the "**Capital Account**") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

## Interest on Capital

19) No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

## Management

20) The Class A Voting Members shall have the sole authority to appoint a manager of the Company (individually the "**Manager**" and collectively the "**Managers**") if unanimously agreed upon. Management of the Company is vested in the following Managers until such time as they are removed by the Class A Voting Members or withdraw from the position:

   a) Eli M Blatt, Managing Partner
   b) Marc Goldner, Managing Partner
      i) For avoidance of doubt, both Eli Blatt and Marc Goldner are the two Managers of the Company as well as the only two Class A voting managing members of the Company. The only way to add a new Manager to the company is if both Eli and Marc unanimously agree signed in writing to appoint a new Manager and/or a new Class A, Class B, or Class C member of the Company.

21) The duties and responsibilities of the Managers will include the following:

a) Managers will supervise the day-to-day operations of the Company including supervising sales and production staff and maintaining financial accounts.

22) Notwithstanding any other provisions contained in the Certificate of Formation or this Agreement, each of the Managers is empowered to bind the Company for any and all decisions except Major Decisions. A unanimous vote of the Class A Voting Members shall be required for all Major Decisions. Such votes may be accomplished via electronic mail, WhatsApp, or any other written medium upon which the Class A Voting Members unanimously agree. For purposes of this Agreement, "**Major Decisions**" are the following:

a) Incur debt, expend funds, write checks, pay bills, or enter into contracts, or otherwise obligate the Company for any amount in excess of $5,000 per calendar year.

b) Negotiate or agree to an accounts payables/receivables payment schedule.

c) Establish credit lines and the use of such credit lines.

d) The sale or dissolution of the Company or its assets.

e) Issuance of additional member or shareholder interests.

f) Scheduling repayment of any capital contributions from any Member.

g) Selling, leasing, or encumbering any property owned by the Company.

h) Scheduling repayment of any loans from Members.

i) Changing or amending this Agreement or approving any action or resolution that would alter the terms of this Agreement.

j) Appointment or removal of a Manager which shall require a unanimous vote and be signed in writing by all Class A Members excluding the Member being removed. For clarity, Marc Goldner and Eli Blatt cannot be removed under any circumstances.

k) Addition, withdrawal, appointment, or removal of a Member. For clarity, Marc Goldner and Eli Blatt cannot be removed under any circumstances.

l) Amending the duties and responsibilities of any Manager.

m) Any changes to the Company Name, branding imagery, and public relations positioning.

n) Adjustments to the compensation of any Member, Manager, Employee, or contractor.

o) Payment of any distributions or other compensation to any Member.

p) Registering the company with any regulatory or governmental agency.

q) Creation of an additional Series within the Goldner Blatt Investments LLC umbrella. For avoidance of doubt, any Series created for any entities for Goldner Blatt Investments will be approved by all Class A Members in writing.

r) Determination of each Series equity.

s) Each Series investment objective and policies will be defined by the Managers and shall be unanimously approved by all Class A Members signed in writing.

t) No manager shall move any "General Assets" to any Series without unanimous approval by all Class A Members.

u) No Class A Members shall take on personal liability or personal obligations of Goldner Blatt Investments LLC unless expressly approved and unanimously approved by all Class A Voting Members.

v) Taking any investment from outsiders must be unanimously approved by all Class A Voting Members.

w) Any change in control must be unanimously approved by all Class A Members.

x) Giving any equity and/or cash distributions must be unanimously approved by all Class A Members.

y) No other Class A members except Marc Goldner and Eli Blatt will be added as Class A Members unless unanimously approved by Marc and Eli.

23) A new Manager may be added to the Company with a unanimous vote of the Class A Voting Members.

24) A Manager will be reimbursed for reasonable expenses directly related to the operation of the Company and approved, in advance, by a unanimous vote of the Class A Voting Members (voting as a separate class). However, these reasonable expenses, shall not exceed $5,000 per calendar year unless otherwise approved in writing by a unanimous vote of the Class A Members.

25) The Members will be consulted and the advice and opinions of the Members will be obtained as much as is practicable. However, subject to Section 21 above and outlined in Section 22, the Managers will have management and control of the day-to-day business of the Company for the purposes stated in this Agreement. All matters outside the day-to-day business of the Company will be decided by the Class A Voting Members (voting as a separate class) as outlined elsewhere in this Agreement.

26) In addition to day-to-day management tasks and any other duties and responsibilities already identified in this Agreement, the Managers' duties will include keeping, or causing to be kept, full and accurate business records for the Company according to generally accepted accounting principles (GAAP), and overseeing the preparation of any reports considered reasonably necessary to keep the Class A Voting Members informed of the business performance of the Company.

27) A Manager will not be liable to the Members for any action or failure to act resulting in loss or harm to the Company except in the case of gross negligence or willful misconduct. It will not be considered to be gross negligence or willful misconduct if one of the Managing Members chooses to invest in a risky asset such as a volatile cryptocurrency token they believe could have a high reward.

28) Each Member will devote such time and attention to the business of the Company as required to carry out their duties and responsibilities for the conduct of the Company's business.

**Authority to Bind Company**

29) Only the Manager(s) have the authority to enter into contracts on behalf of the Company.

**Duty of Loyalty**

30) While a person is a Member or Manager of the Company, and for a period of at least three years after that person ceases to be a Member or Manager, that person will not carry on, or participate in, a business involved in the issuance or transacting of securities in any market regions that were established or contemplated by the Company before or during that person's tenure as Member or Manager. In the event of termination, if either member independently works in the FinTech, Finance, or Crypto Worlds, 10% of their equity, distributions, and proceeds are given to the non-involved Managing Member. Until a Member gives notice that they wish to terminate future applicability of their participation towards the purpose as defined in Section 3 (Purpose), and pursuant to Section 53 (Termination), the Members agree to be bound by the terms of this agreement.

   a) There will be a standard duty of care that is held by each of the Managing Members.

**Duty to Devote Time**

31) Each Member will devote such time and attention to the business of the Company as best as they can in good faith. It is important to note that while one day Marc may be working on Dharma, Eli may be working on BitSource, and that is a primary consideration of this Agreement that they are sharing in their collective work across different companies as time from one person is devoted to one company then time from another person is devoted to a different company to increase their collective likelihood of shared success. Eli's investments managing his and his family's personal investments and Marc's work with Golden Bell and Marc and his family's personal investments shall not be considered a breach of this provision.

**Member Meetings**

32) A meeting may be called by any Class A Voting Member providing that reasonable written notice has been given to the other Members.

**Voting**

33) Each of the Class A Voting Members shall have one vote for each Unit owned by such Class A Voting Member.

**Admission of New Members**

34) A new Member may only be admitted to the Company with a unanimous vote of the Class A Voting Members.

35) No new Class A member shall be admitted as a Member of the Company until such new Member becomes a party to this Agreement, as amended, and agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to effect the admission of the new Member as determined by a supermajority business interest in the Company as determined by a unanimous consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

## Voluntary Withdrawal of a Member

36) The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

37) However, a voluntary withdrawal of any Member will still make that Member responsible for the Terms, Termination, and Mutual Contacts provisions below in Section 53 of this Operating Agreement in terms of monies, equity, distributions, and/or contributions owed to GBI or one of the other Managing Members.

## Dissociation of a Member

38) In the event of a voluntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.
   a) A voluntary withdrawal may only be made after 3 years from the date of the signing of this Operating Agreement.

39) A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

40) Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 60 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company. In the event that the non-disassociated Member is unable to buy-out the disassociating member, then the disassociated Member will be paid what is owed to the disassociating member as liquidity events happen with no interest due to that disassociating member.

41) A member may not wrongfully disassociate from the Company. A wrongful disassociation will not rid that dissociated member from liability. For instance, a Managing Member may not disassociate from the business for sheer self gain in the sense that they have another opportunity to go work in a directly competing business under different terms or a larger pay out that would put the non-disassociating member at an inequitable juncture which would put them in a worse off economic situation. The previous example is not the only example of wrongful disassociation.

## Sale, Transfer, or Assignment of a Member's Interest; Drag-Along

42) No Member may sell, transfer or assign any of such Member's Interest, including, but not limited to, any Units owned by such Member, without the unanimous written consent of the Class A Voting Members. Where a Member's financial interest in the Company is assigned to another party who is not an existing Member, that party will be considered a New Member and their Class of Units will be determined unanimously by the current voting Class A Members signed in writing. An assignment of full membership status inclusive of all duties, obligations, and rights held by the previous Member will be governed by the conditions described under the Admission of New Members section of this Agreement.

43) **Drag-Along Rights.** In the event that the Class A Voting Members receive a bona fide offer from an independent third party purchaser to purchase (including by merger) all of the outstanding Units or all or a substantial portion of the assets of the Company, the Class A Voting Members may send written notice (the **"Drag-Along Notice"**) to the Company and the remaining Class B Members (the **"Class B Members"**) notifying them they will be required to sell all of their Units in such sale. Upon receipt of a Drag-Along Notice, each Class B Member receiving such notice shall be obligated to (a) sell all of the Class B Member's Units contemplated by the Drag-Along Notice on the same terms and conditions as the Class A Voting Members; and (b) otherwise take all necessary action to cause the consummation of such transaction. Each Class B Member further agrees to (a) take all actions (including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by the Class A Members; (b) waive all applicable appraisal rights, if any, under the laws of the State of Delaware; and (c) appoint the Class A Members as the Class B Member's attorney-in-fact to do the same on its behalf. Notwithstanding the foregoing, no Class B Member may sell or assign such Member's Units, in whole or in part, under this Section without the express prior written approval and consent of a Supermajority of Class A Voting Members.

## Right of First Purchase

44) In the event that a Member's Interest in the Company is or will be sold, due to any reason other than as said forth in section 43 (Drag-Along Rights) above, the remaining Members will have a right of first purchase of that Member's Interest, property, assets, or investments. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

45) In the event that a Member's interest in the company is transferred or assigned as the result of a court order or operation of law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

NOT A CERTIFIED COPY

## Valuation of Interest

46) In the event of a sale of all or substantially all of the Units and/or assets of the Company, a Member's financial interest in the Company will be based in the percentage of Units owned in proportion to all of the issued and outstanding Units of the Company at the time of such sale.

47) In the absence of a written agreement setting a value, the value of the Company will be based on an appraisal of the fair market value of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members to be retained within a reasonable period of the event giving rise to the disposition of a Member's interest. The results of the appraisal will be binding on all Members. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member.

48) No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

## Dissolution

49) The Company may be dissolved by a unanimous vote of the Class A Voting Members. Further, the Class A Members agree to sign Exhibit B (NCNDA) to not Circumvent each other.

50) Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, as well as any other outstanding liabilities, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

   a) First, to the Class A Members on a 50/50 basis in the amount of their capital contribution, valued properties, valued investments, and valued assets;

      A. Second, to all of the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement in satisfaction of Company debt obligations to current Members;

   b) Third, to the satisfaction of liabilities to unsecured creditors except Company obligations to current Class A Members up to the amount of their Capital Contributions;

   c) Fourth, to the Class B Members up to the amount of their Capital Contributions.

51) In the event of a death of a Member, the deceased Member's heirs and/or family or assigns (through a will or otherwise) will gain the deceased Member's ownership interest, equity, and assets of the Company.

52) In the event the laws change and creditors or UCC-1 Holders must be paid out before any of the above mentioned payouts such as Class A Members being paid out first than this Dissolution section will be revised to be compliant with all current laws in the State of Delaware.

**Term, Termination, and Mutual Contacts Definition**

53) The future applicability of Section 3 (Purpose) of this Agreement may be terminated by either party with written notice, subject to the below provisions. If it is not so terminated by either party, the Agreement shall remain in effect in perpetuity. Neither party may terminate this Agreement for a minimum of 3 years from the date of signing this Agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets. Nor shall such termination effect and/or impact either Party's interests in GBI whether relating to assets, equity, ownership, interest, stake, property, long term and/or short-term investments, or otherwise. In the event of a termination the following shall apply:

a) Any mutual contacts even after termination shall be categorized into the following 'Tiers':

   i) 1st Degree – For example, David, David is a shared contact and will remain at 10% perpetually for each Managing Member. Thus, even the Managing Members agree to walk away, any deals they conduct independently from one another, the deal maker will always owe 10% in perpetuity to the other Managing Member. For illustrative purposes only, if Marc does a deal with David 10 years after terminating, then Marc will still owe Eli 10% for any deals Marc does with David.

   ii) 2nd Degree – For example, if David introduces one of the Managing Members to a third party Joe (after the termination) then that contact will remain at 5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Joe in this case, shall be considered a 1st Degree mutual contact of the Parties).

   iii) 3rd Degree – For example, if Joe introduces one of the Managing Members to a third party Sam (after the termination) then that contact will remain at 7.5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Sam in this case, shall be considered a 1st Degree mutual contact of the Parties).

   iv) 4th Degree – For example, if Sam introduces one of the Managing Members to a third party Jack (after the termination) then that contact will remain at 5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Jack in this case, shall be considered a 1st Degree mutual contact of the Parties).

   v) 5th Degree – For example, if Jack introduces one of the Managing Members to a third party Tom (after the termination) then that contact will remain at 2.5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Tom in this case, shall be considered a 1st Degree mutual contact of the Parties).

vi) 6th Degree+ and after – For example, if Tom introduces one of the Managing Members to a third party Billy (after the termination) then that contact will remain at 1% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Billy in this case, shall be considered a 1st Degree mutual contact of the Parties).

vii) For any degrees after the sixth degree, that contact shall remain in perpetuity at 1% due to the other Managing Member that is not part of the deal as long as that contact can be traced back to an origin of one of the degrees (sources of origination) listed above. (However, if that Party is introduced during the scope of this Agreement than that third party shall be considered a 1st Degree mutual contact of the Parties).

b) Mutual contacts are defined as the following:

i) Alex from Visionary and anyone he introduces us to from the Visionary Network (including but not limited to Andra, Mindrock, Pavel, Barry Dorfman, Idan, Michael, Jeff, Esther, Nick, Orka, Artemis, Unicorns, etc.)
ii) Maxwell, Cole, and DJ
iii) David Ruttenberg, RGI, Johnny Gordon, and anyone else from RGI
iv) Fahad
v) Anyone that is met going forward from the point of starting MegaCap and going forward will be deemed Mutual Contacts
vi) Anyone from TRIUM (whether it is our class of 2022 or any other previous or future cohorts), as well as anyone we are introduced to through the TRIUM network
vii) All professors from TRIUM
viii) Anyone from the Wall Street Investors Conference (i.e. David Goodboy)
ix) Anyone from the Bitcoin Conference (i.e. Daniel the Cryptominer introduced from Cole)
x) Anyone from the Underground Crytpo talk (excluding Brock Pierce and Adrian for example which are Eli's Solo Contacts from Prior to this Agreement but do include people like David Namdar)
xi) Anyone from any conventions, tradeshow, and/or event (excluding Entertainment and Media events, conventions, and tradeshows) that is met shall be considered a mutual contact.
xii) LinkedIn and Facebook and other social media contacts PRIOR to the start of this operating agreement shall be considered non-mutual contacts. Social Media contacts AFTER the start of this agreement shall be considered mutual contacts.

c) Anyone a Member knew before the start of TRIUM are that Managing Member's own contacts and are not considered to be mutual contacts. However, anyone that that non-mutual contact introduces one of the Managing Members to shall become considered a mutual contact after signing of this Agreement (unless one of Marc's solo existing contacts introduces someone to him specifically and only for Golden Bell purposes) however, if one of the Managing Member's mutual contacts or one of Eli's contacts introduces Marc to a new contact for Golden Bell purposes then the above 1st degree shall apply in terms of house splits and 'kickbacks'.

i)   The same fee structure will apply to Emily Rhen in a side letter deal made with Eli Blatt whereas if one of the Managing Member's mutual contacts is used or utilized by Emily for personal gain or otherwise (i.e., for raising money for a fund, receiving front end on a fund for example, receiving a carry from a fund she is working in that includes any mutual contacts, etc.) then the above 1st degree shall apply in terms of house splits and 'kickbacks' except that the 10% would go Marc Goldner not to GBI. Eli will do his best efforts to have Emily sign an NCNDA with each of the businesses.

d)   Non Mutual Contacts are as follows (minor misspellings may have occurred in this section below):

i)   Marc solo contacts (non-mutual contacts): Ludwig Kuttner and Trixie, Oliver Kuttner, Susan Kreischel, Hampshire Investments Paul Wasserman, Paul Sanar, Justin Miller, Shashi Matta, Robert Wilder, Joe Testa, Shylesh, Sarmen Saryan, Nicole Santiago, Ted Ovtavius Reid, Chris Ramonetti, Express Trade Capital, Drew Cohen, David Estrakh from Express Trade, Mark Bienstock, Ethan founder of Events.com, Mark Peters, anyone from Semester at Sea, Marc's professors from Penn including but not limited to Igor, Marc's Professor from OSU including but not limited to and anyone in the Entertainment industry including but not limited to Rod Reiner, Doobry, Arya Zand, Simon Divilov, Christian Ternstedt, Christian Von Uffel and his father, Rachel Korsen, Robert Gross, Tom and Abigail Shewalter, Eric Goldner, Raymonde Goldner, Robert Goldner, the Levy family, Solon, Zach Honig, Mike Fattoulah, Robert Garson, Robert Cohen, Michael Schwab, Alex Corey, Daniel Engel, Ken Erickson, Glenn eric's friend, John Delia, Alonso, Adam Doyle, Rexford Brabson, Andy Nitkin, Carl Toy Sales Rep (not from Late Stage), Aarush, Chris Craddock, David Garces, Charles and Daniel Greenberg, Sean Acosta, Seth Godnick, anyone from Roslyn High School, John Rosenberg, Dan Jablons, anyone from the Mamieh Family, The Safra Family, members from the ABA and CBA and NYBA, the Weiner family, Angel May, Gang Li, Daniel Niamehr, Scott and Jared and Jordan and Barbara and Chad Bleznick, Michael Kushner, Harvey and Stephen Davis, Cheryl Davis Korsen, Matthew Korsen, Kroze, Konstantin Divilov, Stephan Winkelmann, David Blake, Christopher Costa, employees and board members of The International Spy Museum, Steven Raskind,  Sarah Ebad, any of Marc's Professors from Columbia, any of Marc's Professors from UConn Law, Ezelle and Quintin and Ally Van Der Heever, Craig Miller, Merchant Factors, Gary Vaynerchuk, Alan Rosenberg, Carlos from UPenn, any of Marc's classmates from UPenn Columbia and UConn Law, Abdou Sylla, Rodny from Roslyn, Liel from Israel, Josh Elder, Orit Golos, Simon Moskowitz, all cohort mates from JGSI, all cohortmates from ISEF, all cohortmates from Penn Law's Human Rights Program, Ndidi Moses, Jordan Meiselas and the meisalas family, Shota Nakama composer of Final Fantasy, Ruth from Sony, Rashid Chotani, the Schneck family, the Shottenstein family, the Wexner family, the Freleng family, Jordan Urbach, Karen Booth, all members from Columbus Computer Consulting, Rob from Charlottesville, Rob Smith, Ben Abelson, Brad Okeson, Cleve Adams, Steven Astrein, Ben Oheb, Ben Shoshan, Kevin Cai, Seunghoon Cha, Winsum in China, Steven from China, Linxaio, Michael Chang, Abhinav Chaturvedi, Richie Chen, Zachary Cohen, Giuseppe Maria de Peppo, Mariana Donagelo, Jean-Phillippe Emelie Marcos, David Fisher, Stuary Foley, Geremy Grunin, Gian-Luca Cioletti, Angel Iribozov, Matthew Levenberg, Jay Maybruck, Piyuush Mehta, Abhijeet Muzumdar, Zoria Ospina, Iris Perl, Thomaz Quintella, John Ricci of US Angel Investors, Lawrence Richnstein, Mayer Rosenzweig, Renata Scavassa Dearo, Michael Schneck, Richard Sergay, Tarang Shah, Mateus Tessler, Peter Valhouli-Farb, members from the Entertainment Law Las Vegas Conference, Harris Cohn, Pam Kaufman,

NOT A CERTIFIED COPY

Charlie Talbot, James Vena, John Deming, Jordan from Viacom, EdTech Week's Education Entrepreneurs Investors, Bill Teitelvaum, Ray Kurzweil, Aubrey Degrey, Michiu Kaku, the Roddenbery Family, Brian Greene, Charlottesville Angels, and anyone affiliated involved and/or related to any of the Golden Bell entities whether in business art design or otherwise.

    ii) Eli's non-exhaustive list of solo contacts (non-mutual contacts): Eli Broverman, Adam Krim, all professors or classmates Eli had at Stanford, all Professors or classmates Eli had at Brown, Eli's mom, Eli's dad, Wayaca, anyone from Eli's High School, Andrew Marcus, Adrian Baschuk, Matt Caps, Jeff Laretto, Jeff Crutenden from Acorns, Brock Pierce, Ralph Serrano, Joel Dietz, anyone from Eli's BitFinance or prior companies as per emails, texts or LinkedIn.

e) If both Eli and Marc agree a contact of that partner can become a mutual contact if agreed if both parties decided to make a solo contact a mutual contact in exchange. i.e. Trade Ludwig for Broverman but that is a case by case basis or deal by deal basis.

f) There will be a specific exception given to Marc Goldner in the case of Intelligence, Espionage, Contractor, and Security contacts that either Marc knew before or will meet after the signing of this Agreement. Under no circumstance will any intelligence agents be disclosed to Eli Blatt by Marc Goldner, nor will any military (either public or private), spies, intelligence agents, military contractors. However, if a deal is brokered by Marc Goldner such as a deal with a private military contractor that deal will still be split 50/50 if it is for business purposes from a mutual contact (i.e. if MegaCap is acting as a Broker Dealer for a transaction that Marc is bringing to the table then Marc will also use MegaCap as the Broker Dealer of question but there will be redacted names and non-disclosures that prevent Eli knowing who the parties in question are unless Eli winds up being given a security clearance, authorization from that party, or is recruited by a contractor or intelligence agency). However, it is acknowledged by the parties that Marc may conduct business-like activities for the sake of national security, by any direct government orders and/or mandates, or for any missions by any given contractor or intelligence agency. For avoidance of doubt, Marc Goldner's existing and future contacts relating to people in the Intelligence, Espionage, Contractor, and/or Security industries will not be considered mutual contacts unless it is for a direct business purpose such as dealing data or utilizing Marc and Eli's Broker Dealer of choice at the time if a Broker Dealer is needed for a transaction that Marc is working on with those said 'agents'. This may also apply to G42 in Abu Dhabi or companies like Palantir, In-Q-Tel, or other third party intelligence-related companies working on classified projects or has access to sensitive data. If Marc does any third party consulting in these industries he will not disclose it to Eli.

    i) For avoidance of doubt, Paragraph F's (above) contacts do not need to be disclosed but any financial deals from those contacts must be split between Marc Goldner and Eli Blatt 50/50.

## Records

54) The Company will at all times maintain accurate records of the following:

    A. Information regarding the status of the business and the financial condition of the Company.

B. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.

C. Name and last known business, residential, or mailing address of each Member and Manager, as well as the date that person became a Member or Manager.

D. A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement and any amendments have been executed.

E. The cash, property, and services contributed to the Company by each Member, along with a description and value thereof.

55) Each of the Class A Voting Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

56) Each Manager has the right to examine the above documents for any purpose reasonably related to their position as Manager of the Company.

## Books of Account

57) Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any of the Class A Voting Members. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

## Banking and Company Funds

58) The funds of the Company will be placed in such investments and banking accounts as will be designated by the unanimous vote of all Class A Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by unanimous consent of the Class A Voting Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

## Audit

59) Any of the Class A Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Class A member requesting the Audit. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Class A Voting Members for any fiscal year.

## Tax Treatment

60) The Company is intended to be treated as an S-Corp for the purposes of Federal and State Income Tax.

## Annual Report

61) As soon as practicable after the close of each fiscal year, the Company will furnish to each Class A Voting Member an annual report showing a full and complete account of the condition of the Company, including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

   a) A copy of the Company's federal income tax returns for that fiscal year.
   b) Income statement.
   c) Balance sheet.
   d) Cash flow statement.
   e) A breakdown of the profit and loss attributable to each Member.

## Goodwill

62) The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## Force Majeure

63) A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to an event of force majeure, such as earthquake, typhoon, flood, fire, pandemic, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

## Forbidden Acts

64) No Member may do any act in contravention of this Agreement or prevailing law.

65) No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company unless such party is Managed and/or owned by one of the Members or is a family member, spouse, or significant other of a Managing Member. However, such assignment can only be for that Member's individual interest in that specific asset (including but not limited to the entire portion of the Member's interest in the Company) but the Voting Rights cannot be assigned and will remain the exclusive rights of the Managing Members. However, if one of the Class A members has signed a Power of Attorney or provided a third party with Agency to vote as a proxy where the vote is still the vote of the Managing Member in any manner than that shall not be considered a forbidden act and that third party vote will be considered the vote of the Class A member.

66) No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

67) No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

68) No Member may confess a judgment against the Company.

71. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members. However it is clear that this will be handled through a mediation process and that neither Marc or Eli will be involuntarily removed as this is for any third party members who are not Marc and Eli. For avoidance of doubt, no assets owned by Marc or Eli will become the property of the other regardless of any disassociation or removal without an equal split being applied to the value of those assets. No such Involuntary Withdrawal shall clawback any equity to the non-disassociated member.

## Indemnification

69) All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature whatsoever, arising out of a Member's participation in Company affairs pursuant to this Agreement. A Member will not be entitled to indemnification under this section for liability arising out of negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

## Liability

70) A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

## Liability Insurance

71) The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

## Life Insurance

72) The Company will have the right to acquire life insurance on the lives of any or all of the Members if unanimously agreed by the Class A voting members.

## Amendment of this Agreement

73) No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all of the Class A Voting Members.

**Title to Company Property**

74) Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member.

**Dispute Resolution**

75) Dispute Resolution . Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this Section. The initiation and pendency of the procedures under this Section does not relieve the Parties from their respective obligations under the Agreement. ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS SECTION SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

    A. Negotiations by and between the Parties.

    (1) Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail. Within thirty (30) days after receiving such notice the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

    (2) Upon the Disputing Party's receipt of the Responding Parties' response, the Parties shall then have thirty (30) days, or such other time as they may mutually agree upon in writing, to resolve the Dispute amongst themselves.

    B. Mediation.

    If the Parties are not able to resolve a Dispute pursuant to subsection (A) above, they agree to participate in at least five (5) full length business days of good faith mediation administered by the American Arbitration Association under its Commercial Mediation Procedures.

    C. If the Parties are not able to resolve a Dispute pursuant to subsections (A) and (B) above, the Dispute shall finally be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Nothing herein shall limit the right of any Party to seek interim or provisional equitable relief in a court of competent jurisdiction prior to or pending the conclusion of the arbitration. Any Arbitration shall take place virtually unless the parties agree on a physical location. The arbitrator shall apply the law of the State of Delaware without regard to conflicts of law principles. No demand for arbitration may be made after the date when the institution of legal or equitable

proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

76)    Equitable Remedies. The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement. The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware. For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of forum non conveniens.

77) Waiver of Certain Rights . AS A MATERIAL INDUCEMENT TO EACH MEMBER TO ENTER INTO THIS AGREEMENT, EACH MEMBER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO MAINTAIN ANY ACTION FOR DISSOLUTION OF THE COMPANY OR FOR PARTITION OF PROPERTY UNDER THE ACT. IN ADDITION, THE MEMBERS AGREE THAT THIS AGREEMENT HAS BEEN CAREFULLY DRAFTED TO PROVIDE FAIR TREATMENT OF ALL MEMBERS AND PARTICULARLY IN RESPECT OF EQUITABLE PAYMENT IN LIQUIDATION TO HOLDERS OF ECONOMIC INTERESTS. ACCORDINGLY, EXCEPT WHERE AND ONLY IF THE MANAGER OR LIQUIDATOR, AS THE CASE MAY BE, HAS FAILED TO LIQUIDATE THE COMPANY IN A REASONABLY TIMELY MANNER AS REQUIRED UNDER THIS AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES AND RENOUNCES ITS RIGHT TO INITIATE A LEGAL ACTION OR OTHER CLAIM TO SEEK THE APPOINTMENT OF A RECEIVER OR TRUSTEE TO LIQUIDATE THE COMPANY.

78) No Waiver. A Person's waiver of or consent to, express or implied, any breach or default by any Person as to the performance by such Person's obligations with respect to the Company, shall not constitute a waiver of or consent to any other breach or default by such other Person of the same or any other obligations with respect to the Company. Failure on the part of a Person to complain, provide notice of, or object to any action or inaction of any Person, or to declare any Person in breach or default with respect to the Company, irrespective of how long such failure continues, shall not constitute a waiver by such Person of its rights with respect to such breach or default, until the applicable statute of limitations period has run.

79) Binding Effect. Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective Personal Representatives, successors and permitted assigns.

80) Parties in Interest. Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective Personal Representatives, successors and permitted assigns, and nothing in this Agreement shall be construed to relieve or discharge the obligation or liability of any

Person to any party to this Agreement, or to provide any Person any right of subrogation or action over or against any party to this Agreement.

81) Prevailing Terms . In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

82) Severability. If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances.

83) Further Assurances . In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

84) Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all signing parties hereto had signed the same document. All counterparts shall be construed together and constitute the same instrument. Signatures by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory and shall be deemed to be originals for all purposes. The Members acknowledge and agree that it may be executed electronically, and that the provisions of the Electronic Signatures in Global and National Commerce Act of 2000, 15 U.S.C. 7001 et al, as amended and in effect as of the Effective Date of this Agreement, shall apply.

85) Acknowledgment of Provisions . BY EXECUTING THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES THAT IT HAS ACTUAL NOTICE OF: (A) ALL OF THE PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTERESTS; AND (B) ALL OF THE PROVISIONS OF THE ARTICLES. EACH MEMBER HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES ADEQUATE NOTICE OF ALL SUCH PROVISIONS, AND EACH MEMBER HEREBY WAIVES ANY REQUIREMENT THAT ANY FURTHER NOTICE REQUIRED BY ANY PROVISION OF THE ACT OR APPLICABLE LAW.

## Miscellaneous

86) Time is of the essence in this Agreement.

87) Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

88) If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

89) This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matter hereof, and may not be modified or amended except by a written instrument executed by or on behalf of authorized representatives each of Party to this Agreement. However, any agreements between Marc Goldner and Eli Blatt still remain in effect such as any agreements pertaining to BitSource, MegaCap, or otherwise.

90) All notices or other communications relating to the performance, enforcement, or other legal aspects of this Security Agreement will be in writing and may be personally delivered, sent by overnight courier service to all parties, and delivered as a .pdf e-mail attachment to all parties. Any other communications between the parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to all parties.

91) All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

92) If there is ever a subpoena served to the Company, requested Discovery by any third party, or any other Compelled Court Disclosure, the Company shall file a motion to quash, claim privilege, and file a protective order on any subpoena or discovery requests made by any third party.

## Definitions

93) For the purpose of this Agreement, the following terms are defined as follows:

  a) "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

b) "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

c) "Distributions" means a payment of Company profits to the Members.

d) "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

e) "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, Member's rights to participate in the management of the Company, and any Units of membership interest in the Company owned by such Member.

f) "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

g) "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

h) "Principal Office" means the office whether inside or outside the State of Delaware where the executive or management of the Company maintain their primary office.

i) "Voting Members" means the Members who belong to a membership class that has voting power.

j) "Supermajority Vote" means a vote by Members representing no less than 60% of the Class A Voting Units.

SIGNED, SEALED, AND DELIVERED

**ELI M BLATT**

By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮          12 / 08 / 2021

**MARC GOLDNER**

By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮          12 / 08 / 2021

## EXHIBITS

| | |
|---|---|
| Exhibit A | Confidentiality Agreement |
| Exhibit B | Non-Circumvent Non-Disclosure Agreement |
| Exhibit C Incorporation | Incorporation Filings, Papers, IRS EIN Documents, and Articles of |
| Exhibit D | Entity Decks that are discussed in the Purpose of Company |

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered into on December 7, 2021 (the "Date") Effective by and between: (i) GOLDNBER BLATT INVESTMENTS LLC ("GOLDNER BLATT INVESTMENTS"); and (ii) Eli Blatt (the "Receiving Party"). GOLDNER BLATT INVESTMENTS and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for GOLDNER BLATT INVESTMENTS to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with GOLDNER BLATT INVESTMENTS (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by GOLDNER BLATT INVESTMENTS to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. For avoidance of doubt, Confidential Information shall include but not be limited to all business dealings, terms, and legal discussions including but not limited to Operating Agreements, PPMs, Subscription Agreements, Contracts, Term Sheets, any documents, any files, any messages, any recordings, any videos, any pictures, any emails, any texts, and any other legal type related documents or forms of documents communication which shall not be disclosed under any circumstances. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) GOLDNER BLATT INVESTMENTS releases without restriction to a party other than the Receiving Party; or (e) GOLDNER BLATT INVESTMENTS authorizes the Receiving Party to disclose. In any action in which GOLDNER BLATT INVESTMENTS alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2. **Use of Confidential Information; Non-Disclosure Obligations**

2.1. Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party whether knowingly or unknowingly.

2.2. The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of GOLDNER BLATT INVESTMENTS and secure such other persons' written agreement, a copy of which shall be provided to GOLDNER BLATT INVESTMENTS, to abide by the terms herein. GOLDNER BLATT INVESTMENTS shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3. The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to GOLDNER BLATT INVESTMENTS. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4. The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5. **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.   **Compelled Disclosure**

The Receiving Party may not disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority. The Receiving Party, if requested by the other party and at their expense, shall file a motion to quash, claim privilege, and file a protective order on any subpoena or discovery requests made by any third party.

4.   **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of GOLDNER BLATT INVESTMENTS and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of GOLDNER BLATT INVESTMENTS.

5.   **Return of Confidential Information**

At the request of GOLDNER BLATT INVESTMENTS or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to GOLDNER BLATT INVESTMENTS. The Receiving Party shall also destroy (and certify such destruction in writing to GOLDNER BLATT INVESTMENTS any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

## 6.    Term, Termination, and Mutual Contacts Definition

The Term, Termination, and Mutual Contacts definition are defined in the Operating Agreement to which this document is an exhibit.

## 7.    Remedies

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of GOLDNER BLATT INVESTMENTS'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause GOLDNER BLATT INVESTMENTS irreparable harm, the amount of which may be difficult to ascertain, and that GOLDNER BLATT INVESTMENTS shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as GOLDNER BLATT INVESTMENTS shall deem appropriate. Such right of GOLDNER BLATT INVESTMENTS shall be in addition to the remedies otherwise available to GOLDNER BLATT INVESTMENTS at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

## 8.    Governing Law, Submission to Jurisdiction, and Consent to Suit

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.

## 9.    Entire Agreement

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

## 10.    Counterparts

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

## 11.   Severability

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

## 12.   Relationship of The Parties

This Agreement is an addendum to the Goldner Blatt Investments, LLC Operating Agreement where Marc and Eli are partners in that business.

## 13.   Assignments

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

## 14.   Waiver

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

## 15.   Notices/Points of Contact

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to GOLDNER BLATT INVESTMENTS:

      Address:       8 The Green Street, Suite A, Dover, DE 19901

      E-Mail:       partners@gb.investments

If to Eli Blatt                               :

      Address:    2020 N Bayshore Dr #2310 Miami FL 33137

      E-Mail:      e@gb.investments

If to Marc Goldner                        :

NOT A CERTIFIED COPY

Address:     15 Peacock Drive, Roslyn, NY 11576

E-Mail:      m@gb.investments

## 16.   <u>Headings Non-Substantive</u>

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**GOLDNER BLATT INVESTMENTS LLC**

By: _____

Name: Eli Blatt
Title:  Managing Member

Date: _12 / 08 / 2021_____

By: _____

Name: Marc Goldner
Title:  Managing Member

Date: _12 / 08 / 2021_____

**THE RECEIVING PARTIES**

_____

Marc Goldner

Date: _12 / 08 / 2021_____

_____

Eli M Blatt

Date: _12 / 08 / 2021_____

NOT A CERTIFIED COPY

## INVESTOR CONFIDENTIALITY AND NON-CIRCUMVENTION AGREEMENT

THIS Investor Confidentiality and Non-Circumvention Agreement (this "Agreement"), dated December 7, 2021 is entered by and between Goldner Blatt Investments, LLC (the "Company"), whose address is 8 The Green, Suite A, Dover DE 19901, Marc Goldner, and Eli Blatt (individually and jointly "Investor") (collectively, the "Parties" and each individually a "Party"):

WHEREAS, part of the Company's business is purchasing investment assets (the "Assets"), including, but not limited to, pre-IPO interests in private companies, investments in crypto, asset and property purchases, and general investments.

WHEREAS, Investor has, or is considering making an investment in the Company (the "Transaction") and to conduct a due diligence process with respect to a certain class of Assets the Company owns or intends to purchase (the "Purpose").

WHEREAS, the Parties have determined that they can best accomplish the Purpose by sharing certain Confidential Information (defined below) and the Company connecting Investor to certain of the Company's business contacts ("Company Contacts").

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Confidentiality.** Each Party receiving Confidential Information (defined below) shall be known as a Recipient, and each Party disclosing Confidential Information shall be known as a Disclosing Party:

   1. **Confidential Information.** "Confidential Information" means (a) the identity and information relating to or provided by any Company Contacts, and (b) all non-public, proprietary or confidential information of the Disclosing Party whether disclosed in oral, visual, written, electronic, or other tangible or intangible form, whether or not marked or designated as "confidential," and all notes, analyses, summaries, and other materials prepared by Recipient or any of its affiliates, officers, directors, employees, shareholders, partners, members, managers, or agents (collectively, "Representatives") that contain, are based on, or otherwise reflect, to any degree, any of the foregoing. Without limiting the foregoing, Confidential Information includes, but is not limited to: projected financial information, patents, trademarks, copyrights, ideas, trade secrets, trade dress, potential patents, schematics, frameworks, financing/investment structures, business models, business plans, products, pricing, product validation tests/clinical studies, commercialization plans/results, customers, vendors, financing sources, buyers, capitalization tables, shareholders, directors, employees, advisors, the occurrence of discussions among Recipient and Disclosing Party. For avoidance of doubt, Confidential Information shall include but not be limited to all business dealings, terms, and legal discussions including but not limited to Operating Agreements, PPMs, Subscription Agreements, Contracts, Term Sheets, any documents, any files, any messages, any recordings, any videos, any pictures, any emails, any texts, and any other legal type related documents or forms of documents communication which shall not be disclosed under any circumstances. Recipient agrees that all Confidential

Information constitutes private, privileged, valuable and proprietary assets of the Disclosing Party and that its unauthorized use or misuse would adversely affect the business and interests of the Disclosing Party. Except for the identity and information relating to any Company Contacts which is always considered Confidential Information, the term "Confidential Information" does not include information which can be demonstrated to (i) have previously become generally available to the public other than as a result of disclosure by Recipient or a source bound by a confidentiality agreement, or (ii) have been made available to Recipient on a non-confidential basis from a third party prior to its disclosure by the Disclosing Party, unless such source was bound by a confidentiality agreemen.

2.      **Limited Permitted Use.** Recipient agrees that the Confidential Information is disclosed for Recipient's sole use for the Transaction and is owned by the Disclosing Party. Conveyance of Confidential Information to the Recipient by the Disclosing Party or any Company Contact does not constitute a general release of, or license to use, such information. Recipient agrees not to use the Confidential Information for its own benefit or for the use or benefit of any other person or entity or for any reason other than for the Transaction. Recipient acknowledges that as the result of discussions relating to the Purpose, certain of the Disclosing Party's business opportunities will become known to Recipient. Recipient agrees that such opportunities belong to the Disclosing Party, and that Recipient will not misappropriate any such opportunity. All Confidential Information shall be destroyed or returned to Disclosing Party upon completion or abandonment of the Purpose.

3.      **No Unauthorized Disclosures.** Recipient agrees to protect all Confidential Information and not to duplicate or disclose any such information and materials to any person or entity except internally to its legal counsel and employees who have a need to know for furtherance of the Transaction. Recipient shall ensure that each such person has agreed to comply with these confidentiality provisions contained herein prior to the person receiving any Confidential Information. Recipient assumes responsibility for ensuring its Representatives' compliance with this Agreement and shall be liable for any unauthorized disclosure or use of the Confidential Information by its Representatives.

4.      **Company's Use**. Notwithstanding the foregoing, the Company may disclose to third parties or the public the Assets and the purchase price, market value, and sale price of the Assets purchased, held, and sold by the Company, but will not disclose the name of Investor, or that Investor is considering making an investment in Company, without Investor's prior consent.

2.    **No Representations and Warranties**. The Disclosing Party provides all Confidential Information without any representation or warranty, expressed or implied, as to the accuracy or completeness thereof, and the Disclosing Party shall have no liability to Recipient or any other person or entity relating to Recipient's use of any of the Confidential Information or any errors therein or omissions therefrom. Further, the Company makes no representation or warranty, expressed or implied, as to the accuracy or completeness of any information provided to Investor by a Company Contact ("Contact Provided Information"), and the Company shall have no liability to Investor with respect Contact

Provided Information, or any errors therein or omissions therefrom, or resulting from Investors use thereof.

3.  **Non-Circumvention**. Investor shall not, directly or indirectly, except in collaboration with or with the express written consent of the Company: (a) enter into any transaction for the purchase or sale of Assets with a Company Contact or enter into any transaction with a Company Contact similar to, in competition with, or which otherwise could have the effect of preventing the Company from receiving the full benefits of the transactions contemplated by the Purpose, (b) contact any Company Contact or any individuals or entities that are associated with a Company Contact except for contacting Company Contacts with whom Investor had a pre-existing relationship provided that such contact is not related to the Purpose and is not otherwise intended to or results in a circumvention of this Agreement, (c) solicit a Company Contact to enter into a transaction for the purchase or sale of Assets without the knowledge and prior consent of the Company, (d) use any Confidential Information to its own benefit or advantage or to the exclusion of the Company, or (e) induce, solicit, procure, or otherwise encourage any of the Investor's Representatives or any other person or entity to respond to any solicitation from a Company Contact to enter into a purchase or sale of Assets, or take any other action in contravention of this Agreement. Investor acknowledges that the Company has devoted substantial time and resources to develop relationships with Company Contacts ("Relationships") that will assist the Parties in accomplishing the Transaction and the Purpose, and that the Relationships constitute valuable, special, and proprietary assets of the Company, and that circumvention by Investor of the terms of this Agreement will materially damage the Company. In consideration of their interest in conducting the Transaction, Investor hereby waives any right to claim a prior relationship with a Company Contact or to claim that Investor is not bound by the terms of this Section 3 due to such prior relationship (unless as defined in the Section 53 of the Goldner Blatt Investments Operating Agreement). Each party assumes responsibility for ensuring its Representatives' compliance with this Section 3 and shall be liable for any violation of this Section 3 by its Representatives. Additionally, the Receiving Party agrees not to share any of the Company Contacts or any contacts of the Managing Members to any third parties without the express written consent of said Managing Member.

4.  **Term.** This Agreement shall extend for a period of five (5) years from the Effective Date and is binding on the Parties hereto, their heirs, assigns, executors, administrators and all others succeeding in interest to any Party either directly or indirectly. If Investor consummates a transaction related to the Purpose, the term of this Agreement will automatically renew for a 5-year period from the date of such transaction.

5.  **Termination.**

    1.  This Non-Disclosure Agreement shall never terminate unless certain information is made accessible and available to the public.

    2.  If Investor enters into any transaction for the purchase or sale of Assets with a Company Contact during the term of this Agreement or in the 48 months following termination of this Agreement without the Company's express written consent (a "Breaching Transaction"), Investor will pay the Company an amount equal to 20% of the aggregate total transaction value of such Breaching Transaction over and above

the greater of any compensation contemplated for such transaction or the total amount of compensation paid by Investor in breach of this agreement and/or the Seller of such breaching transaction. Investor acknowledges that Company would be harmed by a Breaching Transaction and such harm would be very difficult to accurately estimate, and the damages provided in this Section are a reasonable estimate of the anticipated actual harm that might arise from a Breaching Transaction.

3.      The terms and conditions of Sections 1, 2, 3, 5, 7, 10, 12 shall survive the expiration or termination of this Agreement.

6.   **Relationship of the Parties.** This Agreement is an addendum to the Goldner Blatt Investments, LLC Operating Agreement where Marc and Eli are partners in that business.

7.   **Indemnification.** Each Party shall defend, indemnify and hold harmless the other Party and its affiliates and their officers, directors, employees, agents, successors and assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from: (a) such Party's breach of their obligations under this Agreement; (b) resulting from such Party's acts or omissions in violation of this Agreement; and (c) such Party's breach of any confidentiality obligation under this Agreement.

8.   **Counterparts.** This Agreement may be executed in any number of identical counterparts and via digital or electronic signatures. Copies of the fully executed Agreement shall be deemed originals for all purposes.

9.   **Construction.** The parties hereto agree this Agreement is an instrument negotiated by all the parties hereto and will not be construed against its drafter. The recitals to this Agreement are part of this Agreement and shall be enforceable according to their terms.

10.   **Severability.** If any provision or any part of any provision of this Agreement is for any reason held to be invalid, unenforceable, or contrary to any public policy, law, statue or ordinance, then such provision or part shall be severed from this Agreement, and the remainder of this Agreement shall not be affected thereby, and shall remain valid and fully enforceable.

11.   **Integration and Amendment.** This Agreement contains the final, complete, and exclusive understanding and agreement among the Parties with respect to the subject matter of this Agreement, and supersedes any prior or contemporaneous agreements, representations, understandings, oral or written, by any of them. There are no terms, conditions, warranties, or representations other than those contained herein. This Agreement may be amended only by an instrument in writing executed by all Parties hereto.

12.   **Governing Law.** This Agreement shall be governed by the laws of the State of Delaware. Any claim, cause, or action relating to or arising out of this Agreement shall be brought in any state court sitting in Miami Dade County, Florida, and not in any other venue, unless otherwise agreed by the parties hereto in writing. THE PARTIES EXPRESSLY CONSENT TO THE PERSONAL JURISDICTION OF THE STATE AND

FEDERAL COURTS LOCATED IN THE CITY OF MIAMI, IN THE STATE OF FLORIDA, FOR ANY LAWSUIT, ARISING FROM OR RELATING TO THIS AGREEMENT.

13.   **Effective Date**. This Agreement shall be deemed effective on the date first above written when fully executed by all parties hereto (the "Effective Date").

[Signature page follows]

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement on the dates set forth below.

**GOLDNER BLATT INVESTMENTS LLC**

By: _____

Name: Eli Blatt
Title:  Managing Member

Date: 12 / 08 / 2021

By: _____

Name: Marc Goldner
Title:  Managing Member

Date: 12 / 08 / 2021

**THE INVESTOR PARTIES**

_____

Marc Goldner

Date: 12 / 08 / 2021

_____

Eli M Blatt

Date: 12 / 08 / 2021

NOT A CERTIFIED COPY

# EXHIBIT B



| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | $ | % | | | | | | |
| 2 | Eli | | $415,821 | | | | | | |
| 3 | Marc | | $402,086 | -$13,736 Paid to Marc on Back end | | | | | |
| 4 | | | | | | | | | |
| 5 | What? | Who? | How much? | Notes | | | | | |
| 6 | GoDaddy | Eli | $4,946 | thenftfund.com | | | | | |
| 7 | Bitfinance.com | Eli | $10,000 | | | | | | |
| 8 | Mythic/Dragon | Eli | $72,000 | | | | | | |
| 9 | NFTs | Eli | $200,000 | | | | | | |
| 10 | Miners | Eli | $131,931 | | | | | | |
| 11 | NFTs | Marc | $400,000 | | | | | | |
| 12 | Miners | Marc | $43,977 | | | | | | |
| 13 | tcb.com | Marc | $10,000 | | | | | | |
| 14 | Miners | Eli | $20,000 | | | | | | |
| 15 | Miners | Marc | ??? | | | | | | |
| 16 | Wayaca NFT | Eli | -$50,000 | | | | | | |
| 17 | Wayaca Miners | Eli | -$66,500 | $33,500 | $23,450 | | | | |
| 18 | Mario/Jeremy/Damien | Marc | -$100,000 | | | | | | |
| 19 | Mar a Lago | Eli | $10,000 | | | | | | |
| 20 | Mining | Eli | $70,218 | | | | | | |
| 21 | Mining | Marc | $48,109 | | | | | | |
| 22 | BitSource | Eli | $13,800 | | | | | | |
| 23 | Thecryptomotel.com | Eli | $20 | | | | | | |
| 24 | thecryptohotel.com | Eli | $2,504 | | | | | | |



From: **Eli Blatt** | eli@gb.investments          To: **m@gb.investments**          February 4, 2022 at 3:42AM

Hi Marc,

This is to confirm our understanding as follows:

1. We each agree to a capital contribution of $100K towards the purchase of NFTs
2. You have already purchased a significant portion of these with full transaction records for each purchase and will soon complete the purchases
3. I will remit my $100K capital contribution to you as payment on behalf of GBI for $100K worth of the NFTs in #2
4. You will then assign ownership of a total transaction value of $200K as per #2 to GBI which will then own NFTs valued at $200K at the time of their purchase and complete your capital contribution as per #1

Please confirm with wire instructions below.

Thanks!

Eli





Hi Marc,

I regard you as both a friend and business partner, but unfortunately our relationship right now is not in good standing. I am always happy to discuss and work out disagreements, however if your position is that you will do what you want, when you want, with impunity, regardless of the OA, as it has been to date, then you don't leave me a way forward with GBI.

We both need to abide by the OA – *especially* when we don't want to. I will not continue investing in GBI if you're going to refuse to abide by the OA and threaten me or tell me to sue you every time we disagree, as has now happened with both the miners and the NFTs, as well as your demands for excessive expense reimbursement.

Regarding the NFTs, I get that you didn't *want* to sell in May when I did, but, per the OA, if they indeed belong to GBI, it was your *obligation* to either sell or buy. Instead, you used your exclusive control over the wallets to simply refuse to sell and told me to sue you, promptly causing us to lose $250K in value – plus the ability to redeploy that now in the down market. I need to be compensated for this loss.

As it stands now, based on your handling of and communications to me regarding both the miners and the NFTs, my position is that you misappropriated my wire transfers to you, which were credited as capital contributions into GBI and earmarked for you to purchase those assets for GBI; instead, you purchased them in a manner controlled by and effectively titled to you individually. They are thus, in fact, de facto and de jure, not owned by GBI.

If we can resolve this as per the below, then I'm amenable to helping you launch an NFT Fund and moving forward with GBI.

## General Concerns

*Availability*

Your extensive external time commitments and frequent lack of availability / responsiveness have become an increasing problem. Your previously undisclosed security business, increasing commitments to ECAs, and decision to go back to law school full time are significant deviations from the commitments you had represented to me as having when we signed the GBI OA. As a result of you being continually over-extended, I can't get you to reply in a timely manner to anything – and you haven't even started law school back up yet.

*Accountability*

You don't follow through on many things you say you will and take no accountability for the consequences. When I argued that we should not buy the ATM for Sprinkles, you promised you would dedicate yourself to BitSource after Panama, but to my knowledge the only thing you've

done in over two months is send a proof of ID after multiple requests and this past week a few emails. Your recent ramp up in effort has come too late. That business is now basically dead, and Courtney is pissed at us (and says she's no longer part of the company). As a result, I am no longer willing to bear the regulatory and compliance risks associated with running this business and will need a waiver of liability from you in order to permit it to continue.

*Misrepresentation*

You perpetually misrepresent and over-promise opportunities (ATMs through David, ATMs through Adam, Ludwig funding BitSource, NFT this that and the other, etc.) in order to placate me or induce me into agreements or concessions. You are continually rapid-fire presenting a million different opportunities that you are too over-extended to actually pursue and which it is unclear even really exist.

Before we signed the GBI OA, you had represented that there were significant opportunities to raise money in Dubai, claiming among other things that his excellency and others promised us money. On the basis of these representations, I wasted time making presentation decks and subsequently agreed to enter into the GBI OA to pursue those with you. I understand nothing is guaranteed ever, but literally not a single group chat or email thread was ever even started – it all turned out to be less than nothing. I'm not even sure the decks I made were ever shared with anyone in Dubai besides Miriam or that these conversations even happened.

*Threats and verbal abuse*

When we have disagreements, you become verbally abusive and threaten me. Your reaction to my refusal to accept your demands for expense reimbursement well beyond that provided for by the OAs is a notable example.



This is unacceptable and no way to conduct business with anyone, let alone someone you say is your friend and partner, and it has to stop immediately if we are going to continue working

together. I will not be threatened in this manner, and I categorically do not consent to anything you pressure me to do in this matter.

*Ethics*

You have stated that you have no qualms operating in an unethical manner, only to not break the law. If this is how you truly feel, it is an obstacle to us working together – especially since you have shown clearly that you do not believe you need to behave ethically with me. I believe in operating and treating partners ethically. You either need to commit to being ethical in your dealings with me and our partners, or I cannot work with you.

**Specific requirements in order to move forward with GBI**

1. You will either refund me or transfer direct ownership to me of all of the miners you induced me to wire you funds for as supposed capital contributions to GBI – all 19 XPs.
   a. This transfer is to be effectuated by a signed statement sent to me and copying Compass support from your Compass-registered email account requesting that Compass send me a receipt for these miners in my name; change the login email account to team@megacap.capital; grant me 2FA access so I can access the account; and instructing Compass to transfer my miners to my own login account as soon as feasible.
      i. I can draft it and you can sign and send it.
   b. The two Pros can be bought by either you or Dharma at full value.
   c. For the remaining half miner, you or Dharma buy me out at full value.
   d. The balance of the miners for which our wire transfers were credited as capital contributions to GBI, you can title as you see fit, as you already are, leaving GBI with zero miners (as is in fact currently the case).

2. We complete the NFT shared wallet contract to protect and honor your commitments to the TRIUMers and Wayaca, as well as me.
   a. As part of this, you will need to compensate me for my losses as a result of your refusal to sell on May 6.
   b. I will not bear the financial consequences of you misappropriating my funds and/or refusing to honor your obligation to sell the NFTs back in May.

| NFTs Purchased before May 6, 2022 | At Purchase | 5/6/2022 | 7/13/22 |
|---|---|---|---|
| Price of ETH | $2,742.65 | $2,694.98 | $1,079.00 |
| ETH Portfolio Value | 169.21 | 138.6926 | 108.19 |
| Change in ETH Value from Purchase | 0.00 | -30.52 | -61.03 |
| % Change in ETH Value from Purchase | 0% | -18% | -36% |
| Change in ETH Value from May 6, 2022 | 30.52 | 0 | -30.51 |
| % Change in ETH Value from May 6, 2022 | 27% | 0% | -68% |

| | | | |
|---|---|---|---|
| USD Portfolio Value | $475,678 | $373,774 | $118,707 |
| Change in USD Value from Purchase | $0 | -$101,905 | -$356,971 |
| % Change in USD Value from Purchase | 0% | -21% | -75% |
| Change in USD Value from May 6, 2022 | $101,905 | $0 | -$255,066 |
| % Change in USD Value from May 6, 2022 | 27% | 0% | -68% |

    c.  Note that I will not negotiate this or anything else until the miners are transferred to me without qualification, as per the above.

**The Path Forward**

I really want to work out our disagreements. However, I cannot walk away from matters where you violated my trust and breached our written agreements, causing me significant financial harm. I have here proposed a reasonable path forward that can help ensure a productive partnership in the future. Once the above are completed, I will consider our relationship back in good standing and will help you launch an NFT Fund.

Regardless of anything herein, I will continue to work diligently and professionally on MegaCap. I trust that you will do likewise, as well as respond professionally to this proposal.

I'm hopeful we can resolve all of the above, continue to work together, and make Kash Money through GBI in the future in a way that is rewarding for both of us.

Best,

Eli

**APPENDIX**

*Miners*

1. I sent you $222,149, recorded as capital contributions to GBI, to buy miners for GBI.
2. Instead, you bought miners under your personal email address that I have no access to, which you 100% control, and which you have refused to manage in accordance with the GBI OA.
3. You thus induced me to wire you funds as an alleged capital contribution into our business but then in fact bought miners that you own and control.
4. You have used this control over the miners to try and pressure me into a below-market sale of "my" miners (which proves you do not in fact deem them as belonging to GBI), and to demand I pay hosting fees upfront for 5 years.
5. Of the miners you used GBI capital contributions for, you claim:

a. 9 miners in total (including each of our interests) are part of Dharma, for which I had never until two weeks ago even been supplied an operating agreement let alone signed one, nor in which did I ever explicitly agree to invest capital in any email or text.

    i. The fact that the funds I sent were recorded as capital contributions to GBI (even though you admittedly did not deploy them as such), directly and unequivocally refutes your claim that I invested in Dharma.

    ii. You simply misappropriated GBI capital contributions and used them as your own capital contribution to Dharma and alleged that I had agreed to do likewise despite there being no executed Dharma OA or cap table.

b. 30 allegedly belong to GBI, although I have no access to any of them, and you are refusing to distribute or sell those assets in violation of the OA.

    i. If, as you claim, GBI owns these miners, then I need to have 100% equal access to them as you.

    ii. Since I don't have that access, which you have clearly stated I do not and which as a practical matter I do not, they are, de facto, not GBI miners and you have thus misappropriated my funds to buy miners for yourself and Dharma.

6. Your numerous messages to me attempting to pressure me into a severable, individual sale of my miners – not via a sale of Dharma or GBI miners – is clear evidence of the fact that you feel you can apportion ownership of the miners in any way you see fit and that those miners don't concretely belong to anyone unless you say so.

    a. You flip flop at will as to who you claim owns the miners – GBI or me individually – to suit your needs.

7. I have demanded you provide me an invoice for the ownership of my half of these miners as per the above terms – which Compass has told me you can do with a single email.

    a. You have refused for over two weeks now to request or provide this invoice, attempting to use your control over the miners to pressure me into various concessions, including a below-market sale, pre-paying hosting fees for 5 years, and other non-miner related GBI issues.

8. I have told you that, in the absence of such an invoice, I will not remit any further payments for the miners.

    a. The same applies to my other requirements: until the full balance of your $400K alleged capital contribution to GBI to purchase NFTs as per below is fully accounted for and the NFT 'SPV' issue dealt with, I will not contribute any more funds towards the miners.

9. Should you pay the balance on the miners in order to not default on the entire order, per Section 17 of the GBI operating agreement, it will be an interest-free loan to GBI or evidence that you misappropriated my funds and dilution of my miner count, and for Dharma it would be a dilution in the Hardware Series.

    a. I do **not** authorize you to sell to yourself or Dharma or otherwise usurp pro-rata interests in "my" or "GBI" miners at any price except as follows:

        i. You or Dharma can buy out all 4.5 of the Dharma XP miners at cost if you want, so long as I receive a receipt for 15 XPs.

      ii.    Any funds you advance on my behalf I shall deem to be for that purpose unless otherwise agreed.

  b.  Should you want to buy out the balance of my / the GBI miners, you may do so at the basis price paid, not at a discount.

  c.  Any transactions involving the miners will have to be agreed in writing and signed by me.

10. I do not authorize any miners I contributed capital for to use the Dharma Pool, use of which constitutes a Major Decision and needs to be agreed on in writing for GBI or by me individually.

  a.  After my requirements above are completed without qualification, we can discuss the pool when the time comes, but not as a contingency to transferring ownership and control of my miners to me.

*NFTs*

11. You induced me to send you $200K as a supposed capital contribution to GBI to buy $600K worth of NFTs for GBI.

  a.  You recorded a $400K capital contribution to GBI for your purchase of NFTs.

      i.    Your alleged contribution of $400K has never been accounted for.

  b.  You have stated that you credited your ETH contributions to the NFT purchases at the basis price of the coins instead of their then present value.

      i.    You have alternatively stated it was half of your $400K contribution and another time that it was $30-$40K, but you have never provided any accounting.

      ii.   Regardless, this is an explicit breach of Section 3(e) of the GBI OA.

      iii.  You are obligated to have purchased $400K in USD value as per the etherscan records.

12. It was agreed that the NFTs would be owned pro rata $100K/$50K/$450K TRIUM/Wayaca/GBI, with Wayaca and the TRIUMers having wired $50K and $100K respectively.

13. You have stated to me and to the TRIUMers that you have also spent $200K on NFTs for yourself, and thus the total NFT purchases should be on the order of $800K in basis value.

  a.  Regardless, the minimum owed to the GBI collection is $600K worth of basis value NFTs, commencing in February when the joint purchase agreement commenced, regardless of the basis price of the ETH you may have used to purchase them.

14. You have yet to provide a complete accounting of how the money was spent or which NFTs GBI allegedly owns.

  a.  I had to conduct my own extensive research project to identify NFTs purchased to the GBI wallet.

15. I have no access to any of the wallets that own the NFTs allegedly bought on behalf of GBI, nor have you provided any record or wallet address whatsoever evidencing any SOL purchases.

16. As outlined in detail in my analysis of the NFT purchases, on May 6 you refused my right per the GBI OA to force a sale of the NFTs, telling me in writing that I'd have to sue you.

    a. As a result, the $475K basis value collection of NFTs in the ETH wallet at the time lost $255K (68% of their value on May 6), plus we lost the ability to redeploy the funds now in the down market.

    b. I consider you to be personally liable for my losses given your handling of the NFTs and/or misappropriation of my funds, and I need to be compensated for this.

17. Your only argument for not selling was that we agreed on a hold horizon, but this is patently and demonstrably false.

    a. There was never an email or even any messages to that effect.

    b. We only ever discussed LP lockup not an agreed GBI hold period.

    c. In fact, as evidenced by our chats and the warehousing language in the draft fund docs, we explicitly planned for GBI to sell them to the Fund as soon as possible so that we would not be over-exposed, which entails that they were bought with the intent of not holding onto them long term but rather liquidating them ASAP.

18. Given the above, you effectively induced me to wire you funds as a supposed capital contribution into GBI but then in fact bought NFTs that you legally own and control, thus misappropriating my funds.

    a. This is the exact same maneuver you pulled with the miners, fully intended to usurp total control over those assets in breach of the terms under which I agreed to wire you the funds.

19. In response to your most recent accusation that not being willing to move forward with the NFT Fund places me in breach, it most certainly does not.

    a. Companies abandon plans and products all the time due to changes in market conditions – for example as a result of market crashes – and other developments.

        i. In this case, I do not deem an NFT Fund to be a productive use of my time or resources given the onset of a crypto winter; our recent track record raising money; your bandwidth; and the performance of the NFT portfolio to date.

    b. Just because I invest time and resources to explore or create the possibility of a venture does not mean I am bound to move it forward.

    c. We have had and continue to have numerous disagreements about how the current NFT portfolio and potential future fund should be handled.

    d. The GBI OA requires both of us to sign a Series agreement, and, until that is done, there is no Series and no fund, period.

    e. As a practical matter, GBI does not have the financial resources to launch a fund.

# EXHIBIT E

## NOTICE OF DEFAULT

Dear Mr. Eli Blatt,                                                          Date of Notice: December 31, 2022

I am writing to you on behalf of The Dharma Initiative, LLC., in which you have been a member of and have failed to meet the capital contributions requirements outlined and agreed to in this chat. You are in *material breach*.

On or about March 2022 two Invoices (2231 and 2309) was received from Compass Mining which was then later revised and shown to you in June due to the agreed increase of miners. You claimed an entity you were a part of called Goldner Blatt Investments, LLC., was purchasing another 36 miners (6 bundles), which you have failed to pay the balance on leaving the rest of the miners at risk. It was made transparent through these screenshots that all the miners were being purchased together at a bulk discount which was said numerous times in this chat. You have attempted through different means to acquire these miners in your name to damage the company and to use leverage of non-payment to coerce us all into an unfavorable agreement.

Additionally, you claimed your Mom and an entity named Wayaca was putting in money and that everyone had to "keep consistent with equity." We all agreed to purchase 3 Bundles at Dharma (4.5 Miners each between you, Marc Goldner, Rachel Korsen, and myself). You have failed to live up to the agreement that was agreed upon over 9 months ago. Your failure to abide by the terms of our agreement has put nearly a million dollars of miners in jeopardy which you will be held liable for in the event of your continued breach and non-payment.

Your default has put 72 total miners at risk. You have failed to meet your obligations knowing full well the consequences of your actions. We had offered to give you a 0% interest rate loan for 1 year in May or June, which you refused. We then offered to buy you out at a discount which you then refused. Now that the miners we all purchased are down over 50% you are refusing to pay the balance due that we had to front in order to not lose our own assets.

Therefore, as of today, December 31, 2022, The Dharma Initiative, LLC., is informing you that you are in default and that you have 30 days to pay the outstanding balance, or you will forfeit your rights, interest, equity, and potential earnings in the miners. Additionally, if the balance is not paid, there will be a meeting held to discuss your redemption from The Dharma Initiative.

This notice is made under all applicable laws with the rights stated in The Dharma Initiative Operating Agreement that has been shared with you and that allows for the redemption and notice of such a default.

We have discussed in good faith that we are extending you this 30-day notice in an effort to come to an agreement. If the balance of **$140,512.50** is paid in full by January 27, 2023, then we will consider this to be a tender offer where we will agree (if legally allowed) to backdate an agreement so that you may share in any potential capital loss from any sale of the miners to any person or entity whereas the effective date of such backdated agreement will be December 31, 2022. The breakdown of the balance includes but is not limited to 1) your portion of the GBI balance due, 2) your portion of the Dharma S19XPs that were acquired to mine more crypto and use to buy more miners perpetually, 3) Hosting Deposits, 4) Security Deposits, and 5) the 2 S19J Pros that you personally asked us to acquire for you. We sincerely hope that you are willing to pay off the debt due and come current so that you are not continuing to jeopardize the miners of everyone else that is part of The Dharma Initiative. If timely payment is not made, we are informing you that we will be forced to explore the option of bankruptcy protection as without your balance there will be nearly no way for us to continue to pay the monthly hosting fees that come due without a significant capital injection to prevent The Dharma Initiative from no longer being solvent.

The Dharma Initiative, LLC. Reserves All Rights and will explore pursuing legal action against you if not paid.

Sincerely,
*Simon Divilov*   12 / 31 / 2022
Simon Divilov
On Behalf of The Dharma Initiative, LLC.

Note: As an alternative, Marc has agreed to continue to have good faith discussions with you to determine the final language for a settlement agreement that will allow all parties to be made whole in this situation.

P.S. Please be informed that we were advised by Compass last week that the miners should start to be delivered shortly and for everyone to remain patient as they work through their own operational issues.

                                                                Audit trail

| | |
|---|---|
| Title | Eli Blatt Notice of Default |
| File name | Notice of Default...ember 31 2022.pdf |
| Document ID | 66377b5cd8917d77590c45a826322870c49dbbca |
| Audit trail date format | MM / DD / YYYY |
| Status | ● Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | 12 / 31 / 2022 22:13:10 UTC | Sent for signature to Simon Divilov (sdiv00@gmail.com) from scheduling@marcgoldner.com IP: 148.74.125.240 |
| **VIEWED** | 12 / 31 / 2022 22:13:25 UTC | Viewed by Simon Divilov (sdiv00@gmail.com) IP: 172.58.3.85 |
| **SIGNED** | 12 / 31 / 2022 22:16:02 UTC | Signed by Simon Divilov (sdiv00@gmail.com) IP: 172.58.3.85 |
| **COMPLETED** | 12 / 31 / 2022 22:16:02 UTC | The document has been completed. |

NOT A CERTIFIED COPY

Powered by 🗙 Dropbox Sign

**From:** Rachel Korsen
**Subject:** Notice of Default from The Dharma Initiative, LLC.
**Date:** 29 Jan, 2023, 7:52 pm
**To:** Simon Divilov <simon@thecryptominers.io>
**Cc:** e@emb.org, "e@megacap.capital" <e@megacap.capital>

Hi Eli,

I hope you had a nice holiday and are enjoying the New Year. I have spent a substantial amount of time attempting to come up with a resolution to solve the issues between you and Marc for everyone's sake and I think I have a good resolution everyone will be happy with.

I'm willing to exercise a veto that I have to prevent a Default within Simon's proposed 30-day letter that was issued to you on December 31, 2022. However, I am only able to do this for so long. As long as you are willing to talk with us in good faith, I see no reason not to include you in sharing the capital losses and make the effective date of the Agreement between you and Marc to be 2022 (unless you prefer to have 2023 for your own personal tax reasons which as long as it is legal then we are happy to agree to do with you). We can discuss this all together amicably.

Marc is willing to cede the investment in the James Bond video game (which he is certainly entitled to) in order to move forward and to decrease the amount owned in the TV Studio Dragonfire (most likely entirely in order to avoid any more issues between you two – but he'll discuss that more). However, I do agree with him that you have an explicit authorizing text to invest $3-5k in Masterworks so that $5k should be included as he had invested even more than that in good faith so that should be honored. Also, the description of the Goldner Blatt Investments WhatsApp chat clearly outlines all of the investments made on GBI's behalf and that should be honored in some fashion as there were tens of thousands of dollars invested & known about.

What I think is most important is that you understand that Simon, Marc, and myself have lent you a significant amount of money to cover your balance due for the miners. There is a clear message history that Simon and I reviewed independently in The Crypto Miners, LLC. WhatsApp chat where we all knew our money was being sent to Dharma for 4.5 miners each and that Dharma was acquiring the miners on behalf of everyone including but not limited to the entities we have all discussed prior to acquiring the miners. I believe Marc said he told you to read that chat log so I will suggest to save everyone a headache that you do too when you have time. Marc posted Compass' contract and terms prior to anyone sending money (his PDF even has comments outlining the potential risks), it was crystal clear to everyone that the balance must be paid otherwise everyone would default. It isn't fair that you have forced us to lend you the money in order to save our own investments so please do the right thing and return the capital that was lent to you immediately. I do not want to have to escalate this whatsoever so I am asking you to please come to the negotiating table right away. Marc said that your mom is willing to take one less miner in good faith to help resolve this so we can discuss that as an option as well if that is what will help speed this process along for you.

Other than that, Marc will send you a revised Cap Table in a separate email and I'm happy to remain involved in helping you two resolve the issues. Marc also suggested that maybe your

mom and his dad could also help which I think is a really good idea too. Why don't we try?

At the end of the day, I think we all want to do good business, make money, and have fun.

Say hi to Emily and Brady for me!

Sincerely,
Rachel

> On Sun, Jan 29, 2023 at 5:11 PM Simon Divilov <simon@thecryptominers.io> wrote:
> CC'ing Rachel, she would like to chime in on this.
>
> Thanks,
> Simon
>
> > On Sat, Dec 31, 2022 at 5:28 PM Simon Divilov <simon@thecryptominers.io> wrote:
> > Dear Mr. Blatt,
> >
> > Please see the attached Notice of Default sent on behalf of The Dharma Initiative, LLC., for your outstanding balance of $140,512.50.
> >
> > Sincerely,
> > Simon Divilov

NOT A CERTIFIED COPY

# EXHIBIT F

April 30, 2023

Marc Goldner
marc.goldner@uconn.edu

      RE:    Rescission Notice

Mr. Goldner,

I am writing to inform you of my position on Goldner Blatt, LLC ("GBI" or the "Company").

You are hereby informed that I deem the GBI operating agreement (the "Agreement") to be an invalid contract because:

1. I was fraudulently induced to enter into it on the basis of numerous representations you made prior to executing the agreement that you knew to be untrue at the time you made them;

2. I received no consideration for entering into the contract, neither in the form of any contribution by you directly to the Company, as well as by the fact that you stated in writing that you are not making any of your contacts mutual contacts or granting me Neuralverse or Dharma interests;

3. Neither of us contributed any capital directly to the company, resulting in us both having $0 basis of equity value, with the company having also $0 in profit in 2022, which means there is no tax filing required nor will there ever be, and I will deem any filing that shows otherwise to be fraudulent; and

4. You failed to abide by any of the terms of the agreement, notably with regard to your handling of funds I sent you ostensibly to purchase assets for GBI but which you did not use in the intended way, nor subsequently did you manage pursuant to the terms of the Agreement.

I thus deem GBI to never really have existed and/or to hereby have been rescinded.

All of its ostensible income and expenses are zero-sum payments from Megacap and expenses that could equally well have been borne by Megacap, and all of which flow through to us individually via S-Corp regardless. No tax filing ever was, is, or ever will be required for GBI, which has no bank account or any active lines of business. There is thus no basis, no revenue, no business, no consideration, and no Company. Regardless of whether the Rescission is ultimately upheld, these considerations relating to tax basis and income/expense are nonetheless facts, and any filings to the contrary will be fraud.

If and to the extent it is ever determined that the Agreement is valid and enforceable, I am hereby giving you notice out waiving any of my rights to the consideration contemplated in the Agreement that I deem myself to have retroactively voluntarily withdrawn from GBI as of December 31, 2022 for the following reasons:

1. Your repeated refusal to operate in accordance with the terms of our agreement;
2. Threats against my life that you began transmitting to me in December 2022 and escalated recently to felony extortion using files you obtained by committing misdemeanor unauthorized access to a computer; and
3. Notice given to me on December 31, 2022 by Dharma, over which you have acknowledged having 100% total management control, that you were permitting Dharma to usurp all the Compass miners for which you induced me to wire payments, a majority of which at a minimum you claimed belonged to the company, but which demonstrably you never purchased for the company.

I told you repeatedly prior to that date that I was done working with you on anything besides required Megacap business, with you stating clearly your revocation of any consideration due to me by you under the Agreement, with that interaction constituting my de facto withdrawal. To the extent that it is determined that my retroactive withdrawal as per above is not valid, then I hereby give you notice of my withdrawal as of today.

Please note that this letter does not alter my position that I deem communications from you to be harassment given your threats and extortion attempts. If you have any *legitimate* concerns regarding non-GBI matters, you are instructed (yes, *instructed*) to contact Celina – and do not copy me. Given your ability to contact her in order to reach me, you have *NO* legitimate reason to contact me directly, and I will deem any attempts to do so to constitute further harassment.

Govern Yourself Accordingly,

Eli M. Blatt

# EXHIBIT G

NOT A CERTIFIED COPY

April 30, 2023


Marc Goldner
marc.goldner@uconn.edu

> RE:   Civil Theft Demand

Mr. Goldner,

I am writing to demand restitution for the civil theft that you have committed against me. Pursuant to Florida Statutes § 772.11, you have seven days from the receipt of this letter to pay me the full amount of damages incurred as a result of your actions, or face further legal action.

As you are aware, you fraudulently induced me to wire a total of $422,149 to purchase Bitcoin miners (the "Miners") and Non-Fungible Tokens (the "NFTs", and collectively the "Assets") for Goldner Blatt Investments, LLC ("GBI"), over which we share equal control and management rights, and which was formed in part expressly to facilitate joint investments such as the Assets in question. $202,148.55 was sent directly to Compass Mining, Inc. and $20,000 to you at your instruction to purchase Miners for GBI's account, and $200,000 was sent directly to you to purchase NFTs for GBI's account. Instead of doing so, you purchased these assets for yourself, held in wallets and accounts owned and controlled by you individually, commingled with your own Miners and NFTs; refused to provide a full and complete accounting of the assets; actively deprived me of any equal care or control thereover; and blatantly ignored my legitimate management and information rights thereover pursuant to the GBI operating agreement. In short, under the false promise of buying Assets for GBI, you in fact committed wire fraud instead, stealing my funds to unjustly enrich yourself.

I have spent almost a year trying to reach an amicable settlement involving the transfer of my interest in these Assets to me. During this time, you have repeatedly and persistently used your exclusive ownership of, access to, and control over the Assets to attempt to threaten and extort me into various concessions, most recently escalating to threatening me and my family's lives, allegedly on behalf of Jiri Novotny, whose threats you claim to have in writing but refuse to share in order to validate that the threats are not yours alone. As a result, I am no longer amenable to any of the agreements previously discussed.

According to Florida Statutes § 772.11, I am entitled to three times the amount of actual damages incurred, plus attorney's fees and court costs. Therefore, I am entitled to the sum of $1,226,477 in restitution, plus interest thereon at the statutory rate.

If restitution is not paid within seven days from the receipt of this letter, I will be forced to pursue legal action against you in a court of law. This action may include filing a lawsuit against you, seeking a judgment against you, and pursuing every available legal remedy to recover the damages caused by your theft. Given that the purchase of the Assets on behalf of GBI was in fact a lie designed to induce me to wire you funds directly, which you subsequently used to purchase Assets for your own account, and no funds or Assets nor the Assets were ever properly in accounts

or wallets owned by GBI, my claims are against you individually and not governed by the dispute resolution terms of GBI, which you simply used as a mechanism to induce me to wire you funds.

I strongly urge you to take this matter seriously and to make restitution immediately in order to avoid any further legal action. You have seven days from receipt of this letter to confirm that you have made full restitution to me. Should you fail to do so, I reserve my right to share this demand letter with and serve a demand for preservation of evidence to all parties involved with the Assets and threats made against me, including but not limited to parties with ostensible shared interests in the NFTs and Miners you purchased for your own account, and the parties you allege to have made threats against me.

Thank you for your prompt attention to this matter.

Sincerely,

Eli M. Blatt

# EXHIBIT H

NOT A CERTIFIED COPY

## OPERATING AGREEMENT OF MEGACAP CAPITAL, LLC

**This OPERATING AGREEMENT** (the "**Agreement**") made and entered into this 7 day of July 2021 (the "**Effective Date**") by and among **MEGACAP CAPITAL LLC**, a Delaware Series Limited Liability Company (the "**Company**") and the following persons (each, a "**Member**," and, collectively the "**Members**"):

ELI M BLATT
MARC GOLDNER
RODERYCK REITER

### BACKGROUND:

A. The Members wish to associate themselves as members of a limited liability company.

B. The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

**Formation**

1. By this Agreement, the Members form a Series Limited Liability Company (the "**Company**") in accordance with the laws of the State of Delaware. The rights and obligations of the Members will be as stated in the Delaware Limited Liability Company Act (the "**Act**") except as otherwise provided in this Agreement.

**Name**

2. The name of the Company will be **MEGACAP CAPITAL, LLC**.

**Purpose**

3. Investing and Finance

**Term**

4. The Company will continue until terminated as provided in this Agreement or in the Act.

**Place of Business**

5. The Company's principal place of business will be located at:
   A Registered Agent, Inc.
   ATTN: MegaCap Capital, LLC.

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 2 of 20*

8 The Green Street
Suite A
Dover, Delaware 19901

## Units and Capital Contributions

6. The Company shall be authorized to issue one million (**1,000,000**) units of membership interest in the Company (each, a "**Unit,**" collectively, "**Units**"), of which 900,000 units are hereby issued ("**Issued Units**") as per Section 8. These units constitute units of the "Master Series". The Company may authorize the issuance of additional Units with the prior written consent of all of the Class A Voting Members. As per Section 16, additional Series may be authorized each with its own Membership Units. The remainder of this agreement concerns the Master Series of the Company, however all provisions shall apply to any additional Series authorized unless otherwise approved by a supermajority vote of the Class A Members of the Master Series.

7. Units shall be divided into two classes: (a) "**Class A Voting Members,**" and (b) "**Class B Non-Voting Members.**" Each class will have distinct rights and obligations as follows:

| Member Class | Rights and Obligations |
|---|---|
| Class A | Class A Voting Members have full voting rights. |
| Class B | Class B Non-Voting Members have no voting rights. |

8. The following is a list of the initial Members (the "**Initial Members**") of the Company and Units of membership interest of the Company:

| Member | Class and Units Issued |
|---|---|
| Eli M Blatt | 333,000 Class A Units (37% of all Issued Units) |
| Marc Goldner | 234,000 Class A Units (26% of all Issued Units) |
| Roderyck Reiter | 333,000 Class A Units (37% of all Issued Units) |

9. The following is a list Initial Members of the Company and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution | Value |
|---|---|---|
| Eli M Blatt | Cash | $1,000.00 |
| Marc Goldner | Cash | $1,000.00 |
| Roderyck Reiter | Cash | $1,000.00 |

## Independent Contractor Agreement; Redemption Agreement

10. All Members receiving shares in exchange for services to the Company shall be required to execute. that certain Stock Redemption Agreement, a copy of which is attached hereto as **Exhibit A**. All

Members shall be required to execute that certain Confidentiality Agreement, a copy of which is attached hereto as **Exhibit B.** In addition to the foregoing, any and all owners, principals, officers, directors, managers, members, or affiliates of each Member (each, along with the Members, a "**Member Affiliate**") shall also execute the Confidentiality Agreement.

11. The Company may enforce its rights under the Redemption Agreement at any time if (a) any Member is in material breach of this Agreement and/or the Confidentiality Agreement; (b) commits any of the forbidden acts delineated in Section 68-72; (c) violates the Duty to Devote time under Section 34; or (c) terminates this Agreement or otherwise ceases to be a member of the Company for any reason.

12. In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other. For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units).

## Allocation and Distribution of Profits/Losses

13. Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will be allocated between all Class A Members in accordance with their percentage interest in the Company or individual Series as determined by their respective percentage of Issued Units therein. For the Initial Members in the Master Series, Net Profits and Losses shall be allocated in the following manner:

| Member | Profit and Loss Percentage |
|---|---|
| Eli M Blatt | 37% |
| Marc Goldner | 26% |
| Roderyck Reiter | 37% |

14. Cash Distributions to Class A Members will be made in the same fixed proportions as the allocation of Net Profits or Losses described above. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

15. The Company shall make distributions of profit monthly, retaining an operating account reserve as agreed by a supermajority vote of Class A Members.

16. Series Interests and Series.

   (a)   The Members shall cause the Company to issue Interests in one or more separate and distinct series (each, a "Series"), with each such Series established to make separate

Investment or portfolio of Investments. The Members may establish Series for the purpose of (1) making Investments in specific and distinct companies identified by the Members, (2) to purchase securities in such companies from secondary sources, or (3) to invest in interests of investment funds, special purpose vehicles or other Entities consistent with the Company's investment focus, which such Series will be segregated from each other. The Members may use its commercially reasonable efforts to have securities purchased by a particular Series be issued for the benefit of such particular Series to which they are allocated. Members of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to share in the profits, losses, allocations or distributions of any other Series of which they are not a Member.

(b)     Each Series so established shall be set forth on Schedule A to this Agreement, and Schedule A will be updated by the Managers from time to time in connection with the establishment of one or more additional Series. Subject to such limitations as may be set forth in this Agreement, the Members shall establish and may modify the investment objective and policies of each Series and all other rights and features thereof.

(c)     Interests of each Series shall have the following relative rights and preferences:

(i)     Assets Held with Respect to a Particular Series. All Capital Contributions made to the Company with respect to a particular Series, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Series for all purposes, subject only to the rights of creditors of such Series, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Series, are herein referred to as "assets held with respect to" that Series. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Series (collectively "General Assets"), the Members shall allocate such General Assets to, between or among any one or more of the Series' in such manner and on such basis as the Members, in its sole discretion, deems fair and equitable, and any General Assets so allocated to a particular Series shall be assets held with respect to that Series. Each such allocation by the Members shall be conclusive and binding upon Members of all Series for all purposes.

(ii)     Liabilities Attributable to a Particular Series. The assets of the Company held with respect to each particular Series shall be charged with all liabilities, expenses, costs, charges and reserves attributable to that Series. All such liabilities, expenses, costs, charges, and reserves so charged to a Series are herein referred to as "liabilities attributable to" that Series. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Series ("General Liabilities") shall be allocated and charged by the Manager to, between or among any one or more of the Series in such manner and on such basis as the Members, in their sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Series shall be liabilities attributable to that Series. Each such allocation of liabilities, expenses, costs, charges and reserves by the Members shall be conclusive and binding upon Members of all

Series for all purposes. The liabilities attributable to any Series shall be enforceable against the assets of such Series only, and not against the General Assets, or the assets of any other Series. All Persons, including any Affiliates of the Members, who have extended credit that has been allocated to a particular Series, or who have a claim or contract that has been allocated to any particular Series, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Series for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship.

## Withdrawal of Contribution

17. No Member will withdraw any portion of their Capital Contribution without the supermajority consent of the Class A Voting Members.

## Liability for Contribution

18. A Member's obligation to make their required Capital Contribution can only be compromised or released with the consent of all Class A Voting Members or as otherwise provided in this Agreement. If a Member does not make the Capital Contribution when it is due, he is obligated at the option of the Class A Voting Members voting as a separate class, to contribute cash equal to the agreed value of the Capital Contribution. This option is in addition to and not in lieu of any other rights, including the right to specific performance that the Company may have against such Member.

## Additional Contributions

19. Capital Contributions may be amended from time to time, according to the business needs of the Company by supermajority vote of the Class A Voting Members.

20. Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by the Class A Voting Members, voting as a separate class. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

## Capital Accounts

21. An individual capital account (the "**Capital Account**") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

## Interest on Capital

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 6 of 20*

22. No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

## Management

23. The Class A Voting Members shall have the sole authority to appoint a manager of the Company (individually the "**Manager**" and collectively the "**Managers**"). Management of the Company is vested in the following Managers until such time as they are removed by the Class A Voting Members or withdraw from the position:

    A. Eli M Blatt, Managing Partner
    B. Marc Goldner, Managing Partner
    C. Roderyck Reiter, Managing Partner

24. The duties and responsibilities of the Managers will include the following:

    ● Managers will supervise the day-to-day operations of the Company including supervising sales and production staff and maintaining financial accounts.

25. Notwithstanding any other provisions contained in the Certificate of Formation or this Agreement, each of the Managers is empowered to bind the Company for any and all decisions except Major Decisions. A supermajority vote of the Class A Voting Members shall be required for all Major Decisions, except where a unanimous vote is expressly called for. Such votes may be accomplished via electronic mail, What's App, or any other written medium upon which the Class A Voting Members unanimously agree. For purposes of this Agreement, "**Major Decisions**" are the following:

    A. Incur debt, expend funds, write checks, pay bills, or enter into contracts, or otherwise obligate the Company for any amount in excess of $1,500.
    B. Negotiate or agree to an accounts payables/receivables payment schedule.
    C. Establish credit lines and the use of such credit lines.
    D. The sale or dissolution of the Company or its assets.
    E. Issuance of additional member or shareholder interests, which shall require a unanimous vote and be signed in writing by all Class A Members.
    F. Approval of a member or shareholder buy-sell agreement, approval of which shall not be unreasonably withheld.
    G. Scheduling repayment of any capital contributions from any Member.
    H. Selling, leasing, or encumbering any property owned by the Company.
    I. Scheduling repayment of any loans from Members.
    J. Changing or amending this Agreement or approving any action or resolution that would alter the terms of this Agreement, which shall require a unanimous vote and be signed in writing by all Class A Members.
    K. Appointment or removal of a Manager which shall require a unanimous vote and be signed in writing by all Class A Members excluding the Member being removed.
    L. Addition, withdrawal, appointment, or removal of a Member, which shall require a unanimous vote and be signed in writing by all Class A Members (unless the Member being removed is a

Class A Member, in which case the unanimous vote of the remaining Class A Members is required.

M. Amending the duties and responsibilities of any Manager.

N. Any changes to the Company Name, branding imagery, and public relations positioning.

O. Adjustments to the compensation of any Member, Manager, Employee, or contractor.

P. Payment of any distributions or other compensation to any Member beyond the monthly Distributions required in Section 15.

Q. Registering the company with any regulatory or governmental agency.

R. Creation of an additional Series within the MegaCap umbrella, which shall require a unanimous vote and be signed in writing by all Class A Members. For avoidance of doubt, any Series created for any entities such as additional SPVs or for any purpose defined in Section 16(a) for MegaCap will be approved by all Class A Members in writing.

S. Each Series equity percentage shall require a unanimous vote and be signed in writing by all Class A Members.

T. Each Series investment objective and policies will be defined by the Managers and shall unanimously approved by all Class A Members signed in writing.

U. No manager shall move any "General Assets" to any Series without unanimous approval by all Class A Members.

V. No Class A Members shall take on personal liability or personal obligations of MegaCap unless expressly approved and unanimously approved by all Class A Voting Members.

26. A new Manager may be added to the Company with a supermajority vote of the Class A Voting Members.

27. A Manager will be reimbursed for reasonable expenses directly related to the operation of the Company and approved, in advance, by a supermajority of the Class A Voting Members (voting as a separate class).

28. The Members will be consulted and the advice and opinions of the Members will be obtained as much as is practicable. However, subject to Section 25 above, the Managers will have management and control of the day-to-day business of the Company for the purposes stated in this Agreement. All matters outside the day-to-day business of the Company will be decided by the Class A Voting Members (voting as a separate class) as outlined elsewhere in this Agreement.

A. In determining and selecting which manufacturing hardware partner and software partner to use for operations, only a simple majority vote of 51% will be required between the Members.

29. In addition to day-to-day management tasks and any other duties and responsibilities already identified in this Agreement, the Managers' duties will include keeping, or causing to be kept, full and accurate business records for the Company according to generally accepted accounting principles (GAAP), and overseeing the preparation of any reports considered reasonably necessary to keep the Class A Voting Members informed of the business performance of the Company.

30. A Manager will not be liable to the Members for any action or failure to act resulting in loss or harm to the Company except in the case of gross negligence or willful misconduct.

31. Each Member will devote such time and attention to the business of the Company as required to carry out their duties and responsibilities for the conduct of the Company's business.

## Authority to Bind Company

32. Only the Manager(s) have the authority to enter into contracts on behalf of the Company.

## Duty of Loyalty

33. While a person is a Member or Manager of the Company, and for a period of at least two years after that person ceases to be a Member or Manager, that person will not carry on, or participate in, a business involved in the issuance or transacting of securities in any market regions that were established or contemplated by the Company before or during that person's tenure as Member or Manager.

## Duty to Devote Time

34. Each Member will devote such time and attention to the business of the Company as the supermajority of the Class A Voting Members (voting as a separate class) will from time to time reasonably determine for the conduct of the Company's business. Should a Member or Members be deemed by supermajority vote of the Members voting thereon to be in violation of this provision, those Members will be subject to Involuntary Withdrawal as per Section 43.

## Member Meetings

35. A meeting may be called by any Class A Voting Member providing that reasonable written notice has been given to the other Members.

## Voting

36. Each of the Class A Voting Members shall have one vote for each Unit owned by such Class A Voting Member.

37. INTENTIONALLY LEFT BLANK

## Admission of New Members

38. A new Member may only be admitted to the Company with a supermajority vote of the Class A Voting Members.

39. No new Class A member shall be admitted as a Member of the Company until such new Member becomes a party to this Agreement, as amended, and agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to effect the admission of the new Member as determined by a supermajority vote of the Class A Members. Any new Member will receive such

business interest in the Company as determined by a supermajority consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

## Voluntary Withdrawal of a Member

40. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

41. INTENTIONALLY LEFT BLANK

## Involuntary Withdrawal of a Member

42. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; felony conviction of a Member; or a legal judgment against a Member (excluding any judgment resulting from any litigation relating to Marc Goldner) that is pending as of the effective date hereof) that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member has engaged in conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member, including not devoting time to the Company as required per Section 34.

43. The involuntary withdrawal of a Member will have no effect upon the continuance of the Company.

## Dissociation of a Member

44. In the event of either a voluntary or involuntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.

45. A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

46. Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 60 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company.

## Sale, Transfer, or Assignment of a Member's Interest; Drag-Along

47. No Member may sell, transfer or assign any of such Member's Interest, including, but not limited to, any Units owned by such Member, without the supermajority written consent of the Class A Voting Members. Where a Member's financial interest in the Company is assigned to another party who is not an existing Member, that party will be considered a New Member. An assignment of full membership status inclusive of all duties, obligations, and rights held by the previous Member will be governed by the conditions described under the Admission of New Members section of this Agreement.

48. **Drag-Along Rights.** In the event that the Class A Voting Members receive a bona fide offer from an independent third party purchaser to purchase (including by merger) all of the outstanding Units or all or a substantial portion of the assets of the Company, the Class A Voting Members may send written notice (the **"Drag-Along Notice"**) to the Company and the remaining Class B Members (the **"Class B Members"**) notifying them they will be required to sell all of their Units in such sale. Upon receipt of a Drag-Along Notice, each Class B Member receiving such notice shall be obligated to (a) sell all of the Class B Member's Units contemplated by the Drag-Along Notice on the same terms and conditions as the Class A Voting Members; and (b) otherwise take all necessary action to cause the consummation of such transaction. Each Class B Member further agrees to (a) take all actions (including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by the Class A Members; (b) waive all applicable appraisal rights, if any, under the laws of the State of Delaware; and (c) appoint the Class A Members as the Class B Member's attorney-in-fact to do the same on its behalf. Notwithstanding the foregoing, no Class B Member may sell or assign such Member's Units, in whole or in part, under this Section without the express prior written approval and consent of a Supermajority of Class A Voting Members.

## Right of First Purchase

49. In the event that a Member's Interest in the Company is or will be sold, due to any reason other than as said forth in section 48 above, the remaining Members will have a right of first purchase of that Member's Interest. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

50. In the event that a Member's interest in the company is transferred or assigned as the result of a court order or operation of law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

## Valuation of Interest

51. In the event of a sale of all or substantially all of the Units and/or assets of the Company, a Member's financial interest in the Company will be based in the percentage of Units owned in proportion to all of the issued and outstanding Units of the Company at the time of such sale.

52. In the absence of a written agreement setting a value, the value of the Company will be based on an appraisal of the fair market value of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members to be retained within a reasonable period of the event giving rise to the disposition of a Member's interest. The results of the appraisal will be binding on all Members. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member.

53. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

**Dissolution**

54. The Company may be dissolved by a unanimous vote of the Class A Voting Members. The Company will also be dissolved on the occurrence of events specified in the Act.

55. Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

    A. First, in satisfaction of liabilities to creditors except Company obligations to current Members;

    B. Second, in satisfaction of Company debt obligations to current Members;

    C. Third, to the Class A Members up to the amount of their Capital Contributions;

    D. Fourth, to the Class B Members up to the amount of their Capital Contributions; and

    E. Finally, to all of the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement.

**Records**

56. The Company will at all times maintain accurate records of the following:

    A. Information regarding the status of the business and the financial condition of the Company.

    B. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.

    C. Name and last known business, residential, or mailing address of each Member and Manager, as well as the date that person became a Member or Manager.

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 12 of 20*

D. A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement and any amendments have been executed.

E. The cash, property, and services contributed to the Company by each Member, along with a description and value thereof.

57. Each of the Class A Voting Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

58. Each Manager has the right to examine the above documents for any purpose reasonably related to their position as Manager of the Company.

## Books of Account

59. Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any of the Class A Voting Members. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

## Banking and Company Funds

60. The funds of the Company will be placed in such investments and banking accounts as will be designated by the unanimous vote of all Class A Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by supermajority consent of the Class A Voting Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

## Audit

61. Any of the Class A Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Company. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Class A Voting Members for any fiscal year.

## Tax Treatment

62. The Company is intended to be treated as an S-Corp for the purposes of Federal and State Income Tax.

## Annual Report

63. As soon as practicable after the close of each fiscal year, the Company will furnish to each Class A Voting Member an annual report showing a full and complete account of the condition of the Company

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 13 of 20*

including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

    A. A copy of the Company's federal income tax returns for that fiscal year.

    B. Income statement.

    C. Balance sheet.

    D. Cash flow statement.

    E. A breakdown of the profit and loss attributable to each Member.

## Goodwill

64. The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## Governing Law

65. INTENTIONALLY LEFT BLANK

## Force Majeure

66. A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to an event of force majeure, such as earthquake, typhoon, flood, fire, pandemic, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

## Forbidden Acts

67. No Member may do any act in contravention of this Agreement or prevailing law.

68. No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company.

69. No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

70. No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

71. No Member may confess a judgment against the Company.

72. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

## Indemnification

73. All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature whatsoever, arising out of a Member's participation in Company affairs pursuant to this Agreement. A Member will not be entitled to indemnification under this section for liability arising out of negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

## Liability

74. A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

## Liability Insurance

75. The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

## Life Insurance

76. The Company will not have the right to acquire life insurance on the lives of any or all of the Members.

## Amendment of this Agreement

77. No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all of the Class A Voting Members.

## Title to Company Property

78. Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member.

79. A breach of the Confidentiality Agreement

## Dispute Resolution

NOT A CERTIFIED COPY

80. <u>Dispute Resolution</u>.   Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this <u>Section</u>. The initiation and pendency of the procedures under this <u>Section</u> does not relieve the Parties from their respective obligations under the Agreement.  ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS <u>SECTION</u> SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

   A.  Negotiations by and between the Parties.

   (1) Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail.  Within ten (10) days after receiving such notice, the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

   (2) Upon the Disputing Party's receipt of the Responding Parties' response, the Parties shall then have thirty (30) days, or such other time as they may mutually agree upon in writing, to resolve the Dispute amongst themselves.

   B.  Mediation

       If the Parties are not able to resolve a  Dispute pursuant to subsection (A) above,  they agree to participate in at least ten (10) hours of good faith mediation administered by the American Arbitration Association under its Commercial Mediation Procedures.

   C.  If the Parties are not able to resolve a Dispute pursuant to subsections (A) and (B) above, the Dispute shall finally be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association.   Nothing herein shall  limit the right of any Party to seek interim or provisional equitable relief in a court of competent jurisdiction prior to or pending the     conclusion of the arbitration.  Any Arbitration shall take place virtually  unless the parties agree on a physical location.  The arbitrator shall apply the law of the State of Delaware without regard to conflicts of law principles.   No demand for arbitration may be made after the date when the institution of legal or equitable proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

81.  <u>Equitable Remedies</u>.  The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights

and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement. The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware. For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of *forum non conveniens*.

82. Prevailing Party. In the event that any Dispute between the Company and the Members or among the Members arising out of or related to this Agreement results in any formal proceedings, the prevailing party as determined by the arbiter or court of competent jurisdiction, as the case may be, shall be entitled to recover from the non-prevailing parties all reasonable fees, costs and expenses of enforcing any right of such prevailing party including, without limitation, reasonable attorneys' fees and expenses, including appeal costs, all of which shall be deemed to have accrued upon the commencement of such formal proceeding and shall be paid whether or not such formal proceeding is prosecuted to judgment. The "prevailing party" for purposes of this Section shall be the party who, in the arbitrator or judge's discretion, prevails on substantially all the merits in the Dispute, irrespective of the actual number of claims or counterclaims actually won or defeated. Any award, judgment or order entered in such formal proceeding shall contain a specific written statement of findings with respect to the prevailing party's recovery of fees and costs as contemplated under this Section, and shall include an award of pre-award or prejudgment interest running from the date of the breach at the maximum rate of interest allowed by applicable law.

83. Waiver of Certain Rights. AS A MATERIAL INDUCEMENT TO EACH MEMBER TO ENTER INTO THIS AGREEMENT, EACH MEMBER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO MAINTAIN ANY ACTION FOR DISSOLUTION OF THE COMPANY OR FOR PARTITION OF PROPERTY UNDER THE ACT. IN ADDITION, THE MEMBERS AGREE THAT THIS AGREEMENT HAS BEEN CAREFULLY DRAFTED TO PROVIDE FAIR TREATMENT OF ALL MEMBERS AND PARTICULARLY IN RESPECT OF EQUITABLE PAYMENT IN LIQUIDATION TO HOLDERS OF ECONOMIC INTERESTS. ACCORDINGLY, EXCEPT WHERE AND ONLY IF THE MANAGER OR LIQUIDATOR, AS THE CASE MAY BE, HAS FAILED TO LIQUIDATE THE COMPANY IN A REASONABLY TIMELY MANNER AS REQUIRED UNDER THIS AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES AND RENOUNCES ITS RIGHT TO INITIATE A LEGAL ACTION OR OTHER CLAIM TO SEEK THE APPOINTMENT OF A RECEIVER OR TRUSTEE TO LIQUIDATE THE COMPANY.

84. No Waiver. A Person's waiver of or consent to, express or implied, any breach or default by any Person as to the performance by such Person's obligations with respect to the Company, shall not constitute a waiver of or consent to any other breach or default by such other Person of the same or any other obligations with respect to the Company. Failure on the part of a Person to complain, provide notice of, or object to any action or inaction of any Person, or to declare any Person in breach or default with respect to the Company, irrespective of how long such failure continues, shall not constitute a waiver by such Person of its rights with respect to such breach or default, until the applicable statute of limitations period has run.

85. <u>Binding Effect</u>.  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective Personal Representatives, successors and permitted assigns.

86. <u>Parties in Interest</u>.  Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective Personal Representatives, successors and permitted assigns, and nothing in this Agreement shall be construed to relieve or discharge the obligation or liability of any Person to any party to this Agreement, or to provide any Person any right of subrogation or action over or against any party to this Agreement.

87. <u>Prevailing Terms</u>.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

88. <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect.  The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances.

89. <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

90. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties hereto had signed the same document.  All counterparts shall be construed together and constitute the same instrument.  Signatures by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory and shall be deemed to be originals for all purposes.  The Members acknowledge and agree that it may be executed electronically, and that the provisions of the Electronic Signatures in Global and National Commerce Act of 2000, 15 U.S.C. 7001 et al, as amended and in effect as of the Effective Date of this Agreement, shall apply.

91. <u>Acknowledgment of Provisions</u>.  BY EXECUTING THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES THAT IT HAS ACTUAL NOTICE OF: (A) ALL OF THE PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTERESTS; AND (B) ALL OF THE PROVISIONS OF THE ARTICLES.  EACH MEMBER HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES ADEQUATE NOTICE OF ALL SUCH PROVISIONS, AND EACH MEMBER HEREBY WAIVES ANY REQUIREMENT THAT ANY FURTHER NOTICE REQUIRED BY ANY PROVISION OF THE ACT OR APPLICABLE LAW.

## Miscellaneous

92. Time is of the essence in this Agreement.

93. Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

94. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

95. This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matter hereof, and may not be modified or amended except by a written instrument executed by or on behalf of authorized representatives each of Party to this Agreement.

96. All notices or other communications relating to the performance, enforcement, or other legal aspects of this Security Agreement will be in writing and may be personally delivered, sent by overnight courier service to all parties, and delivered as a .pdf e-mail attachment to all parties. Any other communications between the parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to all parties.

97. All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

## Definitions

98. For the purpose of this Agreement, the following terms are defined as follows:

   A. "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

   B. "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

   C. "Distributions" means a payment of Company profits to the Members.

   D. "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

E. "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, Member's rights to participate in the management of the Company, and any Units of membership interest in the Company owned by such Member.

F. "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

G. "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

H. "Principal Office" means the office whether inside or outside the State of Delaware where the executive or management of the Company maintain their primary office.

I. "Voting Members" means the Members who belong to a membership class that has voting power.

J. "Supermajority Vote" means a vote by Members representing no less than 60% of the Class A Voting Units.

**SIGNED, SEALED, AND DELIVERED**

**ELI M BLATT**

By: _____

**MARC GOLDNER**

By: *Marc Goldner*
_____

**RODERYCK REITER**

By: _____

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 20 of 20*

## EXHIBITS

Exhibit A      Redemption Agreement
Exhibit B      Confidentiality Agreement

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Eli Blatt _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2. **Use of Confidential Information; Non-Disclosure Obligations**

2.1.    Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.    The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.    The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

3

**13.   Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

**14.   Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

**15.   Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

     Address:        2020 N Bayshore Dr. Apt 2310, Miami FL 33137

     E-Mail:         team@megacap.capital

If to  Eli Blatt

     Address:        2020 N Bayshore Dr #2310 Miami FL 33137

     E-Mail:         e@megacap.capital

**16.   Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**               **THE RECEIVING PARTY**

By: _____         _____

Name: Eli M Blatt                 Name:  Eli Blatt

Title:  Managing Member

Date:  Jul 08 2021                Date:  Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of _____, (the "**Effective Date**") by and between **Eli M Blatt** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").   Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>333,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.    **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

   a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.    **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.    **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3. **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4. **Member's Obligations**.

4.1    Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2    At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3    The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5. **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6. **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7. **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8. **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9. **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.    **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

    **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

Individual

By: Eli Blatt

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Eli M Blatt** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Marc Goldner _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1.   Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

### 2.   Use of Confidential Information; Non-Disclosure Obligations

2.1.   Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.   The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.   The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

## 3.    Compelled Disclosure

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

## 4.    Proprietary Rights

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

## 5.    Return of Confidential Information

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

## 6.    Term and Termination

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13. **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14. **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15. **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:        2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:        team@megacap.capital

If to  Marc Goldner:

    Address:        15 Peacock Drive, Roslyn, NY 11576

    E-Mail:        m@megacap.capital

16. **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                    **THE RECEIVING PARTY**

By: _____                    _Marc Goldner_

Name: Eli M Blatt                    Name: Marc Goldner

Title:  Managing Member

Date: Jul 08 2021                    Date: Jul 08 2021

NOT A CERTIFIED COPY

4

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ____Jul 08 2021____ , (the "**Effective Date**") by and between **Marc Goldner** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").  Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>234,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.     **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

      a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.     **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.     **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3. **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4. **Member's Obligations**.

4.1    Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2    At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3    The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.    **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.    **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.    **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.    **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.    **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 3 of 4

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.   **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.

MEMBER:

*Marc Goldner*

_____
Individual and Managing Partner of MegaCap Capital, LLC.

By: Marc Goldner

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Marc Goldner** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 234,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**

By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Roderyck Reiter _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2. **Use of Confidential Information; Non-Disclosure Obligations**

2.1. Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2. The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3. The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.   The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.   **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

### 3.   Compelled Disclosure

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

### 4.   Proprietary Rights

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

### 5.   Return of Confidential Information

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

### 6.   Term and Termination

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate.  Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof.  All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution.  In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.  The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof.  This Agreement may only be modified or amended in a writing signed by the Parties.  No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

**13.**   **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

**14.**   **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

**15.**   **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

  Address:   2020 N Bayshore Dr. Apt 2310, Miami FL 33137

  E-Mail:   team@megacap.capital

If to   Roderyck Reiter                                            :

  Address:   4661 NW 2nd Ave APT 603, Boca Raton, FL 33431

  E-Mail:   r@megacap.capital

**16.**   **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                                    **THE RECEIVING PARTY**

By: _____                                      _____

Name: Eli M Blatt                                                Name:  Roderyck Reiter

Title:   Managing Member

Date: Jul 08 2021                                                Date: Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ___Jul 08 2021___ , (the "**Effective Date**") by and between **Roderyk Reiter** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company"). Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member 333,000 units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

    1.    **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

            a.    For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

    2.    **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

    2.    **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 2 of 4

3.     **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.     **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.     **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.     **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.     **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.     **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.     **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.      **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

Individual and Managing Partner of MegaCap Capital, LLC

By: Roderyck Reiter

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Roderyk Reiter** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY



## RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF
## THE VOTING MEMBERS OF THE DIRECTORS OF MEGACAP CAPITAL, LLC

The undersigned, being the Voting Members of **MEGACAP CAPITAL, LLC** (the "**Company**") hereby adopt the following resolutions and take the following actions by unanimous written consent on **January 16, 2023** (the "**Effective Date**") in lieu of a meeting and is to deemed effective immediately:

### PREAMBLE

1. Marc J Goldner ("**Marc**") is an individual who owns 50% of the Company.

2. Eli M Blatt ("**Eli**") is an individual who owns 50% of the Company.

3. Eli and Marc are both parties to the *Operating Agreement of Megacap Capital, LLC* (the "**Operating Agreement**"). A copy of the fully executed Operating Agreement is attached hereto as **Exhibit A**.

4. Marc is refusing to adhere to the Company's own Subscription documents and Series Agreement relating to Megacap Funds, LP – Tech I, of which the Company is the General Partner as regards the treatment of management fees, which the parties previously agreed to in a meeting in early December 2022, preventing the Company from filing tax returns and issuing Tech I LPs K1s that reflect the terms of the Series Agreement, the use of funds sent to Tech I, and the advice of the Company's Fund administer, Flow, constituting a "breach of fiduciary duty" to the Company that makes it "impossible to carry on the ordinary business of the Company".

5. Marc has on numerous occasions, in writing, made personal threats against Eli as well as his fiancé relating to his desire to receive unapproved expense reimbursement, which has resulted in both Eli and his fiancé at times feeling unsafe. Marc has claimed to have connections to the criminal underworld, which has amplified the seriousness of his threats. As a result, Eli no longer feels comfortable engaging directly with Marc. Marc's threats have thus made it "impossible to carry on the ordinary business of the Company".

6. Marc has made numerous false, distorted, and unsubstantiated allegations against Eli to the Company's corporate counsel, jeopardizing the ability of the Company to receive proper legal counsel, making it "impossible to carry on the ordinary business of the Company".

7. As a result of the above, Marc has breached his obligations to the Company and is hereby involuntarily withdrawn from the Company as provided in the following sections of the Operating Agreement:

    a. **Section 41** which states that "Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to... breach of fiduciary duties by a Member" and engaging "in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member"
    b. **Section 69** which states "No Member may do any act that would make it impossible to carry on the ordinary business of the Company."

**NOW, THEREFORE, BE IT RESOLVED** that, effective immediately, the Company acknowledges, approves, and ratifies Marc's involuntary withdrawal as both Manager and Member from the Company as provided in **Sections 41 and 69** of the Operating Agreement; the Company reserves the right to void this Resolution at its sole discretion.

**FURTHER RESOLVED,** that, barring voiding of this agreement by the Company, effective immediately upon Marc's involuntary withdrawal as a member of the Company, the only remaining voting member is Eli.

**FURTHER RESOLVED**, as consideration for removal of his Membership, the Company shall in due time pass a resolution issuing Marc 50% interests in the Company in the form of Class B non-voting shares, thus retaining his economic interests in the Company.

This Written Consent is executed as of the Effective Date by the Voting Members of the Company.

**MEGACAP CAPITAL, LLC**

By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Name:  Eli M Blatt

Title:   Managing Member

**EXHIBIT A**
**OPERATING AGREEMENT**

## OPERATING AGREEMENT OF MEGACAP CAPITAL, LLC

**This OPERATING AGREEMENT** (the "**Agreement**") made and entered into this 7 day of July 2021 (the "**Effective Date**") by and among **MEGACAP CAPITAL LLC**, a Delaware Series Limited Liability Company (the "**Company**") and the following persons (each, a "**Member**," and, collectively the "**Members**"):

ELI M BLATT
MARC GOLDNER
RODERYCK REITER

### BACKGROUND:

A. The Members wish to associate themselves as members of a limited liability company.

B. The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

**Formation**

1. By this Agreement, the Members form a Series Limited Liability Company (the "**Company**") in accordance with the laws of the State of Delaware. The rights and obligations of the Members will be as stated in the Delaware Limited Liability Company Act (the "**Act**") except as otherwise provided in this Agreement.

**Name**

2. The name of the Company will be **MEGACAP CAPITAL, LLC**.

**Purpose**

3. Investing and Finance

**Term**

4. The Company will continue until terminated as provided in this Agreement or in the Act.

**Place of Business**

5. The Company's principal place of business will be located at:
A Registered Agent, Inc.
ATTN: MegaCap Capital, LLC.

8 The Green Street
Suite A
Dover, Delaware 19901

## Units and Capital Contributions

6. The Company shall be authorized to issue one million (**1,000,000**) units of membership interest in the Company (each, a "**Unit,**" collectively, "**Units**"), of which 900,000 units are hereby issued ("**Issued Units**") as per Section 8. These units constitute units of the "Master Series". The Company may authorize the issuance of additional Units with the prior written consent of all of the Class A Voting Members. As per Section 16, additional Series may be authorized each with its own Membership Units. The remainder of this agreement concerns the Master Series of the Company, however all provisions shall apply to any additional Series authorized unless otherwise approved by a supermajority vote of the Class A Members of the Master Series.

7. Units shall be divided into two classes: (a) "**Class A Voting Members**," and (b) "**Class B Non-Voting Members**." Each class will have distinct rights and obligations as follows:

| Member Class | Rights and Obligations |
|---|---|
| Class A | Class A Voting Members have full voting rights. |
| Class B | Class B Non-Voting Members have no voting rights. |

8. The following is a list of the initial Members (the "**Initial Members**") of the Company and Units of membership interest of the Company:

| Member | Class and Units Issued |
|---|---|
| Eli M Blatt | 333,000 Class A Units (37% of all Issued Units) |
| Marc Goldner | 234,000 Class A Units (26% of all Issued Units) |
| Roderyck Reiter | 333,000 Class A Units (37% of all Issued Units) |

9. The following is a list Initial Members of the Company and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution | Value |
|---|---|---|
| Eli M Blatt | Cash | $1,000.00 |
| Marc Goldner | Cash | $1,000.00 |
| Roderyck Reiter | Cash | $1,000.00 |

## Independent Contractor Agreement; Redemption Agreement

10. All Members receiving shares in exchange for services to the Company shall be required to execute. that certain Stock Redemption Agreement, a copy of which is attached hereto as **Exhibit A**. All

Members shall be required to execute that certain Confidentiality Agreement, a copy of which is attached hereto as **Exhibit B.** In addition to the foregoing, any and all owners, principals, officers, directors, managers, members, or affiliates of each Member (each, along with the Members, a "**Member Affiliate**") shall also execute the Confidentiality Agreement.

11. The Company may enforce its rights under the Redemption Agreement at any time if (a) any Member is in material breach of this Agreement and/or the Confidentiality Agreement; (b) commits any of the forbidden acts delineated in Section 68-72; (c) violates the Duty to Devote time under Section 34; or (c) terminates this Agreement or otherwise ceases to be a member of the Company for any reason.

12. In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other. For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units).

## Allocation and Distribution of Profits/Losses

13. Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will be allocated between all Class A Members in accordance with their percentage interest in the Company or individual Series as determined by their respective percentage of Issued Units therein. For the Initial Members in the Master Series, Net Profits and Losses shall be allocated in the following manner:

| Member | Profit and Loss Percentage |
|---|---|
| Eli M Blatt | 37% |
| Marc Goldner | 26% |
| Roderyck Reiter | 37% |

14. Cash Distributions to Class A Members will be made in the same fixed proportions as the allocation of Net Profits or Losses described above. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

15. The Company shall make distributions of profit monthly, retaining an operating account reserve as agreed by a supermajority vote of Class A Members.

16. Series Interests and Series.

      (a)    The Members shall cause the Company to issue Interests in one or more separate and distinct series (each, a "Series"), with each such Series established to make separate

Investment or portfolio of Investments. The Members may establish Series for the purpose of (1) making Investments in specific and distinct companies identified by the Members, (2) to purchase securities in such companies from secondary sources, or (3) to invest in interests of investment funds, special purpose vehicles or other Entities consistent with the Company's investment focus, which such Series will be segregated from each other. The Members may use its commercially reasonable efforts to have securities purchased by a particular Series be issued for the benefit of such particular Series to which they are allocated. Members of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to share in the profits, losses, allocations or distributions of any other Series of which they are not a Member.

(b)      Each Series so established shall be set forth on Schedule A to this Agreement, and Schedule A will be updated by the Managers from time to time in connection with the establishment of one or more additional Series. Subject to such limitations as may be set forth in this Agreement, the Members shall establish and may modify the investment objective and policies of each Series and all other rights and features thereof.

(c)      Interests of each Series shall have the following relative rights and preferences:

(i)      Assets Held with Respect to a Particular Series. All Capital Contributions made to the Company with respect to a particular Series, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Series for all purposes, subject only to the rights of creditors of such Series, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Series, are herein referred to as "assets held with respect to" that Series. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Series (collectively "General Assets"), the Members shall allocate such General Assets to, between or among any one or more of the Series' in such manner and on such basis as the Members, in its sole discretion, deems fair and equitable, and any General Assets so allocated to a particular Series shall be assets held with respect to that Series. Each such allocation by the Members shall be conclusive and binding upon Members of all Series for all purposes.

(ii)      Liabilities Attributable to a Particular Series. The assets of the Company held with respect to each particular Series shall be charged with all liabilities, expenses, costs, charges and reserves attributable to that Series. All such liabilities, expenses, costs, charges, and reserves so charged to a Series are herein referred to as "liabilities attributable to" that Series. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Series ("General Liabilities") shall be allocated and charged by the Manager to, between or among any one or more of the Series in such manner and on such basis as the Members, in their sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Series shall be liabilities attributable to that Series. Each such allocation of liabilities, expenses, costs, charges and reserves by the Members shall be conclusive and binding upon Members of all

NOT A CERTIFIED COPY

Series for all purposes. The liabilities attributable to any Series shall be enforceable against the assets of such Series only, and not against the General Assets, or the assets of any other Series. All Persons, including any Affiliates of the Members, who have extended credit that has been allocated to a particular Series, or who have a claim or contract that has been allocated to any particular Series, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Series for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship.

## Withdrawal of Contribution

17. No Member will withdraw any portion of their Capital Contribution without the supermajority consent of the Class A Voting Members.

## Liability for Contribution

18. A Member's obligation to make their required Capital Contribution can only be compromised or released with the consent of all Class A Voting Members or as otherwise provided in this Agreement. If a Member does not make the Capital Contribution when it is due, he is obligated at the option of the Class A Voting Members voting as a separate class, to contribute cash equal to the agreed value of the Capital Contribution. This option is in addition to and not in lieu of any other rights, including the right to specific performance that the Company may have against such Member.

## Additional Contributions

19. Capital Contributions may be amended from time to time, according to the business needs of the Company by supermajority vote of the Class A Voting Members.

20. Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by the Class A Voting Members, voting as a separate class. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

## Capital Accounts

21. An individual capital account (the "**Capital Account**") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

## Interest on Capital

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 6 of 20*

22. No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

## Management

23. The Class A Voting Members shall have the sole authority to appoint a manager of the Company (individually the "**Manager**" and collectively the "**Managers**"). Management of the Company is vested in the following Managers until such time as they are removed by the Class A Voting Members or withdraw from the position:

   A. Eli M Blatt, Managing Partner
   B. Marc Goldner, Managing Partner
   C. Roderyck Reiter, Managing Partner

24. The duties and responsibilities of the Managers will include the following:

   ● Managers will supervise the day-to-day operations of the Company including supervising sales and production staff and maintaining financial accounts.

25. Notwithstanding any other provisions contained in the Certificate of Formation or this Agreement, each of the Managers is empowered to bind the Company for any and all decisions except Major Decisions. A supermajority vote of the Class A Voting Members shall be required for all Major Decisions, except where a unanimous vote is expressly called for. Such votes may be accomplished via electronic mail, What's App, or any other written medium upon which the Class A Voting Members unanimously agree. For purposes of this Agreement, "**Major Decisions**" are the following:

   A. Incur debt, expend funds, write checks, pay bills, or enter into contracts, or otherwise obligate the Company for any amount in excess of $1,500.
   B. Negotiate or agree to an accounts payables/receivables payment schedule.
   C. Establish credit lines and the use of such credit lines.
   D. The sale or dissolution of the Company or its assets.
   E. Issuance of additional member or shareholder interests, which shall require a unanimous vote and be signed in writing by all Class A Members.
   F. Approval of a member or shareholder buy-sell agreement, approval of which shall not be unreasonably withheld.
   G. Scheduling repayment of any capital contributions from any Member.
   H. Selling, leasing, or encumbering any property owned by the Company.
   I. Scheduling repayment of any loans from Members.
   J. Changing or amending this Agreement or approving any action or resolution that would alter the terms of this Agreement, which shall require a unanimous vote and be signed in writing by all Class A Members.
   K. Appointment or removal of a Manager which shall require a unanimous vote and be signed in writing by all Class A Members excluding the Member being removed.
   L. Addition, withdrawal, appointment, or removal of a Member, which shall require a unanimous vote and be signed in writing by all Class A Members (unless the Member being removed is a

Class A Member, in which case the unanimous vote of the remaining Class A Members is required.

M. Amending the duties and responsibilities of any Manager.

N. Any changes to the Company Name, branding imagery, and public relations positioning.

O. Adjustments to the compensation of any Member, Manager, Employee, or contractor.

P. Payment of any distributions or other compensation to any Member beyond the monthly Distributions required in Section 15.

Q. Registering the company with any regulatory or governmental agency.

R. Creation of an additional Series within the MegaCap umbrella, which shall require a unanimous vote and be signed in writing by all Class A Members. For avoidance of doubt, any Series created for any entities such as additional SPVs or for any purpose defined in Section 16(a) for MegaCap will be approved by all Class A Members in writing.

S. Each Series equity percentage shall require a unanimous vote and be signed in writing by all Class A Members.

T. Each Series investment objective and policies will be defined by the Managers and shall be unanimously approved by all Class A Members signed in writing.

U. No manager shall move any "General Assets" to any Series without unanimous approval by all Class A Members.

V. No Class A Members shall take on personal liability or personal obligations of MegaCap unless expressly approved and unanimously approved by all Class A Voting Members.

26. A new Manager may be added to the Company with a supermajority vote of the Class A Voting Members.

27. A Manager will be reimbursed for reasonable expenses directly related to the operation of the Company and approved, in advance, by a supermajority of the Class A Voting Members (voting as a separate class).

28. The Members will be consulted and the advice and opinions of the Members will be obtained as much as is practicable. However, subject to Section 25 above, the Managers will have management and control of the day-to-day business of the Company for the purposes stated in this Agreement. All matters outside the day-to-day business of the Company will be decided by the Class A Voting Members (voting as a separate class) as outlined elsewhere in this Agreement.

A. In determining and selecting which manufacturing hardware partner and software partner to use for operations, only a simple majority vote of 51% will be required between the Members.

29. In addition to day-to-day management tasks and any other duties and responsibilities already identified in this Agreement, the Managers' duties will include keeping, or causing to be kept, full and accurate business records for the Company according to generally accepted accounting principles (GAAP), and overseeing the preparation of any reports considered reasonably necessary to keep the Class A Voting Members informed of the business performance of the Company.

30. A Manager will not be liable to the Members for any action or failure to act resulting in loss or harm to the Company except in the case of gross negligence or willful misconduct.

31. Each Member will devote such time and attention to the business of the Company as required to carry out their duties and responsibilities for the conduct of the Company's business.

## Authority to Bind Company

32. Only the Manager(s) have the authority to enter into contracts on behalf of the Company.

## Duty of Loyalty

33. While a person is a Member or Manager of the Company, and for a period of at least two years after that person ceases to be a Member or Manager, that person will not carry on, or participate in, a business involved in the issuance or transacting of securities in any market regions that were established or contemplated by the Company before or during that person's tenure as Member or Manager.

## Duty to Devote Time

34. Each Member will devote such time and attention to the business of the Company as the supermajority of the Class A Voting Members (voting as a separate class) will from time to time reasonably determine for the conduct of the Company's business. Should a Member or Members be deemed by supermajority vote of the Members voting thereon to be in violation of this provision, those Members will be subject to Involuntary Withdrawal as per Section 43.

## Member Meetings

35. A meeting may be called by any Class A Voting Member providing that reasonable written notice has been given to the other Members.

## Voting

36. Each of the Class A Voting Members shall have one vote for each Unit owned by such Class A Voting Member.

37. INTENTIONALLY LEFT BLANK

## Admission of New Members

38. A new Member may only be admitted to the Company with a supermajority vote of the Class A Voting Members.

39. No new Class A member shall be admitted as a Member of the Company until such new Member becomes a party to this Agreement, as amended, and agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to effect the admission of the new Member as determined by a supermajority vote of the Class A Members. Any new Member will receive such

business interest in the Company as determined by a supermajority consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

## Voluntary Withdrawal of a Member

40. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

41. INTENTIONALLY LEFT BLANK

## Involuntary Withdrawal of a Member

42. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; felony conviction of a Member; or a legal judgment against a Member (excluding any judgment resulting from any litigation relating to Marc Goldner) that is pending as of the effective date hereof) that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member has engaged in conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member, including not devoting time to the Company as required per Section 34.

43. The involuntary withdrawal of a Member will have no effect upon the continuance of the Company.

## Dissociation of a Member

44. In the event of either a voluntary or involuntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.

45. A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

46. Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 60 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company.

## Sale, Transfer, or Assignment of a Member's Interest; Drag-Along

47. No Member may sell, transfer or assign any of such Member's Interest, including, but not limited to, any Units owned by such Member, without the supermajority written consent of the Class A Voting Members. Where a Member's financial interest in the Company is assigned to another party who is not an existing Member, that party will be considered a New Member. An assignment of full membership status inclusive of all duties, obligations, and rights held by the previous Member will be governed by the conditions described under the Admission of New Members section of this Agreement.

48. **Drag-Along Rights.** In the event that the Class A Voting Members receive a bona fide offer from an independent third party purchaser to purchase (including by merger) all of the outstanding Units or all or a substantial portion of the assets of the Company, the Class A Voting Members may send written notice (the **"Drag-Along Notice"**) to the Company and the remaining Class B Members (the **"Class B Members"**) notifying them they will be required to sell all of their Units in such sale. Upon receipt of a Drag-Along Notice, each Class B Member receiving such notice shall be obligated to (a) sell all of the Class B Member's Units contemplated by the Drag-Along Notice on the same terms and conditions as the Class A Voting Members; and (b) otherwise take all necessary action to cause the consummation of such transaction. Each Class B Member further agrees to (a) take all actions (including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by the Class A Members; (b) waive all applicable appraisal rights, if any, under the laws of the State of Delaware; and (c) appoint the Class A Members as the Class B Member's attorney-in-fact to do the same on its behalf. Notwithstanding the foregoing, no Class B Member may sell or assign such Member's Units, in whole or in part, under this Section without the express prior written approval and consent of a Supermajority of Class A Voting Members.

## Right of First Purchase

49. In the event that a Member's Interest in the Company is or will be sold, due to any reason other than as said forth in section 48 above, the remaining Members will have a right of first purchase of that Member's Interest. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

50. In the event that a Member's interest in the company is transferred or assigned as the result of a court order or operation of law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

## Valuation of Interest

51. In the event of a sale of all or substantially all of the Units and/or assets of the Company, a Member's financial interest in the Company will be based in the percentage of Units owned in proportion to all of the issued and outstanding Units of the Company at the time of such sale.

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 11 of 20*

52. In the absence of a written agreement setting a value, the value of the Company will be based on an appraisal of the fair market value of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members to be retained within a reasonable period of the event giving rise to the disposition of a Member's interest. The results of the appraisal will be binding on all Members. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member.

53. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

## Dissolution

54. The Company may be dissolved by a unanimous vote of the Class A Voting Members. The Company will also be dissolved on the occurrence of events specified in the Act.

55. Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

   A. First, in satisfaction of liabilities to creditors except Company obligations to current Members;

   B. Second, in satisfaction of Company debt obligations to current Members;

   C. Third, to the Class A Members up to the amount of their Capital Contributions;

   D. Fourth, to the Class B Members up to the amount of their Capital Contributions; and

   E. Finally, to all of the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement.

## Records

56. The Company will at all times maintain accurate records of the following:

   A. Information regarding the status of the business and the financial condition of the Company.

   B. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.

   C. Name and last known business, residential, or mailing address of each Member and Manager, as well as the date that person became a Member or Manager.

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 12 of 20*

D. A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement and any amendments have been executed.

E. The cash, property, and services contributed to the Company by each Member, along with a description and value thereof.

57. Each of the Class A Voting Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

58. Each Manager has the right to examine the above documents for any purpose reasonably related to their position as Manager of the Company.

## Books of Account

59. Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any of the Class A Voting Members. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

## Banking and Company Funds

60. The funds of the Company will be placed in such investments and banking accounts as will be designated by the unanimous vote of all Class A Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by supermajority consent of the Class A Voting Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

## Audit

61. Any of the Class A Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Company. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Class A Voting Members for any fiscal year.

## Tax Treatment

62. The Company is intended to be treated as an S-Corp for the purposes of Federal and State Income Tax.

## Annual Report

63. As soon as practicable after the close of each fiscal year, the Company will furnish to each Class A Voting Member an annual report showing a full and complete account of the condition of the Company

including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

    A.  A copy of the Company's federal income tax returns for that fiscal year.

    B.  Income statement.

    C.  Balance sheet.

    D.  Cash flow statement.

    E.  A breakdown of the profit and loss attributable to each Member.

## Goodwill

64.  The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## Governing Law

65.  INTENTIONALLY LEFT BLANK

## Force Majeure

66.  A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to an event of force majeure, such as earthquake, typhoon, flood, fire, pandemic, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

## Forbidden Acts

67.  No Member may do any act in contravention of this Agreement or prevailing law.

68.  No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company.

69.  No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

70.  No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

71. No Member may confess a judgment against the Company.

72. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

## Indemnification

73. All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature whatsoever, arising out of a Member's participation in Company affairs pursuant to this Agreement. A Member will not be entitled to indemnification under this section for liability arising out of negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

## Liability

74. A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

## Liability Insurance

75. The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

## Life Insurance

76. The Company will not have the right to acquire life insurance on the lives of any or all of the Members.

## Amendment of this Agreement

77. No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all of the Class A Voting Members.

## Title to Company Property

78. Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member.

79. A breach of the Confidentiality Agreement

## Dispute Resolution

80. <u>Dispute Resolution</u>.   Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this <u>Section</u>. The initiation and pendency of the procedures under this <u>Section</u> does not relieve the Parties from their respective obligations under the Agreement. ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS <u>SECTION</u> SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

   A.  Negotiations by and between the Parties.

   (1)  Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail.  Within ten (10) days after receiving such notice, the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

   (2)  Upon the Disputing Party's receipt of the Responding Parties' response, the Parties shall then have thirty (30) days, or such other time as they may mutually agree upon in writing, to resolve the Dispute amongst themselves.

   B.  Mediation

   If the Parties are not able to resolve a  Dispute pursuant to subsection (A) above,  they agree to participate in at least ten (10) hours of good faith mediation administered by the American Arbitration Association under its Commercial Mediation Procedures.

   C.  If the Parties are not able to resolve a Dispute pursuant to subsections (A) and (B) above, the Dispute shall finally be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association.   Nothing herein shall limit the right of any Party to seek interim or provisional equitable relief in a court of competent jurisdiction prior to or pending the      conclusion of the arbitration. Any Arbitration shall take place virtually  unless the parties agree on a physical location. The arbitrator shall apply the law of the State of Delaware without regard to conflicts of law principles.  No demand for arbitration may be made after the date when the institution of legal or equitable proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

81.  <u>Equitable Remedies</u>.  The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights

and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement.  The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware.  For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of *forum non conveniens*.

82. Prevailing Party.  In the event that any Dispute between the Company and the Members or among the Members arising out of or related to this Agreement results in any formal proceedings, the prevailing party as determined by the arbiter or court of competent jurisdiction, as the case may be, shall be entitled to recover from the non-prevailing parties all reasonable fees, costs and expenses of enforcing any right of such prevailing party including, without limitation, reasonable attorneys' fees and expenses, including appeal costs, all of which shall be deemed to have accrued upon the commencement of such formal proceeding and shall be paid whether or not such formal proceeding is prosecuted to judgment. The "prevailing party" for purposes of this Section shall be the party who, in the arbitrator or judge's discretion, prevails on substantially all the merits in the Dispute, irrespective of the actual number of claims or counterclaims actually won or defeated. Any award, judgment or order entered in such formal proceeding shall contain a specific written statement of findings with respect to the prevailing party's recovery of fees and costs as contemplated under this Section, and shall include an award of pre-award or prejudgment interest running from the date of the breach at the maximum rate of interest allowed by applicable law.

83. Waiver of Certain Rights.  AS A MATERIAL INDUCEMENT TO EACH MEMBER TO ENTER INTO THIS AGREEMENT, EACH MEMBER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO MAINTAIN ANY ACTION FOR DISSOLUTION OF THE COMPANY OR FOR PARTITION OF PROPERTY UNDER THE ACT.  IN ADDITION, THE MEMBERS AGREE THAT THIS AGREEMENT HAS BEEN CAREFULLY DRAFTED TO PROVIDE FAIR TREATMENT OF ALL MEMBERS AND PARTICULARLY IN RESPECT OF EQUITABLE PAYMENT IN LIQUIDATION TO HOLDERS OF ECONOMIC INTERESTS.   ACCORDINGLY, EXCEPT WHERE AND ONLY IF THE MANAGER OR LIQUIDATOR, AS THE CASE MAY BE, HAS FAILED TO LIQUIDATE THE COMPANY IN A REASONABLY TIMELY MANNER AS REQUIRED UNDER THIS AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES AND RENOUNCES ITS RIGHT TO INITIATE A LEGAL ACTION OR OTHER CLAIM TO SEEK THE APPOINTMENT OF A RECEIVER OR TRUSTEE TO LIQUIDATE THE COMPANY.

84. No Waiver.  A Person's waiver of or consent to, express or implied, any breach or default by any Person as to the performance by such Person's obligations with respect to the Company, shall not constitute a waiver of or consent to any other breach or default by such other Person of the same or any other obligations with respect to the Company. Failure on the part of a Person to complain, provide notice of, or object to any action or inaction of any Person, or to declare any Person in breach or default with respect to the Company, irrespective of how long such failure continues, shall not constitute a waiver by such Person of its rights with respect to such breach or default, until the applicable statute of limitations period has run.

85. <u>Binding Effect</u>.  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective Personal Representatives, successors and permitted assigns.

86. <u>Parties in Interest</u>.  Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective Personal Representatives, successors and permitted assigns, and nothing in this Agreement shall be construed to relieve or discharge the obligation or liability of any Person to any party to this Agreement, or to provide any Person any right of subrogation or action over or against any party to this Agreement.

87. <u>Prevailing Terms</u>.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

88. <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect.  The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances.

89. <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

90. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties hereto had signed the same document.  All counterparts shall be construed together and constitute the same instrument.  Signatures by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory and shall be deemed to be originals for all purposes.  The Members acknowledge and agree that it may be executed electronically, and that the provisions of the Electronic Signatures in Global and National Commerce Act of 2000, 15 U.S.C. 7001 et al, as amended and in effect as of the Effective Date of this Agreement, shall apply.

91. <u>Acknowledgment of Provisions</u>.   BY EXECUTING THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES THAT IT HAS ACTUAL NOTICE OF: (A) ALL OF THE PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTERESTS; AND (B) ALL OF THE PROVISIONS OF THE ARTICLES.  EACH MEMBER HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES ADEQUATE NOTICE OF ALL SUCH PROVISIONS, AND EACH MEMBER HEREBY WAIVES ANY REQUIREMENT THAT ANY FURTHER NOTICE REQUIRED BY ANY PROVISION OF THE ACT OR APPLICABLE LAW.

## Miscellaneous

92.  Time is of the essence in this Agreement.

93.  Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

94.  If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

95.  This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matter hereof, and may not be modified or amended except by a written instrument executed by or on behalf of authorized representatives each of Party to this Agreement.

96.  All notices or other communications relating to the performance, enforcement, or other legal aspects of this Security Agreement will be in writing and may be personally delivered, sent by overnight courier service to all parties, and delivered as a .pdf e-mail attachment to all parties. Any other communications between the parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to all parties.

97.  All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

## Definitions

98.  For the purpose of this Agreement, the following terms are defined as follows:

   A. "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

   B. "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

   C. "Distributions" means a payment of Company profits to the Members.

   D. "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

E. "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, Member's rights to participate in the management of the Company, and any Units of membership interest in the Company owned by such Member.

F. "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

G. "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

H. "Principal Office" means the office whether inside or outside the State of Delaware where the executive or management of the Company maintain their primary office.

I. "Voting Members" means the Members who belong to a membership class that has voting power.

J. "Supermajority Vote" means a vote by Members representing no less than 60% of the Class A Voting Units.

**SIGNED, SEALED, AND DELIVERED**

**ELI M BLATT**

By: _____

**MARC GOLDNER**

By: _____

**RODERYCK REITER**

By: _____

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 20 of 20*



## EXHIBITS

Exhibit A      Redemption Agreement
Exhibit B      Confidentiality Agreement

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Eli Blatt _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2. **Use of Confidential Information; Non-Disclosure Obligations**

2.1. Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2. The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3. The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

## 7.    Remedies

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate.  Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

## 8.    Governing Law, Submission to Jurisdiction, and Consent to Suit

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof.  All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution.  In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.  The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

## 9.    Entire Agreement

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof.  This Agreement may only be modified or amended in a writing signed by the Parties.  No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

## 10.    Counterparts

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

## 11.    Severability

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

## 12.    Relationship of The Parties

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

**13.    Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

**14.    Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

**15.    Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

      Address:          2020 N Bayshore Dr. Apt 2310, Miami FL 33137

      E-Mail:           team@megacap.capital

If to Eli Blatt                              :

      Address:          2020 N Bayshore Dr #2310 Miami FL 33137

      E-Mail:           e@megacap.capital

**16.    Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                         **THE RECEIVING PARTY**

By: _____                      _____

Name: Eli M Blatt                                Name: Eli Blatt

Title:  Managing Member

Date: Jul 08 2021                                Date: Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of _____, (the "**Effective Date**") by and between **Eli M Blatt** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").   Member and Company hereafter are collectively referred to as the "Parties."

## RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>333,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

## AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.       **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

        a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.       **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.       **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

MEGACAP CAPITAL, LLC
*Redemption Agreement*
*Page 2 of 4*

3.      **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.      **Member's Obligations**.

4.1      Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2      At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3      The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.      **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.      **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.      **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.      **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.      **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 3 of 4

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

      10.    **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

      **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

MEMBER:

Individual

By: Eli Blatt

Its: Managing Member

THE COMPANY:

MEGACAP CAPITAL, LLC

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Eli M Blatt** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By: _____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Marc Goldner _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1.   Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

### 2.   Use of Confidential Information; Non-Disclosure Obligations

2.1.   Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.   The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.   The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

**7.    Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate.  Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

**8.    Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof.  All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution.  In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.  The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

**9.    Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof.  This Agreement may only be modified or amended in a writing signed by the Parties.  No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

**10.    Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

**11.    Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

**12.    Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13. **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14. **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15. **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:        2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:         team@megacap.capital

If to  Marc Goldner     :

    Address:        15 Peacock Drive, Roslyn, NY 11576

    E-Mail:         m@megacap.capital

16. **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**             **THE RECEIVING PARTY**

By: _____          *Marc Goldner*
                                           _____

Name: Eli M Blatt                 Name: Marc Goldner

Title:  Managing Member

Date: Jul 08 2021                Date: Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of <u>Jul 08 2021</u>, (the "**Effective Date**") by and between **Marc Goldner** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company"). Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>234,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.      **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

  a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.      **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.      **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

MEGACAP CAPITAL, LLC
*Redemption Agreement*
*Page 2 of 4*

3.     **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.     **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.     **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.     **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.     **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.     **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.     **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10. **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees), regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

MEMBER:

*Marc Goldner*

_____

Individual and Managing Partner of MegaCap Capital, LLC.

By: Marc Goldner

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Marc Goldner** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 234,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Roderyck Reiter _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1. Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

### 2. Use of Confidential Information; Non-Disclosure Obligations

2.1. Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2. The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3. The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care.  In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL.  The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party.  Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it.  In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL.  The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL) any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice.  If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement.  Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.      **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.      **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.      **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.     **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.     **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.     **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

**13.    Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

**14.    Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

**15.    Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:        2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:         team@megacap.capital

If to Roderyck Reiter                                :

    Address:        4661 NW 2nd Ave APT 603, Boca Raton, FL 33431

    E-Mail:         r@megacap.capital

**16.    Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                                    **THE RECEIVING PARTY**

By: _____                    _____

Name: Eli M Blatt                                    Name:  Roderyck Reiter

Title:  Managing Member

Date: Jul 08 2021                                    Date: Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ___Jul 08 2021___ , (the "**Effective Date**") by and between **Roderyk Reiter** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").  Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member 333,000 units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.      **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US \$0.00001 per Unit (the "Redemption Price").

a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.      **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.      **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3.      **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.      **Member's Obligations**.

4.1      Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2      At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3      The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.      **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.      **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.      **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.      **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.      **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.     **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

    **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

Individual and Managing Partner of MegaCap Capital, LLC

By: Roderyck Reiter

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Roderyk Reiter** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.0001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

**RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF**
**THE VOTING MEMBER OF MEGACAP CAPITAL, LLC**

The undersigned, being the sole Voting Member of **MEGACAP CAPITAL, LLC** (the "**Company**") hereby adopt the following resolutions and take the following actions by unanimous written consent on **Friday April 28, 2023 (the "Effective Date")** in lieu of a meeting and is to deemed effective immediately:

**PREAMBLE**

1. Eli M Blatt ("**Blatt**") is an individual who owns 50% of the Company in the form of Class A Shares and is the only voting Member or Manager of the Company.
2. Marc J Goldner ("**Goldner**") is an individual who owns 50% of the Company in the form of Class B shares.
3. Blatt and Goldner are both parties to the *Operating Agreement of Megacap Capital, LLC* (the "**Operating Agreement**"). A copy of the fully executed Operating Agreement is attached hereto as **Exhibit A**.
4. The Forbidden Acts in Sections 67 and 69 do not require judicial review or determination and are at the sole discretion of the Company when determining whether to withdraw a Member.
5. Goldner has himself affirmed that the Members themselves are the sole arbiter of whether another Member has committed the forbidden act of making it impossible to carry on the ordinary course of business by making repeated threats to unilaterally withdraw Blatt; in his case, Goldner did so simply because Blatt disagreed with his approach to an agreement, notably his aggressive harassment and threats towards Blatt, but also as regards legitimate concerns regarding liability to the Company.
6. Goldner has on numerous occasions made personal threats against Blatt as well as his fiancé relating to his desire to receive unapproved expense reimbursement in excess of that provided for in the operating agreements, which has resulted in both Blatt and his fiancé feeling unsafe (**Exhibit B**), which has made it impossible to carry on the ordinary business of the Company.
7. Goldner has made unfounded claims to have connections to the criminal underworld and various unnamed intelligence and spy agencies, for whom he has clearly stated he is not an employee but works as an informal independent contractor on a bounty basis, which have amplified the seriousness of his threats.
8. Goldner has since December 2022 repeatedly transmitted threats against Blatt and his family's lives, allegedly on behalf of one of the Members of one of Megacap's creditors, however he has refused to provide any evidence of such threats (**Exhibit C**).
9. Goldner was instructed that if he were to continue transmitting threats without proof thereof he would be deemed to be making the threats himself yet continued to do so.
10. On April 19, Goldner escalated his threats to include direct blackmail and extortion threats against Blatt using files he obtained through unauthorized use of a computer, actions which are felonies and misdemeanors under US Federal and State laws (**Exhibit D**) and thus represent contraventions of law.
11. Goldner's actions made Blatt feel compelled to file for a restraining order for cyberstalking, for which there is a hearing scheduled on May 15, 2023 in Miami Dade.
12. Goldner has further committed civil theft, fraud in the inducement, and unjust enrichment as detailed in a Florida legal case now being prepared for filing.
13. As a result, Blatt no longer feels comfortable engaging directly with Goldner, making it impossible to carry on the ordinary business of the Company
14. Goldner's threats have made it "impossible to carry on the ordinary business of the Company" and constitutes a clear contravention of prevailing law and of his fiduciary duties as General Partner.
15. Goldner refused to allow the Company to complete its K1s in a timely manner by tying critical tax matters to demands prioritizing his own financial interests, as documented in the 2023 resolutions,

which were executed by Blatt under threats to his and his family's lives transmitted by Goldner as well as threats against the Company to fail to file K1s timely, which Marc's actions did in fact result in, and which represent a breach of his fiduciary duty.

16. Goldner and Blatt executed that certain 2023 Resolutions document which laid out terms which, once completed, would void any attempted withdrawal of a Member, however the Members have since unanimously agreed pursuant to Goldner's April 8, 2023 email that those terms have not been completed and that thus redemption pursuant to the terms of the operating agreement is permitted.

17. Goldner has made repeated threats to involuntarily withdraw Blatt for disagreeing with him on how to handle an agreement with the Company's Limited Partner and Creditor, Little Prince, with respect to which Blatt had numerous legitimate reservations and regarding which Goldner repeatedly threatened him, as well as for requiring him to communicate with Blatt via Blatt's assistant given the threats he has made towards Blatt, making it impossible for Blatt to participate in the Company being able to carry on the ordinary business of the Company.

18. Goldner has acknowledged breaching his fiduciary duty and committing fraud and fraud in the inducement against the Company's Limited Partner and Creditor, Little Prince, by lying to and manipulating them for his own financial gain by stating his willingness to enter into agreements that he can subsequently invalidate on the basis of the distress he has placed Blatt under in his attempts to get Blatt to execute them, as well as by manipulating them by lying to them about interactions between him and Blatt (**Exhibit E**).

19. Goldner breached the Partners' standard agreed course of dealings in contract negotiations in a manner that breached his fiduciary duty by approving his own tracked changes without any notice to or consent by Blatt of such changes, as evidenced by the comments to those sections left in place and the lack of any turnaround by Blatt of a version received with the tracked changes and returned with them accepted to the 2023 Resolution Consent, thus deceiving Blatt into unwittingly signing the Resolution on the assumption that Goldner had honored their course of dealings and rendering the agreement invalid; these changes granted Golder expense reimbursement well in excess of that provided by the operating agreement; in a manner Blatt had clearly told him on principal Blatt would never approve given how Marc had threatened him over the issue (**Exhibit F**); for expenses incurred securing contacts and opportunities for his own exclusive benefit and that of other companies; for expenses that were not approved or even reviewed by Blatt or the Company; and at the expense of Blatt's equal right to claim expenses, representing a breach of fiduciary duty and a breach of trust that has made it impossible to carry on the ordinary business of the Company. (**Exhibit G**).

20. Goldner further blatantly breached his fiduciary duty to the Company and made it impossible to carry on the ordinary business of the Company by denying it a safe banking partner by refusing to setup new company bank accounts, despite the fact that First Republic Bank is at risk of failing, in order to justify maintaining Company funds for his own benefit.

21. In the process of refusing to open new bank accounts, Goldner defamed and Slandered Blatt with Bank of America as well as other Megacap partners by claiming Blatt effectively stole or otherwise transferred funds from the Company to Goldner Blatt Investments, LLC (GBI), transfers of which he was demonstrably aware (**Exhibit H**) and which funds he used to make personal charges on an Amex company card as well as approved payments to GBI legal counsel, making it impossible to carry on the ordinary course of the business.

22. After Blatt send Goldner a demand letter for $422,188.55 relating to a personal matter unrelated to the Company, Goldner threatened in writing on a chat with Limited Partners and Creditors to jeopardize company and its assets if Blatt did not refrain from pursuing his legitimate charges, for which Blatt has in fact already filed a lawsuit (**Exhibit I**), representing an additional instance of extortion.

**NOW, THEREFORE, BE IT RESOLVED,** that in part as a result of his actions detailed herein, Goldner has breached his obligations to the Company and his involuntary withdrawal as a Class A Member and Manager

from the Company is hereby amended and reaffirmed pursuant to the following sections of the Operating Agreement:

1. **Section 41**, which states that "Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to… breach of fiduciary duties by a Member", a Member "willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members", and engaging "in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member"
2. **Section 67**, which states "No Member may do any act in contravention of this Agreement or prevailing law."
3. **Section 69** which states "No Member may do any act that would make it impossible to carry on the ordinary business of the Company."

**FURTHER RESOLVED**, that, effective immediately upon Goldner's initial involuntary withdrawal as a Class A Member of the Company, the only remaining voting member is Blatt.

**FURTHER RESOLVED**, the Company has awarded Goldner his equivalent Membership interests in the Company in the form of Class B non-voting shares, thus retaining his full economic interests in the Company.

**FURTHER RESOLVED**, In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

**FURTHER RESOLVED**, If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances. Under no circumstances shall a technical failure as regards the implementation of this withdrawal or the timely service of appropriate documents invalidate the withdrawal, but rather shall be cause to cure such defects.

This Written Consent is executed as of the Effective Date by the Voting Members of the Company.

**MEGACAP CAPITAL, LLC**

By:_____
Name:  Eli M Blatt
Title:    Managing Member

**EXHIBIT B**
**INITIAL THREAT**

On Jun 19, 2022, 1:09 PM -0400, Marc Goldner <marc@gb.investments>, wrote:
You're brain dead. I am not going to sell my crypto or use every dollar I have to cover you defaulting when this is how you're acting. You've fucked yourself bro and if you want me as an enemy honestly you're about to see how I can be.

I'll make this business the most difficult it can be.

You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me.

**EXHIBIT C**
**REPEATED THREATS**



NON-CERTIFIED COPY









**EXHIBIT D**
**EXTORTION THREAT**



## EXHIBIT E
## ATTEMPTS TO DECEIVE LIMITED PARTNERS





**Marc Goldner**

Hi Laren! Hope you've been well and school pickups aren't driving you crazy lol I had a quick question for you. If we were to repay one of our capital partners in shares instead of cash, would they be able to be on the GlobalX cap table instead of having to hold our company's interest in Neuralink? This would be about $500k in equity just FYI.

We financed a large part the shares we bought from you with a promissory note. It looks like we might need to repay that promissory note with the shares. The investor is US LLC (Wyoming) and it is a relatively large chunk ($500k±). I hope this would be OK with you?

We understand if this is something that risks the SPV and not something you are willing to do we just need to know.                                                                    10:37 AM

**Laren Pisciotti**

We can not do any transfers of your ownership- you would need your lp to subscribe to you.                                                                                                         10:40 AM

3 UNREAD MESSAGES

**Marc Goldner**

> **Laren Pisciotti**
> We can not do any transfers of your ownership- you would need your lp to subscribe to you.

Thanks. That's all. Just as expected!                                                              12:26 PM



**Anthropos x Megacap**
Celina, Lily, Marc, You

SATURDAY

**Marc Goldner**

@Eli M Blatt I told them they can't just be direct on GlobalX captable that u and Laren Wont approve it                                                                                      9:46 AM

I explained that even if I were to help them sell in their own entities they have to setup it'll cost them 50k so it's the same thing as interest waiver and you'll have to give me a waiver to sell for them                                                                                    9:48 AM

Now let's sit and see if it works   9:48 AM

I also explained that i wanted to be on captable and u refused with me being directly on globalx                                                                                            10:29 AM

YESTERDAY

**Marc Goldner**

@Eli M Blatt how much was the SpaceX fees for the deal we got Jiri? How much would we have been entitled to EXACTLY if he had funded and didn't kill that deal                 12:28 AM

I understand your position that those fees should be cancelling out any interest because that's his fault and it cost us the relationship supplier who won't work with us anymore after so many bids and looking bad totally get ur position thanks                                         12:29 AM

Ahhhhh I get ur position now so ur saying u redeemed rod bc u thought that moni would continue bringing and referring LPs but that didn't pan out how u expected                12:31 AM

**Celina Moreno**

Hi Marc, as you are well aware Eli has not communicated with you by phone or videoconference since February, and has since recently not been communicating with you directly in any medium. I just confirmed with him that both of the above positions you are attributing to him are false — he has said no such things to you nor does he maintain these positions.                                                                                 10:51 AM


1. Eli will get a one-time $21k expense reimbursement from MC for any expenses incurred from the start of TRIUM through time of payment, and Marc will get a one-time $30K expense reimbursement from MC for any expenses incurred from the start of TRIUM through time of payment, paid out by MegaCap once Jiri is fully repaid with at least $100K in additional MC bank balance above and beyond Jiri's repayment (of LP Shares if it is agreed to unanimously by the Class A Members of MegaCap, and upon repayment of the Promissory Notes for Little Prince and Bear General, as well as the rebate for Jiri). However, if Jiri is not repaid and is given Neuralink shares instead of being repaid, then this reimbursement for Marc's expenses and Eli's Wayaca front end due will be paid out upon the first exit where carry is awarded to MegaCap (i.e. the Betterment carry once Betterment IPOs) pursuant to the above $100K bank balance existing to cover it.  The Wayaca front end due to Eli will also be paid at this time and Marc's additional $20,000 incurred in 2022 will be paid at this time.

2. Thereafter, total expense reimbursement will be capped at 2.5% each of total Profits (5% total between both partners) from MegaCap and GBI for Expenses as per below.

3. If going forward either of us travels and we close a deal for GBI or funding for MC, we can have reimbursement for documented expenses incurred on the trip on which that deal was put together or a contact was made that subsequently closes something equal to the greater of $10K of expenses for the trip in question (with a trip being any period of time extending from when Marc or Eli leave their home-base to when they return there, and can last up to one year) or 5% of profit (net front end) generated from the first close by contacts established directly or indirectly during that trip applied to flights, food, networking events, extracurriculars with potential LPs or Suppliers, Taxies/Ubers/Travel, Travel Insurance, rental cars, rental boats/ferry's, hosting events, hotels, and transportation (busses,



**EXHIBIT H**
**GOLDNER WAS AWARE OF THE TRANSFERS HE ALLEGES BLATT COMMITTED THEFT OF**



## EXHIBIT I
## GOLDNER THREATENING MEGACAP OVER PERSONAL MATTERS



**Marc Goldner**

I am happy to bring to light other issues as well. First off, you wired Anthropos fees PRIOR to there ever being a 'consulting agreement'. So instead of having Celina messaging me while you refuse private communication with me outside of this chat (you are NOT some busy executive, Eli, you're just a spoiled trust fund kid who has never worked a real day in his life who claims they need approval from 'mom' for almost anything), let's not have Celina ask me if she initiated a BofA account setup for MegaCap without the rhetorical response of, "Didn't Eli also take $70,000 out of MegaCap and sent it to GBI unauthorized?". Any way you slice it Eli, I NEVER authorized that funds transfer and our Operating Agreement is clear that transactions of that magnitude **REQUIRES UNANIMOUS APPROVAL of ALL MANAGING PARTNERS.** You have breached your fiduciary duty and will be removed as such for your breaches that have put MegaCap's shares at risk. You have risked the entire portfolio and if Laren gets wind of this and of any perceived dispute she will most likely redeem MegaCap so I suggest you start cooperating and stop hiding behind your assistant to speak on your behalf for everyone's sake because your actions are risking millions of dollars of shares and it will be my job to ensure your removal from this situation. I am giving you a chance to come clean and correct this. You need to stop saying behind closed doors that you are only signing agreements with Little Prince because you are under duress, no one buys it. Honor your word, obligations, and promises and cut the crap out and start conducting business as it's supposed to be done. I once again am going to kindly suggest, take your mark-up and carry and walk away from MegaCap. You clearly have no intention of selling anything to anyone as you're hiding the fact that you have gotten other jobs from everyone in this chat. How about being honest for once in your life instead of causing drama like a teenage girl? I understand being around a child like Emily can easily rub off on you but you need to work on your professional decorum and learn how to conduct legitimate business without risking everyone else's time, money, and energies. I know you have a habit of bringing everyone else around you for your own personal woes and unsustainable lifestyle but that has to stop TODAY. I will not allow you to drag MegaCap through the mud like all your other failed business attempts because you can't accept that a mining comany hasn't delivered our miners, that you haven't paid your balance due on ANOTHER unrelated business, and because you have not honored your agreement with LPs from TRIUM to start an NFT Fund, nor wired the promised amounts of NFTs, not even mentioning fraudulently inducing me to invest with you under the disguise that you had private placements like with Bond that would be shared with me after your 'mom approved it' (which she did). The game you're playing here Eli will wind up dragging this into a Federal Court that will have a tortious discovery process that could reveal not just people's names, but has the impact of creating a regulatory securities risk with agencies such as the SEC. I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've 'stolen' your money and tying it back to MegaCap by refusing to operate this business in good faith. Thanks!

7:35 PM



**Marc Goldner**

Eli, I am giving you a chance to cut this shit out. You do not want to escalate this where discovery will be all inclusive. Your drug charges will come to light, your infractions will come to light, your parole will come to light, your probation officer will come to light, your continued drug use (which I have evidence of) will come to light. I really suggest that you rethink your actions here. I am not threatening you, I am merely telling you that I don't think you understand that the reaches of a federal court action sees no limits in relation to discovery. You are digging yourself into a hole and Laren is going to get wind of this and likely redeem MegaCap which means we will have to repay the mark-up we earned. Do not do this or you will be held liable for breaching your fiduciary duty. I really don't want to have to sue you, Emily, and your mom but if you force my hand I will be left with no choice. Do the right thing, pay your balance due and debts, and walk away peacefully and keep the monies we've earned so we can both move on from each other and live our lives. Thanks.

8:41 PM

## REDEMPTION NOTICE

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Marc Goldner** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as of May 22, 2023 (the "Effective Date") as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement") and the MegaCap Operating Agreement Resolution and Updated Terms ("Amendment").

2. Pursuant to the Amendment, the Company issued to Member 330,000 Units of membership interest in the Company (the "Units"), with 330,000 Units issued to Eli Blatt, 330,000 Units issued to Rod Raiter ("Reiter"), and 10,000 of issued Units held in trust by the Company.

3. Pursuant to the Reiter Redemption Agreement dated March 24, 2022, the Company fully redeemed the 330,000 Units granted to Reiter, increasing the Units held in Trust by the Company to 340,000.

4. Pursuant to the Operating Agreement and Amendment, the Units issued to Members are subject to redemption following a vesting schedule of three (3) years commencing on the date of the Amendment, December 8, 2021.

5. Effective as of the date hereof, the Company hereby redeems 170,274 Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price"), for a total "Redemption Value" of $1.70.

6. Member is currently illegally in possession of $18,146.70 of Company funds member is refusing to return to the Company; the Redemption Value due is hereby deducted from the Company funds being illegally held by Member, reducing the total Company funds being held by Member to $18,145.00

**MEGACAP CAPITAL, LLC**

By: _____

Name: Eli M Blatt

Title: Managing Member

May 23 2023

## RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF THE VOTING MEMBERS OF MEGACAP CAPITAL, LLC

The undersigned, being Voting Members of **MEGACAP CAPITAL, LLC** (the "**Company**") hereby adopt the following "Goldner Class B Withdrawal" resolutions and take the following actions by unanimous written consent on **Tuesday, September 2, 2025 (**the **"Effective Date")** in lieu of a meeting and is to be deemed effective immediately:

### INVOLUNTARY WITHDRAWAL OF MARC J GOLNDER AND PURCHASE OF MEMBERSHIP UNITS

**WHEREAS,** Marc J. Goldner ("Goldner") remains a Class B Member of the Company after having his unvested Membership Units redeemed and his vested Membership Units converted to Class B units upon his withdrawal and redemption from the Company in 2023 for breaches of fiduciary duty and committing Forbidden Acts.

**WHEREAS,** subsequent to his withdrawal, Goldner committed numerous additional breaches of fiduciary duty and forbidden acts, as detailed extensively in Megacap Capital, LLC v. Goldner (1:24-cv-24385), District Court, S.D. Florida (the "Megacap Lawsuit").

**WHEREAS,** the Company has determined that it is in the best interest of the Company to completely dissociate Goldner from the Company by way of an involuntary withdrawal for the breaches of fiduciary duty and forbidden acts detailed in the Megacap Lawsuit committed subsequent to his prior withdrawal and redemption, including but not limited to the Partner Breaches, sending the November 2023 Letter, and the offenses detailed in the RICO Count.

**WHEREAS,** the involuntary withdrawal of a Member for breaches of fiduciary duty or the forbidden acts detailed in Megacap Operating Agreement ("OA") Sections 67-72 do not require judicial review or determination and are at the sole discretion of the Company when determining whether to withdraw a Member.

**WHEREAS,** because the Company and Goldner are actively engaged in litigation, the Company has selected an independent auditor independently referred by the Company's accountant for the purposes of valuing Goldner's Membership Units pursuant to OA Sections 44, 46, and 51-53.

**WHEREAS,** the Company's accountant has informed the Company that, given that the Company's liabilities exceed its assets and the Members have no deficit restoration obligations per the OA, the GAAP valuation will produce a $0 valuation.

**NOW, THEREFORE, BE IT RESOLVED,** that in part as a result of his actions detailed in the Megacap Lawsuit, Goldner has breached his obligations to the Company and his involuntary withdrawal as a Class B Member of the Company is hereby effectuated  pursuant to the following sections of the Operating Agreement:

1. **Section 42:** which states that "Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to… breach of fiduciary duties by a Member."
2. **Section 67:** which states "No Member may do any act in contravention of this Agreement or prevailing law."
3. **Section 68:** Which states "No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company."
4. **Section 69:** which states "No Member may do any act that would make it impossible to carry on the ordinary business of the Company."

5. **Section 71:** Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

**FURTHER RESOLVED,** The remaining Members have elected to exercise their rights to purchase Goldner's remaining Membership Units pursuant to OA Sections 44, 46, and 51-53. Given the anticipated $0 GAAP valuation, Goldner will be sent $1 upon service of this notice by the remaining Members as consideration for his Membership Units.

**FURTHER RESOLVED,** Pursuant to OA Section 46, the Company will provide Goldner the final GAAP valuation upon completion; should any additional payment be due for his Membership Units the remaining Members will remit that within 60 days of this notice per OA Section 46 or provide notice of rescission of purchase.

**FURTHER RESOLVED,** Per OA Section 45, Goldner will only have liability to the Company for his negative capital account balance per the date of his dissociation and no liability for any Company obligations thereafter.

**FURTHER RESOLVED,** Should Goldner object to the GAAP valuation commissioned by the Company, he may within 15 days of receipt thereof provide the Company a list of five national and/or international auditor firms with no less than 50 accountants on staff to conduct a secondary valuation at his sole expense to be paid upfront prior to the valuation. The Company shall select one from the list and be the primary point of contact for the auditor once Goldner has made payment, which shall be done within 15 days of the Company's selection of the auditor.

**FURTHER RESOLVED,** Should Goldner's prior redemption be deemed to have been calculated incorrectly or otherwise be overturned, his full Membership Unit count is hereby being purchased for $1 based on the anticipated $0 GAAP valuation, which is possible given the $0 valuation produced by the GAAP valuation. Should the GAP valuation produce a non-zero valuation, the remaining Members shall have the ability to determine whether to proceed with the purchase by supplementing the required payment or rescind the purchase.

**FURTHER RESOLVED,** In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

**FURTHER RESOLVED,** If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances. Under no circumstances shall a technical failure as regards the implementation of this withdrawal or the timely service of appropriate documents invalidate the withdrawal but rather shall be cause to cure such defects.

By: _____   Sep 02 2025          By: _____   Sep 02 2025

Name:  Eli M Blatt                                 Name:  Eli M Blatt on behalf of Anthropos, LLC

Title:   Managing Member                           Title:   Managing Member



## MEGACAP REDEMPTION NOTICE

**Date:** 3/24/22

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Roderyk Reiter** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**", jointly "the Parties"), the Company hereby notifies Member as follows:

1) Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").
2) Members and the Company are parties to a certain updated terms as defined in the Memorandum of Understanding (the "MOU"), serving as an addendum to the Operating Agreement.
3) Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").
4) Effective as of the date hereof, per the agreement between the parties, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of $15,000, already remitted to the Member in shares of MegaCap Funds, LP - Tech I (the "Redemption Price") as consideration for the redemption.
   a) For avoidance of Doubt, the Member shall still receive the specified carry compensation delineated in Memorandum of Understanding signed on December 18, 2021 for CivRobotics, SpaceX, and the first Betterment deal (but not on the SPV for Betterment). For avoidance of doubt, the member will not receive any economics including but not limited to front end and/or carry for anything related to MegaCap Funds, LP – Tech I or any other deals and/or SPVs going forward from the date of this redemption.
5) The parties agree to sign an NDA, Non-Disparagement agreement, and Non-Defamation agreements.
6) With the Company's consent on a deal-by-deal basis, Member shall have the option to participate as a Special LP and earn 5% issuer fee for his referrals to that SPV.
7) For the avoidance of doubt, this constitutes a full redemption of all the Member's interests in the Company per the agreement between the parties.

**MEGACAP CAPITAL, LLC**

By: ▮▮▮▮
Name: Marc Goldner
Title: Managing Member
Date Signed: 04 / 03 / 2022

**RODERYK REITER**

By: ▮▮▮▮
Name: Roderyck Reiter
Title: Managing Partner
Date Signed: 03 / 24 / 2022

By: ▮▮▮▮
Name: Eli M Blatt
Title: Managing Member
Date Signed: 03 / 23 / 2022



# EXHIBIT L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA (MIAMI DIVISION)

Case No. 1:23-CV-24819

ELI M. BLATT, individually and derivatively on
behalf of Goldner Blatt Investments, LLC,

      Plaintiff,

v.

MARC J. GOLDNER, RACHEL KORSEN,
SIMON DIVILOV, and THE DHARMA
INITIATIVE, LLC,

      Defendants and Counter-Plaintiffs,

v.

ELI M. BLATT,

      Counter-Defendant, and

MegaCap Capital, LLC, MegaCap Funds, LP,
MegaCap Funds, LP – Tech Holding, MegaCap
Funds, LP – Tech I, Little Prince Equity, LLC,
Thibaut Denonain, Michael Elkins, Wayaca,
LLC, Flow, Inc., BitSource, LLC, JPMorgan
Chase & Co., and Bank of America Corporation,

      Third Party Defendants.

_____/

### DECLARATION OF ELI M. BLATT

I, Plaintiff and Counter-Defendant, ELI M. BLATT, declare as follows:

1.    I, ELI M. BLATT, am over 18 years of age and have personal knowledge of the contents of this declaration. This declaration is submitted for consideration by the Court for any lawful purpose.

2.    This statement serves to document the full extent of abuse I suffered personally by way of Defendant Marc J. Goldner's ("Goldner") litany of malicious communications to me, as

1

well as the damage he caused Megacap Capital, LLC ("Megacap" or the "Company") by way of repeated breaches of his fiduciary duties.

3.       I am an investor in various alternative investments, including shares of pre-IPO companies through Special Purpose Vehicles ("SPVs").

4.       I am the originator of the idea to found Megacap, which serves as the General Partner for several such SPVs, including Megacap Funds, LP - Tech Holding ("MCTH") and Megacap Funds, LP- Tech I ("MCTI"), both series of Megacap Funds, LP.

5.       I named the Company and incorporated it, secured the registered agent and fund administrator, filed for the EIN, and purchased the domain names with the aid of my administrative assistant for Megacap and the series of its affiliated entities, Megacap Funds, LP.

6.       I met Goldner through our MBA Program, TRIUM.

7.       Although I did not realize it at the time, on information and belief, Goldner had been sued multiple times already and has now been sued around a dozen times by numerous defendants claiming, among other things, breach of contract, fraud, and harassment.

8.       Many of the lawsuits against Goldner center on his conduct in the board game community, where he has become a notorious figure to the point where there are news articles published and numerous Reddit and other community threads about his misdeeds and the resulting lawsuits against him[1].

---

[1]https://thetabletoptribune.com/how-golden-bell-broke-its-reputation-with-the-tabletop-community/
https://www.abbynews.com/news/abbotsford-woman-wins-legal-battle-over-board-game-on-reality-t-v-s-the-peoples-court-1796685
https://icv2.com/articles/news/view/53233/oh-no-creator-webcomic-name-raises-almost-250-000-legal-fees
https://boingboing.net/2022/11/11/alex-norris-creator-of-the-webcomic-name-battles-boardgame-company-that-claims-to-own-it-oh-no.html
https://downthetubes.net/webcomic-name-cartoonist-alex-norris-continues-battle-for-his-creation/
https://boardgamegeek.com/thread/2967724/the-oh-no-comics-guy-is-suing-marc-goldner-and-sta
https://boardgamegeek.com/thread/2369510/it-looks-like-a-new-lawsuit-against-marc-goldner-g
https://boardgamegeek.com/thread/2334403/golden-bells-marc-goldner-lose-legal-battle-on-rea
https://boardgamegeek.com/thread/2749497/a-sixth-lawsuit-against-golden-bell-studios-and-ma
https://boardgamegeek.com/thread/2193183/lawsuit-details-for-those-concerned-about-golden-b
https://boardgamegeek.com/thread/2337663/golden-bell-on-the-peoples-court
https://boardgamegeek.com/boardgamepublisher/35902/golden-bell-games/forums/0
https://boardgamegeek.com/thread/2400986/peoples-court-10th-april-marcs-greatest-hour-is-at

9.  Goldner's history of improper conduct and harassment also led to his company, Golden Bell, being banned from Kickstarter.

10.  Goldner is so reviled in the board game community that one content creator suing him raised over $250,000 via a GoFundMe specifically to fund his litigation against Goldner.

11.  Not knowing the extent of the claims against him at the time and having a false sense of security from what little I did know by virtue of him being admitted to TRIUM, I agreed to enter into business with Goldner, including inviting him to join me in founding Megacap.

12.  Two companies that we founded together are relevant to the instant case, the Counterclaim, and the Motion for Temporary Injunctive Relief: Goldner Blatt Investments, LLC ("GBI") and Megacap (including the MCTH and MCTI SPVs it manages).

13.  As detailed in the Second Amended Complaint, GBI was conceived by Goldner primarily as a means for Goldner to defraud me.

14.  Using GBI, he induced me to wire in excess of Four Hundred Twenty-two Thousand Dollars ($422,000), ostensibly to purchase NFTs and bitcoin miners (equipment hosted by a third party for the purposes of generating bitcoin for the investor) for GBI.

15.  In fact, he purchased the NFTs for himself and the Miners for Dharma and, to this day, Goldner and Dharma are in sole possession of all the assets purchased in part or in full with my funds.

16.  I am not alone in being defrauded by Goldner:

---

https://boardgamegeek.com/geeklist/259248/golden-bell-affiliated-projects-and-companies
https://boardgamegeek.com/thread/1950215/concerns-about-golden-bell-and-deliveryfuture-of-d
https://www.metafilter.com/184772/Im-in-law-school-Kelsey
https://www.reddit.com/r/boardgames/comments/edth3t/golden_bells_marc_goldner_lose_legal_battle_on
https://www.reddit.com/r/boardgames/comments/yq1jnd/webcomic_artist_alex_norris_vs_golden_bell/
https://www.reddit.com/r/boardgames/comments/m3scjn/how_golden_bell_broke_its_reputation_with_the/
https://www.reddit.com/r/boardgames/comments/ewuiyi/golden_bell_studios_officially_suspended_from/
https://www.metafilter.com/197119/oh-no
https://twitter.com/Xeliassame/status/1772698973993656378
https://x.com/JakeNelsonMN/status/1590046120352579584

   a.   three of our TRIUM peers wired Goldner directly $100,000 for interests in NFTs and have received no benefit for their bargain whatsoever, with Goldner retaining their funds and providing them no value for therefore; and

   b.   at least two other investors solicited by Goldner to invest in bitcoin miners remitted to him excess of $150,000 over three years ago for the purchase of miners to be hosted through Compass Mining, as did I, and have not received a fraction of a bitcoin or any other value in return—Goldner simply took their money, allegedly bought miners, and returned them nothing they were due or promised.

17.    I realized that Goldner misled me as to the use of my funds in May 2022, at which point I began a protracted process of negotiating to secure some benefit from the NFTs and the miners for which deposits were paid.

18.    Unfortunately, despite nearly a year of diligent effort to secure some benefit of my bargain, my efforts would ultimately all be in vain.

19.    On June 19, 2022, after unsuccessfully pressuring me to grant him Thirty Thousand Dollars ($30,000) in expense reimbursement via Megacap in order for me to get any benefit of my bargain for the NFTs and miners, Goldner wrote me an email stating, "I'll make this business the most difficult it can be. You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me."

20.    This was the first instance of a breach of his duty of care towards me, and I could not have possibly imagined at the time how serious he was in his promise to torment me or how much damage it would cause me as well as Megacap.

21.    At this point, although I wanted no further entanglement with Golder, I had a fiduciary duty to continue working with him on Megacap despite his increasing hostility towards me.

22.    At the same time, I also needed to get the value of the funds he had stolen from me, and so I issued him a very courteous but firm demand letter in July, 2022 (*See* Exhibit A to this Declaration).

23.    Given that the value of the NFTs had plummeted after he refused my call for GBI to sell them (which is how I realized that GBI did not in fact own them or the miners), there was no realistic chance for a return of my funds.

24. As a result, I was willing to remain in an NFT SPV with him and our three TRIUM peers who had wired him funds for NFTs in order to accomplish a viable settlement and ensure our peers would receive value for their investments.

25. Unfortunately, Goldner kept insisting on conditions such as his company, Golden Bell, receiving exclusive financial benefits from the SPV, as well as for him to receive Thirty Thousand Dollars ($30,000) in compensation over which he had previously threatened me.

26. With regard to the miners, Compass Mining had agreed to allow Goldner to transfer to me the miners I had paid deposits on, at which point I would have been responsible for any future balances due thereon.

27. This should have been an easy matter to resolve, as Goldner could simply have transferred to me the miners my funds had paid the deposits on and settled that matter.

28. But Goldner refused and instead demanded I send him more money for future balances after it was clear he had already misappropriated the funds I had remitted, making that a non-starter for me.

29. I had no reason to believe he would honor any commitments to me given his threats and actions.

30. I tried unsuccessfully to secure the benefit of my funds for nearly a year, with Goldner never agreeing to give me any value for the money I had wired without demanding onerous and unacceptable terms just to receive what was already due to me.

31. All the while, in order to honor my fiduciary duties to Megacap and its investors, despite my legitimate grievances with Goldner, I kept our GBI dispute separate from Megacap.

32. Goldner, however, did not.

33. Having managed to defraud me successfully (for the time being) via GBI, he was now emboldened and began becoming increasingly abusive in his dealings with me regarding Megacap to the detriment of the Company.

34. Goldner first sought to improperly leverage his claim that I somehow owed him more money for miners he purchased for Dharma with my misappropriated funds in order to threaten me with imperiling Megacap's ongoing operations, which undeniably constitutes a breach of his fiduciary duty to me and to the Company:

    a. In a December 9, 2022 WhatsApp message on Megacap's official internal Company "WhatsApp Channel," Goldner explicitly and improperly tied his

willingness to manage critical Megacap business to me making concessions in my personal claims involving GBI, stating that the two issues were "intertwined" for him.

b. Goldner reaffirmed in the Megacap WhatsApp Channel on December 16, 2022 that his willingness to cooperate on critical Megacap business was tied to me personally paying him at least One Hundred Thousand Dollars ($100,000.00), writing, "I cannot commit to a new fund admin when you owe me over $100k," referring to alleged additional balances due on miners whose deposits I paid for but which were owned by Dharma and that he had refused to transfer to me. Note at that time the miners had not even been delivered by Compass.

35.    Goldner thus conditioned acting in Megacap's best interests on me acquiescing to a personal settlement with him on matters entirely unrelated to the Company, a clear cut breach of his fiduciary duty to Megacap and to me.

36.    Around this same time, Goldner began pressuring me to file inaccurate and likely fraudulent tax returns for the Company not showing the Company's MCTI management fees as having been earned in full upon receipt in order to reduce his own tax liability.

37.    To rationalize his position, he wrote: "The management fee shouldn't be 5% up front, the 5% is held in trust" on December 12, 2022 in the WhatsApp Channel.

38.    However, I had consulted with Megacap's fund administrator, legal counsel, and accountants, all of whom had confirmed that the MCTI governing documents had the General Partner earning its management fees upon each LP's closing.

39.    And, as a practical matter, the Company distributed the management fees from MCTI to Megacap and used them to purchase assets for MCTH.

40.    But Goldner didn't care. He insisted that he would not allow taxes to be filed that showed the Company had earned the management fees, as he wanted to reduce his own pass-through tax liability–even if it meant filing fraudulent returns that disadvantaged the Limited Partners by reducing their tax write-offs and increasing MCTI's tax preparation fees.

41.    In addition to his desire to avoid paying taxes on Megacap fees earned and his willingness to leverage my imagined debt to him as a means to extort me into acquiescing to his demand to file fraudulent tax return, Goldner became obsessed with signing an interest waiver

6

agreement ("Interest Agreement") with our creditor, Little Prince, LLC ("Little Prince"), managed by Jiri Novotny ("Jiri").

42.    A key provision that Little Prince wanted to include was for Megacap to waive its rights to repay their loan in equity of the portfolio company ("TECH") that the proceeds of the loan were used to purchase derivative equity in at its basis price.

43.    I felt strongly that waiving this right had the potential to bankrupt the Company, as we had not subscribed many LPs to MCTI in nearly a year due to a downturn in the cryptocurrency market, which substantially affected the pre-IPO market.

44.    In fact, the right to repay the loan in shares was the only reason I had ever consented to borrowing the funds in the first place, as it meant there was no possibility the Company could default on the loan.

45.    And so, to protect the Company and its investors, I steadfastly refused to concede on this point and was willing to repay the loan in shares if need be.

46.    He believed the Interest Agreement would benefit him derivatively by reducing interest payments due on the Company's loan with Little Prince to his benefit, and to justify using extortive means to pressure me into signing it. (He seems to have convinced himself that Little Prince would kill us both if we did not sign the agreement, even though there is not a shred of evidence to support that delusion.[2])

47.    In fact, as detailed below, Goldner himself would later admit that he was motivated by derivatively saving interest due on the loan.

48.    Motivated by greed and fueled by his delusion, Goldner's harassment, abuse, and threats towards me escalated exponentially, making it increasingly impossible to carry on the ordinary course of business for Megacap given his increasingly erratic behavior and nearly daily threats towards me.

49.    In WhatsApp messages to me on December 8, 2022, Goldner insisted we speak over video conference rather than communicate in writing, allegedly about Company tax matters "too complex" to discuss over WhatsApp.

---

[2] This is not the only instance where Goldner has exhibited delusional behavior. He has told me and others that he believes he has been chased by assassins as part of his activities as a "freelance spy" for various unnamed government agencies tasked with taking down the hacktivist collective, Anonymous, going so far as to write language to that basic effect into the GBI Operating Agreement to support his claims of having valuable "mutual contacts."

50.     During the ensuing conversation, however, Goldner in fact wanted to again pressure me into agreeing to the Interest Agreement.

51.     This time, however, over a WhatsApp call instead of by our usual messaging, presumably in order to avoid threatening me in writing, Goldner transmitted a threat to my physical safety, allegedly on behalf of Jiri, telling me that someone would "show up at [my] door and break [my] knees" if I did not agree to the Interest Agreement.

52.     While Goldner claimed to have these threats in writing, he refused to share any screenshots with me.

53.     Instead, he arranged a video conference with his father who supposedly read messages from Goldner's phone and said something along the lines of that they contained "some not so nice things."

54.     Nonetheless, I was unwilling to breach my fiduciary duty to the Company and endanger its ability to protect the interests of its Limited Partners ("LPs") by agreeing to an agreement I knew could bankrupt the Company.

55.     Goldner's threats and harassment continued relentlessly for the next month, including by posting a long personal attack against me and my then-fiancé on the Company's official WhatsApp Channel, which includes contractors and affiliates of the company, in a series of December 31, 2022 messages, in a way that denigrated me and the Company which is yet another instance of Goldner breaching his duties of care and loyalty.

56.     At this point, Goldner's constant abuse and threats to my safety had started impacting my mental health, causing me to begin to withdraw from ongoing real time communications with him.

57.     This led me on January 12, 2023, to write to Goldner to "please email me with any [Megacap] or other business" instead of writing messages in the Company's WhatsApp group, on which Goldner had been relentlessly bombarding me with abusive messages.

58.     In response, the next day, he wrote in a WhatsApp chat including Megacap Little Prince and other LPs: "Honestly Eli? I'm sick and tired of your forbidden acts. *I will vote to have you involuntarily removed.*" (emphasis added).

59.     The following day, he wrote me again on the BitSource, LLC Whatsapp channel for good measure:

"@Eli this is notice that you are in breach of the Operating Agreement. *You are committing a Forbidden Act and will be involuntarily removed*... I suggest that you formally withdraw rather than fighting this… Your behavior is not just unethical but is deplorable. I am tired of this behavior and your inaction for your failure to devote time to this business or *any business* that we are a part of in a meaningful way. Thanks for your understanding in this matter." (emphasis added).

60.     To be clear, Goldner's only alleged cause for his threats to withdraw me from Megacap was my refusal to submit tax returns I believed to be fraudulent or agree to an Interest Agreement I believed would likely bankrupt the Company, both of which Goldner wanted primarily to benefit him financially by way of reduced passthrough tax liability and his derivative share of the Company's interest obligations. He also objected to the fact that I was no longer willing to suffer his constant abuse and had relegated him to using email to contact me via my assistant as a means to protect myself.

61.     Goldner's messages caused me to legitimately fear that he would involuntarily withdraw me, given that he was plainly stating his intention to do so, a course of action that despite all his threats, abuse, extortion and fraud against me I had never once made towards him, even though I had ample cause to withdraw and redeem him.

62.     Upon carefully studying the OA, I came to the conclusion that the way the OA is structured, Goldner could indeed unilaterally withdraw me from the Company, as he threatened.

63.     Even if such withdrawal was not for legitimate reasons, it was clear to me that were he to do so, it would force me to arbitrate or file suit in order to have the withdrawal overturned and, in the meantime, the Company and our Limited Partners and creditors would be at the mercy of his increasingly erratic behavior and reckless, self-interested decision-making.

64.     Given Goldner's theft of over Four Hundred Twenty-two Thousand Dollars ($422,000) from me, forcing me to sell my condo in Miami, I did not have the resources at that time to challenge him were he to involuntarily withdraw me.

65.     As I had come to the conclusion at that point that I believed him to not only be unethical but also mentally ill, I felt compelled to protect the Company and our investors.

66.     Accordingly, given that I had unequivocally legitimate cause to withdraw him, I exercised that right in furtherance of my fiduciary duty to the Company.

67.     I thus drafted a formal Company consent for Goldner's involuntary withdrawal on the basis of his transmitted threats to injure me, breaches of fiduciary duty, and actions that were

9

making it impossible to carry on the ordinary business of the Company, in strict accordance with the terms of the OA  (the "IW").

68.     The IW was drafted with an effective date of January 16, 2023 and executed via Eversign on January 17, 2024.

69.     Upon drafting the IW, on January 16, 2023, I emailed Megacap's then counsel to inform him of the IW, writing:

> Things with Marc have been going dramatically downhill.  I'm concerned he may try to spuriously involuntarily withdraw me from Megacap, and I have a fiduciary duty to the Company and our LPs to not leave him solely in control.  He also has been preventing us from filing our taxes, which I suspect he is doing to pressure me on the miner/NFT issue. Sending this just for the record to confirm the effective date as accurate in the event he later tries to withdraw me.  As of now, he is withdrawn unless/until I void the agreement.  Hopefully he doesn't go too far off the rails. Sigh.

70.     Much to my dismay, Goldner would indeed go further and further "off the rails."d

71.     In the meantime, the OA does not require notice of withdrawal to a Member; it only requires notice in the event of redemption.

72.     Given that my withdrawal of Goldner was not financially motivated, I did not redeem him at that time, as clearly indicated in the IW.

73.     My only goal was to prevent me from being withdrawn and thus ensure proper, ethical, and legal management of the Company.

74.     By effectuating the IW but not redeeming or notifying him, I could insure against his increasingly erratic behavior and protect the Company from it without creating a maelstrom of chaos.

75.     In the end, I only managed to delay the chaos.

76.     Having failed to pressure me into signing the Interest Agreement by way of transmitting death threats against me, Goldner expanded his harassment to include my *mother*.

77.     In iMessage group messages on January 27, 2023 including me and mother, Goldner:

   a.   tried to ascertain my physical location, causing me to fear for my safety;

   b.   transmitted threats to my "safety";

   c.   claimed there was a "safety risk";

   d.   stated I was putting my "family's lives at risk"; and

10

e.  said "I don't think you understand what they will do to us. Do you think this is
some kind of fucking game?

78.  I responded: "I will not stand for any more of these threats to my safety. If you
persist, you will force me to file a restraining order against you, because you are legitimately
giving me cause to fear for my safety."

79.  Goldner would repeat these threats several times via WhatsApp and email, writing
on March 18, 2022 "you can get fucked to hell brotha… what do you think they're going to do to
us if we repay in shares."

80.  Between his January messages copying my mother and the March 18 message,
my mental health had started to decline as a result of his harassment and the theft he had
perpetrated on me.

81.  I began not sleeping well, waking up anxious, and ultimately entered into therapy
in order to try and manage the stress he was putting on me.

82.  As much as I wanted nothing to do with him, I had a fiduciary duty to protect
Megacap and its LPs from his increasingly unhinged behavior, as a result of which I was,
admittedly, afraid of what might happen were I to notice him of his withdrawal.

83.  As March rolled around, I became increasingly concerned about the March 15,
2023 tax filing deadline for Partnerships.

84.  Goldner leveraged this concern to again attempt to force me into all manner of
concessions relating to Megacap and GBI, as well as again to grant him individually the $30,000
he had become obsessed with.

85.  Accordingly, under the ongoing threats to my life and my fear that I had no choice
but to reason with him in order to get him to go along with accepting tax filings (since, even
though I had already withdrawn him, I was basically afraid of him and what he might do were I
to formally notice him of such), I went along with his pressure to enter into the so-called
Megacap "Resolutions," executed on February 13, 2023.

86.  Although I realized that any resolutions we signed would not be valid given (i) the
fact that I was under legitimate duress by way of the death threats against me and my sense that I
had no choice but to negotiate with him in order to ensure the Company could timely file taxes;
and (ii) the fact that I was the only Class A Member and could thus void them at will, I

nonetheless carefully considered the structure of the Resolutions in order to protect the Company in the event they were ever found to be enforceable.

87.   Thus, I was careful to ensure that, in general, the Resolutions were just that: they "resolved" many things but didn't actually "effectuate" anything, as all the major resolutions had conditions precedent and/or required further consents and agreements subject to a Class A vote.

88.   Additionally, all of the resolutions applied to Class A Members, which Goldner was not.

89.   Where my goal was to protect the Company, Goldner's goals with the Resolutions were (i) to force me to stay in business with him, as he was incapable of running the Company alone (which is why despite all his threats he never withdrew me); (ii) to enrich himself via a convoluted assignment of MCTH equity directly to him at the expense of the Company, which would then no longer be able to earn fees on those shares; (iii) to reduce his own pass-through tax liability; and (iv) to finally get the $30,000 he had been threatening and pressuring me about for over 8 months that as a result of his first threat against me I had explicitly stated I would never to grant him out of principle (yet he managed to trick me into agreeing to by not tracking the changes granting him that consideration in the final draft).

90.   In the end, the Resolutions, which were not valid to begin with for the reasons detailed above, actually did not effectuate anything because, as detailed more thoroughly in the written opposition to the Motion to Dismiss Defendants' Counterclaim ("MTDC"):

   a.   The conditions precedent for preventing and invalidating Member withdrawal were never completed, which he himself affirmed months later on April 8, 2023 when threatening yet again to withdraw me, writing: "*The terms haven't been completed.*" (emphasis original just so he could drive home his ability to withdraw me).

   b.   The convoluted "Option and Loan Agreement" described in the Resolutions, which Goldner wanted in order to enable him to assign Company-owned TECH equity directly to him without any tax consequences, was never drafted let alone executed as clearly required by the Resolution, nor was the formal assignment of a portion of the option (which was further also only available to Class A Members) by way of a "boilerplate assignment agreement."

c. More generally, all of the Resolutions explicitly required a further vote by the Class A Members to effectuate or had conditions precedent that were never met, and all the benefits Goldner sought to grant himself were only available to Class A Members (which he was not), and so the entire Resolution ultimately lacked any real effect.

91.     For all his greed and abusive tactics, Goldner was ultimately not very savvy and failed spectacularly to accomplish his goals to disadvantage me and the Company for his benefit.

92.     Given that Goldner had already been withdrawn and the Resolutions were invalid to begin with, and the fact that I was under acute duress during that entire period and did not actually consent to anything Goldner was pressuring me into, the Company formally rescinded and voided the Resolutions on October 15, 2023, and no assignment of Company-owned TECH or other equity or funds was ever distributed to me, directly or indirectly.

93.     Unfortunately, executing the Resolutions did not placate Goldner, and he immediately turned his sights back on pressuring me to execute the Interest Agreement by way of increasingly hostile and threatening messages.

94.     This led me on March 19, 2023 to write to Goldner by email that "I cannot and will not continue working under the current environment of constant, near daily threats against me, nor am I under any obligation to do so. Despite what you seem to think, you do not have the right to verbally abuse me — or anyone for that matter."

95.     In a March 23, 2023 email to me in reference to his threats surrounding the Interest Agreement and my desire to file taxes timely, Goldner wrote: "I do not give a flying fuck if you believe it's real or not. You need to come to terms that nothing is going to proceed [with Megacap taxes] until we're on the same page and that our lives aren't [sic] at risk because of your inaction," referring to my refusal to sign the Interest Agreement even under threat to my and my family's lives.

96.     On April 4, 2023 in response to two follow-up emails that day pressing me to sign the Interest Waiver Agreement, I wrote Goldner:

> "I am not going to commit fraud against a [sic] little prince, which is what you are urging me to do, by signing a document that you have already acknowledged, and I have already states [sic] would not be not valid due to the duress that you have placed me under… I am hereby again instructing you in no uncertain terms stop contacting me. I deem your continued aggressive and persistent messages to be harassment on matters I have already told you where I stand and for which your main purpose is to force me into doing things

13

you want me to do by placing me under emotional distress. You sent me at least five long harassing and threatening [email] messages on Sunday alone… Any additional emails to me directly will be deemed by me to be harassment, as I already DM [sic] your prior emails to be given that I had clearly instructed you I did not want to be threatened, abused, or harassed by you over email or WhatsApp."

97.    Rather than respect my request to direct his communications to my assistant, Goldner expanded his campaign of harassment in his reply by blackmailing me under threat of disclosing confidential files relating to unrelated litigation for a Company I was managing to the opposing party in that case that he had stolen if I didn't acquiesce to his demands, sharing the name of a zip file he had made of a Google Drive folder of mine without authorization over a year ago, clearly with the intent to secure leverage to extort me.

98.    I shared the distress Goldner was causing me with the Company's then lawyer to whom I had previously sent the IW, writing him in messages between April 3-4:

"When I see am (sic) email come in from him my heart rate spikes. He has waged a campaign of terror against me. I'd like immediately consult on whether I have grounds to file a restraining order… Marc has ruined my life for a year now… I've developed an anxiety disorder basically because of him… I'm having a nervous breakdown… I'm past my limit and [I] do not know what to do… Somewhere Marc is laughing… At a certain point it's just all too much. Losing my money. Losing my home. Multiple court cases. More theft from me. Unceasing psychological warfare against me."

99.    Around this same time, Goldner had also been directing unhinged and unfounded threats directed at First Republic Bank, where Megacap banked.

100.    As a result of his aggressive communications with the bank, I received a call in or around April, 2023 from our banker at First Republic, Morgan Elgebali, notifying me that he was going to report Goldner's threats to his superiors and that most likely Megacap would be dropped as a customer.

101.    Between that, the banking crisis of 2022, and some Megacap account being closed and others put under protective services by First Republic due to Goldner's threats towards it, the Company determined that to safeguard its funds while I secured it another banking partner, Goldner and I would each receive temporary distributions of Eighteen Thousand One Hundred Forty-six Dollars and Seventy Cents ($18,146.70) to hold in trust (the "Funds in Trust") until such time as they could be deposited into a new Company account.

102.    Goldner agreed that until such time they could be deposited into a new Company account, he would use the Funds in Trust to perfect an arbitration award against a Limited

Partner who defaulted on his capital contribution, which he never did, nor did he ever return the funds to the Company, as detailed further below.

103.    All the while, he continued writing inappropriate messages in breach of his fiduciary duty to me and the Company in the WhatsApp channel with several LPs and Little Prince:

    a.  expressing a desire to avoid personal taxable income by having the Company breach MCTI's governing documents;

    b.  threatening to withdraw me from the Company for refusing to sign the Interest Agreement and not acquiescing to his demands to file fraudulent tax returns for his personal tax benefit;

    c.  admittedly and wilfully deceiving Little Prince by knowingly and demonstrably lying to them about my alleged refusal to approve an imaginary cap table transaction, an *entirely made-up* allegation designed to boost his status with Little Prince at my expense by way of deception;

    d.  falsely claiming I had made unauthorized distributions to GBI;

    e.  again attacking my then fiancé and baselessly claiming the Company could sue her for tortiously interfering with Megacap affairs simply because she (understandably) did not like him; and

    f.  disclosing private internal Company business in an effort to improve his own personal standing with Little Prince and its affiliates, to the detriment of the Company.

104.    Finally, after holding out for over four months in the face of Goldner's threats, harassment, and abuse, Little Prince acquiesced to my refusal for the Interest Agreement to waive the right to repay its loan in shares.

105.    Having secured that victory for the Company at an incredibly high personal cost to my own wellbeing, I negotiated the final terms of and drafted an Interest Agreement that was to the Company's benefit without exposing it to the threat of bankruptcy, which was executed on April 26, 2023.

106.    At no point ever did Jiri or any of his associates threaten me, and when I ultimately shared with him that Goldner had been accusing him of threatening me and my family's lives, he called the allegations defamatory.

107.     His associate and Megacap LP Thibault Denonain, whom Goldner in a pivot later ascribed the threats to, also explicitly affirmed in a sworn affidavit that he never transmitted any death threats against me, let alone my family.

108.     The screenshots of Goldner WhatsApp messages with Denonain beginning on January 13 (attached as Exhibit 19 to the Counterclaim), a month after he first transmitted a threat against me, make make it abundantly clear that Goldner's alleged threats to our safety are entirely a product of his delusional imagination.

109.     Nonetheless, Goldner's campaign of terror had affected my mental health to the point where I did file a restraining order against him on April 10, 2023.

110.     However, as Goldner had intentionally never updated his driver's license and had registered his car to a UPS mailbox, both illegal in both Connecticut and New York (one of which, on information and belief, was his state of residency), the sheriff was unable to serve him.

111.     To this day, I have never succeeded in serving Goldner anything—not the restraining order, the complaint for the instant case[3], or the complaint for the Related Case—since he has intentionally made himself a ghost in order to evade service, given that he is a perpetual defendant in civil actions.

112.     Having failed to secure a restraining order due to being unable to serve him as a result of his calculated efforts to avoid being able to be served lawsuits or other actions, and no longer being able to suffer his continually escalating abuse, on April 30, 2023, I filed a rescission notice for GBI and a civil theft demand letter for the funds I had wired, in accordance with Florida law, in preparation to file suit.

113.     My hope was that entering into litigation would provide me some measure of protection from his abuse and enable me to be made whole financially.

114.     In response to the rescission notice, in a long rant on May 4, 2023 in the WhatsApp channel with Little Prince and other LPs, Goldner doubled down on his threats not only against me but, inexplicably, also Megacap:

> "You have breached your fiduciary duty and *will be removed* as such for your breaches that have put MegaCap's shares at risk. *You have risked the entire portfolio and if [the TECH supplier] gets wind of this and of any perceived*

_____

[3] Goldner's counsel ultimately voluntarily accepted service in the instant case originally filed in Florida on behalf of Goldner and the individual Defendants (with Dharma having been previously successfully served via its Registered Agent) once I successfully delivered a certified letter to his UPS Mailbox, which would have enabled me to obtain service by mail.

*dispute she will most likely redeem MegaCap...* The game you're playing here Eli will wind up dragging this into a Federal Court that will have a tortious discovery process that could reveal not just *people's names*, but has the impact of creating a regulatory securities risk with agencies such as the *SEC*. I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've 'stolen' your money… You have continually concocted a fantasy that you have signed the agreement with Little Prince because you feel *your life is in danger*. You should get it through your head that our financial safety and financial security are absolutely at risk because bankruptcy or *threat of suit could destroy MegaCap and expose the name of the employee for TECH with the forward contract.* That would be doomsday and disaster for all of us and no one would ever get paid then… *I suggest you re-think your approach and come to the table instead of playing games and pretending you haven't sent me a letter claiming that I've stolen money from you on a business operation unrelated to MegaCap.* So you can scream to the end of the day that this *is 'ranting'* but this is also coming from the same guy that thinks *he's in 'danger' from us.*" (emphasis added).

115.     Given that my rescission notice and civil theft demand had absolutely nothing to do with Megacap, and at that time he did not yet even know he had already been withdrawn from the Company, I took this message as a clear extortive threat against not only myself but also the Company, namely that if I did not withdraw my legitimate claims regarding the NFTs and miners he would needlessly expose confidential information that could irreparably harm the Company and its Limited Partners.

116.     That same day, Goldner also messaged my then fiance on WhatsApp to sextort me by threatening to release compromising images of me unless I withdrew my claims: "you all should have thought twice before attempting to call me a theif (sic). You ever wonder if when you spoke to me I was recording you… Do you not remember [video] calling me when Eli was butt naked… You two should think long and hard about what to do because you're asking to go to war against an army."

117.     That was the final straw. Continuing to work with the already-withdrawn Goldner was no longer tenable.

118.     I amended his withdrawal on April 28, 2023 to include the additional threats made and had it served to him on May 5, 2023 by my assistant, as I was no longer in any form of direct contact with him at that point for my own wellbeing.

119.     At that time, as I was essentially in a haze from his constant barrage of abuse, I failed to attach the original January 16, 2023 IW, serving him only the amended withdrawal, although this did not change the fact that he had in fact been withdrawn since January 16, 2023

per the IW tendered to the Company's counsel. It is unclear to me whether Goldner still does not realize that he was withdrawn in January or has simply chosen to ignore that fact.

120.     Despite notifying him of his withdrawal, I still at that time did not redeem him, as my goal still was not to economically disenfranchise him or enrich myself but rather to minimize the impact to the Company, which the withdrawal notice made explicit.

121.     My hope was that by noticing him of his withdrawal but explicitly not redeeming and permitting him to continue vesting equity, I could minimize his efforts to damage the Company.

122.     Unfortunately, I was wrong.

123.     Instead of adhering to the dispute resolution protocols in the OA, Goldner began improperly contacting Megacap partners and causing problems for the Company almost immediately, while continuing to harass me, causing me significant ongoing distress.

124.     On May 12, 2023 I messaged the Company's then lawyer again, writing:

> "I just got a call from a tertiary potential MC partner we never even closed any business with saying that Marc called both him and his partners. I don't think our [TECH] GP would ever have any cause to redeem us, since we don't know the employee whose shares we bought's name[4], and that's the really only unforgivable act, simply us having a dispute is not, but, still, I need to stop Marc. I would like to get a cease and desist order and also a letter from you as MC's attorney that I can share with all our partners to inform them that Marc has been removed and to contact me at the official Megacap email address should he contact them."

125.     On May 22, 2023, the Company notified him that it was aware of his activities and ordered him to cease and desist, as well as instructed him to return the Funds in Trust to the Company's new bank account at Bank of America.

126.     Goldner refused on both counts.

127.     Realizing that my hopes that Goldner would follow dispute resolution protocols and behave in a professional manner was naive, and the fact that his refusal to return the Funds in Trust was simple theft from the Company, I decided I was not just or proper to allow Goldner to continue vesting equity when it was clear he was actively acting against the Company's best interests, even though he at that time still had an equal interest to me.

---

[4] I was actually wrong about this fact. As Goldner would later bring to light by writing me the employee's name as a means to better extort me, the seller had failed to redact the employee's name in one of the TECH transaction documents.

128.    Accordingly, pursuant to the terms of the OA, Goldner's unvested Membership Units in the Company were redeemed on May 23, 2023 in strict adherence to the terms of the Redemption Agreement template Goldner had executed as part of the OA.

129.    Notice thereof and the purchase of his redeemed shares by the Company by way of a deduction from his Funds in Trust was then served to him promptly.

130.    This precipitated a campaign of terror against not only me but also Megacap and its partners, vendors, and investors that has not stopped to this day.

131.    This ultimately forced me to file an injunction in my case against him in Florida state court seeking to halt the damage he was causing to the Company, which, as with every other service of process I have ever attempted to effectuate on Goldner, was unable to be served to him.

132.    The injunction detailed his campaign of terror, which included:

    a.    doubling down on his extortive threats against me and the Company by, among other things, needlessly naming the name of the TECH employee (which I did not realize had been inadvertently shared with us) and threatening to publicize the name, which he himself has repeatedly acknowledged could cause catastrophic and irreparable harm to the Company and its Limited Partners, unless I reinstated him as a Class A Member and Manager of Megacap and dropped the instant lawsuit against him, writing in a June 29, 2023 letter to me included in Exhibit C to the injunction:

"I strongly *suggest* that you immediately *reinstate me*[5], otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved... *it is extremely important to remember that I possess the name (as do you) of the [TECH] employee that is part of the [TECH] employee forward contract - (his name in case you didn't read the documents is [redacted])...* **I would highly recommend immediately dismissing this case**... failure to do so may result in a federal court action and a tacit approval and waiver for me to sue MegaCap in federal court... MegaCap will be named as a third-party defendant, and I will most certainly *ensure that ALL shares are withheld*. What you do not seem to understand is IF the shares are cancelled [sic], it is YOU who will be held liable as you are the but for causeof all of this happening.... *I have absolutely no issue putting MegaCap into receivership with the SEC.*"

---

[5] Note that, despite his letters to LPs claiming to represent the Company and his claims in the Motion and Counterclaim to being a Class A Member, Goldner has consistently acknowledged that he was withdrawn as a Class A Member and Manager to both me and Limited Partners.

b.  admitted that his coercion of me to sign the agreement with Little Prince under threats to my life was extortion by acknowledging his financial interest in having the agreement signed, stating in that same letter to me: "In order for extortion to exist, I would've needed to have a financial benefit, which I had none – instead, I saved MegaCap over $100,000 in the interest waiver agreement that I had gotten signed"; this is a confounding statement given that Goldner was clearly aware that he had and continues to have financial interests in Megacap and thus pecuniary interests in the actions he was coercing me to take under threat to my life, thus rendering his threats felony extortion under Federal, Florida, and Delaware statutes;

c.  unsuccessfully solicited support and money from Megacap's Limited Partners to aid him in disputing his withdrawal outside of the proscribed mediation and arbitration under threat of the loss of their investment by implying that he will make the name of TECH, the TECH employee, and TECH supplier public if they did not assist him in forcing me to acquiesce to his demands;

d.  instructed potential investors not to invest with Megacap, thus causing the Company irreparable financial harm and preventing it from repaying its debts to its creditors;

e.  induced Roderyck Reiter to call my mother and relay extortive threats against me, including to "put [me] in jail" if I did not acquiesce to their demands; and

f.  contacted and baselessly threatened critical partners of the Company with, among other things, legal actions he has no standing or right under the OA to bring, including:

    i.  the TECH supplier to inquire about their ability to redeem the MCTH's subscription, thus planting the seed for them to potentially do so;

    ii.  the supplier of the Company's shares for another SPV it manages in a manner they characterized as "alarming";

    iii.  the Company's SPV administrator, causing it to breach its contractual obligations to Megacap by ceasing all work on Megacap's critical tax reporting in the middle of tax season and dropping registered agent services in response to the threats from Goldner, as well as to demand an

indemnification by the Company from any actions against it by Goldner in order to resume performance of its contractual obligations, thus hamstringing Megacap administratively and operationally;

iv. its accountant, who ceased work on Megacap's taxes out of fear of a lawsuit from Goldner, stating that he could not afford to be sued, even if frivilously; and

v. Megacap's counsel, whom his lawyer contacted and threatened with ethics complaints if they did not withdraw.

133.   Filing the injunction was, unfortunately, not sufficient to deter Goldner from attempting to cause further harm to Megacap, and the fallout from his letters created a tremendous amount of additional work and expense for the Company, in addition to likely lost referrals and subscriptions from prospective investors.

134.   Subsequent to its filing, Goldner's then counsel Raúl A. Reichard ("Reichard"), who subsequently withdrew after explosive allegations between him and Defendants aired in a hearing, wrote letters to Megacap's LPs on behalf of Goldner, (i) defaming me; (ii) spuriously alleging their 2022 K1s to be incorrect; (iii) falsely claiming to have requested formal mediation pursuant to the terms of Section 80 of the Agreement when in fact no formal "mediation administered by the American Arbitration Association under its Commercial Mediation Procedures" had ever been requested or let alone arranged by Goldner as the OA proscribes; and (iv) alleging that their investments were at risk from being withheld as a result of my actions.

135.   Reichard subsequently wrote Megacap's then-counsel, conveying threats from Goldner and Divilov to file ethics complaints against them unless both they and I acquiesced to various demands, including for Megacap's counsel to cease representing it.

136.   This is a flagrant breach of the Florida Bar's Rules of Professional Conduct Rule 4-3.4(h), which states that a lawyer must not "present, participate in presenting, or threaten to present disciplinary charges under these rules solely to obtain an advantage in a civil matter."

137.   Goldner's current attorney relayed this same message to the Company's current counsel in an effort to coerce them into ceasing their representation of the Company.

138.   Goldner next surfaced in November, 2024, along with Reiter and Defendant Divilov, writing Megacap's Limited Partners a 68-page letter in an effort to confuse and

intimidate them, with the three of them declaring: "Marc Goldner and Roderyck Reiter Reunite to Unify MegaCap Capital & MegaCap Funds."

139.     The November 2023 Letter was written by Goldner in collaboration with Divilov and Reiter, who each included their own letter. In this letter, Goldner, supported by Reiter and Divilov:

    a.   breached the Operating Agreement's dispute resolution terms and Megacap Funds' Limited Partnership Agreement's tortious interference terms (to which Reiter and Divilov are bound) by seeking to resolve his dispute with the Company by way of direct appeal to Megacap's LPs instead of through proper channels, writing "I am requesting that there is a mass request from each and every LP to tell Eli to comply with his duties;"

    b.   threatened to needlessly make public highly sensitive, confidential information about Megacap's suppliers, which he warned could wipe out all the LPs as well as Megacap;

    c.   alarmed LPs with an allegation that a critical Megacap supplier would withhold Megacap's investors' equity at Goldner's instruction, writing "MegaCap and Eli will not be distributed anything from the Sellers in which we acquired [redacted] and [redacted] without either my consent, authorization, and approval or without proper adjudication," where the latter claim is a gross misrepresentation;

    d.   falsely claimed to represent the company, sharing fraudulent Megacap email addresses to contact Goldner and Reiter, which Goldner has since written LPs from fraudulently claiming to represent the Company despite his repeated admissions to being withdrawn, as per above and the Counterclaim;

    e.   defamed and disparaged me as Megacap's Manager and, by extension, Megacap, by, among other things, baselessly accusing me of crimes, including double-selling TECH inventory, thereby defrauding Megacap LPs;

    f.   disclosed detailed confidential Company information, including disclosing the Company had a One Million Dollar ($1,000,000.00) debt obligation;

    g.   falsely claimed that mismanagement by Megacap could "result in the destruction of LP equity"; and

h.  attached letters written by Divilov as well as Goldner and Divilov's personal lawyer defaming the Company by, among other things, falsely claiming to MCTI LPs that their K1s were incorrect and fraudulent when they simply showed each partner receiving a credit for their fees paid.

140.  Despite Goldner's best efforts, while several LPs did contact the Company expressing concern and alarm over Goldner's letter, not a single LP expressed any support for Goldner.

141.  In response to Goldner's campaign of terror against the Company, it filed suit against him and his accomplices, Reiter and Divilov.

142.  With the aid of his attorney, he once again evaded service, causing the case to be dismissed without prejudice due to being unable to file a joint scheduling order.

143.  Thereafter, Goldner promptly filed his Counterclaim and Injunction in the instant case rather than keeping the unrelated matters separate, as would have been proper.

144.  Given that Goldner is impossible to serve by virtue of his concerted efforts to conceal his whereabouts and my desire is to put this painful chapter with him behind me, I have decided the best course of action is to litigate Megacap's claims in the instant case.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed on August 29, 2025.

_____

Eli M. Blatt

23



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

Dear Michael Murray,

I trust this find you well.

I hope everyone has had an incredible summer and an even better autumn! I want to assure everyone that I am still here and actively have been working on this disastrous situation. As you will see from this extremely detailed letter (with exhibits), I am leaving no stone unturned. I am sifting through over 100,000 emails, messages, photos, recordings, and more. I will not let Eli get away with this and he will be brought to justice!

What follows is additional details regarding the illicit actions of Dr. Eli Blatt, one of the co-founders of MegaCap. As a refresher, Eli had illegally and against the terms of the signed MegaCap Resolution removed me from MegaCap and had attempted to abscond some of its assets, presumably to enrich himself at the expense of not only myself, but other LPs and partners.

Matters have expectedly and predictably devolved since our last formal correspondence, but I am happy to report that any and all expected distribution of the Neuralink and SpaceX shares (or proceeds therein) have been frozen, protecting your investments until such time that this matter is finally resolved. The sellers of both Neuralink and SpaceX have assured me in writing that there will not be any distributions, dividends, or otherwise sent to Eli without my approval.

I.      **Letter from Attorney Raul Reichard:**

First and foremost, I think it is important for you all to read this letter from an attorney, Raul Reichard, who has taken the time to put together a letter addressed to all Limited Partners. The contents of the letter deals with many topics including but not limited to the status and situation surrounding the K1s, the various breaches Eli has committed, Flow's role in the destabilization of MegaCap, verification of Eli's misrepresentations including falsely stating that he is a Certified Investment Management Analyst, amongst other legal facts including but not limited to Eli's unenforceable withdrawal of me from MegaCap, that Eli himself is the one being withdrawn, information surrounding the legal liability of a third party who threatened me, as well as the falsities surrounding Eli's claim of holding Rod Reiter's units "in trust" and verification of my ability to pursue legal action in Federal Court under specific provisions of the Operating Agreement. The letter continues to discuss my rightful title to an LP stake in Neuralink, information around potential tax fraud being actively committed by Eli, that IRS Form 8832 was signed by Eli and myself, as well as confirmation that there was in fact a signed resolution preventing my removal. Days after (on September 14, 2023) sending LPs the letter on or about September 12, 2023, I received an email from the third-party Accountant that handled MegaCap's taxes, stating, "I mailed Form 8832 on March 14, 2023 to the IRS." Apparently, this accountant has since "disassociated" himself from MegaCap. It is important to note that it took this accountant over 2 months to respond to me after emailing him as early as July 2, 2023.

You can read the letter from Raul below at Exhibit X. You can also read the letter from Raul addressed to MegaCap from Simon Divilov, one of MegaCap's Limited Partners and one of my business partners for over a decade – that latter exhibit can be found below at Exhibit Y. For your information and for the sake of transparency, we are in the process of replacing Raul as our attorney of record. This is due to numerous reasons, the most pressing of which is that we believe a conflict of interest arose. By Raul's own admission, we had later learned that Raul is a friend and colleague of Michel Elkins. During the Summer of 2023, Raul had entering

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

into correspondence with Elkins. Crucially, he had billed us for that correspondence. Naturally, we queried this and asked for a copy to be provided. After all, if we had paid for this exchange, we are entitled to see what was being said. To date, and despite our request, Raul has failed to disclose the proof of that correspondence that was allegedly made VIA text message.

### Marc Goldner and Roderyck Reiter Reunite to Unify MegaCap Capital & MegaCap Funds

At this time, I'd like to state that Roderyck Reiter, the other rightful co-founder of MegaCap and I have teamed up to ensure Eli's illegal conduct is stopped in order to protect the Limited Partners!

**II.     New Incidents of Fraud By Eli Blatt:**

It has come to my attention and to my absolute astonishment that Eli Blatt has been misrepresenting to current and Limited Partners, on his Social Media, his Resume, as well as to myself that he is a Certified Investment Management Analyst ("CIMA"). Eli has gone as far as putting "CIMA" in the letters behind his name. I now possess proof that Eli Blatt has been fraudulently misrepresenting this information. Eli Blatt is not an "active certificant" of CIMA, which is issued by the Investments and Wealth Institute. I have confirmed this with the organization's General Counsel, Robert E. Frankel, who informed me by email that "[y]ou can go to https://investmenthelp.org/ and search for any name. If that name does not appear, he/she is not an active certificant." A copy of the email is attached hereto as *Exhibit V*. Furthermore, Mr. Frankel granted me permission to print out his email and share it if it was needed to be confirmed in writing. He further stated in previous communications that "...Mr Blatt is not an Institute candidate or certificant", and his colleague Ashley Vargas confirmed first to begin with that she is "unable to confirm that Eli Blatt has an active certification." (Please see Exhibit V) As is patently clear, Eli has been fraudulently misrepresenting himself to hold a title which he has not earned, and is now attempting to cover his tracks. As will be illustrated throughout, that is not the only matter Eli has been lying about. This fraudulent claim that Eli had been boasting on LinkedIn and other forms of digital communicative distribution should give all LPs insight to who "Dr" Eli Blatt really is as it is clearly a willful misrepresentation of his credentials. Eli's ego will never cease to amaze me at this point as it is one thing after another that Eli will continue to pile on top of himself with no end in sight.

Eli has attempted to unjustly enrich himself, fraudulently induced me into agreements based on this misrepresentation, and has continued to act in bad faith. The net result of his actions has caused the deterioration of affairs into their current, pitiable state. Simply put, Eli Blatt has proven time and again that he cannot be trusted at his word. He has continued to attempt to wage a war against myself and my other partners (through various businesses) to commandeer MegaCap (as he has also done the same with the Bitcoin ATM company, BitSource, that we started together – in which he also locked me out of the email, bank, and illegally withdrew over $6,500 without authorization from BitSource's banking partner called Arival Bank) and dispossess myself, and others, of our assets. If any were still skeptical before or up to this point regarding Eli's integrity or honest, I hope that the above revelation that has come to light has now dispelled any doubts of Eli's malicious intentions and lack of trustworthiness. If such reservations remain to exist, I ask that you continue reading as I provide further proof below.

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

### III.   Updates on Ongoing & Vexatious Legal Cases Between Eli, myself, and others:

After Eli had begun engaging in legal maneuvering, it had come to our attention that Eli has a history of suing his former business partners – it appears to be his modus operandi. While, we were aware that Eli had a troubled legal past, we were unaware of the nature of these suits as we had trusted Eli at his word. Upon further investigation, if all of the above wasn't enough, and further to this point, what Eli conveniently leaves out of his fictitious warped narrative is that he isn't only trying to sue me, but he has a habit of suing his 'former' business partners such as Zachary Burton and a slew of other people from his former Merchant Cash Advance business. It isn't quite clear to us as of yet what exactly has transpired, but what is known is that after matters soured in at an entity that has come to be known as "K4B" (we believe Kash 4 Biz), Eli eventually exited that business venture, and sued his former business partners, much in the same fashion that he is doing again. Upon information and belief, at least one of these is in Florida State Court against Zachary Burton, and another is allegedly in an arbitration. To be clear, Eli is attempting to play boy-scout, but I know the monster behind the mask. Eli is the same guy attempting to win everyone over claiming he's 'authentic,' 'genuine,' 'honest,' and a bunch of other fluffy 'psuedo-professional' phrases, when at the same time he has messaged me some inhumane, unethical, and borderline illegal messages. Do not let his performative professionalism deceive you. Only now, after the fact and in full context, I fully understand some of the messages Eli had sent me. For brevity, I will quote two. "Still ideating about literally strangling Zach to death" and "I told Emily yesterday I'm going to put his dad in the grave with this arbitration and then go to the funeral just so that I can creepily smile at Zach the whole time". Does this sound like someone you want to work with? At the time, I mistakenly believed that Mr. Burton had wronged Eli, as I was told that Eli had gotten into an argument with Mr. Burton in person at a party in Miami. I had justified it to myself that Eli was merely blowing off steam at a failed business venture, had given my partner, Eli, at the time the benefit of the doubt, but now the true, malicious nature of Eli is clear for all of us to see. Hindsight here truly is 20/20.

### IV.   Flow Letter

Upon these discoveries and revelations of Eli's fraudulent misrepresentation of various atrocities above, I now write this letter to all of you. As a courtesy from a fellow Limited Partner, I was forwarded Eli's June 4 Letter issued improperly from Flow (and without my approval). This letter was apparently not sent to ALL Limited Partners as certified by Simon Divilov, an LP of MegaCap, a close friend, and my longtime business partner, as well as confirmed by Roderyck Reiter, the other rightful Managing Partner of MegaCap. Simon & Rod granted me permission to disclose this information to you. I have also heard from other LPs that they have not received this letter. Naturally, even as an LP myself, I had not received a copy of this letter either. For your reference and for the sake of transparency, I've attached the letter as *Exhibit A*.

### V.   Michael Elkins' Attorney Misconduct and Conflict of Interest Exposed

The letter attached to Eli's letter (*Please see Exhibit A*) contained a letter from an attorney, Michael Elkins, herein attached as *Exhibit B*. This letter shows Elkins' grossly negligent and willful misconduct as he has stated in the past that in a dispute between Eli and I (that he had been aware of) that he would be conflicted out of representing Eli. He has breached that trust and continued to work for Eli to assist him in commandeering MegaCap. You can see Elkins' certification VIA email stating this attached as *Exhibit C*. For an attorney to conduct

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

himself this way is not just unethical, but I believe certainly violates the Rules of Professional Conduct which opens Elkins up to an investigation and a potential grievance claim with the Florida State Bar. However, upon information and belief, I was notified that Elkins is claiming that he no longer is representing anyone in this matter and that he had represented MegaCap in an unrelated arbitration. The direct quote allegedly believed to be originating from Elkins states, "I'm not co-counseling on the Blatt matter. I'm not sure why Marc thinks that. Happy to discuss with you when I get back on Monday, but I don't have much info. … I had very minor involvement for a very short time , I am no longer representing anyone in this mater … I represented Megacap in an unrelated arbitration … let's discuss" – this was on July 15, 2023 and I have to date still received no further word from Elkins. Upon information and belief, Elkins has been too busy in over three months to communicate.

To continue on this point, Mr. Elkins has had various communications with Flow and with Limited Partners of MegaCap. Mr. Elkins told Mr. Goldner on April 2, 2023 that "[i]f there ever was a dispute between [Mr. Goldner] and Eli as relates to MegaCap, I would likely be prevented from representing either of you against the other since I represented MegaCap." Mr. Elkins further went on to state, "[i]n short, my representation of MegaCap was on a single, discreet contract matter." Further to put this specific issue to rest, Mr Muschel emailed Flow, Inc on or about June 26, 2023 and stated that "Mr. Elkins has already communicated to your previously, both in writing as well as over the phone[…]" and that "[Mr. Muschel and Kopelowitz Ostrow] now represent[s] [MegaCap Capital, LLC], along with Mr. Elkins. However, upon information and belief, based on word received from Raul Reichard, whom once again is an attorney, Mr Elkins is not representing MegaCap at this time. Mr. Goldner is demanding all communications between Mr. Elkins, Mr Muschel, and any other attorneys who have allegedly represented MegaCap to be sent to Mr. Goldner, as well as a complete record of the phone call that occurred between Mr. Elkins and any representatives of Flow.

Surprisingly though, according to a letter provided to Rod (who is once again one of the Founding Managing Partners of MegaCap), Elkins is still co-counsel on matters relating to MegaCap according to a letter written by Benjamin Muschel on June 26. (Please see Exhibit D) Elkins has had various communications with Flow and with Limited Partners of MegaCap. Once again, Elkins told me on April 2, 2023 that "[i]f there ever was a dispute between [Marc] and Eli as relates to MegaCap, I would likely be prevented from representing either of you against the other since I represented MegaCap." Thus, it is hard to absolutely be certain of Elkins' position.

## VI.   Removal of Myself from MegaCap

Eli's letter contains many provable lies, which I will detail below and illustrate shortly, that shows his continued breach of trust with MegaCap's LPs and a breach of his fiduciary duties to fraudulently conceal the truth from MegaCap's investors, not including his breach of fiduciary duties to MegaCap and myself.

The first of these falsities is that Eli claims "[I] ha[ve] been withdrawn from the Company as a Class A Voting Member and Manager according to the withdrawal and redemption provisions of the Company Operating Agreement and is no longer operating at the Company." Eli has most certainly not abided by any withdrawal and removal clauses because Eli conveniently leaves out the following:

    1) That we signed a MegaCap resolution and completed it on February 13, 2023 (Please see *Exhibit E*). In terms of that agreement, no Class A Member, of which both Eli and I were, can remove another Class A Member.

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

In other words, Eli's purported removal of me is de facto impossible due to the agreement we signed. For the sake of convenience, I quote the relevant portion of the clause which states, "all Sections of the operating agreement relating to Redemption of Membership Units or Involuntary Withdrawal are hereby voided upon fulfillment of the terms of this agreement, such that no Class A member can be removed as a Class A Member or Manager to any degree by the other Class A Members, and that any such attempted removal shall be void upon completion of the terms of this resolution." Since the Material Terms of the agreement, all of which have been completed, as stated in an email I sent to Eli in Early 2023 were completed prior to Eli's illegal, improper, invalid, unenforceable, and attempted withdrawal of me which at worst can be viewed as upon the signing of the Interest Waiver Agreement, thus, Eli is unable to retroactively redeem and withdraw me on that same date in early May as he claims. (*Please see Exhibit F*)

2) That in order to have withdrawn or redeemed me regardless, he would have had to go through the dispute resolution clause. Eli is accusing me of not doing the very thing he did not do himself. Moreover, as I will set out below, I did engage with the proper procedure to attempt to resolve my illegal removal and instead Eli blocked my attempts from doing so on spurious grounds. Eli keeps espousing this false narrative that I haven't "formally disputed [my] withdrawal". Eli also continues to claim that I refuse to abide by the dispute resolution provision, but after numerous attempts, the most recent being on July 10, 2023, which was a follow-up email from the communication on June 29, 2023, Eli still refuses to abide by the Dispute Resolution Terms he claims that we are bound to. Eli has refused to reply as required by Section 80(A)(1) of the MegaCap OA. (Please see Exhibit G) Eli has even gone so far as admitting to Rod via email that he won't negotiate with me unless I accept service for an unrelated claim, a claim which he is attempting to use as leverage to extort me (the irony!). He specifically told Rod, "And if Marc wants to negotiate with me, all he has to do is accept service for the lawsuit." Please keep in mind that said alleged lawsuit is once again unrelated to MegaCap. Eli continued, "I am not prepared to negotiate anything, I am not speaking with Marc again, ever, under any circumstance […]." Eli has displayed a blatant disregard for the Dispute Resolution Provision, the very provision that he falsely accuses me of not complying with. His false accusations are provable fabrications. That is one of the many reasons that I am forced to escalate these matters. However, unlike Eli, I am proceeding in a legal manner and following the appropriate protocols governed under the various Agreements and Resolutions signed by MegaCap's Partners.

3) My alleged and purported withdrawal and redemption were not valid. Eli continues to claim that I have 'extorted' him. This is factually untrue. I will refrain from commenting further on this aspect for my own safety, save to state that Eli is mischaracterizing specific statements I had made, holding the patently fallible position that I was making a threat. Rather, I was discussing the risks of non-compliance with our duties that would equally impact both of us. Such an escalation, I believed at the time, was a risk to both of us where we would have been in drastic danger and could have faced severe life-altering consequences. My conveyance of this to Eli was that BOTH of OUR lives were in danger and that we would face equally dire repercussions. Eli is completely aware of all of this, despite his statements to the contrary. If the danger of Eli's malicious conduct continues to escalate and the need arises, I do in fact possess written and documented proof of these chain of events in the form of a signed affidavit and screenshots taken from various communication channels. Eli has tried to mischaracterize these statements to defame, disparage, and destroy me and my reputation in order to proceed to take over MegaCap. He is attempting to steal my LP interest in ✕✕✕✕✕ (which he has deprived me access of to date), as well as my entire vested equity in MegaCap. I have learned that Eli's telling at least one known LP that I am "mentally ill" which, again, is a misguided lie. I am taking legal advice on Eli's continued



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

defamation and libel of me, as well as besmirchment of my good name.

Further, Eli claims that I must adhere to a private mediation or arbitration, the former of which he has continued to deny me. His mother, Loretta Moreno, lied to Roderyck Reiter, the other rightful General Partner with an equal interest as Eli and myself in ⬛⬛⬛ and MegaCap. She claimed that I never attempted to mediate, when in reality I had offered to even fly down to Miami to mediate in person with him and his own mother. Loretta's claim to Rod is a provable lie as can be shown in numerous texts. Further, Eli attempts to claim to Rod that it was my idea to call Loretta, but that idea to call and speak with Loretta was Rod's idea and Rod's idea alone. He has had a long-standing nearly 40+ year relationship with collectively Loretta and Eli Blatt (as Rod has known Loretta since childhood and had grown up together with Eli since childhood as somewhat further elaborated by Rod in his letter) which he details in his letter to the Limited Partners below at the bottom of this email attached as the last exhibit.

Eli is factually incorrect about me being forced into a mediation (which he has continually denied me my right of) or an arbitration. Under MegaCap's Operating Agreement, I am entitled to 'Equitable Remedies' in the form of an injunction in federal court as per Section 81 of MegaCap's OA, doubly so now that Eli has doggedly refused to engage in the mediation/arbitration clauses and is himself in material breach of the OA. I pause to set out that Eli is fully aware of these provisions considering that Eli himself is attempting to file his own injunction against me without abiding by the same dispute resolution provisions that he keeps echoing to all LPs that I need to abide by. (*Please see Exhibit H & I*). Eli has paraded around claiming that it was me bringing MegaCap's issues to the courts publicly, yet it was Eli who is deciding to go and allegedly file an injunction according to an email Eli sent to Rod in which said alleged suit could now be exposing MegaCap and all of its LPs. It is apparent that Eli is trying to silence me and take over MegaCap. What is most insidious is that, upon information and belief, he is attempting to use the assets he illegitimately obtained through MegaCap to do so by depriving me of access to MegaCap's bank accounts. Thus, using some of my own money against me to wage a frivolous legal battle. I do ask all of you LPs to look inside yourselves and see what Eli is doing and ask yourselves if this is someone you want to work with.

Eli's claims that I have committed any "felonies" are completely unfounded, without merit, and factually untrue. In fact, again, it is comical because it is Eli who has tried in the past to extort not just Rod, or myself, but possibly even other former business associates as well.

With all that said, it should be understood, that the Resolution that Eli and I signed in February of 2023 completely removed any and all attempted Redemption provisions. Thus, it is clear that Rod's coerced 'redemption', illegal 'withdrawal', and forced 'removal' from MegaCap is not valid. As the Managing Partner of MegaCap, one of the first orders of business I will execute upon regaining control of the MegaCap entities will be to reinstate Rod's position and equity at MC.

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## VII. Exhibit A Letter Refuted in Detail

To now address Eli's bullet points in his Exhibit A letter ad seriatim:

> • Marc was withdrawn to protect the Company pursuant to the procedures outlined in the Company Operating Agreement for breaches of the Agreement, including his fiduciary duty

1. Eli did not withdraw me to "protect" the Company. That is a load of nonsense. Ask yourself this: "Who or what exactly is Eli protecting the Company from?" Please realize, rather, that I was the individual who identified            as a target investment less than a couple weeks after founding MegaCap and more than 6 months prior to the         deal. (*Please see Exhibit J*) Truthfully, it is hard to say Eli did much of anything material or beneficial for MegaCap. In my opinion and if I'm being generous, Eli was barely doing what an administrator would be doing. And even in that capacity, there were still issues and constant problems that would arise on a regular basis. Eli would frequently make incorrect spreadsheets and would produce or aid in the creation of incorrect tax filing documentation that needed to be nearly entirely redone, often by myself. Eli's work product often did way more harm than good in my opinion. In that same vein, Eli has continued to fail to issue K1s for other MegaCap Fund entities such as         for 2022 and upon information and belief has clearly abandoned those Limited Partners leaving all of us with a question of uncertainty; whereas the IRS may fine MegaCap late penalties, and in which LP equity may be destroyed or diluted due to Eli's incompetence and illicit actions. Rod and I are trying to do everything we can to course correct the ship (*Please see Exhibit W*), so we ask that you please work with us to help ensure the safety of your investments. Equally, I spent months away from my family to network and raise capital on behalf of MegaCap. I bring this up not to aggrandize my achievements, but to illustrate my unwavering commitment to MegaCap. I have done nothing but try to grow MegaCap and serve our Limited Partners' interests. Just recently, when one LP needed assistance with a third-party Trust, I was happy to oblige, providing that input to ensure he would not have any issues with his taxes. Measure me by my actions and decide whether I intend to harm MegaCap, then do the same with Eli.

What is more interesting is the lack of information and details provided by Eli regarding my purported breach of fiduciary duty. What exactly are these alleged breaches of fiduciary duties that Eli purposefully inserts into his language to be vague? One must ask, what exactly are these alleged breaches that I had committed? The answer is clear in the vagueness of the accusation. This is merely just another attempt to slander myself and divert attention away from Eli's own misdeeds. The truth is that I was giving it my all to make a success of the venture. Even hours prior to Eli illegally removing me, I had followed up on the Flow thread insisting that Eli do his "due diligence to make sure it is correct so there are no issues." Further stating that, "Two sets of two eyes are better than one here." I had reviewed and reviewed the K1s (Please see Exhibit K) several times and as late as back on May 5, 2023 (hours prior to Eli illegally removing my MegaCap email in breach of the February resolution – *Exhibit L* – which, evidently, will result in **HIS** involuntary removal from MegaCap when all is said and done) after working for months to correct Eli's numerous mistakes and oversights. Thus, on the contrary, and to illustrate how patently false Eli's claims are, I will list only a few of the many actions taken by Eli that would put him in breach of his fiduciary duty instead. I had to spend months correcting a series of mistakes made by Eli that resulted in Flow and the accounting team not being informed of a promissory note that led



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

to the threatening behavior I was exposed to, and Eli incorrectly allocating the management fee to be entirely front loaded on the K1s rather than earned on an annualized basis as we had agreed to when we began that entire SPV. Additionally, because Eli failed to understand that the ✕✕✕✕ closing happened in 2022, and not 2021, it resulted in a the K1s for 2021 being entirely miscalculated. To add on to the dangers presented by Eli maintaining the helm of MegaCap, he has not only refused to update MegaCap Funds, LP – Tech I Series Agreement to include the Limited Partnership Agreement in Exhibit B which I notified him was not in the documents issued to Limited Partners once again on February 7 (*Please see Exhibit M*), but he also failed to timely file the Form D Amendment with the SEC for nearly a year which exposed the SPV stating the name ✕✕✕✕ on the SEC's Edgar public website. Further to Eli's misconduct, Eli said to Ryan Nanney at Flow on April 28, 2023: "So long as the taxable income is just 10% of the total fee then we are good." The most recent ✕✕✕✕ K1s that Eli provided do not reflect this statement and his improper recreation of MegaCap's K1s are not just illegal but a breach of his fiduciary duty to all Limited Partners. On this very same subject, I have informed Eli that there must be changes made to the ✕✕✕✕ K1s to reflect the agreed upon fee structure that was stated to MegaCap Limited partners VIA email on or about February 9, 2023. In said email, MegaCap (*vis-à-vis* in a message approved by Eli and myself) specifically stated that, "The amended K1s are currently being prepared by Flow, and we are pushing them to get them out by next week at the latest. In the interim, we can report **definitively** that the loss will be 0.5% of your capital commitment, representing one tenth of the 10-year 0.5% management fees. **You can report this to your accountant and proceed confidently with that number.** You will receive a notice through Flow once the K1 is complete." (emphasis added). There are Limited Partners that have already filed their tax returns that reflected this material representations & material statements, and it is completely unacceptable for Eli to unilaterally make these changes by giving Limited Partners a few days before MegaCap's extended deadline. Simon had sent a letter addressing these concerns and issues to MegaCap which had went ignored without so much as a response from Eli himself. Continually, Eli is attempting to hide behind attorneys and refuses to engage in any dialogue. I pause to state that these are only some of the issues that I had to correct after the fact, issues that can be placed solely at the feet of Eli and only became issues due to him failing to comply with his responsibilities and duties.

All the while, Eli touted how effectively and competently he was running the back office. Only once issues began cropping up in a way that he could not keep from me did I realize the dire state of the work Eli was doing and I set about attempting to set matters right. The last issue I was working on before I was locked out of my MegaCap email account concerned and centered around attempting to ensure compliance and timely distribution of the K1s. It beggars belief that he would claim that the company needs protection from me when he is the one doing it the most harm. As a final nail in the proverbial coffin (Eli may try to say this is a threat – it's not, it's something known as an 'expression' which is perfectly legal to say), *Exhibit L* states that where one member attempts to remove another, the removing member must be removed instead. In other words, Eli's actions, under the false guise of protecting the company, can only result in his immediate removal. But I am stymied from enacting the terms of our signed agreement by his strident refusal to engage in the proper processes and being illegally and completely locked out of the pre-existing MegaCap logins.

Much of that brings us to today. On or about September 9, 2023, Simon received a notification from Flow stating that a "draft 2022 K1 package for MegaCap Funds, LP – Tech I" is available. (*Please see Exhibit N*) Raul Reichard, informed Eli that there are noticeable errors that need to be changed. You may find that notice as part of *Exhibit Y*. Further, what's quite disconcerting, is that Eli had purposefully waited to send Simon this email



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

**MegaCap Capital**

because he had informed a different Limited Partner nearly the same identical message, which was conveyed to me by Rod on that Friday evening. As predicted, Eli did in fact breach the terms of the Option & Loan Agreement we signed, and instead opted to elect to commit what I believe to be tax fraud by retroactively re-classifying the management fees that were agreed to be earned annually. Instead, he has accelerated the entire management fee of 5%. The danger with what Eli has done is jeopardizing the solvency of MegaCap. By my earlier estimated calculations, by Eli front-loading the entire management fee of over $200,000, there will now likely be an adverse tax consequence that MegaCap will have to bear. Upon meeting and conferring with Rod, we both believe that due to this, mixed with Eli's refusal to operate on an accrual accounting system (instead electing and opting for a cash-basis method), MegaCap may in fact run out of money prior to the ⨯ years until ⨯⨯⨯ plans to IPO. The entire thought process and rationale behind holding the funds in trust were to ensure that the management fees would be used for annualized operational expenses and not to be used as income for the general partners own lifestyles. The danger of what Eli has done by this fraudulent distribution of the K1s will present what we believe to be an inherent danger to MegaCap and its LPs which can only be saved by the General Partners being forced to either have an internal capital contribution or to ask LPs for an additional capital call as expenses continue to accrue through the years – Rod and I's intention is not to have an additional unplanned Capital Call from the Limited Parnters and that is just one of the many things we are trying to prevent Eli from doing. All the hard work I had done to protect MegaCap and its Limited Partners have nearly and effectively been washed down the drain by Eli, and i will be exploring the appropriate reporting mechanisms to the Internal Revenue Service for Eli's illicit actions that put this venture at severe risk of failure and potential bankruptcy.

> The redemption of Marc's unvested equity that he had not yet earned was done in accordance with the terms of the Operating Agreement at a predetermined valuation that is fully auditable

2. Eli claims that I had unvested equity that I hadn't earned yet and that such redemption was "done in accordance with the terms of the Operating Agreement at a predetermined valuation that is fully auditable" – such claim is patently false. There are several issues with Eli's claims here:

First, Eli conveniently leaves out that he illegally, improperly, and invalidly "redeemed" 170,274 Units of my interest for $1.70. To emphasize this point once more, Eli purports that I accepted **One DOLLAR and Seventy CENTS** in exchange for over 170k units of interest equating to a worth of 17% of MegaCap Capital – that means that 17% of my portion of the Carried Interest that will be earned from MegaCap Eli has stolen from me. Eli knows this is an unconscionable redemption and is not enforceable. Now, what's fascinating here is that in this "Redemption Notice", Eli claims that "[p]ursuant to Reiter Redemption Agreement dated March 24, 2022, the Company fully redeemed the 330,000 Units granted to Reiter, increasing the Units held in Trust by the Company to 340,000" However, I believe that Eli is willfully withholding from all the Limited Partners that the MegaCap Operating Agreement also states, "In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other." (*Please see Exhibit O*) Divesting the unites in the matter he has is simply impermissible by the terms of the OA. Not to mention that Rod's 'redemption' was never actually fully effectuated and is thus invalidated.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

Second, nowhere in the Operating Agreement or any alleged redemption provisions does it mention that upon a redemption that Units will be held in "trust" by the Company. Therefore, even in a fictional parallel world where Eli did legally redeem me, a contention that I reject with the contempt it deserves, it would still mean that in that alternate reality I would've been entitled to those shares that Eli claims the Company holds in "trust."

Third, as per stated above and as shown in *Exhibit E*, it is clear that no redemption or withdrawal would be valid.

And fourth, to reiterate the first point above, even in the alternative, where Eli thinks he did redeem and withdraw me, he fails to cite Section 12 of the Operating Agreement that gives the example in the case of a redemption, "For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units)." Whereas any redeemed equity would be evenly distributed amongst the remaining Members. (Please see Exhibit O) Whereas, even if Eli's fraudulent version was to be believed, I would be entitled to a far greater share than the 159,726 units insinuated in Eli's 'notice.' This is due to an even re-distribution of Rod's illegal and invalid redemption which Eli coerced me into signing based on other business matters and investments. Eli claimed he would stop working and further dispossess me of my assets such as an investment in Chad Troutwine's entities relating to an investment in a James Bond Video Game, unless I agreed to his terms and tried to force Rod's removal from MegaCap proper.

> Should Marc elect to formally dispute his withdrawal, the
> Company's dispute resolution provisions call for a private and
> confidential mediation and arbitration governed by the American
> Arbitration Association that exists specifically to protect the
> company and its investors

3. Eli continues to reiterate in his letter that a formal dispute on a withdrawal is governed under the dispute resolution provision, which again is patently false. Rather, even if he is presumed correct, I am *still* entitled to Equitable Relief as per *Exhibit H* (Section 81 of MegaCap's Operating Agreement). Eli pretends to be the aggrieved party, but his actions prove otherwise. A lot of this may be quite mindboggling (yet at this point I am trying to refrain from constantly being surprised, but admittedly, it is truly shocking). Eli insists on the formal dispute resolution procedures needing to be followed, however, Eli himself has told Rod he is planning on filing an injunction against me relating to MegaCap – although I cannot confirm if this threat Eli has made is in fact true as I haven't been served and have absolutely no clue what jurisdiction Eli has even allegedly filed said injunction. There is an underlying risk to me seeking injunctive relief in order to minimize exigent risks, but Eli has continually blockaded me. Please know that I have tried to mediate with Eli for months and he has refused to even exchange so much as an email, never mind talk on the phone or meet in person. My attempts have been to no avail. He falsely claims that I am trying to hurt him and that he is 'afraid,' which is a blatantly false excuse he is deploying in order to avoid following proper process and evading being held accountable for his illicit actions. Eli's actions and behaviors are not someone who was afraid for their lives. On the contrary, he is the one issuing and volleying threats. Eli is also publicly displaying that he and MegaCap raised money for a XXXX SPV. In fact, according to the email obtained from Rod, it is Eli who is attempting to seek injunctive relief in an improper venue that has broadly risked this entire transaction. Eli's numerous actions are the truly threatening behavior that he is trying to hold over all of us and we must stand up to him – behavior we must all



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

endeavor to halt, lest he destroy this venture and the remainder of the Limited Partner's equity entirely.

> Neither that process itself nor the outcome would have any direct
> impact on the SPVs managed by Megacap Capital

    4. Eli claims that "that process itself nor the outcome would have any direct impact on the SPVs managed by Megacap Capital". This statement again is potentially false. With pending litigation that may take years, even possibly over a decade, as well as other investigations that must follow Eli's illegal acts, MegaCap may, unfortunately, find itself effectively frozen until these disputes are resolved. We plan to request the Court to redact the name of a particular ✕✕✕✕ employee, failing which, the assets of the entire SPV for ✕✕✕, as well as MegaCap's other SPVs and assets, could be placed in jeopardy. For those unfamiliar with the legal process, there are unknowns and uncertainties present in any litigation, and it is quite difficult to predict how a judge may rule, especially when it comes to keeping information out of the public record. I, of course will attempt to legally protect this information from the public, but I have no decision-making authority if a Judge orders me or Eli to disclose the name of that Employee – the only option we may have is to file a Motion to Quash and request for that information to be filed under seal, but even such a Motion may be outright rejected by the Judge for any reason determined. As such, even on a cursory look at the current state of affairs, Eli cannot in good faith make the undertaking that he has already embarked upon. There will be legal consequences for Eli's illicit actions and conduct, those of which will impact matters going forward. Eli knows many of the risks with litigation and is continually attempting to shift the blame back towards me as part of his strategy. Ultimately, Eli is attempting to hold a metaphorical weapon to my head and is using threats and false accusations in order to try to gain unobstructed and unsupervised control of MegaCap and its assets while diverting attention away from the illegal manner in which he is attempting to do so. Eli attempting to halt my actions to save MegaCap and Eli's crusade to harm MegaCap will ultimately be unsuccessful.

> All SPV equity is calculated on a per-share basis at a fixed price,
> is managed and reported by Flow, and there is no way to "take
> any shares right off the bat of most of the LPs"

    5. Eli's claims that the SPV equity is calculated on a per-share basis at a fixed price, and is managed, and reported by Flow. What Eli fails to disclose to our LPs is that MegaCap Tech Holding's assets and purchase price are governed internally. A major dispute that Rod and Eli had in the early days was of Eli's handling of the accounting. According to Rod, the way Eli handles the accounting methods raised a severe concern in that Eli is attempting to prioritize his own payouts and using a frame of reference that he needs to be paid before LPs are made whole. I broached the subject with Rod, who described Eli's methodology as follows: "The reason I was such a stickler that the accounting had to be verified was because Eli had a peculiar way of calculating the accounting. When he did the accounting, he would first calculate what he was 'owed', and since he had negotiated such an onerous and complex split of the proceeds, it was hard to verify whether he was subtracting expenses prior to calculating his portion. After he had calculated his portion, he would calculate the rest. He would also usually immediately transfer his portion of the funds from the company bank account without first having the other partners sign off on the accounting." In a text discussion with Eli, it became clear that Eli was attempting to adjust the calculations of Rod's held LP equity interest in order to benefit himself to the detriment of many of the other stakeholders. As such, it is once again patent that Eli's statement was deceptive in nature when he claimed that he never wished to deprive any shareholders of their value. Further,



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

Eli then has attempted to tell Rod that he said things out of frustration. Well, let me ask you this, if Eli would threaten to withhold a Limited Partner's rightful share for personal gain, then how is that NOT trying to take shares right off the bat? Those messages Eli sent to me on June 1, 2022 state, "total up all those charges" (in reference to expenses such as Mailchimp, Pipedrive, Asana, and other third-party services), which Eli then proceeded to state "we are deducting all of that from Rod's eventual carry payout" and "i'm not kidding", which I replied "I know ur not", before Eli continued on, "also any of my losses from Straightpath", "loss of profit on shares I may not get due to their fraud, which he guaranteed", "all those deals will unwind before _____ / Civ""pls add all these up in a sheet somewhere marc", "this one is a legit expense for us" and "but all that other shit that Rod neglected we should absolutely bill to his ass". This is the kind of person Eli truly is behind the scenes. I ask all of you to really look at these messages and see what Eli is doing here – he's trying to deprive and dispossess rightful assets of Rod with absolutely no remorse, yet at this point I expect nothing less from Eli Blatt.

> The GP for the SPV via which Tech I has its derivative equity interest in Neuralink is already aware of Marc's withdrawal and has stated she has no cause to redeem the underlying equity on the basis of a private Member dispute

6. This is one of Eli's most blatant and disturbing lies, which could be the final straw and ultimately may lead you down the path of whether or not to trust Eli M. Blatt. I asked the GP of the SPV where we purchased the derivative equity of _____ from, if Eli ever told them that I was "withdrawn" from MegaCap. They replied they were not notified by Eli of my attempted illegal withdrawal, an attempted withdrawal which I pause once again to state is illegal. This GP has asked me personally not to involve them, so I am maintaining to keep their identity and exact long-form quotes confidential. Regardless, what Eli did lie to this GP about is that I had taken a 'step back' from MegaCap to 'focus on Law School.' Therefore, I do testify and certify under penalty of perjury that on July 13, 2023 that she stated to me that she was **not notified by Eli of my 'withdrawal' from MegaCap**. Upon being informed, the Seller did preemptively halt any planned distributions of any of the _____ holdings. However, I will share a copy of the redacted letter from the Seller of _____ (*Please see Exhibit P*), as well as a copy of the redacted letter from the Seller of _____ whom we initially purchased the _____ derivative equity from prior to going directly on to the _____ Seller (*Please see Exhibit Q*). **To be clear, MegaCap and Eli will not be distributed anything from the Sellers in which we acquired _____ and _____ without either my consent, authorization, and approval or without proper adjudication.** It is part of my fiduciary duty to inform you of this freeze that will only be lifted once this dispute between all of the partners is resolved. I hope this alleviates everyone's concerns, albeit only temporarily until this matter can be properly resolved and set to right.

> As a matter of public record, I have litigation filed against Marc relating to non-Megacap matters (as numerous others have had recently as well -- google "Marc Goldner Lawsuit"), which to date he has evaded service for

7. Eli discusses other litigious matters. However, what Eli fails to state is that he owes me, my partners, and the entities that I am a part of approximately **$797,817.00**. This debt is due to his failure to pay (& subsequent default on) of his portion of over a dozen Bitcoin Miners, as well as his underfunding of NFTs we jointly purchased, the James Bond investment previously mentioned which he certified was approved to be

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

a joint investment (Please see Exhibit R), amongst other things. This does not include other money Eli owes me such as the approved expenses I have from MegaCap that I now have to bear in my personal capacity. Additionally, the particular series of investments in Chad Troutwine's companies was a material representation that was part of a series of representations that Eli used to fraudulently induce me into numerous contracts, one of which was Goldner Blatt Investments, LLC ("GBI"). When challenged on these representations, he refused to respond and attempted to shift blame towards his mother, Loretta Moreno, further showing his dogged intention to not mediate or settle any disputes on any matters with myself and my other partners. It takes a special individual to hide behind their mother at 40+ years old. On or about June 29, 2023 and in a series of emails to Eli, a set of auditable provisions were provided in a good faith attempt to settle all matters and issues, however, Eli has to date not responded at all, left these emails unanswered for months on end and has continued to refuse to engage in any manner. On the contrary, it appears as if Eli has blocked me (as he has said he has done in the past – repeatedly blocking and then proceeding to unblock me on WhatsApp and emails) on various forms of standard communication channels. Since Eli's has withdrawn from GBI, I am happy to share my audit of Goldner Blatt Investment's Cap Table that I shared with Eli on June 29, 2023. You'll quickly be able to see Eli has something to hide from a transparent audit I conducted. Also, Eli attempts to paint me in a bad light about 'other lawsuits' but as per Section 42 of MegaCap's Operating Agreement (*Please see Exhibit S*), Eli knew from Day 1 of going into business with me that I am involved in various Intellectual Property disputes originating from an entertainment and media company that I had founded in 2015. The details of these lawsuits are immaterial to this discussion, but in the spirit of transparency, I will add that in the latest lawsuit I had entered a parallel suit against both the publisher and the artist to vindicate myself and my companies. Should any LP have any concerns regarding this, I have nothing to hide in any regard and will provide any and all details as far as I am able to and as far as is permissible. But I digress. Eli was fully aware of this protracted litigation and is trying to act surprised by something he knew about for years and on which he had much commentary to share, stating that it was just a bunch of artists that got upset that I got 'too good of a deal.' Eli sharing this clearly shows he has a complete and utter disregard for our Non-Disclosure Agreement. As stated above, I am happy to discuss that litigation with anyone interested – one can be found HERE. All LPs are more than welcome to download the complaint that one of my company's and I filed against an artist and a behemoth publisher who has committed Copyright Infringement and stolen our optioned work.

On the topic of lawsuits, circling back to the egregious lowly comments in relation to Mr. Burton and his father – my opinion and two cents on the matter is that it may be Eli's strategy is to go into business with people, extricate himself whenever he sees fit (with or without ill-gotten gains), sue them, then tell the next round of people that he was wronged, until he has time to do it all over again by seemingly repeating this cycle whenever it suits him to do so. As alluded to above, we now believe we are aware of a pattern of behavior from Eli wherein he exits from a venture (whether forced out, voluntarily, or otherwise) and engages in so-called 'lawfare' to defend any ill-gotten gains he has obtained. Before the current instance, we refer to the actions taken against Mr. Burton alluded to above. At the time, Eli told us that he was wronged by Mr. Burton. And now, to you, he repeats that behavior by vehemently accusing me of wrongdoing. In this very instance, he didn't just try suing me, but he has also tried suing my significant other for Conspiracy. Nearly equally, Simon Divilov, one of the earliest Limited Partners of MegaCap and my co-founder at the Bitcoin Mining operation that Eli was once a part of, is also being sued for Conspiracy, amongst other frivolous claims. Simon will have a statement about this below (Please see *Exhibit T*). In Simon's case, as in this instance as well, Eli repeats his behavior of crying foul while refusing to engage in mediation, all the while attempting to escape liability. Again, Eli



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

refused to mediate or let alone talk with Simon to resolve his issues about his underfunding and default of the Bitcoin Miners that we purchased – instead electing to sue one of Eli's very own investors, Simon. Outside of being a long-time business partner, colleague, friend, and investor, Simon also works with the United States of America's Department of Defense and he has found Eli's behavior and candor to be absolutely deplorable. Eli's failure to pay our company, The Dharma Initiative, wherein Simon and I hold equity, has forced Simon, myself and other Dharma partners to temporarily fund Eli's default of over $100,000. Had we not done so, we would have faced a company-wide default and would have lost nearly all of our Bitcoin miners. Once again, Eli attempts to paint a false narrative that we are the 'bad guys' while he engages in fraudulent and malicious behavior. We have at our disposal hundreds (if not thousands) of messages on a WhatsApp group discussing these transactions as well as several signed documents in support of our claims. As they are not directly related to the current matter, I elected not to include them herein, but should any LP be interested, I can discuss with you making those documents available. I believe that Eli's lack of accountability and responsibility is just another *flawless (sarcasm)* character trait that he possesses and should not be overlooked in these instances.

Eli has told Rod as recently as July 12 that "All of that being said, I am not prepared to negotiate anything, I am not speaking with Marc again, ever, under any circumstance…" Does that sound like someone willing to mediate if he won't even negotiate or speak with me? Please do not believe Eli's blatant and flagrant lies in his communications with fellow Limited Partners and understand that A) Eli has no jurisdiction over me in any Jurisdiction except for Delaware and I have no requirement to consent to jurisdiction in any Jurisdiction except for Delaware, B) Our Goldner Blatt Investments Operating Agreement has the same dispute resolution provisions as MegaCap (which Eli consistently mentions), provisions which he is refusing to abide by in both instances, C) that the GBI OA is governed under Delaware law, and D) has refused to not just Mediate, but, has also under false pretenses threatened litigation and is disguising his true motives to try to destroy me, steal my assets, and take away from me all the years of hard work I put into building these Companies and creating a dream, vision, and goal for us to share in together in this journey.

> Marc's email to you appears to be intended to sow fear and solicit money from you to defend against these suits and finance a dispute of his withdrawal

8. My previous letter to you was not an attempt to "sow fear and solicit money", I believe that my message to each and every LP was an authentic and genuine account of the status quo, and that I have a fiduciary duty to inform LPs the truth of what is going on behind the scenes. The purpose of my messages are not to solicit money from LPs to "defend against these suits", it is primarily informational as all LPs have a right to know what's going on – that is part of my Fiduciary Duty to all of you. I do want to take a breath to thank each and every LP who has taken the time to meet with me and go through this disastrous situation. Eli's statements again are patently false as that is not the underlying purpose of my letters to you. As I said above, I inform you of these matters since it is my fiduciary duty to do so, a duty that I take extremely seriously. There are numerous LPs who are joining me as a Class to sue Eli and MegaCap for his breach of fiduciary duty, amongst other causes of action. Eli conveniently misconstrues this to be a solicitation of funds, when it is in fact just Rod, myself, and the LPs regaining rightful control of our collective equity.

I believe I have always done right by each and every LP, many of whom I consider some of my closest friends



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

in life. Every investor is not just an investor and LPs should not be just looked at as dollar signs. You are each people, and as a person, I ask you to ask yourself, is Eli Blatt the person you want to trust handling *any* of your assets?

> • Despite his aspersions to the contrary, Company operations continue to function normally at this time despite Marc's efforts to disrupt operations, and the investments it manages are unaffected

9. Eli claims that "Company operations continue to function normally at this time." Again, this is untrue.

First, that K1s for ✕✕✕ still have not been properly issued for 2021, and we are now in November of 2023. Eli unilaterally changing the K1s to fit his own needs and illegal takeover of MegaCap is not the definition of functioning normally. It is now clear that, from the Flow correspondence, that Eli is attempting to issue them now, however, entirely improperly and incorrectly calculated. What's the most outrageous about this whole K1 debacle is that Eli is asking Blake Schneider at Flow for the K1s because Eli doesn't have them – which leads to the natural assumption that he never even downloaded them when we had access to them far prior to Eli's illegal, invalid, unenforceable, and improper removal of me from MegaCap. The grand irony is that all Eli has to do is actually speak with me. I actually have the correct K1s I reviewed and approved. Regardless of the dispute between Eli and myself, I have always been and continue to remain committed to my fiduciary duty to each and every LP and I have read through every single page of every LPs K1 that I had access to prior to my access being restricted. Please see *Exhibit U* which sets out the chain of events and I am happy to discuss this further with any and all LPs who would like a deeper understanding of the situation surrounding the K1s. What we have seen is that Eli tried to effectively 'backdate' my 'withdrawal' to the last email I sent at MegaCap which happened to be to Flow on April 28. In that email I asked Eli to actually look at the K1s, but instead of committing to his responsibility, he instead began waging a war against me and doing everything he could to dispossess me of my interest and rights. So that every Limited Partner is aware, I have the K1s for the LPs but Eli is preventing me from transacting on behalf of MegaCap through my MegaCap email and through Flow. Eli has been the primary reason that the 2021 K1s for ✕✕✕ have not been issued until just recently, as they have existed, and were ready to distribute for months, but once again I have been dispossessed of my ability to issue them and complete them in a timely manner due to Eli.

Second, upon information and belief, Eli has still failed to issue K1s to Limited Partners for ✕✕✕ for 2022, ✕✕ for 2022, and ✕✕✕✕✕ for 2022. Eli's attention seems to be solely focused on MegaCap's ✕✕✕ investment because that is where *his* money is locked up, where there is an active promissory note continually accruing interest, and where the most money raised out of any MegaCap vehicle is located. Rod and I's ability to help is limited, but please rest assured that I'll do everything in my power and legal authority to do what I can!

Due to these restrictions imposed, I want everyone to be informed that Rod and I can now be reached at Marc@ MegaCapFunds.com and Rod@MegaCapFunds.com for any MegaCap concerns. Please do not hesitate to reach out with any and all questions you may have.

In light of the above, I am requesting that there is a mass request from each and every LP to tell Eli to comply with his duties and permit the proper submission of K1s with immediate effect. Regardless of his undertaking



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

**MegaCap Capital**

11/7/2023

to submit the K1s, due to his past pattern of lackadaisical and apathetic handling of even simple back-office tasks, I have serious concerns that the K1s will be submitted improperly, if at all, despite his undertakings to the contrary. As such, per my initial review of Simon and Rod's K1, it does not appear that these K1s were prepared by an accounting firm as the introductory letter page is signed by MegaCap proper. I ask that you insist that Eli stop playing funny games with all of your taxes. Rod and I are doing our best to do right by everyone, and will work diligently to help us all get through this to a successful exit!

Third, upon information and belief that Eli's attempted sales efforts have ceased, or at the very least slowed down to a crawl, and I was told as of Friday July 7, 2023, "No incoming money from Eli, correct." However, I was notified on August 7, 2023 that Eli is attempting to waive management fees and reduce carried interest to new LPs, an action that he is unable to do, but will still attempt, as he continues to try to unjustly enrich himself. Prior to Eli's illegal withdrawal and improper and unenforceable redemption of me from MegaCap, I negotiated a deal with a Capital Partner to extend a Promissory Note (as well as waive over $100k in interest owed) in order to prevent MegaCap from defaulting. This default could have jeopardized the SPV of _____ due to the Note being held by MegaCap Funds, LP Tech Holding and not by the General Partnership which is how it was supposed to be structured and which could have bankrupted MegaCap Funds without me. But yet again, Eli fails to mention this as he pretends that every aspect of the company is running fine and dandy – all hunky dory, right? Not quite so.

Fourth, that he has presumably diverted his focus to his new "company" called Thinkable, which apparently is an AI company that he boasts that he is the "Co-Founder and President" of. While it is speculation and opinion on our part, it seems that his focus is on new ventures and not on current ones, including what could only be assumed that funding such new ventures, at least in part, with funds illegitimately obtained from MegaCap proceeds – however, that is speculation.

## VIII. Wrapping Up, Next Steps, and the New and Improved MegaCap Funds

> I regret Marc's inappropriate letter to you and assure you that from an operational and security standpoint, the Company and the investments it oversees are not at any imminent risk at this time.

Eli may "regret" my letter to you, as it exposes his malfeasance, but I do not. I fully believe that my previous letter, as well as this one, truthfully and honestly depicts the absolute truth to the events that have occurred. What is regrettable is that the outcome of Eli's actions will be a multi-year protracted legal battle. Instead of working to resolve these problems, Eli is attempting to create a litigious circus and raise frivolous claims because he thought he'd be able to use bullying tactics in order to force us to walk away.. One thing is for certain, my partners and I are not going anywhere!

I will continue to do my best to protect the name of the XXXX employee in case of an impending federal lawsuit and potential injunction against Eli and will do my best to ensure that the potential risks are minimized surrounding the fact that the Employee's shares could get cancelled or redeemed if the GP of the SPV that purchased the derivative equity in XXXX becomes involved by proxy, or worse, if XXXX and/or



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

XXXX proper finds out about this transaction and cancels the Employee's shares himself.

Due to these restrictions imposed, I want everyone to be informed that I can now be reached at +1.516.984.1466 and you can reach Rod at Rod@MegaCapFunds.com for any MegaCap concerns. Please do not hesitate to reach out with any and all questions you may have. For the sake of convenience, I repeat in my new email address here again as Marc@MegaCapFunds.com should you have any concerns or questions.

Once again, I am more than happy to discuss everything openly and transparently with each and every one of you. Unlike Eli, I have nothing to hide. I want to thank you all once again for your support while we deal with this unfortunate series of events. It is disappointing and unfortunate that matters have turned out like this and truly hope that everyone can see the massive amount of work that Rod and I are putting in to correct this. Thank you for reading!

I continue to Reserve All Rights, and this letter is not inclusive of all of Eli's breaches of our numerous signed and enforceable Agreements. My rights are fully reserved herein.

All the best,



Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing & General Partner
MegaCap Capital & MegaCap Funds

/ Endorsed by Roderyck Reiter and Simon Divilov /

I, Roderyck Reiter, Reserve All Rights.



Roderyck Reiter
Series 7
Series 63
Licensed Real Estate Broker (Florida)

I, Dr. Simon Divilov, Reserve All Rights.



Dr. Simon Divilov, PhD

P.S. Please see a letter from Rod attached below as *Exhibit Z*. Thank you once again!

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466


MegaCap Capital

11/7/2023

## Exhibit A

Update from Megacap Counsel and the General Partner



Please see this _letter from Megacap's counsel_ addressing the management of the Company in response to a letter Marc Goldner recently sent to you and other Megacap Limited Partners. Mr. Elkins previously represented the Company in an unrelated matter commencing in June of 2022.

As both letters confirm, Marc has been withdrawn from the Company as a Class A Voting Member and Manager according to the withdrawal and redemption provisions of the Company Operating Agreement and is no longer operating the Company. Both letters further convey that he has not formally requested private mediation or arbitration pursuant to the dispute resolution terms of the Company Operating Agreement he is obligated to adhere to in the event of a dispute.

To address some pertinent questions and concerns Marc's letter may have raised:

- Marc was withdrawn to protect the Company pursuant to the procedures outlined in the Company Operating Agreement for breaches of the Agreement, including his fiduciary duty

- Marc was withdrawn to protect the Company pursuant to the procedures outlined in the Company Operating Agreement for breaches of the Agreement, including his fiduciary duty

- The redemption of Marc's unvested equity that he had not yet earned was done in accordance with the terms of the Operating Agreement at a predetermined valuation that is fully auditable

- Should Marc elect to formally dispute his withdrawal, the Company's dispute resolution provisions call for a private and confidential mediation and arbitration governed by the American Arbitration Association that exists specifically to protect the company and its investors

- Neither that process itself nor the outcome would have any direct impact on the SPVs managed by Megacap Capital

- All SPV equity is calculated on a per-share basis at a fixed price, is managed and reported by Flow, and there is no way to "take any shares right off the bat of most of the LPs"

- The GP for the SPV via which Tech I has its derivative equity interest in Neuralink is already aware of Marc's withdrawal and has stated she has no cause to redeem the underlying equity on the basis of a private Member dispute

- The GP for the SPV via which Tech I has its derivative equity interest in Neuralink is already aware of Marc's withdrawal and has stated she has no cause to redeem the underlying equity on the basis of a private Member dispute

- As a matter of public record, I have litigation filed against Marc relating to non-Megacap matters (as numerous others have had recently as well – google "Marc Goldner Lawsuit"), which to date he has evaded service for

- Marc's email to you appears to be intended to sow fear and solicit money from you to defend against these suits and finance a dispute of his withdrawal

- Despite his aspersions to the contrary, Company operations continue to function normally at this time despite Marc's efforts to disrupt operations, and the investments it manages are unaffected

I regret Marc's inappropriate letter to you and assure you that from an operational and security standpoint, the Company and the investments it oversees are not at any imminent risk at this time.

Please contact me with any concern and advise me if you should hear from Marc again.

Sincerely,

Eli M. Blatt
Managing Partner, Megacap Capital

NOT A CERTIFIED COPY

Doc ID: 3fcd7f9950b2b48a3e72e5e62f310a063b10321a

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit B

June 2, 2023

**VIA FLOW**

RE:   *Megacap Capital, LLC*

Dear Megacap Partner,

I represent Megacap Capital, LLC ("the Company").

I am writing regarding the current operation of the Company. Presently, the Company is operated by Dr. Eli Blatt. Dr. Blatt withdrew Marc Goldner as a Class A voting Member and Manager of the Company.

Any dispute between the Members of the Company is subject to the Company's dispute resolution procedure which calls for private mediation and arbitration. As of the date of this letter, Mr. Goldberg has not taken advantage of this procedure.

Please direct any questions or concerns relating to the Company to Dr. Blatt at team@megacap.capital.

Sincerely,

Michael L. Elkins
melkins@mlelawfirm.com

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit C

---

JAMS Payment

Michael Elkins
To: Marc Goldner, Eli M Blatt

Marc,

Thank you for your email.

Below I address the issues from your email. I am not representing Eli in any dispute that involves you.

I represented MegaCap Capital, LLC ("MegaCap"). The scope of that representation was to enforce an agreement between MegaCap and ▆▆▆▆▆▆. You and Eli are both members of MegaCap. You and Eli were not my clients. MegaCap was and remains my client as to matters involving ▆▆▆▆▆▆. I do not represent MegaCap on any other matters.

I have never represented you individually in anything. I have never represented Eli individually as relates to MegaCap. Further, through my representation of MegaCap I never learned anything about your other business interests or anything else about you individually. In fact, other than the fact that you're a member of MegaCap, I know almost nothing else about you.

If there ever was a dispute between you and Eli as relates to MegaCap, I would likely be prevented from representing either of you against the other since I represented MegaCap.

That said, since you individually have never been my client, and I did not learn any confidential information about you via my representation of MegaCap, with the exception of matters relating to MegaCap, there is no conflict if I were to represent a party against you.

Nonetheless, as to any dispute between you and Eli, as I stated above, I am not representing Eli, so there is no conflict and there is no issue.

As to my prior representation of Eli, I previously represented Eli individually in the enforcement of a promissory note. That representation was completely unrelated to my representation of MegaCap.

I currently represent an entity called Sure MCA, LLC ("Sure"). Eli is a member of that entity. The scope of that representation is also completely unrelated to my representation of MegaCap.

In short, my representation of MegaCap was on a single, discreet contract matter. My prior representation of Eli and Sure had/have no bearing on, or connection to, my representation of MegaCap.

You were aware that I handled other matters for Eli. With that being said, it doesn't matter since my representation of MegaCap is not connected in any way to the matters described above, and I am not handling any matters for anyone that is/are adverse to you individually. Although I will remind you, you individually have never been my client in any matter.

I don't see a need for a call since there is no conflict.

I trust this clarifies any issues.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit D





NOT A CERTIFIED COPY

Doc ID: 3fcb7f96f002b48a3e72e5a62f310a063b10321a



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit E

**NOW, THEREFORE, BE IT RESOLVED** by a unanimous vote of the Members voting on the issue that Eli and Marc each agree that, upon fulfillment of the terms of this resolution relating to the Domain Name(s) being transferred (including but not limited to megapcap.capital) as stated herein, 2021 LP K1s issues and Megacap taxes being completed, the Registered Agent login being shared between the Parties, any intellectual property including but not limited to Copyrights, Trademarks, and potential patents held by MegaCap and/or relating to MegaCap such as the MegaCap Trademark (that will be filed after 2021's taxes are filed), their Class A Membership interests are fully vested, and that neither may be removed as Class A Voting Members or Managers from the Company by any other Member for any reason, nor is any attempted removal in the interim valid. In the interest of clarity, that means that all Sections of the operating agreement relating to Redemption of Membership Units or Involuntary Withdrawal are hereby voided upon fulfillment of the terms of this agreement, such that no Class A member can be removed as a Class A Member or Manager to any degree by the

Doc ID: be88819ca047bb925c6e98368c703ece37b9503d

other Class A Members, and that any such attempted removal shall be void upon completion of the terms of this resolution. Further, it is understood and acknowledged by the parties that any and all deals from the past up until MCTH and MCTI are governed under the prior December 2021 resolution, and that any current (including but not limited to MCTH and MCTI) and future deals being worked on are to be split evenly between all Class A Members on all accounts. Therefore, once the capital partners are repaid and expenses are reimbursed, going forward any distributions for the deal flow that MegaCap has conducted to date will be deemed to be evenly split between all Class A Members as reflected in the past agreements agreed by the parties.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit F – Clip of Email sent on February 2, 2023



Summary of legal counsel

Lastly for now, the documents that MUST all be signed at the same time in order for this to be a transaction that I am authorizing is as follows:

1. MegaCap Tech Holding Series Agreement
2. MegaCap Resolution
3. ▮▮▮▮▮ Interest Waiver Agreement
4. ▮▮▮▮▮ Rebate Agreement
5. MegaCap Option & Loan Agreement (which contains the Flow of Funds diagram)

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit G

80. <u>Dispute Resolution</u>.   Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this <u>Section</u>. The initiation and pendency of the procedures under this <u>Section</u> does not relieve the Parties from their respective obligations under the Agreement.  ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS <u>SECTION</u> SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

A.  Negotiations by and between the Parties.

(1)  Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail.  Within ten (10) days after receiving such notice, the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit H

81.  Equitable Remedies.  The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights

MEGACAP CAPITAL, LLC Operating Agreement
Page 16 of 20

and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement.  The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware.  For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of *forum non conveniens*.

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit I

📄 Injunction Exhibit C - Goldner Felonies.pdf



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

**Exhibit J – First Communication with Intermediary about** ███████ **after** ✕✕✕✕ **'closes'**

NOT A CERTIFIED COPY

Apr 30, 2021

🔒 Messages and calls are end-to-end encrypted.
No one outside of this chat, not even WhatsApp,
can read or listen to them. Tap to learn more.

Rod MegaCap created this group

Eli "Stanford Homeless" TRIUM Always Homefree
added you

Eli "Stanford Homeless" TRIUM Always...
Adding Marc, our third partner                    13:02

Hey all! Pleasure    13:02 ✓✓

After we close this, we need to find a
way to get into the ████████
                                        ★ 13:02 ✓✓

Doc ID: 3fcb7f9600a2b48a3e72e5e82f310a063b103216

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



**MegaCap Capital**

11/7/2023

## Exhibit K





Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit L

Doc ID: be88819ca047bb925c6e98368c705ece37b9503

other Class A Members, and that any such attempted removal shall be void upon completion of the terms of this resolution. Further, it is understood and acknowledged by the parties that any and all deals from the past up until MCTH and MCTI are governed under the prior December 2021 resolution, and that any current (including but not limited to MCTH and MCTI) and future deals being worked on are to be split evenly between all Class A Members on all accounts. Therefore, once the capital partners are repaid and expenses are reimbursed, going forward any distributions for the deal flow that MegaCap has conducted to date will be deemed to be evenly split between all Class A Members as reflected in the past agreements agreed by the parties.

**FURTHER RESOLVED**, that Eli will consent to moving the registered agent and domain accounts to a separate login as soon as the Option and Loan Resolution is fully executed and the 2021 taxes are filed and LP K1s issued for 2021. Additionally, Eli will make Marc a super-admin with equal administrative privileges as Eli has in the MegaCap google workspace and any other accounts relating to MegaCap. If Eli fails to complete this within reasonable time after such filing, or if Marc or Eli uses such privileges to alter Eli's or Marc's privileges, it shall constitute immediate grounds for involuntary withdrawal from the Company.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

## Exhibit M



NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

**Exhibit N**



Dear Simon,

Attached please find your draft 2022 K1 package for Megacap Funds, LP - Tech I.

Please note, if your management fee included a fractional dollar, it has been either rounded or truncated, as the tax software did not permit cents. However your ending capital account balance corresponds identically to your subscription amount, which did not contain any cents.

Should you notice any errors or things that need to be changed (e.g. address or a TIN you acquired since subscribing), you must let us know by before Thursday, September 14, as the return will be e-filed on that day.

As a reminder, as you were notified last October, the 2021 Tech I return contained errors by both the source of the equity and the fund administrator requiring amendment. That amendment is now being finalized and will be sent to you in the next few days. It will show zero income and expense, as management fees were deferred until Megacap closed on the equity in 2022, which is why your 2022 return shows your management fee paid, even if you subscribed in 2021.

Thank you once again for your confidence in us. Please feel free to contact us with any questions at team@megacap.capital.

Best,
Eli M Blatt
Managing Partner

Doc ID: 3fcb7f39500zb48a3e72e5e62f310a063b10321a



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit O

12. In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other. For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units).

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

# Exhibit P

[redacted]

June 16, 2023

Marc Goldner,

Re: Admission in [redacted]

Dear Marc Goldner,

Thank you for contacting us about the internal dispute between yourself (Marc Goldner) and business partner Eli Blatt of MegaCap LLC pertaining to your recent investment in membership interest in [redacted] A Series of [redacted] LLC.

At this time, we are now aware of the situation and agree there will be no distributions or movement of your holdings until all parties of MegaCap LLC sign and agree when there is a required liquidity event.

If you have any questions regarding the company or your investment, please contact investor relations:

Phone [redacted]

Email [redacted]

Sincerely,

[redacted]

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

# Exhibit Q

[redacted]

TO: MARC GOLDNER

[redacted]

THANKS FOR INFORMING US ABOUT YOUR DISPUTE WITH ELI M BLATT AND MEGACAP.

WE CONFIRM THAT WE WILL NOT BE ABLE TO RELEASE ANY SHARES OR, IN CASE OF A LIQUIDITY EVENT, ANY PROCEEDS FROM SALE OF SHARES OF SPACEX TO MEGACAP UNTIL ALL INVOLVED PARTIES UNANIMOUSLY REACH AN AGREEMENT OR SETTLEMENT AND PROVIDE A SOLID EVIDENCE FOR THAT

KIND REGARDS,

[redacted]

[redacted]

[redacted] CA [redacted]



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit R



NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit S

MEGACAP CAPITAL, LLC Operating Agreement
Page 9 of 20

business interest in the Company as determined by a supermajority consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

**Voluntary Withdrawal of a Member**

40. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

41. INTENTIONALLY LEFT BLANK

**Involuntary Withdrawal of a Member**

42. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; felony conviction of a Member; or a legal judgment against a Member (excluding any judgment resulting from any litigation relating to Marc Goldner) that is pending as of the effective date hereof) that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member has engaged in conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member, including not devoting time to the Company as required per Section 34.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit T – Simon's Statement



**THE DHARMA INITIATIVE**
THE CRYPTO MINERS

Simon Divilov
Co-Founder & Chief Technology Officer
Simon@TheCryptoMiners.io
1 (347) 260 - 3135

5 November 2023

Dear Investors of MegaCap,

My name is Simon Divilov, I'm an academic researcher with a PhD in theoretical physics, but also, I am an LP much like yourselves, in fact, one of the earliest ones due to my long personal friendship with Marc. I am a very private person, but the wrongdoing I suffered entering into a business venture with Eli Blatt has caused me to speak out, to warn you and possibly prevent future new victims.

To give a brief background on Marc and my professional and personal history. We had met when we were both still in undergrad in 2008. We quickly became friends and often theorized about what the future would hold. As two self-prescribed futurists, we had envisioned what the future would hold and that eventually led to us co-investing in the early 2010s. However, prior to that, Marc and I had been pitching to our friends the mining prospects around Bitcoin. At the time, many thought it was an outlandish investment. Some even laughed us out of the room at a party in New York City. However, Marc and I continued exploring the digital asset space.

In 2012, Marc, his now significant other, formed our first consulting and investment venture which still exists to this day. It was in 2013 that Rachel encouraged us to explore Bitcoin once again. Shortly after, we began the process of opening an account at Mt. Gox – which unfortunately, went sideways when Mt. Gox abruptly halted its operations upon discovery of the loss or theft of its Bitcoins, which slowed our exploration of the space due to diminished confidence in the custodial and trading-related operations and practices of exchanges akin to Mt. Gox. The temporary slowdown of our various crypto-related activities were ultimately revitalized when we began investing in Dogecoin several years later and decided to restart our original thesis from 2009 to build a mining venture – now known as The Dharma Initiative (or The Crypto Miners) since its founding by our team sans-Eli. Throughout this time, Marc and I always remained optimistic about the future promises of a decentralized asset class as well as futuristic technologies.

During our long discussions in 2009, we would discuss the potential application of cybernetics, life longevity, and neural interface device technologies. All of this pre-dated the existence of ▬▬▬ While my interest was in the mathematical and technological side, Marc's was of the business and legal nature. Early on, Marc had theorized the early laws and regulations surrounding Robotic Rights, as well as privacy and regulatory concerns surrounding brain computer interfaces. We began working on the foundation of a think-tank later to be called Neuralverse around 2012. As Marc worked on founding MegaCap, it was no surprise to me that ▬▬▬ was one of his first targets for investment as it aligned with his investment thesis.

Around May of 2021, after a brief discussion Marc and I had, about his clear vision on future technologies, shortly after, I decided to invest in MegaCap. Marc and I had first discussed ▬▬▬ in 2014. Around Winter of 2020, Marc propositioned about revitalizing our Bitcoin mining venture that we had been discussing for years, but due to time constraints we were never able to fully materialize. Prior to Marc attending TRIUM in person, Rachel had pushed both of us to make the time every Sunday to iron out plans because otherwise we'd one day regret it. Marc pitched what is now known as The Dharma Initiative as a capstone project to some of his TRIUM classmates – I was always

NOT CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit T – Simon's Statement



THE DHARMA INITIATIVE
THE CRYPTO MINERS

Simon Divilov
Co-Founder & Chief Technology Officer
Simon@TheCryptoMiners.io
1 (347) 260 - 3135

5 November 2023

meant to be a partner at the company, as Marc and I originally founded the company. I specifically created the financial model as well as proprietary intellectual property for all backend to mine BTC. We ended up going into the business with Eli who allegedly had previous experience with cryptocurrencies, as well as, connections to like-minded investors. Eli was at one time one of many partners that were part of Dharma after its initial founding by Marc, myself, and several others that are still involved.

The initial part of the business involved buying and operating a number of miners, which was carefully determined after financial modeling of the cash flow and profits done by me. Everyone was confident and over the phone Eli told me that he was "really looking forward to working with me and growing the business."

After obtaining a small pool of investors, with the majority of funds coming from the founding members of Dharma, we entered into a contract with a third-party vendor to obtain the necessary miners as the seed to grow the business. Initially, things did not go as planned, with delays from the third-party vendor and the significant downturn in the price of Bitcoin. However, Marc, myself and the majority of the founding team were optimistic given that short term fluctuations were not particularly important in the overall long-term profit, as this already incorporated into our business plan. Part of that business model stemmed from years of work Marc, Rachel, and I had built around refining our processes, developing intellectual property, and collaborations dating back to our pre-existing automated trading algorithm plans and code, a ramen spectrometer scanner to increase the yield of crops accounting for localized weather fluctuations, amongst several other 'neural' ideas.

It turned out that Eli did not share our optimistic forward-looking sentiment with the rest of us, specifically related to the potential gains I had predicted regarding the miners held at The Dharma Initiative. To this day, I am of the belief that Eli understood the financial models I had developed but chose to act with malice in an attempt to position himself to commandeer control of Dharma, which I had prevented. While, admittedly, my belief of Eli's actions have changed with time, this was due to Eli's inconsistent story that was constantly changing over the years. The actions Eli took seemed spontaneous, illogical, and desperate. Around Winter of 2022, Eli began demanding the financial records of our transactions with the third-party vendor so that he can understand what was paid for and create a spreadsheet for our other investors so they can understand our financial situation. The ultimate purpose of this spreadsheet was for Eli to explain how much of the 'balance' everyone owed pro-rata since the only thing paid up until this point on many of the miners was the deposit to secure the miners themselves, as well as a security deposit, and an advance on hosting fees. After providing him with the documents, he created an extremely Byzantine spreadsheet that not only had the wrong financial figures, but also the incorrect allocation of miners. Dharma's members were left confused about what prompted him to act this rashly and sloppily, so between March-May 2022, we attempted to explain to him the financial models (which in principle he should have already understood before investing any money). We began to suspect that Eli was 'playing dumb' and pretending to act clueless. Eli appeared to say one thing, do another, then forget he said it to begin with. Eli's behavior became suspect, and we all began to worry about our start-up.

Our efforts were to no avail, and he began demanding that we start selling off our assets (miners) because the

Doc ID: 3fcb7f3600a2b48a3e42e5e82f310a063b103214



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit T – Simon's Statement



**THE DHARMA INITIATIVE**
THE CRYPTO MINERS

Simon Divilov
Co-Founder & Chief Technology Officer
Simon@TheCryptoMiners.io
1 (347) 260 - 3135

5 November 2023

business was not profitable (even for a basic investor it should be obvious that the first few years are mostly expenses and losses). After we declined to go through with such illogical demands, a proposal was floated around that we "buy him out", which I found confusing at first considering we were in a joint venture. Eli wasn't just some random investor. Marc attempted to offer Eli an incredibly generous deal that I believe was above market price of the miners, but Eli declined attempting to strong-arm his business partners with the specter of defaulting, which was utilized as a fear tactic against us. Ultimately, we declined again, although we did offer him an interest-free loan, because it seemed that he needed the money due to his lifestyle choices – however, as business partners, we wanted to offer an olive branch to a partner in need, when we had no obligation to do so. His response to this generous offer, was deciding to default on the payments, leaving the rest of the Dharma members to pick up the tab. In brief, he defaulted and left the business in a distressed state, all because he pretended not to understand the finances of the business model that he helped co-create in an XLS format, and instead opted to sue Dharma, myself, Marc, and Rachel. I believe that his tactics were simply a way for Dharma to be forced to pay for the miners hosting fees which exceed $10,000 a month, while a painstakingly long litigation process would ensue. Eli failed to arbitrate, as was required by our Agreement, and instead has fabricated a lie that we have 'stolen' his money – which I assure you we haven't. I am more than willing to talk with any fellow LP about Eli's unprofessional behavior.

Given that Eli had a big commitment of capital in this venture, paying his share forced me to borrow money from friends and family, which is not only extremely stressful but embarrassing. I am slowly recovering financially, by trying to redistribute my other investments. Unfortunately, what was initially a fun and promising vision has turned into a nightmare, which I hope no one has to suffer through. One lesson I have learned from this is about trust, loyalty, and friendship. Since this entire debacle ensued, Marc and I have become closer than ever and have elevated our professional working relationship to continue our ventures without the likes of someone like Eli who can't be trusted. I hope this helped shed some light on this situation with Eli Blatt.

This letter is not meant to be all inclusive of all the details surrounding Eli Blatt's breaches, illicit actions, and continued fraudulent malfeasance relating to MegaCap and all our other ventures.

I reserve all rights.

Best,

*Simon Divilov*

Simon Divilov, PhD

NOT DEFENDANT COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit U

 MegaCap K1s Eli is Withholding

36 items, 8.02 GB available

---

**RN**  **Ryan Nanney**                                                April 10, 2023 at 1:42 PM
     Re: Flow / Mega-Cap - resolution needed by Dec 16
     To: Marc Goldner,  Cc: Eli M Blatt                              Details

Hi Marc and Eli, I heard back from our tax preparer and he said the Tech Holding and Tech I tax returns should be good as they are reported. There were no items of income reported for Tech Holding for 2021:

https://app.box.com/s/57iowqu64s49g4vvyy6q1fc0uhb7ociy

and the only items reported for Tech I was the Management Fee:

https://app.box.com/s/q2kgvy7h8dumz4dof49271f0yrbf0eeo

Please let me know if these look good to you and we can distribute the K-1s.

Thanks!

See More from Marc Goldner

--
**Ryan Nanney**
Fund Accounting Controller


https://flowinc.com/

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



11/7/2023

## Exhibit U





Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit U



NOT A CERTIFIED COPY

**Marc Goldner**
Re: Flow / Mega-Cap - resolution needed by Dec 16
To:  Ryan Nanney,   Cc:  Eli M Blatt

Eli, do you approve? Please advise. Thank you.

This communication and any attachments, is intended for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure or copying is prohibited.  If you have received this communication in error, please notify the sender immediately by replying to this communication and then deleting it from your system.  Thank you.

See More from Ryan Nanney

**Eli M Blatt**
Re: Flow / Mega-Cap - resolution needed by Dec 16
To:  Marc Goldner,   Ryan Nanney

So long as the taxable income is just 10% of the total fee then we are good.

See More from Ryan Nanney

**Marc Goldner**
Re: Flow / Mega-Cap - resolution needed by Dec 16
To:  Ryan Nanney,   Eli M Blatt

Please review it and approve it Eli. You need to do your due diligence to make sure it is correct so there are no issues. Two sets of two eyes are better than one here. Thanks.

This communication and any attachments, is intended for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure or copying is prohibited.  If you have received this communication in error, please notify the sender immediately by replying to this communication and then deleting it from your system.  Thank you.

See More from Eli M Blatt



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit U (continued) – a snippet of Eli's July 24th email to Flow

a. Flow's only obligation with respect to reporting going forward would be to provide the Company all past, completed tax and regulatory information, filings, and documents in its possession, as I requested in my prior email.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit V



**Ashley Vargas**
To: Marc Goldner                    Wednesday, Jul 19, 6:09 PM

Marc,

I am unable to confirm that Eli Blatt has an active certification.

---

Rob Frankel
To: Marc Goldner    Cc: Anita, Ashley and 1 more    Friday, Jul 21, 5:09 PM

Marc:

As far as what we are doing or next steps, privacy laws prevent me from sharing our strategy with you or anyone else not connected with our organization. Without more facts and a crystal ball as to what will happen in the future, I cannot commit to any particular outcome if he should apply to one of our programs in the future.

You can go to https://investmenthelp.org/ and search for any name. If that name does not appear, he/she is not an active certificant. You can print out this email if you need something in writing to confirm that.

If you are the victim of fraud, there are governmental agencies and private attorneys who can help you recover any losses.

Have a great weekend.

Sincerely,

Rob

Robert E. Frankel
General Counsel
203-850-2082
rfrankel@fi-se.org

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

**Exhibit W – No K1s for**  **(suspected none for Betterment or FTX) Issued for 2022**



NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

**Exhibit W – No K1s for ▨▨▨ (suspected none for ▨▨▨▨ or ▨ ) Issued for 2022**



NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

**MegaCap Capital**

11/7/2023

## Exhibit X – Raul Letter to Limited Partners



REICHARD & TORNES
ATTORNEYS AT LAW

September 12, 2023

<u>VIA E-MAIL</u>
Limited Partners of MegaCap Funds, LP

RE:  **Demands Made to Flow Inc. and Clarifications & Current Status on MegaCap Affairs and Management**

Dear Limited Partners of MegaCap Funds, LP ("LPs"):

I am writing on behalf of Marc Goldner, one of MegaCap Capital, LLC's ("MegaCap") Founding Members and one of the current General Partners.

We have reviewed correspondences between Flow and Mr. Blatt, specifically one sent to Mr. Blatt on July 26, 2023 and are puzzled as to why Flow did not include Mr. Goldner. As per Ryan Nanney's June 1, 2023 e-mail to Mr. Goldner and Mr. Blatt, wherein Mr. Nanney stated that "[they] will not respond to individual emails, or work on the MegaCap portfolio in general, until [they] receive clear guidance on who is legally in charge for MegaCap Capital." Clearly, Mr. Blatt and his or MegaCap's purported counsel sending Flow a letter and communicating with Flow privately does not constitute or provide Flow with "clear guidance."

To be clear, Mr. Blatt breached the February 13, 2023 Resolution among and between MegaCap's Members when he removed Mr. Goldner's MegaCap e-mail access, *inter alia*, this constitutes automatic grounds for the involuntary withdrawal of Mr. Blatt from MegaCap by operation of the terms of one of the resolutions for MegaCap signed by and between Mr. Blatt and Mr. Goldner. Further, the Resolution that Mr. Blatt is in breach of also states that, "no member shall remove the other from any bank account and *any financial accounts.* (emphasis added)" Flow, undoubtedly must be considered a financial account of MegaCap. Mr. Blatt attempted to wrongfully and unilaterally withdraw Mr. Goldner by backdating a withdrawal and redemption under false pretenses.

Mr. Blatt has no authority whatsoever to act unilaterally on behalf of any of the MegaCap entities and, accordingly, Flow has been instructed to not turn over any Accounting Records (including, but not limited to, K1 forms) without written and signed approval. Mr. Goldner is in possession of the unanimously approved K1s from 2021 that

Reichard Tornes, PLLC | 3663 SW 8th Street, Third Floor, Miami, FL 33135 | 305.407.1734

NOT CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 2 of 5
September 12, 2023

were, and is willing and able to send proper K1s to LPs upon request. Please be aware that Mr. Blatt's illicit distribution of K1s for 2022 is not authorized nor approved by Mr. Goldner and falsely state the entire fees have been earned. Management Fees earned from LPs of MegaCap are to be annual income. Mr. Goldner had been working with Mr. Nanney, from Flow, for several months on MegaCap's complex accounting and Mr. Blatt not having access to the K1s demonstrates Mr. Blatt's failure to actively participate in the review and creation of these documents which were provided to both Mr. Blatt and Mr. Goldner on April 10, 2023. Mr. Blatt's failure to have these K1s in his possession for months seemingly indicates a breach of fiduciary duties Mr. Blatt owes to MegaCap's Limited Partners, to MegaCap proper, and to Mr. Goldner himself.

The only K1s that were ever authorized to be created by Mr. Goldner are the ones outlined in a detailed thread with the subject title "Re: Flow / Mega-Cap – resolution needed by Dec 16." This e-mail thread was a lengthy detailed discussion between MegaCap and Flow's representative, Ryan Nanney. Without Mr. Goldner's direct involvement, there is no way for him to verify the authenticity of any of the K1s that need to be distributed, thus, any K1s received by LPs are invalid and illegally distributed. Therefore, anything other than the taxable income on LP's K1s being 10% of the total fee as Mr. Goldner last reviewed on his April 27, 2023, e-mail Mr. Goldner believes will constitute tax fraud on Mr. Blatt and Flow's part and Mr. Goldner will contend and may be forced to report this incident to the relevant tax and regulatory authorities. To be clear, considering that Mr. Goldner is also a Limited Partner of MegaCap, Mr. Goldner is further seeking written and absolute assurances that these K1s include him as a Limited Partner and not just as a General Partner of MegaCap. Mr. Blatt has illegally converted the stated terms of the Resolution where the Management Fees were to be treated as loans and earned as income annually rather than completely accelerated in 2022.

Further, it should be abundantly clear that Mr. Blatt is prevented from unilaterally using MegaCap's Flow admin to contact Limited Partners. This is doubly true where he purports to be the only individual entitled to do so. As an LP, please be aware that no communication sent by Mr. Blatt from Flow, e-mail, or otherwise is authorized by Mr. Goldner, nor does Mr. Goldner accept any liability for Mr. Blatt's illicit actions. Again, please be advised that Mr. Goldner is not just a General Partner of MegaCap but a Limited Partner of MegaCap. What is more, Mr. Blatt also has illegally restricted Mr. Goldner's access to MegaCap banking at First Republic. As a result, Flow has been provided a demand letter by Mr. Goldner to cease and desist from working on the MegaCap portfolio and account without Mr. Goldner's direct involvement and say in any and all matters in connection therewith.

By way of a brief background on Mr. Blatt's other egregious actions, Mr. Goldner has been informed by the General Counsel of the Investments and Wealth Institute, Mr. Frankel, on July 21, 2023, that "...Mr Blatt is not an Institute candidate or certificant." However, Mr. Blatt was consistently misrepresenting same and holding himself out to the world and to Limited Partners and Prospective Limited Partners through pitch decks and via his LinkedIn profile that he was a "Certified Investment Management Analyst" (CIMA)

Doc ID: 3fcb7f38002c34ba3e77e5e82f310a063b10321a



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

**MegaCap Capital**

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 3 of 5
September 12, 2023

while not being properly certified to hold that title. Further, Mr. Blatt has refused to correspond with Mr. Goldner as is required by the Mediation provision contained in the MegaCap Capital LLC Operating Agreement (the "OA"). This is so, despite he himself citing to Limited Partners of his purported willingness to do so. Naturally, this constitutes a direct breach of the OA's Dispute Resolution provisions. Last but not least, and as clearly documented, Mr. Blatt has not only removed around $70,000 from MegaCap's First Republic Bank Account without Mr. Goldner's approval—which was required before such funds could be transferred—, but then proceeded to spend that money from an entity called Goldner Blatt Investments, LLC. Again, the OA likewise required Mr. Goldner's approval on all expenses above $5,000; which the formation of the aforementioned entity entailed. Mr. Blatt also repeated the behavior illustrated here regarding another jointly held company of the parties called BitSource, LLC, where Mr. Blatt removed Mr. Goldner from the bank account and misappropriated over $6,500, along with restricting Mr. Goldner's e-mail access to the shared @Bitsource.Group e-mail address. It is Mr. Goldner's position that Mr. Blatt has also withheld legitimate, approved expenses of Mr. Goldner in excess of $30,000.

The following are additional issues that Flow has been made aware of:

(a) On February 15, 2023, Mr. Goldner and Mr. Blatt signed IRS Form 8832 which is an Entity Classification Election for the Taxable Year Ended December 31, 2021 which stated, "THERE WAS A MISTAKE ON THE INITIAL APPLICATION. IT WAS NOT NOTED UNTIL THE DATE THAT THE FIRST TAX RETURN (TY DEC 2021) WAS GOING TO BE FILED. TAX RETURN FOR TY DEC 2021 FILED AS A PARTNERSHIP (FORM 1065) ON FEBRUARY 15, 2023. ENTITY HAS TWO MEMBERS AND EACH ARE RECEIVIING A K-1." Please note, that due to Mr. Blatt and Flow's negligence, Mr. Goldner has been prevented from properly accounting for his own tax returns due to a failure to receive a proper K-1 from MegaCap for nearly two entire years.

(b) Mr. Blatt has incorrectly stated that Mr. Goldner must solely abide by the dispute resolution provisions of the MegaCap OA. This is patently false: Under Section 81 of the MegaCap OA, Mr. Goldner is entitled to equitable remedies in the form of an injunction to be filed in Federal Court in the State of Delaware. Mr. Blatt has continued to breach the MegaCap OA by attempting to file an injunction in a Florida State Court with complete knowledge of the OA's jurisdictional provisions and restrictions. Further, Mr. Blatt is in breach of Section 80 of the OA by refusing to respond to Mr. Goldner's attempt to mediate.

(c) Flow further has been made aware that Mr. Goldner's life was threatened by a Capital Partner of MegaCap Funds, LP in connection with Mr. Blatt's Frivolous attempts at claiming Mr. Goldner has extorted Mr. Blatt which are baseless and have no legal bearing or leg to stand on. Mr. Blatt's continued false narrative

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 4 of 5
September 12, 2023

is merely an attempt to disparage, defame, besmirch, and assassinate Mr. Goldner's good name, reputation, and character.

(d) Mr. Blatt has no authority to hold any Units of MegaCap Capital 'in trust' that were redeemed from the third MegaCap General Partner, Roderyck Reiter. Under MegaCap's OA Section 12, it is clearly stated that "[i]n the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other."

Indeed, to illustrate the severity and unambiguous nature of this situation, Mr. Goldner possesses not one, but two letters from two different apropos sellers of shares to MegaCap stating that the release of shares are halted pending the resolution of this matter. The first states: "WE CONFIRM THAT WE WILL NOT BE ABLE TO RELEASE ANY SHARES OR, IN CASE OF A LIQUIDITY EVENT, ANY PROCEEDS FROM SALE OF SHARES OF [REDACTED] TO MEGACAP UNTIL ALL INVOLVED PARTIES UNANIMOUSLY REACH AN AGREEMENT OR SETTLEMENT AND PROVIDE A SOLID EVIDNECE FOR THAT." The second letter states: "At this time, we are now aware of the situation and agree there will be no distribution or movement of your holdings until all parties of MegaCap LLC sign and agree when there is a required liquidity event." Evidently, Mr. Blatt is not in control of MegaCap and has no sole authority whatsoever to make any unilateral decisions on behalf or to the detriment of Mr. Goldner or to any of you Limited Partners of MegaCap. Mr. Blatt's illegal takeover and commandeering of MegaCap and its assets once again are in breach of various MegaCap agreements as well as his fiduciary duties therewith and thereunder which may have constituted grounds for Mr. Blatt's automatic removal from MegaCap and all matters pertaining to any of the MegaCap entities.

To reiterate, Mr. Blatt has dispossessed Mr. Goldner of 8,217 Shares of Derivative Equity in ▓▓▓▓ which share value Mr. Goldner estimates to total in excess of $500,000. This matter is not being taken lightly by Mr. Goldner and he is taking appropriate action in a timely, thorough, and appropriate manner. Additionally, we've made Flow aware of the full circumstances and repercussions surrounding Mr. Blatt's conduct as well as Flow's actions in connection therewith, together with the details of the dispute involving all of MegaCap Capital General Partners. Please note that the foregoing does not include the $797,817 that Mr. Golder contends Mr. Blatt owes him.

Further, Mr. Goldner has demanded that his access be reinstated to the back-end and investor Flow portal, which portal he is rightfully entitled to have access to as Managing Partner of MegaCap. As clearly set forth herein, Mr. Blatt has no authority to restrict such access, and Flow's refusal to reinstate Mr. Goldner potentially will continue to expand Flow's exposure and liability.

Failure by Flow to abide by these demands may result in legal action being taken by Mr. Goldner against Flow, its principals, and its representatives. Furthermore, if Flow

NOT THE FILED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 5 of 5
September 12, 2023

fails to respond thoroughly, it may result in a more substantive letter—at Mr. Goldner's sole discretion—which in turn may precipitate escalation to said legal action. As such, Flow has been well-advised and urged to speak with Mr. Goldner directly who has also requested that Flow cc: him on any and all further correspondences and communications with Mr. Blatt as well as any other correspondences and communications relevant and appertaining to the contents of the present letter.

Mr. Goldner hopes to hear back from Flow no later than Wednesday, September 13, 2023, which deadline was stated in the demand and cease & desist letter to Flow sent on September 11, 2023.

Sincerely yours,

REICHARD TORNES, PLLC

/s/ Raúl A. Reichard
Raúl A. Reichard, Esq., LL.M.
For the Firm

RAR

cc:
Marc Goldner
Jacqueline Tornes, Esquire

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Y – Raul Letter to MegaCap



REICHARD & TORNES
ATTORNEYS AT LAW

September 14, 2023

**VIA E-MAIL**
MegaCap Capital, LLC
MegaCap Funds, LP
team@megacap.capital; ops@megacap.capital

**RE:   MegaCap K1s and Improper Actions in Connection Therewith**

Dear MegaCap Capital, LLC and MegaCap Funds, LP ("MegaCap"):

I am writing on behalf of Dr. Simon Divilov and in response to a recent e-mail received by Flow. See Exhibit A. Dr. Divilov is quite taken aback at your most recent actions. Also, I write in light of MegaCap's—via Mr. Goldner—recent requirement to halt the filing of ostensibly fraudulent K1s and tax returns. Dr. Divilov hereby demands to know the accounting firm that you used to prepare these seemingly fraudulent K1s.

You requested Dr. Divilov to let you know by or before Thursday, September 14 if he "should [sic] notice any errors or things that need to be changed." We are hereby informing you that there must be changes made to the K1s to reflect the agreed-upon fee structure that was stated to MegaCap Limited partners via e-mail on or about February 9, 2023. In said email, MegaCap specifically stated that "[t]he amended K1s are currently being prepared by Flow, and we are pushing them to get them out by next week at the latest. In the interim, we can report *definitively* that the loss will be 0.5% of your capital commitment, representing one tenth of the 10-year 0.5% management fees. **You can report this to your accountant and proceed confidently with that number.** You will receive a notice through Flow once the K1 is complete." (emphasis added.)

Dr. Divilov did, in fact, prepare his 2021 and 2022 returns to reflect such material representations. It is unacceptable for you to unilaterally make these changes without informing Dr. Divilov and the Limited Partners of MegaCap sooner. By noticing Dr. Divilov less than a week prior to you making this

Reichard Tornes, PLLC | 3663 SW 8ᵗʰ Street, Third Floor, Miami, FL 33135 | 305.407.1734

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Y – Raul Letter to MegaCap

MegaCap Capital, LLC
MegaCap Funds, LP
Page 2 of 3
September 14, 2023

unauthorized change to MegaCap's returns, it will cause undue harm to Dr. Divilov. You cannot reasonably expect Dr. Divilov and Limited Partners of MegaCap to amend their returns from over a year ago due to MegaCap's malfeasance or negligence.

To be clear, you cannot amend K1s that you told Dr. Divilov and Limited Partners to file at 0.5% a year at an annual loss and then retroactively expect Dr. Divilov and Limited Partners to amend their previously filed returns to 5% loss in a previous filing. This is simply not acceptable and Dr. Divilov will be forced to proceed with legal action to correct this unjust action taken by MegaCap. And, to be clear, MegaCap will be held fully liable for any fees and costs associated with this action as per the relevant investor agreement.

Dr. Divilov is not accepting these K1s you have just sent as valid because there is a signed resolution (and an e-mail you sent to Flow certifying as such) which clearly states that there would be 0.5% loss to LPs annually. You said to Ryan Nanney at Flow on April 28, 2023: "So long as the taxable income is just 10% of the total fee then we are good." The K1 you provided does not reflect this statement and your improper recreation of MegaCap's K1s are not just seemingly illegal, but a breach of your fiduciary duties to Dr. Divilov and all other Limited Partners.

Outside of the above, Dr. Divilov demands the K1s to be created as per the Resolution you signed in February with the Managing Partner of MegaCap, Marc Goldner, and to reflect the e-mail sent to Flow which was agreed to.

Please respond immediately with your accounting firm so that Dr. Divilov can obtain the necessary details prior to reporting this violation to the Internal Revenue Service for apparent tax fraud, as it is imperative that Dr. Divilov can maintain good standing with the Department of Defense and other government agencies. As such, Dr. Divilov requires an immediate response.

Failure to comply with these demands will result in exploring a multi-party legal action with other Limited Partners against MegaCap and yourself. Dr. Divilov will be seeking removal of whomever is behind the foregoing from MegaCap entirely and will be calling a vote to halt the actor's misconduct that is jeopardizing Limited Partner funds at various MegaCap vehicles.

Lastly, your malicious withholding of Dr. Divilov's draft K1 until nearly the eleventh hour on a weekend is unacceptable. Dr. Divilov is fully aware you distributed similar drafts to at least one other LP on (at latest) Friday of last week—likewise inappropriate.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Y – Raul Letter to MegaCap

MegaCap Capital, LLC
MegaCap Funds, LP
Page 3 of 3
September 14, 2023

    Therefore, Dr. Divilov expects a response no later than September 15, 2023 and demands that you do not go through with any tax filings. Your failure to otherwise abide by this demand letter may result in an escalation in this matter.

    Dr. Divilov reserves all of his rights.

Sincerely yours,

REICHARD TORNES, PLLC

/s/ Raúl A. Reichard
Raúl A. Reichard, Esq., LL.M.
For the Firm

RAR

cc:
Simon Divilov
Jacqueline Tornes, Esquire

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit Y – Raul Letter to MegaCap

### Exhibit A:

Flow                                                                  Saturday, Sep 9, 1:59 PM
> To: Simon Divilov

## flow

Dear Simon,

Attached please find your draft 2022 K1 package for Megacap Funds, LP - Tech I.

Please note, if your management fee included a fractional dollar, it has been either rounded or truncated, as the tax software did not permit cents. However your ending capital account balance corresponds identically to your subscription amount, which did not contain any cents.

Should you notice any errors or things that need to be changed (e.g. address or a TIN you acquired since subscribing), you must let us know by before Thursday, September 14, as the return will be e-filed on that day.

As a reminder, as you were notified last October, the 2021 Tech I return contained errors by both the source of the equity and the fund administrator requiring amendment. That amendment is now being finalized and will be sent to you in the next few days. It will show zero income and expense, as management fees were deferred until Megacap closed on the equity in 2022, which is why your 2022 return shows your management fee paid, even if you subscribed in 2021.

Thank you once again for your confidence in us. Please feel free to contact us with any questions at team@megacap.capital.

Best,
Eli M Blatt
Managing Partner

**View Documents**

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

MegaCap Capital

11/5/2023

To the Limited Partners of MegaCap,

I hope this letter provides much needed insight on my relationship with MegaCap & Eli M Blatt.

Since my improper and illegal redemption from MegaCap, I have chosen to keep a low profile in the interest of protecting the LPs, however, in the past several months, the situation has developed in such a way that it has forced me to break my silence.

I was involved with MegaCap since before its official inception as an entity. Previous to my time at MegaCap, I worked with a private equity fund from New York, and I adapted what I learned there to create what was in my vision a "cleaner and more transparent" version of what I had experienced.

Private Equity is a notorious branch of finance which is rife with bad actors and where trust is in short supply. I knew that the scope of the work was going to be more than I could handle on my own, so I knew I would have to find a partner to help me realize the vision.  Obviously, it was important to me that I could trust my partner, in order to extend that trust down to the LPs.

Ultimately, I made the fateful, and in hindsight terrible decision of selecting Eli M. Blatt as my initial partner for this venture. My reasoning for choosing Eli Blatt, was the fact that I have known him personally since childhood (around 40 years). I knew Eli because his grandmother and my grandparents had been neighbors. So, the family connection went far beyond the 40 years I have known Eli. I was close with his grandmother, I knew his great grandmother, and I know his uncles and his mother. I also know most of his extended family on his mother's side.

In short, I knew Eli Blatt and his entire family, so I figured that at the very least I wouldn't have to worry about having to watch my back internally. I couldn't have been more wrong.

MegaCap was launched when a contact I had made in the private equity world approached me with an offer of shares of ⟩—⟨ At the time, ⟩—⟨ was the hottest issue in the pre-IPO world, and I knew that this would be an ideal launching pad for MegaCap. I had already pre-negotiated the deal with my contact for the shares of ⟩—⟨ prior to reaching out to Eli. So, I had originated not only the idea for the business, but also sourced the deal that launched MegaCap. This same contact would later also be our source for shares of ⟩—⟨ Simply put, without my direct input, MegaCap would not exist, the biggest deal made by MegaCap would not exist, and Eli Blatt would not be a "Managing Member" of MegaCap. There is a mountain of evidence to support my claim, because it is factual.

Shortly after getting started with MegaCap, Eli introduced me to Marc Goldner, one of his classmates at TRIUM, as a potential third partner. It was at this meeting where the first clues of Eli's underhanded ways manifested, as in the process of introducing Marc into the partnership, he immediately diluted his equity. As Marc did not get equal equity, but junior equity.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

MegaCap Capital

11/5/2023

A few days later, Eli doubled down on his grotesque behavior, by "misremembering" the split of equity negotiated with Marc at this meeting, in Eli's own favor, having a blowout fight with Marc over the equity split on our group chat. In hindsight, this should have been my red flag that it was going to be a problematic partnership, but I continued to give Eli the benefit of the doubt.

This incident was a mere preview of the preferred way of doing business with Eli M. Blatt. Every new deal we worked on, Eli would forcibly renegotiate our split, arguing that he deserved more. One such instance was when Eli, Marc and myself had a Zoom call that I insisted that we record. It was around this time that my distrust for Eli's business practices began to accelerate. Eli's contribution was generally limited to initial capital investment, specifically to partially fund a deal. What should have been a clear meeting of the minds with partners, turned into a never-ending renegotiation. Eli would continually reiterate that he didn't get into this business to do "sales". Still to this day, it is unclear how Eli actually wanted to contribute to our business. He he claimed that he wanted to run the "back office" of MegaCap but then would delegate such tasks to Marc and myself, all while Marc and myself were the ones attempting to raise capital expending our time, money, resources, and energy at networking events globally.

To say that Eli is unprofessional, would be a gross understatement. In particular, Eli's communication skills are notoriously atrocious, as he quickly resorts to insulting and berating his counterpart, regardless of who that may be. And when a conversation would not go his way, particularly when the counterpart would not accept Eli's distorted version of events, he would freeze them out. Eli would burn bridges just as quickly as Marc or myself would build them. Decency and common courtesy do not feature in Eli M. Blatt's vast repertoire of skills.

In one particular instance, due to either his failure to properly negotiate compensation in advance or something such as once again his 'misremembering' of the deal terms, Eli got into a written altercation in a group chat with an alleged broker dealer that was introduced to Eli through one of Eli and Marc's mutual contacts. The conflict originated when Eli refused to compensate that fund for the part they played in securing a deal relating to Betterment. Eli insulted and berated this person in a public chat with multiple people having visibility into the argument, with no regard for the consequences of his actions.

To Eli Blatt's credit, he did in fact attempt to set-up a deal with his college friend, for Betterment, but Eli Blatt did so without speaking, consulting, or getting the deal approved by Marc and myself as per the terms of MegaCap's Operating Agreement. The details surrounding this deal is where a lot of contention began to brew amongst us partners. Eli Blatt attempted to take the lion's share of the deal and the credit in effect telling us that instead of confronting him about acting without our cognizance, we should have been thanking us. Whereas Eli Blatt tried to cut corners and do things the improper way, Marc and I attempted as best we could to right the ship and act in an ethical and

Doc ID: 3fcb7f96d02c048a3e22e5e82d310a063b103214



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

# Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

11/5/2023

MegaCap Capital

legal manner. This chain of events in hindsight was the beginning of Eli beginning to attempt to renegotiate the Operating Agreement to increase his pay out upon certain deals closing.

Eli also had a peculiar way of doing accounting. He would calculate his personal split of the proceeds first, then he would calculate everything else from that point. It wasn't always incorrect, but it was definitely confusing as normally you would calculate the company proceeds first and then the splits from that point. Eli would also, once having calculated his "monies", immediately transfer the funds from the company account to his personal account, without Marc or I signing off on it first, since when Eli set up the bank account, he gave himself full authority, rather than requiring multiple partners to sign off.

Many times, I addressed Eli's actions directly, in particular his communication skills and how that could impact MegaCap's overall business. Eli himself did not see any fault in his actions.

Ultimately, these constant disagreements and renegotiations resulted in an overall amendment of MegaCap's Operating Agreement, a document known as the Memorandum of Understanding. This new agreement stripped both Marc and myself, but especially me, of upside and equity in various deals that had been achieved under the MegaCap umbrella, while Eli's percentage was increased. After much discussion, Marc and I had believed that it would be in the best interest of MegaCap to not fight with Eli about what we hoped would be looked at as smaller deals in the future. Our goal was to avoid a blow-out argument with Eli that could harm LPs. Marc and I did what we did to try to isolate Eli's actions and deflect the harm to ourselves and to protect the Limited Partners. In hindsight, it was at this point it appears that Eli was attempting to work me out of MegaCap. I also started getting disillusioned with the various projects, and that even if I was able to salvage my position within MegaCap, I grew concerned that Eli's behavior would inevitably result in the implosion of MegaCap itself and destruction of the Limited Partner's funds.

All of this coincided with the birth of my daughter, which had me understandably pre-occupied, combined with the market downturn at the end of 2021, there was a general slowdown in securing investments by LPs. I had spoken with Marc on the phone constantly, as at this point my relationship with Eli began to deteriorate to the point that speaking with him was fruitless and a detriment to the business. Marc was effectively acting as a mediator between Eli and myself. Then, together, and for months, Marc and I would strategize for hours on end nearly every day on how to grow MegaCap and to do so despite Eli's continued and nearly constant interference. Together, we devised a plan to find a Capital Partner to take the business to another level so that we wouldn't be held in Eli's clutches on every new deal we'd do. Around November or December of 2020, Marc was able to successfully find a Capital Partner in Dubai to jumpstart the ⬡ deal. That Capital Partner was in the form of a $1M+ Promissory Note. Ultimately, this entity grew frustrated with the slowdown in sales velocity and Eli used this slowdown in LPs as justification for redeeming me from MegaCap, even though this temporary slowdown had no bearing on the long-term health of MegaCap. He recruited Marc,



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

MegaCap Capital

11/5/2023

through coercion, to negotiate my redemption on his behalf, telling Marc he would no longer work on their ventures as long as I wasn't redeemed.

Eli wanted to not just take all of my equity away from me, even though the business was my idea and I brought him into it, even though we were childhood friends of nearly 40 years, our families were neighbors and knew each other even longer, even though that if it wasn't for me, Eli would still be begging his mother for an allowance, but he conspired to take all of our collective equity and control away.

Eli M. Blatt is a seemingly impressive person at first glance. He has a collection of degrees from several prestigious institutions. However, other than being a lifelong student, Eli has accomplished what I perceive to be very little in his life.

He has been involved in various business partnerships that failed miserably and he was (or still is) in dispute with at least one prior business partner. He has never held, as I've been told gainful employment other than at Zynga, where he was and I quote my memory of Eli himself saying: "escorted out of the building by security after being terminated". It's worth noting Eli considers himself, and I quote Eli once again here: "unhirable."

He has also threatened, in writing, to not honor the laughable settlement I was given for my improper redemption. Even when he's already fucked me, he can't help himself and wants to double down. There is no limit to his lack of human decency, there is no limit to his lack of ethics, and there is no limit to how far Eli will go to dispossess Marc and I of our assets knowing no limit to what he will do to fulfill his selfish desires, hidden agenda, and secret motivations.

To be clear though, my primary concern remains the LPs investment. If we all lose because ⟩⟨ or ⟩⟨ fail, then so be it, that is the risk we all accepted when entering this venture. Barring that, I want everyone to win, there was no reason this venture couldn't have been a win-win for everyone. In funding rounds since MegaCap did the ⟩⟨ deal, the secondary market has valued the shares of ⟩⟨ at a higher price than the allocation paid for by MegaCap's LPs.

As I later feared, Eli found a way to implode MegaCap when he executed the improper and illegal redemption of Marc Goldner. Just like he had done with me, he found a way to reinterpret facts to his favor, and since he had prepared every mechanism necessary to dispossess us of our equity whenever he deemed it necessary, he was able to do so quite promptly. If Marc or I had the power to easily regain control, we already would have done so.

Despite his vast collection of degrees from various prestigious institutions, Eli has not found a way to translate this into competence. For instance, despite his claims of wanting to safeguard the MegaCap

Doc ID: 3fcb7f98d02c04ba3e72e5e623310a053b103214



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

11/5/2023

MegaCap Capital

investments, he hasn't even properly handled the taxes for MegaCap, which is likely to result in fines, which if left unchecked can result in the destruction of LP equity.

Simply put, Eli M. Blatt cannot be trusted to be the caretaker of these investments by the LPs, he lacks the ethics, he lacks the moral compass, he lacks the trust, he lacks the professionalism, and most importantly, he lacks the competence to be effective in that position. On top of that, Eli constantly changes his story, was unable to handle the back-office without severe 'hand holding' and assistance from Marc, and issuing K1s (without approval) with less than a week's notice to provide edits to draft K1s being distributed. Ultimately, I cannot in good conscience recommend that he be trusted.

The seller of the shares of both _____ nd the fund that sourced them have been made aware of Eli's actions and have pledged in writing to not distribute unless all the managing partners sign off on it, so the investment is safeguarded for now. However, the seller of the _____ shares has refused to provide such an assurance, not to Limited Partners, nor to Marc Regardless and despite the assurances we were able to obtain, this does not yet stop Eli from causing more damage and as such, Marc and I are going to do everything within our power to correct this situation, and ensure that the LPs investment remains safe and experiences a smooth exit.

On behalf of Marc and myself, thank you not just for your understanding, but for your initial trust in the MegaCap vision and your belief in us. We are working tirelessly to make that vision come true.

Sincerely,



Roderyck Reiter
Series 7
Series 63
Licensed Real Estate Broker (Florida)

**✖ Dropbox** Sign                                                    Audit trail

| | |
|---|---|
| Title | November 7, 2023 Letter to MegaCap's Limited Partners |
| File name | Letter to MegaCap...7, 2023 Final.pdf |
| Document ID | 3fcb7ff98002b46a3a22e5a62f310a083b10321a |
| Audit trail date format | MM / DD / YYYY |
| Status | ● Signed |

Document History

| | | |
|---|---|---|
| ⟳ SENT | **11 / 07 / 2023** 07:35:30 UTC | Sent for signature to Roderyck Reiter (rod@megacapfunds.com) and Simon Divilov (simon@thecryptominers.io) from marc@megacapfunds.com IP: 174.50.214.142 |
| ◉ VIEWED | **11 / 07 / 2023** 11:40:57 UTC | Viewed by Simon Divilov (simon@thecryptominers.io) IP: 45.37.181.84 |
| ⤴ SIGNED | **11 / 07 / 2023** 11:41:10 UTC | Signed by Simon Divilov (simon@thecryptominers.io) IP: 45.37.181.84 |
| ◉ VIEWED | **11 / 07 / 2023** 14:52:53 UTC | Viewed by Roderyck Reiter (rod@megacapfunds.com) IP: 172.58.134.61 |
| ⤴ SIGNED | **11 / 07 / 2023** 14:53:33 UTC | Signed by Roderyck Reiter (rod@megacapfunds.com) IP: 172.58.134.61 |
| ✓ COMPLETED | **11 / 07 / 2023** 14:53:33 UTC | The document has been completed. |

NOT A CERTIFIED COPY

# EXHIBIT M

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-016030-CA-01

**ELI M. BLATT**,

      Plaintiff,

vs.

**MARC J. GOLDNER, RACHEL KORSEN,
SIMON DIVILOV, THE DHARMA
INITIATIVE, LLC**, a Delaware company, and
**COMPASS MINING, INC.,** a Delaware
corporation,

      Defendants.

_____/

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Florida Rule of Civil Procedure 1.610, Plaintiff, ELI BLATT ("Plaintiff"), by

and through his undersigned counsel, moves for the entry of a preliminary injunction against

Defendant MARC J. GOLDNER ("Goldner"); enjoining Goldner from:

    a.  contacting Plaintiff as well as vendors, partners, and Limited Partners of Megacap
        Capital, LLC ("Megacap" or the "Company");

    b.  taking any actions on behalf of the Company, representing himself as authorized to
        do so, claiming to have been illegally or improperly withdrawn from the Company,
        or otherwise claiming to be a duly authorized representative of the Company;

    c.  disclosing any confidential, sensitive, or proprietary information regarding the
        Company or filing any State or Federal lawsuits relating to Megacap in breach of
        the Agreement;

    d.  filing any tax returns for Goldner Blatt Investments, LLC ("GBI") until the current
        case is concluded or without the express written consent of Blatt; and

    e.  fraudulently conveying any of his assets, including but not limited to the Miners
        and any NFTs or cryptocurrencies under Defendants' control, as well as his equity
        interests in Dharma and any other companies in which he has equity interests.

NOT A CERTIFIED COPY

## FACTUAL BACKGROUND

**Overview**

This motion stems primarily from actions taken and threats made by Goldner subsequent to being noticed of Blatt's intent to pursue this present litigation and being provided with a copy of the filed complaint. Specifically, Blatt seeks injunctive relief in the face of extortive threats made towards Blatt with respect to his interests in and fiduciary duty to Megacap if Blatt does not acquiesce to Goldner's demands to drop the present litigation.

Although not mentioned by name in the Complaint, Megacap is the "other" company that Goldner was pressuring Blatt to sign an agreement for with its creditor under threat to Blatt's life. See Complaint ¶¶ 95-101 and Count XI - Civil Threat and Extortion. In order to protect the Company and its investors, the Complaint purposefully omitted Megacap's name in the allegations and counts. As detailed herein, Goldner's actions since the filing of the complaint have inexorably tied the present litigation to Megacap and necessitated this motion for injunctive relief.

Megacap is a Delaware-based company founded by Blatt, Goldner, and a third Member no longer with the Company. It is engaged in the business of syndicating equity in pre-IPO private investments as the General Partner for various Special Purpose Vehicles ("SPVs") which own interests in privately held companies. Put simply, Megacap enables retail investors to invest in late stage, private, pre-IPO companies. Megacap's current still-open offering, in which its Limited Partners have invested more than $3,000,000, has its equity exposure via a forward contract for the vested shares of a former employee (the "Employee") of the SPV's target "Portfolio-Company" (the "Shares")[1].

---

[1] Megacap's current offering has derivative equity exposure to the Portfolio-Company via an investment in an SPV that has a forward contract with the Employee for his vested equity in the Portfolio-Company. The names of the Seller, the Employee, and the Portfolio-Company are of the highest degree of confidentiality given the

As a Class A voting Member and Manager of Megacap, Goldner had access to confidential information, as well as rights and obligations under the terms of the Megacap Operating Agreement (the "Agreement"). A copy of the Agreement is attached as Composite **Exhibit A.** Goldner has used his access to this information, including the contact information of Megacap's partners, to make repeated, serious threats towards Blatt and Megacap.

**Goldner's Involuntary Withdrawal from Megacap after Repeated Threats Towards Blatt and Megacap.**

In addition to the threats and extortion detailed in the Complaint, upon being noticed by Blatt of his intent to pursue the present litigation, and escalating thereafter upon being provided a copy of the filed complaint, Goldner continued his campaign of harassment and intimidation against Blatt by, among other things:

1. admitting to illegally recording Blatt in Florida without Blatt's knowledge or consent;

2. extorting Blatt by threatening to release these illegal recordings of Blatt and to accuse him of crimes unless Blatt acquiesced to his demands;

3. extorting Blatt, Megacap, and all of its Limited Partners, by repeatedly threatening to disclose critically sensitive information that could destroy Megacap and the investments of its Limited Partners[2] unless Blatt drops the present litigation, stating in a WhatsApp chat:

---

possibility that public disclosure of the forward contract could potentially result in the Portfolio-Company voiding the Employee's shares if the Portfolio-Company has the rights to do so (which the Employee has represented is not the case to the best of his knowledge but which is not known with certainty), as well as the fact that the Seller has the ability to redeem Megacap's investment. Given their highly confidential and sensitive nature, the names of the Employee, their former employer (herein referred to as the "Portfolio-Company"), and the Seller, reference thereto in the exhibits has been redacted.

[2] The Limited Partnership Agreement governing the SPV that owns the forward contract with the Employee allows for the General Partner of the SPV (the "Seller") to redeem the interests therein that Megacap manages for its Limited Partners for reasonable cause, which would be catastrophic for Megacap and its Limited Partners. Rather than adhere to Megacap's dispute resolution terms, which require confidential and private mediation and arbitration, precisely to protect the Company from this type of adverse consequence in the event of a dispute, Goldner has contacted myriad Megacap partners and even potential partners (*See* Exhibit "B") and threatened to disclose Employee or Seller's name as means to extort Blatt into reinstating Goldner into the Company as a Class A Member and Manager and to withdraw the present case against him. Among those he contacted is the Seller for the Shares. Goldner's aim in contacting the Seller was to lay the foundation for threats that he might take actions to needlessly make the Employee's name public, or to name the Seller in a lawsuit, and thus give the Seller's General Partner cause to redeem the equity Megacap manages, a threat he has repeatedly used to

I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've "stolen" your money [referring to the civil theft demand letter]. The game you're playing here could wind up dragging this into a Federal Court that will have a tortious discovery process, [which could] expose the [Portfolio-Company] employee's name that could [cause the Seller to] revoke the shares, resulting in all the hard work we put into Megacap and [the Portfolio-Company deal] being extinguished;

4. threatening to destroy Blatt's fiancé's career by disclosing illegally obtained and allegedly compromising recordings of conversations with her made without her knowledge or consent;

5. 'Sextorting' both Blatt and his fiancé by contacting her directly and threatening to make public compromising images and/or videos of Blatt made without his knowledge or consent.

Goldner's harassing texts, emails, and WhatsApp messages are summarized and attached as Composite **Exhibit B**.

Blatt endured nearly a year of threats and coercion by Goldner without taking action with regard to Megacap, despite Goldner's litany of forbidden acts and other breaches of the Agreement, in the interests of putting the best interests of Megacap above his own. The goal was, and remains, to minimize any potential adverse impact to the Company or its Limited Partners.

But Goldner's escalation to very serious extortive threats against not only Blatt but also Megacap and all of its Limited Partners unless Blatt agreed to withdraw his complaint and reinstate him, compounded by his other breaches of the Agreement and its forbidden acts, prevailing law, and his fiduciary duty, left Blatt no choice but to protect Megacap from Goldner's increasingly erratic behavior by withdrawing him as a Class A Member and Manager of the Company. Simply put, as a practical matter, Goldner's actions had made it impossible for Blatt to continue working with him, making it impossible for Megacap to conduct its ordinary course of business; in addition,

---

scare Megacap's Limited Partners and extort Blatt into dropping the present lawsuit and reinstating him into Megacap as a Class A Member and Manager.

given that Blatt could not ethically withdraw from Megacap himself considering that he has a fiduciary duty to Megacap's Limited Partners to protect them from Goldner's threats, withdrawing Goldner was the only option.

Consequently, and in accordance with the terms of the Agreement and Goldner's Redemption Agreement, Goldner was duly withdrawn as a Class A Member of the Company. As a result, he is thus no longer authorized to act on behalf of the Company, represent himself as being authorized to do so, or otherwise engage in any activities related to its business.

**Goldner Escalates His Extortion Efforts by Directly Contacting and Threatening Megacap Partners in Breach of the Agreement, Causing Irreparable Harm to the Company.**

The Agreement contains explicit provisions for resolving disputes, which Members must adhere to in order to assert any claims against the Company or its Members. These provisions call for private and confidential mediation and arbitration and exist to protect the Company from the type of harm Goldner has been engaging in.

Goldner, for his part, has successfully evaded service for the subject litigation for over two months. During this time, rather than invoke any of the proscribed dispute resolution proceedings, Goldner has been engaging in a campaign of harassment against Blatt, Megacap, and Megacap's partners that directly violate the dispute resolution and other terms of the Agreement in an attempt to get Blatt to drop the present litigation as well as reinstate him in Megacap. Specifically, Goldner:

1. doubled down on his extortive threats against Blatt and the Company by, among other things, needlessly naming the Employee and threatening to publicize the name, which he himself has repeatedly acknowledged could cause catastrophic and irreparable harm to the Company and its Limited Partners, unless Blatt reinstates him as a Class A Member and Manager of Megacap and drops the present lawsuit against him, stating:

> I strongly suggest that you immediately reinstate me, otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved... it is extremely important to remember that I possess the name (as do you) of the [Portfolio-Company] employee that is part of the

[Portfolio-Company] employee forward contract - (his name in case you didn't read the documents is [redacted])... **I would highly recommend immediately dismissing this case**[3]... failure to do so may result in a federal court action and a tacit approval and waiver for me to sue MegaCap in federal court… MegaCap will be named as a third-party defendant, and I will most certainly ensure that ALL shares are withheld. What you do not seem to understand that is IF the shares are cancelled, it is YOU who will be held liable as you are the but for cause of all of this happening…. I have absolutely no issue putting MegaCap into receivership with the SEC" (emphasis added, *see further* **Exhibit C**);

2.  inadvertently admitted that his coercion of Blatt to sign the agreement with a creditor of the Company under threats to Blatt's life, as detailed in the complaint, was extortion by acknowledging his financial interest in having the agreement signed, stating in a letter to Blatt, "In order for extortion to exist, I would've needed to have a financial benefit, which I had none – instead, I saved MegaCap over $100,000 in the interest waiver agreement" (*See* **Exhibit C**), a confounding statement given that Goldner is clearly aware that he had and continues to have financial interests in Megacap and thus pecuniary interests in the actions he was coercing Blatt to take under threat to Blatt's life;

3.  solicited money from Megacap's Limited Partners to aid him in disputing his withdrawal outside of the proscribed mediation and arbitration under threat of the loss of their investment by implying that he will make the name of the Employee, Portfolio-Company, and Seller public if they did not assist him in forcing Blatt to acquiesce to his demands;

4.  instructed potential investors not to invest with Megacap, thus causing the Company financial harm and preventing it from repaying its debts to its creditors;

5.  contacted and baselessly threatened critical partners of the Company with, among other things, legal actions he has no standing or right under the Agreement to bring, including:

    a.  the Seller for the Shares of the Portfolio-Company to inquire about their ability to redeem the Shares and plant the seed for them to potentially do so;
    b.  the supplier of the Company's shares for another SPV it manages in a manner they characterized as "alarming";
    c.  its SPV Administrator, causing it to breach its contractual obligations to Megacap by ceasing all work on Megacap's critical tax reporting, as well as to demand an indemnification by the Company from any actions against it by Goldner in order to

---

[3] Goldner is here referring to the present litigation, leaving no doubt as to the fact that he is fully aware of it and actively evading service while simultaneously hiring an attorney to defend Dharma, which was served via its Delaware Registered Agent, as well as making it unequivocally clear that he is extorting Blatt with threats of causing catastrophic damage to Megacap if Blatt does not drop the present litigation.

resume performance of its contractual obligations, thus hamstringing Megacap administratively and operationally; and

d.  its accountant, who ceased work on Megacap's taxes out of fear of a lawsuit from Goldner;

6.  induced Megacap's original third partner to call Blatt's mother and relay extortive threats against Blatt, including to "put him in jail" if Blatt did not acquiesce to their demands; and

7.  repeatedly and persistently harassed, defamed, threatened, extorted, and 'sextorted' Blatt.

(*See* **Exhibits B** and **C** attached).

Goldner's threatening messages to current and potential Limited Partners have irreparably damaged, and continue to risk damage to, the Company's ability to attract additional investment through its network of existing Limited Partners (and thus to repay its creditors), who are all now concerned about the safety of their investments. As referrals have been the Company's primary source of fundraising, given that its offerings, including that for the Portfolio-Company, have primarily been under Regulation D 506(b), which does not allow for general solicitation, Goldner's actions have caused, and continue to cause, irreparable harm to the Company.

They are also egregious breaches of, among other provisions, the Company's dispute resolution terms, which exist precisely to protect the Company from the type of harm which Goldner is both threatening and actively causing for his own personal benefit at the expense of the Company and the interests of its Limited Partners. Goldner, per the terms of the Agreement, must take up any grievances with Megacap or Blatt in relation to Megacap, including his withdrawal, via private and confidential mediation and arbitration in order to protect the Company and its partners from harm. Instead, Goldner has initiated a very non-private, non-confidential campaign of harassment, threats and extortion against the Company, its partners, vendors, and Limited Partners that has already irreparably harmed the Company and has the potential to cause it and its Limited Partners catastrophic and irreparable harm if he is not stopped.

**The Agreement Explicitly Allows Members to Seek Injunctive Relief.**

Section 81 of the Agreement contains provisions allowing Members to seek equitable relief via an injunction where there is no adequate remedy of law and there is immediate risk to the Company, both of which are present given Goldner's threats against the Company as well as its vendors and Limited Partners. Pursuant to these provisions and the duly executed and valid consent resolutions passed by the Company (*See* Exhibit A), Blatt, representing the only Class A Membership interests in the Company, seeks immediate relief from the Court to prevent further harm to Blatt via harm to Megacap and its Limited Partners by enjoining Goldner from engaging in any actions that violate the Agreement or threaten the Company's interests.

Blatt further seeks immediate relief from the Court to prevent Goldner from filing erroneous or potentially fraudulent tax returns for GB1 and to prevent him from fraudulently conveying any Assets during the course of the current litigation.

## LEGAL ARGUMENT

### A.    Standard on a Motion for Temporary Injunction.

In Florida, "[t]o be entitled to a temporary injunction, the movant must show the following elements: (1) irreparable harm; (2) lack of an adequate remedy at law; (3) a substantial likelihood of success on the merits; and (4) that temporary injunctive relief will serve the public interest. *Mapei Corp. v. J.M. Field Mktg.*, 295 So. 3d 1193, 1198 (Fla. 4th DCA 2020) (citing *Donoho v. Allen-Rosner*, 254 So. 3d 472, 474 (Fla. 4th DCA 2018)). The movant must also show a clear legal right to the injunction. *McKeegan v. Ernst*, 84 So. 3d 1229, 1230 (Fla. 4th DCA 2012).

"[T]he purpose of a temporary injunction is to preserve the status quo until full relief can be granted following a final hearing." *Int'l Vill. Ass'n v. Schaaffee*, 786 So. 2d 656, 658 (Fla. 4th DCA

2001) (citing *Tamiami Trail Tours, Inc. v. Greyhound Lines, Inc.*, 212 So. 2d 365, 366 (Fla. 4th DCA 1968)); *see also Planned Parenthood of Greater Orlando, Inc. v. MMB Props.*, 211 So. 3d 918, 924 (Fla. 2017) ("As this Court acknowledged long ago, the purpose of a temporary injunction is to preserve the status quo while final injunctive relief is sought.").

"The controlling reason for the very existence of the power to grant a temporary injunction is that the court may thereby prevent a threatened or continuous irremediable injury which might otherwise occur before the plaintiff's claim could be thoroughly investigated." *Adoption Hot Line, Inc. v. State, Dept. of Health & Rehab. Services, Dist. XI ex rel. Rothman*, 385 So. 2d 682, 684 (Fla. 3d DCA 1980) (citing *Tamiami Trail Tours, Inc.*, 212 So. 2d at 365; *Murphy v. Daytona Beach Human Society, Inc.*, 176 So. 2d 922 (Fla. 1st DCA 1965)).

As demonstrated below, each of the foregoing elements are present, entitling Plaintiff to a preliminary injunction as a matter of law.

**B.    Plaintiff Will Suffer Irreparable Harm.**

Plaintiff, both directly and via his interests in Megacap, will suffer irreparable harm if Goldner continues to put the Company at risk by threatening partners, extorting Blatt, acting as if he was not withdrawn from the company, and, most critically, if he takes actions that make confidential company information public, notably the names of the Seller, Employee, and Portfolio-Company, as he has repeatedly threatened to do, in breach of the Agreement. As demonstrated above, Blatt and Megacap have already suffered irreparable harm, and there is a reasonable probability that additional harm will occur unless this Court grants immediate injunctive relief. It is clear the actual and threatened injury to Blatt, Megacap, and its Limited Partners strongly outweighs any potential harm to Goldner if the temporary injunction is granted.

### C.     There is No Adequate Remedy at Law.

Furthermore, Plaintiff has no adequate remedy at law, since monetary damages will not be able to compensate Blatt or Megacap for the reputational damage sustained from Goldner's continued threats and harassment, especially should he cause the Seller to redeem the Shares, nor does Goldner have the resources to compensate Megacap and its Limited Partners in the event the Seller does so. The potential value of the damages incurred by Goldner's bad acts cannot be determined for purposes of awarding Plaintiffs money damages, as the value to Megacap cannot be fully determined until the IPO of the Portfolio-Company, at which time the carried interest due to Megacap from the Limited Partners can be calculated. Based on the foregoing, an injunction requiring Goldner to cease and desist is reasonably necessary to protect Blatt, Megacap, and its Limited Partners from further harm.

### D.     Plaintiff Has a Substantial Likelihood of Success on the Merits.

To grant temporary injunctive relief, the Court must estimate the likelihood of Plaintiff prevailing on the merits. *Gold Coast Chemical Corp. v. Goldberg,* 668 So. 2d 326, 327 (Fla. 4th DCA 1996). A substantial likelihood of success on the merits is shown if good reasons for anticipating that result are demonstrated. *City of Jacksonville v. Naegele Outdoor Advertising Co.,* 634 So. 2d 750, 753 (Fla. 1st DCA 1994). However, the Plaintiff is not required to prove its case in full at a preliminary injunction hearing; rather, it must make a showing of likely or probably, but not certain, success at trial on *one* or more claims. *Id.*

Blatt's case against Goldner involves numerous claims that, as evidenced by the exhibits to this Motion and the Complaint, have a high likelihood of success:

**Claims related to the Assets.**

Blatt wired Goldner and Compass funds for Miners and NFTs (the "Assets"), which bank statements and the extensive communications between Blatt, Goldner and Dharma make unequivocal. Blatt has no direct visibility, control, or ownership of any kind over the assets, with Dharma having clearly stated in its Redemption Notice that it has usurped all of the Miners for which Blatt sent payment and Goldner stating via WhatsApp with regard to the NFTs, "sue me, Eli, I'm not selling", making it clear that Blatt has no ownership or control of any kind over the NFTs given they are in Goldner's personal cryptocurrency wallet. These two unequivocal facts establish a high likelihood of success of prevailing on:

- Count V, Breach of Contract and Count VI, Breach of Fiduciary Duty, as Goldner was obligated to title any assets purchased for GBI into GBI-titled accounts pursuant to the terms of the GBI Operating Agreement Section 74;

- Count VIII, Constructive Fraud, given that the end-result of the above facts is that Blatt was defrauded, regardless of any intent Goldner may or may not have had to do so;

- Counts IX and XIII, Unjust Enrichment and Disgorgement, given that the Defendants have unequivocally enjoyed exclusive access to and use of the Assets that Blatt remitted funds for, including the ability to mine bitcoin and use the NFTs to gain access to private events and chat channels for networking purposes;

- Count XIV, Conversion, given that as per Dharma's December 31, 2022 Redemption Notice, it had converted Blatt's investments for its own benefit, while Goldner took funds from Blatt intended for GBI to purchase NFTs and instead purchased them into his own wallets; and

- Count XV, Accounting, which has arguably the highest likelihood of success, since Blatt unequivocally sent funds for which he has never received any formal accounting of any kind from any of the Defendants, without which no detailed analysis of the claims can be finalized.

**Count XI, Civil Threat and Extortion.**

1. Florida Statute 836.10 provides: "Any person who writes or composes and also sends or procures the sending of any letter, inscribed communication, or electronic communication, whether such letter or communication be signed or anonymous, to any person, containing

a threat to kill or to do bodily injury to the person to whom such letter or communication is sent, or a threat to kill or do bodily injury to any member of the family of the person to whom such letter or communication is sent commits a felony of the second degree."

2. Florida Statute 836.05, for which civil suits can be brought under Florida 772, does not require the perpetrator to directly threaten harm themselves. Transmitting or communicating a threat to injure or harm someone else can be sufficient for charges under this statute. *See Ventura v. State*, 29 So. 3d 1086 (Fla. 2010) (sending an email threatening to arrange for someone else to murder the recipient constituted a violation of 836.05).

3. Goldner's electronic communications to Blatt unequivocally transmitted explicit threats against Blatt and Blatt's families lives if Blatt did not sign an Agreement Goldner was pressuring him to sign. Blatt clearly instructed Goldner to cease transmission of the threats, and that in the absence of any evidence to the contrary he deemed the threats as coming from Goldner, which did not deter Goldner from continuing to transmit the threats. Under Florida Statute 836.10 and 836.05, it is irrelevant whether Goldner in his communications made the threats on his own behalf or allegedly on behalf of a third party. The simple transmission of the threat itself is a violation of Florida Statute 836.10 and the threat being tied to pressuring Blatt to sign the agreement a violation of Florida Statute 836.05.

Blatt is all but certain to prevail on these counts for the reasons detailed above. Florida courts have repeatedly issued injunctions based on a substantial likelihood of success on one count, even where other claims may not rise to that level of potential success early in the litigation, thus showing one key claim to supports the injunction can be sufficient. As detailed, Plaintiff is likely to succeed on one or more counts. Accordingly, the Court should grant immediate injunctive relief.

E.      **Temporary Injunctive Relief Will Serve the Public Interest.**

Granting a temporary injunction in favor of Plaintiff advances the public's interest by ensuring that Florida citizens are protected from the type of threats and harassment Goldner has been engaging in. Additionally, failure to protect Megacap's Limited Partners from further tortious interference and explicit threats from Goldner could result in the redemption by the Seller of the interests in the Portfolio-Company or by the Portfolio-Company of the Employee's shares, irreparably harming Megacap's Limited Partners. This would in turn damage the confidence of all Florida citizens in the security of not only their pre-IPO investments but all private and

alternative investments in general. Accordingly, the public interest weighs strongly in favor of granting the temporary injunction.

### F.        This Court Should Set a Bond for an Appropriate Amount.

A party moving for a temporary injunction shall post a bond "in an amount the court deems proper, conditioned for the payment of costs and damages sustained by the adverse party if the adverse party is wrongfully enjoined." Fla. R. Civ. P. 1.610(b). "Before setting a bond, a trial court must have some basis for exercising its discretion in determining the amount of the bond." *AOT, Inc. v. Hampshire Management Co.*, 653 So. 2d 476, 478 (Fla. 3d DCA 1995). "The purpose of the bond required as a condition to issuance of a temporary injunction is to provide a sufficient fund to cover the adverse party's costs and damages if the injunction is wrongfully issued." *Montville v. Mobile Medical Industries, Inc.*, 855 So. 2d 212, 215 (Fla. 4th DCA 2003). "Since the damages recoverable for a wrongfully issued injunction are ordinarily limited to the bond . . . the bond initially set by the court constitutes the court's determination of the foreseeable damages based on the good faith representations that are before it." *Id.* (internal citations omitted). "Additionally, while foreseeable damages are considered a major factor in setting a temporary injunction bond, the court is permitted to consider factors other than the anticipated damages and costs, including the adverse party's chances of overturning the temporary injunction." *Id.* at 216; *see also Cushman & Wakefield, Inc. v. Cozart*, 561 So. 2d 368, 370-71 (Fla. 2d DCA 1990) (noting that a court may consider the good faith representations of the parties, the adverse party's anticipated costs and damages, and the adverse party's chances of subsequently overturning the temporary injunction).

Here, in the event this Court grants the instant Motion and issues a temporary injunction, and Goldner can subsequently prove that the injunction was erroneously granted (which is unlikely),

Goldner would only be entitled to a reasonable amount associated with defending this Motion. No further anticipated damages will result. Given the facts of this case, Blatt submits that a nominal bond should be adequate to cover reasonable attorneys' fees and costs associated with actions taken to oppose, dissolve or overturn the injunction should it be issued.

**WHEREFORE,** Plaintiff ELI BLATT, respectfully requests that this Honorable Court enter an order:

1. enjoining Goldner from further contacting Blatt, including through participation in any group chats that Blatt is in, as well as vendors, partners, potential partners, or Limited Partners of Megacap;

2. prohibiting Goldner from taking any actions ostensibly on behalf of Megacap, representing himself as authorized to do so, claiming he was improperly or illegally withdrawn from Megacap absent a ruling from an Arbitrator reinstating him, or otherwise representing himself to be a duly authorized representative of the Company, given that he no longer has rights to act on behalf of or otherwise represent the Company as a result of the duly executed and valid consent resolutions withdrawing him as a Class A Member (See Exhibit "A");

3. prohibiting Goldner from disclosing any confidential information regarding the Company to any individual, company, court, or regulatory body, including but not limited to the name of its suppliers, portfolio companies, Limited Partners, creditors, the former Portfolio-Company Employee whose Shares Megacap manages interests in for its Limited Partners, or the Seller thereof;

4. preventing Goldner from filing any tax returns for Goldner Blatt Investments, LLC until the conclusion of the present case and without Blatt's express written consent;

5. preventing Goldner from fraudulently conveying any of his assets, including but not limited to the Miners and any NFTs or cryptocurrencies under Defendants' control, as well as his equity interests in Dharma and any other companies in which he has equity interests;

6. any such other and further relief as this Court deems just and proper.

**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Boulevard, Suite 500
Fort Lauderdale, FL 33301
(954) 525-4100 Telephone
(954) 525-4300 Facsimile
*Attorneys for Plaintiff*

By:   /s/ Benjamin R. Muschel
      Benjamin R. Muschel, Esq.
      Fla. Bar No. 122701
      muschel@kolawyers.com

NOT A CERTIFIED COPY

# EXHIBIT A

**See Master Exhibit H**

NOT A CERTIFIED COPY



Eli M Blatt
18117 Biscayne Blvd PMB 61473
Miami, FL 33160
415-341-6258

To Whom it May Concern,

The following details what I allege to be criminal actions by Marc Goldner ("Goldner"). Specifically, I believe Goldner to have committed breaches of Florida §836.10, §836.05, §815.06, §843.08, §934.03, and SB 1798.

**Summary of the Breaches**

Beginning in late 2021, Goldner began pressuring me to sign an interest waiver agreement ("Interest Waiver") with a creditor of one of our companies, Megacap Capital, LLC ("Megacap"). The Interest Waiver would waive Megacap's ability to repay a note from the creditor in shares of the portfolio-company the note proceeds were used to purchase in exchange for a waiver of accruing further interest. I did not want to sign the interest waiver and rather to simply repay in shares, as I did not feel the risk of potentially waiving our ability to repay in shares and thus potentially defaulting was worth the interest we could save. In a separate matter unrelated to Megacap, I served Goldner a civil theft demand letter, notifying him that I intended to file a lawsuit if he did not return funds he had appropriated from me. Rather than accept my decision regarding the interest waiver or respond in a legitimate, civil manner to the civil theft demand, Goldner:

1. Did "transmit, or procure the sending, posting, or transmission of, a writing or other record, including an electronic record, in any manner in which it may be viewed by another person, when in such writing or record the person makes a threat to: (a) Kill or to do bodily harm to another person" by repeatedly transmitting in writing threats to me and my family's lives. This is a breach of §836.10.

2. "By a written or printed communication… maliciously threaten[ed] an injury" to me "with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will" by transmitting threats against my life if I did not cooperate in signing the interest waiver from which he stood to gain financially. This is a breach of §836.05.

3. Acknowledged previously having "Accesse[d] or cause[d] to be accessed any computer, computer system, computer network, or electronic device with knowledge that such access is unauthorized or the manner of use exceeds authorization." This is a breach of §815.06.

4. "By a written or printed communication, maliciously" threatened "to expose any secret affecting" me and "to accuse [me] of any crime or offense" "with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will" by threatening to disclose confidential information gained via unauthorized access to a computer to Defendants in civil cases I have filed in Florida if I did not cooperate in signing the interest waiver from which he stood to gain financially. This is a breach of §836.05.

5. "Endeavor[ing] to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection" by admitting to

both me and my fiance to making unauthorized recordings of us in our Miami home and threatening to disclose those recordings if we did not acquiesce to his demands and threats. This is a breach of §934.03.

6. "By a written or printed communication… maliciously threaten[ed] … the reputation of another" and "maliciously threaten[ed] to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will" by making threats against both me and my fiance to release embarrassing audio and video he recorded without consent in order to expose us to disgrace, damage our reputations, and disparage my fiance as being unchaste if I did not stand down in my legal attempts to recoup money appropriated from me which I had commenced by serving a civil theft demand letter, which would benefit him financially if I did back down. This is a breach of §836.05

7. Committed "violations relating to sexual cyberharassment" by "committing theft of sexually explicit images with the intent to promote such images" without my consent. This is a breach of SB 1798.

All of these actions were done after Goldner had repeatedly claimed to be affiliated with unnamed security agencies, which he first claimed in November, 2021, using his alleged academic credentials as an alleged student at Columbia's School of International and Public Affairs to bolster his claims. This is a breach of §843.08.

## Jurisdiction

I am a US Citizen and Miami-Dade resident. The suspect, Goldner is, by information and belief, a US Citizen and New York or Connecticut resident (he has illegally failed to update his address on his license and has also illegally registered his car to a UPS mailbox in Connecticut in order to avoid process servers). He has claimed on numerous occasions to be some form of operative for unnamed US security or intelligence agencies with connections to terrorists and criminals, though I believe these claims to be fabrications designed to aid him in securing influence over me. These representations, if false, are criminal offenses, as well as material facts in the context of his transmitted threats.

While Goldner's location when he committed these crimes is unknown, they were all:
1. committed while I was in Florida or else traveling while a Florida resident;
2. involve recordings made and files downloaded without permission while I was in Florida;
3. relate to an agreement involving a promissory note clearly marked with Miami, Dade as the location for the agreement; and
4. relate to companies
   a. whose operating agreements I executed while I was in Florida,
   b. which have had offices in Florida,
   c. for which Goldner personally carried on business in Florida,
   d. for which Goldner personally solicited service activities in Florida on multiple occasions.

As such, given that the crimes are all electronic in nature and Goldner's location at the time they were committed is unknown, Florida has jurisdiction over these crimes as a result of:
1. my physical presence in the state while the crimes were committed at the time they were committed;
2. the agreements in question being signed in and/or marked in the dateline as being in Florida;

3. my residency in Florida while temporarily traveling for crimes that were committed electronically from an unknown location; and

4. numerous provisions of Florida's long-arm statutes §48.193.

## Factual Allegations

1. Beginning in November of 2021, Goldner began making claims that he was a "Spy" for an unnamed federal agency investigating Anonymous and trying to save the world from terrorists.

    a. He made these claims both to me and my Fiance numerous times, as well as in the presence of other people, while we and/or he were in the state of Florida.

    b. He referenced these claims in an Operating Agreement for Goldner Blatt Investments, LLC by referencing his connections to "Intelligence, Espionage, Contractor, and Security contacts that either Marc knew before or will meet after the signing of this Agreement. Under no circumstance will any intelligence agents be disclosed to Eli Blatt by Marc Goldner, nor will any military (either public or private), spies, intelligence agents, military contractors" and that "Marc may conduct business- like activities for the sake of national security, by any direct government orders and/or mandates, or for any missions by any given contractor or intelligence agency". (**Exhibit A**).

    c. Goldner was intentionally vague about the exact nature of his work, though he spoke about the activities frequently, and his supposed role as a Spy eventually became known as his "Extra Curricular Activities", or "ECAs"; he has frequently bragged about how he employs vagueness in his writing in order to get away with things, which I believe includes his claims regarding his ECAs, for which there is no evidence (**Exhibit B**).

    d. These claims were in fact simply used to gain influence over me, and they also amplified the gravity of subsequent threats he made against me.

2. Beginning on a Zoom call on December 6, 2022, while I was temporarily in Philadelphia and Goldner's location was unknown, Goldner conveyed to me that supposedly me and my family's lives were in danger if we did not sign the Interest Waiver Agreement he had been pressuring me to sign.

    a. He attributed these threats to one of the Members of the creditor but refused to provide evidence of the threats.

    b. I told him to refrain from further communication of threats to me and to advise the creditor that if he wanted to threaten me to do so directly.

3. On January 26, 2023, while I was in Florida, after I had blocked him as a result of his ongoing threats, Goldner started a group chat with my mother included, with the intent of forcing an in-person meeting to further pressure me to sign the Interest Waiver agreement.

    a. In this chat (**Exhibit C**), again without providing any evidence to substantiate his transmitted threats, he referenced:

        i. "safety"

        ii. "safety risk",

        iii. "family's lives at risk"

        iv. "I don't think you understand what they will do to us. Do you think this is some kind of fucking game?"

        v. "Very scary situation"

    b. I responded: "I will not stand for any more of these threats to my safety. If you persist, you will force me to file a restraining order against you, because you are legitimately giving me cause to fear for my safety".

    c. Despite my clear warning, Goldner followed up on the same chat the next day attempting to ascertain my whereabouts and force a meeting

4. On March 18, 2023, on a WhatsApp chat, Goldner once again transmitted from an unknown location threats against my safety in regards to the Interest Waiver Agreement he was pressuring me to sign. In this chat, the following exchange took place (**Exhibit D**):

    a. Me, regarding the alleged threat, which: "With all due respect, Marc, I do not trust you and I do not take any of that at face value… the threats are not credible… but I'm none the less having to take a [sic] face value "

    b. Goldner: "you can get fucked to hell brotha"

    c. Goldner: "what do you think they're going to do to us if we repay in shares"

5. In a March 23, 2023 email to me (**Exhibit E**), in reference to his threats surrounding the Interest Waiver Agreement, Goldner states: "I do not give a flying fuck if you believe it's real or not. You need to come to terms that nothing is going to proceed until we're on the same page and that our lives aren't [sic] at risk because of your inaction and disappearance".

6. On April 4, 2023 (**Exhibit F**), in response to two follow up emails that day pressing me to sign the Interest Waiver Agreement, I told Respondent:

    a. "I am not going to commit fraud against [the Creditor], which is what you are urging me to do, by signing a document that you have already acknowledged, and I have already states [sic] would not be not valid due to the duress that you have placed me under… I am hereby again instructing you in no uncertain terms stop contacting me. I deem your continued aggressive and persistent messages to be harassment on matters I have already told you where I stand and for which your main purpose is to force me into doing things you want me to do by placing me under emotional distress. You sent me at least five long harassing and threatening messages on Sunday alone."

7. In an April 19, 2023 follow up on the same email thread (**Exhibit G**) , Goldner escalated his threats further to include direct blackmail and extortion threats against me involving files that, on information and belief, he downloaded from my Google Drive server shared with him on a temporary basis without notice or consent while I was in Florida, from where the files were shared..

    a. In the email, addressed to me, on which he copied my assistant, he states (referring to me in the third person): "I would assume the K4B.zip (K4B Litigation-20211208T040808Z-001.zip) that he sent me is also 'not confidential information' and that he has no problem with me contacting Craig, Flash, and all other parties".

    b. On information and belief, the files Goldner here references were **not** sent to him by me; they were shared with him via a Google Drive folder I shared with him to provide online access for the purpose of him providing me feedback (Goldner claims to be a Law School student) and help referring a lawyer in regards to one then-active lawsuit and two being then contemplated which have now been filed.

    c. As a result, Goldner here acknowledges exceeding authorized access to a computer nearly 1.5 years ago by downloading local copies without consent or notice, apparently in a pre-planned effort to secure information he could potentially use in the future to blackmail me, which he has now resorted to.

    d. The 'Craig' and 'Flash' parties he references are two Defendants in three different lawsuits that I have brought in Florida in cases that have absolutely nothing to do with Goldner in any way.

        i. He merely read some of my notes to refer an attorney – and then apparently made local copies of the entire folder and all files without permission which he is now using to threaten my financial interests in those cases – which involve millions of dollars in actual damages – by threatening to share them with the Defendants.

        ii. Note also that I have confidentiality agreements in place with Goldner, and some of the files he stole contain personally identifying information such as merchant data which are absolutely bound by confidentiality agreements.

    e. Regardless of how the files were obtained, Goldner's use thereof was clear extortion under Florida law.

8. Subsequent to these threats made to my life, on April 21, 2023, Goldner began writing messages in a group chat with me and my assistant (**Exhibit H**) acknowledging that he was intentionally trying to paint us as being in conflict with the creditor and and designed to suggest that I am maintaining positions against the creditor's interests, which gave me the impression that he was potentially trying to set me up with the creditor to make me the target of its Member's alleged threats – or at least to induce me to believe that while painting me as the bad guy with the creditor.

9. After receiving a civil theft demand letter from me on April 30, 2023 for $422,148.55 relating to a separate matter unrelated to Megacap, Goldner threatened in writing on May 4, 2023 in chats with Limited Partners, Creditors, and contractors of Megacap to "expose the [portfolio-company] employee's name that could [cause the Seller of the share to] revoke the shares. We'd both be bankrupted and you'd be liable for securities fraud for initiating an action on unrelated matters but trying to intertwine Megacap", and thus "having all the hard work we put into Megacap and [the portfolio-company deal] being extinguished" if I did not refrain from pursuing my legitimate and unrelated claims, which would benefit him financially both in terms of his legal costs to defend and the potential judgment against him that would likely follow (**Exhibit I**).

10. On May 4, 2023, Goldner again escalated his threats in response to the demand letter, acknowledging in harassing messages to both me and my fiance having made unauthorized recordings of us while we were in our Miami home that contain sensitive, embarrassing, and compromising information, and threatening to make those public if I did not abandon my efforts in regards to the civil theft demand letter, which would benefit him financially (**Exhibit J**).

11. In a letter dated June 29, Goldner further baselessly threatened to accuse me of committing crimes, including securities fraud and federal felonies, as well as doubling down on his threats to destroy Megacap by needlessly taking actions that would result in redemption of the shares the Company manages on behalf of its Limited Partners, if I didn't withdraw my claims against him, which would benefit him financially (**Exhibit I and Exhibit K**).

12. Goldner made all of these threats after initially stating in an email (**Exhibit L**) to me in May of 2022 while I was in Florida: "You've fucked yourself bro and if you want me as an enemy honestly you're about to see how I can be. I'll make this business the most difficult it can be. You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me." All of the threats and crimes committed outlined herein stem from this initial threat against me made while I was in Florida

In these communications and through his actions, which were transmitted and committed electronically, Goldner clearly breached Florida §836.10, §836.05, §815.06, §843.08, §934.03, and SB 1798 by:

1. Repeatedly transmitting threats against my life with the goal of pressuring me to sign an agreement from which stood to benefit financially. While he claimed the threats were on behalf of a third party, I specifically instructed him to stop making the threats, and that if he continued to do so without providing any evidence of the allegation that the threats were on behalf of a third party, I deemed the threats to be coming from him. This is a breach of §836.10.

2. Making these threats with the intent of getting me to take an action I did not want to take but from which he stood to benefit financially. This is a breach of §836.05.

3. Exceeding his authorized access to my Google Drive folder to download confidential files by making local copies without notice or consent with the explicit purpose of retaining the files for potential future leverage against me. This is a breach of §815.06.

4. Threatening to expose these confidential files to Defendants in three cases I have filed in Florida if I did not agree to sign the agreements he was pressuring me to sign and from which he stood to benefit financially. This is a breach of §836.05.

5. Threatening to destroy my business and damage the interests of the Limited Partners to whom I owe a fiduciary duty if I did not withdraw my claims against him, from which he would benefit financially, a further breach of §836.05.

6. Threatening to accuse me of crimes if I did not withdraw my claims against him, also breach of §836.05.

7. Admitting to making unauthorized recordings of me and my Fiance, in breach of §934.03 and SB 1798, and threatening to make them public in an effort cause us harm if I did not acquiesce to his demands in regards to a civil theft demand, which would benefit him financially if I were to abandon my recovery efforts, in breach of §836.05.

I swear under penalty of perjury that all of the statements above are true to the best of my knowledge and that the attached exhibits are true and correct, unaltered screenshots (with the exception of redaction of confidential or private information not relevant to the factual allegations to which they attest) of the communications described.

Sincerely,

Eli M Blatt

## EXHIBIT A
## GOLDNER CLAIMING TO BE IN INTELLIGENCE



## EXHIBIT B
## GOLDNER IS INTENTIONALLY VAGUE IN HIS DEALINGS



# EXHIBIT C
# THREATENING MESSAGES



**EXHIBIT D**





**EXHIBIT E**

From: **Marc Goldner** | m@megacap.capital                                    Thursday, Mar 23 at 8:28 PM

To: **Eli M Blatt** | team@megacap.capital, **Eli M Blatt** | e@megacap.capital

Eli,

I'll be quite clear because it seems you have a gross misunderstanding of the situation that you've put us all in. At this point, I do not give a flying fuck if you believe it's real or not. You need to come to terms that nothing is going to proceed until we're on the same page and that our lives aren't at risk because of your inaction and disappearance. I will be as clear & concise as possible and maybe you will get it through your thick skull…

**EXHIBIT F**



## EXHIBIT G



> **Marc Goldner**
> I understand that's your perspective. But this is what craig did with K4B according to Eli. Had his assistant do eveyrhting. This isn't cool at all. I've been reviewing the K4B discovery folder and seems this is a repeat pattern behavior Eli has
> 10:05 AM

## EXHIBIT H



NOT A CERTIFIED COPY

**Anthropos x Megacap**
Celina, Lily, Marc, You

Marc Goldner
It's ok. The game of telephone isn't fun  6:52 PM

I need to know what Eli deleted  6:52 PM

Because I coordinate messages between public chat with LP and negotiating with them privately  6:53 PM

And now they won't align  6:53 PM

Fuck  6:53 PM

Celina Moreno
TBH, I have to blame it on you in a sense: you do not execute a plan like this without advising and having an agreement with the other party anyway.  6:53 PM

Marc Goldner
> Celina Moreno
> TBH, I have to blame it on you in a sense: you do not execute a plan like this without advising and having an agreement with the other party anyway.

I told Eli on the zoom call 3 months ago. Everything is discoverable and there must be conflict  6:53 PM

Marc Goldner
I've studied military tactical warfare. Applying to communication methods and negotiation is child's play  6:54 PM

Marc Goldner
If this deal is to be signed there must be conflict: they'll never sign it otherwise  6:55 PM

Marc Goldner
I know what I'm doing. Eli doesn't have 3 hour long calls with these people. I do  6:59 PM

You all must understand: these people don't want to deal with US. They want me to sell and move on. The more Eli and I fight the more they want to sign this deal and not negotiate  7:03 PM

Y did Antonio quit? Bc Eli and I fight. And the list goes on.  7:03 PM

@Eli M Blatt did u delete anything else I missed in my posts that I just reposted  7:04 PM

I'm making sure it all aligns with what else I tell them  7:04 PM



**Marc Goldner**

> **Marc Goldner** 
> @Eli M Blatt did u delete anything else I missed in my posts that I just reposted

?                                                                        7:10 PM

Okay we now have to sit and wait. They need to think I have some control over the situation and brought u to the negotiation table                           7:10 PM

Ur absence for weeks wasn't ideal but I was able to use it to our advantage so let's not fuck up and let's do right by then and get then repaid so I can sell our shares next   7:11 PM

Ok ▇ is waking up let's hope this worked   7:14 PM

@Eli M Blatt maybe throw in a good ol fuck you marc all you're good for is maybe sell if that                                                             7:15 PM

Maybe that's OD idk   7:15 PM

YESTERDAY

**Marc Goldner**
@Eli M Blatt I told them they can't just be direct on ▇ captable that u and ▇ Wont approve it                                                             9:46 AM

I explained that even if I were to help them sell in their own entities they have to setup it'll cost them 50k so it's the same thing as interest waiver and you'll have to give me a waiver to sell for them                                                             9:48 AM

Now let's sit and see if it works   9:48 AM

I also explained that i wanted to be on captable and u refused with me being directly on                                                             10:29 AM



**Marc Goldner**

@Eli M Blatt how much was the ▓▓▓▓ fees for the deal we got ▓? How much would we have been entitled to EXACTLY if he had funded and didn't kill that deal

12:28 AM

I understand your position that those fees should be cancelling out any interest because that's his fault and it cost us the relatiosnhip supplier who won't work with us anymore after so many bids and looking bad totally get ur position thanks

12:29 AM

Ahhhhh I get ur position now so ur saying u redeemed rod bc u thought that ▓▓▓ would continue bringing and referring LPs but that didn't pan out how u expected

12:31 AM



**Celina Moreno**

Hi Marc, as you are well aware Eli has not communicated with you by phone or videoconference since February, and has since recently not been communicating with you directly in any medium. I just confirmed with him that both of the above positions you are attributing to him are false — he has said no such things to you nor does he maintain these positions.

10:51 AM

## EXHIBIT I

approved it' (which she did). The game you're playing here Eli will wind up dragging this into a Federal Court that will have a tortious discovery process that could reveal not just people's names, but has the impact of creating a regulatory securities risk with agencies such as the SEC. I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've 'stolen' your money and tying it back to MegaCap by refusing to operate this business in good faith. Thanks!

7:35 PM

▨ is never working with you again. I can salvage that relationship that you destroyed by dissappearing and you can still get a cut. You are pretending that you haven't seen the Notice I sent weeks ago. Gamesmanship like that won't work, Eli. Do not go to war against an Army -- you will lose and badly. I do not want to have to destroy Emily's career by suing her for tortious interference but you should think VERY carefully if you think it's possible that maybe there are recordings of our conversations out there that you don't want to come to light. I would be very careful with your next moves because you are on thin ice of having all the hard work we put into MegaCap and ▨ being extinguished which neither of us want. Just know that neither of us have ANYTHING to gain by putting this into a public court where ultimately the far reaches of discovery will expose the ▨ employee's name that could revoke the shares. We'd both be bankrupted and you'd be liable for securities fraud for initiating an action on unrelated matters but trying to intertwine MegaCap. Be smart. Everyone know's your not dumb - malicious maybe, but not dumb, Eli.

8:45 PM

**EXHIBIT J**

▨s never working with you again. I can salvage that relationship that you destroyed by dissappearing and you can still get a cut. You are pretending that you haven't seen the Notice I sent weeks ago. Gamesmanship like that won't work, Eli. Do not go to war against an Army -- you will lose and badly. I do not want to have to destroy Emily's career by suing her for tortious interference but you should think VERY carefully if you think it's possible that maybe there are recordings of our conversations out there that you don't want to come to light. I would be very careful with your next moves because you are on thin ice of having all the hard work we put into MegaCap and ▨ being extinguished which neither of us want. Just know that neither of us have ANYTHING to gain by putting this into a public court where ultimately the far reaches of discovery will expose the ▨ employee's name that could revoke the shares. We'd both be bankrupted and you'd be liable for securities fraud for initiating an action on unrelated matters but trying to intertwine MegaCap. Be smart. Everyone know's your not dumb - malicious maybe, but not dumb, Eli.

8:45 PM

↱ Forwarded

Eli the more I think about it, do you really want the world to know in a public complaint that your unfaithful fiancé came to my room in Dubai to seduce me? That she's told me



**EXHIBIT K**

makes Michael Elkins an accomplice to your illegal actions and crimes. I strongly suggest that you immediately reinstate me, otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved.

I want to state one more thing: regarding your divulgence of any private contracting work that I may have done in the past – if it turns out to be true, as you allege, that I am involved in 'spy activities,' you may be tried for charges relating to the breaching of 50 U.S.C. 421, potentially punishable by a prison sentence for divulgence of my identity and putting my family's life at risk. (As an aside, it is extremely important to remember that I possess the name (as do you) of the ⬜⬜⬜⬜ employee that is part of the ⬜⬜⬜⬜ employee forward contract - (his name in case you didn't read the documents is ⬜⬜⬜⬜). You cannot just file a court complaint in the public record to attempt to coerce me to settle on your demands by hanging my life and my family's lives in the balance alleging that I was a "spy". Further, it is egregious that ANY attorney put their name on a complaint in which stated anything about me being a "spy" – your counsel, whoever they may be, should be ashamed of themselves for potentially putting a patriot's life at risk and may also be liable for aiding in your illegal actions relating to 50 U.S.C. 421. To note, though,

or proceeds from ⬛⬛⬛ or ⬛⬛⬛ without my signed authorization. At this point, you are right about one thing: I am protecting you from yourself because I need to protect ALL entities and LPs – including myself from your illicit and illegal actions, including, but limited to, upon information and belief, committing ACH and Bank Fraud. I'm willing to look past everything that you've done up until this point, so please don't let me down. I hope to hear back from you soon and that we can work through this productively.

Eli, if this were a game of chess, you've been checkmated. There is nowhere you can run from the law. And so,

## EXHIBIT L

On Jun 19, 2022, 1:09 PM -0400, Marc Goldner <marc@gb.investments>, wrote:
You're brain dead. I am not going to sell my crypto or use every dollar I have to cover you defaulting when this is how you're acting. You've fucked yourself bro and if you want me as an enemy honestly you're about to see how I can be.

I'll make this business the most difficult it can be.

You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me.



EXHIBIT C

Marc J. Goldner
Founding Managing Part█████
MegaCap Capital & Mega█████
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Dearest █████

I write this to you on the ev█████████████████████ed w███nix of emotions ranging from pure joy, to feeling a moment of great succe███ yet I write this to you with a mix of sorrow, sadness, and apology.

My entire life, I've always wanted to lead with the bad and end with the good, but this letter will be a little bit different. Each and every one of us should be celebrating this momentous occasion of ████████ 's FDA approval. Since I was a kid, I have always dreamed of what a world could look like with n████████ ████████, and tonight is a night where I am seeing right before my eyes a lot of this come to fruition. Admittedly, back in my younger elementary days, some kids would poke fun and think a lot of what I was talking about was just science fiction – I'd always rebut that it's just science that hasn't been discovered yet. But in life, there is a balance, and with everything that is good, there is always something that comes right back to bite you.

To rip the Band-Aid off, I have a fiduciary duty to tell you that I no longer believe our investment in ████ is safe anymore. Eli Blatt has illegally, improperly, and invalidly attempted to withdraw me from MegaCap, and redeem a significant portion of my rightful equity for $1.70 – yes one dollar and seventy cents, I understand how crazy it sounds but it's true. Eli's bad faith and malicious actions, I believe, have been orchestrated since the very beginning. Upon information and belief, he first registered MegaCap as a single member LLC, he then puppeteered me to redeem Roderyck Reiter, (the other rightful general partner), and now finally, to execute Eli's grand plan, he cut off my email access, restricted my banking access, removed my permissions from Flow, and has begun removing me from communication channels with people affiliated with MegaCap. He has now removed me from access to our bank at First Republic, and it is upon my information and belief, from what I have seen, that Eli may have committed bank fraud.

Eli has lied to the seller whom we acquired ████ from and told them that I stepped down from MegaCap 'due to my legal studies and retained my economic interests'. Eli's claim that I stepped down from MegaCap is patently false. He also failed to mention to the seller of his malicious plan to redeem me days later after speaking with her. His unilateral attempted withdrawal letter and ridiculous redemption notice are illegal and invalid, however, Eli is right about one thing – I will maintain my economic interest in MegaCap and I will stand by each and every one of you until you get your rightful shares of ████

This SPV of ████ has become more than just an investment. It is a vehicle into the future that many of us hope to see in our lifetimes. Along this ride, each and every one of you have made this dream a reality. Some of us have budding relationships, others I've known for over a decade, some of you are my best friends that I've traveled the world with, others I've grown up throughout my adult life and been through thick and thin. But one thing I believe is consistent amongst all of us – you all believed in the vision I had for ████, and you believed in me and in what I promised I could achieve at MegaCap.

This oversight I had at Eli's ability to manipulate and deceive I'm sorry for, but there's one thing that Eli just must not know about me – I am a fighter and I am not going to let Eli get away with this. I will not stop until corrective legal measures are taken, and Eli faces the appropriate legal consequences for his illegal, malicious, and unethical actions that have potentially harmed each and every one of you.



Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Eli said to me in an email a[...]                                                                  [...]ween us to be confidential
besides our MC share price[...]                                                                     [...]nation to our businesses
[…]" The only thing Eli care[...]                          [...]t is my [...]le hearted belief. It is with
a heavy heart that someone I once viewed as a big brother could turn on me and villainize me in the way he
has.

I have come to believe that Eli doesn't care about anyone but himself, most certainly upon my own belief, he
doesn't care about anyone's privacy (shown by his actions in exposing private individuals in a very public way), and
I believe all he cares about is his own self-interested gain. Eli has attempted to tell one of MegaCap's capital
partner's to have me continuing to sell for MegaCap and that he would issue me a side letter. Eli has the actual
audacity to not just illegally attempt to withdraw me, but he has the gumption to send me an invalid and illegal
redemption notice for a significant percent of my equity for once again $1.70. That is the kind of person Eli
Blatt is. He acts like a know-it-all 'hot shot' who thinks he is above the law and tries to bypass securities laws by
having me do the hard work of MegaCap and sell for him through a 'side letter' when he knows full well that I'd
be acting as an unregistered broker dealer which I refuse to do under any circumstances.

In my earnest opinion, I believe Eli acts like this pseudo professional know-it-all PhD who only cares about his
reputation and how he appears to others because of what I believe are his own insecurities. If Eli thinks for
one moment that I won't expose his true nature to the world, he is grossly mistaken – all of this is what you as
LPs will uncover through the internal workings of what has gone on at MegaCap and what Rod and I had tried
to manage behind the scenes for several years. Eli thought I would just lay down here and die while he basks
in some type of glory and victory that is, unfortunately for him, short lived. Eli has a habit of underestimating
people around him, because he's grown up smarter than most people around him (I'll give him that), he thinks
that he could take advantage of anyone he sees he could make a profit off of – he betrayed his best friend, Rod,
of 40+ years since they were kids by throwing his oldest childhood friend to the curb when Rod just had his first
kid, a beautiful baby girl named Celeste.

In truth, I'm not angry at Eli. I'm not mad. If anything, I'm sad and devastated, in fact, and I pity him. I pity
his loneliness that all he feels he has in this world is to take his partners equity – two of his partners, in fact,
that helped build this company into what it is today – to have to post on social media and then lie to an LP
that he was in 'hiding' because of me. If that's the type of person you want leading your investment into the
future, then I just ask that you take a step back and consider the alternatives and take a moment to see Eli for
who he truly is. All I'd ask before you would make that decision is to reconsider and really think about who Eli
Blatt is under the surface of who he pretends to portray himself to be and if that is the person that you feel
comfortable with to safeguard your investment with MegaCap in ✕✕✕✕ then at the very least let us please
have a talk about a path forward. People wear many masks in life, but under Eli's crafted face is a grotesque
caricature of a very sad, pathetic, and lonely man who needs true help.

I have a duty to further disclose the following to you. When I spoke with the seller, where we acquired the
✕✕✕✕ derivative equity from, she informed me that, if legal action is potentially taken that would harm her,
she would redeem MegaCap at a price of about $35 a share. Although they claim they can and will do this, I do
not know if they have the legal ability to do so – it seems quite 'out there' so I am less inclined to take that as a
credible threat. She also claimed that she would not release shares or cash to MegaCap with just Eli's signature

Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466



6/2/2023

and she would require min[...]get involved and step in then that would be a differ[...]s situation. So, knowing that brings a slight bright s[...]to take[...] shares right off the bat of most of the LPs to my understanding. There are potential legal maneuvers that Eli can attempt to do but it is hard to ascertain the full extent of his plan at this point, but I will continue to keep all LPs and relevant parties informed as I discover new information.

I am currently exploring all potential legal actions to take against Eli, including filing an injunction, suing Eli for breach of fiduciary duty, amongst other things, and possibly organizing a class of Limited Partners to sue Eli and MegaCap in order to ensure the safety of each and every one of the shares. Again, to reiterate, I will NOT allow Eli to pursue his illegal activities that I believe has permanently damaged the brand and goodwill associated with MegaCap that I've helped to create over the last several years. Each of you has placed your trust in me to help guide this vehicle to a safe exit. Along the way, there are often bumps in the road to be expected – unfortunately, this is one of those speed bumps.

Eli hasn't just tried to take away my equity, or shares, or manager and member status, but Eli has attempted to taint and destroy my dreams and ambition. Admittedly, over the past several weeks it's been extremely hard to cope with and I had to look inside myself and ask if I was prepared to fight for what I believe in, and the answer every single time was a resounding "YES!" I am not going to let Eli destroy the vision that this little boy in me had 20 years ago on what the world could be. This investment for me was not just about money – I truly believe that being able to wield a degree of influence by being part of technological history is a moral and ethical duty that those of us that think we know what will happen, will be able to aid in what will happen and prevent the worst from occurring. I won't just stand by idly to see, not just my hopes and dreams destroyed, but to see the potential risk that each of you could face if I am not there to help protect you. I've realized a lot from this, it is really hard to extinguish a flame that burns within when you truly believe in something. Embers can sometimes flicker, but when you're able to maintain a steady internal peace within, you are able to allow that flame to stay ignited unwavering. That clear mindset is what I know I can bring to the table as I am prepared for the long bumpy road ahead.

It's unfortunate that Eli is conflating non-MegaCap matters and issues with unrelated businesses and attempting to try to use that as leverage to "oust" me - this is never going to work. Eli has already attempted to claim that I am extorting him (which I have proof that I never did) and that I owe him large sums of money – which is also patently false. Eli has attempted to use unrelated matters in which I failed to fund a roughly 40% factory deposit for Bitcoin Miners and wound up defaulting, and that he failed to provide me agreed upon investments, as well as failed to wire me money for NFTs in which I helped advance the money for over a year (along with his refusal to sign fund documents when we took money from LPs). Eli has attempted to claim that he was under 'duress' as he was traveling across the world in beautiful getaways while him and his fiancé posted pictures on social media (someone 'afraid for their life' doesn't give away their location for the world to see). Eli left me to attend to most MegaCap matters and said he was blocking me from all communication channels (and archiving our chats) and would only respond to 'tax-related matters' ("I have reached the end of my ability to continue working with you on anything but legally-required tax matters based on your continued insistence on withholding the miners from me [….] It's honestly a shame that you're willing to sacrifice our potentially still productive continued partnership around Megacap on more than just taxes […]" – when the reality is that



Marc J. Goldner
Founding Managing Part...
MegaCap Capital & Mega...
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Eli never paid me for these ... ... d coerce me by hanging MegaCap and its Limited P... ...perate – this level of toxicity became unmanage... ...heir own. At the end of the day, I'm not some greedy money hungry Wall Street-esque guy that needs to live in a $1M+ condo in Miami or feel that I need validation from others by going to exclusive clubs or yacht parties – I've always enjoyed a more low-key lifestyle in a small apartment without the bells and whistles of gaudiness. I hope that's relatable to some of you and it gives everyone a closer microscope into who I really am underneath.

Throughout this semester in Law School, I was working my best on managing this as my full-time focus. Look, those of you that know me know that I joke that "I'm a simple guy living in a complex world." I live with my partner, we have two puppies, Lucky and Lady, and I'm happy just watching a cool movie once ever few months like the newest Mario movie which was a real treat and nostalgic trip from childhood. I believe most, if not all, of you know that I love to study and focus on learning on a daily basis – currently I'm wrapping up my Law Degree (I have about 1-2 semesters left of academic study). Eli has tried to weaponize my studies against me claiming to others that I stepped down for my studies and that I said I would defer to propel our businesses (which I did defer Law School for over a year). Eli has created a fictious narrative against me which is easily able to be dispelled and will be in due time.

Eli also fails to mention that some of the previous speed bumps was when I legitimately was threatened which I have documented and can prove. Out of fear, I conveyed this to Eli, and he knows I possess the screenshots and a signed affidavit from the individual who threatened me. All I had tried to do was warn and protect someone who I thought was one of my closest friends who instead took these messages and tried to turn them against me which is so sad. Under no circumstances have I ever threatened Eli, nor have I extorted Eli as he has illicitly claimed in bad faith. I will do everything that I legally can to clear up all of these false accusations.

I want to assure everyone that I believe that I have all of the contractual agreements necessary to achieve a legal victory against Eli and to reclaim control over my rightful position at MegaCap.

I am willing to share anything that I can with each and every one of you at a moment's notice, yet I don't want any of you to walk away from this reading this letter in fear that your investment is at risk, though that unfortunately will always remain a possibility until we can safely and successful exit this SPV. I know I can never guarantee or promise that everything will be perfectly fine and safe, but I promise that I will do the very best I can to help all of us. One option that I am continuing to explore is having MegaCap put into receivership with the SEC – a type of action like this will ensure that authorities will oversee MegaCap through ✕✕✕✕✕'s IPO. The safety of your investments is something that I'm not taking lightly. Some of you are the hardest working people I've ever met, and again you trusted me with your money on a belief and vision that I shared with all of you. With that trust, came not just a trust in me but a trust in MegaCap. I had pumped my life savings into my business ventures with Eli which has left me in the wake of true financial destruction & unimaginable hardships due to Eli's negligence, malicious illegal actions, and reckless behavior that I now truly believe was part of his 'plan'. Fact of the matter is, I trusted Eli, I believed in what we could do together – I believed he was my best friend, and now I feel betrayed. I never could have imagined how cold, calculating, and conniving Eli could have been. This was the guy who we shared some of the most intimate personal things going on in our lives, he is the guy who I forgave after his 'fiancé' stole documents from one of our companies and had reached out to at



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

6/2/2023

least one known prospecti                                                                                                    'd be the godfather of each other's kids, and the guy w                                                                   situation has become such a sad and demoralizi                                                    the co          e to write all of this without admittedly having an emotional breakdown here and there to be so openly vulnerable. I maybe am a bit naïve, but I still deep down, feel that Eli's personal demons and internal struggles have gotten the better of him and that this is just a temporary lapse in judgement, and he'll eventually come around. This isn't the guy that I would spend hundreds of hours with during class or share in meals while we'd talk about our plans for the future in our underwear. Whoever replaced Eli with what he's become makes me feel like this is sometimes part of a sick elaborate joke – but then I get grounded back into reality.

Eli can claim all he wants that he is the "initial founder" of MegaCap but Rod and I know the truth. Rod is the one that came up with this visionary-esque idea of starting a business centered around Pre-IPOs and Unicorns. It was Rod who introduced us to the intermediary for ╳╳╳ (one of our first deals), and we also know that the very first thing I said to that intermediary is, quote, "After we close this, we need to find a way to get into the                     !" That mention of                     was the first ever mention of                     at MegaCap to my recollection – although, I had been talking about this for years, even at my GEMBA prior to Eli joining. Eli saw me as someone he could exploit – it was hard hearing from some of my classmates that he never cared about me. He came into TRIUM, into a program where I was very active and ultimately became the Academic Class Representative, and saw in me a network that he could exploit not just through the relationships I had formed in academia but the friends I've made along the way through my life.

It wasn't Eli who grew up falling in love with movies like *The Matrix* or *Total Recall*, or taking the time to spend thousands upon thousands of hours trying to create content, designing games (or just playing my favorite Nintendo games that would transport me to other imaginative worlds as a kid), or researching the future of                     (and how the world we know today will be a thing of the past). It wasn't Eli who did all of that. And it's not to say that I'm the smartest person in the room, nor the most educated, but I did and I still do have a vision for that future. I've always considered myself a futurist, I always have considered myself out of place with current times, whether it was reading science fiction, or hanging out with my parents' friends instead of people my own age, I've always had a firm grasp on what the future holds, and the repercussions society may face as we move forward. One of the first papers I wrote in college was titled "Robotic Rights" (in a class centered around The Twilight Zone no less!) – now we don't seem that far off with the rise of Artificial Intelligence and integration of robotics into nearly everyday life.

All of this is one of the reasons why I've been working on starting a think tank and a fund, called The Neuralverse – over the last several years going on in the background. One of my goals in life is to invest in this entire space, the ecosystem itself, outside of just                     and to help steer the world and prepare society for the next evolution that the fifth industrial revolution will bring. Each and every one of you that invested in                     and are here today, you too have a future in all of this. You didn't just believe in a wild idea of what                     could create, or what I was able to pitch and explain to each of you. This wasn't just about a good price on a deal or making a potential 100x return (that could go to $0 – but hopefully not!), but you're a special type of person too.

You invested in something that you knew would be a decade away from ever seeing the light of day. You had a risk tolerance to believe that a government's regulatory body would approve

Marc J. Goldner
Founding Managing Part███
MegaCap Capital & Mega████
Marc@GB.Investments
+1.516.984.1466

6/2/2023

███████. You saw th████          ████████████████████████. Deep down, you all know that one day ████          ████████████████ns that we're using to today will be replaced with██          ██████████████████████, where the ████████, where ████████████          ████, and that's a future that you all want to be a part of. This investment isn't just about money, but about what you each see the world could be, and for that, I want to thank each and every one of you for believing in me and seeing the same future, and being able to hang on tight through all these speed bumps that I hope will flatten out.

As many of you know me, I do believe that I am a genuine person. Maybe not perceived to be the nicest all the time, yet I will always speak my mind and tell the truth, and there's one truth that I know will eventually get back to Eli and it's something you all should know – I will not pull any punches when going to spar with Eli in a court of law and I will not stop until justice is served. Eli will get what he truly does deserve and I will always stand up for what I believe in and what I know is the right thing to do.

We hopefully will get through all of this together. All that I ask is if you can please ask Eli to reinstate me without me having to escalate this any further by bringing legal action against Eli and MegaCap. In the meantime, I will focus my efforts on attempting to resolve things on the backend with Flow, the bank, the accountants, and any other relevant parties of this situation, and doing my best to freeze Eli's illegal action and rampage. I believe there's still time to correct this issue and try to just move on from this. ████████ is just one of many companies that we can all be a part of and I don't want it to be the last.

If Eli fails to reinstate me, I would like all of you to join me as a class in suing MegaCap and Eli to ensure that our interests in ██████ are safely secured. I'm sorry if any of you feel that I failed you. All I can do is apologize and try to make this right. I will be available to speak with anyone at any time – you all have my number, but just as a reminder it's +1-(516)-984-1466 and if you want to reach me by email, you can contact me at Marc@GB.Investments so please, don't hesitate to pick up the phone to give me a call. Don't be afraid to ask me any of the hard questions. I'm not going anywhere, and I will do my very best to do everything that I possibly can to make this right for each and every Limited Partner of MegaCap.

Thank you again for believing in me and giving me this opportunity to try and fix this disastrous situation.

With Love and Apologies,

*Marc Goldner*

Marc Goldner

P.S. Oh! And one more thing…

When I first started on my creative journey, I once authored a story called The Forgotten Adventures Of The Lost Toys. Look, I'm not some big wig finance guy, I may not be the smartest person in the room, nor the most educated as I said before, but I would like to think I'm creative and one of the most passionate people you will ever meet in your life. When I set my mind to something – I chase it with all my might. Something my Mom has



Marc J. Goldner
Founding Managing Part...
MegaCap Capital & Mega...
Marc@GB.Investments
+1.516.984.1466

6/2/2023

instilled in me since I'm a li... ...y least you'll land on the
moon or maybe it's a cloud... ...ithout hope that all the
hard work will pay off. We a...

I took this time of adversity to power through creatively and create a new logo for MegaCap that I believe is
representative of what is going on as we speak – that life itself is a journey…a winding road… a path that we all
find ourselves on. We're all on this adventure together and we have no way to know what curveballs life will be
throwing at us, but we have to each power through and find it within ourselves to keep on pushing forward!

What this whole thing has made me realize is to not just remember what is important but to never forget
where your passions and loves lay within. For we will never know what tomorrow holds for all of us, but we can
always try to remember to not forget what our dreams are today. All of us had that favorite toy growing up, we
had dreams, some of us chased those ambitions, while others will hopefully rediscover them later in life. But,
one thing is for sure, all those dreams, our memories, they have a life of their own and it is up to us to revitalize
those passions and always remember to stay faithful to who we really are within and deep down inside. Thank
you again for taking the time to take this journey with me – I can promise you at least one thing, it will never be
taken even remotely lightly and it will not be forgotten!



The Forgotten Adventures Of The Lost Toys © 2023 By: Marc Goldner and Rachel Korsen

"A key just opens a door to somewhere we find out we belong."

Messages with the Creditor Goldner Alleged was Threatening Blatt's Life





Messages with over a dozen Megacap Limited Partners threatened by Goldner









6/4/2023

Hey Eli,

I have heard Marc's side of the story. I'm very stressed and confused with what's going on at MegaCap, can you please tell me what's happening? I would greatly appreciate it

9:00 AM

Hi ✕ So you got Marc's long letter too?  I have a letter from Megacap's lawyer along with an update to address the fears that Marc is intentionally stoking. I am in the countryside for the weekend with very scant reception and that has slowed me down from
Getting the letter out. But I'm hoping it will go out today or at the latest tomorrow. It will go out via Flow. In the meantime, just rest easy. Marc is simply attempting to scare people to try and get his way. But all is well. Stay tuned.

1:58 PM

I actually managed to scrape enough signal to get this done -- so you should have the email in your inbox now from Flow.  Again, I really regret that Marc is so unstable and causing fear to further his own ends, but as I hopefully convey in the letter, in fact all is well.

2:25 PM

Thank you Eli, and yes, I got his letter. Appreciate the reassurance, looking forward to it

4:27 PM

No worries. Rest easy I am at the helm and maintaining a steady course.

5:15 PM 👍

6/6/2023

Hey Eli, is there any news with the letter? Thank you

5:13 PM

Did you get it?  It went out to you when I messaged you before.

5:13 PM

Via Flow.

5:14 PM

There's no news besides the letter.

5:14 PM

Oh got it, thank you Eli

5:14 PM

No!

5:14 PM







6/2/2023

howdy Eli. Do you also have a lengthy response to a lengthy claims Marc made about you and MegaCap? thx
3:34 PM

Hey ▨▨ I'm just getting all these messages rolling in.  Can you please send me the letter?
3:38 PM ✓✓

And no, I won't be writing a long rambling response.  Megacap has a lawyer, as Marc should, and they will be sending him a cease and desist as well as drafting a letter for LPs that will hopefully go out through Flow later today.
3:39 PM ✓✓

MC corp.pdf
7 pages · PDF · 2 MB
3:39 PM

Marc is just trying to scare everyone unfortunately.  It's his modus operandi.  I've been dealing with a lot with him...
3:39 PM ✓✓

in a nutshell, what happened between you guys? 3:40 PM

e-Filed Blatt vs. Goldner, et al.pdf
522 pages · PDF · 28 MB
3:40 PM ✓✓

NOT A CERTIFIED COPY



> Wow this letter!! Ha! 3:46 PM

Yeah no kidding 4:05 PM

> He is something else.  I think you can draw your own conclusion from that letter.  No professional would ever write that kind of letter.  Anyway, the Company's lawyer is on it. Everything I did I did to protect the Company. 4:06 PM

> It's been a difficult year for me dealing with him... 4:07 PM

I dealt with him in Module 7 discussion and just totally blocked him 5:28 PM

so no joke 5:28 PM

your story is another level 5:28 PM

> Oh wow, well I'm sorry to hear that 5:28 PM

> Though it's reassuring in a way to know I'm not the only one 5:28 PM

> He is the most disturbed individual I've ever dealt with, and sadly my dealings with him are deep 6:29 PM

> The charm of his "toastersexual" type off-beat persona mask how deeply troubled he actually is 5:29 PM

hahaha 6:30 PM

> The sad part for me is that it's now clear in retrospect that he engaged in a protracted campaign, well before we even started having disputes, to paint me as a bad actor and alienate me from other TRIUMers... and basically he succeeded 5:30 PM

good luck settling all of it man 5:30 PM



otherwise you are ok? 5:30 PM

> Besides the Marc drama yeah I'm overall good, thank you for asking.  Your encouragement/support really means a lot to me. 5:31 PM

NOT A CERTIFIED COPY



June 2, 2023

**VIA FLOW**

RE:     *Megacap Capital, LLC*

Dear Megacap Partner,

I represent Megacap Capital, LLC ("the Company").

I am writing regarding the current operation of the Company. Presently, the Company is operated by Dr. Eli Blatt. Dr. Blatt withdrew Marc Goldner as a Class A voting Member and Manager of the Company.

Any dispute between the Members of the Company is subject to the Company's dispute resolution procedure which calls for private mediation and arbitration. As of the date of this letter, Mr. Goldberg has not taken advantage of this procedure.

Please direct any questions or concerns relating to the Company to Dr. Blatt at team@megacap.capital.

Sincerely,

Michael L. Elkins
melkins@mlelawfirm.com

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Part...
MegaCap Capital & Mega...
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Dear Prospective Limited P...

I hope you have been well. █████████████ .... ██ ...... better news... .. as come to my attention that Eli M. Blatt of MegaCap is attempting to sell 'shares' (and/or derivative equity VIA an employee forward contract) to Prospective LPs, such as yourself, of ████████. I have seen messages that he claims that these are new shares and that "[w]e have secured additional allocation" which is far from the truth. Apparently, Eli is attempting to illegally commandeer MegaCap.

These ████████ shares are a form of derivative equity originating from an Employee Forward Contract that we purchased through a third-party seller. MegaCap has held inventory of interest in a forward contract that it has been trying to sell for roughly a year. These are NOT new shares or derivative equity.

Further, as a Prospective LP I have a fiduciary duty that is created that I must inform you that Eli has illegally, improperly, and invalidly sent me a withdrawal letter from MegaCap. In addition, Eli has attempted to illegally, invalid, and improperly 'redeem' a significant part of my equity (nearly 25%) for $1.70 - yes, that's right one DOLLAR and seventy cents. Truly unimaginable!

I cannot allow you to make this potential investment because I do not believe your money is currently safe at MegaCap. Eli has illegally, invalidly, and improperly removed my access to the MegaCap email address (so there is no "we" as per his solicitation that I've seen), as well as restricted my banking access (which I believe amounts to Bank Fraud), as well as restricted my access to MegaCap's Fund Administrator, Flow. Again, Eli does NOT speak on my behalf, nor can he act on my behalf, nor make any unilateral decisions that are completely unauthorized.

I am currently in the process to initiate a lawsuit in federal court against Eli and MegaCap, as well as preparing to file an injunction against the same parties and potential additional third parties. In full transparency, you should know that I am exploring options such as cooperating with the SEC to place MegaCap into receivership to protect the existing LPs of MegaCap. I may be at the point where I need to include the regulators, and this measure is not being taken lightly.

████████████████████████████████████████████████
interests. Seeing Eli do this just before ████████ achieved ████████ was one of the most gut-wrenching things I've ever witnessed in my life. However, when things like this happen it is important to keep a cool head and pursue the appropriate legal avenues to achieve a remedy that is just and equitable.

I won't talk your ear off, but I will be happy to field any call and discuss this and answer any and all questions you may have. I ask you to please preserve all messages, communications, emails, or otherwise that you receive from Eli Blatt, his 'assistant' Celina, Anthropos, MegaCap, or any seemingly related and/or affiliated entity as they may be relevant to the forthcoming suit which makes the communications discoverable. If you have wired any funds, please advise me immediately and I will do my best to keep you appraised of any communications that I have with the recipient bank of those funds. I am someone who has always put relationships first – and this is one of those times. I will not allow friends and genuinely good people to be taken advantage of unknowingly by someone like Eli. This isn't just about money – this is about ethical principles.



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

6/2/2023

I am sorry to have to bothe⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ hat your funds remain safe and that you do not wire a⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛ such ⬛⬛⬛ re-IPO solicited 'deals' i.e., ⬛⬛⬛⬛⬛⬛⬛⬛⬛, etc.) or subscribe to any MegaCap entities or other entities that may be improperly run by Eli Blatt (without my knowledge). The current operations are without my approval or authorization.

Please do NOT wire funds to MegaCap, any affiliated entities, Eli, his assigns, or any of his affiliated and/or unaffiliated entities until I can fully ascertain the level of damage that Eli has maliciously conducted behind the scenes, and I can ensure your potential future investment would be secured and safely invested. In the event that you did in fact already invest, please thoroughly review the subscription agreement to see if you can immediately request to cancel your subscription and request that your funds could hopefully be returned to your account.

I am doing my best to regain my rightful control of MegaCap to ensure a safe exit of all vehicles and entities in the best interest of all our trusted Limited Partners and their respective funds.

Thank you and I hope to hear from you soon (albeit, under ideally better circumstances). Again, don't hesitate to give me a call – we can still geek and nerd out about the future of ⬛⬛⬛⬛ and the impact it will have on society. It's always good to try and end on a good note. :) Talk soon!

All the best,
Marc Goldner
Founding Managing Partner of MegaCap Capital and MegaCap Funds
+1.516.984.1466
Marc@GB.Investments



Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466

6/7/2023

Ryan & the rest of the team [...]

I am demanding that Flow in[...] backend. I have a right to see all correspondence and t[...] my acc[...] as erroneously removed. It is absolute negligence that you have allowed Eli to remove my access when you know that we are both General Partners. He has no unilateral authority over the accounts. Flow is preventing me from fulfilling my fiduciary duty to Limited Partners and that liability will pass to Flow in the event that the regulators get involved.

To reiterate, Eli does **NOT** have unilateral authority to remove me and restrict my access, and that Flow has allowed him to do this makes Flow liable as well. There is ample enough evidence in the exhibits that show that not only was Flow aware of the issues that have been brewing at MegaCap for months, but that Flow confirmed with Eli that everything must be jointly approved. That you deviated from that initial understanding and agreement is a breach of your various duties to myself.

I would like assurances that until this is resolved that there are no outgoing subscription agreements or documents of any kind, including any tax filings being sent to anyone. This is all to ensure that Eli does not try and double sell any shares, amongst other reasons, as he is clearly not to be trusted to manage any kind of fund. I have been told my numerous Prospective Limited Partners that Eli has been attempting to solicit them ✕✕✕✕. Unfortunately for Eli, these are my contacts from my network that Eli has falsely claimed that I 'deprived' him of and never shared those contacts – yet, he fails to mention that I brought in the majority of the LPs for ✕✕✕✕ through my networking and fundraising activities since the inception of the fund.

Further, I am once again requesting Flow forwards ALL email communications that Flow has had with Eli since early May as I stated in my last message to be sent IMMEDIATELY and then to send me any and all communications with Eli where I was not CC'd prior to May. I have a right to know what he has illegally attempted to tell you to do by changing K1s and attempting to commit tax fraud. There was a full agreement that the terms of our agreement were completed and that "[so] long as the taxable income is just 10% of the total fee then we are good."

Therefore, I would like an immediate breakdown of what Eli, upon information and belief, fraudulently told you to change. For instance, such suspected changes include but are not limited to, 1) if Eli tried to attempt to steal any of my [████] equity, 2) my equity in MCC, 3) misappropriate any carried interest, management fees, shares, or otherwise to himself or MCC.

Your forthcoming transparency is of vital importance, and failure to do so will result in Flow being named as a third-party defendant in the looming lawsuit against MegaCap and Eli.

Thank you once again for your cooperation in this matter.

All the best,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing & General Partner
MegaCap Capital and MegaCap Funds

P.S. To Repeat, Flow has a duty and obligation to send me **ANY** and **ALL** communications Flow has had with Eli since he has attempted to remove me illegally. If you do not provide these communications, I will be filing a suit against Flow and I continue to reserve all rights.



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

6/26/2023

Flow,

It is OUTRAGEOUS that you ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚ preparing the lawsuit and injunction against Eli and MegaCap and you may be a defendant as well. There may be legal ramifications if I discover that you're speaking with Eli or anyone affiliated with MegaCap behind my back. Having Eli or any attorney (i.e., Michael Elkins) breaching his ethical duty is not legal direction or judicial intervention and will not absolve Flow of liability. I have no issue of discussing this matter with the regulators — in fact it will bring Justice to a lot of others to know how you conduct business which is unacceptable at best.

I'm already in possession of letters from Sellers stating that MegaCap and Eli won't be released any shares, proceeds, or any distributions, upon any type of liquidity event relating to those SPVs without my authorization and signed consent. Eli must now understand the repercussions for his actions which may amount to what I believe to be criminal fraud. Flow needs to do the right thing, and require dual authorization on all documents, access, instructions, messaging, and any other actions taken by Flow and on the Flow platform itself.

Thanks,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing & General Partner
MegaCap Capital and MegaCap Funds

P.S. I already possess proof from an LP that Eli is individually targeting LPs with messages through the Flow platform stating misconstrued 'facts' and not sending it to ALL LPs. Flow aiding in Eli's illegal actions may amount to a claim against Flow for tortious interference. Flow will be in the middle of this. I suggest you immediately restrict Eli's sole individual access to Flow and reinstate my access where ALL messaging and actions must be DUAL approved as agreed with Flow in writing. This agreement has been previously shown in the prior attached exhibits. Do not make me ask again or I will take this to the court of public opinion prior to naming Flow in the looming legal proceedings. Once again, take action immediately! This is greatly appreciated.

P.P.S. To reiterate and for avoidance of doubt, Flow can not issue any changes to K1s from the last draft that I had reviewed. If Eli or anyone at MegaCap attempted to 'instruct' to make any changes they are NOT approved and may not be issued. I have been assigned approximately $500,000 (8,217 shares) in this deal and am STILL owed a K1 along with to my knowledge every other Limited Partner.  If any changes are made without my approval, I will hold Flow liable. To be clear, Eli nor MegaCap has any authority to unilaterally change the agreed upon structure, management fees, loans, K1s, or any other financial and tax documents without my signed AND verbal authorization!

# MegaCap Capital Entities

From: **Ryan Nanney** | ryan.nanney@flowinc.com

June 2 at
12:38 AM

To: **marc@gb.investments**, **Eli Blatt** | e@megacap.capital, **Blake Schneider** | blake.schneider@flowinc.com,
**Relationship Management** | rm@flowinc.com

Hi Marc and Eli, over the past few days and weeks, we (Flow) have been getting conflicting stories and demands from each of you.  For this reason, we will not respond to individual emails, or work on the MegaCap portfolio in general, until we receive clear guidance on who legally is in charge for MegaCap Capital.

--

**Ryan Nanney**
Fund Accounting Controller



https://flowinc.com/

NOT A CERTIFIED COPY



June 2, 2023

**<u>VIA EMAIL ONLY</u>**

Ryan Nanney
ryan.nanney@flowinc.com

      RE:   *Megacap Capital, LLC*

Dear Ryan,

      My firm represents Megacap Capital, LLC ("Company"). I do not represent Eli Blatt, individually or Marc Goldner, individually. This is in response to your June 1, 2023, email.

      Eli has withdrawn Marc as a Class A voting Member and as Manager of the Company. Eli is presently managing the Company. The issuance of K1s is a time-sensitive matter. The Company requests that you work with Eli to finalize the K1s.

      The Company has dispute resolution procedures for Eli and Marc to resolve any disputes between them. However, the Company needs to continue functioning and sending the K1s is vital to the Company's continued operation.

      Thank you for your cooperation.

                  Sincerely,

                  Michael L. Elkins
                  melkins@mlelawfirm.com

NOT A CERTIFIED COPY



ONE WEST LAS OLAS BOULEVARD, SUITE 500
FORT LAUDERDALE, FLORIDA 33301

TELEPHONE: 954.525.4100
FACSIMILE: 954.525.4300

Benjamin R. Muschel

muschel@kolawyers.com

June 26, 2023

**VIA EMAIL**                                    *IMMEDIATE ATTENTION REQUIRED*
Flow, Inc.
Attn: Blake Schneider, SVP Operations
Blake.Schneider@flowinc.com

          Re:    *Megacap Capital, LLC*

Dear Mr. Schneider,

**Your immediate attention to this matter is required.** This law firm represents Megacap Capital, LLC (the "Company"), as co-counsel with Michael Elkins, with whom we understand you have corresponded previously. Among other things, our representation is specifically focused on matters involving Marc Goldner's persistent attempts to destabilize the Company.

It is our understanding you have requested more explicit guidance regarding who is in control of the Company and, in the interim, Flow has frozen all work on Company matters. As you can probably appreciate, there are dozens of Limited Partners relying on both Flow and Megacap to ensure both their peace of mind as well as the stable management of their investments, and so we recognize your desire to ensure you are taking the right steps to protect everyone's interests. We are also aware that Mr. Goldner has made numerous threats, not only against Flow, but also against other partners of the Company.

This letter serves to reaffirm what Mr. Elkins has already communicated to you previously, both in writing as well as over the phone, including:

1.  We now represent the Company, along with Mr. Elkins;

2.  Mr. Goldner was withdrawn pursuant to the terms of the Company Operating Agreement (the "Agreement") and is no longer authorized to speak or act on behalf of the Company;

3.  Mr. Goldner is within his rights to challenge his withdrawal from the Company via the dispute resolution terms detailed in the Agreement;

4.  To date, Mr. Goldner has not availed himself of these procedures, opting instead to breach the Agreement further by tortiously interfering with the Company's partners and attempting to cause the Company harm;

000001/01459974_1

MIAMI   -   FORT LAUDERDALE   -   BOCA RATON

June 26, 2023
Page 2

5. In fact, to our knowledge Mr. Goldner has not retained counsel;

6. Mr. Goldner is not authorized to have any access to any Company information or resources; and

7. The Company formally requests that you continue working with Dr. Eli Blatt to finalize the 2021 and 2022 tax reporting, after which the only remaining ongoing engagement between Flow and the Company is the continued use of the software platform.

If you have any questions or require any further information, please contact us immediately. The statements and demands set forth above are made in full reservation of all rights, remedies, and defenses.

Sincerely,

BENJAMIN R. MUSCHEL
For the Firm

CC:    Ryan Nanney
       Relationship Management Team
       Dr. Eli Blatt

# Re: Flow / Mega-Cap - resolution needed by Dec 16

From: **Blake Schneider** | blake.schneider@flowinc.com                                    July 20 at 5:49 AM

To: **Eli M Blatt** | e@megacap.capital

Cc: **Ryan Nanney** | ryan.nanney@flowinc.com, **MegaCap Capital Operations** | ops@megacap.capital, **Benjamin R. Muschel** | muschel@kolawyers.com, **Blake Schneider** | blake.schneider@flow.inc, **Relationship Management** | rm@flowinc.com

Hi Eli,

I would be the first to admit if I or anyone on the Flow team has made a mistake. As humans, we do make mistakes from time to time, and we always own up to them, fix the issue at hand, and learn from the mistake to ensure it does not happen again in the future. However, that is not the case in this instance - far from it.

As discussed in my conversation with your outside counsel, Ben (as well as the other counsel in addition to/before him), Flow will not tolerate unreasonable (not to mention, unprofessional) threats or demands - of which we have received many from MegaCap and its representatives over the past ~10 months. We will always be respectful and professional - and expect the same in return.

As you are well aware, due to MegaCap/its Partners being unable to agree on just about anything related to its investments/entities/filings (at least while Flow was included), Flow suggested strongly that we should part ways. Both you and Marc - despite not agreeing on just about anything material at the time - asked us to help out for a little bit longer. Again, due to the lack of alignment and agreement amongst MegaCap Partners - as well as receiving many contradictory statements regarding how to proceed - Flow has had to spend orders of magnitude more time on MegaCap work than it allocates to each of its clients. Because of that, this is a massively costly arrangement for Flow. Flow would typically charge for all of the extra work/re-work. We have not done so yet, as we just want this to all be over with.

In addition, many members of the Flow team have had to work through mental suffering due to the harassment it has been exposed to at the hands of MegaCap Partners. This is not ok. We will not tolerate any sort of harassment.

I pride myself on being a respectful, professional human who is diligent about getting things done. However, I pride myself more about taking care of people around me, including my team here at Flow. I kindly - but firmly - request that you, as well as any MegaCap representatives, limit communication to Ryan and any other Flow team members to information useful in getting things closed out. Please refrain from any communications that even border on threats or harassment. If you or any other MegaCap representatives would like to discuss anything else, please reach out to me directly.

I am out through this Friday, but would welcome a call anytime next week if you'd like to talk through any of the above or the path forward.

Best,
Blake

# Re: Flow / Mega-Cap - resolution needed by Dec 16

From: **Eli M Blatt** | e@megacap.capital                                                      July 24 at 3:29 PM

To: **Blake Schneider** | blake.schneider@flowinc.com

Cc: **Ryan Nanney** | ryan.nanney@flowinc.com, **MegaCap Capital Operations** | ops@megacap.capital, **Benjamin R. Muschel** | muschel@kolawyers.com, **Blake Schneider** | blake.schneider@flow.inc, **Relationship Management** | rm@flowinc.com

Hi Blake,

Thank you for your thoughtful email.  I appreciate the open line of communication and share your desire for a path forward.

Let me start by saying that I regret that Marc's behavior caused suffering among the Flow team; I certainly know what it feels like to be threatened by Marc, so I am particularly empathetic to that.  To the extent he made any threats towards Flow or its representatives while he represented Megacap, I apologize on behalf of the Company.  I know that if you ask Ryan, Michael, or Haley, they will tell you I have only ever been courteous and professional with the Flow team.

My ask is that you not throw Megacap and its LPs out with Marc's bathwater, especially given that his most recent volley of threats came after he was no longer authorized to speak or act on behalf of the Company.  In the spirit of finding a solution that protects both Flow and Megacap and its LPs, I propose as follows:

1. Megacap will relieve Flow of all of its contractual obligations to complete the 2021 and 2022 reporting, which as I understand is the primary pain point for Flow at this juncture.
   a. Flow's only obligation with respect to reporting going forward would be to provide the Company all past, completed tax and regulatory information, filings, and documents in its possession, as I requested in my prior email.
2. In exchange for the waiver of its reporting obligations, Flow would simply continue to provide access to the platform through each entity's exit:
   a. Existing LPs continue to have access to their accounts, and
   b. Megacap continues to have access to the platform to manage its SPVs and onboard new LPs into Tech I / Tech Holding only – with no reporting obligations – until the exit of each entity.

This compromise limits the scope of Flow's ongoing relationship with Megacap by relieving it of its reporting obligations and the perceived liability from Marc therewith, while ensuring Megacap can continue to manage its responsibilities to its LPs as well as its creditors who are counting on the Company continuing to onboard new investors into Tech I.

Please let me know if this solution is agreeable.  If so, the Company will take over the 2021 amendment process and all subsequent reporting, with access to the Flow platform remaining unchanged until each SPV unwinds.

I'm happy to discuss at your convenience.

Best,

Eli

# Re: Flow / Mega-Cap - resolution needed by Dec 16

From: **Blake Schneider** I blake.schneider@flowinc.com                              July 26 at 2:19 AM

To: **Eli M Blatt** I e@megacap.capital

Cc: **Ryan Nanney** I ryan.nanney@flowinc.com, **MegaCap Capital Operations** I ops@megacap.capital, **Benjamin R. Muschel** I muschel@kolawyers.com, **Relationship Management** I rm@flowinc.com

Hi Eli,

Thank you for your email - I appreciate it.

Regarding your proposal, we are open to it, with the following additions/clarifications:

1) In addition to being relieved of any and all Admin work (financials, tax prep/filings, securities filings, entity maintenance, etc.), we request a release of any and all potential claims through the date of the release. We have never had to ask for such a thing, but given the aforementioned threats by (and seemingly litigious nature of) some MegaCap representatives, this is a must for us.

2) The current contract term runs through March 2024. You and your LPs will continue to have access to the Flow Platform through then. Beyond that and as we get closer to the end of the current term, we can discuss renewal options for whichever entities you would like to remain on the Platform.

As we communicated last year and I mentioned below, ideally, we would fully part ways. Shy of that, we will need the above to feel comfortable moving forward.

Again, I do appreciate your email and look forward to a healthy, professional relationship moving forward.

Best,
Blake

# RE: RE: URGENT Notice - Action REQUIRED! Cease and Desist ALL MegaCap Matters

From: **Rafael Schuck** | rschuck@gcpa.com                                July 3 at 2:36 PM

To: **Eli M Blatt** | e@emb.org

Dear Eli:

I just received this letter from Marc Goldberg.  I am not sure what this means.  However, I don't have the financial ability to hire lawyers and defend anything in a protracted legal battle with Mr. Marc Goldberg,

Therefore, I must refrain from working on any tax work associated with any of the MegaCap entities to avoid any possible legal ramifications until this matter is resolved.

Sincerely, Rafael

Rafael J. Schuck, CPA CGMA

Partner

**R&L SCHUCK – CPAs, LLC**

**Accountants and Finance Consultants**

6710 Main Street Suite 233

Miami Lakes, FL  33014

RSchuck@gcpa.com

T: (305) 362-1040

F: (305) 362-3344

From: **Marc Goldner** | marc@gb.investments        To: **Rafael Schuck** | rschuck@gcpa.com        July 2 at 11:27 PM

Dear Rafael Schuck and Associates of R&L Schuck – CPAs, LLC.,

Please see attached. I am demanding a formal and detailed response by end of business Friday, July 7, 2023.

I highly suggest you inform Eli of the potential ramifications of his conduct, including, possible criminal conduct.

Thank you for your attentiveness to this matter. I hope you enjoy your Fourth of July holiday. Much appreciated!

Cordially,

Marc Goldner

Founding & Managing & General Partner of MegaCap Capital, LLC., MegaCap Funds, LP., and Goldner Blatt Investments, LLC.

This communication and any attachments, is intended for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure or copying is prohibited.  If

Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466



7/2/2023

Dear Rafael Schuck and As

Let me start off by saying h                                                    as transpired, and I'm
extremely skeptical with any and all actions you            ken on MegaCap's behalf, as well as for myself. By now,
you may or may not know, but Eli Blatt has attempted to improperly, invalidly, and illegally withdraw and
redeem me from MegaCap. I want you to understand that Eli's unilateral signature on a piece of paper, without
my consent, authorization, approval, or signature, has no legal bearing and is not binding

I am writing this to inform you that I am in the process of filing an injunction and federal lawsuit against Eli
Blatt, and others, including but not limited to the various MegaCap entities for breach of fiduciary duty, breach
of contract, and bank fraud, amongst several other causes of action and claims for damages that I am entitled
to for Eli's negligent and reckless conduct.

I am informing you and your firm that any and all records pertaining to MegaCap, including but not limited to
any communications and/or records between Eli's assistant, Celina, Loretta Moreno, Eli Blatt, and/or any other
entities including, but not limited to: Anthropos, Wayaca, Myami, BitSource, Goldner Blatt Investments, and
MegaCap must be preserved for discovery purposes and are to be forward to me immediately. In due course,
a subpoena to you and your firm will be issued requesting all documents and records, and you will be subject
to a deposition for any communications you've had with any of the aforementioned parties and your work
thereto.

It is upon my information and belief that you acted improperly, which has exposed you and your firm to
liability for failure to properly handle the MegaCap accounts. I am in the process of reporting Eli and MegaCap
to several federal government agencies and regulators. I bring this up to you because I may be in discussion
shortly with the Internal Revenue Service about how Eli illegally submitted MegaCap as a single member LLC. I
told you NOT to file ANYTHING under a single member LLC and you incorrectly and illegally advised and
misrepresented to me that changing to a multi member LLC could be done after filing. This attestation you've
made is a fraudulent misrepresentation of reality and you will be held liable for any and all damages, even
tangentially related to the situation.

On or about May 4, 2023, Eli illegally removed my access to MegaCap, which is in direct breach of a MegaCap
resolution signed by both of us, dated February 13, 2023 (with an effective date of December 1, 2021).
This resolution stated that, if Eli were to remove my email access, he would be withdrawn from MegaCap.
("Additionally, Eli will make Marc a super-admin with equal administrative privileges as Eli has in the MegaCap
google workspace and any other accounts relating to MegaCap. If Eli fails to complete this within reasonable
time after such filing, or if Marc or Eli uses such privileges to alter Eli's or Marc's privileges, it shall constitute
immediate grounds for involuntary withdrawal from the Company."). If Eli has attempted to portray to you and
your firm that my withdrawal and redemption was consented, I can assure you that it most certainly was NOT.
To reiterate, I will never, under any circumstances, be consenting to a withdrawal and redemption to any equity,
ownership, interest, managerial status, or otherwise in ANY of the MegaCap entities under any circumstances
so let us make sure that is crystal clear.

If Eli has been in communication with you since May 4, 2023, or before, I am requesting that you immediately
forward me these communications and any conversations you've had with Eli on the phone should be
immediately documented, so you won't be 'forgetting anything' when you are deposed in the future.



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

7/2/2023

To reiterate once again, yo[...]ie decision to remove
me from any communicati[...]her entities in question
– thus, please ensure that [...]mail communications
even tangentially related to the previously ment[...]d parties. I will be seeking a ju[...]cial order and decree to
resolve this issue if it is not appropriately and speedily corrected. Once again, your failure to include me in
any and all communications as well as any documentation relating to K1s, tax filings, or any approvals of the
aforementioned will then make you and your associates liable and named as Defendants.

I am informing you that I am not giving any consent, authorization, or approval for **anything** relating to any
MegaCap, or other mentioned entities in this email including but not limited to issuing any K1s relating to
MegaCap and any other entities, filing and/or amending any tax filings relating to MegaCap and any other
entities, and any other business or accounting related services including but not limited to advice relating to
the MegaCap entities and any other entities mentioned herein without my SIGNED written authorization AND
verbal approval. Your failure to abide by this request will create immense liability for you, as I am sure you do
not want to be held liable for tax fraud. At this point, I will put nothing past Eli when, upon suspicion and belief,
he has likely already committed bank fraud and when he has restricted my access to MegaCap bank accounts
including but not limited to the ones held at First Republic. Further, I would like immediate confirmation
that the IRS has approved Form 8832 to make MegaCap a multi member LLC with myself as a Managing
Member. ("Exhibit A") I also want confirmation that this was filed timely, when you said it was going to be
filed. Additionally, I want to know who at your firm allowed Eli to file any of these entities as a single member
LLC. On top of this, I want confirmation in writing that you, your firm, nor Eli have attempted to invalidate the
legally binding and filed Form 8832 sent to the IRS and that the form we filed that was sent to you on or about
February 15, 2023 is deemed completed and accepted by the IRS. I would also like notice written VIA email
if Eli has attempted to circumvent this filing and if he has tried to change it or invalidate the agreed upon
documentation that we worked together on for months.

In addition, I am demanding immediate records of ALL communication, emails, documentation, approvals,
letters, or other with the Internal Revenue Service including but not limited to letters sent relating to MegaCap,
Goldner Blatt Investments, and any other entities mentioned herein.

You will find attached, an email from Flow, MegaCap's Fund Adminstrator, stating, "Hi Marc and Eli, over the
past few days and weeks, we (Flow) have been getting conflicting stories and demands from each of you.  For
this reason, we will not respond to individual emails, **or work on the MegaCap portfolio in general,** until we
receive clear guidance on who legally is in charge for MegaCap Capital." (emphasis/bold added) ("Exhibit B")
Therefore, to be clear, I am informing you that if Eli has attempted to get you or your firm to do his dirty work
and illegally issue K1s that I am not approving you are to cease work immediately and not issue any K1s or file
any tax returns, nor amend any returns, for ANY of the MegaCap entities or others mentioned.

Further, as mentioned to you numerous times, two of which pre-date the actual MegaCap returns from being
filed, is that the address on the returns was INCORRECT. Eli, attempted, to use his address, when we have
agreed in writing to use the 15 Peacock Drive address. This 15 Peacock Address is the same address that Eli
approved to be on MegaCap Form D filings. ("Exhibit C") You claimed that the IRS used to 'reject' the filings, but
this is patently false because upon discovery this new Biscayne address you used was NOT Eli's address used
initially – he had used the 2020 N Bayshore Road address, so the change to 15 Peacock should have been made.
It is your negligent conduct that allowed Eli to attempt to illegally commandeer MegaCap's banks. Just some
of the emails discussing the address issue was on February 14, 2023. Further, in that same thread, I highlighted



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

7/2/2023

and noted several other m                                                   that, "Eli has to sign as the
partnership representative                                              e one that received the
initial letter, so it is right fo                                              il communication, which
is clearly a fraudulent misrepresentation as it wa    ...gaCap who received the lette    ot Eli and I am and have
always been a Founding Managing and General Partner of all MegaCap entities.

I need IMMEDIATE confirmation that you mailed the Form 8832 to the IRS as we agreed.

It is an undisputed fact that the initial application was incorrectly filed and that Eli fraudulently filed MegaCap
as a Single Member LLC and the 8832 form HAD to be filed to correct Eli's illicit mistakes as our Operating
Agreement, Amendments, and Resolutions are clear that I'm a 50% owner of all MegaCap entities. This is clearly
shown in "Exhibit A" on Page 5 of IRS Form 8832 that Eli and I both signed on 2/15/23.

Then, to address another February 15, 2023 email. You said, "Eli had signed the 8879 and my assistance saw
the signed form and filed the return. Any change need to be amended.  Anyways, most of what you point
out is minor." The issue here is that maybe "most" of what I pointed out was minor, but NOT all of it was minor.
Your reckless and negligent conduct is the but for cause of some of my claims that I have against Eli and
MegaCap. As you said yourself when we first spoke on the phone, "You know how Eli is" in relation to him doing
everything last minute when he dumped the initial MegaCap tax issues on you in September of 2021 without
giving you time to prepare which led to some of the issues we have.

I expect an immediate response, in full detail, addressing each and every point listed in this email. I do sincerely
appreciate your cooperation in this matter and expect you to fully cooperate without judicial intervention. I am
sorry it has come to this, but I have been left with no other choice but to stop Eli in his tracks from his illegal
and malicious actions taken against me, which has put countless Limited Partners, Capital Partners, and myself
at risk of redemption from the seller of            which could cause the entire deal to implode within itself.
Failure to respond to receipt of this email and to provide the requested documentation and communication
will lead to legal action and consequences taken against you and your firm, Rafael. I truly hope it doesn't
come to that and I hope that you are willing to cooperate. Thank you for your understanding of this extremely
unfortunate situation and I look forward to hearing from you in a timely manner.

I, Marc Goldner, reserve all rights. It may be beneficial for us to arrange a call with you and your partners at the
firm, Rafael, immediately!

Sincerely,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding, Managing, and General Partner
MegaCap Capital, LLC., MegaCap Funds, LP., MegaCap Funds - Tech I, LP., MegaCap Funds - Tech Holding, LP.

P.S. Please note, Rafael, that you were FULLY aware that I have veto power on all of the entities including but
not limited to MegaCap as per our phone call which you referenced in your October 3, 2022 email.

P.P.S. Please be aware that I am still owed a K-1 from your firm for MegaCap Funds – Tech Holding which cite

Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466

7/2/2023

my ownership of ███████ █████████████████████████████████████████ have requested numerous times and need proof of th[...]

P.P.P.S. You and your firm are explicitly informed ██ you have NO LEGAL AUTHOR██ to conduct ANY work relating to any of the MegaCap entities or any other entities herein, whether that be tax filings, K1 issuance, entity closures, or otherwise. You are not to forward any communications or records to any third-party accountants or to advise on any tax or accounting related matters once again. Lastly, we may need to meet & confer with the IRS as it is upon information and belief that I believe that Eli Blatt may have committed or at the very least attempted to commit Tax Fraud relating to the MegaCap entities by his fraudulent and illegal conduct.

P.P.P.P.S. Please be fully aware that I possess letters from both ███████ and ██████████████, the sellers in which we acquired the derivative equity in ████████ vis-à-vis through the employee forward contract, and ██████ through the dual-layer SPV respectively that state that they will **NOT** be releasing any shares, proceeds, distributions, dividends, or otherwise to Eli Blatt and MegaCap without my signed authorization and consent. Thanks once again!

Email from a Megacap Supplier of Pre-IPO shares

# Re:

From:                                                                                    July 3 at 6:46 PM

To: **Eli M Blatt** | e@megacap.capital

Cc:

Hi Eli,




Additionally, I suggest that we make a zoom call to discuss the situation with Marc Goldner.  He approached us in an alarming way and we'd like to also hear your view of the situation.




Kind regards

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466



6/29/2023

Dear Eliakim Moshe Blatt A.K.A. MR. Eli Blatt:,

I am telling you right now, you have ONE last chance to resolve all matters relating to GBI and reinstate me at MegaCap. We are all willing to overlook your outlandish actions heretofore and this is the final offered olive branch before we all decide to continue with litigation and escalate this matter even further.

_____

It is a shame it has come to this, however, based on the April 30th 2023 letter allegedly sent to me, entitled 'GBI Rescission Notice.pdf.' ("Exhibit A") I am hereby informing you that, under section 40 of GBI's Operating Agreement (dissociation of a member), I hereby accept your withdrawal, but understand that the Mutual Contacts provision as per Section 37 will still remain. (the "GBI OA" which you have access to). On top of this, if you recall looking, it is important to note that under Section 38(a) of the GBI OA states, "[a] voluntary withdrawal may only be made after 3 years from the date of the signing of this Operating Agreement." Thus, your letter sent on April 30, 2023, was sent improperly and without proper notice and is deemed an improper withdrawal as the GBI OA is in effect as of December 7, 2021 – thus, I'm correcting your mistakes for your mutually agreed departure. Further, the 60 days under Section 40 are not triggered until I notify you that I elect to purchase your interest in GBI, which event has not transpired. For avoidance of doubt, GBI shall mean Goldner Blatt Investments, LLC, herein.

Understand that, under Section 39 of the GBI OA you still maintain liability for your time as a member of GBI. To be clear, you still owe GBI roughly $797,817 based on the emailed "Exhibit B" updated cap table.

Please note, you have no authority to "instruct" me to do anything that I do not want to do. Further, you cannot coerce me to not file for taxes – I WILL eventually be filing for taxes for GBI in which you will maintain a 0% interest in all GBI assets that you have effectively walked away from as per Exhibit A. Your lack of understanding of the debt you owe to GBI, to Dharma and its members, and to myself is your problem and your problem alone and you will be held fully liable for all debts and liabilities owed. You have grossly underfunded the agreed upon capital contributions to GBI which puts you in material breach.

You claim, in this same GBI Rescission Notice, that I attempted to deprive you of interest in the Neuralverse and in Dharma, however, this is patently false. You, by your own words, provided me with a tacit waiver of such interests. This is evident in your November 17, 2022 withdrawal from the Neuralverse fund chat, and more so, your tacit waiver of those very same interests was made very clear when you messaged me in the MegaCap group chat: "Bitsource, you can have it", "NFT fund, you can have it", "neuralverse, you can have it", and "dharma, you can have it".

Furthermore, it has come to my attention that you are in material breach of our various Non-Circumvent and Non-Disclosure Agreements ("NCNDA") which will continue to remain intact and enforceable. Your nonsensical attempt to circumvent our NCNDA and breach the mutual contacts provisions contained in the GBI Operating Agreement under Section 53 is something you will be held liable for. The GBI OA states, under Section 37, that the mutual contacts provision will remain in full force even upon dissociation of a member. You attempting to deprive me of these rights will prove to be unsuccessful and shows your bad faith in your conduct to date. You claim in the GBI Rescission Notice that "[I] a[m] not making any of [my] mutual contacts [...available to you]" – this is patently false and easily disproven as I have not only shared hundreds upon hundreds of contacts with you, but I have successfully raised well over $1,000,000 through my network that you have exploited without reimbursing me for my expenses. In bad faith, you have continued to attempt to solicit my contacts behind my back after your illegal and improper withdrawal and illegal redemption of my interests in MegaCap. Please note, I possess proof that you have attempted

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED

Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466



6/29/2023

to circumvent this NCNDA, which puts you in material breach of these agreements when you contacted at least one LP, one by the name of Bob Feldman on May 31, 2023 at 6:47AM. Bob Feldman is my contact which is easily proven through my creating the group chat title "Bobby / MegaCap" on December 14, 2021. In addition, to your misfortune, not only is Bob Feldman my contact but he is in the Private Security industry which puts you in further breach of the GBI OA under Section 53(f), whereas it is clear that individuals from various industries "will not be considered mutual contacts". Thus, attempting to solicit my contacts for derivative equity in ☒☒☒☒ in which you are restricted from selling at MegaCap, is a direct and material breach of the GBI OA and you and MegaCap will face legal consequences for your illegal actions. To wrap this point up, I wholly dispute your outlandish claims that I fraudulently induced you into entering this contract, when in fact it was YOU who was the one that proposed starting an investment company together on May 25, 2021 called "GoldBlatt Partners or something", which I possess definitive, undeniable proof of.

Further, I wholly dispute that I failed to abide by any of the terms of the agreement; it is YOU who has breached countless provisions. One such egregious breach that has put the entire operation at risk is your commingling of funds relating to MegaCap, BitSource, and GBI, with an intern by the name of ☒☒☒☒ whom you told to do 'work' on an NFT spreadsheet, which was done a) without my permission, b) without a contract with GBI, and c) when he was paid by BitSource when it was supposed to be by MegaCap which was not approved by myself.

Upon information, belief, and categorical, hard evidence, I am aware that you have engaged in numerous illegal activities. These are Forbidden Acts under Section 64 of the GBI OA where you are breaking the law which can bring harm to our business and jeopardize our Limited Partners investments due to your perpetual ☒☒☒☒ I possess concrete proof of your illegal actions. Section 64 states, "[n]o Member may do any act in contravention of this Agreement or prevailing law". I have this evidence readily available, and I can provide this to you upon request – please let me know if you'd like me to share this discoverable evidence with you. While, Section 68 of the GBI OA provides for any Forbidden Acts to "be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members", a mediation process would have followed, but since you instead opted to withdraw with the GBI Rescission Notice, I hereby redeem, mutually and voluntarily agreed-upon terms relating to your withdrawal, including all your equity, interests, assignments, investments, and so forth. Please note, that you are still fully responsible for distributing GBI's rightful interest in investments such as, but not limited to, in the James Bond Video Game and ☒☒☒☒ that was "approved" by your mother and sent to me by you in writing on WhatsApp prior to the increase in valuation that was sent by ☒☒☒☒ with his most recent upcoming distribution letter.

To be clear, and going back just a bit, the mutual contacts provisions still remain intact and enforceable, and your breach thereof entitles me to damages to be determined at trial. I am giving you notice to immediately cease any and all communications with not just my contacts, but GBI's contacts in general, which you have not only failed to reimburse me for the expenses I incurred whilst obtaining them, but you have also prioritized your invalid and unapproved expenses in the amount of roughly $70,000, and used some of that money to pay for ☒☒☒☒ to go to "Summit" without my approval – which, by your own words, produced no mutual contacts and I had NEVER agreed to pay for Emily to go, especially after she had already stolen from Neuralverse which you allowed her to do. (Please note: Now that you are no longer a part of GBI, GBI will be exploring a legal action against Emily for her breach of the NCNDA that she signed when she contacted ☒☒☒☒ which was my contact as a SIPA Alumni, soliciting him for a competing metaverse fund with stolen documents that you allowed her to possess). You don't seem to understand that awareness is NOT approval of such. You continue to claim that I was aware of this alleged $70,000 expense that you unilaterally approved, but, by your own words, without a written approval and authorization awareness is not enough. You prioritized your personal relationships with an attorney by the name of Michael Elkins because you said that you are not willing to jeopardize your unrelated case against K4B. You further

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED



Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023

continued to claim that the onl  thin  'confidential' about our relationship is the share price            which is patently false. Your outrageous claim an  a  egation t  at I changed an expense provision in the MegaCap Agreement is patently false as there is DOCUMENTED proof in the MegaCap chat with the track changes of the specific provision that you were sent well prior to signing the resolution.

Eli, to reiterate, the facts indicate that you are entering a losing battle. There is no world in which you are going to win – none whatsoever. Once again, you are setting yourself up for a protracted, multi-year, and scorched-earth legal battle involving a myriad of people. I will not sit idly by allowing you to continually breach your fiduciary duties with impunity. You have instructed me to not contact you – but you can't have it both ways like you always try to do, and then get upset that I'm 'ignoring' you when you told me not to speak to you. Mind you, you writing on a piece of paper that GBI has never existed is meaningless as it is factually untrue, and once again there WILL eventually be tax filings for GBI in which you will be responsible for. I will be more than happy to share all of this with the IRS as everything and all assignments were done completely legally. However, please note, that your notice has effectively waived almost all of your rights under our agreement, and your retroactive withdrawal is hereby denied.

Additionally, and for clarity, your attempted withdrawal as of April 30th, 2023 is hereby accepted as of June 29, 2023, and the entire equity, interest, and all assignments are being purchased for $0 due to the debt, liabilities, and balance that you owe GBI as per Exhibit B (the updated cap table). GBI possesses all the requisite and legal documents for any assignment, sale, or transfer of any assets, and your failure to understand the structure of these agreements is your fault and your fault only as they were never requested – all the legal documentation exists, Eli. You cannot claim that you did not understand that you owe GBI money, who owes Dharma money, when you are the one that made the excel spreadsheet for Dharma and determined how much each individual and entity owes for the balance due to Compass (not inclusive of the underfunding and underpayment to me for the NFTs and other assets including but not limited to your required assignment of the 'Troutwine' investments). You know the money to Dharma was just a deposit, and with every deposit eventually comes due a balance, which you failed to provide to GBI which in turn was unable to pay Dharma as per the December 31, 2022 Default Notice that Simon had issued you and to GBI. As a result of the foregoing, you have no valuable interest to be purchased and no viable claim in that respect – you owe more than whatever you believe you are entitled to. Therefore, I accept your voluntary withdrawal as of the date of this correspondence but disclaim any obligation to purchase an interest as there is no value therein. If any value is determined to exist, such amount would be considered to be 'set-off' from the amount that you owe to GBI in the amount of $797,817.

Also, it was you who chose not to pay for your GBI email address, I NEVER restricted you from it – it was instead you that breached MegaCap's resolution and removed my email which is grounds for involuntary withdrawal as per the MegaCap signed resolution. You cannot, in good conscience, run to the courts and claim that the Dispute Resolution terms as per Section 75 of the GBI Operating Agreement are invalid, but then turn around and claim that the Dispute Resolutions terms of the MegaCap Operating Agreement ARE valid – it doesn't work that way.

I have tried in good faith to look past your behavior but your escalation and failure to work in good faith has led to this. Your childish attempts at claiming that I threatened you, when we both know that        threatened me privately AND conveniently left out that he hopes you are not going to die          – any way you slice it, I was protecting us and our families whether you want to believe it or not. As I said numerous times, I extended many olive branches to you, acting in good faith, hoping you would turn around. Regardless of all of this, to repeat, you still breached the MegaCap resolution that stated that if I were to have my email removed, that you would be involuntarily withdrawn as per said signed resolution. You utilizing your personal attorney to commandeer MegaCap

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED



Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023

makes Michael Elkins an accomplice to your illegal actions and crimes. I strongly suggest that you immediately reinstate me, otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved.

I want to state one more thing: regarding your divulgence of any private contracting work that I may have done in the past – if it turns out to be true, as you allege, that I am involved in 'spy activities,' you may be tried for charges relating to the breaching of 50 U.S.C. 421, potentially punishable by a prison sentence for divulgence of my identity and putting my family's life at risk. (As an aside, it is extremely important to remember that I possess the name (as do you) of the ▨▨▨▨ employee that is part of the ▨▨▨▨ employee forward contract - (his name in case you didn't read the documents is ▨▨▨▨). You cannot just file a court complaint in the public record to attempt to coerce me to settle on your demands by hanging my life and my family's lives in the balance alleging that I was a "spy". Further, it is egregious that ANY attorney put their name on a complaint in which stated anything about me being a "spy" – your counsel, whoever they may be, should be ashamed of themselves for potentially putting a patriot's life at risk and may also be liable for aiding in your illegal actions relating to 50 U.S.C. 421. To note, though, this is not the first time you have breached this statute – you also disclosed this claim to Audra when we discussed many MegaCap matters such as when she told us we MUST get the proper documents for LPs done, especially since MegaCap Tech Holding ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ Or are these all part of your ▨▨▨▨ delusions when you claim that I am some "spy"? I guess you will have to take your chances to find out the truth, but I would highly recommend immediately dismissing this case and abiding by the dispute resolution terms of the agreement, otherwise, your failure to do so may result in a federal court action and a tacit approval and waiver for me to sue MegaCap in federal court, as you cannot have it both ways – that one contract is invalid and the other is valid whether we're discussing the dispute resolution section or the contracts as a whole. MegaCap will be named as a third-party defendant, and I will most certainly ensure that ALL shares are withheld. What you do not seem to understand that is IF the shares are cancelled, it is YOU who will be held liable as you are the but for cause of all of this happening. Further, our Limited Partners need to be protected from you and I have absolutely no issue putting MegaCap into receivership with the SEC. You should also really stop thinking that I am working alone and that I am the only one that you have harmed at MegaCap. I suggest you confirm and deliver me my K1 for MegaCap Tech Holding, showing my interest in ▨▨▨▨ for 8,217 shares, and placing me on ▨▨▨▨ cap table with ▨▨▨▨ confirmation signed in writing, and then we can discuss all other MegaCap matters. Failure to provide me, as an LP, with these K1s will force me to bring a class action suit against you with LPs that have already agreed to sue MegaCap with me. You are risking this entire deal by threatening to allow it to implode within itself as *allegedly* being the only Class A member makes you entirely liable if the shares of ▨▨▨▨ were to be canceled, because our resolution contains the name of the employee in which we acquired the derivative equity in. In the case of cancellation, you'd be entirely liable for repaying all LPs (including myself) for any and all losses ▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨ This entire letter and its contents are CONFIDENTIAL!

Eli, if this were a game of chess, you've been checkmated. There is nowhere you can run from the law. And so, you have no valid defenses. It is time for you to stop hiding behind Celina, Elkins, and any other counsel. It is time to have a good faith discussion in order to resolve these matters. For the record, you very well know that I never extorted you. You know that, after ▨▨▨▨ produced that signed affidavit, that he was the one who threatened me. I also know that ▨▨▨▨ is liable for their illegal actions, and I will be telling them as such in due time. To be clear, ▨▨▨▨ will be a named defendant in this matter. ▨▨▨▨ signed affidavit has two lies, which will be impeached: first, I possess proof that ▨▨▨ told ▨▨ to speak to me when they were at a coffee shop in Dubai.

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED



Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023

Second, we both possess proof that ▓ told us that ▓ has a side agreement with ▓▓▓▓ on WhatsApp – he had apparent authority and we all believed that ▓ was acting on behalf of ▓▓▓. There is no question that ▓ had agency, which makes ▓▓▓▓ liable for the threats against our lives. Your claims of extortion, therefore, are nothing more than gamesmanship. In order for extortion to exist, I would've needed to have a financial benefit, which I had none – instead, I saved MegaCap over $100,000 in the interest waiver agreement that I had gotten signed which ▓ said (and I possess proof of) that she never would've authorized to be signed if it weren't for me. I've maintained my fiduciary duty to MegaCap – you have NOT. I truly hope that warning one of my best friends, risking my own life, to tell you that a bunch of overseas thugs threatening to show up at our houses saying they would get their money back "one way or another" and telling me privately and sarcastically "make sure Eli doesn't die" will quash your claims of extortion against me and will divert your attacks towards ▓▓▓. We should be working together here, Eli, not against each other. I strongly believe there is still time to resolve these matters before they get completely out of hand.

With all this said, I propose we form a truce, Eli. You drop your claims against me, reinstate me at MegaCap, and we sue ▓▓▓ for trying to tear our relationship apart. They are the wedge that got between us, as everything else would've been resolved in due time. Please let us take the high road here and preserve both of our reputations, finances, and valuable time. I do NOT want to be arguing and fighting with you, but, make no mistake, Eli, I will defend myself and go after what is rightfully mine. I know you didn't think I was just going to walk away from MegaCap for $1.70. We can be on the same team, and on the same side, but you must start acting in good faith and working with me, not against me. At this point, Eli, the choice is yours. I am willing to put the past behind us and move forward I hope to hear back from you such that we can work through this productively. Please advise me of your decision immediately, and if later then next week, I will otherwise continue to prepare my cases against you.

Do not consider this letter to be entirely conclusive as more is to come considering that you have committed numerous forbidden acts that have "ma[d]e it impossible to carry on the ordinary business of the Company" as per Section 66 of the GBI when you've stated you will not allow anything else to be done under GBI, which at this point, is no longer your choice to make. I continue to reserve all rights and will be pursuing all legal avenues available to me if you decide not to take the high road. Be well, Eli. I continue to reserve all rights. Thank you!

Respectfully,

▓▓▓▓▓▓▓

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds

PS. If you attempt to sell even one of my 8,217 shares of ▓▓▓ you will be held liable and it will come from your shares and carried interest. Please note that I possess a letter from both ▓▓▓ and WCEP that state that they will not release any shares and/ or proceeds from ▓▓▓ of ▓▓▓ without my signed authorization. At this point, you are right about one thing: I am protecting you from yourself because I need to protect ALL entities and LPs – including myself from your illicit and illegal actions, including, but limited to, upon information and belief, committing ACH and Bank Fraud. I'm willing to look past everything that you've done up until this point, so please don't let me down. I hope to hear back from you soon and that we can work through this productively.

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED



## OPERATING AGREEMENT OF GOLDNER BLATT INVESTMENTS, LLC

**This OPERATING AGREEMENT** (the "**Agreement**") made and entered into this 7 day of December 2021 (the "**Effective Date**") by and among **GOLDNER BLATT INVESTMENTS LLC**, a Delaware Series Limited Liability Company (the "**Company**" or "GBI" used interchangeably) and the following persons (each, a "**Member**," and, collectively the "**Members**"):

ELI M BLATT

MARC GOLDNER

### BACKGROUND:

A.  The Members wish to associate themselves as members of a limited liability company.

B.  The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

### Formation

1)  By this Agreement, the Members form a Series Limited Liability Company (the "**Company**") in accordance with the laws of the State of Delaware. The rights and obligations of the Members will be as stated in the Delaware Limited Liability Company Act (the "**Act**") except as otherwise provided in this Agreement.

### Name

2)  The name of the Company will be **GOLDNER BLATT INVESTMENTS, LLC**.

### Purpose

3)  Investing, Operations, Speculation, Analysis, Consulting, and Finance relating to any asset class (i.e. tokens, currencies, collectibles, neural interfaces, tokenization, real estate, diamonds, fund management, fund operations, funds, and anything else that is part of the Company decks in the below Exhibits, etc.) in the cryptocurrency world (including but not limited to Cryptocurrencies, Metaverse, and NFTs except for the exclusion listed below relating to Marc's independent NFT-related ventures and businesses. Further, it is acknowledged that Marc has several collectibles which are part of his personal collection and not part of the Company unless Marc agrees to assign some of those assets. Marc's collectibles include but are not limited to video games sometimes pre-dating SNES

NOT A CERTIFIED COPY

area, Pokemon Cards, Yu-Gi-Oh cards, Comic Books, Figurines, Sports Memorabilia, and other collectibles. If Marc sells any of his Collectibles, that money is not due to the Company.), Pre-IPO FinTech sourcing platform such as building with Kumar an early employee stock option Pre-IPO platform (also, however, the Parties agree that BitSource DBA The Crypto Bank and any former BitFinance assets such as the tokenomics and/or platform are part of BitSource and are governed under that operating agreement and that cap table where Marc and Eli are currently at 45% each and Courtney Spaeth is at 10%), and brokering  or otherwise intermediating non MegaCap Securities as defined herein ("the Purpose").  However, it is noted that the Crypto Bank South Africa is held 75% by The Crypto Bank main series in America while 25% is held by Quentin Van Der Heever and his team.

a)  If any investment and/or opportunity and/or deal is in the cryptocurrency world or is considered to be a non-MegaCap Securities brokering and/or intermediating deals (i.e. less than $250,000,000 valued companies), real estate (by tokenization or otherwise), or any other general deals whether institutional, retail, or otherwise, then this shall be structured as 100% of the proceeds, earnings, and/or revenue goes 100% directly to the Company's House pool which shall be split evenly between the Class A Members pro-rata based on each Class A Member's share of equity ownership as defined herein.

   i)  For The Dharma Initiative LLC (which is a separate Series LLC whose purpose is to mine cryptocurrencies) the splits proposed shall be 24.4% will go to Marc Goldner, 24.4% will go to Eli Blatt, 24.4% will go to Simon Divilov, 24.4% will go to Rachel Korsen, 2% shall go to Jasmine Garcia, .1% shall go to Eric Goldner, .1% shall go to Robert Gross, .1% shall go to Josh Korsen, and .1% shall go to Abigail Shewalter.

b)  Any equity or cash earned as part of compensation for employment or other services such as but not limited to consulting services is subject to this Agreement, which applies to joint investment and fees from individual deals.

   i)  Any consulting that either Eli or Marc do will be split 50/50. In the event that any consulting services exceeds $10,000 then there will be a new series created on a 50/50 basis for our Consulting business.  This business will earn cash fees and equity. Any advisory equity and/or board fees will be split on a 50/50 basis split between the Class A members.

   ii)  The only exclusion that applies here is that Simon Divilov, Rachel Korsen, and Marc Goldner have had a consulting business called Columbus Computer Consulting since 2013 and has had a focus on investment club, and technology related consulting. That entity Columbus Computer Consulting will remain entirely under the ownership of Marc Goldner, Simon Divilov, and Rachel Korsen. In full disclosure, that entity may hold Bitcoin and other crypto assets that could have been stolen during the Mt Gox hack so any crypto assets received or earned from that entity that is not new business but potentially a legal recovery or finding any crypto assets will remain entirely the ownership of Marc Goldner, Rachel Korsen, and Simon Divilov. Thus, any Technology related consulting service or business will be split 25% between each of the Founding Members with Eli being the newest member of a new entity that they form called The Crypto Consultants Group with Eli also receiving 25% equity in that business.

c)  Goldner Blatt Divilov will be the first Series created at the Company and the splits shall be 33.3% each to Marc Goldner, Eli Blatt, and Simon Divilov, with .1% being held for an advisor. This series shall be for passive investments only for Marc, Eli, and Simon to make together (i.e. If there is a limited investments such as $50,000 being made available of any particular investment and Marc

& Eli want to put in the full $50,000 then they may put that in themselves through Goldner Blatt Investments without any obligation to offering Simon an opportunity to invest in that asset, however, if there is an extra allocation or an availability for something we want to minimize risk then Simon will have the option to invest and be involved in that asset purchase and/or investment). This will also be the equity split for a potential new venture with a trading algorithm programmed by Simon (whether for publicly traded stock markets and/or Crypto).  For avoidance of doubt, the equity split on the trading algorithm program and software business for that trading algorithm will be 33.3% each to Marc, Eli, and Simon, with .1% being held for an advisor. However, if any token (crypto or otherwise) is created by Eli, Marc, and Simon, then Marc and Eli shall each be fully vested with 45% equity and Simon shall earn 10% equity where Simon's first 5% is fully dilutable to outside investors prior to Marc and Eli diluting.

d) If any deals conducted are not part of the Purpose, then the splits will be the deal lead takes 60% and there is a two-sided origination that is 40%. For example, if both sides of the origination (buy and sell side) have a shared contact then both sides of the origination would go to GBI, however, if one side is a shared contact then only that side would go to GBI and the other side would go to whoever is responsible for that contact. Therefore, if it's one sided then the Members split the 20% (one sided origination) that goes to the house where each Managing Member gets half of the 20% and therefore each Managing member gets 10%, whereas also if there is a two-sided origination then the full 40% (two sided origination) goes to the house and each Managing Member splits the 40% and therefore gets 20% to each Managing Member. It is noted that two-sided is defined as a buyer and a seller. For illustrative purposes only, if the supplier comes to Eli through his neighbor and then Eli goes to David Ruttenberg (who is a shared contact between the Members) then 20% would go to GBI and Marc and Eli would get 10% each on that deal. All such deals would be assigned to GBI so if Eli were to get 90% on a Real Estate deal then Eli's entity Anthropos would invoice GBI and be paid and then the 10% would be paid directly to Marc (either personally or through an entity of his choosing) for that deal.

e) Any investments that the Managing Members make are a 1:1 cash value based on current market prices at the time of assignment and will be certified and memorialized in an email and on WhatsApp to avoid confusion or dispute of that assets value with a screenshot being taken at the time of assignment and attached. All such assignments must be signed over in writing to GBI and approved by both Managing Members unanimously.

i) In the event that one of the Managing Members wants to sell a GBI asset for any reason and there is a potential buyer, then the other Managing Member has the right of first refusal and can buy out the Managing Member who wants to sell. For illustrative purposes only, if a Collectible is worth $50,000, then the partner that wants to sell can sell his portion to GBI through an assignment and then GBI can pay out $25,000 out of net pocket expenses to the Member who wants to sell.

   (1) When deciding to purchase an asset (i.e. a Collectible, a Cryptocurrency, a piece of Artwork, Shares in a company, or otherwise), there will be an agreement VIA email in writing in relation to the time horizon to hold the Investment and the Exit Parameters of such an investment (i.e. if the Investment doubles, or if the Members agree to hold it for 5 years, or if an investment like a Painting on MasterWorks has a 10 year old period estimate), and then once the asset, property, and/or investment hits either of those marks

NOT A CERTIFIED COPY

then ither partner may force a sale but the right of first refusal as stated above will apply. In the event one of the Managing Members opts out of an investment, then a tacit waiver is given for that managing member to go invest in that asset, property, investment, or otherwise on their own, however, the Managing Member who declines to invest in that asset, property, investment, or otherwise will not circumvent the other Managing Member and invest in that on their own. For avoidance of doubt, the email setting the terms, time horizon, and overall agreement of the purchase of that specific asset will say something to the effect of this email constitutes the final agreement for this asset purchase that explicitly confirms the asset purchase and if it is approved with a confirmation email than that asset purchase contract will be bound by this Operating Agreement. No forced sale may happen until after the agreed amount of time has passed as defined in the time horizon of the agreed upon time window to hold the Investment unless mutually agreed unanimously by the Class A Members.

ii) Potential investments include but are not limited to TV and Game Studios (including but not limited to Virtual Reality and Video Game studios), Masterworks, Vinovest, Rally, Collectibles (i.e. Video Games, Pokemon Cards, Art, Cars, etc.), NFTs, Mining Assets (that may not be part of The Dharma Initiative), and Real Estate. However, it is noted that Marc Goldner's personal collection of collectibles ranging from Pokemon Cards, Video Games, Comic Books, and other collectible items are not part of GBI unless they are explicitly transferred to GBI and Marc & Eli can agree on the valuation of those collectibles so that Eli can match Marc's collectible contribution with another asset of equal value.

   (1) Any investment either Member makes, where possible, should be offered to the other partner to be made though GBI. This includes but is not limited to cryptocurrencies, NFTs, and private investments.

iii) NFTs will be considered on a case-by-case basis because Marc Goldner's company that is unrelated to Eli Blatt is currently pursuing NFTs. Thus, Marc and Golden Bell have an exclusion to pursue NFTs without Eli's permission. However, if Eli and Golden Bell agree that Eli will lead an NFT project, then Eli and Golden Bell will discuss a consulting fee agreement or a percentage split on that NFT if Eli is able to help bring that NFT to market and runs that specific NFT project. Eli would have the right of first refusal to be the newest member of any NFT projects (that exclude simply listing an NFT for a Golden Bell property on a place like OpenSea) that are run, concepted, created, or planned for Golden Bell. In the event that Eli chooses to be a part of Golden Bell's NFT project, then Golden Bell will set up a new Series LLC that Eli Blatt would be on the cap table for. In no event would Eli ever receive more than 50% of Marc's total equity in that LLC for Golden Bell NFTs. Golden Bell would be the Managing Member of this project and would be responsible as the solo Manager of that LLC with sole decision making authority.

f) For any new entities that are created by either Marc Goldner or Eli Blatt (excluding Entertainment related businesses, leveraging any existing Golden Bell relationships to create new entitles in the Trans and Multi Media Space including but not limited to toys, games, comics, and/or animation, as well as the Adult and/or Entertainment Businesses, and MegaCap/BitSource/Golden Bell/Dharma related companies which are already defined. This exclusion includes any companies that are created either as part of a Series or as a separate entity under Golden Bell such as a

Golden Bell off-shoot spin off company like Strangelight Games after they acquire it and it becomes a separate entity) then those entities will be split between Marc and Eli on a 50%/50% basis. For example, if one of the Managing Members created a discretionary fund (i.e. GBI Real Estate) then that will be split between the Class A Members of GBI. If Marc and Eli both decide to start a new venture unrelated to any of the aforementioned ventures, then they agree that GBI shall hold their equity in that new business since that new venture will be taking time away from their current obligations, and the Class A Members will split the equity that is held in that new business 50/50. Additionally, if Marc decides to work with any third parties on a Sex Robot business, then Marc's equity will be held in GBI.

i) Marc Goldner hereby assigns all his equity from Suitor Tutor, LLC. to GBI. In the event that it is not permitted, half of any distributions, half of any sales, half of any equity, or otherwise shall be given directly to Eli Blatt within 90 days of distribution and/or sale.

ii) Eli Blatt hereby assigns all his equity from Catalyst, LLC. to GBI. In the event that it is not permitted, half of any distributions, half of any sales, half of any equity, or otherwise shall be given directly to Marc Goldner within 90 days of distribution and/or sale.

iii) Any entity (i.e. a new digital start-up, crypto start-up, virtual space startup, etc.) that GBI creates that utilizes Golden Bell relationships then Golden Bell will receive 50% and GBI will receive 50% equity, ownership, and share in profits of that specific start-up entity and/or deal.

g) The Neuralverse Fund that is an investment fund (essentially a hybrid PE/VC/Hedge Fund Model) will have an equity cap table of 23.75% to each of the founding 4 members will be Managing Members, they are Marc Goldner, Rachel Korsen, Simon Divilov, and Eli Blatt. There will be 5% allocated to the advisor pool, In terms of being the 'director of the vision of the fund', that role would be held by Marc Goldner where Marc will steer the strategic investments and vision of the fund that then the investment committee and Managing Partners will vote to invest in. Managing Partners may recommend investments and there will be some investment committee that will be agreed upon by the partners in the Operating Agreement to vote on submissions by partners. Each of the partners will be allowed to invest in at least 2.5% of the Fund's allocated budget without any votes from any managing members of the Neuralverse fund.

h) A separate series will be created for each Neural Interface Device intellectual property that is created, 50% of that new entity will be owned by The Neuralverse Fund and 50% will be given to Golden Bell and/or it's Founders and/or Equity Holding Partners. For example, for a theoretical neural interface device camera that has been conceptualized for years that IP's ownership would be 50% split between the founding members of The NeuralVerse Fund (Marc Goldner, Eli Batt, Rachel Korsen, and Simon Divilov) while the other 50% would be given to the leads and intellectual property creators on that project whereas 10% would be owned by Robert Gross, 5% by Golden Bell, 10% would be owned by Marc Goldner, 10% would be owned by Rachel Korsen, 10% would be owned by Simon Divilov, 2% would be owned by Jasmine Garcia, 1.5% would be owned by Jon Meller, and 1.5% would be owned by Ezelle Van Der Heever. The deal lead on a specific project, in this case Robert Gross, would have the 'vision' control that sets the stage for how the technology should be commercialized, implemented, used, and so forth.

i)  For any Neural Interface Device content that is created, 51% would be owned by Golden Bell and Golden Bell has final authority on direction of all content that is created, 5% would be allocated to Advisors, while 44% is given to The Neuralverse Fund for the content being created such as an immersive underwater experience that is more a 'lived' entertainment adventure akin to a simulated adventure in a virtual space. The Neural Verse Fund would be granted the equity in any Neural Interface Device Content if and only if the Neuralverse Fund is the primary investor at an acceptable valuation to the managing members that own the intellectual property that is potentially being licensed and in question and/or development.

j)  Any data business that either Marc or Eli start will be split 50/50. However, Marc has complete decision making authority on the data if used for any intelligence, espionage, or legal purposes. All other data deals being brokered such as consumer data would be agreed to and split on a 50/50 basis. The data business will be structured that Andrew has 50% and GBI has 50% which is split 25% each for Marc and Eli.

k)  The Pre-IPO secondaries platform being built with Kumar to source employee forward contracts, grants, and options will be split on a 50/50 basis between Eli and Marc.

l)  The new series that is created for any new entity such as GBI Properties and GBI Securities as defined in the GBI Deck will also be split 50/50 between Marc and Eli. For avoidance of doubt, any new entity that is not defined herein to be a different percentage equity structure (cap table) will be 50% for Marc Goldner and 50% for Eli Blatt.

## Term

4)  The Company will continue until terminated as provided in this Agreement or in the Act.

## Place of Business

5)  The Company's principal place of business will be located at: A Registered Agent, Inc.

    ATTN: GOLDNER BLATT INVESTMENTS, LLC.
    8 The Green Street
    Suite A
    Dover, Delaware 19901

## Units and Capital Contributions

6)  The Company shall be authorized to issue one million (**1,000,000**) units of membership interest in the Company (each, a "**Unit,**" collectively, "**Units**"), of which 1,000,000 units are hereby issued ("**Issued Units**") as per Section 8. These units constitute units of the "Master Series". The Company may authorize the issuance of additional Units with the prior written consent of all of the Class A Voting Members. As per Section 14, additional Series may be authorized each with its own Membership Units. The remainder of this agreement concerns the Master Series of the Company, however all provisions shall apply to any additional Series authorized unless otherwise approved by a unanimous

Doc ID: 88a0ad065a55a3c832141744af1fb05755e013db

vote of the Class A Members of the Master Series. For clarity, both Members (Marc Goldner and Eli Blatt) are fully vested with no redemption agreement in relation to GBI.

7) Units shall be divided into two classes: (a) "**Class A Voting Members**," and (b) "**Class B Non-Voting Members**." Each class will have distinct rights and obligations as follows:

| Member Class | Rights and Obligations |
|---|---|
| Class A | Class A Voting Members have full voting rights. |

8) The following is a list of the initial Members (the "**Initial Members**") of the Company and Units of membership interest of the Company:

| Member | Class and Units Issued |
|---|---|
| Eli M Blatt | 500,000 Class A Units (50% of all Issued Units) |
| Marc Goldner | 500,000 Class A Units (50% of all Issued Units) |

9) The following is a list Initial Members of the Company and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution | Value |
|---|---|---|
| Eli M Blatt | Cash | $1,000.00 |
| Marc Goldner | Cash | $1,000.00 |

**Confidentiality Contractor Agreement**

10) All Members shall be required to execute that certain **Confidentiality Agreement**, a copy of which is attached hereto as Exhibit A. In addition to the foregoing, any and all owners, principals, officers, directors, managers, members, or affiliates of each Member (each, along with the Members, a "Member Affiliate") shall also execute the Confidentiality Agreement.

**Allocation and Distribution of Profits/Losses**

11) Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will be allocated between all Class A Members in accordance with their percentage interest in the Company or individual Series as determined by their respective percentage of Issued Units therein. For the Initial Members in the Master Series, Net Profits and Losses shall be allocated in the following manner:

| Member | Profit and Loss Percentage |
|---|---|
| Eli M Blatt | 50% |

| Marc Goldner | 50% |
|---|---|

12) Cash Distributions to Class A Members will be made in the same fixed proportions as the allocation of Net Profits or Losses described above. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

13) The Company shall make distributions of profit monthly, retaining an operating account reserve as agreed by a unanimous vote of Class A Members, however in no case shall this reserve be lower than $1,000. If a unanimous vote can't be reached on the operating account's cash reserves, then the entire cash reserves shall be evenly distributed between the Class A Members, leaving no less than $1,000 in reserve.

14) Series Interests and Series.

a) The Members shall cause the Company to issue Interests in one or more separate and distinct series (each, a "Series"), with each such Series including but not limited to establishing such Series to make separate Investments, portfolio of Investments, business ventures, or other types of business deals such as brokering, being an intermediary, or anything else relating to the Company Purpose. The Members may establish a Series for the purpose of (1) making Investments in specific and distinct companies identified by the Members, (2) making Investments in specific and distinct assets identified by the Members (such as Collectibles, Real Estate, Cryptocurrencies, Crytpoassets, NFTs, Pre-IPO Shares, or otherwise) (3) to purchase securities in such companies from secondary sources, or (4) to invest in interests of investment funds, special purpose vehicles or other Entities consistent with the Company's investment focus, which such Series will be segregated from each other which shall exclude MegaCap's securities (for clarity, the Company will invest in all early stage companies together that are under $250,000,000 as to not compete with MegaCap, as well as all types of securities under or over $250,000,000 that aren't defined by MegaCap's scope such as raising debt for publicly traded companies).any purpose on which the Members agree. The Members may use its commercially reasonable efforts to have assets and/or securities purchased by a particular Series be issued for the benefit of such particular Series to which they are allocated. For illustrative purposes only, if Masterworks doesn't allow Marc to transfer his ownership of a fractional piece of a painting, he has partially purchased to the GBI entity then Eli would have a choice to either allow Marc to keep it in his name and then pay out once it is liquidated or Marc may just choose another asset at his decision. Otherwise, a side letter can be issued by the owner of the asset and that side letter becomes an asset of the Company. Members of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to share in the profits, losses, allocations or distributions of any other Series of which they are not a Member. A creation of such Series must be unanimously agreed upon by all Class A Members.

b) Each Series so established shall be set forth on Schedule A (which is an external spread sheet that will be created upon signing of this Agreement) to this Agreement, and Schedule A will be updated by the Managers from time to time in connection with the establishment of one or more additional Series. Subject to such limitations as may be set forth in this Agreement, the Members

NOT A CERTIFIED COPY

shall establish and may modify the investment objective and policies of each Series and all other rights and features thereof.

i) Interests of each Series shall have the following relative rights and preferences:

(1) Assets Held with Respect to a Particular Series. All Capital Contributions made to the Company with respect to a particular Series, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Series for all purposes, subject only to the rights of creditors of such Series, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Series, are herein referred to as "assets held with respect to" that Series. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Series (collectively "General Assets"), the Members shall allocate such General Assets to, between or among any one or more of the Series' in such manner and on such basis as the Members, in its sole discretion, deems fair and equitable, and any General Assets so allocated to a particular Series shall be assets held with respect to that Series. Each such allocation by the Members shall be conclusive and binding upon Members of all Series for all purposes.

(2) Liabilities Attributable to a Particular Series. The assets of the Company held with respect to each particular Series shall be charged with all liabilities, expenses, costs, charges and reserves attributable to that Series. All such liabilities, expenses, costs, charges, and reserves so charged to a Series are herein referred to as "liabilities attributable to" that Series. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Series ("General Liabilities") shall be allocated and charged by a unanimous vote by the Class A Members to, between or among any one or more of the Series in such manner and on such basis as the Members, in their sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Series shall be liabilities attributable to that Series. Each such allocation of liabilities, expenses, costs, charges and reserves by the Members shall be conclusive and binding upon Members of all Series for all purposes. The liabilities attributable to any Series shall be enforceable against the assets of such Series only, and not against the General Assets, or the assets of any other Series. All Persons, including any Affiliates of the Members, who have extended credit that has been allocated to a particular Series, or who have a claim or contract that has been allocated to any particular Series, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Series for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship

ii) In the event any Series files for Bankruptcy, it shall in no way impact the assets and/or obligations of any of the other Series including but not limited to the Master Series.

## Withdrawal of Contribution

15) No Member will withdraw any portion of their Capital Contribution or any assets, property, and/or investments without the unanimous consent of the Class A Voting Members.

## Additional Contributions

16) Capital Contributions may be amended from time to time, according to the business needs of the Company by a unanimous vote of the Class A Voting Members.

17) Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by the Class A Voting Members, voting unanimously. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

## Capital Accounts

18) An individual capital account (the "**Capital Account**") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

## Interest on Capital

19) No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

## Management

20) The Class A Voting Members shall have the sole authority to appoint a manager of the Company (individually the "**Manager**" and collectively the "**Managers**") if unanimously agreed upon. Management of the Company is vested in the following Managers until such time as they are removed by the Class A Voting Members or withdraw from the position:

   a) Eli M Blatt, Managing Partner
   b) Marc Goldner, Managing Partner
      i)  For avoidance of doubt, both Eli Blatt and Marc Goldner are the two Managers of the Company as well as the only two Class A voting managing members of the Company. The only way to add a new Manager to the company is if both Eli and Marc unanimously agree signed in writing to appoint a new Manager and/or a new Class A, Class B, or Class C member of the Company.

21) The duties and responsibilities of the Managers will include the following:

Doc ID: 88a0ad065a55a3c832141744af1fb05755e013db

a) Managers will supervise the day-to-day operations of the Company including supervising sales and production staff and maintaining financial accounts.

22) Notwithstanding any other provisions contained in the Certificate of Formation or this Agreement, each of the Managers is empowered to bind the Company for any and all decisions except Major Decisions. A unanimous vote of the Class A Voting Members shall be required for all Major Decisions. Such votes may be accomplished via electronic mail, WhatsApp, or any other written medium upon which the Class A Voting Members unanimously agree. For purposes of this Agreement, "**Major Decisions**" are the following:

a) Incur debt, expend funds, write checks, pay bills, or enter into contracts, or otherwise obligate the Company for any amount in excess of $5,000 per calendar year.

b) Negotiate or agree to an accounts payables/receivables payment schedule.

c) Establish credit lines and the use of such credit lines.

d) The sale or dissolution of the Company or its assets.

e) Issuance of additional member or shareholder interests.

f) Scheduling repayment of any capital contributions from any Member.

g) Selling, leasing, or encumbering any property owned by the Company.

h) Scheduling repayment of any loans from Members.

i) Changing or amending this Agreement or approving any action or resolution that would alter the terms of this Agreement.

j) Appointment or removal of a Manager which shall require a unanimous vote and be signed in writing by all Class A Members excluding the Member being removed. For clarity, Marc Goldner and Eli Blatt cannot be removed under any circumstances.

k) Addition, withdrawal, appointment, or removal of a Member. For clarity, Marc Goldner and Eli Blatt cannot be removed under any circumstances.

l) Amending the duties and responsibilities of any Manager.

m) Any changes to the Company Name, branding imagery, and public relations positioning.

n) Adjustments to the compensation of any Member, Manager, Employee, or contractor.

o) Payment of any distributions or other compensation to any Member.

p) Registering the company with any regulatory or governmental agency.

q) Creation of an additional Series within the Goldner Blatt Investments LLC umbrella. For avoidance of doubt, any Series created for any entities for Goldner Blatt Investments will be approved by all Class A Members in writing.

r) Determination of each Series equity.

s) Each Series investment objective and policies will be defined by the Managers and shall be unanimously approved by all Class A Members signed in writing.

t) No manager shall move any "General Assets" to any Series without unanimous approval by all Class A Members.

u) No Class A Members shall take on personal liability or personal obligations of Goldner Blatt Investments LLC unless expressly approved and unanimously approved by all Class A Voting Members.

v) Taking any investment from outsiders must be unanimously approved by all Class A Voting Members.

w) Any change in control must be unanimously approved by all Class A Members.

x) Giving any equity and/or cash distributions must be unanimously approved by all Class A Members.

y) No other Class A members except Marc Goldner and Eli Blatt will be added as Class A Members unless unanimously approved by Marc and Eli.

23) A new Manager may be added to the Company with a unanimous vote of the Class A Voting Members.

24) A Manager will be reimbursed for reasonable expenses directly related to the operation of the Company and approved, in advance, by a unanimous vote of the Class A Voting Members (voting as a separate class). However, these reasonable expenses, shall not exceed $5,000 per calendar year unless otherwise approved in writing by a unanimous vote of the Class A Members.

25) The Members will be consulted and the advice and opinions of the Members will be obtained as much as is practicable. However, subject to Section 21 above and outlined in Section 22, the Managers will have management and control of the day-to-day business of the Company for the purposes stated in this Agreement. All matters outside the day-to-day business of the Company will be decided by the Class A Voting Members (voting as a separate class) as outlined elsewhere in this Agreement.

26) In addition to day-to-day management tasks and any other duties and responsibilities already identified in this Agreement, the Managers' duties will include keeping, or causing to be kept, full and accurate business records for the Company according to generally accepted accounting principles (GAAP), and overseeing the preparation of any reports considered reasonably necessary to keep the Class A Voting Members informed of the business performance of the Company.

27) A Manager will not be liable to the Members for any action or failure to act resulting in loss or harm to the Company except in the case of gross negligence or willful misconduct. It will not be considered to be gross negligence or willful misconduct if one of the Managing Members chooses to invest in a risky asset such as a volatile cryptocurrency token they believe could have a high reward.

28) Each Member will devote such time and attention to the business of the Company as required to carry out their duties and responsibilities for the conduct of the Company's business.

## Authority to Bind Company

29) Only the Manager(s) have the authority to enter into contracts on behalf of the Company.

## Duty of Loyalty

30) While a person is a Member or Manager of the Company, and for a period of at least three years after that person ceases to be a Member or Manager, that person will not carry on, or participate in, a business involved in the issuance or transacting of securities in any market regions that were established or contemplated by the Company before or during that person's tenure as Member or Manager. In the event of termination, if either member independently works in the FinTech, Finance, or Crypto Worlds, 10% of their equity, distributions, and proceeds are given to the non-involved Managing Member. Until a Member gives notice that they wish to terminate future applicability of their participation towards the purpose as defined in Section 3 (Purpose), and pursuant to Section 53 (Termination), the Members agree to be bound by the terms of this agreement.

   a) There will be a standard duty of care that is held by each of the Managing Members.

## Duty to Devote Time

31) Each Member will devote such time and attention to the business of the Company as best as they can in good faith. It is important to note that while one day Marc may be working on Dharma, Eli may be working on BitSource, and that is a primary consideration of this Agreement that they are sharing in their collective work across different companies as time from one person is devoted to one company then time from another person is devoted to a different company to increase their collective likelihood of shared success. Eli's investments managing his and his family's personal investments and Marc's work with Golden Bell and Marc and his family's personal investments shall not be considered a breach of this provision.

## Member Meetings

32) A meeting may be called by any Class A Voting Member providing that reasonable written notice has been given to the other Members.

## Voting

33) Each of the Class A Voting Members shall have one vote for each Unit owned by such Class A Voting Member.

## Admission of New Members

34) A new Member may only be admitted to the Company with a unanimous vote of the Class A Voting Members.

35) No new Class A member shall be admitted as a Member of the Company until such new Member becomes a party to this Agreement, as amended, and agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to effect the admission of the new Member as determined by a supermajority business interest in the Company as determined by a unanimous consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

**Voluntary Withdrawal of a Member**

36) The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

37) However, a voluntary withdrawal of any Member will still make that Member responsible for the Terms, Termination, and Mutual Contacts provisions below in Section 53 of this Operating Agreement in terms of monies, equity, distributions, and/or contributions owed to GBI or one of the other Managing Members.

**Dissociation of a Member**

38) In the event of a voluntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.
   a) A voluntary withdrawal may only be made after 3 years from the date of the signing of this Operating Agreement.

39) A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

40) Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 60 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company. In the event that the non-disassociated Member is unable to buy-out the disassociating member, then the disassociated Member will be paid what is owed to the disassociating member as liquidity events happen with no interest due to that disassociating member.

NOT A CERTIFIED COPY

41) A member may not wrongfully disassociate from the Company. A wrongful disassociation will not rid that dissociated member from liability. For instance, a Managing Member may not disassociate from the business for sheer self gain in the sense that they have another opportunity to go work in a directly competing business under different terms or a larger pay out that would put the non-disassociating member at an inequitable juncture which would put them in a worse off economic situation. The previous example is not the only example of wrongful disassociation.

## Sale, Transfer, or Assignment of a Member's Interest; Drag-Along

42) No Member may sell, transfer or assign any of such Member's Interest, including, but not limited to, any Units owned by such Member, without the unanimous written consent of the Class A Voting Members. Where a Member's financial interest in the Company is assigned to another party who is not an existing Member, that party will be considered a New Member and their Class of Units will be determined unanimously by the current voting Class A Members signed in writing. An assignment of full membership status inclusive of all duties, obligations, and rights held by the previous Member will be governed by the conditions described under the Admission of New Members section of this Agreement.

43) **Drag-Along Rights.** In the event that the Class A Voting Members receive a bona fide offer from an independent third party purchaser to purchase (including by merger) all of the outstanding Units or all or a substantial portion of the assets of the Company, the Class A Voting Members may send written notice (the **"Drag-Along Notice"**) to the Company and the remaining Class B Members (the **"Class B Members"**) notifying them they will be required to sell all of their Units in such sale. Upon receipt of a Drag-Along Notice, each Class B Member receiving such notice shall be obligated to (a) sell all of the Class B Member's Units contemplated by the Drag-Along Notice on the same terms and conditions as the Class A Voting Members; and (b) otherwise take all necessary action to cause the consummation of such transaction. Each Class B Member further agrees to (a) take all actions (including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by the Class A Members; (b) waive all applicable appraisal rights, if any, under the laws of the State of Delaware; and (c) appoint the Class A Members as the Class B Member's attorney-in-fact to do the same on its behalf. Notwithstanding the foregoing, no Class B Member may sell or assign such Member's Units, in whole or in part, under this Section without the express prior written approval and consent of a Supermajority of Class A Voting Members.

## Right of First Purchase

44) In the event that a Member's Interest in the Company is or will be sold, due to any reason other than as said forth in section 43 (Drag-Along Rights) above, the remaining Members will have a right of first purchase of that Member's Interest, property, assets, or investments. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

45) In the event that a Member's interest in the company is transferred or assigned as the result of a court order or operation of law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

NOT A CERTIFIED COPY

## Valuation of Interest

46) In the event of a sale of all or substantially all of the Units and/or assets of the Company, a Member's financial interest in the Company will be based in the percentage of Units owned in proportion to all of the issued and outstanding Units of the Company at the time of such sale.

47) In the absence of a written agreement setting a value, the value of the Company will be based on an appraisal of the fair market value of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members to be retained within a reasonable period of the event giving rise to the disposition of a Member's interest. The results of the appraisal will be binding on all Members. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member.

48) No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

## Dissolution

49) The Company may be dissolved by a unanimous vote of the Class A Voting Members. Further, the Class A Members agree to sign Exhibit B (NCNDA) to not Circumvent each other.

50) Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, as well as any other outstanding liabilities, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

   a) First, to the Class A Members on a 50/50 basis in the amount of their capital contribution, valued properties, valued investments, and valued assets;

   A. Second, to all of the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement in satisfaction of Company debt obligations to current Members;

   b) Third, to the satisfaction of liabilities to unsecured creditors except Company obligations to current Class A Members up to the amount of their Capital Contributions;

   c) Fourth, to the Class B Members up to the amount of their Capital Contributions.

51) In the event of a death of a Member, the deceased Member's heirs and/or family or assigns (through a will or otherwise) will gain the deceased Member's ownership interest, equity, and assets of the Company.

52) In the event the laws change and creditors or UCC-1 Holders must be paid out before any of the above mentioned payouts such as Class A Members being paid out first than this Dissolution section will be revised to be compliant with all current laws in the State of Delaware.

**Term, Termination, and Mutual Contacts Definition**

53) The future applicability of Section 3 (Purpose) of this Agreement may be terminated by either party with written notice, subject to the below provisions. If it is not so terminated by either party, the Agreement shall remain in effect in perpetuity. Neither party may terminate this Agreement for a minimum of 3 years from the date of signing this Agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets. Nor shall such termination effect and/or impact either Party's interests in GBI whether relating to assets, equity, ownership, interest, stake, property, long term and/or short-term investments, or otherwise. In the event of a termination the following shall apply:

a) Any mutual contacts even after termination shall be categorized into the following 'Tiers':

i) 1st Degree – For example, David, David is a shared contact and will remain at 10% perpetually for each Managing Member. Thus, even the Managing Members agree to walk away, any deals they conduct independently from one another, the deal maker will always owe 10% in perpetuity to the other Managing Member. For illustrative purposes only, if Marc does a deal with David 10 years after terminating, then Marc will still owe Eli 10% for any deals Marc does with David.

ii) 2nd Degree – For example, if David introduces one of the Managing Members to a third party Joe (after the termination) then that contact will remain at 5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Joe in this case, shall be considered a 1st Degree mutual contact of the Parties).

iii) 3rd Degree – For example, if Joe introduces one of the Managing Members to a third party Sam (after the termination) then that contact will remain at 7.5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Sam in this case, shall be considered a 1st Degree mutual contact of the Parties).

iv) 4th Degree – For example, if Sam introduces one of the Managing Members to a third party Jack (after the termination) then that contact will remain at 5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Jack in this case, shall be considered a 1st Degree mutual contact of the Parties).

v) 5th Degree – For example, if Jack introduces one of the Managing Members to a third party Tom (after the termination) then that contact will remain at 2.5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Tom in this case, shall be considered a 1st Degree mutual contact of the Parties).

NOT A CERTIFIED COPY

vi) 6th Degree+ and after – For example, if Tom introduces one of the Managing Members to a third party Billy (after the termination) then that contact will remain at 1% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Billy in this case, shall be considered a 1st Degree mutual contact of the Parties).

vii) For any degrees after the sixth degree, that contact shall remain in perpetuity at 1% due to the other Managing Member that is not part of the deal as long as that contact can be traced back to an origin of one of the degrees (sources of origination) listed above. (However, if that Party is introduced during the scope of this Agreement than that third party shall be considered a 1st Degree mutual contact of the Parties).

b) Mutual contacts are defined as the following:

   i) Alex from Visionary and anyone he introduces us to from the Visionary Network (including but not limited to Andra, Mindrock, Pavel, Barry Dorfman, Idan, Michael, Jeff, Esther, Nick, Orka, Artemis, Unicorns, etc.)
   ii) Maxwell, Cole, and DJ
   iii) David Ruttenberg, RGI, Johnny Gordon, and anyone else from RGI
   iv) Fahad
   v) Anyone that is met going forward from the point of starting MegaCap and going forward will be deemed Mutual Contacts
   vi) Anyone from TRIUM (whether it is our class of 2022 or any other previous or future cohorts), as well as anyone we are introduced to through the TRIUM network
   vii) All professors from TRIUM
   viii) Anyone from the Wall Street Investors Conference (i.e. David Goodboy)
   ix) Anyone from the Bitcoin Conference (i.e. Daniel the Cryptominer introduced from Cole)
   x) Anyone from the Underground Crytpo talk (excluding Brock Pierce and Adrian for example which are Eli's Solo Contacts from Prior to this Agreement but do include people like David Namdar)
   xi) Anyone from any conventions, tradeshow, and/or event (excluding Entertainment and Media events, conventions, and tradeshows) that is met shall be considered a mutual contact.
   xii) LinkedIn and Facebook and other social media contacts PRIOR to the start of this operating agreement shall be considered non-mutual contacts. Social Media contacts AFTER the start of this agreement shall be considered mutual contacts.

c) Anyone a Member knew before the start of TRIUM are that Managing Member's own contacts and are not considered to be mutual contacts. However, anyone that that non-mutual contact introduces one of the Managing Members to shall become considered a mutual contact after signing of this Agreement (unless one of Marc's solo existing contacts introduces someone to him specifically and only for Golden Bell purposes) however, if one of the Managing Member's mutual contacts or one of Eli's contacts introduces Marc to a new contact for Golden Bell purposes then the above 1st degree shall apply in terms of house splits and 'kickbacks'.

i) The same fee structure will apply to Emily Rhen in a side letter deal made with Eli Blatt whereas if one of the Managing Member's mutual contacts is used or utilized by Emily for personal gain or otherwise (i.e., for raising money for a fund, receiving front end on a fund for example, receiving a carry from a fund she is working in that includes any mutual contacts, etc.) then the above 1st degree shall apply in terms of house splits and 'kickbacks' except that the 10% would go Marc Goldner not to GBI. Eli will do his best efforts to have Emily sign an NCNDA with each of the businesses.

d) Non Mutual Contacts are as follows (minor misspellings may have occurred in this section below):

i) Marc solo contacts (non-mutual contacts): Ludwig Kuttner and Trixie, Oliver Kuttner, Susan Kreischel, Hampshire Investments Paul Wasserman, Paul Sanar, Justin Miller, Shashi Matta, Robert Wilder, Joe Testa, Shylesh, Sarmen Saryan, Nicole Santiago, Ted Ovtavius Reid, Chris Ramonetti, Express Trade Capital, Drew Cohen, David Estrakh from Express Trade, Mark Bienstock, Ethan founder of Events.com, Mark Peters, anyone from Semester at Sea, Marc's professors from Penn including but not limited to Igor, Marc's Professor from OSU including but not limited to and anyone in the Entertainment industry including but not limited to Rod Reiner, Doobry, Arya Zand, Simon Divilov, Christian Ternstedt, Christian Von Uffel and his father, Rachel Korsen, Robert Gross, Tom and Abigail Shewalter, Eric Goldner, Raymonde Goldner, Robert Goldner, the Levy family, Solon, Zach Honig, Mike Fattoulah, Robert Garson, Robert Cohen, Michael Schwab, Alex Corey, Daniel Engel, Ken Erickson, Glenn eric's friend, John Delia, Alonso, Adam Doyle, Rexford Brabson, Andy Nitkin, Carl Toy Sales Rep (not from Late Stage), Aarush, Chris Craddock, David Garces, Charles and Daniel Greenberg, Sean Acosta, Seth Godnick, anyone from Roslyn High School, John Rosenberg, Dan Jablons, anyone from the Mamieh Family, The Safra Family, members from the ABA and CBA and NYBA, the Weiner family, Angel May, Gang Li, Daniel Niamehr, Scott and Jared and Jordan and Barbara and Chad Bleznick, Michael Kushner, Harvey and Stephen Davis, Cheryl Davis Korsen, Matthew Korsen, Kroze, Konstantin Divilov, Stephan Winkelmann, David Blake, Christopher Costa, employees and board members of The International Spy Museum, Steven Raskind, Sarah Ebad, any of Marc's Professors from Columbia, any of Marc's Professors from UConn Law, Ezelle and Quintin and Ally Van Der Heever, Craig Miller, Merchant Factors, Gary Vaynerchuk, Alan Rosenberg, Carlos from UPenn, any of Marc's classmates from UPenn Columbia and UConn Law, Abdou Sylla, Rodny from Roslyn, Liel from Israel, Josh Elder, Orit Golos, Simon Moskowitz, all cohort mates from JGSI, all cohortmates from ISEF, all cohortmates from Penn Law's Human Rights Program, Ndidi Moses, Jordan Meiselas and the meisalas family, Shota Nakama composer of Final Fantasy, Ruth from Sony, Rashid Chotani, the Schneck family, the Shottenstein family, the Wexner family, the Freleng family, Jordan Urbach, Karen Booth, all members from Columbus Computer Consulting, Rob from Charlottesville, Rob Smith, Ben Abelson, Brad Okeson, Cleve Adams, Steven Astrein, Ben Oheb, Ben Shoshan, Kevin Cai, Seunghoon Cha, Winsum in China, Steven from China, Linxaio, Michael Chang, Abhinav Chaturvedi, Richie Chen, Zachary Cohen, Giuseppe Maria de Peppo, Mariana Donagelo, Jean-Phillippe Emelie Marcos, David Fisher, Stuary Foley, Geremy Grunin, Gian-Luca Cioletti, Angel Iribozov, Matthew Levenberg, Jay Maybruck, Piyuush Mehta, Abhijeet Muzumdar, Zoria Ospina, Iris Perl, Thomaz Quintella, John Ricci of US Angel Investors, Lawrence Richnstein, Mayer Rosenzweig, Renata Scavassa Dearo, Michael Schneck, Richard Sergay, Tarang Shah, Mateus Tessler, Peter Valhouli-Farb, members from the Entertainment Law Las Vegas Conference, Harris Cohn, Pam Kaufman,

Charlie Talbot, James Vena, John Deming, Jordan from Viacom, EdTech Week's Education Entrepreneurs Investors, Bill Teitelvaum, Ray Kurzweil, Aubrey Degrey, Michiu Kaku, the Roddenbery Family, Brian Greene, Charlottesville Angels, and anyone affiliated involved and/or related to any of the Golden Bell entities whether in business art design or otherwise.

ii) Eli's non-exhaustive list of solo contacts (non-mutual contacts): Eli Broverman, Adam Krim, all professors or classmates Eli had at Stanford, all Professors or classmates Eli had at Brown, Eli's mom, Eli's dad, Wayaca, anyone from Eli's High School, Andrew Marcus, Adrian Baschuk, Matt Caps, Jeff Laretto, Jeff Crutenden from Acorns, Brock Pierce, Ralph Serrano, Joel Dietz, anyone from Eli's BitFinance or prior companies as per emails, texts or LinkedIn.

e) If both Eli and Marc agree a contact of that partner can become a mutual contact if agreed if both parties decided to make a solo contact a mutual contact in exchange. i.e. Trade Ludwig for Broverman but that is a case by case basis or deal by deal basis.

f) There will be a specific exception given to Marc Goldner in the case of Intelligence, Espionage, Contractor, and Security contacts that either Marc knew before or will meet after the signing of this Agreement. Under no circumstance will any intelligence agents be disclosed to Eli Blatt by Marc Goldner, nor will any military (either public or private), spies, intelligence agents, military contractors. However, if a deal is brokered by Marc Goldner such as a deal with a private military contractor that deal will still be split 50/50 if it is for business purposes from a mutual contact (i.e. if MegaCap is acting as a Broker Dealer for a transaction that Marc is bringing to the table then Marc will also use MegaCap as the Broker Dealer of question but there will be redacted names and non-disclosures that prevent Eli knowing who the parties in question are unless Eli winds up being given a security clearance, authorization from that party, or is recruited by a contractor or intelligence agency). However, it is acknowledged by the parties that Marc may conduct business-like activities for the sake of national security, by any direct government orders and/or mandates, or for any missions by any given contractor or intelligence agency. For avoidance of doubt, Marc Goldner's existing and future contacts relating to people in the Intelligence, Espionage, Contractor, and/or Security industries will not be considered mutual contacts unless it is for a direct business purpose such as dealing data or utilizing Marc and Eli's Broker Dealer of choice at the time if a Broker Dealer is needed for a transaction that Marc is working on with those said 'agents'. This may also apply to G42 in Abu Dhabi or companies like Palantir, In-Q-Tel, or other third party intelligence-related companies working on classified projects or has access to sensitive data. If Marc does any third party consulting in these industries he will not disclose it to Eli.

i) For avoidance of doubt, Paragraph F's (above) contacts do not need to be disclosed but any financial deals from those contacts must be split between Marc Goldner and Eli Blatt 50/50.

## Records

54) The Company will at all times maintain accurate records of the following:

A. Information regarding the status of the business and the financial condition of the Company.

NOT A CERTIFIED COPY

B. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.

C. Name and last known business, residential, or mailing address of each Member and Manager, as well as the date that person became a Member or Manager.

D. A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement and any amendments have been executed.

E. The cash, property, and services contributed to the Company by each Member, along with a description and value thereof.

55) Each of the Class A Voting Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

56) Each Manager has the right to examine the above documents for any purpose reasonably related to their position as Manager of the Company.

## Books of Account

57) Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any of the Class A Voting Members. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

## Banking and Company Funds

58) The funds of the Company will be placed in such investments and banking accounts as will be designated by the unanimous vote of all Class A Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by unanimous consent of the Class A Voting Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

## Audit

59) Any of the Class A Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Class A member requesting the Audit. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Class A Voting Members for any fiscal year.

## Tax Treatment

60) The Company is intended to be treated as an S-Corp for the purposes of Federal and State Income Tax.

## Annual Report

61) As soon as practicable after the close of each fiscal year, the Company will furnish to each Class A Voting Member an annual report showing a full and complete account of the condition of the Company, including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

   a) A copy of the Company's federal income tax returns for that fiscal year.
   b) Income statement.
   c) Balance sheet.
   d) Cash flow statement.
   e) A breakdown of the profit and loss attributable to each Member.

## Goodwill

62) The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## Force Majeure

63) A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to an event of force majeure, such as earthquake, typhoon, flood, fire, pandemic, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

## Forbidden Acts

64) No Member may do any act in contravention of this Agreement or prevailing law.

65) No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company unless such party is Managed and/or owned by one of the Members or is a family member, spouse, or significant other of a Managing Member. However, such assignment can only be for that Member's individual interest in that specific asset (including but not limited to the entire portion of the Member's interest in the Company) but the Voting Rights cannot be assigned and will remain the exclusive rights of the Managing Members. However, if one of the Class A members has signed a Power of Attorney or provided a third party with Agency to vote as a proxy where the vote is still the vote of the Managing Member in any manner than that shall not be considered a forbidden act and that third party vote will be considered the vote of the Class A member.

NOT A CERTIFIED COPY

66) No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

67) No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

68) No Member may confess a judgment against the Company.

71. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members. However it is clear that this will be handled through a mediation process and that neither Marc or Eli will be involuntarily removed as this is for any third party members who are not Marc and Eli. For avoidance of doubt, no assets owned by Marc or Eli will become the property of the other regardless of any disassociation or removal without an equal split being applied to the value of those assets. No such Involuntary Withdrawal shall clawback any equity to the non-disassociated member.

## Indemnification

69) All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature whatsoever, arising out of a Member's participation in Company affairs pursuant to this Agreement. A Member will not be entitled to indemnification under this section for liability arising out of negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

## Liability

70) A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

## Liability Insurance

71) The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

## Life Insurance

72) The Company will have the right to acquire life insurance on the lives of any or all of the Members if unanimously agreed by the Class A voting members.

## Amendment of this Agreement

73) No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all of the Class A Voting Members.

**Title to Company Property**

74) Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member.

**Dispute Resolution**

75) Dispute Resolution . Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this Section. The initiation and pendency of the procedures under this Section does not relieve the Parties from their respective obligations under the Agreement. ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS SECTION SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

    A. Negotiations by and between the Parties.

    (1) Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail. Within thirty (30) days after receiving such notice the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

    (2) Upon the Disputing Party's receipt of the Responding Parties' response, the Parties shall then have thirty (30) days, or such other time as they may mutually agree upon in writing, to resolve the Dispute amongst themselves.

    B. Mediation.

    If the Parties are not able to resolve a Dispute pursuant to subsection (A) above, they agree to participate in at least five (5) full length business days of good faith mediation administered by the American Arbitration Association under its Commercial Mediation Procedures.

    C. If the Parties are not able to resolve a Dispute pursuant to subsections (A) and (B) above, the Dispute shall finally be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Nothing herein shall limit the right of any Party to seek interim or provisional equitable relief in a court of competent jurisdiction prior to or pending the conclusion of the arbitration. Any Arbitration shall take place virtually unless the parties agree on a physical location. The arbitrator shall apply the law of the State of Delaware without regard to conflicts of law principles. No demand for arbitration may be made after the date when the institution of legal or equitable

proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

76) Equitable Remedies. The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement. The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware. For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of forum non conveniens.

77) Waiver of Certain Rights . AS A MATERIAL INDUCEMENT TO EACH MEMBER TO ENTER INTO THIS AGREEMENT, EACH MEMBER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO MAINTAIN ANY ACTION FOR DISSOLUTION OF THE COMPANY OR FOR PARTITION OF PROPERTY UNDER THE ACT. IN ADDITION, THE MEMBERS AGREE THAT THIS AGREEMENT HAS BEEN CAREFULLY DRAFTED TO PROVIDE FAIR TREATMENT OF ALL MEMBERS AND PARTICULARLY IN RESPECT OF EQUITABLE PAYMENT IN LIQUIDATION TO HOLDERS OF ECONOMIC INTERESTS. ACCORDINGLY, EXCEPT WHERE AND ONLY IF THE MANAGER OR LIQUIDATOR, AS THE CASE MAY BE, HAS FAILED TO LIQUIDATE THE COMPANY IN A REASONABLY TIMELY MANNER AS REQUIRED UNDER THIS AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES AND RENOUNCES ITS RIGHT TO INITIATE A LEGAL ACTION OR OTHER CLAIM TO SEEK THE APPOINTMENT OF A RECEIVER OR TRUSTEE TO LIQUIDATE THE COMPANY.

78) No Waiver. A Person's waiver of or consent to, express or implied, any breach or default by any Person as to the performance by such Person's obligations with respect to the Company, shall not constitute a waiver of or consent to any other breach or default by such other Person of the same or any other obligations with respect to the Company. Failure on the part of a Person to complain, provide notice of, or object to any action or inaction of any Person, or to declare any Person in breach or default with respect to the Company, irrespective of how long such failure continues, shall not constitute a waiver by such Person of its rights with respect to such breach or default, until the applicable statute of limitations period has run.

79) Binding Effect. Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective Personal Representatives, successors and permitted assigns.

80) Parties in Interest. Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective Personal Representatives, successors and permitted assigns, and nothing in this Agreement shall be construed to relieve or discharge the obligation or liability of any

Person to any party to this Agreement, or to provide any Person any right of subrogation or action over or against any party to this Agreement.

81) <u>Prevailing Terms</u> . In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

82) <u>Severability</u>. If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances.

83) <u>Further Assurances</u> . In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

84) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts with the same effect as if all signing parties hereto had signed the same document. All counterparts shall be construed together and constitute the same instrument. Signatures by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory and shall be deemed to be originals for all purposes. The Members acknowledge and agree that it may be executed electronically, and that the provisions of the Electronic Signatures in Global and National Commerce Act of 2000, 15 U.S.C. 7001 et al, as amended and in effect as of the Effective Date of this Agreement, shall apply.

85) <u>Acknowledgment of Provisions</u> . BY EXECUTING THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES THAT IT HAS ACTUAL NOTICE OF: (A) ALL OF THE PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTERESTS; AND (B) ALL OF THE PROVISIONS OF THE ARTICLES. EACH MEMBER HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES ADEQUATE NOTICE OF ALL SUCH PROVISIONS, AND EACH MEMBER HEREBY WAIVES ANY REQUIREMENT THAT ANY FURTHER NOTICE REQUIRED BY ANY PROVISION OF THE ACT OR APPLICABLE LAW.

## Miscellaneous

86) Time is of the essence in this Agreement.

87) Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

88) If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

89) This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matter hereof, and may not be modified or amended except by a written instrument executed by or on behalf of authorized representatives each of Party to this Agreement. However, any agreements between Marc Goldner and Eli Blatt still remain in effect such as any agreements pertaining to BitSource, MegaCap, or otherwise.

90) All notices or other communications relating to the performance, enforcement, or other legal aspects of this Security Agreement will be in writing and may be personally delivered, sent by overnight courier service to all parties, and delivered as a .pdf e-mail attachment to all parties. Any other communications between the parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to all parties.

91) All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

92) If there is ever a subpoena served to the Company, requested Discovery by any third party, or any other Compelled Court Disclosure, the Company shall file a motion to quash, claim privilege, and file a protective order on any subpoena or discovery requests made by any third party.

## Definitions

93) For the purpose of this Agreement, the following terms are defined as follows:

    a) "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

b) "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

c) "Distributions" means a payment of Company profits to the Members.

d) "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

e) "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, Member's rights to participate in the management of the Company, and any Units of membership interest in the Company owned by such Member.

f) "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

g) "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

h) "Principal Office" means the office whether inside or outside the State of Delaware where the executive or management of the Company maintain their primary office.

i) "Voting Members" means the Members who belong to a membership class that has voting power.

j) "Supermajority Vote" means a vote by Members representing no less than 60% of the Class A Voting Units.

SIGNED, SEALED, AND DELIVERED

**ELI M BLATT**

By: _____          12 / 08 / 2021

**MARC GOLDNER**

By: _____          12 / 08 / 2021

EXHIBITS

Exhibit A    Confidentiality Agreement

Exhibit B    Non-Circumvent Non-Disclosure Agreement

Exhibit C    Incorporation Filings, Papers, IRS EIN Documents, and Articles of
Incorporation

Exhibit D    Entity Decks that are discussed in the Purpose of Company

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered into on December 7, 2021 (the "Date") Effective by and between: (i) GOLDNBER BLATT INVESTMENTS LLC ("GOLDNER BLATT INVESTMENTS"); and (ii) Eli Blatt (the "Receiving Party"). GOLDNER BLATT INVESTMENTS and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for GOLDNER BLATT INVESTMENTS to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with GOLDNER BLATT INVESTMENTS (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by GOLDNER BLATT INVESTMENTS to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. For avoidance of doubt, Confidential Information shall include but not be limited to all business dealings, terms, and legal discussions including but not limited to Operating Agreements, PPMs, Subscription Agreements, Contracts, Term Sheets, any documents, any files, any messages, any recordings, any videos, any pictures, any emails, any texts, and any other legal type related documents or forms of documents communication which shall not be disclosed under any circumstances. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) GOLDNER BLATT INVESTMENTS releases without restriction to a party other than the Receiving Party; or (e) GOLDNER BLATT INVESTMENTS authorizes the Receiving Party to disclose. In any action in which GOLDNER BLATT INVESTMENTS alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2.    **Use of Confidential Information; Non-Disclosure Obligations**

2.1. Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party whether knowingly or unknowingly.

Doc ID: 88a0■■■■■55a3c832141744af1fb05755e013db

2.2. The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of GOLDNER BLATT INVESTMENTS and secure such other persons' written agreement, a copy of which shall be provided to GOLDNER BLATT INVESTMENTS, to abide by the terms herein. GOLDNER BLATT INVESTMENTS shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3. The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to GOLDNER BLATT INVESTMENTS. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4. The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5. **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3. **Compelled Disclosure**

The Receiving Party may not disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority. The Receiving Party, if requested by the other party and at their expense, shall file a motion to quash, claim privilege, and file a protective order on any subpoena or discovery requests made by any third party.

4. **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of GOLDNER BLATT INVESTMENTS and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of GOLDNER BLATT INVESTMENTS.

5. **Return of Confidential Information**

At the request of GOLDNER BLATT INVESTMENTS or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to GOLDNER BLATT INVESTMENTS. The Receiving Party shall also destroy (and certify such destruction in writing to GOLDNER BLATT INVESTMENTS any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.   **Term, Termination, and Mutual Contacts Definition**

The Term, Termination, and Mutual Contacts definition are defined in the Operating Agreement to which this document is an exhibit.

7.   **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of GOLDNER BLATT INVESTMENTS'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause GOLDNER BLATT INVESTMENTS irreparable harm, the amount of which may be difficult to ascertain, and that GOLDNER BLATT INVESTMENTS shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as GOLDNER BLATT INVESTMENTS shall deem appropriate. Such right of GOLDNER BLATT INVESTMENTS shall be in addition to the remedies otherwise available to GOLDNER BLATT INVESTMENTS at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.   **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.

9.   **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

## 11.   Severability

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

## 12.   Relationship of The Parties

This Agreement is an addendum to the Goldner Blatt Investments, LLC Operating Agreement where Marc and Eli are partners in that business.

## 13.   Assignments

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

## 14.   Waiver

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

## 15.   Notices/Points of Contact

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to GOLDNER BLATT INVESTMENTS:

    Address:          8 The Green Street, Suite A, Dover, DE 19901

    E-Mail:           partners@gb.investments

If to Eli Blatt                            :

    Address:       2020 N Bayshore Dr #2310 Miami FL 33137

    E-Mail:          e@gb.investments

If to Marc Goldner                   :

NOT A CERTIFIED COPY

Address:      15 Peacock Drive, Roslyn, NY 11576

E-Mail:       m@gb.investments

## 16.   Headings Non-Substantive

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**GOLDNER BLATT INVESTMENTS LLC**

By: █████████

Name: Eli Blatt
Title:  Managing Member

Date: 12 / 08 / 2021

By: █████████

Name: Marc Goldner
Title:  Managing Member

Date: 12 / 08 / 2021

**THE RECEIVING PARTIES**

█████████

Marc Goldner

Date: 12 / 08 / 2021

█████████

Eli M Blatt

Date: 12 / 08 / 2021

NOT A CERTIFIED COPY

## INVESTOR CONFIDENTIALITY AND NON-CIRCUMVENTION AGREEMENT

THIS Investor Confidentiality and Non-Circumvention Agreement (this "Agreement"), dated December 7, 2021 is entered by and between Goldner Blatt Investments, LLC (the "Company"), whose address is 8 The Green, Suite A, Dover DE 19901, Marc Goldner, and Eli Blatt (individually and jointly "Investor") (collectively, the "Parties" and each individually a "Party"):

WHEREAS, part of the Company's business is purchasing investment assets (the "Assets"), including, but not limited to, pre-IPO interests in private companies, investments in crypto, asset and property purchases, and general investments.

WHEREAS, Investor has, or is considering making an investment in the Company (the "Transaction") and to conduct a due diligence process with respect to a certain class of Assets the Company owns or intends to purchase (the "Purpose").

WHEREAS, the Parties have determined that they can best accomplish the Purpose by sharing certain Confidential Information (defined below) and the Company connecting Investor to certain of the Company's business contacts ("Company Contacts").

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

1.   **Confidentiality.** Each Party receiving Confidential Information (defined below) shall be known as a Recipient, and each Party disclosing Confidential Information shall be known as a Disclosing Party:

1.   **Confidential Information.** "Confidential Information" means (a) the identity and information relating to or provided by any Company Contacts, and (b) all non-public, proprietary or confidential information of the Disclosing Party whether disclosed in oral, visual, written, electronic, or other tangible or intangible form, whether or not marked or designated as "confidential," and all notes, analyses, summaries, and other materials prepared by Recipient or any of its affiliates, officers, directors, employees, shareholders, partners, members, managers, or agents (collectively, "Representatives") that contain, are based on, or otherwise reflect, to any degree, any of the foregoing. Without limiting the foregoing, Confidential Information includes, but is not limited to: projected financial information, patents, trademarks, copyrights, ideas, trade secrets, trade dress, potential patents, schematics, frameworks, financing/investment structures, business models, business plans, products, pricing, product validation tests/clinical studies, commercialization plans/results, customers, vendors, financing sources, buyers, capitalization tables, shareholders, directors, employees, advisors, the occurrence of discussions among Recipient and Disclosing Party. For avoidance of doubt, Confidential Information shall include but not be limited to all business dealings, terms, and legal discussions including but not limited to Operating Agreements, PPMs, Subscription Agreements, Contracts, Term Sheets, any documents, any files, any messages, any recordings, any videos, any pictures, any emails, any texts, and any other legal type related documents or forms of documents communication which shall not be disclosed under any circumstances. Recipient agrees that all Confidential

Information constitutes private, privileged, valuable and proprietary assets of the Disclosing Party and that its unauthorized use or misuse would adversely affect the business and interests of the Disclosing Party. Except for the identity and information relating to any Company Contacts which is always considered Confidential Information, the term "Confidential Information" does not include information which can be demonstrated to (i) have previously become generally available to the public other than as a result of disclosure by Recipient or a source bound by a confidentiality agreement, or (ii) have been made available to Recipient on a non-confidential basis from a third party prior to its disclosure by the Disclosing Party, unless such source was bound by a confidentiality agreemen.

2.      **Limited Permitted Use.** Recipient agrees that the Confidential Information is disclosed for Recipient's sole use for the Transaction and is owned by the Disclosing Party. Conveyance of Confidential Information to the Recipient by the Disclosing Party or any Company Contact does not constitute a general release of, or license to use, such information. Recipient agrees not to use the Confidential Information for its own benefit or for the use or benefit of any other person or entity or for any reason other than for the Transaction. Recipient acknowledges that as the result of discussions relating to the Purpose, certain of the Disclosing Party's business opportunities will become known to Recipient. Recipient agrees that such opportunities belong to the Disclosing Party, and that Recipient will not misappropriate any such opportunity. All Confidential Information shall be destroyed or returned to Disclosing Party upon completion or abandonment of the Purpose.

3.      **No Unauthorized Disclosures.** Recipient agrees to protect all Confidential Information and not to duplicate or disclose any such information and materials to any person or entity except internally to its legal counsel and employees who have a need to know for furtherance of the Transaction. Recipient shall ensure that each such person has agreed to comply with these confidentiality provisions contained herein prior to the person receiving any Confidential Information. Recipient assumes responsibility for ensuring its Representatives' compliance with this Agreement and shall be liable for any unauthorized disclosure or use of the Confidential Information by its Representatives.

4.      **Company's Use**. Notwithstanding the foregoing, the Company may disclose to third parties or the public the Assets and the purchase price, market value, and sale price of the Assets purchased, held, and sold by the Company, but will not disclose the name of Investor, or that Investor is considering making an investment in Company, without Investor's prior consent.

2.    **No Representations and Warranties**. The Disclosing Party provides all Confidential Information without any representation or warranty, expressed or implied, as to the accuracy or completeness thereof, and the Disclosing Party shall have no liability to Recipient or any other person or entity relating to Recipient's use of any of the Confidential Information or any errors therein or omissions therefrom. Further, the Company makes no representation or warranty, expressed or implied, as to the accuracy or completeness of any information provided to Investor by a Company Contact ("Contact Provided Information"), and the Company shall have no liability to Investor with respect Contact

Doc ID: 88a0ad065a55a3c832141744af1fb05755e013db

Provided Information, or any errors therein or omissions therefrom, or resulting from Investors use thereof.

3.   **Non-Circumvention**. Investor shall not, directly or indirectly, except in collaboration with or with the express written consent of the Company: (a) enter into any transaction for the purchase or sale of Assets with a Company Contact or enter into any transaction with a Company Contact similar to, in competition with, or which otherwise could have the effect of preventing the Company from receiving the full benefits of the transactions contemplated by the Purpose, (b) contact any Company Contact or any individuals or entities that are associated with a Company Contact except for contacting Company Contacts with whom Investor had a pre-existing relationship provided that such contact is not related to the Purpose and is not otherwise intended to or results in a circumvention of this Agreement, (c) solicit a Company Contact to enter into a transaction for the purchase or sale of Assets without the knowledge and prior consent of the Company, (d) use any Confidential Information to its own benefit or advantage or to the exclusion of the Company, or (e) induce, solicit, procure, or otherwise encourage any of the Investor's Representatives or any other person or entity to respond to any solicitation from a Company Contact to enter into a purchase or sale of Assets, or take any other action in contravention of this Agreement. Investor acknowledges that the Company has devoted substantial time and resources to develop relationships with Company Contacts ("Relationships") that will assist the Parties in accomplishing the Transaction and the Purpose, and that the Relationships constitute valuable, special, and proprietary assets of the Company, and that circumvention by Investor of the terms of this Agreement will materially damage the Company. In consideration of their interest in conducting the Transaction, Investor hereby waives any right to claim a prior relationship with a Company Contact or to claim that Investor is not bound by the terms of this Section 3 due to such prior relationship (unless as defined in the Section 53 of the Goldner Blatt Investments Operating Agreement). Each party assumes responsibility for ensuring its Representatives' compliance with this Section 3 and shall be liable for any violation of this Section 3 by its Representatives. Additionally, the Receiving Party agrees not to share any of the Company Contacts or any contacts of the Managing Members to any third parties without the express written consent of said Managing Member.

4.   **Term.** This Agreement shall extend for a period of five (5) years from the Effective Date and is binding on the Parties hereto, their heirs, assigns, executors, administrators and all others succeeding in interest to any Party either directly or indirectly.  If Investor consummates a transaction related to the Purpose, the term of this Agreement will automatically renew for a 5-year period from the date of such transaction.

5.   **Termination.**

    1.     This Non-Disclosure Agreement shall never terminate unless certain information is made accessible and available to the public.

    2.     If Investor enters into any transaction for the purchase or sale of Assets with a Company Contact during the term of this Agreement or in the 48 months following termination of this Agreement without the Company's express written consent (a "Breaching Transaction"), Investor will pay the Company an amount equal to 20% of the aggregate total transaction value of such Breaching Transaction over and above

the greater of any compensation contemplated for such transaction or the total amount of compensation paid by Investor in breach of this agreement and/or the Seller of such breaching transaction. Investor acknowledges that Company would be harmed by a Breaching Transaction and such harm would be very difficult to accurately estimate, and the damages provided in this Section are a reasonable estimate of the anticipated actual harm that might arise from a Breaching Transaction.

3.       The terms and conditions of Sections 1, 2, 3, 5, 7, 10, 12 shall survive the expiration or termination of this Agreement.

6.   **Relationship of the Parties.** This Agreement is an addendum to the Goldner Blatt Investments, LLC Operating Agreement where Marc and Eli are partners in that business.

7.   **Indemnification.** Each Party shall defend, indemnify and hold harmless the other Party and its affiliates and their officers, directors, employees, agents, successors and assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from: (a) such Party's breach of their obligations under this Agreement; (b) resulting from such Party's acts or omissions in violation of this Agreement; and (c) such Party's breach of any confidentiality obligation under this Agreement.

8.   **Counterparts.** This Agreement may be executed in any number of identical counterparts and via digital or electronic signatures. Copies of the fully executed Agreement shall be deemed originals for all purposes.

9.   **Construction.** The parties hereto agree this Agreement is an instrument negotiated by all the parties hereto and will not be construed against its drafter. The recitals to this Agreement are part of this Agreement and shall be enforceable according to their terms.

10.   **Severability.** If any provision or any part of any provision of this Agreement is for any reason held to be invalid, unenforceable, or contrary to any public policy, law, statue or ordinance, then such provision or part shall be severed from this Agreement, and the remainder of this Agreement shall not be affected thereby, and shall remain valid and fully enforceable.

11.   **Integration and Amendment**. This Agreement contains the final, complete, and exclusive understanding and agreement among the Parties with respect to the subject matter of this Agreement, and supersedes any prior or contemporaneous agreements, representations, understandings, oral or written, by any of them. There are no terms, conditions, warranties, or representations other than those contained herein. This Agreement may be amended only by an instrument in writing executed by all Parties hereto.

12.   **Governing Law**. This Agreement shall be governed by the laws of the State of Delaware. Any claim, cause, or action relating to or arising out of this Agreement shall be brought in any state court sitting in Miami Dade County, Florida, and not in any other venue, unless otherwise agreed by the parties hereto in writing. THE PARTIES EXPRESSLY CONSENT TO THE PERSONAL JURISDICTION OF THE STATE AND

FEDERAL COURTS LOCATED IN THE CITY OF MIAMI, IN THE STATE OF FLORIDA, FOR ANY LAWSUIT, ARISING FROM OR RELATING TO THIS AGREEMENT.

13.   **Effective Date**. This Agreement shall be deemed effective on the date first above written when fully executed by all parties hereto (the "Effective Date").

[Signature page follows]

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement on the dates set forth below.

**GOLDNER BLATT INVESTMENTS LLC**

By: ███████

Name: Eli Blatt
Title: Managing Member

Date: 12 / 08 / 2021

By: ███████

Name: Marc Goldner
Title: Managing Member

Date: 12 / 08 / 2021

**THE INVESTOR PARTIES**

███████

Marc Goldner

Date: 12 / 08 / 2021

███████

Eli M Blatt

Date: 12 / 08 / 2021

NOT A CERTIFIED COPY

# EXHIBIT B



April 18, 2022, 11:05 AM   Restore this version

|  | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 |  | $ | % |  |  |  |  |  |  |
| 2 | Eli |  | $415,821 |  |  |  |  |  |  |
| 3 | Marc |  | $402,086 |  | -$13,736 | Paid to Marc on Back end |  |  |  |
| 4 |  |  |  |  |  |  |  |  |  |
| 5 | What? | Who? | How much? | Notes |  |  |  |  |  |
| 6 | GoDaddy | Eli | $4,946 | thenftfund.com |  |  |  |  |  |
| 7 | Bitfinance.com | Eli | $10,000 |  |  |  |  |  |  |
| 8 | Mythic/Dragon | Eli | $72,000 |  |  |  |  |  |  |
| 9 | NFTs | Eli | $200,000 |  |  |  |  |  |  |
| 10 | Miners | Eli | $131,931 |  |  |  |  |  |  |
| 11 | NFTs | Marc | $400,000 |  |  |  |  |  |  |
| 12 | Miners | Marc | $43,977 |  |  |  |  |  |  |
| 13 | tcb.com | Marc | $10,000 |  |  |  |  |  |  |
| 14 | Miners | Eli | $20,000 |  |  |  |  |  |  |
| 15 | Miners | Marc | ??? |  |  |  |  |  |  |
| 16 | Wayaca NFT | Eli | -$50,000 |  |  |  |  |  |  |
| 17 | Wayaca Miners | Eli | -$66,500 | $33,500 | $23,450 |  |  |  |  |
| 18 | Mario/Jeremy/Damien | Marc | -$100,000 |  |  |  |  |  |  |
| 19 | Mar a Lago | Eli | $10,000 |  |  |  |  |  |  |
| 20 | Mining | Eli | $70,218 |  |  |  |  |  |  |
| 21 | Mining | Marc | $48,109 |  |  |  |  |  |  |
| 22 | BitSource | Eli | $13,800 |  |  |  |  |  |  |
| 23 | Thecryptomotel.com | Eli | $20 |  |  |  |  |  |  |
| 24 | thecryptohotel.com | Eli | $2,504 |  |  |  |  |  |  |

Version history

All versions

▶ May 29, 2022, 7:59 PM
  ● Eli M Blatt

▶ May 15, 2022, 6:37 PM
  ● Eli M Blatt

APRIL 2022

April 18, 2022, 11:05 AM
  ● Eli M Blatt

April 14, 2022, 9:00 PM
  ● Eli M Blatt

April 13, 2022, 2:23 PM
  ● Eli M Blatt

MARCH 2022

March 31, 2022, 5:05 AM
  ● Eli M Blatt

▶ March 25, 2022, 6:01 AM
  ● Eli M Blatt

March 22, 2022, 9:33 AM

NOT A CERTIFIED COPY



From: **Eli Blatt** | eli@gb.investments          To: **m@gb.investments**          February 4, 2022 at 3:42AM

Hi Marc,

This is to confirm our understanding as follows:

1. We each agree to a capital contribution of $100K towards the purchase of NFTs
2. You have already purchased a significant portion of these with full transaction records for each purchase and will soon complete the purchases
3. I will remit my $100K capital contribution to you as payment on behalf of GBI for $100K worth of the NFTs in #2
4. You will then assign ownership of a total transaction value of $200K as per #2 to GBI which will then own NFTs valued at $200K at the time of their purchase and complete your capital contribution as per #1

Please confirm with wire instructions below.

Thanks!

Eli


NOT A CERTIFIED COPY



Hi Marc,

I regard you as both a friend and business partner, but unfortunately our relationship right now is not in good standing. I am always happy to discuss and work out disagreements, however if your position is that you will do what you want, when you want, with impunity, regardless of the OA, as it has been to date, then you don't leave me a way forward with GBI.

We both need to abide by the OA – *especially* when we don't want to. I will not continue investing in GBI if you're going to refuse to abide by the OA and threaten me or tell me to sue you every time we disagree, as has now happened with both the miners and the NFTs, as well as your demands for excessive expense reimbursement.

Regarding the NFTs, I get that you didn't *want* to sell in May when I did, but, per the OA, if they indeed belong to GBI, it was your *obligation* to either sell or buy. Instead, you used your exclusive control over the wallets to simply refuse to sell and told me to sue you, promptly causing us to lose $250K in value – plus the ability to redeploy that now in the down market. I need to be compensated for this loss.

As it stands now, based on your handling of and communications to me regarding both the miners and the NFTs, my position is that you misappropriated my wire transfers to you, which were credited as capital contributions into GBI and earmarked for you to purchase those assets for GBI; instead, you purchased them in a manner controlled by and effectively titled to you individually. They are thus, in fact, de facto and de jure, not owned by GBI.

If we can resolve this as per the below, then I'm amenable to helping you launch an NFT Fund and moving forward with GBI.


**General Concerns**

*Availability*

Your extensive external time commitments and frequent lack of availability / responsiveness have become an increasing problem. Your previously undisclosed security business, increasing commitments to ECAs, and decision to go back to law school full time are significant deviations from the commitments you had represented to me as having when we signed the GBI OA. As a result of you being continually over-extended, I can't get you to reply in a timely manner to anything – and you haven't even started law school back up yet.

*Accountability*

You don't follow through on many things you say you will and take no accountability for the consequences. When I argued that we should not buy the ATM for Sprinkles, you promised you would dedicate yourself to BitSource after Panama, but to my knowledge the only thing you've

done in over two months is send a proof of ID after multiple requests and this past week a few emails. Your recent ramp up in effort has come too late. That business is now basically dead, and Courtney is pissed at us (and says she's no longer part of the company). As a result, I am no longer willing to bear the regulatory and compliance risks associated with running this business and will need a waiver of liability from you in order to permit it to continue.

*Misrepresentation*

You perpetually misrepresent and over-promise opportunities (ATMs through David, ATMs through Adam, Ludwig funding BitSource, NFT this that and the other, etc.) in order to placate me or induce me into agreements or concessions. You are continually rapid-fire presenting a million different opportunities that you are too over-extended to actually pursue and which it is unclear even really exist.

Before we signed the GBI OA, you had represented that there were significant opportunities to raise money in Dubai, claiming among other things that his excellency and others promised us money. On the basis of these representations, I wasted time making presentation decks and subsequently agreed to enter into the GBI OA to pursue those with you. I understand nothing is guaranteed ever, but literally not a single group chat or email thread was ever even started – it all turned out to be less than nothing. I'm not even sure the decks I made were ever shared with anyone in Dubai besides Miriam or that these conversations even happened.

*Threats and verbal abuse*

When we have disagreements, you become verbally abusive and threaten me. Your reaction to my refusal to accept your demands for expense reimbursement well beyond that provided for by the OAs is a notable example.



This is unacceptable and no way to conduct business with anyone, let alone someone you say is your friend and partner, and it has to stop immediately if we are going to continue working

together. I will not be threatened in this manner, and I categorically do not consent to anything you pressure me to do in this matter.

*Ethics*

You have stated that you have no qualms operating in an unethical manner, only to not break the law. If this is how you truly feel, it is an obstacle to us working together – especially since you have shown clearly that you do not believe you need to behave ethically with me. I believe in operating and treating partners ethically. You either need to commit to being ethical in your dealings with me and our partners, or I cannot work with you.

**Specific requirements in order to move forward with GBI**

1. You will either refund me or transfer direct ownership to me of all of the miners you induced me to wire you funds for as supposed capital contributions to GBI – all 19 XPs.
   a. This transfer is to be effectuated by a signed statement sent to me and copying Compass support from your Compass-registered email account requesting that Compass send me a receipt for these miners in my name; change the login email account to team@megacap.capital; grant me 2FA access so I can access the account; and instructing Compass to transfer my miners to my own login account as soon as feasible.
      i. I can draft it and you can sign and send it.
   b. The two Pros can be bought by either you or Dharma at full value.
   c. For the remaining half miner, you or Dharma buy me out at full value.
   d. The balance of the miners for which our wire transfers were credited as capital contributions to GBI, you can title as you see fit, as you already are, leaving GBI with zero miners (as is in fact currently the case).

2. We complete the NFT shared wallet contract to protect and honor your commitments to the TRIUMers and Wayaca, as well as me.
   a. As part of this, you will need to compensate me for my losses as a result of your refusal to sell on May 6.
   b. I will not bear the financial consequences of you misappropriating my funds and/or refusing to honor your obligation to sell the NFTs back in May.

| NFTs Purchased before May 6, 2022 | At Purchase | 5/6/2022 | 7/13/22 |
|---|---|---|---|
| Price of ETH | $2,742.65 | $2,694.98 | $1,079.00 |
| ETH Portfolio Value | 169.21 | 138.6926 | 108.19 |
| Change in ETH Value from Purchase | 0.00 | -30.52 | -61.03 |
| % Change in ETH Value from Purchase | 0% | -18% | -36% |
| Change in ETH Value from May 6, 2022 | 30.52 | 0 | -30.51 |
| % Change in ETH Value from May 6, 2022 | 27% | 0% | -68% |

| | | | |
|---|---|---|---|
| USD Portfolio Value | $475,678 | $373,774 | $118,707 |
| Change in USD Value from Purchase | $0 | -$101,905 | -$356,971 |
| % Change in USD Value from Purchase | 0% | -21% | -75% |
| Change in USD Value from May 6, 2022 | $101,905 | $0 | -$255,066 |
| % Change in USD Value from May 6, 2022 | 27% | 0% | -68% |

    c.  Note that I will not negotiate this or anything else until the miners are transferred to me without qualification, as per the above.

**The Path Forward**

I really want to work out our disagreements. However, I cannot walk away from matters where you violated my trust and breached our written agreements, causing me significant financial harm. I have here proposed a reasonable path forward that can help ensure a productive partnership in the future. Once the above are completed, I will consider our relationship back in good standing and will help you launch an NFT Fund.

Regardless of anything herein, I will continue to work diligently and professionally on MegaCap. I trust that you will do likewise, as well as respond professionally to this proposal.

I'm hopeful we can resolve all of the above, continue to work together, and make Kash Money through GBI in the future in a way that is rewarding for both of us.

Best,

Eli

**APPENDIX**

*Miners*

1. I sent you $222,149, recorded as capital contributions to GBI, to buy miners for GBI.
2. Instead, you bought miners under your personal email address that I have no access to, which you 100% control, and which you have refused to manage in accordance with the GBI OA.
3. You thus induced me to wire you funds as an alleged capital contribution into our business but then in fact bought miners that you own and control.
4. You have used this control over the miners to try and pressure me into a below-market sale of "my" miners (which proves you do not in fact deem them as belonging to GBI), and to demand I pay hosting fees upfront for 5 years.
5. Of the miners you used GBI capital contributions for, you claim:

    a. 9 miners in total (including each of our interests) are part of Dharma, for which I had never until two weeks ago even been supplied an operating agreement let alone signed one, nor in which did I ever explicitly agree to invest capital in any email or text.

        i. The fact that the funds I sent were recorded as capital contributions to GBI (even though you admittedly did not deploy them as such), directly and unequivocally refutes your claim that I invested in Dharma.

        ii. You simply misappropriated GBI capital contributions and used them as your own capital contribution to Dharma and alleged that I had agreed to do likewise despite there being no executed Dharma OA or cap table.

    b. 30 allegedly belong to GBI, although I have no access to any of them, and you are refusing to distribute or sell those assets in violation of the OA.

        i. If, as you claim, GBI owns these miners, then I need to have 100% equal access to them as you.

        ii. Since I don't have that access, which you have clearly stated I do not and which as a practical matter I do not, they are, de facto, not GBI miners and you have thus misappropriated my funds to buy miners for yourself and Dharma.

6. Your numerous messages to me attempting to pressure me into a severable, individual sale of my miners – not via a sale of Dharma or GBI miners – is clear evidence of the fact that you feel you can apportion ownership of the miners in any way you see fit and that those miners don't concretely belong to anyone unless you say so.

    a. You flip flop at will as to who you claim owns the miners – GBI or me individually – to suit your needs.

7. I have demanded you provide me an invoice for the ownership of my half of these miners as per the above terms – which Compass has told me you can do with a single email.

    a. You have refused for over two weeks now to request or provide this invoice, attempting to use your control over the miners to pressure me into various concessions, including a below-market sale, pre-paying hosting fees for 5 years, and other non-miner related GBI issues.

8. I have told you that, in the absence of such an invoice, I will not remit any further payments for the miners.

    a. The same applies to my other requirements: until the full balance of your $400K alleged capital contribution to GBI to purchase NFTs as per below is fully accounted for and the NFT 'SPV' issue dealt with, I will not contribute any more funds towards the miners.

9. Should you pay the balance on the miners in order to not default on the entire order, per Section 17 of the GBI operating agreement, it will be an interest-free loan to GBI or evidence that you misappropriated my funds and dilution of my miner count, and for Dharma it would be a dilution in the Hardware Series.

    a. I do **not** authorize you to sell to yourself or Dharma or otherwise usurp pro-rata interests in "my" or "GBI" miners at any price except as follows:

        i. You or Dharma can buy out all 4.5 of the Dharma XP miners at cost if you want, so long as I receive a receipt for 15 XPs.

      ii.    Any funds you advance on my behalf I shall deem to be for that purpose unless otherwise agreed.

    b.   Should you want to buy out the balance of my / the GBI miners, you may do so at the basis price paid, not at a discount.

    c.   Any transactions involving the miners will have to be agreed in writing and signed by me.

10. I do not authorize any miners I contributed capital for to use the Dharma Pool, use of which constitutes a Major Decision and needs to be agreed on in writing for GBI or by me individually.

    a.   After my requirements above are completed without qualification, we can discuss the pool when the time comes, but not as a contingency to transferring ownership and control of my miners to me.

*NFTs*

11. You induced me to send you $200K as a supposed capital contribution to GBI to buy $600K worth of NFTs for GBI.

    a.   You recorded a $400K capital contribution to GBI for your purchase of NFTs.

        i.    Your alleged contribution of $400K has never been accounted for.

    b.   You have stated that you credited your ETH contributions to the NFT purchases at the basis price of the coins instead of their then present value.

        i.    You have alternatively stated it was half of your $400K contribution and another time that it was $30-$40K, but you have never provided any accounting.

        ii.   Regardless, this is an explicit breach of Section 3(e) of the GBI OA.

        iii.  You are obligated to have purchased $400K in USD value as per the etherscan records.

12. It was agreed that the NFTs would be owned pro rata $100K/$50K/$450K TRIUM/Wayaca/GBI, with Wayaca and the TRIUMers having wired $50K and $100K respectively.

13. You have stated to me and to the TRIUMers that you have also spent $200K on NFTs for yourself, and thus the total NFT purchases should be on the order of $800K in basis value.

    a.   Regardless, the minimum owed to the GBI collection is $600K worth of basis value NFTs, commencing in February when the joint purchase agreement commenced, regardless of the basis price of the ETH you may have used to purchase them.

14. You have yet to provide a complete accounting of how the money was spent or which NFTs GBI allegedly owns.

    a.   I had to conduct my own extensive research project to identify NFTs purchased to the GBI wallet.

15. I have no access to any of the wallets that own the NFTs allegedly bought on behalf of GBI, nor have you provided any record or wallet address whatsoever evidencing any SOL purchases.

16. As outlined in detail in my analysis of the NFT purchases, on May 6 you refused my right per the GBI OA to force a sale of the NFTs, telling me in writing that I'd have to sue you.

    a. As a result, the $475K basis value collection of NFTs in the ETH wallet at the time lost $255K (68% of their value on May 6), plus we lost the ability to redeploy the funds now in the down market.

    b. I consider you to be personally liable for my losses given your handling of the NFTs and/or misappropriation of my funds, and I need to be compensated for this.

17. Your only argument for not selling was that we agreed on a hold horizon, but this is patently and demonstrably false.

    a. There was never an email or even any messages to that effect.

    b. We only ever discussed LP lockup not an agreed GBI hold period.

    c. In fact, as evidenced by our chats and the warehousing language in the draft fund docs, we explicitly planned for GBI to sell them to the Fund as soon as possible so that we would not be over-exposed, which entails that they were bought with the intent of not holding onto them long term but rather liquidating them ASAP.

18. Given the above, you effectively induced me to wire you funds as a supposed capital contribution into GBI but then in fact bought NFTs that you legally own and control, thus misappropriating my funds.

    a. This is the exact same maneuver you pulled with the miners, fully intended to usurp total control over those assets in breach of the terms under which I agreed to wire you the funds.

19. In response to your most recent accusation that not being willing to move forward with the NFT Fund places me in breach, it most certainly does not.

    a. Companies abandon plans and products all the time due to changes in market conditions – for example as a result of market crashes – and other developments.

        i. In this case, I do not deem an NFT Fund to be a productive use of my time or resources given the onset of a crypto winter; our recent track record raising money; your bandwidth; and the performance of the NFT portfolio to date.

    b. Just because I invest time and resources to explore or create the possibility of a venture does not mean I am bound to move it forward.

    c. We have had and continue to have numerous disagreements about how the current NFT portfolio and potential future fund should be handled.

    d. The GBI OA requires both of us to sign a Series agreement, and, until that is done, there is no Series and no fund, period.

    e. As a practical matter, GBI does not have the financial resources to launch a fund.

# EXHIBIT E

# NOTICE OF DEFAULT

Dear Mr. Eli Blatt,                                                    Date of Notice: December 31, 2022

I am writing to you on behalf of The Dharma Initiative, LLC., in which you have been a member of and have failed to meet the capital contributions requirements outlined and agreed to in this chat. You are in ***material breach***.

On or about March 2022 two Invoices (2231 and 2309) was received from Compass Mining which was then later revised and shown to you in June due to the agreed increase of miners. You claimed an entity you were a part of called Goldner Blatt Investments, LLC., was purchasing another 36 miners (6 bundles), which you have failed to pay the balance on leaving the rest of the miners at risk. It was made transparent through these screenshots that all the miners were being purchased together at a bulk discount which was said numerous times in this chat. You have attempted through different means to acquire these miners in your name to damage the company and to use leverage of non-payment to coerce us all into an unfavorable agreement.

Additionally, you claimed your Mom and an entity named Wayaca was putting in money and that everyone had to "keep consistent with equity." We all agreed to purchase 3 Bundles at Dharma (4.5 Miners each between you, Marc Goldner, Rachel Korsen, and myself). You have failed to live up to the agreement that was agreed upon over 9 months ago. Your failure to abide by the terms of our agreement has put nearly a million dollars of miners in jeopardy which you will be held liable for in the event of your continued breach and non-payment.

Your default has put 72 total miners at risk. You have failed to meet your obligations knowing full well the consequences of your actions. We had offered to give you a 0% interest rate loan for 1 year in May or June, which you refused. We then offered to buy you out at a discount which you then refused. Now that the miners we all purchased are down over 50% you are refusing to pay the balance due that we had to front in order to not lose our own assets.

Therefore, as of today, December 31, 2022, The Dharma Initiative, LLC., is informing you that you are in default and that you have 30 days to pay the outstanding balance, or you will forfeit your rights, interest, equity, and potential earnings in the miners. Additionally, if the balance is not paid, there will be a meeting held to discuss your redemption from The Dharma Initiative.

This notice is made under all applicable laws with the rights stated in The Dharma Initiative Operating Agreement that has been shared with you and that allows for the redemption and notice of such a default.

We have discussed in good faith that we are extending you this 30-day notice in an effort to come to an agreement. If the balance of **$140,512.50** is paid in full by January 27, 2023, then we will consider this to be a tender offer where we will agree (if legally allowed) to backdate an agreement so that you may share in any potential capital loss from any sale of the miners to any person or entity whereas the effective date of such backdated agreement will be December 31, 2022. The breakdown of the balance includes but is not limited to 1) your portion of the GBI balance due, 2) your portion of the Dharma S19XPs that were acquired to mine more crypto and use to buy more miners perpetually, 3) Hosting Deposits, 4) Security Deposits, and 5) the 2 S19J Pros that you personally asked us to acquire for you. We sincerely hope that you are willing to pay off the debt due and come current so that you are not continuing to jeopardize the miners of everyone else that is part of The Dharma Initiative. If timely payment is not made, we are informing you that we will be forced to explore the option of bankruptcy protection as without your balance there will be nearly no way for us to continue to pay the monthly hosting fees that come due without a significant capital injection to prevent The Dharma Initiative from no longer being solvent.

The Dharma Initiative, LLC. Reserves All Rights and will explore pursuing legal action against you if not paid.

Sincerely,
*Simon Divilov*   12 / 31 / 2022
Simon Divilov
On Behalf of The Dharma Initiative, LLC.

Note: As an alternative, Marc has agreed to continue to have good faith discussions with you to determine the final language for a settlement agreement that will allow all parties to be made whole in this situation.

P.S. Please be informed that we were advised by Compass last week that the miners should start to be delivered shortly and for everyone to remain patient as they work through their own operational issues.

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| Title | Eli Blatt Notice of Default |
| File name | Notice of Default...ember 31 2022.pdf |
| Document ID | 66377b5cd8917d77590c45a826322870c49dbbca |
| Audit trail date format | MM / DD / YYYY |
| Status | • Signed |

## Document History

| | | |
|---|---|---|
| SENT | 12 / 31 / 2022<br>22:13:10 UTC | Sent for signature to Simon Divilov (sdiv00@gmail.com) from<br>scheduling@marcgoldner.com<br>IP: 148.74.125.240 |
| VIEWED | 12 / 31 / 2022<br>22:13:25 UTC | Viewed by Simon Divilov (sdiv00@gmail.com)<br>IP: 172.58.3.85 |
| SIGNED | 12 / 31 / 2022<br>22:16:02 UTC | Signed by Simon Divilov (sdiv00@gmail.com)<br>IP: 172.58.3.85 |
| COMPLETED | 12 / 31 / 2022<br>22:16:02 UTC | The document has been completed. |

Powered by **Dropbox** Sign

**From:** Rachel Korsen

**Subject:** Notice of Default from The Dharma Initiative, LLC.

**Date:** 29 Jan, 2023, 7:52 pm

**To:** Simon Divilov <simon@thecryptominers.io>

**Cc:** e@emb.org, "e@megacap.capital" <e@megacap.capital>



Hi Eli,

I hope you had a nice holiday and are enjoying the New Year. I have spent a substantial amount of time attempting to come up with a resolution to solve the issues between you and Marc for everyone's sake and I think I have a good resolution everyone will be happy with.

I'm willing to exercise a veto that I have to prevent a Default within Simon's proposed 30-day letter that was issued to you on December 31, 2022. However, I am only able to do this for so long. As long as you are willing to talk with us in good faith, I see no reason not to include you in sharing the capital losses and make the effective date of the Agreement between you and Marc to be 2022 (unless you prefer to have 2023 for your own personal tax reasons which as long as it is legal then we are happy to agree to do with you). We can discuss this all together amicably.

Marc is willing to cede the investment in the James Bond video game (which he is certainly entitled to) in order to move forward and to decrease the amount owned in the TV Studio Dragonfire (most likely entirely in order to avoid any more issues between you two – but he'll discuss that more). However, I do agree with him that you have an explicit authorizing text to invest $3-5k in Masterworks so that $5k should be included as he had invested even more than that in good faith so that should be honored. Also, the description of the Goldner Blatt Investments WhatsApp chat clearly outlines all of the investments made on GBI's behalf and that should be honored in some fashion as there were tens of thousands of dollars invested & known about.

What I think is most important is that you understand that Simon, Marc, and myself have lent you a significant amount of money to cover your balance due for the miners. There is a clear message history that Simon and I reviewed independently in The Crypto Miners, LLC. WhatsApp chat where we all knew our money was being sent to Dharma for 4.5 miners each and that Dharma was acquiring the miners on behalf of everyone including but not limited to the entities we have all discussed prior to acquiring the miners. I believe Marc said he told you to read that chat log so I will suggest to save everyone a headache that you do too when you have time. Marc posted Compass' contract and terms prior to anyone sending money (his PDF even has comments outlining the potential risks), it was crystal clear to everyone that the balance must be paid otherwise everyone would default. It isn't fair that you have forced us to lend you the money in order to save our own investments so please do the right thing and return the capital that was lent to you immediately. I do not want to have to escalate this whatsoever so I am asking you to please come to the negotiating table right away. Marc said that your mom is willing to take one less miner in good faith to help resolve this so we can discuss that as an option as well if that is what will help speed this process along for you.

Other than that, Marc will send you a revised Cap Table in a separate email and I'm happy to remain involved in helping you two resolve the issues. Marc also suggested that maybe your

mom and his dad could also help which I think is a really good idea too. Why don't we try?

At the end of the day, I think we all want to do good business, make money, and have fun.

Say hi to Emily and Brady for me!

Sincerely,
Rachel

On Sun, Jan 29, 2023 at 5:11 PM Simon Divilov <simon@thecryptominers.io> wrote:
CC'ing Rachel, she would like to chime in on this.

Thanks,
Simon

On Sat, Dec 31, 2022 at 5:28 PM Simon Divilov <simon@thecryptominers.io> wrote:
Dear Mr. Blatt,

Please see the attached Notice of Default sent on behalf of The Dharma Initiative, LLC., for
your outstanding balance of $140,512.50.

Sincerely,
Simon Divilov

NOT A CERTIFIED COPY

# EXHIBIT F

NOT A CERTIFIED COPY

April 30, 2023

Marc Goldner
marc.goldner@uconn.edu

      RE:    Rescission Notice

Mr. Goldner,

I am writing to inform you of my position on Goldner Blatt, LLC ("GBI" or the "Company").

You are hereby informed that I deem the GBI operating agreement (the "Agreement") to be an invalid contract because:

1. I was fraudulently induced to enter into it on the basis of numerous representations you made prior to executing the agreement that you knew to be untrue at the time you made them;

2. I received no consideration for entering into the contract, neither in the form of any contribution by you directly to the Company, as well as by the fact that you stated in writing that you are not making any of your contacts mutual contacts or granting me Neuralverse or Dharma interests;

3. Neither of us contributed any capital directly to the company, resulting in us both having $0 basis of equity value, with the company having also $0 in profit in 2022, which means there is no tax filing required nor will there ever be, and I will deem any filing that shows otherwise to be fraudulent; and

4. You failed to abide by any of the terms of the agreement, notably with regard to your handling of funds I sent you ostensibly to purchase assets for GBI but which you did not use in the intended way, nor subsequently did you manage pursuant to the terms of the Agreement.

I thus deem GBI to never really have existed and/or to hereby have been rescinded.

All of its ostensible income and expenses are zero-sum payments from Megacap and expenses that could equally well have been borne by Megacap, and all of which flow through to us individually via S-Corp regardless. No tax filing ever was, is, or ever will be required for GBI, which has no bank account or any active lines of business. There is thus no basis, no revenue, no business, no consideration, and no Company. Regardless of whether the Rescission is ultimately upheld, these considerations relating to tax basis and income/expense are nonetheless facts, and any filings to the contrary will be fraud.

If and to the extent it is ever determined that the Agreement is valid and enforceable, I am hereby giving you notice out waiving any of my rights to the consideration contemplated in the Agreement that I deem myself to have retroactively voluntarily withdrawn from GBI as of December 31, 2022 for the following reasons:

1.  Your repeated refusal to operate in accordance with the terms of our agreement;
2.  Threats against my life that you began transmitting to me in December 2022 and escalated recently to felony extortion using files you obtained by committing misdemeanor unauthorized access to a computer; and
3.  Notice given to me on December 31, 2022 by Dharma, over which you have acknowledged having 100% total management control, that you were permitting Dharma to usurp all the Compass miners for which you induced me to wire payments, a majority of which at a minimum you claimed belonged to the company, but which demonstrably you never purchased for the company.

I told you repeatedly prior to that date that I was done working with you on anything besides required Megacap business, with you stating clearly your revocation of any consideration due to me by you under the Agreement, with that interaction constituting my de facto withdrawal. To the extent that it is determined that my retroactive withdrawal as per above is not valid, then I hereby give you notice of my withdrawal as of today.

Please note that this letter does not alter my position that I deem communications from you to be harassment given your threats and extortion attempts. If you have any *legitimate* concerns regarding non-GBI matters, you are instructed (yes, *instructed*) to contact Celina – and do not copy me. Given your ability to contact her in order to reach me, you have **NO** legitimate reason to contact me directly, and I will deem any attempts to do so to constitute further harassment.

Govern Yourself Accordingly,

Eli M. Blatt

# EXHIBIT G

April 30, 2023

Marc Goldner
marc.goldner@uconn.edu

> RE:   Civil Theft Demand

Mr. Goldner,

I am writing to demand restitution for the civil theft that you have committed against me. Pursuant to Florida Statutes § 772.11, you have seven days from the receipt of this letter to pay me the full amount of damages incurred as a result of your actions, or face further legal action.

As you are aware, you fraudulently induced me to wire a total of $422,149 to purchase Bitcoin miners (the "Miners") and Non-Fungible Tokens (the "NFTs", and collectively the "Assets") for Goldner Blatt Investments, LLC ("GBI"), over which we share equal control and management rights, and which was formed in part expressly to facilitate joint investments such as the Assets in question. $202,148.55 was sent directly to Compass Mining, Inc. and $20,000 to you at your instruction to purchase Miners for GBI's account, and $200,000 was sent directly to you to purchase NFTs for GBI's account. Instead of doing so, you purchased these assets for yourself, held in wallets and accounts owned and controlled by you individually, commingled with your own Miners and NFTs; refused to provide a full and complete accounting of the assets; actively deprived me of any equal care or control thereover; and blatantly ignored my legitimate management and information rights thereover pursuant to the GBI operating agreement. In short, under the false promise of buying Assets for GBI, you in fact committed wire fraud instead, stealing my funds to unjustly enrich yourself.

I have spent almost a year trying to reach an amicable settlement involving the transfer of my interest in these Assets to me. During this time, you have repeatedly and persistently used your exclusive ownership of, access to, and control over the Assets to attempt to threaten and extort me into various concessions, most recently escalating to threatening me and my family's lives, allegedly on behalf of Jiri Novotny, whose threats you claim to have in writing but refuse to share in order to validate that the threats are not yours alone. As a result, I am no longer amenable to any of the agreements previously discussed.

According to Florida Statutes § 772.11, I am entitled to three times the amount of actual damages incurred, plus attorney's fees and court costs. Therefore, I am entitled to the sum of $1,226,477 in restitution, plus interest thereon at the statutory rate.

If restitution is not paid within seven days from the receipt of this letter, I will be forced to pursue legal action against you in a court of law. This action may include filing a lawsuit against you, seeking a judgment against you, and pursuing every available legal remedy to recover the damages caused by your theft. Given that the purchase of the Assets on behalf of GBI was in fact a lie designed to induce me to wire you funds directly, which you subsequently used to purchase Assets for your own account, and no funds or Assets nor the Assets were ever properly in accounts

or wallets owned by GBI, my claims are against you individually and not governed by the dispute resolution terms of GBI, which you simply used as a mechanism to induce me to wire you funds.

I strongly urge you to take this matter seriously and to make restitution immediately in order to avoid any further legal action. You have seven days from receipt of this letter to confirm that you have made full restitution to me.  Should you fail to do so, I reserve my right to share this demand letter with and serve a demand for preservation of evidence to all parties involved with the Assets and threats made against me, including but not limited to parties with ostensible shared interests in the NFTs and Miners you purchased for your own account, and the parties you allege to have made threats against me.

Thank you for your prompt attention to this matter.

Sincerely,

Eli M. Blatt

# EXHIBIT H

## OPERATING AGREEMENT OF MEGACAP CAPITAL, LLC

This **OPERATING AGREEMENT** (the "**Agreement**") made and entered into this 7 day of July 2021 (the "**Effective Date**") by and among **MEGACAP CAPITAL LLC**, a Delaware Series Limited Liability Company (the "**Company**") and the following persons (each, a "**Member**," and, collectively the "**Members**"):

ELI M BLATT
MARC GOLDNER
RODERYCK REITER

### BACKGROUND:

A. The Members wish to associate themselves as members of a limited liability company.

B. The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

### Formation

1. By this Agreement, the Members form a Series Limited Liability Company (the "**Company**") in accordance with the laws of the State of Delaware. The rights and obligations of the Members will be as stated in the Delaware Limited Liability Company Act (the "**Act**") except as otherwise provided in this Agreement.

### Name

2. The name of the Company will be **MEGACAP CAPITAL, LLC**.

### Purpose

3. Investing and Finance

### Term

4. The Company will continue until terminated as provided in this Agreement or in the Act.

### Place of Business

5. The Company's principal place of business will be located at:
A Registered Agent, Inc.
ATTN: MegaCap Capital, LLC.

8 The Green Street
Suite A
Dover, Delaware 19901

## Units and Capital Contributions

6. The Company shall be authorized to issue one million (**1,000,000**) units of membership interest in the Company (each, a "**Unit,**" collectively, "**Units**"), of which 900,000 units are hereby issued ("**Issued Units**") as per Section 8. These units constitute units of the "Master Series". The Company may authorize the issuance of additional Units with the prior written consent of all of the Class A Voting Members. As per Section 16, additional Series may be authorized each with its own Membership Units. The remainder of this agreement concerns the Master Series of the Company, however all provisions shall apply to any additional Series authorized unless otherwise approved by a supermajority vote of the Class A Members of the Master Series.

7. Units shall be divided into two classes: (a) "**Class A Voting Members,**" and (b) "**Class B Non-Voting Members.**" Each class will have distinct rights and obligations as follows:

| Member Class | Rights and Obligations |
|---|---|
| Class A | Class A Voting Members have full voting rights. |
| Class B | Class B Non-Voting Members have no voting rights. |

8. The following is a list of the initial Members (the "**Initial Members**") of the Company and Units of membership interest of the Company:

| Member | Class and Units Issued |
|---|---|
| Eli M Blatt | 333,000 Class A Units (37% of all Issued Units) |
| Marc Goldner | 234,000 Class A Units (26% of all Issued Units) |
| Roderyck Reiter | 333,000 Class A Units (37% of all Issued Units) |

9. The following is a list Initial Members of the Company and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution | Value |
|---|---|---|
| Eli M Blatt | Cash | $1,000.00 |
| Marc Goldner | Cash | $1,000.00 |
| Roderyck Reiter | Cash | $1,000.00 |

## Independent Contractor Agreement; Redemption Agreement

10. All Members receiving shares in exchange for services to the Company shall be required to execute. that certain Stock Redemption Agreement, a copy of which is attached hereto as **Exhibit A**. All

Members shall be required to execute that certain Confidentiality Agreement, a copy of which is attached hereto as **Exhibit B.** In addition to the foregoing, any and all owners, principals, officers, directors, managers, members, or affiliates of each Member (each, along with the Members, a "**Member Affiliate**") shall also execute the Confidentiality Agreement.

11.  The Company may enforce its rights under the Redemption Agreement at any time if (a) any Member is in material breach of this Agreement and/or the Confidentiality Agreement; (b) commits any of the forbidden acts delineated in Section 68-72; (c) violates the Duty to Devote time under Section 34; or (c) terminates this Agreement or otherwise ceases to be a member of the Company for any reason.

12.  In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other. For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units).

## Allocation and Distribution of Profits/Losses

13.  Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will be allocated between all Class A Members in accordance with their percentage interest in the Company or individual Series as determined by their respective percentage of Issued Units therein. For the Initial Members in the Master Series, Net Profits and Losses shall be allocated in the following manner:

| Member | Profit and Loss Percentage |
|---|---|
| Eli M Blatt | 37% |
| Marc Goldner | 26% |
| Roderyck Reiter | 37% |

14.  Cash Distributions to Class A Members will be made in the same fixed proportions as the allocation of Net Profits or Losses described above. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

15.  The Company shall make distributions of profit monthly, retaining an operating account reserve as agreed by a supermajority vote of Class A Members.

16.  Series Interests and Series.

      (a)    The Members shall cause the Company to issue Interests in one or more separate and distinct series (each, a "Series"), with each such Series established to make separate

Investment or portfolio of Investments. The Members may establish Series for the purpose of (1) making Investments in specific and distinct companies identified by the Members, (2) to purchase securities in such companies from secondary sources, or (3) to invest in interests of investment funds, special purpose vehicles or other Entities consistent with the Company's investment focus, which such Series will be segregated from each other. The Members may use its commercially reasonable efforts to have securities purchased by a particular Series be issued for the benefit of such particular Series to which they are allocated. Members of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to share in the profits, losses, allocations or distributions of any other Series of which they are not a Member.

(b)    Each Series so established shall be set forth on Schedule A to this Agreement, and Schedule A will be updated by the Managers from time to time in connection with the establishment of one or more additional Series. Subject to such limitations as may be set forth in this Agreement, the Members shall establish and may modify the investment objective and policies of each Series and all other rights and features thereof.

(c)    Interests of each Series shall have the following relative rights and preferences:

(i)    Assets Held with Respect to a Particular Series. All Capital Contributions made to the Company with respect to a particular Series, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Series for all purposes, subject only to the rights of creditors of such Series, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Series, are herein referred to as "assets held with respect to" that Series. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Series (collectively "General Assets"), the Members shall allocate such General Assets to, between or among any one or more of the Series' in such manner and on such basis as the Members, in its sole discretion, deems fair and equitable, and any General Assets so allocated to a particular Series shall be assets held with respect to that Series. Each such allocation by the Members shall be conclusive and binding upon Members of all Series for all purposes.

(ii)    Liabilities Attributable to a Particular Series. The assets of the Company held with respect to each particular Series shall be charged with all liabilities, expenses, costs, charges and reserves attributable to that Series. All such liabilities, expenses, costs, charges, and reserves so charged to a Series are herein referred to as "liabilities attributable to" that Series. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Series ("General Liabilities") shall be allocated and charged by the Manager to, between or among any one or more of the Series in such manner and on such basis as the Members, in their sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Series shall be liabilities attributable to that Series. Each such allocation of liabilities, expenses, costs, charges and reserves by the Members shall be conclusive and binding upon Members of all

Series for all purposes. The liabilities attributable to any Series shall be enforceable against the assets of such Series only, and not against the General Assets, or the assets of any other Series. All Persons, including any Affiliates of the Members, who have extended credit that has been allocated to a particular Series, or who have a claim or contract that has been allocated to any particular Series, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Series for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship.

## Withdrawal of Contribution

17. No Member will withdraw any portion of their Capital Contribution without the supermajority consent of the Class A Voting Members.

## Liability for Contribution

18. A Member's obligation to make their required Capital Contribution can only be compromised or released with the consent of all Class A Voting Members or as otherwise provided in this Agreement. If a Member does not make the Capital Contribution when it is due, he is obligated at the option of the Class A Voting Members voting as a separate class, to contribute cash equal to the agreed value of the Capital Contribution. This option is in addition to and not in lieu of any other rights, including the right to specific performance that the Company may have against such Member.

## Additional Contributions

19. Capital Contributions may be amended from time to time, according to the business needs of the Company by supermajority vote of the Class A Voting Members.

20. Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by the Class A Voting Members, voting as a separate class. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

## Capital Accounts

21. An individual capital account (the "**Capital Account**") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

## Interest on Capital

22. No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

## Management

23. The Class A Voting Members shall have the sole authority to appoint a manager of the Company (individually the "**Manager**" and collectively the "**Managers**"). Management of the Company is vested in the following Managers until such time as they are removed by the Class A Voting Members or withdraw from the position:

    A. Eli M Blatt, Managing Partner
    B. Marc Goldner, Managing Partner
    C. Roderyck Reiter, Managing Partner

24. The duties and responsibilities of the Managers will include the following:

    ● Managers will supervise the day-to-day operations of the Company including supervising sales and production staff and maintaining financial accounts.

25. Notwithstanding any other provisions contained in the Certificate of Formation or this Agreement, each of the Managers is empowered to bind the Company for any and all decisions except Major Decisions. A supermajority vote of the Class A Voting Members shall be required for all Major Decisions, except where a unanimous vote is expressly called for. Such votes may be accomplished via electronic mail, What's App, or any other written medium upon which the Class A Voting Members unanimously agree. For purposes of this Agreement, "**Major Decisions**" are the following:

    A. Incur debt, expend funds, write checks, pay bills, or enter into contracts, or otherwise obligate the Company for any amount in excess of $1,500.
    B. Negotiate or agree to an accounts payables/receivables payment schedule.
    C. Establish credit lines and the use of such credit lines.
    D. The sale or dissolution of the Company or its assets.
    E. Issuance of additional member or shareholder interests, which shall require a unanimous vote and be signed in writing by all Class A Members.
    F. Approval of a member or shareholder buy-sell agreement, approval of which shall not be unreasonably withheld.
    G. Scheduling repayment of any capital contributions from any Member.
    H. Selling, leasing, or encumbering any property owned by the Company.
    I. Scheduling repayment of any loans from Members.
    J. Changing or amending this Agreement or approving any action or resolution that would alter the terms of this Agreement, which shall require a unanimous vote and be signed in writing by all Class A Members.
    K. Appointment or removal of a Manager which shall require a unanimous vote and be signed in writing by all Class A Members excluding the Member being removed.
    L. Addition, withdrawal, appointment, or removal of a Member, which shall require a unanimous vote and be signed in writing by all Class A Members (unless the Member being removed is a

Class A Member, in which case the unanimous vote of the remaining Class A Members is required.

M.  Amending the duties and responsibilities of any Manager.

N.  Any changes to the Company Name, branding imagery, and public relations positioning.

O.  Adjustments to the compensation of any Member, Manager, Employee, or contractor.

P.  Payment of any distributions or other compensation to any Member beyond the monthly Distributions required in Section 15.

Q.  Registering the company with any regulatory or governmental agency.

R.  Creation of an additional Series within the MegaCap umbrella, which shall require a unanimous vote and be signed in writing by all Class A Members. For avoidance of doubt, any Series created for any entities such as additional SPVs or for any purpose defined in Section 16(a) for MegaCap will be approved by all Class A Members in writing.

S.  Each Series equity percentage shall require a unanimous vote and be signed in writing by all Class A Members.

T.  Each Series investment objective and policies will be defined by the Managers and shall be unanimously approved by all Class A Members signed in writing.

U.  No manager shall move any "General Assets" to any Series without unanimous approval by all Class A Members.

V.  No Class A Members shall take on personal liability or personal obligations of MegaCap unless expressly approved and unanimously approved by all Class A Voting Members.

26. A new Manager may be added to the Company with a supermajority vote of the Class A Voting Members.

27. A Manager will be reimbursed for reasonable expenses directly related to the operation of the Company and approved, in advance, by a supermajority of the Class A Voting Members (voting as a separate class).

28. The Members will be consulted and the advice and opinions of the Members will be obtained as much as is practicable. However, subject to Section 25 above, the Managers will have management and control of the day-to-day business of the Company for the purposes stated in this Agreement. All matters outside the day-to-day business of the Company will be decided by the Class A Voting Members (voting as a separate class) as outlined elsewhere in this Agreement.

A.  In determining and selecting which manufacturing hardware partner and software partner to use for operations, only a simple majority vote of 51% will be required between the Members.

29. In addition to day-to-day management tasks and any other duties and responsibilities already identified in this Agreement, the Managers' duties will include keeping, or causing to be kept, full and accurate business records for the Company according to generally accepted accounting principles (GAAP), and overseeing the preparation of any reports considered reasonably necessary to keep the Class A Voting Members informed of the business performance of the Company.

30. A Manager will not be liable to the Members for any action or failure to act resulting in loss or harm to the Company except in the case of gross negligence or willful misconduct.

31. Each Member will devote such time and attention to the business of the Company as required to carry out their duties and responsibilities for the conduct of the Company's business.

## Authority to Bind Company

32. Only the Manager(s) have the authority to enter into contracts on behalf of the Company.

## Duty of Loyalty

33. While a person is a Member or Manager of the Company, and for a period of at least two years after that person ceases to be a Member or Manager, that person will not carry on, or participate in, a business involved in the issuance or transacting of securities in any market regions that were established or contemplated by the Company before or during that person's tenure as Member or Manager.

## Duty to Devote Time

34. Each Member will devote such time and attention to the business of the Company as the supermajority of the Class A Voting Members (voting as a separate class) will from time to time reasonably determine for the conduct of the Company's business. Should a Member or Members be deemed by supermajority vote of the Members voting thereon to be in violation of this provision, those Members will be subject to Involuntary Withdrawal as per Section 43.

## Member Meetings

35. A meeting may be called by any Class A Voting Member providing that reasonable written notice has been given to the other Members.

## Voting

36. Each of the Class A Voting Members shall have one vote for each Unit owned by such Class A Voting Member.

37. INTENTIONALLY LEFT BLANK

## Admission of New Members

38. A new Member may only be admitted to the Company with a supermajority vote of the Class A Voting Members.

39. No new Class A member shall be admitted as a Member of the Company until such new Member becomes a party to this Agreement, as amended, and agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to effect the admission of the new Member as determined by a supermajority vote of the Class A Members. Any new Member will receive such

business interest in the Company as determined by a supermajority consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

## Voluntary Withdrawal of a Member

40. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

41. INTENTIONALLY LEFT BLANK

## Involuntary Withdrawal of a Member

42. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; felony conviction of a Member; or a legal judgment against a Member (excluding any judgment resulting from any litigation relating to Marc Goldner) that is pending as of the effective date hereof) that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member has engaged in conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member, including not devoting time to the Company as required per Section 34.

43. The involuntary withdrawal of a Member will have no effect upon the continuance of the Company.

## Dissociation of a Member

44. In the event of either a voluntary or involuntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.

45. A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

46. Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 60 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company.

## Sale, Transfer, or Assignment of a Member's Interest; Drag-Along

47. No Member may sell, transfer or assign any of such Member's Interest, including, but not limited to, any Units owned by such Member, without the supermajority written consent of the Class A Voting Members. Where a Member's financial interest in the Company is assigned to another party who is not an existing Member, that party will be considered a New Member. An assignment of full membership status inclusive of all duties, obligations, and rights held by the previous Member will be governed by the conditions described under the Admission of New Members section of this Agreement.

48. **Drag-Along Rights.** In the event that the Class A Voting Members receive a bona fide offer from an independent third party purchaser to purchase (including by merger) all of the outstanding Units or all or a substantial portion of the assets of the Company, the Class A Voting Members may send written notice (the **"Drag-Along Notice"**) to the Company and the remaining Class B Members (the **"Class B Members"**) notifying them they will be required to sell all of their Units in such sale. Upon receipt of a Drag-Along Notice, each Class B Member receiving such notice shall be obligated to (a) sell all of the Class B Member's Units contemplated by the Drag-Along Notice on the same terms and conditions as the Class A Voting Members; and (b) otherwise take all necessary action to cause the consummation of such transaction. Each Class B Member further agrees to (a) take all actions (including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by the Class A Members; (b) waive all applicable appraisal rights, if any, under the laws of the State of Delaware; and (c) appoint the Class A Members as the Class B Member's attorney-in-fact to do the same on its behalf. Notwithstanding the foregoing, no Class B Member may sell or assign such Member's Units, in whole or in part, under this Section without the express prior written approval and consent of a Supermajority of Class A Voting Members.

## Right of First Purchase

49. In the event that a Member's Interest in the Company is or will be sold, due to any reason other than as said forth in section 48 above, the remaining Members will have a right of first purchase of that Member's Interest. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

50. In the event that a Member's interest in the company is transferred or assigned as the result of a court order or operation of law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

## Valuation of Interest

51. In the event of a sale of all or substantially all of the Units and/or assets of the Company, a Member's financial interest in the Company will be based in the percentage of Units owned in proportion to all of the issued and outstanding Units of the Company at the time of such sale.

52. In the absence of a written agreement setting a value, the value of the Company will be based on an appraisal of the fair market value of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members to be retained within a reasonable period of the event giving rise to the disposition of a Member's interest. The results of the appraisal will be binding on all Members. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member.

53. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

## Dissolution

54. The Company may be dissolved by a unanimous vote of the Class A Voting Members. The Company will also be dissolved on the occurrence of events specified in the Act.

55. Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

   A. First, in satisfaction of liabilities to creditors except Company obligations to current Members;

   B. Second, in satisfaction of Company debt obligations to current Members;

   C. Third, to the Class A Members up to the amount of their Capital Contributions;

   D. Fourth, to the Class B Members up to the amount of their Capital Contributions; and

   E. Finally, to all of the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement.

## Records

56. The Company will at all times maintain accurate records of the following:

   A. Information regarding the status of the business and the financial condition of the Company.

   B. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.

   C. Name and last known business, residential, or mailing address of each Member and Manager, as well as the date that person became a Member or Manager.

D. A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement and any amendments have been executed.

E. The cash, property, and services contributed to the Company by each Member, along with a description and value thereof.

57. Each of the Class A Voting Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

58. Each Manager has the right to examine the above documents for any purpose reasonably related to their position as Manager of the Company.

## Books of Account

59. Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any of the Class A Voting Members. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

## Banking and Company Funds

60. The funds of the Company will be placed in such investments and banking accounts as will be designated by the unanimous vote of all Class A Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by supermajority consent of the Class A Voting Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

## Audit

61. Any of the Class A Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Company. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Class A Voting Members for any fiscal year.

## Tax Treatment

62. The Company is intended to be treated as an S-Corp for the purposes of Federal and State Income Tax.

## Annual Report

63. As soon as practicable after the close of each fiscal year, the Company will furnish to each Class A Voting Member an annual report showing a full and complete account of the condition of the Company

including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

  A.  A copy of the Company's federal income tax returns for that fiscal year.

  B.  Income statement.

  C.  Balance sheet.

  D.  Cash flow statement.

  E.  A breakdown of the profit and loss attributable to each Member.

## Goodwill

64. The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## Governing Law

65. INTENTIONALLY LEFT BLANK

## Force Majeure

66. A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to an event of force majeure, such as earthquake, typhoon, flood, fire, pandemic, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

## Forbidden Acts

67. No Member may do any act in contravention of this Agreement or prevailing law.

68. No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company.

69. No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

70. No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

71. No Member may confess a judgment against the Company.

72. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

## Indemnification

73. All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature whatsoever, arising out of a Member's participation in Company affairs pursuant to this Agreement. A Member will not be entitled to indemnification under this section for liability arising out of negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

## Liability

74. A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

## Liability Insurance

75. The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

## Life Insurance

76. The Company will not have the right to acquire life insurance on the lives of any or all of the Members.

## Amendment of this Agreement

77. No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all of the Class A Voting Members.

## Title to Company Property

78. Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member.

79. A breach of the Confidentiality Agreement

## Dispute Resolution

80. <u>Dispute Resolution</u>.   Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this <u>Section</u>. The initiation and pendency of the procedures under this <u>Section</u> does not relieve the Parties from their respective obligations under the Agreement.  ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS <u>SECTION</u> SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

A.  Negotiations by and between the Parties.

(1)  Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail.  Within ten (10) days after receiving such notice, the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

(2)  Upon the Disputing Party's receipt of the Responding Parties' response, the Parties shall then have thirty (30) days, or such other time as they may mutually agree upon in writing, to resolve the Dispute amongst themselves.

B.  Mediation

If the Parties are not able to resolve a  Dispute pursuant to subsection (A) above,  they agree to participate in at least ten (10) hours of good faith mediation administered by the American Arbitration Association under its Commercial Mediation Procedures.

C.  If the Parties are not able to resolve a Dispute pursuant to subsections (A) and (B) above, the Dispute  shall finally be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association.   Nothing herein shall  limit  the right of any Party to seek interim or provisional equitable relief in a court of competent jurisdiction prior to or pending the      conclusion of the arbitration.  Any Arbitration shall take place virtually  unless the parties agree on a physical location.  The arbitrator shall apply the law of the State of Delaware without regard to conflicts of law principles.   No demand for arbitration may be made after the date when the institution of legal or equitable proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

81.  <u>Equitable Remedies</u>.  The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights

and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement. The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this <u>Section</u> that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware. For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of *forum non conveniens*.

82. <u>Prevailing Party</u>. In the event that any Dispute between the Company and the Members or among the Members arising out of or related to this Agreement results in any formal proceedings, the prevailing party as determined by the arbiter or court of competent jurisdiction, as the case may be, shall be entitled to recover from the non-prevailing parties all reasonable fees, costs and expenses of enforcing any right of such prevailing party including, without limitation, reasonable attorneys' fees and expenses, including appeal costs, all of which shall be deemed to have accrued upon the commencement of such formal proceeding and shall be paid whether or not such formal proceeding is prosecuted to judgment. The "prevailing party" for purposes of this <u>Section</u> shall be the party who, in the arbitrator or judge's discretion, prevails on substantially all the merits in the Dispute, irrespective of the actual number of claims or counterclaims actually won or defeated. Any award, judgment or order entered in such formal proceeding shall contain a specific written statement of findings with respect to the prevailing party's recovery of fees and costs as contemplated under this <u>Section</u>, and shall include an award of pre-award or prejudgment interest running from the date of the breach at the maximum rate of interest allowed by applicable law.

83. <u>Waiver of Certain Rights</u>. AS A MATERIAL INDUCEMENT TO EACH MEMBER TO ENTER INTO THIS AGREEMENT, EACH MEMBER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO MAINTAIN ANY ACTION FOR DISSOLUTION OF THE COMPANY OR FOR PARTITION OF PROPERTY UNDER THE ACT. IN ADDITION, THE MEMBERS AGREE THAT THIS AGREEMENT HAS BEEN CAREFULLY DRAFTED TO PROVIDE FAIR TREATMENT OF ALL MEMBERS AND PARTICULARLY IN RESPECT OF EQUITABLE PAYMENT IN LIQUIDATION TO HOLDERS OF ECONOMIC INTERESTS. ACCORDINGLY, EXCEPT WHERE AND ONLY IF THE MANAGER OR LIQUIDATOR, AS THE CASE MAY BE, HAS FAILED TO LIQUIDATE THE COMPANY IN A REASONABLY TIMELY MANNER AS REQUIRED UNDER THIS AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES AND RENOUNCES ITS RIGHT TO INITIATE A LEGAL ACTION OR OTHER CLAIM TO SEEK THE APPOINTMENT OF A RECEIVER OR TRUSTEE TO LIQUIDATE THE COMPANY.

84. <u>No Waiver</u>. A Person's waiver of or consent to, express or implied, any breach or default by any Person as to the performance by such Person's obligations with respect to the Company, shall not constitute a waiver of or consent to any other breach or default by such other Person of the same or any other obligations with respect to the Company. Failure on the part of a Person to complain, provide notice of, or object to any action or inaction of any Person, or to declare any Person in breach or default with respect to the Company, irrespective of how long such failure continues, shall not constitute a waiver by such Person of its rights with respect to such breach or default, until the applicable statute of limitations period has run.

85. <u>Binding Effect</u>.  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective Personal Representatives, successors and permitted assigns.

86. <u>Parties in Interest</u>.  Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective Personal Representatives, successors and permitted assigns, and nothing in this Agreement shall be construed to relieve or discharge the obligation or liability of any Person to any party to this Agreement, or to provide any Person any right of subrogation or action over or against any party to this Agreement.

87. <u>Prevailing Terms</u>.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

88. <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances.

89. <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

90. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties hereto had signed the same document.  All counterparts shall be construed together and constitute the same instrument.  Signatures by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory and shall be deemed to be originals for all purposes.  The Members acknowledge and agree that it may be executed electronically, and that the provisions of the Electronic Signatures in Global and National Commerce Act of 2000, 15 U.S.C. 7001 et al, as amended and in effect as of the Effective Date of this Agreement, shall apply.

91. <u>Acknowledgment of Provisions</u>.   BY EXECUTING THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES THAT IT HAS ACTUAL NOTICE OF: (A) ALL OF THE PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTERESTS; AND (B) ALL OF THE PROVISIONS OF THE ARTICLES.  EACH MEMBER HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES ADEQUATE NOTICE OF ALL SUCH PROVISIONS, AND EACH MEMBER HEREBY WAIVES ANY REQUIREMENT THAT ANY FURTHER NOTICE REQUIRED BY ANY PROVISION OF THE ACT OR APPLICABLE LAW.

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 18 of 20*

## Miscellaneous

92. Time is of the essence in this Agreement.

93. Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

94. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

95. This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matter hereof, and may not be modified or amended except by a written instrument executed by or on behalf of authorized representatives each of Party to this Agreement.

96. All notices or other communications relating to the performance, enforcement, or other legal aspects of this Security Agreement will be in writing and may be personally delivered, sent by overnight courier service to all parties, and delivered as a .pdf e-mail attachment to all parties. Any other communications between the parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to all parties.

97. All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

## Definitions

98. For the purpose of this Agreement, the following terms are defined as follows:

    A.  "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

    B.  "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

    C.  "Distributions" means a payment of Company profits to the Members.

    D.  "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

MEGACAP CAPITAL, LLC Operating Agreement
Page 19 of 20

E. "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, Member's rights to participate in the management of the Company, and any Units of membership interest in the Company owned by such Member.

F. "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

G. "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

H. "Principal Office" means the office whether inside or outside the State of Delaware where the executive or management of the Company maintain their primary office.

I. "Voting Members" means the Members who belong to a membership class that has voting power.

J. "Supermajority Vote" means a vote by Members representing no less than 60% of the Class A Voting Units.

**SIGNED, SEALED, AND DELIVERED**

**ELI M BLATT**

By: _____

**MARC GOLDNER**

By: *Marc Goldner* _____

**RODERYCK REITER**

By: _____

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 20 of 20*

## EXHIBITS

Exhibit A        Redemption Agreement
Exhibit B        Confidentiality Agreement

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Eli Blatt _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2. **Use of Confidential Information; Non-Disclosure Obligations**

2.1.  Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.  The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.  The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4. The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5. **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

## 3. Compelled Disclosure

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

## 4. Proprietary Rights

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

## 5. Return of Confidential Information

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

## 6. Term and Termination

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7. **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8. **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9. **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10. **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11. **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12. **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13. **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14. **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15. **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

Address:        2020 N Bayshore Dr. Apt 2310, Miami FL 33137

E-Mail:         team@megacap.capital

If to Eli Blatt                                  :

Address:        2020 N Bayshore Dr #2310 Miami FL 33137

E-Mail:         e@megacap.capital

16. **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                    **THE RECEIVING PARTY**

By: _____                    _____

Name: Eli M Blatt                          Name: Eli Blatt

Title:  Managing Member

Date: Jul 08 2021                          Date: Jul 08 2021

4

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of _____, (the "**Effective Date**") by and between **Eli M Blatt** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").   Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>333,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.    **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

      a.    For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.    **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.    **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 2 of 4

3.     **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.     **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.     **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.     **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.     **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.     **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.     **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 3 of 4

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.    **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

Individual

By: Eli Blatt

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Eli M Blatt** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Marc Goldner _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1.    Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

### 2.    Use of Confidential Information; Non-Disclosure Obligations

2.1.    Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.    The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.    The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL) any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.     **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.     **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.     **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.    **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.    **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.    **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

**13.**   **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

**14.**   **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

**15.**   **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:         2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:          team@megacap.capital

If to _Marc Goldner_ :

    Address:         15 Peacock Drive, Roslyn, NY 11576

    E-Mail:          m@megacap.capital

**16.**   **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                    **THE RECEIVING PARTY**

By: _____                    _Marc Goldner_
                                           _____

Name: Eli M Blatt                          Name: Marc Goldner

Title:  Managing Member

Date: Jul 08 2021                          Date: Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of __Jul 08 2021__, (the "**Effective Date**") by and between **Marc Goldner** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").  Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>234,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.      **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

   a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.      **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.      **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3.    **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.    **Member's Obligations**.

4.1    Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2    At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3    The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.    **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.    **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.    **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.    **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.    **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 3 of 4

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.    **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

MEMBER:

*Marc Goldner*
_____
Individual and Managing Partner of MegaCap Capital, LLC.

By: Marc Goldner

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Marc Goldner** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 234,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Roderyck Reiter _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2. **Use of Confidential Information; Non-Disclosure Obligations**

2.1. Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2. The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3. The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4. The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5. **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

### 3.   Compelled Disclosure

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

### 4.   Proprietary Rights

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

### 5.   Return of Confidential Information

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL) any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

### 6.   Term and Termination

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate.  Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof.  All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution.  In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.  The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof.  This Agreement may only be modified or amended in a writing signed by the Parties.  No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

**13.   Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

**14.   Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

**15.   Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

      Address:        2020 N Bayshore Dr. Apt 2310, Miami FL 33137

      E-Mail:         team@megacap.capital

If to Roderyck Reiter                    :

      Address:        4661 NW 2nd Ave APT 603, Boca Raton, FL 33431

      E-Mail:         r@megacap.capital

**16.   Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                    **THE RECEIVING PARTY**

By: _____                    _____

Name:  Eli M Blatt                    Name:  Roderyck Reiter

Title:  Managing Member

Date:  Jul 08 2021                    Date:  Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ___Jul 08 2021___ , (the "**Effective Date**") by and between **Roderyk Reiter** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").  Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>333,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.  **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

    a.  For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.  **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.  **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3.    **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.    **Member's Obligations**.

4.1    Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2    At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3    The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.    **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.    **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.    **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.    **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.    **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

      10.    **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees), regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

      **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

_____

Individual and Managing Partner of MegaCap Capital, LLC

By: Roderyck Reiter

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

### SCHEDULE A
### REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Roderyk Reiter** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1.  Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2.  Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3.  Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.0001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY



## RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF
## THE VOTING MEMBERS OF THE DIRECTORS OF MEGACAP CAPITAL, LLC

The undersigned, being the Voting Members of **MEGACAP CAPITAL, LLC** (the "**Company**") hereby adopt the following resolutions and take the following actions by unanimous written consent on **January 16, 2023** (the "**Effective Date**") in lieu of a meeting and is to deemed effective immediately:

### PREAMBLE

1.  Marc J Goldner ("**Marc**") is an individual who owns 50% of the Company.

2.  Eli M Blatt ("**Eli**") is an individual who owns 50% of the Company.

3.  Eli and Marc are both parties to the *Operating Agreement of Megacap Capital, LLC* (the "**Operating Agreement**"). A copy of the fully executed Operating Agreement is attached hereto as **Exhibit A**.

4.  Marc is refusing to adhere to the Company's own Subscription documents and Series Agreement relating to Megacap Funds, LP – Tech I, of which the Company is the General Partner as regards the treatment of management fees, which the parties previously agreed to in a meeting in early December 2022, preventing the Company from filing tax returns and issuing Tech I LPs K1s that reflect the terms of the Series Agreement, the use of funds sent to Tech I, and the advice of the Company's Fund administer, Flow, constituting a "breach of fiduciary duty" to the Company that makes it "impossible to carry on the ordinary business of the Company".

5.  Marc has on numerous occasions, in writing, made personal threats against Eli as well as his fiancé relating to his desire to receive unapproved expense reimbursement, which has resulted in both Eli and his fiancé at times feeling unsafe. Marc has claimed to have connections to the criminal underworld, which has amplified the seriousness of his threats. As a result, Eli no longer feels comfortable engaging directly with Marc. Marc's threats have thus made it "impossible to carry on the ordinary business of the Company".

6.  Marc has made numerous false, distorted, and unsubstantiated allegations against Eli to the Company's corporate counsel, jeopardizing the ability of the Company to receive proper legal counsel, making it "impossible to carry on the ordinary business of the Company".

7.  As a result of the above, Marc has breached his obligations to the Company and is hereby involuntarily withdrawn from the Company as provided in the following sections of the Operating Agreement:

    a.  **Section 41** which states that "Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to… breach of fiduciary duties by a Member" and engaging "in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member"
    b.  **Section 69** which states "No Member may do any act that would make it impossible to carry on the ordinary business of the Company."

**NOW, THEREFORE, BE IT RESOLVED** that, effective immediately, the Company acknowledges, approves, and ratifies Marc's involuntary withdrawal as both Manager and Member from the Company as provided in **Sections 41 and 69** of the Operating Agreement; the Company reserves the right to void this Resolution at its sole discretion.

**FURTHER RESOLVED,** that, barring voiding of this agreement by the Company, effective immediately upon Marc's involuntary withdrawal as a member of the Company, the only remaining voting member is Eli.

**FURTHER RESOLVED**, as consideration for removal of his Membership, the Company shall in due time pass a resolution issuing Marc 50% interests in the Company in the form of Class B non-voting shares, thus retaining his economic interests in the Company.

This Written Consent is executed as of the Effective Date by the Voting Members of the Company.

**MEGACAP CAPITAL, LLC**

By: █████████████

Name:   Eli M Blatt

Title:    Managing Member

NOT A CERTIFIED COPY

## EXHIBIT A
## OPERATING AGREEMENT

## OPERATING AGREEMENT OF MEGACAP CAPITAL, LLC

**This OPERATING AGREEMENT** (the "**Agreement**") made and entered into this 7 day of July 2021 (the "**Effective Date**") by and among **MEGACAP CAPITAL LLC**, a Delaware Series Limited Liability Company (the "**Company**") and the following persons (each, a "**Member**," and, collectively the "**Members**"):

ELI M BLATT
MARC GOLDNER
RODERYCK REITER

### BACKGROUND:

A.  The Members wish to associate themselves as members of a limited liability company.

B.  The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

### Formation

1.  By this Agreement, the Members form a Series Limited Liability Company (the "**Company**") in accordance with the laws of the State of Delaware. The rights and obligations of the Members will be as stated in the Delaware Limited Liability Company Act (the "**Act**") except as otherwise provided in this Agreement.

### Name

2.  The name of the Company will be **MEGACAP CAPITAL, LLC**.

### Purpose

3.  Investing and Finance

### Term

4.  The Company will continue until terminated as provided in this Agreement or in the Act.

### Place of Business

5.  The Company's principal place of business will be located at:
    A Registered Agent, Inc.
    ATTN: MegaCap Capital, LLC.

8 The Green Street
Suite A
Dover, Delaware 19901

## Units and Capital Contributions

6. The Company shall be authorized to issue one million (**1,000,000**) units of membership interest in the Company (each, a "**Unit,**" collectively, "**Units**"), of which 900,000 units are hereby issued ("**Issued Units**") as per Section 8. These units constitute units of the "Master Series". The Company may authorize the issuance of additional Units with the prior written consent of all of the Class A Voting Members. As per Section 16, additional Series may be authorized each with its own Membership Units. The remainder of this agreement concerns the Master Series of the Company, however all provisions shall apply to any additional Series authorized unless otherwise approved by a supermajority vote of the Class A Members of the Master Series.

7. Units shall be divided into two classes: (a) "**Class A Voting Members**," and (b) "**Class B Non-Voting Members**." Each class will have distinct rights and obligations as follows:

| Member Class | Rights and Obligations |
| --- | --- |
| Class A | Class A Voting Members have full voting rights. |
| Class B | Class B Non-Voting Members have no voting rights. |

8. The following is a list of the initial Members (the "**Initial Members**") of the Company and Units of membership interest of the Company:

| Member | Class and Units Issued |
| --- | --- |
| Eli M Blatt | 333,000 Class A Units (37% of all Issued Units) |
| Marc Goldner | 234,000 Class A Units (26% of all Issued Units) |
| Roderyck Reiter | 333,000 Class A Units (37% of all Issued Units) |

9. The following is a list Initial Members of the Company and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution | Value |
| --- | --- | --- |
| Eli M Blatt | Cash | $1,000.00 |
| Marc Goldner | Cash | $1,000.00 |
| Roderyck Reiter | Cash | $1,000.00 |

## Independent Contractor Agreement; Redemption Agreement

10. All Members receiving shares in exchange for services to the Company shall be required to execute. that certain Stock Redemption Agreement, a copy of which is attached hereto as **Exhibit A**. All

Members shall be required to execute that certain Confidentiality Agreement, a copy of which is attached hereto as **Exhibit B.** In addition to the foregoing, any and all owners, principals, officers, directors, managers, members, or affiliates of each Member (each, along with the Members, a "**Member Affiliate**") shall also execute the Confidentiality Agreement.

11. The Company may enforce its rights under the Redemption Agreement at any time if (a) any Member is in material breach of this Agreement and/or the Confidentiality Agreement; (b) commits any of the forbidden acts delineated in Section 68-72; (c) violates the Duty to Devote time under Section 34; or (c) terminates this Agreement or otherwise ceases to be a member of the Company for any reason.

12. In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other. For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units).

## Allocation and Distribution of Profits/Losses

13. Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will be allocated between all Class A Members in accordance with their percentage interest in the Company or individual Series as determined by their respective percentage of Issued Units therein. For the Initial Members in the Master Series, Net Profits and Losses shall be allocated in the following manner:

| Member | Profit and Loss Percentage |
|---|---|
| Eli M Blatt | 37% |
| Marc Goldner | 26% |
| Roderyck Reiter | 37% |

14. Cash Distributions to Class A Members will be made in the same fixed proportions as the allocation of Net Profits or Losses described above. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

15. The Company shall make distributions of profit monthly, retaining an operating account reserve as agreed by a supermajority vote of Class A Members.

16. Series Interests and Series.

    (a)     The Members shall cause the Company to issue Interests in one or more separate and distinct series (each, a "Series"), with each such Series established to make separate

Investment or portfolio of Investments. The Members may establish Series for the purpose of (1) making Investments in specific and distinct companies identified by the Members, (2) to purchase securities in such companies from secondary sources, or (3) to invest in interests of investment funds, special purpose vehicles or other Entities consistent with the Company's investment focus, which such Series will be segregated from each other. The Members may use its commercially reasonable efforts to have securities purchased by a particular Series be issued for the benefit of such particular Series to which they are allocated. Members of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to share in the profits, losses, allocations or distributions of any other Series of which they are not a Member.

(b)      Each Series so established shall be set forth on Schedule A to this Agreement, and Schedule A will be updated by the Managers from time to time in connection with the establishment of one or more additional Series. Subject to such limitations as may be set forth in this Agreement, the Members shall establish and may modify the investment objective and policies of each Series and all other rights and features thereof.

(c)      Interests of each Series shall have the following relative rights and preferences:

(i)      Assets Held with Respect to a Particular Series. All Capital Contributions made to the Company with respect to a particular Series, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Series for all purposes, subject only to the rights of creditors of such Series, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Series, are herein referred to as "assets held with respect to" that Series. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Series (collectively "General Assets"), the Members shall allocate such General Assets to, between or among any one or more of the Series' in such manner and on such basis as the Members, in its sole discretion, deems fair and equitable, and any General Assets so allocated to a particular Series shall be assets held with respect to that Series. Each such allocation by the Members shall be conclusive and binding upon Members of all Series for all purposes.

(ii)      Liabilities Attributable to a Particular Series. The assets of the Company held with respect to each particular Series shall be charged with all liabilities, expenses, costs, charges and reserves attributable to that Series. All such liabilities, expenses, costs, charges, and reserves so charged to a Series are herein referred to as "liabilities attributable to" that Series. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Series ("General Liabilities") shall be allocated and charged by the Manager to, between or among any one or more of the Series in such manner and on such basis as the Members, in their sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Series shall be liabilities attributable to that Series. Each such allocation of liabilities, expenses, costs, charges and reserves by the Members shall be conclusive and binding upon Members of all

Series for all purposes. The liabilities attributable to any Series shall be enforceable against the assets of such Series only, and not against the General Assets, or the assets of any other Series. All Persons, including any Affiliates of the Members, who have extended credit that has been allocated to a particular Series, or who have a claim or contract that has been allocated to any particular Series, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Series for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship.

## Withdrawal of Contribution

17. No Member will withdraw any portion of their Capital Contribution without the supermajority consent of the Class A Voting Members.

## Liability for Contribution

18. A Member's obligation to make their required Capital Contribution can only be compromised or released with the consent of all Class A Voting Members or as otherwise provided in this Agreement. If a Member does not make the Capital Contribution when it is due, he is obligated at the option of the Class A Voting Members voting as a separate class, to contribute cash equal to the agreed value of the Capital Contribution. This option is in addition to and not in lieu of any other rights, including the right to specific performance that the Company may have against such Member.

## Additional Contributions

19. Capital Contributions may be amended from time to time, according to the business needs of the Company by supermajority vote of the Class A Voting Members.

20. Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by the Class A Voting Members, voting as a separate class. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

## Capital Accounts

21. An individual capital account (the "**Capital Account**") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

## Interest on Capital

22. No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

## Management

23. The Class A Voting Members shall have the sole authority to appoint a manager of the Company (individually the "**Manager**" and collectively the "**Managers**"). Management of the Company is vested in the following Managers until such time as they are removed by the Class A Voting Members or withdraw from the position:

    A. Eli M Blatt, Managing Partner
    B. Marc Goldner, Managing Partner
    C. Roderyck Reiter, Managing Partner

24. The duties and responsibilities of the Managers will include the following:

    ● Managers will supervise the day-to-day operations of the Company including supervising sales and production staff and maintaining financial accounts.

25. Notwithstanding any other provisions contained in the Certificate of Formation or this Agreement, each of the Managers is empowered to bind the Company for any and all decisions except Major Decisions. A supermajority vote of the Class A Voting Members shall be required for all Major Decisions, except where a unanimous vote is expressly called for. Such votes may be accomplished via electronic mail, What's App, or any other written medium upon which the Class A Voting Members unanimously agree. For purposes of this Agreement, "**Major Decisions**" are the following:

    A. Incur debt, expend funds, write checks, pay bills, or enter into contracts, or otherwise obligate the Company for any amount in excess of $1,500.
    B. Negotiate or agree to an accounts payables/receivables payment schedule.
    C. Establish credit lines and the use of such credit lines.
    D. The sale or dissolution of the Company or its assets.
    E. Issuance of additional member or shareholder interests, which shall require a unanimous vote and be signed in writing by all Class A Members.
    F. Approval of a member or shareholder buy-sell agreement, approval of which shall not be unreasonably withheld.
    G. Scheduling repayment of any capital contributions from any Member.
    H. Selling, leasing, or encumbering any property owned by the Company.
    I. Scheduling repayment of any loans from Members.
    J. Changing or amending this Agreement or approving any action or resolution that would alter the terms of this Agreement, which shall require a unanimous vote and be signed in writing by all Class A Members.
    K. Appointment or removal of a Manager which shall require a unanimous vote and be signed in writing by all Class A Members excluding the Member being removed.
    L. Addition, withdrawal, appointment, or removal of a Member, which shall require a unanimous vote and be signed in writing by all Class A Members (unless the Member being removed is a

      Class A Member, in which case the unanimous vote of the remaining Class A Members is required.

M. Amending the duties and responsibilities of any Manager.

N. Any changes to the Company Name, branding imagery, and public relations positioning.

O. Adjustments to the compensation of any Member, Manager, Employee, or contractor.

P. Payment of any distributions or other compensation to any Member beyond the monthly Distributions required in Section 15.

Q. Registering the company with any regulatory or governmental agency.

R. Creation of an additional Series within the MegaCap umbrella, which shall require a unanimous vote and be signed in writing by all Class A Members. For avoidance of doubt, any Series created for any entities such as additional SPVs or for any purpose defined in Section 16(a) for MegaCap will be approved by all Class A Members in writing.

S. Each Series equity percentage shall require a unanimous vote and be signed in writing by all Class A Members.

T. Each Series investment objective and policies will be defined by the Managers and shall unanimously approved by all Class A Members signed in writing.

U. No manager shall move any "General Assets" to any Series without unanimous approval by all Class A Members.

V. No Class A Members shall take on personal liability or personal obligations of MegaCap unless expressly approved and unanimously approved by all Class A Voting Members.

26. A new Manager may be added to the Company with a supermajority vote of the Class A Voting Members.

27. A Manager will be reimbursed for reasonable expenses directly related to the operation of the Company and approved, in advance, by a supermajority of the Class A Voting Members (voting as a separate class).

28. The Members will be consulted and the advice and opinions of the Members will be obtained as much as is practicable. However, subject to Section 25 above, the Managers will have management and control of the day-to-day business of the Company for the purposes stated in this Agreement. All matters outside the day-to-day business of the Company will be decided by the Class A Voting Members (voting as a separate class) as outlined elsewhere in this Agreement.

    A. In determining and selecting which manufacturing hardware partner and software partner to use for operations, only a simple majority vote of 51% will be required between the Members.

29. In addition to day-to-day management tasks and any other duties and responsibilities already identified in this Agreement, the Managers' duties will include keeping, or causing to be kept, full and accurate business records for the Company according to generally accepted accounting principles (GAAP), and overseeing the preparation of any reports considered reasonably necessary to keep the Class A Voting Members informed of the business performance of the Company.

30. A Manager will not be liable to the Members for any action or failure to act resulting in loss or harm to the Company except in the case of gross negligence or willful misconduct.

31. Each Member will devote such time and attention to the business of the Company as required to carry out their duties and responsibilities for the conduct of the Company's business.

## Authority to Bind Company

32. Only the Manager(s) have the authority to enter into contracts on behalf of the Company.

## Duty of Loyalty

33. While a person is a Member or Manager of the Company, and for a period of at least two years after that person ceases to be a Member or Manager, that person will not carry on, or participate in, a business involved in the issuance or transacting of securities in any market regions that were established or contemplated by the Company before or during that person's tenure as Member or Manager.

## Duty to Devote Time

34. Each Member will devote such time and attention to the business of the Company as the supermajority of the Class A Voting Members (voting as a separate class) will from time to time reasonably determine for the conduct of the Company's business. Should a Member or Members be deemed by supermajority vote of the Members voting thereon to be in violation of this provision, those Members will be subject to Involuntary Withdrawal as per Section 43.

## Member Meetings

35. A meeting may be called by any Class A Voting Member providing that reasonable written notice has been given to the other Members.

## Voting

36. Each of the Class A Voting Members shall have one vote for each Unit owned by such Class A Voting Member.

37. INTENTIONALLY LEFT BLANK

## Admission of New Members

38. A new Member may only be admitted to the Company with a supermajority vote of the Class A Voting Members.

39. No new Class A member shall be admitted as a Member of the Company until such new Member becomes a party to this Agreement, as amended, and agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to effect the admission of the new Member as determined by a supermajority vote of the Class A Members. Any new Member will receive such

business interest in the Company as determined by a supermajority consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

## Voluntary Withdrawal of a Member

40. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

41. INTENTIONALLY LEFT BLANK

## Involuntary Withdrawal of a Member

42. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; felony conviction of a Member; or a legal judgment against a Member (excluding any judgment resulting from any litigation relating to Marc Goldner) that is pending as of the effective date hereof) that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member has engaged in conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member, including not devoting time to the Company as required per Section 34.

43. The involuntary withdrawal of a Member will have no effect upon the continuance of the Company.

## Dissociation of a Member

44. In the event of either a voluntary or involuntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.

45. A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

46. Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 60 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company.

## Sale, Transfer, or Assignment of a Member's Interest; Drag-Along

47. No Member may sell, transfer or assign any of such Member's Interest, including, but not limited to, any Units owned by such Member, without the supermajority written consent of the Class A Voting Members. Where a Member's financial interest in the Company is assigned to another party who is not an existing Member, that party will be considered a New Member. An assignment of full membership status inclusive of all duties, obligations, and rights held by the previous Member will be governed by the conditions described under the Admission of New Members section of this Agreement.

48. **Drag-Along Rights.** In the event that the Class A Voting Members receive a bona fide offer from an independent third party purchaser to purchase (including by merger) all of the outstanding Units or all or a substantial portion of the assets of the Company, the Class A Voting Members may send written notice (the **"Drag-Along Notice"**) to the Company and the remaining Class B Members (the **"Class B Members"**) notifying them they will be required to sell all of their Units in such sale. Upon receipt of a Drag-Along Notice, each Class B Member receiving such notice shall be obligated to (a) sell all of the Class B Member's Units contemplated by the Drag-Along Notice on the same terms and conditions as the Class A Voting Members; and (b) otherwise take all necessary action to cause the consummation of such transaction. Each Class B Member further agrees to (a) take all actions (including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by the Class A Members; (b) waive all applicable appraisal rights, if any, under the laws of the State of Delaware; and (c) appoint the Class A Members as the Class B Member's attorney-in-fact to do the same on its behalf. Notwithstanding the foregoing, no Class B Member may sell or assign such Member's Units, in whole or in part, under this Section without the express prior written approval and consent of a Supermajority of Class A Voting Members.

## Right of First Purchase

49. In the event that a Member's Interest in the Company is or will be sold, due to any reason other than as said forth in section 48 above, the remaining Members will have a right of first purchase of that Member's Interest. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

50. In the event that a Member's interest in the company is transferred or assigned as the result of a court order or operation of law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

## Valuation of Interest

51. In the event of a sale of all or substantially all of the Units and/or assets of the Company, a Member's financial interest in the Company will be based in the percentage of Units owned in proportion to all of the issued and outstanding Units of the Company at the time of such sale.

52. In the absence of a written agreement setting a value, the value of the Company will be based on an appraisal of the fair market value of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members to be retained within a reasonable period of the event giving rise to the disposition of a Member's interest. The results of the appraisal will be binding on all Members. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member.

53. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

## Dissolution

54. The Company may be dissolved by a unanimous vote of the Class A Voting Members. The Company will also be dissolved on the occurrence of events specified in the Act.

55. Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

    A. First, in satisfaction of liabilities to creditors except Company obligations to current Members;

    B. Second, in satisfaction of Company debt obligations to current Members;

    C. Third, to the Class A Members up to the amount of their Capital Contributions;

    D. Fourth, to the Class B Members up to the amount of their Capital Contributions; and

    E. Finally, to all of the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement.

## Records

56. The Company will at all times maintain accurate records of the following:

    A. Information regarding the status of the business and the financial condition of the Company.

    B. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.

    C. Name and last known business, residential, or mailing address of each Member and Manager, as well as the date that person became a Member or Manager.

D. A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement and any amendments have been executed.

E. The cash, property, and services contributed to the Company by each Member, along with a description and value thereof.

57. Each of the Class A Voting Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

58. Each Manager has the right to examine the above documents for any purpose reasonably related to their position as Manager of the Company.

## Books of Account

59. Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any of the Class A Voting Members. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

## Banking and Company Funds

60. The funds of the Company will be placed in such investments and banking accounts as will be designated by the unanimous vote of all Class A Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by supermajority consent of the Class A Voting Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

## Audit

61. Any of the Class A Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Company. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Class A Voting Members for any fiscal year.

## Tax Treatment

62. The Company is intended to be treated as an S-Corp for the purposes of Federal and State Income Tax.

## Annual Report

63. As soon as practicable after the close of each fiscal year, the Company will furnish to each Class A Voting Member an annual report showing a full and complete account of the condition of the Company

including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

    A.  A copy of the Company's federal income tax returns for that fiscal year.

    B.  Income statement.

    C.  Balance sheet.

    D.  Cash flow statement.

    E.  A breakdown of the profit and loss attributable to each Member.

## Goodwill

64.  The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## Governing Law

65.  INTENTIONALLY LEFT BLANK

## Force Majeure

66.  A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to an event of force majeure, such as earthquake, typhoon, flood, fire, pandemic, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

## Forbidden Acts

67.  No Member may do any act in contravention of this Agreement or prevailing law.

68.  No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company.

69.  No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

70.  No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

71. No Member may confess a judgment against the Company.

72. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

## Indemnification

73. All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature whatsoever, arising out of a Member's participation in Company affairs pursuant to this Agreement. A Member will not be entitled to indemnification under this section for liability arising out of negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

## Liability

74. A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

## Liability Insurance

75. The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

## Life Insurance

76. The Company will not have the right to acquire life insurance on the lives of any or all of the Members.

## Amendment of this Agreement

77. No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all of the Class A Voting Members.

## Title to Company Property

78. Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member.

79. A breach of the Confidentiality Agreement

## Dispute Resolution

80. <u>Dispute Resolution</u>.   Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this <u>Section</u>. The initiation and pendency of the procedures under this <u>Section</u> does not relieve the Parties from their respective obligations under the Agreement. ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS <u>SECTION</u> SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

    A.  Negotiations by and between the Parties.

    (1) Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail. Within ten (10) days after receiving such notice, the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

    (2) Upon the Disputing Party's receipt of the Responding Parties' response, the Parties shall then have thirty (30) days, or such other time as they may mutually agree upon in writing, to resolve the Dispute amongst themselves.

    B.  Mediation

    If the Parties are not able to resolve a  Dispute pursuant to subsection (A) above,  they agree to participate in at least ten (10) hours of good faith mediation administered by the American Arbitration Association under its Commercial Mediation Procedures.

    C.  If the Parties are not able to resolve a Dispute pursuant to subsections (A) and (B) above, the Dispute shall finally be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association.   Nothing herein shall  limit  the right of any Party to seek interim or provisional equitable relief in a court of competent jurisdiction prior to or pending the       conclusion of the arbitration. Any Arbitration shall take place virtually  unless the parties agree on a physical location. The arbitrator shall apply the law of the State of Delaware without regard to conflicts of law principles.   No demand for arbitration may be made after the date when the institution of legal or equitable proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

81.  <u>Equitable Remedies</u>.  The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights

and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement. The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware. For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of *forum non conveniens*.

82. Prevailing Party. In the event that any Dispute between the Company and the Members or among the Members arising out of or related to this Agreement results in any formal proceedings, the prevailing party as determined by the arbiter or court of competent jurisdiction, as the case may be, shall be entitled to recover from the non-prevailing parties all reasonable fees, costs and expenses of enforcing any right of such prevailing party including, without limitation, reasonable attorneys' fees and expenses, including appeal costs, all of which shall be deemed to have accrued upon the commencement of such formal proceeding and shall be paid whether or not such formal proceeding is prosecuted to judgment. The "prevailing party" for purposes of this Section shall be the party who, in the arbitrator or judge's discretion, prevails on substantially all the merits in the Dispute, irrespective of the actual number of claims or counterclaims actually won or defeated. Any award, judgment or order entered in such formal proceeding shall contain a specific written statement of findings with respect to the prevailing party's recovery of fees and costs as contemplated under this Section, and shall include an award of pre-award or prejudgment interest running from the date of the breach at the maximum rate of interest allowed by applicable law.

83. Waiver of Certain Rights. AS A MATERIAL INDUCEMENT TO EACH MEMBER TO ENTER INTO THIS AGREEMENT, EACH MEMBER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO MAINTAIN ANY ACTION FOR DISSOLUTION OF THE COMPANY OR FOR PARTITION OF PROPERTY UNDER THE ACT. IN ADDITION, THE MEMBERS AGREE THAT THIS AGREEMENT HAS BEEN CAREFULLY DRAFTED TO PROVIDE FAIR TREATMENT OF ALL MEMBERS AND PARTICULARLY IN RESPECT OF EQUITABLE PAYMENT IN LIQUIDATION TO HOLDERS OF ECONOMIC INTERESTS. ACCORDINGLY, EXCEPT WHERE AND ONLY IF THE MANAGER OR LIQUIDATOR, AS THE CASE MAY BE, HAS FAILED TO LIQUIDATE THE COMPANY IN A REASONABLY TIMELY MANNER AS REQUIRED UNDER THIS AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES AND RENOUNCES ITS RIGHT TO INITIATE A LEGAL ACTION OR OTHER CLAIM TO SEEK THE APPOINTMENT OF A RECEIVER OR TRUSTEE TO LIQUIDATE THE COMPANY.

84. No Waiver. A Person's waiver of or consent to, express or implied, any breach or default by any Person as to the performance by such Person's obligations with respect to the Company, shall not constitute a waiver of or consent to any other breach or default by such other Person of the same or any other obligations with respect to the Company. Failure on the part of a Person to complain, provide notice of, or object to any action or inaction of any Person, or to declare any Person in breach or default with respect to the Company, irrespective of how long such failure continues, shall not constitute a waiver by such Person of its rights with respect to such breach or default, until the applicable statute of limitations period has run.

85. <u>Binding Effect</u>.  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective Personal Representatives, successors and permitted assigns.

86. <u>Parties in Interest</u>.  Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective Personal Representatives, successors and permitted assigns, and nothing in this Agreement shall be construed to relieve or discharge the obligation or liability of any Person to any party to this Agreement, or to provide any Person any right of subrogation or action over or against any party to this Agreement.

87. <u>Prevailing Terms</u>.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

88. <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect.  The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances.

89. <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

90. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties hereto had signed the same document.  All counterparts shall be construed together and constitute the same instrument.  Signatures by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory and shall be deemed to be originals for all purposes.  The Members acknowledge and agree that it may be executed electronically, and that the provisions of the Electronic Signatures in Global and National Commerce Act of 2000, 15 U.S.C. 7001 et al, as amended and in effect as of the Effective Date of this Agreement, shall apply.

91. <u>Acknowledgment of Provisions</u>.   BY EXECUTING THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES THAT IT HAS ACTUAL NOTICE OF: (A) ALL OF THE PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTERESTS; AND (B) ALL OF THE PROVISIONS OF THE ARTICLES.  EACH MEMBER HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES ADEQUATE NOTICE OF ALL SUCH PROVISIONS, AND EACH MEMBER HEREBY WAIVES ANY REQUIREMENT THAT ANY FURTHER NOTICE REQUIRED BY ANY PROVISION OF THE ACT OR APPLICABLE LAW.

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 18 of 20*

## Miscellaneous

92. Time is of the essence in this Agreement.

93. Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

94. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

95. This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matter hereof, and may not be modified or amended except by a written instrument executed by or on behalf of authorized representatives each of Party to this Agreement.

96. All notices or other communications relating to the performance, enforcement, or other legal aspects of this Security Agreement will be in writing and may be personally delivered, sent by overnight courier service to all parties, and delivered as a .pdf e-mail attachment to all parties. Any other communications between the parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to all parties.

97. All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

## Definitions

98. For the purpose of this Agreement, the following terms are defined as follows:

    A. "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

    B. "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

    C. "Distributions" means a payment of Company profits to the Members.

    D. "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

E.  "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, Member's rights to participate in the management of the Company, and any Units of membership interest in the Company owned by such Member.

F.  "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

G.  "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

H.  "Principal Office" means the office whether inside or outside the State of Delaware where the executive or management of the Company maintain their primary office.

I.  "Voting Members" means the Members who belong to a membership class that has voting power.

J.  "Supermajority Vote" means a vote by Members representing no less than 60% of the Class A Voting Units.


**SIGNED, SEALED, AND DELIVERED**


**ELI M BLATT**

By:_____


**MARC GOLDNER**

By:_____


**RODERYCK REITER**

By:_____

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 20 of 20*

## EXHIBITS

| | |
|---|---|
| Exhibit A | Redemption Agreement |
| Exhibit B | Confidentiality Agreement |



## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Eli Blatt _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2.  **Use of Confidential Information; Non-Disclosure Obligations**

2.1.    Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.    The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.    The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

### 3.    Compelled Disclosure

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

### 4.    Proprietary Rights

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

### 5.    Return of Confidential Information

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

### 6.    Term and Termination

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13.   **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14.   **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15.   **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:    2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:    team@megacap.capital

If to Eli Blatt                                    :

    Address:    2020 N Bayshore Dr #2310 Miami FL 33137

    E-Mail:    e@megacap.capital

16.   **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                                    **THE RECEIVING PARTY**

By: _____                              _____

Name: Eli M Blatt                                    Name: Eli Blatt

Title:  Managing Member

Date: Jul 08 2021                                    Date: Jul 08 2021

NOT A CERTIFIED COPY

4

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of _____, (the "**Effective Date**") by and between **Eli M Blatt** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").   Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>333,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.     **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

   a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.     **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.     **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3.      **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.      **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.      **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.      **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.      **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.      **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.      **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 3 of 4

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

      10.    **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

      **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

Individual

By: Eli Blatt

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: 
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Eli M Blatt** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Marc Goldner _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1.    Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

## 2.    Use of Confidential Information; Non-Disclosure Obligations

2.1.    Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.    The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.    The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

**7.**     **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate.  Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

**8.**     **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof.  All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution.  In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.  The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

**9.**     **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof.  This Agreement may only be modified or amended in a writing signed by the Parties.  No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

**10.**     **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

**11.**     **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

**12.**     **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

**13.** __Assignments__

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

**14.** __Waiver__

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

**15.** __Notices/Points of Contact__

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

      Address:        2020 N Bayshore Dr. Apt 2310, Miami FL 33137

      E-Mail:        team@megacap.capital

If to   Marc Goldner                          :

      Address:      15 Peacock Drive, Roslyn, NY 11576

      E-Mail:      m@megacap.capital

**16.** __Headings Non-Substantive__

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                                    **THE RECEIVING PARTY**

By: _____                    _Marc Goldner_____

Name: Eli M Blatt                                         Name: Marc Goldner

Title:  Managing Member

Date: Jul 08 2021                                         Date: Jul 08 2021

4

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ___Jul 08 2021___ , (the "**Effective Date**") by and between **Marc Goldner** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company"). Member and Company hereafter are collectively referred to as the "Parties."

## RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>234,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

## AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.     **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

        a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.     **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.     **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3.      **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.      **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.      **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.      **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.      **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.      **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.      **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 3 of 4

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10. **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees), regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

MEMBER:

*Marc Goldner*

Individual and Managing Partner of MegaCap Capital, LLC.

By: Marc Goldner

Its: Managing Member

THE COMPANY:

MEGACAP CAPITAL, LLC

By: ███████

Name: Eli M Blatt

Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Marc Goldner** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 234,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Roderyck Reiter _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1.   Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

### 2.   Use of Confidential Information; Non-Disclosure Obligations

2.1.   Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.   The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.   The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care.  In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL.  The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

## 3.    Compelled Disclosure

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

## 4.    Proprietary Rights

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party.  Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

## 5.    Return of Confidential Information

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it.  In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL.  The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

## 6.    Term and Termination

This Agreement may be terminated by either party upon ten (10) days' written notice.  If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement.  Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate.  Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof.  All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution.  In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.  The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof.  This Agreement may only be modified or amended in a writing signed by the Parties.  No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13. **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14. **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15. **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:    2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:    team@megacap.capital

If to Roderyck Reiter_____:

    Address:    4661 NW 2nd Ave APT 603, Boca Raton, FL 33431

    E-Mail:    r@megacap.capital

16. **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**        **THE RECEIVING PARTY**

By: _____    _____

Name: Eli M Blatt        Name: Roderyck Reiter

Title: Managing Member

Date: Jul 08 2021        Date: Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of   Jul 08 2021   , (the "**Effective Date**") by and between **Roderyk Reiter** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").   Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member 333,000 units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.      **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

   a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.      **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.      **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3.     **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.     **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.     **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.     **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.     **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.     **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.     **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 3 of 4

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.    **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

Individual and Managing Partner of MegaCap Capital, LLC

By: Roderyck Reiter

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Roderyk Reiter** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF
## THE VOTING MEMBER OF MEGACAP CAPITAL, LLC

The undersigned, being the sole Voting Member of **MEGACAP CAPITAL, LLC** (the "**Company**") hereby adopt the following resolutions and take the following actions by unanimous written consent on **Friday April 28, 2023** (the **"Effective Date"**) in lieu of a meeting and is to deemed effective immediately:

### PREAMBLE

1. Eli M Blatt ("**Blatt**") is an individual who owns 50% of the Company in the form of Class A Shares and is the only voting Member or Manager of the Company.
2. Marc J Goldner ("**Goldner**") is an individual who owns 50% of the Company in the form of Class B shares.
3. Blatt and Goldner are both parties to the *Operating Agreement of Megacap Capital, LLC* (the "**Operating Agreement**"). A copy of the fully executed Operating Agreement is attached hereto as **Exhibit A**.
4. The Forbidden Acts in Sections 67 and 69 do not require judicial review or determination and are at the sole discretion of the Company when determining whether to withdraw a Member.
5. Goldner has himself affirmed that the Members themselves are the sole arbiter of whether another Member has committed the forbidden act of making it impossible to carry on the ordinary course of business by making repeated threats to unilaterally withdraw Blatt; in his case, Goldner did so simply because Blatt disagreed with his approach to an agreement, notably his aggressive harassment and threats towards Blatt, but also as regards legitimate concerns regarding liability to the Company.
6. Goldner has on numerous occasions made personal threats against Blatt as well as his fiancé relating to his desire to receive unapproved expense reimbursement in excess of that provided for in the operating agreements, which has resulted in both Blatt and his fiancé feeling unsafe (**Exhibit B**), which has made it impossible to carry on the ordinary business of the Company.
7. Goldner has made unfounded claims to have connections to the criminal underworld and various unnamed intelligence and spy agencies, for whom he has clearly stated he is not an employee but works as an informal independent contractor on a bounty basis, which have amplified the seriousness of his threats.
8. Goldner has since December 2022 repeatedly transmitted threats against Blatt and his family's lives, allegedly on behalf of one of the Members of one of Megacap's creditors, however he has refused to provide any evidence of such threats (**Exhibit C**).
9. Goldner was instructed that if he were to continue transmitting threats without proof thereof he would be deemed to be making the threats himself yet continued to do so.
10. On April 19, Goldner escalated his threats to include direct blackmail and extortion threats against Blatt using files he obtained through unauthorized use of a computer, actions which are felonies and misdemeanors under US Federal and State laws (**Exhibit D**) and thus represent contraventions of law.
11. Goldner's actions made Blatt feel compelled to file for a restraining order for cyberstalking, for which there is a hearing scheduled on May 15, 2023 in Miami Dade.
12. Goldner has further committed civil theft, fraud in the inducement, and unjust enrichment as detailed in a Florida legal case now being prepared for filing.
13. As a result, Blatt no longer feels comfortable engaging directly with Goldner, making it impossible to carry on the ordinary business of the Company
14. Goldner's threats have made it "impossible to carry on the ordinary business of the Company" and constitutes a clear contravention of prevailing law and of his fiduciary duties as General Partner.
15. Goldner refused to allow the Company to complete its K1s in a timely manner by tying critical tax matters to demands prioritizing his own financial interests, as documented in the 2023 resolutions,

which were executed by Blatt under threats to his and his family's lives transmitted by Goldner as well as threats against the Company to fail to file K1s timely, which Marc's actions did in fact result in, and which represent a breach of his fiduciary duty.

16. Goldner and Blatt executed that certain 2023 Resolutions document which laid out terms which, once completed, would void any attempted withdrawal of a Member, however the Members have since unanimously agreed pursuant to Goldner's April 8, 2023 email that those terms have not been completed and that thus redemption pursuant to the terms of the operating agreement is permitted.

17. Goldner has made repeated threats to involuntarily withdraw Blatt for disagreeing with him on how to handle an agreement with the Company's Limited Partner and Creditor, Little Prince, with respect to which Blatt had numerous legitimate reservations and regarding which Goldner repeatedly threatened him, as well as for requiring him to communicate with Blatt via Blatt's assistant given the threats he has made towards Blatt, making it impossible for Blatt to participate in the Company being able to carry on the ordinary business of the Company.

18. Goldner has acknowledged breaching his fiduciary duty and committing fraud and fraud in the inducement against the Company's Limited Partner and Creditor, Little Prince, by lying to and manipulating them for his own financial gain by stating his willingness to enter into agreements that he can subsequently invalidate on the basis of the distress he has placed Blatt under in his attempts to get Blatt to execute them, as well as by manipulating them by lying to them about interactions between him and Blatt (**Exhibit E**).

19. Goldner breached the Partners' standard agreed course of dealings in contract negotiations in a manner that breached his fiduciary duty by approving his own tracked changes without any notice to or consent by Blatt of such changes, as evidenced by the comments to those sections left in place and the lack of any turnaround by Blatt of a version received with the tracked changes and returned with them accepted to the 2023 Resolution Consent, thus deceiving Blatt into unwittingly signing the Resolution on the assumption that Goldner had honored their course of dealings and rendering the agreement invalid; these changes granted Golder expense reimbursement well in excess of that provided by the operating agreement; in a manner Blatt had clearly told him on principal Blatt would never approve given how Marc had threatened him over the issue (**Exhibit F**); for expenses incurred securing contacts and opportunities for his own exclusive benefit and that of other companies; for expenses that were not approved or even reviewed by Blatt or the Company; and at the expense of Blatt's equal right to claim expenses, representing a breach of fiduciary duty and a breach of trust that has made it impossible to carry on the ordinary business of the Company. (**Exhibit G**).

20. Goldner further blatantly breached his fiduciary duty to the Company and made it impossible to carry on the ordinary business of the Company by denying it a safe banking partner by refusing to setup new company bank accounts, despite the fact that First Republic Bank is at risk of failing, in order to justify maintaining Company funds for his own benefit.

21. In the process of refusing to open new bank accounts, Goldner defamed and Slandered Blatt with Bank of America as well as other Megacap partners by claiming Blatt effectively stole or otherwise transferred funds from the Company to Goldner Blatt Investments, LLC (GBI), transfers of which he was demonstrably aware (**Exhibit H**) and which funds he used to make personal charges on an Amex company card as well as approved payments to GBI legal counsel, making it impossible to carry on the ordinary course of the business.

22. After Blatt send Goldner a demand letter for $422,188.55 relating to a personal matter unrelated to the Company, Goldner threatened in writing on a chat with Limited Partners and Creditors to jeopardize company and its assets if Blatt did not refrain from pursuing his legitimate charges, for which Blatt has in fact already filed a lawsuit (**Exhibit I**), representing an additional instance of extortion.

**NOW, THEREFORE, BE IT RESOLVED,** that in part as a result of his actions detailed herein, Goldner has breached his obligations to the Company and his involuntary withdrawal as a Class A Member and Manager

from the Company is hereby amended and reaffirmed pursuant to the following sections of the Operating Agreement:

1. **Section 41**, which states that "Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to… breach of fiduciary duties by a Member", a Member "willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members", and engaging "in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member"
2. **Section 67**, which states "No Member may do any act in contravention of this Agreement or prevailing law."
3. **Section 69** which states "No Member may do any act that would make it impossible to carry on the ordinary business of the Company."

**FURTHER RESOLVED,** that, effective immediately upon Goldner's initial involuntary withdrawal as a Class A Member of the Company, the only remaining voting member is Blatt.

**FURTHER RESOLVED**, the Company has awarded Goldner his equivalent Membership interests in the Company in the form of Class B non-voting shares, thus retaining his full economic interests in the Company.

**FURTHER RESOLVED,** In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

**FURTHER RESOLVED,** If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances. Under no circumstances shall a technical failure as regards the implementation of this withdrawal or the timely service of appropriate documents invalidate the withdrawal, but rather shall be cause to cure such defects.

This Written Consent is executed as of the Effective Date by the Voting Members of the Company.

**MEGACAP CAPITAL, LLC**

By:_____

Name:  Eli M Blatt

Title:  Managing Member

**EXHIBIT B**
**INITIAL THREAT**

On Jun 19, 2022, 1:09 PM −0400, Marc Goldner <marc@gb.investments>, wrote:
You're brain dead. I am not going to sell my crypto or use every dollar I have to cover you defaulting when this is how you're acting. You've fucked yourself bro and if you want me as an enemy honestly you're about to see how I can be.

I'll make this business the most difficult it can be.

You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me.

**EXHIBIT C**
**REPEATED THREATS**











**EXHIBIT D**
**EXTORTION THREAT**



# EXHIBIT E
## ATTEMPTS TO DECEIVE LIMITED PARTNERS





**Marc Goldner**

Hi Laren! Hope you've been well and school pickups aren't driving you crazy lol I had a quick question for you. If we were to repay one of our capital partners in shares instead of cash, would they be able to be on the GlobalX cap table instead of having to hold our company's interest in Neuralink? This would be about $500k in equity just FYI.

We financed a large part the shares we bought from you with a promissory note. It looks like we might need to repay that promissory note with the shares. The investor is US LLC (Wyoming) and it is a relatively large chunk ($500k±). I hope this would be OK with you?

We understand if this is something that risks the SPV and not something you are willing to do we just need to know.

10:37 AM

**Laren Pisciotti**

We can not do any transfers of your ownership- you would need your lp to subscribe to you.

10:40 AM

**3 UNREAD MESSAGES**

**Marc Goldner**

> **Laren Pisciotti**
> We can not do any transfers of your ownership- you would need your lp to subscribe to you.

Thanks. That's all. Just as expected!

12:26 PM



**Anthropos x Megacap**
Celina, Lily, Marc, You

SATURDAY

**Marc Goldner**

@Eli M Blatt I told them they can't just be direct on GlobalX captable that u and Laren Wont approve it

9:46 AM

I explained that even if I were to help them sell in their own entities they have to setup it'll cost them 50k so it's the same thing as interest waiver and you'll have to give me a waiver to sell for them

9:48 AM

Now let's sit and see if it works    9:48 AM

I also explained that i wanted to be on captable and u refused with me being directly on globalx

10:29 AM

YESTERDAY

**Marc Goldner**

@Eli M Blatt how much was the SpaceX fees for the deal we got Jiri? How much would we have been entitled to EXACTLY if he had funded and didn't kill that deal

12:28 AM

I understand your position that those fees should be cancelling out any interest because that's his fault and it cost us the relationship supplier who won't work with us anymore after so many bids and looking bad totally get ur position thanks

12:29 AM

Ahhhhh I get ur position now so ur saying u redeemed rod bc u thought that moni would continue bringing and referring LPs but that didn't pan out how u expected

12:31 AM

**Celina Moreno**

Hi Marc, as you are well aware Eli has not communicated with you by phone or videoconference since February, and has since recently not been communicating with you directly in any medium. I just confirmed with him that both of the above positions you are attributing to him are false — he has said no such things to you nor does he maintain these positions.

10:51 AM

## EXHIBIT F
## THREATENING EMAIL OVER EXPENSE REIMBURSEMENT

From: Eli M Blatt e@gb.investments
Subject: Re: Summarizing what was discussed / agreed
Date: Jun 19, 2022 at 11:26:12 AM
To: Marc Goldner marc@gb.investments
Cc: m@gb.investments

If/when there's revenue, obviously we can cover expenses.  There's no revenue.
I'm not sure what you want from me?

On Jun 19, 2022, 1:09 PM -0400, Marc Goldner <marc@gb.investments>, wrote:
You're brain dead. I am not going to sell my crypto or use every dollar I have to
cover you defaulting when this is how you're acting. You've fucked yourself bro
and if you want me as an enemy honestly you're about to see how I can be.

I'll make this business the most difficult it can be.

You try to fuck me and pretend we didn't already agree on the below then you're
in for a rude awakening. I told you. Do not fuck with me.

Best,
Marc Goldner

## EXHIBIT G
## BREACH OF COURSE OF DUTY AND FIDUCIARY DUTY

CERTIFIED COPY

**MC Expenses**

1. Eli and Marc will both get a one-time $30K expense reimbursement from MC for any expenses incurred from the start of TRIUM through time of payment, paid out by MegaCap once Jiri is fully repaid with at least $90K in additional MC bank balance above and beyond Jiri's repayment. Eli agrees that if his expenses do not add up to $30,000 then he will not take the full $30,000 expense reimbursement. However, if Jiri is not repaid and is given Neuralink shares instead of being repaid, then this reimbursement for Marc's expenses and Eli's Wayaca front end due will be paid out upon the first exit where carry is awarded to MegaCap (i.e. the Betterment carry once Betterment IPOs) pursuant to the above $90K bank balance existing to cover it.  The Wayaca front end due to Eli will also be paid at this time.

2. Thereafter, total expense reimbursement will be capped at 2.5% each of total Profits (5% total between both partners) from MegaCap and GBI for Expenses as per below.

3. If going forward either of us travels and we close a deal for GBI or funding for MC, we can have reimbursement for documented expenses incurred on the trip on which that deal was put together or a contact was made that subsequently closes something equal to the lesser of $10K of expenses for the trip in question (with a trip being any period of time extending from when Marc or Eli leave their home-base to when they return there, and can last up to one year) or 5% of profit (net front end) generated from the first close by contacts established directly or indirectly during that trip applied to flights, food, networking events, extracurriculars with potential LPs or Suppliers, Taxies/Ubers/Travel, Travel Insurance, rental cars, rental boats/ferry's, hosting events, hotels, and transportation (busses, rental cars etc) only for any given deal/trip that results in a new contact making an investment that generates profit/front end unless otherwise agreed (e.g. we agree to pickup a tab for a potential LP dinner). For example, Marc making contact with Thibaut which led to an introduction to Moni and Jiri which provided us the necessary capital partner to acquire the early Neuralink would entitle him to the lesser of $10K of expenses from that trip or 5% of the profits from those LPs.

4. If we are going to attend conferences or events, we can also discuss in advance having MC / GB pay for conference fee, flight, and hotel on a case-by-case basis on top of the above reimbursement procedure.

1. Eli will get a one-time $21k expense reimbursement from MC for any expenses incurred from the start of TRIUM through time of payment, and Marc will get a one-time $30K expense reimbursement from MC for any expenses incurred from the start of TRIUM through time of payment, paid out by MegaCap once Jiri is fully repaid with at least $100K in additional MC bank balance above and beyond Jiri's repayment (of LP Shares if it is agreed to unanimously by the Class A Members of MegaCap, and upon repayment of the Promissory Notes for Little Prince and Bear General, as well as the rebate for Jiri). However, if Jiri is not repaid and is given Neuralink shares instead of being repaid, then this reimbursement for Marc's expenses and Eli's Wayaca front end due will be paid out upon the first exit where carry is awarded to MegaCap (i.e. the Betterment carry once Betterment IPOs) pursuant to the above $100K bank balance existing to cover it.  The Wayaca front end due to Eli will also be paid at this time and Marc's additional $20,000 incurred in 2022 will be paid at this time.

2. Thereafter, total expense reimbursement will be capped at 2.5% each of total Profits (5% total between both partners) from MegaCap and GBI for Expenses as per below.

3. If going forward either of us travels and we close a deal for GBI or funding for MC, we can have reimbursement for documented expenses incurred on the trip on which that deal was put together or a contact was made that subsequently closes something equal to the greater of $10K of expenses for the trip in question (with a trip being any period of time extending from when Marc or Eli leave their home-base to when they return there, and can last up to one year) or 5% of profit (net front end) generated from the first close by contacts established directly or indirectly during that trip applied to flights, food, networking events, extracurriculars with potential LPs or Suppliers, Taxies/Ubers/Travel, Travel Insurance, rental cars, rental boats/ferry's, hosting events, hotels, and transportation (busses,



**EXHIBIT H**
**GOLDNER WAS AWARE OF THE TRANSFERS HE ALLEGES BLATT COMMITTED THEFT OF**



## EXHIBIT I
## GOLDNER THREATENING MEGACAP OVER PERSONAL MATTERS



**Marc Goldner**

I am happy to bring to light other issues as well. First off, you wired Anthropos fees PRIOR to there ever being a 'consulting agreement'. So instead of having Celina messaging me while you refuse private communication with me outside of this chat (you are NOT some busy executive, Eli, you're just a spoiled trust fund kid who has never worked a real day in his life who claims they need approval from 'mom' for almost anything), let's not have Celina ask me if she initiated a BofA account setup for MegaCap without the rhetorical response of, "Didn't Eli also take $70,000 out of MegaCap and sent it to GBI unauthorized?". Any way you slice it Eli, I NEVER authorized that funds transfer and our Operating Agreement is clear that transactions of that magnitude **REQUIRES UNANIMOUS APPROVAL of ALL MANAGING PARTNERS.** You have breached your fiduciary duty and will be removed as such for your breaches that have put MegaCap's shares at risk. You have risked the entire portfolio and if Laren gets wind of this and of any perceived dispute she will most likely redeem MegaCap so I suggest you start cooperating and stop hiding behind your assistant to speak on your behalf for everyone's sake because your actions are risking millions of dollars of shares and it will be my job to ensure your removal from this situation. I am giving you a chance to come clean and correct this. You need to stop saying behind closed doors that you are only signing agreements with Little Prince because you are under duress, no one buys it. Honor your word, obligations, and promises and cut the crap out and start conducting business as it's supposed to be done. I once again am going to kindly suggest, take your mark-up and carry and walk away from MegaCap. You clearly have no intention of selling anything to anyone as you're hiding the fact that you have gotten other jobs from everyone in this chat. How about being honest for once in your life instead of causing drama like a teenage girl? I understand being around a child like Emily can easily rub off on you but you need to work on your professional decorum and learn how to conduct legitimate business without risking everyone else's time, money, and energies. I know you have a habit of bringing everyone else around you for your own personal woes and unsustainable lifestyle but that has to stop TODAY. I will not allow you to drag MegaCap through the mud like all your other failed business attempts because you can't accept that a mining comany hasn't delivered our miners, that you haven't paid your balance due on ANOTHER unrelated business, and because you have not honored your agreement with LPs from TRIUM to start an NFT Fund, nor wired the promised amounts of NFTs, not even mentioning fraudulently inducing me to invest with you under the disguise that you had private placements like with Bond that would be shared with me after your 'mom approved it' (which she did). The game you're playing here Eli will wind up dragging this into a Federal Court that will have a tortious discovery process that could reveal not just people's names, but has the impact of creating a regulatory securities risk with agencies such as the SEC. I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've 'stolen' your money and tying it back to MegaCap by refusing to operate this business in good faith. Thanks!

7:35 PM



**Marc Goldner**

Eli, I am giving you a chance to cut this shit out. You do not want to escalate this where discovery will be all inclusive. Your drug charges will come to light, your infractions will come to light, your parole will come to light, your probation officer will come to light, your continued drug use (which I have evidence of) will come to light. I really suggest that you rethink your actions here. I am not threatening you, I am merely telling you that I don't think you understand that the reaches of a federal court action sees no limits in relation to discovery. You are digging yourself into a hole and Laren is going to get wind of this and likely redeem MegaCap which means we will have to repay the mark-up we earned. Do not do this or you will be held liable for breaching your fiduciary duty. I really don't want to have to sue you, Emily, and your mom but if you force my hand I will be left with no choice. Do the right thing, pay your balance due and debts, and walk away peacefully and keep the monies we've earned so we can both move on from each other and live our lives. Thanks.

8:41 PM



**REDEMPTION NOTICE**

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Marc Goldner** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as of May 22, 2023 (the "Effective Date") as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement") and the MegaCap Operating Agreement Resolution and Updated Terms ("Amendment").

2. Pursuant to the Amendment, the Company issued to Member 330,000 Units of membership interest in the Company (the "Units"), with 330,000 Units issued to Eli Blatt, 330,000 Units issued to Rod Raiter ("Reiter"), and 10,000 of issued Units held in trust by the Company.

3. Pursuant to the Reiter Redemption Agreement dated March 24, 2022, the Company fully redeemed the 330,000 Units granted to Reiter, increasing the Units held in Trust by the Company to 340,000.

4. Pursuant to the Operating Agreement and Amendment, the Units issued to Members are subject to redemption following a vesting schedule of three (3) years commencing on the date of the Amendment, December 8, 2021.

5. Effective as of the date hereof, the Company hereby redeems 170,274 Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price"), for a total "Redemption Value" of $1.70.

6. Member is currently illegally in possession of $18,146.70 of Company funds member is refusing to return to the Company; the Redemption Value due is hereby deducted from the Company funds being illegally held by Member, reducing the total Company funds being held by Member to $18,145.00

**MEGACAP CAPITAL, LLC**

By: _____

Name: Eli M Blatt
Title: Managing Member
May 23 2023

## RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF THE VOTING MEMBERS OF MEGACAP CAPITAL, LLC

The undersigned, being Voting Members of **MEGACAP CAPITAL, LLC** (the "**Company**") hereby adopt the following "Goldner Class B Withdrawal" resolutions and take the following actions by unanimous written consent on **Tuesday, September 2, 2025 (**the **"Effective Date")** in lieu of a meeting and is to be deemed effective immediately:

### INVOLUNTARY WITHDRAWAL OF MARC J GOLNDER AND PURCHASE OF MEMBERSHIP UNITS

**WHEREAS,** Marc J. Goldner ("Goldner") remains a Class B Member of the Company after having his unvested Membership Units redeemed and his vested Membership Units converted to Class B units upon his withdrawal and redemption from the Company in 2023 for breaches of fiduciary duty and committing Forbidden Acts.

**WHEREAS,** subsequent to his withdrawal, Goldner committed numerous additional breaches of fiduciary duty and forbidden acts, as detailed extensively in Megacap Capital, LLC v. Goldner (1:24-cv-24385), District Court, S.D. Florida (the "Megacap Lawsuit").

**WHEREAS,** the Company has determined that it is in the best interest of the Company to completely dissociate Goldner from the Company by way of an involuntary withdrawal for the breaches of fiduciary duty and forbidden acts detailed in the Megacap Lawsuit committed subsequent to his prior withdrawal and redemption, including but not limited to the Partner Breaches, sending the November 2023 Letter, and the offenses detailed in the RICO Count.

**WHEREAS,** the involuntary withdrawal of a Member for breaches of fiduciary duty or the forbidden acts detailed in Megacap Operating Agreement ("OA") Sections 67-72 do not require judicial review or determination and are at the sole discretion of the Company when determining whether to withdraw a Member.

**WHEREAS,** because the Company and Goldner are actively engaged in litigation, the Company has selected an independent auditor independently referred by the Company's accountant for the purposes of valuing Goldner's Membership Units pursuant to OA Sections 44, 46, and 51-53.

**WHEREAS,** the Company's accountant has informed the Company that, given that the Company's liabilities exceed its assets and the Members have no deficit restoration obligations per the OA, the GAAP valuation will produce a $0 valuation.

**NOW, THEREFORE, BE IT RESOLVED,** that in part as a result of his actions detailed in the Megacap Lawsuit, Goldner has breached his obligations to the Company and his involuntary withdrawal as a Class B Member of the Company is hereby effectuated  pursuant to the following sections of the Operating Agreement:

1. **Section 42:** which states that "Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to… breach of fiduciary duties by a Member."
2. **Section 67:** which states "No Member may do any act in contravention of this Agreement or prevailing law."
3. **Section 68:** Which states "No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company."
4. **Section 69:** which states "No Member may do any act that would make it impossible to carry on the ordinary business of the Company."

5. **Section 71:** Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

**FURTHER RESOLVED,** The remaining Members have elected to exercise their rights to purchase Goldner's remaining Membership Units pursuant to OA Sections 44, 46, and 51-53. Given the anticipated $0 GAAP valuation, Goldner will be sent $1 upon service of this notice by the remaining Members as consideration for his Membership Units.

**FURTHER RESOLVED,** Pursuant to OA Section 46, the Company will provide Goldner the final GAAP valuation upon completion; should any additional payment be due for his Membership Units the remaining Members will remit that within 60 days of this notice per OA Section 46 or provide notice of rescission of purchase.

**FURTHER RESOLVED,** Per OA Section 45, Goldner will only have liability to the Company for his negative capital account balance per the date of his dissociation and no liability for any Company obligations thereafter.

**FURTHER RESOLVED,** Should Goldner object to the GAAP valuation commissioned by the Company, he may within 15 days of receipt thereof provide the Company a list of five national and/or international auditor firms with no less than 50 accountants on staff to conduct a secondary valuation at his sole expense to be paid upfront prior to the valuation. The Company shall select one from the list and be the primary point of contact for the auditor once Goldner has made payment, which shall be done within 15 days of the Company's selection of the auditor.

**FURTHER RESOLVED,** Should Goldner's prior redemption be deemed to have been calculated incorrectly or otherwise be overturned, his full Membership Unit count is hereby being purchased for $1 based on the anticipated $0 GAAP valuation, which is possible given the $0 valuation produced by the GAAP valuation. Should the GAP valuation produce a non-zero valuation, the remaining Members shall have the ability to determine whether to proceed with the purchase by supplementing the required payment or rescind the purchase.

**FURTHER RESOLVED,** In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

**FURTHER RESOLVED,** If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances. Under no circumstances shall a technical failure as regards the implementation of this withdrawal or the timely service of appropriate documents invalidate the withdrawal but rather shall be cause to cure such defects.

By:_____   Sep 02 2025
Name:   Eli M Blatt
Title:   Managing Member

By:_____   Sep 02 2025
Name:   Eli M Blatt on behalf of Anthropos, LLC
Title:   Managing Member



## MEGACAP REDEMPTION NOTICE

**Date:** 3/24/22

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Roderyk Reiter** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**", jointly "the Parties"), the Company hereby notifies Member as follows:

1)  Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").
2)  Members and the Company are parties to a certain updated terms as defined in the Memorandum of Understanding (the "MOU"), serving as an addendum to the Operating Agreement.
3)  Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").
4)  Effective as of the date hereof, per the agreement between the parties, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of $15,000, already remitted to the Member in shares of MegaCap Funds, LP - Tech I (the "Redemption Price") as consideration for the redemption.
    a)  For avoidance of Doubt, the Member shall still receive the specified carry compensation delineated in Memorandum of Understanding signed on December 18, 2021 for CivRobotics, SpaceX, and the first Betterment deal (but not on the SPV for Betterment). For avoidance of doubt, the member will not receive any economics including but not limited to front end and/or carry for anything related to MegaCap Funds, LP – Tech I or any other deals and/or SPVs going forward from the date of this redemption.
5)  The parties agree to sign an NDA, Non-Disparagement agreement, and Non-Defamation agreements.
6)  With the Company's consent on a deal-by-deal basis, Member shall have the option to participate as a Special LP and earn 5% issuer fee for his referrals to that SPV.
7)  For the avoidance of doubt, this constitutes a full redemption of all the Member's interests in the Company per the agreement between the parties.

**MEGACAP CAPITAL, LLC**

By: ████
Name: Marc Goldner
Title: Managing Member
Date Signed: 04 / 03 / 2022

**RODERYK REITER**

By: ████
Name: Roderyck Reiter
Title: Managing Partner
Date Signed: 03 / 24 / 2022

By: ████
Name: Eli M Blatt
Title: Managing Member
Date Signed: 03 / 23 / 2022

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Rod Redemption Agreement for MegaCap |
| **FILE NAME** | Microsoft Word - ...ice.docx copy.pdf |
| **DOCUMENT ID** | 8dfa45994ae56290a78a2b65bc01639eb42bf34c |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

| | | |
|---|---|---|
| SENT | 03 / 24 / 2022<br>01:56:26 UTC | Sent for signature to Marc Goldner (m@megacap.capital), Eli Blatt (e@megacap.capital) and Roderyk Reiter (rapidresponserod@gmail.com) from team@megacap.capital<br>IP: 5.192.195.132 |
| VIEWED | 03 / 24 / 2022<br>03:22:56 UTC | Viewed by Eli Blatt (e@megacap.capital)<br>IP: 70.35.80.97 |
| SIGNED | 03 / 24 / 2022<br>03:23:14 UTC | Signed by Eli Blatt (e@megacap.capital)<br>IP: 70.35.80.97 |
| VIEWED | 03 / 24 / 2022<br>15:30:52 UTC | Viewed by Roderyk Reiter (rapidresponserod@gmail.com)<br>IP: 108.67.13.19 |
| SIGNED | 03 / 24 / 2022<br>15:35:42 UTC | Signed by Roderyk Reiter (rapidresponserod@gmail.com)<br>IP: 108.67.13.19 |

NOT A CERTIFIED COPY

Powered by **HELLOSIGN**



# EXHIBIT L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA (MIAMI DIVISION)

Case No. 1:23-CV-24819

ELI M. BLATT, individually and derivatively on
behalf of Goldner Blatt Investments, LLC,

     Plaintiff,

v.

MARC J. GOLDNER, RACHEL KORSEN,
SIMON DIVILOV, and THE DHARMA
INITIATIVE, LLC,

     Defendants and Counter-Plaintiffs,

v.

ELI M. BLATT,

     Counter-Defendant, and

MegaCap Capital, LLC, MegaCap Funds, LP,
MegaCap Funds, LP – Tech Holding, MegaCap
Funds, LP – Tech I, Little Prince Equity, LLC,
Thibaut Denonain, Michael Elkins, Wayaca,
LLC, Flow, Inc., BitSource, LLC, JPMorgan
Chase & Co., and Bank of America Corporation,

     Third Party Defendants.

_____ /

## DECLARATION OF ELI M. BLATT

I, Plaintiff and Counter-Defendant, ELI M. BLATT, declare as follows:

1.     I, ELI M. BLATT, am over 18 years of age and have personal knowledge of the contents of this declaration. This declaration is submitted for consideration by the Court for any lawful purpose.

2.     This statement serves to document the full extent of abuse I suffered personally by way of Defendant Marc J. Goldner's ("Goldner") litany of malicious communications to me, as

1

well as the damage he caused Megacap Capital, LLC ("Megacap" or the "Company") by way of repeated breaches of his fiduciary duties.

3.      I am an investor in various alternative investments, including shares of pre-IPO companies through Special Purpose Vehicles ("SPVs").

4.      I am the originator of the idea to found Megacap, which serves as the General Partner for several such SPVs, including Megacap Funds, LP - Tech Holding ("MCTH") and Megacap Funds, LP- Tech I ("MCTI"), both series of Megacap Funds, LP.

5.      I named the Company and incorporated it, secured the registered agent and fund administrator, filed for the EIN, and purchased the domain names with the aid of my administrative assistant for Megacap and the series of its affiliated entities, Megacap Funds, LP.

6.      I met Goldner through our MBA Program, TRIUM.

7.      Although I did not realize it at the time, on information and belief, Goldner had been sued multiple times already and has now been sued around a dozen times by numerous defendants claiming, among other things, breach of contract, fraud, and harassment.

8.      Many of the lawsuits against Goldner center on his conduct in the board game community, where he has become a notorious figure to the point where there are news articles published and numerous Reddit and other community threads about his misdeeds and the resulting lawsuits against him[1].

---

[1]https://thetabletoptribune.com/how-golden-bell-broke-its-reputation-with-the-tabletop-community/

https://www.abbynews.com/news/abbotsford-woman-wins-legal-battle-over-board-game-on-reality-t-v-s-the-peoples-court-1796685

https://icv2.com/articles/news/view/53233/oh-no-creator-webcomic-name-raises-almost-250-000-legal-fees

https://boingboing.net/2022/11/11/alex-norris-creator-of-the-webcomic-name-battles-boardgame-company-that-claims-to-own-it-oh-no.html

https://downthetubes.net/webcomic-name-cartoonist-alex-norris-continues-battle-for-his-creation/

https://boardgamegeek.com/thread/2967724/the-oh-no-comics-guy-is-suing-marc-goldner-and-sta

https://boardgamegeek.com/thread/2369510/it-looks-like-a-new-lawsuit-against-marc-goldner-g

https://boardgamegeek.com/thread/2334403/golden-bells-marc-goldner-lose-legal-battle-on-rea

https://boardgamegeek.com/thread/2749497/a-sixth-lawsuit-against-golden-bell-studios-and-ma

https://boardgamegeek.com/thread/2193183/lawsuit-details-for-those-concerned-about-golden-b

https://boardgamegeek.com/thread/2337663/golden-bell-on-the-peoples-court

https://boardgamegeek.com/boardgamepublisher/35902/golden-bell-games/forums/0

https://boardgamegeek.com/thread/2400986/peoples-court-10th-april-marcs-greatest-hour-is-at

9.      Goldner's history of improper conduct and harassment also led to his company, Golden Bell, being banned from Kickstarter.

10.      Goldner is so reviled in the board game community that one content creator suing him raised over $250,000 via a GoFundMe specifically to fund his litigation against Goldner.

11.      Not knowing the extent of the claims against him at the time and having a false sense of security from what little I did know by virtue of him being admitted to TRIUM, I agreed to enter into business with Goldner, including inviting him to join me in founding Megacap.

12.      Two companies that we founded together are relevant to the instant case, the Counterclaim, and the Motion for Temporary Injunctive Relief: Goldner Blatt Investments, LLC ("GBI") and Megacap (including the MCTH and MCTI SPVs it manages).

13.      As detailed in the Second Amended Complaint, GBI was conceived by Goldner primarily as a means for Goldner to defraud me.

14.      Using GBI, he induced me to wire in excess of Four Hundred Twenty-two Thousand Dollars ($422,000), ostensibly to purchase NFTs and bitcoin miners (equipment hosted by a third party for the purposes of generating bitcoin for the investor) for GBI.

15.      In fact, he purchased the NFTs for himself and the Miners for Dharma and, to this day, Goldner and Dharma are in sole possession of all the assets purchased in part or in full with my funds.

16.      I am not alone in being defrauded by Goldner:

---

https://boardgamegeek.com/geeklist/259248/golden-bell-affiliated-projects-and-companies
https://boardgamegeek.com/thread/1950215/concerns-about-golden-bell-and-deliveryfuture-of-d
https://www.metafilter.com/184772/Im-in-law-school-Kelsey
https://www.reddit.com/r/boardgames/comments/edth3t/golden_bells_marc_goldner_lose_legal_battle_on
https://www.reddit.com/r/boardgames/comments/yq1jnd/webcomic_artist_alex_norris_vs_golde n_bell/
https://www.reddit.com/r/boardgames/comments/m3scjn/how_golden_bell_broke_its_reputation _with_the/
https://www.reddit.com/r/boardgames/comments/ewuiyi/golden_bell_studios_officially_suspend ed_from/
https://www.metafilter.com/197119/oh-no
https://twitter.com/Xeliassame/status/1772698973993656378
https://x.com/JakeNelsonMN/status/1590046120352579584

a.  three of our TRIUM peers wired Goldner directly $100,000 for interests in NFTs and have received no benefit for their bargain whatsoever, with Goldner retaining their funds and providing them no value for therefore; and

b.  at least two other investors solicited by Goldner to invest in bitcoin miners remitted to him excess of $150,000 over three years ago for the purchase of miners to be hosted through Compass Mining, as did I, and have not received a fraction of a bitcoin or any other value in return—Goldner simply took their money, allegedly bought miners, and returned them nothing they were due or promised.

17.  I realized that Goldner misled me as to the use of my funds in May 2022, at which point I began a protracted process of negotiating to secure some benefit from the NFTs and the miners for which deposits were paid.

18.  Unfortunately, despite nearly a year of diligent effort to secure some benefit of my bargain, my efforts would ultimately all be in vain.

19.  On June 19, 2022, after unsuccessfully pressuring me to grant him Thirty Thousand Dollars ($30,000) in expense reimbursement via Megacap in order for me to get any benefit of my bargain for the NFTs and miners, Goldner wrote me an email stating, "I'll make this business the most difficult it can be. You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me."

20.  This was the first instance of a breach of his duty of care towards me, and I could not have possibly imagined at the time how serious he was in his promise to torment me or how much damage it would cause me as well as Megacap.

21.  At this point, although I wanted no further entanglement with Golder, I had a fiduciary duty to continue working with him on Megacap despite his increasing hostility towards me.

22.  At the same time, I also needed to get the value of the funds he had stolen from me, and so I issued him a very courteous but firm demand letter in July, 2022 (*See* Exhibit A to this Declaration).

23.  Given that the value of the NFTs had plummeted after he refused my call for GBI to sell them (which is how I realized that GBI did not in fact own them or the miners), there was no realistic chance for a return of my funds.

4

24.     As a result, I was willing to remain in an NFT SPV with him and our three TRIUM peers who had wired him funds for NFTs in order to accomplish a viable settlement and ensure our peers would receive value for their investments.

25.     Unfortunately, Goldner kept insisting on conditions such as his company, Golden Bell, receiving exclusive financial benefits from the SPV, as well as for him to receive Thirty Thousand Dollars ($30,000) in compensation over which he had previously threatened me.

26.     With regard to the miners, Compass Mining had agreed to allow Goldner to transfer to me the miners I had paid deposits on, at which point I would have been responsible for any future balances due thereon.

27.     This should have been an easy matter to resolve, as Goldner could simply have transferred to me the miners my funds had paid the deposits on and settled that matter.

28.     But Goldner refused and instead demanded I send him more money for future balances after it was clear he had already misappropriated the funds I had remitted, making that a non-starter for me.

29.     I had no reason to believe he would honor any commitments to me given his threats and actions.

30.     I tried unsuccessfully to secure the benefit of my funds for nearly a year, with Goldner never agreeing to give me any value for the money I had wired without demanding onerous and unacceptable terms just to receive what was already due to me.

31.     All the while, in order to honor my fiduciary duties to Megacap and its investors, despite my legitimate grievances with Goldner, I kept our GBI dispute separate from Megacap.

32.     Goldner, however, did not.

33.     Having managed to  defraud me successfully (for the time being) via GBI, he was now emboldened and began becoming increasingly abusive in his dealings with me regarding Megacap to the detriment of the Company.

34.     Goldner first sought to improperly leverage his claim that I somehow owed him more money for miners he purchased for Dharma with my misappropriated funds in order to threaten me with imperiling Megacap's ongoing operations, which undeniably constitutes a breach of his fiduciary duty to me and to the Company:

> a. In a December 9, 2022 WhatsApp message on Megacap's official internal Company "WhatsApp Channel," Goldner explicitly and improperly tied his

willingness to manage critical Megacap business to me making concessions in my personal claims involving GBI, stating that the two issues were "intertwined" for him.

b. Goldner reaffirmed in the Megacap WhatsApp Channel on December 16, 2022 that his willingness to cooperate on critical Megacap business was tied to me personally paying him at least One Hundred Thousand Dollars ($100,000.00), writing, "I cannot commit to a new fund admin when you owe me over $100k," referring to alleged additional balances due on miners whose deposits I paid for but which were owned by Dharma and that he had refused to transfer to me. Note at that time the miners had not even been delivered by Compass.

35.     Goldner thus conditioned acting in Megacap's best interests on me acquiescing to a personal settlement with him on matters entirely unrelated to the Company, a clear cut breach of his fiduciary duty to Megacap and to me.

36.     Around this same time, Goldner began pressuring me to file inaccurate and likely fraudulent tax returns for the Company not showing the Company's MCTI management fees as having been earned in full upon receipt in order to reduce his own tax liability.

37.     To rationalize his position, he wrote: "The management fee shouldn't be 5% up front, the 5% is held in trust" on December 12, 2022 in the WhatsApp Channel.

38.     However, I had consulted with Megacap's fund administrator, legal counsel, and accountants, all of whom had confirmed that the MCTI governing documents had the General Partner earning its management fees upon each LP's closing.

39.     And, as a practical matter, the Company distributed the management fees from MCTI to Megacap and used them to purchase assets for MCTH.

40.     But Goldner didn't care. He insisted that he would not allow taxes to be filed that showed the Company had earned the management fees, as he wanted to reduce his own pass-through tax liability–even if it meant filing fraudulent returns that disadvantaged the Limited Partners by reducing their tax write-offs and increasing MCTI's tax preparation fees.

41.     In addition to his desire to avoid paying taxes on Megacap fees earned and his willingness to leverage my imagined debt to him as a means to extort me into acquiescing to his demand to file fraudulent tax return, Goldner became obsessed with signing an interest waiver

6

agreement ("Interest Agreement") with our creditor, Little Prince, LLC ("Little Prince"), managed by Jiri Novotny ("Jiri").

42.     A key provision that Little Prince wanted to include was for Megacap to waive its rights to repay their loan in equity of the portfolio company ("TECH") that the proceeds of the loan were used to purchase derivative equity in at its basis price.

43.     I felt strongly that waiving this right had the potential to bankrupt the Company, as we had not subscribed many LPs to MCTI in nearly a year due to a downturn in the cryptocurrency market, which substantially affected the pre-IPO market.

44.     In fact, the right to repay the loan in shares was the only reason I had ever consented to borrowing the funds in the first place, as it meant there was no possibility the Company could default on the loan.

45.     And so, to protect the Company and its investors, I steadfastly refused to concede on this point and was willing to repay the loan in shares if need be.

46.     He believed the Interest Agreement would benefit him derivatively by reducing interest payments due on the Company's loan with Little Prince to his benefit, and to justify using extortive means to pressure me into signing it. (He seems to have convinced himself that Little Prince would kill us both if we did not sign the agreement, even though there is not a shred of evidence to support that delusion.[2])

47.     In fact, as detailed below, Goldner himself would later admit that he was motivated by derivatively saving interest due on the loan.

48.     Motivated by greed and fueled by his delusion, Goldner's harassment, abuse, and threats towards me escalated exponentially, making it increasingly impossible to carry on the ordinary course of business for Megacap given his increasingly erratic behavior and nearly daily threats towards me.

49.     In WhatsApp messages to me on December 8, 2022, Goldner insisted we speak over video conference rather than communicate in writing, allegedly about Company tax matters "too complex" to discuss over WhatsApp.

---

[2] This is not the only instance where Goldner has exhibited delusional behavior. He has told me and others that he believes he has been chased by assassins as part of his activities as a "freelance spy" for various unnamed government agencies tasked with taking down the hacktivist collective, Anonymous, going so far as to write language to that basic effect into the GBI Operating Agreement to support his claims of having valuable "mutual contacts."

50.    During the ensuing conversation, however, Goldner in fact wanted to again pressure me into agreeing to the Interest Agreement.

51.    This time, however, over a WhatsApp call instead of by our usual messaging, presumably in order to avoid threatening me in writing, Goldner transmitted a threat to my physical safety, allegedly on behalf of Jiri, telling me that someone would "show up at [my] door and break [my] knees" if I did not agree to the Interest Agreement.

52.    While Goldner claimed to have these threats in writing, he refused to share any screenshots with me.

53.    Instead, he arranged a video conference with his father who supposedly read messages from Goldner's phone and said something along the lines of that they contained "some not so nice things."

54.    Nonetheless, I was unwilling to breach my fiduciary duty to the Company and endanger its ability to protect the interests of its Limited Partners ("LPs") by agreeing to an agreement I knew could bankrupt the Company.

55.    Goldner's threats and harassment continued relentlessly for the next month, including by posting a long personal attack against me and my then-fiancé on the Company's official WhatsApp Channel, which includes contractors and affiliates of the company, in a series of December 31, 2022 messages, in a way that denigrated me and the Company which is yet another instance of Goldner breaching his duties of care and loyalty.

56.    At this point, Goldner's constant abuse and threats to my safety had started impacting my mental health, causing me to begin to withdraw from ongoing real time communications with him.

57.    This led me on January 12, 2023, to write to Goldner to "please email me with any [Megacap] or other business" instead of writing messages in the Company's WhatsApp group, on which Goldner had been relentlessly bombarding me with abusive messages.

58.    In response, the next day, he wrote in a WhatsApp chat including Megacap Little Prince and other LPs: "Honestly Eli? I'm sick and tired of your forbidden acts. *I will vote to have you involuntarily removed.*" (emphasis added).

59.    The following day, he wrote me again on the BitSource, LLC Whatsapp channel for good measure:

"@Eli this is notice that you are in breach of the Operating Agreement. *You are committing a Forbidden Act and will be involuntarily removed*... I suggest that you formally withdraw rather than fighting this... Your behavior is not just unethical but is deplorable. I am tired of this behavior and your inaction for your failure to devote time to this business or *any business* that we are a part of in a meaningful way. Thanks for your understanding in this matter." (emphasis added).

60. To be clear, Goldner's only alleged cause for his threats to withdraw me from Megacap was my refusal to submit tax returns I believed to be fraudulent or agree to an Interest Agreement I believed would likely bankrupt the Company, both of which Goldner wanted primarily to benefit him financially by way of reduced passthrough tax liability and his derivative share of the Company's interest obligations. He also objected to the fact that I was no longer willing to suffer his constant abuse and had relegated him to using email to contact me via my assistant as a means to protect myself.

61. Goldner's messages caused me to legitimately fear that he would involuntarily withdraw me, given that he was plainly stating his intention to do so, a course of action that despite all his threats, abuse, extortion and fraud against me I had never once made towards him, even though I had ample cause to withdraw and redeem him.

62. Upon carefully studying the OA, I came to the conclusion that the way the OA is structured, Goldner could indeed unilaterally withdraw me from the Company, as he threatened.

63. Even if such withdrawal was not for legitimate reasons, it was clear to me that were he to do so, it would force me to arbitrate or file suit in order to have the withdrawal overturned and, in the meantime, the Company and our Limited Partners and creditors would be at the mercy of his increasingly erratic behavior and reckless, self-interested decision-making.

64. Given Goldner's theft of over Four Hundred Twenty-two Thousand Dollars ($422,000) from me, forcing me to sell my condo in Miami, I did not have the resources at that time to challenge him were he to involuntarily withdraw me.

65. As I had come to the conclusion at that point that I believed him to not only be unethical but also mentally ill, I felt compelled to protect the Company and our investors.

66. Accordingly, given that I had unequivocally legitimate cause to withdraw him, I exercised that right in furtherance of my fiduciary duty to the Company.

67. I thus drafted a formal Company consent for Goldner's involuntary withdrawal on the basis of his transmitted threats to injure me, breaches of fiduciary duty, and actions that were

making it impossible to carry on the ordinary business of the Company, in strict accordance with the terms of the OA  (the "IW").

68.     The IW was drafted with an effective date of January 16, 2023 and executed via Eversign on January 17, 2024.

69.     Upon drafting the IW, on January 16, 2023, I emailed Megacap's then counsel to inform him of the IW, writing:

> Things with Marc have been going dramatically downhill.  I'm concerned he may try to spuriously involuntarily withdraw me from Megacap, and I have a fiduciary duty to the Company and our LPs to not leave him solely in control.  He also has been preventing us from filing our taxes, which I suspect he is doing to pressure me on the miner/NFT issue. Sending this just for the record to confirm the effective date as accurate in the event he later tries to withdraw me.  As of now, he is withdrawn unless/until I void the agreement.  Hopefully he doesn't go too far off the rails. Sigh.

70.     Much to my dismay, Goldner would indeed go further and further "off the rails."d

71.     In the meantime, the OA does not require notice of withdrawal to a Member; it only requires notice in the event of redemption.

72.     Given that my withdrawal of Goldner was not financially motivated, I did not redeem him at that time, as clearly indicated in the IW.

73.     My only goal was to prevent me from being withdrawn and thus ensure proper, ethical, and legal management of the Company.

74.     By effectuating the IW but not redeeming or notifying him, I could insure against his increasingly erratic behavior and protect the Company from it without creating a maelstrom of chaos.

75.     In the end, I only managed to delay the chaos.

76.     Having failed to pressure me into signing the Interest Agreement by way of transmitting death threats against me, Goldner expanded his harassment to include my *mother*.

77.     In iMessage group messages on January 27, 2023 including me and mother, Goldner:

    a.   tried to ascertain my physical location, causing me to fear for my safety;

    b.   transmitted threats to my "safety";

    c.   claimed there was a "safety risk";

    d.   stated I was putting my "family's lives at risk"; and

e.    said "I don't think you understand what they will do to us. Do you think this is some kind of fucking game?

78.    I responded: "I will not stand for any more of these threats to my safety. If you persist, you will force me to file a restraining order against you, because you are legitimately giving me cause to fear for my safety."

79.    Goldner would repeat these threats several times via WhatsApp and email, writing on March 18, 2022 "you can get fucked to hell brotha… what do you think they're going to do to us if we repay in shares."

80.    Between his January messages copying my mother and the March 18 message, my mental health had started to decline as a result of his harassment and the theft he had perpetrated on me.

81.    I began not sleeping well, waking up anxious, and ultimately entered into therapy in order to try and manage the stress he was putting on me.

82.    As much as I wanted nothing to do with him, I had a fiduciary duty to protect Megacap and its LPs from his increasingly unhinged behavior, as a result of which I was, admittedly, afraid of what might happen were I to notice him of his withdrawal.

83.    As March rolled around, I became increasingly concerned about the March 15, 2023 tax filing deadline for Partnerships.

84.    Goldner leveraged this concern to again attempt to force me into all manner of concessions relating to Megacap and GBI, as well as again to grant him individually the $30,000 he had become obsessed with.

85.    Accordingly, under the ongoing threats to my life and my fear that I had no choice but to reason with him in order to get him to go along with accepting tax filings (since, even though I had already withdrawn him, I was basically afraid of him and what he might do were I to formally notice him of such), I went along with his pressure to enter into the so-called Megacap "Resolutions," executed on February 13, 2023.

86.    Although I realized that any resolutions we signed would not be valid given (i) the fact that I was under legitimate duress by way of the death threats against me and my sense that I had no choice but to negotiate with him in order to ensure the Company could timely file taxes; and (ii) the fact that I was the only Class A Member and could thus void them at will, I

11

nonetheless carefully considered the structure of the Resolutions in order to protect the Company in the event they were ever found to be enforceable.

87.   Thus, I was careful to ensure that, in general, the Resolutions were just that: they "resolved" many things but didn't actually "effectuate" anything, as all the major resolutions had conditions precedent and/or required further consents and agreements subject to a Class A vote.

88.   Additionally, all of the resolutions applied to Class A Members, which Goldner was not.

89.   Where my goal was to protect the Company, Goldner's goals with the Resolutions were (i) to force me to stay in business with him, as he was incapable of running the Company alone (which is why despite all his threats he never withdrew me); (ii) to enrich himself via a convoluted assignment of MCTH equity directly to him at the expense of the Company, which would then no longer be able to earn fees on those shares; (iii) to reduce his own pass-through tax liability; and (iv) to finally get the $30,000 he had been threatening and pressuring me about for over 8 months that as a result of his first threat against me I had explicitly stated I would never to grant him out of principle (yet he managed to trick me into agreeing to by not tracking the changes granting him that consideration in the final draft).

90.   In the end, the Resolutions, which were not valid to begin with for the reasons detailed above, actually did not effectuate anything because, as detailed more thoroughly in the written opposition to the Motion to Dismiss Defendants' Counterclaim ("MTDC"):

  a.  The conditions precedent for preventing and invalidating Member withdrawal were never completed, which he himself affirmed months later on April 8, 2023 when threatening yet again to withdraw me, writing: "*The terms haven't been completed.*" (emphasis original just so he could drive home his ability to withdraw me).

  b.  The convoluted "Option and Loan Agreement" described in the Resolutions, which Goldner wanted in order to enable him to assign Company-owned TECH equity directly to him without any tax consequences, was never drafted let alone executed as clearly required by the Resolution, nor was the formal assignment of a portion of the option (which was further also only available to Class A Members) by way of a "boilerplate assignment agreement."

c.  More generally, all of the Resolutions explicitly required a further vote by the Class A Members to effectuate or had conditions precedent that were never met, and all the benefits Goldner sought to grant himself were only available to Class A Members (which he was not), and so the entire Resolution ultimately lacked any real effect.

91.  For all his greed and abusive tactics, Goldner was ultimately not very savvy and failed spectacularly to accomplish his goals to disadvantage me and the Company for his benefit.

92.  Given that Goldner had already been withdrawn and the Resolutions were invalid to begin with, and the fact that I was under acute duress during that entire period and did not actually consent to anything Goldner was pressuring me into, the Company formally rescinded and voided the Resolutions on October 15, 2023, and no assignment of Company-owned TECH or other equity or funds was ever distributed to me, directly or indirectly.

93.  Unfortunately, executing the Resolutions did not placate Goldner, and he immediately turned his sights back on pressuring me to execute the Interest Agreement by way of increasingly hostile and threatening messages.

94.  This led me on March 19, 2023 to write to Goldner by email that "I cannot and will not continue working under the current environment of constant, near daily threats against me, nor am I under any obligation to do so. Despite what you seem to think, you do not have the right to verbally abuse me — or anyone for that matter."

95.  In a March 23, 2023 email to me in reference to his threats surrounding the Interest Agreement and my desire to file taxes timely, Goldner wrote: "I do not give a flying fuck if you believe it's real or not. You need to come to terms that nothing is going to proceed [with Megacap taxes] until we're on the same page and that our lives aren't [sic] at risk because of your inaction," referring to my refusal to sign the Interest Agreement even under threat to my and my family's lives.

96.  On April 4, 2023 in response to two follow-up emails that day pressing me to sign the Interest Waiver Agreement, I wrote Goldner:

"I am not going to commit fraud against a [sic] little prince, which is what you are urging me to do, by signing a document that you have already acknowledged, and I have already states [sic] would not be not valid due to the duress that you have placed me under... I am hereby again instructing you in no uncertain terms stop contacting me. I deem your continued aggressive and persistent messages to be harassment on matters I have already told you where I stand and for which your main purpose is to force me into doing things

you want me to do by placing me under emotional distress. You sent me at least five long harassing and threatening [email] messages on Sunday alone… Any additional emails to me directly will be deemed by me to be harassment, as I already DM [sic] your prior emails to be given that I had clearly instructed you I did not want to be threatened, abused, or harassed by you over email or WhatsApp."

97.     Rather than respect my request to direct his communications to my assistant, Goldner expanded his campaign of harassment in his reply by blackmailing me under threat of disclosing confidential files relating to unrelated litigation for a Company I was managing to the opposing party in that case that he had stolen if I didn't acquiesce to his demands, sharing the name of a zip file he had made of a Google Drive folder of mine without authorization over a year ago, clearly with the intent to secure leverage to extort me.

98.     I shared the distress Goldner was causing me with the Company's then lawyer to whom I had previously sent the IW, writing him in messages between April 3-4:

> "When I see am (sic) email come in from him my heart rate spikes. He has waged a campaign of terror against me. I'd like immediately consult on whether I have grounds to file a restraining order… Marc has ruined my life for a year now… I've developed an anxiety disorder basically because of him… I'm having a nervous breakdown… I'm past my limit and [I] do not know what to do… Somewhere Marc is laughing… At a certain point it's just all too much. Losing my money. Losing my home. Multiple court cases. More theft from me. Unceasing psychological warfare against me."

99.     Around this same time, Goldner had also been directing unhinged and unfounded threats directed at First Republic Bank, where Megacap banked.

100.    As a result of his aggressive communications with the bank, I received a call in or around April, 2023 from our banker at First Republic, Morgan Elgebali, notifying me that he was going to report Goldner's threats to his superiors and that most likely Megacap would be dropped as a customer.

101.    Between that, the banking crisis of 2022, and some Megacap account being closed and others put under protective services by First Republic due to Goldner's threats towards it, the Company determined that to safeguard its funds while I secured it another banking partner, Goldner and I would each receive temporary distributions of Eighteen Thousand One Hundred Forty-six Dollars and Seventy Cents ($18,146.70) to hold in trust (the "Funds in Trust") until such time as they could be deposited into a new Company account.

102.    Goldner agreed that until such time they could be deposited into a new Company account, he would use the Funds in Trust to perfect an arbitration award against a Limited

Partner who defaulted on his capital contribution, which he never did, nor did he ever return the funds to the Company, as detailed further below.

103.   All the while, he continued writing inappropriate messages in breach of his fiduciary duty to me and the Company in the WhatsApp channel with several LPs and Little Prince:

    a.  expressing a desire to avoid personal taxable income by having the Company breach MCTI's governing documents;

    b.  threatening to withdraw me from the Company for refusing to sign the Interest Agreement and not acquiescing to his demands to file fraudulent tax returns for his personal tax benefit;

    c.  admittedly and wilfully deceiving Little Prince by knowingly and demonstrably lying to them about my alleged refusal to approve an imaginary cap table transaction, an *entirely made-up* allegation designed to boost his status with Little Prince at my expense by way of deception;

    d.  falsely claiming I had made unauthorized distributions to GBI;

    e.  again attacking my then fiancé and baselessly claiming the Company could sue her for tortiously interfering with Megacap affairs simply because she (understandably) did not like him; and

    f.  disclosing private internal Company business in an effort to improve his own personal standing with Little Prince and its affiliates, to the detriment of the Company.

104.   Finally, after holding out for over four months in the face of Goldner's threats, harassment, and abuse, Little Prince acquiesced to my refusal for the Interest Agreement to waive the right to repay its loan in shares.

105.   Having secured that victory for the Company at an incredibly high personal cost to my own wellbeing, I negotiated the final terms of and drafted an Interest Agreement that was to the Company's benefit without exposing it to the threat of bankruptcy, which was executed on April 26, 2023.

106.   At no point ever did Jiri or any of his associates threaten me, and when I ultimately shared with him that Goldner had been accusing him of threatening me and my family's lives, he called the allegations defamatory.

107.   His associate and Megacap LP Thibault Denonain, whom Goldner in a pivot later ascribed the threats to, also explicitly affirmed in a sworn affidavit that he never transmitted any death threats against me, let alone my family.

108.   The screenshots of Goldner WhatsApp messages with Denonain beginning on January 13 (attached as Exhibit 19 to the Counterclaim), a month after he first transmitted a threat against me, make make it abundantly clear that Goldner's alleged threats to our safety are entirely a product of his delusional imagination.

109.   Nonetheless, Goldner's campaign of terror had affected my mental health to the point where I did file a restraining order against him on April 10, 2023.

110.   However, as Goldner had intentionally never updated his driver's license and had registered his car to a UPS mailbox, both illegal in both Connecticut and New York (one of which, on information and belief, was his state of residency), the sheriff was unable to serve him.

111.   To this day, I have never succeeded in serving Goldner anything—not the restraining order, the complaint for the instant case[3], or the complaint for the Related Case—since he has intentionally made himself a ghost in order to evade service, given that he is a perpetual defendant in civil actions.

112.   Having failed to secure a restraining order due to being unable to serve him as a result of his calculated efforts to avoid being able to be served lawsuits or other actions, and no longer being able to suffer his continually escalating abuse, on April 30, 2023, I filed a rescission notice for GBI and a civil theft demand letter for the funds I had wired, in accordance with Florida law, in preparation to file suit.

113.   My hope was that entering into litigation would provide me some measure of protection from his abuse and enable me to be made whole financially.

114.   In response to the rescission notice, in a long rant on May 4, 2023 in the WhatsApp channel with Little Prince and other LPs, Goldner doubled down on his threats not only against me but, inexplicably, also Megacap:

> "You have breached your fiduciary duty and *will be removed* as such for your breaches that have put MegaCap's shares at risk. *You have risked the entire portfolio and if [the TECH supplier] gets wind of this and of any perceived*

---

[3] Goldner's counsel ultimately voluntarily accepted service in the instant case originally filed in Florida on behalf of Goldner and the individual Defendants (with Dharma having been previously successfully served via its Registered Agent) once I successfully delivered a certified letter to his UPS Mailbox, which would have enabled me to obtain service by mail.

*dispute she will most likely redeem MegaCap…* The game you're playing here Eli will wind up dragging this into a Federal Court that will have a tortious discovery process that could reveal not just *people's names*, but has the impact of creating a regulatory securities risk with agencies such as the *SEC*. I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've 'stolen' your money… You have continually concocted a fantasy that you have signed the agreement with Little Prince because you feel *your life is in danger*. You should get it through your head that our financial safety and financial security are absolutely at risk because bankruptcy or *threat of suit could destroy MegaCap and expose the name of the employee for TECH with the forward contract*. That would be doomsday and disaster for all of us and no one would ever get paid then… *I suggest you re-think your approach and come to the table instead of playing games and pretending you haven't sent me a letter claiming that I've stolen money from you on a business operation unrelated to MegaCap.* So you can scream to the end of the day that this is 'ranting' but this is also coming from the same guy that thinks *he's in 'danger' from us.*" (emphasis added).

115.    Given that my rescission notice and civil theft demand had absolutely nothing to do with Megacap, and at that time he did not yet even know he had already been withdrawn from the Company, I took this message as a clear extortive threat against not only myself but also the Company, namely that if I did not withdraw my legitimate claims regarding the NFTs and miners he would needlessly expose confidential information that could irreparably harm the Company and its Limited Partners.

116.    That same day, Goldner also messaged my then fiance on WhatsApp to sextort me by threatening to release compromising images of me unless I withdrew my claims: "you all should have thought twice before attempting to call me a theif (sic). You ever wonder if when you spoke to me I was recording you… Do you not remember [video] calling me when Eli was butt naked… You two should think long and hard about what to do because you're asking to go to war against an army."

117.    That was the final straw. Continuing to work with the already-withdrawn Goldner was no longer tenable.

118.    I amended his withdrawal on April 28, 2023 to include the additional threats made and had it served to him on May 5, 2023 by my assistant, as I was no longer in any form of direct contact with him at that point for my own wellbeing.

119.    At that time, as I was essentially in a haze from his constant barrage of abuse, I failed to attach the original January 16, 2023 IW, serving him only the amended withdrawal, although this did not change the fact that he had in fact been withdrawn since January 16, 2023

per the IW tendered to the Company's counsel. It is unclear to me whether Goldner still does not realize that he was withdrawn in January or has simply chosen to ignore that fact.

120.     Despite notifying him of his withdrawal, I still at that time did not redeem him, as my goal still was not to economically disenfranchise him or enrich myself but rather to minimize the impact to the Company, which the withdrawal notice made explicit.

121.     My hope was that by noticing him of his withdrawal but explicitly not redeeming and permitting him to continue vesting equity, I could minimize his efforts to damage the Company.

122.     Unfortunately, I was wrong.

123.     Instead of adhering to the dispute resolution protocols in the OA, Goldner began improperly contacting Megacap partners and causing problems for the Company almost immediately, while continuing to harass me, causing me significant ongoing distress.

124.     On May 12, 2023 I messaged the Company's then lawyer again, writing:

> "I just got a call from a tertiary potential MC partner we never even closed any business with saying that Marc called both him and his partners. I don't think our [TECH] GP would ever have any cause to redeem us, since we don't know the employee whose shares we bought's name[4], and that's the really only unforgivable act, simply us having a dispute is not, but, still, I need to stop Marc. I would like to get a cease and desist order and also a letter from you as MC's attorney that I can share with all our partners to inform them that Marc has been removed and to contact me at the official Megacap email address should he contact them."

125.     On May 22, 2023, the Company notified him that it was aware of his activities and ordered him to cease and desist, as well as instructed him to return the Funds in Trust to the Company's new bank account at Bank of America.

126.     Goldner refused on both counts.

127.     Realizing that my hopes that Goldner would follow dispute resolution protocols and behave in a professional manner was naive, and the fact that his refusal to return the Funds in Trust was simple theft from the Company, I decided I was not just or proper to allow Goldner to continue vesting equity when it was clear he was actively acting against the Company's best interests, even though he at that time still had an equal interest to me.

---

[4] I was actually wrong about this fact. As Goldner would later bring to light by writing me the employee's name as a means to better extort me, the seller had failed to redact the employee's name in one of the TECH transaction documents.

128.    Accordingly, pursuant to the terms of the OA, Goldner's unvested Membership Units in the Company were redeemed on May 23, 2023 in strict adherence to the terms of the Redemption Agreement template Goldner had executed as part of the OA.

129.    Notice thereof and the purchase of his redeemed shares by the Company by way of a deduction from his Funds in Trust was then served to him promptly.

130.    This precipitated a campaign of terror against not only me but also Megacap and its partners, vendors, and investors that has not stopped to this day.

131.    This ultimately forced me to file an injunction in my case against him in Florida state court seeking to halt the damage he was causing to the Company, which, as with every other service of process I have ever attempted to effectuate on Goldner, was unable to be served to him.

132.    The injunction detailed his campaign of terror, which included:

    a.    doubling down on his extortive threats against me and the Company by, among other things, needlessly naming the name of the TECH employee (which I did not realize had been inadvertently shared with us) and threatening to publicize the name, which he himself has repeatedly acknowledged could cause catastrophic and irreparable harm to the Company and its Limited Partners, unless I reinstated him as a Class A Member and Manager of Megacap and dropped the instant lawsuit against him, writing in a June 29, 2023 letter to me included in Exhibit C to the injunction:

"I strongly *suggest* that you immediately *reinstate me*[5], otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved... *it is extremely important to remember that I possess the name (as do you) of the [TECH] employee that is part of the [TECH] employee forward contract - (his name in case you didn't read the documents is [redacted])*... **I would highly recommend immediately dismissing this case**... failure to do so may result in a federal court action and a tacit approval and waiver for me to sue MegaCap in federal court… MegaCap will be named as a third-party defendant, and I will most certainly *ensure that ALL shares are withheld*. What you do not seem to understand is that is IF the shares are cancelled [sic], it is YOU who will be held liable as you are the but for causeof all of this happening…. *I have absolutely no issue putting MegaCap into receivership with the SEC.*"

_____

[5] Note that, despite his letters to LPs claiming to represent the Company and his claims in the Motion and Counterclaim to being a Class A Member, Goldner has consistently acknowledged that he was withdrawn as a Class A Member and Manager to both me and Limited Partners.

b.  admitted that his coercion of me to sign the agreement with Little Prince under threats to my life was extortion by acknowledging his financial interest in having the agreement signed, stating in that same letter to me: "In order for extortion to exist, I would've needed to have a financial benefit, which I had none – instead, I saved MegaCap over $100,000 in the interest waiver agreement that I had gotten signed"; this is a confounding statement given that Goldner was clearly aware that he had and continues to have financial interests in Megacap and thus pecuniary interests in the actions he was coercing me to take under threat to my life, thus rendering his threats felony extortion under Federal, Florida, and Delaware statutes;

c.  unsuccessfully solicited support and money from Megacap's Limited Partners to aid him in disputing his withdrawal outside of the proscribed mediation and arbitration under threat of the loss of their investment by implying that he will make the name of TECH, the TECH employee, and TECH supplier public if they did not assist him in forcing me to acquiesce to his demands;

d.  instructed potential investors not to invest with Megacap, thus causing the Company irreparable financial harm and preventing it from repaying its debts to its creditors;

e.  induced Roderyck Reiter to call my mother and relay extortive threats against me, including to "put [me] in jail" if I did not acquiesce to their demands; and

f.  contacted and baselessly threatened critical partners of the Company with, among other things, legal actions he has no standing or right under the OA to bring, including:

   i.    the TECH supplier to inquire about their ability to redeem the MCTH's subscription, thus planting the seed for them to potentially do so;

   ii.   the supplier of the Company's shares for another SPV it manages in a manner they characterized as "alarming";

   iii.  the Company's SPV administrator, causing it to breach its contractual obligations to Megacap by ceasing all work on Megacap's critical tax reporting in the middle of tax season and dropping registered agent services in response to the threats from Goldner, as well as to demand an

> indemnification by the Company from any actions against it by Goldner in order to resume performance of its contractual obligations, thus hamstringing Megacap administratively and operationally;
>
> iv. its accountant, who ceased work on Megacap's taxes out of fear of a lawsuit from Goldner, stating that he could not afford to be sued, even if frivilously; and
>
> v. Megacap's counsel, whom his lawyer contacted and threatened with ethics complaints if they did not withdraw.

133. Filing the injunction was, unfortunately, not sufficient to deter Goldner from attempting to cause further harm to Megacap, and the fallout from his letters created a tremendous amount of additional work and expense for the Company, in addition to likely lost referrals and subscriptions from prospective investors.

134. Subsequent to its filing, Goldner's then counsel Raúl A. Reichard ("Reichard"), who subsequently withdrew after explosive allegations between him and Defendants aired in a hearing, wrote letters to Megacap's LPs on behalf of Goldner, (i) defaming me; (ii) spuriously alleging their 2022 K1s to be incorrect; (iii) falsely claiming to have requested formal mediation pursuant to the terms of Section 80 of the Agreement when in fact no formal "mediation administered by the American Arbitration Association under its Commercial Mediation Procedures" had ever been requested or let alone arranged by Goldner as the OA proscribes; and (iv) alleging that their investments were at risk from being withheld as a result of my actions.

135. Reichard subsequently wrote Megacap's then-counsel, conveying threats from Goldner and Divilov to file ethics complaints against them unless both they and I acquiesced to various demands, including for Megacap's counsel to cease representing it.

136. This is a flagrant breach of the Florida Bar's Rules of Professional Conduct Rule 4-3.4(h), which states that a lawyer must not "present, participate in presenting, or threaten to present disciplinary charges under these rules solely to obtain an advantage in a civil matter."

137. Goldner's current attorney relayed this same message to the Company's current counsel in an effort to coerce them into ceasing their representation of the Company.

138. Goldner next surfaced in November, 2024, along with Reiter and Defendant Divilov, writing Megacap's Limited Partners a 68-page letter in an effort to confuse and

intimidate them, with the three of them declaring: "Marc Goldner and Roderyck Reiter Reunite to Unify MegaCap Capital & MegaCap Funds."

139.    The November 2023 Letter was written by Goldner in collaboration with Divilov and Reiter, who each included their own letter. In this letter, Goldner, supported by Reiter and Divilov:

  a.  breached the Operating Agreement's dispute resolution terms and Megacap Funds' Limited Partnership Agreement's tortious interference terms (to which Reiter and Divilov are bound) by seeking to resolve his dispute with the Company by way of direct appeal to Megacap's LPs instead of through proper channels, writing "I am requesting that there is a mass request from each and every LP to tell Eli to comply with his duties;"

  b.  threatened to needlessly make public highly sensitive, confidential information about Megacap's suppliers, which he warned could wipe out all the LPs as well as Megacap;

  c.  alarmed LPs with an allegation that a critical Megacap supplier would withhold Megacap's investors' equity at Goldner's instruction, writing "MegaCap and Eli will not be distributed anything from the Sellers in which we acquired [redacted] and [redacted] without either my consent, authorization, and approval or without proper adjudication," where the latter claim is a gross misrepresentation;

  d.  falsely claimed to represent the company, sharing fraudulent Megacap email addresses to contact Goldner and Reiter, which Goldner has since written LPs from fraudulently claiming to represent the Company despite his repeated admissions to being withdrawn, as per above and the Counterclaim;

  e.  defamed and disparaged me as Megacap's Manager and, by extension, Megacap, by, among other things, baselessly accusing me of crimes, including double-selling TECH inventory, thereby defrauding Megacap LPs;

  f.  disclosed detailed confidential Company information, including disclosing the Company had a One Million Dollar ($1,000,000.00) debt obligation;

  g.  falsely claimed that mismanagement by Megacap could "result in the destruction of LP equity"; and

h. attached letters written by Divilov as well as Goldner and Divilov's personal lawyer defaming the Company by, among other things, falsely claiming to MCTI LPs that their K1s were incorrect and fraudulent when they simply showed each partner receiving a credit for their fees paid.

140.    Despite Goldner's best efforts, while several LPs did contact the Company expressing concern and alarm over Goldner's letter, not a single LP expressed any support for Goldner.

141.    In response to Goldner's campaign of terror against the Company, it filed suit against him and his accomplices, Reiter and Divilov.

142.    With the aid of his attorney, he once again evaded service, causing the case to be dismissed without prejudice due to being unable to file a joint scheduling order.

143.    Thereafter, Goldner promptly filed his Counterclaim and Injunction in the instant case rather than keeping the unrelated matters separate, as would have been proper.

144.    Given that Goldner is impossible to serve by virtue of his concerted efforts to conceal his whereabouts and my desire is to put this painful chapter with him behind me, I have decided the best course of action is to litigate Megacap's claims in the instant case.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed on August 29, 2025.

_____

Eli M. Blatt



# EXHIBIT L



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

Dear Michael Murray,

I trust this find you well.

I hope everyone has had an incredible summer and an even better autumn! I want to assure everyone that I am still here and actively have been working on this disastrous situation. As you will see from this extremely detailed letter (with exhibits), I am leaving no stone unturned. I am sifting through over 100,000 emails, messages, photos, recordings, and more. I will not let Eli get away with this and he will be brought to justice!

What follows is additional details regarding the illicit actions of Dr. Eli Blatt, one of the co-founders of MegaCap. As a refresher, Eli had illegally and against the terms of the signed MegaCap Resolution removed me from MegaCap and had attempted to abscond some of its assets, presumably to enrich himself at the expense of not only myself, but other LPs and partners.

Matters have expectedly and predictably devolved since our last formal correspondence, but I am happy to report that any and all expected distribution of the Neuralink and SpaceX shares (or proceeds therein) have been frozen, protecting your investments until such time that this matter is finally resolved. The sellers of both Neuralink and SpaceX have assured me in writing that there will not be any distributions, dividends, or otherwise sent to Eli without my approval.

**I.      Letter from Attorney Raul Reichard:**

First and foremost, I think it is important for you all to read this letter from an attorney, Raul Reichard, who has taken the time to put together a letter addressed to all Limited Partners. The contents of the letter deals with many topics including but not limited to the status and situation surrounding the K1s, the various breaches Eli has committed, Flow's role in the destabilization of MegaCap, verification of Eli's misrepresentations including falsely stating that he is a Certified Investment Management Analyst, amongst other legal facts including but not limited to Eli's unenforceable withdrawal of me from MegaCap, that Eli himself is the one being withdrawn, information surrounding the legal liability of a third party who threatened me, as well as the falsities surrounding Eli's claim of holding Rod Reiter's units "in trust" and verification of my ability to pursue legal action in Federal Court under specific provisions of the Operating Agreement. The letter continues to discuss my rightful title to an LP stake in Neuralink, information around potential tax fraud being actively committed by Eli, that IRS Form 8832 was signed by Eli and myself, as well as confirmation that there was in fact a signed resolution preventing my removal. Days after (on September 14, 2023) sending LPs the letter on or about September 12, 2023, I received an email from the third-party Accountant that handled MegaCap's taxes, stating, "I mailed Form 8832 on March 14, 2023 to the IRS." Apparently, this accountant has since "disassociated" himself from MegaCap. It is important to note that it took this accountant over 2 months to respond to me after emailing him as early as July 2, 2023.

You can read the letter from Raul below at Exhibit X. You can also read the letter from Raul addressed to MegaCap from Simon Divilov, one of MegaCap's Limited Partners and one of my business partners for over a decade – that latter exhibit can be found below at Exhibit Y. For your information and for the sake of transparency, we are in the process of replacing Raul as our attorney of record. This is due to numerous reasons, the most pressing of which is that we believe a conflict of interest arose. By Raul's own admission, we had later learned that Raul is a friend and colleague of Michel Elkins. During the Summer of 2023, Raul had entering

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

into correspondence with Elkins. Crucially, he had billed us for that correspondence. Naturally, we queried this and asked for a copy to be provided. After all, if we had paid for this exchange, we are entitled to see what was being said. To date, and despite our request, Raul has failed to disclose the proof of that correspondence that was allegedly made VIA text message.

### Marc Goldner and Roderyck Reiter Reunite to Unify MegaCap Capital & MegaCap Funds

At this time, I'd like to state that Roderyck Reiter, the other rightful co-founder of MegaCap and I have teamed up to ensure Eli's illegal conduct is stopped in order to protect the Limited Partners!

**II.     New Incidents of Fraud By Eli Blatt:**

It has come to my attention and to my absolute astonishment that Eli Blatt has been misrepresenting to current and Limited Partners, on his Social Media, his Resume, as well as to myself that he is a Certified Investment Management Analyst ("CIMA"). Eli has gone as far as putting "CIMA" in the letters behind his name. I now possess proof that Eli Blatt has been fraudulently misrepresenting this information. Eli Blatt is not an "active certificant" of CIMA, which is issued by the Investments and Wealth Institute. I have confirmed this with the organization's General Counsel, Robert E. Frankel, who informed me by email that "[y]ou can go to https://investmenthelp.org/ and search for any name. If that name does not appear, he/she is not an active certificant." A copy of the email is attached hereto as *Exhibit V*. Furthermore, Mr. Frankel granted me permission to print out his email and share it if it was needed to be confirmed in writing. He further stated in previous communications that "...Mr Blatt is not an Institute candidate or certificant", and his colleague Ashley Vargas confirmed first to begin with that she is "unable to confirm that Eli Blatt has an active certification." (Please see Exhibit V) As is patently clear, Eli has been fraudulently misrepresenting himself to hold a title which he has not earned, and is now attempting to cover his tracks. As will be illustrated throughout, that is not the only matter Eli has been lying about. This fraudulent claim that Eli had been boasting on LinkedIn and other forms of digital communicative distribution should give all LPs insight to who "Dr" Eli Blatt really is as it is clearly a willful misrepresentation of his credentials. Eli's ego will never cease to amaze me at this point as it is one thing after another that Eli will continue to pile on top of himself with no end in sight.

Eli has attempted to unjustly enrich himself, fraudulently induced me into agreements based on this misrepresentation, and has continued to act in bad faith. The net result of his actions has caused the deterioration of affairs into their current, pitiable state. Simply put, Eli Blatt has proven time and again that he cannot be trusted at his word. He has continued to attempt to wage a war against myself and my other partners (through various businesses) to commandeer MegaCap (as he has also done the same with the Bitcoin ATM company, BitSource, that we started together – in which he also locked me out of the email, bank, and illegally withdrew over $6,500 without authorization from BitSource's banking partner called Arival Bank) and dispossess myself, and others, of our assets. If any were still skeptical before or up to this point regarding Eli's integrity or honest, I hope that the above revelation that has come to light has now dispelled any doubts of Eli's malicious intentions and lack of trustworthiness. If such reservations remain to exist, I ask that you continue reading as I provide further proof below.

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

### III.   Updates on Ongoing & Vexatious Legal Cases Between Eli, myself, and others:

After Eli had begun engaging in legal maneuvering, it had come to our attention that Eli has a history of suing his former business partners – it appears to be his modus operandi. While, we were aware that Eli had a troubled legal past, we were unaware of the nature of these suits as we had trusted Eli at his word. Upon further investigation, if all of the above wasn't enough, and further to this point, what Eli conveniently leaves out of his fictitious warped narrative is that he isn't only trying to sue me, but he has a habit of suing his 'former' business partners such as Zachary Burton and a slew of other people from his former Merchant Cash Advance business. It isn't quite clear to us as of yet what exactly has transpired, but what is known is that after matters soured in at an entity that has come to be known as "K4B" (we believe Kash 4 Biz), Eli eventually exited that business venture, and sued his former business partners, much in the same fashion that he is doing again. Upon information and belief, at least one of these is in Florida State Court against Zachary Burton, and another is allegedly in an arbitration. To be clear, Eli is attempting to play boy-scout, but I know the monster behind the mask. Eli is the same guy attempting to win everyone over claiming he's 'authentic,' 'genuine,' 'honest,' and a bunch of other fluffy 'psuedo-professional' phrases, when at the same time he has messaged me some inhumane, unethical, and borderline illegal messages. Do not let his performative professionalism deceive you. Only now, after the fact and in full context, I fully understand some of the messages Eli had sent me. For brevity, I will quote two. "Still ideating about literally strangling Zach to death" and "I told Emily yesterday I'm going to put his dad in the grave with this arbitration and then go to the funeral just so that I can creepily smile at Zach the whole time". Does this sound like someone you want to work with? At the time, I mistakenly believed that Mr. Burton had wronged Eli, as I was told that Eli had gotten into an argument with Mr. Burton in person at a party in Miami. I had justified it to myself that Eli was merely blowing off steam at a failed business venture, had given my partner, Eli, at the time the benefit of the doubt, but now the true, malicious nature of Eli is clear for all of us to see. Hindsight here truly is 20/20.

### IV.   Flow Letter

Upon these discoveries and revelations of Eli's fraudulent misrepresentation of various atrocities above, I now write this letter to all of you. As a courtesy from a fellow Limited Partner, I was forwarded Eli's June 4 Letter issued improperly from Flow (and without my approval). This letter was apparently not sent to ALL Limited Partners as certified by Simon Divilov, an LP of MegaCap, a close friend, and my longtime business partner, as well as confirmed by Roderyck Reiter, the other rightful Managing Partner of MegaCap. Simon & Rod granted me permission to disclose this information to you. I have also heard from other LPs that they have not received this letter. Naturally, even as an LP myself, I had not received a copy of this letter either. For your reference and for the sake of transparency, I've attached the letter as *Exhibit A*.

### V.   Michael Elkins' Attorney Misconduct and Conflict of Interest Exposed

The letter attached to Eli's letter (*Please see Exhibit A*) contained a letter from an attorney, Michael Elkins, herein attached as *Exhibit B*. This letter shows Elkins' grossly negligent and willful misconduct as he has stated in the past that in a dispute between Eli and I (that he had been aware of) that he would be conflicted out of representing Eli. He has breached that trust and continued to work for Eli to assist him in commandeering MegaCap. You can see Elkins' certification VIA email stating this attached as *Exhibit C*. For an attorney to conduct



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

himself this way is not just unethical, but I believe certainly violates the Rules of Professional Conduct which opens Elkins up to an investigation and a potential grievance claim with the Florida State Bar. However, upon information and belief, I was notified that Elkins is claiming that he no longer is representing anyone in this matter and that he had represented MegaCap in an unrelated arbitration. The direct quote allegedly believed to be originating from Elkins states, "I'm not co-counseling on the Blatt matter. I'm not sure why Marc thinks that. Happy to discuss with you when I get back on Monday, but I don't have much info. … I had very minor involvement for a very short time , I am no longer representing anyone in this mater … I represented Megacap in an unrelated arbitration … let's discuss" – this was on July 15, 2023 and I have to date still received no further word from Elkins. Upon information and belief, Elkins has been too busy in over three months to communicate.

To continue on this point, Mr. Elkins has had various communications with Flow and with Limited Partners of MegaCap. Mr. Elkins told Mr. Goldner on April 2, 2023 that "[i]f there ever was a dispute between [Mr. Goldner] and Eli as relates to MegaCap, I would likely be prevented from representing either of you against the other since I represented MegaCap." Mr. Elkins further went on to state, "[i]n short, my representation of MegaCap was on a single, discreet contract matter." Further to put this specific issue to rest, Mr Muschel emailed Flow, Inc on or about June 26, 2023 and stated that "Mr. Elkins has already communicated to your previously, both in writing as well as over the phone[…]" and that "[Mr. Muschel and Kopelowitz Ostrow] now represent[s] [MegaCap Capital, LLC], along with Mr. Elkins. However, upon information and belief, based on word received from Raul Reichard, whom once again is an attorney, Mr Elkins is not representing MegaCap at this time. Mr. Goldner is demanding all communications between Mr. Elkins, Mr Muschel, and any other attorneys who have allegedly represented MegaCap to be sent to Mr. Goldner, as well as a complete record of the phone call that occurred between Mr. Elkins and any representatives of Flow.

Surprisingly though, according to a letter provided to Rod (who is once again one of the Founding Managing Partners of MegaCap), Elkins is still co-counsel on matters relating to MegaCap according to a letter written by Benjamin Muschel on June 26. (Please see Exhibit D) Elkins has had various communications with Flow and with Limited Partners of MegaCap. Once again, Elkins told me on April 2, 2023 that "[i]f there ever was a dispute between [Marc] and Eli as relates to MegaCap, I would likely be prevented from representing either of you against the other since I represented MegaCap." Thus, it is hard to absolutely be certain of Elkins' position.

## VI.    Removal of Myself from MegaCap

Eli's letter contains many provable lies, which I will detail below and illustrate shortly, that shows his continued breach of trust with MegaCap's LPs and a breach of his fiduciary duties to fraudulently conceal the truth from MegaCap's investors, not including his breach of fiduciary duties to MegaCap and myself.

The first of these falsities is that Eli claims "[I] ha[ve] been withdrawn from the Company as a Class A Voting Member and Manager according to the withdrawal and redemption provisions of the Company Operating Agreement and is no longer operating at the Company." Eli has most certainly not abided by any withdrawal and removal clauses because Eli conveniently leaves out the following:

1) That we signed a MegaCap resolution and completed it on February 13, 2023 (Please see *Exhibit E*). In terms of that agreement, no Class A Member, of which both Eli and I were, can remove another Class A Member.

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

In other words, Eli's purported removal of me is de facto impossible due to the agreement we signed. For the sake of convenience, I quote the relevant portion of the clause which states, "all Sections of the operating agreement relating to Redemption of Membership Units or Involuntary Withdrawal are hereby voided upon fulfillment of the terms of this agreement, such that no Class A member can be removed as a Class A Member or Manager to any degree by the other Class A Members, and that any such attempted removal shall be void upon completion of the terms of this resolution." Since the Material Terms of the agreement, all of which have been completed, as stated in an email I sent to Eli in Early 2023 were completed prior to Eli's illegal, improper, invalid, unenforceable, and attempted withdrawal of me which at worst can be viewed as upon the signing of the Interest Waiver Agreement, thus, Eli is unable to retroactively redeem and withdraw me on that same date in early May as he claims. (*Please see Exhibit F*)

2) That in order to have withdrawn or redeemed me regardless, he would have had to go through the dispute resolution clause. Eli is accusing me of not doing the very thing he did not do himself. Moreover, as I will set out below, I did engage with the proper procedure to attempt to resolve my illegal removal and instead Eli blocked my attempts from doing so on spurious grounds. Eli keeps espousing this false narrative that I haven't "formally disputed [my] withdrawal". Eli also continues to claim that I refuse to abide by the dispute resolution provision, but after numerous attempts, the most recent being on July 10, 2023, which was a follow-up email from the communication on June 29, 2023, Eli still refuses to abide by the Dispute Resolution Terms he claims that we are bound to. Eli has refused to reply as required by Section 80(A)(1) of the MegaCap OA. (Please see Exhibit G) Eli has even gone so far as admitting to Rod via email that he won't negotiate with me unless I accept service for an unrelated claim, a claim which he is attempting to use as leverage to extort me (the irony!). He specifically told Rod, "And if Marc wants to negotiate with me, all he has to do is accept service for the lawsuit." Please keep in mind that said alleged lawsuit is once again unrelated to MegaCap. Eli continued, "I am not prepared to negotiate anything, I am not speaking with Marc again, ever, under any circumstance [...]." Eli has displayed a blatant disregard for the Dispute Resolution Provision, the very provision that he falsely accuses me of not complying with. His false accusations are provable fabrications. That is one of the many reasons that I am forced to escalate these matters. However, unlike Eli, I am proceeding in a legal manner and following the appropriate protocols governed under the various Agreements and Resolutions signed by MegaCap's Partners.

3) My alleged and purported withdrawal and redemption were not valid. Eli continues to claim that I have 'extorted' him. This is factually untrue. I will refrain from commenting further on this aspect for my own safety, save to state that Eli is mischaracterizing specific statements I had made, holding the patently fallible position that I was making a threat. Rather, I was discussing the risks of non-compliance with our duties that would equally impact both of us. Such an escalation, I believed at the time, was a risk to both of us where we would have been in drastic danger and could have faced severe life-altering consequences. My conveyance of this to Eli was that BOTH of OUR lives were in danger and that we would face equally dire repercussions. Eli is completely aware of all of this, despite his statements to the contrary. If the danger of Eli's malicious conduct continues to escalate and the need arises, I do in fact possess written and documented proof of these chain of events in the form of a signed affidavit and screenshots taken from various communication channels. Eli has tried to mischaracterize these statements to defame, disparage, and destroy me and my reputation in order to proceed to take over MegaCap. He is attempting to steal my LP interest in ⨯⨯⨯⨯⨯ (which he has deprived me access of to date), as well as my entire vested equity in MegaCap. I have learned that Eli's telling at least one known LP that I am "mentally ill" which, again, is a misguided lie. I am taking legal advice on Eli's continued



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

defamation and libel of me, as well as besmirchment of my good name.

Further, Eli claims that I must adhere to a private mediation or arbitration, the former of which he has continued to deny me. His mother, Loretta Moreno, lied to Roderyck Reiter, the other rightful General Partner with an equal interest as Eli and myself in ⬚⬚⬚ and MegaCap. She claimed that I never attempted to mediate, when in reality I had offered to even fly down to Miami to mediate in person with him and his own mother. Loretta's claim to Rod is a provable lie as can be shown in numerous texts. Further, Eli attempts to claim to Rod that it was my idea to call Loretta, but that idea to call and speak with Loretta was Rod's idea and Rod's idea alone. He has had a long-standing nearly 40+ year relationship with collectively Loretta and Eli Blatt (as Rod has known Loretta since childhood and had grown up together with Eli since childhood as somewhat further elaborated by Rod in his letter) which he details in his letter to the Limited Partners below at the bottom of this email attached as the last exhibit.

Eli is factually incorrect about me being forced into a mediation (which he has continually denied me my right of) or an arbitration. Under MegaCap's Operating Agreement, I am entitled to 'Equitable Remedies' in the form of an injunction in federal court as per Section 81 of MegaCap's OA, doubly so now that Eli has doggedly refused to engage in the mediation/arbitration clauses and is himself in material breach of the OA. I pause to set out that Eli is fully aware of these provisions considering that Eli himself is attempting to file his own injunction against me without abiding by the same dispute resolution provisions that he keeps echoing to all LPs that I need to abide by. (*Please see Exhibit H & I*). Eli has paraded around claiming that it was me bringing MegaCap's issues to the courts publicly, yet it was Eli who is deciding to go and allegedly file an injunction according to an email Eli sent to Rod in which said alleged suit could now be exposing MegaCap and all of its LPs. It is apparent that Eli is trying to silence me and take over MegaCap. What is most insidious is that, upon information and belief, he is attempting to use the assets he illegitimately obtained through MegaCap to do so by depriving me of access to MegaCap's bank accounts. Thus, using some of my own money against me to wage a frivolous legal battle. I do ask all of you LPs to look inside yourselves and see what Eli is doing and ask yourselves if this is someone you want to work with.

Eli's claims that I have committed any "felonies" are completely unfounded, without merit, and factually untrue. In fact, again, it is comical because it is Eli who has tried in the past to extort not just Rod, or myself, but possibly even other former business associates as well.

With all that said, it should be understood, that the Resolution that Eli and I signed in February of 2023 completely removed any and all attempted Redemption provisions. Thus, it is clear that Rod's coerced 'redemption', illegal 'withdrawal', and forced 'removal' from MegaCap is not valid. As the Managing Partner of MegaCap, one of the first orders of business I will execute upon regaining control of the MegaCap entities will be to reinstate Rod's position and equity at MC.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## VII. Exhibit A Letter Refuted in Detail

To now address Eli's bullet points in his Exhibit A letter ad seriatim:

> • Marc was withdrawn to protect the Company pursuant to the procedures outlined in the Company Operating Agreement for breaches of the Agreement, including his fiduciary duty

1. Eli did not withdraw me to "protect" the Company. That is a load of nonsense. Ask yourself this: "Who or what exactly is Eli protecting the Company from?" Please realize, rather, that I was the individual who identified ▮▮▮▮▮ as a target investment less than a couple weeks after founding MegaCap and more than 6 months prior to the ▮▮▮▮ deal. (*Please see Exhibit J*) Truthfully, it is hard to say Eli did much of anything material or beneficial for MegaCap. In my opinion and if I'm being generous, Eli was barely doing what an administrator would be doing. And even in that capacity, there were still issues and constant problems that would arise on a regular basis. Eli would frequently make incorrect spreadsheets and would produce or aid in the creation of incorrect tax filing documentation that needed to be nearly entirely redone, often by myself. Eli's work product often did way more harm than good in my opinion. In that same vein, Eli has continued to fail to issue K1s for other MegaCap Fund entities such as ▮▮▮▮ for 2022 and upon information and belief has clearly abandoned those Limited Partners leaving all of us with a question of uncertainty; whereas the IRS may fine MegaCap late penalties, and in which LP equity may be destroyed or diluted due to Eli's incompetence and illicit actions. Rod and I are trying to do everything we can to course correct the ship (*Please see Exhibit W*), so we ask that you please work with us to help ensure the safety of your investments. Equally, I spent months away from my family to network and raise capital on behalf of MegaCap. I bring this up not to aggrandize my achievements, but to illustrate my unwavering commitment to MegaCap. I have done nothing but try to grow MegaCap and serve our Limited Partners' interests. Just recently, when one LP needed assistance with a third-party Trust, I was happy to oblige, providing that input to ensure he would not have any issues with his taxes. Measure me by my actions and decide whether I intend to harm MegaCap, then do the same with Eli.

What is more interesting is the lack of information and details provided by Eli regarding my purported breach of fiduciary duty. What exactly are these alleged breaches of fiduciary duties that Eli purposefully inserts into his language to be vague? One must ask, what exactly are these alleged breaches that I had committed? The answer is clear in the vagueness of the accusation. This is merely just another attempt to slander myself and divert attention away from Eli's own misdeeds. The truth is that I was giving it my all to make a success of the venture. Even hours prior to Eli illegally removing me, I had followed up on the Flow thread insisting that Eli do his "due diligence to make sure it is correct so there are no issues." Further stating that, "Two sets of two eyes are better than one here." I had reviewed and reviewed the K1s (Please see Exhibit K) several times and as late as back on May 5, 2023 (hours prior to Eli illegally removing my MegaCap email in breach of the February resolution – *Exhibit L* – which, evidently, will result in **HIS** involuntary removal from MegaCap when all is said and done) after working for months to correct Eli's numerous mistakes and oversights. Thus, on the contrary, and to illustrate how patently false Eli's claims are, I will list only a few of the many actions taken by Eli that would put him in breach of his fiduciary duty instead. I had to spend months correcting a series of mistakes made by Eli that resulted in Flow and the accounting team not being informed of a promissory note that led



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

to the threatening behavior I was exposed to, and Eli incorrectly allocating the management fee to be entirely front loaded on the K1s rather than earned on an annualized basis as we had agreed to when we began that entire SPV. Additionally, because Eli failed to understand that the ✗✗✗✗ closing happened in 2022, and not 2021, it resulted in a the K1s for 2021 being entirely miscalculated. To add on to the dangers presented by Eli maintaining the helm of MegaCap, he has not only refused to update MegaCap Funds, LP – Tech I Series Agreement to include the Limited Partnership Agreement in Exhibit B which I notified him was not in the documents issued to Limited Partners once again on February 7 (*Please see Exhibit M*), but he also failed to timely file the Form D Amendment with the SEC for nearly a year which exposed the SPV since the name ✗✗✗✗ on the SEC's Edgar public website. Further to Eli's misconduct, Eli said to Ryan Nanney at Flow on April 28, 2023: "So long as the taxable income is just 10% of the total fee then we are good." The most recent ✗✗✗✗ K1s that Eli provided do not reflect this statement and his improper recreation of MegaCap's K1s are not just illegal but a breach of his fiduciary duty to all Limited Partners. On this very same subject, we have informed Eli that there must be changes made to the ✗✗✗✗ K1s to reflect the agreed upon fee structure that was stated to MegaCap Limited partners VIA email on or about February 9, 2023. In said email, MegaCap (*vis-à-vis* in a message approved by Eli and myself) specifically stated that, "The amended K1s are currently being prepared by Flow, and we are pushing them to get them out by next week at the latest. In the interim, we can report **definitively** that the loss will be 0.5% of your capital commitment, representing one tenth of the 10-year 0.5% management fees. **You can report this to your accountant and proceed confidently with that number.** You will receive a notice through Flow once the K1 is complete." (emphasis added). There are Limited Partners that have already filed their tax returns that reflected this material representations & material statements, and it is completely unacceptable for Eli to unilaterally make these changes by giving Limited Partners a few days before MegaCap's extended deadline. Simon had sent a letter addressing these concerns and issues to MegaCap which had went ignored without so much as a response from Eli himself. Continually, Eli is attempting to hide behind attorneys and refuses to engage in any dialogue. I pause to state that these are only some of the issues that I had to correct after the fact, issues that can be placed solely at the feet of Eli and only became issues due to him failing to comply with his responsibilities and duties.

All the while, Eli touted how effectively and competently he was running the back office. Only once issues began cropping up in a way that he could not keep from me did I realize the dire state of the work Eli was doing and I set about attempting to set matters right. The last issue I was working on before I was locked out of my MegaCap email account concerned and centered around attempting to ensure compliance and timely distribution of the K1s. It beggars belief that he would claim that the company needs protection from me when he is the one doing it the most harm. As a final nail in the proverbial coffin (Eli may try to say this is a threat – it's not, it's something known as an 'expression' which is perfectly legal to say), *Exhibit L* states that where one member attempts to remove another, the removing member must be removed instead. In other words, Eli's actions, under the false guise of protecting the company, can only result in his immediate removal. But I am stymied from enacting the terms of our signed agreement by his strident refusal to engage in the proper processes and being illegally and completely locked out of the pre-existing MegaCap logins.

Much of that brings us to today. On or about September 9, 2023, Simon received a notification from Flow stating that a "draft 2022 K1 package for MegaCap Funds, LP – Tech I" is available. (*Please see Exhibit N*) Raul Reichard, informed Eli that there are noticeable errors that need to be changed. You may find that notice as part of *Exhibit Y*. Further, what's quite disconcerting, is that Eli had purposefully waited to send Simon this email



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

**MegaCap Capital**

11/7/2023

because he had informed a different Limited Partner nearly the same identical message, which was conveyed to me by Rod on that Friday evening. As predicted, Eli did in fact breach the terms of the Option & Loan Agreement we signed, and instead opted to elect to commit what I believe to be tax fraud by retroactively re-classifying the management fees that were agreed to be earned annually. Instead, he has accelerated the entire management fee of 5%. The danger with what Eli has done is jeopardizing the solvency of MegaCap. By my earlier estimated calculations, by Eli front-loading the entire management fee of over $200,000, there will now likely be an adverse tax consequence that MegaCap will have to bear. Upon meeting and conferring with Rod, we both believe that due to this, mixed with Eli's refusal to operate on an accrual accounting system (instead electing and opting for a cash-basis method), MegaCap may in fact run out of money prior to the ✕ years until ✕✕✕✕ plans to IPO. The entire thought process and rationale behind holding the funds in trust were to ensure that the management fees would be used for annualized operational expenses and not to be used as income for the general partners own lifestyles. The danger of what Eli has done by this fraudulent distribution of the K1s will present what we believe to be an inherent danger to MegaCap and its LPs which can only be saved by the General Partners being forced to either have an internal capital contribution or to ask LPs for an additional capital call as expenses continue to accrue through the years – Rod and I's intention is not to have an additional unplanned Capital Call from the Limited Parnters and that is just one of the many things we are trying to prevent Eli from doing. All the hard work I had done to protect MegaCap and its Limited Partners have nearly and effectively been washed down the drain by Eli, and I will be exploring the appropriate reporting mechanisms to the Internal Revenue Service for Eli's illicit actions that put this venture at severe risk of failure and potential bankruptcy.

> The redemption of Marc's unvested equity that he had not yet earned was done in accordance with the terms of the Operating Agreement at a predetermined valuation that is fully auditable

2. Eli claims that I had unvested equity that I hadn't earned yet and that such redemption was "done in accordance with the terms of the Operating Agreement at a predetermined valuation that is fully auditable" – such claim is patently false. There are several issues with Eli's claims here:

First, Eli conveniently leaves out that he illegally, improperly, and invalidly "redeemed" 170,274 Units of my interest for $1.70. To emphasize this point once more, Eli purports that I accepted **One DOLLAR and Seventy CENTS** in exchange for over 170k units of interest equating to a worth of 17% of MegaCap Capital – that means that 17% of my portion of the Carried Interest that will be earned from MegaCap Eli has stolen from me. Eli knows this is an unconscionable redemption and is not enforceable. Now, what's fascinating here is that in this "Redemption Notice", Eli claims that "[p]ursuant to Reiter Redemption Agreement dated March 24, 2022, the Company fully redeemed the 330,000 Units granted to Reiter, increasing the Units held in Trust by the Company to 340,000" However, I believe that Eli is willfully withholding from all the Limited Partners that the MegaCap Operating Agreement also states, "In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other." (*Please see Exhibit O*) Divesting the unites in the matter he has is simply impermissible by the terms of the OA. Not to mention that Rod's 'redemption' was never actually fully effectuated and is thus invalidated.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

Second, nowhere in the Operating Agreement or any alleged redemption provisions does it mention that upon a redemption that Units will be held in "trust" by the Company. Therefore, even in a fictional parallel world where Eli did legally redeem me, a contention that I reject with the contempt it deserves, it would still mean that in that alternate reality I would've been entitled to those shares that Eli claims the Company holds in "trust."

Third, as per stated above and as shown in *Exhibit E*, it is clear that no redemption or withdrawal would be valid.

And fourth, to reiterate the first point above, even in the alternative, where Eli thinks he did redeem and withdraw me, he fails to cite Section 12 of the Operating Agreement that gives the example in the case of a redemption, "For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units)." Whereas any redeemed equity would be evenly distributed amongst the remaining Members. (Please see Exhibit O) Whereas, even if Eli's fraudulent version was to be believed, I would be entitled to a far greater share than the 159,726 units insinuated in Eli's 'notice.' This is due to an even re-distribution of Rod's illegal and invalid redemption which Eli coerced me into signing based on other business matters and investments. Eli claimed he would stop working and further dispossess me of my assets such as an investment in Chad Troutwine's entities relating to an investment in a James Bond Video Game, unless I agreed to his terms and tried to force Rod's removal from MegaCap proper.

> Should Marc elect to formally dispute his withdrawal, the Company's dispute resolution provisions call for a private and confidential mediation and arbitration governed by the American Arbitration Association that exists specifically to protect the company and its investors

3. Eli continues to reiterate in his letter that a formal dispute on a withdrawal is governed under the dispute resolution provision, which again is patently false. Rather, even if he is presumed correct, I am *still* entitled to Equitable Relief as per *Exhibit H* (Section 81 of MegaCap's Operating Agreement). Eli pretends to be the aggrieved party, but his actions prove otherwise. A lot of this may be quite mindboggling (yet at this point I am trying to refrain from constantly being surprised, but admittedly, it is truly shocking). Eli insists on the formal dispute resolution procedures needing to be followed, however, Eli himself has told Rod he is planning on filing an injunction against me relating to MegaCap – although I cannot confirm if this threat Eli has made is in fact true as I haven't been served and have absolutely no clue what jurisdiction Eli has even allegedly filed said injunction. There is an underlying risk to me seeking injunctive relief in order to minimize exigent risks, but Eli has continually blockaded me. Please know that I have tried to mediate with Eli for months and he has refused to even exchange so much as an email, never mind talk on the phone or meet in person. My attempts have been to no avail. He falsely claims that I am trying to hurt him and that he is 'afraid,' which is a blatantly false excuse he is deploying in order to avoid following proper process and evading being held accountable for his illicit actions. Eli's actions and behaviors are not someone who was afraid for their lives. On the contrary, he is the one issuing and volleying threats. Eli is also publicly displaying that he and MegaCap raised money for a XXXX SPV. In fact, according to the email obtained from Rod, it is Eli who is attempting to seek injunctive relief in an improper venue that has broadly risked this entire transaction. Eli's numerous actions are the truly threatening behavior that he is trying to hold over all of us and we must stand up to him – behavior we must all



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

endeavor to halt, lest he destroy this venture and the remainder of the Limited Partner's equity entirely.

> Neither that process itself nor the outcome would have any direct
> impact on the SPVs managed by Megacap Capital

4. Eli claims that "that process itself nor the outcome would have any direct impact on the SPVs managed by Megacap Capital". This statement again is potentially false. With pending litigation that may take years, even possibly over a decade, as well as other investigations that must follow Eli's illegal acts, MegaCap may, unfortunately, find itself effectively frozen until these disputes are resolved. We plan to request the Court to redact the name of a particular ✕✕✕✕ employee, failing which, the assets of the entire SPV for ✕✕✕, as well as MegaCap's other SPVs and assets, could be placed in jeopardy. For those unfamiliar with the legal process, there are unknowns and uncertainties present in any litigation, and it is quite difficult to predict how a judge may rule, especially when it comes to keeping information out of the public record. I, of course will attempt to legally protect this information from the public, but I have no decision-making authority if a Judge orders me or Eli to disclose the name of that Employee – the only option we may have is to file a Motion to Quash and request for that information to be filed under seal, but even such a Motion may be outright rejected by the Judge for any reason determined. As such, even on a cursory look at the current state of affairs, Eli cannot in good faith make the undertaking that he has already embarked upon. There will be legal consequences for Eli's illicit actions and conduct, those of which will impact matters going forward. Eli knows many of the risks with litigation and is continually attempting to shift the blame back towards me as part of his strategy. Ultimately, Eli is attempting to hold a metaphorical weapon to my head and is using threats and false accusations in order to try to gain unobstructed and unsupervised control of MegaCap and its assets while diverting attention away from the illegal manner in which he is attempting to do so. Eli attempting to halt my actions to save MegaCap and Eli's crusade to harm MegaCap will ultimately be unsuccessful.

> All SPV equity is calculated on a per-share basis at a fixed price,
> is managed and reported by Flow, and there is no way to "take
> any shares right off the bat of most of the LPs"

5. Eli's claims that the SPV equity is calculated on a per-share basis at a fixed price, and is managed, and reported by Flow. What Eli fails to disclose to our LPs is that MegaCap Tech Holding's assets and purchase price are governed internally. A major dispute that Rod and Eli had in the early days was of Eli's handling of the accounting. According to Rod, the way Eli handles the accounting methods raised a severe concern in that Eli is attempting to prioritize his own payouts and using a frame of reference that he needs to be paid before LPs are made whole. I broached the subject with Rod, who described Eli's methodology as follows: "The reason I was such a stickler that the accounting had to be verified was because Eli had a peculiar way of calculating the accounting. When he did the accounting, he would first calculate what he was 'owed', and since he had negotiated such an onerous and complex split of the proceeds, it was hard to verify whether he was subtracting expenses prior to calculating his portion. After he had calculated his portion, he would calculate the rest. He would also usually immediately transfer his portion of the funds from the company bank account without first having the other partners sign off on the accounting." In a text discussion with Eli, it became clear that Eli was attempting to adjust the calculations of Rod's held LP equity interest in order to benefit himself to the detriment of many of the other stakeholders. As such, it is once again patent that Eli's statement was deceptive in nature when he claimed that he never wished to deprive any shareholders of their value. Further,



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

Eli then has attempted to tell Rod that he said things out of frustration. Well, let me ask you this, if Eli would threaten to withhold a Limited Partner's rightful share for personal gain, then how is that NOT trying to take shares right off the bat? Those messages Eli sent to me on June 1, 2022 state, "total up all those charges" (in reference to expenses such as Mailchimp, Pipedrive, Asana, and other third-party services), which Eli then proceeded to state "we are deducting all of that from Rod's eventual carry payout" and "i'm not kidding", which I replied "I know ur not", before Eli continued on, "also any of my losses from Straightpath", "loss of profit on shares I may not get due to their fraud, which he guaranteed", "all those deals will unwind before _____ / Civ" "pls add all these up in a sheet somewhere marc", "this one is a legit expense for us" and "but all that other shit that Rod neglected we should absolutely bill to his ass". This is the kind of person Eli truly is behind the scenes. I ask all of you to really look at these messages and see what Eli is doing here – he's trying to deprive and dispossess rightful assets of Rod with absolutely no remorse, yet at this point I expect nothing less from Eli Blatt.

> The GP for the SPV via which Tech I has its derivative equity interest in Neuralink is already aware of Marc's withdrawal and has stated she has no cause to redeem the underlying equity on the basis of a private Member dispute

6. This is one of Eli's most blatant and disturbing lies, which could be the final straw and ultimately may lead you down the path of whether or not to trust Eli M. Blatt. I asked the GP of the SPV where we purchased the derivative equity of _____ from, if Eli ever told them that I was "withdrawn" from MegaCap. They replied they were not notified by Eli of my attempted illegal withdrawal, an attempted withdrawal which I pause once again to state is illegal. This GP has asked me personally not to involve them, so I am maintaining to keep their identity and exact long-form quotes confidential. Regardless, what Eli did lie to this GP about is that I had taken a 'step back' from MegaCap to 'focus on Law School.' Therefore, I do testify and certify under penalty of perjury that on July 13, 2023 that she stated to me that she was **not notified by Eli of my 'withdrawal' from MegaCap**. Upon being informed, the Seller did preemptively halt any planned distributions of any of the _____ holdings. However, I will share a copy of the redacted letter from the Seller of _____ (*Please see Exhibit P*), as well as a copy of the redacted letter from the Seller of _____ whom we initially purchased the _____ derivative equity from prior to going directly on to the _____ Seller (*Please see Exhibit Q*). **To be clear, MegaCap and Eli will not be distributed anything from the Sellers in which we acquired _____ and _____ without either my consent, authorization, and approval or without proper adjudication.** It is part of my fiduciary duty to inform you of this freeze that will only be lifted once this dispute between all of the partners is resolved. I hope this alleviates everyone's concerns, albeit only temporarily until this matter can be properly resolved and set to right.

> As a matter of public record, I have litigation filed against Marc relating to non-Megacap matters (as numerous others have had recently as well -- google "Marc Goldner Lawsuit"), which to date he has evaded service for

7. Eli discusses other litigious matters. However, what Eli fails to state is that he owes me, my partners, and the entities that I am a part of approximately **$797,817.00**. This debt is due to his failure to pay (& subsequent default on) of his portion of over a dozen Bitcoin Miners, as well as his underfunding of NFTs we jointly purchased, the James Bond investment previously mentioned which he certified was approved to be

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

a joint investment (Please see Exhibit R), amongst other things. This does not include other money Eli owes me such as the approved expenses I have from MegaCap that I now have to bear in my personal capacity. Additionally, the particular series of investments in Chad Troutwine's companies was a material representation that was part of a series of representations that Eli used to fraudulently induce me into numerous contracts, one of which was Goldner Blatt Investments, LLC ("GBI"). When challenged on these representations, he refused to respond and attempted to shift blame towards his mother, Loretta Moreno, further showing his dogged intention to not mediate or settle any disputes on any matters with myself and my other partners. It takes a special individual to hide behind their mother at 40+ years old. On or about June 29, 2023 and in a series of emails to Eli, a set of auditable provisions were provided in a good faith attempt to settle all matters and issues, however, Eli has to date not responded at all, left these emails unanswered for months on end and has continued to refuse to engage in any manner. On the contrary, it appears as if Eli has blocked me (as he has said he has done in the past – repeatedly blocking and then proceeding to unblock me on WhatsApp and emails) on various forms of standard communication channels. Since Eli's has withdrawn from GBI, I am happy to share my audit of Goldner Blatt Investment's Cap Table that I shared with Eli on June 29, 2023. You'll quickly be able to see Eli has something to hide from a transparent audit I conducted. Also, Eli attempts to paint me in a bad light about 'other lawsuits' but as per Section 42 of MegaCap's Operating Agreement (*Please see Exhibit S*), Eli knew from Day 1 of going into business with me that I am involved in various Intellectual Property disputes originating from an entertainment and media company that I had founded in 2015. The details of these lawsuits are immaterial to this discussion, but in the spirit of transparency, I will add that in the latest lawsuit I had entered a parallel suit against both the publisher and the artist to vindicate myself and my companies. Should any LP have any concerns regarding this, I have nothing to hide in any regard and will provide any and all details as far as I am able to and as far as is permissible. But I digress. Eli was fully aware of this protracted litigation and is trying to act surprised by something he knew about for years and on which he had much commentary to share, stating that it was just a bunch of artists that got upset that I got 'too good of a deal.' Eli sharing this clearly shows he has a complete and utter disregard for our Non-Disclosure Agreement. As stated above, I am happy to discuss that litigation with anyone interested – one can be found HERE. All LPs are more than welcome to download the complaint that one of my company's has and I filed against an artist and a behemoth publisher who has committed Copyright Infringement and stolen our optioned work.

On the topic of lawsuits, circling back to the egregious lowly comments in relation to Mr. Burton and his father – my opinion and two cents on the matter is that it may be Eli's strategy is to go into business with people, extricate himself whenever he sees fit (with or without ill-gotten gains), sue them, then tell the next round of people that he was wronged, until he has time to do it all over again by seemingly repeating this cycle whenever it suits him to do so. As alluded to above, we now believe we are aware of a pattern of behavior from Eli wherein he exits from a venture (whether forced out, voluntarily, or otherwise) and engages in so-called 'lawfare' to defend any ill-gotten gains he has obtained. Before the current instance, we refer to the actions taken against Mr. Burton alluded to above. At the time, Eli told us that he was wronged by Mr. Burton. And now, to you, he repeats that behavior by vehemently accusing me of wrongdoing. In this very instance, he didn't just try suing me, but he has also tried suing my significant other for Conspiracy. Nearly equally, Simon Divilov, one of the earliest Limited Partners of MegaCap and my co-founder at the Bitcoin Mining operation that Eli was once a part of, is also being sued for Conspiracy, amongst other frivolous claims. Simon will have a statement about this below (Please see *Exhibit T*). In Simon's case, as in this instance as well, Eli repeats his behavior of crying foul while refusing to engage in mediation, all the while attempting to escape liability. Again, Eli

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

refused to mediate or let alone talk with Simon to resolve his issues about his underfunding and default of the Bitcoin Miners that we purchased – instead electing to sue one of Eli's very own investors, Simon. Outside of being a long-time business partner, colleague, friend, and investor, Simon also works with the United States of America's Department of Defense and he has found Eli's behavior and candor to be absolutely deplorable. Eli's failure to pay our company, The Dharma Initiative, wherein Simon and I hold equity, has forced Simon, myself and other Dharma partners to temporarily fund Eli's default of over $100,000. Had we not done so, we would have faced a company-wide default and would have lost nearly all of our Bitcoin miners. Once again, Eli attempts to paint a false narrative that we are the 'bad guys' while he engages in fraudulent and malicious behavior. We have at our disposal hundreds (if not thousands) of messages on a WhatsApp group discussing these transactions as well as several signed documents in support of our claims. As they are not directly related to the current matter, I elected not to include them herein, but should any LP be interested, I can discuss with you making those documents available. I believe that Eli's lack of accountability and responsibility is just another *flawless (sarcasm)* character trait that he possesses and should not be overlooked in these instances.

Eli has told Rod as recently as July 12 that "All of that being said, I am not prepared to negotiate anything, I am not speaking with Marc again, ever, under any circumstance…" Does that sound like someone willing to mediate if he won't even negotiate or speak with me? Please do not believe Eli's blatant and flagrant lies in his communications with fellow Limited Partners and understand that A) Eli has no jurisdiction over me in any Jurisdiction except for Delaware and I have no requirement to consent to jurisdiction in any Jurisdiction except for Delaware, B) Our Goldner Blatt Investments Operating Agreement has the same dispute resolution provisions as MegaCap (which Eli consistently mentions), provisions which he is refusing to abide by in both instances, C) that the GBI OA is governed under Delaware law, and D) has refused to not just Mediate, but, has also under false pretenses threatened litigation and is disguising his true motives to try to destroy me, steal my assets, and take away from me all the years of hard work I put into building these Companies and creating a dream, vision, and goal for us to share in together in this journey.

> Marc's email to you appears to be intended to sow fear and solicit money from you to defend against these suits and finance a dispute of his withdrawal

       8. My previous letter to you was not an attempt to "sow fear and solicit money", I believe that my message to each and every LP was an authentic and genuine account of the status quo, and that I have a fiduciary duty to inform LPs the truth of what is going on behind the scenes. The purpose of my messages are not to solicit money from LPs to "defend against these suits", it is primarily informational as all LPs have a right to know what's going on – that is part of my Fiduciary Duty to all of you. I do want to take a breath to thank each and every LP who has taken the time to meet with me and go through this disastrous situation. Eli's statements again are patently false as that is not the underlying purpose of my letters to you. As I said above, I inform you of these matters since it is my fiduciary duty to do so, a duty that I take extremely seriously. There are numerous LPs who are joining me as a Class to sue Eli and MegaCap for his breach of fiduciary duty, amongst other causes of action. Eli conveniently misconstrues this to be a solicitation of funds, when it is in fact just Rod, myself, and the LPs regaining rightful control of our collective equity.

I believe I have always done right by each and every LP, many of whom I consider some of my closest friends



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

in life. Every investor is not just an investor and LPs should not be just looked at as dollar signs. You are each people, and as a person, I ask you to ask yourself, is Eli Blatt the person you want to trust handling *any* of your assets?

> Despite his aspersions to the contrary, Company operations
> continue to function normally at this time despite Marc's efforts to
> disrupt operations, and the investments it manages are
> unaffected

9. Eli claims that "Company operations continue to function normally at this time." Again, this is untrue.

First, that K1s for XXXX still have not been properly issued for 2021, and we are now in November of 2023. Eli unilaterally changing the K1s to fit his own needs and illegal takeover of MegaCap is not the definition of functioning normally. It is now clear that, from the Flow correspondence, that Eli is attempting to issue them now, however, entirely improperly and incorrectly calculated. What's the most outrageous about this whole K1 debacle is that Eli is asking Blake Schneider at Flow for the K1s because Eli doesn't have them – which leads to the natural assumption that he never even downloaded them when we had access to them far prior to Eli's illegal, invalid, unenforceable, and improper removal of me from MegaCap. The grand irony is that all Eli has to do is actually speak with me. I actually have the correct K1s I reviewed and approved. Regardless of the dispute between Eli and myself, I have always been and continue to remain committed to my fiduciary duty to each and every LP and I have read through every single page of every LPs K1 that I had access to prior to my access being restricted. Please see *Exhibit U* which sets out the chain of events and I am happy to discuss this further with any and all LPs who would like a deeper understanding of the situation surrounding the K1s. What we have seen is that Eli tried to effectively 'backdate' my 'withdrawal' to the last email I sent at MegaCap which happened to be to Flow on April 28. In that email I asked Eli to actually look at the K1s, but instead of committing to his responsibility, he instead began waging a war against me and doing everything he could to dispossess me of my interest and rights. So that every Limited Partner is aware, I have the K1s for the LPs but Eli is preventing me from transacting on behalf of MegaCap through my MegaCap email and through Flow. Eli has been the primary reason that the 2021 K1s for XXXX have not been issued until just recently, as they have existed, and were ready to distribute for months, but once again I have been dispossessed of my ability to issue them and complete them in a timely manner due to Eli.

Second, upon information and belief, Eli has still failed to issue K1s to Limited Partners for XXXX for 2022, XXXX for 2022, and XXXX for 2022. Eli's attention seems to be solely focused on MegaCap's XXXX investment because that is where *his* money is locked up, where there is an active promissory note continually accruing interest, and where the most money raised out of any MegaCap vehicle is located. Rod and I's ability to help is limited, but please rest assured that I'll do everything in my power and legal authority to do what I can!

Due to these restrictions imposed, I want everyone to be informed that Rod and I can now be reached at Marc@ MegaCapFunds.com and Rod@MegaCapFunds.com for any MegaCap concerns. Please do not hesitate to reach out with any and all questions you may have.

In light of the above, I am requesting that there is a mass request from each and every LP to tell Eli to comply with his duties and permit the proper submission of K1s with immediate effect. Regardless of his undertaking



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

to submit the K1s, due to his past pattern of lackadaisical and apathetic handling of even simple back-office tasks, I have serious concerns that the K1s will be submitted improperly, if at all, despite his undertakings to the contrary. As such, per my initial review of Simon and Rod's K1, it does not appear that these K1s were prepared by an accounting firm as the introductory letter page is signed by MegaCap proper. I ask that you insist that Eli stop playing funny games with all of your taxes. Rod and I are doing our best to do right by everyone, and will work diligently to help us all get through this to a successful exit!

Third, upon information and belief that Eli's attempted sales efforts have ceased, or at the very least slowed down to a crawl, and I was told as of Friday July 7, 2023, "No incoming money from Eli, correct." However, I was notified on August 7, 2023 that Eli is attempting to waive management fees and reduce carried interest to new LPs, an action that he is unable to do, but will still attempt, as he continues to try to unjustly enrich himself. Prior to Eli's illegal withdrawal and improper and unenforceable redemption of me from MegaCap, I negotiated a deal with a Capital Partner to extend a Promissory Note (as well as waive over $100k in interest owed) in order to prevent MegaCap from defaulting. This default could have jeopardized the SPV of _____ due to the Note being held by MegaCap Funds, LP Tech Holding and not by the General Partnership which is how it was supposed to be structured and which could have bankrupted MegaCap Funds without me. But yet again, Eli fails to mention this as he pretends that every aspect of the company is running fine and dandy – all hunky dory, right? Not quite so.

Fourth, that he has presumably diverted his focus to his new "company" called Thinkable, which apparently is an AI company that he boasts that he is the "Co-Founder and President" of. While it is speculation and opinion on our part, it seems that his focus is on new ventures and not on current ones, including what could only be assumed that funding such new ventures, at least in part, with funds illegitimately obtained from MegaCap proceeds – however, that is speculation.

## VIII. Wrapping Up, Next Steps, and the New and Improved MegaCap Funds

> I regret Marc's inappropriate letter to you and assure you that from an
> operational and security standpoint, the Company and the investments
> it oversees are not at any imminent risk at this time.

Eli may "regret" my letter to you, as it exposes his malfeasance, but I do not. I fully believe that my previous letter, as well as this one, truthfully and honestly depicts the absolute truth to the events that have occurred. What is regrettable is that the outcome of Eli's actions will be a multi-year protracted legal battle. Instead of working to resolve these problems, Eli is attempting to create a litigious circus and raise frivolous claims because he thought he'd be able to use bullying tactics in order to force us to walk away.. One thing is for certain, my partners and I are not going anywhere!

I will continue to do my best to protect the name of the XXXXX employee in case of an impending federal lawsuit and potential injunction against Eli and will do my best to ensure that the potential risks are minimized surrounding the fact that the Employee's shares could get cancelled or redeemed if the GP of the SPV that purchased the derivative equity in XXXXX becomes involved by proxy, or worse, if XXXXX and/or



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

⨉⨉⨉ proper finds out about this transaction and cancels the Employee's shares himself.

Due to these restrictions imposed, I want everyone to be informed that I can now be reached at +1.516.984.1466 and you can reach Rod at Rod@MegaCapFunds.com for any MegaCap concerns. Please do not hesitate to reach out with any and all questions you may have. For the sake of convenience, I repeat in my new email address here again as Marc@MegaCapFunds.com should you have any concerns or questions.

Once again, I am more than happy to discuss everything openly and transparently with each and every one of you. Unlike Eli, I have nothing to hide. I want to thank you all once again for your support while we deal with this unfortunate series of events. It is disappointing and unfortunate that matters have turned out like this and truly hope that everyone can see the massive amount of work that Rod and I are putting in to correct this. Thank you for reading!

I continue to Reserve All Rights, and this letter is not inclusive of all of Eli's breaches of our numerous signed and enforceable Agreements. My rights are fully reserved herein.

All the best,



Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing & General Partner
MegaCap Capital & MegaCap Funds

/ Endorsed by Roderyck Reiter and Simon Divilov /

I, Roderyck Reiter, Reserve All Rights.



Roderyck Reiter
Series 7
Series 63
Licensed Real Estate Broker (Florida)

I, Dr. Simon Divilov, Reserve All Rights.



Dr. Simon Divilov, PhD

P.S. Please see a letter from Rod attached below as *Exhibit Z*. Thank you once again!



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit A

Update from Megacap Counsel and the General Partner



Please see this letter from Megacap's counsel addressing the management of the Company in response to a letter Marc Goldner recently sent to you and other Megacap Limited Partners. Mr. Elkins previously represented the Company in an unrelated matter commencing in June of 2022.

As both letters confirm, Marc has been withdrawn from the Company as a Class A Voting Member and Manager according to the withdrawal and redemption provisions of the Company Operating Agreement and is no longer operating the Company. Both letters further convey that he has not formally requested private mediation or arbitration pursuant to the dispute resolution terms of the Company Operating Agreement he is obligated to adhere to in the event of a dispute.

To address some pertinent questions and concerns Marc's letter may have raised:

- Marc was withdrawn to protect the Company pursuant to the procedures outlined in the Company Operating Agreement for breaches of the Agreement, including his fiduciary duty

- Marc was withdrawn to protect the Company pursuant to the procedures outlined in the Company Operating Agreement for breaches of the Agreement, including his fiduciary duty

- The redemption of Marc's unvested equity that he had not yet earned was done in accordance with the terms of the Operating Agreement at a predetermined valuation that is fully auditable

- Should Marc elect to formally dispute his withdrawal, the Company's dispute resolution provisions call for a private and confidential mediation and arbitration governed by the American Arbitration Association that exists specifically to protect the company and its investors

- Neither that process itself nor the outcome would have any direct impact on the SPVs managed by Megacap Capital

- All SPV equity is calculated on a per-share basis at a fixed price, is managed and reported by Flow, and there is no way to "take any shares right off the bat of most of the LPs"

- The GP for the SPV via which Tech I has its derivative equity interest in Neuralink is already aware of Marc's withdrawal and has stated she has no cause to redeem the underlying equity on the basis of a private Member dispute

- The GP for the SPV via which Tech I has its derivative equity interest in Neuralink is already aware of Marc's withdrawal and has stated she has no cause to redeem the underlying equity on the basis of a private Member dispute

- As a matter of public record, I have litigation filed against Marc relating to non-Megacap matters (as numerous others have had recently as well -- google "Marc Goldner Lawsuit"), which to date he has evaded service for

- Marc's email to you appears to be intended to sow fear and solicit money from you to defend against these suits and finance a dispute of his withdrawal

- Despite his aspersions to the contrary, Company operations continue to function normally at this time despite Marc's efforts to disrupt operations, and the investments it manages are unaffected

I regret Marc's inappropriate letter to you and assure you that from an operational and security standpoint, the Company and the investments it oversees are not at any imminent risk at this time.

Please contact me with any concern and advise me if you should hear from Marc again.

Sincerely,

Eli M. Blatt
Managing Partner, Megacap Capital

Doc ID: 3fcd027c3b00a063b103214



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit B

June 2, 2023

**VIA FLOW**

RE:   *Megacap Capital, LLC*

Dear Megacap Partner,

I represent Megacap Capital, LLC ("the Company").

I am writing regarding the current operation of the Company. Presently, the Company is operated by Dr. Eli Blatt. Dr. Blatt withdrew Marc Goldner as a Class A voting Member and Manager of the Company.

Any dispute between the Members of the Company is subject to the Company's dispute resolution procedure which calls for private mediation and arbitration. As of the date of this letter, Mr. Goldberg has not taken advantage of this procedure.

Please direct any questions or concerns relating to the Company to Dr. Blatt at team@megacap.capital.

Sincerely,

Michael L. Elkins
melkins@mlelawfirm.com

Doc ID: 3fcb7f39800a2b43a3a72e5e82f310a063b10321e



**MC**

MegaCap Capital

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

## Exhibit C

---

JAMS Payment

Michael Elkins
To: Marc Goldner, Eli M Biatt

Marc,

Thank you for your email.

Below I address the issues from your email. I am not representing Eli in any dispute that involves you.

I represented MegaCap Capital, LLC ("MegaCap"). The scope of that representation was to enforce an agreement between MegaCap and ▓▓▓▓▓. You and Eli are both members of MegaCap. You and Eli were not my clients. MegaCap was and remains my client as to matters involving ▓▓▓▓▓. I do not represent MegaCap on any other matters.

I have never represented you individually in anything. I have never represented Eli individually as relates to MegaCap. Further, through my representation of MegaCap I never learned anything about your other business interests or anything else about you individually. In fact, other than the fact that you're a member of MegaCap, I know almost nothing else about you.

If there ever was a dispute between you and Eli as relates to MegaCap, I would likely be prevented from representing either of you against the other since I represented MegaCap.

That said, since you individually have never been my client, and I did not learn any confidential information about you via my representation of MegaCap, with the exception of matters relating to MegaCap, there is no conflict if I were to represent a party against you.

Nonetheless, as to any dispute between you and Eli, as I stated above, I am not representing Eli, so there is no conflict and there is no issue.

As to my prior representation of Eli, I previously represented Eli individually in the enforcement of a promissory note. That representation was completely unrelated to my representation of MegaCap.

I currently represent an entity called Sure MCA, LLC ("Sure"). Eli is a member of that entity. The scope of that representation is also completely unrelated to my representation of MegaCap.

In short, my representation of MegaCap was on a single, discreet contract matter. My prior representation of Eli and Sure had/have no bearing on, or connection to, my representation of MegaCap.

You were aware that I handled other matters for Eli. With that being said, it doesn't matter since my representation of MegaCap is not connected in any way to the matters described above, and I am not handling any matters for anyone that is/are adverse to you individually. Although I will remind you, you individually have never been my client in any matter.

I don't see a need for a call since there is no conflict.

I trust this clarifies any issues.

NOT A CERTIFIED COPY

Doc ID: 3fcb7f9600a2b48a3e72e5e62f310a063b10321a



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit D



Benjamin R. Muschel

June 26, 2023

**VIA EMAIL**

*IMMEDIATE ATTENTION REQUIRED*

Re:   *Megacap Capital, LLC*

Dear

Your immediate attention to this matter is required. This law firm represents Megacap Capital, LLC (the "Company"), as co-counsel with Michael Elkins, with whom we understand you have corresponded previously. Among other things, our representation is specifically focused on matters involving Marc Goldner's persistent attempts to destabilize the Company.

We are also aware that Mr. Goldner has made numerous threats, not only against _____ but also against other partners of the Company.

This letter serves to reaffirm what Mr. Elkins has already communicated to you previously, both in writing as well as over the phone, including:

1. We now represent the Company, along with Mr. Elkins;
2. Mr. Goldner was withdrawn pursuant to the terms of the Company Operating Agreement (the "Agreement") and is no longer authorized to speak or act on behalf of the Company;
3. Mr. Goldner is within his rights to challenge his withdrawal from the Company via the dispute resolution terms detailed in the Agreement;
4. To date, Mr. Goldner has not availed himself of these procedures, opting instead to breach the Agreement further by tortiously interfering with the Company's partners and attempting to cause the Company harm;

MIAMI   –   FORT LAUDERDALE   –   BOCA RATON

June 26, 2023
Page 2

5. In fact, to our knowledge Mr. Goldner has not retained counsel;

6. Mr. Goldner is not authorized to have any access to any Company information or resources; and

7. The Company formally requests that you continue working with Dr. Eli Blatt

If you have any questions or require any further information, please contact us immediately. The statements and demands set forth above are made in full reservation of all rights, remedies, and defenses.

Sincerely,

BENJAMIN R. MUSCHEL
For the Firm

CC:

Dr. Eli Blatt

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit E

**NOW, THEREFORE, BE IT RESOLVED** by a unanimous vote of the Members voting on the issue that Eli and Marc each agree that, upon fulfillment of the terms of this resolution relating to the Domain Name(s) being transferred (including but not limited to megapcap.capital) as stated herein, 2021 LP K1s issues and Megacap taxes being completed, the Registered Agent login being shared between the Parties, any intellectual property including but not limited to Copyrights, Trademarks, and potential patents held by MegaCap and/or relating to MegaCap such as the MegaCap Trademark (that will be filed after 2021's taxes are filed), their Class A Membership interests are fully vested, and that neither may be removed as Class A Voting Members or Managers from the Company by any other Member for any reason, nor is any attempted removal in the interim valid. In the interest of clarity, that means that all Sections of the operating agreement relating to Redemption of Membership Units or Involuntary Withdrawal are hereby voided upon fulfillment of the terms of this agreement, such that no Class A member can be removed as a Class A Member or Manager to any degree by the

Doc ID: be88819ca047bb925c6e98368c703ece37b9503d

other Class A Members, and that any such attempted removal shall be void upon completion of the terms of this resolution. Further, it is understood and acknowledged by the parties that any and all deals from the past up until MCTH and MCTI are governed under the prior December 2021 resolution, and that any current (including but not limited to MCTH and MCTI) and future deals being worked on are to be split evenly between all Class A Members on all accounts. Therefore, once the capital partners are repaid and expenses are reimbursed, going forward any distributions for the deal flow that MegaCap has conducted to date will be deemed to be evenly split between all Class A Members as reflected in the past agreements agreed by the parties.

NOT A CERTIFIED COPY

Doc ID: 3fcb7f09d002a34ba3e72e5e82f310a063b103214



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit F – Clip of Email sent on February 2, 2023



Summary of legal counsel

Lastly for now, the documents that MUST all be signed at the same time in order for this to be a transaction that I am authorizing is as follows:

1. MegaCap Tech Holding Series Agreement
2. MegaCap Resolution
3. ███████ Interest Waiver Agreement
4. ███████ Rebate Agreement
5. MegaCap Option & Loan Agreement (which contains the Flow of Funds diagram)



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit G

80. <u>Dispute Resolution</u>.   Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this <u>Section</u>. The initiation and pendency of the procedures under this <u>Section</u> does not relieve the Parties from their respective obligations under the Agreement. ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS <u>SECTION</u> SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

    A.   Negotiations by and between the Parties.

    (1)   Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail. Within ten (10) days after receiving such notice, the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

**MegaCap Capital**

## Exhibit H

81.  <u>Equitable Remedies</u>.  The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 16 of 20*

and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement.  The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law.  For any relief or enforcement sought under this *Section* that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware.  For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of *forum non conveniens*.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

**MegaCap Capital**

11/7/2023

## Exhibit I

📄 **Injunction Exhibit C - Goldner Felonies.pdf**

NOT A CERTIFIED COPY

Doc ID: 3fcb7f9b002b43a3e72e5e82d3f0a0b3b103254

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

**Exhibit J – First Communication with Intermediary about ▮▮▮▮▮ after ✕✕✕✕ 'closes'**

Apr 30, 2021

🔒 Messages and calls are end-to-end encrypted. No one outside of this chat, not even WhatsApp, can read or listen to them. Tap to learn more.

Rod MegaCap created this group

Eli "Stanford Homeless" TRIUM Always Homefree added you

Eli "Stanford Homeless" TRIUM Always...
Adding Marc, our third partner          13:02

Hey all! Pleasure   13:02 ✓✓

After we close this, we need to find a way to get into the ▮▮▮▮▮
                        ★ 13:02 ✓✓

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit K



**Marc Goldner**
To: Ryan Nanney    Cc: Eli
Thursday, Apr 22, 4:19 PM

Eli, do you approve? Please advise. Thank you.

This communication and any attachments, is intended for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure or copying is prohibited. If you have received this communication in error, please notify the sender immediately by replying to this communication and then deleting it from your system. Thank you.

Show History

Reply    Forward

**Eli M Blatt**
To: Marc Goldner, Ryan Nanney
Friday, Apr 28, 7:35 AM

So long as the taxable income is just 10% of the total fee then we are good.

Show History

Reply    Forward    Quick Reply

**Marc Goldner**
To: Ryan Nanney, Eli M Blatt
Friday, May 5, 3:59 AM

Please review it and approve it Eli. You need to do your due diligence to make sure it is correct so there are no issues just as I've done. Two sets of two eyes are better than one here. Thanks and please confirm ASAP.

This communication and any attachments, is intended for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure or copying is prohibited. If you have received this communication in error, please notify the sender immediately by replying to this communication and then deleting it from your system. Thank you.

Show History

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit L

Doc ID: be88819ca047bb925c6e98368c703ece37b9503

other Class A Members, and that any such attempted removal shall be void upon completion of the terms of this resolution. Further, it is understood and acknowledged by the parties that any and all deals from the past up until MCTH and MCTI are governed under the prior December 2021 resolution, and that any current (including but not limited to MCTH and MCTI) and future deals being worked on are to be split evenly between all Class A Members on all accounts. Therefore, once the capital partners are repaid and expenses are reimbursed, going forward any distributions for the deal flow that MegaCap has conducted to date will be deemed to be evenly split between all Class A Members as reflected in the past agreements agreed by the parties.

**FURTHER RESOLVED,** that Eli will consent to moving the registered agent and domain accounts to a separate login as soon as the Option and Loan Resolution is fully executed and the 2021 taxes are filed and LP K1s issued for 2021. Additionally, Eli will make Marc a super-admin with equal administrative privileges as Eli has in the MegaCap google workspace and any other accounts relating to MegaCap.  If Eli fails to complete this within reasonable time after such filing, or if Marc or Eli uses such privileges to alter Eli's or Marc's privileges, it shall constitute immediate grounds for involuntary withdrawal from the Company.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

## MegaCap Capital

## Exhibit M



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit N



Dear Simon,

Attached please find your draft 2022 K1 package for Megacap Funds, LP - Tech I.

Please note, if your management fee included a fractional dollar, it has been either rounded or truncated, as the tax software did not permit cents. However your ending capital account balance corresponds identically to your subscription amount, which did not contain any cents.

Should you notice any errors or things that need to be changed (e.g. address or a TIN you acquired since subscribing), you must let us know by before Thursday, September 14, as the return will be e-filed on that day.

As a reminder, as you were notified last October, the 2021 Tech I return contained errors by both the source of the equity and the fund administrator requiring amendment. That amendment is now being finalized and will be sent to you in the next few days.  It will show zero income and expense, as management fees were deferred until Megacap closed on the equity in 2022, which is why your 2022 return shows your management fee paid, even if you subscribed in 2021.

Thank you once again for your confidence in us. Please feel free to contact us with any questions at team@megacap.capital.

Best,
Eli M Blatt
Managing Partner

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit O

12. In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other. For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units).

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit P

June 16, 2023

Marc Goldner,

Re: Admission i̶n̶ ✖✖✖✖✖

Dear Marc Goldner,

Thank you for contacting us about the internal dispute between yourself (Marc Goldner) and business partner Eli Blatt of MegaCap LLC pertaining to your recent investment in membership interest in ████ A Series of ✖✖✖✖✖ LLC.

At this time, we are now aware of the situation and agree there will be no distributions or movement of your holdings until all parties of MegaCap LLC sign and agree when there is a required liquidity event.

If you have any questions regarding the company or your investment, please contact investor relations:

Phone ✖✖✖✖✖

Email ✖✖✖✖✖

Sincerely,

✖✖✖✖✖

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Q



TO: MARC GOLDNER

THANKS FOR INFORMING US ABOUT YOUR DISPUTE WITH ELI M BLATT AND MEGACAP.

WE CONFIRM THAT WE WILL NOT BE ABLE TO RELEASE ANY SHARES OR, IN CASE OF A LIQUIDITY EVENT, ANY PROCEEDS FROM SALE OF SHARES OF SPACEX TO MEGACAP UNTIL ALL INVOLVED PARTIES UNANIMOUSLY REACH AN AGREEMENT OR SETTLEMENT AND PROVIDE A SOLID EVIDENCE FOR THAT

KIND REGARDS,

CA

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit R



NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit S

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 9 of 20*

business interest in the Company as determined by a supermajority consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

### Voluntary Withdrawal of a Member

40. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

41. INTENTIONALLY LEFT BLANK

### Involuntary Withdrawal of a Member

42. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; felony conviction of a Member; or a legal judgment against a Member (excluding any judgment resulting from any litigation relating to Marc Goldner) that is pending as of the effective date hereof) that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member has engaged in conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member, including not devoting time to the Company as required per Section 34.

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit T – Simon's Statement



**THE DHARMA INITIATIVE**
THE CRYPTO MINERS

Simon Divilov
Co-Founder & Chief Technology Officer
Simon@TheCryptoMiners.io
1 (347) 260 - 3135

5 November 2023

Dear Investors of MegaCap,

My name is Simon Divilov, I'm an academic researcher with a PhD in theoretical physics, but also, I am an LP much like yourselves, in fact, one of the earliest ones due to my long personal friendship with Marc. I am a very private person, but the wrongdoing I suffered entering into a business venture with Eli Blatt has caused me to speak out, to warn you and possibly prevent future new victims.

To give a brief background on Marc and my professional and personal history. We had met when we were both still in undergrad in 2008. We quickly became friends and often theorized about what the future would hold. As two self-prescribed futurists, we had envisioned what the future would hold and that eventually led to us co-investing in the early 2010s. However, prior to that, Marc and I had been pitching to our friends the mining prospects around Bitcoin. At the time, many thought it was an outlandish investment. Some even laughed us out of the room at a party in New York City. However, Marc and I continued exploring the digital asset space.

In 2012, Marc, his now significant other, and myself formed our first consulting and investment venture which still exists to this day. It was in 2013 that Rachel encouraged us to explore Bitcoin once again. Shortly after, we began the process of opening an account at Mt. Gox – which unfortunately, went sideways when Mt. Gox abruptly halted its operations upon discovery of the loss or theft of its Bitcoins, which slowed our exploration of the space due to diminished confidence in the custodial and trading-related operations and practices of exchanges akin to Mt. Gox. The temporary slowdown of our various crypto-related activities were ultimately revitalized when we began investing in Dogecoin several years later and decided to restart our original thesis from 2009 to build a mining venture – now known as The Dharma Initiative (or The Crypto Miners) since its founding by our team sans-Eli. Throughout this time, Marc and I always remained optimistic about the future promises of a decentralized asset class as well as futuristic technologies.

During our long discussions in 2009, we would discuss the potential application of cybernetics, life longevity, and neural interface device technologies. All of this pre-dated the existence of ▬▬▬▬ While my interest was in the mathematical and technological side, Marc's was of the business and legal nature. Early on, Marc had theorized the early laws and regulations surrounding Robotic Rights, as well as privacy and regulatory concerns surrounding brain computer interfaces. We began working on the foundation of a think-tank later to be called Neuralverse around 2012. As Marc worked on founding MegaCap, it was no surprise to me that ▬▬▬ was one of his first targets for investment as it aligned with his investment thesis.

Around May of 2021, after a brief discussion Marc and I had, about his clear vision on future technologies, shortly after, I decided to invest in MegaCap. Marc and I had first discussed ▬▬▬ in 2014. Around Winter of 2020, Marc propositioned about revitalizing our Bitcoin mining venture that we had been discussing for years, but due to time constraints we were never able to fully materialize. Prior to Marc attending TRIUM in person, Rachel had pushed both of us to make the time every Sunday to iron out plans because otherwise we'd one day regret it. Marc pitched what is now known as The Dharma Initiative as a capstone project to some of his TRIUM classmates – I was always

NOT CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit T – Simon's Statement



**THE DHARMA INITIATIVE**
THE CRYPTO MINERS

Simon Divilov
Co-Founder & Chief Technology Officer
Simon@TheCryptoMiners.io
1 (347) 260 - 3135

5 November 2023

meant to be a partner at the company, as Marc and I originally founded the company. I specifically created the
financial model as well as proprietary intellectual property for all backend to mine BTC. We ended up going into
the business with Eli who allegedly had previous experience with cryptocurrencies, as well as, connections to like-
minded investors. Eli was at one time one of many partners that were part of Dharma after its initial founding by
Marc, myself, and several others that are still involved.

The initial part of the business involved buying and operating a number of miners, which was carefully determined
after financial modeling of the cash flow and profits done by me. Everyone was confident and over the phone Eli
told me that he was "really looking forward to working with me and growing the business."

After obtaining a small pool of investors, with the majority of funds coming from the founding members of
Dharma, we entered into a contract with a third-party vendor to obtain the necessary miners as the seed to grow
the business. Initially, things did not go as planned, with delays from the third-party vendor and the significant
downturn in the price of Bitcoin. However, Marc, myself and the majority of the founding team were optimistic
given that short term fluctuations were not particularly important in the overall long-term profit, as this already
incorporated into our business plan. Part of that business model stemmed from years of work Marc, Rachel, and I
had built around refining our processes, developing intellectual property, and collaborations dating back to our
pre-existing automated trading algorithm plans and code, a ramen spectrometer scanner to increase the yield of
crops accounting for localized weather fluctuations, amongst several other 'neural' ideas.

It turned out that Eli did not share our optimistic forward-looking sentiment with the rest of us, specifically related
to the potential gains I had predicted regarding the miners held at The Dharma Initiative. To this day, I am of
the belief that Eli understood the financial models I had developed but chose to act with malice in an attempt
to position himself to commandeer control of Dharma, which I had prevented. While, admittedly, my belief of
Eli's actions have changed with time, this was due to Eli's inconsistent story that was constantly changing over
the years. The actions Eli took seemed spontaneous, illogical, and desperate. Around Winter of 2022, Eli began
demanding the financial records of our transactions with the third-party vendor so that he can understand
what was paid for and create a spreadsheet for our other investors so they can understand our financial
situation. The ultimate purpose of this spreadsheet was for Eli to explain how much of the 'balance' everyone
owed pro-rata since the only thing paid up until this point on many of the miners was the deposit to secure the
miners themselves, as well as a security deposit, and an advance on hosting fees. After providing him with the
documents, he created an extremely Byzantine spreadsheet that not only had the wrong financial figures, but
also the incorrect allocation of miners. Dharma's members were left confused about what prompted him to act
this rashly and sloppily, so between March-May 2022, we attempted to explain to him the financial models (which
in principle he should have already understood before investing any money). We began to suspect that Eli was
'playing dumb' and pretending to act clueless. Eli appeared to say one thing, do another, then forget he said it to
begin with. Eli's behavior became suspect, and we all began to worry about our start-up.

Our efforts were to no avail, and he began demanding that we start selling off our assets (miners) because the

Doc ID: 3fcb7f39600a043a30e72e5e82f310a063b103258

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit T – Simon's Statement



**THE DHARMA INITIATIVE**
THE CRYPTO MINERS

Simon Divilov
Co-Founder & Chief Technology Officer
Simon@TheCryptoMiners.io
1 (347) 260 - 3135

5 November 2023

business was not profitable (even for a basic investor it should be obvious that the first few years are mostly expenses and losses). After we declined to go through with such illogical demands, a proposal was floated around that we "buy him out", which I found confusing at first considering we were in a joint venture, Eli wasn't just some random investor. Marc attempted to offer Eli an incredibly generous deal that I believe was above market price of the miners, but Eli declined attempting to strong-arm his business partners with the specter of defaulting, which was utilized as a fear tactic against us. Ultimately, we declined again, although we did offer him an interest-free loan, because it seemed that he needed the money due to his lifestyle choices – however, as business partners, we wanted to offer an olive branch to a partner in need, when we had no obligation to do so. His response to this generous offer, was deciding to default on the payments, leaving the rest of the Dharma members to pick up the tab. In brief, he defaulted and left the business in a distressed state, all because he pretended not to understand the finances of the business model that he helped co-create in an XLS format, and instead opted to sue Dharma, myself, Marc, and Rachel. I believe that his tactics were simply a way for Dharma to be forced to pay for the miners hosting fees which exceed $10,000 a month, while a painstakingly long litigation process would ensue. Eli failed to arbitrate, as was required by our Agreement, and instead has fabricated a lie that we have 'stolen' his money – which I assure you we haven't. I am more than willing to talk with any fellow LP about Eli's unprofessional behavior.

Given that Eli had a big commitment of capital in this venture, paying his share forced me to borrow money from friends and family, which is not only extremely stressful but embarrassing. I am slowly recovering financially, by trying to redistribute my other investments. Unfortunately, what was initially a fun and promising vision has turned into a nightmare, which I hope no one has to suffer through. One lesson I have learned from this is about trust, loyalty, and friendship. Since this entire debacle ensued, Marc and I have become closer than ever and have elevated our professional working relationship to continue our ventures without the likes of someone like Eli who can't be trusted. I hope this helped shed some light on this situation with Eli Blatt.

This letter is not meant to be all inclusive of all the details surrounding Eli Blatt's breaches, illicit actions, and continued fraudulent malfeasance relating to MegaCap and all our other ventures.

I reserve all rights.

Best,

*Simon Divilov*

Simon Divilov, PhD

NOT FOR PUBLIC COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit U

 MegaCap K1s Eli is Withholding

36 items, 8.02 GB available

---

**RN** **Ryan Nanney**
Re: Flow / Mega-Cap - resolution needed by Dec 16
To: Marc Goldner,  Cc: Eli M Blatt

April 10, 2023 at 1:42 PM

Details

Hi Marc and Eli, I heard back from our tax preparer and he said the Tech Holding and Tech I tax returns should be good as they are reported. There were no items of income reported for Tech Holding for 2021:

https://app.box.com/s/57iowqu64s49g4vvyy6q1fc0uhb7ociy

and the only items reported for Tech I was the Management Fee:

https://app.box.com/s/q2kgvy7h8dumz4dof49271f0yrbf0eeo

Please let me know if these look good to you and we can distribute the K-1s.

Thanks!

See More from Marc Goldner

--
**Ryan Nanney**
Fund Accounting Controller

 flow

https://flowinc.com/

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

**MegaCap Capital**

## Exhibit U





Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit U





Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit U (continued) – a snippet of Eli's July 24th email to Flow

a. Flow's only obligation with respect to reporting going forward would be to provide the Company all past, completed tax and regulatory information, filings, and documents in its possession, as I requested in my prior email.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit V



**Ashley Vargas**
To: Marc Goldner                                      Wednesday, Jul 19, 6:09 PM

Marc,

I am unable to confirm that Eli Blatt has an active certification.

**Rob Frankel**
To: Marc Goldner      Cc: Anita, Ashley and 1 more              Friday, Jul 21, 3:09 PM

Marc:

As far as what we are doing or next steps, privacy laws prevent me from sharing our strategy with you or anyone else not connected with our organization. Without more facts and a crystal ball as to what will happen in the future, I cannot commit to any particular outcome if he should apply to one of our programs in the future.

You can go to https://investmenthelp.org/ and search for any name. If that name does not appear, he/she is not an active certificant. You can print out this email if you need something in writing to confirm that.

If you are the victim of fraud, there are governmental agencies and private attorneys who can help you recover any losses.

Have a great weekend.

Sincerely,

Rob

Robert E. Frankel
General Counsel
303-850-3082
rfrankel@i-w.org

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit W – No K1s for  (suspected none for Betterment or FTX) Issued for 2022





Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit W – No K1s for ▨▨▨ (suspected none for ▨▨▨▨ or ▨) Issued for 2022



NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

**MegaCap Capital**

11/7/2023

## Exhibit X – Raul Letter to Limited Partners



**REICHARD & TORNES**
ATTORNEYS AT LAW

September 12, 2023

**VIA E-MAIL**
Limited Partners of MegaCap Funds, LP

RE:   **Demands Made to Flow Inc. and Clarifications & Current Status on MegaCap Affairs and Management**

Dear Limited Partners of MegaCap Funds, LP ("LPs"):

I am writing on behalf of Marc Goldner, one of MegaCap Capital, LLC's ("MegaCap") Founding Members and one of the current General Partners.

We have reviewed correspondences between Flow and Mr. Blatt, specifically one sent to Mr. Blatt on July 26, 2023 and are puzzled as to why Flow did not include Mr. Goldner. As per Ryan Nanney's June 1, 2023 e-mail to Mr. Goldner and Mr. Blatt, wherein Mr. Nanney stated that "[they] will not respond to individual emails, or work on the MegaCap portfolio in general, until [they] receive clear guidance on who is legally in charge for MegaCap Capital." Clearly, Mr. Blatt and his or MegaCap's purported counsel sending Flow a letter and communicating with Flow privately does not constitute or provide Flow with "clear guidance."

To be clear, Mr. Blatt breached the February 13, 2023 Resolution among and between MegaCap's Members when he removed Mr. Goldner's MegaCap e-mail access, *inter alia*, this constitutes automatic grounds for the involuntary withdrawal of Mr. Blatt from MegaCap by operation of the terms of one of the resolutions for MegaCap signed by and between Mr. Blatt and Mr. Goldner. Further, the Resolution that Mr. Blatt is in breach of also states that, "no member shall remove the other from any bank account and **any financial accounts.** (emphasis added)" Flow, undoubtedly must be considered a financial account of MegaCap. Mr. Blatt attempted to wrongfully and unilaterally withdraw Mr. Goldner by backdating a withdrawal and redemption under false pretenses.

Mr. Blatt has no authority whatsoever to act unilaterally on behalf of any of the MegaCap entities and, accordingly, Flow has been instructed to not turn over any Accounting Records (including, but not limited to, K1 forms) without written and signed approval. Mr. Goldner is in possession of the unanimously approved K1s from 2021 that

Reichard Tornes, PLLC | 3663 SW 8th Street, Third Floor, Miami, FL 33135 | 305.407.1734

Doc ID: 3fcb7f39500b04ba3ef2e5e62f310a063b10321a



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 2 of 5
September 12, 2023

were, and is willing and able to send proper K1s to LPs upon request. Please be aware that Mr. Blatt's illicit distribution of K1s for 2022 is not authorized nor approved by Mr. Goldner and falsely state the entire fees have been earned. Management Fees earned from LPs of MegaCap are to be annual income. Mr. Goldner had been working with Mr. Nanney, from Flow, for several months on MegaCap's complex accounting and Mr. Blatt not having access to the K1s demonstrates Mr. Blatt's failure to actively participate in the review and creation of these documents which were provided to both Mr. Blatt and Mr. Goldner on April 10, 2023. Mr. Blatt's failure to have these K1s in his possession for months seemingly indicates a breach of fiduciary duties Mr. Blatt owes to MegaCap's Limited Partners, to MegaCap proper, and to Mr. Goldner himself.

The only K1s that were ever authorized to be created by Mr. Goldner are the ones outlined in a detailed thread with the subject title "Re: Flow / Mega-Cap – resolution needed by Dec 16." This e-mail thread was a lengthy detailed discussion between MegaCap and Flow's representative, Ryan Nanney. Without Mr. Goldner's direct involvement, there is no way for him to verify the authenticity of any of the K1s that need to be distributed, thus, any K1s received by LPs are invalid and illegally distributed. Therefore, anything other than the taxable income on LP's K1s being 10% of the total fee as Mr. Goldner last reviewed on his April 27, 2023, e-mail Mr. Goldner believes will constitute tax fraud on Mr. Blatt and Flow's part and Mr. Goldner will contend and may be forced to report this incident to the relevant tax and regulatory authorities. To be clear, considering that Mr. Goldner is also a Limited Partner of MegaCap, Mr. Goldner is further seeking written and absolute assurances that these K1s include him as a Limited Partner and not just as a General Partner of MegaCap. Mr. Blatt has illegally converted the stated terms of the Resolution where the Management Fees were to be treated as loans and earned as income annually rather than completely accelerated in 2022.

Further, it should be abundantly clear that Mr. Blatt is prevented from unilaterally using MegaCap's Flow admin to contact Limited Partners. This is doubly true where he purports to be the only individual entitled to do so. As an LP, please be aware that no communication sent by Mr. Blatt from Flow, e-mail, or otherwise is authorized by Mr. Goldner, nor does Mr. Goldner accept any liability for Mr. Blatt's illicit actions. Again, please be advised that Mr. Goldner is not just a General Partner of MegaCap but a Limited Partner of MegaCap. What is more, Mr. Blatt also has illegally restricted Mr. Goldner's access to MegaCap banking at First Republic. As a result, Flow has been provided a demand letter by Mr. Goldner to cease and desist from working on the MegaCap portfolio and account without Mr. Goldner's direct involvement and say in any and all matters in connection therewith.

By way of a brief background on Mr. Blatt's other egregious actions, Mr. Goldner has been informed by the General Counsel of the Investments and Wealth Institute, Mr. Frankel, on July 21, 2023, that "...Mr Blatt is not an Institute candidate or certificant." However, Mr. Blatt was consistently misrepresenting same and holding himself out to the world and to Limited Partners and Prospective Limited Partners through pitch decks and via his LinkedIn profile that he was a "Certified Investment Management Analyst" (CIMA)

Doc ID: 3fcd027c3b...



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 3 of 5
September 12, 2023

while not being properly certified to hold that title. Further, Mr. Blatt has refused to correspond with Mr. Goldner as is required by the Mediation provision contained in the MegaCap Capital LLC Operating Agreement (the "OA"). This is so, despite he himself citing to Limited Partners of his purported willingness to do so. Naturally, this constitutes a direct breach of the OA's Dispute Resolution provisions. Last but not least, and as clearly documented, Mr. Blatt has not only removed around $70,000 from MegaCap's First Republic Bank Account without Mr. Goldner's approval—which was required before such funds could be transferred—, but then proceeded to spend that money from an entity called Goldner Blatt Investments, LLC. Again, the OA likewise required Mr. Goldner's approval on all expenses above $5,000; which the formation of the aforementioned entity entailed. Mr. Blatt also repeated the behavior illustrated here regarding another jointly held company of the parties called BitSource, LLC, where Mr. Blatt removed Mr. Goldner from the bank account and misappropriated over $6,500, along with restricting Mr. Goldner's e-mail access to the shared @Bitsource.Group e-mail address. It is Mr. Goldner's position that Mr. Blatt has also withheld legitimate, approved expenses of Mr. Goldner in excess of $30,000.

The following are additional issues that Flow has been made aware of:

(a) On February 15, 2023, Mr. Goldner and Mr. Blatt signed IRS Form 8832 which is an Entity Classification Election for the Taxable Year Ended December 31, 2021 which stated, "THERE WAS A MISTAKE ON THE INITIAL APPLICATION. IT WAS NOT NOTED UNTIL THE DATE THAT THE FIRST TAX RETURN (TY DEC 2021) WAS GOING TO BE FILED. TAX RETURN FOR TY DEC 2021 FILED AS A PARTNERSHIP (FORM 1065) ON FEBRUARY 15, 2023. ENTITY HAS TWO MEMBERS AND EACH ARE RECEIVIING A K-1." Please note, that due to Mr. Blatt and Flow's negligence, Mr. Goldner has been prevented from properly accounting for his own tax returns due to a failure to receive a proper K-1 from MegaCap for nearly two entire years.

(b) Mr. Blatt has incorrectly stated that Mr. Goldner must solely abide by the dispute resolution provisions of the MegaCap OA. This is patently false: Under Section 81 of the MegaCap OA, Mr. Goldner is entitled to equitable remedies in the form of an injunction to be filed in Federal Court in the State of Delaware. Mr. Blatt has continued to breach the MegaCap OA by attempting to file an injunction in a Florida State Court with complete knowledge of the OA's jurisdictional provisions and restrictions. Further, Mr. Blatt is in breach of Section 80 of the OA by refusing to respond to Mr. Goldner's attempt to mediate.

(c) Flow further has been made aware that Mr. Goldner's life was threatened by a Capital Partner of MegaCap Funds, LP in connection with Mr. Blatt's Frivolous attempts at claiming Mr. Goldner has extorted Mr. Blatt which are baseless and have no legal bearing or leg to stand on. Mr. Blatt's continued false narrative

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 4 of 5
September 12, 2023

is merely an attempt to disparage, defame, besmirch, and assassinate Mr. Goldner's good name, reputation, and character.

(d) Mr. Blatt has no authority to hold any Units of MegaCap Capital 'in trust' that were redeemed from the third MegaCap General Partner, Roderyck Reiter. Under MegaCap's OA Section 12, it is clearly stated that "[i]n the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other."

Indeed, to illustrate the severity and unambiguous nature of this situation, Mr. Goldner possesses not one, but two letters from two different apropos sellers of shares to MegaCap stating that the release of shares are halted pending the resolution of this matter. The first states: "WE CONFIRM THAT WE WILL NOT BE ABLE TO RELEASE ANY SHARES OR, IN CASE OF A LIQUIDITY EVENT, ANY PROCEEDS FROM SALE OF SHARES OF [REDACTED] TO MEGACAP UNTIL ALL INVOLVED PARTIES UNANIMOUSLY REACH AN AGREEMENT OR SETTLEMENT AND PROVIDE A SOLID EVIDNECE FOR THAT." The second letter states: "At this time, we are now aware of the situation and agree there will be no distribution or movement of your holdings until all parties of MegaCap LLC sign and agree when there is a required liquidity event." Evidently, Mr. Blatt is not in control of MegaCap and has no sole authority whatsoever to make any unilateral decisions on behalf or to the detriment of Mr. Goldner or to any of you Limited Partners of MegaCap. Mr. Blatt's illegal takeover and commandeering of MegaCap and its assets once again are in breach of various MegaCap agreements as well as his fiduciary duties therewith and thereunder which may have constituted grounds for Mr. Blatt's automatic removal from MegaCap and all matters pertaining to any of the MegaCap entities.

To reiterate, Mr. Blatt has dispossessed Mr. Goldner of 8,217 Shares of Derivative Equity in ▓▓▓ which share value Mr. Goldner estimates to total in excess of $500,000. This matter is not being taken lightly by Mr. Goldner and he is taking appropriate action in a timely, thorough, and appropriate manner. Additionally, we've made Flow aware of the full circumstances and repercussions surrounding Mr. Blatt's conduct as well as Flow's actions in connection therewith, together with the details of the dispute involving all of MegaCap Capital General Partners. Please note that the foregoing does not include the $797,817 that Mr. Golder contends Mr. Blatt owes him.

Further, Mr. Goldner has demanded that his access be reinstated to the back-end and investor Flow portal, which portal he is rightfully entitled to have access to as Managing Partner of MegaCap. As clearly set forth herein, Mr. Blatt has no authority to restrict such access, and Flow's refusal to reinstate Mr. Goldner potentially will continue to expand Flow's exposure and liability.

Failure by Flow to abide by these demands may result in legal action being taken by Mr. Goldner against Flow, its principals, and its representatives. Furthermore, if Flow

NOT FOR DISTRIBUTION COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 5 of 5
September 12, 2023

fails to respond thoroughly, it may result in a more substantive letter—at Mr. Goldner's sole discretion—which in turn may precipitate escalation to said legal action. As such, Flow has been well-advised and urged to speak with Mr. Goldner directly who has also requested that Flow cc: him on any and all further correspondences and communications with Mr. Blatt as well as any other correspondences and communications relevant and appertaining to the contents of the present letter.

Mr. Goldner hopes to hear back from Flow no later than Wednesday, September 13, 2023, which deadline was stated in the demand and cease & desist letter to Flow sent on September 11, 2023.

Sincerely yours,

REICHARD TORNES, PLLC

/s/ Raúl A. Reichard
Raúl A. Reichard, Esq., LL.M.
For the Firm

RAR

cc:
Marc Goldner
Jacqueline Tornes, Esquire

NOT A CERTIFIED COPY

Doc ID: 3fcb7f39600a2b4ba3e72e5e82f310a053b10321e



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Y – Raul Letter to MegaCap



REICHARD & TORNES
ATTORNEYS AT LAW

September 14, 2023

**VIA E-MAIL**
MegaCap Capital, LLC
MegaCap Funds, LP
team@megacap.capital; ops@megacap.capital

**RE:   MegaCap K1s and Improper Actions in Connection Therewith**

Dear MegaCap Capital, LLC and MegaCap Funds, LP ("MegaCap"):

I am writing on behalf of Dr. Simon Divilov and in response to a recent e-mail received by Flow. See Exhibit A. Dr. Divilov is quite taken aback at your most recent actions. Also, I write in light of MegaCap's—via Mr. Goldner—recent requirement to halt the filing of ostensibly fraudulent K1s and tax returns. Dr. Divilov hereby demands to know the accounting firm that you used to prepare these seemingly fraudulent K1s.

You requested Dr. Divilov to let you know by or before Thursday, September 14 if he "should [sic] notice any errors or things that need to be changed." We are hereby informing you that there must be changes made to the K1s to reflect the agreed-upon fee structure that was stated to MegaCap Limited partners via e-mail on or about February 9, 2023. In said email, MegaCap specifically stated that "[t]he amended K1s are currently being prepared by Flow, and we are pushing them to get them out by next week at the latest. In the interim, we can report ***definitively*** that the loss will be 0.5% of your capital commitment, representing one tenth of the 10-year 0.5% management fees. **You can report this to your accountant and proceed confidently with that number.** You will receive a notice through Flow once the K1 is complete." (emphasis added.)

Dr. Divilov did, in fact, prepare his 2021 and 2022 returns to reflect such material representations. It is unacceptable for you to unilaterally make these changes without informing Dr. Divilov and the Limited Partners of MegaCap sooner. By noticing Dr. Divilov less than a week prior to you making this

Reichard Tornes, PLLC | 3663 SW 8th Street, Third Floor, Miami, FL 33135 | 305.407.1734



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Y – Raul Letter to MegaCap

MegaCap Capital, LLC
MegaCap Funds, LP
Page 2 of 3
September 14, 2023

unauthorized change to MegaCap's returns, it will cause undue harm to Dr. Divilov. You cannot reasonably expect Dr. Divilov and Limited Partners of MegaCap to amend their returns from over a year ago due to MegaCap's malfeasance or negligence.

To be clear, you cannot amend K1s that you told Dr. Divilov and Limited Partners to file at 0.5% a year at an annual loss and then retroactively expect Dr. Divilov and Limited Partners to amend their previously filed returns to 5% loss in a previous filing. This is simply not acceptable and Dr. Divilov will be forced to proceed with legal action to correct this unjust action taken by MegaCap. And, to be clear, MegaCap will be held fully liable for any fees and costs associated with this action as per the relevant investor agreement.

Dr. Divilov is not accepting these K1s you have just sent as valid because there is a signed resolution (and an e-mail you sent to Flow certifying as such) which clearly states that there would be 0.5% loss to LPs annually. You said to Ryan Nanney at Flow on April 28, 2023: "So long as the taxable income is just 10% of the total fee then we are good." The K1 you provided does not reflect this statement and your improper recreation of MegaCap's K1s are not just seemingly illegal, but a breach of your fiduciary duties to Dr. Divilov and all other Limited Partners.

Outside of the above, Dr. Divilov demands the K1s to be created as per the Resolution you signed in February with the Managing Partner of MegaCap, Marc Goldner, and to reflect the e-mail sent to Flow which was agreed to.

Please respond immediately with your accounting firm so that Dr. Divilov can obtain the necessary details prior to reporting this violation to the Internal Revenue Service for apparent tax fraud, as it is imperative that Dr. Divilov can maintain good standing with the Department of Defense and other government agencies. As such, Dr. Divilov requires an immediate response.

Failure to comply with these demands will result in exploring a multi-party legal action with other Limited Partners against MegaCap and yourself. Dr. Divilov will be seeking removal of whomever is behind the foregoing from MegaCap entirely and will be calling a vote to halt the actor's misconduct that is jeopardizing Limited Partner funds at various MegaCap vehicles.

Lastly, your malicious withholding of Dr. Divilov's draft K1 until nearly the eleventh hour on a weekend is unacceptable. Dr. Divilov is fully aware you distributed similar drafts to at least one other LP on (at latest) Friday of last week—likewise inappropriate.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Y – Raul Letter to MegaCap

MegaCap Capital, LLC
MegaCap Funds, LP
Page 3 of 3
September 14, 2023

Therefore, Dr. Divilov expects a response no later than September 15, 2023 and demands that you do not go through with any tax filings. Your failure to otherwise abide by this demand letter may result in an escalation in this matter.

Dr. Divilov reserves all of his rights.

Sincerely yours,

REICHARD TORNES, PLLC

/s/ Raúl A. Reichard
Raúl A. Reichard, Esq., LL.M.
For the Firm

RAR

cc:
Simon Divilov
Jacqueline Tornes, Esquire

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Y – Raul Letter to MegaCap

**Exhibit A:**

Flow — To: Simon Divilov — Saturday, Sep 9, 11:59 PM

### flow

Dear Simon,

Attached please find your draft 2022 K1 package for Megacap Funds, LP - Tech I.

Please note, if your management fee included a fractional dollar, it has been either rounded or truncated, as the tax software did not permit cents. However your ending capital account balance corresponds identically to your subscription amount, which did not contain any cents.

Should you notice any errors or things that need to be changed (e.g. address or a TIN you acquired since subscribing), you must let us know by before Thursday, September 14, as the return will be e-filed on that day.

As a reminder, as you were notified last October, the 2021 Tech I return contained errors by both the source of the equity and the fund administrator requiring amendment. That amendment is now being finalized and will be sent to you in the next few days. It will show zero income and expense, as management fees were deferred until Megacap closed on the equity in 2022, which is why your 2022 return shows your management fee paid, even if you subscribed in 2021.

Thank you once again for your confidence in us. Please feel free to contact us with any questions at team@megacap.capital.

Best,
Eli M Blatt
Managing Partner

**View Documents**

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

MegaCap Capital

11/5/2023

To the Limited Partners of MegaCap,

I hope this letter provides much needed insight on my relationship with MegaCap & Eli M Blatt.

Since my improper and illegal redemption from MegaCap, I have chosen to keep a low profile in the interest of protecting the LPs, however, in the past several months, the situation has developed in such a way that it has forced me to break my silence.

I was involved with MegaCap since before its official inception as an entity. Previous to my time at MegaCap, I worked with a private equity fund from New York, and I adapted what I learned there to create what was in my vision a "cleaner and more transparent" version of what I had experienced.

Private Equity is a notorious branch of finance which is rife with bad actors and where trust is in short supply. I knew that the scope of the work was going to be more than I could handle on my own, so I knew I would have to find a partner to help me realize the vision. Obviously, it was important to me that I could trust my partner, in order to extend that trust down to the LPs.

Ultimately, I made the fateful, and in hindsight terrible decision of selecting Eli M. Blatt as my initial partner for this venture. My reasoning for choosing Eli Blatt, was the fact that I have known him personally since childhood (around 40 years). I knew Eli because his grandmother and my grandparents had been neighbors. So, the family connection went far beyond the 40 years I have known Eli. I was close with his grandmother, I knew his great grandmother, and I know his uncles and his mother. I also know most of his extended family on his mother's side.

In short, I knew Eli Blatt and his entire family, so I figured that at the very least I wouldn't have to worry about having to watch my back internally. I couldn't have been more wrong.

MegaCap was launched when a contact I had made in the private equity world approached me with an offer of shares of ———— At the time, ———— was the hottest issue in the pre-IPO world, and I knew that this would be an ideal launching pad for MegaCap. I had already pre-negotiated the deal with my contact for the shares of ———— prior to reaching out to Eli. So, I had originated not only the idea for the business, but also sourced the deal that launched MegaCap. This same contact would later also be our source for shares of ———— Simply put, without my direct input, MegaCap would not exist, the biggest deal made by MegaCap would not exist, and Eli Blatt would not be a "Managing Member" of MegaCap. There is a mountain of evidence to support my claim, because it is factual.

Shortly after getting started with MegaCap, Eli introduced me to Marc Goldner, one of his classmates at TRIUM, as a potential third partner. It was at this meeting where the first clues of Eli's underhanded ways manifested, as in the process of introducing Marc into the partnership, he immediately diluted his equity. As Marc did not get equal equity, but junior equity.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

MegaCap Capital

11/5/2023

A few days later, Eli doubled down on his grotesque behavior, by "misremembering" the split of equity negotiated with Marc at this meeting, in Eli's own favor, having a blowout fight with Marc over the equity split on our group chat. In hindsight, this should have been my red flag that it was going to be a problematic partnership, but I continued to give Eli the benefit of the doubt.

This incident was a mere preview of the preferred way of doing business with Eli M. Blatt. Every new deal we worked on, Eli would forcibly renegotiate our split, arguing that he deserved more. One such instance was when Eli, Marc and myself had a Zoom call that I insisted that we record. It was around this time that my distrust for Eli's business practices began to accelerate. Eli's contribution was generally limited to initial capital investment, specifically to partially fund a deal. What should have been a clear meeting of the minds with partners, turned into a never-ending renegotiation. Eli would continually reiterate that he didn't get into this business to do "sales". Still to this day, it is unclear how Eli actually wanted to contribute to our business. He he claimed that he wanted to run the "back office" of MegaCap but then would delegate such tasks to Marc and myself, all while Marc and myself were the ones attempting to raise capital expending our time, money, resources, and energy at networking events globally.

To say that Eli is unprofessional, would be a gross understatement. In particular, Eli's communication skills are notoriously atrocious, as he quickly resorts to insulting and berating his counterpart, regardless of who that may be. And when a conversation would not go his way, particularly when the counterpart would not accept Eli's distorted version of events, he would freeze them out. Eli would burn bridges just as quickly as Marc or myself would build them. Decency and common courtesy do not feature in Eli M. Blatt's vast repertoire of skills.

In one particular instance, due to either his failure to properly negotiate compensation in advance or something such as once again his 'misremembering' of the deal terms, Eli got into a written altercation in a group chat with an alleged broker dealer that was introduced to Eli through one of Eli and Marc's mutual contacts. The conflict originated when Eli refused to compensate that fund for the part they played in securing a deal relating to Betterment. Eli insulted and berated this person in a public chat with multiple people having visibility into the argument, with no regard for the consequences of his actions.

To Eli Blatt's credit, he did in fact attempt to set-up a deal with his college friend, for Betterment, but Eli Blatt did so without speaking, consulting, or getting the deal approved by Marc and myself as per the terms of MegaCap's Operating Agreement. The details surrounding this deal is where a lot of contention began to brew amongst us partners. Eli Blatt attempted to take the lion's share of the deal and the credit in effect telling us that instead of confronting him about acting without our cognizance, we should have been thanking him. Whereas Eli Blatt tried to cut corners and do things the improper way, Marc and I attempted as best we could to right the ship and act in an ethical and

Doc ID: 3fcb7f96002c043a3b22e5e6231310a053b103214



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

11/5/2023

MegaCap Capital

legal manner. This chain of events in hindsight was the beginning of Eli beginning to attempt to renegotiate the Operating Agreement to increase his pay out upon certain deals closing.

Eli also had a peculiar way of doing accounting. He would calculate his personal split of the proceeds first, then he would calculate everything else from that point. It wasn't always incorrect, but it was definitely confusing as normally you would calculate the company proceeds first and then the splits from that point. Eli would also, once having calculated his "monies", immediately transfer the funds from the company account to his personal account, without Marc or I signing off on it first, since when Eli set up the bank account, he gave himself full authority, rather than requiring multiple partners to sign off.

Many times, I addressed Eli's actions directly, in particular his communication skills and how that could impact MegaCap's overall business. Eli himself did not see any fault in his actions.

Ultimately, these constant disagreements and renegotiations resulted in an overall amendment of MegaCap's Operating Agreement, a document known as the Memorandum of Understanding. This new agreement stripped both Marc and myself, but especially me, of upside and equity in various deals that had been achieved under the MegaCap umbrella, while Eli's percentage was increased. After much discussion, Marc and I had believed that it would be in the best interest of MegaCap to not fight with Eli about what we hoped would be looked at as smaller deals in the future. Our goal was to avoid a blow-out argument with Eli that could harm LPs. Marc and I did what we did to try to isolate Eli's actions and deflect the harm to ourselves and to protect the Limited Partners. In hindsight, it was at this point it appears that Eli was attempting to work me out of MegaCap. I also started getting disillusioned with the various projects, and that even if I was able to salvage my position within MegaCap, I grew concerned that Eli's behavior would inevitably result in the implosion of MegaCap itself and destruction of the Limited Partner's funds.

All of this coincided with the birth of my daughter, which had me understandably pre-occupied, combined with the market downturn at the end of 2021, there was a general slowdown in securing investments by LPs. I had spoken with Marc on the phone constantly, as at this point my relationship with Eli began to deteriorate to the point that speaking with him was fruitless and a detriment to the business. Marc was effectively acting as a mediator between Eli and myself. Then, together, and for months, Marc and I would strategize for hours on end nearly every day on how to grow MegaCap and to do so despite Eli's continued and nearly constant interference. Together, we devised a plan to find a Capital Partner to take the business to another level so that we wouldn't be held in Eli's clutches on every new deal we'd do. Around November or December of 2020, Marc was able to successfully find a Capital Partner in Dubai to jumpstart the _____ deal. That Capital Partner was in the form of a $1M+ Promissory Note. Ultimately, this entity grew frustrated with the slowdown in sales velocity and Eli used this slowdown in LPs as justification for redeeming me from MegaCap, even though this temporary slowdown had no bearing on the long-term health of MegaCap. He recruited Marc,

Doc ID: 3fcb7f98d02c048a3e22e5e821310a083b103214



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

11/5/2023

MegaCap Capital

through coercion, to negotiate my redemption on his behalf, telling Marc he would no longer work on their ventures as long as I wasn't redeemed.

Eli wanted to not just take all of my equity away from me, even though the business was my idea and I brought him into it, even though we were childhood friends of nearly 40 years, our families were neighbors and knew each other even longer, even though that if it wasn't for me, Eli would still be begging his mother for an allowance, but he conspired to take all of our collective equity and control away.

Eli M. Blatt is a seemingly impressive person at first glance. He has a collection of degrees from several prestigious institutions. However, other than being a lifelong student, Eli has accomplished what I perceive to be very little in his life.

He has been involved in various business partnerships that failed miserably and he was (or still is) in dispute with at least one prior business partner. He has never held, as I've been told gainful employment other than at Zynga, where he was and I quote my memory of Eli himself saying: "escorted out of the building by security after being terminated". It's worth noting Eli considers himself, and I quote Eli once again here: "unhirable."

He has also threatened, in writing, to not honor the laughable settlement I was given for my improper redemption. Even when he's already fucked me, he can't help himself and wants to double down. There is no limit to his lack of human decency, there is no limit to his lack of ethics, and there is no limit to how far Eli will go to dispossess Marc and I of our assets knowing no limit to what he will do to fulfill his selfish desires, hidden agenda, and secret motivations.

To be clear though, my primary concern remains the LPs investment. If we all lose because ⟩———⟨ or ⟩———⟨ fail, then so be it, that is the risk we all accepted when entering this venture. Barring that, I want everyone to win, there was no reason this venture couldn't have been a win-win for everyone. In funding rounds since MegaCap did the ⟩———⟨ deal, the secondary market has valued the shares of ⟩———⟨ at a higher price than the allocation paid for by MegaCap's LPs.

As I later feared, Eli found a way to implode MegaCap when he executed the improper and illegal redemption of Marc Goldner. Just like he had done with me, he found a way to reinterpret facts to his favor, and since he had prepared every mechanism necessary to dispossess us of our equity whenever he deemed it necessary, he was able to do so quite promptly. If Marc or I had the power to easily regain control, we already would have done so.

Despite his vast collection of degrees from various prestigious institutions, Eli has not found a way to translate this into competence. For instance, despite his claims of wanting to safeguard the MegaCap



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

MegaCap Capital

11/5/2023

investments, he hasn't even properly handled the taxes for MegaCap, which is likely to result in fines, which if left unchecked can result in the destruction of LP equity.

Simply put, Eli M. Blatt cannot be trusted to be the caretaker of these investments by the LPs, he lacks the ethics, he lacks the moral compass, he lacks the trust, he lacks the professionalism, and most importantly, he lacks the competence to be effective in that position. On top of that, Eli constantly changes his story, was unable to handle the back-office without severe 'hand holding' and assistance from Marc, and issuing K1s (without approval) with less than a week's notice to provide edits to draft K1s being distributed. Ultimately, I cannot in good conscience recommend that he be trusted.

The seller of the shares of both  nd the fund that sourced them have been made aware of Eli's actions and have pledged in writing to not distribute unless all the managing partners sign off on it, so the investment is safeguarded for now. However, the seller of the shares has refused to provide such an assurance, not to Limited Partners, nor to Marc Regardless and despite the assurances we were able to obtain, this does not yet stop Eli from causing more damage and as such, Marc and I are going to do everything within our power to correct this situation, and ensure that the LPs investment remains safe and experiences a smooth exit.

On behalf of Marc and myself, thank you not just for your understanding, but for your initial trust in the MegaCap vision and your belief in us. We are working tirelessly to make that vision come true.

Sincerely,

Roderyck Reiter
Series 7
Series 63
Licensed Real Estate Broker (Florida)

Doc ID: 3fcb7f96f02b48a3e72e5e623310a063b103214

NOT A CERTIFIED COPY

# EXHIBIT M

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-016030-CA-01

**ELI M. BLATT**,

      Plaintiff,

vs.

**MARC J. GOLDNER, RACHEL KORSEN,
SIMON DIVILOV, THE DHARMA
INITIATIVE, LLC**, a Delaware company, and
**COMPASS MINING, INC.,** a Delaware
corporation,

      Defendants.

_____/

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Florida Rule of Civil Procedure 1.610, Plaintiff, ELI BLATT ("Plaintiff"), by

and through his undersigned counsel, moves for the entry of a preliminary injunction against

Defendant MARC J. GOLDNER ("Goldner"); enjoining Goldner from:

    a. contacting Plaintiff as well as vendors, partners, and Limited Partners of Megacap
       Capital, LLC ("Megacap" or the "Company");

    b. taking any actions on behalf of the Company, representing himself as authorized to
       do so, claiming to have been illegally or improperly withdrawn from the Company,
       or otherwise claiming to be a duly authorized representative of the Company;

    c. disclosing any confidential, sensitive, or proprietary information regarding the
       Company or filing any State or Federal lawsuits relating to Megacap in breach of
       the Agreement;

    d. filing any tax returns for Goldner Blatt Investments, LLC ("GBI") until the current
       case is concluded or without the express written consent of Blatt; and

    e. fraudulently conveying any of his assets, including but not limited to the Miners
       and any NFTs or cryptocurrencies under Defendants' control, as well as his equity
       interests in Dharma and any other companies in which he has equity interests.

NOT A CERTIFIED COPY

## FACTUAL BACKGROUND

**Overview**

This motion stems primarily from actions taken and threats made by Goldner subsequent to being noticed of Blatt's intent to pursue this present litigation and being provided with a copy of the filed complaint. Specifically, Blatt seeks injunctive relief in the face of extortive threats made towards Blatt with respect to his interests in and fiduciary duty to Megacap if Blatt does not acquiesce to Goldner's demands to drop the present litigation.

Although not mentioned by name in the Complaint, Megacap is the "other" company that Goldner was pressuring Blatt to sign an agreement for with its creditor under threat to Blatt's life. See Complaint ¶¶ 95-101 and Count XI - Civil Threat and Extortion. In order to protect the Company and its investors, the Complaint purposefully omitted Megacap's name in the allegations and counts. As detailed herein, Goldner's actions since the filing of the complaint have inexorably tied the present litigation to Megacap and necessitated this motion for injunctive relief.

Megacap is a Delaware-based company founded by Blatt, Goldner, and a third Member no longer with the Company. It is engaged in the business of syndicating equity in pre-IPO private investments as the General Partner for various Special Purpose Vehicles ("SPVs") which own interests in privately held companies. Put simply, Megacap enables retail investors to invest in late stage, private, pre-IPO companies. Megacap's current still-open offering, in which its Limited Partners have invested more than $3,000,000, has its equity exposure via a forward contract for the vested shares of a former employee (the "Employee") of the SPV's target "Portfolio-Company" (the "Shares")[1].

---

[1] Megacap's current offering has derivative equity exposure to the Portfolio-Company via an investment in an SPV that has a forward contract with the Employee for his vested equity in the Portfolio-Company. The names of the Seller, the Employee, and the Portfolio-Company are of the highest degree of confidentiality given the

As a Class A voting Member and Manager of Megacap, Goldner had access to confidential information, as well as rights and obligations under the terms of the Megacap Operating Agreement (the "Agreement"). A copy of the Agreement is attached as Composite **Exhibit A.** Goldner has used his access to this information, including the contact information of Megacap's partners, to make repeated, serious threats towards Blatt and Megacap.

**Goldner's Involuntary Withdrawal from Megacap after Repeated Threats Towards Blatt and Megacap.**

In addition to the threats and extortion detailed in the Complaint, upon being noticed by Blatt of his intent to pursue the present litigation, and escalating thereafter upon being provided a copy of the filed complaint, Goldner continued his campaign of harassment and intimidation against Blatt by, among other things:

1. admitting to illegally recording Blatt in Florida without Blatt's knowledge or consent;

2. extorting Blatt by threatening to release these illegal recordings of Blatt and to accuse him of crimes unless Blatt acquiesced to his demands;

3. extorting Blatt, Megacap, and all of its Limited Partners, by repeatedly threatening to disclose critically sensitive information that could destroy Megacap and the investments of its Limited Partners[2] unless Blatt drops the present litigation, stating in a WhatsApp chat:

---

possibility that public disclosure of the forward contract could potentially result in the Portfolio-Company voiding the Employee's shares if the Portfolio-Company has the rights to do so (which the Employee has represented is not the case to the best of his knowledge but which is not known with certainty), as well as the fact that the Seller has the ability to redeem Megacap's investment. Given their highly confidential and sensitive nature, the names of the Employee, their former employer (herein referred to as the "Portfolio-Company"), and the Seller, reference thereto in the exhibits has been redacted.

[2] The Limited Partnership Agreement governing the SPV that owns the forward contract with the Employee allows for the General Partner of the SPV (the "Seller") to redeem the interests therein that Megacap manages for its Limited Partners for reasonable cause, which would be catastrophic for Megacap and its Limited Partners. Rather than adhere to Megacap's dispute resolution terms, which require confidential and private mediation and arbitration, precisely to protect the Company from this type of adverse consequence in the event of a dispute, Goldner has contacted myriad Megacap partners and even potential partners (*See* Exhibit "B") and threatened to disclose Employee or Seller's name as means to extort Blatt into reinstating Goldner into the Company as a Class A Member and Manager and to withdraw the present case against him. Among those he contacted is the Seller for the Shares. Goldner's aim in contacting the Seller was to lay the foundation for threats that he might take actions to needlessly make the Employee's name public, or to name the Seller in a lawsuit, and thus give the Seller's General Partner cause to redeem the equity Megacap manages, a threat he has repeatedly used to

I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've "stolen" your money [referring to the civil theft demand letter]. The game you're playing here could wind up dragging this into a Federal Court that will have a tortious discovery process, [which could] expose the [Portfolio-Company] employee's name that could [cause the Seller to] revoke the shares, resulting in all the hard work we put into Megacap and [the Portfolio-Company deal] being extinguished;

4.  threatening to destroy Blatt's fiancé's career by disclosing illegally obtained and allegedly compromising recordings of conversations with her made without her knowledge or consent;

5.  'Sextorting' both Blatt and his fiancé by contacting her directly and threatening to make public compromising images and/or videos of Blatt made without his knowledge or consent.

Goldner's harassing texts, emails, and WhatsApp messages are summarized and attached as Composite **Exhibit B**.

Blatt endured nearly a year of threats and coercion by Goldner without taking action with regard to Megacap, despite Goldner's litany of forbidden acts and other breaches of the Agreement, in the interests of putting the best interests of Megacap above his own. The goal was, and remains, to minimize any potential adverse impact to the Company or its Limited Partners.

But Goldner's escalation to very serious extortive threats against not only Blatt but also Megacap and all of its Limited Partners unless Blatt agreed to withdraw his complaint and reinstate him, compounded by his other breaches of the Agreement and its forbidden acts, prevailing law, and his fiduciary duty, left Blatt no choice but to protect Megacap from Goldner's increasingly erratic behavior by withdrawing him as a Class A Member and Manager of the Company. Simply put, as a practical matter, Goldner's actions had made it impossible for Blatt to continue working with him, making it impossible for Megacap to conduct its ordinary course of business; in addition,

---

scare Megacap's Limited Partners and extort Blatt into dropping the present lawsuit and reinstating him into Megacap as a Class A Member and Manager.

given that Blatt could not ethically withdraw from Megacap himself considering that he has a fiduciary duty to Megacap's Limited Partners to protect them from Goldner's threats, withdrawing Goldner was the only option.

Consequently, and in accordance with the terms of the Agreement and Goldner's Redemption Agreement, Goldner was duly withdrawn as a Class A Member of the Company. As a result, he is thus no longer authorized to act on behalf of the Company, represent himself as being authorized to do so, or otherwise engage in any activities related to its business.

**Goldner Escalates His Extortion Efforts by Directly Contacting and Threatening Megacap Partners in Breach of the Agreement, Causing Irreparable Harm to the Company.**

The Agreement contains explicit provisions for resolving disputes, which Members must adhere to in order to assert any claims against the Company or its Members. These provisions call for private and confidential mediation and arbitration and exist to protect the Company from the type of harm Goldner has been engaging in.

Goldner, for his part, has successfully evaded service for the subject litigation for over two months. During this time, rather than invoke any of the proscribed dispute resolution proceedings, Goldner has been engaging in a campaign of harassment against Blatt, Megacap, and Megacap's partners that directly violate the dispute resolution and other terms of the Agreement in an attempt to get Blatt to drop the present litigation as well as reinstate him in Megacap. Specifically, Goldner:

1. doubled down on his extortive threats against Blatt and the Company by, among other things, needlessly naming the Employee and threatening to publicize the name, which he himself has repeatedly acknowledged could cause catastrophic and irreparable harm to the Company and its Limited Partners, unless Blatt reinstates him as a Class A Member and Manager of Megacap and drops the present lawsuit against him, stating:

    > I strongly suggest that you immediately reinstate me, otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved... it is extremely important to remember that I possess the name (as do you) of the [Portfolio-Company] employee that is part of the

[Portfolio-Company] employee forward contract - (his name in case you didn't read the documents is [redacted])... **I would highly recommend immediately dismissing this case**[3]... failure to do so may result in a federal court action and a tacit approval and waiver for me to sue MegaCap in federal court… MegaCap will be named as a third-party defendant, and I will most certainly ensure that ALL shares are withheld. What you do not seem to understand that is IF the shares are cancelled, it is YOU who will be held liable as you are the but for cause of all of this happening…. I have absolutely no issue putting MegaCap into receivership with the SEC" (emphasis added, *see further* **Exhibit C**);

2.  inadvertently admitted that his coercion of Blatt to sign the agreement with a creditor of the Company under threats to Blatt's life, as detailed in the complaint, was extortion by acknowledging his financial interest in having the agreement signed, stating in a letter to Blatt, "In order for extortion to exist, I would've needed to have a financial benefit, which I had none – instead, I saved MegaCap over $100,000 in the interest waiver agreement" (*See* **Exhibit C**), a confounding statement given that Goldner is clearly aware that he had and continues to have financial interests in Megacap and thus pecuniary interests in the actions he was coercing Blatt to take under threat to Blatt's life;

3.  solicited money from Megacap's Limited Partners to aid him in disputing his withdrawal outside of the proscribed mediation and arbitration under threat of the loss of their investment by implying that he will make the name of the Employee, Portfolio-Company, and Seller public if they did not assist him in forcing Blatt to acquiesce to his demands;

4.  instructed potential investors not to invest with Megacap, thus causing the Company financial harm and preventing it from repaying its debts to its creditors;

5.  contacted and baselessly threatened critical partners of the Company with, among other things, legal actions he has no standing or right under the Agreement to bring, including:

    a.  the Seller for the Shares of the Portfolio-Company to inquire about their ability to redeem the Shares and plant the seed for them to potentially do so;
    b.  the supplier of the Company's shares for another SPV it manages in a manner they characterized as "alarming";
    c.  its SPV Administrator, causing it to breach its contractual obligations to Megacap by ceasing all work on Megacap's critical tax reporting, as well as to demand an indemnification by the Company from any actions against it by Goldner in order to

---

[3] Goldner is here referring to the present litigation, leaving no doubt as to the fact that he is fully aware of it and actively evading service while simultaneously hiring an attorney to defend Dharma, which was served via its Delaware Registered Agent, as well as making it unequivocally clear that he is extorting Blatt with threats of causing catastrophic damage to Megacap if Blatt does not drop the present litigation.

resume performance of its contractual obligations, thus hamstringing Megacap administratively and operationally; and

    d.  its accountant, who ceased work on Megacap's taxes out of fear of a lawsuit from Goldner;

6.  induced Megacap's original third partner to call Blatt's mother and relay extortive threats against Blatt, including to "put him in jail" if Blatt did not acquiesce to their demands; and

7.  repeatedly and persistently harassed, defamed, threatened, extorted, and 'sextorted' Blatt.

(*See* **Exhibits B** and **C** attached).

Goldner's threatening messages to current and potential Limited Partners have irreparably damaged, and continue to risk damage to, the Company's ability to attract additional investment through its network of existing Limited Partners (and thus to repay its creditors), who are all now concerned about the safety of their investments. As referrals have been the Company's primary source of fundraising, given that its offerings, including that for the Portfolio-Company, have primarily been under Regulation D 506(b), which does not allow for general solicitation, Goldner's actions have caused, and continue to cause, irreparable harm to the Company.

They are also egregious breaches of, among other provisions, the Company's dispute resolution terms, which exist precisely to protect the Company from the type of harm which Goldner is both threatening and actively causing for his own personal benefit at the expense of the Company and the interests of its Limited Partners. Goldner, per the terms of the Agreement, must take up any grievances with Megacap or Blatt in relation to Megacap, including his withdrawal, via private and confidential mediation and arbitration in order to protect the Company and its partners from harm. Instead, Goldner has initiated a very non-private, non-confidential campaign of harassment, threats and extortion against the Company, its partners, vendors, and Limited Partners that has already irreparably harmed the Company and has the potential to cause it and its Limited Partners catastrophic and irreparable harm if he is not stopped.

**The Agreement Explicitly Allows Members to Seek Injunctive Relief.**

Section 81 of the Agreement contains provisions allowing Members to seek equitable relief via an injunction where there is no adequate remedy of law and there is immediate risk to the Company, both of which are present given Goldner's threats against the Company as well as its vendors and Limited Partners. Pursuant to these provisions and the duly executed and valid consent resolutions passed by the Company (*See* Exhibit A), Blatt, representing the only Class A Membership interests in the Company, seeks immediate relief from the Court to prevent further harm to Blatt via harm to Megacap and its Limited Partners by enjoining Goldner from engaging in any actions that violate the Agreement or threaten the Company's interests.

Blatt further seeks immediate relief from the Court to prevent Goldner from filing erroneous or potentially fraudulent tax returns for GB1 and to prevent him from fraudulently conveying any Assets during the course of the current litigation.

## LEGAL ARGUMENT

### A.    Standard on a Motion for Temporary Injunction.

In Florida, "[t]o be entitled to a temporary injunction, the movant must show the following elements: (1) irreparable harm; (2) lack of an adequate remedy at law; (3) a substantial likelihood of success on the merits; and (4) that temporary injunctive relief will serve the public interest. *Mapei Corp. v. J.M. Field Mktg.*, 295 So. 3d 1193, 1198 (Fla. 4th DCA 2020) (citing *Donoho v. Allen-Rosner*, 254 So. 3d 472, 474 (Fla. 4th DCA 2018)). The movant must also show a clear legal right to the injunction. *McKeegan v. Ernst*, 84 So. 3d 1229, 1230 (Fla. 4th DCA 2012).

"[T]he purpose of a temporary injunction is to preserve the status quo until full relief can be granted following a final hearing." *Int'l Vill. Ass'n v. Schaaffee*, 786 So. 2d 656, 658 (Fla. 4th DCA

2001) (citing *Tamiami Trail Tours, Inc. v. Greyhound Lines, Inc.*, 212 So. 2d 365, 366 (Fla. 4th DCA 1968)); *see also Planned Parenthood of Greater Orlando, Inc. v. MMB Props.*, 211 So. 3d 918, 924 (Fla. 2017) ("As this Court acknowledged long ago, the purpose of a temporary injunction is to preserve the status quo while final injunctive relief is sought.").

"The controlling reason for the very existence of the power to grant a temporary injunction is that the court may thereby prevent a threatened or continuous irremediable injury which might otherwise occur before the plaintiff's claim could be thoroughly investigated." *Adoption Hot Line, Inc. v. State, Dept. of Health & Rehab. Services, Dist. XI ex rel. Rothman*, 385 So. 2d 682, 684 (Fla. 3d DCA 1980) (citing *Tamiami Trail Tours, Inc.*, 212 So. 2d at 365; *Murphy v. Daytona Beach Human Society, Inc.*, 176 So. 2d 922 (Fla. 1st DCA 1965)).

As demonstrated below, each of the foregoing elements are present, entitling Plaintiff to a preliminary injunction as a matter of law.

### B.   Plaintiff Will Suffer Irreparable Harm.

Plaintiff, both directly and via his interests in Megacap, will suffer irreparable harm if Goldner continues to put the Company at risk by threatening partners, extorting Blatt, acting as if he was not withdrawn from the company, and, most critically, if he takes actions that make confidential company information public, notably the names of the Seller, Employee, and Portfolio-Company, as he has repeatedly threatened to do, in breach of the Agreement. As demonstrated above, Blatt and Megacap have already suffered irreparable harm, and there is a reasonable probability that additional harm will occur unless this Court grants immediate injunctive relief. It is clear the actual and threatened injury to Blatt, Megacap, and its Limited Partners strongly outweighs any potential harm to Goldner if the temporary injunction is granted.

**C.       There is No Adequate Remedy at Law.**

Furthermore, Plaintiff has no adequate remedy at law, since monetary damages will not be able to compensate Blatt or Megacap for the reputational damage sustained from Goldner's continued threats and harassment, especially should he cause the Seller to redeem the Shares, nor does Goldner have the resources to compensate Megacap and its Limited Partners in the event the Seller does so. The potential value of the damages incurred by Goldner's bad acts cannot be determined for purposes of awarding Plaintiffs money damages, as the value to Megacap cannot be fully determined until the IPO of the Portfolio-Company, at which time the carried interest due to Megacap from the Limited Partners can be calculated. Based on the foregoing, an injunction requiring Goldner to cease and desist is reasonably necessary to protect Blatt, Megacap, and its Limited Partners from further harm.

**D.       Plaintiff Has a Substantial Likelihood of Success on the Merits.**

To grant temporary injunctive relief, the Court must estimate the likelihood of Plaintiff prevailing on the merits. *Gold Coast Chemical Corp. v. Goldberg,* 668 So. 2d 326, 327 (Fla. 4th DCA 1996). A substantial likelihood of success on the merits is shown if good reasons for anticipating that result are demonstrated. *City of Jacksonville v. Naegele Outdoor Advertising Co.,* 634 So. 2d 750, 753 (Fla. 1st DCA 1994). However, the Plaintiff is not required to prove its case in full at a preliminary injunction hearing; rather, it must make a showing of likely or probably, but not certain, success at trial on *one* or more claims. *Id.*

Blatt's case against Goldner involves numerous claims that, as evidenced by the exhibits to this Motion and the Complaint, have a high likelihood of success:

**Claims related to the Assets.**

Blatt wired Goldner and Compass funds for Miners and NFTs (the "Assets"), which bank statements and the extensive communications between Blatt, Goldner and Dharma make unequivocal. Blatt has no direct visibility, control, or ownership of any kind over the assets, with Dharma having clearly stated in its Redemption Notice that it has usurped all of the Miners for which Blatt sent payment and Goldner stating via WhatsApp with regard to the NFTs, "sue me, Eli, I'm not selling", making it clear that Blatt has no ownership or control of any kind over the NFTs given they are in Goldner's personal cryptocurrency wallet. These two unequivocal facts establish a high likelihood of success of prevailing on:

- Count V, Breach of Contract and Count VI, Breach of Fiduciary Duty, as Goldner was obligated to title any assets purchased for GBI into GBI-titled accounts pursuant to the terms of the GBI Operating Agreement Section 74;

- Count VIII, Constructive Fraud, given that the end-result of the above facts is that Blatt was defrauded, regardless of any intent Goldner may or may not have had to do so;

- Counts IX and XIII, Unjust Enrichment and Disgorgement, given that the Defendants have unequivocally enjoyed exclusive access to and use of the Assets that Blatt remitted funds for, including the ability to mine bitcoin and use the NFTs to gain access to private events and chat channels for networking purposes;

- Count XIV, Conversion, given that as per Dharma's December 31, 2022 Redemption Notice, it had converted Blatt's investments for its own benefit, while Goldner took funds from Blatt intended for GBI to purchase NFTs and instead purchased them into his own wallets; and

- Count XV, Accounting, which has arguably the highest likelihood of success, since Blatt unequivocally sent funds for which he has never received any formal accounting of any kind from any of the Defendants, without which no detailed analysis of the claims can be finalized.

**Count XI, Civil Threat and Extortion.**

1. Florida Statute 836.10 provides: "Any person who writes or composes and also sends or procures the sending of any letter, inscribed communication, or electronic communication, whether such letter or communication be signed or anonymous, to any person, containing

a threat to kill or to do bodily injury to the person to whom such letter or communication is sent, or a threat to kill or do bodily injury to any member of the family of the person to whom such letter or communication is sent commits a felony of the second degree."

2.  Florida Statute 836.05, for which civil suits can be brought under Florida 772, does not require the perpetrator to directly threaten harm themselves. Transmitting or communicating a threat to injure or harm someone else can be sufficient for charges under this statute. *See Ventura v. State*, 29 So. 3d 1086 (Fla. 2010) (sending an email threatening to arrange for someone else to murder the recipient constituted a violation of 836.05).

3.  Goldner's electronic communications to Blatt unequivocally transmitted explicit threats against Blatt and Blatt's families lives if Blatt did not sign an Agreement Goldner was pressuring him to sign. Blatt clearly instructed Goldner to cease transmission of the threats, and that in the absence of any evidence to the contrary he deemed the threats as coming from Goldner, which did not deter Goldner from continuing to transmit the threats. Under Florida Statute 836.10 and 836.05, it is irrelevant whether Goldner in his communications made the threats on his own behalf or allegedly on behalf of a third party. The simple transmission of the threat itself is a violation of Florida Statute 836.10 and the threat being tied to pressuring Blatt to sign the agreement a violation of Florida Statute 836.05.

Blatt is all but certain to prevail on these counts for the reasons detailed above. Florida courts have repeatedly issued injunctions based on a substantial likelihood of success on one count, even where other claims may not rise to that level of potential success early in the litigation, thus showing one key claim to supports the injunction can be sufficient. As detailed, Plaintiff is likely to succeed on one or more counts. Accordingly, the Court should grant immediate injunctive relief.

### E.    Temporary Injunctive Relief Will Serve the Public Interest.

Granting a temporary injunction in favor of Plaintiff advances the public's interest by ensuring that Florida citizens are protected from the type of threats and harassment Goldner has been engaging in. Additionally, failure to protect Megacap's Limited Partners from further tortious interference and explicit threats from Goldner could result in the redemption by the Seller of the interests in the Portfolio-Company or by the Portfolio-Company of the Employee's shares, irreparably harming Megacap's Limited Partners. This would in turn damage the confidence of all Florida citizens in the security of not only their pre-IPO investments but all private and

alternative investments in general. Accordingly, the public interest weighs strongly in favor of granting the temporary injunction.

### F.       This Court Should Set a Bond for an Appropriate Amount.

A party moving for a temporary injunction shall post a bond "in an amount the court deems proper, conditioned for the payment of costs and damages sustained by the adverse party if the adverse party is wrongfully enjoined." Fla. R. Civ. P. 1.610(b). "Before setting a bond, a trial court must have some basis for exercising its discretion in determining the amount of the bond." *AOT, Inc. v. Hampshire Management Co.*, 653 So. 2d 476, 478 (Fla. 3d DCA 1995). "The purpose of the bond required as a condition to issuance of a temporary injunction is to provide a sufficient fund to cover the adverse party's costs and damages if the injunction is wrongfully issued." *Montville v. Mobile Medical Industries, Inc.*, 855 So. 2d 212, 215 (Fla. 4th DCA 2003). "Since the damages recoverable for a wrongfully issued injunction are ordinarily limited to the bond . . . the bond initially set by the court constitutes the court's determination of the foreseeable damages based on the good faith representations that are before it." *Id.* (internal citations omitted). "Additionally, while foreseeable damages are considered a major factor in setting a temporary injunction bond, the court is permitted to consider factors other than the anticipated damages and costs, including the adverse party's chances of overturning the temporary injunction." *Id.* at 216; *see also Cushman & Wakefield, Inc. v. Cozart*, 561 So. 2d 368, 370-71 (Fla. 2d DCA 1990) (noting that a court may consider the good faith representations of the parties, the adverse party's anticipated costs and damages, and the adverse party's chances of subsequently overturning the temporary injunction).

Here, in the event this Court grants the instant Motion and issues a temporary injunction, and Goldner can subsequently prove that the injunction was erroneously granted (which is unlikely),

Goldner would only be entitled to a reasonable amount associated with defending this Motion. No further anticipated damages will result. Given the facts of this case, Blatt submits that a nominal bond should be adequate to cover reasonable attorneys' fees and costs associated with actions taken to oppose, dissolve or overturn the injunction should it be issued.

      **WHEREFORE,** Plaintiff ELI BLATT, respectfully requests that this Honorable Court enter an order:

1. enjoining Goldner from further contacting Blatt, including through participation in any group chats that Blatt is in, as well as vendors, partners, potential partners, or Limited Partners of Megacap;

2. prohibiting Goldner from taking any actions ostensibly on behalf of Megacap, representing himself as authorized to do so, claiming he was improperly or illegally withdrawn from Megacap absent a ruling from an Arbitrator reinstating him, or otherwise representing himself to be a duly authorized representative of the Company, given that he no longer has rights to act on behalf of or otherwise represent the Company as a result of the duly executed and valid consent resolutions withdrawing him as a Class A Member (See Exhibit "A");

3. prohibiting Goldner from disclosing any confidential information regarding the Company to any individual, company, court, or regulatory body, including but not limited to the name of its suppliers, portfolio companies, Limited Partners, creditors, the former Portfolio-Company Employee whose Shares Megacap manages interests in for its Limited Partners, or the Seller thereof;

4. preventing Goldner from filing any tax returns for Goldner Blatt Investments, LLC until the conclusion of the present case and without Blatt's express written consent;

5. preventing Goldner from fraudulently conveying any of his assets, including but not limited to the Miners and any NFTs or cryptocurrencies under Defendants' control, as well as his equity interests in Dharma and any other companies in which he has equity interests;

6. any such other and further relief as this Court deems just and proper.

                          **KOPELOWITZ OSTROW**
                          **FERGUSON WEISELBERG GILBERT**
                          One West Las Olas Boulevard, Suite 500
                          Fort Lauderdale, FL 33301
                          (954) 525-4100 Telephone
                          (954) 525-4300 Facsimile
                          *Attorneys for Plaintiff*

By:    */s/ Benjamin R. Muschel*

        Benjamin R. Muschel, Esq.
        Fla. Bar No. 122701
        muschel@kolawyers.com



## OPERATING AGREEMENT OF MEGACAP CAPITAL, LLC

This **OPERATING AGREEMENT** (the "**Agreement**") made and entered into this 7 day of July 2021 (the "**Effective Date**") by and among **MEGACAP CAPITAL LLC**, a Delaware Series Limited Liability Company (the "**Company**") and the following persons (each, a "**Member**," and, collectively the "**Members**"):

ELI M BLATT
MARC GOLDNER
RODERYCK REITER

### BACKGROUND:

A. The Members wish to associate themselves as members of a limited liability company.

B. The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

### Formation

1. By this Agreement, the Members form a Series Limited Liability Company (the "**Company**") in accordance with the laws of the State of Delaware. The rights and obligations of the Members will be as stated in the Delaware Limited Liability Company Act (the "**Act**") except as otherwise provided in this Agreement.

### Name

2. The name of the Company will be **MEGACAP CAPITAL, LLC**.

### Purpose

3. Investing and Finance

### Term

4. The Company will continue until terminated as provided in this Agreement or in the Act.

### Place of Business

5. The Company's principal place of business will be located at:
   A Registered Agent, Inc.
   ATTN: MegaCap Capital, LLC.

8 The Green Street
Suite A
Dover, Delaware 19901

## Units and Capital Contributions

6. The Company shall be authorized to issue one million (**1,000,000**) units of membership interest in the Company (each, a "**Unit,**" collectively, "**Units**"), of which 900,000 units are hereby issued ("**Issued Units**") as per Section 8. These units constitute units of the "Master Series". The Company may authorize the issuance of additional Units with the prior written consent of all of the Class A Voting Members. As per Section 16, additional Series may be authorized each with its own Membership Units. The remainder of this agreement concerns the Master Series of the Company, however all provisions shall apply to any additional Series authorized unless otherwise approved by a supermajority vote of the Class A Members of the Master Series.

7. Units shall be divided into two classes: (a) "**Class A Voting Members,**" and (b) "**Class B Non-Voting Members.**" Each class will have distinct rights and obligations as follows:

| Member Class | Rights and Obligations |
|---|---|
| Class A | Class A Voting Members have full voting rights. |
| Class B | Class B Non-Voting Members have no voting rights. |

8. The following is a list of the initial Members (the "**Initial Members**") of the Company and Units of membership interest of the Company:

| Member | Class and Units Issued |
|---|---|
| Eli M Blatt | 333,000 Class A Units (37% of all Issued Units) |
| Marc Goldner | 234,000 Class A Units (26% of all Issued Units) |
| Roderyck Reiter | 333,000 Class A Units (37% of all Issued Units) |

9. The following is a list Initial Members of the Company and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution | Value |
|---|---|---|
| Eli M Blatt | Cash | $1,000.00 |
| Marc Goldner | Cash | $1,000.00 |
| Roderyck Reiter | Cash | $1,000.00 |

## Independent Contractor Agreement; Redemption Agreement

10. All Members receiving shares in exchange for services to the Company shall be required to execute. that certain Stock Redemption Agreement, a copy of which is attached hereto as **Exhibit A**. All

Members shall be required to execute that certain Confidentiality Agreement, a copy of which is attached hereto as **Exhibit B.** In addition to the foregoing, any and all owners, principals, officers, directors, managers, members, or affiliates of each Member (each, along with the Members, a "**Member Affiliate**") shall also execute the Confidentiality Agreement.

11. The Company may enforce its rights under the Redemption Agreement at any time if (a) any Member is in material breach of this Agreement and/or the Confidentiality Agreement; (b) commits any of the forbidden acts delineated in Section 68-72; (c) violates the Duty to Devote time under Section 34; or (c) terminates this Agreement or otherwise ceases to be a member of the Company for any reason.

12. In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other. For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units).

## Allocation and Distribution of Profits/Losses

13. Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will be allocated between all Class A Members in accordance with their percentage interest in the Company or individual Series as determined by their respective percentage of Issued Units therein. For the Initial Members in the Master Series, Net Profits and Losses shall be allocated in the following manner:

| Member | Profit and Loss Percentage |
|---|---|
| Eli M Blatt | 37% |
| Marc Goldner | 26% |
| Roderyck Reiter | 37% |

14. Cash Distributions to Class A Members will be made in the same fixed proportions as the allocation of Net Profits or Losses described above. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

15. The Company shall make distributions of profit monthly, retaining an operating account reserve as agreed by a supermajority vote of Class A Members.

16. Series Interests and Series.

      (a)      The Members shall cause the Company to issue Interests in one or more separate and distinct series (each, a "Series"), with each such Series established to make separate

Investment or portfolio of Investments. The Members may establish Series for the purpose of (1) making Investments in specific and distinct companies identified by the Members, (2) to purchase securities in such companies from secondary sources, or (3) to invest in interests of investment funds, special purpose vehicles or other Entities consistent with the Company's investment focus, which such Series will be segregated from each other. The Members may use its commercially reasonable efforts to have securities purchased by a particular Series be issued for the benefit of such particular Series to which they are allocated. Members of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to share in the profits, losses, allocations or distributions of any other Series of which they are not a Member.

(b)     Each Series so established shall be set forth on Schedule A to this Agreement, and Schedule A will be updated by the Managers from time to time in connection with the establishment of one or more additional Series. Subject to such limitations as may be set forth in this Agreement, the Members shall establish and may modify the investment objective and policies of each Series and all other rights and features thereof.

(c)     Interests of each Series shall have the following relative rights and preferences:

(i)     Assets Held with Respect to a Particular Series. All Capital Contributions made to the Company with respect to a particular Series, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Series for all purposes, subject only to the rights of creditors of such Series, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Series, are herein referred to as "assets held with respect to" that Series. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Series (collectively "General Assets"), the Members shall allocate such General Assets to, between or among any one or more of the Series' in such manner and on such basis as the Members, in its sole discretion, deems fair and equitable, and any General Assets so allocated to a particular Series shall be assets held with respect to that Series. Each such allocation by the Members shall be conclusive and binding upon Members of all Series for all purposes.

(ii)     Liabilities Attributable to a Particular Series. The assets of the Company held with respect to each particular Series shall be charged with all liabilities, expenses, costs, charges and reserves attributable to that Series. All such liabilities, expenses, costs, charges, and reserves so charged to a Series are herein referred to as "liabilities attributable to" that Series. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Series ("General Liabilities") shall be allocated and charged by the Manager to, between or among any one or more of the Series in such manner and on such basis as the Members, in their sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Series shall be liabilities attributable to that Series. Each such allocation of liabilities, expenses, costs, charges and reserves by the Members shall be conclusive and binding upon Members of all

Series for all purposes. The liabilities attributable to any Series shall be enforceable against the assets of such Series only, and not against the General Assets, or the assets of any other Series. All Persons, including any Affiliates of the Members, who have extended credit that has been allocated to a particular Series, or who have a claim or contract that has been allocated to any particular Series, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Series for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship.

## Withdrawal of Contribution

17. No Member will withdraw any portion of their Capital Contribution without the supermajority consent of the Class A Voting Members.

## Liability for Contribution

18. A Member's obligation to make their required Capital Contribution can only be compromised or released with the consent of all Class A Voting Members or as otherwise provided in this Agreement. If a Member does not make the Capital Contribution when it is due, he is obligated at the option of the Class A Voting Members voting as a separate class, to contribute cash equal to the agreed value of the Capital Contribution. This option is in addition to and not in lieu of any other rights, including the right to specific performance that the Company may have against such Member.

## Additional Contributions

19. Capital Contributions may be amended from time to time, according to the business needs of the Company by supermajority vote of the Class A Voting Members.

20. Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by the Class A Voting Members, voting as a separate class. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

## Capital Accounts

21. An individual capital account (the "**Capital Account**") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

## Interest on Capital

22. No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

## Management

23. The Class A Voting Members shall have the sole authority to appoint a manager of the Company (individually the "**Manager**" and collectively the "**Managers**"). Management of the Company is vested in the following Managers until such time as they are removed by the Class A Voting Members or withdraw from the position:

   A. Eli M Blatt, Managing Partner
   B. Marc Goldner, Managing Partner
   C. Roderyck Reiter, Managing Partner

24. The duties and responsibilities of the Managers will include the following:

   ● Managers will supervise the day-to-day operations of the Company including supervising sales and production staff and maintaining financial accounts.

25. Notwithstanding any other provisions contained in the Certificate of Formation or this Agreement, each of the Managers is empowered to bind the Company for any and all decisions except Major Decisions. A supermajority vote of the Class A Voting Members shall be required for all Major Decisions, except where a unanimous vote is expressly called for. Such votes may be accomplished via electronic mail, What's App, or any other written medium upon which the Class A Voting Members unanimously agree. For purposes of this Agreement, "**Major Decisions**" are the following:

   A. Incur debt, expend funds, write checks, pay bills, or enter into contracts, or otherwise obligate the Company for any amount in excess of $1,500.
   B. Negotiate or agree to an accounts payables/receivables payment schedule.
   C. Establish credit lines and the use of such credit lines.
   D. The sale or dissolution of the Company or its assets.
   E. Issuance of additional member or shareholder interests, which shall require a unanimous vote and be signed in writing by all Class A Members.
   F. Approval of a member or shareholder buy-sell agreement, approval of which shall not be unreasonably withheld.
   G. Scheduling repayment of any capital contributions from any Member.
   H. Selling, leasing, or encumbering any property owned by the Company.
   I. Scheduling repayment of any loans from Members.
   J. Changing or amending this Agreement or approving any action or resolution that would alter the terms of this Agreement, which shall require a unanimous vote and be signed in writing by all Class A Members.
   K. Appointment or removal of a Manager which shall require a unanimous vote and be signed in writing by all Class A Members excluding the Member being removed.
   L. Addition, withdrawal, appointment, or removal of a Member, which shall require a unanimous vote and be signed in writing by all Class A Members (unless the Member being removed is a

  Class A Member, in which case the unanimous vote of the remaining Class A Members is required.

M. Amending the duties and responsibilities of any Manager.

N. Any changes to the Company Name, branding imagery, and public relations positioning.

O. Adjustments to the compensation of any Member, Manager, Employee, or contractor.

P. Payment of any distributions or other compensation to any Member beyond the monthly Distributions required in Section 15.

Q. Registering the company with any regulatory or governmental agency.

R. Creation of an additional Series within the MegaCap umbrella, which shall require a unanimous vote and be signed in writing by all Class A Members. For avoidance of doubt, any Series created for any entities such as additional SPVs or for any purpose defined in Section 16(a) for MegaCap will be approved by all Class A Members in writing.

S. Each Series equity percentage shall require a unanimous vote and be signed in writing by all Class A Members.

T. Each Series investment objective and policies will be defined by the Managers and shall be unanimously approved by all Class A Members signed in writing.

U. No manager shall move any "General Assets" to any Series without unanimous approval by all Class A Members.

V. No Class A Members shall take on personal liability or personal obligations of MegaCap unless expressly approved and unanimously approved by all Class A Voting Members.

26. A new Manager may be added to the Company with a supermajority vote of the Class A Voting Members.

27. A Manager will be reimbursed for reasonable expenses directly related to the operation of the Company and approved, in advance, by a supermajority of the Class A Voting Members (voting as a separate class).

28. The Members will be consulted and the advice and opinions of the Members will be obtained as much as is practicable. However, subject to Section 25 above, the Managers will have management and control of the day-to-day business of the Company for the purposes stated in this Agreement. All matters outside the day-to-day business of the Company will be decided by the Class A Voting Members (voting as a separate class) as outlined elsewhere in this Agreement.

  A. In determining and selecting which manufacturing hardware partner and software partner to use for operations, only a simple majority vote of 51% will be required between the Members.

29. In addition to day-to-day management tasks and any other duties and responsibilities already identified in this Agreement, the Managers' duties will include keeping, or causing to be kept, full and accurate business records for the Company according to generally accepted accounting principles (GAAP), and overseeing the preparation of any reports considered reasonably necessary to keep the Class A Voting Members informed of the business performance of the Company.

30. A Manager will not be liable to the Members for any action or failure to act resulting in loss or harm to the Company except in the case of gross negligence or willful misconduct.

31. Each Member will devote such time and attention to the business of the Company as required to carry out their duties and responsibilities for the conduct of the Company's business.

## Authority to Bind Company

32. Only the Manager(s) have the authority to enter into contracts on behalf of the Company.

## Duty of Loyalty

33. While a person is a Member or Manager of the Company, and for a period of at least two years after that person ceases to be a Member or Manager, that person will not carry on, or participate in, a business involved in the issuance or transacting of securities in any market regions that were established or contemplated by the Company before or during that person's tenure as Member or Manager.

## Duty to Devote Time

34. Each Member will devote such time and attention to the business of the Company as the supermajority of the Class A Voting Members (voting as a separate class) will from time to time reasonably determine for the conduct of the Company's business. Should a Member or Members be deemed by supermajority vote of the Members voting thereon to be in violation of this provision, those Members will be subject to Involuntary Withdrawal as per Section 43.

## Member Meetings

35. A meeting may be called by any Class A Voting Member providing that reasonable written notice has been given to the other Members.

## Voting

36. Each of the Class A Voting Members shall have one vote for each Unit owned by such Class A Voting Member.

37. INTENTIONALLY LEFT BLANK

## Admission of New Members

38. A new Member may only be admitted to the Company with a supermajority vote of the Class A Voting Members.

39. No new Class A member shall be admitted as a Member of the Company until such new Member becomes a party to this Agreement, as amended, and agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to effect the admission of the new Member as determined by a supermajority vote of the Class A Members. Any new Member will receive such

business interest in the Company as determined by a supermajority consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

## Voluntary Withdrawal of a Member

40. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

41. INTENTIONALLY LEFT BLANK

## Involuntary Withdrawal of a Member

42. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; felony conviction of a Member; or a legal judgment against a Member (excluding any judgment resulting from any litigation relating to Marc Goldner) that is pending as of the effective date hereof) that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member has engaged in conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member, including not devoting time to the Company as required per Section 34.

43. The involuntary withdrawal of a Member will have no effect upon the continuance of the Company.

## Dissociation of a Member

44. In the event of either a voluntary or involuntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.

45. A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

46. Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 60 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company.

NOT A CERTIFIED COPY

## Sale, Transfer, or Assignment of a Member's Interest; Drag-Along

47. No Member may sell, transfer or assign any of such Member's Interest, including, but not limited to, any Units owned by such Member, without the supermajority written consent of the Class A Voting Members. Where a Member's financial interest in the Company is assigned to another party who is not an existing Member, that party will be considered a New Member. An assignment of full membership status inclusive of all duties, obligations, and rights held by the previous Member will be governed by the conditions described under the Admission of New Members section of this Agreement.

48. **Drag-Along Rights.** In the event that the Class A Voting Members receive a bona fide offer from an independent third party purchaser to purchase (including by merger) all of the outstanding Units or all or a substantial portion of the assets of the Company, the Class A Voting Members may send written notice (the **"Drag-Along Notice"**) to the Company and the remaining Class B Members (the **"Class B Members"**) notifying them they will be required to sell all of their Units in such sale. Upon receipt of a Drag-Along Notice, each Class B Member receiving such notice shall be obligated to (a) sell all of the Class B Member's Units contemplated by the Drag-Along Notice on the same terms and conditions as the Class A Voting Members; and (b) otherwise take all necessary action to cause the consummation of such transaction. Each Class B Member further agrees to (a) take all actions (including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by the Class A Members; (b) waive all applicable appraisal rights, if any, under the laws of the State of Delaware; and (c) appoint the Class A Members as the Class B Member's attorney-in-fact to do the same on its behalf. Notwithstanding the foregoing, no Class B Member may sell or assign such Member's Units, in whole or in part, under this Section without the express prior written approval and consent of a Supermajority of Class A Voting Members.

## Right of First Purchase

49. In the event that a Member's Interest in the Company is or will be sold, due to any reason other than as said forth in section 48 above, the remaining Members will have a right of first purchase of that Member's Interest. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

50. In the event that a Member's interest in the company is transferred or assigned as the result of a court order or operation of law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

## Valuation of Interest

51. In the event of a sale of all or substantially all of the Units and/or assets of the Company, a Member's financial interest in the Company will be based in the percentage of Units owned in proportion to all of the issued and outstanding Units of the Company at the time of such sale.

52. In the absence of a written agreement setting a value, the value of the Company will be based on an appraisal of the fair market value of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members to be retained within a reasonable period of the event giving rise to the disposition of a Member's interest. The results of the appraisal will be binding on all Members. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member.

53. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

## Dissolution

54. The Company may be dissolved by a unanimous vote of the Class A Voting Members. The Company will also be dissolved on the occurrence of events specified in the Act.

55. Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

    A. First, in satisfaction of liabilities to creditors except Company obligations to current Members;

    B. Second, in satisfaction of Company debt obligations to current Members;

    C. Third, to the Class A Members up to the amount of their Capital Contributions;

    D. Fourth, to the Class B Members up to the amount of their Capital Contributions; and

    E. Finally, to all of the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement.

## Records

56. The Company will at all times maintain accurate records of the following:

    A. Information regarding the status of the business and the financial condition of the Company.

    B. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.

    C. Name and last known business, residential, or mailing address of each Member and Manager, as well as the date that person became a Member or Manager.

    D.  A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement and any amendments have been executed.

    E.  The cash, property, and services contributed to the Company by each Member, along with a description and value thereof.

57. Each of the Class A Voting Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

58. Each Manager has the right to examine the above documents for any purpose reasonably related to their position as Manager of the Company.

## Books of Account

59. Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any of the Class A Voting Members. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

## Banking and Company Funds

60. The funds of the Company will be placed in such investments and banking accounts as will be designated by the unanimous vote of all Class A Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by supermajority consent of the Class A Voting Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

## Audit

61. Any of the Class A Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Company. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Class A Voting Members for any fiscal year.

## Tax Treatment

62. The Company is intended to be treated as an S-Corp for the purposes of Federal and State Income Tax.

## Annual Report

63. As soon as practicable after the close of each fiscal year, the Company will furnish to each Class A Voting Member an annual report showing a full and complete account of the condition of the Company

including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

A.  A copy of the Company's federal income tax returns for that fiscal year.

B.  Income statement.

C.  Balance sheet.

D.  Cash flow statement.

E.  A breakdown of the profit and loss attributable to each Member.

## Goodwill

64.  The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## Governing Law

65.  INTENTIONALLY LEFT BLANK

## Force Majeure

66.  A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to an event of force majeure, such as earthquake, typhoon, flood, fire, pandemic, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

## Forbidden Acts

67.  No Member may do any act in contravention of this Agreement or prevailing law.

68.  No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company.

69.  No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

70.  No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

71. No Member may confess a judgment against the Company.

72. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

## Indemnification

73. All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature whatsoever, arising out of a Member's participation in Company affairs pursuant to this Agreement. A Member will not be entitled to indemnification under this section for liability arising out of negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

## Liability

74. A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

## Liability Insurance

75. The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

## Life Insurance

76. The Company will not have the right to acquire life insurance on the lives of any or all of the Members.

## Amendment of this Agreement

77. No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all of the Class A Voting Members.

## Title to Company Property

78. Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member.

79. A breach of the Confidentiality Agreement

## Dispute Resolution

80. <u>Dispute Resolution</u>.   Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this <u>Section</u>. The initiation and pendency of the procedures under this <u>Section</u> does not relieve the Parties from their respective obligations under the Agreement.  ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS <u>SECTION</u> SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

A. Negotiations by and between the Parties.

(1) Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail.  Within ten (10) days after receiving such notice, the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

(2) Upon the Disputing Party's receipt of the Responding Parties' response, the Parties shall then have thirty (30) days, or such other time as they may mutually agree upon in writing, to resolve the Dispute amongst themselves.

B. Mediation

If the Parties are not able to resolve a Dispute pursuant to subsection (A) above, they agree to participate in at least ten (10) hours of good faith mediation administered by the American Arbitration Association under its Commercial Mediation Procedures.

C. If the Parties are not able to resolve a Dispute pursuant to subsections (A) and (B) above, the Dispute shall finally be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association.   Nothing herein shall limit the right of any Party to seek interim or provisional equitable relief in a court of competent jurisdiction prior to or pending the       conclusion of the arbitration.  Any Arbitration shall take place virtually  unless the parties agree on a physical location.  The arbitrator shall apply the law of the State of Delaware without regard to conflicts of law principles.   No demand for arbitration may be made after the date when the institution of legal or equitable proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

81.   <u>Equitable Remedies</u>.  The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights

and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement. The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware. For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of *forum non conveniens*.

82. Prevailing Party. In the event that any Dispute between the Company and the Members or among the Members arising out of or related to this Agreement results in any formal proceedings, the prevailing party as determined by the arbiter or court of competent jurisdiction, as the case may be, shall be entitled to recover from the non-prevailing parties all reasonable fees, costs and expenses of enforcing any right of such prevailing party including, without limitation, reasonable attorneys' fees and expenses, including appeal costs, all of which shall be deemed to have accrued upon the commencement of such formal proceeding and shall be paid whether or not such formal proceeding is prosecuted to judgment. The "prevailing party" for purposes of this Section shall be the party who, in the arbitrator or judge's discretion, prevails on substantially all the merits in the Dispute, irrespective of the actual number of claims or counterclaims actually won or defeated. Any award, judgment or order entered in such formal proceeding shall contain a specific written statement of findings with respect to the prevailing party's recovery of fees and costs as contemplated under this Section, and shall include an award of pre-award or prejudgment interest running from the date of the breach at the maximum rate of interest allowed by applicable law.

83. Waiver of Certain Rights. AS A MATERIAL INDUCEMENT TO EACH MEMBER TO ENTER INTO THIS AGREEMENT, EACH MEMBER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO MAINTAIN ANY ACTION FOR DISSOLUTION OF THE COMPANY OR FOR PARTITION OF PROPERTY UNDER THE ACT. IN ADDITION, THE MEMBERS AGREE THAT THIS AGREEMENT HAS BEEN CAREFULLY DRAFTED TO PROVIDE FAIR TREATMENT OF ALL MEMBERS AND PARTICULARLY IN RESPECT OF EQUITABLE PAYMENT IN LIQUIDATION TO HOLDERS OF ECONOMIC INTERESTS. ACCORDINGLY, EXCEPT WHERE AND ONLY IF THE MANAGER OR LIQUIDATOR, AS THE CASE MAY BE, HAS FAILED TO LIQUIDATE THE COMPANY IN A REASONABLY TIMELY MANNER AS REQUIRED UNDER THIS AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES AND RENOUNCES ITS RIGHT TO INITIATE A LEGAL ACTION OR OTHER CLAIM TO SEEK THE APPOINTMENT OF A RECEIVER OR TRUSTEE TO LIQUIDATE THE COMPANY.

84. No Waiver. A Person's waiver of or consent to, express or implied, any breach or default by any Person as to the performance by such Person's obligations with respect to the Company, shall not constitute a waiver of or consent to any other breach or default by such other Person of the same or any other obligations with respect to the Company. Failure on the part of a Person to complain, provide notice of, or object to any action or inaction of any Person, or to declare any Person in breach or default with respect to the Company, irrespective of how long such failure continues, shall not constitute a waiver by such Person of its rights with respect to such breach or default, until the applicable statute of limitations period has run.

85. <u>Binding Effect</u>.  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective Personal Representatives, successors and permitted assigns.

86. <u>Parties in Interest</u>.  Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective Personal Representatives, successors and permitted assigns, and nothing in this Agreement shall be construed to relieve or discharge the obligation or liability of any Person to any party to this Agreement, or to provide any Person any right of subrogation or action over or against any party to this Agreement.

87. <u>Prevailing Terms</u>.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

88. <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect.  The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances.

89. <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

90. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties hereto had signed the same document.  All counterparts shall be construed together and constitute the same instrument.  Signatures by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory and shall be deemed to be originals for all purposes.  The Members acknowledge and agree that it may be executed electronically, and that the provisions of the Electronic Signatures in Global and National Commerce Act of 2000, 15 U.S.C. 7001 et al, as amended and in effect as of the Effective Date of this Agreement, shall apply.

91. <u>Acknowledgment of Provisions</u>.   BY EXECUTING THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES THAT IT HAS ACTUAL NOTICE OF: (A) ALL OF THE PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTERESTS; AND (B) ALL OF THE PROVISIONS OF THE ARTICLES.  EACH MEMBER HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES ADEQUATE NOTICE OF ALL SUCH PROVISIONS, AND EACH MEMBER HEREBY WAIVES ANY REQUIREMENT THAT ANY FURTHER NOTICE REQUIRED BY ANY PROVISION OF THE ACT OR APPLICABLE LAW.

## Miscellaneous

92. Time is of the essence in this Agreement.

93. Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

94. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

95. This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matter hereof, and may not be modified or amended except by a written instrument executed by or on behalf of authorized representatives each of Party to this Agreement.

96. All notices or other communications relating to the performance, enforcement, or other legal aspects of this Security Agreement will be in writing and may be personally delivered, sent by overnight courier service to all parties, and delivered as a .pdf e-mail attachment to all parties. Any other communications between the parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to all parties.

97. All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

## Definitions

98. For the purpose of this Agreement, the following terms are defined as follows:

    A. "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

    B. "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

    C. "Distributions" means a payment of Company profits to the Members.

    D. "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

E. "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, Member's rights to participate in the management of the Company, and any Units of membership interest in the Company owned by such Member.

F. "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

G. "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

H. "Principal Office" means the office whether inside or outside the State of Delaware where the executive or management of the Company maintain their primary office.

I. "Voting Members" means the Members who belong to a membership class that has voting power.

J. "Supermajority Vote" means a vote by Members representing no less than 60% of the Class A Voting Units.

**SIGNED, SEALED, AND DELIVERED**

**ELI M BLATT**

By:_____

**MARC GOLDNER**

By:_____

**RODERYCK REITER**

By:_____

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 20 of 20*

## EXHIBITS

Exhibit A      Redemption Agreement
Exhibit B      Confidentiality Agreement

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Eli Blatt _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1. Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

### 2. Use of Confidential Information; Non-Disclosure Obligations

2.1.    Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.    The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.    The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate.  Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof.  All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution.  In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.  The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof.  This Agreement may only be modified or amended in a writing signed by the Parties.  No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

**13.**   **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

**14.**   **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

**15.**   **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:       2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:       team@megacap.capital

If to  Eli Blatt  :

    Address:       2020 N Bayshore Dr #2310 Miami FL 33137

    E-Mail:       e@megacap.capital

**16.**   **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                              **THE RECEIVING PARTY**

By: _____              _____

Name: Eli M Blatt                                       Name:  Eli Blatt

Title:  Managing Member

Date: Jul 08 2021                                        Date:  Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of _____, (the "**Effective Date**") by and between **Eli M Blatt** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").   Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>333,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.    **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

      a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.    **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.    **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

MEGACAP CAPITAL, LLC
*Redemption Agreement*
Page 2 of 4

3.     **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.     **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.     **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.     **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.     **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.     **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.     **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.     **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

MEMBER:

Individual

By: Eli Blatt

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By:

Name: Eli M Blatt

Title: Manager

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Eli M Blatt** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Marc Goldner _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2. **Use of Confidential Information; Non-Disclosure Obligations**

2.1. Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2. The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3. The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

NOT A CERTIFIED COPY

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL) any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7. <u>**Remedies**</u>

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8. <u>**Governing Law, Submission to Jurisdiction, and Consent to Suit**</u>

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9. <u>**Entire Agreement**</u>

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10. <u>**Counterparts**</u>

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11. <u>**Severability**</u>

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12. <u>**Relationship of The Parties**</u>

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

**13.    Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

**14.    Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

**15.    Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

Address:         2020 N Bayshore Dr. Apt 2310, Miami FL 33137

E-Mail:          team@megacap.capital

If to  Marc Goldner                                :

Address:      15 Peacock Drive, Roslyn, NY 11576

E-Mail:       m@megacap.capital

**16.    Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

MEGACAP CAPITAL LLC                          THE RECEIVING PARTY

By: _____                 _____

Name: Eli M Blatt                            Name:  Marc Goldner

Title:  Managing Member

Date: Jul 08 2021                            Date: Jul 08 2021

4

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ___Jul 08 2021___, (the "**Effective Date**") by and between **Marc Goldner** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").  Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member 234,000 units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1. **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

    a. For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2. **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2. **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3.    **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.    **Member's Obligations**.

4.1    Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2    At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3    The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.    **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.    **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.    **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.    **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.    **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.     **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees), regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

MEMBER:

*Marc Goldner*

Individual and Managing Partner of MegaCap Capital, LLC.

By: Marc Goldner

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____

Name: Eli M Blatt

Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Marc Goldner** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 234,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Roderyck Reiter _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1.   Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

### 2.   Use of Confidential Information; Non-Disclosure Obligations

2.1.   Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.   The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.   The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

**13.  Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

**14.  Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

**15.  Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:    2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:    team@megacap.capital

If to Roderyck Reiter    :

    Address:    4661 NW 2nd Ave APT 603, Boca Raton, FL 33431

    E-Mail:    r@megacap.capital

**16.  Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**          **THE RECEIVING PARTY**

By: _____      _____

Name: Eli M Blatt          Name: Roderyck Reiter

Title:  Managing Member

Date: Jul 08 2021          Date: Jul 08 2021

NOT A CERTIFIED COPY

4

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ___Jul 08 2021___ , (the "**Effective Date**") by and between **Roderyk Reiter** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").  Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member 333,000 units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.      **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

   a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.      **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.      **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3.      **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.      **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.      **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.      **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.      **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.      **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.      **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 3 of 4

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.    **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

MEMBER:

_____

Individual and Managing Partner of MegaCap Capital, LLC

By: Roderyck Reiter

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Roderyk Reiter** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.0001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

# EXHIBIT

# B

Eli M Blatt
18117 Biscayne Blvd PMB 61473
Miami, FL 33160
415-341-6258


To Whom it May Concern,

The following details what I allege to be criminal actions by Marc Goldner ("Goldner"). Specifically, I believe Goldner to have committed breaches of Florida §836.10, §836.05, §815.06, §843.08, §934.03, and SB 1798.

## Summary of the Breaches

Beginning in late 2021, Goldner began pressuring me to sign an interest waiver agreement ("Interest Waiver") with a creditor of one of our companies, Megacap Capital, LLC ("Megacap"). The Interest Waiver would waive Megacap's ability to repay a note from the creditor in shares of the portfolio-company the note proceeds were used to purchase in exchange for a waiver of accruing further interest. I did not want to sign the interest waiver and rather to simply repay in shares, as I did not feel the risk of potentially waiving our ability to repay in shares and thus potentially defaulting was worth the interest we could save. In a separate matter unrelated to Megacap, I served Goldner a civil theft demand letter, notifying him that I intended to file a lawsuit if he did not return funds he had appropriated from me. Rather than accept my decision regarding the interest waiver or respond in a legitimate, civil manner to the civil theft demand, Goldner:

1. Did "transmit, or procure the sending, posting, or transmission of, a writing or other record, including an electronic record, in any manner in which it may be viewed by another person, when in such writing or record the person makes a threat to: (a) Kill or to do bodily harm to another person" by repeatedly transmitting in writing threats to me and my family's lives. This is a breach of §836.10.
2. "By a written or printed communication… maliciously threaten[ed] an injury" to me "with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will" by transmitting threats against my life if I did not cooperate in signing the interest waiver from which he stood to gain financially. This is a breach of §836.05.
3. Acknowledged previously having "Accesse[d] or cause[d] to be accessed any computer, computer system, computer network, or electronic device with knowledge that such access is unauthorized or the manner of use exceeds authorization." This is a breach of §815.06.
4. "By a written or printed communication, maliciously" threatened "to expose any secret affecting" me and "to accuse [me] of any crime or offense" "with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will" by threatening to disclose confidential information gained via unauthorized access to a computer to Defendants in civil cases I have filed in Florida if I did not cooperate in signing the interest waiver from which he stood to gain financially. This is a breach of §836.05.
5. "Endeavor[ing] to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection" by admitting to

both me and my fiance to making unauthorized recordings of us in our Miami home and threatening to disclose those recordings if we did not acquiesce to his demands and threats. This is a breach of §934.03.

6.  "By a written or printed communication… maliciously threaten[ed] … the reputation of another" and "maliciously threaten[ed] to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will" by making threats against both me and my fiance to release embarrassing audio and video he recorded without consent in order to expose us to disgrace, damage our reputations, and disparage my fiance as being unchaste if I did not stand down in my legal attempts to recoup money appropriated from me which I had commenced by serving a civil theft demand letter, which would benefit him financially if I did back down. This is a breach of §836.05

7.  Committed "violations relating to sexual cyberharassment" by "committing theft of sexually explicit images with the intent to promote such images" without my consent. This is a breach of SB 1798.

All of these actions were done after Goldner had repeatedly claimed to be affiliated with unnamed security agencies, which he first claimed in November, 2021, using his alleged academic credentials as an alleged student at Columbia's School of International and Public Affairs to bolster his claims. This is a breach of §843.08.

## Jurisdiction

I am a US Citizen and Miami-Dade resident. The suspect, Goldner is, by information and belief, a US Citizen and New York or Connecticut resident (he has illegally failed to update his address on his license and has also illegally registered his car to a UPS mailbox in Connecticut in order to avoid process servers). He has claimed on numerous occasions to be some form of operative for unnamed US security or intelligence agencies with connections to terrorists and criminals, though I believe these claims to be fabrications designed to aid him in securing influence over me. These representations, if false, are criminal offenses, as well as material facts in the context of his transmitted threats.

While Goldner's location when he committed these crimes is unknown, they were all:
1.  committed while I was in Florida or else traveling while a Florida resident;
2.  involve recordings made and files downloaded without permission while I was in Florida;
3.  relate to an agreement involving a promissory note clearly marked with Miami, Dade as the location for the agreement; and
4.  relate to companies
    a.  whose operating agreements I executed while I was in Florida,
    b.  which have had offices in Florida,
    c.  for which Goldner personally carried on business in Florida,
    d.  for which Goldner personally solicited service activities in Florida on multiple occasions.

As such, given that the crimes are all electronic in nature and Goldner's location at the time they were committed is unknown, Florida has jurisdiction over these crimes as a result of:
1.  my physical presence in the state while the crimes were committed at the time they were committed;
2.  the agreements in question being signed in and/or marked in the dateline as being in Florida;

3. my residency in Florida while temporarily traveling for crimes that were committed electronically from an unknown location; and

4. numerous provisions of Florida's long-arm statutes §48.193.

## Factual Allegations

1. Beginning in November of 2021, Goldner began making claims that he was a "Spy" for an unnamed federal agency investigating Anonymous and trying to save the world from terrorists.

   a. He made these claims both to me and my Fiance numerous times, as well as in the presence of other people, while we and/or he were in the state of Florida.

   b. He referenced these claims in an Operating Agreement for Goldner Blatt Investments, LLC by referencing his connections to "Intelligence, Espionage, Contractor, and Security contacts that either Marc knew before or will meet after the signing of this Agreement. Under no circumstance will any intelligence agents be disclosed to Eli Blatt by Marc Goldner, nor will any military (either public or private), spies, intelligence agents, military contractors" and that "Marc may conduct business- like activities for the sake of national security, by any direct government orders and/or mandates, or for any missions by any given contractor or intelligence agency". (**Exhibit A**).

   c. Goldner was intentionally vague about the exact nature of his work, though he spoke about the activities frequently, and his supposed role as a Spy eventually became known as his "Extra Curricular Activities", or "ECAs"; he has frequently bragged about how he employs vagueness in his writing in order to get away with things, which I believe includes his claims regarding his ECAs, for which there is no evidence (**Exhibit B**).

   d. These claims were in fact simply used to gain influence over me, and they also amplified the gravity of subsequent threats he made against me.

2. Beginning on a Zoom call on December 6, 2022, while I was temporarily in Philadelphia and Goldner's location was unknown, Goldner conveyed to me that supposedly me and my family's lives were in danger if we did not sign the Interest Waiver Agreement he had been pressuring me to sign.

   a. He attributed these threats to one of the Members of the creditor but refused to provide evidence of the threats.

   b. I told him to refrain from further communication of threats to me and to advise the creditor that if he wanted to threaten me to do so directly.

3. On January 26, 2023, while I was in Florida, after I had blocked him as a result of his ongoing threats, Goldner started a group chat with my mother included, with the intent of forcing an in-person meeting to further pressure me to sign the Interest Waiver agreement.

   a. In this chat (**Exhibit C**), again without providing any evidence to substantiate his transmitted threats, he referenced:

      i. "safety"

      ii. "safety risk",

      iii. "family's lives at risk"

      iv. "I don't think you understand what they will do to us. Do you think this is some kind of fucking game?"

      v. "Very scary situation"

    b. I responded: "I will not stand for any more of these threats to my safety. If you persist, you will force me to file a restraining order against you, because you are legitimately giving me cause to fear for my safety".

    c. Despite my clear warning, Goldner followed up on the same chat the next day attempting to ascertain my whereabouts and force a meeting

4. On March 18, 2023, on a WhatsApp chat, Goldner once again transmitted from an unknown location threats against my safety in regards to the Interest Waiver Agreement he was pressuring me to sign. In this chat, the following exchange took place (**Exhibit D**):

    a. Me, regarding the alleged threat, which: "With all due respect, Marc, I do not trust you and I do not take any of that at face value… the threats are not credible… but I'm none the less having to take a [sic] face value "

    b. Goldner: "you can get fucked to hell brotha"

    c. Goldner: "what do you think they're going to do to us if we repay in shares"

5. In a March 23, 2023 email to me (**Exhibit E**), in reference to his threats surrounding the Interest Waiver Agreement, Goldner states: "I do not give a flying fuck if you believe it's real or not. You need to come to terms that nothing is going to proceed until we're on the same page and that our lives aren't [sic] at risk because of your inaction and disappearance".

6. On April 4, 2023 (**Exhibit F**), in response to two follow up emails that day pressing me to sign the Interest Waiver Agreement, I told Respondent:

    a. "I am not going to commit fraud against [the Creditor], which is what you are urging me to do, by signing a document that you have already acknowledged, and I have already states [sic] would not be not valid due to the duress that you have placed me under… I am hereby again instructing you in no uncertain terms stop contacting me. I deem your continued aggressive and persistent messages to be harassment on matters I have already told you where I stand and for which your main purpose is to force me into doing things you want me to do by placing me under emotional distress. You sent me at least five long harassing and threatening messages on Sunday alone."

7. In an April 19, 2023 follow up on the same email thread (**Exhibit G**) , Goldner escalated his threats further to include direct blackmail and extortion threats against me involving files that, on information and belief, he downloaded from my Google Drive server shared with him on a temporary basis without notice or consent while I was in Florida, from where the files were shared..

    a. In the email, addressed to me, on which he copied my assistant, he states (referring to me in the third person): "I would assume the K4B.zip (K4B Litigation-20211208T040808Z-001.zip) that he sent me is also 'not confidential information' and that he has no problem with me contacting Craig, Flash, and all other parties".

    b. On information and belief, the files Goldner here references were **not** sent to him by me; they were shared with him via a Google Drive folder I shared with him to provide online access for the purpose of him providing me feedback (Goldner claims to be a Law School student) and help referring a lawyer in regards to one then-active lawsuit and two being then contemplated which have now been filed.

    c. As a result, Goldner here acknowledges exceeding authorized access to a computer nearly 1.5 years ago by downloading local copies without consent or notice, apparently in a pre-planned effort to secure information he could potentially use in the future to blackmail me, which he has now resorted to.

    d. The 'Craig' and 'Flash' parties he references are two Defendants in three different lawsuits that I have brought in Florida in cases that have absolutely nothing to do with Goldner in any way.

      i. He merely read some of my notes to refer an attorney – and then apparently made local copies of the entire folder and all files without permission which he is now using to threaten my financial interests in those cases – which involve millions of dollars in actual damages – by threatening to share them with the Defendants.

      ii. Note also that I have confidentiality agreements in place with Goldner, and some of the files he stole contain personally identifying information such as merchant data which are absolutely bound by confidentiality agreements.

    e. Regardless of how the files were obtained, Goldner's use thereof was clear extortion under Florida law.

8. Subsequent to these threats made to my life, on April 21, 2023, Goldner began writing messages in a group chat with me and my assistant (**Exhibit H**) acknowledging that he was intentionally trying to paint us as being in conflict with the creditor and and designed to suggest that I am maintaining positions against the creditor's interests, which gave me the impression that he was potentially trying to set me up with the creditor to make me the target of its Member's alleged threats – or at least to induce me to believe that while painting me as the bad guy with the creditor.

9. After receiving a civil theft demand letter from me on April 30, 2023 for $422,148.55 relating to a separate matter unrelated to Megacap, Goldner threatened in writing on May 4, 2023 in chats with Limited Partners, Creditors, and contractors of Megacap to "expose the [portfolio-company] employee's name that could [cause the Seller of the share to] revoke the shares. We'd both be bankrupted and you'd be liable for securities fraud for initiating an action on unrelated matters but trying to intertwine Megacap", and thus "having all the hard work we put into Megacap and [the portfolio-company deal] being extinguished" if I did not refrain from pursuing my legitimate and unrelated claims, which would benefit him financially both in terms of his legal costs to defend and the potential judgment against him that would likely follow (**Exhibit I**)

10. On May 4, 2023, Goldner again escalated his threats in response to the demand letter, acknowledging in harassing messages to both me and my fiance having made unauthorized recordings of us while we were in our Miami home that contain sensitive, embarrassing, and compromising information, and threatening to make those public if I did not abandon my efforts in regards to the civil theft demand letter, which would benefit him financially (**Exhibit J**).

11. In a letter dated June 29, Goldner further baselessly threatened to accuse me of committing crimes, including securities fraud and federal felonies, as well as doubling down on his threats to destroy Megacap by needlessly taking actions that would result in redemption of the shares the Company manages on behalf of its Limited Partners, if I didn't withdraw my claims against him, which would benefit him financially (**Exhibit I and Exhibit K**).

12. Goldner made all of these threats after initially stating in an email (**Exhibit L**) to me in May of 2022 while I was in Florida: "You've fucked yourself bro and if you want me as an enemy honestly you're about to see how I can be. I'll make this business the most difficult it can be. You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me." All of the threats and crimes committed outlined herein stem from this initial threat against me made while I was in Florida

In these communications and through his actions, which were transmitted and committed electronically, Goldner clearly breached Florida §836.10, §836.05, §815.06, §843.08, §934.03, and SB 1798 by:

1. Repeatedly transmitting threats against my life with the goal of pressuring me to sign an agreement from which stood to benefit financially.  While he claimed the threats were on behalf of a third party, I specifically instructed him to stop making the threats, and that if he continued to do so without providing any evidence of the allegation that the threats were on behalf of a third party, I deemed the threats to be coming from him.  This is a breach of §836.10.

2. Making these threats with the intent of getting me to take an action I did not want to take but from which he stood to benefit financially.  This is a breach of §836.05.

3. Exceeding his authorized access to my Google Drive folder to download confidential files by making local copies without notice or consent with the explicit purpose of retaining the files for potential future leverage against me. This is a breach of §815.06.

4. Threatening to expose these confidential files to Defendants in three cases I have filed in Florida if I did not agree to sign the agreements he was pressuring me to sign and from which he stood to benefit financially.  This is a breach of §836.05.

5. Threatening to destroy my business and damage the interests of the Limited Partners to whom I owe a fiduciary duty if I did not withdraw my claims against him, from which he would benefit financially, a further breach of §836.05.

6. Threatening to accuse me of crimes if I did not withdraw my claims against him, also breach of §836.05.

7. Admitting to making unauthorized recordings of me and my Fiance, in breach of §934.03 and SB 1798, and threatening to make them public in an effort cause us harm if I did not acquiesce to his demands in regards to a civil theft demand, which would benefit him financially if I were to abandon my recovery efforts, in breach of §836.05.

I swear under penalty of perjury that all of the statements above are true to the best of my knowledge and that the attached exhibits are true and correct, unaltered screenshots (with the exception of redaction of confidential or private information not relevant to the factual allegations to which they attest) of the communications described.

Sincerely,

Eli M Blatt

# EXHIBIT A
## GOLDNER CLAIMING TO BE IN INTELLIGENCE



# EXHIBIT B
## GOLDNER IS INTENTIONALLY VAGUE IN HIS DEALINGS



# EXHIBIT C
# THREATENING MESSAGES



**EXHIBIT D**





## EXHIBIT E

From: **Marc Goldner** | m@megacap.capital                                        Thursday, Mar 23 at 8:28 PM

To: **Eli M Blatt** | team@megacap.capital, **Eli M Blatt** | e@megacap.capital

Eli,

I'll be quite clear because it seems you have a gross misunderstanding of the situation that you've put us all in. At this point, I do not give a flying fuck if you believe it's real or not. You need to come to terms that nothing is going to proceed until we're on the same page and that our lives aren't at risk because of your inaction and disappearance. I will be as clear & concise as possible and maybe you will get it through your thick skull…

## EXHIBIT F



**EXHIBIT G**



**Marc Goldner**

I understand that's your perspective. But this is what craig did with K4B according to Eli. Had his assistant do eveyrhting. This isn't cool at all. I've been reviewing the K4B discovery folder and seems this is a repeat pattern behavior Eli has

10:05 AM

**EXHIBIT H**



**Anthropos x Megacap**
Celina, Lily, Marc, You

**Marc Goldner**
It's ok. The game of telephone isn't fun  6:52 PM

I need to know what Eli deleted  6:52 PM

Because I coordinate messages between public chat with LP and negotiating with them privately
6:53 PM

And now they won't align  6:53 PM

Fuck  6:53 PM

**Celina Moreno**
TBH, I have to blame it on you in a sense: you do not execute a plan like this without advising and having an agreement with the other party anyway.
6:53 PM

**Marc Goldner**
> **Celina Moreno**
> TBH, I have to blame it on you in a sense: you do not execute a plan like this without advising and having an agreement with the other party anyway.

I told Eli on the zoom call 3 months ago. Everything is discoverable and there must be conflict
6:53 PM



**Marc Goldner**
I've studied military tactical warfare. Applying to communication methods and negotiation is child's play
6:54 PM

**Marc Goldner**
If this deal is to be signed there must be conflict: they'll never sign it otherwise  6:55 PM

**Marc Goldner**
I know what I'm doing. Eli doesn't have 3 hour long calls with these people. I do  6:59 PM

You all must understand: these people don't want to deal with US. They want me to sell and move on. The more Eli and I fight the more they want to sign this deal and not negotiate
7:03 PM

Y did Antonio quit? Bc Eli and I fight. And the list goes on.  7:03 PM

@Eli M Blatt did u delete anything else I missed in my posts that I just reposted  7:04 PM

I'm making sure it all aligns with what else I tell them  7:04 PM  



**Marc Goldner**

> **Marc Goldner** 
>
> @Eli M Blatt did u delete anything else I missed in my posts that I just reposted

?      7:10 PM

Okay we now have to sit and wait. They need to think I have some control over the situation and brought u to the negotiation table    7:10 PM

Ur absence for weeks wasn't ideal but I was able to use it to our advantage so let's not fuck up and let's do right by then and get then repaid so I can sell our shares next   7:11 PM

Ok ▮ is waking up let's hope this worked   7:14 PM

@Eli M Blatt maybe throw in a good ol fuck you marc all you're good for is maybe sell... if that      7:15 PM

Maybe that's OD idk   7:15 PM



YESTERDAY

**Marc Goldner**

@Eli M Blatt I told them they can't just be direct on ▮ captable that u and ▮ Wont approve it     9:46 AM

I explained that even if I were to help them sell in their own entities they have to setup it'll cost them 50k so it's the same thing as interest waiver and you'll have to give me a waiver to sell for them   9:48 AM

Now let's sit and see if it works   9:48 AM

I also explained that i wanted to be on captable and u refused with me being directly on     10:29 AM



**Marc Goldner**

@Eli M Blatt how much was the ▮▮▮▮ fees for the deal we got ▮? How much would we have been entitled to EXACTLY if he had funded and didn't kill that deal
12:28 AM

I understand your position that those fees should be cancelling out any interest because that's his fault and it cost us the relatiosnhip supplier who won't work with us anymore after so many bids and looking bad totally get ur position thanks
12:29 AM

Ahhhhh I get ur position now so ur saying u redeemed rod bc u thought that ▮▮▮ would continue bringing and referring LPs but that didn't pan out how u expected
12:31 AM



**Celina Moreno**

Hi Marc, as you are well aware Eli has not communicated with you by phone or videoconference since February, and has since recently not been communicating with you directly in any medium. I just confirmed with him that both of the above positions you are attributing to him are false — he has said no such things to you nor does he maintain these positions.
10:51 AM

## EXHIBIT I

approved it' (which she did). The game you're playing here Eli will wind up dragging this into a Federal Court that will have a tortious discovery process that could reveal not just people's names, but has the impact of creating a regulatory securities risk with agencies such as the SEC. I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've 'stolen' your money and tying it back to MegaCap by refusing to operate this business in good faith. Thanks!
7:35 PM

██ is never working with you again. I can salvage that relationship that you destroyed by dissappearing and you can still get a cut. You are pretending that you haven't seen the Notice I sent weeks ago. Gamesmanship like that won't work, Eli. Do not go to war against an Army -- you will lose and badly. I do not want to have to destroy Emily's career by suing her for tortious interference but you should think VERY carefully if you think it's possible that maybe there are recordings of our conversations out there that you don't want to come to light. I would be very careful with your next moves because you are on thin ice of having all the hard work we put into MegaCap and ██ being extinguished which neither of us want. Just know that neither of us have ANYTHING to gain by putting this into a public court where ultimately the far reaches of discovery will expose the ██ employee's name that could revoke the shares. We'd both be bankrupted and you'd be liable for securities fraud for initiating an action on unrelated matters but trying to intertwine MegaCap. Be smart. Everyone know's your not dumb - malicious maybe, but not dumb, Eli.

8:45 PM

**EXHIBIT J**

██ s never working with you again. I can salvage that relationship that you destroyed by dissappearing and you can still get a cut. You are pretending that you haven't seen the Notice I sent weeks ago. Gamesmanship like that won't work, Eli. Do not go to war against an Army -- you will lose and badly. I do not want to have to destroy Emily's career by suing her for tortious interference but you should think VERY carefully if you think it's possible that maybe there are recordings of our conversations out there that you don't want to come to light. I would be very careful with your next moves because you are on thin ice of having all the hard work we put into MegaCap and ██ being extinguished which neither of us want. Just know that neither of us have ANYTHING to gain by putting this into a public court where ultimately the far reaches of discovery will expose the ██ employee's name that could revoke the shares. We'd both be bankrupted and you'd be liable for securities fraud for initiating an action on unrelated matters but trying to intertwine MegaCap. Be smart. Everyone know's your not dumb - malicious maybe, but not dumb, Eli.

8:45 PM

➡ Forwarded

Eli the more I think about it, do you really want the world to know in a public complaint that your unfaithful fiancé came to my room in Dubai to seduce me? That she's told me



**EXHIBIT K**

makes Michael Elkins an accomplice to your illegal actions and crimes. I strongly suggest that you immediately reinstate me, otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved.

I want to state one more thing: regarding your divulgence of any private contracting work that I may have done in the past – if it turns out to be true, as you allege, that I am involved in 'spy activities,' you may be tried for charges relating to the breaching of 50 U.S.C. 421, potentially punishable by a prison sentence for divulgence of my identity and putting my family's life at risk. (As an aside, it is extremely important to remember that I possess the name (as do you) of the ⬜⬜⬜ employee that is part of the ⬜⬜⬜ employee forward contract - (his name in case you didn't read the documents is ⬜⬜⬜). You cannot just file a court complaint in the public record to attempt to coerce me to settle on your demands by hanging my life and my family's lives in the balance alleging that I was a "spy". Further, it is egregious that ANY attorney put their name on a complaint in which stated anything about me being a "spy" – your counsel, whoever they may be, should be ashamed of themselves for potentially putting a patriot's life at risk and may also be liable for aiding in your illegal actions relating to 50 U.S.C. 421. To note, though,

or proceeds from ⨯⨯⨯ or ▬▬▬ without my signed authorization. At this point, you are right about one thing: I am protecting you from yourself because I need to protect ALL entities and LPs – including myself from your illicit and illegal actions, including, but limited to, upon information and belief, committing ACH and Bank Fraud. I'm willing to look past everything that you've done up until this point, so please don't let me down. I hope to hear back from you soon and that we can work through this productively.

Eli, if this were a game of chess, you've been checkmated. There is nowhere you can run from the law. And so,

## EXHIBIT L

On Jun 19, 2022, 1:09 PM -0400, Marc Goldner <marc@gb.investments>, wrote:
You're brain dead. I am not going to sell my crypto or use every dollar I have to cover you defaulting when this is how you're acting. You've fucked yourself bro and if you want me as an enemy honestly you're about to see how I can be.

I'll make this business the most difficult it can be.

You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me.

NOT A CERTIFIED COPY

# EXHIBIT C

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Part...
MegaCap Capital & Mega...
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Dearest ████

I write this to you on the ev... ████████████ ...ed w... ...ix of emotions ranging from pure joy, to feeling a moment of great succe... yet I write this to you with a mix of sorrow, sadness, and apology.

My entire life, I've always wanted to lead with the bad and end with the good, but this letter will be a little bit different. Each and every one of us should be celebrating this momentous occasion of ████████ 's FDA approval. Since I was a kid, I have always dreamed of what a world could look like with n... ████████ , and tonight is a night where I am seeing right before my eyes a lot of this come to fruition. Admittedly, back in my younger elementary days, some kids would poke fun and think a lot of what I was talking about was just science fiction – I'd always rebut that it's just science that hasn't been discovered yet. But in life, there is a balance, and with everything that is good, there is always something that comes right back to bite you.

To rip the Band-Aid off, I have a fiduciary duty to tell you that I no longer believe our investment in ████ is safe anymore. Eli Blatt has illegally, improperly, and invalidly attempted to withdraw me from MegaCap, and redeem a significant portion of my rightful equity for $1.70 – yes one dollar and seventy cents, I understand how crazy it sounds but it's true. Eli's bad faith and malicious actions, I believe, have been orchestrated since the very beginning. Upon information and belief, he first registered MegaCap as a single member LLC, he then puppeteered me to redeem Roderyck Reiter, (the other rightful general partner), and now finally, to execute Eli's grand plan, he cut off my email access, restricted my banking access, removed my permissions from Flow, and has begun removing me from communication channels with people affiliated with MegaCap. He has now removed me from access to our bank at First Republic, and it is upon my information and belief, from what I have seen, that Eli may have committed bank fraud.

Eli has lied to the seller whom we acquired ████ from and told them that I stepped down from MegaCap 'due to my legal studies and retained my economic interests'. Eli's claim that I stepped down from MegaCap is patently false. He also failed to mention to the seller of his malicious plan to redeem me days later after speaking with her. His unilateral attempted withdrawal letter and ridiculous redemption notice are illegal and invalid, however, Eli is right about one thing – I will maintain my economic interest in MegaCap and I will stand by each and every one of you until you get your rightful shares of ████

This SPV of ████ has become more than just an investment. It is a vehicle into the future that many of us hope to see in our lifetimes. Along this ride, each and every one of you have made this dream a reality. Some of us have budding relationships, others I've known for over a decade, some of you are my best friends that I've traveled the world with, others I've grown up throughout my adult life and been through thick and thin. But one thing I believe is consistent amongst all of us – you all believed in the vision I had for ████ , and you believed in me and in what I promised I could achieve at MegaCap.

This oversight I had at Eli's ability to manipulate and deceive I'm sorry for, but there's one thing that Eli just must not know about me – I am a fighter and I am not going to let Eli get away with this. I will not stop until corrective legal measures are taken, and Eli faces the appropriate legal consequences for his illegal, malicious, and unethical actions that have potentially harmed each and every one of you.



Marc J. Goldner
Founding Managing Part...
MegaCap Capital & Mega...
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Eli said to me in an email a[...] ...ween us to be confidential besides our MC share price [...] ...nation to our businesses [...]" The only thing Eli care... ...t is my ...ple hearted belief. It is with a heavy heart that someone I once viewed as a big brother could turn on me and villainize me in the way he has.

I have come to believe that Eli doesn't care about anyone but himself, most certainly upon my own belief, he doesn't care about anyone's privacy (shown by his actions in exposing private individuals in a very public way), and I believe all he cares about is his own self-interested gain. Eli has attempted to tell one of MegaCap's capital partner's to have me continuing to sell for MegaCap and that he would issue me a side letter. Eli has the actual audacity to not just illegally attempt to withdraw me, but he has the gumption to send me an invalid and illegal redemption notice for a significant percent of my equity for once again $1.70. That is the kind of person Eli Blatt is. He acts like a know-it-all 'hot shot' who thinks he is above the law and tries to bypass securities laws by having me do the hard work of MegaCap and sell for him through a 'side letter' when he knows full well that I'd be acting as an unregistered broker dealer which I refuse to do under any circumstances.

In my earnest opinion, I believe Eli acts like this pseudo professional know-it-all PhD who only cares about his reputation and how he appears to others because of what I believe are his own insecurities. If Eli thinks for one moment that I won't expose his true nature to the world, he is grossly mistaken – all of this is what you as LPs will uncover through the internal workings of what has gone on at MegaCap and what Rod and I had tried to manage behind the scenes for several years. Eli thought I would just lay down here and die while he basks in some type of glory and victory that is, unfortunately for him, short lived. Eli has a habit of underestimating people around him, because he's grown up smarter than most people around him (I'll give him that), he thinks that he could take advantage of anyone he sees he could make a profit off of – he betrayed his best friend, Rod, of 40+ years since they were kids by throwing his oldest childhood friend to the curb when Rod just had his first kid, a beautiful baby girl named Celeste.

In truth, I'm not angry at Eli. I'm not mad. If anything, I'm sad and devastated, in fact, and I pity him. I pity his loneliness that all he feels he has in this world is to take his partners equity – two of his partners, in fact, that helped build this company into what it is today – to have to post on social media and then lie to an LP that he was in 'hiding' because of me. If that's the type of person you want leading your investment into the future, then I just ask that you take a step back and consider the alternatives and take a moment to see Eli for who he truly is. All I'd ask before you would make that decision is to reconsider and really think about who Eli Blatt is under the surface of who he pretends to portray himself to be and if that is the person that you feel comfortable with to safeguard your investment with MegaCap in ⟨redacted⟩ then at the very least let us please have a talk about a path forward. People wear many masks in life, but under Eli's crafted face is a grotesque caricature of a very sad, pathetic, and lonely man who needs true help.

I have a duty to further disclose the following to you. When I spoke with the seller, where we acquired the ⟨redacted⟩ derivative equity from, she informed me that, if legal action is potentially taken that would harm her, she would redeem MegaCap at a price of about $35 a share. Although they claim they can and will do this, I do not know if they have the legal ability to do so – it seems quite 'out there' so I am less inclined to take that as a credible threat. She also claimed that she would not release shares or cash to MegaCap with just Eli's signature



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

6/2/2023

and she would require min[...]                                                    [...]get involved and step in
then that would be a differ[...]                                              [...]s situation. So, knowing
that brings a slight bright s[...]                        [...]to take[...]y shares right off the bat
of most of the LPs to my understanding. There are potential legal maneuvers that Eli can attempt to do but it is
hard to ascertain the full extent of his plan at this point, but I will continue to keep all LPs and relevant parties
informed as I discover new information.

I am currently exploring all potential legal actions to take against Eli, including filing an injunction, suing Eli
for breach of fiduciary duty, amongst other things, and possibly organizing a class of Limited Partners to sue
Eli and MegaCap in order to ensure the safety of each and every one of the shares. Again, to reiterate, I will
NOT allow Eli to pursue his illegal activities that I believe has permanently damaged the brand and goodwill
associated with MegaCap that I've helped to create over the last several years. Each of you has placed your trust
in me to help guide this vehicle to a safe exit. Along the way, there are often bumps in the road to be expected
– unfortunately, this is one of those speed bumps.

Eli hasn't just tried to take away my equity, or shares, or manager and member status, but Eli has attempted to
taint and destroy my dreams and ambition. Admittedly, over the past several weeks it's been extremely hard to
cope with and I had to look inside myself and ask if I was prepared to fight for what I believe in, and the answer
every single time was a resounding "YES!" I am not going to let Eli destroy the vision that this little boy in me
had 20 years ago on what the world could be. This investment for me was not just about money – I truly believe
that being able to wield a degree of influence by being part of technological history is a moral and ethical duty
that those of us that think we know what will happen, will be able to aid in what will happen and prevent the
worst from occurring. I won't just stand by idly to see, not just my hopes and dreams destroyed, but to see the
potential risk that each of you could face if I am not there to help protect you. I've realized a lot from this, it is
really hard to extinguish a flame that burns within when you truly believe in something. Embers can sometimes
flicker, but when you're able to maintain a steady internal peace within, you are able to allow that flame to stay
ignited unwavering. That clear mindset is what I know I can bring to the table as I am prepared for the long
bumpy road ahead.

It's unfortunate that Eli is conflating non-MegaCap matters and issues with unrelated businesses and
attempting to try to use that as leverage to "oust" me - this is never going to work. Eli has already attempted
to claim that I am extorting him (which I have proof that I never did) and that I owe him large sums of money
– which is also patently false. Eli has attempted to use unrelated matters in which he failed to fund a roughly
40% factory deposit for Bitcoin Miners and wound up defaulting, and that he failed to provide me agreed upon
investments, as well as failed to wire me money for NFTs in which I helped advance the money for over a year
(along with his refusal to sign fund documents when we took money from LPs). Eli has attempted to claim that
he was under 'duress' as he was traveling across the world in beautiful getaways while him and his fiancé posted
pictures on social media (someone 'afraid for their life' doesn't give away their location for the world to see).
Eli left me to attend to most MegaCap matters and said he was blocking me from all communication channels
(and archiving our chats) and would only respond to 'tax-related matters' ("I have reached the end of my ability
to continue working with you on anything but legally-required tax matters based on your continued insistence
on withholding the miners from me [....] It's honestly a shame that you're willing to sacrifice our potentially
still productive continued partnership around Megacap on more than just taxes [...]" – when the reality is that



Marc J. Goldner
Founding Managing Part...
MegaCap Capital & Mega...
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Eli never paid me for these [...] coerce me by hanging MegaCap and its Limited P[...] perate – this level of toxicity became unmanage[...] handle [...]heir own. At the end of the day, I'm not some greedy money hungry Wall Street-esque guy that needs to live in a $1M+ condo in Miami or feel that I need validation from others by going to exclusive clubs or yacht parties – I've always enjoyed a more low-key lifestyle in a small apartment without the bells and whistles of gaudiness. I hope that's relatable to some of you and it gives everyone a closer microscope into who I really am underneath.

Throughout this semester in Law School, I was working my best on managing this as my full-time focus. Look, those of you that know me know that I joke that "I'm a simple guy living in a complex world." I live with my partner, we have two puppies, Lucky and Lady, and I'm happy just watching a cool movie once ever few months like the newest Mario movie which was a real treat and nostalgic trip from childhood. I believe most, if not all, of you know that I love to study and focus on learning on a daily basis – currently I'm wrapping up my Law Degree (I have about 1-2 semesters left of academic study). Eli has tried to weaponize my studies against me claiming to others that I stepped down for my studies and that I said I would defer to propel our businesses (which I did defer Law School for over a year). Eli has created a fictious narrative against me which is easily able to be dispelled and will be in due time.

Eli also fails to mention that some of the previous speed bumps was when I legitimately was threatened which I have documented and can prove. Out of fear, I conveyed this to Eli, and he knows I possess the screenshots and a signed affidavit from the individual who threatened me. All I had tried to do was warn and protect someone who I thought was one of my closest friends who instead took these messages and tried to turn them against me which is so sad. Under no circumstances have I ever threatened Eli, nor have I extorted Eli as he has illicitly claimed in bad faith. I will do everything that I legally can to clear up all of these false accusations.

I want to assure everyone that I believe that I have all of the contractual agreements necessary to achieve a legal victory against Eli and to reclaim control over my rightful position at MegaCap.

I am willing to share anything that I can with each and every one of you at a moment's notice, yet I don't want any of you to walk away from this reading this letter in fear that your investment is at risk, though that unfortunately will always remain a possibility until we can safely and successful exit this SPV. I know I can never guarantee or promise that everything will be perfectly fine and safe, but I promise that I will do the very best I can to help all of us. One option that I am continuing to explore is having MegaCap put into receivership with the SEC – a type of action like this will ensure that authorities will oversee MegaCap through ✕✕✕✕'s IPO. The safety of your investments is something that I'm not taking lightly. Some of you are the hardest working people I've ever met, and again you trusted me with your money on a belief and vision that I shared with all of you. With that trust, came not just a trust in me but a trust in MegaCap. I had pumped my life savings into my business ventures with Eli which has left me in the wake of true financial destruction & unimaginable hardships due to Eli's negligence, malicious illegal actions, and reckless behavior that I now truly believe was part of his 'plan'. Fact of the matter is, I trusted Eli, I believed in what we could do together – I believed he was my best friend, and now I feel betrayed. I never could have imagined how cold, calculating, and conniving Eli could have been. This was the guy who we shared some of the most intimate personal things going on in our lives, he is the guy who I forgave after his 'fiancé' stole documents from one of our companies and had reached out to at



Marc J. Goldner
Founding Managing Part█
MegaCap Capital & Mega█
Marc@GB.Investments
+1.516.984.1466

6/2/2023

least one known prospecti█████████████████████████████████████████████'d be the godfather of each other's kids, and the guy w█████████████████████████████████████ situation has become such a sad and demoralizing ███████████████████████████████ the cou█████ge to write all of this without admittedly having an emotional breakdown here and there to be so openly vulnerable. I maybe am a bit naïve, but I still deep down, feel that Eli's personal demons and internal struggles have gotten the better of him and that this is just a temporary lapse in judgement, and he'll eventually come around. This isn't the guy that I would spend hundreds of hours with during class or share in meals while we'd talk about our plans for the future in our underwear. Whoever replaced Eli with what he's become makes me feel like this is sometimes part of a sick elaborate joke – but then I get grounded back into reality.

Eli can claim all he wants that he is the "initial founder" of MegaCap but Rod and I know the truth. Rod is the one that came up with this visionary-esque idea of starting a business centered around Pre-IPOs and Unicorns. It was Rod who introduced us to the intermediary for ❌❌❌ (one of our first deals), and we also know that the very first thing I said to that intermediary is, quote, "After we close this, we need to find a way to get into the ████████!" That mention of ██████████ was the first ever mention of ████████ at MegaCap to my recollection – although, I had been talking about this for years, even at my GEMBA prior to Eli joining. Eli saw me as someone he could exploit – it was hard hearing from some of my classmates that he never cared about me. He came into TRIUM, into a program where I was very active and ultimately became the Academic Class Representative, and saw in me a network that he could exploit not just through the relationships I had formed in academia but the friends I've made along the way through my life.

It wasn't Eli who grew up falling in love with movies like *The Matrix* or *Total Recall*, or taking the time to spend thousands upon thousands of hours trying to create content, designing games (or just playing my favorite Nintendo games that would transport me to other imaginative worlds as a kid), or researching the future of ████████████████ (and how the world we know today will be a thing of the past). It wasn't Eli who did all of that. And it's not to say that I'm the smartest person in the room, nor the most educated, but I did and I still do have a vision for that future. I've always considered myself a futurist, I always have considered myself out of place with current times, whether it was reading science fiction, or hanging out with my parents' friends instead of people my own age, I've always had a firm grasp on what the future holds, and the repercussions society may face as we move forward. One of the first papers I wrote in college was titled "Robotic Rights" (in a class centered around The Twilight Zone no less!) – now we don't seem that far off with the rise of Artificial Intelligence and integration of robotics into nearly everyday life.

All of this is one of the reasons why I've been working on starting a think tank and a fund, called The Neuralverse – over the last several years going on in the background. One of my goals in life is to invest in this entire space, the ecosystem itself, outside of just ████████ and to help steer the world and prepare society for the next evolution that the fifth industrial revolution will bring. Each and every one of you that invested in ████████ and are here today, you too have a future in all of this. You didn't just believe in a wild idea of what ████████ could create, or what I was able to pitch and explain to each of you. This wasn't just about a good price on a deal or making a potential 100x return (that could go to $0 – but hopefully not!), but you're a special type of person too.

You invested in something that you knew would be a decade away from ever seeing the light of day. You had a risk tolerance to believe that a government's regulatory body would approve ████████████████

Marc J. Goldner
Founding Managing Part▓▓▓
MegaCap Capital & Mega▓▓▓
Marc@GB.Investments
+1.516.984.1466

6/2/2023

▓▓▓▓▓▓▓. You saw th▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Deep down, you all know that one day ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ns that we're using to today will be replaced with ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓, where the ▓▓▓▓▓▓▓, where ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, and that's a future that you all want to be a part of. This investment isn't just about money, but about what you each see the world could be, and for that, I want to thank each and every one of you for believing in me and seeing the same future, and being able to hang on tight through all these speed bumps that I hope will flatten out.

As many of you know me, I do believe that I am a genuine person. Maybe not perceived to be the nicest all the time, yet I will always speak my mind and tell the truth, and there's one truth that I know will eventually get back to Eli and it's something you all should know – I will not pull any punches when going to spar with Eli in a court of law and I will not stop until justice is served. Eli will get what he truly does deserve and I will always stand up for what I believe in and what I know is the right thing to do.

We hopefully will get through all of this together. All that I ask is if you can please ask Eli to reinstate me without me having to escalate this any further by bringing legal action against Eli and MegaCap. In the meantime, I will focus my efforts on attempting to resolve things on the backend with Flow, the bank, the accountants, and any other relevant parties of this situation, and doing my best to freeze Eli's illegal action and rampage. I believe there's still time to correct this issue and try to just move on from this. ▓▓▓▓▓ is just one of many companies that we can all be a part of and I don't want it to be the last.

If Eli fails to reinstate me, I would like all of you to join me as a class in suing MegaCap and Eli to ensure that our interests in ▓▓▓▓▓ are safely secured. I'm sorry if any of you feel that I failed you. All I can do is apologize and try to make this right. I will be available to speak with anyone at any time – you all have my number, but just as a reminder it's +1-(516)-984-1466 and if you want to reach me by email, you can contact me at Marc@GB.Investments so please, don't hesitate to pick up the phone to give me a call. Don't be afraid to ask me any of the hard questions. I'm not going anywhere, and I will do my very best to do everything that I possibly can to make this right for each and every Limited Partner of MegaCap.

Thank you again for believing in me and giving me this opportunity to try and fix this disastrous situation.

With Love and Apologies,

*Marc Goldner*

Marc Goldner

P.S. Oh! And one more thing…

When I first started on my creative journey, I once authored a story called The Forgotten Adventures Of The Lost Toys. Look, I'm not some big wig finance guy, I may not be the smartest person in the room, nor the most educated as I said before, but I would like to think I'm creative and one of the most passionate people you will ever meet in your life. When I set my mind to something – I chase it with all my might. Something my Mom has



Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466

6/2/2023

instilled in me since I'm a li[...]                                                                  ry least you'll land on the
moon or maybe it's a cloud[...]                                                                  without hope that all the
hard work will pay off. We a[...]

I took this time of adversity to power through creatively and create a new logo for MegaCap that I believe is representative of what is going on as we speak – that life itself is a journey…a winding road… a path that we all find ourselves on. We're all on this adventure together and we have no way to know what curveballs life will be throwing at us, but we have to each power through and find it within ourselves to keep on pushing forward!

What this whole thing has made me realize is to not just remember what is important but to never forget where your passions and loves lay within. For we will never know what tomorrow holds for all of us, but we can always try to remember to not forget what our dreams are today. All of us had that favorite toy growing up, we had dreams, some of us chased those ambitions, while others will hopefully rediscover them later in life. But, one thing is for sure, all those dreams, our memories, they have a life of their own and it is up to us to revitalize those passions and always remember to stay faithful to who we really are within and deep down inside. Thank you again for taking the time to take this journey with me – I can promise you at least one thing, it will never be taken even remotely lightly and it will not be forgotten!



The Forgotten Adventures Of The Lost Toys © 2023 By: Marc Goldner and Rachel Korsen

"A key just opens a door to somewhere we find out we belong."

Messages with the Creditor Goldner Alleged was Threatening Blatt's Life





Messages with over a dozen Megacap Limited Partners threatened by Goldner









6/4/2023

Hey Eli,

I have heard Marc's side of the story. I'm very stressed and confused with what's going on at MegaCap, can you please tell me what's happening? I would greatly appreciate it

9:00 AM

Hi ▨ So you got Marc's long letter too?  I have a letter from Megacap's lawyer along with an update to address the fears that Marc is intentionally stoking. I am in the countryside for the weekend with very scant reception and that has slowed me down from
Getting the letter out. But I'm hoping it will go out today or at the latest tomorrow. It will go out via Flow. In the meantime, just rest easy. Marc is simply attempting to scare people to try and get his way. But all is well. Stay tuned.

1:58 PM

I actually managed to scrape enough signal to get this done -- so you should have the email in your inbox now from Flow.  Again, I really regret that Marc is so unstable and causing fear to further his own ends, but as I hopefully convey in the letter, in fact all is well.

2:25 PM

Thank you Eli, and yes, I got his letter. Appreciate the reassurance, looking forward to it

4:27 PM

No worries. Rest easy I am at the helm and maintaining a steady course.

5:15 PM

👍

6/6/2023

Hey Eli, is there any news with the letter? Thank you

5:13 PM

Did you get it?  It went out to you when I messaged you before.

5:13 PM

Via Flow.

5:14 PM

There's no news besides the letter.

5:14 PM

Oh got it, thank you Eli

5:14 PM

No!









Wow this letter!! Ha! 3:46 PM

Yeah no kidding 4:05 PM

He is something else. I think you can draw your own conclusion from that letter. No professional would ever write that kind of letter. Anyway, the Company's lawyer is on it. Everything I did I did to protect the Company. 4:06 PM

It's been a difficult year for me dealing with him... 4:07 PM

I dealt with him in Module 7 discussion and just totally blocked him 5:28 PM

so no joke 5:28 PM

your story is another level 5:28 PM

Oh wow, well I'm sorry to hear that 5:28 PM

Though it's reassuring in a way to know I'm not the only one 5:28 PM

He is the most disturbed individual I've ever dealt with, and sadly my dealings with him are deep 6:29 PM

The charm of his "toastersexual" type off-beat persona mask how deeply troubled he actually is 5:29 PM

hahaha 6:30 PM

The sad part for me is that it's now clear in retrospect that he engaged in a protracted campaign, well before we even started having disputes, to paint me as a bad actor and alienate me from other TRIUMers... and basically he succeeded 5:30 PM

good luck settling all of it man 5:30 PM
❤️

otherwise you are ok? 5:30 PM

Besides the Marc drama yeah I'm overall good, thank you for asking. Your encouragement/support really means a lot to me. 5:31 PM
❤️

NOT A CERTIFIED COPY



June 2, 2023

**VIA FLOW**

      RE:   *Megacap Capital, LLC*

Dear Megacap Partner,

      I represent Megacap Capital, LLC ("the Company").

      I am writing regarding the current operation of the Company. Presently, the Company is operated by Dr. Eli Blatt. Dr. Blatt withdrew Marc Goldner as a Class A voting Member and Manager of the Company.

      Any dispute between the Members of the Company is subject to the Company's dispute resolution procedure which calls for private mediation and arbitration. As of the date of this letter, Mr. Goldberg has not taken advantage of this procedure.

      Please direct any questions or concerns relating to the Company to Dr. Blatt at team@megacap.capital.

                        Sincerely,

                        Michael L. Elkins
                        melkins@mlelawfirm.com

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Part...
MegaCap Capital & Mega...
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Dear Prospective Limited P...

I hope you have been well. While there are... ... you while some better news... as come to my attention that Eli M. Blatt of MegaCap is attempting to sell 'shares' (and/or derivative equity VIA an employee forward contract) to Prospective LPs, such as yourself, of _____. I have seen messages that he claims that these are new shares and that "[w]e have secured additional allocation" which is far from the truth. Apparently, Eli is attempting to illegally commandeer MegaCap.

These _____ shares are a form of derivative equity originating from an Employee Forward Contract that we purchased through a third-party seller. MegaCap has held inventory of interest in a forward contract that it has been trying to sell for roughly a year. These are NOT new shares or derivative equity.

Further, as a Prospective LP I have a fiduciary duty that is created that I must inform you that Eli has illegally, improperly, and invalidly sent me a withdrawal letter from MegaCap. In addition, Eli has attempted to illegally, invalid, and improperly 'redeem' a significant part of my equity (nearly 25%) for $1.70 - yes, that's right one DOLLAR and seventy cents. Truly unimaginable!

I cannot allow you to make this potential investment because I do not believe your money is currently safe at MegaCap. Eli has illegally, invalidly, and improperly removed my access to the MegaCap email address (so there is no "we" as per his solicitation that I've seen), as well as restricted my banking access (which I believe amounts to Bank Fraud), as well as restricted my access to MegaCap's Fund Administrator, Flow. Again, Eli does NOT speak on my behalf, nor can he act on my behalf, nor make any unilateral decisions that are completely unauthorized.

I am currently in the process to initiate a lawsuit in federal court against Eli and MegaCap, as well as preparing to file an injunction against the same parties and potential additional third parties. In full transparency, you should know that I am exploring options such as cooperating with the SEC to place MegaCap into receivership to protect the existing LPs of MegaCap. I may be at the point where I need to include the regulators, and this measure is not being taken lightly.

_____ interests. Seeing Eli do this just before _____ achieved _____ was one of the most gut-wrenching things I've ever witnessed in my life. However, when things like this happen it is important to keep a cool head and pursue the appropriate legal avenues to achieve a remedy that is just and equitable.

I won't talk your ear off, but I will be happy to field any call and discuss this and answer any and all questions you may have. I ask you to please preserve all messages, communications, emails, or otherwise that you receive from Eli Blatt, his 'assistant' Celina, Anthropos, MegaCap, or any seemingly related and/or affiliated entity as they may be relevant to the forthcoming suit which makes the communications discoverable. If you have wired any funds, please advise me immediately and I will do my best to keep you appraised of any communications that I have with the recipient bank of those funds. I am someone who has always put relationships first – and this is one of those times. I will not allow friends and genuinely good people to be taken advantage of unknowingly by someone like Eli. This isn't just about money – this is about ethical principles.



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

6/2/2023

I am sorry to have to bothe                                        hat your funds remain safe and that you do not wire a                             es such a  re-IPO solicited 'deals' i.e., _____, etc.) or subscribe to any MegaCap entities or other entities that may be improperly run by Eli Blatt (without my knowledge). The current operations are without my approval or authorization.

Please do NOT wire funds to MegaCap, any affiliated entities, Eli, his assigns, or any of his affiliated and/or unaffiliated entities until I can fully ascertain the level of damage that Eli has maliciously conducted behind the scenes, and I can ensure your potential future investment would be secured and safely invested. In the event that you did in fact already invest, please thoroughly review the subscription agreement to see if you can immediately request to cancel your subscription and request that your funds could hopefully be returned to your account.

I am doing my best to regain my rightful control of MegaCap to ensure a safe exit of all vehicles and entities in the best interest of all our trusted Limited Partners and their respective funds.

Thank you and I hope to hear from you soon (albeit, under ideally better circumstances). Again, don't hesitate to give me a call – we can still geek and nerd out about the future of _____ and the impact it will have on society. It's always good to try and end on a good note. :) Talk soon!

All the best,
Marc Goldner
Founding Managing Partner of MegaCap Capital and MegaCap Funds
+1.516.984.1466
Marc@GB.Investments



Marc J. Goldner
Founding Managing Part...
MegaCap Capital & Mega...
Marc@GB.Investments
+1.516.984.1466

6/7/2023

Ryan & the rest of the team @...

I am demanding that Flow in... backend. I have a right to see all correspondence and t... my acc... as erroneously removed. It is absolute negligence that you have allowed Eli to rem...e my access when you know that we are both General Partners. He has no unilateral authority over the accounts. Flow is preventing me from fulfilling my fiduciary duty to Limited Partners and that liability will pass to Flow in the event that the regulators get involved.

To reiterate, Eli does **NOT** have unilateral authority to remove me and restrict my access, and that Flow has allowed him to do this makes Flow liable as well. There is ample enough evidence in the exhibits that show that not only was Flow aware of the issues that have been brewing at MegaCap for months, but that Flow confirmed with Eli that everything must be jointly approved. That you deviated from that initial understanding and agreement is a breach of your various duties to myself.

I would like assurances that until this is resolved that there are no outgoing subscription agreements or documents of any kind, including any tax filings being sent to anyone. This is all to ensure that Eli does not try and double sell any shares, amongst other reasons, as he is clearly not to be trusted to manage any kind of fund. I have been told my numerous Prospective Limited Partners that Eli has been attempting to solicit them ⨯⨯⨯⨯. Unfortunately for Eli, these are my contacts from my network that Eli has falsely claimed that I 'deprived' him of and never shared those contacts – yet, he fails to mention that I brought in the majority of the LPs for ⨯⨯⨯⨯ through my networking and fundraising activities since the inception of the fund.

Further, I am once again requesting Flow forwards ALL email communications that Flow has had with Eli since early May as I stated in my last message to be sent IMMEDIATELY and then to send me any and all communications with Eli where I was not CC'd prior to May. I have a right to know what he has illegally attempted to tell you to do by changing K1s and attempting to commit tax fraud. There was a full agreement that the terms of our agreement were completed and that "[so] long as the taxable income is just 10% of the total fee then we are good."

Therefore, I would like an immediate breakdown of what Eli, upon information and belief, fraudulently told you to change. For instance, such suspected changes include but are not limited to, 1) if Eli tried to attempt to steal any of my ▮▮▮▮ equity, 2) my equity in MCC, 3) misappropriate any carried interest, management fees, shares, or otherwise to himself or MCC.

Your forthcoming transparency is of vital importance, and failure to do so will result in Flow being named as a third-party defendant in the looming lawsuit against MegaCap and Eli.

Thank you once again for your cooperation in this matter.

All the best,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing & General Partner
MegaCap Capital and MegaCap Funds

P.S. To Repeat, Flow has a duty and obligation to send me **ANY** and **ALL** communications Flow has had with Eli since he has attempted to remove me illegally. If you do not provide these communications, I will be filing a suit against Flow and I continue to reserve all rights.



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

6/26/2023

Flow,

It is OUTRAGEOUS that you ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ preparing the lawsuit and injunction against Eli and MegaCap and you ⬛⬛⬛ be a defendant as well. There may be legal ramifications if I discover that you're speaking with Eli or anyone affiliated with MegaCap behind my back. Having Eli or any attorney (i.e., Michael Elkins) breaching his ethical duty is not legal direction or judicial intervention and will not absolve Flow of liability. I have no issue of discussing this matter with the regulators — in fact it will bring Justice to a lot of others to know how you conduct business which is unacceptable at best.

I'm already in possession of letters from Sellers stating that MegaCap and Eli won't be released any shares, proceeds, or any distributions, upon any type of liquidity event relating to those SPVs without my authorization and signed consent. Eli must now understand the repercussions for his actions which may amount to what I believe to be criminal fraud. Flow needs to do the right thing, and require dual authorization on all documents, access, instructions, messaging, and any other actions taken by Flow and on the Flow platform itself.

Thanks,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing & General Partner
MegaCap Capital and MegaCap Funds

P.S. I already possess proof from an LP that Eli is individually targeting LPs with messages through the Flow platform stating misconstrued 'facts' and not sending it to ALL LPs. Flow aiding in Eli's illegal actions may amount to a claim against Flow for tortious interference. Flow will be in the middle of this. I suggest you immediately restrict Eli's sole individual access to Flow and reinstate my access where ALL messaging and actions must be DUAL approved as agreed with Flow in writing. This agreement has been previously shown in the prior attached exhibits. Do not make me ask again or I will take this to the court of public opinion prior to naming Flow in the looming legal proceedings. Once again, take action immediately! This is greatly appreciated.

P.P.S. To reiterate and for avoidance of doubt, Flow can not issue any changes to K1s from the last draft that I had reviewed. If Eli or anyone at MegaCap attempted to 'instruct' to make any changes they are NOT approved and may not be issued. I have been assigned approximately $500,000 (8,217 shares) in this deal and am STILL owed a K1 along with to my knowledge every other Limited Partner. If any changes are made without my approval, I will hold Flow liable. To be clear, Eli nor MegaCap has any authority to unilaterally change the agreed upon structure, management fees, loans, K1s, or any other financial and tax documents without my signed AND verbal authorization!

# MegaCap Capital Entities

From: **Ryan Nanney** | ryan.nanney@flowinc.com                                    June 2 at
                                                                                     12:38 AM

To: **marc@gb.investments**, **Eli Blatt** | e@megacap.capital, **Blake Schneider** | blake.schneider@flowinc.com,
**Relationship Management** | rm@flowinc.com

Hi Marc and Eli, over the past few days and weeks, we (Flow) have been getting conflicting stories and demands from each of you.  For this reason, we will not respond to individual emails, or work on the MegaCap portfolio in general, until we receive clear guidance on who legally is in charge for MegaCap Capital.

--

**Ryan Nanney**
Fund Accounting Controller



https://flowinc.com/

NOT A CERTIFIED COPY



June 2, 2023

**VIA EMAIL ONLY**

Ryan Nanney
ryan.nanney@flowinc.com

      RE:    *Megacap Capital, LLC*

Dear Ryan,

      My firm represents Megacap Capital, LLC ("Company"). I do not represent Eli Blatt, individually or Marc Goldner, individually. This is in response to your June 1, 2023, email.

      Eli has withdrawn Marc as a Class A voting Member and as Manager of the Company. Eli is presently managing the Company. The issuance of K1s is a time-sensitive matter. The Company requests that you work with Eli to finalize the K1s.

      The Company has dispute resolution procedures for Eli and Marc to resolve any disputes between them. However, the Company needs to continue functioning and sending the K1s is vital to the Company's continued operation.

      Thank you for your cooperation.

                  Sincerely,

                  Michael L. Elkins
                  melkins@mlelawfirm.com

NOT A CERTIFIED COPY



ONE WEST LAS OLAS BOULEVARD, SUITE 500
FORT LAUDERDALE, FLORIDA 33301

TELEPHONE: 954.525.4100
FACSIMILE: 954.525.4300

Benjamin R. Muschel                                               muschel@kolawyers.com

June 26, 2023

**VIA EMAIL**                                   *IMMEDIATE ATTENTION REQUIRED*
Flow, Inc.
Attn: Blake Schneider, SVP Operations
Blake.Schneider@flowinc.com

    Re:   ***Megacap Capital, LLC***

Dear Mr. Schneider,

**Your immediate attention to this matter is required.** This law firm represents Megacap Capital, LLC (the "Company"), as co-counsel with Michael Elkins, with whom we understand you have corresponded previously. Among other things, our representation is specifically focused on matters involving Marc Goldner's persistent attempts to destabilize the Company.

It is our understanding you have requested more explicit guidance regarding who is in control of the Company and, in the interim, Flow has frozen all work on Company matters. As you can probably appreciate, there are dozens of Limited Partners relying on both Flow and Megacap to ensure both their peace of mind as well as the stable management of their investments, and so we recognize your desire to ensure you are taking the right steps to protect everyone's interests. We are also aware that Mr. Goldner has made numerous threats, not only against Flow, but also against other partners of the Company.

This letter serves to reaffirm what Mr. Elkins has already communicated to you previously, both in writing as well as over the phone, including:

1. We now represent the Company, along with Mr. Elkins;

2. Mr. Goldner was withdrawn pursuant to the terms of the Company Operating Agreement (the "Agreement") and is no longer authorized to speak or act on behalf of the Company;

3. Mr. Goldner is within his rights to challenge his withdrawal from the Company via the dispute resolution terms detailed in the Agreement;

4. To date, Mr. Goldner has not availed himself of these procedures, opting instead to breach the Agreement further by tortiously interfering with the Company's partners and attempting to cause the Company harm;

000001/01459974_1

MIAMI  -  FORT LAUDERDALE  -  BOCA RATON

June 26, 2023
Page 2

5.  In fact, to our knowledge Mr. Goldner has not retained counsel;

6.  Mr. Goldner is not authorized to have any access to any Company information or resources; and

7.  The Company formally requests that you continue working with Dr. Eli Blatt to finalize the 2021 and 2022 tax reporting, after which the only remaining ongoing engagement between Flow and the Company is the continued use of the software platform.

If you have any questions or require any further information, please contact us immediately. The statements and demands set forth above are made in full reservation of all rights, remedies, and defenses.

Sincerely,

BENJAMIN R. MUSCHEL
For the Firm

CC:    Ryan Nanney
       Relationship Management Team
       Dr. Eli Blatt

NOT A CERTIFIED COPY

# Re: Flow / Mega-Cap - resolution needed by Dec 16

From: **Blake Schneider** | blake.schneider@flowinc.com                                    July 20 at 5:49 AM

To: **Eli M Blatt** | e@megacap.capital

Cc: **Ryan Nanney** | ryan.nanney@flowinc.com, **MegaCap Capital Operations** | ops@megacap.capital, **Benjamin R. Muschel** | muschel@kolawyers.com, **Blake Schneider** | blake.schneider@flow.inc, **Relationship Management** | rm@flowinc.com

Hi Eli,

I would be the first to admit if I or anyone on the Flow team has made a mistake. As humans, we do make mistakes from time to time, and we always own up to them, fix the issue at hand, and learn from the mistake to ensure it does not happen again in the future. However, that is not the case in this instance - far from it.

As discussed in my conversation with your outside counsel, Ben (as well as the other counsel in addition to/before him), Flow will not tolerate unreasonable (not to mention, unprofessional) threats or demands - of which we have received many from MegaCap and its representatives over the past ~10 months. We will always be respectful and professional - and expect the same in return.

As you are well aware, due to MegaCap/its Partners being unable to agree on just about anything related to its investments/entities/filings (at least while Flow was included), Flow suggested strongly that we should part ways. Both you and Marc - despite not agreeing on just about anything material at the time - asked us to help out for a little bit longer. Again, due to the lack of alignment and agreement amongst MegaCap Partners - as well as receiving many contradictory statements regarding how to proceed - Flow has had to spend orders of magnitude more time on MegaCap work than it allocates to each of its clients. Because of that, this is a massively costly arrangement for Flow. Flow would typically charge for all of the extra work/re-work. We have not done so yet, as we just want this to all be over with.

In addition, many members of the Flow team have had to work through mental suffering due to the harassment it has been exposed to at the hands of MegaCap Partners. This is not ok. We will not tolerate any sort of harassment.

I pride myself on being a respectful, professional human who is diligent about getting things done. However, I pride myself more about taking care of people around me, including my team here at Flow. I kindly - but firmly - request that you, as well as any MegaCap representatives, limit communication to Ryan and any other Flow team members to information useful in getting things closed out. Please refrain from any communications that even border on threats or harassment. If you or any other MegaCap representatives would like to discuss anything else, please reach out to me directly.

I am out through this Friday, but would welcome a call anytime next week if you'd like to talk through any of the above or the path forward.

Best,
Blake

# Re: Flow / Mega-Cap - resolution needed by Dec 16

From: **Eli M Blatt** | e@megacap.capital                                                      July 24 at 3:29 PM

To: **Blake Schneider** | blake.schneider@flowinc.com

Cc: **Ryan Nanney** | ryan.nanney@flowinc.com, **MegaCap Capital Operations** | ops@megacap.capital, **Benjamin R. Muschel** | muschel@kolawyers.com, **Blake Schneider** | blake.schneider@flow.inc, **Relationship Management** | rm@flowinc.com

Hi Blake,

Thank you for your thoughtful email. I appreciate the open line of communication and share your desire for a path forward.

Let me start by saying that I regret that Marc's behavior caused suffering among the Flow team; I certainly know what it feels like to be threatened by Marc, so I am particularly empathetic to that. To the extent he made any threats towards Flow or its representatives while he represented Megacap, I apologize on behalf of the Company. I know that if you ask Ryan, Michael, or Haley, they will tell you I have only ever been courteous and professional with the Flow team.

My ask is that you not throw Megacap and its LPs out with Marc's bathwater, especially given that his most recent volley of threats came after he was no longer authorized to speak or act on behalf of the Company. In the spirit of finding a solution that protects both Flow and Megacap and its LPs, I propose as follows:

1. Megacap will relieve Flow of all of its contractual obligations to complete the 2021 and 2022 reporting, which as I understand is the primary pain point for Flow at this juncture.
    a. Flow's only obligation with respect to reporting going forward would be to provide the Company all past, completed tax and regulatory information, filings, and documents in its possession, as I requested in my prior email.
2. In exchange for the waiver of its reporting obligations, Flow would simply continue to provide access to the platform through each entity's exit:
    a. Existing LPs continue to have access to their accounts, and
    b. Megacap continues to have access to the platform to manage its SPVs and onboard new LPs into Tech I / Tech Holding only – with no reporting obligations – until the exit of each entity.

This compromise limits the scope of Flow's ongoing relationship with Megacap by relieving it of its reporting obligations and the perceived liability from Marc therewith, while ensuring Megacap can continue to manage its responsibilities to its LPs as well as its creditors who are counting on the Company continuing to onboard new investors into Tech I.

Please let me know if this solution is agreeable. If so, the Company will take over the 2021 amendment process and all subsequent reporting, with access to the Flow platform remaining unchanged until each SPV unwinds.

I'm happy to discuss at your convenience.

Best,

Eli

# Re: Flow / Mega-Cap - resolution needed by Dec 16

From: **Blake Schneider** I blake.schneider@flowinc.com                                                July 26 at 2:19 AM

To: **Eli M Blatt** I e@megacap.capital

Cc: **Ryan Nanney** I ryan.nanney@flowinc.com, **MegaCap Capital Operations** I ops@megacap.capital, **Benjamin R. Muschel** I muschel@kolawyers.com, **Relationship Management** I rm@flowinc.com

Hi Eli,

Thank you for your email - I appreciate it.

Regarding your proposal, we are open to it, with the following additions/clarifications:

1) In addition to being relieved of any and all Admin work (financials, tax prep/filings, securities filings, entity maintenance, etc.), we request a release of any and all potential claims through the date of the release. We have never had to ask for such a thing, but given the aforementioned threats by (and seemingly litigious nature of) some MegaCap representatives, this is a must for us.

2) The current contract term runs through March 2024. You and your LPs will continue to have access to the Flow Platform through then. Beyond that and as we get closer to the end of the current term, we can discuss renewal options for whichever entities you would like to remain on the Platform.

As we communicated last year and I mentioned below, ideally, we would fully part ways. Shy of that, we will need the above to feel comfortable moving forward.

Again, I do appreciate your email and look forward to a healthy, professional relationship moving forward.

Best,
Blake

# RE: RE: URGENT Notice - Action REQUIRED! Cease and Desist ALL MegaCap Matters

From: **Rafael Schuck** | rschuck@gcpa.com          July 3 at 2:36 PM

To: **Eli M Blatt** | e@emb.org

Dear Eli:

I just received this letter from Marc Goldberg. I am not sure what this means. However, I don't have the financial ability to hire lawyers and defend anything in a protracted legal battle with Mr. Marc Goldberg.

Therefore, I must refrain from working on any tax work associated with any of the MegaCap entities to avoid any possible legal ramifications until this matter is resolved.

Sincerely, Rafael

Rafael J. Schuck, CPA CGMA

Partner

**R&L SCHUCK – CPAs, LLC**

**Accountants and Finance Consultants**

6710 Main Street Suite 233

Miami Lakes, FL 33014

RSchuck@gcpa.com

T: (305) 362-1040

F: (305) 362-3344

From: **Marc Goldner** | marc@gb.investments    To: **Rafael Schuck** | rschuck@gcpa.com      July 2 at 11:27 PM

Dear Rafael Schuck and Associates of R&L Schuck – CPAs, LLC.,

Please see attached. I am demanding a formal and detailed response by end of business Friday, July 7, 2023.

I highly suggest you inform Eli of the potential ramifications of his conduct, including, possible criminal conduct.

Thank you for your attentiveness to this matter. I hope you enjoy your Fourth of July holiday. Much appreciated!

Cordially,

Marc Goldner

Founding & Managing & General Partner of MegaCap Capital, LLC., MegaCap Funds, LP., and Goldner Blatt Investments, LLC.

This communication and any attachments, is intended for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure or copying is prohibited. If

Marc J. Goldner
Founding Managing Part█
MegaCap Capital & Mega█
Marc@GB.Investments
+1.516.984.1466



7/2/2023

Dear Rafael Schuck and As█

Let me start off by saying h█████████████████████████████████████ as transpired, and I'm
extremely skeptical with any and all actions you█████████ ████ on MegaCap's behalf, as ████ll as for myself. By now,
you may or may not know, but Eli Blatt has attempted to improperly, invalidly, and illegally withdraw and
redeem me from MegaCap. I want you to understand that Eli's unilateral signature on a piece of paper, without
my consent, authorization, approval, or signature, has no legal bearing and is not binding

I am writing this to inform you that I am in the process of filing an injunction and federal lawsuit against Eli
Blatt, and others, including but not limited to the various MegaCap entities for breach of fiduciary duty, breach
of contract, and bank fraud, amongst several other causes of action and claims for damages that I am entitled
to for Eli's negligent and reckless conduct.

I am informing you and your firm that any and all records pertaining to MegaCap, including but not limited to
any communications and/or records between Eli's assistant, Celina, Loretta Moreno, Eli Blatt, and/or any other
entities including, but not limited to: Anthropos, Wayaca, Myami, BitSource, Goldner Blatt Investments, and
MegaCap must be preserved for discovery purposes and are to be forward to me immediately. In due course,
a subpoena to you and your firm will be issued requesting all documents and records, and you will be subject
to a deposition for any communications you've had with any of the aforementioned parties and your work
thereto.

It is upon my information and belief that you acted improperly, which has exposed you and your firm to
liability for failure to properly handle the MegaCap accounts. I am in the process of reporting Eli and MegaCap
to several federal government agencies and regulators. I bring this up to you because I may be in discussion
shortly with the Internal Revenue Service about how Eli illegally submitted MegaCap as a single member LLC. I
told you NOT to file ANYTHING under a single member LLC and you incorrectly and illegally advised and
misrepresented to me that changing to a multi member LLC could be done after filing. This attestation you've
made is a fraudulent misrepresentation of reality and you will be held liable for any and all damages, even
tangentially related to the situation.

On or about May 4, 2023, Eli illegally removed my access to MegaCap, which is in direct breach of a MegaCap
resolution signed by both of us, dated February 13, 2023 (with an effective date of December 1, 2021).
This resolution stated that, if Eli were to remove my email access, he would be withdrawn from MegaCap.
("Additionally, Eli will make Marc a super-admin with equal administrative privileges as Eli has in the MegaCap
google workspace and any other accounts relating to MegaCap. If Eli fails to complete this within reasonable
time after such filing, or if Marc or Eli uses such privileges to alter Eli's or Marc's privileges, it shall constitute
immediate grounds for involuntary withdrawal from the Company."). If Eli has attempted to portray to you and
your firm that my withdrawal and redemption was consented, I can assure you that it most certainly was NOT.
To reiterate, I will never, under any circumstances, be consenting to a withdrawal and redemption to any equity,
ownership, interest, managerial status, or otherwise in ANY of the MegaCap entities under any circumstances
so let us make sure that is crystal clear.

If Eli has been in communication with you since May 4, 2023, or before, I am requesting that you immediately
forward me these communications and any conversations you've had with Eli on the phone should be
immediately documented, so you won't be 'forgetting anything' when you are deposed in the future.

Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466



7/2/2023

To reiterate once again, yo _____ ie decision to remove me from any communicati _____ her entities in question – thus, please ensure that r _____ mail communications even tangentially related to the previously men____ed parties. I will be seeking a ju__cial order and decree to resolve this issue if it is not appropriately and speedily corrected. Once again, your failure to include me in any and all communications as well as any documentation relating to K1s, tax filings, or any approvals of the aforementioned will then make you and your associates liable and named as Defendants.

I am informing you that I am not giving any consent, authorization, or approval for **anything** relating to any MegaCap, or other mentioned entities in this email including but not limited to issuing any K1s relating to MegaCap and any other entities, filing and/or amending any tax filings relating to MegaCap and any other entities, and any other business or accounting related services including but not limited to advice relating to the MegaCap entities and any other entities mentioned herein without my SIGNED written authorization AND verbal approval. Your failure to abide by this request will create immense liability for you, as I am sure you do not want to be held liable for tax fraud. At this point, I will put nothing past Eli when, upon suspicion and belief, he has likely already committed bank fraud and when he has restricted my access to MegaCap bank accounts including but not limited to the ones held at First Republic. Further, I would like immediate confirmation that the IRS has approved Form 8832 to make MegaCap a multi member LLC with myself as a Managing Member. ("Exhibit A") I also want confirmation that this was filed timely, when you said it was going to be filed. Additionally, I want to know who at your firm allowed Eli to file any of these entities as a single member LLC. On top of this, I want confirmation in writing that you, your firm, nor Eli have attempted to invalidate the legally binding and filed Form 8832 sent to the IRS and that the form we filed that was sent to you on or about February 15, 2023 is deemed completed and accepted by the IRS. I would also like notice written VIA email if Eli has attempted to circumvent this filing and if he has tried to change it or invalidate the agreed upon documentation that we worked together on for months.

In addition, I am demanding immediate records of ALL communication, emails, documentation, approvals, letters, or other with the Internal Revenue Service including but not limited to letters sent relating to MegaCap, Goldner Blatt Investments, and any other entities mentioned herein.

You will find attached, an email from Flow, MegaCap's Fund Adminstrator, stating, "Hi Marc and Eli, over the past few days and weeks, we (Flow) have been getting conflicting stories and demands from each of you. For this reason, we will not respond to individual emails, **or work on the MegaCap portfolio in general,** until we receive clear guidance on who legally is in charge for MegaCap Capital." (emphasis/bold added) ("Exhibit B") Therefore, to be clear, I am informing you that if Eli has attempted to get you or your firm to do his dirty work and illegally issue K1s that I am not approving you are to cease work immediately and not issue any K1s or file any tax returns, nor amend any returns, for ANY of the MegaCap entities or others mentioned.

Further, as mentioned to you numerous times, two of which pre-date the actual MegaCap returns from being filed, is that the address on the returns was INCORRECT. Eli, attempted, to use his address, when we have agreed in writing to use the 15 Peacock Drive address. This 15 Peacock Address is the same address that Eli approved to be on MegaCap Form D filings. ("Exhibit C") You claimed that the IRS would 'reject' the filings, but this is patently false because upon discovery this new Biscayne address you used was NOT Eli's address used initially – he had used the 2020 N Bayshore Road address, so the change to 15 Peacock should have been made. It is your negligent conduct that allowed Eli to attempt to illegally commandeer MegaCap's banks. Just some of the emails discussing the address issue was on February 14, 2023. Further, in that same thread, I highlighted



Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466

7/2/2023

and noted several other m[...] that, "Eli has to sign as the
partnership representative [...] e one that received the
initial letter, so it is right fo[...] [...]il communication, which
is clearly a fraudulent misrepresentation as it wa[...]gaCap who received the lett[...] ot Eli and I am and have
always been a Founding Managing and General Partner of all MegaCap entities.

I need IMMEDIATE confirmation that you mailed the Form 8832 to the IRS as we agreed.

It is an undisputed fact that the initial application was incorrectly filed and that Eli fraudulently filed MegaCap
as a Single Member LLC and the 8832 form HAD to be filed to correct Eli's illicit mistakes as our Operating
Agreement, Amendments, and Resolutions are clear that I'm a 50% owner of all MegaCap entities. This is clearly
shown in "Exhibit A" on Page 5 of IRS Form 8832 that Eli and I both signed on 2/15/23.

Then, to address another February 15, 2023 email. You said, "Eli had signed the 8879 and my assistance saw
the signed form and filed the return. Any change need to be amended.  Anyways, most of what you point
out is minor." The issue here is that maybe "most" of what I pointed out was minor, but NOT all of it was minor.
Your reckless and negligent conduct is the but for cause of some of my claims that I have against Eli and
MegaCap. As you said yourself when we first spoke on the phone, "You know how Eli is" in relation to him doing
everything last minute when he dumped the initial MegaCap tax issues on you in September of 2021 without
giving you time to prepare which led to some of the issues we have.

I expect an immediate response, in full detail, addressing each and every point listed in this email. I do sincerely
appreciate your cooperation in this matter and expect you to fully cooperate without judicial intervention. I am
sorry it has come to this, but I have been left with no other choice but to stop Eli in his tracks from his illegal
and malicious actions taken against me, which has put countless Limited Partners, Capital Partners, and myself
at risk of redemption from the seller of [...] which could cause the entire deal to implode within itself.
Failure to respond to receipt of this email and to provide the requested documentation and communication
will lead to legal action and consequences taken against you and your firm, Rafael. I truly hope it doesn't
come to that and I hope that you are willing to cooperate. Thank you for your understanding of this extremely
unfortunate situation and I look forward to hearing from you in a timely manner.

I, Marc Goldner, reserve all rights. It may be beneficial for us to arrange a call with you and your partners at the
firm, Rafael, immediately!

Sincerely,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding, Managing, and General Partner
MegaCap Capital, LLC., MegaCap Funds, LP., MegaCap Funds - Tech I, LP., MegaCap Funds - Tech Holding, LP.

P.S. Please note, Rafael, that you were FULLY aware that I have veto power on all of the entities including but
not limited to MegaCap as per our phone call which you referenced in your October 3, 2022 email.

P.P.S. Please be aware that I am still owed a K-1 from your firm for MegaCap Funds – Tech Holding which cite

Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466

7/2/2023

my ownership of ▮▮▮▮▮▮▮▮▮▮▮                                             [...]ave requested numerous
times and need proof of th[...]

P.P.P.S. You and your firm are explicitly informed [...] you have NO LEGAL AUTHOR[...] to conduct ANY work relating to any of the MegaCap entities or any other entities herein, whether that be tax filings, K1 issuance, entity closures, or otherwise. You are not to forward any communications or records to any third-party accountants or to advise on any tax or accounting related matters once again. Lastly, we may need to meet & confer with the IRS as it is upon information and belief that I believe that Eli Blatt may have committed or at the very least attempted to commit Tax Fraud relating to the MegaCap entities by his fraudulent and illegal conduct.

P.P.P.P.S. Please be fully aware that I possess letters from both ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮, the sellers in which we acquired the derivative equity in ▮▮▮▮▮ vis-à-vis through the employee forward contract, and ▮▮▮▮ through the dual-layer SPV respectively that state that they will **NOT** be releasing any shares, proceeds, distributions, dividends, or otherwise to Eli Blatt and MegaCap without my signed authorization and consent. Thanks once again!

NOT A CERTIFIED COPY

Email from a Megacap Supplier of Pre-IPO shares

# Re:

NOT A CERTIFIED COPY

| From: | | July 3 at 6:46 PM |
|---|---|---|

To: **Eli M Blatt** | e@megacap.capital

Cc:

Hi Eli,

Additionally, I suggest that we make a zoom call to discuss the situation with Marc Goldner.  He approached us in an alarming way and we'd like to also hear your view of the situation.

Kind regards

Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466



6/29/2023

Dear Eliakim Moshe Blatt A.K.A. MR. Eli Blatt:,

I am telling you right now, you have ONE last chance to resolve all matters relating to GBI and reinstate me at MegaCap. We are all willing to overlook your outlandish actions heretofore and this is the final offered olive branch before we all decide to continue with litigation and escalate this matter even further.

It is a shame it has come to this, however, based on the April 30th 2023 letter allegedly sent to me, entitled 'GBI Rescission Notice.pdf.' ("Exhibit A") I am hereby informing you that, under section 40 of GBI's Operating Agreement (dissociation of a member), I hereby accept your withdrawal, but understand that the Mutual Contacts provision as per Section 37 will still remain. (the "GBI OA" which you have access to). On top of this, if you recall looking, it is important to note that under Section 38(a) of the GBI OA states, "[a] voluntary withdrawal may only be made after 3 years from the date of the signing of this Operating Agreement." Thus, your letter sent on April 30, 2023, was sent improperly and without proper notice and is deemed an improper withdrawal as the GBI OA is in effect as of December 7, 2021 – thus, I'm correcting your mistakes for your mutually agreed departure. Further, the 60 days under Section 40 are not triggered until I notify you that I elect to purchase your interest in GBI, which event has not transpired. For avoidance of doubt, GBI shall mean Goldner Blatt Investments, LLC, herein.

Understand that, under Section 39 of the GBI OA you still maintain liability for your time as a member of GBI. To be clear, you still owe GBI roughly $797,817 based on the emailed "Exhibit B" updated cap table.

Please note, you have no authority to "instruct" me to do anything that I do not want to do. Further, you cannot coerce me to not file for taxes – I WILL eventually be filing for taxes for GBI in which you will maintain a 0% interest in all GBI assets that you have effectively walked away from as per Exhibit A. Your lack of understanding of the debt you owe to GBI, to Dharma and its members, and to myself is your problem and your problem alone and you will be held fully liable for all debts and liabilities owed. You have grossly underfunded the agreed upon capital contributions to GBI which puts you in material breach.

You claim, in this same GBI Rescission Notice, that I attempted to deprive you of interest in the Neuralverse and in Dharma, however, this is patently false. You, by your own words, provided me with a tacit waiver of such interests. This is evident in your November 17, 2022 withdrawal from the Neuralverse fund chat, and more so, your tacit waiver of those very same interests was made very clear when you messaged me in the MegaCap group chat: "Bitsource, you can have it", "NFT fund, you can have it", "neuralverse, you can have it", and "dharma, you can have it".

Furthermore, it has come to my attention that you are in material breach of our various Non-Circumvent and Non-Disclosure Agreements ("NCNDA") which will continue to remain intact and enforceable. Your nonsensical attempt to circumvent our NCNDA and breach the mutual contacts provisions contained in the GBI Operating Agreement under Section 53 is something you will be held liable for. The GBI OA states, under Section 37, that the mutual contacts provision will remain in full force even upon dissociation of a member. You attempting to deprive me of these rights will prove to be unsuccessful and shows your bad faith in your conduct to date. You claim in the GBI Rescission Notice that "[I] a[m] not making any of [my] mutual contacts [...available to you]" – this is patently false and easily disproven as I have not only shared hundreds upon hundreds of contacts with you, but I have successfully raised well over $1,000,000 through my network that you have exploited without reimbursing me for my expenses. In bad faith, you have continued to attempt to solicit my contacts behind my back after your illegal and improper withdrawal and illegal redemption of my interests in MegaCap. Please note, I possess proof that you have attempted

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED



Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023

to circumvent this NCNDA, which puts you in material breach of these agreements when you contacted at least one LP, one by the name of Bob Feldman on May 31, 2023 at 6:47AM. Bob Feldman is my contact which is easily proven through my creating the group chat title "Bobby / MegaCap" on December 14, 2021. In addition, to your misfortune, not only is Bob Feldman my contact but he is in the Private Security industry which puts you in further breach of the GBI OA under Section 53(f), whereas it is clear that individuals from various industries "will not be considered mutual contacts". Thus, attempting to solicit my contacts for derivative equity in ☒☒☒☒ in which you are restricted from selling at MegaCap, is a direct and material breach of the GBI OA and you and MegaCap will face legal consequences for your illegal actions. To wrap this point up, I wholly dispute your outlandish claims that I fraudulently induced you into entering this contract, when in fact it was YOU who was the one that proposed starting an investment company together on May 25, 2021 called "GoldBlatt Partners or something", which I possess definitive, undeniable proof of.

Further, I wholly dispute that I failed to abide by any of the terms of the agreement; it is YOU who has breached countless provisions. One such egregious breach that has put the entire operation at risk is your commingling of funds relating to MegaCap, BitSource, and GBI, with an intern by the name of ☒☒☒☒ whom you told to do 'work' on an NFT spreadsheet, which was done a) without my permission, b) without a contract with GBI, and c) when he was paid by BitSource when it was supposed to be by MegaCap which was not approved by myself.

Upon information, belief, and categorical, hard evidence, I am aware that you have engaged in numerous illegal activities. These are Forbidden Acts under Section 64 of the GBI OA where you are breaking the law which can bring harm to our business and jeopardize our Limited Partners investments due to your perpetual ☒☒☒☒ I possess concrete proof of your illegal actions. Section 64 states, "[n]o Member may do any act in contravention of this Agreement or prevailing law". I have this evidence readily available, and I can provide this to you upon request – please let me know if you'd like me to share this discoverable evidence with you. While, Section 68 of the GBI OA provides for any Forbidden Acts to "be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members", a mediation process would have followed, but since you instead opted to withdraw with the GBI Rescission Notice, I hereby redeem, mutually and voluntarily agreed-upon terms relating to your withdrawal, including all your equity, interests, assignments, investments, and so forth. Please note, that you are still fully responsible for distributing GBI's rightful interest in investments such as, but not limited to, in the James Bond Video Game and ☒☒☒☒ that was "approved" by your mother and sent to me by you in writing on WhatsApp prior to the increase in valuation that was sent by ☒☒☒☒ with his most recent upcoming distribution letter.

To be clear, and going back just a bit, the mutual contacts provisions still remain intact and enforceable, and your breach thereof entitles me to damages to be determined at trial. I am giving you notice to immediately cease any and all communications with not just my contacts, but GBI's contacts in general, which you have not only failed to reimburse me for the expenses I incurred whilst obtaining them, but you have also prioritized your invalid and unapproved expenses in the amount of roughly $70,000, and used some of that money to pay for ☒☒☒☒ to go to "Summit" without my approval – which, by your own words, produced no mutual contacts and I had NEVER agreed to pay for Emily to go, especially after she had already stolen from Neuralverse which you allowed her to do. (Please note: Now that you are no longer a part of GBI, GBI will be exploring a legal action against Emily for her breach of the NCNDA that she signed when she contacted ☒☒☒☒ which was my contact as a SIPA Alumni, soliciting him for a competing metaverse fund with stolen documents that you allowed her to possess). You don't seem to understand that awareness is NOT approval of such. You continue to claim that I was aware of this alleged $70,000 expense that you unilaterally approved, but, by your own words, without a written approval and authorization awareness is not enough. You prioritized your personal relationships with an attorney by the name of Michael Elkins because you said that you are not willing to jeopardize your unrelated case against K4B. You further

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED



Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023

continued to claim that the onl  thin  'confidential' about our relationship is the share price █████████
█████████  which is patently false. Your outrageous claim an  a  egation t  at I
changed' an expense provision in the MegaCap Agreement is patently false as there is DOCUMENTED proof in the
MegaCap chat with the track changes of the specific provision that you were sent well prior to signing the resolution.

Eli, to reiterate, the facts indicate that you are entering a losing battle. There is no world in which you are going to
win – none whatsoever. Once again, you are setting yourself up for a protracted, multi-year, and scorched-earth
legal battle involving a myriad of people. I will not sit idly by allowing you to continually breach your fiduciary duties
with impunity. You have instructed me to not contact you – but you can't have it both ways like you always try to do,
and then get upset that I'm 'ignoring' you when you told me not to speak to you. Mind you, you writing on a piece
of paper that GBI has never existed is meaningless as it is factually untrue, and once again there WILL eventually be
tax filings for GBI in which you will be responsible for. I will be more than happy to share all of this with the IRS as
everything and all assignments were done completely legally. However, please note, that your notice has effectively
waived almost all of your rights under our agreement, and your retroactive withdrawal is hereby denied.

Additionally, and for clarity, your attempted withdrawal as of April 30th, 2023 is hereby accepted as of June 29,
2023, and the entire equity, interest, and all assignments are being purchased for $0 due to the debt, liabilities,
and balance that you owe GBI as per Exhibit B (the updated cap table). GBI possesses all the requisite and legal
documents for any assignment, sale, or transfer of any assets, and your failure to understand the structure of these
agreements is your fault and your fault only as they were never requested – all the legal documentation exists, Eli.
You cannot claim that you did not understand that you owe GBI money, who owes Dharma money, when you are
the one that made the excel spreadsheet for Dharma and determined how much each individual and entity owes
for the balance due to Compass (not inclusive of the underfunding and underpayment to me for the NFTs and other
assets including but not limited to your required assignment of the 'Troutwine' investments). You know the money
to Dharma was just a deposit, and with every deposit eventually comes due a balance, which you failed to provide to
GBI which in turn was unable to pay Dharma as per the December 31, 2022 Default Notice that Simon had issued you
and to GBI. As a result of the foregoing, you have no valuable interest to be purchased and no viable claim in that
respect – you owe more than whatever you believe you are entitled to. Therefore, I accept your voluntary withdrawal
as of the date of this correspondence but disclaim any obligation to purchase an interest as there is no value therein.
If any value is determined to exist, such amount would be considered to be 'set-off' from the amount that you owe to
GBI in the amount of $797,817.

Also, it was you who chose not to pay for your GBI email address, I NEVER restricted you from it – it was instead you
that breached MegaCap's resolution and removed my email which is grounds for involuntary withdrawal as per the
MegaCap signed resolution. You cannot, in good conscience, run to the courts and claim that the Dispute Resolution
terms as per Section 75 of the GBI Operating Agreement are invalid, but then turn around and claim that the Dispute
Resolutions terms of the MegaCap Operating Agreement ARE valid – it doesn't work that way.

I have tried in good faith to look past your behavior but your escalation and failure to work in good faith has led
to this. Your childish attempts at claiming that I threatened you, when we both know that █████ threatened me
privately AND conveniently left out that he hopes you are not going to die █████████ – any way you slice
it, I was protecting us and our families whether you want to believe it or not. As I said numerous times, I extended
many olive branches to you, acting in good faith, hoping you would turn around. Regardless of all of this, to repeat,
you still breached the MegaCap resolution that stated that if I were to have my email removed, that you would be
involuntarily withdrawn as per said signed resolution. You utilizing your personal attorney to commandeer MegaCap

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR
IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED

Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466



6/29/2023

makes Michael Elkins an accomplice to your illegal actions and crimes. I strongly suggest that you immediately reinstate me, otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved.

I want to state one more thing: regarding your divulgence of any private contracting work that I may have done in the past – if it turns out to be true, as you allege, that I am involved in 'spy activities,' you may be tried for charges relating to the breaching of 50 U.S.C. 421, potentially punishable by a prison sentence for divulgence of my identity and putting my family's life at risk. (As an aside, it is extremely important to remember that I possess the name (as do you) of the ▨▨▨▨▨ employee that is part of the ▨▨▨▨▨ employee forward contract - (his name in case you didn't read the documents is ▨▨▨▨▨). You cannot just file a court complaint in the public record to attempt to coerce me to settle on your demands by hanging my life and my family's lives in the balance alleging that I was a "spy". Further, it is egregious that ANY attorney put their name on a complaint in which stated anything about me being a "spy" – your counsel, whoever they may be, should be ashamed of themselves for potentially putting a patriot's life at risk and may also be liable for aiding in your illegal actions relating to 50 U.S.C. 421. To note, though, this is not the first time you have breached this statute – you also disclosed this claim to Audra when we discussed many MegaCap matters such as when she told us we MUST get the proper documents for LPs done, especially since MegaCap Tech Holding▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ Or are these all part of your ▨▨▨▨▨▨ delusions when you claim that I am some "spy"? I guess you will have to take your chances to find out the truth, but I would highly recommend immediately dismissing this case and abiding by the dispute resolution terms of the agreement, otherwise, your failure to do so may result in a federal court action and a tacit approval and waiver for me to sue MegaCap in federal court, as you cannot have it both ways – that one contract is invalid and the other is valid whether we're discussing the dispute resolution section or the contracts as a whole. MegaCap will be named as a third-party defendant, and I will most certainly ensure that ALL shares are withheld. What you do not seem to understand that is IF the shares are cancelled, it is YOU who will be held liable as you are the but for cause of all of this happening. Further, our Limited Partners need to be protected from you and I have absolutely no issue putting MegaCap into receivership with the SEC. You should also really stop thinking that I am working alone and that I am the only one that you have harmed at MegaCap. I suggest you confirm and deliver me my K1 for MegaCap Tech Holding, showing my interest in ▨▨▨▨▨ for 8,217 shares, and placing me on ▨▨▨▨▨ cap table with ▨▨▨▨▨ confirmation signed in writing, and then we can discuss all other MegaCap matters. Failure to provide me, as an LP, with these K1s will force me to bring a class action suit against you with LPs that have already agreed to sue MegaCap with me. You are risking this entire deal by threatening to allow it to implode within itself as *allegedly* being the only Class A member makes you entirely liable if the shares of ▨▨▨▨▨ were to be canceled, because our resolution contains the name of the employee in which we acquired the derivative equity in. In the case of cancellation, you'd be entirely liable for repaying all LPs (including myself) for any and all losses▨▨▨▨▨▨▨▨▨▨▨

This entire letter and its contents are CONFIDENTIAL!

Eli, if this were a game of chess, you've been checkmated. There is nowhere you can run from the law. And so, you have no valid defenses. It is time for you to stop hiding behind Celina, Elkins, and any other counsel. It is time to have a good faith discussion in order to resolve these matters. For the record, you very well know that I never extorted you. You know that, after ▨▨▨▨ produced that signed affidavit, that he was the one who threatened me. I also know that ▨▨▨▨▨▨ is liable for their illegal actions, and I will be telling them as such in due time. To be clear, ▨▨▨▨▨ will be a named defendant in this matter. ▨▨▨▨▨ signed affidavit has two lies, which will be impeached: first, I possess proof that ▨▨ told ▨▨ to speak to me when they were at a coffee shop in Dubai.

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED




Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023

Second, we both possess proof that [redacted] told us that [redacted] has a side agreement with [redacted] on WhatsApp – he had apparent authority and we all believed that [redacted] was acting on behalf of [redacted]. There is no question that [redacted] had agency, which makes [redacted] liable for the threats against our lives. Your claims of extortion, therefore, are nothing more than gamesmanship. In order for extortion to exist, I would've needed to have a financial benefit, which I had none – instead, I saved MegaCap over $100,000 in the interest waiver agreement that I had gotten signed which [redacted] said (and I possess proof of) that she never would've authorized to be signed if it weren't for me. I've maintained my fiduciary duty to MegaCap – you have NOT. I truly hope that warning one of my best friends, risking my own life, to tell you that a bunch of overseas thugs threatening to show up at our houses saying they would get their money back "one way or another" and telling me privately and sarcastically "make sure Eli doesn't die [redacted]" will quash your claims of extortion against me and will divert your attacks towards [redacted]. We should be working together here, Eli, not against each other. I strongly believe there is still time to resolve these matters before they get completely out of hand.

With all this said, I propose we form a truce, Eli. You drop your claims against me, reinstate me at MegaCap, and we sue [redacted] for trying to tear our relationship apart. They are the wedge that got between us, as everything else would've been resolved in due time. Please let us take the high road here and preserve both of our reputations, finances, and valuable time. I do NOT want to be arguing and fighting with you, but, make no mistake, Eli, I will defend myself and go after what is rightfully mine. I know you didn't think I was just going to walk away from MegaCap for $1.70. We can be on the same team, and on the same side, but you must start acting in good faith and working with me, not against me. At this point, Eli, the choice is yours. I am willing to put the past behind us and move forward I hope to hear back from you such that we can work through this productively. Please advise me of your decision immediately, and if later then next week, I will otherwise continue to prepare my cases against you.

Do not consider this letter to be entirely conclusive as more is to come considering that you have committed numerous forbidden acts that have "ma[d]e it impossible to carry on the ordinary business of the Company" as per Section 66 of the GBI when you've stated you will not allow anything else to be done under GBI, which at this point, is no longer your choice to make. I continue to reserve all rights and will be pursuing all legal avenues available to me if you decide not to take the high road. Be well, Eli. I continue to reserve all rights. Thank you!

Respectfully,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds

PS. If you attempt to sell even one of my 8,217 shares of [redacted] you will be held liable and it will come from your shares and carried interest. Please note that I possess a letter from both [redacted] and WCEP that state that they will not release any shares and/or proceeds from [redacted] or [redacted] without my signed authorization. At this point, you are right about one thing: I am protecting you from yourself because I need to protect ALL entities and LPs – including myself from your illicit and illegal actions, including, but limited to, upon information and belief, committing ACH and Bank Fraud. I'm willing to look past everything that you've done up until this point, so please don't let me down. I hope to hear back from you soon and that we can work through this productively.

**THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED**

# RECEIPT

5938051

CLERK OF THE CIRCUIT COURT & COMPTROLLER
PALM BEACH COUNTY, FLORIDA

Printed On:
09/04/2025 11:53
Page 1 of 1

| Receipt Number: 5938051 - Date 09/04/2025  Time 11:53AM | |
|---|---|
| Received of: | Kelsky Law, P.A.<br>150 S. Pine Island Road<br>Suite 300<br>Plantation, FL 33324 |

| | | | |
|---|---|---|---|
| Cashier Name: | ADMIN | Balance Owed: | 406.00 |
| Cashier Location: | E-Filing | Total Amount Paid: | 406.00 |
| Receipt ID: | 12391372 | Remaining Balance: | 0.00 |
| Division: | AK: Circuit Civil Central - AK(Civil) | | |

| Case# 50-2025-CA-008971-XXXA-MB -- PLAINTIFF/PETITIONER: BLATT, ELI | | | |
|---|---|---|---|
| Item | Balance | Paid | Bal Remaining |
| Fees | 406.00 | 406.00 | 0.00 |
| Case Total | 406.00 | 406.00 | 0.00 |

| Payments | | |
|---|---|---|
| Type | Ref# | Amount |
| EFiling_CREDITCARD | 16221196 | 406.00 |
| Total Received | | 406.00 |
| Total Paid | | 406.00 |



**How was your service today?**  Please visit www.mypalmbeachclerk.com/survey or send your feedback to clerkweb@mypalmbeachclerk.com.
**For office locations and information about Clerk & Comptroller services:**
Visit www.mypalmbeachclerk.com or call (561) 355-2996.

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AK"
CASE NO.: 502025CA008971XXXAMB

ELI BLATT,
ELI BLATT,
ELI BLATT,
et al.,

      Plaintiff/Petitioners

vs.

MARC J GOLDNER,
SIMON DIVILOV,
RODERYCK REITER,
et al.,

      Defendant/Respondents.

_____/

## UNIFORM DIFFERENTIATED CASE MANAGEMENT ORDER
## AND ORDER SETTING TRIAL
### (DCMSNT)

     **THIS MATTER** is a Circuit Civil case calling for a non-jury trial (or streamlined jury by stipulation or court order). Pursuant to Fla. R. Gen. Prac. & Jud. Admin. 2.250(a)(1)(B) and 2.545(b), and Fifteenth Judicial Circuit Administrative Order 3.110 (as amended), **Plaintiff/Petitioner is directed to serve this Order upon each Defendant/Respondent with the initial Complaint/Petition and Summons**.

     It is hereby **ORDERED AND ADJUDGED** that this case is designated to the **STREAMLINED TRACK** for time to disposition. The deadlines and procedures set forth in this Order will be strictly enforced unless changed by court order.

Consistent with the Professionalism Expectations of the Florida Supreme Court and the Florida Bar, the parties and counsel are expected to govern themselves at all times with a spirit of cooperation, professionalism and civility. They are expected to accommodate each other whenever reasonably possible and eliminate disputes by reasonable agreements. Self-Represented/*Pro Se* Litigants (i.e., those without counsel) are held to the same procedural and legal obligations as are imposed upon counsel.

## I. SCHEDULING

### A. Calendar Call

**YOU MUST APPEAR FOR A MANDATORY CALENDAR CALL on November 6, 2026 at 9:00 am**. The parties must be ready to try the case by that date. The actual trial period begins on the docket associated with this Calendar Call date as provided in Divisional Instructions or by court order.

Case No. 50-2025-CA-008971-XXXA-MB

Calendar Call may be conducted in person, via Zoom or by e-calendar. <u>All parties are instructed to review the Court's Divisional Instructions for specific procedures at www.15thcircuit.com/divisions.</u>

At the Calendar Call, the Court may conduct a final case management conference. Attorneys who appear for Calendar Call must be prepared on all pending matters and have authority to make representations to the Court and enter into binding agreements concerning motions, issues, and scheduling. These include issues raised by the parties' Pre-Trial Stipulation; trial procedures; jury selection procedures; jury instructions and objections; and the need for any special equipment, courtroom facilities, or interpreters. An appearing attorney must be prepared to advise the Court of all attorneys' availability for trial and future hearings as necessary.

**<u>This Order serves as notice to the parties that failure to attend Calendar Call will result in an Order of Dismissal without prejudice, or entry of default, without further notice or hearing.</u>** *See* **Fla. R. Civ. P. 1.200(j)(6).**

B. **Case Management Deadlines**

The following deadlines strictly apply unless otherwise modified by the Court:

|   | EVENTS | COMPLETION DEADLINE |
|---|--------|---------------------|
| 1. | Service of Complaint | January 1, 2026; service under extension is only by court order. |
| 2. | Answer and/or initial motions/objections directed to the pleadings (i.e. to dismiss or strike) | 20 days after service |
| 3. | Initial Discovery Disclosures | 60 days after service |
| 4. | Amendment of pleadings/Adding parties | February 10, 2026 |
| 5. | Resolution of all motions/ objections directed to the pleadings and pleadings closed | March 2, 2026 |
| 6. | Disclosure of Expert Witness(es) | July 9, 2026 |
| 7. | Disclosure of Rebuttal Experts | July 29, 2026 |
| 8. | Inspections, Expert Witness Depositions and Compulsory Examinations completed | August 18, 2026 |
| 9. | File Witness & Exhibit Lists | September 7, 2026 |
| 10. | Completion of Discovery relating to Summary Judgment and *Daubert* Motions | August 18, 2026 |
| 11. | File and Serve Motion(s) for Summary Judgment and *Daubert* Motions | August 28, 2026 |
| 12. | File Rebuttal Witness Lists | September 17, 2026 |
| 13. | Completion of All Discovery | September 27, 2026 |
| 14. | Pre-Trial Meet & Confer | October 7, 2026 |

Case No. 50-2025-CA-008971-XXXA-MB

| 15. | File all Pre-Trial Motions (i.e. Motions in Limine) | October 7, 2026 |
|---|---|---|
| 16. | Deadline for Mediation | October 27, 2026 |
| 17. | Deposition Designations | October 27, 2026 |
| 18. | File Joint Pre-Trial Stipulation | October 27, 2026 |
| 19. | Deadline to hear ALL Motions | November 1, 2026 |
| 20. | Jury Instructions and Verdict Form | November 3, 2026 |
| 21. | Calendar Call/Trial Ready Date | November 6, 2026 |
| 22. | Trial Period | Begins on the docket associated with the above Calendar Call date, as provided in Divisional Instructions or by court order. |

**Note: If the above deadlines fall on a weekend or holiday, please refer to Fla. R. Gen. Prac. & Jud. Admin. 2.514.**

The parties are expected to actively manage the case and to confer early and often to ensure compliance with the Florida Rules of Civil Procedure and this order in timely resolving this case. **The parties are encouraged to file, meet, and make disclosures prior to the deadlines imposed above, in order to ensure compliance with the Rules requiring timely disposition of cases**.

The Court may, at any time, modify this Order by entry of: 1) an Amended Trial Order, 2) an Amended Case Management Order; or 3) any other Order intended to establish a modified case resolution schedule, any of which shall supersede the deadlines set forth in this Order. The Court reserves the authority to expedite the trial setting and amend pretrial deadlines accordingly. The Court further retains its discretion to modify any provision herein.

C. **Motions**

Unless court approval is required to set a particular motion for hearing, the parties must expeditiously set all contested motions for hearing. All non-dispositive motions, including motions directed to the pleadings, must be scheduled for hearing within **five (5) days** of filing. Parties shall schedule the hearing for the first vacancy on the Court's docket when all parties are available. **Failure to schedule a hearing within five (5) days may result in the Court deeming the motion(s) abandoned without further notice or hearing**.

The moving party shall be the party responsible for securing the presence of a court reporter. The moving party shall advise all parties in writing in advance of the hearing or trial of the arrangements made, if any, for the presence of a court reporter, or shall advise all parties in advance of the hearing or trial that the moving party has chosen not to obtain a court reporter.

Before filing a non-dispositive motion, the movant must follow Rule 1.202 and Local Rule 4. Failure to comply with the requirements of Rule 1.202 and Local Rule 4 may result in sanctions against the non-compliant party.

The requirements of Rule 1.202 do not apply when the movant or the nonmovant is unrepresented by counsel (*pro se*).

D.  **Extensions, Modifications and Continuances**

**Extensions of Deadlines Other than Trial/Calendar Call: All motions to extend deadlines must be filed prior to the deadline.** Untimely motions will be denied absent compelling circumstances and a showing of good cause.

The parties must strictly follow Rule 1.200(e) and Administrative Order 3.110 (as amended) when filing motions for extension or modification. If the parties agree, and the extension will not prevent the case from being trial ready by the original Calendar Call date, the parties may file a motion and submit for the Court's consideration an agreed order or proposed Amended DCMO, as applicable under Rule 1.200(e)(1). The motion shall identify which deadlines are requested to be extended and the basis for the request. Each agreed order or Amended DCMO must contain agreed-upon dates for all remaining deadlines and confirm that the Calendar Call date remains as previously set. The Court will accept the amendment or direct the parties to set a DCM Conference. **Agreements to extend the dates for the filing of Summary Judgment and *Daubert* motions, and for completion of discovery, must be set for hearing, and the parties must be prepared to address how the proposed extension will not affect the Calendar Call date.**

**Motions to Continue Trial:** Motions to continue trial must strictly comply with Rule 1.460. **Motions to continue are disfavored and will rarely be granted and then only upon good cause shown. Successive continuances are highly disfavored. Lack of due diligence in preparing for trial is not grounds to continue the case**. Failure to timely complete discovery and/or file a motion for summary judgment shall not be grounds to continue the trial.

E.  **DCM Conferences**

If any party is unable to meet the deadlines set forth in this Order for any reason, including unavailability of hearing time, the affected party must promptly set a DCM conference as described in Administrative Order 3.110 (as amended), identifying the hearing time requested and the pending motion(s). DCM conferences shall be scheduled through online scheduling (OLS) on either the Court's: 1) DCM - Case Management Conference docket; or 2) Uniform Motion Calendar, in accordance with Divisional Instructions.

II.  **UNIFORM PRE-TRIAL PROCEDURE**

A.  TIMELY SERVICE AND DEFAULTS

Case No. 50-2025-CA-008971-XXXA-MB

Parties must make reasonable efforts to ensure speedy service. Each return of service must be separately filed for each defendant. If service is not completed within ninety (90) days, an Order will be issued directing service by the **ONE-HUNDRED TWENTY (120) DAY DEADLINE**. Failure to comply will result in dismissal of the case or party for lack of service. Any motions to extend the deadline for service must specify why service could not have been effectuated, what has and is being done to effectuate service and request only that amount of additional time necessary.

If all defendants become defaulted, a Motion for Default Final Judgment along with supporting documentation must be filed within **thirty (30) days** of the last default and set for hearing at the next available hearing time.

B.  INITIAL DISCLOSURES

Within **sixty (60) days after service** on a defendant, and except as exempted by Rule 1.280(a)(2) or as ordered by the court, each party must, without awaiting a discovery request, provide to the other parties initial discovery disclosures in compliance with Rule 1.280(a), unless privileged or protected from disclosure.

C.  EXHIBITS AND WITNESSES

No later than **sixty (60) days before Calendar Call**, each party shall file and exchange lists of all trial exhibits, names, and addresses of all trial witnesses. Each party's witness list must include a brief description of the substance and scope of the testimony to be elicited from each witness. Both sides must cooperate in the scheduling of all witness depositions.

Each party's exhibit list shall include each exhibit separately numbered and identified. Generic or prospective designations are not allowed (e.g. insurer's file, documents to be produced, etc.). Each party shall provide for a reasonable time and place for the other parties to review and copy the exhibits.

D.  EXPERT WITNESS DISCLOSURES

In addition to the names and addresses of each expert retained to formulate an expert opinion, as well as any hybrid fact/expert witnesses, no later than **one-hundred and twenty (120) days before Calendar Call**, the parties must provide:

1.  The subject matter about which the expert will testify;
2.  The opinions to which the expert will testify;
3.  A summary of the grounds and facts for each opinion; and
4.  A copy of the expert's curriculum vitae.

**Each expert will be limited to testifying only about those matters which have been fully disclosed.**

Case No. 50-2025-CA-008971-XXXA-MB

Parties shall furnish opposing counsel with two (2) alternative dates of availability of all expert witnesses for the purpose of taking their deposition. All parties shall cooperate in the scheduling of expert depositions.

The parties shall also provide answers to standard form expert interrogatories. All reports or other data compiled by each disclosed expert which are intended to be used by the expert and/or referred to during his/her deposition testimony shall be provided electronically to all opposing parties at least 72 hours prior to the date of the scheduled deposition.

**Rebuttal/Responsive Experts**

No later than **one-hundred (100) days before Calendar Call**, the parties shall provide opposing counsel with a written list with the names and addresses of all rebuttal/responsive expert witnesses intended to be called at trial and only those rebuttal/responsive expert witnesses listed shall be permitted to testify. The parties shall also furnish opposing counsel with expert reports or summaries of all rebuttal/responsive expert witnesses' anticipated testimony to the same extent as the expert disclosure requirement above.

Within **twenty (20) days** following this disclosure, the parties shall make their rebuttal/responsive experts available for deposition. The experts' depositions may be conducted without further court order.

E. REBUTTAL FACT WITNESSES AND EXHIBITS

No later than **fifty (50) days before Calendar Call**, the parties must file and exchange lists of names and addresses of all rebuttal fact witnesses and lists of any rebuttal exhibits.

F. ADDITIONAL EXHIBITS, WITNESSES OR OBJECTIONS

At trial, the parties will be strictly limited to exhibits and witnesses previously disclosed absent agreement of the parties or order of the Court upon good cause shown. A party desiring to use an exhibit or witness discovered after counsel have conferred must immediately furnish the Court and other counsel with a description of the exhibit or with the witness' name and address and the expected subject matter of the witness' testimony, together with the reason for the late discovery of the exhibit or witness. Failure to reserve objections constitutes a waiver. Use of the exhibit or witness may be allowed by the Court for good cause shown.

G. DEPOSITION DESIGNATIONS

No later than **ten (10) days prior to Calendar Call**, each party must serve deposition designations, or portions of depositions, each intends to offer as testimony.

No later than **eight (8) days prior to Calendar Call**, each opposing party is to serve any counter (or "fairness") designations, together with objections to the depositions, or portions thereof, originally designated. No later than **five (5) days before Calendar Call**, each party must serve any objections to counter-designations served by an opposing party.

## H.  DISCOVERY COMPLETION

All discovery relating to Summary Judgment and *Daubert* motions must be completed no later than **eighty (80) days prior to Calendar Call**.

All discovery must be completed no later than **forty (40) days prior to Calendar Call**.

Rulings as to admission on late discovery will be made on a case by case basis. Absent unforeseeable, exigent circumstances, the failure to complete discovery is not grounds for a continuance.

## I.  COUNSEL MEETING AND PRE-TRIAL STIPULATION

Counsel or the parties, if not represented by counsel, shall meet in person at a mutually convenient time and place no later than **thirty (30) days before Calendar Call** to discuss settlement, simplify the issues, and stipulate to as many facts and issues as possible, and prepare a Pre-Trial Stipulation in accordance with this paragraph.

It shall be the duty of Plaintiff's counsel to see that the Pre-Trial Stipulation is drawn, executed by counsel for all parties, and filed with the Clerk no later than **ten (10) days prior to Calendar Call. UNILATERAL PRE-TRIAL STIPULATIONS ARE DISALLOWED, UNLESS APPROVED BY THE COURT AFTER NOTICE AND HEARING**. If a party does not receive a substantive response to a proposed Pre-Trial Stipulation after good faith effort, such party shall file a unilateral Pre-Trial Stipulation with a certification of all efforts that were made to confer with the opposing party. Counsel for all parties are charged with good faith cooperation in preparing the Pre-Trial Stipulation, and the parties shall make exhibits available for inspection and copying. Failure to cooperate in preparing the Pre-Trial Stipulation may result in striking pleadings, witnesses, or exhibits.

The Pre-Trial Stipulation must contain the following in separately numbered paragraphs:

1. Names and contact information of attorneys to try case.
2. A list of all pending motions requiring action by the Court. **Motions not listed are deemed abandoned or waived**.
3. A statement of estimated trial time, including the total number of trial days anticipated, and the time needed per side for (1) jury selection, (2) opening arguments, (3) each case in chief, and (4) closing arguments.

Case No. 50-2025-CA-008971-XXXA-MB

4. **Statement of the Facts:** A concise statement of the facts in an impartial, easily understandable manner which may be read to the jury.

5. **Statement Facts and Agreed Rules of Law:** A list of any stipulated facts requiring no proof at trial and any agreed rules of law.

6. **Statements of Disputed Law & Fact:** A statement of disputed issues of law and fact that are to be tried.

7. **Witness Lists:** Parties must attach their previously filed Witness Lists, including rebuttal or impeachment witnesses. If any party objects to any witness, such objections must be stated in the Stipulation, setting forth the grounds with specificity. At trial, all parties will be strictly limited to witnesses properly and timely disclosed. Only those witnesses listed by NAME will be permitted to testify at trial.

8. **Exhibit Lists:** Parties must attach their previously filed Exhibit Lists. All exhibits to be offered in evidence at trial must have been made available to opposing counsel for examination. Only those exhibits listed may be offered in evidence. If any party objects to the introduction of any such exhibit, such objection must be stated in the Pre-Trial Stipulation, setting forth the grounds with specificity. Demonstrative exhibits (e.g. PowerPoints, charts, enlargements of exhibits) to be used at a Jury Trial must be displayed to all counsel before being shown to the jury. All exhibits must be pre-marked and numbered consistent with Clerk guidelines.

9. **Jury Instructions:** Counsel must identify all agreed-upon standard jury instructions and all special instructions. Any objections or disputed jury instructions must be attached and identified as to the party that proposed the instruction [indicated in redline/track changes]. Copies of all agreed-upon instructions or disputed instructions must be attached to the Stipulation as one document, redlined as necessary, along with copies of supporting statutory citations and/or case law.

10. **Verdict Forms:** The jury verdict form must be attached and designated as agreed to or disputed.

11. **Peremptory Challenges:** State the number of peremptory challenges for each party.

12. Other agreements or issues for trial, if any.

Failure to file a Joint Pre-Trial Stipulation as provided above may result in Court-imposed sanctions, including dismissal or default without further notice of the Court.

J. <u>MOTIONS</u>

**Summary Judgment and *Daubert* Motions** must be filed at least **seventy (70) days before Calendar Call**. The parties shall confer regarding summary judgment motions to ensure discovery necessary for those motions is completed in advance of their filing.

**ALL MOTIONS** (including dispositive motions and motions in limine), deposition objections, and expert challenges must be filed, served and heard at least **five (5) days before Calendar Call**.

Case No. 50-2025-CA-008971-XXXA-MB

K. PRE-MARKING EXHIBITS

Prior to trial, each party is to mark for identification all exhibits in accordance with the guidelines of the Clerk of Court. Instructions and templates may be found at: www.mypalmbeachclerk.com/departments/courts/evidence-guidelines/civil-evidence).

L. ENLARGED JURY PANELS

Local Rules require advance approval of the Chief Judge and Jury Office for jury panels exceeding 31 jurors. **To ensure enough jurors are available, requests for enlarged jury panels must be resolved at least six (6) months before Calendar Call**. Failure to timely request an enlarged panel may result in Court-ordered sanctions, including a limitation on peremptory challenges.

M. INTERPRETERS

Unless otherwise ordered by the Court, it shall be the responsibility of the party who needs the services of an interpreter, whether for a litigant or for a witness, to have a competent interpreter present in court.

N. JURY INSTRUCTIONS AND VERDICT FORM

A joint set of proposed jury instructions and a proposed verdict form must be provided to the court no less than **three (3) days before Calendar Call** in a printed form appropriate for submission to the jury and in Microsoft Word format.

If there is an objection to a proposed instruction, the instruction should be followed by the specific objection, a brief explanation, and a citation to legal authority. If an alternative or modified instruction is proposed, it should follow the instruction it is intended to replace.

O. UNIQUE QUESTIONS OF LAW

Prior to calendar call, counsel for the parties are directed to exchange and simultaneously submit to the Court appropriate memoranda with citations to legal authority in support of any unique legal questions that may reasonably be anticipated to arise during the trial.

III. **MEDIATION**

A. MEDIATION REQUIRED

1. All parties are required to participate in mediation.
2. The attendance of counsel who will try the case and representatives of each party with full authority to enter into a complete compromise and settlement is

Case No. 50-2025-CA-008971-XXXA-MB

mandatory. If insurance is involved, an adjuster with authority up to the policy limits must attend.

3. At least one week prior to a scheduled mediation conference, all parties are to file with the mediator a brief, written summary of the case containing a list of issues as to each party.

4. All communications at the mediation conference are privileged consistent with Florida Statutes sections 44.102 and 90.408.

5. The mediator has no power to compel or enforce a settlement agreement. If a settlement is reached, it is a responsibility of the attorneys or parties to reduce the agreement to writing and to comply with Florida Rule of Civil Procedure 1.730(b), unless waived.

B. MEDIATION SCHEDULING

**The Plaintiff's attorney is responsible for scheduling mediation.** The parties should agree on a mediator. If they are unable to agree, any party may apply to the Court for appointment of a mediator in conformity with Rule 1.720 (j), Fla. R. Civ. P. The lead attorney or party must file and serve on all parties and the mediator a Notice of Mediation giving the time, place, and date of the mediation and the mediator's name.

C. COMPLETION OF MEDIATION BEFORE CALENDAR CALL

Completion of mediation prior to calendar call is a prerequisite to trial and must be completed no later than **ten (10) days prior to Calendar Call**. If mediation is not conducted, or if a party fails to participate in mediation, the Court may impose sanctions, including monetary sanctions, striking pleadings and witnesses, and dismissal or default without further notice of the Court.

D. OPPOSITION TO MEDIATION

Any party opposing mediation may proceed under Florida Rule of Civil Procedure 1.700(b).

IV. **NON-COMPLIANCE**

**NON-COMPLIANCE WITH ANY PORTION OF THIS ORDER MAY RESULT IN THE STRIKING OF THE PLEADINGS, WITNESSES, OR EXHIBITS, ENTRY OF DEFAULT OR DISMISSAL WITHOUT FURTHER NOTICE OF THE COURT, OR IMPOSITION OF SUCH OTHER SANCTIONS AS IS JUST AND PROPER.**

**DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida.

Case No. 50-2025-CA-008971-XXXA-MB

50-2025-CA-008971-XXXA-MB   09/05/2025
James Sherman   Judge

50-2025-CA-008971-XXXA-MB      09/05/2025
James Sherman
Judge

A copy of this Order has been furnished to the Plaintiff. The Plaintiff shall serve this Order to the Defendant(s) in compliance with Administrative Order 3.110 (amended).

# ADA NOTICE

This notice is provided pursuant to Administrative Order No. 2.207-7/22

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm**

Case No. 50-2025-CA-008971-XXXA-MB

**pou w tande oubyen pale, rele 711.”**



IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AK"
CASE NO.: 50-2025-CA-008971-XXXA-MB

ELI BLATT,
ELI BLATT,
ELI BLATT,
et al.,

     Plaintiff/Petitioners

vs.

MARC J GOLDNER,
SIMON DIVILOV,
RODERYCK REITER,
et al.,

     Defendant/Respondents.

_____/

**ORDER DIRECTING PLAINTIFF TO EFFECT SERVICE UPON DEFENDANT(S)**
**(ODS)**

**NOTE: Although this Order was entered by the Administrative Judge for the Circuit Civil Divisions, the parties should continue presenting all motions, proposed orders or questions relating to this matter to the Judge presiding over the division to which the case remains assigned.**

     **THIS CAUSE** came before the Court upon a *sua sponte* review of the court file. Pursuant to Administrative Order 3.110, case review for Lack of Service will take place after Ninety (90) days. Ninety (90) days has elapsed since the filing of the complaint, the Defendant(s) has not been served with process. Plaintiff is placed on notice that it must complete service required by Florida Rule of Civil Procedure 1.070(j).

     **IT IS HEREBY ORDERED AND ADJUDGED** that

1. Pursuant to Florida Rule of Civil Procedure 1.070(j), the Plaintiff is directed to serve process on Defendant(s) within one hundred and twenty (120) days from the date of filing of the Complaint.

2. If Plaintiff is unable to serve by the one hundred and twenty (120) day deadline, Plaintiff may file a motion showing good cause or excusable neglect why the Defendant(s) has not yet been served with process. The motion must contain specific detail showing good cause or excusable neglect for the failure and what steps are being undertaken to serve. No extensions will be granted unless a timely motion is filed which lays out the required detail. In the event that Plaintiff elects to file a motion for good cause or excusable neglect, the Plaintiff must set the same motion for hearing pursuant to divisional instructions on the Uniform Motion Calendar and must occur no later than thirty (30) days from the date of this Order.

Case No. 50-2025-CA-008971-XXXA-MB

Failure to obtain an Order Granting Extension of Time or serve process on all Defendant(s) in the time frames set forth above will result in an Order of Dismissal of the case against the unserved Defendant(s).

**DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida.

**ADMINISTRATIVE JUDGE FOR DIVISIONAL JUDGE**

50-2025-CA-008971-XXXA-MB   12/04/2025
G. Joseph Curley, Jr.
Circuit Judge

**COPIES TO:**

BRAD E. KELSKY, ESQ. 150 S PINE ISLAND ROAD BRADKELSKY@KELSKYLAW.COM
SUITE 300
PLANTATION, FL 33324    barbarallinas@kelskylaw.com
benkelsky@kelskylaw.com

NOT A CERTIFIED COPY

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, individually and
derivatively on behalf of GOLDNER
BLATT INVESTMENTS, LLC and
MEGACAP CAPITAL, LLC, and in his
representative capacity as Managing
Member of MEGACAP CAPITAL, LLC,
General Partner of MEGACAP FUNDS, LP
– TECH I and MEGACAP FUNDS, LP –
SPACEX I,

     Plaintiff,

v.                      Case No.:    502025CA008971XXXAMB

MARC J. GOLDNER, RACHEL KORSEN,
SIMON DIVILOV, THE DHARMA
INITIATIVE, LLC, RODERYCK REITER,
GOLDNER BLATT INVESTMENTS, LLC
(Direct and Nominal Defendant), and
MEGACAP CAPITAL, LLC (Nominal
Defendant),

     Defendants.

_____/

## FIRST AMENDED VERIFIED COMPLAINT

    Plaintiff, ELI M. BLATT ("Blatt" or "Plaintiff"), brings this action (i) individually against Defendants MARC J. GOLDNER ("Goldner"), RACHEL KORSEN ("Korsen"), SIMON DIVILOV ("Divilov"), THE DHARMA INITIATIVE, LLC ("Dharma"), and RODERYCK REITER ("Reiter"); (ii) derivatively on behalf of MEGACAP CAPITAL, LLC ("Megacap"); and (iii) in his representative capacity as Managing Member of Megacap, the General Partner of

MEGACAP FUNDS, LP – TECH I ("Tech I") and MEGACAP FUNDS, LP – SPACEX I ("SpaceX"), and states as follows:

<center>INTRODUCTORY STATEMENT</center>

1.     This action arises from two related disputes involving overlapping parties, with Defendant Goldner central to each: (i) claims involving GBI and the purchase of NFTs and bitcoin miners; and (ii) claims involving Megacap and its affiliated limited partnerships, Tech I and SpaceX.

2.     For the sake of clarity and judicial efficiency, this Complaint is organized into two major parts to ensure that each group of claims is read together with their supporting factual allegations, improving readability and clarity while avoiding duplication of facts across counts.

<center>PARTIES, JURISDICTION, AND VENUE</center>

3.     **Plaintiff.** Plaintiff Blatt is a natural person over the age of eighteen who resided in Miami-Dade County, Florida at the time of the events alleged herein and currently resides in Broward County, Florida. Plaintiff Blatt is a founding member of GBI and Megacap. Furthermore, Megacap, on whose behalf Plaintiff brings derivative claims, is the General Partner of Tech I and SpaceX.

4.     **GBI and Megacap.** GBI and Megacap (collectively, the "Companies") are Delaware limited liability companies. Megacap is joined solely as a derivative and nominal party where necessary to ensure complete relief and to bind the entity as to governance or property rights affected by the adjudication, consistent with Fla. R. Civ. P. 1.210(a) and Del. Ch. Ct. R. 17(a) (real party in interest). No wrongdoing is alleged against Megacap, and no affirmative relief is sought from it; its inclusion is procedural and non-adverse. GBI is named as an adverse party in Count I for purposes of declaratory and equitable relief concerning its governance,

existence, and property rights.; its' inclusion is procedural, non-adverse and for the sake of completeness.

5. **Tech I and SpaceX (Representative Capacity).** Tech I and SpaceX ("The Partnerships") are limited partnerships organized under Delaware law for which Megacap is the General Partner. The Partnerships are not named as separate party plaintiffs or defendants; their inclusion is procedural, non-adverse, and for the sake of being complete, consistent with Fla. R. Civ. P. 1.210(a) and Del. Ch. Ct. R. 17(a) (real party in interest).

6. **Defendants.** Defendants Goldner, GBI, Korsen, Divilov, Dharma, and Reiter are persons and entities whose acts and omissions give rise to Plaintiff's claims under Florida and Delaware law.

7. **Jurisdiction.** This Court has subject matter jurisdiction because the claims asserted arise under Florida law and under Delaware law pursuant to the governing agreements of the entities at issue. Personal jurisdiction exists over Defendants because Defendant Reiter resides in Palm Beach County, Florida and because Defendants conducted substantial wrongful acts in Florida, which causes of action exceed the minimum jurisdictional amount of Fifty Thousand ($50,000) dollars exclusive of costs and prejudgment interest. This action could not have been brought originally in federal court because complete diversity is lacking and several claims arise under Delaware law but do not invoke federal jurisdiction. For avoidance of doubt, complete diversity does not exist in either Part I or Part II of this action.

8. **Venue.** Venue is proper in Palm Beach County pursuant to Fla. Stat. § 47.011 because Reiter resides in Palm Beach County.

9. **Choice of Law.** Contract-based and fiduciary duty counts are pleaded under Delaware law pursuant to the governing agreements of GBI and the Megacap entities, while tort

and statutory counts are pleaded under Florida law to reflect the wrongful acts directed at Plaintiff in Florida, with each Count clearly indicating choice of law.

<div align="center">

**PART I:  PLAINTIFF'S TORT CLAIMS**

</div>

**Summary of the GBI Case**

10.     On December 7, 2021, Goldner and Blatt (the "GBI Members") executed the GBI operating agreement (the "GBI Agreement"), pursuant to which they were to be equal members and managers. A true and correct copy of the GBI Agreement is attached hereto as **Exhibit "A."**

11.     Shortly after execution of the GBI Agreement, Goldner induced Blatt to wire him and Compass Mining, LLC ("Compass") a total of Four Hundred Twenty-Two Thousand, One Hundred Forty-Eight Dollars and Fifty-Five Cents ($422,148.55) ("Blatt's Funds"), all of which were wired and received from Florida.

12.     Goldner represented that Blatt's Funds would be used by Goldner for the purchase of bitcoin miners (the "Miners") and non-fungible tokens (the "NFTs"), and that would title these (collectively, the "Assets") to GBI on Blatt's behalf as in-kind capital contributions by Blatt to GBI, as required by the GBI Agreement in order to be deemed GBI property and as recorded on a GBI Spreadsheet of intended capital contributions which Goldner reviewed.

13.     Goldner's representations, which Blatt relied upon, were false.

14.     As evidenced by his actions and inactions, Goldner never intended to, nor did he, use Blatt's Funds to complete Blatt's intended in-kind capital contributions to GBI by formally titling or assigning the Assets purchased with Blatt's Funds to GBI as required by the GBI Agreement.

15.     Instead, Goldner misappropriated Blatt's Funds to purchase the NFTs and Miners for his and Dharma's benefit and to the exclusion of Blatt.

16.     As a result, Blatt's capital contributions to GBI were never completed, nor did he receive any consideration for the GBI Agreement, rendering it void and subject to rescission.

**Background and the Companies**

17.     GBI was purportedly formed in December 2021 to invest and engage in commercial activities "in the cryptocurrency world."

18.     Prior to that, Goldner, Korsen, and Divilov (collectively, the "Dharma Members") had allegedly independently organized Dharma to service bitcoin miners for others for a fee.

19.     As Dharma's managing member and in his individual capacity, Goldner represented that Blatt would receive membership interests in Dharma in exchange for Blatt entering into the GBI Agreement.

20.     However, Goldner never provided Blatt with a Dharma operating agreement or with any other governing documents prior to Blatt wiring Blatt's Funds, and Blatt never executed any Dharma agreement, contributed any capital to Dharma, or received any consideration from Dharma.

**Goldner's GBI Representations**

21.     In early December 2021, Goldner sent Blatt a proposed operating agreement for GBI that Goldner initially drafted.

22.     In it and subsequent drafts, Goldner memorialized prior representations to Blatt material for Blatt to subsequently execute the final GBI Agreement, including but not limited to, that:

    a.  Goldner was a "freelance spy" for unnamed agencies working on bringing down the hacktivist collective Anonymous, and that he conducted "business-like activities for the sake of national security, by any direct government orders and/or mandates, or for any missions by any given contractor or intelligence agency" (*See* GBI Agreement at § 53(f)), giving him unique connections that would lead to various safe and legal opportunities for GBI;

b. Goldner would give GBI a percentage of the revenue generated from his "Mutual Contacts", including those from his spy activities;

c. "[t]itle to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member." *See* id § 74;

d. all GBI funds were to be held in accounts unanimously voted on by GBI Members, and the GBI Members were prohibited from commingling GBI's funds and assets with any other persons or entities' assets, accounts, or liabilities. *See* id at §§ 58, 74;

e. "Any investments that the Managing Members make are a 1:1 cash value based on current market prices at the time of assignment and will be certified and memorialized in an email and on WhatsApp to avoid confusion or dispute of that assets value with a screenshot being taken at the time of assignment and attached. All such assignments must be signed over in writing to GBI and approved by both Managing Members unanimously." *See* id at § 3(e); and

f. "When deciding to purchase an… there will be an agreement VIA email in writing in relation to the time horizon to hold the Investment and the Exit Parameters of such an investment… and then once the asset, property, and/or investment hits either of those marks then [e]ither partner may force a sale." *See* id at § 3(i).

(Collectively, the "GBI Representations").

23.    Relying upon the GBI Representations, which were incorporated into in the GBI Agreement, Blatt executed an updated version of the draft operating agreement on December 7, 2021 (*See* GBI Agreement Exhibit A) and created a spreadsheet to track the assets that he and Goldner *planned* to title to GBI to maintain equal contributions (the "GBI Spreadsheet," attached hereto as **Exhibit "B"**)[1].

**The NFT Funds and NFTs**

---

[1] The GBI Members used the GBI Spreadsheet to track their *promised* contributions to GBI to ensure that the GBI Members would be making equal in-kind contributions to GBI, however, as a factual matter, none of the assets listed on the spreadsheet were ever titled or transferred to GBI as required by the terms of the GBI Agreement governing GBI property as detailed above.

24.     After Blatt executed the GBI Agreement, on or around December 19, 2021, Goldner proposed that GBI purchase NFTs with the idea of selling them to a proposed GBI NFT Fund once investor capital was raised into it.

25.     As recorded on the GBI Spreadsheet, Goldner was to contribute Four Hundred Thousand Dollars ($400,000.00) worth of NFTs he already owned to GBI as in-kind capital contributions, with Blatt to contribute Two Hundred Thousand Dollars ($200,000.00) worth of NFTs which Goldner would transact for Blatt and then assign to GBI on his behalf as in-kind capital contributions, with their differing NFT contributions to be offset by Blatt's Miner contributions, as detailed below.

26.     Prior to Blatt wiring Goldner the first tranche of the NFT Funds, on February 4, 2022, Blatt emailed Goldner memorializing a telephonic conference he had with Goldner immediately prior regarding the NFTs (the "NFT Assignment Email"). A true and correct copy of the NFT Assignment Email is attached hereto as Exhibit **"C."**

27.     In the NFT Assignment Email, Blatt memorialized Goldner's representations and affirmations on their preceding call with an enumerated list of steps they had agreed Goldner would follow to purchase NFTs for GBI, including, critically, that Goldner would "assign" all the subject NFTs to GBI.

28.     Goldner never revised, objected to, or corrected Blatt's email or established any other parameters for the NFTs that would limit the GBI Members' ability to force a sale pursuant to GBI Agreement § 3(i).

29.     Based on representations that Goldner would ultimately contribute Four Hundred Thousand Dollars ($400,000.00) worth of NFTs to GBI, the NFT Assignment Email, and the GBI Representations (collectively, the "NFT Representations"), on February 4, 2022, and

February 7, 2022, Blatt sent two One Hundred Thousand Dollar ($100,000,00) wires, totaling Two Hundred Thousand Dollars ($200,000.00) (the "NFT Funds") <u>directly</u> to Goldner to purchase NFTs to be contributed by Goldner to GBI on Blatt's behalf as in-kind capital contributions by Blatt to GBI.

30.     Blatt's NFT Funds were wired directly by Blatt to Goldner at his instruction; never cleared any account owned by GBI or voted on by the Members as being a GBI account; and were used by Goldner to purchase NFTs into Goldner's own personal wallets commingled with other NFTs over which GBI had no ostensible claim—the same wallets Goldner had been using to purchase NFTs for himself prior to the NFT Assignment Email.

31.     Despite Goldner's telephonic representation that Blatt memorialized in the NFT Assignment Email, however, Goldner never formally assigned the NFTs to GBI in writing or otherwise took any steps to title them to GBI by storing them in cryptocurrency wallets[2] belonging to and accessible by Blatt as a GBI Managing Member.

32.     In fact, Goldner never even created a wallet to store the NFTs for GBI's exclusive use and benefit, despite having allegedly purchased NFTs for GBI prior to Blatt wiring the NFT Funds.

33.     Instead, Goldner stored the NFTs in wallets belonging to and exclusively accessible by him, commingling them with NFTs he claimed belonged to the Dharma Members.

34.     In short, Goldner simply took Blatt's NFT Funds and bought NFTs for himself.

35.     The NFTs nor the NFT Funds were never GBI property.

---

[2] NFTs are stored in "hot" virtual "wallets" as well as in "cold" hardware wallets that are tried to a physical wallet device; both types of wallets are identified by a unique address on a blockchain, with the latter requiring access to the physical wallet device. Unique wallet addresses can be generated via either soft wallet providers or using a hot wallet, which can host numerous wallet addresses.

36.     As a result, Goldner never completed Blatt's intended capital contribution to GBI as he represented he would.

**The Miner Funds and Miners**

37.     Beginning in late December 2021, Goldner approached Blatt about purchasing miners for GBI to be leased out to investors for profit.

38.     Korsen and Divilov participated in this plan because they both actively engaged in a WhatsApp group chat with Goldner and Blatt (the "Miner Chat"), as they wanted to purchase miners for their and Dharma's benefit.

39.     On February 28, 2022, Goldner affirmed to Blatt, Divilov, and Korsen in the Miner Chat that "Eli and I [are] doing 3 [B]undles" (referring to the GBI Members).

40.     To further induce Blatt to wire funds for the Miners, on March 1, 2022, Goldner posted screenshots of Compass' invoices for the Miners (collectively, the "Invoices") in the Miner Chat and claimed he had secured a "heavy discount" (collectively with the February 28 Message, the "First Miner Chat Messages"); however, these screenshots omitted the name of the invoicee, and Goldner failed to specify what, exactly, the discount was.

41.     At the time Goldner shared the Invoices, the word "Dharma" never appeared in the Miner Chat.

42.     Blatt thus had no possible reason to think that Goldner would use Blatt's Miner Funds to purchase Miners for Dharma, a company for which Blatt had never even seen an operating agreement at that time and in which he had no equity, voting interest, or operational control.

43.     Based on the Invoices, the GBI Spreadsheet, the First Miner Chat Messages, and the GBI Representations, (collectively, the "Initial Miner Representations"), on March 2, 2022,

at Goldner's instruction, Blatt directly sent Compass two (2) wires totaling One Hundred Thirty-One Thousand, Nine Hundred Fifty One Dollars ($131,951).

44.     The next day, in a series of WhatsApp messages on the Miner Chat (the "Second Miner Chat Messages"), Goldner reaffirmed explicitly to Blatt with Korsen and Divilov copied that GBI would own its own Bundles, stating, "$29,318 for GBI to own one more bundle… Dharma has 3 bundles. GBI will have 3 bundles… Rachel [Korsen] and Simon [Divilov] don't get economics on GBI bundles. You [Blatt] and I split 50/50 on all GBI miners." *See* id.

45.     None of the Dharma Members disputed, retracted, clarified, or restated the Second Miner Chat Messages.

46.     Based upon the Dharma Message, GBI Lease Agreement drafts showing GBI as the owner of the Miners to which Goldner did not object, a March 3 message by Blatt to Goldner clarifying that Dharma was not needed for GBI's miners in any capacity, the Initial Miner Representations, and the Second Miner Chat Messages (collectively, the "Miner Representations"), on March 4, 2022, Blatt wired Twenty Thousand Dollars ($20,000.00) directly to Goldner at his instruction to purchase the additional Bundle for GBI from Compass (the "Second Bundle Purchase").

47.     Subsequently, predicated upon the Miner Representations and at Goldner's instructions, on March 21, 2022, Blatt wired Compass Seventy Thousand Two Hundred Seventeen Dollars and Fifty-Five Cents ($70,217.55) to be used to purchase additional Miners to be contributed by Goldner to GBI in kind as a capital contribution on behalf of Blatt.

48.     In total, Blatt wired Two Hundred Twenty-Two Thousand, One Hundred Forty-Eight Dollars and Fifty-Five Cents ($222,148.55) of his funds (the "Miner Funds")

intended to be used by the recipients at Goldner's instructions to purchase Miners to be titled by Goldner to GBI as in-kind contributions by Blatt.

49.     As with the NFT Funds, the GBI Members recorded the Miner Funds on the GBI Spreadsheet as intended—but never completed—in-kind capital contributions to GBI in the form of the Miners. *See* Exhibit B.

50.     Goldner reviewed the GBI Spreadsheet on April 24, 2022 and never objected to it.

51.     Meanwhile, unbeknownst to Blatt, Goldner in fact used Blatt's Miner Funds to purchase Miners from Compass for his and Dharma's own benefit and use, rather than completing Blatt's intended in-kind contribution to GBI.

52.     Instead, Goldner, acting as both GBI's and Dharma's manager, purchased the Miners into an account owned and managed by and exclusively accessible to Goldner and Dharma.

53.     Goldner never granted Blatt access to the account storing the Miners or transferred title of any of the Miners therein to GBI, nor did GBI ever receive depreciation statements from Compass, which Compass stated to Blatt it provides to the owners of their miners for tax purposes.

54.     Accordingly, neither Blatt's Miner Funds, wired directly to Goldner and Compass by Blatt, nor the Miners purchased therewith, ever became GBI property nor does GBI have any claim to ownership over either given that the Miner Funds were Blatt's.

55.     As a result, no capital contributions to GBI were ever completed by Blatt or on his behalf, nor did Blatt receive any consideration.

**The Falsities and Concealments**

56.     In May 2022, given a downturn in the cryptocurrency market that the GBI Members agreed would worsen, as well as a lack of any investor interest in the contemplated GBI NFT Fund, Blatt called for GBI to sell the NFTs, as was his right pursuant to the GBI Representations and corresponding GBI Agreement terms governing the purchase and sale of investment assets (GBI Agreement §3(e)) given that there was no email in writing stating a hold period (GBI Agreement §3(i)).

57.     Goldner refused, saying in a May 6, 2022 WhatsApp message: "sue me, Eli, **I'm not selling**" (emphasis added), indicating that *he* was not selling, not that GBI would not sell.

58.     Adding injury to insult, Goldner went on to admit in that same thread that, despite the clear requirement in GBI Agreement § 3(e) to value in-kind contributions at their current fair market value, he had valued the Ethereum coins he had used to allegedly purchase the NFTs at their basis price when recording NFTs on the GBI Spreadsheet—approximately double their value at the time he purchased the NFTs.

59.     This is when Blatt first realized that Goldner had misled him about his use of the NFT Funds and how Goldner would title and manage the NFTs.

60.     It likewise became clear to Blatt that, as with the NFTs, GBI did not own any Miners in the manner required by the GBI Agreement to be deemed GBI property.

61.     In fact, no non-fungible asset of any kind was ever properly titled to GBI, and as a result, Blatt's and Goldner's capital account balance in GBI is $0, as is GBI's net asset value, as evidenced by the fact that, on information and belief, Goldner never filed any tax returns for GBI.

62.     Meanwhile, Goldner personally received the NFT Funds and some of the Miner Funds.

63.    Dharma also benefited from Blatt's Miner Funds to Blatt's detriment.

64.    Goldner made the Representations and Falsities knowing they were false, or else made them with reckless indifference to the truth at the time they were made, and used the GBI Agreement and GBI Spreadsheet to induce Blatt to wire Blatt's Funds to him and Compass for his and Dharma's benefit.

65.    The Dharma Members also concealed material facts and made omissions and material misrepresentations with the intent of inducing Plaintiff to rely upon the misrepresentations and omissions and thereby defraud and deceive Plaintiff.

66.    Specifically, the Dharma Members deliberately concealed material facts relating to the GBI Agreement, Assets, and Funds, inter alia, including, among other things, that:

   a.  Goldner never intended to title any of the Assets in GBI's name, as evidenced by Goldner making no effort to secure a cryptocurrency wallet to store NFTs for GBI, instead purchasing NFTs into his own wallets commingled with the Dharma Members NFTs;
   b.  Goldner never intended to complete any capital contributions to GBI, nor did he;
   c.  the "heavy discount" Goldner had allegedly secured for the Miners was, in fact, Compass' standard Bundle pricing available to any person purchasing a Bundle (WhatsApp, January 12, 2023) but which Korsen and Divilov could not afford on their own;
   d.  GBI was not the invoicee on the Compass mining invoices sent to Blatt;
   e.  as Korsen would later admit, the Dharma Members "all knew" from the start that Dharma, and not GBI, would in fact own and have access to the Miners prior to Blatt wiring the Miner Funds; and
   f.  that the Representations were false.

(Collectively, the "Concealments").

67.    Adding to this injustice, the GBI Representations, NFT Representations, and Miner Representations (collectively, the "Representations"), upon which Blatt had relied when sending Blatt's Funds, were false.

68.    The GBI Representations were false because, among other things, Goldner:

a.  was not a spy with access to government contracts and relationships that would provide GBI financial benefit;

b.  never made any efforts to, nor did he ever, title any property (including the Assets) in GBI's name or contribute assets of any kind to GBI, either on his own behalf or Blatt's; and

c.  never made any efforts to, nor did he ever grant Blatt equal management rights over or access to GBI's alleged assets, even though doing so would have been trivial.

69.    The NFT Representations were likewise false, as evidenced by, among other things: (i) Goldner never assigning or otherwise titling the NFTs to GBI, and making no efforts of any kind to do so; (ii) Goldner instead using Blatt's NFT Funds to purchase NFTs into his own wallets; and (iii) Goldner never refuting the NFT Assignment Email.

70.    The Miner Representations were also false, as evidenced by, among other things: (i) Goldner never making a Compass account for GBI and (ii) Korsen's admission detailed below that the Dharma Members "all knew" from the start that the Miners would be owned by Dharma. Collectively with the preceding two paragraphs, the "Falsities."

**Demands, Extortion, and Rescission**

71.    In an effort to gain access to, control over, and the benefit of the Assets, Blatt sent Goldner, both individually and as Dharma's manager, a letter (the "Demand Letter") demanding that Goldner transfer him the number of Miners that Blatt's Miner Funds had been used to pay deposits  on (which Compass had agreed to effectuate) and that Goldner place the NFTs in a shared wallet. A true and correct copy of the Demand Letter is attached hereto as **Exhibit "D."**

72.    Goldner and Dharma refused to comply with the Demand Letter.

73.    Instead, they demanded that Blatt (i) alone among the parties prepay the balances due as well as five years of hosting fees for miners which had not yet even been delivered; (ii) agree to hold the NFTs in a Special Purpose Vehicle that would pay fees to another of Korsen and Goldner's companies; and (iii) agree to reimburse Goldner $30,000 (Thirty Thousand

Dollars) for non-preapproved, unitemized travel expenses for Megacap in order for Blatt to gain any benefit from his Funds.

74.    December 31, 2022, Divilov, as one of Dharma's members, sent Blatt a Notice of Default (the "Notice of Default"), copying the Dharma Members. A true and correct copy of the Notice of Default and the accompanying email messages, including the Korsen Correspondence, is attached hereto as **Compound Exhibit "E."**

75.    The Notice of Default (i) falsely asserted without evidence that Blatt was one of Dharma's members; (ii) claimed Blatt was in "material breach" of an agreement, without specifying what agreement he was supposedly bound to; (iii) asserted ownership on behalf of Dharma of the Miners; and (iv) demanded that Blatt pay Dharma One Hundred Forty Thousand Five Hundred Twelve Dollars and Fifty Cents ($140,512.50) by January 30, 3023, for Dharma's outstanding balance due from Compass, as well as for future service fees without including any accounting or documentation detailing those charges.

76.    At the end of the Notice of Default, Divilov wrote, "[n]ote, [a]s an alternative, Marc [Goldner] has agreed to continue to have good faith discussions with you to determine the final language for a settlement agreement that will allow all parties to be made whole."

77.    With that statement, Divilov made it clear that Goldner orchestrated these baseless demands against Blatt to try, with Korsen and Divilov's assistance, to extort Blatt into an unfavorable settlement involving not only the Miners but also the NFTs and travel expense reimbursement that Goldner was demanding.

78.    Before the Notice of Default's deadline expired, on January 29, 2023, Korsen wrote Blatt with the Dharma Members copied:

      a.  offering to "veto" Blatt's default if Blatt agreed to concessions to Goldner;

    b.   admitting the Dharma Members "all knew our money was being sent to Dharma" (the "Korsen Admission") and

    c.   tacitly admitting that Blatt was, in fact, not a Member of Dharma, by stating that the Defendants were willing to backdate an agreement that would allow Blatt to "share the capital losses and make the effective date of the Agreement between you and Marc to be 2022." (*See* Exhibit E).

79.    Having come to the inescapable conclusion that he had been misled by Goldner as to the use of Blatt's Funds, and that the GBI Agreement was void of consideration, Blatt sent Goldner individually and as Dharma's Manager a Civil Theft Notice demanding the return of Blatt's Funds and Assets (the "Civil Theft Notice"). A true and correct copy of the Civil Theft Notice is attached hereto as **Exhibit "F."**

80.    Goldner also wrote in a June 29, 2023 letter to Blatt asserting unilaterally to buy Blatt's "entire equity, interest, and all assignments for $0," without providing any accounting or any consideration for the unilaterally asserted valuation.

81.    No transaction was ever effectuated.

82.    Nonetheless, Goldner's asserted $0 valuation effectively conceded that GBI had no assets, since that is the only way Blatt's Membership Units could be worth $0 per §§ 16-19 and 46-48 of the GBI Agreement—i.e. if no capital contributions were ever completed by or on behalf of Blatt— given that GBI had no liabilities as per any GBI-executed contracts or filings.

83.    Defendants' actions have left Blatt with no choice but to bring this action.

84.    Plaintiff contends that the GBI claims are direct, because Plaintiff wired Blatt's Funds personally and the NFTs and Miners were never assigned or titled to GBI, and therefore neither Blatt's Funds nor the Assets ever became GBI property under the clear terms of the GBI Agreement.

85.    In the interest of judicial economy, Plaintiff does not here assert duplicative derivative counts in the alternative in the event the Court finds some claims do belong to GBI.

86.     To the extent the Court determines on a motion to dismiss that any claim must be treated as derivative rather than direct, Plaintiff respectfully requests leave to amend to assert such claim derivatively at that time.

87.     All conditions precedent to the filing of this action have occurred, have been performed, or have otherwise been fulfilled; or their performance has been excused or waived.

88.     Plaintiff has retained the services of undersigned counsel for the purpose of bringing and maintaining this action and has obligated himself to pay a reasonable fee for the costs and legal services associated with the same.

## COUNT I - DECLARATORY JUDGMENT (DE)
### (Blatt v. GBI and Goldner)

89.     Plaintiff repeats and re-alleges the allegations in paragraphs 10-88 as if fully set forth herein.

90.     There is a substantial and continuing controversy regarding GBI's status under Delaware Law and the Disputed Assets.

91.     A declaration is both necessary and appropriate to establish;

    a.   whether:

          i.   the GBI Agreement is void *ab initio* (i) due to having been arranged by Goldner, *ultra vires,* in breach of his fiduciary duties, fraudulently, by way of the Representations and Concealments with knowledge of the Falsities; (ii) in furtherance of a fraudulent scheme;  (iii) because neither of the GBI Members completed any contributions; and/or (iv) because neither Blatt nor GBI received consideration related thereto; or

         ii.   whether it is instead terminated as of August 6, 2025 per Blatt's written notice, pursuant to his right as GBI Member to do so and now pending liquidation under the terms of GBI Agreement §§ 4, 30, 50, and 53;

    b.   whether, if the GBI Agreement is not subject to rescission, Goldner and/or Dharma are liable to GBI or Blatt for Blatt's Funds and Assets, in order to clarify who holds the causes of action in the subsequent counts; and

      c.   whether, if the agreement is deemed to have been terminated, to declare
which, if any, Assets belong to GBI such that final accounting and liquidation
can be effectuated.

WHEREFORE, Plaintiff, ELI M. BLATT, respectfully requests that this Court enter judgment in his favor and against Defendants MARC J. GOLDNER, GOLDNER BLATT INVESTMENTS, LLC, and issue a declaratory judgment: (i) declaring that the GBI Agreement is void for lack of consideration or procured by fraud, (ii) declaring that GBI never acquired any ownership interest in the Miner Funds, Miners, Mined Bitcoin, NFT Funds, NFTs, or any other assets referenced in the Complaint, and that Blatt is the sole legal and equitable owner of those assets and all related claims; (iii) in the alternative, only if the Court finds that the GBI Operating Agreement is valid declaring GBI to be subject to judicial dissolution under 6 Del. C. § 18-802 in light of Blatt's right pursuant the GBI Agreement to terminate it upon written notice, the failure of GBI's essential purpose, member deadlock, and the impossibility of carrying on the business in conformity with the operating agreement, and ordering such dissolution and appropriate winding-up relief; (iv) awarding supplemental relief to Blatt (v) and awarding Blatt his costs and such other and further relief as the Court deems just and proper.

### COUNT II - CIVIL THEFT (FL)
(Blatt v. Goldner and Dharma)

92.    Plaintiff realleges and incorporates by reference paragraphs 10-16, 24-63, 71-88, as if fully set forth herein.

93.    This is an action for civil theft pursuant to sections 812.014 and 772.11, Florida Statutes. At Defendants' direction and based on their express representations, Plaintiff wired specific, identifiable funds totaling $422,148.55 for a limited and defined purpose, namely, to acquire assets to be contributed for Plaintiff's benefit and/or as agreed capital contributions. The funds were not general operating capital and were traceable to Plaintiff.

94.     Instead of using the funds for their stated purpose, Defendants knowingly diverted and misappropriated the funds and/or assets purchased therewith for their own use and benefit, including by titling assets in their own names or controlled entities, excluding Plaintiff entirely.

95.     At the time Defendants obtained Plaintiff's funds, they did so with felonious intent, meaning the intent to temporarily or permanently deprive Plaintiff of his property or a benefit therefrom, within the meaning of section 812.014, Florida Statutes.

96.     Defendants' felonious intent is evidenced by, among other things: inducing Plaintiff to wire funds while never intending to apply them as represented; diverting the funds or assets purchased therewith for Defendants' own benefit; asserting ownership over property purchased exclusively with Plaintiff's funds; refusing to return the funds or assets upon demand; and conditioning Plaintiff's access to or recovery of his own property on additional payments or concessions.

97.     Goldner's actions constitute theft under Fla. Stat. § 812.014, and Plaintiff is entitled to treble damages and attorneys' fees under Fla. Stat. § 772.11; pre-suit written demand was properly issued pursuant to section 772.11, Florida Statutes, despite being futile because Defendants denied wrongdoing, asserted ownership of the stolen property, and refused to return Plaintiff's funds or the assets purchased therewith.

98.     Defendants' actions constitute an independent tort and criminal taking, and not merely a breach of contract, because Defendants never intended to perform as promised and instead used deception to obtain Plaintiff's property for their own use.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court grant judgment in his favor and against MARC J. GOLDNER and THE DHARMA INITIATIVE, LLC by (i) awarding Blatt treble damages, including but not limited to $1,266,445.65; (ii) awarding

Blatt costs, prejudgment interest, and post-judgment interest; (iii) awarding Blatt reasonable attorneys' fees; and (iv) granting such other and further relief as this Court deems just and equitable.

### COUNT III - COMMON LAW FRAUD (FL)
(Blatt v. Goldner, Divilov, Korsen, and Dharma)

99.     Plaintiff re-alleges and reincorporates paragraphs 10-88 as if fully set forth herein.

100.    Defendants, individually and acting in concert, knowingly made the false Representations of material fact to Plaintiff, including but not limited to:

 a. that Plaintiff's capital contributions and funds provided pursuant to the GBI Agreement would be used to acquire and hold assets (including NFTs and Miners) for the benefit of Plaintiff and GBI as in-kind capital contributions to GBI by Blatt (Goldner);

 b. that Plaintiff would be recognized and treated as a member/owner in GBI and entitled to the rights, profits, and assets associated therewith (Goldner);

 c. that Defendants would not divert or misappropriate Plaintiff's funds or assets acquired with those funds for their own benefit or for the benefit of entities other than GBI (The Dharma Members); and

 d. the Falsities (Goldner), Concealments (Dharma Members), Miner Representations (Dharma Members), and NFT Representations (Goldner).

101.    As Korsen would later admit, at the time the Miner Representations were made, Defendants "all knew" they were false, or made them recklessly without regard for their truth, intending that Plaintiff rely upon them.

102.    Plaintiff, in justifiable reliance on Defendants' misrepresentations, wired Blatt's Funds with the specific intent and expectation that they would be used for the purchase of NFTs and Miners for GBI's benefit as in-kind capital contributions to GBI to be completed by Goldner on behalf of Blatt.

103.    Instead, Defendants misappropriated Plaintiff's funds directly and caused the NFTs, Miners, and related assets to be purchased and held in the name of Defendants or their controlled entities, excluding Plaintiff and GBI from ownership and benefit.

104.   As a direct and proximate cause of Plaintiff's justifiable reliance upon these knowingly false Representations, Plaintiff suffered damages including but not limited to the present value of Blatt's Funds wrongfully diverted.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court grant judgment in his favor and against MARC J. GOLDNER RACHEL KORSIN, SIMON DIVILOV, and THE DHARMA INITIATIVE, LLC by (i) granting Plaintiff compensatory, consequential, and special damages jointly and severally; (ii) establishing a constructive trust over the Disputed Assets; (iii) ordering disgorgement of all Disputed Assets to be returned to Plaintiff; (iv) granting Plaintiff costs, prejudgment interest, and post-judgment interest; and (v) granting Plaintiff such other and further relief that this Court deems just and equitable.

## COUNT IV - UNJUST ENRICHMENT FOR THE NFTs (FL)
### (Blatt v. Goldner)

105.   Plaintiff repeats and re-alleges paragraphs 10-16, 21-36, 69, and 79-88 as if fully set forth herein.

106.   Goldner was unjustly enriched by Plaintiff by knowingly accepting and retaining the benefit of the NFT Funds conferred by Plaintiff and, in turn, purchasing the NFTs for Goldner's own benefit, without providing Blatt or GBI fair value for them by assigning them formally to GBI as in-kind capital contributions by Blatt per the NFT Representations and managing them in accordance with the GBI Representations.

107.   It would be inequitable for Goldner to retain the benefits conferred upon him by Plaintiff without compensating Plaintiff for the value of the benefit conferred.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court (i) grant judgment for damages in his favor and against MARC J. GOLDNER in an amount to be proven at trial, but in no event less than the greater of the NFT Funds or the current value of the NFT,

together with costs and prejudgment interest; and (ii) grant such other and further relief as the Court deems just, equitable, and proper.

## COUNT V - UNJUST ENRICHMENT FOR THE MINERS AND MINED BITCOIN (FL)
### (Blatt v. Goldner and Dharma)

108.    Plaintiff repeats and re-alleges paragraphs 10-16, 21-23, 37-55, 62-66, 70-88, and 80-87 as if fully set forth herein.

109.    Goldner was unjustly enriched by Plaintiff when Goldner accepted and retained $20,000 of the Miner Funds conferred upon him by Plaintiff, without providing Plaintiff fair value therefore.

110.    Dharma was unjustly enriched by Plaintiff's Miner Funds by titling ownership of the Miners purchased therewith to itself and using them to mine bitcoin without providing Plaintiff with any consideration.

111.    Goldner and Dharma knowingly and willfully accepted the benefit conferred upon them by Blatt.

112.    Neither Goldner nor Dharma has any justification for retaining the Miner Funds, the Miners purchased therewith, or the Mined Bitcoin without providing Plaintiff adequate compensation.

113.    It would be inequitable for Goldner and Dharma to retain this knowingly conferred benefit without compensating Plaintiff.

114.    As a direct and proximate cause of Dharma and Goldner's unjust enrichment, Plaintiff has suffered in an amount to be determined at trial, for which he lacks an adequate remedy at law given the unique and appreciating nature of the Miners and Mined Bitcoin.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court enter judgment in his favor and against MARC J. GOLDNER and THE DHARMA INITIATIVE, LLC

by ordering (i) the disgorgement of all Miners purchased in part or in whole with the Miner Funds as well as the Mined Bitcoin;  (ii) imposing a constructive trust over all Miners and Mined Bitcoin (or the proceeds thereof) wrongfully held by Defendants; (iii) awarding costs and prejudgment interest; and (iv) granting such other and further relief as the Court deems just, equitable, and proper.

### COUNT VI - CONVERSION OF BLATT'S FUNDS (FL) - in the alternative
(Blatt v. Goldner and Dharma)

115.     Plaintiff repeats and re-alleges his allegations in paragraphs 10-16, 24-63, 71-88, as if fully set forth herein.

116.     In the alternative to Plaintiff's unjust enrichment claims, Plaintiff asserts this claim for conversion of Blatt's Funds.

117.     Blatt owned and possessed Blatt's Funds prior to wiring them to Compass and to Goldner at Goldner's direction in reliance on Goldner's representations that the Assets purchased with Blatt's Funds would be contributed to GBI on Blatt's behalf.

118.     Goldner exercised wrongful dominion and control over Blatt's Funds by not using them as agreed, in a manner inconsistent with Blatt's ownership rights and without lawful justification.

119.     As a direct and proximate result of Defendants' conversion, Blatt has suffered damages in the amount of at least $422,148.55, plus prejudgment interest.

WHEREFORE, Plaintiff respectfully requests judgment against MARC J. GOLDNER and THE DHARMA INITIATIVE, LLC, jointly and severally, for (i) the return of $422,148.55; (ii) prejudgment interest; (iii) costs; and (iv) any further relief this Court deems just and proper.

### COUNT VIII - BREACH OF FIDUCIARY DUTIES (DE)
(Blatt v. Goldner; GBI and Dharma named as Nominal Defendants)

120.    Plaintiff re-alleges and reincorporates by reference paragraphs 10-88 as if fully set forth herein.

121.    At all times relevant, Blatt and Goldner have been parties to the GBI Agreement.

122.    Delaware law imposes fiduciary obligations, including a duty of care and loyalty, upon members of a Delaware limited liability company and to a company itself (*See* 6 Del. C. § 18-1101(c)).

123.    The GBI Members never executed any agreements that extinguished their duties of loyalty and care owed to each other and to GBI pursuant to Delaware law; to the contrary, GBI §30(a) expressly imposes a duty of care upon its Members.

124.    As such, Goldner owed Blatt the fiduciary duties of good faith, loyalty, and care.

125.    Fiduciary principles demanded that Goldner refrain from making the Representations and Concealments to Blatt as a Member of GBI with knowledge of the Falsities.

126.    Goldner breached his fiduciary duties to GBI and Blatt by engaging in egregious misconduct that resulted in Goldner's personal enrichment to Blatt's detriment, including by, among other things:

    a.  making the Representations with actual knowledge of the Falsities and Concealments;

    b.  inducing Plaintiff to execute the GBI Agreement and wire Blatt's Funds under false pretenses;

    c.  making no efforts to honor the Representations thereafter or provide Blatt the benefit of his Funds;

    d.  failing to assign the NFTs to GBI as per the NFT Assignment Email to which he did not object;

    e.  titling the Assets in his own and Dharma's name;

    f.  seeking to needlessly have GBI pay Dharma servicing fees;

    g.  demanding that Plaintiffs pay Dharma and Goldner for Miners purchased using Plaintiffs's Miner Funds that Goldner represented would belong to GBI;

    h.  intentionally overvaluing the ethereum he allegedly used to purchase the NFTs recorded on the GBI Spreadsheet in spite of the GBI Representations;

    i.   refusing Blatt's legitimate call to force a sale of the NFTs or otherwise have access or manage the Assets; and

    j.   using threats, intimidation, and extortion in his efforts to coerce Blatt into dropping his claims to the Assets.

127.    Goldner had superior knowledge of and access to material information regarding the Miners, as he was the only one communicating with Compass about the Miners and the only one with access to the account storing the Miners under his own personal email address, ostensibly acting in his capacity as Dharma's Manager.

128.    Goldner also had superior knowledge of and access to material information regarding the NFTs because he was the only one with access to the cryptocurrency wallets where he was storing the NFTs, none of which were associated with a GBI email address or otherwise accessible by both of the GBI Members.

129.    Goldner improperly used his superior knowledge and position of trust and confidence to further his own personal benefit.

130.    Goldner thereby breached the special trust and confidence placed in him by Blatt and GBI not to use the GBI Agreement, the Assets, or Blatt's Funds to Blatt's detriment.

WHEREFORE, Plaintiff, ELI M. BLATT respectfully requests that this Court grant judgment in his favor and against MARC J. GOLDNER by (i) awarding damages in an amount to be proven at trial, but in no event less than the present value of the Disputed Assets; (ii) ordering the disgorgement of the Disputed Assets to restore Plaintiff and/or GBI to their rightful position; (iii) declaring that Plaintiff has authority to effectuate the sale and/or liquidation of any of the Disputed Assets properly belonging to Plaintiff or GBI pursuant to its termination, or alternatively appointing a JAMS Neutral at Goldner's expense to do so; and (iv) granting such other and further relief as this Court deems just and equitable.

## PART II: THE MEGACAP CLAIMS

## THE MEGACAP FACTUAL ALLEGATIONS

**The Megacap Parties**

131.    Plaintiff Blatt is the General Partner of Megacap.

132.    Megacap serves as the General Partner of multiple Special Purpose Vehicles ("SPVs"), managing more than $4 million in late-stage startup equity exposure for over 50 Limited Partners ("LPs"). A true and correct copy of the founding operating agreement ("Megacap Agreement") governing Megacap at all relevant times is attached as **Exhibit "G."**

133.    Tech I and SpaceX are two SPVs that Megacap manages as General Partner.

134.    Defendant Goldner is a former member of Megacap. As further detailed below:

    a.  he was involuntarily withdrawn as a Class A Member and Manager on January 16, 2023, by Megacap pursuant to the terms of the Megacap Agreement governing member withdrawal;

    b.  he subsequently had his unvested Membership Units redeemed on May 22, 2023 pursuant to the terms of Megacap Agreement and the Redemption Agreement template attached thereto governing same; and

    c.  he was thereafter involuntarily withdrawn from Megacap, and his remaining Class B Membership Units purchased by the remaining Members, on September 2, 2025, pursuant to the terms of the Megacap Agreement.

135.    True and correct copies of Goldner's initial and amended Class A withdrawal, redemption, and final Class B withdrawal and Membership Unit Purchase are attached hereto as **Compound Exhibit "H."**

136.    Defendant Reiter was a Class A Member of Megacap whose Membership Units were voluntarily redeemed by Megacap in exchange for being granted LP interests in Tech I as consideration on March 24, 2022. A true and correct copy of Reiter's executed "Redemption Agreement" is attached as **Exhibit "I."** Reiter remains bound by the Governing Documents of Tech I and SpaceX as a Limited Partner, despite no longer being a Member of Megacap.

137.    Defendant Divilov, is Goldner's "long-time business partner, colleague, friend,

and investor," as well as an LP in Tech I and SpaceX, bound by their Governing Documents.

**Summary of the Megacap Claims**

138.    While the dispute detailed in Section I was unfolding, Goldner simultaneously initiated a calculated campaign of threats, harassment, and intimidation against Blatt with regard to issues relating to Megacap.

139.    As part that, he (i) transmitted threats against Blatt and his family's lives and physical safety, (ii) threatened to disclose compromising photos of Blatt, and (iii) repeatedly and flagrantly breached his fiduciary duties and duty of care to Megacap and Blatt, as detailed below.

140.    Goldner's actions left Megacap no choice but to initially involuntarily withdraw him as a Class A Member in January 2023 without redeeming his unvested Membership Units in the hope this would prevent him from seeking to harm Megacap and Blatt.

141.    When that turned out not to be the case, Megacap subsequently redeemed his unvested Membership Units four months later for continued and escalating offenses.

142.    Subsequent to his redemption, Goldner recruited Divilov and Reiter to aid him in threatening not only Blatt but also Megacap and its vendors, contractors, associates, and limited partners, causing the company irreparable harm.

143.    This ultimately led to Megacap involuntarily withdrawing Goldner for these new breaches of fiduciary duty and forbidden acts, with the remaining Members purchasing Goldner's Membership Units pursuant to the terms of the Megacap Agreement governing same, rendering Goldner no longer a member but still having a substantial negative capital account balance with Megacap.

**Initial Threats and Harassment**

144.     As Blatt sought to gain the benefit of Blatt's Funds, Goldner repeatedly pressured Blatt as part of that settlement to agree on behalf of Megacap to grant Goldner exclusively among Megacap's Managers reimbursement for Thirty Thousand Dollars ($30,000.00) of non-pre-approved, non-itemized travel expenses.

145.     When Blatt refused to acquiesce to Goldner's pressure to have Megacap grant him concessions as part of resolving their GBI dispute, Goldner, having already defrauded Blatt of Blatt's Funds, wrote him an email on June 19, 2022, stating, "I'll make this business the most difficult it can be. You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me."

146.     As detailed in **Exhibit "J,"** Blatt's Declaration, Goldner's threat here was not an idle one, as he thereafter embarked on a campaign of terror against Blatt including extortion, sextortion, harassment, and the transmission of death threats.

147.     On January 12, 2023, in an effort to protect himself from Goldner's escalating harassment, as detailed further below, Blatt, who had by then blocked Goldner personally on messaging channels, instructed Goldner to "please email me with any [Megacap] or other business" instead of writing messages in Megacap's official WhatsApp group.

148.     Goldner rejected Blatt's appeal, continuing to write Blatt threatening and harassing messages regarding non-Megacap matters on Megacap's official WhatsApp Channel, as detailed in Blatt's Declaration (collectively, Goldner's "Harassment").

**Tax Breaches and Self-Dealing**

149.     In a December 9, 2022 WhatsApp message on Megacap's official internal company "WhatsApp Channel," Goldner explicitly tied his willingness to manage critical

Megacap business to Blatt making concessions in their GBI dispute, stating that the two issues were "intertwined" for him.

150.    Goldner reaffirmed in the WhatsApp Channel on December 16, 2022 that his willingness to cooperate on critical Megacap business was tied to Blatt personally paying him at least One Hundred Thousand Dollars ($100,000.00), stating, "I cannot commit to a new [Megacap] fund admin when you owe me over $100k" (collectively with the June 19 Email and December 9, 2022 message contents, the "Self-Dealing Statements").

151.    In doing so, Goldner conditioned honoring his fiduciary duties to Megacap on Blatt agreeing to a personal settlement with him unrelated to Megacap, thereby breaching those same fiduciary duties.

152.    Beginning early December 2022, Blatt and Goldner, as Managers of Megacap, disagreed on several matters critical to Megacap's timely filing of tax returns.

153.    The disagreement centered around the tax reporting of Tech I management fees.

154.    Blatt had consulted with Megacap's fund administrator ("Flow"), legal counsel, and accountant, all of whom had confirmed that the Tech I Governing Documents had the General Partner earning its Management Fees upon each LP's closing.

155.    As a practical matter, the Management Fees had also been sent from the SPV in question to Megacap's operating accounts.

156.    Goldner, however, insisted that he would not allow taxes to be filed that showed Megacap had earned the Management Fees.

157.    Goldner wanted to reduce his own pass-through tax liability.

158.    To rationalize his position, he wrote: "The management fee shouldn't be 5% up front, the 5% is held in trust" on December 12, 2022 in the WhatsApp Channel, even though this

unequivocally is not how fees are treated in the Limited Partnership Agreement, which cannot be amended without a vote of the limited partners.

159.     Blatt, in numerous WhatsApp messages from December, 2023 to January 2024, tried to impress upon Goldner the reality of the situation and that he was not willing to commit tax fraud by filing returns showing no management fees as having been earned.

160.     Nonetheless, seeking to decrease his own personal tax burden, Goldner continued to pressure Blatt to have Megacap file inaccurate and possibly fraudulent tax returns for Megacap not showing the Management Fees as having been earned (the "Tax Breaches").

161.     Shortly thereafter, during the banking crisis of 2023, Megacap agreed that Goldner and Blatt would each hold half of Megacap's funds in trust on a temporary basis until they could be redeposited into a new Megacap account.

162.     Goldner and Blatt each received Eighteen Thousand One Hundred and Forty-Six Dollars and Seventy Cents ($18,146.70) of Megacap funds (the "Megacap Funds") to hold in trust and use for needed Megacap expenses until such time as Megacap had a new bank account into which the Megacap Funds could be deposited.

163.     Upon Megacap establishing a new bank account in its name at Bank of America, Blatt asked Goldner to return the Megacap Funds.

164.     Goldner refused, stating that he would use the Megacap Funds to perfect a judgment against a Limited Partner who had defaulted on a One Million Two Hundred Thousand Dollars ($1,200,000.00) subscription to Tech I.

165.     But Goldner never returned the Megacap Funds to Megacap's account, nor did he take any action to perfect the judgment against the defaulted Limited Partner (collectively, the

"Banking Breaches"), to the detriment of Megacap, which stood to earn sixty thousand dollars ($60,000) in upfront fees from that subscription.

**Extortion and Withdrawal**

166.    Beginning around December 2022, Goldner began pressuring Blatt to execute an interest waiver agreement (the "Interest Agreement") with a "Creditor" of Megacap.

167.    Goldner believed the Interest Agreement would derivatively benefit him financially by freezing the accrual of interest on a Megacap loan.

168.    Blatt was concerned the Interest Agreement required taking on substantial additional liability capable of bankrupting Megacap.

169.    Goldner would ultimately resort to repeatedly transmitting extortive death threats against Blatt and his family if Blatt did not sign the Interest Agreement, initially telling Blatt on a December 8, 2022 Zoom Meeting that people would "show up at [his] door and break [his] knees" if he didn't sign the Interest Agreement.

170.    Goldner also threatened in writing on numerous occasions to unilaterally withdraw Blatt from Megacap if Blatt did not acquiesce to his threats relating to the Interest Agreement.

171.    Goldner's (i) persistent pattern of placing his own interests above those of Megacap in breach of his fiduciary duty; (ii) breaches prevailing law—a "forbidden act" triggering involuntary withdrawal per the Megacap Agreement; and (iii) breaches of duty of care to Blatt by way of his threats and harassment; left Megacap no choice but to involuntarily withdraw Goldner as a Class A Member of Megacap on January 16, 2023.

172.    In an effort to avoid extra-legal retribution from Goldner, and because Goldner's withdrawal was not financially motivated, at the time of his withdrawal from Megacap as a

Manager and Class A Member in January 2023, Megacap did not redeem his unvested Membership Units—it only converted his Membership Units to Class B.

173.    According to the Megacap Agreement, notice to a Member is only required if the remaining Members wish to *purchase* a withdrawn Member's *vested* Membership Units, which Megacap initially did not elect to do—again to protect itself from retribution.

174.    Unfortunately, Goldner's threats towards Blatt continued to escalate thereafter, with Goldner graduating to transmitting written death threats against Blatt as well as his family.

175.    On January 27, 2023 in group text messages to Blatt and Blatt's mother, Goldner sought to ascertain Blatt's physical location and said that Blatt was putting his "family's lives at risk" by not acquiescing to Goldner's pressure regarding the Interest Agreement.

176.    Goldner would repeat these threats several times via WhatsApp and email, writing on March 18, 2023 "what do you think they're going to do to us if we repay in shares," (collectively with the December 8, 2022 and January 27, 2023 threats, Goldner's "Personal Threats").

177.    Goldner's increasing hostility and threats led Blatt on March 19, 2023 to write to Goldner that, with regard to his efforts for Megacap, he "cannot and will not continue working under the current environment of constant, near-daily threats against me, nor am I under any obligation to do so. Despite what you seem to think, you do not have the right to verbally abuse me—or anyone for that matter."

178.    Rather than respect Blatt's request, Goldner escalated his campaign of harassment and extortion further by writing inappropriate messages in an official Megacap WhatsApp channel with several LPs and the Creditor:

   a.   threatening to withdraw Blatt from Megacap for refusing to sign the Interest Agreement and not acquiescing to the Tax Breaches;

    b.  admittedly and wilfully deceiving the Creditor by knowingly and demonstrably lying to them about Blatt refusing to approve a cap table transaction;

    c.  falsely claiming Blatt had made unauthorized distributions;

    d.  again attacking Blatt's fiancé and baselessly claiming Megacap could sue her for tortiously interfering with Megacap affairs simply because she (understandably) did not like Goldner;

    e.  expressing a desire to avoid personal taxable income by having Megacap breach Tech I's governing documents; and

    f.  detailing private internal Megacap business to Megacap Creditors and LPs in an effort to improve his own personal standing with them, to the detriment of Megacap.

(Collectively, the "Creditor Breaches").

179.    Shortly thereafter, upon being served notice by Blatt of his intent to sue over the GBI Claims, Goldner threatened to take actions that would "destroy" Megacap and the Tech I SPV if Blatt did not acquiesce to his various demands, including dropping his GBI claims against Goldner, a gross breach of his fiduciary duty to Megacap.

180.    This led to Goldner's prior withdrawal being amended and Goldner being notified of his withdrawal, which had been effective since January 16, 2023, subsequent to which he was only a Class B Member. (*See* Exhibit H).

181.    At that time, despite all his malfeasance, Megacap *still* did not redeem Goldner's unvested Membership Units nor did Blatt purchase his unvested units, hoping that this would prevent him from seeking to harm the company by virtue of fully aligning his financial interests with that of Megacap.

**Redemption and Retribution**

182.    Blatt and Megacap had hoped that not redeeming Goldner's unvested shares would keep him from seeking to harm Megacap.

183.    However, subsequent to being noticed of his withdrawal but not redemption, Goldner escalated his campaign of threats against Blatt, Megacap, and the interests of its LPs.

184.    This ultimately led to his unvested equity being redeemed via the May 22, 2023

Redemption Notice served upon Goldner over four months after his initial withdrawal. (*See*

Exhibit H).

185.    Goldner responded by doubling down on his threats of a "scorched-earth"

campaign against Megacap and its affiliates, including, among other things, by writing letters to:

      a.  Blatt as manager of Megacap, threatening (i) to destroy Megacap and Tech I
          SPV, (ii) to share indecent photos of Blatt publicly, (iii) to disclose highly
          sensitive, confidential legal information to opposing parties in ongoing
          litigation in which Blatt represented the plaintiff, and (iv) to accuse Blatt of
          crimes under threat of imprisonment if Blatt did not acquiesce to his demands
          relating to Megacap;
      b.  LPs of Megacap (i) soliciting funds from them personally for his own benefit
          to aid in bringing litigation against Blatt, (ii) defaming and disparaging Blatt
          as Manager of Megacap, and thus by extension Megacap itself, by accusing
          him without any factual basis of stealing Tech I equity, and (iii) instilling fear
          about the safety of their investments;
      c.  prospective LPs instructing them not to invest with Megacap;
      d.  numerous vendors and partners of Megacap with baseless threats of litigation,
          some of whom subsequently refused to provide services to Megacap out of
          fear of Goldner; and
      e.  suppliers of equity to the SPVs it manages, pressuring them not to make
          contractually mandated distributions thereto.

(Collectively, the "Partner Threats").

186.    Goldner next recruited former Megacap Member Reiter to aid him in his efforts to

use threats, coercion, and intimidation to pressure Megacap into reinstating him.

187.    This led, on July 12, 2023, to Blatt's mother texted him saying "I got a call from

Roderyck [Reiter] - threatening" to put [Blatt] "in jail" if Blatt didn't acquiesce to Goldner's

demands—the second time Defendants harassed Blatt's mother with threats relating to Megacap.

188.    Divilov subsequently joined Goldner and Reiter's association-in-fact to

collectively confuse and intimidate Megacap's partners, with the three of them declaring in a

"November 2023 Letter" (attached hereto as **Exhibit "K"**) to Megacap's LPs: "Marc Goldner and Roderyck Reiter Reunite to Unify MegaCap Capital & MegaCap Funds."

189.    The November 2023 Letter was written by Goldner in collaboration with Divilov and Reiter (collectively the "Conspirators"), who each included their own letter.

190.    In it, Goldner states that his allegations were confirmed by "Simon Divilov, an LP of MegaCap, a close friend, and my longtime business partner, as well as confirmed by Roderyck Reiter, the other rightful Managing Partner of MegaCap. Simon & Rod granted me permission to disclose this information to you."

191.    In writing the November 2023 Letter and positioning Reiter as a "rightful Managing Partner of MegaCap" despite Reiter no longer being a Megacap Member, Goldner expressly committed the forbidden act detailed in § 68 of the Megacap Agreement: "No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company."

192.    Among the Conspirators' numerous communications to Megacap's partners in that letter, described by one partner as "alarming," the Conspirators:

    a. breached the Operating Agreement's dispute resolution terms by seeking to resolve his dispute with Megacap by way of direct appeal to Megacap's LPs, writing, "I am requesting that there is a mass request from each and every LP to tell Eli to comply with his duties;"

    b. threatened to needlessly make public highly sensitive, confidential information about Megacap's suppliers, which they warned could wipe out all the LPs investments as well as destroy Megacap;

    c. claimed that a critical Megacap supplier would withhold Megacap's investors' equity at Goldner's instruction, writing, "MegaCap and Eli will not be distributed anything from the Sellers in which we acquired [redacted] and [redacted] without either my consent, authorization, and approval or without proper adjudication;"

    d. falsely claimed to represent the company, sharing a new fraudulent company email addresses to contact Goldner and Reiter as Megacap Managers;

    e.  defamed and disparaged Blatt as Megacap's Manager and, by extension, Megacap, by, among other things, baselessly accusing Blatt of crimes, including double-selling Tech I inventory, thereby defrauding Megacap LPs;

    f.  disclosed detailed confidential Megacap information, including disclosing Megacap had a One Million Dollar ($1,000,000.00) debt obligation;

    g.  falsely claimed that mismanagement by Megacap could "result in the destruction of LP equity;" and

    h.  attached letters written by Divilov as well as Goldner and Divilov's personal lawyer defaming Megacap by, among other things, falsely and baselessly claiming to Tech I LPs that their K1s were incorrect and fraudulent

(Collectively, the "Partner Breaches")

193.    The Partner Breaches were made by the Conspirators with willful and flagrant disregard for their confidentiality, dispute resolution, and non-interference obligations under the Megacap Agreement and SPV governing documents, causing some Tech I LPs to fear for the safety of their investments as a result of Goldner's erratic behavior.

194.    Goldner's actions leading up to the November 2023 letter led Blatt to seek an injunction on behalf of Megacap in his litigation against Goldner, which was subsequently removed to Federal Court before being closed, leading to the filing of the instant case. A true and correct copy of the filed injunction is attached as **Exhibit "L."**

195.    Thereafter, as a result of Goldner's November 2023 Letter, the Partner Breaches, and Goldner's ongoing efforts to harm Megacap, on September 2, 2025, Megacap involuntarily withdrew Goldner as a Class B Member for breaches of fiduciary duty and committing forbidden acts.

196.    At that time, finally, the remaining Members elected to purchase Goldner's Class B Membership Units at a price determined by an independent third-party GAAP valuation, pursuant to §§ 44, 46, and 51-53 of the Megacap Agreement (*See* Exhibit G), thereby fully terminating his Membership in Megacap, leaving him with a substantial negative capital account balance with Megacap that it is now unable to offset against future distributions.

197.    Nonetheless, as a direct and proximate result of Defendants' actions, Megacap has suffered significant damages that are impossible to calculate, including but not limited to:

    a.  loss of referrals from current LPs;
    b.  loss of investment from prospective LPs;
    c.  disruption of services from vendors and partners;
    d.  increased costs associated with finding new service providers;
    e.  loss of future business opportunities and revenue;
    f.  costs associated with mitigating the effects of Goldner's breaches, including legal fees and vendor switching costs;
    g.  a negative capital account balance with Megacap that can no longer be offset by future distributions; and
    h.  reputational damage.

198.    Blatt is now forced to bring this action on behalf of himself and derivatively on behalf of Megacap and as the representative of Tech I and SpaceX to protect himself, Megacap, and its LPs from further harm.

## THE MEGACAP COUNTS

## COUNT VIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (FL)
### (Blatt v. Goldner)

199.    Plaintiff ELI M. BLATT realleges and incorporates by reference paragraphs 138-139, 144-148, 166-170, 174-179, and 185-194 of the Factual Allegations as if fully set forth herein.

200.    As detailed in Blatt's Declaration and the Personal Threats, Defendant MARC GOLDNER engaged in a prolonged and malicious pattern of harassment, threats, and psychological abuse directed at Blatt, including but not limited to:

    a.  transmitting threats to Blatt's physical safety via a Zoom call, including statements that someone would "show up at Blatt's door and break his knees" if he refused to sign the Interest Agreement;
    b.  transmitting written threats to the lives of Blatt and his family, including against and directly to his mother, by stating that Blatt was putting his "family's lives at risk" and "what do you think they're going to do to us if we repay in shares;"

   c. a sextortion attempt via a WhatsApp message to Blatt's former fiancée, threatening to release compromising images of Blatt unless he withdrew his legitimate legal claims relating to GBI;

   d. dispossessing Plaintiff of the Funds and Disputed Assets;

   e. repeated abusive communications on official Megacap channels, including defamatory attacks on Blatt's fiancée and false accusations of criminal conduct; and

   f. repeated personal attacks against Blatt including allegations of criminal misconduct on the TRIUM alumni WhatsApp group.

201.   Goldner engaged in this conduct intentionally and with knowledge that it would inflict severe emotional distress upon Blatt. These acts were designed to coerce Blatt into surrendering legal rights and executing documents under duress, including but not limited to the Interest Agreement and, unsuccessfully, Megacap Resolutions executed in or around February 2023, as detailed in Blatt's Declaration.

202.   Goldner's conduct includes:

   a. repeated, escalating threats over a period of more than 12 months, despite Blatt's repeated demands for cessation;

   b. use of telecommunications across state lines to carry out the threats and harassment;

   c. statements and admissions that his threats were intended to force Blatt into compliance;

   d. exploitation of personal and professional channels to amplify distress and reputational harm.

203.   As a direct and proximate result of Goldner's conduct, Blatt has suffered severe emotional distress, including:

   a. clinically significant anxiety, panic attacks, and sleep disturbances;

   b. entry into therapy and medical treatment for stress-induced conditions;

   c. ongoing financial and emotional strain;

   d. a reported nervous breakdown and serious disruption of his personal and professional life, including his relationship with his fiancée.

204.   Goldner's harassment of Blatt was so severe and unrelenting that it caused Blatt to seek a restraining order against Goldner, which the Florida Sheriff was unable to serve upon him despite repeated attempts.

205. Florida law recognizes a claim for intentional infliction of emotional distress where a defendant's conduct is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community.

206. Goldner's actions clearly meet this standard. His conduct was intentional, extreme, and outrageous and caused Blatt emotional distress so severe that no reasonable person should be expected to endure it.

**WHEREFORE**, Plaintiff, ELI M. BLATT, respectfully requests that this Court enter judgment in his favor and against Defendant MARC J. GOLDNER, and award (i) compensatory damages for emotional distress, reputational harm, and related losses; (ii) punitive damages for Goldner's malicious, wanton, and outrageous conduct; (iii) injunctive relief barring Goldner from any further direct or indirect contact with Blatt or his family; and (iv) costs of this action, together with attorneys' fees if and as permitted by law.

### COUNT IX – TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS (FL)
(Blatt, derivatively on behalf of Megacap v. Goldner, Divilov, and Reiter; Megacap named as Nominal Defendant)

207. Plaintiff realleges and incorporates by reference paragraphs 138-142, 183, and 185-198 of the Factual Allegations as if fully set forth herein.

208. At all times relevant, Plaintiff Blatt was the Managing Member of Megacap Capital, LLC and the General Partner of Megacap Funds, LP, and was responsible for managing Megacap's relationships with its limited partners (LPs), vendors, and prospective investors.

209. Blatt on behalf of Megacap maintained advantageous business relationships with numerous third parties, including but not limited to:

    a. Existing limited partners who had entrusted funds under management;

b.  Vendors and service providers who supported Megacap's infrastructure and operations.

210.   Defendants Goldner, Divilov, and Reiter had actual knowledge of these business relationships by virtue of their past affiliations with Megacap and their receipt of confidential internal information concerning LPs and vendors.

211.   Beginning in 2023, Defendants intentionally and unjustifiably interfered with Megacap's business relationships by, among other things, sending the November 2023 Letter and committing the Partner Breaches.

212.   Defendants also intentionally and maliciously interfered with Blatt's relationship as Megacap's Manager with investors, partners, and vendors, and business relationships held by Megacap in trust by Plaintiff in his fiduciary capacity by, among other things:

a.  disseminating communications attacking Blatt personally, making false and disparaging statements about his professional character and conduct;
b.  claiming he engaged in misconduct that would subject him to regulatory or criminal penalties;
c.  alleging he had "double-sold" LPs' interests in Tech I;
d.  attempting to replace or discredit him as the point of contact for Megacap LPs and vendors; and
e.  using threats, false pretenses, and impersonation tactics to induce others to terminate or avoid dealings with Blatt.

213.   These actions were designed to, and did, harm Blatt's personal standing as Megacap's Manager, credibility, and prospects, as well as Megacap's operational relationships.

214.   Defendants' actions were intentional, malicious, and without legal justification or privilege. Their sole objective was to disrupt Blatt's control of Megacap and divert relationships and business opportunities for their own gain.

215.   As a direct and proximate result of Defendants' interference, Megacap has suffered (i) damage to its reputation and credibility with LPs and third parties; (ii) loss of

existing and prospective investment commitments; (iii) termination or suspension of vendor

relationships; and (iv) increased legal, administrative, and reputational costs.

WHEREFORE, Plaintiff ELI M. BLATT, derivatively on behalf of MEGACP CAPITAL,

LLC, respectfully request that the Court enter judgment in its favor and against Defendants

MARC J. GOLDNER, SIMON DIVILOV, and RODERYCK REITER and award the following

relief: (i) damages against Goldner in an amount to be determined at trial, including lost profits;

(ii) damages against Divilov and Reiter in an amount to be determined at trial, including lost

profits; (iii) an order that the value of their interests be deducted from the award and applied

towards redemption of their LP units by Megacap, with said units deemed redeemed by Megacap

upon entry of judgment, without further action required by Divilov or Reiter, as contemplated by

the Governing Documents; (iv) pre- and post-judgment interest as allowed by law; (v) costs; and

(vi) such other and further relief as the Court deems just and proper.

## COUNT X: BREACH OF FIDUCIARY DUTY (DE)
(Blatt, derivatively on behalf of Megacap v. Goldner; Megacap named as Nominal Defendant)

216.    Plaintiff realleges and incorporates by reference paragraphs 138-198 of the

Factual Allegations as if fully set forth herein.

217.    Goldner is and was at all relevant times a Member of Megacap

218.    As such, under Delaware law, Goldner owed Megacap a fiduciary duty, including

the duties of loyalty, care, and good faith.

219.    Goldner breached his fiduciary duties to Megacap in numerous ways, including

but not limited to, by:

> a.  making the Self-Dealing Statements and Partner Threats, and engaging in the
>     Tax Breaches, Self Dealing, Creditor Breaches, Partner Breaches, and
>     Banking Breaches, thus placing his own interests above Megacap's while
>     causing direct harm to Megacap; and

    b.   engaging in the Harassment and making the repeated Personal Threats against Blatt and his family's lives on the official Megacap WhatsApp Channel, as a result of which Goldner breached his duties of care and good faith to Blatt as Manager of Megacap and thus, by extension, Megacap.

220.    Goldner's actions were willful, wanton, and in conscious disregard of their fiduciary obligations to Megacap.

221.    As a direct and proximate result of Goldner's breaches of fiduciary duty, Megacap has suffered damages to be determined at trial.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of MEGACAP CAPITAL, LLC, respectfully requests that this Court enter judgment in its favor against Defendant MARC J. GOLDNER, and award the following relief: (i) damages in an amount to be determined at trial, including but not limited to the value of unsold Tech I inventory that Megacap was unable to place with investors; (ii) an order requiring Goldner to pay down his negative capital account balance with Megacap; (iii) disgorgement of all payments, compensation, and distributions received by Goldner from Megacap during his tenure; (iv) injunctive relief enjoining Goldner from further interference with Megacap's business relationships, use of its name, or solicitation of its investors; and (v) such other and further relief as the Court deems just and proper.

## COUNT XI: BREACH OF CONTRACT (DE)
(Blatt, derivatively on behalf of Megacap v. Goldner; Megacap named as Nominal Defendant)

222.    Plaintiff realleges and incorporates by reference paragraphs 138-198 of the Factual Allegations as if fully set forth herein.

223.    The Megacap Agreement, to which Goldner is bound, contains express terms governing forbidden acts, confidentiality, dispute resolution, and commingling of personal and Megacap assets, which were material to the contract and intended to protect Megacap's interests

and those of its members and LPs (see Exhibit G the Megacap Agreement § 10, 58, 74, 80 and Exhibit B thereto the Confidentiality Agreement).

224.    Goldner intentionally breached these provisions in bad faith in numerous ways, including but not limited to, by:

      a.    committing the Forbidden Acts detailed in Exhibits H, J, and L;

      b.    willfully and flagrantly disregarding Megacap's dispute resolution terms detailed in Megacap Agreement §80 by seeking to resolve his dispute with Megacap via direct appeal to its LPs instead of through arbitration or injunctive relief;

      c.    publicly disclosing to Megacap LPs confidential information about Megacap's internal business matters, including but not limited to internal tax matters, member disputes, and the amount of Megacap's debt, in breach of the Confidentiality Agreement attached to the Megacap Agreement;

      d.    making the Self-Dealing Statements;

      e.    engaging in the Harassment of Blatt, Tax Breaches, and Self Dealing acts; and

      f.    Committing Banking Breaches, Creditor Breaches, Affiliate Threats, and Partner Breaches.

225.    Goldner's willful breaches of the Megacap Agreement and Redemption Agreement were material and intentionally made to defeat the object of these clauses for his own personal gain, to the detriment of Megacap.

226.    As a direct and proximate result of Goldner's breaches of fiduciary duty, Megacap has suffered damages to be determined at trial.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of MEGACAP CAPITAL, LLC, respectfully requests that this Court enter judgment in favor of MEGACAP CAPITAL, LLC and against Defendant MARC J. GOLDNER, and award the following relief: (i) damages in an amount to be determined at trial, including but not limited to the value of unsold Tech I inventory that Megacap was unable to place with investors; (ii) an order requiring Goldner to pay his outstanding debt to Megacap, including the negative balance of his capital account; (iii) disgorgement of all payments, compensation, and distributions received by Goldner

from Megacap during his tenure; (iv) injunctive relief enjoining Goldner from further interference with Megacap's business relationships, use of its name, or solicitation of its investors; (iv) costs and expenses incurred in bringing this action, including reasonable attorney's fees if provided for by contract or statute; and (v) such other and further relief as the Court deems just and proper.

## COUNT XII: BREACH OF CONTRACT (DE)
(Blatt, derivatively on behalf of Megacap and as representative of Tech I and SpaceX v. Divilov and Reiter; Megacap named as Nominal Defendant)

227.    Plaintiff realleges and incorporates by reference paragraphs 138-142, 183, and 185-198 of the Factual Allegations as if fully set forth herein.

228.    Divilov and Reiter are bound to the Governing Documents for two Megacap SPVs, which include provisions relating to confidentiality (Series Agreement, Section 5.9) and tortious interference (Series Agreement, Section 6.2).

229.    Divilov and Reiter's participation in authoring and sending the November 2023 letter, as well as Reiter contacting a Megacap Limited Partner by phone conveying a threat to Blatt, were in material breach of these provisions.

230.    Divilov and Reiter's actions were in bad faith and were undertaken with the improper motive of intentionally violating the express purpose of the above provisions in order to advance their own interests at the expense of Megacap.

231.    Section 5.2 of the Series Agreements to which Divilov and Retier are bound allows for the removal of a Limited Partner for cause through redemption of their interest for the value of their capital account.

232.    As a direct and proximate result of Goldner's breaches of fiduciary duty, Megacap has suffered damages to be determined at trial.

WHEREFORE, Plaintiff, ELI M. BLATT, derivatively on behalf of MEGACAP CAPITAL, LLC and as representative of TECH I and SPACEX, respectfully requests that this Court enter judgment in favor of MEGACAP CAPITAL, LLC and against Defendants SIMON DIVILOV and RODERYCK REITER, and award the following relief: (i) damages in an amount to be determined at trial, including but not limited to the value of unsold Tech I inventory that Megacap was unable to place with investors and the value of Defendants' capital account balances in Tech I and SpaceX; (ii) an order that the value of Defendants' capital accounts be applied toward redemption of their LP units by Megacap, with said units deemed redeemed upon entry of judgment, without further action required by Divilov or Reiter, as contemplated by the Governing Documents; (iii) pre- and post-judgment interest as allowed by law; (iv) costs and expenses incurred in bringing this action, including reasonable attorney's fees if provided for by contract or statute; and (v) such other and further relief as the Court deems just and proper.

## COUNT XIII: CONVERSION (FL)

(Blatt, derivatively on behalf of Megacap v. Goldner; Megacap named as Nominal Defendant)

233.    Plaintiff realleges and incorporates by reference paragraphs 161-165 of the Factual Allegations as if fully set forth herein.

234.    Megacap entrusted Goldner on a temporary basis to steward the Megacap Funds.

235.    Despite Megacap's demands, Defendant Goldner has failed and refused, and continues to fail and refuse, to return the Megacap Funds to Megacap.

236.    Goldner has exerted dominion and control over Megacap's funds in a manner inconsistent with Megacap's ownership thereof.

237.    As a direct and proximate result of Goldner's wrongful conversion of the Megacap Funds, Megacap has been damaged, including but not limited to:

a. loss of the Eighteen Thousand One Hundred and Forty-Five Dollars ($18,145.00) entrusted to Defendant, being the value of the Megacap Funds minus $1.70 for Goldner's redemption that was deducted therefrom as payment of his unvested Membership Units; and

b. loss of Sixty Thousand Dollars ($60,000.00) in Management Fees, future lost carried interest, and other damages relating to Megacap failing to perfect the judgment against the defaulted Limited Partner due to the Banking Breaches;

WHEREFORE, Plaintiff ELI M BLATT, derivatively on behalf of MEGACAP CAPITAL, LLC, respectfully requests that the Court enter judgment in its favor and against Defendant MARC J. GOLDNER and award the following relief: (i) compensatory damages; (ii) disgorgement of any profits or benefits Defendant obtained through his improper retention of the Megacap Funds; (iii) imposition of a constructive trust over any property or funds in Defendant's possession that rightfully belong to Megacap; (iv) pre-judgment interest on the converted funds from the date of conversion; (v) post-judgment interest as allowed by law; (vi) costs and expenses incurred in bringing this action; and (vii) such other and further relief as the Court deems just and proper.

Dated this 2nd day of September, 2025.

/s Brad E. Kelsky
Counsel for Plaintiff
Kelsky Law, P.A.
150 S. Pine Island Rd
Suite 300
Plantation, FL 33324
954.449.1400
Fax: 954.449.8986
Primary: bradkelsky@kelskylaw.com
Secondary: barbarallinas@kelskylaw.com
FBN: 0059307

## VERIFICATION

I, Eli M. Blatt, hereby certify that I am the Plaintiff in the foregoing action. I have read the foregoing Complaint and know the contents thereof. The factual allegations contained in the Complaint are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct.

Executed on this 19th day of December 2025.

Eli M. Blatt, Plaintiff

# EXHIBIT "A"

## OPERATING AGREEMENT OF GOLDNER BLATT INVESTMENTS, LLC

**This OPERATING AGREEMENT** (the "**Agreement**") made and entered into this 7 day of December 2021 (the "**Effective Date**") by and among **GOLDNER BLATT INVESTMENTS LLC**, a Delaware Series Limited Liability Company (the "**Company**" or "GBI" used interchangeably) and the following persons (each, a "**Member**," and, collectively the "**Members**"):

ELI M BLATT

MARC GOLDNER

### BACKGROUND:

A. The Members wish to associate themselves as members of a limited liability company.

B. The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

### Formation

1) By this Agreement, the Members form a Series Limited Liability Company (the "**Company**") in accordance with the laws of the State of Delaware. The rights and obligations of the Members will be as stated in the Delaware Limited Liability Company Act (the "**Act**") except as otherwise provided in this Agreement.

### Name

2) The name of the Company will be **GOLDNER BLATT INVESTMENTS, LLC**.

### Purpose

3) Investing, Operations, Speculation, Analysis, Consulting, and Finance relating to any asset class (i.e. tokens, currencies, collectibles, neural interfaces, tokenization, real estate, diamonds, fund management, fund operations, funds, and anything else that is part of the Company decks in the below Exhibits, etc.) in the cryptocurrency world (including but not limited to Cryptocurrencies, Metaverse, and NFTs except for the exclusion listed below relating to Marc's independent NFT-related ventures and businesses. Further, it is acknowledged that Marc has several collectibles which are part of his personal collection and not part of the Company unless Marc agrees to assign some of those assets. Marc's collectibles include but are not limited to video games sometimes pre-dating SNES

area, Pokemon Cards, Yu-Gi-Oh cards, Comic Books, Figurines, Sports Memorabilia, and other collectibles. If Marc sells any of his Collectibles, that money is not due to the Company.), Pre-IPO FinTech sourcing platform such as building with Kumar an early employee stock option Pre-IPO platform (also, however, the Parties agree that BitSource DBA The Crypto Bank and any former BitFinance assets such as the tokenomics and/or platform are part of BitSource and are governed under that operating agreement and that cap table where Marc and Eli are currently at 45% each and Courtney Spaeth is at 10%), and brokering  or otherwise intermediating non MegaCap Securities as defined herein ("the Purpose").  However, it is noted that the Crypto Bank South Africa is held 75% by The Crypto Bank main series in America while 25% is held by Quentin Van Der Heever and his team.

a) If any investment and/or opportunity and/or deal is in the cryptocurrency world or is considered to be a non-MegaCap Securities brokering and/or intermediating deals (i.e. less than $250,000,000 valued companies), real estate (by tokenization or otherwise), or any other general deals whether institutional, retail, or otherwise, then this shall be structured as 100% of the proceeds, earnings, and/or revenue goes 100% directly to the Company's House pool which shall be split evenly between the Class A Members pro-rata based on each Class A Member's share of equity ownership as defined herein.

   i) For The Dharma Initiative LLC (which is a separate Series LLC whose purpose is to mine cryptocurrencies) the splits proposed shall be 24.4% will go to Marc Goldner, 24.4% will go to Eli Blatt, 24.4% will go to Simon Divilov, 24.4% will go to Rachel Korsen, 2% shall go to Jasmine Garcia, .1% shall go to Eric Goldner, .1% shall go to Robert Gross, .1% shall go to Josh Korsen, and .1% shall go to Abigail Shewalter.

b) Any equity or cash earned as part of compensation for employment or other services such as but not limited to consulting services is subject to this Agreement, which applies to joint investment and fees from individual deals.
   i) Any consulting that either Eli or Marc do will be split 50/50. In the event that any consulting services exceeds $10,000 then there will be a new series created on a 50/50 basis for our Consulting business.  This business will earn cash fees and equity. Any advisory equity and/or board fees will be split on a 50/50 basis split between the Class A members.
   ii) The only exclusion that applies here is that Simon Divilov, Rachel Korsen, and Marc Goldner have had a consulting business called Columbus Computer Consulting since 2013 and has had a focus on investment club, and technology related consulting. That entity Columbus Computer Consulting will remain entirely under the ownership of Marc Goldner, Simon Divilov, and Rachel Korsen. In full disclosure, that entity may hold Bitcoin and other crypto assets that could have been stolen during the Mt Gox hack so any crypto assets received or earned from that entity that is not new business but potentially a legal recovery or finding any crypto assets will remain entirely the ownership of Marc Goldner, Rachel Korsen, and Simon Divilov. Thus, any Technology related consulting service or business will be split 25% between each of the Founding Members with Eli being the newest member of a new entity that they form called The Crypto Consultants Group with Eli also receiving 25% equity in that business.

c) Goldner Blatt Divilov will be the first Series created at the Company and the splits shall be 33.3% each to Marc Goldner, Eli Blatt, and Simon Divilov, with .1% being held for an advisor. This series shall be for passive investments only for Marc, Eli, and Simon to make together (i.e. If there is a limited investments such as $50,000 being made available of any particular investment and Marc

& Eli want to put in the full $50,000 then they may put that in themselves through Goldner Blatt Investments without any obligation to offering Simon an opportunity to invest in that asset, however, if there is an extra allocation or an availability for something we want to minimize risk then Simon will have the option to invest and be involved in that asset purchase and/or investment). This will also be the equity split for a potential new venture with a trading algorithm programmed by Simon (whether for publicly traded stock markets and/or Crypto). For avoidance of doubt, the equity split on the trading algorithm program and software business for that trading algorithm will be 33.3% each to Marc, Eli, and Simon, with .1% being held for an advisor. However, if any token (crypto or otherwise) is created by Eli, Marc, and Simon, then Marc and Eli shall each be fully vested with 45% equity and Simon shall earn 10% equity where Simon's first 5% is fully dilutable to outside investors prior to Marc and Eli diluting.

d) If any deals conducted are not part of the Purpose, then the splits will be the deal lead takes 60% and there is a two-sided origination that is 40%. For example, if both sides of the origination (buy and sell side) have a shared contact then both sides of the origination would go to GBI, however, if one side is a shared contact then only that side would go to GBI and the other side would go to whoever is responsible for that contact. Therefore, if it's one sided then the Members split the 20% (one sided origination) that goes to the house where each Managing Member gets half of the 20% and therefore each Managing member gets 10%, whereas also if there is a two-sided origination then the full 40% (two sided origination) goes to the house and each Managing Member splits the 40% and therefore gets 20% to each Managing Member. It is noted that two-sided is defined as a buyer and a seller. For illustrative purposes only, if the supplier comes to Eli through his neighbor and then Eli goes to David Ruttenberg (who is a shared contact between the Members) then 20% would go to GBI and Marc and Eli would get 10% each on that deal. All such deals would be assigned to GBI so if Eli were to get 90% on a Real Estate deal then Eli's entity Anthropos would invoice GBI and be paid and then the 10% would be paid directly to Marc (either personally or through an entity of his choosing) for that deal.

e) Any investments that the Managing Members make are a 1:1 cash value based on current market prices at the time of assignment and will be certified and memorialized in an email and on WhatsApp to avoid confusion or dispute of that assets value with a screenshot being taken at the time of assignment and attached. All such assignments must be signed over in writing to GBI and approved by both Managing Members unanimously.

i) In the event that one of the Managing Members wants to sell a GBI asset for any reason and there is a potential buyer, then the other Managing Member has the right of first refusal and can buy out the Managing Member who wants to sell. For illustrative purposes only, if a Collectible is worth $50,000, then the partner that wants to sell can sell his portion to GBI through an assignment and then GBI can pay out $25,000 out of net pocket expenses to the Member who wants to sell.

   (1) When deciding to purchase an asset (i.e. a Collectible, a Cryptocurrency, a piece of Artwork, Shares in a company, or otherwise), there will be an agreement VIA email in writing in relation to the time horizon to hold the Investment and the Exit Parameters of such an investment (i.e. if the Investment doubles, or if the Members agree to hold it for 5 years, or if an investment like a Painting on MasterWorks has a 10 year old period estimate), and then once the asset, property, and/or investment hits either of those marks

NOT A CERTIFIED COPY

then ither partner may force a sale but the right of first refusal as stated above will apply. In the event one of the Managing Members opts out of an investment, then a tacit waiver is given for that managing member to go invest in that asset, property, investment, or otherwise on their own, however, the Managing Member who declines to invest in that asset, property, investment, or otherwise will not circumvent the other Managing Member and invest in that on their own. For avoidance of doubt, the email setting the terms, time horizon, and overall agreement of the purchase of that specific asset will say something to the effect of this email constitutes the final agreement for this asset purchase that explicitly confirms the asset purchase and if it is approved with a confirmation email than that asset purchase contract will be bound by this Operating Agreement. No forced sale may happen until after the agreed amount of time has passed as defined in the time horizon of the agreed upon time window to hold the Investment unless mutually agreed unanimously by the Class A Members.

ii) Potential investments include but are not limited to TV and Game Studios (including but not limited to Virtual Reality and Video Game studios), Masterworks, Vinovest, Rally, Collectibles (i.e. Video Games, Pokemon Cards, Art, Cars, etc.), NFTs, Mining Assets (that may not be part of The Dharma Initiative), and Real Estate. However, it is noted that Marc Goldner's personal collection of collectibles ranging from Pokemon Cards, Video Games, Comic Books, and other collectible items are not part of GBI unless they are explicitly transferred to GBI and Marc & Eli can agree on the valuation of those collectibles so that Eli can match Marc's collectible contribution with another asset of equal value.

   (1) Any investment either Member makes, where possible, should be offered to the other partner to be made though GBI. This includes but is not limited to cryptocurrencies, NFTs, and private investments.

iii) NFTs will be considered on a case-by-case basis because Marc Goldner's company that is unrelated to Eli Blatt is currently pursuing NFTs. Thus, Marc and Golden Bell have an exclusion to pursue NFTs without Eli's permission. However, if Eli and Golden Bell agree that Eli will lead an NFT project, then Eli and Golden Bell will discuss a consulting fee agreement or a percentage split on that NFT if Eli is able to help bring that NFT to market and runs that specific NFT project. Eli would have the right of first refusal to be the newest member of any NFT projects (that exclude simply listing an NFT for a Golden Bell property on a place like OpenSea) that are run, concepted, created, or planned for Golden Bell. In the event that Eli chooses to be a part of Golden Bell's NFT project, then Golden Bell will set up a new Series LLC that Eli Blatt would be on the cap table for. In no event would Eli ever receive more than 50% of Marc's total equity in that LLC for Golden Bell NFTs. Golden Bell would be the Managing Member of this project and would be responsible as the solo Manager of that LLC with sole decision making authority.

f) For any new entities that are created by either Marc Goldner or Eli Blatt (excluding Entertainment related businesses, leveraging any existing Golden Bell relationships to create new entitles in the Trans and Multi Media Space including but not limited to toys, games, comics, and/or animation, as well as the Adult and/or Entertainment Businesses, and MegaCap/BitSource/Golden Bell/Dharma related companies which are already defined. This exclusion includes any companies that are created either as part of a Series or as a separate entity under Golden Bell such as a

Golden Bell off-shoot spin off company like Strangelight Games after they acquire it and it becomes a separate entity) then those entities will be split between Marc and Eli on a 50%/50% basis. For example, if one of the Managing Members created a discretionary fund (i.e. GBI Real Estate) then that will be split between the Class A Members of GBI. If Marc and Eli both decide to start a new venture unrelated to any of the aforementioned ventures, then they agree that GBI shall hold their equity in that new business since that new venture will be taking time away from their current obligations, and the Class A Members will split the equity that is held in that new business 50/50. Additionally, if Marc decides to work with any third parties on a Sex Robot business, then Marc's equity will be held in GBI.

i)   Marc Goldner hereby assigns all his equity from Suitor Tutor, LLC. to GBI. In the event that it is not permitted, half of any distributions, half of any sales, half of any equity, or otherwise shall be given directly to Eli Blatt within 90 days of distribution and/or sale.

ii)  Eli Blatt hereby assigns all his equity from Catalyst, LLC. to GBI. In the event that it is not permitted, half of any distributions, half of any sales, half of any equity, or otherwise shall be given directly to Marc Goldner within 90 days of distribution and/or sale.

iii) Any entity (i.e. a new digital start-up, crypto start-up, virtual space startup, etc.) that GBI creates that utilizes Golden Bell relationships then Golden Bell will receive 50% and GBI will receive 50% equity, ownership, and share in profits of that specific start-up entity and/or deal.

g)  The Neuralverse Fund that is an investment fund (essentially a hybrid PE/VC/Hedge Fund Model) will have an equity cap table of 23.75% to each of the founding 4 members will be Managing Members, they are Marc Goldner, Rachel Korsen, Simon Divilov, and Eli Blatt. There will be 5% allocated to the advisor pool, In terms of being the 'director of the vision of the fund', that role would be held by Marc Goldner where Marc will steer the strategic investments and vision of the fund that then the investment committee and Managing Partners will vote to invest in. Managing Partners may recommend investments and there will be some investment committee that will be agreed upon by the partners in the Operating Agreement to vote on submissions by partners. Each of the partners will be allowed to invest in at least 2.5% of the Fund's allocated budget without any votes from any managing members of the Neuralverse fund.

h)  A separate series will be created for each Neural Interface Device intellectual property that is created, 50% of that new entity will be owned by The Neuralverse Fund and 50% will be given to Golden Bell and/or it's Founders and/or Equity Holding Partners. For example, for a theoretical neural interface device camera that has been conceptualized for years that IP's ownership would be 50% split between the founding members of The NeuralVerse Fund (Marc Goldner, Eli Batt, Rachel Korsen, and Simon Divilov) while the other 50% would be given to the leads and intellectual property creators on that project whereas 10% would be owned by Robert Gross, 5% by Golden Bell, 10% would be owned by Marc Goldner, 10% would be owned by Rachel Korsen, 10% would be owned by Simon Divilov, 2% would be owned by Jasmine Garcia, 1.5% would be owned by Jon Meller, and 1.5% would be owned by Ezelle Van Der Heever. The deal lead on a specific project, in this case Robert Gross, would have the 'vision' control that sets the stage for how the technology should be commercialized, implemented, used, and so forth.

i)   For any Neural Interface Device content that is created, 51% would be owned by Golden Bell and Golden Bell has final authority on direction of all content that is created, 5% would be allocated to Advisors, while 44% is given to The Neuralverse Fund for the content being created such as an immersive underwater experience that is more a 'lived' entertainment adventure akin to a simulated adventure in a virtual space. The Neural Verse Fund would be granted the equity in any Neural Interface Device Content if and only if the Neuralverse Fund is the primary investor at an acceptable valuation to the managing members that own the intellectual property that is potentially being licensed and in question and/or development.

j)   Any data business that either Marc or Eli start will be split 50/50. However, Marc has complete decision making authority on the data if used for any intelligence, espionage, or legal purposes. All other data deals being brokered such as consumer data would be agreed to and split on a 50/50 basis. The data business will be structured that Andrew has 50% and GBI has 50% which is split 25% each for Marc and Eli.

k)   The Pre-IPO secondaries platform being built with Kumar to source employee forward contracts, grants, and options will be split on a 50/50 basis between Eli and Marc.

l)   The new series that is created for any new entity such as GBI Properties and GBI Securities as defined in the GBI Deck will also be split 50/50 between Marc and Eli. For avoidance of doubt, any new entity that is not defined herein to be a different percentage equity structure (cap table) will be 50% for Marc Goldner and 50% for Eli Blatt.

## Term

4)   The Company will continue until terminated as provided in this Agreement or in the Act.

## Place of Business

5)   The Company's principal place of business will be located at: A Registered Agent, Inc.

ATTN: GOLDNER BLATT INVESTMENTS, LLC.
8 The Green Street
Suite A
Dover, Delaware 19901

## Units and Capital Contributions

6)   The Company shall be authorized to issue one million (**1,000,000**) units of membership interest in the Company (each, a "**Unit**," collectively, "**Units**"), of which 1,000,000 units are hereby issued ("**Issued Units**") as per Section 8. These units constitute units of the "Master Series". The Company may authorize the issuance of additional Units with the prior written consent of all of the Class A Voting Members. As per Section 14, additional Series may be authorized each with its own Membership Units. The remainder of this agreement concerns the Master Series of the Company, however all provisions shall apply to any additional Series authorized unless otherwise approved by a unanimous

Doc ID: 88a0ad065a55a3c832141744af1fb05755e013db

vote of the Class A Members of the Master Series. For clarity, both Members (Marc Goldner and Eli Blatt) are fully vested with no redemption agreement in relation to GBI.

7) Units shall be divided into two classes: (a) "**Class A Voting Members**," and (b) "**Class B Non-Voting Members**." Each class will have distinct rights and obligations as follows:

| Member Class | Rights and Obligations |
|---|---|
| Class A | Class A Voting Members have full voting rights. |

8) The following is a list of the initial Members (the "**Initial Members**") of the Company and Units of membership interest of the Company:

| Member | Class and Units Issued |
|---|---|
| Eli M Blatt | 500,000 Class A Units (50% of all Issued Units) |
| Marc Goldner | 500,000 Class A Units (50% of all Issued Units) |

9) The following is a list Initial Members of the Company and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution | Value |
|---|---|---|
| Eli M Blatt | Cash | $1,000.00 |
| Marc Goldner | Cash | $1,000.00 |

## Confidentiality Contractor Agreement

10) All Members shall be required to execute that certain **Confidentiality Agreement**, a copy of which is attached hereto as Exhibit A. In addition to the foregoing, any and all owners, principals, officers, directors, managers, members, or affiliates of each Member (each, along with the Members, a "Member Affiliate") shall also execute the Confidentiality Agreement.

## Allocation and Distribution of Profits/Losses

11) Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will be allocated between all Class A Members in accordance with their percentage interest in the Company or individual Series as determined by their respective percentage of Issued Units therein. For the Initial Members in the Master Series, Net Profits and Losses shall be allocated in the following manner:

| Member | Profit and Loss Percentage |
|---|---|
| Eli M Blatt | 50% |

NOT A CERTIFIED COPY

| Marc Goldner | 50% |
|---|---|

12) Cash Distributions to Class A Members will be made in the same fixed proportions as the allocation of Net Profits or Losses described above. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

13) The Company shall make distributions of profit monthly, retaining an operating account reserve as agreed by a unanimous vote of Class A Members, however in no case shall this reserve be lower than $1,000. If a unanimous vote can't be reached on the operating account's cash reserves, then the entire cash reserves shall be evenly distributed between the Class A Members, leaving no less than $1,000 in reserve.

14) Series Interests and Series.

a) The Members shall cause the Company to issue Interests in one or more separate and distinct series (each, a "Series"), with each such Series including but not limited to establishing such Series to make separate Investments, portfolio of Investments, business ventures, or other types of business deals such as brokering, being an intermediary, or anything else relating to the Company Purpose. The Members may establish a Series for the purpose of (1) making Investments in specific and distinct companies identified by the Members, (2) making Investments in specific and distinct assets identified by the Members (such as Collectibles, Real Estate, Cryptocurrencies, Crytpoassets, NFTs, Pre-IPO Shares, or otherwise) (3) to purchase securities in such companies from secondary sources, or (4) to invest in interests of investment funds, special purpose vehicles or other Entities consistent with the Company's investment focus, which such Series will be segregated from each other which shall exclude MegaCap's securities (for clarity, the Company will invest in all early stage companies together that are under $250,000,000 as to not compete with MegaCap, as well as all types of securities under or over $250,000,000 that aren't defined by MegaCap's scope such as raising debt for publicly traded companies).any purpose on which the Members agree. The Members may use its commercially reasonable efforts to have assets and/or securities purchased by a particular Series be issued for the benefit of such particular Series to which they are allocated. For illustrative purposes only, if Masterworks doesn't allow Marc to transfer his ownership of a fractional piece of a painting, he has partially purchased to the GBI entity then Eli would have a choice to either allow Marc to keep it in his name and then pay out once it is liquidated or Marc may just choose another asset at his decision. Otherwise, a side letter can be issued by the owner of the asset and that side letter becomes an asset of the Company. Members of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to share in the profits, losses, allocations or distributions of any other Series of which they are not a Member. A creation of such Series must be unanimously agreed upon by all Class A Members.

b) Each Series so established shall be set forth on Schedule A (which is an external spread sheet that will be created upon signing of this Agreement) to this Agreement, and Schedule A will be updated by the Managers from time to time in connection with the establishment of one or more additional Series. Subject to such limitations as may be set forth in this Agreement, the Members

NOT A CERTIFIED COPY

shall establish and may modify the investment objective and policies of each Series and all other rights and features thereof.

i)    Interests of each Series shall have the following relative rights and preferences:

(1) Assets Held with Respect to a Particular Series. All Capital Contributions made to the Company with respect to a particular Series, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Series for all purposes, subject only to the rights of creditors of such Series, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Series, are herein referred to as "assets held with respect to" that Series. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Series (collectively "General Assets"), the Members shall allocate such General Assets to, between or among any one or more of the Series' in such manner and on such basis as the Members, in its sole discretion, deems fair and equitable, and any General Assets so allocated to a particular Series shall be assets held with respect to that Series. Each such allocation by the Members shall be conclusive and binding upon Members of all Series for all purposes.

(2) Liabilities Attributable to a Particular Series. The assets of the Company held with respect to each particular Series shall be charged with all liabilities, expenses, costs, charges and reserves attributable to that Series. All such liabilities, expenses, costs, charges, and reserves so charged to a Series are herein referred to as "liabilities attributable to" that Series. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Series ("General Liabilities") shall be allocated and charged by a unanimous vote by the Class A Members to, between or among any one or more of the Series in such manner and on such basis as the Members, in their sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Series shall be liabilities attributable to that Series. Each such allocation of liabilities, expenses, costs, charges and reserves by the Members shall be conclusive and binding upon Members of all Series for all purposes. The liabilities attributable to any Series shall be enforceable against the assets of such Series only, and not against the General Assets, or the assets of any other Series. All Persons, including any Affiliates of the Members, who have extended credit that has been allocated to a particular Series, or who have a claim or contract that has been allocated to any particular Series, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Series for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship

ii)   In the event any Series files for Bankruptcy, it shall in no way impact the assets and/or obligations of any of the other Series including but not limited to the Master Series.

## Withdrawal of Contribution

15) No Member will withdraw any portion of their Capital Contribution or any assets, property, and/or investments without the unanimous consent of the Class A Voting Members.

## Additional Contributions

16) Capital Contributions may be amended from time to time, according to the business needs of the Company by a unanimous vote of the Class A Voting Members.

17) Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by the Class A Voting Members, voting unanimously. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

## Capital Accounts

18) An individual capital account (the "**Capital Account**") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

## Interest on Capital

19) No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

## Management

20) The Class A Voting Members shall have the sole authority to appoint a manager of the Company (individually the "**Manager**" and collectively the "**Managers**") if unanimously agreed upon. Management of the Company is vested in the following Managers until such time as they are removed by the Class A Voting Members or withdraw from the position:

a) Eli M Blatt, Managing Partner
b) Marc Goldner, Managing Partner
   i)  For avoidance of doubt, both Eli Blatt and Marc Goldner are the two Managers of the Company as well as the only two Class A voting managing members of the Company. The only way to add a new Manager to the company is if both Eli and Marc unanimously agree signed in writing to appoint a new Manager and/or a new Class A, Class B, or Class C member of the Company.

21) The duties and responsibilities of the Managers will include the following:

a) Managers will supervise the day-to-day operations of the Company including supervising sales and production staff and maintaining financial accounts.

22) Notwithstanding any other provisions contained in the Certificate of Formation or this Agreement, each of the Managers is empowered to bind the Company for any and all decisions except Major Decisions. A unanimous vote of the Class A Voting Members shall be required for all Major Decisions. Such votes may be accomplished via electronic mail, WhatsApp, or any other written medium upon which the Class A Voting Members unanimously agree. For purposes of this Agreement, "**Major Decisions**" are the following:

a) Incur debt, expend funds, write checks, pay bills, or enter into contracts, or otherwise obligate the Company for any amount in excess of $5,000 per calendar year.

b) Negotiate or agree to an accounts payables/receivables payment schedule.

c) Establish credit lines and the use of such credit lines.

d) The sale or dissolution of the Company or its assets.

e) Issuance of additional member or shareholder interests.

f) Scheduling repayment of any capital contributions from any Member.

g) Selling, leasing, or encumbering any property owned by the Company.

h) Scheduling repayment of any loans from Members.

i) Changing or amending this Agreement or approving any action or resolution that would alter the terms of this Agreement.

j) Appointment or removal of a Manager which shall require a unanimous vote and be signed in writing by all Class A Members excluding the Member being removed. For clarity, Marc Goldner and Eli Blatt cannot be removed under any circumstances.

k) Addition, withdrawal, appointment, or removal of a Member. For clarity, Marc Goldner and Eli Blatt cannot be removed under any circumstances.

l) Amending the duties and responsibilities of any Manager.

m) Any changes to the Company Name, branding imagery, and public relations positioning.

n) Adjustments to the compensation of any Member, Manager, Employee, or contractor.

o) Payment of any distributions or other compensation to any Member.

p) Registering the company with any regulatory or governmental agency.

NOT A CERTIFIED COPY

866 of 1222

q) Creation of an additional Series within the Goldner Blatt Investments LLC umbrella. For avoidance of doubt, any Series created for any entities for Goldner Blatt Investments will be approved by all Class A Members in writing.

r) Determination of each Series equity.

s) Each Series investment objective and policies will be defined by the Managers and shall be unanimously approved by all Class A Members signed in writing.

t) No manager shall move any "General Assets" to any Series without unanimous approval by all Class A Members.

u) No Class A Members shall take on personal liability or personal obligations of Goldner Blatt Investments LLC unless expressly approved and unanimously approved by all Class A Voting Members.

v) Taking any investment from outsiders must be unanimously approved by all Class A Voting Members.

w) Any change in control must be unanimously approved by all Class A Members.

x) Giving any equity and/or cash distributions must be unanimously approved by all Class A Members.

y) No other Class A members except Marc Goldner and Eli Blatt will be added as Class A Members unless unanimously approved by Marc and Eli.

23) A new Manager may be added to the Company with a unanimous vote of the Class A Voting Members.

24) A Manager will be reimbursed for reasonable expenses directly related to the operation of the Company and approved, in advance, by a unanimous vote of the Class A Voting Members (voting as a separate class). However, these reasonable expenses, shall not exceed $5,000 per calendar year unless otherwise approved in writing by a unanimous vote of the Class A Members.

25) The Members will be consulted and the advice and opinions of the Members will be obtained as much as is practicable. However, subject to Section 21 above and outlined in Section 22, the Managers will have management and control of the day-to-day business of the Company for the purposes stated in this Agreement. All matters outside the day-to-day business of the Company will be decided by the Class A Voting Members (voting as a separate class) as outlined elsewhere in this Agreement.

26) In addition to day-to-day management tasks and any other duties and responsibilities already identified in this Agreement, the Managers' duties will include keeping, or causing to be kept, full and accurate business records for the Company according to generally accepted accounting principles (GAAP), and overseeing the preparation of any reports considered reasonably necessary to keep the Class A Voting Members informed of the business performance of the Company.

27) A Manager will not be liable to the Members for any action or failure to act resulting in loss or harm to the Company except in the case of gross negligence or willful misconduct. It will not be considered to be gross negligence or willful misconduct if one of the Managing Members chooses to invest in a risky asset such as a volatile cryptocurrency token they believe could have a high reward.

28) Each Member will devote such time and attention to the business of the Company as required to carry out their duties and responsibilities for the conduct of the Company's business.

## Authority to Bind Company

29) Only the Manager(s) have the authority to enter into contracts on behalf of the Company.

## Duty of Loyalty

30) While a person is a Member or Manager of the Company, and for a period of at least three years after that person ceases to be a Member or Manager, that person will not carry on, or participate in, a business involved in the issuance or transacting of securities in any market regions that were established or contemplated by the Company before or during that person's tenure as Member or Manager. In the event of termination, if either member independently works in the FinTech, Finance, or Crypto Worlds, 10% of their equity, distributions, and proceeds are given to the non-involved Managing Member. Until a Member gives notice that they wish to terminate future applicability of their participation towards the purpose as defined in Section 3 (Purpose), and pursuant to Section 53 (Termination), the Members agree to be bound by the terms of this agreement.

   a) There will be a standard duty of care that is held by each of the Managing Members.

## Duty to Devote Time

31) Each Member will devote such time and attention to the business of the Company as best as they can in good faith. It is important to note that while one day Marc may be working on Dharma, Eli may be working on BitSource, and that is a primary consideration of this Agreement that they are sharing in their collective work across different companies as time from one person is devoted to one company then time from another person is devoted to a different company to increase their collective likelihood of shared success. Eli's investments managing his and his family's personal investments and Marc's work with Golden Bell and Marc and his family's personal investments shall not be considered a breach of this provision.

## Member Meetings

32) A meeting may be called by any Class A Voting Member providing that reasonable written notice has been given to the other Members.

## Voting

33) Each of the Class A Voting Members shall have one vote for each Unit owned by such Class A Voting Member.

## Admission of New Members

34) A new Member may only be admitted to the Company with a unanimous vote of the Class A Voting Members.

35) No new Class A member shall be admitted as a Member of the Company until such new Member becomes a party to this Agreement, as amended, and agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to effect the admission of the new Member as determined by a supermajority business interest in the Company as determined by a unanimous consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

## Voluntary Withdrawal of a Member

36) The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

37) However, a voluntary withdrawal of any Member will still make that Member responsible for the Terms, Termination, and Mutual Contacts provisions below in Section 53 of this Operating Agreement in terms of monies, equity, distributions, and/or contributions owed to GBI or one of the other Managing Members.

## Dissociation of a Member

38) In the event of a voluntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.
   a) A voluntary withdrawal may only be made after 3 years from the date of the signing of this Operating Agreement.

39) A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

40) Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 60 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company. In the event that the non-disassociated Member is unable to buy-out the disassociating member, then the disassociated Member will be paid what is owed to the disassociating member as liquidity events happen with no interest due to that disassociating member.

41) A member may not wrongfully disassociate from the Company. A wrongful disassociation will not rid that dissociated member from liability. For instance, a Managing Member may not disassociate from the business for sheer self gain in the sense that they have another opportunity to go work in a directly competing business under different terms or a larger pay out that would put the non-disassociating member at an inequitable juncture which would put them in a worse off economic situation. The previous example is not the only example of wrongful disassociation.

## Sale, Transfer, or Assignment of a Member's Interest; Drag-Along

42) No Member may sell, transfer or assign any of such Member's Interest, including, but not limited to, any Units owned by such Member, without the unanimous written consent of the Class A Voting Members. Where a Member's financial interest in the Company is assigned to another party who is not an existing Member, that party will be considered a New Member and their Class of Units will be determined unanimously by the current voting Class A Members signed in writing. An assignment of full membership status inclusive of all duties, obligations, and rights held by the previous Member will be governed by the conditions described under the Admission of New Members section of this Agreement.

43) **Drag-Along Rights.** In the event that the Class A Voting Members receive a bona fide offer from an independent third party purchaser to purchase (including by merger) all of the outstanding Units or all or a substantial portion of the assets of the Company, the Class A Voting Members may send written notice (the **"Drag-Along Notice"**) to the Company and the remaining Class B Members (the **"Class B Members"**) notifying them they will be required to sell all of their Units in such sale. Upon receipt of a Drag-Along Notice, each Class B Member receiving such notice shall be obligated to (a) sell all of the Class B Member's Units contemplated by the Drag-Along Notice on the same terms and conditions as the Class A Voting Members; and (b) otherwise take all necessary action to cause the consummation of such transaction. Each Class B Member further agrees to (a) take all actions (including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by the Class A Members; (b) waive all applicable appraisal rights, if any, under the laws of the State of Delaware; and (c) appoint the Class A Members as the Class B Member's attorney-in-fact to do the same on its behalf. Notwithstanding the foregoing, no Class B Member may sell or assign such Member's Units, in whole or in part, under this Section without the express prior written approval and consent of a Supermajority of Class A Voting Members.

## Right of First Purchase

44) In the event that a Member's Interest in the Company is or will be sold, due to any reason other than as said forth in section 43 (Drag-Along Rights) above, the remaining Members will have a right of first purchase of that Member's Interest, property, assets, or investments. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

45) In the event that a Member's interest in the company is transferred or assigned as the result of a court order or operation of law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

NOT A CERTIFIED COPY

## Valuation of Interest

46) In the event of a sale of all or substantially all of the Units and/or assets of the Company, a Member's financial interest in the Company will be based in the percentage of Units owned in proportion to all of the issued and outstanding Units of the Company at the time of such sale.

47) In the absence of a written agreement setting a value, the value of the Company will be based on an appraisal of the fair market value of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members to be retained within a reasonable period of the event giving rise to the disposition of a Member's interest. The results of the appraisal will be binding on all Members. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member.

48) No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

## Dissolution

49) The Company may be dissolved by a unanimous vote of the Class A Voting Members. Further, the Class A Members agree to sign Exhibit B (NCNDA) to not Circumvent each other.

50) Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, as well as any other outstanding liabilities, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

   a) First, to the Class A Members on a 50/50 basis in the amount of their capital contribution, valued properties, valued investments, and valued assets;

       A. Second, to all of the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement in satisfaction of Company debt obligations to current Members;

   b) Third, to the satisfaction of liabilities to unsecured creditors except Company obligations to current Class A Members up to the amount of their Capital Contributions;

   c) Fourth, to the Class B Members up to the amount of their Capital Contributions.

51) In the event of a death of a Member, the deceased Member's heirs and/or family or assigns (through a will or otherwise) will gain the deceased Member's ownership interest, equity, and assets of the Company.

52) In the event the laws change and creditors or UCC-1 Holders must be paid out before any of the above mentioned payouts such as Class A Members being paid out first than this Dissolution section will be revised to be compliant with all current laws in the State of Delaware.

**Term, Termination, and Mutual Contacts Definition**

53) The future applicability of Section 3 (Purpose) of this Agreement may be terminated by either party with written notice, subject to the below provisions. If it is not so terminated by either party, the Agreement shall remain in effect in perpetuity. Neither party may terminate this Agreement for a minimum of 3 years from the date of signing this Agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets. Nor shall such termination effect and/or impact either Party's interests in GBI whether relating to assets, equity, ownership, interest, stake, property, long term and/or short-term investments, or otherwise. In the event of a termination the following shall apply:

a) Any mutual contacts even after termination shall be categorized into the following 'Tiers':

   i) 1st Degree – For example, David, David is a shared contact and will remain at 10% perpetually for each Managing Member. Thus, even the Managing Members agree to walk away, any deals they conduct independently from one another, the deal maker will always owe 10% in perpetuity to the other Managing Member. For illustrative purposes only, if Marc does a deal with David 10 years after terminating, then Marc will still owe Eli 10% for any deals Marc does with David.

   ii) 2nd Degree – For example, if David introduces one of the Managing Members to a third party Joe (after the termination) then that contact will remain at 5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Joe in this case, shall be considered a 1st Degree mutual contact of the Parties).

   iii) 3rd Degree – For example, if Joe introduces one of the Managing Members to a third party Sam (after the termination) then that contact will remain at 7.5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Sam in this case, shall be considered a 1st Degree mutual contact of the Parties).

   iv) 4th Degree – For example, if Sam introduces one of the Managing Members to a third party Jack (after the termination) then that contact will remain at 5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Jack in this case, shall be considered a 1st Degree mutual contact of the Parties).

   v) 5th Degree – For example, if Jack introduces one of the Managing Members to a third party Tom (after the termination) then that contact will remain at 2.5% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Tom in this case, shall be considered a 1st Degree mutual contact of the Parties).

NOT A CERTIFIED COPY

vi) 6th Degree+ and after – For example, if Tom introduces one of the Managing Members to a third party Billy (after the termination) then that contact will remain at 1% in perpetuity due to the other Managing Member that is not part of the deal. (However, if that Party is introduced during the scope of this Agreement than that third party, Billy in this case, shall be considered a 1st Degree mutual contact of the Parties).

vii) For any degrees after the sixth degree, that contact shall remain in perpetuity at 1% due to the other Managing Member that is not part of the deal as long as that contact can be traced back to an origin of one of the degrees (sources of origination) listed above. (However, if that Party is introduced during the scope of this Agreement than that third party shall be considered a 1st Degree mutual contact of the Parties).

b) Mutual contacts are defined as the following:

i) Alex from Visionary and anyone he introduces us to from the Visionary Network (including but not limited to Andra, Mindrock, Pavel, Barry Dorfman, Idan, Michael, Jeff, Esther, Nick, Orka, Artemis, Unicorns, etc.)
ii) Maxwell, Cole, and DJ
iii) David Ruttenberg, RGI, Johnny Gordon, and anyone else from RGI
iv) Fahad
v) Anyone that is met going forward from the point of starting MegaCap and going forward will be deemed Mutual Contacts
vi) Anyone from TRIUM (whether it is our class of 2022 or any other previous or future cohorts), as well as anyone we are introduced to through the TRIUM network
vii) All professors from TRIUM
viii) Anyone from the Wall Street Investors Conference (i.e. David Goodboy)
ix) Anyone from the Bitcoin Conference (i.e. Daniel the Cryptominer introduced from Cole)
x) Anyone from the Underground Crytpo talk (excluding Brock Pierce and Adrian for example which are Eli's Solo Contacts from Prior to this Agreement but do include people like David Namdar)
xi) Anyone from any conventions, tradeshow, and/or event (excluding Entertainment and Media events, conventions, and tradeshows) that is met shall be considered a mutual contact.
xii) LinkedIn and Facebook and other social media contacts PRIOR to the start of this operating agreement shall be considered non-mutual contacts. Social Media contacts AFTER the start of this agreement shall be considered mutual contacts.

c) Anyone a Member knew before the start of TRIUM are that Managing Member's own contacts and are not considered to be mutual contacts. However, anyone that that non-mutual contact introduces one of the Managing Members to shall become considered a mutual contact after signing of this Agreement (unless one of Marc's solo existing contacts introduces someone to him specifically and only for Golden Bell purposes) however, if one of the Managing Member's mutual contacts or one of Eli's contacts introduces Marc to a new contact for Golden Bell purposes then the above 1st degree shall apply in terms of house splits and 'kickbacks'.

i) The same fee structure will apply to Emily Rhen in a side letter deal made with Eli Blatt whereas if one of the Managing Member's mutual contacts is used or utilized by Emily for personal gain or otherwise (i.e., for raising money for a fund, receiving front end on a fund for example, receiving a carry from a fund she is working in that includes any mutual contacts, etc.) then the above 1st degree shall apply in terms of house splits and 'kickbacks' except that the 10% would go Marc Goldner not to GBI. Eli will do his best efforts to have Emily sign an NCNDA with each of the businesses.

d) Non Mutual Contacts are as follows (minor misspellings may have occurred in this section below):

i) Marc solo contacts (non-mutual contacts): Ludwig Kuttner and Trixie, Oliver Kuttner, Susan Kreischel, Hampshire Investments Paul Wasserman, Paul Sanar, Justin Miller, Shashi Matta, Robert Wilder, Joe Testa, Shylesh, Sarmen Saryan, Nicole Santiago, Ted Ovtavius Reid, Chris Ramonetti, Express Trade Capital, Drew Cohen, David Estrakh from Express Trade, Mark Bienstock, Ethan founder of Events.com, Mark Peters, anyone from Semester at Sea, Marc's professors from Penn including but not limited to Igor, Marc's Professor from OSU including but not limited to and anyone in the Entertainment industry including but not limited to Rod Reiner, Doobry, Arya Zand, Simon Divilov, Christian Ternstedt, Christian Von Uffel and his father, Rachel Korsen, Robert Gross, Tom and Abigail Shewalter, Eric Goldner, Raymonde Goldner, Robert Goldner, the Levy family, Solon, Zach Honig, Mike Fattoulah, Robert Garson, Robert Cohen, Michael Schwab, Alex Corey, Daniel Engel, Ken Erickson, Glenn eric's friend, John Delia, Alonso, Adam Doyle, Rexford Brabson, Andy Nitkin, Carl Toy Sales Rep (not from Late Stage), Aarush, Chris Craddock, David Garces, Charles and Daniel Greenberg, Sean Acosta, Seth Godnick, anyone from Roslyn High School, John Rosenberg, Dan Jablons, anyone from the Mamieh Family, The Safra Family, members from the ABA and CBA and NYBA, the Weiner family, Angel May, Gang Li, Daniel Niamehr, Scott and Jared and Jordan and Barbara and Chad Bleznick, Michael Kushner, Harvey and Stephen Davis, Cheryl Davis Korsen, Matthew Korsen, Kroze, Konstantin Divilov, Stephan Winkelmann, David Blake, Christopher Costa, employees and board members of The International Spy Museum, Steven Raskind, Sarah Ebad, any of Marc's Professors from Columbia, any of Marc's Professors from UConn Law, Ezelle and Quintin and Ally Van Der Heever, Craig Miller, Merchant Factors, Gary Vaynerchuk, Alan Rosenberg, Carlos from UPenn, any of Marc's classmates from UPenn Columbia and UConn Law, Abdou Sylla, Rodny from Roslyn, Liel from Israel, Josh Elder, Orit Golos, Simon Moskowitz, all cohort mates from JGSI, all cohortmates from ISEF, all cohortmates from Penn Law's Human Rights Program, Ndidi Moses, Jordan Meiselas and the meisalas family, Shota Nakama composer of Final Fantasy, Ruth from Sony, Rashid Chotani, the Schneck family, the Shottenstein family, the Wexner family, the Freleng family, Jordan Urbach, Karen Booth, all members from Columbus Computer Consulting, Rob from Charlottesville, Rob Smith, Ben Abelson, Brad Okeson, Cleve Adams, Steven Astrein, Ben Oheb, Ben Shoshan, Kevin Cai, Seunghoon Cha, Winsum in China, Steven from China, Linxaio, Michael Chang, Abhinav Chaturvedi, Richie Chen, Zachary Cohen, Giuseppe Maria de Peppo, Mariana Donagelo, Jean-Phillippe Emelie Marcos, David Fisher, Stuary Foley, Geremy Grunin, Gian-Luca Cioletti, Angel Iribozov, Matthew Levenberg, Jay Maybruck, Piyuush Mehta, Abhijeet Muzumdar, Zoria Ospina, Iris Perl, Thomaz Quintella, John Ricci of US Angel Investors, Lawrence Richnstein, Mayer Rosenzweig, Renata Scavassa Dearo, Michael Schneck, Richard Sergay, Tarang Shah, Mateus Tessler, Peter Valhouli-Farb, members from the Entertainment Law Las Vegas Conference, Harris Cohn, Pam Kaufman,

Charlie Talbot, James Vena, John Deming, Jordan from Viacom, EdTech Week's Education Entrepreneurs Investors, Bill Teitelvaum, Ray Kurzweil, Aubrey Degrey, Michiu Kaku, the Roddenbery Family, Brian Greene, Charlottesville Angels, and anyone affiliated involved and/or related to any of the Golden Bell entities whether in business art design or otherwise.

ii) Eli's non-exhaustive list of solo contacts (non-mutual contacts): Eli Broverman, Adam Krim, all professors or classmates Eli had at Stanford, all Professors or classmates Eli had at Brown, Eli's mom, Eli's dad, Wayaca, anyone from Eli's High School, Andrew Marcus, Adrian Baschuk, Matt Caps, Jeff Laretto, Jeff Crutenden from Acorns, Brock Pierce, Ralph Serrano, Joel Dietz, anyone from Eli's BitFinance or prior companies as per emails, texts or LinkedIn.

e) If both Eli and Marc agree a contact of that partner can become a mutual contact if agreed if both parties decided to make a solo contact a mutual contact in exchange. i.e. Trade Ludwig for Broverman but that is a case by case basis or deal by deal basis.

f) There will be a specific exception given to Marc Goldner in the case of Intelligence, Espionage, Contractor, and Security contacts that either Marc knew before or will meet after the signing of this Agreement. Under no circumstance will any intelligence agents be disclosed to Eli Blatt by Marc Goldner, nor will any military (either public or private), spies, intelligence agents, military contractors. However, if a deal is brokered by Marc Goldner such as a deal with a private military contractor that deal will still be split 50/50 if it is for business purposes from a mutual contact (i.e. if MegaCap is acting as a Broker Dealer for a transaction that Marc is bringing to the table then Marc will also use MegaCap as the Broker Dealer of question but there will be redacted names and non-disclosures that prevent Eli knowing who the parties in question are unless Eli winds up being given a security clearance, authorization from that party, or is recruited by a contractor or intelligence agency). However, it is acknowledged by the parties that Marc may conduct business-like activities for the sake of national security, by any direct government orders and/or mandates, or for any missions by any given contractor or intelligence agency. For avoidance of doubt, Marc Goldner's existing and future contacts relating to people in the Intelligence, Espionage, Contractor, and/or Security industries will not be considered mutual contacts unless it is for a direct business purpose such as dealing data or utilizing Marc and Eli's Broker Dealer of choice at the time if a Broker Dealer is needed for a transaction that Marc is working on with those said 'agents'. This may also apply to G42 in Abu Dhabi or companies like Palantir, In-Q-Tel, or other third party intelligence-related companies working on classified projects or has access to sensitive data. If Marc does any third party consulting in these industries he will not disclose it to Eli.

i) For avoidance of doubt, Paragraph F's (above) contacts do not need to be disclosed but any financial deals from those contacts must be split between Marc Goldner and Eli Blatt 50/50.

## Records

54) The Company will at all times maintain accurate records of the following:

A. Information regarding the status of the business and the financial condition of the Company.

B. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.

C. Name and last known business, residential, or mailing address of each Member and Manager, as well as the date that person became a Member or Manager.

D. A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement and any amendments have been executed.

E. The cash, property, and services contributed to the Company by each Member, along with a description and value thereof.

55) Each of the Class A Voting Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

56) Each Manager has the right to examine the above documents for any purpose reasonably related to their position as Manager of the Company.

## Books of Account

57) Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any of the Class A Voting Members. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

## Banking and Company Funds

58) The funds of the Company will be placed in such investments and banking accounts as will be designated by the unanimous vote of all Class A Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by unanimous consent of the Class A Voting Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

## Audit

59) Any of the Class A Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Class A member requesting the Audit. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Class A Voting Members for any fiscal year.

## Tax Treatment

60) The Company is intended to be treated as an S-Corp for the purposes of Federal and State Income Tax.

## Annual Report

61) As soon as practicable after the close of each fiscal year, the Company will furnish to each Class A Voting Member an annual report showing a full and complete account of the condition of the Company, including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

   a) A copy of the Company's federal income tax returns for that fiscal year.
   b) Income statement.
   c) Balance sheet.
   d) Cash flow statement.
   e) A breakdown of the profit and loss attributable to each Member.

## Goodwill

62) The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## Force Majeure

63) A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to an event of force majeure, such as earthquake, typhoon, flood, fire, pandemic, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

## Forbidden Acts

64) No Member may do any act in contravention of this Agreement or prevailing law.

65) No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company unless such party is Managed and/or owned by one of the Members or is a family member, spouse, or significant other of a Managing Member. However, such assignment can only be for that Member's individual interest in that specific asset (including but not limited to the entire portion of the Member's interest in the Company) but the Voting Rights cannot be assigned and will remain the exclusive rights of the Managing Members. However, if one of the Class A members has signed a Power of Attorney or provided a third party with Agency to vote as a proxy where the vote is still the vote of the Managing Member in any manner than that shall not be considered a forbidden act and that third party vote will be considered the vote of the Class A member.

NOT A CERTIFIED COPY

66) No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

67) No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

68) No Member may confess a judgment against the Company.

71. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members. However it is clear that this will be handled through a mediation process and that neither Marc or Eli will be involuntarily removed as this is for any third party members who are not Marc and Eli. For avoidance of doubt, no assets owned by Marc or Eli will become the property of the other regardless of any disassociation or removal without an equal split being applied to the value of those assets. No such Involuntary Withdrawal shall clawback any equity to the non-disassociated member.

## Indemnification

69) All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature whatsoever, arising out of a Member's participation in Company affairs pursuant to this Agreement. A Member will not be entitled to indemnification under this section for liability arising out of negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

## Liability

70) A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

## Liability Insurance

71) The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

## Life Insurance

72) The Company will have the right to acquire life insurance on the lives of any or all of the Members if unanimously agreed by the Class A voting members.

## Amendment of this Agreement

73) No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all of the Class A Voting Members.

**Title to Company Property**

74) Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member.

**Dispute Resolution**

75) Dispute Resolution . Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this Section. The initiation and pendency of the procedures under this Section does not relieve the Parties from their respective obligations under the Agreement. ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS SECTION SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

    A. Negotiations by and between the Parties.

    (1) Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail. Within thirty (30) days after receiving such notice the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

    (2) Upon the Disputing Party's receipt of the Responding Parties' response, the Parties shall then have thirty (30) days, or such other time as they may mutually agree upon in writing, to resolve the Dispute amongst themselves.

    B. Mediation.

    If the Parties are not able to resolve a Dispute pursuant to subsection (A) above, they agree to participate in at least five (5) full length business days of good faith mediation administered by the American Arbitration Association under its Commercial Mediation Procedures.

    C. If the Parties are not able to resolve a Dispute pursuant to subsections (A) and (B) above, the Dispute shall finally be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Nothing herein shall limit the right of any Party to seek interim or provisional equitable relief in a court of competent jurisdiction prior to or pending the conclusion of the arbitration. Any Arbitration shall take place virtually unless the parties agree on a physical location. The arbitrator shall apply the law of the State of Delaware without regard to conflicts of law principles. No demand for arbitration may be made after the date when the institution of legal or equitable

proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

76) <u>Equitable Remedies</u>. The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement. The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware. For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of forum non conveniens.

77) <u>Waiver of Certain Rights</u> . AS A MATERIAL INDUCEMENT TO EACH MEMBER TO ENTER INTO THIS AGREEMENT, EACH MEMBER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO MAINTAIN ANY ACTION FOR DISSOLUTION OF THE COMPANY OR FOR PARTITION OF PROPERTY UNDER THE ACT. IN ADDITION, THE MEMBERS AGREE THAT THIS AGREEMENT HAS BEEN CAREFULLY DRAFTED TO PROVIDE FAIR TREATMENT OF ALL MEMBERS AND PARTICULARLY IN RESPECT OF EQUITABLE PAYMENT IN LIQUIDATION TO HOLDERS OF ECONOMIC INTERESTS. ACCORDINGLY, EXCEPT WHERE AND ONLY IF THE MANAGER OR LIQUIDATOR, AS THE CASE MAY BE, HAS FAILED TO LIQUIDATE THE COMPANY IN A REASONABLY TIMELY MANNER AS REQUIRED UNDER THIS AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES AND RENOUNCES ITS RIGHT TO INITIATE A LEGAL ACTION OR OTHER CLAIM TO SEEK THE APPOINTMENT OF A RECEIVER OR TRUSTEE TO LIQUIDATE THE COMPANY.

78) <u>No Waiver</u>. A Person's waiver of or consent to, express or implied, any breach or default by any Person as to the performance by such Person's obligations with respect to the Company, shall not constitute a waiver of or consent to any other breach or default by such other Person of the same or any other obligations with respect to the Company. Failure on the part of a Person to complain, provide notice of, or object to any action or inaction of any Person, or to declare any Person in breach or default with respect to the Company, irrespective of how long such failure continues, shall not constitute a waiver by such Person of its rights with respect to such breach or default, until the applicable statute of limitations period has run.

79) <u>Binding Effect</u>. Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective Personal Representatives, successors and permitted assigns.

80) <u>Parties in Interest</u>. Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective Personal Representatives, successors and permitted assigns, and nothing in this Agreement shall be construed to relieve or discharge the obligation or liability of any

Person to any party to this Agreement, or to provide any Person any right of subrogation or action over or against any party to this Agreement.

81) Prevailing Terms . In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

82) Severability. If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances.

83) Further Assurances . In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

84) Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all signing parties hereto had signed the same document. All counterparts shall be construed together and constitute the same instrument. Signatures by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory and shall be deemed to be originals for all purposes. The Members acknowledge and agree that it may be executed electronically, and that the provisions of the Electronic Signatures in Global and National Commerce Act of 2000, 15 U.S.C. 7001 et al, as amended and in effect as of the Effective Date of this Agreement, shall apply.

85) Acknowledgment of Provisions . BY EXECUTING THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES THAT IT HAS ACTUAL NOTICE OF: (A) ALL OF THE PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTERESTS; AND (B) ALL OF THE PROVISIONS OF THE ARTICLES. EACH MEMBER HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES ADEQUATE NOTICE OF ALL SUCH PROVISIONS, AND EACH MEMBER HEREBY WAIVES ANY REQUIREMENT THAT ANY FURTHER NOTICE REQUIRED BY ANY PROVISION OF THE ACT OR APPLICABLE LAW.

## Miscellaneous

86) Time is of the essence in this Agreement.

87) Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

88) If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

89) This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matter hereof, and may not be modified or amended except by a written instrument executed by or on behalf of authorized representatives each of Party to this Agreement. However, any agreements between Marc Goldner and Eli Blatt still remain in effect such as any agreements pertaining to BitSource, MegaCap, or otherwise.

90) All notices or other communications relating to the performance, enforcement, or other legal aspects of this Security Agreement will be in writing and may be personally delivered, sent by overnight courier service to all parties, and delivered as a .pdf e-mail attachment to all parties. Any other communications between the parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to all parties.

91) All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

92) If there is ever a subpoena served to the Company, requested Discovery by any third party, or any other Compelled Court Disclosure, the Company shall file a motion to quash, claim privilege, and file a protective order on any subpoena or discovery requests made by any third party.

## Definitions

93) For the purpose of this Agreement, the following terms are defined as follows:

   a) "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

b) "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

c) "Distributions" means a payment of Company profits to the Members.

d) "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

e) "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, Member's rights to participate in the management of the Company, and any Units of membership interest in the Company owned by such Member.

f) "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

g) "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

h) "Principal Office" means the office whether inside or outside the State of Delaware where the executive or management of the Company maintain their primary office.

i) "Voting Members" means the Members who belong to a membership class that has voting power.

j) "Supermajority Vote" means a vote by Members representing no less than 60% of the Class A Voting Units.

SIGNED, SEALED, AND DELIVERED

**ELI M BLATT**

By: _____    12 / 08 / 2021

**MARC GOLDNER**

By: _____    12 / 08 / 2021

EXHIBITS

Exhibit A       Confidentiality Agreement

Exhibit B       Non-Circumvent Non-Disclosure Agreement

Exhibit C       Incorporation Filings, Papers, IRS EIN Documents, and Articles of
Incorporation

Exhibit D       Entity Decks that are discussed in the Purpose of Company

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered into on December 7, 2021 (the "Date") Effective by and between: (i) GOLDNBER BLATT INVESTMENTS LLC ("GOLDNER BLATT INVESTMENTS"); and (ii) Eli Blatt (the "Receiving Party"). GOLDNER BLATT INVESTMENTS and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for GOLDNER BLATT INVESTMENTS to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with GOLDNER BLATT INVESTMENTS (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.   **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by GOLDNER BLATT INVESTMENTS to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. For avoidance of doubt, Confidential Information shall include but not be limited to all business dealings, terms, and legal discussions including but not limited to Operating Agreements, PPMs, Subscription Agreements, Contracts, Term Sheets, any documents, any files, any messages, any recordings, any videos, any pictures, any emails, any texts, and any other legal type related documents or forms of documents communication which shall not be disclosed under any circumstances. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) GOLDNER BLATT INVESTMENTS releases without restriction to a party other than the Receiving Party; or (e) GOLDNER BLATT INVESTMENTS authorizes the Receiving Party to disclose. In any action in which GOLDNER BLATT INVESTMENTS alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2.   **Use of Confidential Information; Non-Disclosure Obligations**

2.1. Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party whether knowingly or unknowingly.

2.2. The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of GOLDNER BLATT INVESTMENTS and secure such other persons' written agreement, a copy of which shall be provided to GOLDNER BLATT INVESTMENTS, to abide by the terms herein. GOLDNER BLATT INVESTMENTS shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3. The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to GOLDNER BLATT INVESTMENTS. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4. The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5. **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.   **Compelled Disclosure**

The Receiving Party may not disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority. The Receiving Party, if requested by the other party and at their expense, shall file a motion to quash, claim privilege, and file a protective order on any subpoena or discovery requests made by any third party.

4.   **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of GOLDNER BLATT INVESTMENTS and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of GOLDNER BLATT INVESTMENTS.

5.   **Return of Confidential Information**

At the request of GOLDNER BLATT INVESTMENTS or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to GOLDNER BLATT INVESTMENTS. The Receiving Party shall also destroy (and certify such destruction in writing to GOLDNER BLATT INVESTMENTS any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.      **Term, Termination, and Mutual Contacts Definition**

The Term, Termination, and Mutual Contacts definition are defined in the Operating Agreement to which this document is an exhibit.

7.      **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of GOLDNER BLATT INVESTMENTS'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause GOLDNER BLATT INVESTMENTS irreparable harm, the amount of which may be difficult to ascertain, and that GOLDNER BLATT INVESTMENTS shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as GOLDNER BLATT INVESTMENTS shall deem appropriate. Such right of GOLDNER BLATT INVESTMENTS shall be in addition to the remedies otherwise available to GOLDNER BLATT INVESTMENTS at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.      **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.

9.      **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.     **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

## 11.  Severability

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

## 12.  Relationship of The Parties

This Agreement is an addendum to the Goldner Blatt Investments, LLC Operating Agreement where Marc and Eli are partners in that business.

## 13.  Assignments

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

## 14.  Waiver

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

## 15.  Notices/Points of Contact

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to GOLDNER BLATT INVESTMENTS:

      Address:      8 The Green Street, Suite A, Dover, DE 19901

      E-Mail:      partners@gb.investments

If to Eli Blatt                                      :

      Address:      2020 N Bayshore Dr #2310 Miami FL 33137

      E-Mail:      e@gb.investments

If to Marc Goldner                         :

NOT A CERTIFIED COPY

Address:     15 Peacock Drive, Roslyn, NY 11576

E-Mail:     m@gb.investments

## 16.    Headings Non-Substantive

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**GOLDNER BLATT INVESTMENTS LLC**

By: _____

Name: Eli Blatt
Title:  Managing Member

Date: 12 / 08 / 2021

By: _____

Name: Marc Goldner
Title:  Managing Member

Date: 12 / 08 / 2021

**THE RECEIVING PARTIES**

_____

Marc Goldner

Date: 12 / 08 / 2021

_____

Eli M Blatt

Date: 12 / 08 / 2021

NOT A CERTIFIED COPY

**INVESTOR CONFIDENTIALITY AND NON-CIRCUMVENTION AGREEMENT**

THIS Investor Confidentiality and Non-Circumvention Agreement (this "Agreement"), dated December 7, 2021 is entered by and between Goldner Blatt Investments, LLC (the "Company"), whose address is 8 The Green, Suite A, Dover DE 19901, Marc Goldner, and Eli Blatt (individually and jointly "Investor") (collectively, the "Parties" and each individually a "Party"):

WHEREAS, part of the Company's business is purchasing investment assets (the "Assets"), including, but not limited to, pre-IPO interests in private companies, investments in crypto, asset and property purchases, and general investments.

WHEREAS, Investor has, or is considering making an investment in the Company (the "Transaction") and to conduct a due diligence process with respect to a certain class of Assets the Company owns or intends to purchase (the "Purpose").

WHEREAS, the Parties have determined that they can best accomplish the Purpose by sharing certain Confidential Information (defined below) and the Company connecting Investor to certain of the Company's business contacts ("Company Contacts").

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

1.   **Confidentiality.** Each Party receiving Confidential Information (defined below) shall be known as a Recipient, and each Party disclosing Confidential Information shall be known as a Disclosing Party:

   1.      **Confidential Information.** "Confidential Information" means (a) the identity and information relating to or provided by any Company Contacts, and (b) all non-public, proprietary or confidential information of the Disclosing Party whether disclosed in oral, visual, written, electronic, or other tangible or intangible form, whether or not marked or designated as "confidential," and all notes, analyses, summaries, and other materials prepared by Recipient or any of its affiliates, officers, directors, employees, shareholders, partners, members, managers, or agents (collectively, "Representatives") that contain, are based on, or otherwise reflect, to any degree, any of the foregoing. Without limiting the foregoing, Confidential Information includes, but is not limited to: projected financial information, patents, trademarks, copyrights, ideas, trade secrets, trade dress, potential patents, schematics, frameworks, financing/investment structures, business models, business plans, products, pricing, product validation tests/clinical studies, commercialization plans/results, customers, vendors, financing sources, buyers, capitalization tables, shareholders, directors, employees, advisors, the occurrence of discussions among Recipient and Disclosing Party. For avoidance of doubt, Confidential Information shall include but not be limited to all business dealings, terms, and legal discussions including but not limited to Operating Agreements, PPMs, Subscription Agreements, Contracts, Term Sheets, any documents, any files, any messages, any recordings, any videos, any pictures, any emails, any texts, and any other legal type related documents or forms of documents communication which shall not be disclosed under any circumstances. Recipient agrees that all Confidential

Information constitutes private, privileged, valuable and proprietary assets of the Disclosing Party and that its unauthorized use or misuse would adversely affect the business and interests of the Disclosing Party. Except for the identity and information relating to any Company Contacts which is always considered Confidential Information, the term "Confidential Information" does not include information which can be demonstrated to (i) have previously become generally available to the public other than as a result of disclosure by Recipient or a source bound by a confidentiality agreement, or (ii) have been made available to Recipient on a non-confidential basis from a third party prior to its disclosure by the Disclosing Party, unless such source was bound by a confidentiality agreemen.

2.      **Limited Permitted Use.** Recipient agrees that the Confidential Information is disclosed for Recipient's sole use for the Transaction and is owned by the Disclosing Party. Conveyance of Confidential Information to the Recipient by the Disclosing Party or any Company Contact does not constitute a general release of, or license to use, such information. Recipient agrees not to use the Confidential Information for its own benefit or for the use or benefit of any other person or entity or for any reason other than for the Transaction. Recipient acknowledges that as the result of discussions relating to the Purpose, certain of the Disclosing Party's business opportunities will become known to Recipient. Recipient agrees that such opportunities belong to the Disclosing Party, and that Recipient will not misappropriate any such opportunity. All Confidential Information shall be destroyed or returned to Disclosing Party upon completion or abandonment of the Purpose.

3.      **No Unauthorized Disclosures.** Recipient agrees to protect all Confidential Information and not to duplicate or disclose any such information and materials to any person or entity except internally to its legal counsel and employees who have a need to know for furtherance of the Transaction. Recipient shall ensure that each such person has agreed to comply with these confidentiality provisions contained herein prior to the person receiving any Confidential Information. Recipient assumes responsibility for ensuring its Representatives' compliance with this Agreement and shall be liable for any unauthorized disclosure or use of the Confidential Information by its Representatives.

4.      **Company's Use**. Notwithstanding the foregoing, the Company may disclose to third parties or the public the Assets and the purchase price, market value, and sale price of the Assets purchased, held, and sold by the Company, but will not disclose the name of Investor, or that Investor is considering making an investment in Company, without Investor's prior consent.

2.   **No Representations and Warranties**. The Disclosing Party provides all Confidential Information without any representation or warranty, expressed or implied, as to the accuracy or completeness thereof, and the Disclosing Party shall have no liability to Recipient or any other person or entity relating to Recipient's use of any of the Confidential Information or any errors therein or omissions therefrom. Further, the Company makes no representation or warranty, expressed or implied, as to the accuracy or completeness of any information provided to Investor by a Company Contact ("Contact Provided Information"), and the Company shall have no liability to Investor with respect Contact

Provided Information, or any errors therein or omissions therefrom, or resulting from Investors use thereof.

3.   **Non-Circumvention**. Investor shall not, directly or indirectly, except in collaboration with or with the express written consent of the Company: (a) enter into any transaction for the purchase or sale of Assets with a Company Contact or enter into any transaction with a Company Contact similar to, in competition with, or which otherwise could have the effect of preventing the Company from receiving the full benefits of the transactions contemplated by the Purpose, (b) contact any Company Contact or any individuals or entities that are associated with a Company Contact except for contacting Company Contacts with whom Investor had a pre-existing relationship provided that such contact is not related to the Purpose and is not otherwise intended to or results in a circumvention of this Agreement, (c) solicit a Company Contact to enter into a transaction for the purchase or sale of Assets without the knowledge and prior consent of the Company, (d) use any Confidential Information to its own benefit or advantage or to the exclusion of the Company, or (e) induce, solicit, procure, or otherwise encourage any of the Investor's Representatives or any other person or entity to respond to any solicitation from a Company Contact to enter into a purchase or sale of Assets, or take any other action in contravention of this Agreement. Investor acknowledges that the Company has devoted substantial time and resources to develop relationships with Company Contacts ("Relationships") that will assist the Parties in accomplishing the Transaction and the Purpose, and that the Relationships constitute valuable, special, and proprietary assets of the Company, and that circumvention by Investor of the terms of this Agreement will materially damage the Company. In consideration of their interest in conducting the Transaction, Investor hereby waives any right to claim a prior relationship with a Company Contact or to claim that Investor is not bound by the terms of this Section 3 due to such prior relationship (unless as defined in the Section 53 of the Goldner Blatt Investments Operating Agreement). Each party assumes responsibility for ensuring its Representatives' compliance with this Section 3 and shall be liable for any violation of this Section 3 by its Representatives. Additionally, the Receiving Party agrees not to share any of the Company Contacts or any contacts of the Managing Members to any third parties without the express written consent of said Managing Member.

4.   **Term.** This Agreement shall extend for a period of five (5) years from the Effective Date and is binding on the Parties hereto, their heirs, assigns, executors, administrators and all others succeeding in interest to any Party either directly or indirectly.  If Investor consummates a transaction related to the Purpose, the term of this Agreement will automatically renew for a 5-year period from the date of such transaction.

5.   **Termination.**

   1.      This Non-Disclosure Agreement shall never terminate unless certain information is made accessible and available to the public.

   2.      If Investor enters into any transaction for the purchase or sale of Assets with a Company Contact during the term of this Agreement or in the 48 months following termination of this Agreement without the Company's express written consent (a "Breaching Transaction"), Investor will pay the Company an amount equal to 20% of the aggregate total transaction value of such Breaching Transaction over and above

the greater of any compensation contemplated for such transaction or the total amount of compensation paid by Investor in breach of this agreement and/or the Seller of such breaching transaction. Investor acknowledges that Company would be harmed by a Breaching Transaction and such harm would be very difficult to accurately estimate, and the damages provided in this Section are a reasonable estimate of the anticipated actual harm that might arise from a Breaching Transaction.

3.      The terms and conditions of Sections 1, 2, 3, 5, 7, 10, 12 shall survive the expiration or termination of this Agreement.

6.   **Relationship of the Parties.** This Agreement is an addendum to the Goldner Blatt Investments, LLC Operating Agreement where Marc and Eli are partners in that business.

7.   **Indemnification.** Each Party shall defend, indemnify and hold harmless the other Party and its affiliates and their officers, directors, employees, agents, successors and assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from: (a) such Party's breach of their obligations under this Agreement; (b) resulting from such Party's acts or omissions in violation of this Agreement; and (c) such Party's breach of any confidentiality obligation under this Agreement.

8.   **Counterparts.** This Agreement may be executed in any number of identical counterparts and via digital or electronic signatures. Copies of the fully executed Agreement shall be deemed originals for all purposes.

9.   **Construction.** The parties hereto agree this Agreement is an instrument negotiated by all the parties hereto and will not be construed against its drafter. The recitals to this Agreement are part of this Agreement and shall be enforceable according to their terms.

10.  **Severability.** If any provision or any part of any provision of this Agreement is for any reason held to be invalid, unenforceable, or contrary to any public policy, law, statue or ordinance, then such provision or part shall be severed from this Agreement, and the remainder of this Agreement shall not be affected thereby, and shall remain valid and fully enforceable.

11.  **Integration and Amendment**. This Agreement contains the final, complete, and exclusive understanding and agreement among the Parties with respect to the subject matter of this Agreement, and supersedes any prior or contemporaneous agreements, representations, understandings, oral or written, by any of them. There are no terms, conditions, warranties, or representations other than those contained herein. This Agreement may be amended only by an instrument in writing executed by all Parties hereto.

12.  **Governing Law**. This Agreement shall be governed by the laws of the State of Delaware. Any claim, cause, or action relating to or arising out of this Agreement shall be brought in any state court sitting in Miami Dade County, Florida, and not in any other venue, unless otherwise agreed by the parties hereto in writing. THE PARTIES EXPRESSLY CONSENT TO THE PERSONAL JURISDICTION OF THE STATE AND

FEDERAL COURTS LOCATED IN THE CITY OF MIAMI, IN THE STATE OF FLORIDA, FOR ANY LAWSUIT, ARISING FROM OR RELATING TO THIS AGREEMENT.

13.   **Effective Date**. This Agreement shall be deemed effective on the date first above written when fully executed by all parties hereto (the "Effective Date").

[Signature page follows]

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement on the dates set forth below.

**GOLDNER BLATT INVESTMENTS LLC**

By: _____

Name: Eli Blatt
Title:  Managing Member

Date: 12 / 08 / 2021

By: _____

Name: Marc Goldner
Title:  Managing Member

Date: 12 / 08 / 2021

**THE INVESTOR PARTIES**

_____

Marc Goldner

Date: 12 / 08 / 2021

_____

Eli M Blatt

Date: 12 / 08 / 2021

NOT A CERTIFIED COPY

# EXHIBIT B



| ← April 18, 2022, 11:05 AM | Restore this version | | | | | | | |
|---|---|---|---|---|---|---|---|---|

Total: 1 edit

Version history

All versions

|   | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 |   | $ | % |   |   |   |   |   |   |
| 2 | Eli |   | $415,821 |   |   |   |   |   |   |
| 3 | Marc |   | $402,086 |   | -$13,736 | Paid to Marc on Back end |   |   |   |
| 4 |   |   |   |   |   |   |   |   |   |
| 5 | What? | Who? | How much? | Notes |   |   |   |   |   |
| 6 | GoDaddy | Eli | $4,946 | thenftfund.com |   |   |   |   |   |
| 7 | Bitfinance.com | Eli | $10,000 |   |   |   |   |   |   |
| 8 | Mythic/Dragon | Eli | $72,000 |   |   |   |   |   |   |
| 9 | NFTs | Eli | $200,000 |   |   |   |   |   |   |
| 10 | Miners | Eli | $131,931 |   |   |   |   |   |   |
| 11 | NFTs | Marc | $400,000 |   |   |   |   |   |   |
| 12 | Miners | Marc | $43,977 |   |   |   |   |   |   |
| 13 | tcb.com | Marc | $10,000 |   |   |   |   |   |   |
| 14 | Miners | Eli | $20,000 |   |   |   |   |   |   |
| 15 | Miners | Marc | ??? |   |   |   |   |   |   |
| 16 | Wayaca NFT | Eli | -$50,000 |   |   |   |   |   |   |
| 17 | Wayaca Miners | Eli | -$86,500 | $33,500 | $23,450 |   |   |   |   |
| 18 | Mario/Jeremy/Damien | Marc | -$100,000 |   |   |   |   |   |   |
| 19 | Mar a Lago | Eli | $10,000 |   |   |   |   |   |   |
| 20 | Mining | Eli | $70,218 |   |   |   |   |   |   |
| 21 | Mining | Marc | $48,109 |   |   |   |   |   |   |
| 22 | BitSource | Eli | $13,800 |   |   |   |   |   |   |
| 23 | Thecryptohotel.com | Eli | $20 |   |   |   |   |   |   |
| 24 | thecryptohotel.com | Eli | $2,504 |   |   |   |   |   |   |

Version history entries:

▶ May 29, 2022, 7:59 PM
  ● Eli M Blatt

▶ May 15, 2022, 6:37 PM
  ● Eli M Blatt

APRIL 2022

April 18, 2022, 11:05 AM
  ● Eli M Blatt

April 14, 2022, 9:00 PM
  ● Eli M Blatt

April 13, 2022, 2:23 PM
  ● Eli M Blatt

MARCH 2022

March 31, 2022, 5:05 AM
  ● Eli M Blatt

▶ March 25, 2022, 6:01 AM
  ● Eli M Blatt

March 22, 2022, 9:23 AM

NOT A CERTIFIED COPY



From: **Eli Blatt** | eli@gb.investments          To: **m@gb.investments**          February 4, 2022 at 3:42AM

Hi Marc,

This is to confirm our understanding as follows:

1. We each agree to a capital contribution of $100K towards the purchase of NFTs
2. You have already purchased a significant portion of these with full transaction records for each purchase and will soon complete the purchases
3. I will remit my $100K capital contribution to you as payment on behalf of GBI for $100K worth of the NFTs in #2
4. You will then assign ownership of a total transaction value of $200K as per #2 to GBI which will then own NFTs valued at $200K at the time of their purchase and complete your capital contribution as per #1

Please confirm with wire instructions below.

Thanks!

Eli





Hi Marc,

I regard you as both a friend and business partner, but unfortunately our relationship right now is not in good standing.  I am always happy to discuss and work out disagreements, however if your position is that you will do what you want, when you want, with impunity, regardless of the OA, as it has been to date, then you don't leave me a way forward with GBI.

We both need to abide by the OA – *especially* when we don't want to.  I will not continue investing in GBI if you're going to refuse to abide by the OA and threaten me or tell me to sue you every time we disagree, as has now happened with both the miners and the NFTs, as well as your demands for excessive expense reimbursement.

Regarding the NFTs, I get that you didn't *want* to sell in May when I did, but, per the OA, if they indeed belong to GBI, it was your *obligation* to either sell or buy.  Instead, you used your exclusive control over the wallets to simply refuse to sell and told me to sue you, promptly causing us to lose $250K in value – plus the ability to redeploy that now in the down market.  I need to be compensated for this loss.

As it stands now, based on your handling of and communications to me regarding both the miners and the NFTs, my position is that you misappropriated my wire transfers to you, which were credited as capital contributions into GBI and earmarked for you to purchase those assets for GBI; instead, you purchased them in a manner controlled by and effectively titled to you individually.  They are thus, in fact, de facto and de jure, not owned by GBI.

If we can resolve this as per the below, then I'm amenable to helping you launch an NFT Fund and moving forward with GBI.


**General Concerns**

*Availability*

Your extensive external time commitments and frequent lack of availability / responsiveness have become an increasing problem.  Your previously undisclosed security business, increasing commitments to ECAs, and decision to go back to law school full time are significant deviations from the commitments you had represented to me as having when we signed the GBI OA. As a result of you being continually over-extended, I can't get you to reply in a timely manner to anything – and you haven't even started law school back up yet.

*Accountability*

You don't follow through on many things you say you will and take no accountability for the consequences.  When I argued that we should not buy the ATM for Sprinkles, you promised you would dedicate yourself to BitSource after Panama, but to my knowledge the only thing you've

done in over two months is send a proof of ID after multiple requests and this past week a few emails. Your recent ramp up in effort has come too late. That business is now basically dead, and Courtney is pissed at us (and says she's no longer part of the company). As a result, I am no longer willing to bear the regulatory and compliance risks associated with running this business and will need a waiver of liability from you in order to permit it to continue.

*Misrepresentation*

You perpetually misrepresent and over-promise opportunities (ATMs through David, ATMs through Adam, Ludwig funding BitSource, NFT this that and the other, etc.) in order to placate me or induce me into agreements or concessions. You are continually rapid-fire presenting a million different opportunities that you are too over-extended to actually pursue and which it is unclear even really exist.

Before we signed the GBI OA, you had represented that there were significant opportunities to raise money in Dubai, claiming among other things that his excellency and others promised us money. On the basis of these representations, I wasted time making presentation decks and subsequently agreed to enter into the GBI OA to pursue those with you. I understand nothing is guaranteed ever, but literally not a single group chat or email thread was ever even started – it all turned out to be less than nothing. I'm not even sure the decks I made were ever shared with anyone in Dubai besides Miriam or that these conversations even happened.

*Threats and verbal abuse*

When we have disagreements, you become verbally abusive and threaten me. Your reaction to my refusal to accept your demands for expense reimbursement well beyond that provided for by the OAs is a notable example.



Marc Goldner
To: Eli M Blatt    Cc: Marc                                      Sunday, Jun 19, 1:09 PM

You're brain dead. I am not going to sell my crypto or use every dollar I have to cover you defaulting when this is how you're acting. You've fucked yourself bro and if you want me as an enemy honestly you're about to see how I can be.

I'll make this business the most difficult it can be.

You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me.

This is unacceptable and no way to conduct business with anyone, let alone someone you say is your friend and partner, and it has to stop immediately if we are going to continue working

together. I will not be threatened in this manner, and I categorically do not consent to anything you pressure me to do in this matter.

*Ethics*

You have stated that you have no qualms operating in an unethical manner, only to not break the law. If this is how you truly feel, it is an obstacle to us working together – especially since you have shown clearly that you do not believe you need to behave ethically with me. I believe in operating and treating partners ethically. You either need to commit to being ethical in your dealings with me and our partners, or I cannot work with you.

**Specific requirements in order to move forward with GBI**

1. You will either refund me or transfer direct ownership to me of all of the miners you induced me to wire you funds for as supposed capital contributions to GBI – all 19 XPs.
   a. This transfer is to be effectuated by a signed statement sent to me and copying Compass support from your Compass-registered email account requesting that Compass send me a receipt for these miners in my name; change the login email account to team@megacap.capital; grant me 2FA access so I can access the account; and instructing Compass to transfer my miners to my own login account as soon as feasible.
      i. I can draft it and you can sign and send it.
   b. The two Pros can be bought by either you or Dharma at full value.
   c. For the remaining half miner, you or Dharma buy me out at full value.
   d. The balance of the miners for which our wire transfers were credited as capital contributions to GBI, you can title as you see fit, as you already are, leaving GBI with zero miners (as is in fact currently the case).

2. We complete the NFT shared wallet contract to protect and honor your commitments to the TRIUMers and Wayaca, as well as me.
   a. As part of this, you will need to compensate me for my losses as a result of your refusal to sell on May 6.
   b. I will not bear the financial consequences of you misappropriating my funds and/or refusing to honor your obligation to sell the NFTs back in May.

| NFTs Purchased before May 6, 2022 | At Purchase | 5/6/2022 | 7/13/22 |
|---|---|---|---|
| Price of ETH | $2,742.65 | $2,694.98 | $1,079.00 |
| ETH Portfolio Value | 169.21 | 138.6926 | 108.19 |
| Change in ETH Value from Purchase | 0.00 | -30.52 | -61.03 |
| % Change in ETH Value from Purchase | 0% | -18% | -36% |
| Change in ETH Value from May 6, 2022 | 30.52 | 0 | -30.51 |
| % Change in ETH Value from May 6, 2022 | 27% | 0% | -68% |

| | | | |
|---|---|---|---|
| USD Portfolio Value | $475,678 | $373,774 | $118,707 |
| Change in USD Value from Purchase | $0 | -$101,905 | -$356,971 |
| % Change in USD Value from Purchase | 0% | -21% | -75% |
| Change in USD Value from May 6, 2022 | $101,905 | $0 | -$255,066 |
| % Change in USD Value from May 6, 2022 | 27% | 0% | -68% |

    c.  Note that I will not negotiate this or anything else until the miners are transferred to me without qualification, as per the above.

**The Path Forward**

I really want to work out our disagreements.  However, I cannot walk away from matters where you violated my trust and breached our written agreements, causing me significant financial harm.  I have here proposed a reasonable path forward that can help ensure a productive partnership in the future.  Once the above are completed, I will consider our relationship back in good standing and will help you launch an NFT Fund.

Regardless of anything herein, I will continue to work diligently and professionally on MegaCap. I trust that you will do likewise, as well as respond professionally to this proposal.

I'm hopeful we can resolve all of the above, continue to work together, and make Kash Money through GBI in the future in a way that is rewarding for both of us.

Best,

Eli

**APPENDIX**

*Miners*

1.  I sent you $222,149, recorded as capital contributions to GBI, to buy miners for GBI.
2.  Instead, you bought miners under your personal email address that I have no access to, which you 100% control, and which you have refused to manage in accordance with the GBI OA.
3.  You thus induced me to wire you funds as an alleged capital contribution into our business but then in fact bought miners that you own and control.
4.  You have used this control over the miners to try and pressure me into a below-market sale of "my" miners (which proves you do not in fact deem them as belonging to GBI), and to demand I pay hosting fees upfront for 5 years.
5.  Of the miners you used GBI capital contributions for, you claim:

a. 9 miners in total (including each of our interests) are part of Dharma, for which I had never until two weeks ago even been supplied an operating agreement let alone signed one, nor in which did I ever explicitly agree to invest capital in any email or text.

    i. The fact that the funds I sent were recorded as capital contributions to GBI (even though you admittedly did not deploy them as such), directly and unequivocally refutes your claim that I invested in Dharma.

    ii. You simply misappropriated GBI capital contributions and used them as your own capital contribution to Dharma and alleged that I had agreed to do likewise despite there being no executed Dharma OA or cap table.

b. 30 allegedly belong to GBI, although I have no access to any of them, and you are refusing to distribute or sell those assets in violation of the OA.

    i. If, as you claim, GBI owns these miners, then I need to have 100% equal access to them as you.

    ii. Since I don't have that access, which you have clearly stated I do not and which as a practical matter I do not, they are, de facto, not GBI miners and you have thus misappropriated my funds to buy miners for yourself and Dharma.

6. Your numerous messages to me attempting to pressure me into a severable, individual sale of my miners – not via a sale of Dharma or GBI miners – is clear evidence of the fact that you feel you can apportion ownership of the miners in any way you see fit and that those miners don't concretely belong to anyone unless you say so.

a. You flip flop at will as to who you claim owns the miners – GBI or me individually – to suit your needs.

7. I have demanded you provide me an invoice for the ownership of my half of these miners as per the above terms – which Compass has told me you can do with a single email.

a. You have refused for over two weeks now to request or provide this invoice, attempting to use your control over the miners to pressure me into various concessions, including a below-market sale, pre-paying hosting fees for 5 years, and other non-miner related GBI issues.

8. I have told you that, in the absence of such an invoice, I will not remit any further payments for the miners.

a. The same applies to my other requirements: until the full balance of your $400K alleged capital contribution to GBI to purchase NFTs as per below is fully accounted for and the NFT 'SPV' issue dealt with, I will not contribute any more funds towards the miners.

9. Should you pay the balance on the miners in order to not default on the entire order, per Section 17 of the GBI operating agreement, it will be an interest-free loan to GBI or evidence that you misappropriated my funds and dilution of my miner count, and for Dharma it would be a dilution in the Hardware Series.

a. I do **not** authorize you to sell to yourself or Dharma or otherwise usurp pro-rata interests in "my" or "GBI" miners at any price except as follows:

    i. You or Dharma can buy out all 4.5 of the Dharma XP miners at cost if you want, so long as I receive a receipt for 15 XPs.

      ii.    Any funds you advance on my behalf I shall deem to be for that purpose unless otherwise agreed.

    b.   Should you want to buy out the balance of my / the GBI miners, you may do so at the basis price paid, not at a discount.

    c.   Any transactions involving the miners will have to be agreed in writing and signed by me.

10. I do not authorize any miners I contributed capital for to use the Dharma Pool, use of which constitutes a Major Decision and needs to be agreed on in writing for GBI or by me individually.

    a.   After my requirements above are completed without qualification, we can discuss the pool when the time comes, but not as a contingency to transferring ownership and control of my miners to me.

*NFTs*

11. You induced me to send you $200K as a supposed capital contribution to GBI to buy $600K worth of NFTs for GBI.

    a.   You recorded a $400K capital contribution to GBI for your purchase of NFTs.

        i.    Your alleged contribution of $400K has never been accounted for.

    b.   You have stated that you credited your ETH contributions to the NFT purchases at the basis price of the coins instead of their then present value.

        i.    You have alternatively stated it was half of your $400K contribution and another time that it was $30-$40K, but you have never provided any accounting.

        ii.   Regardless, this is an explicit breach of Section 3(e) of the GBI OA.

       iii.   You are obligated to have purchased $400K in USD value as per the etherscan records.

12. It was agreed that the NFTs would be owned pro rata $100K/$50K/$450K TRIUM/Wayaca/GBI, with Wayaca and the TRIUMers having wired $50K and $100K respectively.

13. You have stated to me and to the TRIUMers that you have also spent $200K on NFTs for yourself, and thus the total NFT purchases should be on the order of $800K in basis value.

    a.   Regardless, the minimum owed to the GBI collection is $600K worth of basis value NFTs, commencing in February when the joint purchase agreement commenced, regardless of the basis price of the ETH you may have used to purchase them.

14. You have yet to provide a complete accounting of how the money was spent or which NFTs GBI allegedly owns.

    a.   I had to conduct my own extensive research project to identify NFTs purchased to the GBI wallet.

NOT A CERTIFIED COPY

15. I have no access to any of the wallets that own the NFTs allegedly bought on behalf of GBI, nor have you provided any record or wallet address whatsoever evidencing any SOL purchases.

16. As outlined in detail in my analysis of the NFT purchases, on May 6 you refused my right per the GBI OA to force a sale of the NFTs, telling me in writing that I'd have to sue you.

    a. As a result, the $475K basis value collection of NFTs in the ETH wallet at the time lost $255K (68% of their value on May 6), plus we lost the ability to redeploy the funds now in the down market.

    b. I consider you to be personally liable for my losses given your handling of the NFTs and/or misappropriation of my funds, and I need to be compensated for this.

17. Your only argument for not selling was that we agreed on a hold horizon, but this is patently and demonstrably false.

    a. There was never an email or even any messages to that effect.

    b. We only ever discussed LP lockup not an agreed GBI hold period.

    c. In fact, as evidenced by our chats and the warehousing language in the draft fund docs, we explicitly planned for GBI to sell them to the Fund as soon as possible so that we would not be over-exposed, which entails that they were bought with the intent of not holding onto them long term but rather liquidating them ASAP.

18. Given the above, you effectively induced me to wire you funds as a supposed capital contribution into GBI but then in fact bought NFTs that you legally own and control, thus misappropriating my funds.

    a. This is the exact same maneuver you pulled with the miners, fully intended to usurp total control over those assets in breach of the terms under which I agreed to wire you the funds.

19. In response to your most recent accusation that not being willing to move forward with the NFT Fund places me in breach, it most certainly does not.

    a. Companies abandon plans and products all the time due to changes in market conditions – for example as a result of market crashes – and other developments.

        i. In this case, I do not deem an NFT Fund to be a productive use of my time or resources given the onset of a crypto winter; our recent track record raising money; your bandwidth; and the performance of the NFT portfolio to date.

    b. Just because I invest time and resources to explore or create the possibility of a venture does not mean I am bound to move it forward.

    c. We have had and continue to have numerous disagreements about how the current NFT portfolio and potential future fund should be handled.

    d. The GBI OA requires both of us to sign a Series agreement, and, until that is done, there is no Series and no fund, period.

    e. As a practical matter, GBI does not have the financial resources to launch a fund.

# EXHIBIT E

# NOTICE OF DEFAULT

Dear Mr. Eli Blatt,                                                            Date of Notice: December 31, 2022

I am writing to you on behalf of The Dharma Initiative, LLC., in which you have been a member of and have failed to meet the capital contributions requirements outlined and agreed to in this chat. You are in ***material breach***.

On or about March 2022 two Invoices (2231 and 2309) was received from Compass Mining which was then later revised and shown to you in June due to the agreed increase of miners. You claimed an entity you were a part of called Goldner Blatt Investments, LLC., was purchasing another 36 miners (6 bundles), which you have failed to pay the balance on leaving the rest of the miners at risk. It was made transparent through these screenshots that all the miners were being purchased together at a bulk discount which was said numerous times in this chat. You have attempted through different means to acquire these miners in your name to damage the company and to use leverage of non-payment to coerce us all into an unfavorable agreement.

Additionally, you claimed your Mom and an entity named Wayaca was putting in money and that everyone had to "keep consistent with equity." We all agreed to purchase 3 Bundles at Dharma (4.5 Miners each between you, Marc Goldner, Rachel Korsen, and myself). You have failed to live up to the agreement that was agreed upon over 9 months ago. Your failure to abide by the terms of our agreement has put nearly a million dollars of miners in jeopardy which you will be held liable for in the event of your continued breach and non-payment.

Your default has put 72 total miners at risk. You have failed to meet your obligations knowing full well the consequences of your actions. We had offered to give you a 0% interest rate loan for 1 year in May or June, which you refused. We then offered to buy you out at a discount which you then refused. Now that the miners we all purchased are down over 50% you are refusing to pay the balance due that we had to front in order to not lose our own assets.

Therefore, as of today, December 31, 2022, The Dharma Initiative, LLC., is informing you that you are in default and that you have 30 days to pay the outstanding balance, or you will forfeit your rights, interest, equity, and potential earnings in the miners. Additionally, if the balance is not paid, there will be a meeting held to discuss your redemption from The Dharma Initiative.

This notice is made under all applicable laws with the rights stated in The Dharma Initiative Operating Agreement that has been shared with you and that allows for the redemption and notice of such a default.

We have discussed in good faith that we are extending you this 30-day notice in an effort to come to an agreement. If the balance of **$140,512.50** is paid in full by January 27, 2023, then we will consider this to be a tender offer where we will agree (if legally allowed) to backdate an agreement so that you may share in any potential capital loss from any sale of the miners to any person or entity whereas the effective date of such backdated agreement will be December 31, 2022. The breakdown of the balance includes but is not limited to 1) your portion of the GBI balance due, 2) your portion of the Dharma S19XPs that were acquired to mine more crypto and use to buy more miners perpetually, 3) Hosting Deposits, 4) Security Deposits, and 5) the 2 S19J Pros that you personally asked us to acquire for you. We sincerely hope that you are willing to pay off the debt due and come current so that you are not continuing to jeopardize the miners of everyone else that is part of The Dharma Initiative. If timely payment is not made, we are informing you that we will be forced to explore the option of bankruptcy protection as without your balance there will be nearly no way for us to continue to pay the monthly hosting fees that come due without a significant capital injection to prevent The Dharma Initiative from no longer being solvent.

The Dharma Initiative, LLC. Reserves All Rights and will explore pursuing legal action against you if not paid.

Sincerely,

*Simon Divilov*   12 / 31 / 2022
Simon Divilov
On Behalf of The Dharma Initiative, LLC.

Note: As an alternative, Marc has agreed to continue to have good faith discussions with you to determine the final language for a settlement agreement that will allow all parties to be made whole in this situation.

P.S. Please be informed that we were advised by Compass last week that the miners should start to be delivered shortly and for everyone to remain patient as they work through their own operational issues.

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| Title | Eli Blatt Notice of Default |
| File name | Notice of Default...ember 31 2022.pdf |
| Document ID | 66377b5cd8917d77590c45a826322870c49dbbca |
| Audit trail date format | MM / DD / YYYY |
| Status | ● Signed |

## Document History

**SENT** — 12 / 31 / 2022 22:13:10 UTC — Sent for signature to Simon Divilov (sdiv00@gmail.com) from scheduling@marcgoldner.com
IP: 148.74.125.240

**VIEWED** — 12 / 31 / 2022 22:13:25 UTC — Viewed by Simon Divilov (sdiv00@gmail.com)
IP: 172.58.3.85

**SIGNED** — 12 / 31 / 2022 22:16:02 UTC — Signed by Simon Divilov (sdiv00@gmail.com)
IP: 172.58.3.85

**COMPLETED** — 12 / 31 / 2022 22:16:02 UTC — The document has been completed.

Powered by **Dropbox** Sign

**From:** Rachel Korsen
**Subject:** Notice of Default from The Dharma Initiative, LLC.
**Date:** 29 Jan, 2023, 7:52 pm
**To:** Simon Divilov <simon@thecryptominers.io>
**Cc:** e@emb.org, "e@megacap.capital" <e@megacap.capital>

Hi Eli,

I hope you had a nice holiday and are enjoying the New Year. I have spent a substantial amount of time attempting to come up with a resolution to solve the issues between you and Marc for everyone's sake and I think I have a good resolution everyone will be happy with.

I'm willing to exercise a veto that I have to prevent a Default within Simon's proposed 30-day letter that was issued to you on December 31, 2022. However, I am only able to do this for so long. As long as you are willing to talk with us in good faith, I see no reason not to include you in sharing the capital losses and make the effective date of the Agreement between you and Marc to be 2022 (unless you prefer to have 2023 for your own personal tax reasons which as long as it is legal then we are happy to agree to do with you). We can discuss this all together amicably.

Marc is willing to cede the investment in the James Bond video game (which he is certainly entitled to) in order to move forward and to decrease the amount owned in the TV Studio Dragonfire (most likely entirely in order to avoid any more issues between you two – but he'll discuss that more). However, I do agree with him that you have an explicit authorizing text to invest $3-5k in Masterworks so that $5k should be included as he had invested even more than that in good faith so that should be honored. Also, the description of the Goldner Blatt Investments WhatsApp chat clearly outlines all of the investments made on GBI's behalf and that should be honored in some fashion as there were tens of thousands of dollars invested & known about.

What I think is most important is that you understand that Simon, Marc, and myself have lent you a significant amount of money to cover your balance due for the miners. There is a clear message history that Simon and I reviewed independently in The Crypto Miners, LLC. WhatsApp chat where we all knew our money was being sent to Dharma for 4.5 miners each and that Dharma was acquiring the miners on behalf of everyone including but not limited to the entities we have all discussed prior to acquiring the miners. I believe Marc said he told you to read that chat log so I will suggest to save everyone a headache that you do too when you have time. Marc posted Compass' contract and terms prior to anyone sending money (his PDF even has comments outlining the potential risks), it was crystal clear to everyone that the balance must be paid otherwise everyone would default. It isn't fair that you have forced us to lend you the money in order to save our own investments so please do the right thing and return the capital that was lent to you immediately. I do not want to have to escalate this whatsoever so I am asking you to please come to the negotiating table right away. Marc said that your mom is willing to take one less miner in good faith to help resolve this so we can discuss that as an option as well if that is what will help speed this process along for you.

Other than that, Marc will send you a revised Cap Table in a separate email and I'm happy to remain involved in helping you two resolve the issues. Marc also suggested that maybe your

mom and his dad could also help which I think is a really good idea too. Why don't we try?

At the end of the day, I think we all want to do good business, make money, and have fun.

Say hi to Emily and Brady for me!

Sincerely,
Rachel

On Sun, Jan 29, 2023 at 5:11 PM Simon Divilov <simon@thecryptominers.io> wrote:
CC'ing Rachel, she would like to chime in on this.

Thanks,
Simon

On Sat, Dec 31, 2022 at 5:28 PM Simon Divilov <simon@thecryptominers.io> wrote:
Dear Mr. Blatt,

Please see the attached Notice of Default sent on behalf of The Dharma Initiative, LLC., for your outstanding balance of $140,512.50.

Sincerely,
Simon Divilov

NOT A CERTIFIED COPY

# EXHIBIT F

NOT A CERTIFIED COPY

April 30, 2023


Marc Goldner
marc.goldner@uconn.edu

      RE:    Civil Theft Demand

Mr. Goldner,

     I am writing to demand restitution for the civil theft that you have committed against me. Pursuant to Florida Statutes § 772.11, you have seven days from the receipt of this letter to pay me the full amount of damages incurred as a result of your actions, or face further legal action.

     As you are aware, you fraudulently induced me to wire a total of $422,149 to purchase Bitcoin miners (the "Miners") and Non-Fungible Tokens (the "NFTs", and collectively the "Assets") for Goldner Blatt Investments, LLC ("GBI"), over which we share equal control and management rights, and which was formed in part expressly to facilitate joint investments such as the Assets in question. $202,148.55 was sent directly to Compass Mining, Inc. and $20,000 to you at your instruction to purchase Miners for GBI's account, and $200,000 was sent directly to you to purchase NFTs for GBI's account. Instead of doing so, you purchased these assets for yourself, held in wallets and accounts owned and controlled by you individually, commingled with your own Miners and NFTs; refused to provide a full and complete accounting of the assets; actively deprived me of any equal care or control thereover; and blatantly ignored my legitimate management and information rights thereover pursuant to the GBI operating agreement. In short, under the false promise of buying Assets for GBI, you in fact committed wire fraud instead, stealing my funds to unjustly enrich yourself.

     I have spent almost a year trying to reach an amicable settlement involving the transfer of my interest in these Assets to me. During this time, you have repeatedly and persistently used your exclusive ownership of, access to, and control over the Assets to attempt to threaten and extort me into various concessions, most recently escalating to threatening me and my family's lives, allegedly on behalf of Jiri Novotny, whose threats you claim to have in writing but refuse to share in order to validate that the threats are not yours alone. As a result, I am no longer amenable to any of the agreements previously discussed.

     According to Florida Statutes § 772.11, I am entitled to three times the amount of actual damages incurred, plus attorney's fees and court costs. Therefore, I am entitled to the sum of $1,226,477 in restitution, plus interest thereon at the statutory rate.

     If restitution is not paid within seven days from the receipt of this letter, I will be forced to pursue legal action against you in a court of law. This action may include filing a lawsuit against you, seeking a judgment against you, and pursuing every available legal remedy to recover the damages caused by your theft. Given that the purchase of the Assets on behalf of GBI was in fact a lie designed to induce me to wire you funds directly, which you subsequently used to purchase Assets for your own account, and no funds or Assets nor the Assets were ever properly in accounts

or wallets owned by GBI, my claims are against you individually and not governed by the dispute resolution terms of GBI, which you simply used as a mechanism to induce me to wire you funds.

I strongly urge you to take this matter seriously and to make restitution immediately in order to avoid any further legal action. You have seven days from receipt of this letter to confirm that you have made full restitution to me. Should you fail to do so, I reserve my right to share this demand letter with and serve a demand for preservation of evidence to all parties involved with the Assets and threats made against me, including but not limited to parties with ostensible shared interests in the NFTs and Miners you purchased for your own account, and the parties you allege to have made threats against me.

Thank you for your prompt attention to this matter.

Sincerely,

Eli M. Blatt

# EXHIBIT G

NOT A CERTIFIED COPY

## OPERATING AGREEMENT OF MEGACAP CAPITAL, LLC

**This OPERATING AGREEMENT** (the "**Agreement**") made and entered into this 7 day of July 2021 (the "**Effective Date**") by and among **MEGACAP CAPITAL LLC**, a Delaware Series Limited Liability Company (the "**Company**") and the following persons (each, a "**Member**," and, collectively the "**Members**"):

ELI M BLATT
MARC GOLDNER
RODERYCK REITER

### BACKGROUND:

A. The Members wish to associate themselves as members of a limited liability company.

B. The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

**Formation**

1. By this Agreement, the Members form a Series Limited Liability Company (the "**Company**") in accordance with the laws of the State of Delaware. The rights and obligations of the Members will be as stated in the Delaware Limited Liability Company Act (the "**Act**") except as otherwise provided in this Agreement.

**Name**

2. The name of the Company will be **MEGACAP CAPITAL, LLC**.

**Purpose**

3. Investing and Finance

**Term**

4. The Company will continue until terminated as provided in this Agreement or in the Act.

**Place of Business**

5. The Company's principal place of business will be located at:
   A Registered Agent, Inc.
   ATTN: MegaCap Capital, LLC.

8 The Green Street
Suite A
Dover, Delaware 19901

## Units and Capital Contributions

6. The Company shall be authorized to issue one million (**1,000,000**) units of membership interest in the Company (each, a "**Unit,**" collectively, "**Units**"), of which 900,000 units are hereby issued ("**Issued Units**") as per Section 8. These units constitute units of the "Master Series". The Company may authorize the issuance of additional Units with the prior written consent of all of the Class A Voting Members. As per Section 16, additional Series may be authorized each with its own Membership Units. The remainder of this agreement concerns the Master Series of the Company, however all provisions shall apply to any additional Series authorized unless otherwise approved by a supermajority vote of the Class A Members of the Master Series.

7. Units shall be divided into two classes: (a) "**Class A Voting Members**," and (b) "**Class B Non-Voting Members**." Each class will have distinct rights and obligations as follows:

| Member Class | Rights and Obligations |
| --- | --- |
| Class A | Class A Voting Members have full voting rights. |
| Class B | Class B Non-Voting Members have no voting rights. |

8. The following is a list of the initial Members (the "**Initial Members**") of the Company and Units of membership interest of the Company:

| Member | Class and Units Issued |
| --- | --- |
| Eli M Blatt | 333,000 Class A Units (37% of all Issued Units) |
| Marc Goldner | 234,000 Class A Units (26% of all Issued Units) |
| Roderyck Reiter | 333,000 Class A Units (37% of all Issued Units) |

9. The following is a list Initial Members of the Company and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution | Value |
| --- | --- | --- |
| Eli M Blatt | Cash | $1,000.00 |
| Marc Goldner | Cash | $1,000.00 |
| Roderyck Reiter | Cash | $1,000.00 |

## Independent Contractor Agreement; Redemption Agreement

10. All Members receiving shares in exchange for services to the Company shall be required to execute. that certain Stock Redemption Agreement, a copy of which is attached hereto as **Exhibit A**. All

Members shall be required to execute that certain Confidentiality Agreement, a copy of which is attached hereto as **Exhibit B.** In addition to the foregoing, any and all owners, principals, officers, directors, managers, members, or affiliates of each Member (each, along with the Members, a "**Member Affiliate**") shall also execute the Confidentiality Agreement.

11. The Company may enforce its rights under the Redemption Agreement at any time if (a) any Member is in material breach of this Agreement and/or the Confidentiality Agreement; (b) commits any of the forbidden acts delineated in Section 68-72; (c) violates the Duty to Devote time under Section 34; or (c) terminates this Agreement or otherwise ceases to be a member of the Company for any reason.

12. In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other. For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units).

## Allocation and Distribution of Profits/Losses

13. Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will be allocated between all Class A Members in accordance with their percentage interest in the Company or individual Series as determined by their respective percentage of Issued Units therein. For the Initial Members in the Master Series, Net Profits and Losses shall be allocated in the following manner:

| Member | Profit and Loss Percentage |
|---|---|
| Eli M Blatt | 37% |
| Marc Goldner | 26% |
| Roderyck Reiter | 37% |

14. Cash Distributions to Class A Members will be made in the same fixed proportions as the allocation of Net Profits or Losses described above. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

15. The Company shall make distributions of profit monthly, retaining an operating account reserve as agreed by a supermajority vote of Class A Members.

16. Series Interests and Series.

    (a)     The Members shall cause the Company to issue Interests in one or more separate and distinct series (each, a "Series"), with each such Series established to make separate

Investment or portfolio of Investments. The Members may establish Series for the purpose of (1) making Investments in specific and distinct companies identified by the Members, (2) to purchase securities in such companies from secondary sources, or (3) to invest in interests of investment funds, special purpose vehicles or other Entities consistent with the Company's investment focus, which such Series will be segregated from each other. The Members may use its commercially reasonable efforts to have securities purchased by a particular Series be issued for the benefit of such particular Series to which they are allocated. Members of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to share in the profits, losses, allocations or distributions of any other Series of which they are not a Member.

(b)      Each Series so established shall be set forth on Schedule A to this Agreement, and Schedule A will be updated by the Managers from time to time in connection with the establishment of one or more additional Series. Subject to such limitations as may be set forth in this Agreement, the Members shall establish and may modify the investment objective and policies of each Series and all other rights and features thereof.

(c)      Interests of each Series shall have the following relative rights and preferences:

(i)      Assets Held with Respect to a Particular Series. All Capital Contributions made to the Company with respect to a particular Series, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Series for all purposes, subject only to the rights of creditors of such Series, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Series, are herein referred to as "assets held with respect to" that Series. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Series (collectively "General Assets"), the Members shall allocate such General Assets to, between or among any one or more of the Series' in such manner and on such basis as the Members, in its sole discretion, deems fair and equitable, and any General Assets so allocated to a particular Series shall be assets held with respect to that Series. Each such allocation by the Members shall be conclusive and binding upon Members of all Series for all purposes.

(ii)      Liabilities Attributable to a Particular Series. The assets of the Company held with respect to each particular Series shall be charged with all liabilities, expenses, costs, charges and reserves attributable to that Series. All such liabilities, expenses, costs, charges, and reserves so charged to a Series are herein referred to as "liabilities attributable to" that Series. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Series ("General Liabilities") shall be allocated and charged by the Manager to, between or among any one or more of the Series in such manner and on such basis as the Members, in their sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Series shall be liabilities attributable to that Series. Each such allocation of liabilities, expenses, costs, charges and reserves by the Members shall be conclusive and binding upon Members of all

Series for all purposes. The liabilities attributable to any Series shall be enforceable against the assets of such Series only, and not against the General Assets, or the assets of any other Series. All Persons, including any Affiliates of the Members, who have extended credit that has been allocated to a particular Series, or who have a claim or contract that has been allocated to any particular Series, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Series for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship.

## Withdrawal of Contribution

17. No Member will withdraw any portion of their Capital Contribution without the supermajority consent of the Class A Voting Members.

## Liability for Contribution

18. A Member's obligation to make their required Capital Contribution can only be compromised or released with the consent of all Class A Voting Members or as otherwise provided in this Agreement. If a Member does not make the Capital Contribution when it is due, he is obligated at the option of the Class A Voting Members voting as a separate class, to contribute cash equal to the agreed value of the Capital Contribution. This option is in addition to and not in lieu of any other rights, including the right to specific performance that the Company may have against such Member.

## Additional Contributions

19. Capital Contributions may be amended from time to time, according to the business needs of the Company by supermajority vote of the Class A Voting Members.

20. Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by the Class A Voting Members, voting as a separate class. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

## Capital Accounts

21. An individual capital account (the "**Capital Account**") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

## Interest on Capital

22. No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

## Management

23. The Class A Voting Members shall have the sole authority to appoint a manager of the Company (individually the "**Manager**" and collectively the "**Managers**"). Management of the Company is vested in the following Managers until such time as they are removed by the Class A Voting Members or withdraw from the position:

    A. Eli M Blatt, Managing Partner
    B. Marc Goldner, Managing Partner
    C. Roderyck Reiter, Managing Partner

24. The duties and responsibilities of the Managers will include the following:

    ● Managers will supervise the day-to-day operations of the Company including supervising sales and production staff and maintaining financial accounts.

25. Notwithstanding any other provisions contained in the Certificate of Formation or this Agreement, each of the Managers is empowered to bind the Company for any and all decisions except Major Decisions. A supermajority vote of the Class A Voting Members shall be required for all Major Decisions, except where a unanimous vote is expressly called for. Such votes may be accomplished via electronic mail, What's App, or any other written medium upon which the Class A Voting Members unanimously agree. For purposes of this Agreement, "**Major Decisions**" are the following:

    A. Incur debt, expend funds, write checks, pay bills, or enter into contracts, or otherwise obligate the Company for any amount in excess of $1,500.
    B. Negotiate or agree to an accounts payables/receivables payment schedule.
    C. Establish credit lines and the use of such credit lines.
    D. The sale or dissolution of the Company or its assets.
    E. Issuance of additional member or shareholder interests, which shall require a unanimous vote and be signed in writing by all Class A Members.
    F. Approval of a member or shareholder buy-sell agreement, approval of which shall not be unreasonably withheld.
    G. Scheduling repayment of any capital contributions from any Member.
    H. Selling, leasing, or encumbering any property owned by the Company.
    I. Scheduling repayment of any loans from Members.
    J. Changing or amending this Agreement or approving any action or resolution that would alter the terms of this Agreement, which shall require a unanimous vote and be signed in writing by all Class A Members.
    K. Appointment or removal of a Manager which shall require a unanimous vote and be signed in writing by all Class A Members excluding the Member being removed.
    L. Addition, withdrawal, appointment, or removal of a Member, which shall require a unanimous vote and be signed in writing by all Class A Members (unless the Member being removed is a

Class A Member, in which case the unanimous vote of the remaining Class A Members is required.

M. Amending the duties and responsibilities of any Manager.

N. Any changes to the Company Name, branding imagery, and public relations positioning.

O. Adjustments to the compensation of any Member, Manager, Employee, or contractor.

P. Payment of any distributions or other compensation to any Member beyond the monthly Distributions required in Section 15.

Q. Registering the company with any regulatory or governmental agency.

R. Creation of an additional Series within the MegaCap umbrella, which shall require a unanimous vote and be signed in writing by all Class A Members. For avoidance of doubt, any Series created for any entities such as additional SPVs or for any purpose defined in Section 16(a) for MegaCap will be approved by all Class A Members in writing.

S. Each Series equity percentage shall require a unanimous vote and be signed in writing by all Class A Members.

T. Each Series investment objective and policies will be defined by the Managers and shall be unanimously approved by all Class A Members signed in writing.

U. No manager shall move any "General Assets" to any Series without unanimous approval by all Class A Members.

V. No Class A Members shall take on personal liability or personal obligations of MegaCap unless expressly approved and unanimously approved by all Class A Voting Members.

26. A new Manager may be added to the Company with a supermajority vote of the Class A Voting Members.

27. A Manager will be reimbursed for reasonable expenses directly related to the operation of the Company and approved, in advance, by a supermajority of the Class A Voting Members (voting as a separate class).

28. The Members will be consulted and the advice and opinions of the Members will be obtained as much as is practicable. However, subject to Section 25 above, the Managers will have management and control of the day-to-day business of the Company for the purposes stated in this Agreement. All matters outside the day-to-day business of the Company will be decided by the Class A Voting Members (voting as a separate class) as outlined elsewhere in this Agreement.

A. In determining and selecting which manufacturing hardware partner and software partner to use for operations, only a simple majority vote of 51% will be required between the Members.

29. In addition to day-to-day management tasks and any other duties and responsibilities already identified in this Agreement, the Managers' duties will include keeping, or causing to be kept, full and accurate business records for the Company according to generally accepted accounting principles (GAAP), and overseeing the preparation of any reports considered reasonably necessary to keep the Class A Voting Members informed of the business performance of the Company.

30. A Manager will not be liable to the Members for any action or failure to act resulting in loss or harm to the Company except in the case of gross negligence or willful misconduct.

31. Each Member will devote such time and attention to the business of the Company as required to carry out their duties and responsibilities for the conduct of the Company's business.

## Authority to Bind Company

32. Only the Manager(s) have the authority to enter into contracts on behalf of the Company.

## Duty of Loyalty

33. While a person is a Member or Manager of the Company, and for a period of at least two years after that person ceases to be a Member or Manager, that person will not carry on, or participate in, a business involved in the issuance or transacting of securities in any market regions that were established or contemplated by the Company before or during that person's tenure as Member or Manager.

## Duty to Devote Time

34. Each Member will devote such time and attention to the business of the Company as the supermajority of the Class A Voting Members (voting as a separate class) will from time to time reasonably determine for the conduct of the Company's business. Should a Member or Members be deemed by supermajority vote of the Members voting thereon to be in violation of this provision, those Members will be subject to Involuntary Withdrawal as per Section 43.

## Member Meetings

35. A meeting may be called by any Class A Voting Member providing that reasonable written notice has been given to the other Members.

## Voting

36. Each of the Class A Voting Members shall have one vote for each Unit owned by such Class A Voting Member.

37. INTENTIONALLY LEFT BLANK

## Admission of New Members

38. A new Member may only be admitted to the Company with a supermajority vote of the Class A Voting Members.

39. No new Class A member shall be admitted as a Member of the Company until such new Member becomes a party to this Agreement, as amended, and agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to effect the admission of the new Member as determined by a supermajority vote of the Class A Members. Any new Member will receive such

business interest in the Company as determined by a supermajority consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

## Voluntary Withdrawal of a Member

40. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

41. INTENTIONALLY LEFT BLANK

## Involuntary Withdrawal of a Member

42. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; felony conviction of a Member; or a legal judgment against a Member (excluding any judgment resulting from any litigation relating to Marc Goldner) that is pending as of the effective date hereof) that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member has engaged in conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member, including not devoting time to the Company as required per Section 34.

43. The involuntary withdrawal of a Member will have no effect upon the continuance of the Company.

## Dissociation of a Member

44. In the event of either a voluntary or involuntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.

45. A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

46. Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 60 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company.

## Sale, Transfer, or Assignment of a Member's Interest; Drag-Along

47. No Member may sell, transfer or assign any of such Member's Interest, including, but not limited to, any Units owned by such Member, without the supermajority written consent of the Class A Voting Members. Where a Member's financial interest in the Company is assigned to another party who is not an existing Member, that party will be considered a New Member. An assignment of full membership status inclusive of all duties, obligations, and rights held by the previous Member will be governed by the conditions described under the Admission of New Members section of this Agreement.

48. **Drag-Along Rights.** In the event that the Class A Voting Members receive a bona fide offer from an independent third party purchaser to purchase (including by merger) all of the outstanding Units or all or a substantial portion of the assets of the Company, the Class A Voting Members may send written notice (the **"Drag-Along Notice"**) to the Company and the remaining Class B Members (the **"Class B Members"**) notifying them they will be required to sell all of their Units in such sale. Upon receipt of a Drag-Along Notice, each Class B Member receiving such notice shall be obligated to (a) sell all of the Class B Member's Units contemplated by the Drag-Along Notice on the same terms and conditions as the Class A Voting Members; and (b) otherwise take all necessary action to cause the consummation of such transaction. Each Class B Member further agrees to (a) take all actions (including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by the Class A Members; (b) waive all applicable appraisal rights, if any, under the laws of the State of Delaware; and (c) appoint the Class A Members as the Class B Member's attorney-in-fact to do the same on its behalf. Notwithstanding the foregoing, no Class B Member may sell or assign such Member's Units, in whole or in part, under this Section without the express prior written approval and consent of a Supermajority of Class A Voting Members.

## Right of First Purchase

49. In the event that a Member's Interest in the Company is or will be sold, due to any reason other than as said forth in section 48 above, the remaining Members will have a right of first purchase of that Member's Interest. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

50. In the event that a Member's interest in the company is transferred or assigned as the result of a court order or operation of law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

## Valuation of Interest

51. In the event of a sale of all or substantially all of the Units and/or assets of the Company, a Member's financial interest in the Company will be based in the percentage of Units owned in proportion to all of the issued and outstanding Units of the Company at the time of such sale.

52. In the absence of a written agreement setting a value, the value of the Company will be based on an appraisal of the fair market value of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members to be retained within a reasonable period of the event giving rise to the disposition of a Member's interest. The results of the appraisal will be binding on all Members. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member.

53. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

## Dissolution

54. The Company may be dissolved by a unanimous vote of the Class A Voting Members. The Company will also be dissolved on the occurrence of events specified in the Act.

55. Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

   A. First, in satisfaction of liabilities to creditors except Company obligations to current Members;

   B. Second, in satisfaction of Company debt obligations to current Members;

   C. Third, to the Class A Members up to the amount of their Capital Contributions;

   D. Fourth, to the Class B Members up to the amount of their Capital Contributions; and

   E. Finally, to all of the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement.

## Records

56. The Company will at all times maintain accurate records of the following:

   A. Information regarding the status of the business and the financial condition of the Company.

   B. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.

   C. Name and last known business, residential, or mailing address of each Member and Manager, as well as the date that person became a Member or Manager.

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 12 of 20*

    D. A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement and any amendments have been executed.

    E. The cash, property, and services contributed to the Company by each Member, along with a description and value thereof.

57. Each of the Class A Voting Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

58. Each Manager has the right to examine the above documents for any purpose reasonably related to their position as Manager of the Company.

## Books of Account

59. Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any of the Class A Voting Members. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

## Banking and Company Funds

60. The funds of the Company will be placed in such investments and banking accounts as will be designated by the unanimous vote of all Class A Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by supermajority consent of the Class A Voting Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

## Audit

61. Any of the Class A Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Company. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Class A Voting Members for any fiscal year.

## Tax Treatment

62. The Company is intended to be treated as an S-Corp for the purposes of Federal and State Income Tax.

## Annual Report

63. As soon as practicable after the close of each fiscal year, the Company will furnish to each Class A Voting Member an annual report showing a full and complete account of the condition of the Company

including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

    A.  A copy of the Company's federal income tax returns for that fiscal year.

    B.  Income statement.

    C.  Balance sheet.

    D.  Cash flow statement.

    E.  A breakdown of the profit and loss attributable to each Member.

## Goodwill

64. The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## Governing Law

65. INTENTIONALLY LEFT BLANK

## Force Majeure

66. A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to an event of force majeure, such as earthquake, typhoon, flood, fire, pandemic, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

## Forbidden Acts

67. No Member may do any act in contravention of this Agreement or prevailing law.

68. No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company.

69. No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

70. No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

71. No Member may confess a judgment against the Company.

72. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

## Indemnification

73. All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature whatsoever, arising out of a Member's participation in Company affairs pursuant to this Agreement. A Member will not be entitled to indemnification under this section for liability arising out of negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

## Liability

74. A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

## Liability Insurance

75. The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

## Life Insurance

76. The Company will not have the right to acquire life insurance on the lives of any or all of the Members.

## Amendment of this Agreement

77. No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all of the Class A Voting Members.

## Title to Company Property

78. Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member.

79. A breach of the Confidentiality Agreement

## Dispute Resolution

80. <u>Dispute Resolution</u>.   Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this <u>Section</u>. The initiation and pendency of the procedures under this <u>Section</u> does not relieve the Parties from their respective obligations under the Agreement.  ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS <u>SECTION</u> SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

    A.  Negotiations by and between the Parties.

    (1)  Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail.  Within ten (10) days after receiving such notice, the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

    (2)  Upon the Disputing Party's receipt of the Responding Parties' response, the Parties shall then have thirty (30) days, or such other time as they may mutually agree upon in writing, to resolve the Dispute amongst themselves.

    B.  Mediation

    If the Parties are not able to resolve a Dispute pursuant to subsection (A) above, they agree to participate in at least ten (10) hours of good faith mediation administered by the American Arbitration Association under its Commercial Mediation Procedures.

    C.  If the Parties are not able to resolve a Dispute pursuant to subsections (A) and (B) above, the Dispute shall finally be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association.   Nothing herein shall limit the right of any Party to seek interim or provisional equitable relief in a court of competent jurisdiction prior to or pending the      conclusion of the arbitration.  Any Arbitration shall take place virtually  unless the parties agree on a physical location.  The arbitrator shall apply the law of the State of Delaware without regard to conflicts of law principles.   No demand for arbitration may be made after the date when the institution of legal or equitable proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

81.  <u>Equitable Remedies</u>.  The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights

and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement. The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware. For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of *forum non conveniens*.

82. Prevailing Party. In the event that any Dispute between the Company and the Members or among the Members arising out of or related to this Agreement results in any formal proceedings, the prevailing party as determined by the arbiter or court of competent jurisdiction, as the case may be, shall be entitled to recover from the non-prevailing parties all reasonable fees, costs and expenses of enforcing any right of such prevailing party including, without limitation, reasonable attorneys' fees and expenses, including appeal costs, all of which shall be deemed to have accrued upon the commencement of such formal proceeding and shall be paid whether or not such formal proceeding is prosecuted to judgment. The "prevailing party" for purposes of this Section shall be the party who, in the arbitrator or judge's discretion, prevails on substantially all the merits in the Dispute, irrespective of the actual number of claims or counterclaims actually won or defeated. Any award, judgment or order entered in such formal proceeding shall contain a specific written statement of findings with respect to the prevailing party's recovery of fees and costs as contemplated under this Section, and shall include an award of pre-award or prejudgment interest running from the date of the breach at the maximum rate of interest allowed by applicable law.

83. Waiver of Certain Rights. AS A MATERIAL INDUCEMENT TO EACH MEMBER TO ENTER INTO THIS AGREEMENT, EACH MEMBER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO MAINTAIN ANY ACTION FOR DISSOLUTION OF THE COMPANY OR FOR PARTITION OF PROPERTY UNDER THE ACT. IN ADDITION, THE MEMBERS AGREE THAT THIS AGREEMENT HAS BEEN CAREFULLY DRAFTED TO PROVIDE FAIR TREATMENT OF ALL MEMBERS AND PARTICULARLY IN RESPECT OF EQUITABLE PAYMENT IN LIQUIDATION TO HOLDERS OF ECONOMIC INTERESTS. ACCORDINGLY, EXCEPT WHERE AND ONLY IF THE MANAGER OR LIQUIDATOR, AS THE CASE MAY BE, HAS FAILED TO LIQUIDATE THE COMPANY IN A REASONABLY TIMELY MANNER AS REQUIRED UNDER THIS AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES AND RENOUNCES ITS RIGHT TO INITIATE A LEGAL ACTION OR OTHER CLAIM TO SEEK THE APPOINTMENT OF A RECEIVER OR TRUSTEE TO LIQUIDATE THE COMPANY.

84. No Waiver. A Person's waiver of or consent to, express or implied, any breach or default by any Person as to the performance by such Person's obligations with respect to the Company, shall not constitute a waiver of or consent to any other breach or default by such other Person of the same or any other obligations with respect to the Company. Failure on the part of a Person to complain, provide notice of, or object to any action or inaction of any Person, or to declare any Person in breach or default with respect to the Company, irrespective of how long such failure continues, shall not constitute a waiver by such Person of its rights with respect to such breach or default, until the applicable statute of limitations period has run.

85. <u>Binding Effect</u>.  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective Personal Representatives, successors and permitted assigns.

86. <u>Parties in Interest</u>.  Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective Personal Representatives, successors and permitted assigns, and nothing in this Agreement shall be construed to relieve or discharge the obligation or liability of any Person to any party to this Agreement, or to provide any Person any right of subrogation or action over or against any party to this Agreement.

87. <u>Prevailing Terms</u>.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

88. <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances.

89. <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

90. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties hereto had signed the same document. All counterparts shall be construed together and constitute the same instrument. Signatures by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory and shall be deemed to be originals for all purposes. The Members acknowledge and agree that it may be executed electronically, and that the provisions of the Electronic Signatures in Global and National Commerce Act of 2000, 15 U.S.C. 7001 et al, as amended and in effect as of the Effective Date of this Agreement, shall apply.

91. <u>Acknowledgment of Provisions</u>.  BY EXECUTING THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES THAT IT HAS ACTUAL NOTICE OF: (A) ALL OF THE PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTERESTS; AND (B) ALL OF THE PROVISIONS OF THE ARTICLES. EACH MEMBER HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES ADEQUATE NOTICE OF ALL SUCH PROVISIONS, AND EACH MEMBER HEREBY WAIVES ANY REQUIREMENT THAT ANY FURTHER NOTICE REQUIRED BY ANY PROVISION OF THE ACT OR APPLICABLE LAW.

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 18 of 20*

## Miscellaneous

92. Time is of the essence in this Agreement.

93. Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

94. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

95. This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matter hereof, and may not be modified or amended except by a written instrument executed by or on behalf of authorized representatives each of Party to this Agreement.

96. All notices or other communications relating to the performance, enforcement, or other legal aspects of this Security Agreement will be in writing and may be personally delivered, sent by overnight courier service to all parties, and delivered as a .pdf e-mail attachment to all parties. Any other communications between the parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to all parties.

97. All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

## Definitions

98. For the purpose of this Agreement, the following terms are defined as follows:

    A. "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

    B. "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

    C. "Distributions" means a payment of Company profits to the Members.

    D. "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

MEGACAP CAPITAL, LLC Operating Agreement
Page 19 of 20

E. "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, Member's rights to participate in the management of the Company, and any Units of membership interest in the Company owned by such Member.

F. "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

G. "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

H. "Principal Office" means the office whether inside or outside the State of Delaware where the executive or management of the Company maintain their primary office.

I. "Voting Members" means the Members who belong to a membership class that has voting power.

J. "Supermajority Vote" means a vote by Members representing no less than 60% of the Class A Voting Units.

**SIGNED, SEALED, AND DELIVERED**

**ELI M BLATT**

By: _____

**MARC GOLDNER**

By: *Marc Goldner* _____

**RODERYCK REITER**

By: _____

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 20 of 20*

## EXHIBITS

Exhibit A     Redemption Agreement
Exhibit B     Confidentiality Agreement

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Eli Blatt _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2. **Use of Confidential Information; Non-Disclosure Obligations**

2.1.    Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.    The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.    The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

## 3.    Compelled Disclosure

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

## 4.    Proprietary Rights

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

## 5.    Return of Confidential Information

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

## 6.    Term and Termination

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    <u>**Remedies**</u>

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    <u>**Governing Law, Submission to Jurisdiction, and Consent to Suit**</u>

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    <u>**Entire Agreement**</u>

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   <u>**Counterparts**</u>

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   <u>**Severability**</u>

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   <u>**Relationship of The Parties**</u>

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13.   **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14.   **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15.   **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

Address:       2020 N Bayshore Dr. Apt 2310, Miami FL 33137

E-Mail:        team@megacap.capital

If to   Eli Blatt                                              :

Address:       2020 N Bayshore Dr #2310 Miami FL 33137

E-Mail:        e@megacap.capital

16.   **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

MEGACAP CAPITAL LLC                          THE RECEIVING PARTY

By: _____                        _____

Name: Eli M Blatt                              Name:  Eli Blatt

Title:  Managing Member

Date: Jul 08 2021                              Date: Jul 08 2021

4

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of _____, (the "**Effective Date**") by and between **Eli M Blatt** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company"). Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>333,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.     **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

   a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.     **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.     **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 2 of 4

3.      **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.      **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.      **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.      **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.      **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.      **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.      **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10. **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees), regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

Individual

By: Eli Blatt

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____

Name: Eli M Blatt

Title: Manager

**SCHEDULE A**
**REDEMPTION NOTICE**

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Eli M Blatt** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**

By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

<div align="center">

### NON-DISCLOSURE AGREEMENT

</div>

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Marc Goldner _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1.   Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

### 2.   Use of Confidential Information; Non-Disclosure Obligations

2.1.   Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.   The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.   The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

<div align="center">1</div>

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

## 3.    Compelled Disclosure

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

## 4.    Proprietary Rights

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

## 5.    Return of Confidential Information

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

## 6.    Term and Termination

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13.   **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14.   **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15.   **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:      2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:      team@megacap.capital

If to   Marc Goldner                              :

    Address:      15 Peacock Drive, Roslyn, NY 11576

    E-Mail:      m@megacap.capital

16.   **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                          **THE RECEIVING PARTY**

By: _____                     _Marc Goldner_____

Name: Eli M Blatt                                Name: Marc Goldner

Title:  Managing Member

Date: Jul 08 2021                                Date: Jul 08 2021

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ___Jul 08 2021___ , (the "**Effective Date**") by and between **Marc Goldner** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company"). Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>234,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.   **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

   a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.   **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.   **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 2 of 4

3.     **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.     **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.     **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.     **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.     **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.     **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.     **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

      10.    **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees), regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

      **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

*Marc Goldner*

_____
Individual and Managing Partner of MegaCap Capital, LLC.

By: Marc Goldner

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Marc Goldner** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1.  Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2.  Pursuant to the Operating Agreement, the Company issued to Member 234,000 Units of membership interest in the Company (the "Units").

3.  Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Roderyck Reiter _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1.    Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

### 2.    Use of Confidential Information; Non-Disclosure Obligations

2.1.    Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.    The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.    The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    <u>Remedies</u>

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate.  Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    <u>Governing Law, Submission to Jurisdiction, and Consent to Suit</u>

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof.  All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution.  In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts.  The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    <u>Entire Agreement</u>

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof.  This Agreement may only be modified or amended in a writing signed by the Parties.  No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   <u>Counterparts</u>

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   <u>Severability</u>

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   <u>Relationship of The Parties</u>

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13.    **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14.    **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15.    **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:        2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:        team@megacap.capital

If to Roderyck Reiter

    Address:        4661 NW 2nd Ave APT 603, Boca Raton, FL 33431

    E-Mail:        r@megacap.capital

16.    **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**             **THE RECEIVING PARTY**

By: _____        _____

Name: Eli M Blatt               Name: Roderyck Reiter

Title:  Managing Member

Date: Jul 08 2021              Date: Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ___Jul 08 2021___, (the "**Effective Date**") by and between **Roderyk Reiter** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").  Member and Company hereafter are collectively referred to as the "Parties."

## RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>333,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

## AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.      **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

   a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48[th] of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.      **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.      **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3.     **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.     **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.     **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.     **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.     **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.     **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.     **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.   **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

   **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

Individual and Managing Partner of MegaCap Capital, LLC

By: Roderyck Reiter

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Roderyk Reiter** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.0001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

# EXHIBIT H

NOT A CERTIFIED COPY

## RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF
## THE VOTING MEMBERS OF THE DIRECTORS OF MEGACAP CAPITAL, LLC

The undersigned, being the Voting Members of **MEGACAP CAPITAL, LLC** (the "**Company**") hereby adopt the following resolutions and take the following actions by unanimous written consent on **January 16, 2023** (the "**Effective Date**") in lieu of a meeting and is to deemed effective immediately:

### PREAMBLE

1. Marc J Goldner ("**Marc**") is an individual who owns 50% of the Company.

2. Eli M Blatt ("**Eli**") is an individual who owns 50% of the Company.

3. Eli and Marc are both parties to the *Operating Agreement of Megacap Capital, LLC* (the "**Operating Agreement**"). A copy of the fully executed Operating Agreement is attached hereto as **Exhibit A**.

4. Marc is refusing to adhere to the Company's own Subscription documents and Series Agreement relating to Megacap Funds, LP – Tech I, of which the Company is the General Partner as regards the treatment of management fees, which the parties previously agreed to in a meeting in early December 2022, preventing the Company from filing tax returns and issuing Tech I LPs K1s that reflect the terms of the Series Agreement, the use of funds sent to Tech I, and the advice of the Company's Fund administer, Flow, constituting a "breach of fiduciary duty" to the Company that makes it "impossible to carry on the ordinary business of the Company".

5. Marc has on numerous occasions, in writing, made personal threats against Eli as well as his fiancé relating to his desire to receive unapproved expense reimbursement, which has resulted in both Eli and his fiancé at times feeling unsafe. Marc has claimed to have connections to the criminal underworld, which have amplified the seriousness of his threats. As a result, Eli no longer feels comfortable engaging directly with Marc. Marc's threats have thus made it "impossible to carry on the ordinary business of the Company".

6. Marc has made numerous false, distorted, and unsubstantiated allegations against Eli to the Company's corporate counsel, jeopardizing the ability of the Company to receive proper legal counsel, making it "impossible to carry on the ordinary business of the Company".

7. As a result of the above, Marc has breached his obligations to the Company and is hereby involuntarily withdrawn from the Company as provided in the following sections of the Operating Agreement:

    a. **Section 41** which states that "Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to… breach of fiduciary duties by a Member" and engaging "in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member"
    b. **Section 69** which states "No Member may do any act that would make it impossible to carry on the ordinary business of the Company."

**NOW, THEREFORE, BE IT RESOLVED** that, effective immediately, the Company acknowledges, approves, and ratifies Marc's involuntary withdrawal as both Manager and Member from the Company as provided in **Sections 41 and 69** of the Operating Agreement; the Company reserves the right to void this Resolution at its sole discretion.

**FURTHER RESOLVED,** that, barring voiding of this agreement by the Company, effective immediately upon Marc's involuntary withdrawal as a member of the Company, the only remaining voting member is Eli.

**FURTHER RESOLVED**, as consideration for removal of his Membership, the Company shall in due time pass a resolution issuing Marc 50% interests in the Company in the form of Class B non-voting shares, thus retaining his economic interests in the Company.

This Written Consent is executed as of the Effective Date by the Voting Members of the Company.

**MEGACAP CAPITAL, LLC**

By: ███████████

Name:  Eli M Blatt

Title:   Managing Member

**EXHIBIT A**
**OPERATING AGREEMENT**

NOT A CERTIFIED COPY

## OPERATING AGREEMENT OF MEGACAP CAPITAL, LLC

**This OPERATING AGREEMENT** (the "**Agreement**") made and entered into this 7 day of July 2021 (the "**Effective Date**") by and among **MEGACAP CAPITAL LLC**, a Delaware Series Limited Liability Company (the "**Company**") and the following persons (each, a "**Member**," and, collectively the "**Members**"):

ELI M BLATT
MARC GOLDNER
RODERYCK REITER

### BACKGROUND:

A. The Members wish to associate themselves as members of a limited liability company.

B. The terms and conditions of this Agreement will govern the Members within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Members entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Members agree as follows:

**Formation**

1. By this Agreement, the Members form a Series Limited Liability Company (the "**Company**") in accordance with the laws of the State of Delaware. The rights and obligations of the Members will be as stated in the Delaware Limited Liability Company Act (the "**Act**") except as otherwise provided in this Agreement.

**Name**

2. The name of the Company will be **MEGACAP CAPITAL, LLC**.

**Purpose**

3. Investing and Finance

**Term**

4. The Company will continue until terminated as provided in this Agreement or in the Act.

**Place of Business**

5. The Company's principal place of business will be located at:
   A Registered Agent, Inc.
   ATTN: MegaCap Capital, LLC.

8 The Green Street
Suite A
Dover, Delaware 19901

## Units and Capital Contributions

6. The Company shall be authorized to issue one million (**1,000,000**) units of membership interest in the Company (each, a "**Unit,**" collectively, "**Units**"), of which 900,000 units are hereby issued ("**Issued Units**") as per Section 8. These units constitute units of the "Master Series". The Company may authorize the issuance of additional Units with the prior written consent of all of the Class A Voting Members. As per Section 16, additional Series may be authorized each with its own Membership Units. The remainder of this agreement concerns the Master Series of the Company, however all provisions shall apply to any additional Series authorized unless otherwise approved by a supermajority vote of the Class A Members of the Master Series.

7. Units shall be divided into two classes: (a) "**Class A Voting Members,**" and (b) "**Class B Non-Voting Members.**" Each class will have distinct rights and obligations as follows:

| Member Class | Rights and Obligations |
|---|---|
| Class A | Class A Voting Members have full voting rights. |
| Class B | Class B Non-Voting Members have no voting rights. |

8. The following is a list of the initial Members (the "**Initial Members**") of the Company and Units of membership interest of the Company:

| Member | Class and Units Issued |
|---|---|
| Eli M Blatt | 333,000 Class A Units (37% of all Issued Units) |
| Marc Goldner | 234,000 Class A Units (26% of all Issued Units) |
| Roderyck Reiter | 333,000 Class A Units (37% of all Issued Units) |

9. The following is a list Initial Members of the Company and their Initial Contributions to the Company. Each of the Members agree to make their Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution | Value |
|---|---|---|
| Eli M Blatt | Cash | $1,000.00 |
| Marc Goldner | Cash | $1,000.00 |
| Roderyck Reiter | Cash | $1,000.00 |

## Independent Contractor Agreement; Redemption Agreement

10. All Members receiving shares in exchange for services to the Company shall be required to execute. that certain Stock Redemption Agreement, a copy of which is attached hereto as **Exhibit A**. All

Members shall be required to execute that certain Confidentiality Agreement, a copy of which is attached hereto as **Exhibit B.** In addition to the foregoing, any and all owners, principals, officers, directors, managers, members, or affiliates of each Member (each, along with the Members, a "**Member Affiliate**") shall also execute the Confidentiality Agreement.

11. The Company may enforce its rights under the Redemption Agreement at any time if (a) any Member is in material breach of this Agreement and/or the Confidentiality Agreement; (b) commits any of the forbidden acts delineated in Section 68-72; (c) violates the Duty to Devote time under Section 34; or (c) terminates this Agreement or otherwise ceases to be a member of the Company for any reason.

12. In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other. For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units).

## Allocation and Distribution of Profits/Losses

13. Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will be allocated between all Class A Members in accordance with their percentage interest in the Company or individual Series as determined by their respective percentage of Issued Units therein. For the Initial Members in the Master Series, Net Profits and Losses shall be allocated in the following manner:

| Member | Profit and Loss Percentage |
|---|---|
| Eli M Blatt | 37% |
| Marc Goldner | 26% |
| Roderyck Reiter | 37% |

14. Cash Distributions to Class A Members will be made in the same fixed proportions as the allocation of Net Profits or Losses described above. No Member will have priority over any other Member for the distribution of Net Profits or Losses.

15. The Company shall make distributions of profit monthly, retaining an operating account reserve as agreed by a supermajority vote of Class A Members.

16. Series Interests and Series.

      (a)      The Members shall cause the Company to issue Interests in one or more separate and distinct series (each, a "Series"), with each such Series established to make separate

Investment or portfolio of Investments. The Members may establish Series for the purpose of (1) making Investments in specific and distinct companies identified by the Members, (2) to purchase securities in such companies from secondary sources, or (3) to invest in interests of investment funds, special purpose vehicles or other Entities consistent with the Company's investment focus, which such Series will be segregated from each other. The Members may use its commercially reasonable efforts to have securities purchased by a particular Series be issued for the benefit of such particular Series to which they are allocated. Members of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to share in the profits, losses, allocations or distributions of any other Series of which they are not a Member.

(b)      Each Series so established shall be set forth on Schedule A to this Agreement, and Schedule A will be updated by the Managers from time to time in connection with the establishment of one or more additional Series. Subject to such limitations as may be set forth in this Agreement, the Members shall establish and may modify the investment objective and policies of each Series and all other rights and features thereof.

(c)      Interests of each Series shall have the following relative rights and preferences:

(i)      Assets Held with Respect to a Particular Series. All Capital Contributions made to the Company with respect to a particular Series, together with all assets in which such contributions are invested or reinvested, all income, earnings and profits thereon, and the proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange or liquidation of such assets, shall irrevocably be held with respect to that Series for all purposes, subject only to the rights of creditors of such Series, and shall be so recorded upon the books of account of the Company. All such consideration, assets, income, earnings, profits and proceeds thereof of a Series, are herein referred to as "assets held with respect to" that Series. In the event that there are any assets, income, earnings, profits and proceeds thereof, funds or payments which are not readily identifiable as assets held with respect to any particular Series (collectively "General Assets"), the Members shall allocate such General Assets to, between or among any one or more of the Series' in such manner and on such basis as the Members, in its sole discretion, deems fair and equitable, and any General Assets so allocated to a particular Series shall be assets held with respect to that Series. Each such allocation by the Members shall be conclusive and binding upon Members of all Series for all purposes.

(ii)      Liabilities Attributable to a Particular Series. The assets of the Company held with respect to each particular Series shall be charged with all liabilities, expenses, costs, charges and reserves attributable to that Series. All such liabilities, expenses, costs, charges, and reserves so charged to a Series are herein referred to as "liabilities attributable to" that Series. Any liabilities of the Company which are not readily identifiable as being attributable to any particular Series ("General Liabilities") shall be allocated and charged by the Manager to, between or among any one or more of the Series in such manner and on such basis as the Members, in their sole discretion, deems fair and equitable, and any General Liabilities so allocated to a particular Series shall be liabilities attributable to that Series. Each such allocation of liabilities, expenses, costs, charges and reserves by the Members shall be conclusive and binding upon Members of all

Series for all purposes. The liabilities attributable to any Series shall be enforceable against the assets of such Series only, and not against the General Assets, or the assets of any other Series. All Persons, including any Affiliates of the Members, who have extended credit that has been allocated to a particular Series, or who have a claim or contract that has been allocated to any particular Series, shall look, and shall be required by contract to look exclusively, to the assets held with respect to that particular Series for payment of such credit, claim or contract. In the absence of an express contractual agreement so limiting the claims of such creditors, claimants and contract providers, each creditor, claimant and contract provider will be deemed nevertheless to have impliedly agreed to such limitation unless an express provision to the contrary has been incorporated in the written contract or other document establishing the claimant relationship.

## Withdrawal of Contribution

17. No Member will withdraw any portion of their Capital Contribution without the supermajority consent of the Class A Voting Members.

## Liability for Contribution

18. A Member's obligation to make their required Capital Contribution can only be compromised or released with the consent of all Class A Voting Members or as otherwise provided in this Agreement. If a Member does not make the Capital Contribution when it is due, he is obligated at the option of the Class A Voting Members voting as a separate class, to contribute cash equal to the agreed value of the Capital Contribution. This option is in addition to and not in lieu of any other rights, including the right to specific performance that the Company may have against such Member.

## Additional Contributions

19. Capital Contributions may be amended from time to time, according to the business needs of the Company by supermajority vote of the Class A Voting Members.

20. Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by the Class A Voting Members, voting as a separate class. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

## Capital Accounts

21. An individual capital account (the "**Capital Account**") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

## Interest on Capital

MEGACAP CAPITAL, LLC Operating Agreement
Page 6 of 20

22. No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

## Management

23. The Class A Voting Members shall have the sole authority to appoint a manager of the Company (individually the "**Manager**" and collectively the "**Managers**"). Management of the Company is vested in the following Managers until such time as they are removed by the Class A Voting Members or withdraw from the position:

   A. Eli M Blatt, Managing Partner
   B. Marc Goldner, Managing Partner
   C. Roderyck Reiter, Managing Partner

24. The duties and responsibilities of the Managers will include the following:

   ● Managers will supervise the day-to-day operations of the Company including supervising sales and production staff and maintaining financial accounts.

25. Notwithstanding any other provisions contained in the Certificate of Formation or this Agreement, each of the Managers is empowered to bind the Company for any and all decisions except Major Decisions. A supermajority vote of the Class A Voting Members shall be required for all Major Decisions, except where a unanimous vote is expressly called for. Such votes may be accomplished via electronic mail, What's App, or any other written medium upon which the Class A Voting Members unanimously agree. For purposes of this Agreement, "**Major Decisions**" are the following:

   A. Incur debt, expend funds, write checks, pay bills, or enter into contracts, or otherwise obligate the Company for any amount in excess of $1,500.
   B. Negotiate or agree to an accounts payables/receivables payment schedule.
   C. Establish credit lines and the use of such credit lines.
   D. The sale or dissolution of the Company or its assets.
   E. Issuance of additional member or shareholder interests, which shall require a unanimous vote and be signed in writing by all Class A Members.
   F. Approval of a member or shareholder buy-sell agreement, approval of which shall not be unreasonably withheld.
   G. Scheduling repayment of any capital contributions from any Member.
   H. Selling, leasing, or encumbering any property owned by the Company.
   I. Scheduling repayment of any loans from Members.
   J. Changing or amending this Agreement or approving any action or resolution that would alter the terms of this Agreement, which shall require a unanimous vote and be signed in writing by all Class A Members.
   K. Appointment or removal of a Manager which shall require a unanimous vote and be signed in writing by all Class A Members excluding the Member being removed.
   L. Addition, withdrawal, appointment, or removal of a Member, which shall require a unanimous vote and be signed in writing by all Class A Members (unless the Member being removed is a

Class A Member, in which case the unanimous vote of the remaining Class A Members is required.

M. Amending the duties and responsibilities of any Manager.

N. Any changes to the Company Name, branding imagery, and public relations positioning.

O. Adjustments to the compensation of any Member, Manager, Employee, or contractor.

P. Payment of any distributions or other compensation to any Member beyond the monthly Distributions required in Section 15.

Q. Registering the company with any regulatory or governmental agency.

R. Creation of an additional Series within the MegaCap umbrella, which shall require a unanimous vote and be signed in writing by all Class A Members. For avoidance of doubt, any Series created for any entities such as additional SPVs or for any purpose defined in Section 16(a) for MegaCap will be approved by all Class A Members in writing.

S. Each Series equity percentage shall require a unanimous vote and be signed in writing by all Class A Members.

T. Each Series investment objective and policies will be defined by the Managers and shall be unanimously approved by all Class A Members signed in writing.

U. No manager shall move any "General Assets" to any Series without unanimous approval by all Class A Members.

V. No Class A Members shall take on personal liability or personal obligations of MegaCap unless expressly approved and unanimously approved by all Class A Voting Members.

26. A new Manager may be added to the Company with a supermajority vote of the Class A Voting Members.

27. A Manager will be reimbursed for reasonable expenses directly related to the operation of the Company and approved, in advance, by a supermajority of the Class A Voting Members (voting as a separate class).

28. The Members will be consulted and the advice and opinions of the Members will be obtained as much as is practicable. However, subject to Section 25 above, the Managers will have management and control of the day-to-day business of the Company for the purposes stated in this Agreement. All matters outside the day-to-day business of the Company will be decided by the Class A Voting Members (voting as a separate class) as outlined elsewhere in this Agreement.

A. In determining and selecting which manufacturing hardware partner and software partner to use for operations, only a simple majority vote of 51% will be required between the Members.

29. In addition to day-to-day management tasks and any other duties and responsibilities already identified in this Agreement, the Managers' duties will include keeping, or causing to be kept, full and accurate business records for the Company according to generally accepted accounting principles (GAAP), and overseeing the preparation of any reports considered reasonably necessary to keep the Class A Voting Members informed of the business performance of the Company.

30. A Manager will not be liable to the Members for any action or failure to act resulting in loss or harm to the Company except in the case of gross negligence or willful misconduct.

31. Each Member will devote such time and attention to the business of the Company as required to carry out their duties and responsibilities for the conduct of the Company's business.

## Authority to Bind Company

32. Only the Manager(s) have the authority to enter into contracts on behalf of the Company.

## Duty of Loyalty

33. While a person is a Member or Manager of the Company, and for a period of at least two years after that person ceases to be a Member or Manager, that person will not carry on, or participate in, a business involved in the issuance or transacting of securities in any market regions that were established or contemplated by the Company before or during that person's tenure as Member or Manager.

## Duty to Devote Time

34. Each Member will devote such time and attention to the business of the Company as the supermajority of the Class A Voting Members (voting as a separate class) will from time to time reasonably determine for the conduct of the Company's business. Should a Member or Members be deemed by supermajority vote of the Members voting thereon to be in violation of this provision, those Members will be subject to Involuntary Withdrawal as per Section 43.

## Member Meetings

35. A meeting may be called by any Class A Voting Member providing that reasonable written notice has been given to the other Members.

## Voting

36. Each of the Class A Voting Members shall have one vote for each Unit owned by such Class A Voting Member.

37. INTENTIONALLY LEFT BLANK

## Admission of New Members

38. A new Member may only be admitted to the Company with a supermajority vote of the Class A Voting Members.

39. No new Class A member shall be admitted as a Member of the Company until such new Member becomes a party to this Agreement, as amended, and agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Member will execute such documents as are needed to effect the admission of the new Member as determined by a supermajority vote of the Class A Members. Any new Member will receive such

business interest in the Company as determined by a supermajority consent of the Class A Voting Members as reflected the execution of an updated schedule of Membership Interests.

## Voluntary Withdrawal of a Member

40. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

41. INTENTIONALLY LEFT BLANK

## Involuntary Withdrawal of a Member

42. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; felony conviction of a Member; or a legal judgment against a Member (excluding any judgment resulting from any litigation relating to Marc Goldner) that is pending as of the effective date hereof) that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member has engaged in conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member, including not devoting time to the Company as required per Section 34.

43. The involuntary withdrawal of a Member will have no effect upon the continuance of the Company.

## Dissociation of a Member

44. In the event of either a voluntary or involuntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member. The purchase amount of any buyout of a Member's Interests will be determined as set out in the Valuation of Interest section of this Agreement.

45. A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

46. Where the remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 60 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company.

NOT A CERTIFIED COPY

### Sale, Transfer, or Assignment of a Member's Interest; Drag-Along

47. No Member may sell, transfer or assign any of such Member's Interest, including, but not limited to, any Units owned by such Member, without the supermajority written consent of the Class A Voting Members. Where a Member's financial interest in the Company is assigned to another party who is not an existing Member, that party will be considered a New Member. An assignment of full membership status inclusive of all duties, obligations, and rights held by the previous Member will be governed by the conditions described under the Admission of New Members section of this Agreement.

48. **Drag-Along Rights.** In the event that the Class A Voting Members receive a bona fide offer from an independent third party purchaser to purchase (including by merger) all of the outstanding Units or all or a substantial portion of the assets of the Company, the Class A Voting Members may send written notice (the **"Drag-Along Notice"**) to the Company and the remaining Class B Members (the **"Class B Members"**) notifying them they will be required to sell all of their Units in such sale. Upon receipt of a Drag-Along Notice, each Class B Member receiving such notice shall be obligated to (a) sell all of the Class B Member's Units contemplated by the Drag-Along Notice on the same terms and conditions as the Class A Voting Members; and (b) otherwise take all necessary action to cause the consummation of such transaction. Each Class B Member further agrees to (a) take all actions (including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by the Class A Members; (b) waive all applicable appraisal rights, if any, under the laws of the State of Delaware; and (c) appoint the Class A Members as the Class B Member's attorney-in-fact to do the same on its behalf. Notwithstanding the foregoing, no Class B Member may sell or assign such Member's Units, in whole or in part, under this Section without the express prior written approval and consent of a Supermajority of Class A Voting Members.

### Right of First Purchase

49. In the event that a Member's Interest in the Company is or will be sold, due to any reason other than as said forth in section 48 above, the remaining Members will have a right of first purchase of that Member's Interest. The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

50. In the event that a Member's interest in the company is transferred or assigned as the result of a court order or operation of law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

### Valuation of Interest

51. In the event of a sale of all or substantially all of the Units and/or assets of the Company, a Member's financial interest in the Company will be based in the percentage of Units owned in proportion to all of the issued and outstanding Units of the Company at the time of such sale.

52. In the absence of a written agreement setting a value, the value of the Company will be based on an appraisal of the fair market value of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members to be retained within a reasonable period of the event giving rise to the disposition of a Member's interest. The results of the appraisal will be binding on all Members. The intent of this section is to ensure the survival of the Company despite the withdrawal of any individual Member.

53. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

## Dissolution

54. The Company may be dissolved by a unanimous vote of the Class A Voting Members. The Company will also be dissolved on the occurrence of events specified in the Act.

55. Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

    A. First, in satisfaction of liabilities to creditors except Company obligations to current Members;

    B. Second, in satisfaction of Company debt obligations to current Members;

    C. Third, to the Class A Members up to the amount of their Capital Contributions;

    D. Fourth, to the Class B Members up to the amount of their Capital Contributions; and

    E. Finally, to all of the Members based on Member financial interest, as set out in the Valuation of Interest section of this Agreement.

## Records

56. The Company will at all times maintain accurate records of the following:

    A. Information regarding the status of the business and the financial condition of the Company.

    B. A copy of the Company federal, state, and local income taxes for each year, promptly after becoming available.

    C. Name and last known business, residential, or mailing address of each Member and Manager, as well as the date that person became a Member or Manager.

D.  A copy of this Agreement and any articles or certificate of formation, as well as all amendments, together with any executed copies of any written powers of attorney pursuant to which this Agreement and any amendments have been executed.

E.  The cash, property, and services contributed to the Company by each Member, along with a description and value thereof.

57.  Each of the Class A Voting Member has the right to demand, within a reasonable period of time, a copy of any of the above documents for any purpose reasonably related to their interest as a Member of the Company, at their expense.

58.  Each Manager has the right to examine the above documents for any purpose reasonably related to their position as Manager of the Company.

## Books of Account

59.  Accurate and complete books of account of the transactions of the Company will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any of the Class A Voting Members. The books and records of the Company will reflect all the Company's transactions and will be appropriate and adequate for the business conducted by the Company.

## Banking and Company Funds

60.  The funds of the Company will be placed in such investments and banking accounts as will be designated by the unanimous vote of all Class A Members. All withdrawals from these accounts will be made by the duly authorized agent or agents of the Company as appointed by supermajority consent of the Class A Voting Members. Company funds will be held in the name of the Company and will not be commingled with those of any other person or entity.

## Audit

61.  Any of the Class A Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Company. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Class A Voting Members for any fiscal year.

## Tax Treatment

62.  The Company is intended to be treated as an S-Corp for the purposes of Federal and State Income Tax.

## Annual Report

63.  As soon as practicable after the close of each fiscal year, the Company will furnish to each Class A Voting Member an annual report showing a full and complete account of the condition of the Company

including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

    A.  A copy of the Company's federal income tax returns for that fiscal year.

    B.  Income statement.

    C.  Balance sheet.

    D.  Cash flow statement.

    E.  A breakdown of the profit and loss attributable to each Member.

## Goodwill

64.  The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

## Governing Law

65.  INTENTIONALLY LEFT BLANK

## Force Majeure

66.  A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to an event of force majeure, such as earthquake, typhoon, flood, fire, pandemic, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to the Company and to mitigate the effects of the event.

## Forbidden Acts

67.  No Member may do any act in contravention of this Agreement or prevailing law.

68.  No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company.

69.  No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

70.  No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

71. No Member may confess a judgment against the Company.

72. Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

## Indemnification

73. All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature whatsoever, arising out of a Member's participation in Company affairs pursuant to this Agreement. A Member will not be entitled to indemnification under this section for liability arising out of negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

## Liability

74. A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

## Liability Insurance

75. The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

## Life Insurance

76. The Company will not have the right to acquire life insurance on the lives of any or all of the Members.

## Amendment of this Agreement

77. No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all of the Class A Voting Members.

## Title to Company Property

78. Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member.

79. A breach of the Confidentiality Agreement

## Dispute Resolution

80. <u>Dispute Resolution</u>.   Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this <u>Section</u>. The initiation and pendency of the procedures under this <u>Section</u> does not relieve the Parties from their respective obligations under the Agreement.  ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS <u>SECTION</u> SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

    A.  Negotiations by and between the Parties.

    (1) Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail.  Within ten (10) days after receiving such notice, the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

    (2) Upon the Disputing Party's receipt of the Responding Parties' response, the Parties shall then have thirty (30) days, or such other time as they may mutually agree upon in writing, to resolve the Dispute amongst themselves.

    B.  Mediation

    If the Parties are not able to resolve a  Dispute pursuant to subsection (A) above,  they agree to participate in at least ten (10) hours of good faith mediation administered by the American Arbitration Association under its Commercial Mediation Procedures.

    C.  If the Parties are not able to resolve a Dispute pursuant to subsections (A) and (B) above, the Dispute shall finally be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association.   Nothing herein shall limit the right of any Party to seek interim or provisional equitable relief in a court of competent jurisdiction prior to or pending the      conclusion of the arbitration.  Any Arbitration shall take place virtually  unless the parties agree on a physical location.  The arbitrator shall apply the law of the State of Delaware without regard to conflicts of law principles.   No demand for arbitration may be made after the date when the institution of legal or equitable proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

81.  <u>Equitable Remedies</u>.  The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights

and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement. The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware. For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of *forum non conveniens.*

82. Prevailing Party. In the event that any Dispute between the Company and the Members or among the Members arising out of or related to this Agreement results in any formal proceedings, the prevailing party as determined by the arbiter or court of competent jurisdiction, as the case may be, shall be entitled to recover from the non-prevailing parties all reasonable fees, costs and expenses of enforcing any right of such prevailing party including, without limitation, reasonable attorneys' fees and expenses, including appeal costs, all of which shall be deemed to have accrued upon the commencement of such formal proceeding and shall be paid whether or not such formal proceeding is prosecuted to judgment. The "prevailing party" for purposes of this Section shall be the party who, in the arbitrator or judge's discretion, prevails on substantially all the merits in the Dispute, irrespective of the actual number of claims or counterclaims actually won or defeated. Any award, judgment or order entered in such formal proceeding shall contain a specific written statement of findings with respect to the prevailing party's recovery of fees and costs as contemplated under this Section, and shall include an award of pre-award or prejudgment interest running from the date of the breach at the maximum rate of interest allowed by applicable law.

83. Waiver of Certain Rights. AS A MATERIAL INDUCEMENT TO EACH MEMBER TO ENTER INTO THIS AGREEMENT, EACH MEMBER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO MAINTAIN ANY ACTION FOR DISSOLUTION OF THE COMPANY OR FOR PARTITION OF PROPERTY UNDER THE ACT. IN ADDITION, THE MEMBERS AGREE THAT THIS AGREEMENT HAS BEEN CAREFULLY DRAFTED TO PROVIDE FAIR TREATMENT OF ALL MEMBERS AND PARTICULARLY IN RESPECT OF EQUITABLE PAYMENT IN LIQUIDATION TO HOLDERS OF ECONOMIC INTERESTS. ACCORDINGLY, EXCEPT WHERE AND ONLY IF THE MANAGER OR LIQUIDATOR, AS THE CASE MAY BE, HAS FAILED TO LIQUIDATE THE COMPANY IN A REASONABLY TIMELY MANNER AS REQUIRED UNDER THIS AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES AND RENOUNCES ITS RIGHT TO INITIATE A LEGAL ACTION OR OTHER CLAIM TO SEEK THE APPOINTMENT OF A RECEIVER OR TRUSTEE TO LIQUIDATE THE COMPANY.

84. No Waiver. A Person's waiver of or consent to, express or implied, any breach or default by any Person as to the performance by such Person's obligations with respect to the Company, shall not constitute a waiver of or consent to any other breach or default by such other Person of the same or any other obligations with respect to the Company. Failure on the part of a Person to complain, provide notice of, or object to any action or inaction of any Person, or to declare any Person in breach or default with respect to the Company, irrespective of how long such failure continues, shall not constitute a waiver by such Person of its rights with respect to such breach or default, until the applicable statute of limitations period has run.

85. <u>Binding Effect</u>.  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective Personal Representatives, successors and permitted assigns.

86. <u>Parties in Interest</u>.  Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective Personal Representatives, successors and permitted assigns, and nothing in this Agreement shall be construed to relieve or discharge the obligation or liability of any Person to any party to this Agreement, or to provide any Person any right of subrogation or action over or against any party to this Agreement.

87. <u>Prevailing Terms</u>.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

88. <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances.

89. <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

90. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties hereto had signed the same document.  All counterparts shall be construed together and constitute the same instrument.  Signatures by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory and shall be deemed to be originals for all purposes.  The Members acknowledge and agree that it may be executed electronically, and that the provisions of the Electronic Signatures in Global and National Commerce Act of 2000, 15 U.S.C. 7001 et al, as amended and in effect as of the Effective Date of this Agreement, shall apply.

91. <u>Acknowledgment of Provisions</u>.  BY EXECUTING THIS AGREEMENT, EACH MEMBER ACKNOWLEDGES THAT IT HAS ACTUAL NOTICE OF: (A) ALL OF THE PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTERESTS; AND (B) ALL OF THE PROVISIONS OF THE ARTICLES.  EACH MEMBER HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES ADEQUATE NOTICE OF ALL SUCH PROVISIONS, AND EACH MEMBER HEREBY WAIVES ANY REQUIREMENT THAT ANY FURTHER NOTICE REQUIRED BY ANY PROVISION OF THE ACT OR APPLICABLE LAW.

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 18 of 20*

## Miscellaneous

92.  Time is of the essence in this Agreement.

93.  Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

94.  If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

95.  This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matter hereof, and may not be modified or amended except by a written instrument executed by or on behalf of authorized representatives each of Party to this Agreement.

96.  All notices or other communications relating to the performance, enforcement, or other legal aspects of this Security Agreement will be in writing and may be personally delivered, sent by overnight courier service to all parties, and delivered as a .pdf e-mail attachment to all parties. Any other communications between the parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to all parties.

97.  All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

## Definitions

98.  For the purpose of this Agreement, the following terms are defined as follows:

A.  "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

B.  "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

C.  "Distributions" means a payment of Company profits to the Members.

D.  "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

E. "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, Member's rights to participate in the management of the Company, and any Units of membership interest in the Company owned by such Member.

F. "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

G. "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

H. "Principal Office" means the office whether inside or outside the State of Delaware where the executive or management of the Company maintain their primary office.

I. "Voting Members" means the Members who belong to a membership class that has voting power.

J. "Supermajority Vote" means a vote by Members representing no less than 60% of the Class A Voting Units.

## SIGNED, SEALED, AND DELIVERED

**ELI M BLATT**

By: _____

**MARC GOLDNER**

By: *Marc Goldner* _____

**RODERYCK REITER**

By: _____

*MEGACAP CAPITAL, LLC Operating Agreement*
*Page 20 of 20*

## EXHIBITS

| | |
|---|---|
| Exhibit A | Redemption Agreement |
| Exhibit B | Confidentiality Agreement |

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Eli Blatt _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Confidential Information**

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

2. **Use of Confidential Information; Non-Disclosure Obligations**

2.1. Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2. The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3. The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

3.    **Compelled Disclosure**

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

4.    **Proprietary Rights**

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

5.    **Return of Confidential Information**

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

6.    **Term and Termination**

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

**7.**   **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

**8.**   **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

**9.**   **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

**10.**   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

**11.**   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

**12.**   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13. **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14. **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15. **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:    2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:    team@megacap.capital

If to Eli Blatt :

    Address:    2020 N Bayshore Dr #2310 Miami FL 33137

    E-Mail:    e@megacap.capital

16. **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                  **THE RECEIVING PARTY**

By: _____        _____

Name: Eli M Blatt                  Name: Eli Blatt

Title: Managing Member

Date: Jul 08 2021                  Date: Jul 08 2021

4

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of _____, (the "**Effective Date**") by and between **Eli M Blatt** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").   Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>333,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.     **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

   a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.     **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.     **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

MEGACAP CAPITAL, LLC
*Redemption Agreement*
*Page 2 of 4*

3.  **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.  **Member's Obligations**.

4.1  Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2  At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3  The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.  **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.  **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.  **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.  **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.  **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.   **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

MEMBER:

Individual
By: Eli Blatt
Its: Managing Member

THE COMPANY:

MEGACAP CAPITAL, LLC

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Eli M Blatt** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

NOT A CERTIFIED COPY

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Marc Goldner _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1.   Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

## 2.   Use of Confidential Information; Non-Disclosure Obligations

2.1.   Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2.   The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3.   The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

1

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.   The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.   **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

## 3.   Compelled Disclosure

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

## 4.   Proprietary Rights

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

## 5.   Return of Confidential Information

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

## 6.   Term and Termination

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.   **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.   **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.   **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13. **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14. **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15. **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

    Address:      2020 N Bayshore Dr. Apt 2310, Miami FL 33137

    E-Mail:      team@megacap.capital

If to  Marc Goldner      :

    Address:    15 Peacock Drive, Roslyn, NY 11576

    E-Mail:    m@megacap.capital

16. **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

MEGACAP CAPITAL LLC              THE RECEIVING PARTY

By: _____        *Marc Goldner* _____

Name: Eli M Blatt                  Name: Marc Goldner

Title: Managing Member

Date: Jul 08 2021                Date: Jul 08 2021

NOT A CERTIFIED COPY

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ___Jul 08 2021___, (the "**Effective Date**") by and between **Marc Goldner** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company").  Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member <u>234,000</u> units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.    **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

   a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.    **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.    **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 2 of 4

3.     **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.     **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.     **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.     **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.     **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.     **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.     **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 3 of 4*

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.    **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

MEMBER:

*Marc Goldner*
_____
Individual and Managing Partner of MegaCap Capital, LLC.

By: Marc Goldner
_____
Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: ▮▮▮▮▮▮ _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Marc Goldner** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 234,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**


By:_____
Name: Eli M Blatt
Title: Managing Member

## NON-DISCLOSURE AGREEMENT

This **NON-DISCLOSURE AGREEMENT** (the "Agreement") is entered June 18, 2021 (the "Effective Date") by and between: (i) **MEGACAP CAPITAL LLC** ("MEGACAP CAPITAL"); and (ii) Roderyck Reiter _____ (the "Receiving Party"). MEGACAP CAPITAL and the Receiving Party hereafter are collectively referred to as the "Parties."

**WHEREAS,** the Parties desire for BITSOURE to provide the Receiving Party with certain confidential and/or proprietary information (hereafter, and as defined below, "Confidential Information") in connection with the Receiving Party's business relationship with MEGACAP CAPITAL (hereafter the "Purpose"); and

**WHEREAS,** the Parties agree that the receipt and use of Confidential Information shall be governed by the provisions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1. Confidential Information

The term "Confidential Information" shall mean all written, electronic, and oral information disclosed by MEGACAP CAPITAL to the Receiving Party relating to the Purpose, including any such information disclosed prior to the Effective Date. The nature and existence of this Agreement are also considered to be "Confidential Information." The term "Confidential Information" shall not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party in violation of this Agreement; (b) is obtained by the Receiving Party on a non-confidential basis from a source that is not prohibited from disclosing such information; (c) is independently developed by the Receiving Party; (d) MEGACAP CAPITAL releases without restriction to a party other than the Receiving Party; or (e) MEGACAP CAPITAL authorizes the Receiving Party to disclose. In any action in which MEGACAP CAPITAL alleges that Confidential Information was disclosed in violation of this Agreement, the Receiving Party shall bear the burden of proving that the information disclosed was not Confidential Information within the meaning of this Paragraph 1.

### 2. Use of Confidential Information; Non-Disclosure Obligations

2.1. Subject to the provisions of Paragraph 3, the Receiving Party shall use Confidential Information only in connection with this Agreement and not for its/his/her own benefit or purposes or for the benefit or purposes of any third party.

2.2. The Receiving Party shall limit access to Confidential Information to its/his/her officers, directors, representatives, agents, and/or employees who are on a "need to know" basis and who are bound by written agreement or professional obligation to preserve the confidentiality of Confidential Information upon terms substantially in conformance with the terms of this Agreement. Should the Receiving Party desire to provide access to any other persons, including third parties, the Receiving Party must first obtain the approval of MEGACAP CAPITAL and secure such other persons' written agreement, a copy of which shall be provided to MEGACAP CAPITAL, to abide by the terms herein. MEGACAP CAPITAL shall be a third-party beneficiary of such written agreement, and the Receiving Party shall be liable for any breach by such other persons of such written agreement or the terms herein.

2.3. The Receiving Party shall employ reasonable procedures to prevent the unauthorized or inadvertent disclosure or use of Confidential Information. These procedures shall be at least as restrictive as the procedures currently being used by the Receiving Party to protect its/his/her own confidential and/or proprietary

information and, in any event, the Receiving Party shall employ no less than a reasonable degree of care. In the event the Receiving Party becomes aware of any unauthorized or inadvertent disclosure of Confidential Information, the Receiving Party shall promptly give notice thereof to MEGACAP CAPITAL. The Receiving Party shall not be liable for the inadvertent disclosure of Confidential Information, provided that the Receiving Party has used the aforementioned degree of care and that, upon discovery of any such inadvertent disclosure, the Receiving Party timely attempts to correct the effects thereof and prevent any further disclosure.

2.4.    The Receiving Party shall not reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that constitute, contain, or embody Confidential Information and which are provided to the Receiving Party hereunder.

2.5.    **ALL CONFIDENTIAL INFORMATION IS PROVIDED TO THE RECEIVING PARTY "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OR REPRESENTATION AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, OR SUFFICIENCY.**

## 3.    Compelled Disclosure

The Receiving Party may disclose Confidential Information to the extent required to comply with an order of a court of competent jurisdiction or governmental authority, provided that the Receiving Party gives MEGACAP CAPITAL timely notice, where reasonably practicable, of the contemplated disclosure so as to give MEGACAP CAPITAL an opportunity to intervene to preserve the information's confidentiality.

## 4.    Proprietary Rights

All Confidential Information furnished hereunder shall remain the property of MEGACAP CAPITAL and shall be held in trust and confidence by the Receiving Party. Neither this Agreement nor any disclosure of Confidential Information hereunder shall be construed as granting the Receiving Party or any other person any right (whether by license or otherwise) in relation to any patent, copyright, trade secret, trademark, or other intellectual property of MEGACAP CAPITAL.

## 5.    Return of Confidential Information

At the request of MEGACAP CAPITAL or upon expiration or termination of this Agreement, and subject to the Receiving Party's right to retain one (1) copy of Confidential Information solely for archival purposes, the Receiving Party shall promptly return all Confidential Information (and any copies thereof) or destroy it. In the event it destroys Confidential Information, the Receiving Party shall confirm such destruction in writing to MEGACAP CAPITAL. The Receiving Party shall also destroy (and certify such destruction in writing to MEGACAP CAPITAL any memoranda, notes, or other materials (whether written, electronic, or otherwise) that reflect or contain Confidential Information.

## 6.    Term and Termination

This Agreement may be terminated by either party upon ten (10) days' written notice. If it is not so terminated by either party, the Agreement shall remain in effect until the earlier of: (a) one (1) year from the Effective Date; or (b) such time as the Parties (i) mutually agree in writing that the Purpose has been completed or (ii) enter into a superseding agreement. Termination of this Agreement shall not abrogate or otherwise limit the Receiving Party's obligations regarding Confidential Information disclosed hereunder for a period of five (5) years, except with respect to trade secrets, as to which the Receiving Party's obligations regarding Confidential Information shall continue for so long as the trade secrets remain trade secrets.

7.    **Remedies**

The Receiving Party acknowledges that the covenants contained in this Agreement are fundamental for the protection of MEGACAP CAPITAL'S legitimate business and proprietary interests and agree that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause MEGACAP CAPITAL irreparable harm, the amount of which may be difficult to ascertain, and that MEGACAP CAPITAL shall have the right to apply to a court of competent jurisdiction (see Paragraph 8 below) for an order restraining any such further disclosure or misappropriation and for such other relief as MEGACAP CAPITAL shall deem appropriate. Such right of MEGACAP CAPITAL shall be in addition to the remedies otherwise available to MEGACAP CAPITAL at law or in equity, it being understood, however, that in no event shall the Receiving Party or any of its/his/her respective officers, directors, representatives, agents, or employees be liable for multiple or punitive damages.

8.    **Governing Law, Submission to Jurisdiction, and Consent to Suit**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. All disputes arising under this Agreement shall initially be referred to the Parties' senior management for resolution. In the event any such dispute is not resolved within thirty (30) days of the date it is first raised, it shall be resolved exclusively by action filed in the federal or state courts serving New Castle County, Delaware. The Parties hereby irrevocably waive any claim that they are not subject to the jurisdiction of those courts. The prevailing party in any dispute shall be entitled to its reasonable attorneys' fees and costs as well as expert witness fees.

9.    **Entire Agreement**

This Agreement contains and represents the entire agreement of the Parties and supersedes all prior agreements, representations, or understandings, oral or written, express or implied, with respect to the subject matter hereof. This Agreement may only be modified or amended in a writing signed by the Parties. No representation, promise, or inducement has been made by the Parties that is not embodied in this Agreement, and the Parties shall not be bound by or liable for any alleged representation, promise, or inducement not specifically set forth herein.

10.    **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

11.    **Severability**

In the event any provision of this Agreement is determined to conflict with the law under which the Agreement is to be construed, or any such provision is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be deleted from this Agreement and the Agreement shall be construed to give full effect to the remaining provisions thereof.

12.    **Relationship of The Parties**

This Agreement shall not be deemed to create a partnership or joint venture between the Parties. Likewise, nothing in this Agreement shall be construed as an obligation by the Parties to enter into a contract, subcontract, or other business relationship, or to bear each other's costs and expenses.

13.    **Assignments**

Unless otherwise agreed in writing, the Parties may not assign their rights or responsibilities under this Agreement.

14.    **Waiver**

The failure of either party to enforce any provision of this Agreement shall in no way be construed to be a waiver of such provision or to affect the validity of this Agreement or the right of the Parties to enforce the provisions thereof.

15.    **Notices/Points of Contact**

All notices required or permitted hereunder shall be provided in writing (email being an acceptable form of notice) as follows:

If to MEGACAP CAPITAL:

  Address:   2020 N Bayshore Dr. Apt 2310, Miami FL 33137

  E-Mail:   team@megacap.capital

If to  Roderyck Reiter                              :

  Address:   4661 NW 2nd Ave APT 603, Boca Raton, FL 33431

  E-Mail:   r@megacap.capital

16.    **Headings Non-Substantive**

The headings in this Agreement are for reference only and shall not affect the construction or interpretation of any provision.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the dates set forth below.

**MEGACAP CAPITAL LLC**                          **THE RECEIVING PARTY**

By: _____                      _____

Name: Eli M Blatt                                 Name:  Roderyck Reiter

Title:  Managing Member

Date: Jul 08 2021                                 Date:  Jul 08 2021

4

## MEMBERSHIP INTEREST REDEMPTION AGREEMENT

**THIS MEMBERSHIP INTEREST REDEMPTION AGREEMENT** ("Agreement") made as of ___Jul 08 2021___, (the "**Effective Date**") by and between **Roderyk Reiter** ("Member") and **MEGACAP CAPITAL, LLC** (the "Company"). Member and Company hereafter are collectively referred to as the "Parties."

### RECITALS

**WHEREAS**, pursuant to that certain Operating Agreement of MEGACAP CAPITAL, LLC (the "Operating Agreement"), the Company issued to Member 333,000 units of membership interest (the "Units") in the Company; and

**WHEREAS**, as consideration for the issuance of the Units to Member by the Company, the Parties hereto have agreed to enter into this Agreement pursuant to which Member agrees to the redemption of his Units in the Company as provided herein.

### AGREEMENT

**NOW THEREFORE**, in reliance on the foregoing recitals, as well as the mutual covenants contained herein, the Parties agree as follows:

1.      **Redemption**. Subject to the provision in 1(a) below, the Company may redeem Membership Units from a Member by delivering the "Redemption Notice" (attached as Schedule A hereto) to Member on or before the end of the fourth year after the effective date of the Operating Agreement (the "Redemption Deadline"). Upon delivery of the Redemption Notice by the Company to Member, the Company shall redeem the Units from Member, and Member shall sell, assign, convey and transfer the Units to the Company, free and clear of any and all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever (collectively, "Liens"), at a redemption price of US $0.00001 per Unit (the "Redemption Price").

          a.   For each month after the date of execution of the Operating Agreement until delivery of the Redemption Notice, the Member may retain 1/48th of his Units in the form of Class B Units, with the remaining Units subject to Redemption.

2.      **Redemption Notice**. The Redemption Notice shall be delivered by the Company to Member in writing and may be personally delivered, sent by overnight courier service to Member's last known mailing address, or delivered as a .pdf e-mail attachment to Member's last known e-mail address. Any other communications between the Parties may be conducted over telephone, email, or by other means reasonable under the circumstances and mutually acceptable to both parties.

2.      **Assignment**. Effective immediately upon delivery of the Redemption Notice by the Company to Member, Member does hereby convey, assign and transfer to the Company all of Member's right, title and interest in and to the Units, along with any and all rights appurtenant thereto, including, but not limited to, any right to receive any distribution of income earned by the Company. Member represents and warrants that (a) the Units constitute all of Member's membership interest in the Company, and (b) Member has good and marketable title to the Units, free and clear of all liens.

3.      **Payment of Redemption Price**. Upon assignment to the Company, the Company shall deliver the Redemption Price to Member by check or wire transfer in immediately available funds. The Redemption Price shall be delivered within 30 days of delivery of the Redemption Notice.

4.      **Member's Obligations**.

4.1     Member hereby grants to the Company a continuing security interest in the Units. Member shall not create, permit, or suffer to exist, and shall at its own expense defend the Units against, any lien or encumbrance on such Units except as provided herein, and shall defend such Member's rights in the Units and the Company's security interest therein against the claims of all persons and entities. Member shall not sell, assign, or otherwise dispose of the Units or any part thereof.

4.2     At any time and from time to time, upon the request of the Company, and at the sole expense of Member, Member shall promptly execute and deliver, or cause to be executed and delivered, all such further instruments and documents and take such further action as the Company may reasonably deem necessary or desirable to preserve and perfect its security interest in the Units and carry out the provisions and purposes of this Agreement.

4.3     The failure of Member to promptly comply with any of the Obligations described herein shall be considered an event of default and material breach of this Agreement (an "Event of Default").

5.      **The Company's Representations and Warranties**. The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement.

6.      **Binding Upon Successors and Assigns**. Subject to, and unless otherwise provided in, this Agreement, each and all of the covenants, terms, provisions, and agreements contained herein shall be binding upon, and inure to the benefit of, the permitted successors, executors, heirs, representatives, administrators and assigns of the Parties.

7.      **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties.

8.      **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties.

9.      **Amendment and Waivers**. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party

MEGACAP CAPITAL, LLC
Redemption Agreement
Page 3 of 4

to be bound thereby. The waiver by a party of any breach hereof for default in payment of any amount due hereunder or default in the performance hereof shall not be deemed to constitute a waiver of any other default or any succeeding breach or default.

10.     **Attorneys' Fees**. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover the costs of suit (including reasonable attorneys' fees),  regardless of whether such suit proceeds to final judgment. **Governing Law; Venue**. This Agreement shall be construed in accordance with the laws of the State of Delaware, and any suit, action or proceeding arising out of or relating to this Agreement shall be commenced and maintained in the state or federal courts serving Miami-Dade County, Florida.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**MEMBER:**

Individual and Managing Partner of MegaCap Capital, LLC

By: Roderyck Reiter

Its: Managing Member

**THE COMPANY:**

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Manager

NOT A CERTIFIED COPY

*MEGACAP CAPITAL, LLC*
*Redemption Agreement*
*Page 4 of 4*

## SCHEDULE A
## REDEMPTION NOTICE

**Date:** _____

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Roderyk Reiter** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").

2. Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").

3. Effective as of the date hereof, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.0001 (the "Redemption Price").

**MEGACAP CAPITAL, LLC**

By: _____
Name: Eli M Blatt
Title: Managing Member

## RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF
## THE VOTING MEMBER OF MEGACAP CAPITAL, LLC

The undersigned, being the sole Voting Member of **MEGACAP CAPITAL, LLC** (the "**Company**") hereby adopt the following resolutions and take the following actions by unanimous written consent on **Friday April 28, 2023** (the **"Effective Date"**) in lieu of a meeting and is to deemed effective immediately:

### PREAMBLE

1. Eli M Blatt ("**Blatt**") is an individual who owns 50% of the Company in the form of Class A Shares and is the only voting Member or Manager of the Company.
2. Marc J Goldner ("**Goldner**") is an individual who owns 50% of the Company in the form of Class B shares.
3. Blatt and Goldner are both parties to the *Operating Agreement of Megacap Capital, LLC* (the "**Operating Agreement**"). A copy of the fully executed Operating Agreement is attached hereto as **Exhibit A**.
4. The Forbidden Acts in Sections 67 and 69 do not require judicial review or determination and are at the sole discretion of the Company when determining whether to withdraw a Member.
5. Goldner has himself affirmed that the Members themselves are the sole arbiter of whether another Member has committed the forbidden act of making it impossible to carry on the ordinary course of business by making repeated threats to unilaterally withdraw Blatt; in his case, Goldner did so simply because Blatt disagreed with his approach to an agreement, notably his aggressive harassment and threats towards Blatt, but also as regards legitimate concerns regarding liability to the Company.
6. Goldner has on numerous occasions made personal threats against Blatt as well as his fiancé relating to his desire to receive unapproved expense reimbursement in excess of that provided for in the operating agreements, which has resulted in both Blatt and his fiancé feeling unsafe (**Exhibit B**), which has made it impossible to carry on the ordinary business of the Company.
7. Goldner has made unfounded claims to have connections to the criminal underworld and various unnamed intelligence and spy agencies, for whom he has clearly stated he is not an employee but works as an informal independent contractor on a bounty basis, which have amplified the seriousness of his threats.
8. Goldner has since December 2022 repeatedly transmitted threats against Blatt and his family's lives, allegedly on behalf of one of the Members of one of Megacap's creditors, however he has refused to provide any evidence of such threats (**Exhibit C**).
9. Goldner was instructed that if he were to continue transmitting threats without proof thereof he would be deemed to be making the threats himself yet continued to do so.
10. On April 19, Goldner escalated his threats to include direct blackmail and extortion threats against Blatt using files he obtained through unauthorized use of a computer, actions which are felonies and misdemeanors under US Federal and State laws (**Exhibit D**) and thus represent contraventions of law.
11. Goldner's actions made Blatt feel compelled to file for a restraining order for cyberstalking, for which there is a hearing scheduled on May 15, 2023 in Miami Dade.
12. Goldner has further committed civil theft, fraud in the inducement, and unjust enrichment as detailed in a Florida legal case now being prepared for filing.
13. As a result, Blatt no longer feels comfortable engaging directly with Goldner, making it impossible to carry on the ordinary business of the Company
14. Goldner's threats have made it "impossible to carry on the ordinary business of the Company" and constitutes a clear contravention of prevailing law and of his fiduciary duties as General Partner.
15. Goldner refused to allow the Company to complete its K1s in a timely manner by tying critical tax matters to demands prioritizing his own financial interests, as documented in the 2023 resolutions,

which were executed by Blatt under threats to his and his family's lives transmitted by Goldner as well as threats against the Company to fail to file K1s timely, which Marc's actions did in fact result in, and which represent a breach of his fiduciary duty.

16. Goldner and Blatt executed that certain 2023 Resolutions document which laid out terms which, once completed, would void any attempted withdrawal of a Member, however the Members have since unanimously agreed pursuant to Goldner's April 8, 2023 email that those terms have not been completed and that thus redemption pursuant to the terms of the operating agreement is permitted.

17. Goldner has made repeated threats to involuntarily withdraw Blatt for disagreeing with him on how to handle an agreement with the Company's Limited Partner and Creditor, Little Prince, with respect to which Blatt had numerous legitimate reservations and regarding which Goldner repeatedly threatened him, as well as for requiring him to communicate with Blatt via Blatt's assistant given the threats he has made towards Blatt, making it impossible for Blatt to participate in the Company being able to carry on the ordinary business of the Company.

18. Goldner has acknowledged breaching his fiduciary duty and committing fraud and fraud in the inducement against the Company's Limited Partner and Creditor, Little Prince, by lying to and manipulating them for his own financial gain by stating his willingness to enter into agreements that he can subsequently invalidate on the basis of the distress he has placed Blatt under in his attempts to get Blatt to execute them, as well as by manipulating them by lying to them about interactions between him and Blatt (**Exhibit E**).

19. Goldner breached the Partners' standard agreed course of dealings in contract negotiations in a manner that breached his fiduciary duty by approving his own tracked changes without any notice to or consent by Blatt of such changes, as evidenced by the comments to those sections left in place and the lack of any turnaround by Blatt of a version received with the tracked changes and returned with them accepted to the 2023 Resolution Consent, thus deceiving Blatt into unwittingly signing the Resolution on the assumption that Goldner had honored their course of dealings and rendering the agreement invalid; these changes granted Golder expense reimbursement well in excess of that provided by the operating agreement; in a manner Blatt had clearly told him on principal Blatt would never approve given how Marc had threatened him over the issue (**Exhibit F**); for expenses incurred securing contacts and opportunities for his own exclusive benefit and that of other companies; for expenses that were not approved or even reviewed by Blatt or the Company; and at the expense of Blatt's equal right to claim expenses, representing a breach of fiduciary duty and a breach of trust that has made it impossible to carry on the ordinary business of the Company. (**Exhibit G**).

20. Goldner further blatantly breached his fiduciary duty to the Company and made it impossible to carry on the ordinary business of the Company by denying it a safe banking partner by refusing to setup new company bank accounts, despite the fact that First Republic Bank is at risk of failing, in order to justify maintaining Company funds for his own benefit.

21. In the process of refusing to open new bank accounts, Goldner defamed and Slandered Blatt with Bank of America as well as other Megacap partners by claiming Blatt effectively stole or otherwise transferred funds from the Company to Goldner Blatt Investments, LLC (GBI), transfers of which he was demonstrably aware (**Exhibit H**) and which funds he used to make personal charges on an Amex company card as well as approved payments to GBI legal counsel, making it impossible to carry on the ordinary course of the business.

22. After Blatt send Goldner a demand letter for $422,188.55 relating to a personal matter unrelated to the Company, Goldner threatened in writing on a chat with Limited Partners and Creditors to jeopardize company and its assets if Blatt did not refrain from pursuing his legitimate charges, for which Blatt has in fact already filed a lawsuit (**Exhibit I**), representing an additional instance of extortion.

**NOW, THEREFORE, BE IT RESOLVED,** that in part as a result of his actions detailed herein, Goldner has breached his obligations to the Company and his involuntary withdrawal as a Class A Member and Manager

from the Company is hereby amended and reaffirmed pursuant to the following sections of the Operating Agreement:

1. **Section 41**, which states that "Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to… breach of fiduciary duties by a Member", a Member "willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members", and engaging "in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member"
2. **Section 67**, which states "No Member may do any act in contravention of this Agreement or prevailing law."
3. **Section 69** which states "No Member may do any act that would make it impossible to carry on the ordinary business of the Company."

**FURTHER RESOLVED,** that, effective immediately upon Goldner's initial involuntary withdrawal as a Class A Member of the Company, the only remaining voting member is Blatt.

**FURTHER RESOLVED,** the Company has awarded Goldner his equivalent Membership interests in the Company in the form of Class B non-voting shares, thus retaining his full economic interests in the Company.

**FURTHER RESOLVED,** In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

**FURTHER RESOLVED,** If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances, and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances. Under no circumstances shall a technical failure as regards the implementation of this withdrawal or the timely service of appropriate documents invalidate the withdrawal, but rather shall be cause to cure such defects.

This Written Consent is executed as of the Effective Date by the Voting Members of the Company.

**MEGACAP CAPITAL, LLC**

By:_____
Name:  Eli M Blatt
Title:   Managing Member

**EXHIBIT B**
**INITIAL THREAT**

On Jun 19, 2022, 1:09 PM −0400, Marc Goldner <marc@gb.investments>, wrote:
You're brain dead. I am not going to sell my crypto or use every dollar I have to cover you defaulting when this is how you're acting. You've fucked yourself bro and if you want me as an enemy honestly you're about to see how I can be.

I'll make this business the most difficult it can be.

You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me.

**EXHIBIT C**
**REPEATED THREATS**











**EXHIBIT D**
**EXTORTION THREAT**



# EXHIBIT E
## ATTEMPTS TO DECEIVE LIMITED PARTNERS





**Marc Goldner**

Hi Laren! Hope you've been well and school pickups aren't driving you crazy lol I had a quick question for you. If we were to repay one of our capital partners in shares instead of cash, would they be able to be on the GlobalX cap table instead of having to hold our company's interest in Neuralink? This would be about $500k in equity just FYI.

We financed a large part the shares we bought from you with a promissory note. It looks like we might need to repay that promissory note with the shares. The investor is US LLC (Wyoming) and it is a relatively large chunk ($500k±). I hope this would be OK with you?

We understand if this is something that risks the SPV and not something you are willing to do we just need to know.                                                                                  10:37 AM

**Laren Pisciotti**

We can not do any transfers of your ownership- you would need your lp to subscribe to you.                                                                                                                    10:40 AM

                                                                                 **3 UNREAD MESSAGES**

**Marc Goldner**

| Laren Pisciotti
| We can not do any transfers of your ownership- you would need your lp to subscribe to you.

Thanks. That's all. Just as expected!                                                                     12:26 PM



**Anthropos x Megacap**
Celina, Lily, Marc, You

                                                              SATURDAY

**Marc Goldner**

@Eli M Blatt I told them they can't just be direct on GlobalX captable that u and Laren Wont approve it                                                                                                       9:46 AM

I explained that even if I were to help them sell in their own entities they have to setup it'll cost them 50k so it's the same thing as interest waiver and you'll have to give me a waiver to sell for them                                                                                             9:48 AM

Now let's sit and see if it works     9:48 AM

I also explained that i wanted to be on captable and u refused with me being directly on globalx                                                                                                              10:29 AM

                                                              YESTERDAY

**Marc Goldner**

@Eli M Blatt how much was the SpaceX fees for the deal we got Jiri? How much would we have been entitled to EXACTLY if he had funded and didn't kill that deal                                                12:28 AM

I understand your position that those fees should be cancelling out any interest because that's his fault and it cost us the relationship supplier who won't work with us anymore after so many bids and looking bad totally get ur position thanks                                               12:29 AM

Ahhhhh I get ur position now so ur saying u redeemed rod bc u thought that moni would continue bringing and referring LPs but that didn't pan out how u expected                                           12:31 AM

**Celina Moreno**

Hi Marc, as you are well aware Eli has not communicated with you by phone or videoconference since February, and has since recently not been communicating with you directly in any medium. I just confirmed with him that both of the above positions you are attributing to him are false — he has said no such things to you nor does he maintain these positions.                                                                                             10:51 AM

## EXHIBIT F
## THREATENING EMAIL OVER EXPENSE REIMBURSEMENT

From: Eli M Blatt e@gb.investments
Subject: Re: Summarizing what was discussed / agreed
Date: Jun 19, 2022 at 11:26:12 AM
To: Marc Goldner marc@gb.investments
Cc: m@gb.investments

If/when there's revenue, obviously we can cover expenses.  There's no revenue.
I'm not sure what you want from me?

On Jun 19, 2022, 1:09 PM -0400, Marc Goldner <marc@gb.investments>, wrote:
You're brain dead. I am not going to sell my crypto or use every dollar I have to
cover you defaulting when this is how you're acting. You've fucked yourself bro
and if you want me as an enemy honestly you're about to see how I can be.

I'll make this business the most difficult it can be.

You try to fuck me and pretend we didn't already agree on the below then you're
in for a rude awakening. I told you. Do not fuck with me.

Best,
Marc Goldner

## EXHIBIT G
## BREACH OF COURSE OF DUTY AND FIDUCIARY DUTY



**MC Expenses**

1. Eli and Marc will both get a one-time $30K expense reimbursement from MC for any expenses incurred from the start of TRIUM through time of payment, paid out by MegaCap once Jiri is fully repaid with at least $90K in additional MC bank balance above and beyond Jiri's repayment. Eli agrees that if his expenses do not add up to $30,000 then he will not take the full $30,000 expense reimbursement. However, if Jiri is not repaid and is given Neuralink shares instead of being repaid, then this reimbursement for Marc's expenses and Eli's Wayaca front end due will be paid out upon the first exit where carry is awarded to MegaCap (i.e. the Betterment carry once Betterment IPOs) pursuant to the above $90K bank balance existing to cover it.  The Wayaca front end due to Eli will also be paid at this time.

2. Thereafter, total expense reimbursement will be capped at 2.5% each of total Profits (5% total between both partners) from MegaCap and GBI for Expenses as per below.

3. If going forward either of us travels and we close a deal for GBI or funding for MC, we can have reimbursement for documented expenses incurred on the trip on which that deal was put together or a contact was made that subsequently closes something equal to the lesser of $10K of expenses for the trip in question (with a trip being any period of time extending from when Marc or Eli leave their home-base to when they return there, and can last up to one year) or 5% of profit (net front end) generated from the first close by contacts established directly or indirectly during that trip applied to flights, food, networking events, extracurriculars with potential LPs or Suppliers, Taxies/Ubers/Travel, Travel Insurance, rental cars, rental boats/ferry's, hosting events, hotels, and transportation (busses, rental cars etc) only for any given deal/trip that results in a new contact making an investment that generates profit/front end unless otherwise agreed (e.g. we agree to pickup a tab for a potential LP dinner). For example, Marc making contact with Thibaut which led to an introduction to Moni and Jiri which provided us the necessary capital partner to acquire the early Neuralink would entitle him to the lesser of $10K of expenses from that trip or 5% of the profits from those LPs.

4. If we are going to attend conferences or events, we can also discuss in advance having MC / GB pay for conference fee, flight, and hotel on a case-by-case basis on top of the above reimbursement procedure.

1. Eli will get a one-time $21k expense reimbursement from MC for any expenses incurred from the start of TRIUM through time of payment, and Marc will get a one-time $30K expense reimbursement from MC for any expenses incurred from the start of TRIUM through time of payment, paid out by MegaCap once Jiri is fully repaid with at least $100K in additional MC bank balance above and beyond Jiri's repayment (of LP Shares if it is agreed to unanimously by the Class A Members of MegaCap, and upon repayment of the Promissory Notes for Little Prince and Bear General, as well as the rebate for Jiri). However, if Jiri is not repaid and is given Neuralink shares instead of being repaid, then this reimbursement for Marc's expenses and Eli's Wayaca front end due will be paid out upon the first exit where carry is awarded to MegaCap (i.e. the Betterment carry once Betterment IPOs) pursuant to the above $100K bank balance existing to cover it.  The Wayaca front end due to Eli will also be paid at this time and Marc's additional $20,000 incurred in 2022 will be paid at this time.

2. Thereafter, total expense reimbursement will be capped at 2.5% each of total Profits (5% total between both partners) from MegaCap and GBI for Expenses as per below.

3. If going forward either of us travels and we close a deal for GBI or funding for MC, we can have reimbursement for documented expenses incurred on the trip on which that deal was put together or a contact was made that subsequently closes something equal to the greater of $10K of expenses for the trip in question (with a trip being any period of time extending from when Marc or Eli leave their home-base to when they return there, and can last up to one year) or 5% of profit (net front end) generated from the first close by contacts established directly or indirectly during that trip applied to flights, food, networking events, extracurriculars with potential LPs or Suppliers, Taxies/Ubers/Travel, Travel Insurance, rental cars, rental boats/ferry's, hosting events, hotels, and transportation (busses,



**EXHIBIT H**
**GOLDNER WAS AWARE OF THE TRANSFERS HE ALLEGES BLATT COMMITTED THEFT OF**



## EXHIBIT I
## GOLDNER THREATENING MEGACAP OVER PERSONAL MATTERS



**Marc Goldner**

I am happy to bring to light other issues as well. First off, you wired Anthropos fees PRIOR to there ever being a 'consulting agreement'. So instead of having Celina messaging me while you refuse private communication with me outside of this chat (you are NOT some busy executive, Eli, you're just a spoiled trust fund kid who has never worked a real day in his life in his life who claims they need approval from 'mom' for almost anything), let's not have Celina ask me if she initiated a BofA account setup for MegaCap without the rhetorical response of, "Didn't Eli also take $70,000 out of MegaCap and sent it to GBI unauthorized?". Any way you slice it Eli, I NEVER authorized that funds transfer and our Operating Agreement is clear that transactions of that magnitude **REQUIRES UNANIMOUS APPROVAL of ALL MANAGING PARTNERS.** You have breached your fiduciary duty and will be removed as such for your breaches that have put MegaCap's shares at risk. You have risked the entire portfolio and if Laren gets wind of this and of any perceived dispute she will most likely redeem MegaCap so I suggest you start cooperating and stop hiding behind your assistant to speak on your behalf for everyone's sake because your actions are risking millions of dollars of shares and it will be my job to ensure your removal from this situation. I am giving you a chance to come clean and correct this. You need to stop saying behind closed doors that you are only signing agreements with Little Prince because you are under duress, no one buys it. Honor your word, obligations, and promises and cut the crap out and start conducting business as it's supposed to be done. I once again am going to kindly suggest, take your mark-up and carry and walk away from MegaCap. You clearly have no intention of selling anything to anyone as you're hiding the fact that you have gotten other jobs from everyone in this chat. How about being honest for once in your life instead of causing drama like a teenage girl? I understand being around a child like Emily can easily rub off on you but you need to work on your professional decorum and learn how to conduct legitimate business without risking everyone else's time, money, and energies. I know you have a habit of bringing everyone else around you for your own personal woes and unsustainable lifestyle but that has to stop TODAY. I will not allow you to drag MegaCap through the mud like all your other failed business attempts because you can't accept that a mining comany hasn't delivered our miners, that you haven't paid your balance due on ANOTHER unrelated business, and because you have not honored your agreement with LPs from TRIUM to start an NFT Fund, nor wired the promised amounts of NFTs, not even mentioning fraudulently inducing me to invest with you under the disguise that you had private placements like with Bond that would be shared with me after your 'mom approved it' (which she did). The game you're playing here Eli will wind up dragging this into a Federal Court that will have a tortious discovery process that could reveal not just people's names, but has the impact of creating a regulatory securities risk with agencies such as the SEC. I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've 'stolen' your money and tying it back to MegaCap by refusing to operate this business in good faith. Thanks!

7:35 PM

---



**Marc Goldner**

Eli, I am giving you a chance to cut this shit out. You do not want to escalate this where discovery will be all inclusive. Your drug charges will come to light, your infractions will come to light, your parole will come to light, your probation officer will come to light, your continued drug use (which I have evidence of) will come to light. I really suggest that you rethink your actions here. I am not threatening you, I am merely telling you that I don't think you understand that the reaches of a federal court action sees no limits in relation to discovery. You are digging yourself into a hole and Laren is going to get wind of this and likely redeem MegaCap which means we will have to repay the mark-up we earned. Do not do this or you will be held liable for breaching your fiduciary duty. I really don't want to have to sue you, Emily, and your mom but if you force my hand I will be left with no choice. Do the right thing, pay your balance due and debts, and walk away peacefully and keep the monies we've earned so we can both move on from each other and live our lives. Thanks.

8:41 PM

## REDEMPTION NOTICE

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Marc Goldner** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**"), the Company hereby notifies Member as of May 22, 2023 (the "Effective Date") as follows:

1. Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement") and the MegaCap Operating Agreement Resolution and Updated Terms ("Amendment").

2. Pursuant to the Amendment, the Company issued to Member 330,000 Units of membership interest in the Company (the "Units"), with 330,000 Units issued to Eli Blatt, 330,000 Units issued to Rod Raiter ("Reiter"), and 10,000 of issued Units held in trust by the Company.

3. Pursuant to the Reiter Redemption Agreement dated March 24, 2022, the Company fully redeemed the 330,000 Units granted to Reiter, increasing the Units held in Trust by the Company to 340,000.

4. Pursuant to the Operating Agreement and Amendment, the Units issued to Members are subject to redemption following a vesting schedule of three (3) years commencing on the date of the Amendment, December 8, 2021.

5. Effective as of the date hereof, the Company hereby redeems 170,274 Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of US$0.00001 (the "Redemption Price"), for a total "Redemption Value" of $1.70.

6. Member is currently illegally in possession of $18,146.70 of Company funds member is refusing to return to the Company; the Redemption Value due is hereby deducted from the Company funds being illegally held by Member, reducing the total Company funds being held by Member to $18,145.00

**MEGACAP CAPITAL, LLC**

By: _____

Name: Eli M Blatt

Title: Managing Member

May 23 2023

## RESOLUTIONS ADOPTED BY WRITTEN CONSENT OF THE VOTING MEMBERS OF MEGACAP CAPITAL, LLC

The undersigned, being Voting Members of **MEGACAP CAPITAL, LLC** (the "**Company**") hereby adopt the following "Goldner Class B Withdrawal" resolutions and take the following actions by unanimous written consent on **Tuesday, September 2, 2025** (the **"Effective Date"**) in lieu of a meeting and is to be deemed effective immediately:

### INVOLUNTARY WITHDRAWAL OF MARC J GOLNDER AND PURCHASE OF MEMBERSHIP UNITS

**WHEREAS,** Marc J. Goldner ("Goldner") remains a Class B Member of the Company after having his unvested Membership Units redeemed and his vested Membership Units converted to Class B units upon his withdrawal and redemption from the Company in 2023 for breaches of fiduciary duty and committing Forbidden Acts.

**WHEREAS,** subsequent to his withdrawal, Goldner committed numerous additional breaches of fiduciary duty and forbidden acts, as detailed extensively in Megacap Capital, LLC v. Goldner (1:24-cv-24385), District Court, S.D. Florida (the "Megacap Lawsuit").

**WHEREAS,** the Company has determined that it is in the best interest of the Company to completely dissociate Goldner from the Company by way of an involuntary withdrawal for the breaches of fiduciary duty and forbidden acts detailed in the Megacap Lawsuit committed subsequent to his prior withdrawal and redemption, including but not limited to the Partner Breaches, sending the November 2023 Letter, and the offenses detailed in the RICO Count.

**WHEREAS,** the involuntary withdrawal of a Member for breaches of fiduciary duty or the forbidden acts detailed in Megacap Operating Agreement ("OA") Sections 67-72 do not require judicial review or determination and are at the sole discretion of the Company when determining whether to withdraw a Member.

**WHEREAS,** because the Company and Goldner are actively engaged in litigation, the Company has selected an independent auditor independently referred by the Company's accountant for the purposes of valuing Goldner's Membership Units pursuant to OA Sections 44, 46, and 51-53.

**WHEREAS,** the Company's accountant has informed the Company that, given that the Company's liabilities exceed its assets and the Members have no deficit restoration obligations per the OA, the GAAP valuation will produce a $0 valuation.

**NOW, THEREFORE, BE IT RESOLVED,** that in part as a result of his actions detailed in the Megacap Lawsuit, Goldner has breached his obligations to the Company and his involuntary withdrawal as a Class B Member of the Company is hereby effectuated  pursuant to the following sections of the Operating Agreement:

1. **Section 42:** which states that "Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to... breach of fiduciary duties by a Member."
2. **Section 67:** which states "No Member may do any act in contravention of this Agreement or prevailing law."
3. **Section 68:** Which states "No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company."
4. **Section 69:** which states "No Member may do any act that would make it impossible to carry on the ordinary business of the Company."

5. **Section 71:** Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

**FURTHER RESOLVED,** The remaining Members have elected to exercise their rights to purchase Goldner's remaining Membership Units pursuant to OA Sections 44, 46, and 51-53. Given the anticipated $0 GAAP valuation, Goldner will be sent $1 upon service of this notice by the remaining Members as consideration for his Membership Units.

**FURTHER RESOLVED,** Pursuant to OA Section 46, the Company will provide Goldner the final GAAP valuation upon completion; should any additional payment be due for his Membership Units the remaining Members will remit that within 60 days of this notice per OA Section 46 or provide notice of rescission of purchase.

**FURTHER RESOLVED,** Per OA Section 45, Goldner will only have liability to the Company for his negative capital account balance per the date of his dissociation and no liability for any Company obligations thereafter.

**FURTHER RESOLVED,** Should Goldner object to the GAAP valuation commissioned by the Company, he may within 15 days of receipt thereof provide the Company a list of five national and/or international auditor firms with no less than 50 accountants on staff to conduct a secondary valuation at his sole expense to be paid upfront prior to the valuation. The Company shall select one from the list and be the primary point of contact for the auditor once Goldner has made payment, which shall be done within 15 days of the Company's selection of the auditor.

**FURTHER RESOLVED,** Should Goldner's prior redemption be deemed to have been calculated incorrectly or otherwise be overturned, his full Membership Unit count is hereby being purchased for $1 based on the anticipated $0 GAAP valuation, which is possible given the $0 valuation produced by the GAAP valuation. Should the GAP valuation produce a non-zero valuation, the remaining Members shall have the ability to determine whether to proceed with the purchase by supplementing the required payment or rescind the purchase.

**FURTHER RESOLVED,** In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles or (b) any mandatory provision of the Act (including any other mandatory statutory provision incorporated into the Act), the applicable provision of this Agreement shall prevail and govern (to the extent permitted by applicable law).

**FURTHER RESOLVED,** If any provision of this Agreement or the application thereof to any Person is held by a court of competent jurisdiction to be invalid or unenforceable to any extent, such provision shall be severed from this Agreement only to the extent invalid or unenforceable, with no effect to the remaining provisions of this Agreement, which shall remain in full force and effect. The application of any such invalid or unenforceable provision so held in one circumstance shall not affect its validity or application to other Persons in other circumstances and shall be enforced to the fullest extent permitted by law unless held invalid or unenforceable as to Persons in other circumstances. Under no circumstances shall a technical failure as regards the implementation of this withdrawal or the timely service of appropriate documents invalidate the withdrawal but rather shall be cause to cure such defects.

By:_____   Sep 02 2025

Name:  Eli M Blatt

Title:  Managing Member

By:_____   Sep 02 2025

Name:  Eli M Blatt on behalf of Anthropos, LLC

Title:  Managing Member



## MEGACAP REDEMPTION NOTICE

**Date:** 3/24/22

In connection with that certain Membership Interest Redemption Agreement (the "Redemption Agreement") by and between **Roderyk Reiter** ("**Member**") and **MEGACAP CAPITAL, LLC** (the "**Company**", jointly "the Parties"), the Company hereby notifies Member as follows:

1) Member and the Company are parties to that certain Operating Agreement (the "Operating Agreement").
2) Members and the Company are parties to a certain updated terms as defined in the Memorandum of Understanding (the "MOU"), serving as an addendum to the Operating Agreement.
3) Pursuant to the Operating Agreement, the Company issued to Member 333,000 Units of membership interest in the Company (the "Units").
4) Effective as of the date hereof, per the agreement between the parties, the Company hereby redeems the Units from Member free and clear of all security interests, liens, encumbrances, charges, claims, charges, assessments and restrictions of any type or nature whatsoever at a redemption price of $15,000, already remitted to the Member in shares of MegaCap Funds, LP - Tech I (the "Redemption Price") as consideration for the redemption.
    a) For avoidance of Doubt, the Member shall still receive the specified carry compensation delineated in Memorandum of Understanding signed on December 18, 2021 for CivRobotics, SpaceX, and the first Betterment deal (but not on the SPV for Betterment). For avoidance of doubt, the member will not receive any economics including but not limited to front end and/or carry for anything related to MegaCap Funds, LP – Tech I or any other deals and/or SPVs going forward from the date of this redemption.
5) The parties agree to sign an NDA, Non-Disparagement agreement, and Non-Defamation agreements.
6) With the Company's consent on a deal-by-deal basis, Member shall have the option to participate as a Special LP and earn 5% issuer fee for his referrals to that SPV.
7) For the avoidance of doubt, this constitutes a full redemption of all the Member's interests in the Company per the agreement between the parties.


**MEGACAP CAPITAL, LLC**

By: ███
Name: Marc Goldner
Title: Managing Member
Date Signed: 04 / 03 / 2022


**RODERYK REITER**

By: ███
Name: Roderyck Reiter
Title: Managing Partner
Date Signed: 03 / 24 / 2022


By: ███
Name: Eli M Blatt
Title: Managing Member
Date Signed: 03 / 23 / 2022



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA (MIAMI DIVISION)

Case No. 1:23-CV-24819

ELI M. BLATT, individually and derivatively on
behalf of Goldner Blatt Investments, LLC,

      Plaintiff,

v.

MARC J. GOLDNER, RACHEL KORSEN,
SIMON DIVILOV, and THE DHARMA
INITIATIVE, LLC,

      Defendants and Counter-Plaintiffs,

v.

ELI M. BLATT,

      Counter-Defendant, and

MegaCap Capital, LLC, MegaCap Funds, LP,
MegaCap Funds, LP – Tech Holding, MegaCap
Funds, LP – Tech I, Little Prince Equity, LLC,
Thibaut Denonain, Michael Elkins, Wayaca,
LLC, Flow, Inc., BitSource, LLC, JPMorgan
Chase & Co., and Bank of America Corporation,

      Third Party Defendants.

_____/

**DECLARATION OF ELI M. BLATT**

I, Plaintiff and Counter-Defendant, ELI M. BLATT, declare as follows:

1.     I, ELI M. BLATT, am over 18 years of age and have personal knowledge of the contents of this declaration. This declaration is submitted for consideration by the Court for any lawful purpose.

2.     This statement serves to document the full extent of abuse I suffered personally by way of Defendant Marc J. Goldner's ("Goldner") litany of malicious communications to me, as

1

well as the damage he caused Megacap Capital, LLC ("Megacap" or the "Company") by way of repeated breaches of his fiduciary duties.

3.     I am an investor in various alternative investments, including shares of pre-IPO companies through Special Purpose Vehicles ("SPVs").

4.     I am the originator of the idea to found Megacap, which serves as the General Partner for several such SPVs, including Megacap Funds, LP - Tech Holding ("MCTH") and Megacap Funds, LP- Tech I ("MCTI"), both series of Megacap Funds, LP.

5.     I named the Company and incorporated it, secured the registered agent and fund administrator, filed for the EIN, and purchased the domain names with the aid of my administrative assistant for Megacap and the series of its affiliated entities, Megacap Funds, LP.

6.     I met Goldner through our MBA Program, TRIUM.

7.     Although I did not realize it at the time, on information and belief, Goldner had been sued multiple times already and has now been sued around a dozen times by numerous defendants claiming, among other things, breach of contract, fraud, and harassment.

8.     Many of the lawsuits against Goldner center on his conduct in the board game community, where he has become a notorious figure to the point where there are news articles published and numerous Reddit and other community threads about his misdeeds and the resulting lawsuits against him[1].

---

[1] https://thetabletoptribune.com/how-golden-bell-broke-its-reputation-with-the-tabletop-community/
https://www.abbynews.com/news/abbotsford-woman-wins-legal-battle-over-board-game-on-reality-t-v-s-the-peoples-court-1796685
https://icv2.com/articles/news/view/53233/oh-no-creator-webcomic-name-raises-almost-250-000-legal-fees
https://boingboing.net/2022/11/11/alex-norris-creator-of-the-webcomic-name-battles-boardgame-company-that-claims-to-own-it-oh-no.html
https://downthetubes.net/webcomic-name-cartoonist-alex-norris-continues-battle-for-his-creation/
https://boardgamegeek.com/thread/2967724/the-oh-no-comics-guy-is-suing-marc-goldner-and-sta
https://boardgamegeek.com/thread/2369510/it-looks-like-a-new-lawsuit-against-marc-goldner-g
https://boardgamegeek.com/thread/2334403/golden-bells-marc-goldner-lose-legal-battle-on-rea
https://boardgamegeek.com/thread/2749497/a-sixth-lawsuit-against-golden-bell-studios-and-ma
https://boardgamegeek.com/thread/2193183/lawsuit-details-for-those-concerned-about-golden-b
https://boardgamegeek.com/thread/2337663/golden-bell-on-the-peoples-court
https://boardgamegeek.com/boardgamepublisher/35902/golden-bell-games/forums/0
https://boardgamegeek.com/thread/2400986/peoples-court-10th-april-marcs-greatest-hour-is-at

9.      Goldner's history of improper conduct and harassment also led to his company, Golden Bell, being banned from Kickstarter.

10.     Goldner is so reviled in the board game community that one content creator suing him raised over $250,000 via a GoFundMe specifically to fund his litigation against Goldner.

11.     Not knowing the extent of the claims against him at the time and having a false sense of security from what little I did know by virtue of him being admitted to TRIUM, I agreed to enter into business with Goldner, including inviting him to join me in founding Megacap.

12.     Two companies that we founded together are relevant to the instant case, the Counterclaim, and the Motion for Temporary Injunctive Relief: Goldner Blatt Investments, LLC ("GBI") and Megacap (including the MCTH and MCTI SPVs it manages).

13.     As detailed in the Second Amended Complaint, GBI was conceived by Goldner primarily as a means for Goldner to defraud me.

14.     Using GBI, he induced me to wire in excess of Four Hundred Twenty-two Thousand Dollars ($422,000), ostensibly to purchase NFTs and bitcoin miners (equipment hosted by a third party for the purposes of generating bitcoin for the investor) for GBI.

15.     In fact, he purchased the NFTs for himself and the Miners for Dharma and, to this day, Goldner and Dharma are in sole possession of all the assets purchased in part or in full with my funds.

16.     I am not alone in being defrauded by Goldner:

---

https://boardgamegeek.com/geeklist/259248/golden-bell-affiliated-projects-and-companies
https://boardgamegeek.com/thread/1950215/concerns-about-golden-bell-and-deliveryfuture-of-d
https://www.metafilter.com/184772/Im-in-law-school-Kelsey
https://www.reddit.com/r/boardgames/comments/edth3t/golden_bells_marc_goldner_lose_legal_battle_on
https://www.reddit.com/r/boardgames/comments/yq1jnd/webcomic_artist_alex_norris_vs_golden_bell/
https://www.reddit.com/r/boardgames/comments/m3scjn/how_golden_bell_broke_its_reputation_with_the/
https://www.reddit.com/r/boardgames/comments/ewuiyi/golden_bell_studios_officially_suspended_from/
https://www.metafilter.com/197119/oh-no
https://twitter.com/Xeliassame/status/1772698973993656378
https://x.com/JakeNelsonMN/status/1590046120352579584

a. three of our TRIUM peers wired Goldner directly $100,000 for interests in NFTs and have received no benefit for their bargain whatsoever, with Goldner retaining their funds and providing them no value for therefore; and

b. at least two other investors solicited by Goldner to invest in bitcoin miners remitted to him excess of $150,000 over three years ago for the purchase of miners to be hosted through Compass Mining, as did I, and have not received a fraction of a bitcoin or any other value in return—Goldner simply took their money, allegedly bought miners, and returned them nothing they were due or promised.

17.     I realized that Goldner misled me as to the use of my funds in May 2022, at which point I began a protracted process of negotiating to secure some benefit from the NFTs and the miners for which deposits were paid.

18.     Unfortunately, despite nearly a year of diligent effort to secure some benefit of my bargain, my efforts would ultimately all be in vain.

19.     On June 19, 2022, after unsuccessfully pressuring me to grant him Thirty Thousand Dollars ($30,000) in expense reimbursement via Megacap in order for me to get any benefit of my bargain for the NFTs and miners, Goldner wrote me an email stating, "I'll make this business the most difficult it can be. You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me."

20.     This was the first instance of a breach of his duty of care towards me, and I could not have possibly imagined at the time how serious he was in his promise to torment me or how much damage it would cause me as well as Megacap.

21.     At this point, although I wanted no further entanglement with Golder, I had a fiduciary duty to continue working with him on Megacap despite his increasing hostility towards me.

22.     At the same time, I also needed to get the value of the funds he had stolen from me, and so I issued him a very courteous but firm demand letter in July, 2022 (*See* Exhibit A to this Declaration).

23.     Given that the value of the NFTs had plummeted after he refused my call for GBI to sell them (which is how I realized that GBI did not in fact own them or the miners), there was no realistic chance for a return of my funds.

4

24.     As a result, I was willing to remain in an NFT SPV with him and our three TRIUM peers who had wired him funds for NFTs in order to accomplish a viable settlement and ensure our peers would receive value for their investments.

25.     Unfortunately, Goldner kept insisting on conditions such as his company, Golden Bell, receiving exclusive financial benefits from the SPV, as well as for him to receive Thirty Thousand Dollars ($30,000) in compensation over which he had previously threatened me.

26.     With regard to the miners, Compass Mining had agreed to allow Goldner to transfer to me the miners I had paid deposits on, at which point I would have been responsible for any future balances due thereon.

27.     This should have been an easy matter to resolve, as Goldner could simply have transferred to me the miners my funds had paid the deposits on and settled that matter.

28.     But Goldner refused and instead demanded I send him more money for future balances after it was clear he had already misappropriated the funds I had remitted, making that a non-starter for me.

29.     I had no reason to believe he would honor any commitments to me given his threats and actions.

30.     I tried unsuccessfully to secure the benefit of my funds for nearly a year, with Goldner never agreeing to give me any value for the money I had wired without demanding onerous and unacceptable terms just to receive what was already due to me.

31.     All the while, in order to honor my fiduciary duties to Megacap and its investors, despite my legitimate grievances with Goldner, I kept our GBI dispute separate from Megacap.

32.     Goldner, however, did not.

33.     Having managed to  defraud me successfully (for the time being) via GBI, he was now emboldened and began becoming increasingly abusive in his dealings with me regarding Megacap to the detriment of the Company.

34.      Goldner first sought to improperly leverage his claim that I somehow owed him more money for miners he purchased for Dharma with my misappropriated funds in order to threaten me with imperiling Megacap's ongoing operations, which undeniably constitutes a breach of his fiduciary duty to me and to the Company:

  a. In a December 9, 2022 WhatsApp message on Megacap's official internal Company "WhatsApp Channel," Goldner explicitly and improperly tied his

willingness to manage critical Megacap business to me making concessions in my personal claims involving GBI, stating that the two issues were "intertwined" for him.

b. Goldner reaffirmed in the Megacap WhatsApp Channel on December 16, 2022 that his willingness to cooperate on critical Megacap business was tied to me personally paying him at least One Hundred Thousand Dollars ($100,000.00), writing, "I cannot commit to a new fund admin when you owe me over $100k," referring to alleged additional balances due on miners whose deposits I paid for but which were owned by Dharma and that he had refused to transfer to me. Note at that time the miners had not even been delivered by Compass.

35.   Goldner thus conditioned acting in Megacap's best interests on me acquiescing to a personal settlement with him on matters entirely unrelated to the Company, a clear cut breach of his fiduciary duty to Megacap and to me.

36.   Around this same time, Goldner began pressuring me to file inaccurate and likely fraudulent tax returns for the Company not showing the Company's MCTI management fees as having been earned in full upon receipt in order to reduce his own tax liability.

37.   To rationalize his position, he wrote: "The management fee shouldn't be 5% up front, the 5% is held in trust" on December 12, 2022 in the WhatsApp Channel.

38.   However, I had consulted with Megacap's fund administrator, legal counsel, and accountants, all of whom had confirmed that the MCTI governing documents had the General Partner earning its management fees upon each LP's closing.

39.   And, as a practical matter, the Company distributed the management fees from MCTI to Megacap and used them to purchase assets for MCTH.

40.   But Goldner didn't care. He insisted that he would not allow taxes to be filed that showed the Company had earned the management fees, as he wanted to reduce his own pass-through tax liability–even if it meant filing fraudulent returns that disadvantaged the Limited Partners by reducing their tax write-offs and increasing MCTI's tax preparation fees.

41.   In addition to his desire to avoid paying taxes on Megacap fees earned and his willingness to leverage my imagined debt to him as a means to extort me into acquiescing to his demand to file fraudulent tax return, Goldner became obsessed with signing an interest waiver

6

agreement ("Interest Agreement") with our creditor, Little Prince, LLC ("Little Prince"), managed by Jiri Novotny ("Jiri").

42.    A key provision that Little Prince wanted to include was for Megacap to waive its rights to repay their loan in equity of the portfolio company ("TECH") that the proceeds of the loan were used to purchase derivative equity in at its basis price.

43.    I felt strongly that waiving this right had the potential to bankrupt the Company, as we had not subscribed many LPs to MCTI in nearly a year due to a downturn in the cryptocurrency market, which substantially affected the pre-IPO market.

44.    In fact, the right to repay the loan in shares was the only reason I had ever consented to borrowing the funds in the first place, as it meant there was no possibility the Company could default on the loan.

45.    And so, to protect the Company and its investors, I steadfastly refused to concede on this point and was willing to repay the loan in shares if need be.

46.    He believed the Interest Agreement would benefit him derivatively by reducing interest payments due on the Company's loan with Little Prince to his benefit, and to justify using extortive means to pressure me into signing it. (He seems to have convinced himself that Little Prince would kill us both if we did not sign the agreement, even though there is not a shred of evidence to support that delusion[2].)

47.    In fact, as detailed below, Goldner himself would later admit that he was motivated by derivatively saving interest due on the loan.

48.    Motivated by greed and fueled by his delusion, Goldner's harassment, abuse, and threats towards me escalated exponentially, making it increasingly impossible to carry on the ordinary course of business for Megacap given his increasingly erratic behavior and nearly daily threats towards me.

49.    In WhatsApp messages to me on December 8, 2022, Goldner insisted we speak over video conference rather than communicate in writing, allegedly about Company tax matters "too complex" to discuss over WhatsApp.

---

[2] This is not the only instance where Goldner has exhibited delusional behavior. He has told me and others that he believes he has been chased by assassins as part of his activities as a "freelance spy" for various unnamed government agencies tasked with taking down the hacktivist collective, Anonymous, going so far as to write language to that basic effect into the GBI Operating Agreement to support his claims of having valuable "mutual contacts."

50.     During the ensuing conversation, however, Goldner in fact wanted to again pressure me into agreeing to the Interest Agreement.

51.     This time, however, over a WhatsApp call instead of by our usual messaging, presumably in order to avoid threatening me in writing, Goldner transmitted a threat to my physical safety, allegedly on behalf of Jiri, telling me that someone would "show up at [my] door and break [my] knees" if I did not agree to the Interest Agreement.

52.     While Goldner claimed to have these threats in writing, he refused to share any screenshots with me.

53.     Instead, he arranged a video conference with his father who supposedly read messages from Goldner's phone and said something along the lines of that they contained "some not so nice things."

54.     Nonetheless, I was unwilling to breach my fiduciary duty to the Company and endanger its ability to protect the interests of its Limited Partners ("LPs") by agreeing to an agreement I knew could bankrupt the Company.

55.     Goldner's threats and harassment continued relentlessly for the next month, including by posting a long personal attack against me and my then-fiancé on the Company's official WhatsApp Channel, which includes contractors and affiliates of the company, in a series of December 31, 2022 messages, in a way that denigrated me and the Company which is yet another instance of Goldner breaching his duties of care and loyalty.

56.     At this point, Goldner's constant abuse and threats to my safety had started impacting my mental health, causing me to begin to withdraw from ongoing real time communications with him.

57.     This led me on January 12, 2023, to write to Goldner to "please email me with any [Megacap] or other business" instead of writing messages in the Company's WhatsApp group, on which Goldner had been relentlessly bombarding me with abusive messages.

58.     In response, the next day, he wrote in a WhatsApp chat including Megacap Little Prince and other LPs: "Honestly Eli? I'm sick and tired of your forbidden acts. *I will vote to have you involuntarily removed.*" (emphasis added).

59.     The following day, he wrote me again on the BitSource, LLC Whatsapp channel for good measure:

8

"@Eli this is notice that you are in breach of the Operating Agreement. *You are committing a Forbidden Act and will be involuntarily removed...* I suggest that you formally withdraw rather than fighting this… Your behavior is not just unethical but is deplorable. I am tired of this behavior and your inaction for your failure to devote time to this business or *any business* that we are a part of in a meaningful way. Thanks for your understanding in this matter." (emphasis added).

60.     To be clear, Goldner's only alleged cause for his threats to withdraw me from Megacap was my refusal to submit tax returns I believed to be fraudulent or agree to an Interest Agreement I believed would likely bankrupt the Company, both of which Goldner wanted primarily to benefit him financially by way of reduced passthrough tax liability and his derivative share of the Company's interest obligations. He also objected to the fact that I was no longer willing to suffer his constant abuse and had relegated him to using email to contact me via my assistant as a means to protect myself.

61.     Goldner's messages caused me to legitimately fear that he would involuntarily withdraw me, given that he was plainly stating his intention to do so, a course of action that despite all his threats, abuse, extortion and fraud against me I had never once made towards him, even though I had ample cause to withdraw and redeem him.

62.     Upon carefully studying the OA, I came to the conclusion that the way the OA is structured, Goldner could indeed unilaterally withdraw me from the Company, as he threatened.

63.     Even if such withdrawal was not for legitimate reasons, it was clear to me that were he to do so, it would force me to arbitrate or file suit in order to have the withdrawal overturned and, in the meantime, the Company and our Limited Partners and creditors would be at the mercy of his increasingly erratic behavior and reckless, self-interested decision-making.

64.     Given Goldner's theft of over Four Hundred Twenty-two Thousand Dollars ($422,000) from me, forcing me to sell my condo in Miami, I did not have the resources at that time to challenge him were he to involuntarily withdraw me.

65.     As I had come to the conclusion at that point that I believed him to not only be unethical but also mentally ill, I felt compelled to protect the Company and our investors.

66.     Accordingly, given that I had unequivocally legitimate cause to withdraw him, I exercised that right in furtherance of my fiduciary duty to the Company.

67.     I thus drafted a formal Company consent for Goldner's involuntary withdrawal on the basis of his transmitted threats to injure me, breaches of fiduciary duty, and actions that were

9

making it impossible to carry on the ordinary business of the Company, in strict accordance with the terms of the OA  (the "IW").

68.     The IW was drafted with an effective date of January 16, 2023 and executed via Eversign on January 17, 2024.

69.     Upon drafting the IW, on January 16, 2023, I emailed Megacap's then counsel to inform him of the IW, writing:

> Things with Marc have been going dramatically downhill.  I'm concerned he may try to spuriously involuntarily withdraw me from Megacap, and I have a fiduciary duty to the Company and our LPs to not leave him solely in control.  He also has been preventing us from filing our taxes, which I suspect he is doing to pressure me on the miner/NFT issue. Sending this just for the record to confirm the effective date as accurate in the event he later tries to withdraw me.  As of now, he is withdrawn unless/until I void the agreement.  Hopefully he doesn't go too far off the rails. Sigh.

70.     Much to my dismay, Goldner would indeed go further and further "off the rails."d

71.     In the meantime, the OA does not require notice of withdrawal to a Member; it only requires notice in the event of redemption.

72.     Given that my withdrawal of Goldner was not financially motivated, I did not redeem him at that time, as clearly indicated in the IW.

73.     My only goal was to prevent me from being withdrawn and thus ensure proper, ethical, and legal management of the Company.

74.     By effectuating the IW but not redeeming or notifying him, I could insure against his increasingly erratic behavior and protect the Company from it without creating a maelstrom of chaos.

75.     In the end, I only managed to delay the chaos.

76.     Having failed to pressure me into signing the Interest Agreement by way of transmitting death threats against me, Goldner expanded his harassment to include my *mother*.

77.     In iMessage group messages on January 27, 2023 including me and mother, Goldner:

   a.   tried to ascertain my physical location, causing me to fear for my safety;

   b.   transmitted threats to my "safety";

   c.   claimed there was a "safety risk";

   d.   stated I was putting my "family's lives at risk"; and

e.   said "I don't think you understand what they will do to us. Do you think this is some kind of fucking game?

78.   I responded: "I will not stand for any more of these threats to my safety. If you persist, you will force me to file a restraining order against you, because you are legitimately giving me cause to fear for my safety."

79.   Goldner would repeat these threats several times via WhatsApp and email, writing on March 18, 2022 "you can get fucked to hell brotha… what do you think they're going to do to us if we repay in shares."

80.   Between his January messages copying my mother and the March 18 message, my mental health had started to decline as a result of his harassment and the theft he had perpetrated on me.

81.   I began not sleeping well, waking up anxious, and ultimately entered into therapy in order to try and manage the stress he was putting on me.

82.   As much as I wanted nothing to do with him, I had a fiduciary duty to protect Megacap and its LPs from his increasingly unhinged behavior, as a result of which I was, admittedly, afraid of what might happen were I to notice him of his withdrawal.

83.   As March rolled around, I became increasingly concerned about the March 15, 2023 tax filing deadline for Partnerships.

84.   Goldner leveraged this concern to again attempt to force me into all manner of concessions relating to Megacap and GBI, as well as again to grant him individually the $30,000 he had become obsessed with.

85.   Accordingly, under the ongoing threats to my life and my fear that I had no choice but to reason with him in order to get him to go along with accepting tax filings (since, even though I had already withdrawn him, I was basically afraid of him and what he might do were I to formally notice him of such), I went along with his pressure to enter into the so-called Megacap "Resolutions," executed on February 13, 2023.

86.   Although I realized that any resolutions we signed would not be valid given (i) the fact that I was under legitimate duress by way of the death threats against me and my sense that I had no choice but to negotiate with him in order to ensure the Company could timely file taxes; and (ii) the fact that I was the only Class A Member and could thus void them at will, I

11

nonetheless carefully considered the structure of the Resolutions in order to protect the Company in the event they were ever found to be enforceable.

87.     Thus, I was careful to ensure that, in general, the Resolutions were just that: they "resolved" many things but didn't actually "effectuate" anything, as all the major resolutions had conditions precedent and/or required further consents and agreements subject to a Class A vote.

88.     Additionally, all of the resolutions applied to Class A Members, which Goldner was not.

89.     Where my goal was to protect the Company, Goldner's goals with the Resolutions were (i) to force me to stay in business with him, as he was incapable of running the Company alone (which is why despite all his threats he never withdrew me); (ii) to enrich himself via a convoluted assignment of MCTH equity directly to him at the expense of the Company, which would then no longer be able to earn fees on those shares; (iii) to reduce his own pass-through tax liability; and (iv) to finally get the $30,000 he had been threatening and pressuring me about for over 8 months that as a result of his first threat against me I had explicitly stated I would never to grant him out of principle (yet he managed to trick me into agreeing to by not tracking the changes granting him that consideration in the final draft).

90.     In the end, the Resolutions, which were not valid to begin with for the reasons detailed above, actually did not effectuate anything because, as detailed more thoroughly in the written opposition to the Motion to Dismiss Defendants' Counterclaim ("MTDC"):

    a.  The conditions precedent for preventing and invalidating Member withdrawal were never completed, which he himself affirmed months later on April 8, 2023 when threatening yet again to withdraw me, writing: "*The terms haven't been completed.*" (emphasis original just so he could drive home his ability to withdraw me).

    b.  The convoluted "Option and Loan Agreement" described in the Resolutions, which Goldner wanted in order to enable him to assign Company-owned TECH equity directly to him without any tax consequences, was never drafted let alone executed as clearly required by the Resolution, nor was the formal assignment of a portion of the option (which was further also only available to Class A Members) by way of a "boilerplate assignment agreement."

NOT A CERTIFIED COPY

c.   More generally, all of the Resolutions explicitly required a further vote by the Class A Members to effectuate or had conditions precedent that were never met, and all the benefits Goldner sought to grant himself were only available to Class A Members (which he was not), and so the entire Resolution ultimately lacked any real effect.

91.   For all his greed and abusive tactics, Goldner was ultimately not very savvy and failed spectacularly to accomplish his goals to disadvantage me and the Company for his benefit.

92.   Given that Goldner had already been withdrawn and the Resolutions were invalid to begin with, and the fact that I was under acute duress during that entire period and did not actually consent to anything Goldner was pressuring me into, the Company formally rescinded and voided the Resolutions on October 15, 2023, and no assignment of Company-owned TECH or other equity or funds was ever distributed to me, directly or indirectly.

93.   Unfortunately, executing the Resolutions did not placate Goldner, and he immediately turned his sights back on pressuring me to execute the Interest Agreement by way of increasingly hostile and threatening messages.

94.   This led me on March 19, 2023 to write to Goldner by email that "I cannot and will not continue working under the current environment of constant, near daily threats against me, nor am I under any obligation to do so. Despite what you seem to think, you do not have the right to verbally abuse me — or anyone for that matter."

95.   In a March 23, 2023 email to me in reference to his threats surrounding the Interest Agreement and my desire to file taxes timely, Goldner wrote: "I do not give a flying fuck if you believe it's real or not. You need to come to terms that nothing is going to proceed [with Megacap taxes] until we're on the same page and that our lives aren't [sic] at risk because of your inaction," referring to my refusal to sign the Interest Agreement even under threat to my and my family's lives.

96.   On April 4, 2023 in response to two follow-up emails that day pressing me to sign the Interest Waiver Agreement, I wrote Goldner:

"I am not going to commit fraud against a [sic] little prince, which is what you are urging me to do, by signing a document that you have already acknowledged, and I have already states [sic] would not be not valid due to the duress that you have placed me under… I am hereby again instructing you in no uncertain terms stop contacting me. I deem your continued aggressive and persistent messages to be harassment on matters I have already told you where I stand and for which your main purpose is to force me into doing things

you want me to do by placing me under emotional distress. You sent me at least five long harassing and threatening [email] messages on Sunday alone… Any additional emails to me directly will be deemed by me to be harassment, as I already DM [sic] your prior emails to be given that I had clearly instructed you I did not want to be threatened, abused, or harassed by you over email or WhatsApp."

97.     Rather than respect my request to direct his communications to my assistant, Goldner expanded his campaign of harassment in his reply by blackmailing me under threat of disclosing confidential files relating to unrelated litigation for a Company I was managing to the opposing party in that case that he had stolen if I didn't acquiesce to his demands, sharing the name of a zip file he had made of a Google Drive folder of mine without authorization over a year ago, clearly with the intent to secure leverage to extort me.

98.     I shared the distress Goldner was causing me with the Company's then lawyer to whom I had previously sent the IW, writing him in messages between April 3-4:

"When I see am (sic) email come in from him my heart rate spikes. He has waged a campaign of terror against me. I'd like immediately consult on whether I have grounds to file a restraining order… Marc has ruined my life for a year now… I've developed an anxiety disorder basically because of him… I'm having a nervous breakdown… I'm past my limit and [I] do not know what to do… Somewhere Marc is laughing… At a certain point it's just all too much. Losing my money. Losing my home. Multiple court cases. More theft from me. Unceasing psychological warfare against me."

99.     Around this same time, Goldner had also been directing unhinged and unfounded threats directed at First Republic Bank, where Megacap banked.

100.    As a result of his aggressive communications with the bank, I received a call in or around April, 2023 from our banker at First Republic, Morgan Elgebali, notifying me that he was going to report Goldner's threats to his superiors and that most likely Megacap would be dropped as a customer.

101.    Between that, the banking crisis of 2022, and some Megacap account being closed and others put under protective services by First Republic due to Goldner's threats towards it, the Company determined that to safeguard its funds while I secured it another banking partner, Goldner and I would each receive temporary distributions of Eighteen Thousand One Hundred Forty-six Dollars and Seventy Cents ($18,146.70) to hold in trust (the "Funds in Trust") until such time as they could be deposited into a new Company account.

102.    Goldner agreed that until such time they could be deposited into a new Company account, he would use the Funds in Trust to perfect an arbitration award against a Limited

14

Partner who defaulted on his capital contribution, which he never did, nor did he ever return the funds to the Company, as detailed further below.

103.   All the while, he continued writing inappropriate messages in breach of his fiduciary duty to me and the Company in the WhatsApp channel with several LPs and Little Prince:

    a.   expressing a desire to avoid personal taxable income by having the Company breach MCTI's governing documents;

    b.   threatening to withdraw me from the Company for refusing to sign the Interest Agreement and not acquiescing to his demands to file fraudulent tax returns for his personal tax benefit;

    c.   admittedly and wilfully deceiving Little Prince by knowingly and demonstrably lying to them about my alleged refusal to approve an imaginary cap table transaction, an *entirely made-up* allegation designed to boost his status with Little Prince at my expense by way of deception;

    d.   falsely claiming I had made unauthorized distributions to GBI;

    e.   again attacking my then fiancé and baselessly claiming the Company could sue her for tortiously interfering with Megacap affairs simply because she (understandably) did not like him; and

    f.   disclosing private internal Company business in an effort to improve his own personal standing with Little Prince and its affiliates, to the detriment of the Company.

104.   Finally, after holding out for over four months in the face of Goldner's threats, harassment, and abuse, Little Prince acquiesced to my refusal for the Interest Agreement to waive the right to repay its loan in shares.

105.   Having secured that victory for the Company at an incredibly high personal cost to my own wellbeing, I negotiated the final terms of and drafted an Interest Agreement that was to the Company's benefit without exposing it to the threat of bankruptcy, which was executed on April 26, 2023.

106.   At no point ever did Jiri or any of his associates threaten me, and when I ultimately shared with him that Goldner had been accusing him of threatening me and my family's lives, he called the allegations defamatory.

107.    His associate and Megacap LP Thibault Denonain, whom Goldner in a pivot later ascribed the threats to, also explicitly affirmed in a sworn affidavit that he never transmitted any death threats against me, let alone my family.

108.    The screenshots of Goldner WhatsApp messages with Denonain beginning on January 13 (attached as Exhibit 19 to the Counterclaim), a month after he first transmitted a threat against me, make make it abundantly clear that Goldner's alleged threats to our safety are entirely a product of his delusional imagination.

109.    Nonetheless, Goldner's campaign of terror had affected my mental health to the point where I did file a restraining order against him on April 10, 2023.

110.    However, as Goldner had intentionally never updated his driver's license and had registered his car to a UPS mailbox, both illegal in both Connecticut and New York (one of which, on information and belief, was his state of residency), the sheriff was unable to serve him.

111.    To this day, I have never succeeded in serving Goldner anything—not the restraining order, the complaint for the instant case[3], or the complaint for the Related Case—since he has intentionally made himself a ghost in order to evade service, given that he is a perpetual defendant in civil actions.

112.    Having failed to secure a restraining order due to being unable to serve him as a result of his calculated efforts to avoid being able to be served lawsuits or other actions, and no longer being able to suffer his continually escalating abuse, on April 30, 2023, I filed a rescission notice for GBI and a civil theft demand letter for the funds I had wired, in accordance with Florida law, in preparation to file suit.

113.    My hope was that entering into litigation would provide me some measure of protection from his abuse and enable me to be made whole financially.

114.    In response to the rescission notice, in a long rant on May 4, 2023 in the WhatsApp channel with Little Prince and other LPs, Goldner doubled down on his threats not only against me but, inexplicably, also Megacap:

> "You have breached your fiduciary duty and *will be removed* as such for your breaches that have put MegaCap's shares at risk. *You have risked the entire portfolio and if [the TECH supplier] gets wind of this and of any perceived*

---

[3] Goldner's counsel ultimately voluntarily accepted service in the instant case originally filed in Florida on behalf of Goldner and the individual Defendants (with Dharma having been previously successfully served via its Registered Agent) once I successfully delivered a certified letter to his UPS Mailbox, which would have enabled me to obtain service by mail.

*dispute she will most likely redeem MegaCap...* The game you're playing here Eli will wind up dragging this into a Federal Court that will have a tortious discovery process that could reveal not just *people's names*, but has the impact of creating a regulatory securities risk with agencies such as the *SEC*. I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've 'stolen' your money… You have continually concocted a fantasy that you have signed the agreement with Little Prince because you feel *your life is in danger*. You should get it through your head that our financial safety and financial security are absolutely at risk because bankruptcy or *threat of suit could destroy MegaCap and expose the name of the employee for TECH with the forward contract.* That would be doomsday and disaster for all of us and no one would ever get paid then… *I suggest you re-think your approach and come to the table instead of playing games and pretending you haven't sent me a letter claiming that I've stolen money from you on a business operation unrelated to MegaCap.* So you can scream to the end of the day that this *is* 'ranting' but this is also coming from the same guy that thinks *he's in 'danger' from us.*" (emphasis added).

115.    Given that my rescission notice and civil theft demand had absolutely nothing to do with Megacap, and at that time he did not yet even know he had already been withdrawn from the Company, I took this message as a clear extortive threat against not only myself but also the Company, namely that if I did not withdraw my legitimate claims regarding the NFTs and miners he would needlessly expose confidential information that could irreparably harm the Company and its Limited Partners.

116.    That same day, Goldner also messaged my then fiance on WhatsApp to sextort me by threatening to release compromising images of me unless I withdrew my claims: "you all should have thought twice before attempting to call me a theif (sic). You ever wonder if when you spoke to me I was recording you… Do you not remember [video] calling me when Eli was butt naked… You two should think long and hard about what to do because you're asking to go to war against an army."

117.    That was the final straw. Continuing to work with the already-withdrawn Goldner was no longer tenable.

118.    I amended his withdrawal on April 28, 2023 to include the additional threats made and had it served to him on May 5, 2023 by my assistant, as I was no longer in any form of direct contact with him at that point for my own wellbeing.

119.    At that time, as I was essentially in a haze from his constant barrage of abuse, I failed to attach the original January 16, 2023 IW, serving him only the amended withdrawal, although this did not change the fact that he had in fact been withdrawn since January 16, 2023

per the IW tendered to the Company's counsel. It is unclear to me whether Goldner still does not realize that he was withdrawn in January or has simply chosen to ignore that fact.

120.    Despite notifying him of his withdrawal, I still at that time did not redeem him, as my goal still was not to economically disenfranchise him or enrich myself but rather to minimize the impact to the Company, which the withdrawal notice made explicit.

121.    My hope was that by noticing him of his withdrawal but explicitly not redeeming and permitting him to continue vesting equity, I could minimize his efforts to damage the Company.

122.    Unfortunately, I was wrong.

123.    Instead of adhering to the dispute resolution protocols in the OA, Goldner began improperly contacting Megacap partners and causing problems for the Company almost immediately, while continuing to harass me, causing me significant ongoing distress.

124.    On May 12, 2023 I messaged the Company's then lawyer again, writing:

> "I just got a call from a tertiary potential MC partner we never even closed any business with saying that Marc called both him and his partners. I don't think our [TECH] GP would ever have any cause to redeem us, since we don't know the employee whose shares we bought's name[4], and that's the really only unforgivable act, simply us having a dispute is not, but, still, I need to stop Marc. I would like to get a cease and desist order and also a letter from you as MC's attorney that I can share with all our partners to inform them that Marc has been removed and to contact me at the official Megacap email address should he contact them."

125.    On May 22, 2023, the Company notified him that it was aware of his activities and ordered him to cease and desist, as well as instructed him to return the Funds in Trust to the Company's new bank account at Bank of America.

126.    Goldner refused on both counts.

127.    Realizing that my hopes that Goldner would follow dispute resolution protocols and behave in a professional manner was naive, and the fact that his refusal to return the Funds in Trust was simple theft from the Company, I decided I was not just or proper to allow Goldner to continue vesting equity when it was clear he was actively acting against the Company's best interests, even though he at that time still had an equal interest to me.

---

[4] I was actually wrong about this fact. As Goldner would later bring to light by writing me the employee's name as a means to better extort me, the seller had failed to redact the employee's name in one of the TECH transaction documents.

128.     Accordingly, pursuant to the terms of the OA, Goldner's unvested Membership Units in the Company were redeemed on May 23, 2023 in strict adherence to the terms of the Redemption Agreement template Goldner had executed as part of the OA.

129.     Notice thereof and the purchase of his redeemed shares by the Company by way of a deduction from his Funds in Trust was then served to him promptly.

130.     This precipitated a campaign of terror against not only me but also Megacap and its partners, vendors, and investors that has not stopped to this day.

131.     This ultimately forced me to file an injunction in my case against him in Florida state court seeking to halt the damage he was causing to the Company, which, as with every other service of process I have ever attempted to effectuate on Goldner, was unable to be served to him.

132.     The injunction detailed his campaign of terror, which included:

a.     doubling down on his extortive threats against me and the Company by, among other things, needlessly naming the name of the TECH employee (which I did not realize had been inadvertently shared with us) and threatening to publicize the name, which he himself has repeatedly acknowledged could cause catastrophic and irreparable harm to the Company and its Limited Partners, unless I reinstated him as a Class A Member and Manager of Megacap and dropped the instant lawsuit against him, writing in a June 29, 2023 letter to me included in Exhibit C to the injunction:

"I strongly *suggest that you immediately reinstate me*[5], otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved... *it is extremely important to remember that I possess the name (as do you) of the [TECH] employee that is part of the [TECH] employee forward contract - (his name in case you didn't read the documents is [redacted])*... **I would highly recommend immediately dismissing this case**... failure to do so may result in a federal court action and a tacit approval and waiver for me to sue MegaCap in federal court... MegaCap will be named as a third-party defendant, and I will most certainly *ensure that ALL shares are withheld*. What you do not seem to understand is IF the shares are cancelled [sic], it is YOU who will be held liable as you are the but for causeof all of this happening.... *I have absolutely no issue putting MegaCap into receivership with the SEC*."

---

[5] Note that, despite his letters to LPs claiming to represent the Company and his claims in the Motion and Counterclaim to being a Class A Member, Goldner has consistently acknowledged that he was withdrawn as a Class A Member and Manager to both me and Limited Partners.

b.  admitted that his coercion of me to sign the agreement with Little Prince under threats to my life was extortion by acknowledging his financial interest in having the agreement signed, stating in that same letter to me: "In order for extortion to exist, I would've needed to have a financial benefit, which I had none – instead, I saved MegaCap over $100,000 in the interest waiver agreement that I had gotten signed"; this is a confounding statement given that Goldner was clearly aware that he had and continues to have financial interests in Megacap and thus pecuniary interests in the actions he was coercing me to take under threat to my life, thus rendering his threats felony extortion under Federal, Florida, and Delaware statutes;

c.  unsuccessfully solicited support and money from Megacap's Limited Partners to aid him in disputing his withdrawal outside of the proscribed mediation and arbitration under threat of the loss of their investment by implying that he will make the name of TECH, the TECH employee, and TECH supplier public if they did not assist him in forcing me to acquiesce to his demands;

d.  instructed potential investors not to invest with Megacap, thus causing the Company irreparable financial harm and preventing it from repaying its debts to its creditors;

e.  induced Roderyck Reiter to call my mother and relay extortive threats against me, including to "put [me] in jail" if I did not acquiesce to their demands; and

f.  contacted and baselessly threatened critical partners of the Company with, among other things, legal actions he has no standing or right under the OA to bring, including:

    i.   the TECH supplier to inquire about their ability to redeem the MCTH's subscription, thus planting the seed for them to potentially do so;

    ii.  the supplier of the Company's shares for another SPV it manages in a manner they characterized as "alarming";

    iii. the Company's SPV administrator, causing it to breach its contractual obligations to Megacap by ceasing all work on Megacap's critical tax reporting in the middle of tax season and dropping registered agent services in response to the threats from Goldner, as well as to demand an

indemnification by the Company from any actions against it by Goldner in order to resume performance of its contractual obligations, thus hamstringing Megacap administratively and operationally;

iv. its accountant, who ceased work on Megacap's taxes out of fear of a lawsuit from Goldner, stating that he could not afford to be sued, even if frivilously; and

v. Megacap's counsel, whom his lawyer contacted and threatened with ethics complaints if they did not withdraw.

133.    Filing the injunction was, unfortunately, not sufficient to deter Goldner from attempting to cause further harm to Megacap, and the fallout from his letters created a tremendous amount of additional work and expense for the Company, in addition to likely lost referrals and subscriptions from prospective investors.

134.    Subsequent to its filing, Goldner's then counsel Raúl A. Reichard ("Reichard"), who subsequently withdrew after explosive allegations between him and Defendants aired in a hearing, wrote letters to Megacap's LPs on behalf of Goldner, (i) defaming me; (ii) spuriously alleging their 2022 K1s to be incorrect; (iii) falsely claiming to have requested formal mediation pursuant to the terms of Section 80 of the Agreement when in fact no formal "mediation administered by the American Arbitration Association under its Commercial Mediation Procedures" had ever been requested or let alone arranged by Goldner as the OA proscribes; and (iv) alleging that their investments were at risk from being withheld as a result of my actions.

135.    Reichard subsequently wrote Megacap's then-counsel, conveying threats from Goldner and Divilov to file ethics complaints against them unless both they and I acquiesced to various demands, including for Megacap's counsel to cease representing it.

136.    This is a flagrant breach of the Florida Bar's Rules of Professional Conduct Rule 4-3.4(h), which states that a lawyer must not "present, participate in presenting, or threaten to present disciplinary charges under these rules solely to obtain an advantage in a civil matter."

137.    Goldner's current attorney relayed this same message to the Company's current counsel in an effort to coerce them into ceasing their representation of the Company.

138.    Goldner next surfaced in November, 2024, along with Reiter and Defendant Divilov, writing Megacap's Limited Partners a 68-page letter in an effort to confuse and

intimidate them, with the three of them declaring: "Marc Goldner and Roderyck Reiter Reunite to Unify MegaCap Capital & MegaCap Funds."

139.     The November 2023 Letter was written by Goldner in collaboration with Divilov and Reiter, who each included their own letter. In this letter, Goldner, supported by Reiter and Divilov:

    a.   breached the Operating Agreement's dispute resolution terms and Megacap Funds' Limited Partnership Agreement's tortious interference terms (to which Reiter and Divilov are bound) by seeking to resolve his dispute with the Company by way of direct appeal to Megacap's LPs instead of through proper channels, writing "I am requesting that there is a mass request from each and every LP to tell Eli to comply with his duties;"

    b.   threatened to needlessly make public highly sensitive, confidential information about Megacap's suppliers, which he warned could wipe out all the LPs as well as Megacap;

    c.   alarmed LPs with an allegation that a critical Megacap supplier would withhold Megacap's investors' equity at Goldner's instruction, writing "MegaCap and Eli will not be distributed anything from the Sellers in which we acquired [redacted] and [redacted] without either my consent, authorization, and approval or without proper adjudication," where the latter claim is a gross misrepresentation;

    d.   falsely claimed to represent the company, sharing fraudulent Megacap email addresses to contact Goldner and Reiter, which Goldner has since written LPs from fraudulently claiming to represent the Company despite his repeated admissions to being withdrawn, as per above and the Counterclaim;

    e.   defamed and disparaged me as Megacap's Manager and, by extension, Megacap, by, among other things, baselessly accusing me of crimes, including double-selling TECH inventory, thereby defrauding Megacap LPs;

    f.   disclosed detailed confidential Company information, including disclosing the Company had a One Million Dollar ($1,000,000.00) debt obligation;

    g.   falsely claimed that mismanagement by Megacap could "result in the destruction of LP equity"; and

h. attached letters written by Divilov as well as Goldner and Divilov's personal lawyer defaming the Company by, among other things, falsely claiming to MCTI LPs that their K1s were incorrect and fraudulent when they simply showed each partner receiving a credit for their fees paid.

140. Despite Goldner's best efforts, while several LPs did contact the Company expressing concern and alarm over Goldner's letter, not a single LP expressed any support for Goldner.

141. In response to Goldner's campaign of terror against the Company, it filed suit against him and his accomplices, Reiter and Divilov.

142. With the aid of his attorney, he once again evaded service, causing the case to be dismissed without prejudice due to being unable to file a joint scheduling order.

143. Thereafter, Goldner promptly filed his Counterclaim and Injunction in the instant case rather than keeping the unrelated matters separate, as would have been proper.

144. Given that Goldner is impossible to serve by virtue of his concerted efforts to conceal his whereabouts and my desire is to put this painful chapter with him behind me, I have decided the best course of action is to litigate Megacap's claims in the instant case.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed on August 29, 2025.

_____

Eli M. Blatt

23

# EXHIBIT K

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

Dear Michael Murray,

I trust this find you well.

I hope everyone has had an incredible summer and an even better autumn! I want to assure everyone that I am still here and actively have been working on this disastrous situation. As you will see from this extremely detailed letter (with exhibits), I am leaving no stone unturned. I am sifting through over 100,000 emails, messages, photos, recordings, and more. I will not let Eli get away with this and he will be brought to justice!

What follows is additional details regarding the illicit actions of Dr. Eli Blatt, one of the co-founders of MegaCap. As a refresher, Eli had illegally and against the terms of the signed MegaCap Resolution removed me from MegaCap and had attempted to abscond some of its assets, presumably to enrich himself at the expense of not only myself, but other LPs and partners.

Matters have expectedly and predictably devolved since our last formal correspondence, but I am happy to report that any and all expected distribution of the Neuralink and SpaceX shares (or proceeds therein) have been frozen, protecting your investments until such time that this matter is finally resolved. The sellers of both Neuralink and SpaceX have assured me in writing that there will not be any distributions, dividends, or otherwise sent to Eli without my approval.

## I.     Letter from Attorney Raul Reichard:

First and foremost, I think it is important for you all to read this letter from an attorney, Raul Reichard, who has taken the time to put together a letter addressed to all Limited Partners. The contents of the letter deals with many topics including but not limited to the status and situation surrounding the K1s, the various breaches Eli has committed, Flow's role in the destabilization of MegaCap, verification of Eli's misrepresentations including falsely stating that he is a Certified Investment Management Analyst, amongst other legal facts including but not limited to Eli's unenforceable withdrawal of me from MegaCap, that Eli himself is the one being withdrawn, information surrounding the legal liability of a third party who threatened me, as well as the falsities surrounding Eli's claim of holding Rod Reiter's units "in trust" and verification of my ability to pursue legal action in Federal Court under specific provisions of the Operating Agreement. The letter continues to discuss my rightful title to an LP stake in Neuralink, information around potential tax fraud being actively committed by Eli, that IRS Form 8832 was signed by Eli and myself, as well as confirmation that there was in fact a signed resolution preventing my removal. Days after (on September 14, 2023) sending LPs the letter on or about September 12, 2023, I received an email from the third-party Accountant that handled MegaCap's taxes, stating, "I mailed Form 8832 on March 14, 2023 to the IRS." Apparently, this accountant has since "disassociated" himself from MegaCap. It is important to note that it took this accountant over 2 months to respond to me after emailing him as early as July 2, 2023.

You can read the letter from Raul below at Exhibit X. You can also read the letter from Raul addressed to MegaCap from Simon Divilov, one of MegaCap's Limited Partners and one of my business partners for over a decade – that latter exhibit can be found below at Exhibit Y. For your information and for the sake of transparency, we are in the process of replacing Raul as our attorney of record. This is due to numerous reasons, the most pressing of which is that we believe a conflict of interest arose. By Raul's own admission, we had later learned that Raul is a friend and colleague of Michel Elkins. During the Summer of 2023, Raul had entering



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

into correspondence with Elkins. Crucially, he had billed us for that correspondence. Naturally, we queried this and asked for a copy to be provided. After all, if we had paid for this exchange, we are entitled to see what was being said. To date, and despite our request, Raul has failed to disclose the proof of that correspondence that was allegedly made VIA text message.

### Marc Goldner and Roderyck Reiter Reunite to Unify MegaCap Capital & MegaCap Funds

At this time, I'd like to state that Roderyck Reiter, the other rightful co-founder of MegaCap and I have teamed up to ensure Eli's illegal conduct is stopped in order to protect the Limited Partners!

**II.      New Incidents of Fraud By Eli Blatt:**

It has come to my attention and to my absolute astonishment that Eli Blatt has been misrepresenting to current and Limited Partners, on his Social Media, his Resume, as well as to myself that he is a Certified Investment Management Analyst ("CIMA"). Eli has gone as far as putting "CIMA" in the letters behind his name. I now possess proof that Eli Blatt has been fraudulently misrepresenting this information. Eli Blatt is not an "active certificant" of CIMA, which is issued by the Investments and Wealth Institute. I have confirmed this with the organization's General Counsel, Robert E. Frankel, who informed me by email that "[y]ou can go to https://investmenthelp.org/ and search for any name. If that name does not appear, he/she is not an active certificant." A copy of the email is attached hereto as *Exhibit V*. Furthermore, Mr. Frankel granted me permission to print out his email and share it if it was needed to be confirmed in writing. He further stated in previous communications that "...Mr Blatt is not an Institute candidate or certificant", and his colleague Ashley Vargas confirmed first to begin with that she is "unable to confirm that Eli Blatt has an active certification." (Please see Exhibit V) As is patently clear, Eli has been fraudulently misrepresenting himself to hold a title which he has not earned, and is now attempting to cover his tracks. As will be illustrated throughout, that is not the only matter Eli has been lying about. This fraudulent claim that Eli had been boasting on LinkedIn and other forms of digital communicative distribution should give all LPs insight to who "Dr" Eli Blatt really is as it is clearly a willful misrepresentation of his credentials. Eli's ego will never cease to amaze me at this point as it is one thing after another that Eli will continue to pile on top of himself with no end in sight.

Eli has attempted to unjustly enrich himself, fraudulently induced me into agreements based on this misrepresentation, and has continued to act in bad faith. The net result of his actions has caused the deterioration of affairs into their current, pitiable state. Simply put, Eli Blatt has proven time and again that he cannot be trusted at his word. He has continued to attempt to wage a war against myself and my other partners (through various businesses) to commandeer MegaCap (as he has also done the same with the Bitcoin ATM company, BitSource, that we started together – in which he also locked me out of the email, bank, and illegally withdrew over $6,500 without authorization from BitSource's banking partner called Arival Bank) and dispossess myself, and others, of our assets. If any were still skeptical before or up to this point regarding Eli's integrity or honest, I hope that the above revelation that has come to light has now dispelled any doubts of Eli's malicious intentions and lack of trustworthiness. If such reservations remain to exist, I ask that you continue reading as I provide further proof below.

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

### III.  Updates on Ongoing & Vexatious Legal Cases Between Eli, myself, and others:

After Eli had begun engaging in legal maneuvering, it had come to our attention that Eli has a history of suing his former business partners – it appears to be his modus operandi. While, we were aware that Eli had a troubled legal past, we were unaware of the nature of these suits as we had trusted Eli at his word. Upon further investigation, if all of the above wasn't enough, and further to this point, what Eli conveniently leaves out of his fictitious warped narrative is that he isn't only trying to sue me, but he has a habit of suing his 'former' business partners such as Zachary Burton and a slew of other people from his former Merchant Cash Advance business. It isn't quite clear to us as of yet what exactly has transpired, but what is known is that after matters soured in at an entity that has come to be known as "K4B" (we believe Kash 4 Biz), Eli eventually exited that business venture, and sued his former business partners, much in the same fashion that he is doing again. Upon information and belief, at least one of these is in Florida State Court against Zachary Burton, and another is allegedly in an arbitration. To be clear, Eli is attempting to play boy-scout, but I know the monster behind the mask. Eli is the same guy attempting to win everyone over claiming he's 'authentic,' 'genuine,' 'honest,' and a bunch of other fluffy 'psuedo-professional' phrases, when at the same time he has messaged me some inhumane, unethical, and borderline illegal messages. Do not let his performative professionalism deceive you. Only now, after the fact and in full context, I fully understand some of the messages Eli had sent me. For brevity, I will quote two. "Still ideating about literally strangling Zach to death" and "I told Emily yesterday I'm going to put his dad in the grave with this arbitration and then go to the funeral just so that I can creepily smile at Zach the whole time". Does this sound like someone you want to work with? At the time, I mistakenly believed that Mr. Burton had wronged Eli, as I was told that Eli had gotten into an argument with Mr. Burton in person at a party in Miami. I had justified it to myself that Eli was merely blowing off steam at a failed business venture, had given my partner, Eli, at the time the benefit of the doubt, but now the true, malicious nature of Eli is clear for all of us to see. Hindsight here truly is 20/20.

### IV.  Flow Letter

Upon these discoveries and revelations of Eli's fraudulent misrepresentation of various atrocities above, I now write this letter to all of you. As a courtesy from a fellow Limited Partner, I was forwarded Eli's June 4 Letter issued improperly from Flow (and without my approval). This letter was apparently not sent to ALL Limited Partners as certified by Simon Divilov, an LP of MegaCap, a close friend, and my longtime business partner, as well as confirmed by Roderyck Reiter, the other rightful Managing Partner of MegaCap. Simon & Rod granted me permission to disclose this information to you. I have also heard from other LPs that they have not received this letter. Naturally, even as an LP myself, I had not received a copy of this letter either. For your reference and for the sake of transparency, I've attached the letter as *Exhibit A*.

### V.  Michael Elkins' Attorney Misconduct and Conflict of Interest Exposed

The letter attached to Eli's letter (*Please see Exhibit A*) contained a letter from an attorney, Michael Elkins, herein attached as *Exhibit B*. This letter shows Elkins' grossly negligent and willful misconduct as he has stated in the past that in a dispute between Eli and I (that he had been aware of) that he would be conflicted out of representing Eli. He has breached that trust and continued to work for Eli to assist him in commandeering MegaCap. You can see Elkins' certification VIA email stating this attached as *Exhibit C*. For an attorney to conduct

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

himself this way is not just unethical, but I believe certainly violates the Rules of Professional Conduct which opens Elkins up to an investigation and a potential grievance claim with the Florida State Bar. However, upon information and belief, I was notified that Elkins is claiming that he no longer is representing anyone in this matter and that he had represented MegaCap in an unrelated arbitration. The direct quote allegedly believed to be originating from Elkins states, "I'm not co-counseling on the Blatt matter. I'm not sure why Marc thinks that. Happy to discuss with you when I get back on Monday, but I don't have much info. … I had very minor involvement for a very short time , I am no longer representing anyone in this mater … I represented Megacap in an unrelated arbitration … let's discuss" – this was on July 15, 2023 and I have to date still received no further word from Elkins. Upon information and belief, Elkins has been too busy in over three months to communicate.

To continue on this point, Mr. Elkins has had various communications with Flow and with Limited Partners of MegaCap. Mr. Elkins told Mr. Goldner on April 2, 2023 that "[i]f there ever was a dispute between [Mr. Goldner] and Eli as relates to MegaCap, I would likely be prevented from representing either of you against the other since I represented MegaCap." Mr. Elkins further went on to state, "[i]n short, my representation of MegaCap was on a single, discreet contract matter." Further to put this specific issue to rest, Mr Muschel emailed Flow, Inc on or about June 26, 2023 and stated that "Mr. Elkins has already communicated to your previously, both in writing as well as over the phone[…]" and that "[Mr. Muschel and Kopelowitz Ostrow] now represent[s] [MegaCap Capital, LLC], along with Mr. Elkins. However, upon information and belief, based on word received from Raul Reichard, whom once again is an attorney, Mr Elkins is not representing MegaCap at this time. Mr. Goldner is demanding all communications between Mr. Elkins, Mr Muschel, and any other attorneys who have allegedly represented MegaCap to be sent to Mr. Goldner, as well as a complete record of the phone call that occurred between Mr. Elkins and any representatives of Flow.

Surprisingly though, according to a letter provided to Rod (who is once again one of the Founding Managing Partners of MegaCap), Elkins is still co-counsel on matters relating to MegaCap according to a letter written by Benjamin Muschel on June 26. (Please see Exhibit D) Elkins has had various communications with Flow and with Limited Partners of MegaCap. Once again, Elkins told me on April 2, 2023 that "[i]f there ever was a dispute between [Marc] and Eli as relates to MegaCap, I would likely be prevented from representing either of you against the other since I represented MegaCap." Thus, it is hard to absolutely be certain of Elkins' position.

## VI.    Removal of Myself from MegaCap

Eli's letter contains many provable lies, which I will detail below and illustrate shortly, that shows his continued breach of trust with MegaCap's LPs and a breach of his fiduciary duties to fraudulently conceal the truth from MegaCap's investors, not including his breach of fiduciary duties to MegaCap and myself.

The first of these falsities is that Eli claims "[I] ha[ve] been withdrawn from the Company as a Class A Voting Member and Manager according to the withdrawal and redemption provisions of the Company Operating Agreement and is no longer operating at the Company." Eli has most certainly not abided by any withdrawal and removal clauses because Eli conveniently leaves out the following:

　　　　1) That we signed a MegaCap resolution and completed it on February 13, 2023 (Please see *Exhibit E*). In terms of that agreement, no Class A Member, of which both Eli and I were, can remove another Class A Member.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

In other words, Eli's purported removal of me is de facto impossible due to the agreement we signed. For the sake of convenience, I quote the relevant portion of the clause which states, "all Sections of the operating agreement relating to Redemption of Membership Units or Involuntary Withdrawal are hereby voided upon fulfillment of the terms of this agreement, such that no Class A member can be removed as a Class A Member or Manager to any degree by the other Class A Members, and that any such attempted removal shall be void upon completion of the terms of this resolution." Since the Material Terms of the agreement, all of which have been completed, as stated in an email I sent to Eli in Early 2023 were completed prior to Eli's illegal, improper, invalid, unenforceable, and attempted withdrawal of me which at worst can be viewed as upon the signing of the Interest Waiver Agreement, thus, Eli is unable to retroactively redeem and withdraw me on that same date in early May as he claims. (*Please see Exhibit F*)

2) That in order to have withdrawn or redeemed me regardless, he would have had to go through the dispute resolution clause. Eli is accusing me of not doing the very thing he did not do himself. Moreover, as I will set out below, I did engage with the proper procedure to attempt to resolve my illegal removal and instead Eli blocked my attempts from doing so on spurious grounds. Eli keeps espousing this false narrative that I haven't "formally disputed [my] withdrawal". Eli also continues to claim that I refuse to abide by the dispute resolution provision, but after numerous attempts, the most recent being on July 10, 2023, which was a follow-up email from the communication on June 29, 2023, Eli still refuses to abide by the Dispute Resolution Terms he claims that we are bound to. Eli has refused to reply as required by Section 80(A)(1) of the MegaCap OA. (Please see Exhibit G) Eli has even gone so far as admitting to Rod via email that he won't negotiate with me unless I accept service for an unrelated claim, a claim which he is attempting to use as leverage to extort me (the irony!). He specifically told Rod, "And if Marc wants to negotiate with me, all he has to do is accept service for the lawsuit." Please keep in mind that said alleged lawsuit is once again unrelated to MegaCap. Eli continued, "I am not prepared to negotiate anything, I am not speaking with Marc again, ever, under any circumstance [. . .]." Eli has displayed a blatant disregard for the Dispute Resolution Provision, the very provision that he falsely accuses me of not complying with. His false accusations are provable fabrications. That is one of the many reasons that I am forced to escalate these matters. However, unlike Eli, I am proceeding in a legal manner and following the appropriate protocols governed under the various Agreements and Resolutions signed by MegaCap's Partners.

3) My alleged and purported withdrawal and redemption were not valid. Eli continues to claim that I have 'extorted' him. This is factually untrue. I will refrain from commenting further on this aspect for my own safety, save to state that Eli is mischaracterizing specific statements I had made, holding the patently fallible position that I was making a threat. Rather, I was discussing the risks of non-compliance with our duties that would equally impact both of us. Such an escalation, I believed at the time, was a risk to both of us where we would have been in drastic danger and could have faced severe life-altering consequences. My conveyance of this to Eli was that BOTH of OUR lives were in danger and that we would face equally dire repercussions. Eli is completely aware of all of this, despite his statements to the contrary. If the danger of Eli's malicious conduct continues to escalate and the need arises, I do in fact possess written and documented proof of these chain of events in the form of a signed affidavit and screenshots taken from various communication channels. Eli has tried to mischaracterize these statements to defame, disparage, and destroy me and my reputation in order to proceed to take over MegaCap. He is attempting to steal my LP interest in ✕✕✕✕ (which he has deprived me access of to date), as well as my entire vested equity in MegaCap. I have learned that Eli's telling at least one known LP that I am "mentally ill" which, again, is a misguided lie. I am taking legal advice on Eli's continued



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

defamation and libel of me, as well as besmirchment of my good name.

Further, Eli claims that I must adhere to a private mediation or arbitration, the former of which he has continued to deny me. His mother, Loretta Moreno, lied to Roderyck Reiter, the other rightful General Partner with an equal interest as Eli and myself in ⬛⬛⬛⬛ and MegaCap. She claimed that I never attempted to mediate, when in reality I had offered to even fly down to Miami to mediate in person with him and his own mother. Loretta's claim to Rod is a provable lie as can be shown in numerous texts. Further, Eli attempts to claim to Rod that it was my idea to call Loretta, but that idea to call and speak with Loretta was Rod's idea and Rod's idea alone. He has had a long-standing nearly 40+ year relationship with collectively Loretta and Eli Blatt (as Rod has known Loretta since childhood and had grown up together with Eli since childhood as somewhat further elaborated by Rod in his letter) which he details in his letter to the Limited Partners below at the bottom of this email attached as the last exhibit.

Eli is factually incorrect about me being forced into a mediation (which he has continually denied me my right of) or an arbitration. Under MegaCap's Operating Agreement, I am entitled to 'Equitable Remedies' in the form of an injunction in federal court as per Section 81 of MegaCap's OA, doubly so now that Eli has doggedly refused to engage in the mediation/arbitration clauses and is himself in material breach of the OA. I pause to set out that Eli is fully aware of these provisions considering that Eli himself is attempting to file his own injunction against me without abiding by the same dispute resolution provisions that he keeps echoing to all LPs that I need to abide by. (*Please see Exhibit H & I*). Eli has paraded around claiming that it was me bringing MegaCap's issues to the courts publicly, yet it was Eli who is deciding to go and allegedly file an injunction according to an email Eli sent to Rod in which said alleged suit could now be exposing MegaCap and all of its LPs. It is apparent that Eli is trying to silence me and take over MegaCap. What is most insidious is that, upon information and belief, he is attempting to use the assets he illegitimately obtained through MegaCap to do so by depriving me of access to MegaCap's bank accounts. Thus, using some of my own money against me to wage a frivolous legal battle. I do ask all of you LPs to look inside yourselves and see what Eli is doing and ask yourselves if this is someone you want to work with.

Eli's claims that I have committed any "felonies" are completely unfounded, without merit, and factually untrue. In fact, again, it is comical because it is Eli who has tried in the past to extort not just Rod, or myself, but possibly even other former business associates as well.

With all that said, it should be understood, that the Resolution that Eli and I signed in February of 2023 completely removed any and all attempted Redemption provisions. Thus, it is clear that Rod's coerced 'redemption', illegal 'withdrawal', and forced 'removal' from MegaCap is not valid. As the Managing Partner of MegaCap, one of the first orders of business I will execute upon regaining control of the MegaCap entities will be to reinstate Rod's position and equity at MC.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## VII. Exhibit A Letter Refuted in Detail

To now address Eli's bullet points in his Exhibit A letter ad seriatim:

> • Marc was withdrawn to protect the Company pursuant to the
> procedures outlined in the Company Operating Agreement for
> breaches of the Agreement, including his fiduciary duty

1. Eli did not withdraw me to "protect" the Company. That is a load of nonsense. Ask yourself this: "Who or what exactly is Eli protecting the Company from?" Please realize, rather, that I was the individual who identified ████████ as a target investment less than a couple weeks after founding MegaCap and more than 6 months prior to the ████ deal. (*Please see Exhibit J*) Truthfully, it is hard to say Eli did much of anything material or beneficial for MegaCap. In my opinion and if I'm being generous, Eli was barely doing what an administrator would be doing. And even in that capacity, there were still issues and constant problems that would arise on a regular basis. Eli would frequently make incorrect spreadsheets and would produce the creation of incorrect tax filing documentation that needed to be nearly entirely redone, often by myself. Eli's work product often did way more harm than good in my opinion. In that same vein, Eli has continued to fail to issue K1s for other MegaCap Fund entities such as ████ for 2022 and upon information and belief has clearly abandoned those Limited Partners leaving all of us with a question of uncertainty; whereas the IRS may fine MegaCap late penalties, and in which LP equity may be destroyed or diluted due to Eli's incompetence and illicit actions. Rod and I are trying to do everything we can to course correct the ship (*Please see Exhibit W*), so we ask that you please work with us to help ensure the safety of your investments. Equally, I spent months away from my family to network and raise capital on behalf of MegaCap. I bring this up not to aggrandize my achievements, but to illustrate my unwavering commitment to MegaCap. I have done nothing but try to grow MegaCap and serve our Limited Partners' interests. Just recently, when one LP needed assistance with a third-party Trust, I was happy to oblige, providing that input to ensure he would not have any issues with his taxes. Measure me by my actions and decide whether I intend to harm MegaCap, then do the same with Eli.

What is more interesting is the lack of information and details provided by Eli regarding my purported breach of fiduciary duty. What exactly are these alleged breaches of fiduciary duties that Eli purposefully inserts into his language to be vague? One must ask, what exactly are these alleged breaches that I had committed? The answer is clear in the vagueness of the accusation. This is merely just another attempt to slander myself and divert attention away from Eli's own misdeeds. The truth is that I was giving it my all to make a success of the venture. Even hours prior to Eli illegally removing me, I had followed up on the Flow thread insisting that Eli do his "due diligence to make sure it is correct so there are no issues." Further stating that, "Two sets of two eyes are better than one here." I had reviewed and reviewed the K1s (Please see Exhibit K) several times and as late as back on May 5, 2023 (hours prior to Eli illegally removing my MegaCap email in breach of the February resolution – *Exhibit L* – which, evidently, will result in **HIS** involuntary removal from MegaCap when all is said and done) after working for months to correct Eli's numerous mistakes and oversights. Thus, on the contrary, and to illustrate how patently false Eli's claims are, I will list only a few of the many actions taken by Eli that would put him in breach of his fiduciary duty instead. I had to spend months correcting a series of mistakes made by Eli that resulted in Flow and the accounting team not being informed of a promissory note that led

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

to the threatening behavior I was exposed to, and Eli incorrectly allocating the management fee to be entirely front loaded on the K1s rather than earned on an annualized basis as we had agreed to when we began that entire SPV. Additionally, because Eli failed to understand that the ✕✕✕✕ closing happened in 2022, and not 2021, it resulted in a the K1s for 2021 being entirely miscalculated. To add on to the dangers presented by Eli maintaining the helm of MegaCap, he has not only refused to update MegaCap Funds, LP – Tech I Series Agreement to include the Limited Partnership Agreement in Exhibit B which I notified him was not in the documents issued to Limited Partners once again on February 7 (*Please see Exhibit M*), but he also failed to timely file the Form D Amendment with the SEC for nearly a year which exposed the SPV since the name ✕✕✕✕ on the SEC's Edgar public website. Further to Eli's misconduct, Eli said to Ryan Nanney at Flow on April 28, 2023: "So long as the taxable income is just 10% of the total fee then we are good." The most recent ✕✕✕✕ K1s that Eli provided do not reflect this statement and his improper recreation of MegaCap's K1s are not just illegal but a breach of his fiduciary duty to all Limited Partners. On this very same subject, we have informed Eli that there must be changes made to the ✕✕✕✕ K1s to reflect the agreed upon fee structure that was stated to MegaCap Limited partners VIA email on or about February 9, 2023. In said email, MegaCap (*vis-à-vis* in a message approved by Eli and myself) specifically stated that, "The amended K1s are currently being prepared by Flow, and we are pushing them to get them out by next week at the latest. In the interim, we can report **definitively** that the loss will be 0.5% of your capital commitment, representing one tenth of the 10-year 0.5% management fees. **You can report this to your accountant and proceed confidently with that number.** You will receive a notice through Flow once the K1 is complete." (emphasis added). There are Limited Partners that have already filed their tax returns that reflected this material representations & material statements, and it is completely unacceptable for Eli to unilaterally make these changes by giving Limited Partners a few days before MegaCap's extended deadline. Simon had sent a letter addressing these concerns and issues to MegaCap which had went ignored without so much as a response from Eli himself. Continually, Eli is attempting to hide behind attorneys and refuses to engage in any dialogue. I pause to state that these are only some of the issues that I had to correct after the fact, issues that can be placed solely at the feet of Eli and only became issues due to him failing to comply with his responsibilities and duties.

All the while, Eli touted how effectively and competently he was running the back office. Only once issues began cropping up in a way that he could not keep from me did I realize the dire state of the work Eli was doing and I set about attempting to set matters right. The last issue I was working on before I was locked out of my MegaCap email account concerned and centered around attempting to ensure compliance and timely distribution of the K1s. It beggars belief that he would claim that the company needs protection from me when he is the one doing it the most harm. As a final nail in the proverbial coffin (Eli may try to say this is a threat – it's not, it's something known as an 'expression' which is perfectly legal to say), *Exhibit L* states that where one member attempts to remove another, the removing member must be removed instead. In other words, Eli's actions, under the false guise of protecting the company, can only result in his immediate removal. But I am stymied from enacting the terms of our signed agreement by his strident refusal to engage in the proper processes and being illegally and completely locked out of the pre-existing MegaCap logins.

Much of that brings us to today. On or about September 9, 2023, Simon received a notification from Flow stating that a "draft 2022 K1 package for MegaCap Funds, LP – Tech I" is available. (*Please see Exhibit N*) Raul Reichard, informed Eli that there are noticeable errors that need to be changed. You may find that notice as part of *Exhibit Y*. Further, what's quite disconcerting, is that Eli had purposefully waited to send Simon this email



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

**MegaCap Capital**

because he had informed a different Limited Partner nearly the same identical message, which was conveyed to me by Rod on that Friday evening. As predicted, Eli did in fact breach the terms of the Option & Loan Agreement we signed, and instead opted to elect to commit what I believe to be tax fraud by retroactively re-classifying the management fees that were agreed to be earned annually. Instead, he has accelerated the entire management fee of 5%. The danger with what Eli has done is jeopardizing the solvency of MegaCap. By my earlier estimated calculations, by Eli front-loading the entire management fee of over $200,000, there will now likely be an adverse tax consequence that MegaCap will have to bear. Upon meeting and conferring with Rod, we both believe that due to this, mixed with Eli's refusal to operate on an accrual accounting system (instead electing and opting for a cash-basis method), MegaCap may in fact run out of money prior to the XX years until XXX plans to IPO. The entire thought process and rationale behind holding the funds in trust were to ensure that the management fees would be used for annualized operational expenses and not to be used as income for the general partners own lifestyles. The danger of what Eli has done by this fraudulent distribution of the K1s will present what we believe to be an inherent danger to MegaCap and its LPs which can only be saved by the General Partners being forced to either have an internal capital contribution or to ask LPs for an additional capital call as expenses continue to accrue through the years – Rod and I's intention is not to have an additional unplanned Capital Call from the Limited Parnters and that is just one of the many things we are trying to prevent Eli from doing. All the hard work I had done to protect MegaCap and its Limited Partners have nearly and effectively been washed down the drain by Eli, and I will be exploring the appropriate reporting mechanisms to the Internal Revenue Service for Eli's illicit actions that put this venture at severe risk of failure and potential bankruptcy.

> The redemption of Marc's unvested equity that he had not yet earned was done in accordance with the terms of the Operating Agreement at a predetermined valuation that is fully auditable

2. Eli claims that I had unvested equity that I hadn't earned yet and that such redemption was "done in accordance with the terms of the Operating Agreement at a predetermined valuation that is fully auditable" – such claim is patently false. There are several issues with Eli's claims here:

First, Eli conveniently leaves out that he illegally, improperly, and invalidly "redeemed" 170,274 Units of my interest for $1.70. To emphasize this point once more, Eli purports that I accepted **One DOLLAR and Seventy CENTS** in exchange for over 170k units of interest equating to a worth of 17% of MegaCap Capital – that means that 17% of my portion of the Carried Interest that will be earned from MegaCap Eli has stolen from me. Eli knows this is an unconscionable redemption and is not enforceable. Now, what's fascinating here is that in this "Redemption Notice", Eli claims that "[p]ursuant to Reiter Redemption Agreement dated March 24, 2022, the Company fully redeemed the 330,000 Units granted to Reiter, increasing the Units held in Trust by the Company to 340,000" However, I believe that Eli is willfully withholding from all the Limited Partners that the MegaCap Operating Agreement also states, "In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other." (*Please see Exhibit O*) Divesting the unites in the matter he has is simply impermissible by the terms of the OA. Not to mention that Rod's 'redemption' was never actually fully effectuated and is thus invalidated.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

Second, nowhere in the Operating Agreement or any alleged redemption provisions does it mention that upon a redemption that Units will be held in "trust" by the Company. Therefore, even in a fictional parallel world where Eli did legally redeem me, a contention that I reject with the contempt it deserves, it would still mean that in that alternate reality I would've been entitled to those shares that Eli claims the Company holds in "trust."

Third, as per stated above and as shown in *Exhibit E*, it is clear that no redemption or withdrawal would be valid.

And fourth, to reiterate the first point above, even in the alternative, where Eli thinks he did redeem and withdraw me, he fails to cite Section 12 of the Operating Agreement that gives the example in the case of a redemption, "For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units)." Whereas any redeemed equity would be evenly distributed amongst the remaining Members. (Please see Exhibit O) Whereas, even if Eli's fraudulent version was to be believed, I would be entitled to a far greater share than the 159,726 units insinuated in Eli's 'notice.' This is due to an even re-distribution of Rod's illegal and invalid redemption which Eli coerced me into signing based on other business matters and investments. Eli claimed he would stop working and further dispossess me of my assets such as an investment in Chad Troutwine's entities relating to an investment in a James Bond Video Game, unless I agreed to his terms and tried to force Rod's removal from MegaCap proper.

> Should Marc elect to formally dispute his withdrawal, the Company's dispute resolution provisions call for a private and confidential mediation and arbitration governed by the American Arbitration Association that exists specifically to protect the company and its investors

3. Eli continues to reiterate in his letter that a formal dispute on a withdrawal is governed under the dispute resolution provision, which again is patently false. Rather, even if he is presumed correct, I am *still* entitled to Equitable Relief as per *Exhibit H* (Section 81 of MegaCap's Operating Agreement). Eli pretends to be the aggrieved party, but his actions prove otherwise. A lot of this may be quite mindboggling (yet at this point I am trying to refrain from constantly being surprised, but admittedly, it is truly shocking). Eli insists on the formal dispute resolution procedures needing to be followed, however, Eli himself has told Rod he is planning on filing an injunction against me relating to MegaCap – although I cannot confirm if this threat Eli has made is in fact true as I haven't been served and have absolutely no clue what jurisdiction Eli has even allegedly filed said injunction. There is an underlying risk to me seeking injunctive relief in order to minimize exigent risks, but Eli has continually blockaded me. Please know that I have tried to mediate with Eli for months and he has refused to even exchange so much as an email, never mind talk on the phone or meet in person. My attempts have been to no avail. He falsely claims that I am trying to hurt him and that he is 'afraid,' which is a blatantly false excuse he is deploying in order to avoid following proper process and evading being held accountable for his illicit actions. Eli's actions and behaviors are not someone who was afraid for their lives. On the contrary, he is the one issuing and volleying threats. Eli is also publicly displaying that he and MegaCap raised money for a SPV. In fact, according to the email obtained from Rod, it is Eli who is attempting to seek injunctive relief in an improper venue that has broadly risked this entire transaction. Eli's numerous actions are the truly threatening behavior that he is trying to hold over all of us and we must stand up to him – behavior we must all



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

endeavor to halt, lest he destroy this venture and the remainder of the Limited Partner's equity entirely.

> Neither that process itself nor the outcome would have any direct
> impact on the SPVs managed by Megacap Capital

    4. Eli claims that "that process itself nor the outcome would have any direct impact on the SPVs managed by Megacap Capital". This statement again is potentially false. With pending litigation that may take years, even possibly over a decade, as well as other investigations that must follow Eli's illegal acts, MegaCap may, unfortunately, find itself effectively frozen until these disputes are resolved. We plan to request the Court to redact the name of a particular ✕✕✕✕ employee, failing which, the assets of the entire SPV for ✕✕✕, as well as MegaCap's other SPVs and assets, could be placed in jeopardy. For those unfamiliar with the legal process, there are unknowns and uncertainties present in any litigation, and it is quite difficult to predict how a judge may rule, especially when it comes to keeping information out of the public record. I, of course will attempt to legally protect this information from the public, but I have no decision-making authority if a Judge orders me or Eli to disclose the name of that Employee – the only option we may have is to file a Motion to Quash and request for that information to be filed under seal, but even such a Motion may be outright rejected by the Judge for any reason determined. As such, even on a cursory look at the current state of affairs, Eli cannot in good faith make the undertaking that he has already embarked upon. There will be legal consequences for Eli's illicit actions and conduct, those of which will impact matters going forward. Eli knows many of the risks with litigation and is continually attempting to shift the blame back towards me as part of his strategy. Ultimately, Eli is attempting to hold a metaphorical weapon to my head and is using threats and false accusations in order to try to gain unobstructed and unsupervised control of MegaCap and its assets while diverting attention away from the illegal manner in which he is attempting to do so. Eli attempting to halt my actions to save MegaCap and Eli's crusade to harm MegaCap will ultimately be unsuccessful.

> All SPV equity is calculated on a per-share basis at a fixed price,
> is managed and reported by Flow, and there is no way to "take
> any shares right off the bat of most of the LPs"

    5. Eli's claims that the SPV equity is calculated on a per-share basis at a fixed price, and is managed, and reported by Flow. What Eli fails to disclose to our LPs is that MegaCap Tech Holding's assets and purchase price are governed internally. A major dispute that Rod and Eli had in the early days was of Eli's handling of the accounting. According to Rod, the way Eli handles the accounting methods raised a severe concern in that Eli is attempting to prioritize his own payouts and using a frame of reference that he needs to be paid before LPs are made whole. I broached the subject with Rod, who described Eli's methodology as follows: "The reason I was such a stickler that the accounting had to be verified was because Eli had a peculiar way of calculating the accounting. When he did the accounting, he would first calculate what he was 'owed', and since he had negotiated such an onerous and complex split of the proceeds, it was hard to verify whether he was subtracting expenses prior to calculating his portion. After he had calculated his portion, he would calculate the rest. He would also usually immediately transfer his portion of the funds from the company bank account without first having the other partners sign off on the accounting." In a text discussion with Eli, it became clear that Eli was attempting to adjust the calculations of Rod's held LP equity interest in order to benefit himself to the detriment of many of the other stakeholders. As such, it is once again patent that Eli's statement was deceptive in nature when he claimed that he never wished to deprive any shareholders of their value. Further,



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

**MegaCap Capital**

Eli then has attempted to tell Rod that he said things out of frustration. Well, let me ask you this, if Eli would threaten to withhold a Limited Partner's rightful share for personal gain, then how is that NOT trying to take shares right off the bat? Those messages Eli sent to me on June 1, 2022 state, "total up all those charges" (in reference to expenses such as Mailchimp, Pipedrive, Asana, and other third-party services), which Eli then proceeded to state "we are deducting all of that from Rod's eventual carry payout" and "i'm not kidding", which I replied "I know ur not", before Eli continued on, "also any of my losses from Straightpath", "loss of profit on shares I may not get due to their fraud, which he guaranteed", "all those deals will unwind before _____ / Civ" "pls add all these up in a sheet somewhere marc", "this one is a legit expense for us" and "but all that other shit that Rod neglected we should absolutely bill to his ass". This is the kind of person Eli truly is behind the scenes. I ask all of you to really look at these messages and see what Eli is doing here – he's trying to deprive and dispossess rightful assets of Rod with absolutely no remorse, yet at this point I expect nothing less from Eli Blatt.

> The GP for the SPV via which Tech I has its derivative equity interest in Neuralink is already aware of Marc's withdrawal and has stated she has no cause to redeem the underlying equity on the basis of a private Member dispute

6. This is one of Eli's most blatant and disturbing lies, which could be the final straw and ultimately may lead you down the path of whether or not to trust Eli M. Blatt. I asked the GP of the SPV where we purchased the derivative equity of _____ from, if Eli ever told them that I was "withdrawn" from MegaCap. They replied they were not notified by Eli of my attempted illegal withdrawal, an attempted withdrawal which I pause once again to state is illegal. This GP has asked me personally not to involve them, so I am maintaining to keep their identity and exact long-form quotes confidential. Regardless, what Eli did lie to this GP about is that I had taken a 'step back' from MegaCap to 'focus on Law School.' Therefore, I do testify and certify under penalty of perjury that on July 13, 2023 that she stated to me that she was **not notified by Eli of my 'withdrawal' from MegaCap**. Upon being informed, the Seller did preemptively halt any planned distributions of any of the _____ holdings. However, I will share a copy of the redacted letter from the Seller of _____ (*Please see Exhibit P*), as well as a copy of the redacted letter from the Seller of _____ whom we initially purchased the _____ derivative equity from prior to going directly on to the _____ Seller (*Please see Exhibit Q*). **To be clear, MegaCap and Eli will not be distributed anything from the Sellers in which we acquired _____ and _____ without either my consent, authorization, and approval or without proper adjudication.** It is part of my fiduciary duty to inform you of this freeze that will only be lifted once this dispute between all of the partners is resolved. I hope this alleviates everyone's concerns, albeit only temporarily until this matter can be properly resolved and set to right.

> As a matter of public record, I have litigation filed against Marc relating to non-Megacap matters (as numerous others have had recently as well -- google "Marc Goldner Lawsuit"), which to date he has evaded service for

7. Eli discusses other litigious matters. However, what Eli fails to state is that he owes me, my partners, and the entities that I am a part of approximately **$797,817.00**. This debt is due to his failure to pay (& subsequent default on) of his portion of over a dozen Bitcoin Miners, as well as his underfunding of NFTs we jointly purchased, the James Bond investment previously mentioned which he certified was approved to be

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

a joint investment (Please see Exhibit R), amongst other things. This does not include other money Eli owes me such as the approved expenses I have from MegaCap that I now have to bear in my personal capacity. Additionally, the particular series of investments in Chad Troutwine's companies was a material representation that was part of a series of representations that Eli used to fraudulently induce me into numerous contracts, one of which was Goldner Blatt Investments, LLC ("GBI"). When challenged on these representations, he refused to respond and attempted to shift blame towards his mother, Loretta Moreno, further showing his dogged intention to not mediate or settle any disputes on any matters with myself and my other partners. It takes a special individual to hide behind their mother at 40+ years old. On or about June 29, 2023 and in a series of emails to Eli, a set of auditable provisions were provided in a good faith attempt to settle all matters and issues, however, Eli has to date not responded at all, left these emails unanswered for months on end and has continued to refuse to engage in any manner. On the contrary, it appears as if Eli has blocked me (as he has said he has done in the past – repeatedly blocking and then proceeding to unblock me on WhatsApp and emails) on various forms of standard communication channels. Since Eli's has withdrawn from GBI, I am happy to share my audit of Goldner Blatt Investment's Cap Table that I shared with Eli on June 29, 2023. You'll quickly be able to see Eli has something to hide from a transparent audit I conducted. Also, Eli attempts to paint me in a bad light about 'other lawsuits' but as per Section 42 of MegaCap's Operating Agreement (*Please see Exhibit S*), Eli knew from Day 1 of going into business with me that I am involved in various Intellectual Property disputes originating from an entertainment and media company that I had founded in 2015. The details of these lawsuits are immaterial to this discussion, but in the spirit of transparency, I will add that in the latest lawsuit I had entered a parallel suit against both the publisher and the artist to vindicate myself and my companies. Should any LP have any concerns regarding this, I have nothing to hide in any regard and will provide any and all details as far as I am able to and as far as is permissible. But I digress. Eli was fully aware of this protracted litigation and is trying to act surprised by something he knew about for years and on which he had much commentary to share, stating that it was just a bunch of artists that got upset that I got 'too good of a deal.' Eli sharing this clearly shows he has a complete and utter disregard for our Non-Disclosure Agreement. As stated above, I am happy to discuss that litigation with anyone interested – one can be found HERE. All LPs are more than welcome to download the complaint that one of my company's and I filed against an artist and a behemoth publisher who has committed Copyright Infringement and stolen our optioned work.

On the topic of lawsuits, circling back to the egregious lowly comments in relation to Mr. Burton and his father – my opinion and two cents on the matter is that it may be Eli's strategy is to go into business with people, extricate himself whenever he sees fit (with or without ill-gotten gains), sue them, then tell the next round of people that he was wronged, until he has time to do it all over again by seemingly repeating this cycle whenever it suits him to do so. As alluded to above, we now believe we aware of a pattern of behavior from Eli wherein he exits from a venture (whether forced out, voluntarily, or otherwise) and engages in so-called 'lawfare' to defend any ill-gotten gains he has obtained. Before the current instance, we refer to the actions taken against Mr. Burton alluded to above. At the time, Eli told us that he was wronged by Mr. Burton. And now, to you, he repeats that behavior by vehemently accusing me of wrongdoing. In this very instance, he didn't just try suing me, but he has also tried suing my significant other for Conspiracy. Nearly equally, Simon Divilov, one of the earliest Limited Partners of MegaCap and my co-founder at the Bitcoin Mining operation that Eli was once a part of, is also being sued for Conspiracy, amongst other frivolous claims. Simon will have a statement about this below (Please see *Exhibit T*). In Simon's case, as in this instance as well, Eli repeats his behavior of crying foul while refusing to engage in mediation, all the while attempting to escape liability. Again, Eli

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

refused to mediate or let alone talk with Simon to resolve his issues about his underfunding and default of the Bitcoin Miners that we purchased – instead electing to sue one of Eli's very own investors, Simon. Outside of being a long-time business partner, colleague, friend, and investor, Simon also works with the United States of America's Department of Defense and he has found Eli's behavior and candor to be absolutely deplorable. Eli's failure to pay our company, The Dharma Initiative, wherein Simon and I hold equity, has forced Simon, myself and other Dharma partners to temporarily fund Eli's default of over $100,000. Had we not done so, we would have faced a company-wide default and would have lost nearly all of our Bitcoin miners. Once again, Eli attempts to paint a false narrative that we are the 'bad guys' while he engages in fraudulent and malicious behavior. We have at our disposal hundreds (if not thousands) of messages on a WhatsApp group discussing these transactions as well as several signed documents in support of our claims. As they are not directly related to the current matter, I elected not to include them herein, but should any LP be interested, I can discuss with you making those documents available. I believe that Eli's lack of accountability and responsibility is just another *flawless (sarcasm)* character trait that he possesses and should not be overlooked in these instances.

Eli has told Rod as recently as July 12 that "All of that being said, I am not prepared to negotiate anything, I am not speaking with Marc again, ever, under any circumstance…" Does that sound like someone willing to mediate if he won't even negotiate or speak with me? Please do not believe Eli's blatant and flagrant lies in his communications with fellow Limited Partners and understand that A) Eli has no jurisdiction over me in any Jurisdiction except for Delaware and I have no requirement to consent to jurisdiction in any Jurisdiction except for Delaware, B) Our Goldner Blatt Investments Operating Agreement has the same dispute resolution provisions as MegaCap (which Eli consistently mentions), provisions which he is refusing to abide by in both instances, C) that the GBI OA is governed under Delaware law, and D) has refused to not just Mediate, but, has also under false pretenses threatened litigation and is disguising his true motives to try to destroy me, steal my assets, and take away from me all the years of hard work I put into building these Companies and creating a dream, vision, and goal for us to all share in together in this journey.

> Marc's email to you appears to be intended to sow fear and solicit money from you to defend against these suits and finance a dispute of his withdrawal

8. My previous letter to you was not an attempt to "sow fear and solicit money", I believe that my message to each and every LP was an authentic and genuine account of the status quo, and that I have a fiduciary duty to inform LPs the truth of what is going on behind the scenes. The purpose of my messages are not to solicit money from LPs to "defend against these suits", it is primarily informational as all LPs have a right to know what's going on – that is part of my Fiduciary Duty to all of you. I do want to take a breath to thank each and every LP who has taken the time to meet with me and go through this disastrous situation. Eli's statements again are patently false as that is not the underlying purpose of my letters to you. As I said above, I inform you of these matters since it is my fiduciary duty to do so, a duty that I take extremely seriously. There are numerous LPs who are joining me as a Class to sue Eli and MegaCap for his breach of fiduciary duty, amongst other causes of action. Eli conveniently misconstrues this to be a solicitation of funds, when it is in fact just Rod, myself, and the LPs regaining rightful control of our collective equity.

I believe I have always done right by each and every LP, many of whom I consider some of my closest friends



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

in life. Every investor is not just an investor and LPs should not be just looked at as dollar signs. You are each people, and as a person, I ask you to ask yourself, is Eli Blatt the person you want to trust handling *any* of your assets?

> Despite his aspersions to the contrary, Company operations continue to function normally at this time despite Marc's efforts to disrupt operations, and the investments it manages are unaffected

9. Eli claims that "Company operations continue to function normally at this time." Again, this is untrue.

First, that K1s for ✕✕✕ still have not been properly issued for 2021, and we are now in November of 2023. Eli unilaterally changing the K1s to fit his own needs and illegal takeover of MegaCap is not the definition of functioning normally. It is now clear that, from the Flow correspondence, that Eli is attempting to issue them now, however, entirely improperly and incorrectly calculated. What's the most outrageous about this whole K1 debacle is that Eli is asking Blake Schneider at Flow for the K1s because Eli doesn't have them – which leads to the natural assumption that he never even downloaded them when we had access to them far prior to Eli's illegal, invalid, unenforceable, and improper removal of me from MegaCap. The grand irony is that all Eli has to do is actually speak with me. I actually have the correct K1s I reviewed and approved. Regardless of the dispute between Eli and myself, I have always been and continue to remain committed to my fiduciary duty to each and every LP and I have read through every single page of every LPs K1 that I had access to prior to my access being restricted. Please see *Exhibit U* which sets out the chain of events and I am happy to discuss this further with any and all LPs who would like a deeper understanding of the situation surrounding the K1s. What we have seen is that Eli tried to effectively 'backdate' my 'withdrawal' to the last email I sent at MegaCap which happened to be to Flow on April 28. In that email I asked Eli to actually look at the K1s, but instead of committing to his responsibility, he instead began waging a war against me and doing everything he could to dispossess me of my interest and rights. So that every Limited Partner is aware, I have the K1s for the LPs but Eli is preventing me from transacting on behalf of MegaCap through my MegaCap email and through Flow. Eli has been the primary reason that the 2021 K1s for ✕✕✕ have not been issued until just recently, as they have existed, and were ready to distribute for months, but once again I have been dispossessed of my ability to issue them and complete them in a timely manner due to Eli.

Second, upon information and belief, Eli has still failed to issue K1s to Limited Partners for ✕✕✕ for 2022, ✕✕ for 2022, and ✕✕✕✕ for 2022. Eli's attention seems to be solely focused on MegaCap's ✕✕✕ investment because that is where *his* money is locked up, where there is an active promissory note continually accruing interest, and where the most money raised out of any MegaCap vehicle is located. Rod and I's ability to help is limited, but please rest assured that I'll do everything in my power and legal authority to do what I can!

Due to these restrictions imposed, I want everyone to be informed that Rod and I can now be reached at Marc@MegaCapFunds.com and Rod@MegaCapFunds.com for any MegaCap concerns. Please do not hesitate to reach out with any and all questions you may have.

In light of the above, I am requesting that there is a mass request from each and every LP to tell Eli to comply with his duties and permit the proper submission of K1s with immediate effect. Regardless of his undertaking



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

to submit the K1s, due to his past pattern of lackadaisical and apathetic handling of even simple back-office tasks, I have serious concerns that the K1s will be submitted improperly, if at all, despite his undertakings to the contrary. As such, per my initial review of Simon and Rod's K1, it does not appear that these K1s were prepared by an accounting firm as the introductory letter page is signed by MegaCap proper. I ask that you insist that Eli stop playing funny games with all of your taxes. Rod and I are doing our best to do right by everyone, and will work diligently to help us all get through this to a successful exit!

Third, upon information and belief that Eli's attempted sales efforts have ceased, or at the very least slowed down to a crawl, and I was told as of Friday July 7, 2023, "No incoming money from Eli, correct." However, I was notified on August 7, 2023 that Eli is attempting to waive management fees and reduce carried interest to new LPs, an action that he is unable to do, but will still attempt, as he continues to try to unjustly enrich himself. Prior to Eli's illegal withdrawal and improper and unenforceable redemption of me from MegaCap, I negotiated a deal with a Capital Partner to extend a Promissory Note (as well as waive over $100k in interest owed) in order to prevent MegaCap from defaulting. This default could have jeopardized the SPV of _____ due to the Note being held by MegaCap Funds, LP Tech Holding and not by the General Partnership which is how it was supposed to be structured and which could have bankrupted MegaCap Funds without me. But yet again, Eli fails to mention this as he pretends that every aspect of the company is running fine and dandy – all hunky dory, right? Not quite so.

Fourth, that he has presumably diverted his focus to his new "company" called Thinkable, which apparently is an AI company that he boasts that he is the "Co-Founder and President" of. While it is speculation and opinion on our part, it seems that his focus is on new ventures and not on current ones, including what could only be assumed that funding such new ventures, at least in part, with funds illegitimately obtained from MegaCap proceeds – however, that is speculation.

## VIII. Wrapping Up, Next Steps, and the New and Improved MegaCap Funds

> I regret Marc's inappropriate letter to you and assure you that from an operational and security standpoint, the Company and the investments it oversees are not at any imminent risk at this time.

Eli may "regret" my letter to you, as it exposes his malfeasance, but I do not. I fully believe that my previous letter, as well as this one, truthfully and honestly depicts the absolute truth to the events that have occurred. What is regrettable is that the outcome of Eli's actions will be a multi-year protracted legal battle. Instead of working to resolve these problems, Eli is attempting to create a litigious circus and raise frivolous claims because he thought he'd be able to use bullying tactics in order to force us to walk away.. One thing is for certain, my partners and I are not going anywhere!

I will continue to do my best to protect the name of the ✕✕✕✕ employee in case of an impending federal lawsuit and potential injunction against Eli and will do my best to ensure that the potential risks are minimized surrounding the fact that the Employee's shares could get cancelled or redeemed if the GP of the SPV that purchased the derivative equity in ✕✕✕✕ becomes involved by proxy, or worse, if ✕✕✕✕ and/or



MegaCap Capital

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

 proper finds out about this transaction and cancels the Employee's shares himself.

Due to these restrictions imposed, I want everyone to be informed that I can now be reached at +1.516.984.1466 and you can reach Rod at Rod@MegaCapFunds.com for any MegaCap concerns. Please do not hesitate to reach out with any and all questions you may have. For the sake of convenience, I repeat in my new email address here again as Marc@MegaCapFunds.com should you have any concerns or questions.

Once again, I am more than happy to discuss everything openly and transparently with each and every one of you. Unlike Eli, I have nothing to hide. I want to thank you all once again for your support while we deal with this unfortunate series of events. It is disappointing and unfortunate that matters have turned out like this and truly hope that everyone can see the massive amount of work that Rod and I are putting in to correct this. Thank you for reading!

I continue to Reserve All Rights, and this letter is not inclusive of all of Eli's breaches of our numerous signed and enforceable Agreements. My rights are fully reserved herein.

All the best,

*Marc Goldner*

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing & General Partner
MegaCap Capital & MegaCap Funds

/ Endorsed by Roderyck Reiter and Simon Divilov /

I, Roderyck Reiter, Reserve All Rights.

Roderyck Reiter
Series 7
Series 63
Licensed Real Estate Broker (Florida)

I, Dr. Simon Divilov, Reserve All Rights.

*Simon Divilov*

Dr. Simon Divilov, PhD

P.S. Please see a letter from Rod attached below as *Exhibit Z*. Thank you once again!

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit A

---

Update from Megacap Counsel and the General Partner



Please see this letter from Megacap's counsel addressing the management of the Company in response to a letter Marc Goldner recently sent to you and other Megacap Limited Partners. Mr. Elkins previously represented the Company in an unrelated matter commencing in June of 2022.

As both letters confirm, Marc has been withdrawn from the Company as a Class A Voting Member and Manager according to the withdrawal and redemption provisions of the Company Operating Agreement and is no longer operating the Company. Both letters further convey that he has not formally requested private mediation or arbitration pursuant to the dispute resolution terms of the Company Operating Agreement he is obligated to adhere to in the event of a dispute.

To address some pertinent questions and concerns Marc's letter may have raised:

- Marc was withdrawn to protect the Company pursuant to the procedures outlined in the Company Operating Agreement for breaches of the Agreement, including his fiduciary duty

---

- Marc was withdrawn to protect the Company pursuant to the procedures outlined in the Company Operating Agreement for breaches of the Agreement, including his fiduciary duty

- The redemption of Marc's unvested equity that he had not yet earned was done in accordance with the terms of the Operating Agreement at a predetermined valuation that is fully auditable

- Should Marc elect to formally dispute his withdrawal, the Company's dispute resolution provisions call for a private and confidential mediation and arbitration governed by the American Arbitration Association that exists specifically to protect the company and its investors

- Neither that process itself nor the outcome would have any direct impact on the SPVs managed by Megacap Capital

- All SPV equity is calculated on a per-share basis at a fixed price, is managed and reported by Flow, and there is no way to "take any shares right off the bat of most of the LPs"

- The GP for the SPV via which Tech I has its derivative equity interest in Neuralink is already aware of Marc's withdrawal and has stated she has no cause to redeem the underlying equity on the basis of a private Member dispute

---

- The GP for the SPV via which Tech I has its derivative equity interest in Neuralink is already aware of Marc's withdrawal and has stated she has no cause to redeem the underlying equity on the basis of a private Member dispute

- As a matter of public record, I have litigation filed against Marc relating to non-Megacap matters (as numerous others have had recently as well – google "Marc Goldner Lawsuit"), which to date he has evaded service for

- Marc's email to you appears to be intended to sow fear and solicit money from you to defend against these suits and finance a dispute of his withdrawal

- Despite his aspersions to the contrary, Company operations continue to function normally at this time despite Marc's efforts to disrupt operations, and the investments it manages are unaffected

I regret Marc's inappropriate letter to you and assure you that from an operational and security standpoint, the Company and the investments it oversees are not at any imminent risk at this time.

Please contact me with any concern and advise me if you should hear from Marc again.

Sincerely,

Eli M. Blatt
Managing Partner, Megacap Capital

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit B

June 2, 2023

**VIA FLOW**

RE:   *Megacap Capital, LLC*

Dear Megacap Partner,

I represent Megacap Capital, LLC ("the Company").

I am writing regarding the current operation of the Company. Presently, the Company is operated by Dr. Eli Blatt. Dr. Blatt withdrew Marc Goldner as a Class A voting Member and Manager of the Company.

Any dispute between the Members of the Company is subject to the Company's dispute resolution procedure which calls for private mediation and arbitration. As of the date of this letter, Mr. Goldberg has not taken advantage of this procedure.

Please direct any questions or concerns relating to the Company to Dr. Blatt at team@megacap.capital.

Sincerely,

Michael L. Elkins
melkins@mlelawfirm.com

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit C

NOT A CERTIFIED COPY

JAMS Payment

Michael Elkins
To: Marc Goldner, Eli M Blatt

Marc,

Thank you for your email.

Below I address the issues from your email. I am not representing Eli in any dispute that involves you.

I represented MegaCap Capital, LLC ("MegaCap"). The scope of that representation was to enforce an agreement between MegaCap and ▮▮▮▮▮▮▮▮. You and Eli are both members of MegaCap. You and Eli were not my clients. MegaCap was and remains my client as to matters involving ▮▮▮▮▮▮▮▮. I do not represent MegaCap on any other matters.

I have never represented you individually in anything. I have never represented Eli individually as relates to MegaCap. Further, through my representation of MegaCap I never learned anything about your other business interests or anything else about you individually. In fact, other than the fact that you're a member of MegaCap, I know almost nothing else about you.

If there ever was a dispute between you and Eli as relates to MegaCap, I would likely be prevented from representing either of you against the other since I represented MegaCap.

That said, since you individually have never been my client, and I did not learn any confidential information about you via my representation of MegaCap, with the exception of matters relating to MegaCap, there is no conflict if I were to represent a party against you.

Nonetheless, as to any dispute between you and Eli, as I stated above, I am not representing Eli, so there is no conflict and there is no issue.

As to my prior representation of Eli, I previously represented Eli individually in the enforcement of a promissory note. That representation was completely unrelated to my representation of MegaCap.

I currently represent an entity called Sure MCA, LLC ("Sure"). Eli is a member of that entity. The scope of that representation is also completely unrelated to my representation of MegaCap.

In short, my representation of MegaCap was on a single, discreet contract matter. My prior representation of Eli and Sure had/have no bearing on, or connection to, my representation of MegaCap.

You were aware that I handled other matters for Eli. With that being said, it doesn't matter since my representation of MegaCap is not connected in any way to the matters described above, and I am not handling any matters for anyone that is/are adverse to you individually. Although I will remind you, you individually have never been my client in any matter.

I don't see a need for a call since there is no conflict.

I trust this clarifies any issues.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

## MegaCap Capital

### Exhibit D



Benjamin R. Muschel

June 26, 2023

**VIA EMAIL**                                    *IMMEDIATE ATTENTION REQUIRED*

Re:   *Megacap Capital, LLC*

Dear

Your immediate attention to this matter is required. This law firm represents Megacap Capital, LLC (the "Company"), as co-counsel with Michael Elkins, with whom we understand you have corresponded previously. Among other things, our representation is specifically focused on matters involving Marc Goldner's persistent attempts to destabilize the Company.

We are also aware that Mr. Goldner has made numerous threats, not only against but also against other partners of the Company.

This letter serves to reaffirm what Mr. Elkins has already communicated to you previously, both in writing as well as over the phone, including:

1. We now represent the Company, along with Mr. Elkins;
2. Mr. Goldner was withdrawn pursuant to the terms of the Company Operating Agreement (the "Agreement") and is no longer authorized to speak or act on behalf of the Company;
3. Mr. Goldner is within his rights to challenge his withdrawal from the Company via the dispute resolution terms detailed in the Agreement;
4. To date, Mr. Goldner has not availed himself of these procedures, opting instead to breach the Agreement further by tortiously interfering with the Company's partners and attempting to cause the Company harm;

MIAMI   -   FORT LAUDERDALE   -   BOCA RATON

---

June 26, 2023
Page 2

5. In fact, to our knowledge Mr. Goldner has not retained counsel;

6. Mr. Goldner is not authorized to have any access to any Company information or resources; and

7. The Company formally requests that you continue working with Dr. Eli Blatt

If you have any questions or require any further information, please contact us immediately. The statements and demands set forth above are made in full reservation of all rights, remedies, and defenses.

Sincerely,



BENJAMIN R. MUSCHEL
For the Firm

CC:

Dr. Eli Blatt

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit E

**NOW, THEREFORE, BE IT RESOLVED** by a unanimous vote of the Members voting on the issue that Eli and Marc each agree that, upon fulfillment of the terms of this resolution relating to the Domain Name(s) being transferred (including but not limited to megapcap.capital) as stated herein, 2021 LP K1s issues and Megacap taxes being completed, the Registered Agent login being shared between the Parties, any intellectual property including but not limited to Copyrights, Trademarks, and potential patents held by MegaCap and/or relating to MegaCap such as the MegaCap Trademark (that will be filed after 2021's taxes are filed), their Class A Membership interests are fully vested, and that neither may be removed as Class A Voting Members or Managers from the Company by any other Member for any reason, nor is any attempted removal in the interim valid. In the interest of clarity, that means that all Sections of the operating agreement relating to Redemption of Membership Units or Involuntary Withdrawal are hereby voided upon fulfillment of the terms of this agreement, such that no Class A member can be removed as a Class A Member or Manager to any degree by the

Doc ID: be88819ca047bb925c6e98368c703ece37b9503d

other Class A Members, and that any such attempted removal shall be void upon completion of the terms of this resolution. Further, it is understood and acknowledged by the parties that any and all deals from the past up until MCTH and MCTI are governed under the prior December 2021 resolution, and that any current (including but not limited to MCTH and MCTI) and future deals being worked on are to be split evenly between all Class A Members on all accounts. Therefore, once the capital partners are repaid and expenses are reimbursed, going forward any distributions for the deal flow that MegaCap has conducted to date will be deemed to be evenly split between all Class A Members as reflected in the past agreements agreed by the parties.

Doc ID: 3fcb7f9f002d4ba3e72e5e82f310a063b1032f4



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit F – Clip of Email sent on February 2, 2023



NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit G

80. <u>Dispute Resolution</u>.   Any Dispute between or among any Members (including any Additional Members, Substitute Members or Assignees), arising out of or relating to this Agreement shall be exclusively resolved in accordance with the procedures set forth in this <u>Section</u>.  The initiation and pendency of the procedures under this <u>Section</u> does not relieve the Parties from their respective obligations under the Agreement.  ALL SUBMISSIONS AND PROCEEDINGS HELD PURSUANT TO THIS <u>SECTION</u> SHALL BE CONFIDENTIAL AND NEITHER THE PARTIES THERETO NOR THE MEDIATOR OR ARBITRATOR, AS THE CASE MAY BE, MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS OF ANY MEDIATION OR ARBITRATION HEREUNDER WITHOUT THE PRIOR WRITTEN CONSENT OF ALL OF THE PARTIES THERETO, UNLESS REQUIRED BY APPLICABLE LAW TO DO SO.

    A.   Negotiations by and between the Parties.

    (1)   Prior to initiating mediation or arbitration related to a Dispute under this Agreement, a Member (the "Disputing Party") shall provide the other Members (the "Responding Parties") with written notice describing the basis for the dispute in reasonable detail.  Within ten (10) days after receiving such notice, the Responding Parties shall provide the Disputing Party with a written response addressing each of the matters raised by the Disputing Party.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit H

81.  Equitable Remedies.  The Members agree that a material breach of this Agreement may cause irreparable harm and damages to the Company and other Members, the amount of which would be impossible to ascertain, and that there may be no adequate remedy at law for any such breach. Therefore, the Company and other Members shall have available, in addition to any and all other rights

*MEGACAP CAPITAL, LLC Operating Agreement*
Page 16 of 20

and remedies available to them, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach, and to specific performance of any provision of this Agreement.  The Members further agree that no bond or other security shall be required in obtaining such equitable relief, unless such bond requirement cannot be waived under applicable law. For any relief or enforcement sought under this Section that must be submitted to a court of law or in equity, any such action shall be brought in the state or federal courts serving New Castle, Delaware.  For purposes of the foregoing, each Member expressly waives any objection to venue or personal jurisdiction in said venue, and waives any jurisdictional-related defenses including, without limitation, based on the doctrine of *forum non conveniens*.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

**MegaCap Capital**

11/7/2023

## Exhibit I

📄 **Injunction Exhibit C - Goldner Felonies.pdf**

Doc ID: 3fcb7f96002b48a3e72e5e62f310a063b10321d

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

**Exhibit J – First Communication with Intermediary about ▮▮▮▮▮ after ✕✕✕✕ 'closes'**

Apr 30, 2021

🔒 Messages and calls are end-to-end encrypted.
No one outside of this chat, not even WhatsApp,
can read or listen to them. Tap to learn more.

Rod MegaCap created this group

Eli "Stanford Homeless" TRIUM Always Homefree
added you

Eli "Stanford Homeless" TRIUM Always...
Adding Marc, our third partner                13:02

Hey all! Pleasure     13:02 ✓✓

After we close this, we need to find a
way to get into the ▮▮▮▮▮
                                  ★ 13:02 ✓✓

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit K





Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit L

Doc ID: be88819ca047bb925c6e98368c705ece37b9503

other Class A Members, and that any such attempted removal shall be void upon completion of the terms of this resolution. Further, it is understood and acknowledged by the parties that any and all deals from the past up until MCTH and MCTI are governed under the prior December 2021 resolution, and that any current (including but not limited to MCTH and MCTI) and future deals being worked on are to be split evenly between all Class A Members on all accounts. Therefore, once the capital partners are repaid and expenses are reimbursed, going forward any distributions for the deal flow that MegaCap has conducted to date will be deemed to be evenly split between all Class A Members as reflected in the past agreements agreed by the parties.

**FURTHER RESOLVED,** that Eli will consent to moving the registered agent and domain accounts to a separate login as soon as the Option and Loan Resolution is fully executed and the 2021 taxes are filed and LP K1s issued for 2021. Additionally, Eli will make Marc a super-admin with equal administrative privileges as Eli has in the MegaCap google workspace and any other accounts relating to MegaCap. If Eli fails to complete this within reasonable time after such filing, or if Marc or Eli uses such privileges to alter Eli's or Marc's privileges, it shall constitute immediate grounds for involuntary withdrawal from the Company.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit M



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit N



Dear Simon,

Attached please find your draft 2022 K1 package for Megacap Funds, LP - Tech I.

Please note, if your management fee included a fractional dollar, it has been either rounded or truncated, as the tax software did not permit cents. However your ending capital account balance corresponds identically to your subscription amount, which did not contain any cents.

Should you notice any errors or things that need to be changed (e.g. address or a TIN you acquired since subscribing), you must let us know by before Thursday, September 14, as the return will be e-filed on that day.

As a reminder, as you were notified last October, the 2021 Tech I return contained errors by both the source of the equity and the fund administrator requiring amendment. That amendment is now being finalized and will be sent to you in the next few days. It will show zero income and expense, as management fees were deferred until Megacap closed on the equity in 2022, which is why your 2022 return shows your management fee paid, even if you subscribed in 2021.

Thank you once again for your confidence in us. Please feel free to contact us with any questions at team@megacap.capital.

Best,
Eli M Blatt
Managing Partner

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit O

12. In the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-à-vis each other. For example, there are three members of a class of Units: Member A owns 100 Units, Member B owns 50 units, and Member C owns 15 Units. The Company redeems Member C's Units. Member A would receive 10 of Member C's units and Member B would receive the remaining 5; 100 Units (Member A's holding) / 150 Units (the sum of Member A and Member B's holdings) x 50 (Member C's Units).

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit P

June 16, 2023

Marc Goldner,

Re: Admission in ████████

Dear Marc Goldner,

Thank you for contacting us about the internal dispute between yourself (Marc Goldner) and business partner Eli Blatt of MegaCap LLC pertaining to your recent investment in membership interest in ████ A Series of ██████████ LLC.

At this time, we are now aware of the situation and agree there will be no distributions or movement of your holdings until all parties of MegaCap LLC sign and agree when there is a required liquidity event.

If you have any questions regarding the company or your investment, please contact investor relations:

████████   Phone ████████

Email ████████

Sincerely,

████████

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Q



TO: MARC GOLDNER

THANKS FOR INFORMING US ABOUT YOUR DISPUTE WITH ELI M
BLATT AND MEGACAP.

WE CONFIRM THAT WE WILL NOT BE ABLE TO RELEASE ANY
SHARES OR, IN CASE OF A LIQUIDITY EVENT, ANY PROCEEDS
FROM SALE OF SHARES OF SPACEX TO MEGACAP UNTIL ALL
INVOLVED PARTIES UNANIMOUSLY REACH AN AGREEMENT OR
SETTLEMENT AND PROVIDE A SOLID EVIDENCE FOR THAT

KIND REGARDS,

CA

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit R



NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit S

MEGACAP CAPITAL, LLC Operating Agreement
Page 9 of 20

business interest in the Company as determined by a supermajority consent of the Class A Voting
Members as reflected the execution of an updated schedule of Membership Interests.

### Voluntary Withdrawal of a Member

40. The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

41. INTENTIONALLY LEFT BLANK

### Involuntary Withdrawal of a Member

42. Events leading to the involuntary withdrawal of a Member from the Company will include but not be
limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable
participation in the Company; Member incompetence; breach of fiduciary duties by a Member; felony
conviction of a Member; or a legal judgment against a Member (excluding any judgment resulting from
any litigation relating to Marc Goldner) that is pending as of the effective date hereof) that can
reasonably be expected to bring the business or societal reputation of the Company into disrepute.
Expulsion of a Member can also occur on application by the Company or another Member, where it
has been judicially determined that the Member has engaged in conduct that adversely and materially
affected the Company's business; has willfully or persistently committed a material breach of this
Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct
relating to the Company's business that makes it not reasonably practicable to carry on the business
with the Member, including not devoting time to the Company as required per Section 34.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

**MegaCap Capital**

## Exhibit T – Simon's Statement



**THE DHARMA INITIATIVE**
THE CRYPTO MINERS

Simon Divilov
Co-Founder & Chief Technology Officer
Simon@TheCryptoMiners.io
1 (347) 260 – 3135

5 November 2023

Dear Investors of MegaCap,

My name is Simon Divilov, I'm an academic researcher with a PhD in theoretical physics, but also, I am an LP much like yourselves, in fact, one of the earliest ones due to my long personal friendship with Marc. I am a very private person, but the wrongdoing I suffered entering into a business venture with Eli Blatt has caused me to speak out, to warn you and possibly prevent future new victims.

To give a brief background on Marc and my professional and personal history. We had met when we were both still in undergrad in 2008. We quickly became friends and often theorized about what the future would hold. As two self-prescribed futurists, we had envisioned what the future would hold and that eventually led to us co-investing in the early 2010s. However, prior to that, Marc and I had been pitching to our friends the mining prospects around Bitcoin. At the time, many thought it was an outlandish investment. Some even laughed us out of the room at a party in New York City. However, Marc and I continued exploring the digital asset space.

In 2012, Marc, his now significant other, and myself formed our first consulting and investment venture which still exists to this day. It was in 2013 that Rachel encouraged us to explore Bitcoin once again. Shortly after, we began the process of opening an account at Mt. Gox – which unfortunately, went sideways when Mt. Gox abruptly halted its operations upon discovery of the loss or theft of its Bitcoins, which slowed our exploration of the space due to diminished confidence in the custodial and trading-related operations and practices of exchanges akin to Mt. Gox. The temporary slowdown of our various crypto-related activities were ultimately revitalized when we began investing in Dogecoin several years later and decided to restart our original thesis from 2009 to build a mining venture – now known as The Dharma Initiative (or The Crypto Miners) since its founding by our team sans-Eli. Throughout this time, Marc and I always remained optimistic about the future promises of a decentralized asset class as well as futuristic technologies.

During our long discussions in 2009, we would discuss the potential application of cybernetics, life longevity, and neural interface device technologies. All of this pre-dated the existence of ▨▨▨▨ While my interest was in the mathematical and technological side, Marc's was of the business and legal nature. Early on, Marc had theorized the early laws and regulations surrounding Robotic Rights, as well as privacy and regulatory concerns surrounding brain computer interfaces. We began working on the foundation of a think-tank later to be called Neuralverse around 2012. As Marc worked on founding MegaCap, it was no surprise to me that ▨▨▨▨ was one of his first targets for investment as it aligned with his investment thesis.

Around May of 2021, after a brief discussion Marc and I had, about his clear vision on future technologies, shortly after, I decided to invest in MegaCap. Marc and I had first discussed ▨▨▨▨ in 2014. Around Winter of 2020, Marc propositioned about revitalizing our Bitcoin mining venture that we had been discussing for years, but due to time constraints we were never able to fully materialize. Prior to Marc attending TRIUM in person, Rachel had pushed both of us to make the time every Sunday to iron out plans because otherwise we'd one day regret it. Marc pitched what is now known as The Dharma Initiative as a capstone project to some of his TRIUM classmates – I was always

VERIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit T – Simon's Statement



THE DHARMA INITIATIVE
THE CRYPTO MINERS

Simon Divilov
Co-Founder & Chief Technology Officer
Simon@TheCryptoMiners.io
1 (347) 260 - 3135

5 November 2023

meant to be a partner at the company, as Marc and I originally founded the company. I specifically created the financial model as well as proprietary intellectual property for all backend to mine BTC. We ended up going into the business with Eli who allegedly had previous experience with cryptocurrencies, as well as, connections to like-minded investors. Eli was at one time one of many partners that were part of Dharma after its initial founding by Marc, myself, and several others that are still involved.

The initial part of the business involved buying and operating a number of miners, which was carefully determined after financial modeling of the cash flow and profits done by me. Everyone was confident and over the phone Eli told me that he was "really looking forward to working with me and growing the business."

After obtaining a small pool of investors, with the majority of funds coming from the founding members of Dharma, we entered into a contract with a third-party vendor to obtain the necessary miners as the seed to grow the business. Initially, things did not go as planned, with delays from the third-party vendor and the significant downturn in the price of Bitcoin. However, Marc, myself and the majority of the founding team were optimistic given that short term fluctuations were not particularly important in the overall long-term profit, as this already incorporated into our business plan. Part of that business model stemmed from years of work Marc, Rachel, and I had built around refining our processes, developing intellectual property, and collaborations dating back to our pre-existing automated trading algorithm plans and code, a ramen spectrometer scanner to increase the yield of crops accounting for localized weather fluctuations, amongst several other 'neural' ideas.

It turned out that Eli did not share our optimistic forward-looking sentiment with the rest of us, specifically related to the potential gains I had predicted regarding the miners held at The Dharma Initiative. To this day, I am of the belief that Eli understood the financial models I had developed but chose to act with malice in an attempt to position himself to commandeer control of Dharma, which I had prevented. While, admittedly, my belief of Eli's actions have changed with time, this was due to Eli's inconsistent story that was constantly changing over the years. The actions Eli took seemed spontaneous, illogical, and desperate. Around Winter of 2022, Eli began demanding the financial records of our transactions with the third-party vendor so that he can understand what was paid for and create a spreadsheet for our other investors so they can understand our financial situation. The ultimate purpose of this spreadsheet was for Eli to explain how much of the 'balance' everyone owed pro-rata since the only thing paid up until this point on many of the miners was the deposit to secure the miners themselves, as well as a security deposit, and an advance on hosting fees. After providing him with the documents, he created an extremely Byzantine spreadsheet that not only had the wrong financial figures, but also the incorrect allocation of miners. Dharma's members were left confused about what prompted him to act this rashly and sloppily, so between March-May 2022, we attempted to explain to him the financial models (which in principle he should have already understood before investing any money). We began to suspect that Eli was 'playing dumb' and pretending to act clueless. Eli appeared to say one thing, do another, then forget he said it to begin with. Eli's behavior became suspect, and we all began to worry about our start-up.

Our efforts were to no avail, and he began demanding that we start selling off our assets (miners) because the

Doc ID: 3fcb7f36002b48a3e22e5e62f310a063b103219

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit T – Simon's Statement



THE DHARMA INITIATIVE
THE CRYPTO MINERS

Simon Divilov
Co-Founder & Chief Technology Officer
Simon@TheCryptoMiners.io
1 (347) 260 - 3135

5 November 2023

business was not profitable (even for a basic investor it should be obvious that the first few years are mostly expenses and losses). After we declined to go through with such illogical demands, a proposal was floated around that we "buy him out", which I found confusing at first considering we were in a joint venture. Eli wasn't just some random investor. Marc attempted to offer Eli an incredibly generous deal that I believe was above market price of the miners, but Eli declined attempting to strong-arm his business partners with the specter of defaulting, which was utilized as a fear tactic against us. Ultimately, we declined again, although we did offer him an interest-free loan, because it seemed that he needed the money due to his lifestyle choices – however, as business partners, we wanted to offer an olive branch to a partner in need, when we had no obligation to do so. His response to this generous offer, was deciding to default on the payments, leaving the rest of the Dharma members to pick up the tab. In brief, he defaulted and left the business in a distressed state, all because he pretended not to understand the finances of the business model that he helped co-create in an XLS format, and instead opted to sue Dharma, myself, Marc, and Rachel. I believe that his tactics were simply a way for Dharma to be forced to pay for the miners hosting fees which exceed $10,000 a month, while a painstakingly long litigation process would ensue. Eli failed to arbitrate, as was required by our Agreement, and instead has fabricated a lie that we have 'stolen' his money – which I assure you we haven't. I am more than willing to talk with any fellow LP about Eli's unprofessional behavior.

Given that Eli had a big commitment of capital in this venture, paying his share forced me to borrow money from friends and family, which is not only extremely stressful but embarrassing. I am slowly recovering financially, by trying to redistribute my other investments. Unfortunately, what was initially a fun and promising vision has turned into a nightmare, which I hope no one has to suffer through. One lesson I have learned from this is about trust, loyalty, and friendship. Since this entire debacle ensued, Marc and I have become closer than ever and have elevated our professional working relationship to continue our ventures without the likes of someone like Eli who can't be trusted. I hope this helped shed some light on this situation with Eli Blatt.

This letter is not meant to be all inclusive of all the details surrounding Eli Blatt's breaches, illicit actions, and continued fraudulent malfeasance relating to MegaCap and all our other ventures.

I reserve all rights.

Best,

*Simon Divilov*

Simon Divilov, PhD

NOT CURRENT COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit U

 MegaCap K1s Eli is Withholding

36 items, 8.02 GB available

---

**RN** **Ryan Nanney**
Re: Flow / Mega-Cap - resolution needed by Dec 16
To: Marc Goldner, Cc: Eli M Blatt

April 10, 2023 at 1:42 PM

Details

Hi Marc and Eli, I heard back from our tax preparer and he said the Tech Holding and Tech I tax returns should be good as they are reported. There were no items of income reported for Tech Holding for 2021:

https://app.box.com/s/57iowqu64s49g4vvyy6q1fc0uhb7ociy

and the only items reported for Tech I was the Management Fee:

https://app.box.com/s/q2kgvy7h8durnz4dof49271f0yrbf0eeo

Please let me know if these look good to you and we can distribute the K-1s.

Thanks!

See More from Marc Goldner

--
**Ryan Nanney**
Fund Accounting Controller

 flow

https://flowinc.com/

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit U



**Marc Goldner**
Re: Flow / Mega-Cap - resolution needed by Dec 16
To: Ryan Nanney,  Cc: Eli M Blatt

Details

Following up on this. Is this approved to send?

I got a question from ▨▨▨ about the K1.

This communication and any attachments, is intended for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure or copying is prohibited. If you have received this communication in error, please notify the sender immediately by replying to this communication and then deleting it from your system.  Thank you.

See More from Marc Goldner

**Ryan Nanney**
Re: Flow / Mega-Cap - resolution needed by Dec 16
To: Marc Goldner,  Cc: Eli M Blatt

Details

I asked Travis to look at it one last time about a week ago but have not heard back yet.  I will let you know as soon as I hear back.

See More from Marc Goldner

—
**Ryan Nanney**
Fund Accounting Controller

flow
https://flowinc.com/

**Ryan Nanney**
Re: Flow / Mega-Cap - resolution needed by Dec 16
To: Marc Goldner,  Cc: Eli M Blatt

Details

Hi Marc and Eli, here is what our tax preparer said.  Thanks!

If I'm understanding the situation correctly, the discrepancy is just a Balance Sheet item that does not affect any taxable amounts.  If that's the case, we are good to move forward.

See More from Marc Goldner

—
**Ryan Nanney**

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit U





Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit U (continued) – a snippet of Eli's July 24th email to Flow

a. Flow's only obligation with respect to reporting going forward would be to provide the Company all past, completed tax and regulatory information, filings, and documents in its possession, as I requested in my prior email.

NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

## Exhibit V



**Ashley Vargas**
To: Marc Goldner

Wednesday, Jul 19, 6:09 PM

Marc,

I am unable to confirm that Eli Blatt has an active certification.

---

**Rob Frankel**
To: Marc Goldner        Cc: Anita, Ashley and 1 more

Friday, Jul 21, 9:09 PM

Marc:

As far as what we are doing or next steps, privacy laws prevent me from sharing our strategy with you or anyone else not connected with our organization. Without more facts and a crystal ball as to what will happen in the future, I cannot commit to any particular outcome if he should apply to one of our programs in the future.

You can go to https://investmenthelp.org/ and search for any name. If that name does not appear, he/she is not an active certificant. You can print out this email if you need something in writing to confirm that.

If you are the victim of fraud, there are governmental agencies and private attorneys who can help you recover any losses.

Have a great weekend.

Sincerely,

Rob

Robert E. Frankel
General Counsel
303-850-3082
rfrankel@d-se.org

NOT A CERTIFIED COPY

Doc ID: 3fcb7f39800a2b45a3e22e5e62f310a063b103214

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

**Exhibit W – No K1s for**  **(suspected none for Betterment or FTX) Issued for 2022**



NOT A CERTIFIED COPY

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466



MegaCap Capital

11/7/2023

**Exhibit W – No K1s for** ▨▨ **(suspected none for** ▨▨▨ **or** ▨ **) Issued for 2022**



NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

**MegaCap Capital**

11/7/2023

## Exhibit X – Raul Letter to Limited Partners



REICHARD & TORNES
ATTORNEYS AT LAW

September 12, 2023

<u>VIA E-MAIL</u>
Limited Partners of MegaCap Funds, LP

RE:   **Demands Made to Flow Inc. and Clarifications & Current Status on MegaCap Affairs and Management**

Dear Limited Partners of MegaCap Funds, LP ("LPs"):

I am writing on behalf of Marc Goldner, one of MegaCap Capital, LLC's ("MegaCap") Founding Members and one of the current General Partners.

We have reviewed correspondences between Flow and Mr. Blatt, specifically one sent to Mr. Blatt on July 26, 2023 and are puzzled as to why Flow did not include Mr. Goldner. As per Ryan Nanney's June 1, 2023 e-mail to Mr. Goldner and Mr. Blatt, wherein Mr. Nanney stated that "[they] will not respond to individual emails, or work on the MegaCap portfolio in general, until [they] receive clear guidance on who is legally in charge for MegaCap Capital." Clearly, Mr. Blatt and his or MegaCap's purported counsel sending Flow a letter and communicating with Flow privately does not constitute or provide Flow with "clear guidance."

To be clear, Mr. Blatt breached the February 13, 2023 Resolution among and between MegaCap's Members when he removed Mr. Goldner's MegaCap e-mail access, *inter alia*, this constitutes automatic grounds for the involuntary withdrawal of Mr. Blatt from MegaCap by operation of the terms of one of the resolutions for MegaCap signed by and between Mr. Blatt and Mr. Goldner. Further, the Resolution that Mr. Blatt is in breach of also states that, "no member shall remove the other from any bank account and *any financial accounts.* (emphasis added)" Flow, undoubtedly must be considered a financial account of MegaCap. Mr. Blatt attempted to wrongfully and unilaterally withdraw Mr. Goldner by backdating a withdrawal and redemption under false pretenses.

Mr. Blatt has no authority whatsoever to act unilaterally on behalf of any of the MegaCap entities and, accordingly, Flow has been instructed to not turn over any Accounting Records (including, but not limited to, K1 forms) without written and signed approval. Mr. Goldner is in possession of the unanimously approved K1s from 2021 that

Reichard Tornes, PLLC | 3663 SW 8th Street, Third Floor, Miami, FL 33135 | 305.407.1734

Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit X – Raul Letter to Limited Partners

were, and is willing and able to send proper K1s to LPs upon request. Please be aware that Mr. Blatt's illicit distribution of K1s for 2022 is not authorized nor approved by Mr. Goldner and falsely state the entire fees have been earned. Management Fees earned from LPs of MegaCap are to be annual income. Mr. Goldner had been working with Mr. Nanney, from Flow,for several months on MegaCap's complex accounting and Mr. Blatt not having access to the K1s demonstrates Mr. Blatt's failure to actively participate in the review and creation of these documents which were provided to both Mr. Blatt and Mr. Goldner on April 10, 2023. Mr. Blatt's failure to have these K1s in his possession for months seemingly indicates a breach of fiduciary duties Mr. Blatt owes to MegaCap's Limited Partners, to MegaCap proper, and to Mr. Goldner himself.

The only K1s that were ever authorized to be created by Mr. Goldner are the ones outlined in a detailed thread with the subject title "Re: Flow / Mega-Cap – resolution needed by Dec 16." This e-mail thread was a lengthy detailed discussion between MegaCap and Flow's representative, Ryan Nanney. Without Mr. Goldner's direct involvement, there is no way for him to verify the authenticity of any of the K1s that need to be distributed, thus, any K1s received by LPs are invalid and illegally distributed. Therefore, anything other than the taxable income on LP's K1s being 10% of the total fee as Mr. Goldner last reviewed on his April 27, 2023, e-mail Mr. Goldner believes will constitute tax fraud on Mr. Blatt and Flow's part and Mr. Goldner will contend and may be forced to report this incident to the relevant tax and regulatory authorities. To be clear, considering that Mr. Goldner is also a Limited Partner of MegaCap, Mr. Goldner is further seeking written and absolute assurances that these K1s include him as a Limited Partner and not just as a General Partner of MegaCap. Mr. Blatt has illegally converted the stated terms of the Resolution where the Management Fees were to be treated as loans and earned as income annually rather than completely accelerated in 2022.

Further, it should be abundantly clear that Mr. Blatt is prevented from unilaterally using MegaCap's Flow admin to contact Limited Partners. This is doubly true where he purports to be the only individual entitled to do so. As an LP, please be aware that no communication sent by Mr. Blatt from Flow, e-mail, or otherwise is authorized by Mr. Goldner, nor does Mr. Goldner accept any liability for Mr. Blatt's illicit actions. Again, please be advised that Mr. Goldner is not just a General Partner of MegaCap but a Limited Partner of MegaCap. What is more, Mr. Blatt also has illegally restricted Mr. Goldner's access to MegaCap banking at First Republic. As a result, Flow has been provided a demand letter by Mr. Goldner to cease and desist from working on the MegaCap portfolio and account without Mr. Goldner's direct involvement and say in any and all matters in connection therewith.

By way of a brief background on Mr. Blatt's other egregious actions, Mr. Goldner has been informed by the General Counsel of the Investments and Wealth Institute, Mr. Frankel, on July 21, 2023, that "...Mr Blatt is not an Institute candidate or certificant." However, Mr. Blatt was consistently misrepresenting same and holding himself out to the world and to Limited Partners and Prospective Limited Partners through pitch decks and via his LinkedIn profile that he was a "Certified Investment Management Analyst" (CIMA)

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 3 of 5
September 12, 2023

while not being properly certified to hold that title.  Further, Mr. Blatt has refused to correspond with Mr. Goldner as is required by the Mediation provision contained in the MegaCap Capital LLC Operating Agreement (the "OA").  This is so, despite he himself citing to Limited Partners of his purported willingness to do so.  Naturally, this constitutes a direct breach of the OA's Dispute Resolution provisions.  Last but not least, and as clearly documented, Mr. Blatt has not only removed around $70,000 from MegaCap's First Republic Bank Account without Mr. Goldner's approval—which was required before such funds could be transferred—, but then proceeded to spend that money from an entity called Goldner Blatt Investments, LLC.  Again, the OA likewise required Mr. Goldner's approval on all expenses above $5,500; which the formation of the aforementioned entity entailed.  Mr. Blatt also repeated the behavior illustrated here regarding another jointly held company of the parties called BitSource, LLC, where Mr. Blatt removed Mr. Goldner from the bank account and misappropriated over $6,500, along with restricting Mr. Goldner's e-mail access to the shared @Bitsource.Group e-mail address.  It is Mr. Goldner's position that Mr. Blatt has also withheld legitimate, approved expenses of Mr. Goldner in excess of $30,000.

The following are additional issues that Flow has been made aware of:

(a) On February 15, 2023, Mr. Goldner and Mr. Blatt signed IRS Form 8832 which is an Entity Classification Election for the Taxable Year Ended December 31, 2021 which stated, "THERE WAS A MISTAKE ON THE INITIAL APPLICATION.  IT WAS NOT NOTED UNTIL THE DATE THAT THE FIRST TAX RETURN (TY DEC 2021) WAS GOING TO BE FILED.  TAX RETURN FOR TY DEC 2021 FILED AS A PARTNERSHIP (FORM 1065) ON FEBRUARY 15, 2023.  ENTITY HAS TWO MEMBERS AND EACH ARE RECEIVIING A K-1."  Please note, that due to Mr. Blatt and Flow's negligence, Mr. Goldner has been prevented from properly accounting for his own tax returns due to a failure to receive a proper K-1 from MegaCap for nearly two entire                                                                                          years.

(b) Mr. Blatt has incorrectly stated that Mr. Goldner must solely abide by the dispute resolution provisions of the MegaCap OA.  This is patently false: Under Section 81 of the MegaCap OA, Mr. Goldner is entitled to equitable remedies in the form of an injunction to be filed in Federal Court in the State of Delaware.  Mr. Blatt has continued to breach the MegaCap OA by attempting to file an injunction in a Florida State Court with complete knowledge of the OA's jurisdictional provisions and restrictions.  Further, Mr. Blatt is in breach of Section 80 of the OA by refusing to respond to Mr. Goldner's attempt to mediate.

(c) Flow further has been made aware that Mr. Goldner's life was threatened by a Capital Partner of MegaCap Funds, LP in connection with Mr. Blatt's Frivolous attempts at claiming Mr. Goldner has extorted Mr. Blatt which are baseless and have no legal bearing or leg to stand on.  Mr. Blatt's continued false narrative



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 4 of 5
September 12, 2023

is merely an attempt to disparage, defame, besmirch, and assassinate Mr. Goldner's good name, reputation, and character.

(d) Mr. Blatt has no authority to hold any Units of MegaCap Capital 'in trust' that were redeemed from the third MegaCap General Partner, Roderyck Reiter. Under MegaCap's OA Section 12, it is clearly stated that "[i]n the event that the Company redeems any Units from a Member, such Units shall be allocated to the remaining Members in that same class of Units so as to maintain the relative percentage ownership of the remaining Members vis-a-vis each other."

Indeed, to illustrate the severity and unambiguous nature of this situation, Mr. Goldner possesses not one, but two letters from two different apropos sellers of shares to MegaCap stating that the release of shares are halted pending the resolution of this matter. The first states: "WE CONFIRM THAT WE WILL NOT BE ABLE TO RELEASE ANY SHARES OR, IN CASE OF A LIQUIDITY EVENT, ANY PROCEEDS FROM SALE OF SHARES OF [REDACTED] TO MEGACAP UNTIL ALL INVOLVED PARTIES UNANIMOUSLY REACH AN AGREEMENT OR SETTLEMENT AND PROVIDE A SOLID EVIDNECE FOR THAT." The second letter states: "At this time, we are now aware of the situation and agree there will be no distribution or movement of your holdings until all parties of MegaCap LLC sign and agree when there is a required liquidity event." Evidently, Mr. Blatt is not in control of MegaCap and has no sole authority whatsoever to make any unilateral decisions on behalf or to the detriment of Mr. Goldner or to any of you Limited Partners of MegaCap. Mr. Blatt's illegal takeover and commandeering of MegaCap and its assets once again are in breach of various MegaCap agreements as well as his fiduciary duties therewith and thereunder which may have constituted grounds for Mr. Blatt's automatic removal from MegaCap and all matters pertaining to any of the MegaCap entities.

To reiterate, Mr. Blatt has dispossessed Mr. Goldner of 8,217 Shares of Derivative Equity in ███████ which share value Mr. Goldner estimates to total in excess of $500,000. This matter is not being taken lightly by Mr. Goldner and he is taking appropriate action in a timely, thorough, and appropriate manner. Additionally, we've made Flow aware of the full circumstances and repercussions surrounding Mr. Blatt's conduct as well as Flow's actions in connection therewith, together with the details of the dispute involving all of MegaCap Capital General Partners. Please note that the foregoing does not include the $797,817 that Mr. Golder contends Mr. Blatt owes him.

Further, Mr. Goldner has demanded that his access be reinstated to the back-end and investor Flow portal, which portal he is rightfully entitled to have access to as Managing Partner of MegaCap. As clearly set forth herein, Mr. Blatt has no authority to restrict such access, and Flow's refusal to reinstate Mr. Goldner potentially will continue to expand Flow's exposure and liability.

Failure by Flow to abide by these demands may result in legal action being taken by Mr. Goldner against Flow, its principals, and its representatives. Furthermore, if Flow

NOT THE ORIGINAL COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit X – Raul Letter to Limited Partners

Limited Partners of MegaCap Funds, LP
Page 5 of 5
September 12, 2023

fails to respond thoroughly, it may result in a more substantive letter—at Mr. Goldner's sole discretion—which in turn may precipitate escalation to said legal action. As such, Flow has been well-advised and urged to speak with Mr. Goldner directly who has also requested that Flow cc: him on any and all further correspondences and communications with Mr. Blatt as well as any other correspondences and communications relevant and appertaining to the contents of the present letter.

Mr. Goldner hopes to hear back from Flow no later than Wednesday, September 13, 2023, which deadline was stated in the demand and cease & desist letter to Flow sent on September 11, 2023.

Sincerely yours,

REICHARD TORNES, PLLC

/s/ Raúl A. Reichard
Raúl A. Reichard, Esq., LL.M.
For the Firm

RAR

cc:
Marc Goldner
Jacqueline Tornes, Esquire

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Y – Raul Letter to MegaCap



REICHARD & TORNES
ATTORNEYS AT LAW

September 14, 2023

**VIA E-MAIL**
MegaCap Capital, LLC
MegaCap Funds, LP
team@megacap.capital; ops@megacap.capital

**RE:   MegaCap K1s and Improper Actions in Connection Therewith**

Dear MegaCap Capital, LLC and MegaCap Funds, LP ("MegaCap"):

I am writing on behalf of Dr. Simon Divilov and in response to a recent e-mail received by Flow. See Exhibit A. Dr. Divilov is quite taken aback at your most recent actions. Also, I write in light of MegaCap's—via Mr. Goldner—recent requirement to halt the filing of ostensibly fraudulent K1s and tax returns. Dr. Divilov hereby demands to know the accounting firm that you used to prepare these seemingly fraudulent K1s.

You requested Dr. Divilov to let you know by or before Thursday, September 14 if he "should [sic] notice any errors or things that need to be changed." We are hereby informing you that there must be changes made to the K1s to reflect the agreed-upon fee structure that was stated to MegaCap Limited partners via e-mail on or about February 9, 2023. In said email, MegaCap specifically stated that "[t]he amended K1s are currently being prepared by Flow, and we are pushing them to get them out by next week at the latest. In the interim, we can report *definitively* that the loss will be 0.5% of your capital commitment, representing one tenth of the 10-year 0.5% management fees. **You can report this to your accountant and proceed confidently with that number.** You will receive a notice through Flow once the K1 is complete." (emphasis added.)

Dr. Divilov did, in fact, prepare his 2021 and 2022 returns to reflect such material representations. It is unacceptable for you to unilaterally make these changes without informing Dr. Divilov and the Limited Partners of MegaCap sooner. By noticing Dr. Divilov less than a week prior to you making this

Reichard Tornes, PLLC | 3663 SW 8th Street, Third Floor, Miami, FL 33135 | 305.407.1734

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Y – Raul Letter to MegaCap

MegaCap Capital, LLC
MegaCap Funds, LP
Page 2 of 3
September 14, 2023



unauthorized change to MegaCap's returns, it will cause undue harm to Dr. Divilov. You cannot reasonably expect Dr. Divilov and Limited Partners of MegaCap to amend their returns from over a year ago due to MegaCap's malfeasance or negligence.

To be clear, you cannot amend K1s that you told Dr. Divilov and Limited Partners to file at 0.5% a year at an annual loss and then retroactively expect Dr. Divilov and Limited Partners to amend their previously filed returns to 5% loss in a previous filing. This is simply not acceptable and Dr. Divilov will be forced to proceed with legal action to correct this unjust action taken by MegaCap. And, to be clear, MegaCap will be held fully liable for any fees and costs associated with this action as per the relevant investor agreement.

Dr. Divilov is not accepting these K1s you have just sent as valid because there is a signed resolution (and an e-mail you sent to Flow certifying as such) which clearly states that there would be 0.5% loss to LPs annually. You said to Ryan Nanney at Flow on April 28, 2023: "So long as the taxable income is just 10% of the total fee then we are good." The K1 you provided does not reflect this statement and your improper recreation of MegaCap's K1s are not just seemingly illegal, but a breach of your fiduciary duties to Dr. Divilov and all other Limited Partners.

Outside of the above, Dr. Divilov demands the K1s to be created as per the Resolution you signed in February with the Managing Partner of MegaCap, Marc Goldner, and to reflect the e-mail sent to Flow which was agreed to.

Please respond immediately with your accounting firm so that Dr. Divilov can obtain the necessary details prior to reporting this violation to the Internal Revenue Service for apparent tax fraud, as it is imperative that Dr. Divilov can maintain good standing with the Department of Defense and other government agencies. As such, Dr. Divilov requires an immediate response.

Failure to comply with these demands will result in exploring a multi-party legal action with other Limited Partners against MegaCap and yourself. Dr. Divilov will be seeking removal of whomever is behind the foregoing from MegaCap entirely and will be calling a vote to halt the actor's misconduct that is jeopardizing Limited Partner funds at various MegaCap vehicles.

Lastly, your malicious withholding of Dr. Divilov's draft K1 until nearly the eleventh hour on a weekend is unacceptable. Dr. Divilov is fully aware you distributed similar drafts to at least one other LP on (at latest) Friday of last week—likewise inappropriate.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Y – Raul Letter to MegaCap

MegaCap Capital, LLC
MegaCap Funds, LP
Page 3 of 3
September 14, 2023

Therefore, Dr. Divilov expects a response no later than September 15, 2023 and demands that you do not go through with any tax filings. Your failure to otherwise abide by this demand letter may result in an escalation in this matter.

Dr. Divilov reserves all of his rights.

Sincerely yours,

REICHARD TORNES, PLLC

/s/ Raúl A. Reichard
Raúl A. Reichard, Esq., LL.M.
For the Firm

RAR

cc:
Simon Divilov
Jacqueline Tornes, Esquire

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Y – Raul Letter to MegaCap

### Exhibit A:

Flow
> To: Simon Divilov

Saturday, Sep 9, 1:09 PM

**flow**

Dear Simon,

Attached please find your draft 2022 K1 package for Megacap Funds, LP - Tech I.

Please note, if your management fee included a fractional dollar, it has been either rounded or truncated, as the tax software did not permit cents. However your ending capital account balance corresponds identically to your subscription amount, which did not contain any cents.

Should you notice any errors or things that need to be changed (e.g. address or a TIN you acquired since subscribing), you must let us know by before Thursday, September 14, as the return will be e-filed on that day.

As a reminder, as you were notified last October, the 2021 Tech I return contained errors by both the source of the equity and the fund administrator requiring amendment. That amendment is now being finalized and will be sent to you in the next few days. It will show zero income and expense, as management fees were deferred until Megacap closed on the equity in 2022, which is why your 2022 return shows your management fee paid, even if you subscribed in 2021.

Thank you once again for your confidence in us. Please feel free to contact us with any questions at team@megacap.capital.

Best,
Eli M Blatt
Managing Partner

**View Documents**

NOT A CERTIFIED COPY

Doc ID: 3fcb7f9500?b45a3e72e5e62f310a053b103234



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

MegaCap Capital

11/5/2023

To the Limited Partners of MegaCap,

I hope this letter provides much needed insight on my relationship with MegaCap & Eli M Blatt.

Since my improper and illegal redemption from MegaCap, I have chosen to keep a low profile in the interest of protecting the LPs, however, in the past several months, the situation has developed in such a way that it has forced me to break my silence.

I was involved with MegaCap since before its official inception as an entity. Previous to my time at MegaCap, I worked with a private equity fund from New York, and I adapted what I learned there to create what was in my vision a "cleaner and more transparent" version of what I had experienced.

Private Equity is a notorious branch of finance which is rife with bad actors and where trust is in short supply. I knew that the scope of the work was going to be more than I could handle on my own, so I knew I would have to find a partner to help me realize the vision. Obviously, it was important to me that I could trust my partner, in order to extend that trust down to the LPs.

Ultimately, I made the fateful, and in hindsight terrible decision of selecting Eli M. Blatt as my initial partner for this venture. My reasoning for choosing Eli Blatt, was the fact that I have known him personally since childhood (around 40 years). I knew Eli because his grandmother and my grandparents had been neighbors. So, the family connection went far beyond the 40 years I have known Eli. I was close with his grandmother, I knew his great grandmother, and I know his uncles and his mother. I also know most of his extended family on his mother's side.

In short, I knew Eli Blatt and his entire family, so I figured that at the very least I wouldn't have to worry about having to watch my back internally. I couldn't have been more wrong.

MegaCap was launched when a contact I had made in the private equity world approached me with an offer of shares of ⟨×⟩ At the time, ⟨×⟩ was the hottest issue in the pre-IPO world, and I knew that this would be an ideal launching pad for MegaCap. I had already pre-negotiated the deal with my contact for the shares of ⟨×⟩ prior to reaching out to Eli. So, I had originated not only the idea for the business, but also sourced the deal that launched MegaCap. This same contact would later also be our source for shares of ⟨×⟩ Simply put, without my direct input, MegaCap would not exist, the biggest deal made by MegaCap would not exist, and Eli Blatt would not be a "Managing Member" of MegaCap. There is a mountain of evidence to support my claim, because it is factual.

Shortly after getting started with MegaCap, Eli introduced me to Marc Goldner, one of his classmates at TRIUM, as a potential third partner. It was at this meeting where the first clues of Eli's underhanded ways manifested, as in the process of introducing Marc into the partnership, he immediately diluted his equity. As Marc did not get equal equity, but junior equity.



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

MegaCap Capital

11/5/2023

A few days later, Eli doubled down on his grotesque behavior, by "misremembering" the split of equity negotiated with Marc at this meeting, in Eli's own favor, having a blowout fight with Marc over the equity split on our group chat. In hindsight, this should have been my red flag that it was going to be a problematic partnership, but I continued to give Eli the benefit of the doubt.

This incident was a mere preview of the preferred way of doing business with Eli M. Blatt. Every new deal we worked on, Eli would forcibly renegotiate our split, arguing that he deserved more. One such instance was when Eli, Marc and myself had a Zoom call that I insisted that we record. It was around this time that my distrust for Eli's business practices began to accelerate. Eli's contribution was generally limited to initial capital investment, specifically to partially fund a deal. What should have been a clear meeting of the minds with partners, turned into a never-ending renegotiation. Eli would continually reiterate that he didn't get into this business to do "sales". Still to this day, it is unclear how Eli actually wanted to contribute to our business. He he claimed that he wanted to run the "back office" of MegaCap but then would delegate such tasks to Marc and myself, all while Marc and myself were the ones attempting to raise capital expending our time, money, resources, and energy at networking events globally.

To say that Eli is unprofessional, would be a gross understatement. In particular, Eli's communication skills are notoriously atrocious, as he quickly resorts to insulting and berating his counterpart, regardless of who that may be. And when a conversation would not go his way, particularly when the counterpart would not accept Eli's distorted version of events, he would freeze them out. Eli would burn bridges just as quickly as Marc or myself would build them. Decency and common courtesy do not feature in Eli M. Blatt's vast repertoire of skills.

In one particular instance, due to either his failure to properly negotiate compensation in advance or something such as once again his 'misremembering' of the deal terms, Eli got into a written altercation in a group chat with an alleged broker dealer that was introduced to Eli through one of Eli and Marc's mutual contacts. The conflict originated when Eli refused to compensate that fund for the part they played in securing a deal relating to Betterment. Eli insulted and berated this person in a public chat with multiple people having visibility into the argument, with no regard for the consequences of his actions.

To Eli Blatt's credit, he did in fact attempt to set-up a deal with his college friend, for Betterment, but Eli Blatt did so without speaking, consulting, or getting the deal approved by Marc and myself as per the terms of MegaCap's Operating Agreement. The details surrounding this deal is where a lot of contention began to brew amongst us partners. Eli Blatt attempted to take the lion's share of the deal and the credit in effect telling us that instead of confronting him about acting without our cognizance, we should have been thanking us. Whereas Eli Blatt tried to cut corners and do things the improper way, Marc and I attempted as best we could to right the ship and act in an ethical and



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

MegaCap Capital

11/5/2023

legal manner. This chain of events in hindsight was the beginning of Eli beginning to attempt to renegotiate the Operating Agreement to increase his pay out upon certain deals closing.

Eli also had a peculiar way of doing accounting. He would calculate his personal split of the proceeds first, then he would calculate everything else from that point. It wasn't always incorrect, but it was definitely confusing as normally you would calculate the company proceeds first and then the splits from that point. Eli would also, once having calculated his "monies", immediately transfer the funds from the company account to his personal account, without Marc or I signing off on it first, since when Eli set up the bank account, he gave himself full authority, rather than requiring multiple partners to sign off.

Many times, I addressed Eli's actions directly, in particular his communication skills and how that could impact MegaCap's overall business. Eli himself did not see any fault in his actions.

Ultimately, these constant disagreements and renegotiations resulted in an overall amendment of MegaCap's Operating Agreement, a document known as the Memorandum of Understanding. This new agreement stripped both Marc and myself, but especially me, of upside and equity in various deals that had been achieved under the MegaCap umbrella, while Eli's percentage was increased. After much discussion, Marc and I had believed that it would be in the best interest of MegaCap to not fight with Eli about what we hoped would be looked at as smaller deals in the future. Our goal was to avoid a blow-out argument with Eli that could harm LPs. Marc and I did what we did to try to isolate Eli's actions and deflect the harm to ourselves and to protect the Limited Partners. In hindsight, it was at this point it appears that Eli was attempting to work me out of MegaCap. I also started getting disillusioned with the various projects, and that even if I was able to salvage my position within MegaCap, I grew concerned that Eli's behavior would inevitably result in the implosion of MegaCap itself and destruction of the Limited Partner's funds.

All of this coincided with the birth of my daughter, which had me understandably pre-occupied, combined with the market downturn at the end of 2021, there was a general slowdown in securing investments by LPs. I had spoken with Marc on the phone constantly, as at this point my relationship with Eli began to deteriorate to the point that speaking with him was fruitless and a detriment to the business. Marc was effectively acting as a mediator between Eli and myself. Then, together, and for months, Marc and I would strategize for hours on end nearly every day on how to grow MegaCap and to do so despite Eli's continued and nearly constant interference. Together, we devised a plan to find a Capital Partner to take the business to another level so that we wouldn't be held in Eli's clutches on every new deal we'd do. Around November or December of 2020, Marc was able to successfully find a Capital Partner in Dubai to jumpstart the ⬭ deal. That Capital Partner was in the form of a $1M+ Promissory Note. Ultimately, this entity grew frustrated with the slowdown in sales velocity and Eli used this slowdown in LPs as justification for redeeming me from MegaCap, even though this temporary slowdown had no bearing on the long-term health of MegaCap. He recruited Marc,

Doc ID: 3fcb7f09d002c048a3b27e5e623310a083b103214



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

11/7/2023

MegaCap Capital

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

11/5/2023

MegaCap Capital

through coercion, to negotiate my redemption on his behalf, telling Marc he would no longer work on their ventures as long as I wasn't redeemed.

Eli wanted to not just take all of my equity away from me, even though the business was my idea and I brought him into it, even though we were childhood friends of nearly 40 years, our families were neighbors and knew each other even longer, even though that if it wasn't for me, Eli would still be begging his mother for an allowance, but he conspired to take all of our collective equity and control away.

Eli M. Blatt is a seemingly impressive person at first glance. He has a collection of degrees from several prestigious institutions. However, other than being a lifelong student, Eli has accomplished what I perceive to be very little in his life.

He has been involved in various business partnerships that failed miserably and he was (or still is) in dispute with at least one prior business partner. He has never held, as I've been told gainful employment other than at Zynga, where he was and I quote my memory of Eli himself saying: "escorted out of the building by security after being terminated". It's worth noting Eli considers himself, and I quote Eli once again here: "unhirable."

He has also threatened, in writing, to not honor the laughable settlement I was given for my improper redemption. Even when he's already fucked me, he can't help himself and wants to double down. There is no limit to his lack of human decency, there is no limit to his lack of ethics, and there is no limit to how far Eli will go to dispossess Marc and I of our assets knowing no limit to what he will do to fulfill his selfish desires, hidden agenda, and secret motivations.

To be clear though, my primary concern remains the LPs investment. If we all lose because ⟨redacted⟩ or ⟨redacted⟩ fail, then so be it, that is the risk we all accepted when entering this venture. Barring that, I want everyone to win, there was no reason this venture couldn't have been a win-win for everyone. In funding rounds since MegaCap did the ⟨redacted⟩ deal, the secondary market has valued the shares of ⟨redacted⟩ at a higher price than the allocation paid for by MegaCap's LPs.

As I later feared, Eli found a way to implode MegaCap when he executed the improper and illegal redemption of Marc Goldner. Just like he had done with me, he found a way to reinterpret facts to his favor, and since he had prepared every mechanism necessary to dispossess us of our equity whenever he deemed it necessary, he was able to do so quite promptly. If Marc or I had the power to easily regain control, we already would have done so.

Despite his vast collection of degrees from various prestigious institutions, Eli has not found a way to translate this into competence. For instance, despite his claims of wanting to safeguard the MegaCap

Doc ID: 3fcb7f96f02c04ba3e72e5e82c310a063b103214



Marc J. Goldner
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Marc@MegaCapFunds.com
+1.516.984.1466

MegaCap Capital

11/7/2023

## Exhibit Z – Letter from Rod to the Limited Partners of MegaCap



Roderyck Reiter
Founding Managing Partner
MegaCap Capital & MegaCap Funds
Rod@MegaCapFunds.com
+1.561.843.6171

MegaCap Capital

11/5/2023

investments, he hasn't even properly handled the taxes for MegaCap, which is likely to result in fines, which if left unchecked can result in the destruction of LP equity.

Simply put, Eli M. Blatt cannot be trusted to be the caretaker of these investments by the LPs, he lacks the ethics, he lacks the moral compass, he lacks the trust, he lacks the professionalism, and most importantly, he lacks the competence to be effective in that position. On top of that, Eli constantly changes his story, was unable to handle the back-office without severe 'hand holding' and assistance from Marc, and issuing K1s (without approval) with less than a week's notice to provide edits to draft K1s being distributed. Ultimately, I cannot in good conscience recommend that he be trusted.

The seller of the shares of both _____ nd the fund that sourced them have been made aware of Eli's actions and have pledged in writing to not distribute unless all the managing partners sign off on it, so the investment is safeguarded for now. However, the seller of the _____ shares has refused to provide such an assurance, not to Limited Partners, nor to Marc Regardless and despite the assurances we were able to obtain, this does not yet stop Eli from causing more damage and as such, Marc and I are going to do everything within our power to correct this situation, and ensure that the LPs investment remains safe and experiences a smooth exit.

On behalf of Marc and myself, thank you not just for your understanding, but for your initial trust in the MegaCap vision and your belief in us. We are working tirelessly to make that vision come true.

Sincerely,



Roderyck Reiter
Series 7
Series 63
Licensed Real Estate Broker (Florida)



EXHIBIT L

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-016030-CA-01

ELI M. BLATT,

       Plaintiff,

vs.

MARC J. GOLDNER, RACHEL KORSEN,
SIMON DIVILOV, THE DHARMA
INITIATIVE, LLC, a Delaware company, and
COMPASS MINING, INC., a Delaware
corporation,

       Defendants.

_____/

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Florida Rule of Civil Procedure 1.610, Plaintiff, ELI BLATT ("Plaintiff"), by

and through his undersigned counsel, moves for the entry of a preliminary injunction against

Defendant MARC J. GOLDNER ("Goldner"); enjoining Goldner from:

    a.   contacting Plaintiff as well as vendors, partners, and Limited Partners of Megacap
        Capital, LLC ("Megacap" or the "Company");

    b.   taking any actions on behalf of the Company, representing himself as authorized to
        do so, claiming to have been illegally or improperly withdrawn from the Company,
        or otherwise claiming to be a duly authorized representative of the Company;

    c.   disclosing any confidential, sensitive, or proprietary information regarding the
        Company or filing any State or Federal lawsuits relating to Megacap in breach of
        the Agreement;

    d.   filing any tax returns for Goldner Blatt Investments, LLC ("GBI") until the current
        case is concluded or without the express written consent of Blatt; and

    e.   fraudulently conveying any of his assets, including but not limited to the Miners
        and any NFTs or cryptocurrencies under Defendants' control, as well as his equity
        interests in Dharma and any other companies in which he has equity interests.

NOT A CERTIFIED COPY

## FACTUAL BACKGROUND

**Overview**

This motion stems primarily from actions taken and threats made by Goldner subsequent to being noticed of Blatt's intent to pursue this present litigation and being provided with a copy of the filed complaint. Specifically, Blatt seeks injunctive relief in the face of extortive threats made towards Blatt with respect to his interests in and fiduciary duty to Megacap if Blatt does not acquiesce to Goldner's demands to drop the present litigation.

Although not mentioned by name in the Complaint, Megacap is the "other" company that Goldner was pressuring Blatt to sign an agreement for with its creditor under threat to Blatt's life. See Complaint ¶¶ 95-101 and Count XI - Civil Threat and Extortion. In order to protect the Company and its investors, the Complaint purposefully omitted Megacap's name in the allegations and counts. As detailed herein, Goldner's actions since the filing of the complaint have inexorably tied the present litigation to Megacap and necessitated this motion for injunctive relief.

Megacap is a Delaware-based company founded by Blatt, Goldner, and a third Member no longer with the Company. It is engaged in the business of syndicating equity in pre-IPO private investments as the General Partner for various Special Purpose Vehicles ("SPVs") which own interests in privately held companies. Put simply, Megacap enables retail investors to invest in late stage, private, pre-IPO companies. Megacap's current still-open offering, in which its Limited Partners have invested more than $3,000,000, has its equity exposure via a forward contract for the vested shares of a former employee (the "Employee") of the SPV's target "Portfolio-Company" (the "Shares")[1].

---

[1] Megacap's current offering has derivative equity exposure to the Portfolio-Company via an investment in an SPV that has a forward contract with the Employee for his vested equity in the Portfolio-Company. The names of the Seller, the Employee, and the Portfolio-Company are of the highest degree of confidentiality given the

As a Class A voting Member and Manager of Megacap, Goldner had access to confidential information, as well as rights and obligations under the terms of the Megacap Operating Agreement (the "Agreement"). A copy of the Agreement is attached as Composite **Exhibit A.** Goldner has used his access to this information, including the contact information of Megacap's partners, to make repeated, serious threats towards Blatt and Megacap.

**Goldner's Involuntary Withdrawal from Megacap after Repeated Threats Towards Blatt and Megacap.**

In addition to the threats and extortion detailed in the Complaint, upon being noticed by Blatt of his intent to pursue the present litigation, and escalating thereafter upon being provided a copy of the filed complaint, Goldner continued his campaign of harassment and intimidation against Blatt by, among other things:

1. admitting to illegally recording Blatt in Florida without Blatt's knowledge or consent;

2. extorting Blatt by threatening to release these illegal recordings of Blatt and to accuse him of crimes unless Blatt acquiesced to his demands;

3. extorting Blatt, Megacap, and all of its Limited Partners, by repeatedly threatening to disclose critically sensitive information that could destroy Megacap and the investments of its Limited Partners[2] unless Blatt drops the present litigation, stating in a WhatsApp chat:

---

possibility that public disclosure of the forward contract could potentially result in the Portfolio-Company voiding the Employee's shares if the Portfolio-Company has the rights to do so (which the Employee has represented is not the case to the best of his knowledge but which is not known with certainty), as well as the fact that the Seller has the ability to redeem Megacap's investment. Given their highly confidential and sensitive nature, the names of the Employee, their former employer (herein referred to as the "Portfolio-Company"), and the Seller, reference thereto in the exhibits has been redacted.

[2] The Limited Partnership Agreement governing the SPV that owns the forward contract with the Employee allows for the General Partner of the SPV (the "Seller") to redeem the interests therein that Megacap manages for its Limited Partners for reasonable cause, which would be catastrophic for Megacap and its Limited Partners. Rather than adhere to Megacap's dispute resolution terms, which require confidential and private mediation and arbitration, precisely to protect the Company from this type of adverse consequence in the event of a dispute, Goldner has contacted myriad Megacap partners and even potential partners (*See* Exhibit "B") and threatened to disclose Employee or Seller's name as means to extort Blatt into reinstating Goldner into the Company as a Class A Member and Manager and to withdraw the present case against him. Among those he contacted is the Seller for the Shares. Goldner's aim in contacting the Seller was to lay the foundation for threats that he might take actions to needlessly make the Employee's name public, or to name the Seller in a lawsuit, and thus give the Seller's General Partner cause to redeem the equity Megacap manages, a threat he has repeatedly used to

I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've "stolen" your money [referring to the civil theft demand letter]. The game you're playing here could wind up dragging this into a Federal Court that will have a tortious discovery process, [which could] expose the [Portfolio-Company] employee's name that could [cause the Seller to] revoke the shares, resulting in all the hard work we put into Megacap and [the Portfolio-Company deal] being extinguished;

4. threatening to destroy Blatt's fiancé's career by disclosing illegally obtained and allegedly compromising recordings of conversations with her made without her knowledge or consent;

5. 'Sextorting' both Blatt and his fiancé by contacting her directly and threatening to make public compromising images and/or videos of Blatt made without his knowledge or consent.

Goldner's harassing texts, emails, and WhatsApp messages are summarized and attached as Composite **Exhibit B**.

Blatt endured nearly a year of threats and coercion by Goldner without taking action with regard to Megacap, despite Goldner's litany of forbidden acts and other breaches of the Agreement, in the interests of putting the best interests of Megacap above his own. The goal was, and remains, to minimize any potential adverse impact to the Company or its Limited Partners.

But Goldner's escalation to very serious extortive threats against not only Blatt but also Megacap and all of its Limited Partners unless Blatt agreed to withdraw his complaint and reinstate him, compounded by his other breaches of the Agreement and its forbidden acts, prevailing law, and his fiduciary duty, left Blatt no choice but to protect Megacap from Goldner's increasingly erratic behavior by withdrawing him as a Class A Member and Manager of the Company. Simply put, as a practical matter, Goldner's actions had made it impossible for Blatt to continue working with him, making it impossible for Megacap to conduct its ordinary course of business; in addition,

---

scare Megacap's Limited Partners and extort Blatt into dropping the present lawsuit and reinstating him into Megacap as a Class A Member and Manager.

given that Blatt could not ethically withdraw from Megacap himself considering that he has a fiduciary duty to Megacap's Limited Partners to protect them from Goldner's threats, withdrawing Goldner was the only option.

Consequently, and in accordance with the terms of the Agreement and Goldner's Redemption Agreement, Goldner was duly withdrawn as a Class A Member of the Company. As a result, he is thus no longer authorized to act on behalf of the Company, represent himself as being authorized to do so, or otherwise engage in any activities related to its business.

**Goldner Escalates His Extortion Efforts by Directly Contacting and Threatening Megacap Partners in Breach of the Agreement, Causing Irreparable Harm to the Company.**

The Agreement contains explicit provisions for resolving disputes, which Members must adhere to in order to assert any claims against the Company or its Members. These provisions call for private and confidential mediation and arbitration and exist to protect the Company from the type of harm Goldner has been engaging in.

Goldner, for his part, has successfully evaded service for the subject litigation for over two months. During this time, rather than invoke any of the proscribed dispute resolution proceedings, Goldner has been engaging in a campaign of harassment against Blatt, Megacap, and Megacap's partners that directly violate the dispute resolution and other terms of the Agreement in an attempt to get Blatt to drop the present litigation as well as reinstate him in Megacap. Specifically, Goldner:

1. doubled down on his extortive threats against Blatt and the Company by, among other things, needlessly naming the Employee and threatening to publicize the name, which he himself has repeatedly acknowledged could cause catastrophic and irreparable harm to the Company and its Limited Partners, unless Blatt reinstates him as a Class A Member and Manager of Megacap and drops the present lawsuit against him, stating:

   > I strongly suggest that you immediately reinstate me, otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved... it is extremely important to remember that I possess the name (as do you) of the [Portfolio-Company] employee that is part of the

[Portfolio-Company] employee forward contract - (his name in case you didn't read the documents is [redacted])... **I would highly recommend immediately dismissing this case**[3]... failure to do so may result in a federal court action and a tacit approval and waiver for me to sue MegaCap in federal court… MegaCap will be named as a third-party defendant, and I will most certainly ensure that ALL shares are withheld. What you do not seem to understand that is IF the shares are cancelled, it is YOU who will be held liable as you are the but for cause of all of this happening…. I have absolutely no issue putting MegaCap into receivership with the SEC" (emphasis added, *see further* **Exhibit C**);

2.  inadvertently admitted that his coercion of Blatt to sign the agreement with a creditor of the Company under threats to Blatt's life, as detailed in the complaint, was extortion by acknowledging his financial interest in having the agreement signed, stating in a letter to Blatt, "In order for extortion to exist, I would've needed to have a financial benefit, which I had none – instead, I saved MegaCap over $100,000 in the interest waiver agreement" (*See* **Exhibit C**), a confounding statement given that Goldner is clearly aware that he had and continues to have financial interests in Megacap and thus pecuniary interests in the actions he was coercing Blatt to take under threat to Blatt's life;

3.  solicited money from Megacap's Limited Partners to aid him in disputing his withdrawal outside of the proscribed mediation and arbitration under threat of the loss of their investment by implying that he will make the name of the Employee, Portfolio-Company, and Seller public if they did not assist him in forcing Blatt to acquiesce to his demands;

4.  instructed potential investors not to invest with Megacap, thus causing the Company financial harm and preventing it from repaying its debts to its creditors;

5.  contacted and baselessly threatened critical partners of the Company with, among other things, legal actions he has no standing or right under the Agreement to bring, including:

    a.  the Seller for the Shares of the Portfolio-Company to inquire about their ability to redeem the Shares and plant the seed for them to potentially do so;
    b.  the supplier of the Company's shares for another SPV it manages in a manner they characterized as "alarming";
    c.  its SPV Administrator, causing it to breach its contractual obligations to Megacap by ceasing all work on Megacap's critical tax reporting, as well as to demand an indemnification by the Company from any actions against it by Goldner in order to

---

[3] Goldner is here referring to the present litigation, leaving no doubt as to the fact that he is fully aware of it and actively evading service while simultaneously hiring an attorney to defend Dharma, which was served via its Delaware Registered Agent, as well as making it unequivocally clear that he is extorting Blatt with threats of causing catastrophic damage to Megacap if Blatt does not drop the present litigation.

resume performance of its contractual obligations, thus hamstringing Megacap administratively and operationally; and

    d.  its accountant, who ceased work on Megacap's taxes out of fear of a lawsuit from Goldner;

6.  induced Megacap's original third partner to call Blatt's mother and relay extortive threats against Blatt, including to "put him in jail" if Blatt did not acquiesce to their demands; and

7.  repeatedly and persistently harassed, defamed, threatened, extorted, and 'sextorted' Blatt.

(*See* **Exhibits B** and **C** attached).

    Goldner's threatening messages to current and potential Limited Partners have irreparably damaged, and continue to risk damage to, the Company's ability to attract additional investment through its network of existing Limited Partners (and thus to repay its creditors), who are all now concerned about the safety of their investments. As referrals have been the Company's primary source of fundraising, given that its offerings, including that for the Portfolio-Company, have primarily been under Regulation D 506(b), which does not allow for general solicitation, Goldner's actions have caused, and continue to cause, irreparable harm to the Company.

    They are also egregious breaches of, among other provisions, the Company's dispute resolution terms, which exist precisely to protect the Company from the type of harm which Goldner is both threatening and actively causing for his own personal benefit at the expense of the Company and the interests of its Limited Partners. Goldner, per the terms of the Agreement, must take up any grievances with Megacap or Blatt in relation to Megacap, including his withdrawal, via private and confidential mediation and arbitration in order to protect the Company and its partners from harm. Instead, Goldner has initiated a very non-private, non-confidential campaign of harassment, threats and extortion against the Company, its partners, vendors, and Limited Partners that has already irreparably harmed the Company and has the potential to cause it and its Limited Partners catastrophic and irreparable harm if he is not stopped.

**The Agreement Explicitly Allows Members to Seek Injunctive Relief.**

Section 81 of the Agreement contains provisions allowing Members to seek equitable relief via an injunction where there is no adequate remedy of law and there is immediate risk to the Company, both of which are present given Goldner's threats against the Company as well as its vendors and Limited Partners. Pursuant to these provisions and the duly executed and valid consent resolutions passed by the Company (*See* Exhibit A), Blatt, representing the only Class A Membership interests in the Company, seeks immediate relief from the Court to prevent further harm to Blatt via harm to Megacap and its Limited Partners by enjoining Goldner from engaging in any actions that violate the Agreement or threaten the Company's interests.

Blatt further seeks immediate relief from the Court to prevent Goldner from filing erroneous or potentially fraudulent tax returns for GB1 and to prevent him from fraudulently conveying any Assets during the course of the current litigation.

## LEGAL ARGUMENT

### A.   Standard on a Motion for Temporary Injunction.

In Florida, "[t]o be entitled to a temporary injunction, the movant must show the following elements: (1) irreparable harm; (2) lack of an adequate remedy at law; (3) a substantial likelihood of success on the merits; and (4) that temporary injunctive relief will serve the public interest. *Mapei Corp. v. J.M. Field Mktg.*, 295 So. 3d 1193, 1198 (Fla. 4th DCA 2020) (citing *Donoho v. Allen-Rosner*, 254 So. 3d 472, 474 (Fla. 4th DCA 2018)). The movant must also show a clear legal right to the injunction. *McKeegan v. Ernst*, 84 So. 3d 1229, 1230 (Fla. 4th DCA 2012).

"[T]he purpose of a temporary injunction is to preserve the status quo until full relief can be granted following a final hearing." *Int'l Vill. Ass'n v. Schaaffee*, 786 So. 2d 656, 658 (Fla. 4th DCA

2001) (citing *Tamiami Trail Tours, Inc. v. Greyhound Lines, Inc.*, 212 So. 2d 365, 366 (Fla. 4th DCA 1968)); *see also Planned Parenthood of Greater Orlando, Inc. v. MMB Props.*, 211 So. 3d 918, 924 (Fla. 2017) ("As this Court acknowledged long ago, the purpose of a temporary injunction is to preserve the status quo while final injunctive relief is sought.").

"The controlling reason for the very existence of the power to grant a temporary injunction is that the court may thereby prevent a threatened or continuous irremediable injury which might otherwise occur before the plaintiff's claim could be thoroughly investigated." *Adoption Hot Line, Inc. v. State, Dept. of Health & Rehab. Services, Dist. XI ex rel. Rothman*, 385 So. 2d 682, 684 (Fla. 3d DCA 1980) (citing *Tamiami Trail Tours, Inc.*, 212 So. 2d at 365; *Murphy v. Daytona Beach Human Society, Inc.*, 176 So. 2d 922 (Fla. 1st DCA 1965)).

As demonstrated below, each of the foregoing elements are present, entitling Plaintiff to a preliminary injunction as a matter of law.

### B.    Plaintiff Will Suffer Irreparable Harm.

Plaintiff, both directly and via his interests in Megacap, will suffer irreparable harm if Goldner continues to put the Company at risk by threatening partners, extorting Blatt, acting as if he was not withdrawn from the company, and, most critically, if he takes actions that make confidential company information public, notably the names of the Seller, Employee, and Portfolio-Company, as he has repeatedly threatened to do, in breach of the Agreement. As demonstrated above, Blatt and Megacap have already suffered irreparable harm, and there is a reasonable probability that additional harm will occur unless this Court grants immediate injunctive relief. It is clear the actual and threatened injury to Blatt, Megacap, and its Limited Partners strongly outweighs any potential harm to Goldner if the temporary injunction is granted.

**C.      There is No Adequate Remedy at Law.**

Furthermore, Plaintiff has no adequate remedy at law, since monetary damages will not be able to compensate Blatt or Megacap for the reputational damage sustained from Goldner's continued threats and harassment, especially should he cause the Seller to redeem the Shares, nor does Goldner have the resources to compensate Megacap and its Limited Partners in the event the Seller does so. The potential value of the damages incurred by Goldner's bad acts cannot be determined for purposes of awarding Plaintiffs money damages, as the value to Megacap cannot be fully determined until the IPO of the Portfolio-Company, at which time the carried interest due to Megacap from the Limited Partners can be calculated. Based on the foregoing, an injunction requiring Goldner to cease and desist is reasonably necessary to protect Blatt, Megacap, and its Limited Partners from further harm.

**D.      Plaintiff Has a Substantial Likelihood of Success on the Merits.**

To grant temporary injunctive relief, the Court must estimate the likelihood of Plaintiff prevailing on the merits. *Gold Coast Chemical Corp. v. Goldberg,* 668 So. 2d 326, 327 (Fla. 4th DCA 1996). A substantial likelihood of success on the merits is shown if good reasons for anticipating that result are demonstrated. *City of Jacksonville v. Naegele Outdoor Advertising Co.,* 634 So. 2d 750, 753 (Fla. 1st DCA 1994). However, the Plaintiff is not required to prove its case in full at a preliminary injunction hearing; rather, it must make a showing of likely or probably, but not certain, success at trial on *one* or more claims. *Id.*

Blatt's case against Goldner involves numerous claims that, as evidenced by the exhibits to this Motion and the Complaint, have a high likelihood of success:

**Claims related to the Assets.**

Blatt wired Goldner and Compass funds for Miners and NFTs (the "Assets"), which bank statements and the extensive communications between Blatt, Goldner and Dharma make unequivocal. Blatt has no direct visibility, control, or ownership of any kind over the assets, with Dharma having clearly stated in its Redemption Notice that it has usurped all of the Miners for which Blatt sent payment and Goldner stating via WhatsApp with regard to the NFTs, "sue me, Eli, I'm not selling", making it clear that Blatt has no ownership or control of any kind over the NFTs given they are in Goldner's personal cryptocurrency wallet. These two unequivocal facts establish a high likelihood of success of prevailing on:

- Count V, Breach of Contract and Count VI, Breach of Fiduciary Duty, as Goldner was obligated to title any assets purchased for GBI into GBI-titled accounts pursuant to the terms of the GBI Operating Agreement Section 74;

- Count VIII, Constructive Fraud, given that the end-result of the above facts is that Blatt was defrauded, regardless of any intent Goldner may or may not have had to do so;

- Counts IX and XIII, Unjust Enrichment and Disgorgement, given that the Defendants have unequivocally enjoyed exclusive access to and use of the Assets that Blatt remitted funds for, including the ability to mine bitcoin and use the NFTs to gain access to private events and chat channels for networking purposes;

- Count XIV, Conversion, given that as per Dharma's December 31, 2022 Redemption Notice, it had converted Blatt's investments for its own benefit, while Goldner took funds from Blatt intended for GBI to purchase NFTs and instead purchased them into his own wallets; and

- Count XV, Accounting, which has arguably the highest likelihood of success, since Blatt unequivocally sent funds for which he has never received any formal accounting of any kind from any of the Defendants, without which no detailed analysis of the claims can be finalized.

**Count XI, Civil Threat and Extortion.**

1. Florida Statute 836.10 provides: "Any person who writes or composes and also sends or procures the sending of any letter, inscribed communication, or electronic communication, whether such letter or communication be signed or anonymous, to any person, containing

a threat to kill or to do bodily injury to the person to whom such letter or communication is sent, or a threat to kill or do bodily injury to any member of the family of the person to whom such letter or communication is sent commits a felony of the second degree."

2. Florida Statute 836.05, for which civil suits can be brought under Florida 772, does not require the perpetrator to directly threaten harm themselves. Transmitting or communicating a threat to injure or harm someone else can be sufficient for charges under this statute. *See Ventura v. State*, 29 So. 3d 1086 (Fla. 2010) (sending an email threatening to arrange for someone else to murder the recipient constituted a violation of 836.05).

3. Goldner's electronic communications to Blatt unequivocally transmitted explicit threats against Blatt and Blatt's families lives if Blatt did not sign an Agreement Goldner was pressuring him to sign. Blatt clearly instructed Goldner to cease transmission of the threats, and that in the absence of any evidence to the contrary he deemed the threats as coming from Goldner, which did not deter Goldner from continuing to transmit the threats. Under Florida Statute 836.10 and 836.05, it is irrelevant whether Goldner in his communications made the threats on his own behalf or allegedly on behalf of a third party. The simple transmission of the threat itself is a violation of Florida Statute 836.10 and the threat being tied to pressuring Blatt to sign the agreement a violation of Florida Statute 836.05.

Blatt is all but certain to prevail on these counts for the reasons detailed above. Florida courts have repeatedly issued injunctions based on a substantial likelihood of success on one count, even where other claims may not rise to that level of potential success early in the litigation, thus showing one key claim to supports the injunction can be sufficient. As detailed, Plaintiff is likely to succeed on one or more counts. Accordingly, the Court should grant immediate injunctive relief.

E.    **Temporary Injunctive Relief Will Serve the Public Interest.**

Granting a temporary injunction in favor of Plaintiff advances the public's interest by ensuring that Florida citizens are protected from the type of threats and harassment Goldner has been engaging in. Additionally, failure to protect Megacap's Limited Partners from further tortious interference and explicit threats from Goldner could result in the redemption by the Seller of the interests in the Portfolio-Company or by the Portfolio-Company of the Employee's shares, irreparably harming Megacap's Limited Partners. This would in turn damage the confidence of all Florida citizens in the security of not only their pre-IPO investments but all private and

alternative investments in general. Accordingly, the public interest weighs strongly in favor of granting the temporary injunction.

**F.      This Court Should Set a Bond for an Appropriate Amount.**

A party moving for a temporary injunction shall post a bond "in an amount the court deems proper, conditioned for the payment of costs and damages sustained by the adverse party if the adverse party is wrongfully enjoined." Fla. R. Civ. P. 1.610(b). "Before setting a bond, a trial court must have some basis for exercising its discretion in determining the amount of the bond." *AOT, Inc. v. Hampshire Management Co.*, 653 So. 2d 476, 478 (Fla. 3d DCA 1995). "The purpose of the bond required as a condition to issuance of a temporary injunction is to provide a sufficient fund to cover the adverse party's costs and damages if the injunction is wrongfully issued." *Montville v. Mobile Medical Industries, Inc.*, 855 So. 2d 212, 215 (Fla. 4th DCA 2003). "Since the damages recoverable for a wrongfully issued injunction are ordinarily limited to the bond . . . the bond initially set by the court constitutes the court's determination of the foreseeable damages based on the good faith representations that are before it." *Id.* (internal citations omitted). "Additionally, while foreseeable damages are considered a major factor in setting a temporary injunction bond, the court is permitted to consider factors other than the anticipated damages and costs, including the adverse party's chances of overturning the temporary injunction." *Id.* at 216; *see also Cushman & Wakefield, Inc. v. Cozart*, 561 So. 2d 368, 370-71 (Fla. 2d DCA 1990) (noting that a court may consider the good faith representations of the parties, the adverse party's anticipated costs and damages, and the adverse party's chances of subsequently overturning the temporary injunction).

Here, in the event this Court grants the instant Motion and issues a temporary injunction, and Goldner can subsequently prove that the injunction was erroneously granted (which is unlikely),

Goldner would only be entitled to a reasonable amount associated with defending this Motion. No further anticipated damages will result. Given the facts of this case, Blatt submits that a nominal bond should be adequate to cover reasonable attorneys' fees and costs associated with actions taken to oppose, dissolve or overturn the injunction should it be issued.

**WHEREFORE,** Plaintiff ELI BLATT, respectfully requests that this Honorable Court enter an order:

1. enjoining Goldner from further contacting Blatt, including through participation in any group chats that Blatt is in, as well as vendors, partners, potential partners, or Limited Partners of Megacap;

2. prohibiting Goldner from taking any actions ostensibly on behalf of Megacap, representing himself as authorized to do so, claiming he was improperly or illegally withdrawn from Megacap absent a ruling from an Arbitrator reinstating him, or otherwise representing himself to be a duly authorized representative of the Company, given that he no longer has rights to act on behalf of or otherwise represent the Company as a result of the duly executed and valid consent resolutions withdrawing him as a Class A Member (See Exhibit "A");

3. prohibiting Goldner from disclosing any confidential information regarding the Company to any individual, company, court, or regulatory body, including but not limited to the name of its suppliers, portfolio companies, Limited Partners, creditors, the former Portfolio-Company Employee whose Shares Megacap manages interests in for its Limited Partners, or the Seller thereof;

4. preventing Goldner from filing any tax returns for Goldner Blatt Investments, LLC until the conclusion of the present case and without Blatt's express written consent;

5. preventing Goldner from fraudulently conveying any of his assets, including but not limited to the Miners and any NFTs or cryptocurrencies under Defendants' control, as well as his equity interests in Dharma and any other companies in which he has equity interests;

6. any such other and further relief as this Court deems just and proper.

KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT
One West Las Olas Boulevard, Suite 500
Fort Lauderdale, FL 33301
(954) 525-4100 Telephone
(954) 525-4300 Facsimile
*Attorneys for Plaintiff*

By:    /s/ Benjamin R. Muschel

        Benjamin R. Muschel, Esq.

        Fla. Bar No. 122701

        muschel@kolawyers.com

NOT A CERTIFIED COPY

# EXHIBIT A

**See Master Exhibit H**

NOT A CERTIFIED COPY



Eli M Blatt
18117 Biscayne Blvd PMB 61473
Miami, FL 33160
415-341-6258

To Whom it May Concern,

The following details what I allege to be criminal actions by Marc Goldner ("Goldner"). Specifically, I believe Goldner to have committed breaches of Florida §836.10, §836.05, §815.06, §843.08, §934.03, and SB 1798.

## Summary of the Breaches

Beginning in late 2021, Goldner began pressuring me to sign an interest waiver agreement ("Interest Waiver") with a creditor of one of our companies, Megacap Capital, LLC ("Megacap"). The Interest Waiver would waive Megacap's ability to repay a note from the creditor in shares of the portfolio-company the note proceeds were used to purchase in exchange for a waiver of accruing further interest. I did not want to sign the interest waiver and rather to simply repay in shares, as I did not feel the risk of potentially waiving our ability to repay in shares and thus potentially defaulting was worth the interest we could save. In a separate matter unrelated to Megacap, I served Goldner a civil theft demand letter, notifying him that I intended to file a lawsuit if he did not return funds he had appropriated from me. Rather than accept my decision regarding the interest waiver or respond in a legitimate, civil manner to the civil theft demand, Goldner:

1. Did "transmit, or procure the sending, posting, or transmission of, a writing or other record, including an electronic record, in any manner in which it may be viewed by another person, when in such writing or record the person makes a threat to: (a) Kill or to do bodily harm to another person" by repeatedly transmitting in writing threats to me and my family's lives. This is a breach of §836.10.

2. "By a written or printed communication… maliciously threaten[ed] an injury" to me "with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will" by transmitting threats against my life if I did not cooperate in signing the interest waiver from which he stood to gain financially. This is a breach of §836.05.

3. Acknowledged previously having "Accesse[d] or cause[d] to be accessed any computer, computer system, computer network, or electronic device with knowledge that such access is unauthorized or the manner of use exceeds authorization." This is a breach of §815.06.

4. "By a written or printed communication, maliciously" threatened "to expose any secret affecting" me and "to accuse [me] of any crime or offense" "with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will" by threatening to disclose confidential information gained via unauthorized access to a computer to Defendants in civil cases I have filed in Florida if I did not cooperate in signing the interest waiver from which he stood to gain financially. This is a breach of §836.05.

5. "Endeavor[ing] to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection" by admitting to

both me and my fiance to making unauthorized recordings of us in our Miami home and threatening to disclose those recordings if we did not acquiesce to his demands and threats. This is a breach of §934.03.

6. "By a written or printed communication... maliciously threaten[ed] ... the reputation of another" and "maliciously threaten[ed] to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will" by making threats against both me and my fiance to release embarrassing audio and video he recorded without consent in order to expose us to disgrace, damage our reputations, and disparage my fiance as being unchaste if I did not stand down in my legal attempts to recoup money appropriated from me which I had commenced by serving a civil theft demand letter, which would benefit him financially if I did back down. This is a breach of §836.05

7. Committed "violations relating to sexual cyberharassment" by "committing theft of sexually explicit images with the intent to promote such images" without my consent. This is a breach of SB 1798.

All of these actions were done after Goldner had repeatedly claimed to be affiliated with unnamed security agencies, which he first claimed in November, 2021, using his alleged academic credentials as an alleged student at Columbia's School of International and Public Affairs to bolster his claims. This is a breach of §843.08.

## Jurisdiction

I am a US Citizen and Miami-Dade resident. The suspect, Goldner is, by information and belief, a US Citizen and New York or Connecticut resident (he has illegally failed to update his address on his license and has also illegally registered his car to a UPS mailbox in Connecticut in order to avoid process servers). He has claimed on numerous occasions to be some form of operative for unnamed US security or intelligence agencies with connections to terrorists and criminals, though I believe these claims to be fabrications designed to aid him in securing influence over me. These representations, if false, are criminal offenses, as well as material facts in the context of his transmitted threats.

While Goldner's location when he committed these crimes is unknown, they were all:
1. committed while I was in Florida or else traveling while a Florida resident;
2. involve recordings made and files downloaded without permission while I was in Florida;
3. relate to an agreement involving a promissory note clearly marked with Miami, Dade as the location for the agreement; and
4. relate to companies
   a. whose operating agreements I executed while I was in Florida,
   b. which have had offices in Florida,
   c. for which Goldner personally carried on business in Florida,
   d. for which Goldner personally solicited service activities in Florida on multiple occasions.

As such, given that the crimes are all electronic in nature and Goldner's location at the time they were committed is unknown, Florida has jurisdiction over these crimes as a result of:
1. my physical presence in the state while the crimes were committed at the time they were committed;
2. the agreements in question being signed in and/or marked in the dateline as being in Florida;

3. my residency in Florida while temporarily traveling for crimes that were committed electronically from an unknown location; and

4. numerous provisions of Florida's long-arm statutes §48.193.

## Factual Allegations

1. Beginning in November of 2021, Goldner began making claims that he was a "Spy" for an unnamed federal agency investigating Anonymous and trying to save the world from terrorists.

   a. He made these claims both to me and my Fiance numerous times, as well as in the presence of other people, while we and/or he were in the state of Florida.

   b. He referenced these claims in an Operating Agreement for Goldner Blatt Investments, LLC by referencing his connections to "Intelligence, Espionage, Contractor, and Security contacts that either Marc knew before or will meet after the signing of this Agreement. Under no circumstance will any intelligence agents be disclosed to Eli Blatt by Marc Goldner, nor will any military (either public or private), spies, intelligence agents, military contractors" and that "Marc may conduct business- like activities for the sake of national security, by any direct government orders and/or mandates, or for any missions by any given contractor or intelligence agency". (**Exhibit A**).

   c. Goldner was intentionally vague about the exact nature of his work, though he spoke about the activities frequently, and his supposed role as a Spy eventually became known as his "Extra Curricular Activities", or "ECAs"; he has frequently bragged about how he employs vagueness in his writing in order to get away with things, which I believe includes his claims regarding his ECAs, for which there is no evidence (**Exhibit B**).

   d. These claims were in fact simply used to gain influence over me, and they also amplified the gravity of subsequent threats he made against me.

2. Beginning on a Zoom call on December 6, 2022, while I was temporarily in Philadelphia and Goldner's location was unknown, Goldner conveyed to me that supposedly me and my family's lives were in danger if we did not sign the Interest Waiver Agreement he had been pressuring me to sign.

   a. He attributed these threats to one of the Members of the creditor but refused to provide evidence of the threats.

   b. I told him to refrain from further communication of threats to me and to advise the creditor that if he wanted to threaten me to do so directly.

3. On January 26, 2023, while I was in Florida, after I had blocked him as a result of his ongoing threats, Goldner started a group chat with my mother included, with the intent of forcing an in-person meeting to further pressure me to sign the Interest Waiver agreement.

   a. In this chat (**Exhibit C**), again without providing any evidence to substantiate his transmitted threats, he referenced:

      i. "safety"

      ii. "safety risk",

      iii. "family's lives at risk"

      iv. "I don't think you understand what they will do to us. Do you think this is some kind of fucking game?"

      v. "Very scary situation"

    b. I responded: "I will not stand for any more of these threats to my safety. If you persist, you will force me to file a restraining order against you, because you are legitimately giving me cause to fear for my safety".

    c. Despite my clear warning, Goldner followed up on the same chat the next day attempting to ascertain my whereabouts and force a meeting

4. On March 18, 2023, on a WhatsApp chat, Goldner once again transmitted from an unknown location threats against my safety in regards to the Interest Waiver Agreement he was pressuring me to sign. In this chat, the following exchange took place (**Exhibit D**):

    a. Me, regarding the alleged threat, which: "With all due respect, Marc, I do not trust you and I do not take any of that at face value… the threats are not credible… but I'm none the less having to take a [sic] face value "

    b. Goldner: "you can get fucked to hell brotha"

    c. Goldner: "what do you think they're going to do to us if we repay in shares"

5. In a March 23, 2023 email to me (**Exhibit E**), in reference to his threats surrounding the Interest Waiver Agreement, Goldner states: "I do not give a flying fuck if you believe it's real or not. You need to come to terms that nothing is going to proceed until we're on the same page and that our lives aren't [sic] at risk because of your inaction and disappearance".

6. On April 4, 2023 (**Exhibit F**), in response to two follow up emails that day pressing me to sign the Interest Waiver Agreement, I told Respondent:

    a. "I am not going to commit fraud against [the Creditor], which is what you are urging me to do, by signing a document that you have already acknowledged, and I have already states [sic] would not be not valid due to the duress that you have placed me under… I am hereby again instructing you in no uncertain terms stop contacting me. I deem your continued aggressive and persistent messages to be harassment on matters I have already told you where I stand and for which your main purpose is to force me into doing things you want me to do by placing me under emotional distress. You sent me at least five long harassing and threatening messages on Sunday alone."

7. In an April 19, 2023 follow up on the same email thread (**Exhibit G**) , Goldner escalated his threats further to include direct blackmail and extortion threats against me involving files that, on information and belief, he downloaded from my Google Drive server shared with him on a temporary basis without notice or consent while I was in Florida, from where the files were shared..

    a. In the email, addressed to me, on which he copied my assistant, he states (referring to me in the third person): "I would assume the K4B.zip (K4B Litigation-20211208T040808Z-001.zip) that he sent me is also 'not confidential information' and that he has no problem with me contacting Craig, Flash, and all other parties".

    b. On information and belief, the files Goldner here references were **not** sent to him by me; they were shared with him via a Google Drive folder I shared with him to provide online access for the purpose of him providing me feedback (Goldner claims to be a Law School student) and help referring a lawyer in regards to one then-active lawsuit and two being then contemplated which have now been filed.

    c. As a result, Goldner here acknowledges exceeding authorized access to a computer nearly 1.5 years ago by downloading local copies without consent or notice, apparently in a pre-planned effort to secure information he could potentially use in the future to blackmail me, which he has now resorted to.

    d. The 'Craig' and 'Flash' parties he references are two Defendants in three different lawsuits that I have brought in Florida in cases that have absolutely nothing to do with Goldner in any way.

        i. He merely read some of my notes to refer an attorney – and then apparently made local copies of the entire folder and all files without permission which he is now using to threaten my financial interests in those cases – which involve millions of dollars in actual damages – by threatening to share them with the Defendants.

        ii. Note also that I have confidentiality agreements in place with Goldner, and some of the files he stole contain personally identifying information such as merchant data which are absolutely bound by confidentiality agreements.

    e. Regardless of how the files were obtained, Goldner's use thereof was clear extortion under Florida law.

8. Subsequent to these threats made to my life, on April 21, 2023, Goldner began writing messages in a group chat with me and my assistant (**Exhibit H**) acknowledging that he was intentionally trying to paint us as being in conflict with the creditor and and designed to suggest that I am maintaining positions against the creditor's interests, which gave me the impression that he was potentially trying to set me up with the creditor to make me the target of its Member's alleged threats – or at least to induce me to believe that while painting me as the bad guy with the creditor.

9. After receiving a civil theft demand letter from me on April 30, 2023 for $422,148.55 relating to a separate matter unrelated to Megacap, Goldner threatened in writing on May 4, 2023 in chats with Limited Partners, Creditors, and contractors of Megacap to "expose the [portfolio-company] employee's name that could [cause the Seller of the share to] revoke the shares. We'd both be bankrupted and you'd be liable for securities fraud for initiating an action on unrelated matters but trying to intertwine Megacap", and thus "having all the hard work we put into Megacap and [the portfolio-company deal] being extinguished" if I did not refrain from pursuing my legitimate and unrelated claims, which would benefit him financially both in terms of his legal costs to defend and the potential judgment against him that would likely follow (**Exhibit I**).

10. On May 4, 2023, Goldner again escalated his threats in response to the demand letter, acknowledging in harassing messages to both me and my fiance having made unauthorized recordings of us while we were in our Miami home that contain sensitive, embarrassing, and compromising information, and threatening to make those public if I did not abandon my efforts in regards to the civil theft demand letter, which would benefit him financially (**Exhibit J**).

11. In a letter dated June 29, Goldner further baselessly threatened to accuse me of committing crimes, including securities fraud and federal felonies, as well as doubling down on his threats to destroy Megacap by needlessly taking actions that would result in redemption of the shares the Company manages on behalf of its Limited Partners, if I didn't withdraw my claims against him, which would benefit him financially (**Exhibit I and Exhibit K**).

12. Goldner made all of these threats after initially stating in an email (**Exhibit L**) to me in May of 2022 while I was in Florida: "You've fucked yourself bro and if you want me as an enemy honestly you're about to see how I can be. I'll make this business the most difficult it can be. You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me." All of the threats and crimes committed outlined herein stem from this initial threat against me made while I was in Florida

In these communications and through his actions, which were transmitted and committed electronically, Goldner clearly breached Florida §836.10, §836.05, §815.06, §843.08, §934.03, and SB 1798 by:

1. Repeatedly transmitting threats against my life with the goal of pressuring me to sign an agreement from which stood to benefit financially. While he claimed the threats were on behalf of a third party, I specifically instructed him to stop making the threats, and that if he continued to do so without providing any evidence of the allegation that the threats were on behalf of a third party, I deemed the threats to be coming from him. This is a breach of §836.10.

2. Making these threats with the intent of getting me to take an action I did not want to take but from which he stood to benefit financially. This is a breach of §836.05.

3. Exceeding his authorized access to my Google Drive folder to download confidential files by making local copies without notice or consent with the explicit purpose of retaining the files for potential future leverage against me. This is a breach of §815.06.

4. Threatening to expose these confidential files to Defendants in three cases I have filed in Florida if I did not agree to sign the agreements he was pressuring me to sign and from which he stood to benefit financially. This is a breach of §836.05.

5. Threatening to destroy my business and damage the interests of the Limited Partners to whom I owe a fiduciary duty if I did not withdraw my claims against him, from which he would benefit financially, a further breach of §836.05.

6. Threatening to accuse me of crimes if I did not withdraw my claims against him, also breach of §836.05.

7. Admitting to making unauthorized recordings of me and my Fiance, in breach of §934.03 and SB 1798, and threatening to make them public in an effort cause us harm if I did not acquiesce to his demands in regards to a civil theft demand, which would benefit him financially if I were to abandon my recovery efforts, in breach of §836.05.

I swear under penalty of perjury that all of the statements above are true to the best of my knowledge and that the attached exhibits are true and correct, unaltered screenshots (with the exception of redaction of confidential or private information not relevant to the factual allegations to which they attest) of the communications described.

Sincerely,

Eli M Blatt

**EXHIBIT A**
**GOLDNER CLAIMING TO BE IN INTELLIGENCE**



**EXHIBIT B**
**GOLDNER IS INTENTIONALLY VAGUE IN HIS DEALINGS**



# EXHIBIT C
# THREATENING MESSAGES



**EXHIBIT D**





## EXHIBIT E

From: **Marc Goldner** | m@megacap.capital                          Thursday, Mar 23 at 8:28 PM

To: **Eli M Blatt** | team@megacap.capital, **Eli M Blatt** | e@megacap.capital

Eli,

I'll be quite clear because it seems you have a gross misunderstanding of the situation that you've put us all in. At this point, I do not give a flying fuck if you believe it's real or not. You need to come to terms that nothing is going to proceed until we're on the same page and that our lives aren't at risk because of your inaction and disappearance. I will be as clear & concise as possible and maybe you will get it through your thick skull...

## EXHIBIT F



**EXHIBIT G**



## Marc Goldner

I understand that's your perspective. But this is what craig did with K4B according to Eli. Had his assistant do eveyrhting. This isn't cool at all. I've been reviewing the K4B discovery folder and seems this is a repeat pattern behavior Eli has                                10:05 AM

**EXHIBIT H**



**Anthropos x Megacap**
Celina, Lily, Marc, You

**Marc Goldner**
It's ok. The game of telephone isn't fun 6:52 PM

I need to know what Eli deleted 6:52 PM

Because I coordinate messages between public chat with LP and negotiating with them privately 6:53 PM

And now they won't align 6:53 PM

Fuck 6:53 PM

**Celina Moreno**
TBH, I have to blame it on you in a sense: you do not execute a plan like this without advising and having an agreement with the other party anyway. 6:53 PM

**Marc Goldner**
> **Celina Moreno**
> TBH, I have to blame it on you in a sense: you do not execute a plan like this without advising and having an agreement with the other party anyway.

I told Eli on the zoom call 3 months ago. Everything is discoverable and there must be conflict 6:53 PM



**Marc Goldner**
I've studied military tactical warfare. Applying to communication methods and negotiation is child's play 6:54 PM

**Marc Goldner**
If this deal is to be signed there must be conflict: they'll never sign it otherwise 6:55 PM

**Marc Goldner**
I know what I'm doing. Eli doesn't have 3 hour long calls with these people. I do 6:59 PM

You all must understand: these people don't want to deal with US. They want me to sell and move on. The more Eli and I fight the more they want to sign this deal and not negotiate 7:03 PM

Y did Antonio quit? Bc Eli and I fight. And the list goes on. 7:03 PM

@Eli M Blatt did u delete anything else I missed in my posts that I just reposted 7:04 PM

I'm making sure it all aligns with what else I tell them 7:04 PM 



**Marc Goldner**

> **Marc Goldner**
> @Eli M Blatt did u delete anything else I missed in my posts that I just reposted

?                                                    7:10 PM

Okay we now have to sit and wait. They need to think I have some control over the situation and brought u to the negotiation table                    7:10 PM

Ur absence for weeks wasn't ideal but I was able to use it to our advantage so let's not fuck up and let's do right by then and get then repaid so I can sell our shares next    7:11 PM

Ok ✖ is waking up let's hope this worked    7:14 PM

@Eli M Blatt maybe throw in a good ol fuck you marc all you're good for is maybe sell if that                                                    7:15 PM

Maybe that's OD idk    7:15 PM



YESTERDAY

**Marc Goldner**
@Eli M Blatt I told them they can't just be direct on ✖ captable that u and ✖ Wont approve it                                                    9:46 AM

I explained that even if I were to help them sell in their own entities they have to setup it'll cost them 50k so it's the same thing as interest waiver and you'll have to give me a waiver to sell for them                                                    9:48 AM

Now let's sit and see if it works    9:48 AM

I also explained that i wanted to be on captable and u refused with me being directly on                                                    10:29 AM



**Marc Goldner**

@Eli M Blatt how much was the ⬛ fees for the deal we got ⬛? How much would we have been entitled to EXACTLY if he had funded and didn't kill that deal
12:28 AM

I understand your position that those fees should be cancelling out any interest because that's his fault and it cost us the relatiosnhip supplier who won't work with us anymore after so many bids and looking bad totally get ur position thanks
12:29 AM

Ahhhhh I get ur position now so ur saying u redeemed rod bc u thought that ⬛ would continue bringing and referring LPs but that didn't pan out how u expected
12:31 AM



**Celina Moreno**

Hi Marc, as you are well aware Eli has not communicated with you by phone or videoconference since February, and has since recently not been communicating with you directly in any medium. I just confirmed with him that both of the above positions you are attributing to him are false — he has said no such things to you nor does he maintain these positions.
10:51 AM

## EXHIBIT I

approved it' (which she did). The game you're playing here Eli will wind up dragging this into a Federal Court that will have a tortious discovery process that could reveal not just people's names, but has the impact of creating a regulatory securities risk with agencies such as the SEC. I do sincerely hope you do not attempt any further to go down this path of threatening me and claiming that I've 'stolen' your money and tying it back to MegaCap by refusing to operate this business in good faith. Thanks!
7:35 PM

is never working with you again. I can salvage that relationship that you destroyed by dissappearing and you can still get a cut. You are pretending that you haven't seen the Notice I sent weeks ago. Gamesmanship like that won't work, Eli. Do not go to war against an Army -- you will lose and badly. I do not want to have to destroy Emily's career by suing her for tortious interference but you should think VERY carefully if you think it's possible that maybe there are recordings of our conversations out there that you don't want to come to light. I would be very careful with your next moves because you are on thin ice of having all the hard work we put into MegaCap and ▬▬▬ being extinguished which neither of us want. Just know that neither of us have ANYTHING to gain by putting this into a public court where ultimately the far reaches of discovery will expose the ▬▬▬ employee's name that could revoke the shares. We'd both be bankrupted and you'd be liable for securities fraud for initiating an action on unrelated matters but trying to intertwine MegaCap. Be smart. Everyone know's your not dumb - malicious maybe, but not dumb, Eli.

8:45 PM

**EXHIBIT J**

s never working with you again. I can salvage that relationship that you destroyed by dissappearing and you can still get a cut. You are pretending that you haven't seen the Notice I sent weeks ago. Gamesmanship like that won't work, Eli. Do not go to war against an Army -- you will lose and badly. I do not want to have to destroy Emily's career by suing her for tortious interference but you should think VERY carefully if you think it's possible that maybe there are recordings of our conversations out there that you don't want to come to light. I would be very careful with your next moves because you are on thin ice of having all the hard work we put into MegaCap and ▬▬▬ being extinguished which neither of us want. Just know that neither of us have ANYTHING to gain by putting this into a public court where ultimately the far reaches of discovery will expose the ▬▬▬ employee's name that could revoke the shares. We'd both be bankrupted and you'd be liable for securities fraud for initiating an action on unrelated matters but trying to intertwine MegaCap. Be smart. Everyone know's your not dumb - malicious maybe, but not dumb, Eli.

8:45 PM

➦ Forwarded

Eli the more I think about it, do you really want the world to know in a public complaint that your unfaithful fiancé came to my room in Dubai to seduce me? That she's told me



A CERTIFIED COPY

**EXHIBIT K**

makes Michael Elkins an accomplice to your illegal actions and crimes. I strongly suggest that you immediately reinstate me, otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved.

I want to state one more thing: regarding your divulgence of any private contracting work that I may have done in the past – if it turns out to be true, as you allege, that I am involved in 'spy activities,' you may be tried for charges relating to the breaching of 50 U.S.C. 421, potentially punishable by a prison sentence for divulgence of my identity and putting my family's life at risk. (As an aside, it is extremely important to remember that I possess the name (as do you) of the ⬜⬜⬜ employee that is part of the ⬜⬜⬜ employee forward contract - (his name in case you didn't read the documents is ⬜⬜⬜). You cannot just file a court complaint in the public record to attempt to coerce me to settle on your demands by hanging my life and my family's lives in the balance alleging that I was a "spy". Further, it is egregious that ANY attorney put their name on a complaint in which stated anything about me being a "spy" – your counsel, whoever they may be, should be ashamed of themselves for potentially putting a patriot's life at risk and may also be liable for aiding in your illegal actions relating to 50 U.S.C. 421. To note, though,

or proceeds from ⨯⨯⨯⨯ or ⎯⎯⎯⎯ without my signed authorization. At this point, you are right about one thing: I am protecting you from yourself because I need to protect ALL entities and LPs – including myself from your illicit and illegal actions, including, but limited to, upon information and belief, committing ACH and Bank Fraud. I'm willing to look past everything that you've done up until this point, so please don't let me down. I hope to hear back from you soon and that we can work through this productively.

Eli, if this were a game of chess, you've been checkmated. There is nowhere you can run from the law. And so,

## EXHIBIT L

On Jun 19, 2022, 1:09 PM -0400, Marc Goldner <marc@gb.investments>, wrote:
You're brain dead. I am not going to sell my crypto or use every dollar I have to cover you defaulting when this is how you're acting. You've fucked yourself bro and if you want me as an enemy honestly you're about to see how I can be.

I'll make this business the most difficult it can be.

You try to fuck me and pretend we didn't already agree on the below then you're in for a rude awakening. I told you. Do not fuck with me.

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Part███
MegaCap Capital & Mega███
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Deare███████

I write this to you on the e█████████████████████████ed w████ ███ix of emotions ranging from pure joy, to feeling a moment of great succ█████ yet I write this to you with a mix of sorrow, sadness, and apology.

My entire life, I've always wanted to lead with the bad and end with the good, but this letter will be a little bit different. Each and every one of us should be celebrating this momentous occasion of ████████ 's FDA approval. Since I was a kid, I have always dreamed of what a world could look like with n████████████ ████████, and tonight is a night where I am seeing right before my eyes a lot of this come to fruition. Admittedly, back in my younger elementary days, some kids would poke fun and think a lot of what I was talking about was just science fiction – I'd always rebut that it's just science that hasn't been discovered yet. But in life, there is a balance, and with everything that is good, there is always something that comes right back to bite you.

To rip the Band-Aid off, I have a fiduciary duty to tell you that I no longer believe our investment in ████ is safe anymore. Eli Blatt has illegally, improperly, and invalidly attempted to withdraw me from MegaCap, and redeem a significant portion of my rightful equity for $1.70 – yes one dollar and seventy cents, I understand how crazy it sounds but it's true. Eli's bad faith and malicious actions, I believe, have been orchestrated since the very beginning. Upon information and belief, he first registered MegaCap as a single member LLC, he then puppeteered me to redeem Roderyck Reiter, (the other rightful general partner), and now finally, to execute Eli's grand plan, he cut off my email access, restricted my banking access, removed my permissions from Flow, and has begun removing me from communication channels with people affiliated with MegaCap. He has now removed me from access to our bank at First Republic, and it is upon my information and belief, from what I have seen, that Eli may have committed bank fraud.

Eli has lied to the seller whom we acquired ████████ from and told them that I stepped down from MegaCap 'due to my legal studies and retained my economic interests'. Eli's claim that I stepped down from MegaCap is patently false. He also failed to mention to the seller of his malicious plan to redeem me days later after speaking with her. His unilateral attempted withdrawal letter and ridiculous redemption notice are illegal and invalid, however, Eli is right about one thing – I will maintain my economic interest in MegaCap and I will stand by each and every one of you until you get your rightful shares of ████████

This SPV of ████████ has become more than just an investment. It is a vehicle into the future that many of us hope to see in our lifetimes. Along this ride, each and every one of you have made this dream a reality. Some of us have budding relationships, others I've known for over a decade, some of you are my best friends that I've traveled the world with, others I've grown up throughout my adult life and been through thick and thin. But one thing I believe is consistent amongst all of us – you all believed in the vision I had for ████████, and you believed in me and in what I promised I could achieve at MegaCap.

This oversight I had at Eli's ability to manipulate and deceive I'm sorry for, but there's one thing that Eli just must not know about me – I am a fighter and I am not going to let Eli get away with this. I will not stop until corrective legal measures are taken, and Eli faces the appropriate legal consequences for his illegal, malicious, and unethical actions that have potentially harmed each and every one of you.



Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Eli said to me in an email a[...] [...]ween us to be confidential besides our MC share price [...] [...]nation to our businesses [...]" The only thing Eli care[...] [...]t is my [...]le hearted belief. It is with a heavy heart that someone I once viewed as a big brother could turn on me and villainize me in the way he has.

I have come to believe that Eli doesn't care about anyone but himself, most certainly upon my own belief, he doesn't care about anyone's privacy (shown by his actions in exposing private individuals in a very public way), and I believe all he cares about is his own self-interested gain. Eli has attempted to tell one of MegaCap's capital partner's to have me continuing to sell for MegaCap and that he would issue me a side letter. Eli has the actual audacity to not just illegally attempt to withdraw me, but he has the gumption to send me an invalid and illegal redemption notice for a significant percent of my equity for once again $1.70. That is the kind of person Eli Blatt is. He acts like a know-it-all 'hot shot' who thinks he is above the law and tries to bypass securities laws by having me do the hard work of MegaCap and sell for him through a 'side letter' when he knows full well that I'd be acting as an unregistered broker dealer which I refuse to do under any circumstances.

In my earnest opinion, I believe Eli acts like this pseudo professional know-it-all PhD who only cares about his reputation and how he appears to others because of what I believe are his own insecurities. If Eli thinks for one moment that I won't expose his true nature to the world, he is grossly mistaken – all of this is what you as LPs will uncover through the internal workings of what has gone on at MegaCap and what Rod and I had tried to manage behind the scenes for several years. Eli thought I would just lay down here and die while he basks in some type of glory and victory that is, unfortunately for him, short lived. Eli has a habit of underestimating people around him, because he's grown up smarter than most people around him (I'll give him that), he thinks that he could take advantage of anyone he sees he could make a profit off of – he betrayed his best friend, Rod, of 40+ years since they were kids by throwing his oldest childhood friend to the curb when Rod just had his first kid, a beautiful baby girl named Celeste.

In truth, I'm not angry at Eli. I'm not mad. If anything, I'm sad and devastated, in fact, and I pity him. I pity his loneliness that all he feels he has in this world is to take his partners equity – two of his partners, in fact, that helped build this company into what it is today – to have to post on social media and then lie to an LP that he was in 'hiding' because of me. If that's the type of person you want leading your investment into the future, then I just ask that you take a step back and consider the alternatives and take a moment to see Eli for who he truly is. All I'd ask before you would make that decision is to reconsider and really think about who Eli Blatt is under the surface of who he pretends to portray himself to be and if that is the person that you feel comfortable with to safeguard your investment with MegaCap in ✕✕✕✕ then at the very least let us please have a talk about a path forward. People wear many masks in life, but under Eli's crafted face is a grotesque caricature of a very sad, pathetic, and lonely man who needs true help.

I have a duty to further disclose the following to you. When I spoke with the seller, where we acquired the ✕✕✕✕ derivative equity from, she informed me that, if legal action is potentially taken that would harm her, she would redeem MegaCap at a price of about $35 a share. Although they claim they can and will do this, I do not know if they have the legal ability to do so – it seems quite 'out there' so I am less inclined to take that as a credible threat. She also claimed that she would not release shares or cash to MegaCap with just Eli's signature

Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466



6/2/2023

and she would require min                                                    get involved and step in
then that would be a differ                                                  s situation. So, knowing
that brings a slight bright s                                    to take     y shares right off the bat
of most of the LPs to my understanding. There are potential legal maneuvers that Eli can attempt to do but it is
hard to ascertain the full extent of his plan at this point, but I will continue to keep all LPs and relevant parties
informed as I discover new information.

I am currently exploring all potential legal actions to take against Eli, including filing an injunction, suing Eli
for breach of fiduciary duty, amongst other things, and possibly organizing a class of Limited Partners to sue
Eli and MegaCap in order to ensure the safety of each and every one of the shares. Again, to reiterate, I will
NOT allow Eli to pursue his illegal activities that I believe has permanently damaged the brand and goodwill
associated with MegaCap that I've helped to create over the last several years. Each of you has placed your trust
in me to help guide this vehicle to a safe exit. Along the way, there are often bumps in the road to be expected
– unfortunately, this is one of those speed bumps.

Eli hasn't just tried to take away my equity, or shares, or manager and member status, but Eli has attempted to
taint and destroy my dreams and ambition. Admittedly, over the past several weeks it's been extremely hard to
cope with and I had to look inside myself and ask if I was prepared to fight for what I believe in, and the answer
every single time was a resounding "YES!" I am not going to let Eli destroy the vision that this little boy in me
had 20 years ago on what the world could be. This investment for me was not just about money – I truly believe
that being able to wield a degree of influence by being part of technological history is a moral and ethical duty
that those of us that think we know what will happen, will be able to aid in what will happen and prevent the
worst from occurring. I won't just stand by idly to see, not just my hopes and dreams destroyed, but to see the
potential risk that each of you could face if I am not there to help protect you. I've realized a lot from this, it is
really hard to extinguish a flame that burns within when you truly believe in something. Embers can sometimes
flicker, but when you're able to maintain a steady internal peace within, you are able to allow that flame to stay
ignited unwavering. That clear mindset is what I know I can bring to the table as I am prepared for the long
bumpy road ahead.

It's unfortunate that Eli is conflating non-MegaCap matters and issues with unrelated businesses and
attempting to try to use that as leverage to "oust" me - this is never going to work. Eli has already attempted to
claim that I am extorting him (which I have proof that I never did) and that I owe him large sums of money
– which is also patently false. Eli has attempted to use unrelated matters in which he failed to fund a roughly
40% factory deposit for Bitcoin Miners and wound up defaulting, and that he failed to provide me agreed upon
investments, as well as failed to wire me money for NFTs in which I helped advance the money for over a year
(along with his refusal to sign fund documents when we took money from LPs). Eli has attempted to claim that
he was under 'duress' as he was traveling across the world in beautiful getaways while him and his fiancé posted
pictures on social media (someone 'afraid for their life' doesn't give away their location for the world to see).
Eli left me to attend to most MegaCap matters and said he was blocking me from all communication channels
(and archiving our chats) and would only respond to 'tax-related matters' ("I have reached the end of my ability
to continue working with you on anything but legally-required tax matters based on your continued insistence
on withholding the miners from me [….] It's honestly a shame that you're willing to sacrifice our potentially
still productive continued partnership around Megacap on more than just taxes […]" – when the reality is that



Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Eli never paid me for these [...] d coerce me by hanging MegaCap and its Limited P[...] perate – this level of toxicity became unmanage[...] handle [...] heir own. At the end of the day, I'm not some greedy money hungry Wall Street-esque guy that needs to live in a $1M+ condo in Miami or feel that I need validation from others by going to exclusive clubs or yacht parties – I've always enjoyed a more low-key lifestyle in a small apartment without the bells and whistles of gaudiness. I hope that's relatable to some of you and it gives everyone a closer microscope into who I really am underneath.

Throughout this semester in Law School, I was working my best on managing this as my full-time focus. Look, those of you that know me know that I joke that "I'm a simple guy living in a complex world." I live with my partner, we have two puppies, Lucky and Lady, and I'm happy just watching a cool movie once ever few months like the newest Mario movie which was a real treat and nostalgic trip from childhood. I believe most, if not all, of you know that I love to study and focus on learning on a daily basis – currently I'm wrapping up my Law Degree (I have about 1-2 semesters left of academic study). Eli has tried to weaponize my studies against me claiming to others that I stepped down for my studies and that I said I would defer to propel our businesses (which I did defer Law School for over a year). Eli has created a fictious narrative against me which is easily able to be dispelled and will be in due time.

Eli also fails to mention that some of the previous speed bumps was when I legitimately was threatened which I have documented and can prove. Out of fear, I conveyed this to Eli, and he knows I possess the screenshots and a signed affidavit from the individual who threatened me. All I had tried to do was warn and protect someone who I thought was one of my closest friends who instead took these messages and tried to turn them against me which is so sad. Under no circumstances have I ever threatened Eli, nor have I extorted Eli as he has illicitly claimed in bad faith. I will do everything that I legally can to clear up all of these false accusations.

I want to assure everyone that I believe that I have all of the contractual agreements necessary to achieve a legal victory against Eli and to reclaim control over my rightful position at MegaCap.

I am willing to share anything that I can with each and every one of you at a moment's notice, yet I don't want any of you to walk away from this reading this letter in fear that your investment is at risk, though that unfortunately will always remain a possibility until we can safely and successful exit this SPV. I know I can never guarantee or promise that everything will be perfectly fine and safe, but I promise that I will do the very best I can to help all of us. One option that I am continuing to explore is having MegaCap put into receivership with the SEC – a type of action like this will ensure that authorities will oversee MegaCap through ✕✕✕✕✕'s IPO. The safety of your investments is something that I'm not taking lightly. Some of you are the hardest working people I've ever met, and again you trusted me with your money on a belief and vision that I shared with all of you. With that trust, came not just a trust in me but a trust in MegaCap. I had pumped my life savings into my business ventures with Eli which has left me in the wake of true financial destruction & unimaginable hardships due to Eli's negligence, malicious illegal actions, and reckless behavior that I now truly believe was part of his 'plan'. Fact of the matter is, I trusted Eli, I believed in what we could do together – I believed he was my best friend, and now I feel betrayed. I never could have imagined how cold, calculating, and conniving Eli could have been. This was the guy who we shared some of the most intimate personal things going on in our lives, he is the guy who I forgave after his 'fiancé' stole documents from one of our companies and had reached out to at



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

6/2/2023

least one known prospecti⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛'d be the godfather of each other's kids, and the guy w⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ situation has become such a sad and demoralizing⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛the cou⬛⬛⬛ge to write all of this without admittedly having an emotional breakdown here and there to be so greey vulnerable. I maybe am a bit naïve, but I still deep down, feel that Eli's personal demons and internal struggles have gotten the better of him and that this is just a temporary lapse in judgement, and he'll eventually come around. This isn't the guy that I would spend hundreds of hours with during class or share in meals while we'd talk about our plans for the future in our underwear. Whoever replaced Eli with what he's become makes me feel like this is sometimes part of a sick elaborate joke – but then I get grounded back into reality.

Eli can claim all he wants that he is the "initial founder" of MegaCap but Rod and I know the truth. Rod is the one that came up with this visionary-esque idea of starting a business centered around Pre-IPOs and Unicorns. It was Rod who introduced us to the intermediary for ⬛⬛⬛⬛ (one of our first deals), and we also know that the very first thing I said to that intermediary is, quote, "After we close this, we need to find a way to get into the ⬛⬛⬛⬛!" That mention of ⬛⬛⬛⬛ was the first ever mention of ⬛⬛⬛⬛ at MegaCap to my recollection – although, I had been talking about this for years, even at my GEMBA prior to Eli joining. Eli saw me as someone he could exploit – it was hard hearing from some of my classmates that he never cared about me. He came into TRIUM, into a program where I was very active and ultimately became the Academic Class Representative, and saw in me a network that he could exploit not just through the relationships I had formed in academia but the friends I've made along the way through my life.

It wasn't Eli who grew up falling in love with movies like *The Matrix* or *Total Recall*, or taking the time to spend thousands upon thousands of hours trying to create content, designing games (or just playing my favorite Nintendo games that would transport me to other imaginative worlds as a kid), or researching the future of ⬛⬛⬛⬛⬛⬛⬛⬛ (and how the world we know today will be a thing of the past). It wasn't Eli who did all of that. And it's not to say that I'm the smartest person in the room, nor the most educated, but I did and I still do have a vision for that future. I've always considered myself a futurist, I always have considered myself out of place with current times, whether it was reading science fiction, or hanging out with my parents' friends instead of people my own age, I've always had a firm grasp on what the future holds, and the repercussions society may face as we move forward. One of the first papers I wrote in college was titled "Robotic Rights" (in a class centered around The Twilight Zone no less!) – now we don't seem that far off with the rise of Artificial Intelligence and integration of robotics into nearly everyday life.

All of this is one of the reasons why I've been working on starting a think tank and a fund, called The Neuralverse – over the last several years going on in the background. One of my goals in life is to invest in this entire space, the ecosystem itself, outside of just ⬛⬛⬛⬛ and to help steer the world and prepare society for the next evolution that the fifth industrial revolution will bring. Each and every one of you that invested in ⬛⬛⬛⬛ and are here today, you too have a future in all of this. You didn't just believe in a wild idea of what ⬛⬛⬛⬛ could create, or what I was able to pitch and explain to each of you. This wasn't just about a good price on a deal or making a potential 100x return (that could go to $0 – but hopefully not!), but you're a special type of person too.

You invested in something that you knew would be a decade away from ever seeing the light of day. You had a risk tolerance to believe that a government's regulatory body would approve ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466

6/2/2023

⬛⬛⬛⬛. You saw th⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. Deep down, you all know that one day ⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ns that we're using to today will be replaced with ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, where the ⬛⬛⬛⬛, where ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, and that's a future that you all want to be a part of. This investment isn't just about money, but about what you each see the world could be, and for that, I want to thank each and every one of you for believing in me and seeing the same future, and being able to hang on tight through all these speed bumps that I hope will flatten out.

As many of you know me, I do believe that I am a genuine person. Maybe not perceived to be the nicest all the time, yet I will always speak my mind and tell the truth, and there's one truth that I know will eventually get back to Eli and it's something you all should know – I will not pull any punches when going to spar with Eli in a court of law and I will not stop until justice is served. Eli will get what he truly does deserve and I will always stand up for what I believe in and what I know is the right thing to do.

We hopefully will get through all of this together. All that I ask is if you can please ask Eli to reinstate me without me having to escalate this any further by bringing legal action against Eli and MegaCap. In the meantime, I will focus my efforts on attempting to resolve things on the backend with Flow, the bank, the accountants, and any other relevant parties of this situation, and doing my best to freeze Eli's illegal action and rampage. I believe there's still time to correct this issue and try to just move on from this. ⬛⬛⬛⬛ is just one of many companies that we can all be a part of and I don't want it to be the last.

If Eli fails to reinstate me, I would like all of you to join me as a class in suing MegaCap and Eli to ensure that our interests in ⬛⬛⬛ are safely secured. I'm sorry if any of you feel that I failed you. All I can do is apologize and try to make this right. I will be available to speak with anyone at any time – you all have my number, but just as a reminder it's +1-(516)-984-1466 and if you want to reach me by email, you can contact me at Marc@GB.Investments so please, don't hesitate to pick up the phone to give me a call. Don't be afraid to ask me any of the hard questions. I'm not going anywhere, and I will do my very best to do everything that I possibly can to make this right for each and every Limited Partner of MegaCap.

Thank you again for believing in me and giving me this opportunity to try and fix this disastrous situation.

With Love and Apologies,

*Marc Goldner*

Marc Goldner

P.S. Oh! And one more thing…

When I first started on my creative journey, I once authored a story called The Forgotten Adventures Of The Lost Toys. Look, I'm not some big wig finance guy, I may not be the smartest person in the room, nor the most educated as I said before, but I would like to think I'm creative and one of the most passionate people you will ever meet in your life. When I set my mind to something – I chase it with all my might. Something my Mom has



Marc J. Goldner
Founding Managing Part...
MegaCap Capital & Mega...
Marc@GB.Investments
+1.516.984.1466

6/2/2023

instilled in me since I'm a li... ...y least you'll land on the moon or maybe it's a cloud... ...ithout hope that all the hard work will pay off. We a...

I took this time of adversity to power through creatively and create a new logo for MegaCap that I believe is representative of what is going on as we speak – that life itself is a journey…a winding road... a path that we all find ourselves on. We're all on this adventure together and we have no way to know what curveballs life will be throwing at us, but we have to each power through and find it within ourselves to keep on pushing forward!

What this whole thing has made me realize is to not just remember what is important but to never forget where your passions and loves lay within. For we will never know what tomorrow holds for all of us, but we can always try to remember to not forget what our dreams are today. All of us had that favorite toy growing up, we had dreams, some of us chased those ambitions, while others will hopefully rediscover them later in life. But, one thing is for sure, all those dreams, our memories, they have a life of their own and it is up to us to revitalize those passions and always remember to stay faithful to who we really are within and deep down inside. Thank you again for taking the time to take this journey with me – I can promise you at least one thing, it will never be taken even remotely lightly and it will not be forgotten!



The Forgotten Adventures Of The Lost Toys © 2023 By: Marc Goldner and Rachel Korsen

"A key just opens a door to somewhere we find out we belong."

Messages with the Creditor Goldner Alleged was Threatening Blatt's Life





Messages with over a dozen Megacap Limited Partners threatened by Goldner







6/4/2023

Hey Eli,

I have heard Marc's side of the story. I'm very stressed and confused with what's going on at MegaCap, can you please tell me what's happening? I would greatly appreciate it

9:00 AM

Hi [redacted]   So you got Marc's long letter too?  I have a letter from Megacap's lawyer along with an update to address the fears that Marc is intentionally stoking. I am in the countryside for the weekend with very scant reception and that has slowed me down from
Getting the letter out. But I'm hoping it will go out today or at the latest tomorrow. It will go out via Flow. In the meantime, just rest easy. Marc is simply attempting to scare people to try and get his way. But all is well. Stay tuned.

1:58 PM

I actually managed to scrape enough signal to get this done -- so you should have the email in your inbox now from Flow.  Again, I really regret that Marc is so unstable and causing fear to further his own ends, but as I hopefully convey in the letter, in fact all is well.

2:25 PM

Thank you Eli, and yes, I got his letter. Appreciate the reassurance, looking forward to it

4:27 PM

No worries. Rest easy I am at the helm and maintaining a steady course.

5:15 PM
👍

6/6/2023

Hey Eli, is there any news with the letter? Thank you   5:13 PM

Did you get it?  It went out to you when I messaged you before.   5:13 PM

Via Flow.   5:14 PM

There's no news besides the letter.   5:14 PM

Oh got it, thank you Eli   5:14 PM

Np!









Wow this letter!! Ha! 3:46 PM

Yeah no kidding 4:05 PM

He is something else. I think you can draw your own conclusion from that letter. No professional would ever write that kind of letter. Anyway, the Company's lawyer is on it. Everything I did I did to protect the Company. 4:06 PM

It's been a difficult year for me dealing with him... 4:07 PM

I dealt with him in Module 7 discussion and just totally blocked him 5:28 PM

so no joke 5:28 PM

your story is another level 5:28 PM

Oh wow, well I'm sorry to hear that 5:28 PM

Though it's reassuring in a way to know I'm not the only one 5:28 PM

He is the most disturbed individual I've ever dealt with, and sadly my dealings with him are deep 6:29 PM

The charm of his "toastersexual" type off-beat persona mask how deeply troubled he actually is 5:29 PM

hahaha 6:30 PM

The sad part for me is that it's now clear in retrospect that he engaged in a protracted campaign, well before we even started having disputes, to paint me as a bad actor and alienate me from other TRIUMers... and basically he succeeded 5:30 PM

good luck settling all of it man 5:30 PM
❤️

otherwise you are ok? 5:30 PM

Besides the Marc drama yeah I'm overall good, thank you for asking. Your encouragement/support really means a lot to me. 5:31 PM
❤️



June 2, 2023

**VIA FLOW**

      RE:    *Megacap Capital, LLC*

Dear Megacap Partner,

      I represent Megacap Capital, LLC ("the Company").

      I am writing regarding the current operation of the Company. Presently, the Company is operated by Dr. Eli Blatt. Dr. Blatt withdrew Marc Goldner as a Class A voting Member and Manager of the Company.

      Any dispute between the Members of the Company is subject to the Company's dispute resolution procedure which calls for private mediation and arbitration. As of the date of this letter, Mr. Goldberg has not taken advantage of this procedure.

      Please direct any questions or concerns relating to the Company to Dr. Blatt at team@megacap.capital.

      Sincerely,

      Michael L. Elkins
      melkins@mlelawfirm.com

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Part█
MegaCap Capital & Mega█
Marc@GB.Investments
+1.516.984.1466

6/2/2023

Dear Prospective Limited P█

I hope you have been well. █████████████ █████ while some better news █ as come to my attention that Eli M. Blatt of MegaCap is attempting to sell 'shares' (and/or derivative equity VIA an employee forward contract) to Prospective LPs, such as yourself, of ███████. I have seen messages that he claims that these are new shares and that "[w]e have secured additional allocation" which is far from the truth. Apparently, Eli is attempting to illegally commandeer MegaCap.

These ████████ shares are a form of derivative equity originating from an Employee Forward Contract that we purchased through a third-party seller. MegaCap has held inventory of interest in a forward contract that it has been trying to sell for roughly a year. These are NOT new shares or derivative equity.

Further, as a Prospective LP I have a fiduciary duty that is created that I must inform you that Eli has illegally, improperly, and invalidly sent me a withdrawal letter from MegaCap. In addition, Eli has attempted to illegally, invalid, and improperly 'redeem' a significant part of my equity (nearly 25%) for $1.70 - yes, that's right one DOLLAR and seventy cents. Truly unimaginable!

I cannot allow you to make this potential investment because I do not believe your money is currently safe at MegaCap. Eli has illegally, invalidly, and improperly removed my access to the MegaCap email address (so there is no "we" as per his solicitation that I've seen), as well as restricted my banking access (which I believe amounts to Bank Fraud), as well as restricted my access to MegaCap's Fund Administrator, Flow. Again, Eli does NOT speak on my behalf, nor can he act on my behalf, nor make any unilateral decisions that are completely unauthorized.

I am currently in the process to initiate a lawsuit in federal court against Eli and MegaCap, as well as preparing to file an injunction against the same parties and potential additional third parties. In full transparency, you should know that I am exploring options such as cooperating with the SEC to place MegaCap into receivership to protect the existing LPs of MegaCap. I may be at the point where I need to include the regulators, and this measure is not being taken lightly.

██████████████████████████████████████████████████████████████████

interests. Seeing Eli do this just before ████████ achieved ██████████ was one of the most gut-wrenching things I've ever witnessed in my life. However, when things like this happen it is important to keep a cool head and pursue the appropriate legal avenues to achieve a remedy that is just and equitable.

I won't talk your ear off, but I will be happy to field any call and discuss this and answer any and all questions you may have. I ask you to please preserve all messages, communications, emails, or otherwise that you receive from Eli Blatt, his 'assistant' Celina, Anthropos, MegaCap, or any seemingly related and/or affiliated entity as they may be relevant to the forthcoming suit which makes the communications discoverable. If you have wired any funds, please advise me immediately and I will do my best to keep you appraised of any communications that I have with the recipient bank of those funds. I am someone who has always put relationships first – and this is one of those times. I will not allow friends and genuinely good people to be taken advantage of unknowingly by someone like Eli. This isn't just about money – this is about ethical principles.



Marc J. Goldner
Founding Managing Part...
MegaCap Capital & Mega...
Marc@GB.Investments
+1.516.984.1466

6/2/2023

I am sorry to have to bothe... ...at your funds remain safe and that you do not wire a... ...any other companies such a... ...re-IPO solicited 'deals' i.e., ..., etc.) or subscribe to any MegaCap entities or other entities that may be improperly run by Eli Blatt (without my knowledge). The current operations are without my approval or authorization.

Please do NOT wire funds to MegaCap, any affiliated entities, Eli, his assigns, or any of his affiliated and/or unaffiliated entities until I can fully ascertain the level of damage that Eli has maliciously conducted behind the scenes, and I can ensure your potential future investment would be secured and safely invested. In the event that you did in fact already invest, please thoroughly review the subscription agreement to see if you can immediately request to cancel your subscription and request that your funds could hopefully be returned to your account.

I am doing my best to regain my rightful control of MegaCap to ensure a safe exit of all vehicles and entities in the best interest of all our trusted Limited Partners and their respective funds.

Thank you and I hope to hear from you soon (albeit, under ideally better circumstances). Again, don't hesitate to give me a call – we can still geek and nerd out about the future of         and the impact it will have on society. It's always good to try and end on a good note. :) Talk soon!

All the best,
Marc Goldner
Founding Managing Partner of MegaCap Capital and MegaCap Funds
+1.516.984.1466
Marc@GB.Investments



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

6/7/2023

Ryan & the rest of the team

I am demanding that Flow in                                                                                 backend. I have a right to
see all correspondence and t                                                           my acc        as erroneously removed. It is
absolute negligence that you have allowed Eli to rem    e my access when you know that we are both General Partners.
He has no unilateral authority over the accounts. Flow is preventing me from fulfilling my fiduciary duty to Limited
Partners and that liability will pass to Flow in the event that the regulators get involved.

To reiterate, Eli does **NOT** have unilateral authority to remove me and restrict my access, and that Flow has allowed him
to do this makes Flow liable as well. There is ample enough evidence in the exhibits that show that not only was Flow
aware of the issues that have been brewing at MegaCap for months, but that Flow confirmed with Eli that everything
must be jointly approved. That you deviated from that initial understanding and agreement is a breach of your various
duties to myself.

I would like assurances that until this is resolved that there are no outgoing subscription agreements or documents
of any kind, including any tax filings being sent to anyone. This is all to ensure that Eli does not try and double sell
any shares, amongst other reasons, as he is clearly not to be trusted to manage any kind of fund. I have been told my
numerous Prospective Limited Partners that Eli has been attempting to solicit them XXXX.Unfortunately for Eli,
these are my contacts from my network that Eli has falsely claimed that I 'deprived' him of and never shared those
contacts – yet, he fails to mention that I brought in the majority of the LPs for XXXX through my networking and
fundraising activities since the inception of the fund.

Further, I am once again requesting Flow forwards ALL email communications that Flow has had with Eli since early May
as I stated in my last message to be sent IMMEDIATELY and then to send me any and all communications with Eli where
I was not CC'd prior to May. I have a right to know what he has illegally attempted to tell you to do by changing K1s and
attempting to commit tax fraud. There was a full agreement that the terms of our agreement were completed and that
"[so] long as the taxable income is just 10% of the total fee then we are good."

Therefore, I would like an immediate breakdown of what Eli, upon information and belief, fraudulently told you to
change. For instance, such suspected changes include but are not limited to, 1) if Eli tried to attempt to steal any of my
            equity, 2) my equity in MCC, 3) misappropriate any carried interest, management fees, shares, or otherwise to
himself or MCC.

Your forthcoming transparency is of vital importance, and failure to do so will result in Flow being named as a third-
party defendant in the looming lawsuit against MegaCap and Eli.

Thank you once again for your cooperation in this matter.

All the best,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing & General Partner
MegaCap Capital and MegaCap Funds

P.S. To Repeat, Flow has a duty and obligation to send me **ANY** and **ALL** communications Flow has had with Eli since he
has attempted to remove me illegally. If you do not provide these communications, I will be filing a suit against Flow
and I continue to reserve all rights.



Marc J. Goldner
Founding Managing Part
MegaCap Capital & Mega
Marc@GB.Investments
+1.516.984.1466

6/26/2023

Flow,

It is OUTRAGEOUS that you ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ preparing the lawsuit and injunction against Eli and MegaCap and you ~~~ be a defendant as well. There may be legal ramifications if I discover that you're speaking with Eli or anyone affiliated with MegaCap behind my back. Having Eli or any attorney (i.e., Michael Elkins) breaching his ethical duty is not legal direction or judicial intervention and will not absolve Flow of liability. I have no issue of discussing this matter with the regulators — in fact it will bring Justice to a lot of others to know how you conduct business which is unacceptable at best.

I'm already in possession of letters from Sellers stating that MegaCap and Eli won't be released any shares, proceeds, or any distributions, upon any type of liquidity event relating to those SPVs without my authorization and signed consent. Eli must now understand the repercussions for his actions which may amount to what I believe to be criminal fraud. Flow needs to do the right thing, and require dual authorization on all documents, access, instructions, messaging, and any other actions taken by Flow and on the Flow platform itself.

Thanks,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing & General Partner
MegaCap Capital and MegaCap Funds

P.S. I already possess proof from an LP that Eli is individually targeting LPs with messages through the Flow platform stating misconstrued 'facts' and not sending it to ALL LPs. Flow aiding in Eli's illegal actions may amount to a claim against Flow for tortious interference. Flow will be in the middle of this. I suggest you immediately restrict Eli's sole individual access to Flow and reinstate my access where ALL messaging and actions must be DUAL approved as agreed with Flow in writing. This agreement has been previously shown in the prior attached exhibits. Do not make me ask again or I will take this to the court of public opinion prior to naming Flow in the looming legal proceedings. Once again, take action immediately! This is greatly appreciated.

P.P.S. To reiterate and for avoidance of doubt, Flow can not issue any changes to K1s from the last draft that I had reviewed. If Eli or anyone at MegaCap attempted to 'instruct' to make any changes they are NOT approved and may not be issued. I have been assigned approximately $500,000 (8,217 shares) in this deal and am STILL owed a K1 along with to my knowledge every other Limited Partner.  If any changes are made without my approval, I will hold Flow liable. To be clear, Eli nor MegaCap has any authority to unilaterally change the agreed upon structure, management fees, loans, K1s, or any other financial and tax documents without my signed AND verbal authorization!

# MegaCap Capital Entities

---

From: **Ryan Nanney** | ryan.nanney@flowinc.com

June 2 at
12:38 AM

To: **marc@gb.investments**, **Eli Blatt** | e@megacap.capital, **Blake Schneider** | blake.schneider@flowinc.com,
**Relationship Management** | rm@flowinc.com

Hi Marc and Eli, over the past few days and weeks, we (Flow) have been getting conflicting stories and demands from each of you. For this reason, we will not respond to individual emails, or work on the MegaCap portfolio in general, until we receive clear guidance on who legally is in charge for MegaCap Capital.

--

**Ryan Nanney**
Fund Accounting Controller



https://flowinc.com/

---



June 2, 2023

**<u>VIA EMAIL ONLY</u>**

Ryan Nanney
ryan.nanney@flowinc.com

     RE:    *Megacap Capital, LLC*

Dear Ryan,

    My firm represents Megacap Capital, LLC ("Company"). I do not represent Eli Blatt, individually or Marc Goldner, individually. This is in response to your June 1, 2023, email.

    Eli has withdrawn Marc as a Class A voting Member and as Manager of the Company. Eli is presently managing the Company. The issuance of K1s is a time-sensitive matter. The Company requests that you work with Eli to finalize the K1s.

    The Company has dispute resolution procedures for Eli and Marc to resolve any disputes between them. However, the Company needs to continue functioning and sending the K1s is vital to the Company's continued operation.

    Thank you for your cooperation.

                Sincerely,

                Michael L. Elkins
                melkins@mlelawfirm.com

NOT A CERTIFIED COPY



ONE WEST LAS OLAS BOULEVARD, SUITE 500
FORT LAUDERDALE, FLORIDA 33301

TELEPHONE: 954.525.4100
FACSIMILE: 954.525.4300

Benjamin R. Muschel                                              muschel@kolawyers.com

June 26, 2023

**VIA EMAIL**                                    *IMMEDIATE ATTENTION REQUIRED*
Flow, Inc.
Attn: Blake Schneider, SVP Operations
Blake.Schneider@flowinc.com

          Re:     *Megacap Capital, LLC*

Dear Mr. Schneider,

**Your immediate attention to this matter is required.** This law firm represents Megacap Capital, LLC (the "Company"), as co-counsel with Michael Elkins, with whom we understand you have corresponded previously. Among other things, our representation is specifically focused on matters involving Marc Goldner's persistent attempts to destabilize the Company.

It is our understanding you have requested more explicit guidance regarding who is in control of the Company and, in the interim, Flow has frozen all work on Company matters. As you can probably appreciate, there are dozens of Limited Partners relying on both Flow and Megacap to ensure both their peace of mind as well as the stable management of their investments, and so we recognize your desire to ensure you are taking the right steps to protect everyone's interests. We are also aware that Mr. Goldner has made numerous threats, not only against Flow, but also against other partners of the Company.

This letter serves to reaffirm what Mr. Elkins has already communicated to you previously, both in writing as well as over the phone, including:

1. We now represent the Company, along with Mr. Elkins;

2. Mr. Goldner was withdrawn pursuant to the terms of the Company Operating Agreement (the "Agreement") and is no longer authorized to speak or act on behalf of the Company;

3. Mr. Goldner is within his rights to challenge his withdrawal from the Company via the dispute resolution terms detailed in the Agreement;

4. To date, Mr. Goldner has not availed himself of these procedures, opting instead to breach the Agreement further by tortiously interfering with the Company's partners and attempting to cause the Company harm;

000001/01459974_1

MIAMI   -   FORT LAUDERDALE   -   BOCA RATON

June 26, 2023
Page 2

5.   In fact, to our knowledge Mr. Goldner has not retained counsel;

6.   Mr. Goldner is not authorized to have any access to any Company information or resources; and

7.   The Company formally requests that you continue working with Dr. Eli Blatt to finalize the 2021 and 2022 tax reporting, after which the only remaining ongoing engagement between Flow and the Company is the continued use of the software platform.

If you have any questions or require any further information, please contact us immediately. The statements and demands set forth above are made in full reservation of all rights, remedies, and defenses.

Sincerely,

BENJAMIN R. MUSCHEL
For the Firm

CC:   Ryan Nanney
      Relationship Management Team
      Dr. Eli Blatt

NOT A CERTIFIED COPY

# Re: Flow / Mega-Cap - resolution needed by Dec 16

From: **Blake Schneider** | blake.schneider@flowinc.com                                        July 20 at 5:49 AM

To: **Eli M Blatt** | e@megacap.capital

Cc: **Ryan Nanney** | ryan.nanney@flowinc.com, **MegaCap Capital Operations** | ops@megacap.capital, **Benjamin R. Muschel** | muschel@kolawyers.com, **Blake Schneider** | blake.schneider@flow.inc, **Relationship Management** | rm@flowinc.com

Hi Eli,

I would be the first to admit if I or anyone on the Flow team has made a mistake. As humans, we do make mistakes from time to time, and we always own up to them, fix the issue at hand, and learn from the mistake to ensure it does not happen again in the future. However, that is not the case in this instance - far from it.

As discussed in my conversation with your outside counsel, Ben (as well as the other counsel in addition to/before him), Flow will not tolerate unreasonable (not to mention, unprofessional) threats or demands - of which we have received many from MegaCap and its representatives over the past ~10 months. We will always be respectful and professional - and expect the same in return.

As you are well aware, due to MegaCap/its Partners being unable to agree on just about anything related to its investments/entities/filings (at least while Flow was included), Flow suggested strongly that we should part ways. Both you and Marc - despite not agreeing on just about anything material at the time - asked us to help out for a little bit longer. Again, due to the lack of alignment and agreement amongst MegaCap Partners - as well as receiving many contradictory statements regarding how to proceed - Flow has had to spend orders of magnitude more time on MegaCap work than it allocates to each of its clients. Because of that, this is a massively costly arrangement for Flow. Flow would typically charge for all of the extra work/re-work. We have not done so yet, as we just want this to all be over with.

In addition, many members of the Flow team have had to work through mental suffering due to the harassment it has been exposed to at the hands of MegaCap Partners. This is not ok. We will not tolerate any sort of harassment.

I pride myself on being a respectful, professional human who is diligent about getting things done. However, I pride myself more about taking care of people around me, including my team here at Flow. I kindly - but firmly - request that you, as well as any MegaCap representatives, limit communication to Ryan and any other Flow team members to information useful in getting things closed out. Please refrain from any communications that even border on threats or harassment. If you or any other MegaCap representatives would like to discuss anything else, please reach out to me directly.

I am out through this Friday, but would welcome a call anytime next week if you'd like to talk through any of the above or the path forward.

Best,
Blake

# Re: Flow / Mega-Cap - resolution needed by Dec 16

From: **Eli M Blatt** | e@megacap.capital                                                    July 24 at 3:29 PM

To: **Blake Schneider** | blake.schneider@flowinc.com

Cc: **Ryan Nanney** | ryan.nanney@flowinc.com, **MegaCap Capital Operations** | ops@megacap.capital, **Benjamin R. Muschel** | muschel@kolawyers.com, **Blake Schneider** | blake.schneider@flow.inc, **Relationship Management** | rm@flowinc.com

Hi Blake,

Thank you for your thoughtful email. I appreciate the open line of communication and share your desire for a path forward.

Let me start by saying that I regret that Marc's behavior caused suffering among the Flow team; I certainly know what it feels like to be threatened by Marc, so I am particularly empathetic to that. To the extent he made any threats towards Flow or its representatives while he represented Megacap, I apologize on behalf of the Company. I know that if you ask Ryan, Michael, or Haley, they will tell you I have only ever been courteous and professional with the Flow team.

My ask is that you not throw Megacap and its LPs out with Marc's bathwater, especially given that his most recent volley of threats came after he was no longer authorized to speak or act on behalf of the Company. In the spirit of finding a solution that protects both Flow and Megacap and its LPs, I propose as follows:

1. Megacap will relieve Flow of all of its contractual obligations to complete the 2021 and 2022 reporting, which as I understand is the primary pain point for Flow at this juncture.
   a. Flow's only obligation with respect to reporting going forward would be to provide the Company all past, completed tax and regulatory information, filings, and documents in its possession, as I requested in my prior email.
2. In exchange for the waiver of its reporting obligations, Flow would simply continue to provide access to the platform through each entity's exit:
   a. Existing LPs continue to have access to their accounts, and
   b. Megacap continues to have access to the platform to manage its SPVs and onboard new LPs into Tech I / Tech Holding only – with no reporting obligations – until the exit of each entity.

This compromise limits the scope of Flow's ongoing relationship with Megacap by relieving it of its reporting obligations and the perceived liability from Marc therewith, while ensuring Megacap can continue to manage its responsibilities to its LPs as well as its creditors who are counting on the Company continuing to onboard new investors into Tech I.

Please let me know if this solution is agreeable. If so, the Company will take over the 2021 amendment process and all subsequent reporting, with access to the Flow platform remaining unchanged until each SPV unwinds.

I'm happy to discuss at your convenience.

Best,

Eli

# Re: Flow / Mega-Cap - resolution needed by Dec 16

From: **Blake Schneider** | blake.schneider@flowinc.com                                    July 26 at 2:19 AM

To: **Eli M Blatt** | e@megacap.capital

Cc: **Ryan Nanney** | ryan.nanney@flowinc.com, **MegaCap Capital Operations** | ops@megacap.capital, **Benjamin R. Muschel** | muschel@kolawyers.com, **Relationship Management** | rm@flowinc.com

Hi Eli,

Thank you for your email - I appreciate it.

Regarding your proposal, we are open to it, with the following additions/clarifications:

1) In addition to being relieved of any and all Admin work (financials, tax prep/filings, securities filings, entity maintenance, etc.), we request a release of any and all potential claims through the date of the release. We have never had to ask for such a thing, but given the aforementioned threats by (and seemingly litigious nature of) some MegaCap representatives, this is a must for us.

2) The current contract term runs through March 2024. You and your LPs will continue to have access to the Flow Platform through then. Beyond that and as we get closer to the end of the current term, we can discuss renewal options for whichever entities you would like to remain on the Platform.

As we communicated last year and I mentioned below, ideally, we would fully part ways. Shy of that, we will need the above to feel comfortable moving forward.

Again, I do appreciate your email and look forward to a healthy, professional relationship moving forward.

Best,
Blake

# RE: RE: URGENT Notice - Action REQUIRED! Cease and Desist ALL MegaCap Matters

From: **Rafael Schuck** | rschuck@gcpa.com

To: **Eli M Blatt** | e@emb.org

July 3 at 2:36 PM

Dear Eli:

I just received this letter from Marc Goldberg.  I am not sure what this means.  However, I don't have the financial ability to hire lawyers and defend anything in a protracted legal battle with Mr. Marc Goldberg.

Therefore, I must refrain from working on any tax work associated with any of the MegaCap entities to avoid any possible legal ramifications until this matter is resolved.

Sincerely, Rafael

Rafael J. Schuck, CPA CGMA

Partner

**R&L SCHUCK – CPAs, LLC**

**Accountants and Finance Consultants**

6710 Main Street Suite 233

Miami Lakes, FL  33014

RSchuck@gcpa.com

T: (305) 362-1040

F: (305) 362-3344

From: **Marc Goldner** | marc@gb.investments     To: **Rafael Schuck** | rschuck@gcpa.com      July 2 at 11:27 PM

Dear Rafael Schuck and Associates of R&L Schuck – CPAs, LLC.,

Please see attached. I am demanding a formal and detailed response by end of business Friday, July 7, 2023.

I highly suggest you inform Eli of the potential ramifications of his conduct, including, possible criminal conduct.

Thank you for your attentiveness to this matter. I hope you enjoy your Fourth of July holiday. Much appreciated!

Cordially,

Marc Goldner

Founding & Managing & General Partner of MegaCap Capital, LLC., MegaCap Funds, LP., and Goldner Blatt Investments, LLC.

This communication and any attachments, is intended for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure or copying is prohibited.  If



Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466

7/2/2023

Dear Rafael Schuck and As[...]

Let me start off by saying h[...] as transpired, and I'm extremely skeptical with any and all actions you [...]ken on MegaCap's behalf, as well as for myself. By now, you may or may not know, but Eli Blatt has attempted to improperly, invalidly, and illegally withdraw and redeem me from MegaCap. I want you to understand that Eli's unilateral signature on a piece of paper, without my consent, authorization, approval, or signature, has no legal bearing and is not binding

I am writing this to inform you that I am in the process of filing an injunction and federal lawsuit against Eli Blatt, and others, including but not limited to the various MegaCap entities for breach of fiduciary duty, breach of contract, and bank fraud, amongst several other causes of action and claims for damages that I am entitled to for Eli's negligent and reckless conduct.

I am informing you and your firm that any and all records pertaining to MegaCap, including but not limited to any communications and/or records between Eli's assistant, Celina, Loretta Moreno, Eli Blatt, and/or any other entities including, but not limited to: Anthropos, Wayaca, Myami, BitSource, Goldner Blatt Investments, and MegaCap must be preserved for discovery purposes and are to be forward to me immediately. In due course, a subpoena to you and your firm will be issued requesting all documents and records, and you will be subject to a deposition for any communications you've had with any of the aforementioned parties and your work thereto.

It is upon my information and belief that you acted improperly, which has exposed you and your firm to liability for failure to properly handle the MegaCap accounts. I am in the process of reporting Eli and MegaCap to several federal government agencies and regulators. I bring this up to you because I may be in discussion shortly with the Internal Revenue Service about how Eli illegally submitted MegaCap as a single member LLC. I told you NOT to file ANYTHING under a single member LLC and you incorrectly and illegally advised and misrepresented to me that changing to a multi member LLC could be done after filing. This attestation you've made is a fraudulent misrepresentation of reality and you will be held liable for any and all damages, even tangentially related to the situation.

On or about May 4, 2023, Eli illegally removed my access to MegaCap, which is in direct breach of a MegaCap resolution signed by both of us, dated February 13, 2023 (with an effective date of December 1, 2021). This resolution stated that, if Eli were to remove my email access, he would be withdrawn from MegaCap. ("Additionally, Eli will make Marc a super-admin with equal administrative privileges as Eli has in the MegaCap google workspace and any other accounts relating to MegaCap. If Eli fails to complete this within reasonable time after such filing, or if Marc or Eli uses such privileges to alter Eli's or Marc's privileges, it shall constitute immediate grounds for involuntary withdrawal from the Company."). If Eli has attempted to portray to you and your firm that my withdrawal and redemption was consented, I can assure you that it most certainly was NOT. To reiterate, I will never, under any circumstances, be consenting to a withdrawal and redemption to any equity, ownership, interest, managerial status, or otherwise in ANY of the MegaCap entities under any circumstances so let us make sure that is crystal clear.

If Eli has been in communication with you since May 4, 2023, or before, I am requesting that you immediately forward me these communications and any conversations you've had with Eli on the phone should be immediately documented, so you won't be 'forgetting anything' when you are deposed in the future.

Marc J. Goldner
Founding Managing Part█
MegaCap Capital & Mega█
Marc@GB.Investments
+1.516.984.1466



7/2/2023

To reiterate once again, yo█ █████████████████████████████████████████ie decision to remove
me from any communicati█ ██████████████████████████████████████████her entities in question
– thus, please ensure that █ ██████████████████████████████████████████mail communications
even tangentially related to the previously men█████ ██ parties. I will be seeking a ju█cial order and decree to
resolve this issue if it is not appropriately and speedily corrected. Once again, your failure to include me in
any and all communications as well as any documentation relating to K1s, tax filings, or any approvals of the
aforementioned will then make you and your associates liable and named as Defendants.

I am informing you that I am not giving any consent, authorization, or approval for **anything** relating to any
MegaCap, or other mentioned entities in this email including but not limited to issuing any K1s relating to
MegaCap and any other entities, filing and/or amending any tax filings relating to MegaCap and any other
entities, and any other business or accounting related services including but not limited to advice relating to
the MegaCap entities and any other entities mentioned herein without my SIGNED written authorization AND
verbal approval. Your failure to abide by this request will create immense liability for you, as I am sure you do
not want to be held liable for tax fraud. At this point, I will put nothing past Eli when, upon suspicion and belief,
he has likely already committed bank fraud and when he has restricted my access to MegaCap bank accounts
including but not limited to the ones held at First Republic. Further, I would like immediate confirmation
that the IRS has approved Form 8832 to make MegaCap a multi member LLC with myself as a Managing
Member. ("Exhibit A") I also want confirmation that this was filed timely, when you said it was going to be
filed. Additionally, I want to know who at your firm allowed Eli to file any of these entities as a single member
LLC. On top of this, I want confirmation in writing that you, your firm, nor Eli have attempted to invalidate the
legally binding and filed Form 8832 sent to the IRS and that the form we filed that was sent to you on or about
February 15, 2023 is deemed completed and accepted by the IRS. I would also like notice written VIA email
if Eli has attempted to circumvent this filing and if he has tried to change it or invalidate the agreed upon
documentation that we worked together on for months.

In addition, I am demanding immediate records of ALL communication, emails, documentation, approvals,
letters, or other with the Internal Revenue Service including but not limited to letters sent relating to MegaCap,
Goldner Blatt Investments, and any other entities mentioned herein.

You will find attached, an email from Flow, MegaCap's Fund Adminstrator, stating, "Hi Marc and Eli, over the
past few days and weeks, we (Flow) have been getting conflicting stories and demands from each of you.  For
this reason, we will not respond to individual emails, **or work on the MegaCap portfolio in general,** until we
receive clear guidance on who legally is in charge for MegaCap Capital." (emphasis/bold added) ("Exhibit B")
Therefore, to be clear, I am informing you that if Eli has attempted to get you or your firm to do his dirty work
and illegally issue K1s that I am not approving you are to cease work immediately and not issue any K1s or file
any tax returns, nor amend any returns, for ANY of the MegaCap entities or others mentioned.

Further, as mentioned to you numerous times, two of which pre-date the actual MegaCap returns from being
filed, is that the address on the returns was INCORRECT. Eli, attempted, to use his address, when we have
agreed in writing to use the 15 Peacock Drive address. This 15 Peacock Address is the same address that Eli
approved to be on MegaCap Form D filings. ("Exhibit C") You claimed that the IRS used to 'reject' the filings, but
this is patently false because upon discovery this new Biscayne address you used was NOT Eli's address used
initially – he had used the 2020 N Bayshore Road address, so the change to 15 Peacock should have been made.
It is your negligent conduct that allowed Eli to attempt to illegally commandeer MegaCap's banks. Just some
of the emails discussing the address issue was on February 14, 2023. Further, in that same thread, I highlighted

Marc J. Goldner
Founding Managing Part[...]
MegaCap Capital & Mega[...]
Marc@GB.Investments
+1.516.984.1466



7/2/2023

and noted several other m[...] that, "Eli has to sign as the
partnership representative[...] e one that received the
initial letter, so it is right fo[...] il communication, which
is clearly a fraudulent misrepresentation as it wa[...]gaCap who received the lett[...] ot Eli and I am and have
always been a Founding Managing and General Partner of all MegaCap entities.

I need IMMEDIATE confirmation that you mailed the Form 8832 to the IRS as we agreed.

It is an undisputed fact that the initial application was incorrectly filed and that Eli fraudulently filed MegaCap
as a Single Member LLC and the 8832 form HAD to be filed to correct Eli's illicit mistakes as our Operating
Agreement, Amendments, and Resolutions are clear that I'm a 50% owner of all MegaCap entities. This is clearly
shown in "Exhibit A" on Page 5 of IRS Form 8832 that Eli and I both signed on 2/15/23.

Then, to address another February 15, 2023 email. You said, "Eli had signed the 8879 and my assistance saw
the signed form and filed the return. Any change need to be amended.  Anyways, most of what you point
out is minor." The issue here is that maybe "most" of what I pointed out was minor, but NOT all of it was minor.
Your reckless and negligent conduct is the but for cause of some of my claims that I have against Eli and
MegaCap. As you said yourself when we first spoke on the phone, "You know how Eli is" in relation to him doing
everything last minute when he dumped the initial MegaCap tax issues on you in September of 2021 without
giving you time to prepare which led to some of the issues we have.

I expect an immediate response, in full detail, addressing each and every point listed in this email. I do sincerely
appreciate your cooperation in this matter and expect you to fully cooperate without judicial intervention. I am
sorry it has come to this, but I have been left with no other choice but to stop Eli in his tracks from his illegal
and malicious actions taken against me, which has put countless Limited Partners, Capital Partners, and myself
at risk of redemption from the seller of [...] which could cause the entire deal to implode within itself.
Failure to respond to receipt of this email and to provide the requested documentation and communication
will lead to legal action and consequences taken against you and your firm, Rafael. I truly hope it doesn't
come to that and I hope that you are willing to cooperate. Thank you for your understanding of this extremely
unfortunate situation and I look forward to hearing from you in a timely manner.

I, Marc Goldner, reserve all rights. It may be beneficial for us to arrange a call with you and your partners at the
firm, Rafael, immediately!

Sincerely,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding, Managing, and General Partner
MegaCap Capital, LLC., MegaCap Funds, LP., MegaCap Funds - Tech I, LP., MegaCap Funds - Tech Holding, LP.

P.S. Please note, Rafael, that you were FULLY aware that I have veto power on all of the entities including but
not limited to MegaCap as per our phone call which you referenced in your October 3, 2022 email.

P.P.S. Please be aware that I am still owed a K-1 from your firm for MegaCap Funds – Tech Holding which cite

Marc J. Goldner
Founding Managing Part████
MegaCap Capital & Mega████           7/2/2023
Marc@GB.Investments
+1.516.984.1466

my ownership of ████████                                    ████ have requested numerous
times and need proof of th███

P.P.P.S. You and your firm are explicitly informed ████ you have NO LEGAL AUTHOR████ to conduct ANY work relating to any of the MegaCap entities or any other entities herein, whether that be tax filings, K1 issuance, entity closures, or otherwise. You are not to forward any communications or records to any third-party accountants or to advise on any tax or accounting related matters once again. Lastly, we may need to meet & confer with the IRS as it is upon information and belief that I believe that Eli Blatt may have committed or at the very least attempted to commit Tax Fraud relating to the MegaCap entities by his fraudulent and illegal conduct.

P.P.P.P.S. Please be fully aware that I possess letters from both ████████ and ██████████████, the sellers in which we acquired the derivative equity in ████████ vis-à-vis through the employee forward contract, and ████████ through the dual-layer SPV respectively that state that they will **NOT** be releasing any shares, proceeds, distributions, dividends, or otherwise to Eli Blatt and MegaCap without my signed authorization and consent. Thanks once again!

Email from a Megacap Supplier of Pre-IPO shares

# Re:

From:                                                                                                    July 3 at 6:46 PM

To: **Eli M Blatt** | e@megacap.capital

Cc:

Hi Eli,

Additionally, I suggest that we make a zoom call to discuss the situation with Marc Goldner.  He approached us in an alarming way and we'd like to also hear your view of the situation.

Kind regards

NOT A CERTIFIED COPY



Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023

Dear Eliakim Moshe Blatt A.K.A. MR. Eli Blatt:,

I am telling you right now, you have ONE last chance to resolve all matters relating to GBI and reinstate me at MegaCap. We are all willing to overlook your outlandish actions heretofore and this is the final offered olive branch before we all decide to continue with litigation and escalate this matter even further.

It is a shame it has come to this, however, based on the April 30th 2023 letter allegedly sent to me, entitled 'GBI Rescission Notice.pdf.' ("Exhibit A") I am hereby informing you that, under section 40 of GBI's Operating Agreement (dissociation of a member), I hereby accept your withdrawal, but understand that the Mutual Contacts provision as per Section 37 will still remain. (the "GBI OA" which you have access to). On top of this, if you recall looking, it is important to note that under Section 38(a) of the GBI OA states, "[a] voluntary withdrawal may only be made after 3 years from the date of the signing of this Operating Agreement." Thus, your letter sent on April 30, 2023, was sent improperly and without proper notice and is deemed an improper withdrawal as the GBI OA is in effect as of December 7, 2021 – thus, I'm correcting your mistakes for your mutually agreed departure. Further, the 60 days under Section 40 are not triggered until I notify you that I elect to purchase your interest in GBI, which event has not transpired. For avoidance of doubt, GBI shall mean Goldner Blatt Investments, LLC, herein.

Understand that, under Section 39 of the GBI OA you still maintain liability for your time as a member of GBI. To be clear, you still owe GBI roughly $797,817 based on the emailed "Exhibit B" updated cap table.

Please note, you have no authority to "instruct" me to do anything that I do not want to do. Further, you cannot coerce me to not file for taxes – I WILL eventually be filing for taxes for GBI in which you will maintain a 0% interest in all GBI assets that you have effectively walked away from as per Exhibit A. Your lack of understanding of the debt you owe to GBI, to Dharma and its members, and to myself is your problem and your problem alone and you will be held fully liable for all debts and liabilities owed. You have grossly underfunded the agreed upon capital contributions to GBI which puts you in material breach.

You claim, in this same GBI Rescission Notice, that I attempted to deprive you of interest in the Neuralverse and in Dharma, however, this is patently false. You, by your own words, provided me with a tacit waiver of such interests. This is evident in your November 17, 2022 withdrawal from the Neuralverse fund chat, and more so, your tacit waiver of those very same interests was made very clear when you messaged me in the MegaCap group chat: "Bitsource, you can have it", "NFT fund, you can have it", "neuralverse, you can have it", and "dharma, you can have it".

Furthermore, it has come to my attention that you are in material breach of our various Non-Circumvent and Non-Disclosure Agreements ("NCNDA") which will continue to remain intact and enforceable. Your nonsensical attempt to circumvent our NCNDA and breach the mutual contacts provisions contained in the GBI Operating Agreement under Section 53 is something you will be held liable for. The GBI OA states, under Section 37, that the mutual contacts provision will remain in full force even upon dissociation of a member. You attempting to deprive me of these rights will prove to be unsuccessful and shows your bad faith in your conduct to date. You claim in the GBI Rescission Notice that "[I] a[m] not making any of [my] mutual contacts [...available to you]" – this is patently false and easily disproven as I have not only shared hundreds upon hundreds of contacts with you, but I have successfully raised well over $1,000,000 through my network that you have exploited without reimbursing me for my expenses. In bad faith, you have continued to attempt to solicit my contacts behind my back after your illegal and improper withdrawal and illegal redemption of my interests in MegaCap. Please note, I possess proof that you have attempted

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED



Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023

to circumvent this NCNDA, which puts you in material breach of these agreements when you contacted at least one LP, one by the name of Bob Feldman on May 31, 2023 at 6:47AM. Bob Feldman is my contact which is easily proven through my creating the group chat title "Bobby / MegaCap" on December 14, 2021. In addition, to your misfortune, not only is Bob Feldman my contact but he is in the Private Security industry which puts you in further breach of the GBI OA under Section 53(f), whereas it is clear that individuals from various industries "will not be considered mutual contacts". Thus, attempting to solicit my contacts for derivative equity in ⨉⨉⨉⨉ in which you are restricted from selling at MegaCap, is a direct and material breach of the GBI OA and you and MegaCap will face legal consequences for your illegal actions. To wrap this point up, I wholly dispute your outlandish claims that I fraudulently induced you into entering this contract, when in fact it was YOU who was the one that proposed starting an investment company together on May 25, 2021 called "GoldBlatt Partners or something", which I possess definitive, undeniable proof of.

Further, I wholly dispute that I failed to abide by any of the terms of the agreement; it is YOU who has breached countless provisions. One such egregious breach that has put the entire operation at risk is your commingling of funds relating to MegaCap, BitSource, and GBI, with an intern by the name of ⨉⨉⨉⨉ whom you told to do 'work' on an NFT spreadsheet, which was done a) without my permission, b) without a contract with GBI, and c) when he was paid by BitSource when it was supposed to be by MegaCap which was not approved by myself.

Upon information, belief, and categorical, hard evidence, I am aware that you have engaged in numerous illegal activities. These are Forbidden Acts under Section 64 of the GBI OA where you are breaking the law which can bring harm to our business and jeopardize our Limited Partners investments due to your perpetual ⨉⨉⨉⨉ I possess concrete proof of your illegal actions. Section 64 states, "[n]o Member may do any act in contravention of this Agreement or prevailing law". I have this evidence readily available, and I can provide this to you upon request – please let me know if you'd like me to share this discoverable evidence with you. While, Section 68 of the GBI OA provides for any Forbidden Acts to "be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members", a mediation process would have followed, but since you instead opted to withdraw with the GBI Rescission Notice, I hereby redeem, mutually and voluntarily agreed-upon terms relating to your withdrawal, including all your equity, interests, assignments, investments, and so forth. Please note, that you are still fully responsible for distributing GBI's rightful interest in investments such as, but not limited to, in the James Bond Video Game and ⨉⨉⨉⨉ that was "approved" by your mother and sent to me by you in writing on WhatsApp prior to the increase in valuation that was sent by ⨉⨉⨉⨉ with his most recent upcoming distribution letter.

To be clear, and going back just a bit, the mutual contacts provisions still remain intact and enforceable, and your breach thereof entitles me to damages to be determined at trial. I am giving you notice to immediately cease any and all communications with not just my contacts, but GBI's contacts in general, which you have not only failed to reimburse me for the expenses I incurred whilst obtaining them, but you have also prioritized your invalid and unapproved expenses in the amount of roughly $70,000, and used some of that money to pay for ⨉⨉⨉⨉ to go to "Summit" without my approval – which, by your own words, produced no mutual contacts and I had NEVER agreed to pay for Emily to go, especially after she had already stolen from Neuralverse which you allowed her to do. (Please note: Now that you are no longer a part of GBI, GBI will be exploring a legal action against Emily for her breach of the NCNDA that she signed when she contacted ⨉⨉⨉⨉ which was my contact as a SIPA Alumni, soliciting him for a competing metaverse fund with stolen documents that you allowed her to possess). You don't seem to understand that awareness is NOT approval of such. You continue to claim that I was aware of this alleged $70,000 expense that you unilaterally approved, but, by your own words, without a written approval and authorization awareness is not enough. You prioritized your personal relationships with an attorney by the name of Michael Elkins because you said that you are not willing to jeopardize your unrelated case against K4B. You further

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED



Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023



continued to claim that the onl  thin  'confidential' about our relationship is the share price                    which is patently false. Your outrageous claim an   a  egation t  at I changed' an expense provision in the MegaCap Agreement is patently false as there is DOCUMENTED proof in the MegaCap chat with the track changes of the specific provision that you were sent well prior to signing the resolution.

Eli, to reiterate, the facts indicate that you are entering a losing battle. There is no world in which you are going to win – none whatsoever. Once again, you are setting yourself up for a protracted, multi-year, and scorched-earth legal battle involving a myriad of people. I will not sit idly by allowing you to continually breach your fiduciary duties with impunity. You have instructed me to not contact you – but you can't have it both ways like you always try to do, and then get upset that I'm 'ignoring' you when you told me not to speak to you. Mind you, you writing on a piece of paper that GBI has never existed is meaningless as it is factually untrue, and once again there WILL eventually be tax filings for GBI in which you will be responsible for. I will be more than happy to share all of this with the IRS as everything and all assignments were done completely legally. However, please note, that your notice has effectively waived almost all of your rights under our agreement, and your retroactive withdrawal is hereby denied.

Additionally, and for clarity, your attempted withdrawal as of April 30th, 2023 is hereby accepted as of June 29, 2023, and the entire equity, interest, and all assignments are being purchased for $0 due to the debt, liabilities, and balance that you owe GBI as per Exhibit B (the updated cap table). GBI possesses all the requisite and legal documents for any assignment, sale, or transfer of any assets, and your failure to understand the structure of these agreements is your fault and your fault only as they were never requested – all the legal documentation exists, Eli. You cannot claim that you did not understand that you owe GBI money, who owes Dharma money, when you are the one that made the excel spreadsheet for Dharma and determined how much each individual and entity owes for the balance due to Compass (not inclusive of the underfunding and underpayment to me for the NFTs and other assets including but not limited to your required assignment of the 'Troutwine' investments). You know the money to Dharma was just a deposit, and with every deposit eventually comes due a balance, which you failed to provide to GBI which in turn was unable to pay Dharma as per the December 31, 2022 Default Notice that Simon had issued you and to GBI. As a result of the foregoing, you have no valuable interest to be purchased and no viable claim in that respect – you owe more than whatever you believe you are entitled to. Therefore, I accept your voluntary withdrawal as of the date of this correspondence but disclaim any obligation to purchase an interest as there is no value therein. If any value is determined to exist, such amount would be considered to be 'set-off' from the amount that you owe to GBI in the amount of $797,817.

Also, it was you who chose not to pay for your GBI email address, I NEVER restricted you from it – it was instead you that breached MegaCap's resolution and removed my email which is grounds for involuntary withdrawal as per the MegaCap signed resolution. You cannot, in good conscience, run to the courts and claim that the Dispute Resolution terms as per Section 75 of the GBI Operating Agreement are invalid, but then turn around and claim that the Dispute Resolutions terms of the MegaCap Operating Agreement ARE valid – it doesn't work that way.

I have tried in good faith to look past your behavior but your escalation and failure to work in good faith has led to this. Your childish attempts at claiming that I threatened you, when we both know that            threatened me privately AND conveniently left out that he hopes you are not going to die            – any way you slice it, I was protecting us and our families whether you want to believe it or not. As I said numerous times, I extended many olive branches to you, acting in good faith, hoping you would turn around. Regardless of all of this, to repeat, you still breached the MegaCap resolution that stated that if I were to have my email removed, that you would be involuntarily withdrawn as per said signed resolution. You utilizing your personal attorney to commandeer MegaCap

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED



Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023

makes Michael Elkins an accomplice to your illegal actions and crimes. I strongly suggest that you immediately reinstate me, otherwise, I will be forced to not only pursue legal actions against you and third parties, but I may have no option but to get various government and regulatory agencies involved.

I want to state one more thing: regarding your divulgence of any private contracting work that I may have done in the past – if it turns out to be true, as you allege, that I am involved in 'spy activities,' you may be tried for charges relating to the breaching of 50 U.S.C. 421, potentially punishable by a prison sentence for divulgence of my identity and putting my family's life at risk. (As an aside, it is extremely important to remember that I possess the name (as do you) of the ☒☒☒ employee that is part of the ☒☒☒ employee forward contract - (his name in case you didn't read the documents is ☒☒☒☒). You cannot just file a court complaint in the public record to attempt to coerce me to settle on your demands by hanging my life and my family's lives in the balance alleging that I was a "spy". Further, it is egregious that ANY attorney put their name on a complaint in which stated anything about me being a "spy" – your counsel, whoever they may be, should be ashamed of themselves for potentially putting a patriot's life at risk and may also be liable for aiding in your illegal actions relating to 50 U.S.C. 421. To note, though, this is not the first time you have breached this statute – you also disclosed this claim to Audra when we discussed many MegaCap matters such as when she told us we MUST get the proper documents for LPs done, especially since MegaCap Tech Holding ☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒. Or are these all part of your ☒☒☒ delusions when you claim that I am some "spy"? I guess you will have to take your chances to find out the truth, but I would highly recommend immediately dismissing this case and abiding by the dispute resolution terms of the agreement, otherwise, your failure to do so may result in a federal court action and a tacit approval and waiver for me to sue MegaCap in federal court, as you cannot have it both ways – that one contract is invalid and the other is valid whether we're discussing the dispute resolution section or the contracts as a whole. MegaCap will be named as a third-party defendant, and I will most certainly ensure that ALL shares are withheld. What you do not seem to understand that is IF the shares are cancelled, it is YOU who will be held liable as you are the but for cause of all of this happening. Further, our Limited Partners need to be protected from you and I have absolutely no issue putting MegaCap into receivership with the SEC. You should also really stop thinking that I am working alone and that I am the only one that you have harmed at MegaCap. I suggest you confirm and deliver me my K1 for MegaCap Tech Holding, showing my interest in ☒☒☒☒☒ for 8,217 shares, and placing me on ☒☒☒ cap table with ☒☒☒ confirmation signed in writing, and then we can discuss all other MegaCap matters. Failure to provide me, as an LP, with these K1s will force me to bring a class action suit against you with LPs that have already agreed to sue MegaCap with me. You are risking this entire deal by threatening to allow it to implode within itself as *allegedly* being the only Class A member makes you entirely liable if the shares of ☒☒☒☒ were to be canceled, because our resolution contains the name of the employee in which we acquired the derivative equity in. In the case of cancellation, you'd be entirely liable for repaying all LPs (including myself) for any and all losses ☒☒☒☒☒☒☒ ☒☒. ☒☒☒☒☒☒☒☒☒☒☒☒☒☒☒ This entire letter and its contents are CONFIDENTIAL!

Eli, if this were a game of chess, you've been checkmated. There is nowhere you can run from the law. And so, you have no valid defenses. It is time for you to stop hiding behind Celina, Elkins, and any other counsel. It is time to have a good faith discussion in order to resolve these matters. For the record, you very well know that I never extorted you. You know that, after ☒☒☒ produced that signed affidavit, that he was the one who threatened me. I also know that ☒☒☒☒☒ is liable for their illegal actions, and I will be telling them as such in due time. To be clear, ☒☒☒☒ will be a named defendant in this matter. ☒☒☒ signed affidavit has two lies, which will be impeached: first, I possess proof that ☒☒ told ☒ to speak to me when they were at a coffee shop in Dubai.

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED



Marc J. Goldner
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds
Marc@GB.Investments
+1.516.984.1466

6/29/2023

Second, we both possess proof that ▮ told us that ▮ has a side agreement with ▮ on WhatsApp – he had apparent authority and we all believed that ▮ was acting on behalf of ▮. There is no question that ▮ had agency, which makes ▮ liable for the threats against our lives. Your claims of extortion, therefore, are nothing more than gamesmanship. In order for extortion to exist, I would've needed to have a financial benefit, which I had none – instead, I saved MegaCap over $100,000 in the interest waiver agreement that I had gotten signed which ▮ said (and I possess proof of) that she never would've authorized to be signed if it weren't for me. I've maintained my fiduciary duty to MegaCap – you have NOT. I truly hope that warning one of my best friends, risking my own life, to tell you that a bunch of overseas thugs threatening to show up at our houses saying they would get their money back "one way or another" and telling me privately and sarcastically "make sure Eli doesn't die ▮" will quash your claims of extortion against me and will divert your attacks towards ▮. We should be working together here, Eli, not against each other. I strongly believe there is still time to resolve these matters before they get completely out of hand.

With all this said, I propose we form a truce, Eli. You drop your claims against me, reinstate me at MegaCap, and we sue ▮ for trying to tear our relationship apart. They are the wedge that got between us, as everything else would've been resolved in due time. Please let us take the high road here and preserve both of our reputations, finances, and valuable time. I do NOT want to be arguing and fighting with you, but, make no mistake, Eli, I will defend myself and go after what is rightfully mine. I know you didn't think I was just going to walk away from MegaCap for $1.70. We can be on the same team, and on the same side, but you must start acting in good faith and working with me, not against me. At this point, Eli, the choice is yours. I am willing to put the past behind us and move forward I hope to hear back from you such that we can work through this productively. Please advise me of your decision immediately, and if later then next week, I will otherwise continue to prepare my cases against you.

Do not consider this letter to be entirely conclusive as more is to come considering that you have committed numerous forbidden acts that have "ma[d]e it impossible to carry on the ordinary business of the Company" as per Section 66 of the GBI when you've stated you will not allow anything else to be done under GBI, which at this point, is no longer your choice to make. I continue to reserve all rights and will be pursuing all legal avenues available to me if you decide not to take the high road. Be well, Eli. I continue to reserve all rights. Thank you!

Respectfully,

Marc Goldner, M.B.A., M.P.A., M.S.Ed., J.D. Candidate
Founding Managing Partner
Goldner Blatt Investments
Goldner Blatt Funds

PS. If you attempt to sell even one of my 8,217 shares of ▮ you will be held liable and it will come from your shares and carried interest. Please note that I possess a letter from both ▮ and WCEP that state that they will not release any shares and/ or proceeds from ▮ of ▮ without my signed authorization. At this point, you are right about one thing: I am protecting you from yourself because I need to protect ALL entities and LPs – including myself from your illicit and illegal actions, including, but limited to, upon information and belief, committing ACH and Bank Fraud. I'm willing to look past everything that you've done up until this point, so please don't let me down. I hope to hear back from you soon and that we can work through this productively.

THIS COMMUNICATION IS WRITTEN WITHOUT PREJUDICE TO OR WAIVER OF ANY OF MY DEFENSES, RIGHTS, AND REMEDIES, AT LAW OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, et al.,

v.                                            Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, et al.
_____/

**MOTION FOR ENLARGEMENT OF TIME TO ACHIEVE SERVICE**

Plaintiffs, ELI M. BLATT, individually and derivatively on behalf of GOLDNER BLATT
INVESTMENTS, LLC, and MEGACAP CAPITAL, LLC, and his representative capacity as
MANAGING MEMBER of MEGACAP FUNDS, LP – TECH I and MEGACAP FUNDS, LP-
SPACEX I, request the Court to enter an order enlarging the time for service of process, and states
as follows:

1.      Part of this case has a highly complicated background including a federal court
action that disposed of two counts (not pleaded here) and dismissed for lack of diversity
jurisdiction.  Hence the reason Plaintiff, ELI M. BLATT, re-filed the continuation of that federal
court case in this Court.

2.      The second part of this lawsuit involves claims with related parties and related
entities.

3.      The instant matter was re-filed shortly after the federal court found no diversity
jurisdiction.

4.      Given several recent developments, including an issue concerning valuation of
Defendant, GOLDNER BLATT INVESTMENTS, LLC, (along with its status in Delaware) and,
after substantial re-drafting to simply issues in the instant lawsuit, Plaintiff indeed filed an
Amended Complaint as a matter of right.

4.      In the federal court matter, there was substantial difficulty in serving the defendants.

5.      To streamline the litigation, the substantial re-draft was necessary because of new information and it is anticipated that there will be difficulty effectuating service.

6.      As a result, to avoid multiple requests to seek additional time to effectuate service, Plaintiff wanted to ensure a more succinct, and shortened re-draft, was presented to the Court.

7.      Given the unusual procedural posture of this case (with hundreds of docket entries in the federal matter pre-dating the instant litigation), Plaintiffs respectfully request an additional ninety (90) days within which to effectuate service of the defendants.

8.      Plaintiffs would be the only parties prejudiced should the extension not be granted.

WHEREFORE, Plaintiffs respectfully request the Court for an additional ninety (90) days within which to effectuate service and for any other relief the Court deems just, equitable and proper.

Dated this 21st day of December 2025.

KELSKY LAW, P.A.
Counsel for Plaintiffs
150 S. Pine Island Road
Suite 300
Plantation, FL 33324
954.449.1400
Fax: 954.449.8986
Primary:   bradkelsky@kelskylaw.com
Secondary:  barbarallinas@kelskylaw.com
Secondary:  benkelsky@kelskylaw.com


BY:     Brad E. Kelsky
        FBN: 0059307

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, et al.,

v.                                           Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, et al.

_____/

### NOTICE OF HEARING
### MOTION CALENDAR

TO:    All counsel of record per the certificate of service.

    **YOU ARE HEREBY NOTIFIED** that the undersigned has called up for hearing the
following:

|  |  |  |
|---|---|---|
| **DATE** | **:** | **January 6, 2026** |
| **TIME** | **:** | **8:30 a.m.** |
| **JUDGE** | **:** | **The Honorable James Sherman** |
| **PLACE** | **:** | **Palm Beach County Courthouse - Via Zoom** |

# **Judge Sherman's Zoom Information**

**Zoom Meeting ID:** 896 9618 5484

**Zoom Dial-In Numbers:** +1 8778535257 US Toll-Free
+1 8884754499 US Toll-Free

NOT A CERTIFIED COPY

SPECIFIC MATTERS TO BE HEARD:

**PLAINTIFFS' MOTION FOR ENLARGEMENT OF TIME TO ACHIEVE SERVICE**

KINDLY GOVERN YOURSELVES ACCORDINGLY.

**CERTIFICATE OF SERVICE**

Dated this 24TH day of December 2025.

> KELSKY LAW, P.A.
> Counsel for Plaintiffs
> 150 S. Pine Island Road
> Suite 300
> Plantation, FL 33324
> 954.449.1400
> Fax:  954.449.8986
> Primary:  bradkelsky@kelskylaw.com
> Secondary:  barbarallinas@kelskylaw.com
> Secondary:  benkelsky@kelskylaw.com
>
>
> BY:   Brad E. Kelsky
>         FBN:  0059307

NOT A CERTIFIED COPY

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, individually and
Derivatively on behalf of GOLDNER
BLATT INVESTMENTS, LLC, and
MEGACAP CAPITAL, LLC and in his
Representative capacity as Managing
Member of MEGACAP CAPITAL, LLC
General Partner of MEGACAP FUNDS, LP
-TECH I and MEGACAP FUNDS, LP
-SPACEX 1,

        Plaintiffs,

v.                                Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, RACHEL
KORSEN, SIMON DIVILOV, THE
DHARMA INITIATIVE, LLC
RODERYCK REITER,
GOLDNER BLATT INVESTMENTS, LLC
(Direct and Nominal Defendant), and
MEGACAP CAPITAL, LLC (Nominal
Defendant),

        Defendants.

_____/

## **SUMMONS**

TO:   MEGACAP CAPITAL, LLC
By and through its Registered Agent, A Registered Agent, Inc.
8 The Green, Suite A
Dover, DE 19901

You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a

legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

> Palm Beach County Courthouse
> 205 N. Dixie Hwy.
> West Palm Beach, FL 33401

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

> BRAD E. KELSKY, ESQ.
>
> whose address is:    KELSKY LAW, P.A.
> 150 S. Pine Island Road, Suite 300
> Plantation, FL 33324
> Telephone: 954-449-1400
> bradkelsky@kelskylaw.com

**TO EACH SHERIFF OF THE STATE: _You are commanded to serve this Summons and a copy of the Amended Complaint._**

DATED ON _____.    MIKE CARUSO
                                       CLERK OF THE CIRCUIT COURT

(SEAL)

                         By:_____
                         Deputy Clerk

<u>IMPORTANT</u>

     A lawsuit has been filed against you. You have twenty (20) calendar days after this Summons is served on you to file a written response to the attached Complaint with the Clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

     If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact** William Hutchings, Jr., **Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos**

propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.

Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon poujwenkèkèd.TanprikontakteWilliamHutchings,Jr.,  kòòdonatèpwogram  Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, individually and
Derivatively on behalf of GOLDNER
BLATT INVESTMENTS, LLC, and
MEGACAP CAPITAL, LLC and in his
Representative capacity as Managing
Member of MEGACAP CAPITAL, LLC
General Partner of MEGACAP FUNDS, LP
-TECH I and MEGACAP FUNDS, LP
-SPACEX 1,

      Plaintiffs,

v.                            Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, RACHEL
KORSEN, SIMON DIVILOV, THE
DHARMA INITIATIVE, LLC
RODERYCK REITER,
GOLDNER BLATT INVESTMENTS, LLC
(Direct and Nominal Defendant), and
MEGACAP CAPITAL, LLC (Nominal
Defendant),

      Defendants.
_____/

## **SUMMONS**

TO:   GOLDNER BLATT INVESTMENTS, LLC
      By and through its Registered Agent, A Registered Agent, Inc.
      8 The Green, Suite A
      Dover, DE 19901

You have 20 calendar days after this summons is served on you to file a written response to
the attached Complaint in this Court.  If you do not file your response on time, you may lose
the case, and your wages, money, and property may thereafter be taken without further
warning from the Court. There are other legal requirements. You may want to call an attorney
right away. If you do not know an attorney, you may call an attorney referral service or a

NOT A CERTIFIED COPY

legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

<div style="text-align:center">

Palm Beach County Courthouse
205 N. Dixie Hwy.
West Palm Beach, FL 33401

</div>

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

whose address is:
BRAD E. KELSKY, ESQ.
KELSKY LAW, P.A.
150 S. Pine Island Road, Suite 300
Plantation, FL 33324
Telephone: 954-449-1400
bradkelsky@kelskylaw.com

TO EACH SHERIFF OF THE STATE: *You are commanded to serve this Summons and a copy of the Amended Complaint.*

DATED ON   Jan 02 2026 .

MIKE CARUSO
CLERK OF THE CIRCUIT COURT

By: _____
Deputy Clerk    KBUTLER

<div style="text-align:center">

IMPORTANT

</div>

A lawsuit has been filed against you. You have twenty (20) calendar days after this Summons is served on you to file a written response to the attached Complaint with the Clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

IMPORTANTE

      Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

      Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

IMPORTANT

      Des poursuites judiciares ont ete entreprises contre vous. Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

      Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos**

propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.

Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon poujwenkèkèd.TanprikontakteWilliamHutchings,Jr.,  kòòdonatèpwogram  Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, individually and
Derivatively on behalf of GOLDNER
BLATT INVESTMENTS, LLC, and
MEGACAP CAPITAL, LLC and in his
Representative capacity as Managing
Member of MEGACAP CAPITAL, LLC
General Partner of MEGACAP FUNDS, LP
-TECH I and MEGACAP FUNDS, LP
-SPACEX 1,

       Plaintiffs,

v.                         Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, RACHEL
KORSEN, SIMON DIVILOV, THE
DHARMA INITIATIVE, LLC
RODERYCK REITER,
GOLDNER BLATT INVESTMENTS, LLC
(Direct and Nominal Defendant), and
MEGACAP CAPITAL, LLC (Nominal
Defendant),

       Defendants.
_____/

**<u>SUMMONS</u>**

TO:   THE DHARMA INITIATIVE, LLC
     By and through its Registered Agent, A Registered Agent, Inc.
     8 The Green, Suite A
     Dover, DE 19901

You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a

NOT A CERTIFIED COPY

legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

<div align="center">

Palm Beach County Courthouse
205 N. Dixie Hwy.
West Palm Beach, FL 33401

</div>

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

whose address is:          BRAD E. KELSKY, ESQ.
                           KELSKY LAW, P.A.
                           150 S. Pine Island Road, Suite 300
                           Plantation, FL 33324
                           Telephone: 954-449-1400
                           bradkelsky@kelskylaw.com

**TO EACH SHERIFF OF THE STATE:** *You are commanded to serve this Summons and a copy of the Amended Complaint.*

DATED ON ___Jan 02 2026__.          MIKE CARUSO
                                     CLERK OF THE CIRCUIT COURT

By:_____
Deputy Clerk    **KBUTLER**

<div align="center">

IMPORTANT

</div>

A lawsuit has been filed against you. You have twenty (20) calendar days after this Summons is served on you to file a written response to the attached Complaint with the Clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact** William Hutchings, Jr., **Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos**

propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.

Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon poujwenkèkèd.TanprikontakteWilliamHutchings,Jr.,  kòòdonatèpwogram  Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, et al.,

v.                                    Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, et al.
_____/

**NOTICE OF HEARING**
**MOTION CALENDAR**

TO:    All counsel of record per the certificate of service.

**YOU ARE HEREBY NOTIFIED** that the undersigned has called up for hearing the
following:

|  |  |  |
|---|---|---|
| **DATE** | : | **January 6, 2026** |
| **TIME** | : | **8:30 a.m.** |
| **JUDGE** | : | **The Honorable James Sherman** |
| **PLACE** | : | **Palm Beach County Courthouse - Via Zoom** |

# **Judge Sherman's Zoom Information**

**Zoom Meeting ID:** 896 9618 5484

**Zoom Dial-In Numbers:** +1 8778535257 US Toll-Free
+1 8884754499 US Toll-Free

NOT A CERTIFIED COPY

SPECIFIC MATTERS TO BE HEARD:

## PLAINTIFFS' MOTION FOR ENLARGEMENT OF TIME TO ACHIEVE SERVICE

KINDLY GOVERN YOURSELVES ACCORDINGLY.

### CERTIFICATE OF SERVICE

Dated this 24TH day of December 2025.

        KELSKY LAW, P.A.
        Counsel for Plaintiffs
        150 S. Pine Island Road
        Suite 300
        Plantation, FL 33324
        954.449.1400
        Fax: 954.449.8986
        Primary:  bradkelsky@kelskylaw.com
        Secondary:  barbarallinas@kelskylaw.com
        Secondary:  benkelsky@kelskylaw.com


BY:    Brad E. Kelsky
       FBN: 0059307

NOT A CERTIFIED COPY

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, et al.,

v.                                        Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, et al.

_____/

**NOTICE OF HEARING**
**MOTION CALENDAR**

TO:     All counsel of record per the certificate of service.

    **YOU ARE HEREBY NOTIFIED** that the undersigned has called up for hearing the following:

| | | |
|---|---|---|
| **DATE** | : | **January 6, 2026** |
| **TIME** | : | **8:30 a.m.** |
| **JUDGE** | : | **The Honorable James Sherman** |
| **PLACE** | : | **Palm Beach County Courthouse - Via Zoom** |

# **Judge Sherman's Zoom Information**

**Zoom Meeting ID:** 896 9618 5484

**Zoom Dial-In Numbers:** +1 8778535257 US Toll-Free
+1 8884754499 US Toll-Free

NOT A CERTIFIED COPY

SPECIFIC MATTERS TO BE HEARD:

**PLAINTIFFS' MOTION FOR ENLARGEMENT OF TIME TO ACHIEVE SERVICE**

KINDLY GOVERN YOURSELVES ACCORDINGLY.

**CERTIFICATE OF SERVICE**

Dated this 24TH day of December 2025.

KELSKY LAW, P.A.
Counsel for Plaintiffs
150 S. Pine Island Road
Suite 300
Plantation, FL 33324
954.449.1400
Fax:  954.449.8986
Primary:  bradkelsky@kelskylaw.com
Secondary:  barbarallinas@kelskylaw.com
Secondary:  benkelsky@kelskylaw.com


BY:    Brad E. Kelsky
        FBN:  0059307

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, individually and
Derivatively on behalf of GOLDNER
BLATT INVESTMENTS, LLC, and
MEGACAP CAPITAL, LLC and in his
Representative capacity as Managing
Member of MEGACAP CAPITAL, LLC
General Partner of MEGACAP FUNDS, LP
-TECH I and MEGACAP FUNDS, LP
-SPACEX 1,

        Plaintiffs,

v.                              Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, RACHEL
KORSEN, SIMON DIVILOV, THE
DHARMA INITIATIVE, LLC
RODERYCK REITER,
GOLDNER BLATT INVESTMENTS, LLC
(Direct and Nominal Defendant), and
MEGACAP CAPITAL, LLC (Nominal
Defendant),

        Defendants,
_____/

**<u>SUMMONS</u>**

TO:   RODERYCK REITER
       4661 NW 2nd Avenue
       Apt. 603
       Boca Raton, FL 33431

You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a

NOT A CERTIFIED COPY

legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

> Palm Beach County Courthouse
> 205 N. Dixie Hwy.
> West Palm Beach, FL 33401

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

whose address is:
> BRAD E. KELSKY, ESQ.
> KELSKY LAW, P.A.
> 150 S. Pine Island Road, Suite 300
> Plantation, FL 33324
> Telephone: 954-449-1400
> bradkelsky@kelskylaw.com

TO EACH SHERIFF OF THE STATE: *You are commanded to serve this Summons and a copy of the Amended Complaint.*

DATED ON ___Jan 02 2026___.

MIKE CARUSO
CLERK OF THE CIRCUIT COURT

By:_____
Deputy Clerk      KBUTLER

**IMPORTANT**

    A lawsuit has been filed against you. You have twenty (20) calendar days after this Summons is served on you to file a written response to the attached Complaint with the Clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

    If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos**

propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.

Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon poujwenkèkèd.TanprikontakteWilliamHutchings,Jr.,   kòòdonatèpwogram  Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, individually and
Derivatively on behalf of GOLDNER
BLATT INVESTMENTS, LLC, and
MEGACAP CAPITAL, LLC and in his
Representative capacity as Managing
Member of MEGACAP CAPITAL, LLC
General Partner of MEGACAP FUNDS, LP
-TECH I and MEGACAP FUNDS, LP
-SPACEX 1,

        Plaintiffs,

v.                               Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, RACHEL
KORSEN, SIMON DIVILOV, THE
DHARMA INITIATIVE, LLC
RODERYCK REITER,
GOLDNER BLATT INVESTMENTS, LLC
(Direct and Nominal Defendant), and
MEGACAP CAPITAL, LLC (Nominal
Defendant),

        Defendants.
_____/

**<u>SUMMONS</u>**

TO:   RACHEL KORSEN
       23 W. Chicago Avenue
       Apt. 2503
       Chicago, IL 60654

You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a

NOT A CERTIFIED COPY

legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

> Palm Beach County Courthouse
> 205 N. Dixie Hwy.
> West Palm Beach, FL 33401

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

whose address is:

> BRAD E. KELSKY, ESQ.
> KELSKY LAW, P.A.
> 150 S. Pine Island Road, Suite 300
> Plantation, FL 33324
> Telephone: 954-449-1400
> bradkelsky@kelskylaw.com

TO EACH SHERIFF OF THE STATE: *You are commanded to serve this Summons and a copy of the Amended Complaint.*

DATED ON ___Jan 02 2026___.

MIKE CARUSO
CLERK OF THE CIRCUIT COURT

By. _____

Deputy Clerk   KBUTLER

**IMPORTANT**

A lawsuit has been filed against you. You have twenty (20) calendar days after this Summons is served on you to file a written response to the attached Complaint with the Clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos**

propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.

Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon poujwenkèkèd.TanprikontakteWilliamHutchings,Jr.,  kòòdonatèpwogram  Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, individually and
Derivatively on behalf of GOLDNER
BLATT INVESTMENTS, LLC, and
MEGACAP CAPITAL, LLC and in his
Representative capacity as Managing
Member of MEGACAP CAPITAL, LLC
General Partner of MEGACAP FUNDS, LP
-TECH I and MEGACAP FUNDS, LP
-SPACEX 1,

        Plaintiffs,

v.                                Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, RACHEL
KORSEN, SIMON DIVILOV, THE
DHARMA INITIATIVE, LLC
RODERYCK REITER,
GOLDNER BLATT INVESTMENTS, LLC
(Direct and Nominal Defendant), and
MEGACAP CAPITAL, LLC (Nominal
Defendant),

        Defendants.
_____/

**<u>SUMMONS</u>**

TO:   MARC J. GOLDNER
       885 S. College Mall Rd.
       # 311
       Bloomington, IN 47401

You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a

NOT A CERTIFIED COPY

legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

Palm Beach County Courthouse
205 N. Dixie Hwy.
West Palm Beach, FL 33401

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

whose address is:

BRAD E. KELSKY, ESQ.
KELSKY LAW, P.A.
150 S. Pine Island Road, Suite 300
Plantation, FL 33324
Telephone: 954-449-1400
bradkelsky@kelskylaw.com

TO EACH SHERIFF OF THE STATE: *You are commanded to serve this Summons and a copy of the Amended Complaint.*

DATED ON Jan 02 2026 .

MIKE CARUSO
CLERK OF THE CIRCUIT COURT

By:_____
Deputy Clerk    KBUTLER

IMPORTANT

A lawsuit has been filed against you. You have twenty (20) calendar days after this Summons is served on you to file a written response to the attached Complaint with the Clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

    If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact** William Hutchings, Jr., **Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos**

propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.

Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon poujwenkèkèd.TanprikontakteWilliamHutchings,Jr.,  kòòdonatèpwogram  Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, individually and
Derivatively on behalf of GOLDNER
BLATT INVESTMENTS, LLC, and
MEGACAP CAPITAL, LLC and in his
Representative capacity as Managing
Member of MEGACAP CAPITAL, LLC
General Partner of MEGACAP FUNDS, LP
-TECH I and MEGACAP FUNDS, LP
-SPACEX 1,

       Plaintiffs,

v.                              Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, RACHEL
KORSEN, SIMON DIVILOV, THE
DHARMA INITIATIVE, LLC
RODERYCK REITER,
GOLDNER BLATT INVESTMENTS, LLC
(Direct and Nominal Defendant), and
MEGACAP CAPITAL, LLC (Nominal
Defendant),

       Defendants.

_____/

**<u>SUMMONS</u>**

TO:   SIMON DIVILOV
      311 Liggett St.
      Apt. 222
      Durham, NC 27701

You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a

NOT A CERTIFIED COPY

legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

> Palm Beach County Courthouse
> 205 N. Dixie Hwy.
> West Palm Beach, FL 33401

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

whose address is:
> BRAD E. KELSKY, ESQ.
> KELSKY LAW, P.A.
> 150 S. Pine Island Road, Suite 300
> Plantation, FL 33324
> Telephone: 954-449-1400
> bradkelsky@kelskylaw.com

TO EACH SHERIFF OF THE STATE: ***You are commanded to serve this Summons and a copy of the Amended Complaint.***

DATED ON ___Jan 02 2026___.

MIKE CARUSO
CLERK OF THE CIRCUIT COURT

By:_____
Deputy Clerk      KBUTLER

## IMPORTANT

A lawsuit has been filed against you. You have twenty (20) calendar days after this Summons is served on you to file a written response to the attached Complaint with the Clerk of this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez vingt (20) jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos**

propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.

Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon poujwenkèkèd.TanprikontakteWilliamHutchings,Jr.,  kòòdonatèpwogram  Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ELI M. BLATT, et al.,

v.                                    Case No.50-2025-CA-008971-XXXA-MB

MARC J. GOLDNER, et al.

_____/

## NOTICE OF CANCELLATION OF HEARING

PLEASE NOTICE that the hearing scheduled for  January 6, 2026  at  8:30 a.m. before

The Honorable James Sherman on Plaintiffs' Motion for Enlargement of Time to Achieve Service

is hereby **cancelled.**

## CERTIFICATE OF SERVICE

Dated this 31st  day of December 2025.

KELSKY LAW, P.A.
Counsel for Plaintiffs
150 S. Pine Island Road
Suite 300
Plantation, FL 33324
954.449.1400
Fax:  954.449.8986
Primary:  bradkelsky@kelskylaw.com
Secondary:  barbarallinas@kelskylaw.com
Secondary:  benkelsky@kelskylaw.com


BY:    Barbara O. Llinas
       BARBAR O. LLINAS
       FBN:  0675903

NOT A CERTIFIED COPY



**MIKE CARUSO**

CLERK OF THE CIRCUIT COURT & COMPTROLLER
PALM BEACH COUNTY, FLORIDA

**RECEIPT**
6091363

Printed On:
01/02/2026 11:21
Page 1 of 1

| Receipt Number: 6091363 - Date 01/02/2026  Time 11:21AM | | | | |
|---|---|---|---|---|
| **Received of:** | Brad Kelsky Kelsky Law, P.A.<br>150 S. Pine Island Road, Suite 300<br>Plantation, FL 33324 | | | |
| **Cashier Name:** | ADMIN | **Balance Owed:** | | 30.00 |
| **Cashier Location:** | E-Filing | **Total Amount Paid:** | | 30.00 |
| **Receipt ID:** | 12551444 | **Remaining Balance:** | | 0.00 |
| **Division:** | AK: Circuit Civil Central - AK(Civil) | | | |

| Case# 50-2025-CA-008971-XXXA-MB -- PLAINTIFF/PETITIONER: BLATT, ELI | | | | |
|---|---|---|---|---|
| Item | Balance | Paid | Bal Remaining | |
| Fees | 30.00 | 30.00 | 0.00 | |
| **Case Total** | **30.00** | **30.00** | **0.00** | |

| Payments | | |
|---|---|---|
| **Type** | **Ref#** | **Amount** |
| EFiling_CREDITCARD | 17409536 | 30.00 |
| **Total Received** | | **30.00** |
| **Total Paid** | | **30.00** |

**How was your service today?**  Please visit www.mypalmbeachclerk.com/survey or send your feedback to clerkweb@mypalmbeachclerk.com.
**For office locations and information about Clerk & Comptroller services:**
Visit www.mypalmbeachclerk.com or call (561) 355-2996.


NOT A CERTIFIED COPY



**MIKE CARUSO**

CLERK OF THE CIRCUIT COURT & COMPTROLLER
PALM BEACH COUNTY, FLORIDA

# RECEIPT
6091398

Printed On:
01/02/2026 11:31
Page 1 of 1

| Receipt Number: 6091398 - Date 01/02/2026  Time 11:31AM | | | | |
|---|---|---|---|---|
| **Received of:** | Brad Kelsky Kelsky Law, P.A. 150 S. Pine Island Road, Suite 300 Plantation, FL 33324 | | | |
| **Cashier Name:** | ADMIN | **Balance Owed:** | | 40.00 |
| **Cashier Location:** | E-Filing | **Total Amount Paid:** | | 40.00 |
| **Receipt ID:** | 12551480 | **Remaining Balance:** | | 0.00 |
| **Division:** | AK: Circuit Civil Central - AK(Civil) | | | |

| Case# 50-2025-CA-008971-XXXA-MB -- PLAINTIFF/PETITIONER: BLATT, ELI | | | | |
|---|---|---|---|---|
| Item | Balance | Paid | Bal Remaining | |
| Fees | 40.00 | 40.00 | 0.00 | |
| **Case Total** | **40.00** | **40.00** | **0.00** | |

| Payments | | |
|---|---|---|
| **Type** | **Ref#** | **Amount** |
| EFiling_CREDITCARD | 17417556 | 40.00 |
| **Total Received** | | **40.00** |
| **Total Paid** | | **40.00** |



**How was your service today?**  Please visit www.mypalmbeachclerk.com/survey or send your feedback to clerkweb@mypalmbeachclerk.com.
**For office locations and information about Clerk & Comptroller services:**
Visit www.mypalmbeachclerk.com or call (561) 355-2996.